## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **FARM CREDIT MID-AMERICA, PCA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNCLE NEAREST, INC., NEAREST** | ) | **Case No. _____** |
| **GREEN DISTILLERY, INC., UNCLE** | ) | |
| **NEAREST REAL ESTATE HOLDINGS,** | ) | |
| **LLC, FAWN WEAVER and KEITH** | ) | |
| **WEAVER,** | ) | |
| | ) | |
| **Defendants.** | ) | |

---

### VERIFIED COMPLAINT AND REQUEST FOR APPOINTMENT OF RECEIVER

---

Plaintiff, Farm Credit Mid-America, PCA (the "Lender" or "Farm Credit"), by and through counsel, hereby submits this Verified Complaint against Defendants Uncle Nearest, Inc., Nearest Green Distillery, Inc., Uncle Nearest Real Estate Holdings, LLC, Fawn and Keith Weaver (in their official and individual capacities) (collectively, "Uncle Nearest") for breach of certain loan agreements to Uncle Nearest and seeks the appointment of a receiver and other relief. In support thereof, the Lender states as follows:

### PRELIMINARY STATEMENT

1.      This action arises out of over a year of Uncle Nearest failing to fulfill obligations owed to the Lender, as well as failing to adequately respond to the Lender's repeated requests for information and a consensual resolution to myriad defaults under the Lender's over $100 million in loans to Uncle Nearest. Among other things, Uncle Nearest has failed to pay principal and interest payments multiple times; used proceeds of a loan from the Lender to purchase an over $2 million home on Martha's Vineyard through a non-loan party and mortgage such property to

another lender; provided apparently inaccurate Borrowing Base reports with respect to the whiskey barrels that constitute a majority of the Lender's collateral; sold barrels to generate cash to pay past due obligations to parties other than the Lenders; sold millions of future receipts and revenue streams at a discount to at least four different parties on at least four separate occasions, unbeknownst to the Lenders (thereby depleting the Lender's collateral); failed to maintain a net income of at least $1.00 at the end of each calendar month, as required by the Loan Documents; and failed to maintain a net worth of at least $100 million during 2024, as required by the Loan Documents.

2.     Despite the Lender's best efforts to support Uncle Nearest, while simultaneously protecting the Lender's own rights with respect to the Loans, the parties have been unable to forge a mutually beneficial path forward. Consequently, the Lender is left with no choice but to seek assistance from this Court to protect its collateral and its rights under the Loan Documents and applicable law, as well as to enforce the Lender's contractual right to meaningful and credible visibility into the operations of Uncle Nearest. A secured lender is entitled to the information it has bargained for in making its loan, especially when it relates to its collateral.

3.     Uncle Nearest has admitted that it is in default and has consented to the appointment of a receiver. More specifically, <u>Section 5.05(d)</u> of each of the Bedford County Deed of Trust and the Eady Road Deed of Trust, described herein, provides that while an Event of Default exists, Uncle Nearest expressly consents to the appointment of a receiver, including an appointment *ex parte*, should the Lender apply for the appointment of a receiver.

4.     Simultaneously herewith, the Lender is filing an emergency motion requesting the appointment of a receiver in order to put a reputable turnaround firm at the helm of Uncle Nearest and determine whether there is a path forward to a profitable business.

## THE PARTIES

5.    The Lender is an agricultural lending cooperative formed under the laws of the United States of America with its principal office located at 12501 Lakefront Place, Louisville, Kentucky 40299.

6.    Upon information and belief, Uncle Nearest, Inc. ("Uncle Nearest, Inc.") is a Delaware corporation with its principal place of business located at 600 N. Main Street, Shelbyville, Tennessee 38106.

7.    Upon information and belief, Nearest Green Distillery, Inc. (the "Distillery") is a Delaware corporation with its principal place of business located at 600 N. Main Street, Shelbyville, Tennessee 38106.

8.    Upon information and belief, Uncle Nearest Real Estate Holdings, LLC ("RE Holdings") is a Tennessee limited liability company with its principal place of business located at 3125 Highway 231 N Shelbyville, Tennessee 37160, and its sole member, Uncle Nearest, Inc., is a citizen of Delaware.

9.    Upon information and belief, Fawn Weaver ("Ms. Weaver") is an individual and representative of Uncle Nearest residing in Shelbyville, Tennessee and serving as the Chief Executive Officer for Uncle Nearest.

10.    Upon information and belief, Keith Weaver ("Mr. Weaver", collectively with Ms. Weaver, the "Weavers") is an individual and representative of Uncle Nearest residing in Shelbyville, Tennessee and serving as the Chief Executive Officer of the Distillery.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) as there is complete diversity among the parties and the amount in controversy exceeds $75,000.00, exclusive of

3

interests and costs.

12.     Pursuant to 28 U.S.C. § 1391(a), venue is proper in this judicial district because Uncle Nearest resides in this district and a substantial part of the events or omissions giving rise to the allegations in this Verified Complaint occurred in this district.

<strong><u>FACTS AND DOCUMENTS COMMON TO ALL CLAIMS FOR RELIEF</u></strong>

**A.      <u>Uncle Nearest</u>**

13.     Founded by the Weavers in 2016, Uncle Nearest is a whiskey company headquartered in Shelbyville, Tennessee that markets and sells eight different whiskeys. Upon information and belief, Uncle Nearest and the Weavers have also acquired the rights to or attempted to develop a vodka line and a cognac division.

14.      Located on a farm in Shelbyville, the Weavers built the Nearest Green Distillery. The Nearest Green Distillery hosts tours of the property and tastings of the various whiskeys. Additionally, in order to bring the Uncle Nearest brand to the market, Uncle Nearest relies on outsourcing many key operations to deliver and market its whiskey to its customers.

**B.      <u>The Loan Documents</u>**

15.     Uncle Nearest and the Lender are parties to (i) that certain Credit Agreement dated July 22, 2022 (as amended by that certain Amendment No. 1 to Credit Agreement dated October 3, 2022, that certain Amendment No. 2 to Credit Agreement dated December 16, 2022, that certain Amendment No. 3 to Credit Agreement dated January 26, 2023, that certain Amendment No. 4 to Credit Agreement dated March 30, 2023, that certain Amendment No. 5 to Credit Agreement dated June 6, 2023, that certain Amendment No. 6 to Credit Agreement and Limited Waiver dated July 26, 2023, that certain Amendment No. 7 to Credit Agreement and Limited Waiver dated December 27, 2023, that certain Amendment No. 8 to Credit Agreement and Forbearance Agreement dated

April 15, 2025 (the "Forbearance Agreement"), the "Credit Agreement"),[1] and (ii) the other agreements, documents and instruments executed and delivered in connection with, related to or referenced in the Credit Agreement (collectively and together with the Credit Agreement, the "Loan Documents").[2]

16.     Pursuant to the terms of the Credit Agreement, the Lender provided certain loans, extensions of credit, and financial accommodations to Uncle Nearest. There are three loans in this matter: the Revolving Loan, the Term Loan, and the RELOC Loan (collectively, the "Loans").

17.     The Lender has, on occasion, agreed to increase its commitments to provide certain loans to Uncle Nearest and waive Events of Default in reliance upon Uncle Nearest's representations as to its success and strategic growth.

### *The Revolving Loan*

18.     In July of 2022, the Lender initially provided a revolving loan in the original commitment amount of $35,000,000 to Uncle Nearest pursuant to the Credit Agreement. Over the course of the next year, upon requests from Uncle Nearest, the Lender agreed to amend the Credit Agreement seven times and increased its commitment to provide revolving loans multiple times to an ultimate commitment of $67,000,000 (advances made pursuant to the revolving credit commitment, the "Revolving Loan"). The current principal balance of the outstanding Revolving Loan is $65,224,031.96.

