**IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **FARM CREDIT MID-AMERICA, PCA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNCLE NEAREST, INC., NEAREST GREEN DISTILLERY, INC., UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, FAWN WEAVER and KEITH WEAVER,**<br><br>**Defendants.** | **)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)**<br>**)** | **Case No. [**4:25-CV-38**]** |

**EMERGENCY MOTION FOR THE IMMEDIATE APPOINTMENT OF RECEIVER**

Plaintiff, Farm Credit Mid-America, PCA (the "Lender" or "Farm Credit") hereby submits this Emergency Motion for the Immediate Appointment of Receiver ("Motion") and states as follows:

**THE PARTIES**

1. The Lender is an agricultural lending cooperative formed under the laws of the United States of America with its principal office located at 12501 Lakefront Place, Louisville, Kentucky 40299.

2. Defendant Uncle Nearest, Inc. ("Uncle Nearest, Inc.") is a Delaware corporation with its principal place of business located at 600 N. Main Street, Shelbyville, Tennessee 38106.

3. Defendant Nearest Green Distillery, Inc (the "Distillery") is a Delaware corporation with its principal place of business located at 600 N. Main Street, Shelbyville, Tennessee 38106.

4. Defendant Uncle Nearest Real Estate Holdings, LLC ("RE Holdings" and together with Uncle Nearest and the Distillery, collectively the "Borrowers" or "Uncle Nearest") is a

Tennessee limited liability company with its principal place of business located at 3125 Highway 231 N Shelbyville, Tennessee 37160.

5. Uncle Nearest is the sole owner of RE Holdings and, as such, RE Holdings is a citizen of the state of Delaware and of Tennessee.

6. Fawn Weaver ("Ms. Weaver") is an individual and representative of Uncle Nearest residing in Shelbyville, Tennessee and serving as the Chief Executive Officer for Uncle Nearest.

7. Keith Weaver ("Mr. Weaver", collectively with Ms. Weaver, the "Weavers" and together with Uncle Nearest, the "Defendants") is an individual and representative of Uncle Nearest residing in Shelbyville, Tennessee and serving as the Chief Executive Officer of the Distillery.

8. Simultaneously herewith, the Lender filed a Verified Complaint (the "Verified Complaint") against the Defendants seeking entry of judgment against the Defendants in the amount of $102,269,182.84 plus interest, attorneys' fees and costs and costs of suit, and requesting the appointment of a receiver.

## FACTUAL BACKGROUND

9. The Lender incorporates by reference as if set forth at length the facts set out in (i) the declaration of Brian Klatt, Managing Director Food & Agribusiness, of Farm Credit Mid-America, PCA in support of this Motion, attached hereto as **Exhibit 1** and (ii) the factual allegations set forth in the Verified Complaint.

### A. The Loan Documents

10. Uncle Nearest and the Lender are parties to (i) that certain Credit Agreement dated July 22, 2022 (as amended by that certain Amendment No. 1 to Credit Agreement dated October 3, 2022, that certain Amendment No. 2 to Credit Agreement dated December 16, 2022, that certain

Amendment No. 3 to Credit Agreement dated January 26, 2023, that certain Amendment No. 4 to Credit Agreement dated March 30, 2023, that certain Amendment No. 5 to Credit Agreement dated June 6, 2023, that certain Amendment No. 6 to Credit Agreement and Limited Waiver dated July 26, 2023, that certain Amendment No. 7 to Credit Agreement and Limited Waiver dated December 27, 2023, that certain Amendment No. 8 to Credit Agreement and Forbearance Agreement dated April 15, 2025 (the "Forbearance Agreement"), the "Credit Agreement"),[1] and (ii) the other agreements, documents and instruments executed and delivered in connection with, related to or referenced in the Credit Agreement (collectively and together with the Credit Agreement, the "Loan Documents").[2]

11. Pursuant to the terms of the Credit Agreement, the Lender provided certain loans, extensions of credit, and financial accommodations to Uncle Nearest. As more fully described in the Verified Complaint, there are three loans in this matter: the Revolving Loan; the Term Loan; and the RELOC Loan (collectively, the "Loans").

12. The Lender has, on occasion, agreed to increase its commitments to provide certain loans to Uncle Nearest and waive Events of Default in reliance upon Uncle Nearest's representations as to its success and strategic growth.

***Repayment of Loans***

13. The Credit Agreement provides that Uncle Nearest is obligated to repay (i) the Revolving Loans on the Maturity Date of the Revolving Credit Facility, (ii) the Term Loans in quarterly installment payments throughout the term of the Term Loan, and (iii) the RELOC Loans

[1] Each capitalized term used but not defined herein shall have the same meaning ascribed thereto in the Credit Agreement.
[2] True and correct copies of the Loan Documents are attached as **Exhibit 2** through **Exhibit 10** hereto.

in accordance with an amortization schedule set forth in the Credit Agreement.