19.     Pursuant to one of those amendments, executed on July 26, 2023, the Lender (i) increased the Revolving Loan commitment from $58,000,000 to $67,000,000; (ii) waived certain Events of Default that had occurred and were continuing as a result of Uncle Nearest's failure to

---

[1] Each capitalized term used but not defined herein shall have the same meaning ascribed thereto in the Credit Agreement.

[2] True and correct copies of the Loan Documents are attached as **Exhibit 1** through **Exhibit 9** hereto.

timely make principal and interest payments and provide the required audited balance sheet for the 2022 fiscal year; and (iii) amended the Credit Agreement to permit Uncle Nearest to acquire a chateau in France to develop Uncle Nearest's cognac business and form a French subsidiary. To date, the Lender has not received any information from Uncle Nearest that any portion of the cognac business is operational.

20. The Revolving Loan was based upon a borrowing base availability composed of Uncle Nearest's Eligible Inventory and Eligible Accounts availability. Pursuant to the Credit Agreement, the "Borrowing Base" is comprised of (i) (a) the value of certain of Uncle Nearest's Eligible Accounts arising out of the sale of barreled spirits or finished goods inventory, plus (b) Eligible Inventory consisting of barreled spirits and raw materials, less (ii) certain reserves.[3] If the amount of the Revolving Loan advanced to Uncle Nearest pursuant to the Credit Agreement at any time exceeds the amount of the Borrowing Base (also known as an "overadvance"), Uncle Nearest must "immediately prepay" the Revolving Loan in the amount of such overadvance.

21. As described in more detail below, Uncle Nearest previously failed to timely provide all required Borrowing Base reports and the Borrowing Base reports that were ultimately provided, apparently inaccurately inflated the Borrowing Base availability to approximately $67,000,000.

22. Information Uncle Nearest provided to the Lender on January 10, 2025, reflected that the Borrowing Base as of August 30, 2024, and most likely November 30, 2024, as well, was in fact approximately $44,000,000. Given the principal balance of the Revolving Loans on August

---

[3] The Credit Agreement provides that "Borrowing Base" means, as of any time it is to be determined, the sum of:

    (a) 75% of the Value of Eligible Accounts; plus
    (b) 70% of the Value of all Eligible Inventory consisting of barreled whiskey, finished goods consisting of bottled whiskey or grain inventory; minus
    (c) all Availability Reserves.

30, 2024, was (and remains as of today) $65,224,031.96, Uncle Nearest was required to immediately prepay approximately $21,000,000. It failed to pay.

### The Term Loan

23.     In July of 2022, the Lender also provided a term loan in the original principal amount of $20,000,000 to Uncle Nearest (the "Initial Term Loan").

24.     On March 30, 2023, upon request by Uncle Nearest, the Lender entered into that certain Amendment No. 4 to Credit Agreement ("Amendment No. 4"), pursuant to which the Lender provided an additional term loan in the amount of $2,300,000 (the "MV Property Loan").

25.     Uncle Nearest requested the MV Property Loan to, among other things, purchase a $2.225 million home on the exclusive Martha's Vineyard Island located off the coast of Cape Cod, Massachusetts (the "MV Property"). Uncle Nearest presented the purchase of the MV Property to the Lender as a marketing opportunity, which would enable Uncle Nearest to host branding events and rent the property to other distributors for co-branding opportunities. Uncle Nearest represented, and agreed in Amendment No. 4, that the proceeds of the MV Property Loan made to *Uncle Nearest* would be used by *Uncle Nearest* to buy the MV Property.

26.     In January 2025, however, the Lender learned that an entity that is not (and never has been) a Borrower or other Loan Party, UN HOUSE MV LLC ("UN House MV"), was used to purchase the MV Property using proceeds from the MV Property Loan, which is a violation of Section 6.11 of the Credit Agreement.[4]

---

[4] Section 6.11 of the Credit Agreement requires Uncle Nearest to:

> (i) u]se the proceeds of the Revolving Credit Facility and the Term Loan Facility for general corporate purposes, including working capital, capital purchases and refinancing of certain Indebtedness as contemplated by Section 4.1, not in contravention of any Law or of any Loan Document and (ii) **use the proceeds of the portion of the Term Loan Facility advanced on the Amendment No. 4 Effective Date to purchase the fee-owned real property interest as discussed with the Administrative Agent**. (emphasis added).

27.     Further, the Lender learned that UN House MV mortgaged the MV Property to a different lender, Oaktree Funding Corp. ("Oaktree Funding"), on or about September 25, 2024, to secure UN House MV's obligations to Oaktree Funding under a promissory note in the principal amount of $1,500,000, as reflected in the Dukes County Registry of Deeds.

28.     Upon request by Uncle Nearest, on June 14, 2023, the Lender provided an additional term loan in the amount of $1,700,000 (the "June 2023 Incremental Term Loan" and together with the Initial Term Loan and the MV Property Loan, the "Term Loans") for the purchase of a 108-acre property, adjacent to the property on which the Distillery sits, which is secured by that certain Deed of Trust, Assignment of Leases, Security Agreement and Financing Statement dated June 5, 2023 (the "Eady Road Deed of Trust"). The current principal balance of the Term Loans is $22,045,150.88.

### The RELOC Loan

29.     On January 26, 2023, upon request by Uncle Nearest, the Lender further provided a real estate line of credit facility in the original commitment amount of $15,000,000 to Uncle Nearest (the "RELOC Loan"). The RELOC Loan was to be used to finance the construction and build-out of the Nearest Green Distillery.

### Repayment of Loans

30.     The Credit Agreement provides that Uncle Nearest is obligated to repay (i) the Revolving Loans on the Maturity Date of the Revolving Credit Facility, (ii) the Term Loans in quarterly installment payments throughout the term of the Term Loan, and (iii) the RELOC Loans in accordance with an amortization schedule set forth in the Credit Agreement.

31.     Specifically, Section 2.5 of the Credit Agreement states:

**2.5  Repayment of Loans.**

(a)     <u>Revolving Credit Loans</u>. The Borrowers shall repay to the Revolving Credit Lenders on the Maturity Date for the Revolving Credit Facility the aggregate principal amount of all Revolving Credit Loans outstanding on such date.

(b)     <u>Term Loans</u>. From and after the Amendment No. 5 Effective Date, the Borrowers shall repay to the Term Loan Lenders the aggregate principal amount of all Term Loans outstanding in quarterly installments of $293,789.06 (commencing on July 1, 2023) on the first day of each calendar quarter (which installments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in <u>Section 2.3</u>); <u>provided</u> that the final principal repayment installment of the Term Loans shall be repaid on the Maturity Date for the Term Loan Facility and in any event shall be in an amount equal to the aggregate principal amount of all Term Loans outstanding on such date.

(c)     <u>RELOC Loans / RELOC Term Loans</u>. With respect to the RELOC Term Loans, promptly following the Conversion Date, the Administrative Agent shall calculate and deliver to the RELOC Lenders and the Company an amortization schedule with respect to the RELOC Term Loans providing for annual "straight-line" amortization of principal over a 15-year amortization period with principal due on the first day of each calendar quarter (commencing April 1, 2025). The Borrowers shall repay to the RELOC Lenders the aggregate principal amount of all RELOC Term Loans as set forth in such amortization schedule (which installments shall be reduced as a result of the application of prepayments in accordance with <u>Section 2.3</u>); <u>provided</u> that the final principal repayment installment of the RELOC Term Loans shall be repaid on the Maturity Date applicable thereto and in any event shall be in an amount equal to the aggregate principal amount all RELOC Term Loans outstanding on such date. To the extent not converted to RELOC Term Loans pursuant to <u>Section 2.1(c)(ii)</u> for any reason, the Borrowers shall repay to the RELOC Lenders on the Conversion Date the aggregate principal amount of all RELOC Loans outstanding on such date.