14. Specifically, Section 2.5 of the Credit Agreement states:

> **2.5 Repayment of Loans.**
>
> (a) Revolving Credit Loans. The Borrowers shall repay to the Revolving Credit Lenders on the Maturity Date for the Revolving Credit Facility the aggregate principal amount of all Revolving Credit Loans outstanding on such date.
>
> (b) Term Loans. From and after the Amendment No. 5 Effective Date, the Borrowers shall repay to the Term Loan Lenders the aggregate principal amount of all Term Loans outstanding in quarterly installments of $293,789.06 (commencing on July 1, 2023) on the first day of each calendar quarter (which installments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.3); provided that the final principal repayment installment of the Term Loans shall be repaid on the Maturity Date for the Term Loan Facility and in any event shall be in an amount equal to the aggregate principal amount of all Term Loans outstanding on such date.
>
> (c) RELOC Loans / RELOC Term Loans. With respect to the RELOC Term Loans, promptly following the Conversion Date, the Administrative Agent shall calculate and deliver to the RELOC Lenders and the Company an amortization schedule with respect to the RELOC Term Loans providing for annual "straight-line" amortization of principal over a 15-year amortization period with principal due on the first day of each calendar quarter (commencing April 1, 2025). The Borrowers shall repay to the RELOC Lenders the aggregate principal amount of all RELOC Term Loans as set forth in such amortization schedule (which installments shall be reduced as a result of the application of prepayments in accordance with Section 2.3); provided that the final principal repayment installment of the RELOC Term Loans shall be repaid on the Maturity Date applicable thereto and in any event shall be in an amount equal to the aggregate principal amount all RELOC Term Loans outstanding on such date. To the extent not converted to RELOC Term Loans pursuant to Section 2.1(c)(ii) for any reason, the Borrowers shall repay to the RELOC Lenders on the Conversion Date the aggregate principal amount of all RELOC Loans outstanding on such date.

**<u>Uncle Nearest Outstanding Principal and Interest as of July 28, 2025</u>**[3]

| Loan Type | Principal Amount | Accrued Interest | Total Principal and Accrued Interest Outstanding | Maturity Date |
|---|---|---|---|---|
| The Revolving Loan | $65,224,031.96 | $4,109,352.17 | $69,333,384.13 | July 22, 2025 |
| The Term Loan | $22,045,150.88 | $1,214,102.77 | $23,259,253.65 | July 22, 2027 |
| The RELOC Loan | $15,000,000 | $653,190.44 | $15,653,190.44 | July 22, 2027 |
| **Totals** | **$102,269,182.84** | **$5,976,645.38** | **$108,245,828.22** | |

***Loan Obligations Secured by Real and Personal Property***

15. Pursuant to the Credit Agreement and as security for repayment of the Loans, Uncle Nearest entered into that certain Security Agreement (the "<u>Security Agreement</u>")[4] dated July 22, 2022, granting a security interest to the Lender in almost all of Uncle Nearest's personal property (the "<u>Personal Property Collateral</u>"), including accounts, accounts receivable, inventory (including, without limitation, spirits, bottles, and barrels), goods and general intangibles.

16. Specifically, <u>Section B.2</u> of the Security Agreement states:

> **2. <u>Grant of Security Interest</u>.** Each Grantor hereby grants as collateral security for the payment, performance and satisfaction of the Secured Obligations to the Administrative Agent for the benefit of the Secured Parties a continuing security interest in and to, and collaterally assigns to, the Administrative Agent for the benefit of the Secured Parties, all of the assets of such Grantor or in which such Grantor has or may have or acquire an interest or the power to transfer rights therein, whether now owned or existing or hereafter created, acquired or arising and wheresoever located, including, without limitation, the following:
>
> (a) All accounts, including accounts receivable, contracts, bills, acceptances, choses in action, and other forms of monetary obligations at any time owing to such Grantor arising out of property sold, leased, licensed, assigned or otherwise disposed of or for services rendered or to be rendered by such Grantor, and all of such Grantor's rights with respect to any property the sale, lease or license of which gave rise thereto, whether

[3] These amounts do not include any attorneys' or other professionals' fees, costs, and expenses, which are reimbursable by Uncle Nearest pursuant to <u>Section 2.14(a)</u> of the Credit Agreement.
[4] A true and accurate copy of the Security Agreement is attached hereto as **Exhibit 11**.

or not delivered, property returned by customers and all rights as an unpaid vendor or lienor, including rights of stoppage in transit and of recovering possession by proceedings including replevin and reclamation (collectively referred to hereinafter as "Accounts");

(b) All inventory, including all goods manufactured or acquired for sale or lease (including, without limitation, spirits, beer, malt beverages, wine, wine cooler products, champagne, juices, waters, coffees, tea, soft drinks and other alcoholic and non-alcoholic beverages), and any piece goods, raw materials, work in process and finished merchandise, component materials, and all supplies, bottles, barrels, cans, syrups, draft equipment, pallets, dunnage, cooperage, goods, incidentals, office supplies, packaging materials and any and all items used or consumed in the operation of the business of such Grantor or which may contribute to the finished product or to the sale, promotion and shipment thereof, in which such Grantor now or at any time hereafter may have an interest, whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of such Grantor or is held by such Grantor or by others for such Grantor's account (collectively referred to hereinafter as "Inventory");