## Uncle Nearest Outstanding Principal and Interest as of July 28, 2025[5]

| Loan Type | Principal Amount | Accrued Interest | Total Principal and Accrued Interest Outstanding | Maturity Date |
|---|---|---|---|---|
| The Revolving Loan | $65,224,031.96 | $4,109,352.17 | $69,333,384.13 | July 22, 2025 |
| The Term Loan | $22,045,150.88 | $1,214,102.77 | $23,259,253.65 | July 22, 2027 |
| The RELOC Loan | $15,000,000 | $653,190.44 | $15,653,190.44 | July 22, 2027 |
| **Totals** | **$102,269,182.84** | **$5,976,645.38** | **$108,245,828.22** | |

### *Loan Obligations Secured by Real and Personal Property*

32.     Pursuant to the Credit Agreement and as security for repayment of the Loans, Uncle Nearest entered into that certain Security Agreement (the "Security Agreement")[6] dated July 22, 2022, granting a security interest to the Lender in almost all of Uncle Nearest's personal property (the "Personal Property Collateral"), including accounts, accounts receivable, inventory (including, without limitation, spirits, bottles, and barrels), goods and general intangibles.

33.     Specifically, Section B.2 of the Security Agreement states:

> **2.   Grant of Security Interest.** Each Grantor hereby grants as collateral security for the payment, performance and satisfaction of the Secured Obligations to the Administrative Agent for the benefit of the Secured Parties a continuing security interest in and to, and collaterally assigns to, the Administrative Agent for the benefit of the Secured Parties, all of the assets of such Grantor or in which such Grantor has or may have or acquire an interest or the power to transfer rights therein, whether now owned or existing or hereafter created, acquired or arising and wheresoever located, including, without limitation, the following:
>
> (a)   All accounts, including accounts receivable, contracts, bills, acceptances, choses in action, and other forms of monetary obligations at any time owing to such Grantor arising out of property sold, leased, licensed, assigned or otherwise disposed of or for services rendered or to be rendered by such Grantor, and all of such Grantor's rights with respect to any property the sale, lease or license of which gave rise thereto, whether or not delivered, property returned by customers and all rights as an unpaid

---

[5] These amounts do not include any attorneys' or other professionals' fees, costs, and expenses, which are reimbursable by Uncle Nearest pursuant to Section 2.14(a) of the Credit Agreement.
[6] A true and accurate copy of the Security Agreement is attached hereto as **Exhibit 10**.

vendor or lienor, including rights of stoppage in transit and of recovering possession by proceedings including replevin and reclamation (collectively referred to hereinafter as "<u>Accounts</u>");

(b) All inventory, including all goods manufactured or acquired for sale or lease (including, without limitation, spirits, beer, malt beverages, wine, wine cooler products, champagne, juices, waters, coffees, tea, soft drinks and other alcoholic and non-alcoholic beverages), and any piece goods, raw materials, work in process and finished merchandise, component materials, and all supplies, bottles, barrels, cans, syrups, draft equipment, pallets, dunnage, cooperage, goods, incidentals, office supplies, packaging materials and any and all items used or consumed in the operation of the business of such Grantor or which may contribute to the finished product or to the sale, promotion and shipment thereof, in which such Grantor now or at any time hereafter may have an interest, whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of such Grantor or is held by such Grantor or by others for such Grantor's account (collectively referred to hereinafter as "<u>Inventory</u>");

(c) All goods, including all machinery, equipment, motor vehicles, crops, farm products, parts, supplies, apparatus, appliances, tools, patterns, molds, dies, blueprints, fittings, furniture, furnishings, fixtures and articles of tangible personal property of every description, and all computer programs embedded in any of the foregoing and all supporting information relating to such computer programs (collectively referred to hereinafter as "<u>Equipment</u>");

(d) All general intangibles, including all rights now or hereafter accruing to such Grantor under contracts, leases, agreements or other instruments, including all contracts or contract rights to perform or receive services, to purchase or sell goods, or to hold or use land or facilities, and to enforce all rights thereunder, all causes of action, corporate or business records, inventions, patents and patent rights, rights in mask works, designs, trade names and trademarks and all goodwill associated therewith, trade secrets, trade processes, licenses, permits, franchises, customer lists, computer programs and software, all internet domain names and registration rights thereto, all internet websites and the content thereof, all payment intangibles, all claims under guaranties, tax refund claims, all rights and claims against carriers and shippers, leases, all claims under insurance policies, all interests in general and limited partnerships, limited liability companies, and other Persons not constituting Investment Property (as defined below), all rights to indemnification and all other intangible personal property and intellectual property of every kind and nature (collectively referred to hereinafter as "<u>General Intangibles</u>");

(e) All Copyrights, Patents and Trademarks;

(f) All deposit accounts, including demand, time, savings, passbook, or other similar accounts maintained with any bank by or for the benefit of such Grantor (collectively referred to hereinafter as "Deposit Accounts");

(g) All chattel paper, including tangible chattel paper, electronic chattel paper, or any hybrid thereof (collectively referred to hereinafter as "Chattel Paper");

(h) All investment property, including all securities, security entitlements, securities accounts, commodity contracts and commodity accounts of or maintained for the benefit of such Grantor, but excluding Equity Interests in Subsidiaries (collectively referred to hereinafter as "Investment Property");

(i) All instruments, including all promissory notes (collectively referred to hereinafter as "Instruments");

(j) All documents, including warehouse receipts, bills of lading and other documents of title (collectively referred to hereinafter as "Documents");

(k) All rights to payment or performance under letters of credit including rights to proceeds of letters of credit ("Letter-of-Credit Rights"), and all guaranties, endorsements, Liens, other Guarantee obligations or supporting obligations of any Person securing or supporting the payment, performance, value or liquidation of any of the foregoing (collectively, with Letter-of-Credit Rights, referred to hereinafter as "Supporting Obligations");

(l) The commercial tort claims identified on Schedule 9(i) hereto, as such Schedule may be supplemented from time to time in accordance with the terms hereof (collectively referred to hereinafter as "Commercial Tort Claims");

(m) All books and records relating to any of the foregoing (including customer data, credit files, ledgers, computer programs, printouts, and other computer materials and records (and all media on which such data, files, programs, materials and records are or may be stored)); and

(n) All proceeds, products and replacements of, accessions to, and substitutions for, any of the foregoing, including without limitation proceeds of insurance policies insuring any of the foregoing.

All of the property and interests in property described in subsections (a) through (n) are herein collectively referred to as the "Collateral;" provided that, notwithstanding the foregoing, the Collateral shall not include any Excluded Asset.

34. The Lender has perfected its liens in the Personal Property Collateral by filing and recording UCC-1 Financing Statements[7] against each of Uncle Nearest, Inc., the Distillery and RE Holdings with the office of the secretary of state for their states of incorporation or organization.