(c) All goods, including all machinery, equipment, motor vehicles, crops, farm products, parts, supplies, apparatus, appliances, tools, patterns, molds, dies, blueprints, fittings, furniture, furnishings, fixtures and articles of tangible personal property of every description, and all computer programs embedded in any of the foregoing and all supporting information relating to such computer programs (collectively referred to hereinafter as "Equipment");

(d) All general intangibles, including all rights now or hereafter accruing to such Grantor under contracts, leases, agreements or other instruments, including all contracts or contract rights to perform or receive services, to purchase or sell goods, or to hold or use land or facilities, and to enforce all rights thereunder, all causes of action, corporate or business records, inventions, patents and patent rights, rights in mask works, designs, trade names and trademarks and all goodwill associated therewith, trade secrets, trade processes, licenses, permits, franchises, customer lists, computer programs and software, all internet domain names and registration rights thereto, all internet websites and the content thereof, all payment intangibles, all claims under guaranties, tax refund claims, all rights and claims against carriers and shippers, leases, all claims under insurance policies, all interests in general and limited partnerships, limited liability companies, and other Persons not constituting Investment Property (as defined below), all rights to indemnification and all other intangible personal property and intellectual property of every kind and nature (collectively referred to hereinafter as "General Intangibles");

(e) All Copyrights, Patents and Trademarks;

(f) All deposit accounts, including demand, time, savings, passbook, or other similar accounts maintained with any bank by or for the benefit of such Grantor (collectively referred to hereinafter as "Deposit Accounts");

(g) All chattel paper, including tangible chattel paper, electronic chattel paper, or any hybrid thereof (collectively referred to hereinafter as "Chattel Paper");

(h) All investment property, including all securities, security entitlements, securities accounts, commodity contracts and commodity accounts of or maintained for the benefit of such Grantor, but excluding Equity Interests in Subsidiaries (collectively referred to hereinafter as "Investment Property");

(i) All instruments, including all promissory notes (collectively referred to hereinafter as "Instruments");

(j) All documents, including warehouse receipts, bills of lading and other documents of title (collectively referred to hereinafter as "Documents");

(k) All rights to payment or performance under letters of credit including rights to proceeds of letters of credit ("Letter-of-Credit Rights"), and all guaranties, endorsements, Liens, other Guarantee obligations or supporting obligations of any Person securing or supporting the payment, performance, value or liquidation of any of the foregoing (collectively, with Letter-of-Credit Rights, referred to hereinafter as "Supporting Obligations");

(l) The commercial tort claims identified on Schedule 9(i) hereto, as such Schedule may be supplemented from time to time in accordance with the terms hereof (collectively referred to hereinafter as "Commercial Tort Claims");

(m) All books and records relating to any of the foregoing (including customer data, credit files, ledgers, computer programs, printouts, and other computer materials and records (and all media on which such data, files, programs, materials and records are or may be stored)); and

(n) All proceeds, products and replacements of, accessions to, and substitutions for, any of the foregoing, including without limitation proceeds of insurance policies insuring any of the foregoing.

All of the property and interests in property described in subsections (a) through (n) are herein collectively referred to as the "Collateral;" provided

that, notwithstanding the foregoing, the Collateral shall not include any Excluded Asset.

17. The Lender has perfected its liens in the Personal Property Collateral by filing and recording UCC-1 Financing Statements[5] against each of Uncle Nearest, Inc., the Distillery and RE Holdings with the office of the secretary of state for their states of incorporation or organization.

18. As additional Collateral to secure the obligations under the Credit Agreement, RE Holdings and the Weavers have executed certain deeds of trust (collectively, the "Deeds of Trust") granting liens in certain real property (the "Real Property Collateral" and together with the Personal Property Collateral, collectively the "Collateral"):

a. RE Holdings executed that certain Deed of Trust, Assignment of Leases, Security Agreement and Financing Statement dated July 22, 2022 (the "Bedford County Deed of Trust").[6] The Bedford County Deed of Trust was recorded in the Bedford County Register of Deeds' Office, Tennessee in Book TD1060, Page 865, as Instrument 22006177. The Bedford County Deed of Trust grants the Lender a first priority lien in the real property under those certain lots, pieces, tracts or parcels of land located in certain cities and/or counties in the State of Tennessee, more particularly described in Exhibit A of the Bedford County Deed of Trust (the "Nearest Green Distillery Property"). The Bedford County Deed of Trust was amended on June 5, 2023, to conform to amendments to the Credit Agreement. The Nearest Green Distillery sits on the Nearest Green Distillery Property. Upon information and belief, the Humble Baron Bar (a restaurant/bar that is purportedly not owned by Uncle Nearest) and Barrel House II BBQ (a second location of a local restaurant that is not owned by Uncle Nearest) were both built on the Nearest Green Distillery Property after the Bedford County Deed of Trust was executed.

b. The Weavers executed that certain Deed of Trust, Assignment of Leases, Security Agreement and Financing Statement dated July 22, 2022 (the "Dan Call Farm Deed of Trust").[7] The Dan Call Farm Deed of Trust was recorded in the Moore County Register of Deeds' Office, Tennessee in Book T174, Page 191, as Instrument 22000783. The Dan Call Farm Deed of Trust grants the Lender a second priority lien[8] in the real property under those certain lots, pieces, tracts or parcels of land

[5] True and accurate copies of the financing statements are attached hereto collectively as **Exhibit 12**.