35. As additional Collateral to secure the obligations under the Credit Agreement, RE Holdings and the Weavers have executed certain deeds of trust (collectively, the "Deeds of Trust") granting liens in certain real property (the "Real Property Collateral" and together with the Personal Property Collateral, collectively the "Collateral"):

    a.    RE Holdings executed that certain Deed of Trust, Assignment of Leases, Security Agreement and Financing Statement dated July 22, 2022 (the "Bedford County Deed of Trust").[8] The Bedford County Deed of Trust was recorded in the Bedford County Register of Deeds' Office, Tennessee in Book TD1060, Page 865, as Instrument 22006177. The Bedford County Deed of Trust grants the Lender a first priority lien in the real property under those certain lots, pieces, tracts or parcels of land located in certain cities and/or counties in the State of Tennessee, more particularly described in Exhibit A of the Bedford County Deed of Trust (the "Nearest Green Distillery Property"). The Bedford County Deed of Trust was amended on June 5, 2023, to conform to amendments to the Credit Agreement. The Nearest Green Distillery sits on the Nearest Green Distillery Property. Upon information and belief, the Humble Baron Bar (a restaurant/bar that is purportedly not owned by Uncle Nearest) and Barrel House II BBQ (a second location of a local restaurant that is not owned by Uncle Nearest) were both built on the Nearest Green Distillery Property after the Bedford County Deed of Trust was executed.

    b.    The Weavers executed that certain Deed of Trust, Assignment of Leases, Security Agreement and Financing Statement dated July 22, 2022 (the "Dan Call Farm Deed of Trust").[9] The Dan Call Farm Deed of Trust was recorded in the Moore County Register of Deeds' Office, Tennessee in Book T174, Page 191, as Instrument 22000783. The Dan Call Farm Deed of Trust grants the Lender a second priority lien[10] in the real property under those certain lots, pieces, tracts or parcels of land located in certain cities and/or counties in the State of Tennessee, more particularly described in Exhibit A of the Dan Call Farm Deed of Trust. The Dan Call Farm Deed of Trust was amended on June 5, 2023, to conform to amendments to the

---

[7] True and accurate copies of the financing statements are attached hereto collectively as **Exhibit 11**.

[8] True and correct copies of the Bedford County Deed of Trust and all amendments thereto are attached collectively hereto as **Exhibit 12**.

[9] A true and correct copy of the Dan Call Farm Deed of Trust and all amendments thereto are attached hereto as **Exhibit 13.**

[10] Farm Credit Mid-America, FLCA, holds the first priority lien in the real property subject to the Dan Call Farm Deed of Trust pursuant to a deed of trust executed to secure the Weavers' obligations under separate, individual loans from Farm Credit Mid-America, FLCA.

Credit Agreement. The property subject to the Dan Call Farm Deed of Trust is upon information and belief, a historic site where Nathan "Nearest" Green began distilling whiskey and met Jack Daniel.

c.     On June 6, 2023, Mr. Weaver executed that certain Deed of Trust which was recorded in the Bedford County Register of Deeds' Office, Tennessee in Book TD1087, Page 919, as Instrument 23003860 (the "Eady Road Deed of Trust").[11] The Eady Road Deed of Trust grants the Lender a first priority lien in the real property under those certain lots, pieces, tracts or parcels of land located in certain cities and/or counties in the State of Tennessee, more particularly described in Exhibit A of the Eady Road Deed of Trust (the "Eady Road Property"). The Eady Road Property is adjacent to the Nearest Green Distillery Property.

## C.     **The Loan Document Defaults**

36.     Uncle Nearest has been in default under the Loans since as early as January 2, 2024, and has continued to incur further defaults over the last eighteen months. One of the most recent defaults occurred as a result of Uncle Nearest's failure to pay the Revolving Loans in full on the applicable Maturity Date of July 22, 2025.

37.     As of the date of the execution of the Forbearance Agreement, Uncle Nearest was in default of the terms of the Credit Agreement as a result of, among other things, the following by or against one or more of the Loan Parties (the "Pre-Forbearance Defaults"):

a.     Failure to timely repay the outstanding overadvance as required by Section 2.3(b)(i);

b.     Failure to timely pay the following amounts of interest on the Loans as required by Section 2.6(c) on the following Interest Payment Dates:

    i.      $1,519,542.95 on January 2, 2024;

    ii.     $1,667,331.68 on July 1, 2024;

    iii.    $2,417,636.84 on October 1, 2024;

    iv.     $2,326,636.93 on January 2, 2025;

    v.      $390,616.44 on February 3, 2025; and

---

[11] A true and correct copy of the Eady Road Deed of Trust is attached hereto as **Exhibit 14**.

vi.    $2,170,372.62 on April 1, 2025;

c.    Failure to timely pay the following quarterly installment payments on the aggregate principal amount of all Term Loans outstanding as required by Section 2.5(b) on the first day of each calendar quarter:

   i.    $293,789.06 on October 1, 2024;

   ii.    $293,789.06 on January 2, 2025; and

   iii.    $293,789.06 on April 1, 2025;

d.    Failure to timely pay on April 1, 2025, the $250,000 amortization payment on the principal amount of the RELOC Loan outstanding as required by Section 2.5(c) on the first day of each calendar quarter, commencing with April 1, 2025;

e.    Failure to timely deliver monthly financial statements required by Section 6.1(b) for one or more months from July 2022 through April 2025;

f.    Failure to timely deliver the annual business plan required by Section 6.1(c) for the fiscal years ending December 31, 2023, and December 31, 2024;

g.    Failure to timely deliver compliance certificates required by Section 6.2(a) for one or more months from July 2022 through March 2025;

h.    Failure to timely deliver Borrowing Base Certificates required by Section 6.2(c) for one or more months from July 2022 through April 2025;

i.    Failure to timely deliver the report summarizing the Borrowers' insurance coverage required by Section 6.2(d);

j.    Failure to adequately respond to requests for information set forth in that certain letter from the Lender to the Borrowers dated as of January 12, 2024, as required by Section 6.2(h);

k.    Failure to timely give notice of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect as required by Section 6.3(b);

l.    Failure to observe the covenant to maintain proper books and records set forth in Section 6.9;

m.    Failure to maintain a minimum Consolidated Tangible Net Worth of no less than $100,000,000 at all times during the period from December 31, 2023, through December 30, 2024, as required by Section 7.11(a);

n.    Failure to maintain a minimum Consolidated Tangible Net Worth of no less than $122,000,000 at all times during the period from December 31, 2024, through the date hereof, as required by Section 7.11(a);

15

o.    Failure to maintain a Consolidated Net Income of no less than $1.00 for each calendar month during the period commencing December 1, 2023, through January 31, 2025, as required by Section 7.11(b);

p.    Failure to observe the covenant set forth in Section 7.5 of the Credit Agreement as a result of one or more Loan Parties' Dispositions of property not permitted by Section 7.5, including, without limitation, any bulk sales or other sales of barreled spirits;

q.    Failure to timely prepay, as required by Section 2.3(b)(ii), an aggregate principal amount of Loans equal to 100% of Net Cash Proceeds realized by the Borrowers as a result of the Borrowers' Dispositions of property of any Loan Party or any of its Subsidiaries (other than any Disposition of any property permitted by any of clauses (a) through (h) of Section 7.5);

r.    Failure to observe the covenant to deliver duly executed joinders of subsidiaries as set forth in Section 6.12;

s.    Failure to observe the covenant in Section 7.1 of the Credit Agreement not to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues except as permitted by Section 7.1, including but not limited to, the following transactions:

   i.    Sold $1,021,300 of future revenue stream for a discount of $700,000 less fees pursuant to a contract dated June 26, 2024;

   ii.   Sold $2,378,300 of future revenue stream for a discount of $1,700,000 less fees pursuant to a contract dated July 26, 2024; and

   iii.  Refinanced $2,658,100 for a discount of $1,900,000 less fees pursuant to a contract dated November 25, 2024.

t.    Failure to observe the covenant in Section 7.2 to not create, incur, assume, or suffer to exist any Indebtedness except as permitted by Section 7.2 as a result of the unsecured Indebtedness incurred by the Borrowers to Grant Sidney Inc. pursuant to the Subordinated Debt Documents; and

u.    Entry of a final judgment in the amount of $2,111,911.60 against Uncle Nearest, Inc. due to Uncle Nearest, Inc.'s failure to pay for goods delivered in the case styled *Berlin Packaging LLC v. Uncle Nearest, Inc.*, Case No. 2024 L 011917 in the Circuit Court of Cook County, Illinois.