[6] True and correct copies of the Bedford County Deed of Trust and all amendments thereto are attached collectively hereto as **Exhibit 13**.

[7] True and correct copies of the Dan Call Farm Deed of Trust and all amendments thereto are attached collectively hereto as **Exhibit 14**.

[8] Farm Credit Mid-America, FLCA, holds the first priority lien in the real property subject to the Dan Call Farm Deed of Trust pursuant to a deed of trust executed to secure the Weavers' obligations under separate, individual loans from Farm Credit Mid-America, FLCA.

located in certain cities and/or counties in the State of Tennessee, more particularly described in Exhibit A of the Dan Call Farm Deed of Trust. The Dan Call Farm Deed of Trust was amended on June 5, 2023, to conform to amendments to the Credit Agreement. The property subject to the Dan Call Farm Deed of Trust is upon information and belief, a historic site where Nathan "Nearest" Green began distilling whiskey and met Jack Daniel.

c. On June 6, 2023, Mr. Weaver executed that certain Deed of Trust which was recorded in the Bedford County Register of Deeds' Office, Tennessee in Book TD1087, Page 919, as Instrument 23003860 (the "Eady Road Deed of Trust").[9] The Eady Road Deed of Trust grants the Lender a first priority lien in the real property under those certain lots, pieces, tracts or parcels of land located in certain cities and/or counties in the State of Tennessee, more particularly described in Exhibit A of the Eady Road Deed of Trust (the "Eady Road Property"). The Eady Road Property is adjacent to the Nearest Green Distillery Property.

**B. The Loan Document Defaults**

19. Uncle Nearest has been in default under the Loans since as early as January 2, 2024, and has continued to incur further defaults over the last eighteen months. One of the most recent defaults occurred as a result of Uncle Nearest's failure to pay the Revolving Loans in full on the applicable Maturity Date of July 22, 2025.

20. As of the date of the execution of the Forbearance Agreement, Uncle Nearest was in default of the terms of the Credit Agreement as a result of, among other things, the following by or against one or more of the Loan Parties (the "Pre-Forbearance Defaults"):

a. Failure to timely repay the outstanding overadvance as required by Section 2.3(b)(i);

b. Failure to timely pay the following amounts of interest on the Loans as required by Section 2.6(c) on the following Interest Payment Dates:

i. $1,519,542.95 on January 2, 2024;

ii. $1,667,331.68 on July 1, 2024;

iii. $2,417,636.84 on October 1, 2024;

iv. $2,326,636.93 on January 2, 2025;

[9] A true and correct copy of the Eady Road Deed of Trust is attached hereto as **Exhibit 15**.

v. $390,616.44 on February 3, 2025; and

vi. $2,170,372.62 on April 1, 2025;

c. Failure to timely pay the following quarterly installment payments on the aggregate principal amount of all Term Loans outstanding as required by Section 2.5(b) on the first day of each calendar quarter:

i. $293,789.06 on October 1, 2024;

ii. $293,789.06 on January 2, 2025; and

iii. $293,789.06 on April 1, 2025;

d. Failure to timely pay on April 1, 2025, the $250,000 amortization payment on the principal amount of the RELOC Loan outstanding as required by Section 2.5(c) on the first day of each calendar quarter, commencing with April 1, 2025;

e. Failure to timely deliver monthly financial statements required by Section 6.1(b) for one or more months from July 2022 through April 2025;

f. Failure to timely deliver the annual business plan required by Section 6.1(c) for the fiscal years ending December 31, 2023, and December 31, 2024;

g. Failure to timely deliver compliance certificates required by Section 6.2(a) for one or more months from July 2022 through March 2025;

h. Failure to timely deliver Borrowing Base Certificates required by Section 6.2(c) for one or more months from July 2022 through April 2025;

i. Failure to timely deliver the report summarizing the Borrowers' insurance coverage required by Section 6.2(d);

j. Failure to adequately respond to requests for information set forth in that certain letter from the Lender to the Borrowers dated as of January 12, 2024, as required by Section 6.2(h);

k. Failure to timely give notice of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect as required by Section 6.3(b);

l. Failure to observe the covenant to maintain proper books and records set forth in Section 6.9;

m. Failure to maintain a minimum Consolidated Tangible Net Worth of no less than $100,000,000 at all times during the period from December 31, 2023, through December 30, 2024, as required by Section 7.11(a);

n. Failure to maintain a minimum Consolidated Tangible Net Worth of no less than $122,000,000 at all times during the period from December 31, 2024, through the

date hereof, as required by Section 7.11(a);

o. Failure to maintain a Consolidated Net Income of no less than $1.00 for each calendar month during the period commencing December 1, 2023, through January 31, 2025, as required by Section 7.11(b);

p. Failure to observe the covenant set forth in Section 7.5 of the Credit Agreement as a result of one or more Loan Parties' Dispositions of property not permitted by Section 7.5, including, without limitation, any bulk sales or other sales of barreled spirits;