38.    Within seven days after entering the Forbearance Agreement, Uncle Nearest

defaulted. This first "Forbearance Default" (which is also an immediate Event of Default under

the Credit Agreement) was due to Uncle Nearest's failure to deliver a weekly cash flow report by

the second Business Day of the following calendar week. To date, numerous Forbearance Defaults have occurred and continue. Uncle Nearest is in default under the Forbearance Agreement and further in default under the Credit Agreement for, among other things, the following reasons (such defaults, the "Post-Forbearance Execution Defaults" and, collectively with the Pre-Forbearance Defaults, the "Defaults"):

a. Failure to timely deliver a duly executed and completed perfection certificate to the Lender no later than 14 days following the Effective Date, as required by Section 2(a)(iii) of the Forbearance Agreement;

b. Failure to timely deliver executed Lien Waivers to the Lender with respect to (A) any personal property Collateral located on lease premises or premises subject to a mortgage, (B) any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, (C) any material Collateral held by a repairman, mechanic or bailee, and (D) any Collateral subject to a licensor's intellectual property rights no later than 14 days following the Effective Date, as required by Section 2(a)(iv) of the Forbearance Agreement;

c. Failure to timely deliver executed control agreements in favor of the Lender, with respect to all of the Borrowers' Deposit Accounts no later than 14 days following the Effective Date, as required by Section 2(a)(v) of the Forbearance Agreement;

d. Failure to timely satisfy, or confirm to the Administrative Agent the satisfaction of, the Loan Parties' obligations under the Security Agreement and the Pledge Agreement, including, without limitation, the obligations set forth in Section 3(d) and Section 9(j) of the Security Agreement, as required by Section 2(a)(ii) of the Forbearance Agreement;

e. Failure to timely deliver resolutions adopted by the board of directors of Uncle Nearest, Inc. appointing one (1) Independent Director (as defined [t]herein) to the board of directors of Uncle Nearest, Inc. at all times from and after the Effective Date by May 2, 2025 (extended from April 25, 2025, upon Uncle Nearest's request), as required by Section 2(a)(viii) of the Forbearance Agreement;

f. Failure to timely deliver to the Lender monthly financial statements required by Section 6.1(b) of the Credit Agreement for the months of March 2025, April 2025, and May 2025;

g. Failure to timely deliver Borrowing Base Certificates for February 2025, March 2025, April 2025, May 2025, and June 2025 in accordance with Section 6.2(c) of the Credit Agreement, as set forth in Section 2(b)(ii)(C) of the Forbearance Agreement;

17

h. Failure to maintain a minimum amount of $1,500,000 in cash and Cash Equivalents, as required by Section 2(b)(iv) of the Forbearance Agreement;

i. Failure to deliver a plan, in form and substance acceptable to the Lender, to pursue an Acceptable Transaction, together with such supplemental information as the Lender may reasonably request by May 23, 2025, as required by Section 2(b)(vii)(A) of the Forbearance Agreement;

j. Failure to no later than 60 days following the Effective Date of the Forbearance Agreement, comply with the Forbearance Milestone set forth in Section 2(a)(vi) of the Forbearance Agreement to make a $10,000,000 paydown;

k. On April 22, 2025, and April 29, 2025, and from May 6, 2025, through July 22, 2025, failure to comply with the Forbearance Covenant set forth in Section 2(b)(ii) of the Forbearance Agreement to deliver a Reporting Package, in form and detail satisfactory to the Lender;

l. Failure to timely deliver to the Lender, 120 days after the end of the fiscal year ending December 31, 2024, in form and detail satisfactory to the Lender, the financial statements and information required by Section 6.1(a) of the Credit Agreement;

m. Failure to timely pay the following amounts of interest on the Loans as required by Section 2.6(c) of the Credit Agreement on the following Interest Payment Dates:

    i. $283,327.43 on May 1, 2025; and

    ii. $892,043.12 on July 1, 2025;

n. Failure to timely pay on July 1, 2025, the quarterly installment in the amount of $293,789.06 on the aggregate principal amount of all Term Loans outstanding as required by Section 2.5(b) of the Credit Agreement;

o. Failure to timely pay on July 1, 2025, the $250,000 amortization payment on the principal amount of the RELOC Loan outstanding as required by Section 2.5(c) of the Credit Agreement; and

p. Failure to repay the aggregate principal amount of all Revolving Credit Loans outstanding on the Maturity Date for the Revolving Credit Facility (which occurred on July 22, 2025).

39. Further, onsite inspections of the Collateral located at Tennessee Distilling Group, LLC were ordered by the Lender and conducted October 22–24, 2024, and again on June 11–13, 2025. The October 2024 collateral inspection revealed that material unreconciled discrepancies existed between the amount of Collateral identified in Uncle Nearest's Borrowing Base and

compliance certificate delivered for the month of August 2024, and what the inspector was able to verify (the "Collateral Discrepancy"). As described above, this Collateral Discrepancy was further confirmed in January 2025 when Uncle Nearest provided an updated Borrowing Base and compliance certificate evidencing that the previously reported Borrowing Base had been overstated by approximately $21,000,000. The outcome and findings of the June 2025 collateral inspection are pending as of the time of the filing of this Verified Complaint.

40.     From January 2024 through March 2025, the Lender sent formal and informal notices of default, requests for updated information regarding its Collateral and requests for meetings to discuss a consensual path forward, including a forbearance agreement. Unfortunately, until March 2025, these notices and requests failed to result in any resolution and were mainly met with extremely delayed responses.

41.     On January 12, 2024, the Lender sent a letter requesting information required to be provided to the Lender pursuant to Section 6.2 of the Credit Agreement regarding Uncle Nearest's operations, including distributorship agreements, inventory, invoices for barrel purchases and barrel storage for 2023, and accounts payable and receivable aging.[12] Uncle Nearest failed to provide the Lender any of the information requested in the January 12 letter.[13]

42.     The Lender has attempted to engage in restructuring negotiations and endeavored to negotiate and effectuate a feasible and consensual restructuring in accordance with the procedures set out under the Farm Credit Act. 12 U.S.C. § 2202a; 12 C.F.R. § 617.7415(a)(1)(iii)-(iv).

---

[12] A true and correct copy of the letter requesting information required under Section 6.2 of the Credit Agreement dated January 12, 2024, is attached hereto as **Exhibit 15**.

[13] It should be noted that the failures to provide requested information detailed in this section of the Verified Complaint continued until the execution of the Forbearance Agreement (as defined and more fully described below) and continued for some time after the execution.

43.     On January 19, 2024, as required by 12 U.S.C. § 2202a, the Lender provided Uncle Nearest with notices of the right to apply for restructuring for each of the Loans, providing the restructuring policy of the AgriBank Farm Credit District and materials necessary to apply for restructuring, recommending a personal meeting to discuss the Loans and potentially develop a plan for restructuring. Uncle Nearest failed to provide a timely response to the January 19 notice.