q. Failure to timely prepay, as required by Section 2.3(b)(ii), an aggregate principal amount of Loans equal to 100% of Net Cash Proceeds realized by the Borrowers as a result of the Borrowers' Dispositions of property of any Loan Party or any of its Subsidiaries (other than any Disposition of any property permitted by any of clauses (a) through (h) of Section 7.5);

r. Failure to observe the covenant to deliver duly executed joinders of subsidiaries as set forth in Section 6.12;

s. Failure to observe the covenant in Section 7.1 of the Credit Agreement not to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues except as permitted by Section 7.1, including but not limited to, the following transactions:

   i. Sold $1,021,300 of future revenue stream for a discount of $700,000 less fees pursuant to a contract dated June 26, 2024;

   ii. Sold $2,378,300 of future revenue stream for a discount of $1,700,000 less fees pursuant to a contract dated July 26, 2024; and

   iii. Refinanced $2,658,100 for a discount of $1,900,000 less fees pursuant to a contract dated November 25, 2024.

t. Failure to observe the covenant in Section 7.2 to not create, incur, assume, or suffer to exist any Indebtedness except as permitted by Section 7.2 as a result of the unsecured Indebtedness incurred by the Borrowers to Grant Sidney Inc. pursuant to the Subordinated Debt Documents; and

u. Entry of a final judgment in the amount of $2,111,911.60 against Uncle Nearest, Inc. due to Uncle Nearest, Inc.'s failure to pay for goods delivered in the case styled *Berlin Packaging LLC v. Uncle Nearest, Inc.*, Case No. 2024 L 011917 in the Circuit Court of Cook County, Illinois.

21. Within seven days after entering the Forbearance Agreement, Uncle Nearest defaulted. This first "Forbearance Default" (which is also an immediate Event of Default under

the Credit Agreement) was due to Uncle Nearest's failure to deliver a weekly cash flow report by the second Business Day of the following calendar week. To date, numerous Forbearance Defaults have occurred and continue. Uncle Nearest is in default under the Forbearance Agreement and further in default under the Credit Agreement for, among other things, the following reasons (such defaults, the "Post-Forbearance Execution Defaults" and, collectively with the Pre-Forbearance Defaults, the "Defaults"):

a. Failure to timely deliver a duly executed and completed perfection certificate to the Lender no later than 14 days following the Effective Date, as required by Section 2(a)(iii) of the Forbearance Agreement;

b. Failure to timely deliver executed Lien Waivers to the Lender with respect to (A) any personal property Collateral located on lease premises or premises subject to a mortgage, (B) any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, (C) any material Collateral held by a repairman, mechanic or bailee, and (D) any Collateral subject to a licensor's intellectual property rights no later than 14 days following the Effective Date, as required by Section 2(a)(iv) of the Forbearance Agreement;

c. Failure to timely deliver executed control agreements in favor of the Lender, with respect to all of the Borrowers' Deposit Accounts no later than 14 days following the Effective Date, as required by Section 2(a)(v) of the Forbearance Agreement;

d. Failure to timely satisfy, or confirm to the Administrative Agent the satisfaction of, the Loan Parties' obligations under the Security Agreement and the Pledge Agreement, including, without limitation, the obligations set forth in Section 3(d) and Section 9(j) of the Security Agreement, as required by Section 2(a)(ii) of the Forbearance Agreement;

e. Failure to timely deliver resolutions adopted by the board of directors of Uncle Nearest, Inc. appointing one (1) Independent Director (as defined [t]herein) to the board of directors of Uncle Nearest, Inc. at all times from and after the Effective Date by May 2, 2025 (extended from April 25, 2025, upon Uncle Nearest's request), as required by Section 2(a)(viii) of the Forbearance Agreement;

f. Failure to timely deliver to the Lender monthly financial statements required by Section 6.1(b) of the Credit Agreement for the months of March 2025, April 2025, and May 2025;

g. Failure to timely deliver Borrowing Base Certificates for February 2025, March 2025, April 2025, May 2025, and June 2025 in accordance with Section 6.2(c) of the Credit Agreement, as set forth in Section 2(b)(ii)(C) of the Forbearance

Agreement;

h. Failure to maintain a minimum amount of $1,500,000 in cash and Cash Equivalents, as required by Section 2(b)(iv) of the Forbearance Agreement;

i. Failure to deliver a plan, in form and substance acceptable to the Lender, to pursue an Acceptable Transaction, together with such supplemental information as the Lender may reasonably request by May 23, 2025, as required by Section 2(b)(vii)(A) of the Forbearance Agreement;

j. Failure to no later than 60 days following the Effective Date of the Forbearance Agreement, comply with the Forbearance Milestone set forth in Section 2(a)(vi) of the Forbearance Agreement to make a $10,000,000 paydown;

k. On April 22, 2025, and April 29, 2025, and from May 6, 2025, through July 22, 2025, failure to comply with the Forbearance Covenant set forth in Section 2(b)(ii) of the Forbearance Agreement to deliver a Reporting Package, in form and detail satisfactory to the Lender;

l. Failure to timely deliver to the Lender, 120 days after the end of the fiscal year ending December 31, 2024, in form and detail satisfactory to the Lender, the financial statements and information required by Section 6.1(a) of the Credit Agreement;