44.     Also on January 19, 2024, the Lender provided a Reservation of Rights letter[14] in which the Lender reiterated its request for information and asked for distributorship agreements; an estimated delivery date and case count for inventory deliveries expected during the first and second quarters of 2024; invoices for all barrel purchases and barrel storage for 2023; a current accounts payable aging report; a current accounts receivable aging report; bank statements; and certain industry data reports. Uncle Nearest failed to provide any of the information requested in the January 19 letter.

45.     On February 5, 2024, after having not received a payment from Uncle Nearest, the Lender provided a notice of continuing events of default[15] and requested a meeting to discuss various issues related to the relationship, including a need to reconcile inventory records. Despite conversations with Uncle Nearest, a productive and comprehensive meeting did not occur.

46.     On May 24, 2024, the Lender sent a Notice of Default and Reservation of Rights letter[16] setting forth a number of Events of Default that had occurred and were continuing, and notifying Uncle Nearest that the Lender would implement the Default Rate as permitted under the Credit Agreement.

47.     On November 5, 2024, the Lender sent a Notice of Default (the "November Notice

---

[14] A true and correct copy of the January 19, 2024 Reservation of Rights letter is attached hereto as **Exhibit 16**.
[15] A true and correct copy of the Notice of Default letter dated February 5, 2024, is attached hereto as **Exhibit 17**.
[16] A true and correct copy of the May 24, 2024 Notice of Default and Reservation of Rights letter is attached hereto as **Exhibit 18**.

of Default")[17] (i) notifying Uncle Nearest of the occurrence of additional Events of Default; (ii) identifying the Collateral Discrepancy; (iii) requesting all information necessary to satisfactorily reconcile the Collateral Discrepancy, including, without limitation, accurate information regarding all 2024 inventory purchases and sales and the disposition of all barrel sale proceeds; (iv) requesting a meeting on or before November 12, 2024, with Uncle Nearest's leadership to discuss the Events of Default set forth therein under the Credit Agreement; and (v) payment of all attorneys' fees incurred by the Lender, as required by the Loan Documents. The Lender also sent another notice of the Lender's right to apply for a restructuring with respect to the Loans.

48.     The November Notice of Default provided that to the extent Uncle Nearest did not satisfy the items set forth therein by November 12, 2024, the Lender would instruct its counsel to begin exercising rights and remedies afforded to the Lender under the Loan Documents and applicable law, including, without limitation, accelerating the Loans and/or seeking appointment of a receiver.

49.     Following the November Notice of Default, Uncle Nearest responded with two letters dated November 13, 2024 (the "UN Response Letters").[18] The UN Response Letters requested (i) an extension of each of the items in the November Notice of Default until December 31, 2024, and (ii) a proposal for a restructuring scenario, including a forbearance agreement, reduced interest rate, and interest-only payments.

50.     On November 22, 2024, the Lender sent a letter[19] to Uncle Nearest in response to the UN Response Letters advising that, while the Lender appreciated the communication, negotiating and effectuating a feasible path forward, especially while the Collateral Discrepancy

---

[17] A true and correct copy of the November Notice of Default is attached hereto as **Exhibit 19**.
[18] True and correct copies of the UN Response Letters are attached hereto as **Exhibit 20**.
[19] A true and correct copy of the Lender's Response to the UN Response Letters is attached hereto as **Exhibit 21**.

remained unresolved, would require Uncle Nearest to engage a chief restructuring officer.

51. Ultimately, after the Lender's repeated requests to Uncle Nearest for meaningful engagement in a restructuring negotiation, Uncle Nearest requested to engage The Keystone Group ("Keystone"), as a chief growth officer with more limited authority than the Lender requested, including assisting the company with financial reviews, reporting, and developing operating plans. Given the Lender saw this development as some modicum of traction, the Lender acquiesced to the significantly pared back engagement.

52. Subsequently, Uncle Nearest agreed to promptly install an individual from Keystone as an officer of Uncle Nearest, Inc. and provide them with access to Uncle Nearest's financial information. The Lender was provided a copy of the executed engagement letter between Keystone and Uncle Nearest, dated as of December 6, 2024.

53. Despite Keystone's engagement, Uncle Nearest continued its pattern of delay and obfuscation. In meetings and communications between the Lender, Keystone, and Uncle Nearest in January through March of 2025, the information provided about Uncle Nearest's financial health and the status of the Lender's Collateral was inconsistent and unverifiable. Further, the information that was provided by Keystone and/or Uncle Nearest in these meetings revealed a disturbing lack of deference by Uncle Nearest to the legal obligations under the Loan Documents by Uncle Nearest. Upon information and belief, Uncle Nearest formed multiple subsidiaries without joining them to the Credit Agreement as required by the Credit Agreement, including Humble Baron, Inc. (a restaurant operating on the grounds of the Distillery without a lease that is purportedly not owned by Uncle Nearest) without informing the Lender.

54. Uncle Nearest never formally installed Keystone by a resolution of the board of Uncle Nearest, Inc., as agreed. Further, upon information and belief, Keystone never received

fulsome access to all financial information necessary to model a routine 13-week cash flow forecast to share with the Lender despite multiple requests. Even with Keystone's engagement, the Lender was unable to gain a clear picture as to the use of the proceeds of its Loans to Uncle Nearest and the state of its Collateral. Eventually, on January 31, 2025, Uncle Nearest (through Keystone) provided a 13-week cash flow forecast to the Lender (the accuracy of which was later disputed by Uncle Nearest), which demonstrated that Uncle Nearest had a negative cash balance. Responses to the diligence questions (which were similar to questions the Lender had been asking for over a year and any operating business should be able to answer fairly quickly) continued to be delayed.

55.     Meanwhile, the Weavers continued to provide incremental infusions of funds to Uncle Nearest to enable the company to keep its doors open and lights on. In March 2025, Uncle Nearest informed the Lender that Keystone was no longer engaged.

56.     Despite these issues, the parties agreed to move forward with a forbearance period to provide Uncle Nearest runway to consummate a transaction to repay the Lender. On March 3, 2025, McGuireWoods LLP, counsel to the Lender, engaged Riveron RTS, LLC ("Riveron") to serve as financial advisor to the Lender to assist with the restructuring efforts and the Forbearance Agreement negotiations.

57.     During the process of negotiating the Forbearance Agreement, Uncle Nearest was unable to provide an organizational chart, operating agreements, or other necessary organizational documents for their newly-created enterprise. Neither Uncle Nearest nor its advisors could determine (or could not provide with confidence) the ownership structure of the Uncle Nearest enterprise. The lack of basic organizational documents adds to the Lender's concern with respect to the opacity of Uncle Nearest's operations and governance. More specifically, given the history of obfuscation, and incorrect documentation provided by Uncle Nearest, the inability or

unwillingness to produce organizational documents created contemporaneously with the formation of the subject entities is rife with issues and pitfalls, including the ability of the Lender to exercise its lien and to recover against those entities.

58.    Finally, on April 15, 2025, the Forbearance Agreement was executed and Uncle Nearest made a required paydown of its Obligations in the amount of $7,500,000 to the Lender. Under the terms of the Forbearance Agreement, the parties acknowledged and agreed the Pre-Forbearance Defaults had occurred and were continuing but, subject to the terms and conditions therein, the Lender would forbear from exercising certain rights and remedies under the Credit Agreement and other Loan Documents until the expiration of the Forbearance Period, pending no additional defaults. In connection with the Forbearance Agreement, Uncle Nearest waived its right to object to Riveron's appointment as a receiver over Uncle Nearest on the supposed basis of Riveron's independence or disinterestedness.[20]

59.    As set forth above, multiple Post-Forbearance Execution Defaults have occurred and are continuing, including without limitation, as a result of Uncle Nearest's failure (despite almost constant requests from the Lender and its advisors) to provide: (a) a duly executed and completed perfection certificate; (b) duly executed deposit account control agreements over all deposit accounts; (c)  duly executed joinders of all applicable subsidiaries; (d) confirmation that all Loan Parties have satisfied obligations under the Pledge Agreement; and (d) executed Lien Waivers, each of which was required within 14 days after the execution of the Forbearance Agreement.