m. Failure to timely pay the following amounts of interest on the Loans as required by Section 2.6(c) of the Credit Agreement on the following Interest Payment Dates:

 i. $283,327.43 on May 1, 2025; and

 ii. $892,043.12 on July 1, 2025;

n. Failure to timely pay on July 1, 2025, the quarterly installment in the amount of $293,789.06 on the aggregate principal amount of all Term Loans outstanding as required by Section 2.5(b) of the Credit Agreement;

o. Failure to timely pay on July 1, 2025, the $250,000 amortization payment on the principal amount of the RELOC Loan outstanding as required by Section 2.5(c) of the Credit Agreement; and

p. Failure to repay the aggregate principal amount of all Revolving Credit Loans outstanding on the Maturity Date for the Revolving Credit Facility (which occurred on July 22, 2025).

22. Further, onsite inspections of the Collateral located at Tennessee Distilling Group, LLC were ordered by the Lender and conducted October 22–24, 2024, and again on June 11–13, 2025. The October 2024 collateral inspection revealed that material unreconciled discrepancies

existed between the amount of Collateral identified in Uncle Nearest's Borrowing Base and compliance certificate delivered for the month of August 2024, and what the inspector was able to verify (the "Collateral Discrepancy"). As described in the Verified Complaint, this Collateral Discrepancy was further confirmed in January 2025 when Uncle Nearest provided an updated Borrowing Base and compliance certificate evidencing that the previously reported Borrowing Base had been overstated by approximately $21,000,000. The outcome and findings of the June 2025 collateral inspection are pending as of the time of the filing of the Verified Complaint.

23. From January 2024 through March 2025, the Lender sent formal and informal notices of default, requests for updated information regarding its Collateral and requests for meetings to discuss a consensual path forward, including a forbearance agreement. Unfortunately, until March 2025, these notices and requests failed to result in any resolution and were mainly met with extremely delayed responses.

24. As set forth above, multiple Post-Forbearance Execution Defaults have occurred and are continuing, including without limitation, as a result of Uncle Nearest's failure (despite almost constant requests from the Lender and its advisors) to provide: (a) a duly executed and completed perfection certificate; (b) duly executed deposit account control agreements over all deposit accounts; (c) duly executed joinders of all applicable subsidiaries; (d) confirmation that all Loan Parties have satisfied obligations under the Pledge Agreement; and (d) executed Lien Waivers, each of which was required within 14 days after the execution of the Forbearance Agreement.

25. Almost immediately after the execution of the Forbearance Agreement, Uncle Nearest also requested an extension to May 2, 2025, of the April 25, 2025 deadline to appoint an Independent Director acceptable to the Lender with the expertise to assist Uncle Nearest in its time

of distress. The Lender agreed to the extension; however, to date, no Independent Director has been officially appointed.

26. As more fully described in the Verified Complaint, Uncle Nearest's need for oversight is evident as its financial problems threaten the continued operation of Uncle Nearest and, by extension, the viability of the Collateral. Given the lack of any reliable financial information and uncertainty with respect to any verifiable source of capital to keep Uncle Nearest maintaining business operations, a receiver is necessary to take over managerial control of Uncle Nearest. The receiver will be able to review the true financial condition of the company and determine the best path forward for all constituents. The Credit Agreement provides that the Lender is entitled to recover from Uncle Nearest jointly and severally all costs and expenses, including but not limited to, reasonable attorneys' fees incurred by the Lender in enforcement of its rights under the Credit Agreement or any other Loan Document.

27. As of July 28, 2025, the following amounts are due from and payable by Uncle Nearest pursuant to the Loan Documents:

**Uncle Nearest Outstanding Principal and Interest as of July 28, 2025**

| **Loan Type** | **Principal Amount** | **Accrued Interest** | **Total Principal and Accrued Interest Outstanding** | **Maturity Date** |
|---|---|---|---|---|
| The Revolving Loan | $65,224,031.96 | $4,109,352.17 | $69,333,384.13 | July 22, 2025 |
| The Term Loan | $22,045,150.88 | $1,214,102.77 | $23,259,253.65 | July 22, 2027 |
| The RELOC Loan | $15,000,000 | $653,190.44 | $15,653,190.44 | July 22, 2027 |
| **Totals** | **$102,269,182.84** | **$5,976,645.38** | **$108,245,828.22** | |

In addition, Uncle Nearest is obligated to pay the Lender all costs, fees and expenses incurred by or otherwise owing to the Lender in connection with the Loan Documents, including but not limited to at least $1,265,519.01 in accrued and unpaid fees and all outstanding attorney's fees and

costs.

### C. Remedies for Default

28. Section 8.2(b) of the Credit Agreement provides that if any Event of Default occurs and is continuing, the Lender may declare the unpaid debt to be immediately due and payable.

29. Each of the Bedford County Road Deed of Trust and the Eady Road Deed of Trust (collectively, the "First Lien Deeds of Trust") provides that upon the occurrence of any Event of Default, the Lender may (i) declare the unpaid debt to be immediately due and payable,[10] and (ii) institute proceedings for the complete foreclosure of the Deeds of Trust.[11]

30. Section 5.04 of each of the First Lien Deeds of Trust provides that while an Event of Default exists, the Lender may "enter into and upon and take possession of, and operate all facilities on, the Premises or any part thereof" either personally or through its agents.