60.    Almost immediately after the execution of the Forbearance Agreement, Uncle Nearest also requested an extension to May 2, 2025, of the April 25, 2025 deadline to appoint an

---

[20] *See* <u>Section 8(d)</u> of the Forbearance Agreement.

Independent Director acceptable to the Lender with the expertise to assist Uncle Nearest in its time of distress. The Lender agreed to the extension; however, to date, no Independent Director has been officially appointed.

61. Even more concerning are the Post-Forbearance Execution Defaults arising from failure to meet financial reporting and minimum liquidity requirements. Among other things, under the Forbearance Agreement, Uncle Nearest agreed to provide cash flow budgets (consisting of an initial four-week period and thirteen-week updates thereafter) and weekly cash flow reporting against those budgets, and further agreed to maintain a minimum cash position of $1,500,000 at all times. Based on the cash flow forecast provided by the interim chief financial officer on May 12, 2025, the forecast purported to show an initial cash balance of $1,500,000 as of May 12, 2025, when, in fact, the Company's beginning cash balance at that time was approximately $261,000. Moreover, the same forecast, projected approximately $557,000 of cash burn in the first week, implying that Uncle Nearest would be facing an approximate $296,000 negative cash balance by the end of the first week. This would require an immediate infusion of $1,796,000 to meet the minimum liquidity requirement. Even with such an infusion, Uncle Nearest's own forecast demonstrated that it would require weekly cash infusions of at least $500,000 to maintain a positive cash balance and the agreed-upon minimum liquidity of $1,500,000.

62. Ms. Weaver has since disputed the accuracy of this 13-week cash flow forecast and she and others at Uncle Nearest have provided several updated cash flow forecasts with differing receipts and disbursements for the same time periods.

63. Uncle Nearest has failed to demonstrate its ability to produce reliable financial information. Until only recently, Uncle Nearest was unable to provide bank account statements to substantiate the reported cash activities and balances, and even what has been provided to date is

incomplete. Further, both prior to the execution of the Forbearance Agreement and thereafter, Uncle Nearest has been unable to demonstrate that it has a functional cash management program or a reliable financial reporting system. The Lender lacks sufficient visibility into Uncle Nearest's cash management system (if there is one) reflecting how Uncle Nearest collects, transfers, and disburses funds generated from its operations, including any intercompany transactions. The Lender has no confidence that Uncle Nearest is able to accurately monitor, forecast or report its cash. As such, Uncle Nearest has failed to provide the Lender with consistent and reliable cash forecasting and cash management. Moreover, Uncle Nearest has failed to provide the Lender the purpose and type of each bank account and what flows through each. The foregoing leads the Lender to question the accuracy of the financial reporting since origination.

64. Uncle Nearest's need for oversight is evident as its financial problems threaten the continued operation of Uncle Nearest and, by extension, the viability of the Collateral. Given the lack of any reliable financial information and uncertainty with respect to any verifiable source of capital to keep Uncle Nearest maintaining business operations, a receiver is necessary to take over managerial control of Uncle Nearest. The receiver will be able to review the true financial condition of the company and determine the best path forward for all constituents. The Credit Agreement provides that the Lender is entitled to recover from Uncle Nearest jointly and severally all costs and expenses, including but not limited to, reasonable attorneys' fees incurred by the Lender in enforcement of its rights under the Credit Agreement or any other Loan Document.

65. As of July 28, 2025, the following amounts are due from and payable by Uncle Nearest pursuant to the Loan Documents:

**Uncle Nearest Outstanding Principal and Interest as of July 28, 2025**

| Loan Type | Principal Amount | Accrued Interest | Total Principal and Accrued Interest Outstanding | Maturity Date |
|---|---|---|---|---|
| The Revolving Loan | $65,224,031.96 | $4,109,352.17 | $69,333,384.13 | July 22, 2025 |
| The Term Loan | $22,045,150.88 | $1,214,102.77 | $23,259,253.65 | July 22, 2027 |
| The RELOC Loan | $15,000,000 | $653,190.44 | $15,653,190.44 | July 22, 2027 |
| **Totals** | **$102,269,182.84** | **$5,976,645.38** | **$108,245,828.22** | |

In addition, Uncle Nearest is obligated to pay the Lender all costs, fees and expenses incurred by or otherwise owing to the Lender in connection with the Loan Documents, including but not limited to at least $1,265,519.01 in accrued and unpaid fees and all outstanding attorney's fees and costs.

### D. Remedies for Default

66. Section 8.2(b) of the Credit Agreement provides that if any Event of Default occurs and is continuing, the Lender may declare the unpaid debt to be immediately due and payable.

67. Each of the Bedford County Road Deed of Trust and the Eady Road Deed of Trust (collectively, the "First Lien Deeds of Trust") provides that upon the occurrence of any Event of Default, the Lender may (i) declare the unpaid debt to be immediately due and payable,[21] and (ii) institute proceedings for the complete foreclosure of the Deeds of Trust.[22]

68. Section 5.04 of each of the First Lien Deeds of Trust provides that while an Event of Default exists, the Lender may "enter into and upon and take possession of, and operate all facilities on, the Premises or any part thereof" either personally or through its agents.

69. Further, Section 5.05(d) of each of the First Lien Deeds of Trust provides that upon the occurrence of any Event of Default, should the Lender apply for the appointment of a receiver,

---

[21] *See* Bedford County Deed of Trust, Section 5.01; Eady Road Deed of Trust, Section 5.01.
[22] *See* Bedford County Deed of Trust, Section 5.05; Eady Road Deed of Trust, Section 5.05.

Uncle Nearest expressly consents to the appointment of a receiver, including an appointment *ex parte*. In each of the First Lien Deeds of Trust, Uncle Nearest or Mr. Weaver, as applicable, agreed that upon an Event of Default, the Lender, "upon application to a court of competent jurisdiction, shall be entitled as a matter of strict right, without notice . . . to the appointment of a receiver."[23]

70.     Based on the foregoing, the Lender brings this action to recover its damages as a result of Uncle Nearest's defaults under the Loan Documents and for this Court's immediate appointment of a receiver with all of the general powers of a court-appointed receiver under applicable law. Accordingly, contemporaneously with the filing of this Verified Complaint, the Lender has also filed an Emergency Motion for Appointment of Receiver and Proposed Order Appointing Receiver.

## FIRST CLAIM FOR RELIEF

### (Breach of Contract against Uncle Nearest–the Loan Documents)

71.     The Lender repeats, realleges, and incorporates by reference, all allegations in the numbered paragraphs above as if fully set forth herein.

72.     Uncle Nearest has defaulted under the Loan Documents as a result of the Defaults.

73.     The Credit Agreement, and all of the amendments thereto, is a legally binding contract whereby Uncle Nearest, among other things, agreed to repay the Revolving Loan, Term Loan, RELOC Loan, and all other amounts due pursuant to the terms of the Credit Agreement.