31. Further, Section 5.05(d) of each of the First Lien Deeds of Trust provides that upon the occurrence of any Event of Default, should the Lender apply for the appointment of a receiver, Uncle Nearest expressly consents to the appointment of a receiver, including an appointment *ex parte*. In each of the First Lien Deeds of Trust, Uncle Nearest or Mr. Weaver, as applicable, agreed that upon an Event of Default, the Lender, "upon application to a court of competent jurisdiction, shall be entitled as a matter of strict right, without notice . . . to the appointment of a receiver."[12]

32. Based on the foregoing, the Lender files this Motion for this Court's immediate appointment of a receiver with all of the general powers of a court-appointed receiver under applicable law. Accordingly, contemporaneously with the filing of this Motion, the Lender has also filed a Proposed Order Appointing Receiver (the "Proposed Receiver Order") attached hereto as

---

[10] *See* Bedford County Deed of Trust, Section 5.01; Eady Road Deed of Trust, Section 5.01.
[11] *See* Bedford County Deed of Trust, Section 5.05; Eady Road Deed of Trust, Section 5.05.
[12] *See* Bedford County Deed of Trust, Section 5.05; Eady Road Deed of Trust, Section 5.05.

**Exhibit 16**.

## APPOINTMENT OF RECEIVER

33. The Lender files this Motion seeking the appointment of Kevin Larin of Riveron as receiver (the "Receiver") for Uncle Nearest.

34. This Court has the power to appoint a receiver over Uncle Nearest, its assets, the Nearest Green Distillery Property, and the Eady Road Property pursuant to its equitable powers and Federal Rule of Civil Procedure 66. *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006). As there is no fixed rule regarding the appointment of a receiver, the Sixth Circuit Court of Appeals has held that district courts should consider the following factors in deciding whether to appoint a receiver: (1) "whether the property at issue is in imminent danger of . . . being lost, concealed, injured, diminished in value, or squandered," (2) "whether the defendant engaged in fraudulent conduct," (3) "the inadequacy of the available legal remedies," (4) "the likelihood that the appointment will do more good than harm,"(5) "whether there is inadequate security for a debt and whether a debtor is insolvent." *Pension Ben. Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414–15 (6th Cir. 2015) (citing *View Crest Garden Apartments, Inc. v. United States*, 281 F.2d 844, 847 (9th Cir. 1960); *Garden Homes, Inc. v. United States*, 200 F.2d 299, 301 (1st Cir. 1952)).

35. Each factor weighs in favor of this Court appointing a receiver.

36. First, the Lender's Collateral is in imminent danger of being lost, concealed, injured, diminished in value, or squandered. As set forth above, at multiple times over the last year, the total amount of the Revolving Loans outstanding exceeded the maximum amount Uncle Nearest was permitted to borrow based on the amount of inventory held by Uncle Nearest. Pursuant to Section 2.3(b)(i) of the Credit Agreement, Uncle Nearest was required to make a payment on the Revolving Loan in order to decrease the outstanding Revolving Loans below this maximum

amount. Uncle Nearest failed to make any such payments.

37. Further, as described above, it appears that Uncle Nearest misrepresented (whether intentionally or not) the amount of inventory in the August 2024 compliance certificate delivered to the Lender. The Collateral Discrepancy discovered by a third-party inspector engaged by the Lender reflects that there is a likelihood that the Lender's Collateral is in imminent danger of dissipating without the appointment of a receiver to provide visibility into the operations of Uncle Nearest.

38. Second, Uncle Nearest has engaged in what appears to be another misrepresentation. Despite representing to the Lender that Term Loan proceeds would be used by Uncle Nearest to purchase a $2.225 million home on Martha's Vineyard Island, the property was purchased by an entity whose existence had never been disclosed to the Lender. Additionally, in September 2024, Uncle Nearest mortgaged the Martha's Vineyard property to another lender.

39. Third, the legal remedies available to the Lender are inadequate. If a receiver is not appointed, Uncle Nearest will continue to dissipate the Lender's Collateral. A receiver will ensure that Uncle Nearest does not dissipate or misuse the Lender's Collateral that could be used to pay Uncle Nearest's overdue obligations to the Lender. The appointment of a receiver is critical to prevent further dilution of the Collateral.

40. Fourth, the appointment of a receiver will do more good than harm. Uncle Nearest has been unable (or unwilling) to make payments on the Loans for over a year and otherwise comply with the obligations under the Loan Documents. Additionally, the numerous forbearance defaults demonstrate a continued inability to complete simple operational requirements. A receiver would provide the operational and business experience and oversight necessary to enable Uncle Nearest to continue to operate as a going concern or to pursue avenues other than a liquidation.

41. The appointment of a receiver will not inhibit Uncle Nearest's ability to carry on business operations. Instead, a receiver will ensure that Uncle Nearest conducts its business operations in a prudent manner and provide transparency to the Lender regarding its financial situation.