74.     The Lender fully performed its obligations under the Credit Agreement by, among other things, funding the Revolving Loan, Term Loan, and RELOC Loan to Uncle Nearest in accordance with the terms of the Credit Agreement.

75.     The Defaults constitute a breach of Uncle Nearest's obligations under the Loan

---

[23] *See* Bedford County Deed of Trust, Section 5.05; Eady Road Deed of Trust, Section 5.05.

Documents.

76.     The Defaults and Uncle Nearest's breach of the Loan Documents caused the Lender to suffer damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF

**(Appointment of Receiver over Uncle Nearest, Inc., the Distillery, RE Holdings, the Nearest Green Distillery Property, the Eady Road Property)**

77.     The Lender repeats, realleges, and incorporates by reference, all allegations in the numbered paragraphs above as if fully set forth herein.

78.     The Lender is further entitled to the appointment of a receiver pursuant to Fed. R. Civ. P. 66 and this Court's equitable powers to preserve and protect the Lender's security interests in the Collateral described in the Security Agreement and the other Loan Documents.

79.     Grounds exist for the appointment of a receiver pursuant to Fed. R. Civ. P. 66 due to one of more of the following conditions (in addition to other conditions that may exist):

   a.     Uncle Nearest is not paying its debts not subject to a bona fide dispute as they become due;

   b.     Uncle Nearest is unable to pay its debts as they become due;

   c.     The Lender has a lien on and security interests in the Collateral set forth in the Credit Agreement, Security Agreement, Deeds of Trust and other documents referenced therein which constitute substantially all of the assets of Uncle Nearest, the Distillery, and RE Holdings;

   d.     Such assets, as more fully described in the Credit Agreement and Security Agreement, are currently in the possession or control of Uncle Nearest; and

   e.     Such assets, or their rents and accounts, issues, proceeds, and profits are the Collateral of the Lender and are in danger of being lost, depleted, removed beyond the jurisdiction of the Court, or materially injured or impaired to the extent current management, is permitted to operate Uncle Nearest and its assets without the appointment of a receiver.

80.     Based upon the facts as set forth above, the Lender is otherwise entitled to the appointment of a receiver as a matter of general equity to protect and preserve the Collateral.

81. The Collateral subject to the Lender's liens is in danger of being lost and/or materially injured or impaired to the extent a receiver is not appointed.

82. It is necessary that a receiver be appointed immediately to serve as a general receiver, with all powers and duties as specifically ordered by this Court. The enhanced value and stabilization from a professional, court-appointed receiver outweighs any potential harm. Uncle Nearest will retain ownership and will be kept informed of the receiver's work through regular reports. The marginal costs of a receiver pales in comparison to the tremendous loss of value of the Collateral if Uncle Nearest continues along the current path, which proves that Uncle Nearest cannot pay the Loans, its property-related expenses and its vendors.

83. Tennessee Code Annotated § 29-40-101, *et. seq.*, Tennessee's enactment of the Uniform Commercial Real Estate Receivership Act, provides an additional basis for the appointment of a receiver over real property and any personal property related to or used in operating the real property.

84. Uncle Nearest consented to the appointment of a receiver under Section 5.05(d) of each of the Bedford County Road Deed of Trust and the Eady Road Deed of Trust.

85. The Court should appoint a receiver because due to Uncle Nearest's mismanagement, the Collateral is in jeopardy of substantial harm.

86. Given the lack of transparency and minimal communication with the Lender by Uncle Nearest, the Lender must exercise its rights and remedies under the Loan Documents and requests that this Court appoint Kevin Larin, a Managing Director with Riveron[24], as receiver over

---

[24] Riveron was engaged on March 3, 2025, by counsel to the Lender, McGuireWoods LLP, to serve as financial advisor to the Lender. However, the engagement will cease to the extent Riveron is appointed as receiver. Moreover, as described above, pursuant to Section 8(d) of the Forbearance Agreement, Uncle Nearest waived its right to object to Riveron's appointment as receiver on the basis of Riveron's independence or disinterestedness.

Uncle Nearest and its assets in order to preserve Uncle Nearest's assets and maximize the value of the Collateral.

87. As a result of the foregoing, the Court immediately should appoint a receiver with all of the general powers of a court-appointed receiver under applicable law.

WHEREFORE, PREMISES CONSIDERED, the Lender respectfully prays:

a. that proper process issue and be served upon Uncle Nearest, and that Uncle Nearest be required to appear and answer this Verified Complaint within the time required by law;

b. that judgment be entered against Uncle Nearest in an amount to be established at trial but in no event less than the principal amount of $102,269,182.84 plus all other amounts due under the Credit Agreement and all other Loan Documents, including but not limited to, all accrued and unpaid interest, incurred attorneys' fees and costs of collection, pre- and post-judgment interest, and any other costs incurred in collecting and enforcing any judgment entered herein, recoverable under the express terms of the contracts entered into between the parties;

c. that, pursuant to Fed. R. Civ. P. 66, the Court enter an order in substantially the form of the Proposed Order Appointing Receiver filed substantially contemporaneously herewith, (i) to appoint Kevin Larin as the receiver for Uncle Nearest, Inc., the Distillery, RE Holdings, the Nearest Green Distillery Property and the Eady Road Property and grant the receiver such rights and responsibilities as necessary to protect the Collateral, and (ii) remove Ms. Weaver, Mr. Weaver, and any others currently serving in management positions from their positions with Uncle Nearest, Inc., the Distillery, and RE Holdings;

d. that injunctive relief, both preliminary and permanent in nature, be granted restraining Uncle Nearest and its agents from: (1) making any disbursement or distribution of any assets of Uncle Nearest; or (2) using, investing, conveying, disposing, executing or encumbering in any fashion any assets of Uncle Nearest.

e. award the Lender all costs and fees associated with the maintenance of this action, including but not limited to, reasonable attorneys' fees and costs, as allowed by the contracts entered into between the parties and the law; and

f. any other legal or equitable relief as this Court deems appropriate.

Respectfully submitted,


/s/*Erika R. Barnes*
Erika R. Barnes (TN Bar No. 028628)
STITES & HARBISON PLLC
401 Commerce St., Suite 800
Nashville, TN 37219
Telephone: (615) 782-2252
Email:  ebarnes@stites.com

   - and-

Demetra Liggins (not admitted in Tennessee)
Dairanetta S. Spain (TN Bar No. 039981)
MCGUIREWOODS LLP
Texas Tower
845 Texas Ave., Suite 2400
Houston, TX  77002
Telephone: (713) 353-6661
Email:  dliggins@mcguirewoods.com
              dspain@mcguirewoods.com

M. Alexandra Shipley (not admitted in Tennessee)
MCGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601
Telephone: (312) 849-8253
Email:  ashipley@mcguirewoods.com

*Attorneys for Farm Credit Mid-America, PCA*

Dated: July 28, 2025

## CERTIFICATE OF SERVICE

I certify that on July 28, 2025, a true and correct copy of the foregoing was served via U.S.

Mail and electronic mail upon the following:

Uncle Nearest, Inc.
Nearest Green Distillery, Inc.
Uncle Nearest Real Estate Holdings, LLC
3125 US 231 N
Shelbyville, TN 37160
Attn: Fawn Weaver (fawn.weaver@unclenearest.com)
Keith Weaver (keith.weaver@unclenearest.com)

David Kurzweil
Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305
kurzweild@gtlaw.com

Nancy Peterman
Greenberg Traurig, LLP
360 North Green Street
Suite 1300
Chicago, IL 60607
petermann@gtlaw.com

Brian Patterson
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
brian.patterson@lw.com

/s/Erika R. Barnes
Erika R. Barnes