42. Fifth, upon information and belief, Uncle Nearest is not able to pay debts when they come due. As previously discussed, Uncle Nearest has failed to make required payments to the Lender for over a year.

43. In addition to the above factors, Uncle Nearest consented to the appointment of the Receiver with respect to certain of the Collateral. RE Holdings and Mr. Weaver expressly consented to the appointment of the Receiver with respect to the Nearest Green Distillery Property and the Eady Road Property pursuant to the First Lien Deeds of Trust, as applicable.[13] Pursuant to the Security Agreement, Uncle Nearest consented to the Lender's exercise of rights and remedies of a secured party under the UCC or under other applicable law with respect to the Personal Property Collateral upon and during the continuance of an Event of Default.[14]

44. Given the nearly 18-month long failure of Uncle Nearest to make required payments of the Loans to the Lender, almost as lengthy lack of communication by Uncle Nearest with the Lender, the opacity of the status of Uncle Nearest's operations, the failure of Uncle Nearest to provide required routine financial reporting to the Lender, the numerous additional Events of Default, the apparent misrepresentation by Uncle Nearest regarding the status of the Collateral in the August 2024 compliance certificate, and the grant of a mortgage over property purchased using proceeds of the Term Loan from the Lender, full transparency into the operations of Uncle Nearest is necessary and the Lender has reason to believe that there is imminent danger

---

[13] *See* Eady Road Deed of Trust § 5.05(d); Bedford County Deed of Trust § 5.05(d).
[14] *See* Security Agreement § 11(a).

that its Collateral may dissipate even further.

45. Based upon the facts as set forth above, and in the Lender's Verified Complaint, the Lender is otherwise entitled to the appointment of the Receiver as a matter of general equity to protect and preserve the Collateral described and consented to by Uncle Nearest.

46. It is necessary that the Receiver be appointed immediately to serve as a general receiver, with all powers and duties as specifically ordered by the Court and as set forth in the Proposed Receivership Order.

## EMERGENCY CONSIDERATION

47. For the reasons set forth above, the Lender respectfully requests this Court's emergency consideration at its earliest available hearing or submission time and immediate granting of this Motion to avoid the imminent risk of concealment, dissipation, loss, or diversion of Uncle Nearest's assets, properties, facilities, insurance, and accounts.

## CONCLUSION

48. As a result of the foregoing, this Court should immediately appoint the Receiver with all of the general powers of a court-appointed receiver under applicable law.

49. The Lender respectfully requests that the Receiver be authorized, *inter alia*, to market and sell the assets of Uncle Nearest pursuant to 28 U.S.C. §2001, *et seq.*, and Tennessee Code Annotated § 29-40-101, *et. seq*, subject to application and further Order of this Court.

WHEREFORE, for the reasons set forth above, Plaintiff Farm Credit Mid-America, PCA respectfully requests that this Honorable Court enter an Order appointing the Receiver and for such other relief as is just and proper.

Respectfully submitted,

/s/ Erika R. Barnes
Erika R. Barnes (TN Bar No. 028628)
STITES & HARBISON PLLC
401 Commerce St., Suite 800
Nashville, TN 37219
Telephone: (615) 782-2252
Email: ebarnes@stites.com

- and-

Demetra Liggins (not admitted in Tennessee)
Dairanetta S. Spain (TN Bar No. 039981)
MCGUIREWOODS LLP
Texas Tower
845 Texas Ave., Suite 2400
Houston, TX 77002
Telephone: (713) 353-6661
Email: dliggins@mcguirewoods.com
dspain@mcguirewoods.com

M. Alexandra Shipley (not admitted in Tennessee)
MCGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601
Telephone: (312) 849-8253
Email: ashipley@mcguirewoods.com

*Attorneys for Farm Credit Mid-America, PCA*

Dated: July 28, 2025

**CERTIFICATE OF SERVICE**

I certify that on July 28, 2025, a true and correct copy of the foregoing was served via U.S. Mail and electronic mail upon the following:

Uncle Nearest Real Estate Holdings, LLC
3125 US 231 N
Shelbyville, TN 37160
Attn: Fawn Weaver (fawn.weaver@unclenearest.com)
Keith Weaver (keith.weaver@unclenearest.com)

Fawn Weaver
600 N. Main Street
Shelbyville, TN 38106
fawn.weaver@unclenearest.com

Uncle Nearest, Inc.
Nearest Green Distillery, Inc.
600 N. Main Street
Shelbyville, TN 38106
Attn: Fawn Weaver (fawn.weaver@unclenearest.com)
Keith Weaver (keith.weaver@unclenearest.com)

Keith Weaver
600 N. Main Street
Shelbyville, TN 38106
keith.weaver@unclenearest.com

David Kurzweil
Greenberg Traurig, LLP
Terminus 200
3333 Piedmont Road NE
Suite 2500
Atlanta, GA 30305
kurzweild@gtlaw.com

Brian Patterson
Latham & Watkins LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Brian.patterson@lw.com

Nancy Peterman
Greenberg Traurig, LLP
360 North Green Street
Suite 1300
Chicago, IL 60607
petermann@gtlaw.com

/s/ Erika R. Barnes
Erika R. Barnes