# AMENDMENT NO. 8 TO CREDIT AGREEMENT AND FORBEARANCE AGREEMENT

THIS AMENDMENT NO. 8 TO CREDIT AGREEMENT AND FORBEARANCE AGREEMENT (this "Agreement") dated as of April 15, 2025, is among (a) UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company (together with the Company and Distillery, collectively, the "Borrowers" and each, a "Borrower"), (b) FAWN WEAVER, an individual resident of Tennessee ("Fawn"), and KEITH WEAVER, an individual resident of Tennessee (together with Fawn, collectively, the "Credit Support Parties" and each, a "Credit Support Party"), (c) FARM CREDIT MID-AMERICA, PCA, in its capacity as administrative agent (in such capacity, the "Administrative Agent"), and (d) each of the Lenders (as defined below) party hereto.

## RECITALS:

A. The Borrowers, the lenders party thereto (collectively, the "Lenders") and the Administrative Agent have entered into that certain Credit Agreement dated as of July 22, 2022 (as amended, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement (as defined below).

B. Certain Events of Default identified on Exhibit A hereto (collectively, the "Specified Defaults") have occurred and are continuing.

C. As a result of the Specified Defaults, the Administrative Agent has the right to exercise all rights and remedies available to it under the Credit Agreement, the other Loan Documents and applicable Law.

D. The Credit Support Parties have indicated to the Administrative Agent that they, or an Affiliate of one or more of the Credit Support Parties or the Borrowers, will provide one or more subordinated loans to one or more of the Borrowers.

E. In connection with such proposal to provide subordinated loans, the Borrowers have requested that the Administrative Agent and the Lenders (i) forbear from the exercise of their respective rights and remedies under the Credit Agreement, the other Loan Documents and applicable Law on account of the Specified Defaults and (ii) agree to make certain amendments to the Existing Credit Agreement, as more particularly set forth below.

F. The Administrative Agent and the Lenders have agreed to (i) forbear from the exercise of their rights and remedies under the Credit Agreement, the other Loan Documents and applicable Law on account of the Specified Defaults and (ii) make certain amendments to the Existing Credit Agreement, in each case, in accordance with, and subject to the terms and conditions set forth in, this Agreement.

In furtherance of the foregoing, the parties agree as follows:

EXHIBIT
10

**Section 1. ACKNOWLEDGEMENT AND FORBEARANCE.**

(a) **Specified Defaults**. Each of the Borrowers and the Credit Support Parties hereby acknowledges that each of the Specified Defaults constitutes an Event of Default under the Credit Agreement.

(b) **Acknowledgment of Continuing Defaults**. Each of the Administrative Agent and the Lenders hereby acknowledges the existence of the Specified Defaults. As a result of the Specified Defaults, pursuant to Section 8.2 of the Credit Agreement, each of the Borrowers and the Credit Support Parties acknowledges and agrees that the Administrative Agent and the Lenders are not required to make any Loan available to the Borrowers, that any Loans made by the Administrative Agent or the Lenders on or after the date of the Specified Defaults are made as an accommodation only and that the same do not constitute nor shall be deemed to constitute (i) a waiver by the Administrative Agent or any Lender of any rights or remedies under the Credit Agreement or the other Loan Documents, at law or in equity, or (ii) an establishment of a course of dealing or course of conduct. With respect to each Specified Default, each of the Borrowers and the Credit Support Parties hereby acknowledges that: (i) each such Specified Default shall remain an Event of Default until such time, if any, as the Administrative Agent and the Lenders waive such Event of Default in accordance with the terms of the Credit Agreement; (ii) each such Specified Default is continuing and has not been waived by virtue of any previous actions (or failures to act) by the Administrative Agent or any of the Lenders through any course of conduct or course of dealing or otherwise; and (iii) subject to the provisions of Section 1(e) below, as a result of the existence of each such Specified Default, the Administrative Agent has the right to, among other things, (A) immediately terminate the Borrowers' rights to request any additional extensions of credit, if applicable, from the Administrative Agent and the Lenders, (B) declare the Loans (with accrued interest thereon) and all other Obligations to be immediately due and payable and (C) exercise any and all other rights and remedies available to the Administrative Agent and the Lenders under the Credit Agreement, the other Loan Documents and applicable Law.

(c) **Acknowledgment of Obligations**. Each of the Borrowers and the Credit Support Parties acknowledges and agrees that (i) as of the date hereof, the aggregate principal balance of the outstanding Obligations under the Credit Agreement is at least $102,278,182.84, exclusive of interest, fees, expenses and other amounts that are chargeable or otherwise reimbursable under the Credit Agreement and the other Loan Documents, and (ii) all Obligations, together with interest accrued and accruing thereon, and fees, costs, expenses and other charges now or hereafter payable by the Loan Parties to the Administrative Agent and the Lenders in accordance with the Credit Agreement and the other Loan Documents, are unconditionally owing by the Loan Parties, all without offset, defense or counterclaim of any kind, nature or description whatsoever.

(d) **Acknowledgment of Liens and Binding Effect of Documents**. Each of the Borrowers and the Credit Support Parties hereby acknowledges, confirms and agrees that: (i) the Administrative Agent has and shall continue to have, valid, enforceable and perfected, first priority (or, solely in respect of the Dan Call Farm Property, second priority solely as a result of the existence of any Liens expressly permitted under the Credit Agreement to be of higher priority thereon) Liens upon and security interests in the Collateral heretofore granted by the Borrowers and Credit Support Parties to the Administrative Agent; (ii) each of the Loan Documents to which it/he/she is a party has been duly executed and delivered to the Administrative Agent, and each is in full force and effect as of the date hereof; (iii) the agreements and obligations of such Borrower or such Credit Support Party contained in the Loan Documents and in this Agreement constitute the legal, valid and binding obligations of such Borrower or such Credit Support Party, enforceable against it/him/her in accordance with their respective terms, subject to bankruptcy, insolvency, Debtor Relief Laws, and similar laws affecting the enforceability of creditor's rights generally and to general principles of equity, and such Borrower or Credit Support Party does not have any valid

defense to the enforcement of such agreements or obligations; and (iv) the Administrative Agent and the Lenders are and shall be entitled to the rights, remedies and benefits provided for them in the Loan Documents and under applicable Law.

(e) **Forbearance Period**. The Administrative Agent agrees that until the expiration or termination of the Forbearance Period (as defined herein), it will forbear from exercising its rights and remedies under the Loan Documents against the Borrowers and the Credit Support Parties solely with respect to the Specified Defaults. As used herein, the term "Forbearance Period" shall mean the period beginning on the Effective Date and ending on the earlier to occur of any of the following (the occurrence of either of the following clauses (i) or (ii) being a "Forbearance Termination Event"): (i) the occurrence of any Forbearance Default (as defined herein); or (ii) May 30, 2025; provided, that, (1) to the extent that no Forbearance Default has occurred on or before May 30, 2025, and the Company is pursuing in good faith one or more Acceptable Transactions (as defined below), the Forbearance Period shall be automatically extended to July 29, 2025, (2) to the extent no Forbearance Default has occurred on or before July 29, 2025, and the Company is pursuing in good faith one or more Acceptable Transactions, the Forbearance Period shall be automatically extended to September 29, 2025, and (3) to the extent no Forbearance Default has occurred as of September 29, 2025, and the Company is pursuing in good faith one or more Acceptable Transactions, the Forbearance Period shall be automatically extended to November 26, 2025. As used herein, the term "Forbearance Default" shall mean (A) the occurrence of any Event of Default other than any of the Specified Defaults, (B) the failure of the Borrowers or the Credit Support Parties to comply timely with any term, condition or covenant set forth in this Agreement (it being understood that, notwithstanding any provision in the Credit Agreement to the contrary, no cure or grace period shall apply to any provision of this Agreement unless specifically set forth in the applicable provision hereof), including, without limitation any Forbearance Covenant or any Forbearance Milestone (as each term is defined herein), (C) the failure of any representation or warranty made by any of the Borrowers or the Credit Support Parties under or in connection with this Agreement to be true and complete in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) as of the date when made, or (D) the repudiation and/or assertion of any defense by any of the Borrowers or the Credit Support Parties with respect to this Agreement, the Credit Agreement or any other Loan Document or the pursuit of any claim by any of the Borrowers or any of the Credit Support Parties against the Administrative Agent, any Lender or any Lender Party Released Person (as defined herein); provided, that to the extent a Forbearance Default would otherwise occur under the foregoing subpart (A) as a result of any Event of Default occurring prior to the Effective Date (i) of which any Loan Party, any Credit Support Party, or Affiliate thereof gains knowledge after the Effective Date and (ii) is discovered in the course of, and occurred as a direct result of the events that are the subject matter of, the investigation currently being conducted by Kroll, LLC and Duane Morris LLP, the Borrowers shall provide written notice of such Event of Default to the Administrative Agent within three (3) calendar days of the discovery thereof, and within five (5) calendar days after the receipt of such written notice, the Administrative Agent shall provide a determination, in the exercise of its reasonable discretion, in writing (including by electronic mail) to the Borrowers as to whether Exhibit A shall be deemed amended to include such Event of Default as a Specified Default for all purposes under this Agreement. Any Forbearance Default shall constitute an immediate Event of Default under the Credit Agreement and the other Loan Documents.

(f) **Occurrence of Forbearance Termination Event**. Upon the occurrence of a Forbearance Termination Event, the agreement of the Administrative Agent to forbear from exercising its rights and remedies with respect to the Specified Defaults shall immediately and automatically terminate, without any requirement of any demand, presentment, protest, or notice of any kind, all of which demand, presentment, protest, or notice each of the Borrowers and the Credit Support Parties hereby waives. Each of the Borrowers and the Credit Support Parties agrees that the Administrative Agent may at any time after the occurrence of a Forbearance Termination Event proceed to exercise any and all of its rights and remedies

under any or all of the Credit Agreement, any other Loan Document and/or applicable Law, including its rights and remedies with respect to the Specified Defaults.

(g) **Acknowledgements Regarding Forbearance**. Each of the Borrowers and the Credit Support Parties hereby acknowledges and agrees that the Administrative Agent and the Lenders have not made any assurances concerning (i) the manner in which or whether the Specified Defaults may be resolved, or (ii) any additional forbearance, waiver, restructuring or other accommodations. Each of the Borrowers and the Credit Support Parties hereby acknowledges and agrees that the running of all statutes of limitation and the doctrine of laches applicable to all claims or causes of action that the Administrative Agent or any Lender may be entitled to take or bring in order to enforce any of their respective rights and/or remedies against any one or more of the Borrowers and/or the Credit Support Parties are, to the fullest extent permitted by applicable Law, tolled and suspended during the Forbearance Period.

(h) **No Restricted Payments, Etc.** For the avoidance of doubt, during the Forbearance Period, no Borrower may make any Restricted Payment or take any action that is only permitted to be taken under the Credit Agreement if a Default or Event of Default has not occurred.

(i) **Financial Covenants During Forbearance Period**. During the Forbearance Period, the Borrowers shall not be required to comply with the financial covenants set forth in Section 7.11 of the Credit Agreement. For the avoidance of doubt, during the Forbearance Period, the Borrowers shall continue to submit Compliance Certificates setting forth the calculations of such financial covenants as required by Section 6.2(a) of the Credit Agreement and continue to comply with all other covenants set forth in the Loan Documents.

**Section 2. FORBEARANCE PERIOD MILESTONES AND COVENANTS.**

(a) **Forbearance Period Milestones**. During the Forbearance Period, the Borrowers shall comply with the following milestones within the time period set forth below (each milestone set forth below, a "Forbearance Milestone"), which Forbearance Milestones may be extended in writing by the Administrative Agent in its sole discretion, and each Borrower acknowledges and agrees that any failure to comply with any Forbearance Milestone shall constitute an immediate Event of Default:

(i) No later than 14 days following the Effective Date, the Borrowers shall have satisfied, or caused all applicable Subsidiaries to have satisfied, the obligations set forth in Section 6.12 of the Credit Agreement with respect to all Subsidiaries, including, without limitation, S1 Organic Vodka, LLC, UN House MV LLC, Dan Call Farm, Inc., Domaine D'Anatole, S.A.S, Domaine D'Anatole, Inc., and Uncle Nearest Ventures, LLC.

(ii) No later than 14 days following the Effective Date, the Loan Parties shall have satisfied, or confirmed to the Administrative Agent the satisfaction of, the Loan Parties' obligations under the Security Agreement and the Pledge Agreement, including, without limitation, the obligations set forth in Section 3(d) and Section 9(j) of the Security Agreement.

(iii) No later than 14 days following the Effective Date, the Administrative Agent shall have received a duly executed and completed perfection certificate, in form and substance satisfactory to the Administrative Agent.

(iv) No later than 14 days following the Effective Date, the Borrowers shall deliver to the Administrative Agent executed Lien Waivers, in form and substance

satisfactory to the Administrative Agent, with respect to (A) any personal property Collateral located on lease premises or premises subject to a mortgage, (B) any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, (C) any material Collateral held by a repairman, mechanic or bailee, and (D) any Collateral subject to a licensor's intellectual property rights.

(v) No later than 14 days following the Effective Date, the Borrowers shall deliver to the Administrative Agent duly executed control agreement(s), in form and substance reasonably satisfactory to the Administrative Agent, in favor of the Administrative Agent with respect to all of the Borrowers' Deposit Accounts (as such term is defined in the Security Agreement).

(vi) No later than 60 days following the Effective Date and no later than each 60th day thereafter until the consummation of one or more Acceptable Transactions (as such term is defined below), the Company shall have:

(A) received cash proceeds in an aggregate principal amount equal to $10,000,000 of (w) Subordinated Debt (which, for the avoidance of doubt, shall not include the Pre-Effective Date Subordinated Debt Advances or the Amendment No. 8 Effective Date Paydown), (x) an issuance of common Equity Interests of the Company, (y) other Indebtedness, on terms and conditions acceptable to the Administrative Agent (including, without limitation, an executed subordination and intercreditor agreement on terms and conditions acceptable to the Administrative Agent) and consented to in writing by the Administrative Agent ("Approved Repayment Indebtedness"), or (z) a combination of any of the foregoing in clauses (w)-(y); and

(B) (x) complied with the requirements of Section 2.3(b)(v) or Section 2.3(b)(vi) of the Credit Agreement (as amended hereby), as applicable, with respect to any such Subordinated Debt or issuance of Equity Interests (including any proceeds of such Subordinated Debt or issuance of Equity Interests in excess of $10,000,000) and/or (y) made a payment to the Administrative Agent equal to one hundred percent (100%) of the proceeds of any such Approved Repayment Indebtedness (including any proceeds of such Indebtedness in excess of $10,000,000), which shall be applied to the Obligations in such manner as the Administrative Agent shall elect in its sole discretion.

(vii) No later than April 18, 2025, the Borrowers shall deliver a certificate of each Borrower signed by a Senior Officer of such Borrower certifying and attaching the resolutions adopted by the board of directors (or other equivalent governing body) of such Borrower authorizing and approving this Agreement and the amendments and other agreements contemplated hereby.

(viii) No later than April 25, 2025, the Administrative Agent shall have received resolutions adopted by the board of directors of the Company appointing one (1) Independent Director (as defined herein) to the board of directors of the Company at all times from and after the Effective Date. The Administrative Agent shall have the right to consent to the identity of the Independent Director and the terms and conditions of their appointment; provided, that consent shall not be unreasonably

withheld. Each of the Administrative Agent, on the one hand, and the Borrowers, on the other, shall use reasonable best efforts to timely meet with Independent Director candidates put forth by the other party at a mutually agreeable date and time. Candidates for Independent Director shall not be entitled to receive confidential information of the Company without first executing a non-disclosure agreement containing terms acceptable to the Company. Notwithstanding anything in this Agreement to the contrary, the Administrative Agent and Lenders may, in the exercise of their reasonable discretion, extend the milestone set forth in this Section 2(a)(viii). The Independent Director shall (A) remain on the Company's board of directors until the Facility Termination Date, and shall only be removed for "cause", and (B) be required for quorum purposes in addition to any other requirement for a quorum under the Company's Organization Documents. In the event that the Independent Director shall resign, die, become legally incompetent or otherwise be removed for "cause", the Company shall (A) promptly notify the Administrative Agent of such vacancy, and (B) select and cause a replacement Independent Director acceptable, and on terms and conditions acceptable, to the Administrative Agent and Lenders to be appointed to the Company's board of directors within thirty (30) days after the date of such occurrence. The Company shall give the Independent Director notice of not less than forty-eight (48) hours prior to any meeting of the board of directors, including any meeting to be held in executive session and any meeting by a committee of the board, and promptly deliver to the Independent Director any materials to be presented or discussed at any such meeting or session and permit the Independent Director to participate in any such meeting or session telephonically. As used herein, the term "Independent Director" shall mean an independent and disinterested Person that (i) is not an employee or Affiliate of the Administrative Agent, any Lender, any Borrower, including, without limitation, the Company, any other Loan Party, any Permitted Investor or other investor or of any Affiliate of any thereof (each, an "Interested Party" and collectively, the "Interested Parties"), (ii) does not have any material business or close personal relationships or any history of any material business or close personal relationships with any Interested Party or any member of senior management of any Loan Party, (iii) does not presently serve, and has not within the last year served, on the board of directors of a competing spirits company, and (iv) has qualifications necessary, with respect to experience (including restructuring experience, spirits industry experience, and having previously served on a board of directors or comparable body), educational background and integrity, to serve as a member of the board of directors of the Company. For the avoidance of doubt, the Loan Parties and the Administrative Agent acknowledge and agree that no individual appointed to the board of directors of any Loan Party or any of their Affiliates prior to April 14, 2025, shall constitute an "Independent Director" for purposes of this Agreement.

(b) **Forbearance Period Covenants**. During the Forbearance Period, the Borrowers shall comply with the following additional covenants (each a "Forbearance Covenant") and acknowledge and agree that failure to comply with any Forbearance Covenant shall constitute an immediate Event of Default (for the avoidance of doubt, the Borrowers shall continue to be required to comply with all covenants set forth in the Credit Agreement during the Forbearance Period):

(i) Cash Flow Budget.

(A) As more fully described and defined in Section 5(e) below, on or before the Effective Date, the Borrowers shall have delivered the Initial Cash Flow Budget for the 4-week period immediately following the Effective Date, in form and substance acceptable to the Administrative Agent.

(B) The Initial Cash Flow Budget will remain in effect until the approval of a subsequent Proposed Cash Flow Budget in accordance with Section Section 2(b)(i)(E) below. Whichever budget is then in effect, whether the Initial Cash Flow Budget or a subsequent Approved Cash Flow Budget, will be referred to herein as the "Prevailing Cash Flow Budget."

(C) On the first (1st) Business Day after four calendar weeks of operation under the then Prevailing Cash Flow Budget, the Borrowers shall deliver to the Administrative Agent a revised weekly forecast of consolidated cash flows of the Borrower and its Subsidiaries, in form and detail satisfactory to the Administrative Agent, prepared by the Borrowers for the 13-week period immediately following the date of submission (the "Proposed Cash Flow Budget").

(D) The first Proposed Cash Flow Budget and all future iterations shall include, among other things, a categorization of accounts payable as follows: (i) accounts payable owed to vendors that will continue to provide services for the Company and that the Company will pay in the ordinary course ("Continuing Vendors"), (ii) accounts payable owed to vendors that have entered into payment plans with the Company and have either past due accounts payable or that will not continue to provide services to the Company ("Payment Plan Vendors"), (iii) accounts payable that appear invalid, are not directly related to the continued operation of the Company, will not be paid, or for which payment will be delayed during the forbearance period ("On Hold Vendors").

(E) The Administrative Agent shall have two (2) Business Days from receipt of the Proposed Cash Flow Budget to approve the Proposed Cash Flow Budget (such approval to not be unreasonably withheld, conditioned or delayed) (such approved Proposed Cash Flow Budget, the "Approved Cash Flow Budget"); provided that, if such Proposed Cash Flow Budget is not approved by the Administrative Agent, the then Prevailing Cash Flow Budget would remain in effect until the Borrowers submit a revised, updated Proposed Cash Flow Budget in form and detail satisfactory to the Administrative Agent.

(ii) Weekly Cash Flow Reporting.

(A) From and after the Effective Date, no later than 5:00 p.m. Eastern time on the second (2nd) Business Day of each calendar week, the Borrowers shall deliver to the Administrative Agent, in form and detail satisfactory to the

Administrative Agent, a weekly reporting package (the "Reporting Package") detailing, at a minimum:

(1) Reconciliation of actual cash receipts and disbursements against the Prevailing Cash Flow Budget for the immediately preceding calendar week, including a narrative explanation of any variance of 10% or more in any line item category;

(2) Reconciliation of cumulative actual cash receipts and disbursements against the Prevailing Cash Flow Budget from the effective date of the Prevailing Cash Flow Budget through the immediately preceding calendar week ("Cumulative Cash Variance"), including a narrative explanation of any variance of 10% or more in any line item category;

(3) Beginning with the first Approved Cash Flow Budget and future iterations of the same, line item, account level, detail on accounts payable as of the end of the immediately preceding calendar week, in form and detail satisfactory to the Administrative Agent, including sufficient detail on balances and payments with respect to (i) Continuing Vendors, (ii) Payment Plan Vendors, and (iii) On Hold Vendors;

(4) Line item, account level, detail on any accounts receivable as of the end of the immediately preceding calendar week, in form and detail satisfactory to the Administrative Agent, including a narrative explanation for any account greater than thirty (30) days past due; and

(5) Any such additional information or reconciliations as the Administrative Agent may reasonably request.

(B) For the avoidance of doubt, any additional reporting or disclosure requirements set forth herein, including, without limitation, delivery of the Reporting Package, shall be additional requirements to all existing reporting and disclosure requirements set forth in the Credit Agreement, including, without limitation, the covenants set forth in Section 6.1 and Section 6.2 of the Credit Agreement, and nothing herein shall modify any such existing reporting and disclosure requirements.

(C) For the avoidance of doubt, the Borrowing Base Certificate delivered in accordance with Section 6.2(c) no later than 25 days after the last day of each calendar month shall be accompanied by supporting materials as the Administrative Agent reasonably requests, including, without limitation, weekly reporting of rolling forward accounts receivable data by reporting weekly sales, cash collections and credits, monthly reporting of gross inventory, inventory ineligibles and accounts receivable ineligibles, an itemized inventory listing with location, a report from Tennessee Distilling Group, LLC ("TDG") reflecting the amount and identification of barreled spirits stored with TDG, a report reflecting the amount and identification

of barreled spirits stored at the Distillery, and a report reflecting the amount and identification of barrels purchased from WhistlePig.

(D) Beginning with the first Approved Cash Flow Budget and future iterations of the same, the Borrowers shall, as of any test date (as more fully described below in Section 2(b)(ii)(E)), (i) not permit any accounts payable owed to Continuing Vendors to be more than 30 days past due, (ii) pay all accounts payable in accordance with the payment plans agreed to with all Payment Plan Vendors, and (iii) not permit any payment of accounts payable to On Hold Vendors.

(E) With respect to the Cumulative Cash Variance, the Borrowers shall not permit, as of any test date (as more fully described below), (i) the aggregate amount of actual disbursements to exceed 115% of the aggregate amount forecasted for disbursements in the Initial Cash Flow Budget, and 110% of the aggregate amount forecasted for disbursements in any subsequent Approved Cash Flow Budget, and (ii) the aggregate amount of actual receipts to be less than eighty five percent (85%) of the aggregate amount forecasted for receipts, in each case, as set forth in the Prevailing Cash Flow Budget for the appliable period. Compliance with the requirements of this Section 2(b)(ii)(E) shall be tested every week (and on the last day of each such week) on a cumulative basis, commencing with the first full week after the Effective Date and an Event of Default shall occur upon the failure to comply with the requirements of this Section 2(b)(ii)(E) for two (2) consecutive weeks; provided, that, any favorable variance in the aggregate amount of receipts or disbursements as reflected in the Cumulative Cash Variance may be carried forward only until the next Prevailing Cash Flow Budget; and

(F) No later than 5:00 p.m. Eastern time on the third (3rd) Business Day of each calendar week (or otherwise at the reasonable request of the Administrative Agent), the Borrowers shall (at a time to be mutually agreed and which may be waived by the Administrative Agent), cause any Person assisting with preparation of any financial reporting, budgeting, or Reporting Package for the Borrowers and appropriate members of their management to participate in a conference call or videoconference with the Administrative Agent, the Lenders, and their respective financial advisors to discuss, among other things: (i) the form, substance, and content of the Reporting Package; (ii) operational and financial performance; (iii) Dispositions, refinancing or other Acceptable Transaction process; (iv) any proposed refinancing transactions or proposals or offers with respect thereto, and performance and projections of the Borrowers' business, cash flows, equity and/or debt capital raise; and (v) such other business matters relating to the Loan Parties as the Administrative Agent may reasonably request.

(iii) Maximum Barrel Conversion. The Company shall not permit the conversion of more than 500 barrels of spirits to bottles or to cases in any calendar month (the "Maximum Conversion Amount"); provided, that, to the extent that fewer than 500 barrels are converted in any calendar month, in the immediately following calendar month, the Maximum Conversion Amount shall increase to the sum of

(x) 500 barrels, and (y) the difference of 500 barrels and the barrels actually converted in the prior calendar month. Notwithstanding anything to the contrary herein, the Maximum Conversion Amount at any time from and after the Effective Date shall not include any production orders in existence prior to the Effective Date. To the extent the Company contemplates any additional conversions in excess of the Maximum Conversion Amount, the Company shall provide a request in writing (including by electronic mail) to the Administrative Agent for consent to such additional conversions and provide a detailed description of the proposed additional conversions (including the amount thereof) and, within five (5) calendar days after the receipt of such written request, the Administrative Agent shall provide in writing (including by electronic mail) its consent or rejection to the proposed additional conversions, in the exercise of its reasonable discretion, in writing (including by electronic mail).

(iv) Minimum Liquidity. The Borrowers shall not permit the amount of cash and Cash Equivalents, in the aggregate, held by the Loan Parties ("Liquidity") to be less than $1,500,000 at any time.

(v) No Borrower shall, nor shall it permit any Subsidiary thereof to, directly or indirectly, permit the aggregate compensation, including, without limitation, all base pay, bonuses, fees and other similar or comparable items, paid to the Permitted Investors, collectively, exceed $7,917 per calendar month (which on an annualized basis would be $95,000 per calendar year) during the Forbearance Period.

(vi) With respect to any single financial advisor engaged by the Administrative Agent (or by counsel to the Administrative Agent), for the benefit of itself and the Lenders (the "Lender Financial Advisor"), the Borrowers shall, and shall cause each of the other Loan Parties and their Subsidiaries to, comply with Section 6.10 of the Credit Agreement, including, without limitation, the obligations to (A) permit the Lender Financial Advisor to visit and inspect any of their properties, to audit and appraise the Collateral, to examine their corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss their affairs, finances and accounts with their directors, officers, and independent public accountants, all at any time during normal business hours and as often as may be reasonably desired without advance notice; provided, that, for the duration of the Forbearance Period, "normal business hours" shall mean between 9:00 a.m. and 5:00 p.m. Eastern time, Monday through Friday, excluding federally recognized holidays, and (B) reimburse the Administrative Agent promptly upon demand for the reasonable and documented out-of-pocket fees and expenses incurred by the Administrative Agent pursuant to the engagement of the Lender Financial Advisor.

(vii) From and after the Effective Date, the Borrowers shall, in good faith, use best efforts to pursue a recapitalization or refinancing transaction or transactions which shall contemplate the occurrence of the Facility Termination Date (each, an "Acceptable Transaction") on or before November 26, 2025, and, in connection with the foregoing, strictly and timely comply with each and every one of the following additional covenants regarding such sale and/or refinancing process:

(A) On or prior to May 23, 2025, deliver to the Administrative Agent and the Lenders a plan, in form and substance acceptable to the Administrative Agent and Lenders, to pursue an Acceptable Transaction, together with such supplemental information as the Administrative Agent may reasonably request.

(B) No later than the fifth (5th) Business Day of each calendar month, in addition to any other required reporting under the Credit Agreement and this Agreement, one or both of the Credit Support Parties shall, at a mutually acceptable date and time, participate in a conference call with the Administrative Agent and its advisors during which the Credit Support Parties shall deliver a presentation detailing the progress made to date with respect to an Acceptable Transaction, which presentation shall be accompanied by (i) written update materials, and (ii) any written indications of interest, letters of intent, or other binding commitment documentation entered with counterparties to an Acceptable Transaction.

**Section 3. AMENDMENTS TO EXISTING CREDIT AGREEMENT.** Subject to the terms and conditions set forth herein and in reliance upon the representations and warranties set forth herein, the Existing Credit Agreement is hereby amended as follows (as so amended, the "Credit Agreement"):

(a) Section 1.1 is hereby amended to add the following new definitions thereto in the appropriate alphabetical order therein:

"Amendment No. 8" means that certain Amendment No. 8 to Credit Agreement and Forbearance Agreement dated as of the Amendment No. 8 Effective Date, among the Borrowers, the Permitted Investors, the Administrative Agent, and the Lenders party thereto.

"Amendment No. 8 Effective Date" means April 15, 2025.

"Amendment No. 8 Effective Date Paydown" has the meaning ascribed thereto in Amendment No. 8.

"Permitted Subordinated Lender" means Grant Sidney Inc.

"Pre-Effective Date Subordinated Debt Advances" has the meaning assigned to such term in the definition of "Subordinated Debt".

"Subordinated Debt" means the unsecured Indebtedness of the Borrowers owing to the Permitted Subordinated Lender pursuant to that certain Subordinated Promissory Note dated as of April 15, 2025 issued by the Borrowers in favor of the Permitted Subordinated Lender in a maximum aggregate principal amount of $51,000,000; provided that (i) the aggregate principal amount of all such Indebtedness shall not exceed, at any time, $51,000,000 (giving effect to any reductions thereof as a result of payments thereon), and (ii) the Borrowers shall have complied with the requirements of Section 2.3(b)(v). The Subordinated Debt shall include (i) the Amendment No. 8 Effective Date Paydown and (ii) all advances made by the Permitted Subordinated Lender at any time prior to the Amendment No. 8 Effective Date, which such advances are in an aggregate outstanding principal amount as of the Amendment No. 8 Effective Date of $12,526,270 (the "Pre-Effective Date Subordinated Debt Advances" which, for the avoidance of doubt, shall exclude the Amendment No. 8 Effective Date Paydown).

"Subordinated Debt Documents" means, collectively, the notes, instruments, documents or other agreements representing or pertaining to any Subordinated Debt, and all other instruments and documents from time to time executed in favor of all or any of the holders of such notes, instruments, documents or other agreements, as the case may be.

"Subordination Agreements" means, collectively, all intercreditor and subordination agreements entered into from time to time between any holders of any Subordinated Debt and the Administrative Agent, each of which shall be in form and substance satisfactory to the Administrative Agent and shall reflect a "deep subordination."

(b) Section 2.3(b)(iv) is hereby amended and restated in its entirety as follows:

(iv) Application of Mandatory Prepayments. Each prepayment of Loans pursuant to the foregoing provisions of this Section 2.3(b) (other than clause (i) and, for the avoidance of doubt, clause (v) and clause (vi) below) shall be applied, first, ratably, to the repayment installments of each of the Term Loans and the RELOC Term Loans (if any) (including the installment due on the respective Maturity Dates therefor) in inverse order of maturity, second, to the outstanding RELOC Loans and third, to the outstanding Revolving Credit Loans (without a corresponding reduction in the aggregate Revolving Credit Commitments). Each prepayment of Loans pursuant to the provisions of Section 2.3(b)(i) shall be applied to the outstanding Revolving Credit Loans (without a corresponding reduction in the aggregate Revolving Credit Commitments).

(c) Section 2.3(b) is hereby amended to include the following new clause (v) and (vi) to the end thereof:

(v) Subordinated Debt. In addition to the foregoing, if any Subordinated Debt (other than the Pre-Effective Date Subordinated Debt Advances) is incurred, immediately after the incurrence thereof, the Borrowers shall make a payment to the Administrative Agent in an amount equal to one hundred percent (100%) of the aggregate principal amount of such Subordinated Debt, which such payment shall be applied by the Administrative Agent to the payment of the Obligations in such manner as the Administrative Agent shall elect in its sole discretion.

(vi) Equity Issuances. In addition to the foregoing, to the extent the Company issues any Equity Interests, immediately after such issuance, the Borrowers shall make a payment to the Administrative Agent in the amount of one hundred percent (100%) of the aggregate proceeds resulting from such issuance of Equity Interests, which such payment shall be applied by the Administrative Agent to the payment of the Obligations in such manner as the Administrative Agent shall elect in its sole discretion.

(d) Section 7.2 is hereby amended to (i) replace the "." at the end of clause (h) therein with "; and" and (ii) insert the following new clause (i) to the end thereof:

(i) the Subordinated Debt so long as it is subject to a Subordination Agreement.

(e) Article VII is hereby amended to add the following new Section 7.14 to the end thereof:

7.14 Restrictions Pertaining to Subordinated Debt.

(a) Amend or modify, or waive any of its rights under, any Subordinated Debt Document, except as expressly permitted by the Subordination Agreement applicable thereto.

(b) Prepay, redeem, repurchase or otherwise acquire for value any Subordinated Debt, or make any principal, interest or other prepayments on any Subordinated Debt, except as expressly permitted by the Subordination Agreement applicable thereto.

(f) Article VII is hereby further amended to add the following new Section 7.15 to the end thereof:

7.15 Compensation. Permit the aggregate compensation, including, without limitation, all base pay, bonuses, fees and other similar or comparable items, paid to the Permitted Investors, collectively, exceed $7,917 per calendar month (which on an annualized basis would be $95,000 per calendar year).

(g) Section 8.1 is hereby amended to add the following new subsection (o) to the end thereof:

(o) Subordinated Debt. Any subordination provision applicable to any Subordinated Debt (including those set forth in the Subordination Agreement applicable thereto) ceases to be in full force and effect; or the Company or any of its Subsidiaries or Affiliates contests in any manner the validity or enforceability of any such provision; or the Company or any of its Subsidiaries or Affiliates breaches any such provision.

The amendments to the Existing Credit Agreement are limited to the extent specifically set forth above and no other terms, covenants or provisions of the Existing Credit Agreement, the Credit Agreement or any other Loan Document is intended to be affected hereby.

**Section 4. ACKNOWLEDGMENT REGARDING DISPOSITIONS OF COLLATERAL.** Without limiting the generality of the provisions of the Credit Agreement (including Section 7.5 therein), each of the Borrowers, the other Loan Parties, and the Credit Support Parties hereby acknowledges and agrees that (a) Dispositions of barreled spirits (pursuant to bulk sales or otherwise) is not permitted under the Credit Agreement and (b) all barreled spirits as to which the Loan Parties have rights are subject to a first priority perfected Lien in favor of the Administrative Agent for the benefit of the Secured Parties. To the extent any such Dispositions are contemplated by the Borrowers or the other Loan Parties, the Company shall notify the Administrative Agent at least three (3) Business Days prior to any contemplated Disposition (or such shorter period as the Administrative Agent shall permit) and provide a detailed description of the proposed Disposition. Any such Disposition shall be subject to the prior written consent of the Administrative Agent and the Required Lenders, which such consent shall be given or withheld in the discretion of the Required Lenders and the Administrative Agent (such consent not to be unreasonably withheld). The provision of any such notice by the Company of a contemplated Disposition of barreled spirts shall in no event constitute the consent of either the Administrative Agent or any Lender to such Disposition or give rise to any obligation of either the Administrative Agent or any Lender to consent thereto.

**Section 5. CONDITIONS PRECEDENT.** The parties hereto agree that this Agreement, the forbearance set forth in Section 1 above and the amendments to the Existing Credit Agreement in Section 3 above shall become effective on the date (such date, the "Effective Date") when the following conditions shall have been satisfied or waived:

(a) **Documentation**. The Administrative Agent shall have received this Agreement, duly executed by each Borrower, each Credit Support Party, the Administrative Agent and the Lenders.

(b) **Evidence of Termination of Liens**. The Administrative Agent shall have received evidence satisfactory to the Administrative Agent of the recorded (if applicable) termination of the UCC-1

financing statement filed with the office of the Delaware Secretary of State in favor of CapStar Bank designated as UCC No. 20227504384.

(c) **Subordinated Debt**. The Administrative Agent shall have received (i) evidence in form and substance satisfactory to the Administrative Agent that one or more of the Borrowers has received the proceeds of the Pre-Effective Date Subordinated Debt Advances (as such term is defined in the Credit Agreement as amended hereby) in an amount of no less than $12,526,270, (ii) true, correct and complete copies of all Subordinated Debt Documents (as such term is defined in the Credit Agreement as amended hereby), and (iii) a duly executed Subordination Agreement with respect to the Subordinated Debt (in each case, as such term is defined in the Credit Agreement, as amended hereby).

(d) **Effective Date Paydown**. The Administrative Agent shall have received the amount of $7,500,000 in immediately available funds (the "Amendment No. 8 Effective Date Paydown"), which shall be applied to the Obligations in such manner as the Administrative Agent shall elect in its sole discretion.

(e) **Cash Flow Budget.** The Administrative Agent shall have received a forecast of consolidated cash flows of the Borrowers and each of their Subsidiaries prepared by the Borrowers in for the 4-week period immediately following the Effective Date, in form and substance acceptable to the Administrative Agent (the "Initial Cash Flow Budget"), including, without limitation, the receipt and use of the proceeds of the Subordinated Debt during such 4-week period.

**Section 6. REPRESENTATIONS AND WARRANTIES.** In order to induce the Administrative Agent and the Lenders party hereto to enter into this Agreement:

(a) Each Borrower represents and warrants to the Administrative Agent and the Lenders party hereto as follows:

(i) The representations and warranties of each Borrower contained in Article V of the Credit Agreement and in each other Loan Document are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) as of such earlier date, and except to the extent the representation and warranty set forth in Section 5.7 of the Credit Agreement relates to the Specified Defaults;

(ii) Except for the Specified Defaults listed on Exhibit A (as may be amended pursuant to the proviso in Section 1(e) of this Agreement), no Default exists on the date hereof immediately prior to or after giving effect to this Agreement and the agreements contemplated hereby; and

(iii) Attached hereto as Exhibit B are true, correct and complete copies of the Subordinated Debt Documents, each of which is in full force and effect and without amendment or modification. As of the Effective Date (and after giving effect to this Agreement), the aggregate outstanding principal amount of the Subordinated Debt is $20,026,270.

(b) Each of the Borrowers and the Credit Support Parties represents and warrants to the Administrative Agent and the Lenders party hereto that this Agreement has been duly authorized (subject to compliance with Section 2(a)(vii) of this Agreement), executed and delivered by it/him/her and constitutes its/his/her legal, valid and binding obligation.

(c) Each of the Credit Support Parties represents and warrants to the Administrative Agent and the Lenders party hereto that, except for the Specified Defaults, to his or her knowledge no Default exists on the date hereof immediately prior to or after giving effect to this Agreement and the agreements contemplated hereby.

**Section 7. FORBEARANCE FEE.** In consideration for the Lenders entering into this Agreement, the Borrowers hereby agree to pay to the Administrative Agent, for the ratable benefit of each Lender party hereto, a fee equal to $700,000 (the "Forbearance Fee"), which Forbearance Fee shall be deemed fully earned as of the Effective Date and due and payable upon the earlier to occur of (a) any Forbearance Termination Event or (b) the Facility Termination Date; provided, that the Lenders shall waive and forgive the Forbearance Fee if, prior to the occurrence of any Forbearance Termination Event, the Facility Termination Date occurs on or before November 26, 2025.

**Section 8. MISCELLANEOUS.**

(a) **Ratification and Confirmation of Loan Documents**. Each Borrower hereby consents, acknowledges and agrees to the agreements set forth herein and hereby confirms and ratifies in all respects the Loan Documents to which such Borrower is a party (including without limitation, the continuation of its payment and performance obligations thereunder and the continuation and extension of the liens granted under the Collateral Documents to secure the Obligations), in each case upon and after the effectiveness of the agreements contemplated hereby.

(b) **Fees and Expenses**. The Borrowers hereby reaffirm their obligations pursuant to Section 10.4 of the Credit Agreement to pay all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent and the Lender Financial Advisor) pursuant to the terms thereof.

(c) **Governing Law; Waiver of Jury Trial**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, and shall be further subject to the provisions of Sections 10.11 and 10.12 of the Credit Agreement.

(d) **Waiver of Right to Object to Riveron as Receiver or Chapter 11 Trustee**. To the extent a case or other proceeding shall be commenced by or against any Borrower, any other Loan Party or any Subsidiary thereof or any Credit Support Party in any court of competent jurisdiction seeking (i) relief under any Debtor Relief Laws, or (ii) the appointment of a trustee, receiver, custodian, liquidator or the like for any Loan Party or any Subsidiary thereof or any Credit Support Party or for all or any substantial part of their respective assets, domestic or foreign, to the extent the Administrative Agent or any Lender file any motion or other pleading seeking to appoint Riveron Consulting, LLC or any of its subsidiaries, Affiliates, or employees (collectively, "Riveron"), as a receiver, trustee, custodian, liquidator or the like in any such proceeding, no Borrower, no other Loan Party, and no Credit Support Parties shall, nor shall any of the foregoing permit any of their respective Subsidiaries or Affiliates to, object to any such motion or pleading on the basis of Riveron's independence or disinterestedness.

(e) **Counterparts**. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(f) **Entire Agreement**. This Agreement, together with all the other Loan Documents (collectively, the "Relevant Documents"), sets forth the entire understanding and agreement of the parties

hereto in relation to the subject matter hereof and supersedes any prior negotiations and agreements among the parties relating to such subject matter. No promise, condition, representation or warranty, express or implied, not set forth in the Relevant Documents shall bind any party hereto, and no such party has relied on any such promise, condition, representation or warranty. Each of the parties hereto acknowledges that, except as otherwise expressly stated in the Relevant Documents, no representations, warranties or commitments, express or implied, have been made by any party to the other. None of the terms or conditions of this Agreement may be changed, modified, waived or canceled orally or otherwise except in a writing and in accordance with Section 10.1 of the Credit Agreement. This Agreement is a Loan Document.

(g) **Severability**. If any provision of this Agreement is held to be illegal, invalid or unenforceable, (i) the legality, validity and enforceability of the remaining provisions of this Agreement shall not be affected or impaired thereby and (ii) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(h) **Successors and Assigns**. This Agreement shall be binding upon and inure to the benefit of each party hereto and their respective successors and assigns (subject to Section 10.6 of the Credit Agreement).

(i) **Release.** For good and valuable consideration, the sufficiency of which is hereby acknowledged, each of the Borrowers, any other Loan Parties, and the Credit Support Parties, on behalf of themselves and each of their Affiliates, hereby voluntarily and knowingly releases and forever discharges the Administrative Agent (and any sub-agent thereof), the Arranger and each Lender, and each Related Party of any of the foregoing Persons (each, a "Lender Party Released Person"), from all possible claims, demands, actions, causes of action, damages, costs, expenses and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law or in equity, originating at any time on or before the Effective Date, that in any way relate to or arise from this Agreement, the Credit Agreement, any other Loan Document, any Loan or any transactions contemplated hereunder or thereunder, which any Borrower or any Credit Support Party may have against any Lender Party Released Person and irrespective of whether or not any such claims arise out of contract, tort, violation of law or regulations, or otherwise, including the exercise of any rights and remedies under this Agreement, the Credit Agreement or any other Loan Document, or the negotiation, execution or implementation of this Agreement, the Credit Agreement or any other Loan Document. This paragraph shall survive the termination of each Loan Document and the repayment, satisfaction or discharge of the Loans and other Obligations.

(j) **Non-Disparagement**. Each of the parties hereto, on behalf of themselves and each of their Affiliates, hereby agrees that from and after the Effective Date, such party, any Affiliates of such party, and any Related Party of such party, shall not directly or indirectly anywhere in the world disparage, discredit, defame, libel or slander any other party, any other party's Affiliates, any other party's Related Parties, or any other party's businesses, services, reputations, or prospects, or its past or present officers, directors, employees, attorneys or agents. The foregoing shall not be deemed to be violated by truthful statements made pursuant to any legal process, required governmental testimony or filings, or administrative or arbitral proceedings (including depositions in connection with such proceedings).

***[Remainder of Page Intentionally Left Blank; Signature Pages Follow]***

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 8 to Credit Agreement and Forbearance Agreement to be executed by their duly authorized officers, all as of the date and year first written above.

**BORROWERS:**

**UNCLE NEAREST, INC.**

DocuSigned by:
By: FAWN WEAVER
8DC5934F0902430...
Name: Fawn Weaver
Title: President and Secretary

**NEAREST GREEN DISTILLERY, INC.**

DocuSigned by:
By: FAWN WEAVER
8DC5934F0902430...
Name: Fawn Weaver
Title: President and Secretary

**UNCLE NEAREST REAL ESTATE HOLDINGS, LLC**

By: Uncle Nearest, Inc., its Member

DocuSigned by:
By: FAWN WEAVER
8DC5934F0902430...
Name: Fawn Weaver
Title: President and Secretary

**CREDIT SUPPORT PARTIES:**

DocuSigned by:
FAWN WEAVER
8DC5934F0902430...
Fawn Weaver, individually

________________________________
Keith Weaver, individually

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 8 to Credit Agreement and Forbearance Agreement to be executed by their duly authorized officers, all as of the date and year first written above.

**BORROWERS:**

**UNCLE NEAREST, INC.**

By:________________________________
Name: Fawn Weaver
Title: President and Secretary

**NEAREST GREEN DISTILLERY, INC.**

By:________________________________
Name: Fawn Weaver
Title: President and Secretary

**UNCLE NEAREST REAL ESTATE HOLDINGS, LLC**

By: Uncle Nearest, Inc., its Member

By:________________________________
Name: Fawn Weaver
Title: President and Secretary

**CREDIT SUPPORT PARTIES:**

________________________________
Fawn Weaver, individually

Signed by:
Keith Weaver
4DE05F18EE5C40E...
________________________________
Keith Weaver, individually

Docusign Envelope ID: AC67D66C-C76C-4F94-87C1-7C135AA8D81E

**ADMINISTRATIVE AGENT / LENDERS:**

**FARM CREDIT MID-AMERICA, PCA**,
as Administrative Agent and a Lender

Signed by:
By: Brian Klatt
90B94385A8674DA...
Name: Brian Klatt
Title: Managing Director Food & Agribusiness

## EXHIBIT A

## Specified Events of Default

Events of Default arising under Section 8.1 of the Credit Agreement as a result of:

1. One or more of the Loan Parties' failure to timely prepay Revolving Credit Loans as a result of the Total Revolving Credit Outstandings exceeding the Maximum Revolving Borrowing Amount at various times prior to the date hereof, as required by Section 2.3(b)(i).

2. One or more of the Loan Parties' failure to timely pay interest on the Loans as required by Section 2.6(c) on the Interest Payment Dates occurring on January 2, 2024, July 2, 2024, October 1, 2024, January 1, 2025, February 1, 2025, and April 1, 2025.

3. One or more of the Loan Parties' failure to timely pay the quarterly installment payments on the aggregate principal amount of all Term Loans outstanding as required by Section 2.5(b) on October 1, 2024, January 1, 2025, and April 1, 2025.

4. One or more of the Loan Parties' failure to timely deliver monthly financial statements required by Section 6.1(b) for one or more months from July 2022 through March 2025.

5. One or more of the Loan Parties' failure to timely deliver the annual business plan required by Section 6.1(c) for the fiscal years ended December 31, 2023, and December 31, 2024.

6. One or more of the Loan Parties' failure to timely deliver compliance certificates required by Section 6.2(a) for one or more months from July 2022 through March 2025.

7. One or more of the Loan Parties' failure to timely deliver Borrowing Base Certificates required by Section 6.2(c) for one or more months from July 2022 through March 2025.

8. One or more of the Loan Parties' failure to timely deliver the report summarizing the Borrowers' insurance coverage required by Section 6.2(d).

9. One or more of the Loan Parties' failure to adequately respond to requests for information set forth in that certain letter from the Administrative Agent to the Borrowers dated as of January 12, 2024, as required by Section 6.2(h).

10. One or more of the Loan Parties' failure to timely give notice as required by Section 6.3(b).

11. One or more of the Loan Parties' failure to observe the covenant set forth in Section 6.9.

12. One or more of the Loan Parties' failure to maintain a minimum Consolidated Tangible Net Worth of no less than $100,000,000 at all times during the period from December 31, 2023, through December 30, 2024, as required by Section 7.11(a).

13. One or more of the Loan Parties' failure to maintain a minimum Consolidated Tangible Net Worth of no less than $122,000,000 at all times during the period from December 31, 2024, through the date hereof, as required by Section 7.11(a).

14. One or more of the Loan Parties' failure to maintain a Consolidated Net Income of no less than $1.00 for each calendar month during the period commencing December 1, 2023, through January 31, 2025, as required by Section 7.11(b).

15. One or more of the Loan Parties' failure to observe the covenant set forth in Section 7.5 of the Credit Agreement as a result of one or more Loan Parties' Dispositions of property not permitted by Section 7.5, including, without limitation, any bulk sales or other sales of barreled spirits.

16. One or more of the Loan Parties' failure to timely prepay, as required by Section 2.3(b)(ii), an aggregate principal amount of Loans equal to 100% of Net Cash Proceeds realized by the Borrowers as a result of the Borrowers' Dispositions of property of any Loan Party or any of its Subsidiaries (other than any Disposition of any property permitted by any of clauses (a) through (h) of Section 7.5).

17. One or more of the Loan Parties' failure to observe the covenant set forth in Section 6.12.

18. One or more of the Loan Parties' failure to observe the covenant set forth in Section 7.1.

19. One or more of the Loan Parties' failure to observe the covenant in Section 7.2 as a result of the unsecured Indebtedness incurred by the Borrowers to Grant Sidney Inc. pursuant to the Subordinated Debt Documents.

20. Entry of a final judgment against one or more Loan Parties in an aggregate amount exceeding $250,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of the potential claim and does not dispute coverage) and a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect.

**EXHIBIT B**

**Subordinated Debt Documents**

*See attached.*

*Execution Version*

THIS AGREEMENT OR INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN INTERCREDITOR AND SUBORDINATION AGREEMENT DATED AS OF APRIL 15, 2025, BETWEEN FARM CREDIT MID-AMERICA, PCA AND THE SUBORDINATED CREDITORS PARTY THERETO (INCLUDING GRANT SIDNEY INC.) (AS AMENDED, THE "SUBORDINATION AGREEMENT") TO THE "SENIOR DEBT" (AS DEFINED IN THE SUBORDINATION AGREEMENT), AND EACH PARTY TO OR HOLDER OF THIS AGREEMENT OR INSTRUMENT, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.

---

**SUBORDINATED CREDIT AGREEMENT**

DATED AS OF April 15, 2025

among

UNCLE NEAREST, INC.,
NEAREST GREEN DISTILLERY, INC.
and
UNCLE NEAREST REAL ESTATE HOLDINGS, LLC
collectively, as Borrower,

and

THE LENDERS FROM TIME TO TIME PARTY HERETO,
collectively, as Lender

---

TABLE OF CONTENTS

Page

**SECTION 1.** DEFINITIONS ..... 1

1.1 Definitions ..... 1
1.2 Rules of Construction. ..... 8

**SECTION 2.** AMOUNTS AND TERMS OF LOANS ..... 9

2.1 Making of Loans; Promise to Pay. ..... 9
2.2 Interest. ..... 9
2.3 Expenses and Attorneys' Fees. ..... 11
2.4 Payments. ..... 11
2.5 Prepayments ..... 11
2.6 Maturity ..... 11

**SECTION 3.** CONDITIONS TO LOANS ..... 12

3.1 Conditions to Initial Term Loans ..... 12
3.2 Conditions to All Loans ..... 12

**SECTION 4.** REPRESENTATIONS AND WARRANTIES ..... 13

4.1 Organization, Powers and Good Standing ..... 13
4.2 No Conflict. ..... 13
4.3 Use of Proceeds ..... 13
4.4 Compliance with Laws ..... 13
4.5 Taxes and Tax Returns. ..... 13

**SECTION 5.** AFFIRMATIVE COVENANTS ..... 14

5.1 Compliance With Laws and Contractual Obligations ..... 14
5.2 Organizational Existence ..... 14
5.3 Payment of Taxes ..... 14

**SECTION 6.** DEFAULT, RIGHTS AND REMEDIES ..... 14

6.1 Event of Default ..... 14
6.2 Suspension or Termination of Commitment to Make Loans ..... 15
6.3 Acceleration and other Remedies ..... 15
6.4 Performance by the Lender ..... 15
6.5 Application of Proceeds ..... 16

**SECTION 7.** ASSIGNMENT AND PARTICIPATION ..... 16

7.1 Assignment and Participations ..... 16

**SECTION 8.** MISCELLANEOUS ..... 16

8.1 Indemnities ..... 16

8.2 Amendments and Waivers ........ 16
8.3 Notices ........ 17
8.4 Failure or Indulgence Not Waiver; Remedies Cumulative ........ 17
8.5 Payments Set Aside ........ 17
8.6 Severability ........ 18
8.7 Headings. ........ 18
8.8 Applicable Law ........ 18
8.9 Successors and Assigns. ........ 18
8.10 Construction. ........ 18
8.11 Consent to Jurisdiction.. ........ 18
8.12 Waiver of Jury Trial ........ 18
8.13 Survival of Warranties and Certain Agreements ........ 19
8.14 Entire Agreement ........ 19
8.15 Counterparts; Effectiveness ........ 19
8.16 Subordination of Intercompany Debt. ........ 19
8.17 Joint and Several Liability ........ 20
8.18 Subordination ........ 20

INDEX OF APPENDICES


Exhibits

| | | |
|---|---|---|
| Exhibit A | - | Form of Notice of Borrowing |
| Exhibit B | - | Form of Initial Term Loan Note |
| Exhibit C | - | Form of Delayed Draw Term Loan Note |

Schedules

| | | |
|---|---|---|
| Schedule 1.1 | - | Commitment Schedule |

SUBORDINATED CREDIT AGREEMENT

This SUBORDINATED CREDIT AGREEMENT is dated as of April 15, 2025 and entered into among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, Inc., a Delaware corporation ("Distillery"), Uncle Nearest Real Estate Holdings, LLC, a Tennessee limited liability company ("Real Estate Holdings" and together with the Company and Distillery, collectively, the "Borrower"), and the lenders from time to time party hereto (such lenders, consisting of the Initial Term Loan Lenders (as defined below) and the Delayed Draw Term Loan Lenders (as defined below), are collectively referred to herein as the "Lender").

R E C I T A L S:

WHEREAS, the Borrower desires that the Lender establish subordinated term loan facilities in favor of the Borrower to repay certain existing Indebtedness (as defined below) and fund the ordinary working capital and general corporate needs of the Borrower;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, the Borrower and the Lender hereby agree as follows:

## SECTION 1.
## DEFINITIONS

1.1 Definitions. Capitalized terms used in this Agreement shall have the following respective meanings:

"Affiliate" means, with respect to any Person, (a) each Person that, directly or indirectly, owns or controls, whether beneficially, or as a trustee, guardian or other fiduciary, more than 20% of the Equity Interests having ordinary voting power in the election of directors or other similar management personnel of such Person, (b) each Person that controls, is controlled by or is under common control with such Person, and (c) each of such Person's officers, directors, managers, joint venturers and partners. For the purposes of this definition, "control" of a Person means the possession, directly or indirectly, of the power to direct or cause the direction of its management or policies, whether through the ownership of voting securities, by contract or otherwise; provided, however, that when used in relation to the Borrower, the term "Affiliate" shall specifically exclude the Lender.

"Agreement" means this Subordinated Credit Agreement (including all Exhibits and Schedules), as the same may be amended, restated, supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Applicable Law" means with respect to any Person, all laws, rules, regulations and governmental guidelines applicable to such Person, conduct, transaction, agreement or matter in question, including all applicable statutory law, common law and equitable principles, and all provisions of constitutions, treaties, statutes, rules, regulations, orders and decrees of Governmental Authorities.

"Applicable Percentage" means:

(a) in respect of the Initial Term Loan Facility, with respect to any Initial Term Loan Lender at any time, the percentage (carried out to the ninth decimal place) of the Initial Term Loan Facility represented by (i) on or prior to the Closing Date, such Initial Term Loan Lender's Initial Term Loan Commitment at such time, and (ii) thereafter, the outstanding principal amount of such Initial Term Loan Lender's Initial Term Loans at such time; and

(b) in respect of the Delayed Draw Term Loan Facility, with respect to any Delayed Draw Term Loan Lender at any time, the percentage (carried out to the ninth decimal place) of the Delayed Draw Term Loan Facility represented by (i) at any time during the Delayed Draw Term Loan Availability Period, such Delayed Draw Term Loan Lender's Delayed Draw Term Loan Commitment at such time, and (ii) thereafter, the outstanding principal amount of such Delayed Draw Term Loan Lender's Delayed Draw Term Loans at such time.

The Applicable Percentage of each Lender in respect of each Facility is set forth opposite the name of such Lender on Schedule 1.1.

"Authorized Officer" means, with respect to the Borrower, any of the chief executive officer, the chief financial officer, the chief operating officer or the president of the Borrower.

"Bankruptcy Code" means the provisions of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. or other applicable bankruptcy, insolvency or similar laws.

"Borrower" has the meaning ascribed to it in the Preamble.

"Business Day" means any day that is not a Saturday, a Sunday or a day on which banks are required or permitted to be closed in the State of New York.

"Change of Control" means any event, transaction or occurrence, whether in one step or a series of related steps, as a result of which (a) the Borrower sells all or substantially all of its assets, whether through the sale of assets, merger or otherwise, or (b) the holders of the Equity Interests of the Borrower on the Closing Date, together with their Affiliates, cease to own and control, directly or indirectly, at least a majority (in number of votes) of the Equity Interests of the Borrower which have ordinary voting power for the election of directors of the Borrower or a majority of the outstanding Equity Interests of the Borrower.

"Closing Date" means April 15, 2025.

"Contingent Obligation" means, as applied to any Person, any direct or indirect liability of that Person: (a) consisting of Guaranteed Indebtedness; (b) with respect to any Indebtedness, lease, dividend or other obligation of another Person, if the purpose or intent of the Person incurring such liability, or the effect thereof, is to provide assurance to the obligee of such liability that such liability will be paid or discharged, or that any agreements relating thereto will be complied with, or that the holders of such liability will be protected (in whole or in part) against loss with respect thereto; (c) with respect to any letter of credit issued for the account of that Person or as to which that Person is otherwise liable for reimbursement of drawings; (d) under any foreign exchange contract, currency swap agreement, interest rate swap agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates; (e) any agreement, contract or transaction involving commodity options or future contracts; (f) to make take-or-pay or similar payments if required regardless of nonperformance by any other party or parties to an agreement; or (g) pursuant to any agreement to purchase, repurchase or otherwise acquire any obligation or any property constituting security therefor, to provide funds for the payment or discharge of such obligation or to maintain the solvency, financial condition or any balance sheet item or level of income of another. The amount of any Contingent Obligation shall be equal to the amount of the obligation so guaranteed or otherwise supported or, if not a fixed and determined amount, the maximum amount so guaranteed.

"Contractual Obligations" means, as applied to any Person, any indenture, mortgage, deed of trust, contract, undertaking, agreement or other instrument to which that Person is a party or by which it or any of its properties is bound or to which it or any of its properties is subject, including the Loan Documents.

"Default" means any event, circumstance or condition that, with the passage of time or notice or both, would become an Event of Default.

"Default Rate" has the meaning ascribed to it in Section 2.2(f).

"Delayed Draw Term Loan" has the meaning assigned to such term in Section 2.1(b).

"Delayed Draw Term Loan Availability Period" means the period from and after the Closing Date to the earliest of (a) the Maturity Date and (b) the date of termination of the Delayed Draw Term Loan Commitments of the respective Delayed Draw Term Loan Lenders to make Delayed Draw Term Loans pursuant to Section 6.2.

"Delayed Draw Term Loan Commitment" means, as to each Delayed Draw Term Loan Lender, its obligation to make a Delayed Draw Term Loan to the Borrower during the Delayed Draw Term Loan Availability Period pursuant to Section 2.1(b) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Schedule 1.1 under the caption "Delayed Draw Term Loan Commitment", as such amount may be adjusted from time to time in accordance with this Agreement. The Delayed Draw Term Loan Commitments of all Delayed Draw Term Loan Lenders on the Closing Date equals $30,000,000. If not sooner terminated, from and after the date of expiration of the Delayed Draw Term Loan Availability Period, the Delayed Draw Term Loan Commitment of each Delayed Draw Term Loan Lender shall equal $0.

"Delayed Draw Term Loan Facility" means the delayed draw term loan facility established under this Agreement pursuant to which the Delayed Draw Term Loan Lenders have agreed to make Delayed Draw Term Loans to the Borrower from time to time during the Delayed Draw Term Loan Availability Period in a maximum aggregate amount at any time equal to the aggregate amount of the Delayed Draw Term Loan Lenders' Delayed Draw Term Loan Commitments at such time.

"Delayed Draw Term Loan Lender" means, at any time, (a) so long as any Delayed Draw Term Loan Commitment is in effect, any Lender that has a Delayed Draw Term Loan Commitment at such time or (b) if the Delayed Draw Term Loan Commitments have terminated or expired, any Lender that has an outstanding Delayed Draw Term Loan at such time.

"Delayed Draw Term Loan Note" means, solely to the extent requested by any Delayed Draw Term Loan Lender, a promissory note made by the Borrower in favor of a Delayed Draw Term Loan Lender evidencing Delayed Draw Term Loans made by such Delayed Draw Term Loan Lender, substantially in the form of Exhibit C.

"Dollars" or "$" means lawful currency of the United States of America.

"Equity Interest" means all shares of capital stock (whether denominated as common stock or preferred stock), equity interests, beneficial partnership or membership interests, joint venture interests, units, limited liability company interests, participations or other ownership or profit interests in or equivalents (regardless of how designated) of or in a Person (other than an individual), whether voting or non-voting.

"Event of Default" has the meaning ascribed to it in Section 6.1.

"Facility" means the Initial Term Loan Facility or the Delayed Draw Term Loan Facility, as the context may require.

"Fees" means any and all fees payable to the Lender pursuant to this Agreement or any of the other Loan Documents.

"Funding Account" means the account of the Borrower into which the Borrower instructs the Lender in writing to fund the proceeds of Loans, which written instruction shall have been given by the Borrower to the Lender prior to the Closing Date.

"GAAP" means generally accepted accounting principles in the United States of America, consistently applied.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any agency, department or other entity exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to government.

"Guaranteed Indebtedness" means, as to any Person, any obligation of such Person guaranteeing, providing comfort for or otherwise supporting any Indebtedness, lease, dividend, or other obligation ("primary obligation") of any other Person (the "primary obligor") in any manner, including any obligation or arrangement of such Person to (a) purchase or repurchase any such primary obligation, (b) advance or supply funds (i) for the purchase or payment of any such primary obligation or (ii) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency or any balance sheet condition of the primary obligor, (c) purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation, (d) protect the beneficiary of such arrangement from loss (other than product warranties given in the ordinary course of business) or (e) indemnify the owner of such primary obligation against loss in respect thereof. The amount of any Guaranteed Indebtedness at any time shall be deemed to be an amount equal to the lesser at such time of (x) the stated or determinable amount of the primary obligation in respect of which such Guaranteed Indebtedness is incurred and (y) the maximum amount for which such Person may be liable pursuant to the terms of the instrument embodying such Guaranteed Indebtedness, or, if not stated or determinable, the maximum reasonably anticipated liability (assuming full performance) in respect thereof.

"Hedging Agreement" means any interest rate protection agreement, foreign currency exchange agreement, currency options, spot contracts, collar transactions, commodity price protection agreement, rate swap transactions, basis swaps, forward rate transactions, or other interest or currency exchange rate or commodity price hedging arrangement, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), designed to provide protection against fluctuations in interest rates, currency exchange rates or commodity prices, whether or not any such transaction is governed by or subject to any master agreement.

"Indebtedness" means, with respect to any Person, without duplication (a) all indebtedness of such Person for borrowed money or for the deferred purchase price of property payment for which is deferred six months or more, but excluding obligations to trade creditors that are unsecured and not overdue by more than six months unless being contested in good faith and accrued expenses, in each case, incurred in the ordinary course of business, (b) all reimbursement and other obligations with respect to letters of credit, bankers' acceptances and surety bonds, whether or not matured, (c) all obligations evidenced by notes, bonds, debentures or similar instruments, (d) all net payment obligations of such Person under any foreign exchange contract, currency swap agreement, interest rate swap (including Hedging Agreements), cap or collar agreement or other similar agreement or arrangement designed to alter the risks of that Person arising from fluctuations in currency values or interest rates, in each case whether contingent or matured, (e) all Indebtedness referred to above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property or other assets (including

accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness, (f) the Obligations, (g) the Senior Obligations and (h) all Contingent Obligations of such Person of the type of Indebtedness described in clauses (a) through (h) above.

"Indemnitees" has the meaning ascribed to it in Section 8.1.

"Initial Term Loan" has the meaning assigned to such term in Section 2.1(a).

"Initial Term Loan Commitment" means, as to each Initial Term Loan Lender, its obligation to make Initial Term Loans to the Borrower on or prior to the Closing Date pursuant to Section 2.1(a) in an aggregate principal amount equal to the amount set forth opposite such Initial Term Loan Lender's name on Schedule 1.1 under the caption "Initial Term Loan Commitment". The Initial Term Loan Commitments of all Initial Term Loan Lenders on the Closing Date equals $20,026,270. From and after the funding of the Initial Term Loans, the Initial Term Loan Commitment of each Initial Term Loan Lender shall equal $0.

"Initial Term Loan Facility" means the term loan facility established under this Agreement pursuant to which the Initial Term Loan Lenders have agreed to make Initial Term Loans to the Borrower on or prior to the Closing Date in an aggregate amount equal to the aggregate amount of the Initial Term Loan Lenders' Initial Term Loan Commitments as of the Closing Date.

"Initial Term Loan Lender" means, (a) on the Closing Date, any Lender that has an Initial Term Loan Commitment, and (b) from and after the Closing Date, any Lender that has an outstanding Initial Term Loan at such time.

"Initial Term Loan Note" means, solely to the extent requested by any Initial Term Loan Lender, a promissory note made by the Borrower in favor of such Initial Term Loan Lender evidencing the Initial Term Loan made by such Initial Term Loan Lender, substantially in the form of Exhibit B.

"Intercompany Debt" has the meaning ascribed to it in Section 8.16(a).

"Interest Payment Date" means the first Business Day of each month to occur while any Loan is outstanding; provided that, in addition to the foregoing, each of (a) the date upon which the Delayed Draw Term Loan Commitment has been terminated and the Loans have been paid in full and (b) the Loan Commitment Termination Date shall be deemed to be an "Interest Payment Date" with respect to any interest that has then accrued under this Agreement.

"Interest Rate" means a rate per annum equal to 5.00% per annum.

"IRS" means the United States Internal Revenue Service.

"Lender" has the meaning ascribed to it in the Preamble.

"Lien" means any mortgage or deed of trust, pledge, hypothecation, assignment, deposit arrangement, lien, charge, claim, security interest, easement or encumbrance, or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any lease or title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, and the filing of, or agreement to give, any financing statement perfecting a security interest under the Uniform Commercial Code or comparable law of any jurisdiction).

"Loan Commitment Termination Date" means the earliest of (a) the Maturity Date, (b) the date of termination of the Lender's obligation to permit existing Loans to remain outstanding pursuant to Section 6.3, and (c) the date of (i) payment or prepayment in full by Borrower of the Loans and (ii) the permanent termination of the Delayed Draw Term Loan Commitment.

"Loan Documents" means this Agreement, the Notes, the Subordination Agreement and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, the Lender and including all other powers of attorney, consents, assignments, contracts, notices and all other written matter whether heretofore, now or hereafter executed by or on behalf of the Borrower, or any employee of the Borrower, and delivered to the Lender in connection with this Agreement or the transactions contemplated thereby. Any reference in this Agreement or any other Loan Document to a Loan Document shall include all appendices, exhibits or schedules thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to this Agreement or such Loan Document as the same may be in effect at any and all times such reference becomes operative.

"Loan" means an extension of credit by the Lender to the Borrower under Article II in the form of an Initial Term Loan or a Delayed Draw Term Loan.

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, or financial condition of the Borrower, (b) the material impairment of the ability of the Borrower to satisfy its Obligations in accordance with the terms of the Loan Documents or (c) the Lender's rights and remedies under this Agreement and the other Loan Documents.

"Maturity Date" means the later of (a) January 22, 2028, and (b) the date that is one hundred eighty (180) days after the payment in full of the Senior Obligations (as contemplated by the Subordination Agreement); provided, that if such date is not a Business Day, the Maturity Date shall be the succeeding Business Day.

"Maximum Lawful Rate" has the meaning ascribed to it in Section 2.2(g).

"Note" means an Initial Term Loan Note or a Delayed Draw Term Loan Note, as the context may require.

"Notice of Borrowing" means a written notice requesting a Loan, which shall be substantially in the form of Exhibit A, appropriately completed and signed by an Authorized Officer of the Borrower.

"Obligations" means all loans, advances, debts, liabilities and obligations, for the performance of covenants, tasks or duties or for payment of monetary amounts (whether or not such performance is then required or contingent, or such amounts are liquidated or determinable) owing by the Borrower to the Lender, and all covenants and duties regarding such amounts, of any kind or nature, present or future, whether or not evidenced by any note, agreement or other instrument, arising under this Agreement or any of the other Loan Documents. This term includes all principal, interest (including all interest that accrues after the commencement of any case or proceeding by or against the Borrower in bankruptcy, whether or not allowed in such case or proceeding), Fees, charges, expenses, reasonable attorneys' fees and any other sum chargeable to the Borrower under this Agreement or any of the other Loan Documents.

"Outstanding Amount" means, with respect to Initial Term Loans and Delayed Draw Term Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any Loans and prepayments or repayments of Initial Term Loans and Delayed Draw Term Loans, as the case may be, occurring on such date.

"Participant" means any participant with respect to the Obligations.

"Person" means any individual, sole proprietorship, partnership, joint venture, trust, unincorporated organization, association, corporation, limited liability company, institution, public benefit corporation, other entity or government (whether federal, state, county, city, municipal, local, foreign, or otherwise, including any instrumentality, division, agency, body or department thereof).

"Proceeding" means a proceeding under the Bankruptcy Code or any similar law in any jurisdiction, in which the Borrower is a debtor.

"Properly Contested" means, in the case of any obligation or Tax of the Borrower that is not paid as and when due or payable by reason of the Borrower's bona fide dispute concerning its liability to pay same or concerning the amount thereof, (a) such obligation or Tax is being properly contested in good faith by appropriate proceedings promptly instituted and diligently conducted, (b) the Borrower has established appropriate reserves as shall be required in conformity with GAAP, (c) the non-payment of such obligation or Tax is not reasonably to be expected to have a Material Adverse Effect, (d) no Lien is imposed upon the Borrower's assets with respect to such obligation or Tax, unless enforcement of such Lien is stayed during the period prior to the final resolution or disposition of such dispute, (e) if such obligation or Tax results from, or is determined by the entry, rendition or issuance against the Borrower or any of its assets of, a judgment, the enforcement of such judgment is stayed pending a timely appeal or other judicial review, and (f) if such contest is abandoned, settled or determined adversely (in whole or in part) to the Borrower, the Borrower forthwith pays such obligation or Tax and all penalties, interest and other amounts due in connection therewith.

"Senior Agent" means Farm Credit Mid-America, PCA, and its successors and assigns.

"Senior Credit Agreement" means that certain Credit Agreement, dated as of July 22, 2022, among the Senior Agent, the Senior Lenders and the Borrower, as amended prior to the Closing Date, and as the same may be further amended, restated, supplemented or otherwise modified from time to time in accordance with the Subordination Agreement.

"Senior Lenders" means, collectively, the "Lenders" (as defined in the Senior Credit Agreement).

"Senior Loan Documents" means the Senior Credit Agreement and all other documents, agreements, and instruments entered into in connection therewith, as amended, restated, supplemented or otherwise modified from time to time in accordance with the Subordination Agreement.

"Senior Obligations" has the meaning ascribed to it in the Subordination Agreement.

"Subordination Agreement" means that certain Intercreditor and Subordination Agreement, dated as of the Closing Date, between the Senior Agent and the Lender, and consented and agreed to by the Borrower, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"Tax Returns" means all reports, returns, information returns, claims for refund, elections, estimated Tax filings or payments, requests for extension, documents, statements, declarations and certifications and other information required to be filed with respect to Taxes, including attachments thereto and amendments thereof.

"Taxes" means any and all present or future taxes, duties, levies, imposts, assessments, fees, deductions, withholdings or other similar charges imposed by a Governmental Authority (including interest, fines, penalties or additions with respect to any of the foregoing).

"Termination Date" means the date on which (a) the Loans have been indefeasibly repaid in full in cash, (b) all other Obligations under this Agreement and the other Loan Documents have been completely discharged (other than contingent indemnification obligations as to which no unsatisfied claim has been asserted) and (c) the Delayed Draw Term Loan Commitment has been terminated.

"Transactions" means the closing of this Agreement and the other Loan Documents, the consummation of the transactions contemplated hereby and pursuant to the other Loan Documents (including the borrowing of the Initial Term Loans on the Closing Date and the payment of fees and expenses in connection with all of the foregoing).

1.2 Rules of Construction.

(a) Rules of construction with respect to accounting terms used in this Agreement or the other Loan Documents shall be as set forth or referred to in this Section 1.2. References in this Agreement to "Preamble", "Recital", "Sections", "Schedules" or "Exhibits" shall be to the Preamble, Recitals, Sections, Schedules or Exhibits of or to this Agreement unless otherwise specifically provided. The words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole, including all Exhibits and Schedules, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section or clause contained in this Agreement or any such Exhibit or Schedule.

(b) Wherever from the context it appears appropriate, each term stated in either the singular or plural shall include the singular and the plural, and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter genders. The words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; the term "or" has, except where otherwise indicated, the inclusive meaning represented by the phrase "and/or"; references to Persons include their respective successors and assigns (to the extent and only to the extent permitted by the Loan Documents) or, in the case of governmental Persons, Persons succeeding to the relevant functions of such Persons. All references in this Agreement or any other Loan Document to statutes shall include all amendments of same and implementing regulations and any successor statutes and regulations; to any instrument or agreement (including any of the Loan Documents) shall include any and all modifications and supplements thereto and any and all restatements, extensions or renewals thereof to the extent such modifications, supplements, restatements, extensions or renewals of any such documents are permitted by the terms hereof and thereof. Whenever any provision in any Loan Document refers to the knowledge (or an analogous phrase) of the Borrower, such words are intended to signify that the Borrower has actual knowledge or awareness of a particular fact or circumstance or that the Borrower, if it had exercised reasonable diligence, would have known or been aware of such fact or circumstance. Unless otherwise specifically indicated, definitions of agreements and instruments herein mean and refer to such agreements and instruments as amended, modified, supplemented, restated, substituted or replaced from time to time in accordance with their respective terms and the terms of this Agreement and the other Loan Documents.

(c) All references in this Agreement or any other Loan Document to the time of day means the time of day on the day in question in New York, New York, unless otherwise expressly provided in such Loan Document. A Default or an Event of Default shall be deemed to exist at all times during the period commencing on the date that such Default or Event of Default occurs to the date on which such Default or Event of Default is waived in writing pursuant to this Agreement or, with respect to any Default, is cured within any period of cure expressly provided in this Agreement. Whenever in any provision of this Agreement or any other Loan Document the Lender is authorized to take or decline to take any action (including making any determination) in the

exercise of its "discretion," such provision shall be understood to mean that the Lender may take or refrain to take such action in its sole and absolute discretion.

## SECTION 2.
## AMOUNTS AND TERMS OF LOANS

2.1 Making of Loans; Promise to Pay. Subject to the terms and conditions of this Agreement and in reliance upon the representations and warranties of the Borrower contained herein:

(a) Initial Term Loans. Subject to the terms and conditions of this Agreement, each Initial Term Loan Lender severally agrees to make a single loan (each such loan, an "Initial Term Loan") to the Borrower, in Dollars, on or prior to the Closing Date in an amount equal to such Initial Term Loan Lender's Applicable Percentage of the Initial Term Loan Facility. For the avoidance of doubt, any Loans funded prior to the Closing Date shall be deemed to be Initial Term Loans. The funding date and funding amount of each Initial Term Loan are set forth opposite the name of the applicable Initial Term Loan Lender on Schedule 1.1 under the captions "Funding Date" and "Funding Amount", respectively. Any portion of the Initial Term Loans that is repaid or prepaid may not be reborrowed.

(b) Delayed Draw Term Loans. Subject to the terms and conditions of this Agreement, each Delayed Draw Term Loan Lender severally agrees to make loans (each such loan, a "Delayed Draw Term Loan") to the Borrower, in Dollars, on each date selected in accordance with Section 2.1(c), in a principal amount not to exceed such Delayed Draw Term Lender's Applicable Percentage of the Delayed Draw Term Loan Facility. Any portion of the Delayed Draw Term Loans that is repaid or prepaid may not be reborrowed.

(c) Notice of Borrowing. To request Loans on or after the Closing Date, the Borrower shall submit a Notice of Borrowing to the Lender. Each Notice of Borrowing shall specify (I) the applicable Facility, (II) the requested funding date (which shall be a Business Day) and (III) the principal amount of Loans to be borrowed. Following receipt of a Notice of Borrowing, the Lender shall, in its sole discretion, determine whether to fund the requested Loans on the requested funding date or a later date. The Lender shall notify the Borrower of its determination promptly following receipt of a Notice of Borrowing.

(d) Funding Authorization. The proceeds of all Loans made pursuant to this Agreement on or subsequent to the Closing Date are to be funded by the Lender by wire transfer to the Funding Account. The Borrower shall provide the Lender with written notice of any change in the wiring instructions for the Funding Account at least two (2) Business Days before the desired effective date of such change.

(e) Promise to Pay. In addition to the specific payment provisions herein, the Borrower hereby irrevocably promises to pay all Obligations, including the outstanding aggregate principal amount of the Loans and interest and fees with respect to the foregoing, as the same become due and payable hereunder and, in any event, on the Loan Commitment Termination Date.

2.2 Interest.

(a) Commencing on the funding date of the Initial Term Loans, interest shall accrue on the unpaid principal amount of the Initial Term Loans, and the Borrower shall pay such interest to the Lender on the Loan Commitment Termination Date, at a rate per annum equal to the Interest Rate.

(b) Commencing on each funding date of Delayed Draw Term Loans, interest shall accrue on the unpaid principal amount of such Delayed Draw Term Loans, and the Borrower shall pay such interest to the Lender on the Loan Commitment Termination Date, at a rate per annum equal to the Interest Rate.

(c) Notwithstanding the foregoing, upon the payment in full of the Senior Obligations (as contemplated by the Subordination Agreement), the Borrower shall pay all previously accrued interest to the Lender. Thereafter, commencing on the first Business Day of the immediately succeeding month, the Borrower shall pay interest to the Lender on the unpaid principal amount of the Loans, in arrears on each applicable Interest Payment Date, at a rate per annum equal to the Interest Rate.

(d) If any payment on any Loan becomes due and payable on a day other than a Business Day, the maturity and payment thereof will be extended to the next succeeding Business Day and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(e) All computations of interest calculated on a per annum basis and interest shall be made by the Lender on the basis of a 360-day year, in each case for the actual number of days occurring in the period for which such Fees and interest are payable. Each determination by the Lender of an interest rate and Fees hereunder shall be presumptive evidence of the correctness of such rates and Fees, absent manifest error.

(f) So long as an Event of Default has occurred and is continuing and without notice of any kind, or so long as any other Event of Default has occurred and is continuing and at the election of the Lender, the interest rate applicable to the Loans shall be increased by 2.00% per annum above the rate of interest or the rate with respect to any other Obligation otherwise applicable hereunder (the "Default Rate"), and the outstanding principal balance of the Loans shall bear interest at the Default Rate applicable to such Obligations. Interest at the Default Rate shall accrue from the initial date of such Event of Default until that Event of Default is waived and shall be payable on the same schedule as interest payable on the Initial Term Loans and the Delayed Draw Term Loans (as described in clauses (a), (b) and (c) of this Section 2.2).

(g) Notwithstanding anything to the contrary set forth in this Section 2.2, if a court of competent jurisdiction determines in a final order that the rate of interest payable hereunder exceeds the highest rate of interest permissible under law (the "Maximum Lawful Rate"), then so long as the Maximum Lawful Rate would be so exceeded, the rate of interest payable hereunder shall be equal to the Maximum Lawful Rate; provided, however, that if at any time thereafter the rate of interest payable hereunder is less than the Maximum Lawful Rate, the Borrower shall continue to pay interest hereunder at the Maximum Lawful Rate until such time as the total interest received by the Lender is equal to the total interest that would have been received had the interest rate payable hereunder been (but for the operation of this paragraph) the interest rate payable since the Closing Date as otherwise provided in this Agreement. Thereafter, interest hereunder shall be paid at the rate(s) of interest and in the manner provided in Sections 2.2(a) through 2.2(e), unless and until the rate of interest again exceeds the Maximum Lawful Rate, and at that time this paragraph shall again apply. In no event shall the total interest received by the Lender pursuant to the terms hereof exceed the amount that the Lender could lawfully have received had the interest due hereunder been calculated for the full term hereof at the Maximum Lawful Rate. If the Maximum Lawful Rate is calculated pursuant to this paragraph, such interest shall be calculated at a daily rate equal to the Maximum Lawful Rate divided by the number of days in the year in which such calculation is made. If, notwithstanding the provisions of this Section 2.2(g), a court of competent

jurisdiction shall determine by a final, non-appealable order that Lender has received interest hereunder in excess of the Maximum Lawful Rate, Lender shall, to the extent permitted by Applicable Law, promptly apply such excess in accordance with Section 2.5 and thereafter shall refund any excess to the Borrower or as such court of competent jurisdiction may otherwise order.

2.3 Expenses and Attorneys' Fees. Subject to the Subordination Agreement, the Borrower agrees to pay all reasonable, documented out-of-pocket fees, charges, costs and expenses (including reasonable and documented attorneys' fees and out-of-pocket expenses) incurred by the Lender in connection with any matters contemplated by or arising out of the Loan Documents, in connection with the examination, review, due diligence investigation, documentation, negotiation and closing of the transactions contemplated herein and in connection with the continued administration of the Loan Documents, including any amendments, modifications, consents and waivers. The Borrower agrees to pay, subject to the Subordination Agreement, all reasonable, documented out-of-pocket fees, charges, costs and expenses (including reasonable and documented fees, charges, costs and out-of-pocket expenses of attorneys, auditors, appraisers, consultants and advisors) incurred by the Lender in connection with any amendment, waiver, consent with respect to the Loan Documents, Event of Default, work-out or action to enforce any Loan Document or to collect any payments due from the Borrower. In addition, in connection with any work-out or action to enforce any Loan Document or to collect any payments due from the Borrower, the Borrower agrees to pay, subject to the Subordination Agreement, all reasonable, documented out-of-pocket fees, charges, costs and expenses, including reasonable and documented attorneys' fees, incurred by the Lender. All fees, charges, costs and expenses for which the Borrower is responsible under this Section 2.3 shall be deemed part of the Obligations when incurred; provided, that, the parties hereto acknowledge and agree that all fees, charges, costs and expenses deemed part of the Obligations hereunder are subject to the Subordination Agreement.

2.4 Payments.

(a) All payments by the Borrower of the Obligations shall be without deduction, defense, setoff or counterclaim and shall be made in Dollars and same day funds and delivered to Lender by wire transfer to the account the Lender may from time to time designate in writing to the Borrower.

(b) Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the payment may be made on the next succeeding Business Day and such extension of time shall be included in the computation of the amount of interest and Fees due hereunder.

2.5 Prepayments. Subject to the Subordination Agreement, at any time, the Borrower may prepay the Loans, in whole or in part, without premium or penalty. Each prepayment of the outstanding Loans pursuant to this Section 2.5 shall be applied, ratably to the Initial Term Loans and the Delayed Draw Term Loans according to the Outstanding Amounts thereof, in accordance with the respective Applicable Percentages of each Lender, and applied pro rata to the remaining principal installments of the Initial Term Loans and Delayed Draw Term Loans.

2.6 Maturity. All of the Obligations shall become due and payable as otherwise set forth herein, but in any event all of the remaining Obligations shall become due and payable upon the Loan Commitment Termination Date. Until the Termination Date, the Lender shall be entitled to exercise all rights and remedies available to it under the Loan Documents and Applicable Law.

## SECTION 3.
## CONDITIONS TO LOANS

The obligations of the Lender to make Loans are subject to satisfaction of all of the applicable conditions set forth below.

3.1 Conditions to Initial Term Loans. The obligation of the Lender to make the Initial Term Loans on the Closing Date are, in addition to the conditions precedent specified in Section 3.2, subject to the receipt by the Lender of the following:

(a) true, correct and complete copies, duly executed by each of the parties thereto, of this Agreement and each of the other Loan Documents to be delivered on the Closing Date;

(b) a certificate signed by the secretary of each Borrower, including a certificate of incumbency with respect to each Authorized Officer of such Borrower executing a Loan Document, together with appropriate attachments which shall include the following: (A) a copy of the certificate or articles of incorporation or formation (or other analogous document in such Borrower's jurisdiction of organization) of such Borrower certified to be true, complete and correct by the appropriate Governmental Authority of such Borrower's jurisdiction of organization; (B) a true, complete and correct copy of the other organizational documents of such Borrower, as amended; (C) a true, complete and correct copy of the resolutions of such Borrower (or its board of directors, members or managers, as appropriate) authorizing the execution, delivery and performance by such Borrower of the Loan Documents and authorizing the borrowings hereunder; and (D) certificates of good standing from the jurisdiction of organization of such Borrower and each other jurisdiction in which such Borrower is qualified to do business;

(c) a certificate signed by an Authorized Officer of the Borrower, certifying that as of the Closing Date after giving effect to the Initial Term Loans funded hereunder, the representations and warranties contained herein and in the other Loan Documents are true and correct (except to the extent that any such representation or warranty expressly relates to an earlier date, in which case, such representation or warranty shall be true and correct as of such earlier date); and

(d) the Subordination Agreement, duly executed by each of the parties thereto.

3.2 Conditions to All Loans. Except as otherwise expressly provided herein, the Lender shall not be obligated to fund any Loan if, as of the date thereof:

(a) any representation or warranty by the Borrower contained herein or in any other Loan Document is untrue or incorrect in any material respect (other than such representations and warranties that are already qualified by materiality, Material Adverse Effect or similar language, in which case such representations and warranties shall be true and correct in all respects) as of such date, except to the extent that such representation or warranty expressly relates to an earlier date; or

(b) the Lender has not received a Notice of Borrowing with respect to such requested Loan, executed by an Authorized Officer.

The request and acceptance by the Borrower of the proceeds of any Loan shall be deemed to constitute, as of the date thereof, a representation and warranty by the Borrower that the conditions in clauses (a) and (b) of this Section 3.2 have been satisfied.

## SECTION 4.
## REPRESENTATIONS AND WARRANTIES

To induce the Lender to enter into the Loan Documents and to make Loans, the Borrower represents, warrants and covenant to the Lender that the following statements are and, after giving effect to the Transactions will remain true, correct and complete until the Termination Date with respect to the Borrower.

4.1 Organization, Powers and Good Standing.

(a) Organization and Powers. Each Borrower is (i) duly organized, validly existing and in good standing under the laws of its jurisdiction of organization and (ii) qualified to do business in all states where such qualification is required except, in the case of this clause (ii), where failure to be so qualified or be in good standing would not reasonably be expected to have a Material Adverse Effect. Each Borrower has all requisite organizational power and authority to own and operate its properties, to carry on its business as now conducted and proposed to be conducted, to enter into each Loan Document to which it is a party and to incur the Obligations and carry out the Transactions.

(b) Binding Obligation. This Agreement is, and the other Loan Documents when executed and delivered will be, the legally valid and binding obligations of the Borrower, each enforceable against the Borrower, as applicable, in accordance with their respective terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting, creditors' rights generally and the effects of general principles of equity.

4.2 No Conflict. The consummation of the Transactions does not and will not violate or conflict with any laws, rules, regulations or orders of any Governmental Authority or violate, conflict with, result in a breach of, or constitute a default (with due notice or lapse of time or both) under any Contractual Obligation or organizational document of any Borrower.

4.3 Use of Proceeds. The Borrower shall utilize the proceeds of the Loans solely to (i) fund the ordinary working capital and general corporate needs of the Borrower, and (ii) repay the Senior Obligations as contemplated by the Senior Credit Agreement.

4.4 Compliance with Laws. The Borrower (a) is in compliance with the requirements of the obligations, covenants and conditions contained in all of its Contractual Obligations, except where in each case the noncompliance would not be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (b) maintains all licenses, qualifications and permits necessary to operate its business, other than any failure to maintain which would not reasonably be expected to have a Material Adverse Effect. The Borrower has duly complied, and its properties and business operations are in compliance with all Applicable Laws, except for Applicable Laws that are immaterial or with respect to which any failure by the Borrower to comply would not adversely affect the interests of the Lender. There have been no citations, notices or orders of material noncompliance issued to the Borrower under any Applicable Law.

4.5 Taxes and Tax Returns.

(a) The Borrower has filed all material Tax Returns that it is required to file and has paid all material Taxes shown on said returns as well as all Taxes shown on all assessments received by it to the extent that such Taxes are not being Properly Contested, and the Borrower is not subject

to any Tax Liens, nor has it received any written notice of deficiency or other official notice to pay any Taxes.

(b) The Borrower has not been notified in writing that either the IRS, or any other Governmental Authority, has raised or intends to raise, any adjustments with respect to Taxes of the Borrower, which adjustments would be reasonably likely to be material.

## SECTION 5.
## AFFIRMATIVE COVENANTS

The Borrower agrees that, from and after the date hereof and until the Termination Date:

5.1 Compliance With Laws and Contractual Obligations. The Borrower shall (a) comply with (i) the requirements of all Applicable Laws, as now in effect and which may be imposed in the future in all jurisdictions in which the Borrower is now doing business or may hereafter be doing business and (ii) the obligations, covenants and conditions contained in all Contractual Obligations of the Borrower other than, in the case of both clauses (a)(i) and (a)(ii), where the noncompliance would not be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect, and (b) obtain and maintain all licenses, qualifications and permits now held or hereafter required to be held by the Borrower, for which the loss, suspension, revocation or failure to obtain or renew, would reasonably be expected to have, either individually or in the aggregate, a Material Adverse Effect. This Section 5.1 shall not preclude the Borrower from contesting any Taxes or other payments, if they are being Properly Contested.

5.2 Organizational Existence. The Borrower shall at all times preserve and keep in full force and effect its organizational existence and all rights and franchises material to its business.

5.3 Payment of Taxes. The Borrower shall timely pay and discharge (or cause to be paid and discharged) all material Taxes imposed upon it or upon its income or profits, or upon property belonging to it; provided, that the Borrower shall not be required to pay any such Tax that is being Properly Contested.

## SECTION 6.
## DEFAULT, RIGHTS AND REMEDIES

6.1 Event of Default. "Event of Default" means the occurrence or existence of any one or more of the following:

(a) Payment. (i) Failure to pay any installment or other payment of principal of any Loan when due, or to pay any interest or Fees on any Loan when due and such failure shall continue unremedied for a period of five (5) Business Days or (ii) failure to pay, within ten (10) days after written request for payment thereof (including reasonable supporting documentation), any other amount due under this Agreement or any of the other Loan Documents (other than principal, interest or Fees in respect of any Loan); or

(b) Breach of Certain Provisions. The Borrower (i) breaches Section 5.2 of this Agreement or (ii) materially breaches any other term, covenant or agreement (not specified in clause (a) above) contained in this Agreement or any other Loan Document on its part to be performed or observed and such material breach continues uncured for thirty (30) or more days; or

(c) Breach of Warranty. Any representation, warranty, certification or other statement made by the Borrower in any Loan Document or in any statement or certificate at any time given by the Borrower in writing pursuant to or in connection with any Loan Document is false in any

material respect (other than such representations and warranties that are already qualified by materiality, Material Adverse Effect or similar language, in which case such representations and warranties shall be true and correct in all respects) on the date made; or

(d) Involuntary Bankruptcy; Appointment of Receiver, Etc. (i) A court enters a decree or order for relief with respect to any Borrower in an involuntary case under the Bankruptcy Code, which decree or order is not stayed or other similar relief is not granted under any applicable federal or state law; or (ii) the continuance of any of the following events for sixty (60) days unless dismissed, bonded or discharged: (A) an involuntary case is commenced against any Borrower, under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect; or (B) a decree or order of a court for the appointment of a receiver, liquidator, sequestrator, trustee, custodian or other officer having similar powers over any Borrower, or over all or a substantial part of its property, is entered; or (C) a receiver, trustee or other custodian is appointed without the consent of any Borrower, for all or a substantial part of the property of such Borrower; or

(e) Voluntary Bankruptcy; Appointment of Receiver, Etc. (i) Any Borrower commences a voluntary case under the Bankruptcy Code, or consents to the entry of an order for relief in an involuntary case or to the conversion of an involuntary case to a voluntary case under any such law or consents to the appointment of or taking possession by a receiver, trustee or other custodian for all or a substantial part of its property; or (ii) any Borrower makes any assignment for the benefit of creditors; or (iii) the board of directors or other managing body of any Borrower adopts any resolution or otherwise authorizes action to approve any of the actions referred to in this Section 6.1(e); or

(f) Change of Control. A Change of Control occurs.

6.2 Suspension or Termination of Commitment to Make Loans. Upon the occurrence and during the continuance of any Event of Default, the Lender may, without notice or demand, immediately suspend or terminate all or any portion of the Delayed Draw Term Loan Commitment.

6.3 Acceleration and other Remedies. Upon the occurrence of any Event of Default described in Sections 6.1(d) or 6.1(e), the Delayed Draw Term Loan Commitment shall be immediately terminated automatically and all of the Obligations, including the Loans, shall automatically become immediately due and payable, without presentment, demand, protest, notice of intent to accelerate, notice of acceleration or other requirements of any kind, all of which are hereby expressly waived by the Borrower. Upon the occurrence and during the continuance of any other Event of Default, the Lender may, by written notice to the Borrower, (a) reduce the aggregate amount of the Delayed Draw Term Loan Commitment, (b) declare all or any portion of the Loans and all or any portion of the other Obligations to be, and the same shall forthwith become, immediately due and payable, together with accrued interest thereon, (c) terminate all or any portion of the Delayed Draw Term Loan Commitment and (d) exercise any other remedies which may be available under the Loan Documents or Applicable Law.

6.4 Performance by the Lender. If the Borrower shall fail to perform any covenant, duty or agreement contained in any of the Loan Documents which failure constitutes an Event of Default, the Lender may perform or attempt to perform such covenant, duty or agreement on behalf of the Borrower. In such event, the Borrower shall, at the request of the Lender, promptly pay any amount reasonably expended by the Lender in such performance or attempted performance to the Lender, together with interest thereon at the Default Rate from the date of such expenditure until paid. Notwithstanding the foregoing, it is expressly agreed that the Lender shall not have any liability or responsibility for the performance of any obligation of the Borrower under this Agreement or any other Loan Document.

6.5 Application of Proceeds. Notwithstanding anything to the contrary contained in this Agreement, upon the occurrence and during the continuance of an Event of Default, the Borrower irrevocably waives the right to direct the application of any and all payments at any time or times thereafter received by the Lender from or on behalf of the Borrower, and the Lender shall have the continuing and exclusive right to apply and to reapply any and all payments received at any time or times after the occurrence and during the continuance of an Event of Default in its discretion. Any balance remaining shall be delivered to the Borrower or to whomever may be lawfully entitled to receive such balance or as a court of competent jurisdiction may direct.

**SECTION 7.**
ASSIGNMENT AND PARTICIPATION

7.1 Assignment and Participations. Subject to the Subordination Agreement, including, without limitation, Section 6.6 thereof, unless an Event of Default has occurred and is continuing, the applicable Lender shall not, without the Borrower's prior written consent, sell, assign, transfer, negotiate or grant participations in all or any part of, or any interest in, such Lender's rights and benefits under this Agreement and the other Loan Documents, other than to an Affiliate of such Lender or to an entity that administers or manages (or is administered or managed by) such Lender (and any sale, assignment, transfer, negotiation or grant of participations in violation of the foregoing shall be void and of no force or effect). If an Event of Default has occurred and is continuing, the applicable Lender may furnish any information concerning the Borrower and the Loan Documents in the possession of such Lender from time to time to assignees and Participants. In addition to the foregoing, subject to the Subordination Agreement, including, without limitation, Section 6.6 thereof, the applicable Lender may at any time pledge the Obligations and its rights under this Agreement and the other Loan Documents to a Federal Reserve Bank or to a lender or liquidity provider under a warehouse line of credit.

**SECTION 8.**
MISCELLANEOUS

8.1 Indemnities. Subject to the Subordination Agreement, the Borrower agrees to indemnify, pay, and hold the Lender and its Affiliates, officers, directors, managers, members, employees, agents, and attorneys (collectively, the "Indemnitees") harmless from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, claims, costs and expenses (including all reasonable, documented out-of-pocket fees and expenses of counsel to any Indemnitee) of any kind or nature whatsoever that may be imposed on, incurred by, or asserted against the Indemnitees as a result of such Indemnitees being a party to this Agreement or the transactions consummated pursuant to this Agreement or otherwise relating to any of the Loan Documents or the Transactions; provided, that the Borrower shall have no obligation to an Indemnitee hereunder with respect to liabilities to the extent resulting from the gross negligence or willful misconduct of such Indemnitee as determined by a final non-appealable order of a court of competent jurisdiction. If and to the extent that the foregoing undertaking may be unenforceable for any reason, the Borrower agrees to make the maximum contribution to the payment and satisfaction thereof which is permissible under Applicable Law. The parties hereto the parties hereto acknowledge and agree that all indemnity payments owed pursuant to this Section 8.1 shall be subject to the Subordination Agreement.

8.2 Amendments and Waivers. Neither this Agreement nor any portion or provisions hereof may be changed, modified, amended, waived, supplemented, discharged, cancelled or terminated orally or by any course of dealing, or in any manner other than by an agreement in writing, signed by the party to be charged.

8.3 Notices. Any notice or other communication required shall be in writing addressed to the respective party as set forth below and may be personally served, sent by email, sent by overnight courier service or U.S. mail and shall be deemed to have been given: (a) if delivered in person, when delivered; (b) if sent by email, by the sender's receipt of an email acknowledgment confirming delivery thereof (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), (c) if delivered by overnight courier, one Business Day after delivery to the courier properly addressed; or (d) if delivered by U.S. mail, four (4) Business Days after deposit with postage prepaid and properly addressed.

Notices shall be addressed as follows:

| | |
|---|---|
| If to the Borrower: | Uncle Nearest, Inc.<br>3125 US 231 N.<br>Shelbyville, TN 37160<br>Attn: Keith Weaver<br>Email: keith.weaver@unclenearest.com |
| With a copy to (which shall not constitute notice): | Troutman Pepper Locke LLP<br>300 S. Grand Avenue<br>Suite 2600<br>Los Angeles, CA 90071<br>Attn: David S. Kupetz, Esq.<br>Email: David.Kupetz@troutman.com<br><br>and<br><br>Troutman Pepper Locke LLP<br>111 Huntington Avenue<br>Boston, MA 02199<br>Attn: Christine Dreyer McCay, Esq.<br>Email: Christine.McCay@troutman.com |
| If to the Lender: | Grant Sidney Inc.<br>600 N. Main Street, Suite 2000<br>Shelbyville, TN 37160<br>Attn: Fawn Weaver<br>Email: fawn.weaver@unclenearest.com |

8.4 Failure or Indulgence Not Waiver; Remedies Cumulative. No failure or delay on the part of the Lender to exercise, nor any partial exercise of, any power, right or privilege hereunder or under any other Loan Documents shall impair such power, right, or privilege or be construed to be a waiver of any Default or Event of Default. All rights and remedies existing hereunder or under any other Loan Document are cumulative to and not exclusive of any rights or remedies otherwise available.

8.5 Payments Set Aside. To the extent that the Borrower makes payment(s), and such payment(s) is subsequently invalidated, declared to be fraudulent or preferential, set aside, or required to be repaid by anyone (whether as a result of any demand, litigation, settlement or otherwise), then to the extent of such recovery, the Obligations or part thereof originally intended to be satisfied, and all rights and remedies therefor, shall be revived and continued in full force and effect as if such payment had not been made.

8.6 Severability. All rights, remedies and powers provided in this Agreement may be exercised only to the extent that the exercise thereof does not violate any applicable provision of law, and all the provisions of this Agreement are intended to be subject to all applicable mandatory provisions of law that may be controlling and to be limited to the extent necessary so that they shall not render this Agreement invalid, unenforceable or not entitled to be recorded or registered, in whole or in part. Any provision in this Agreement that is held to be inoperative, unenforceable, or invalid in any jurisdiction shall, as to that jurisdiction, be inoperative, unenforceable, or invalid without affecting the remaining provisions in that jurisdiction or the operation, enforceability, or validity of that provision in any other jurisdiction, and to this end the provisions of this Agreement are declared to be severable and the validity and enforceability of the remaining provisions, or portions or applications thereof, shall not be affected thereby and shall remain in full force and effect.

8.7 Headings. Section and clause headings are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purposes or be given substantive effect.

8.8 Applicable Law. THIS AGREEMENT AND EACH OF THE OTHER LOAN DOCUMENTS WHICH DOES NOT EXPRESSLY SET FORTH APPLICABLE LAW SHALL BE GOVERNED BY AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH THE INTERNAL LAWS OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.

8.9 Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, except that the Borrower may not assign its rights or obligations hereunder without the written consent of the Lender and any such purported assignment without such written consent shall be void.

8.10 Construction. The Lender and the Borrower acknowledge that each of them has had the benefit of legal counsel of its own choice and has been afforded an opportunity to review the Loan Documents with its legal counsel and that the Loan Documents shall be construed as if jointly drafted by the Lender and the Borrower.

8.11 CONSENT TO JURISDICTION. THE BORROWER HEREBY CONSENTS TO THE JURISDICTION OF ANY STATE OR FEDERAL COURT LOCATED WITHIN NEW YORK COUNTY, STATE OF NEW YORK AND IRREVOCABLY AGREE THAT, SUBJECT TO THE LENDER'S ELECTION, ALL ACTIONS OR PROCEEDINGS ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS SHALL BE LITIGATED IN SUCH COURTS. THE BORROWER EXPRESSLY SUBMITS AND CONSENTS TO THE JURISDICTION OF THE AFORESAID COURTS AND WAIVES ANY DEFENSE OF FORUM NON CONVENIENS. THE BORROWER HEREBY WAIVES PERSONAL SERVICE OF ANY AND ALL PROCESS AND AGREES THAT ALL SUCH SERVICE OF PROCESS MAY BE MADE UPON THE BORROWER BY CERTIFIED OR REGISTERED MAIL, RETURN RECEIPT REQUESTED, ADDRESSED TO THE BORROWER, AT THE ADDRESS SET FORTH IN THIS AGREEMENT AND SERVICE SO MADE SHALL BE COMPLETE TEN (10) DAYS AFTER THE SAME HAS BEEN POSTED.

8.12 WAIVER OF JURY TRIAL. THE BORROWER AND THE LENDER EACH HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS. THE BORROWER AND THE LENDER EACH ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS RELIED ON THE WAIVER IN ENTERING INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN THEIR

RELATED FUTURE DEALINGS. THE BORROWER AND THE LENDER EACH WARRANT AND REPRESENT THAT EACH HAS HAD THE OPPORTUNITY OF REVIEWING THIS JURY WAIVER WITH LEGAL COUNSEL, AND THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS.

8.13 Survival of Warranties and Certain Agreements. All agreements, representations and warranties made herein shall survive the execution and delivery of this Agreement, the making of the Loans and the execution and delivery of this Agreement and the Notes, if any. Notwithstanding anything in this Agreement or any other Loan Document or implied by law to the contrary, the agreements of the Borrower set forth in Sections 2.3 and 8.1 shall survive the repayment of the Obligations and the termination of this Agreement and the other Loan Documents.

8.14 Entire Agreement. This Agreement, the Notes, if any, and the other Loan Documents embody the entire agreement among the parties hereto and supersede all prior commitments, agreements, representations and understandings, whether oral or written, relating to the subject matter hereof, and may not be contradicted or varied by evidence of prior, contemporaneous, or subsequent oral agreements or discussions of the parties hereto. Any promises, representations, warranties or guarantees not herein contained and hereinafter made shall have no force and effect unless in writing, signed by a duly Authorized Officer of the Borrower and the Lender. All Exhibits and Schedules referred to herein are incorporated in this Agreement by reference and constitute a part of this Agreement. The Borrower acknowledges that it has been advised by counsel in connection with the execution of this Agreement and other Loan Documents and is not relying upon oral representations or statements inconsistent with the terms and provisions of this Agreement.

8.15 Counterparts; Effectiveness. This Agreement may be executed by facsimile or other electronic signature and in counterparts and each of such counterparts will for all purposes be deemed to be an original, and such counterparts will together constitute one and the same instrument. This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine, via PDF or other electronic transmission shall be treated in all manner and respects as an original Agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. The exchange of copies of this Agreement and of signature pages by PDF e-mail shall constitute effective execution and delivery of this Agreement as to the parties and may be used in lieu of the original agreement for all purposes. Signatures of the parties transmitted by PDF shall be deemed to be their original signatures for all purposes. No party hereto shall raise the use of a facsimile machine or PDF email to deliver a signature hereto or to any notice delivered hereunder, or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or PDF email, as a defense to the formation of a contract, and each such party forever waives any such defense. Electronic records of executed Loan Documents maintained by the Lender shall be deemed to be originals thereof.

8.16 Subordination of Intercompany Debt.

(a) Each Borrower hereby agrees that any intercompany Indebtedness or other intercompany payables or receivables, or intercompany advances directly or indirectly made by or owed to such Borrower by any other Borrower (collectively, "Intercompany Debt"), of whatever nature at any time outstanding shall be subordinate and subject in right of payment to the prior payment in full in cash of the Obligations. Each Borrower hereby agrees that it will not, while any Event of Default is continuing, accept any payment, including by offset, on any Intercompany Debt until the Termination Date, in each case, except with the prior written consent of the Lender.

(b) In the event that any payment on any Intercompany Debt shall be received by a Borrower other than as permitted by this Section 8.16 before the Termination Date, such Borrower shall receive such payments and hold the same in trust for, segregate the same from its own assets and shall immediately pay over to the Lender all such sums to the extent necessary so that the Lender shall have been paid in full, in cash, all Obligations owed or which may become owing.

(c) Upon any payment or distribution of any assets of any Borrower of any kind or character, whether in cash, property or securities by set-off, recoupment or otherwise, to creditors in any liquidation or other winding-up of such Borrower or in the event of any Proceeding, the Lender shall first be entitled to receive payment in full in cash, in accordance with the terms of the Obligations and of this Agreement, of all amounts payable under or in respect of such Obligations, before any payment or distribution is made on, or in respect of, any Intercompany Debt, in any such Proceeding, any distribution or payment, to which the Lender would be entitled except for the provisions hereof shall be paid by such Borrower, or by any receiver, trustee in bankruptcy, liquidating trustee, agent or other person making such payment or distribution directly to the Lender to the extent necessary to pay all such Obligations in full in cash, after giving effect to any concurrent payment or distribution to the Lender.

8.17 Joint and Several Liability. Each Borrower is accepting joint and several liability hereunder in consideration of the financial accommodations to be provided by this Lender under this Agreement, for the mutual benefit, directly and indirectly, of each Borrower and in consideration of the undertakings of each Borrower to accept joint and several liability for the obligations of each of them.

(a) Each Borrower jointly and severally hereby irrevocably and unconditionally accepts, not merely as a surety but also as a co-debtor, joint and several liability with each other Borrowers with respect to the payment and performance of all of the Obligations, it being the intention of the parties hereto that all the Obligations shall be the joint and several obligations of each Borrower without preferences or distinction among them.

(b) If and to the extent that any Borrower shall fail to make any payment with respect to any of the Obligations as and when due or to perform any of the Obligations in accordance with the terms thereof, then in each such event, each other Borrower will make such payment with respect to, or perform, such Obligation.

(c) The obligations of each Borrower under the provisions of this Section 8.17 constitute full recourse obligations of such Borrower, enforceable against it to the full extent of its properties and assets, irrespective of the validity, regularity or enforceability of this Agreement or any other circumstances whatsoever.

8.18 Subordination. The parties hereto acknowledge and agree that payment of any Obligations under this Agreement is subordinated in full to the Senior Obligations in accordance with the terms of the Subordination Agreement and the exercise of all rights and remedies of the Lender under this Agreement is subject in all respects to the Subordination Agreement.

[Remainder of page intentionally left blank.]

Witness the due execution hereof by the respective duly authorized officers of the undersigned as of the date first written above.

BORROWER:

UNCLE NEAREST, INC.

DocuSigned by:
By: FAWN WEAVER
8DC5934F0902430
Name: Fawn Weaver
Title: President and Secretary

NEAREST GREEN DISTILLERY, INC.

DocuSigned by:
By: FAWN WEAVER
8DC5934F0902430
Name: Fawn Weaver
Title: President and Secretary

UNCLE NEAREST REAL ESTATE HOLDINGS, LLC

By: Uncle Nearest, Inc., its Member

DocuSigned by:
By: FAWN WEAVER
8DC5934F0902430
Name: Fawn Weaver
Title: President and Secretary

<u>LENDER</u>:

GRANT SIDNEY INC.

DocuSigned by:
By: FAWN WEAVER
8DC5934F0902430...
Name: Fawn Weaver
Title: Chief Executive Officer

## EXHIBIT A

**[Form of]**
**Notice of Borrowing**

TO: Grant Sidney Inc. (the "Lender")

RE: Subordinated Credit Agreement, dated as of April 15, 2025, by and among Uncle Nearest, Inc., a Delaware corporation, Nearest Green Distillery, Inc., a Delaware corporation, Uncle Nearest Real Estate Holdings, LLC, a Tennessee limited liability company (collectively, the "Borrower"), and the Lender (defined therein) (as amended, modified, extended, restated, replaced, or supplemented from time to time, the "Credit Agreement"; capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Credit Agreement)

DATE: [Date]

REQUESTED FUNDING DATE: [Date]

---

The undersigned hereby requests the following:

[**Initial Term Loan Facility**

An Initial Term Loan in the principal amount of $______________________.]

OR

[**Delayed Draw Term Loan Facility**

A Delayed Draw Term Loan in the principal amount of $______________________.]

The Borrower hereby represents and warrants that the conditions specified in Section 3.2 of the Credit Agreement shall be satisfied on and as of the date of the Credit Extension.

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this notice.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**BORROWER:**

**UNCLE NEAREST, INC.**,
a Delaware corporation

By:_______________________________
Name: Fawn Weaver
Title: President and Secretary

**NEAREST GREEN DISTILLERY, INC.**,
a Delaware corporation

By:_______________________________
Name: Fawn Weaver
Title: President and Secretary

**UNCLE NEAREST REAL ESTATE HOLDINGS, LLC**,
a Tennessee limited liability company

By: Uncle Nearest, Inc., its Member

By:_______________________________
Name: Fawn Weaver
Title: President and Secretary

**EXHIBIT B**

**[Form of]**
**Initial Term Loan Note**

THIS AGREEMENT OR INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN INTERCREDITOR AND SUBORDINATION AGREEMENT DATED AS OF APRIL 15, 2025, BETWEEN FARM CREDIT MID-AMERICA, PCA AND THE SUBORDINATED CREDITORS (INCLUDING GRANT SIDNEY INC.) PARTY THERETO (AS AMENDED, THE "SUBORDINATION AGREEMENT") TO THE "SENIOR DEBT" (AS DEFINED IN THE SUBORDINATION AGREEMENT), AND EACH PARTY TO OR HOLDER OF THIS AGREEMENT OR INSTRUMENT, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.

[Date]

FOR VALUE RECEIVED, the undersigned (the "Borrower"), hereby promises to pay to GRANT SIDNEY INC. or its registered assigns (the "Lender"), in accordance with the provisions of the Subordinated Credit Agreement (as hereinafter defined), the principal amount of the Initial Term Loan made by the Lender to the Borrower under that certain Subordinated Credit Agreement, dated as of April 15, 2025 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement;" the terms defined therein being used herein as therein defined), among the Borrower and the lenders from time to time party thereto.

The Borrower promises to pay interest on the unpaid principal amount of the Initial Term Loan made by the Lender from the date of the Initial Term Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement. All payments of principal and interest shall be made to the Lender in Dollars and same day funds by wire transfer to the account the Lender may from time to time designate in writing to the Borrower. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Initial Term Loan Note is one of the Initial Term Loan Notes referred to in the Credit Agreement and the holder is entitled to the benefits thereof. The Initial Term Loan made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Initial Term Loan Note and endorse thereon the date, amount and maturity of its Initial Term Loan and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Initial Term Loan Note.

Delivery of an executed counterpart of a signature page of this Initial Term Loan Note by fax transmission or other electronic mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Initial Term Loan Note.

THIS INITIAL TERM LOAN NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**BORROWER:**

**UNCLE NEAREST, INC.**,
a Delaware corporation
By:______________________________
Name: Fawn Weaver
Title: President and Secretary

**NEAREST GREEN DISTILLERY, INC.**,
a Delaware corporation
By:______________________________
Name: Fawn Weaver
Title: President and Secretary

**UNCLE NEAREST REAL ESTATE HOLDINGS, LLC**,
a Tennessee limited liability company

By: Uncle Nearest, Inc., its Member

By:______________________________
Name: Fawn Weaver
Title: President and Secretary

## EXHIBIT C

**[Form of]**
**Delayed Draw Term Loan Note**

THIS AGREEMENT OR INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN INTERCREDITOR AND SUBORDINATION AGREEMENT DATED AS OF APRIL 15, 2025, BETWEEN FARM CREDIT MID-AMERICA, PCA AND THE SUBORDINATED CREDITORS (INCLUDING GRANT SIDNEY INC.) PARTY THERETO (AS AMENDED, THE "SUBORDINATION AGREEMENT") TO THE "SENIOR DEBT" (AS DEFINED IN THE SUBORDINATION AGREEMENT), AND EACH PARTY TO OR HOLDER OF THIS AGREEMENT OR INSTRUMENT, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.

[Date]

FOR VALUE RECEIVED, the undersigned (the "Borrower"), hereby promises to pay to GRANT SIDNEY INC. or its registered assigns (the "Lender"), in accordance with the provisions of the Subordinated Credit Agreement (as hereinafter defined), the principal amount of each Delayed Draw Term Loan made by the Lender to the Borrower under that certain Subordinated Credit Agreement, dated as of April 15, 2025 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement;" the terms defined therein being used herein as therein defined), among the Borrower and the lenders from time to time party thereto.

The Borrower promises to pay interest on the unpaid principal amount of each Delayed Draw Term Loan made by the Lender from the date of such Delayed Draw Term Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement. All payments of principal and interest shall be made to the Lender in Dollars and same day funds by wire transfer to the account the Lender may from time to time designate in writing to the Borrower. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Delayed Draw Term Loan Note is one of the Delayed Draw Term Loan Notes referred to in the Credit Agreement and the holder is entitled to the benefits thereof. The Delayed Draw Term Loans made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Delayed Draw Term Loan Note and endorse thereon the date, amount and maturity of its Delayed Draw Term Loans and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Delayed Draw Term Loan Note.

Delivery of an executed counterpart of a signature page of this Delayed Draw Term Loan Note by fax transmission or other electronic mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Delayed Draw Term Loan Term Note.

THIS DELAYED DRAW TERM LOAN NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**<u>BORROWER</u>:**

**UNCLE NEAREST, INC.**,
a Delaware corporation

By:________________________________________
Name:______________________________________
Title:_______________________________________

**NEAREST GREEN DISTILLERY, INC.**,
a Delaware corporation

By:________________________________________
Name:______________________________________
Title:_______________________________________

**UNCLE NEAREST REAL ESTATE HOLDINGS, LLC**,
a Tennessee limited liability company

By:________________________________________
Name:______________________________________
Title:_______________________________________

Schedule 1.1

Commitment Schedule

Initial Term Loan Commitments:

| Lender | Initial Term Loan Commitment | Applicable Percentage | Funding Date of Fundings Prior to Closing Date | Funding Amount of Fundings Prior to Closing Date |
|---|---|---|---|---|
| Grant Sidney Inc. | $20,026,270.00 | 100% | 02/04/2025 | $467,887.73 |
| Grant Sidney Inc. | | | 02/06/2025 | $391,160.23 |
| Grant Sidney Inc. | | | 02/06/2025 | $600,015.00 |
| Grant Sidney Inc. | | | 02/07/2025 | $600,015.00 |
| Grant Sidney Inc. | | | 02/10/2025 | $1,000,015.00 |
| Grant Sidney Inc. | | | 02/11/2025 | $1,000,015.00 |
| Grant Sidney Inc. | | | 02/20/2025 | $497,693.27 |
| Grant Sidney Inc. | | | 02/20/2025 | $1,000,035.00 |
| Grant Sidney Inc. | | | 02/28/2025 | $4,400,035.00 |
| Grant Sidney Inc. | | | 03/07/2025 | $200,015.00 |
| Grant Sidney Inc. | | | 03/07/2025 | $250,015.00 |
| Grant Sidney Inc. | | | 03/27/2025 | $500,015.00 |
| Grant Sidney Inc. | | | 03/28/2025 | $500,015.00 |
| Grant Sidney Inc. | | | 04/01/2025 | $386,666.77 |
| Grant Sidney Inc. | | | 04/08/2025 | $732,672.00 |
| Grant Sidney Inc. | | | 04/14/2025 | $7,500,000.00 |
| | | | **Total funded prior to Closing Date:** | $20,026,270.00 |
| **Total:** | $20,026,270.00 | **100%** | **Remaining Initial Term Loan Commitment Amount as of Closing Date:** | $0 |

Delayed Draw Term Loan Commitments:

| Lender | Delayed Draw Term Loan Commitment | Applicable Percentage |
|---|---|---|
| Grant Sidney Inc. | $30,000,000.00 | 100% |
| **Total:** | **$30,000,000.00** | **100%** |

**Initial Term Loan Note**

THIS AGREEMENT OR INSTRUMENT AND THE RIGHTS AND OBLIGATIONS EVIDENCED HEREBY ARE SUBORDINATE IN THE MANNER AND TO THE EXTENT SET FORTH IN THAT CERTAIN INTERCREDITOR AND SUBORDINATION AGREEMENT DATED AS OF APRIL 15, 2025, BETWEEN FARM CREDIT MID-AMERICA, PCA AND THE SUBORDINATED CREDITORS (INCLUDING GRANT SIDNEY INC.) PARTY THERETO (AS AMENDED, THE "SUBORDINATION AGREEMENT") TO THE "SENIOR DEBT" (AS DEFINED IN THE SUBORDINATION AGREEMENT), AND EACH PARTY TO OR HOLDER OF THIS AGREEMENT OR INSTRUMENT, BY ITS ACCEPTANCE HEREOF, IRREVOCABLY AGREES TO BE BOUND BY THE PROVISIONS OF THE SUBORDINATION AGREEMENT.

April 15, 2025

FOR VALUE RECEIVED, the undersigned (the "Borrower"), hereby promises to pay to GRANT SIDNEY INC. or its registered assigns (the "Lender"), in accordance with the provisions of the Subordinated Credit Agreement (as hereinafter defined), the principal amount of the Initial Term Loan made by the Lender to the Borrower under that certain Subordinated Credit Agreement, dated as of April 15, 2025 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement;" the terms defined therein being used herein as therein defined), among the Borrower and the lenders from time to time party thereto.

The Borrower promises to pay interest on the unpaid principal amount of the Initial Term Loan made by the Lender from the date of the Initial Term Loan until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement. All payments of principal and interest shall be made to the Lender in Dollars and same day funds by wire transfer to the account the Lender may from time to time designate in writing to the Borrower. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Initial Term Loan Note is one of the Initial Term Loan Notes referred to in the Credit Agreement and the holder is entitled to the benefits thereof. The Initial Term Loan made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Initial Term Loan Note and endorse thereon the date, amount and maturity of its Initial Term Loan and payments with respect thereto.

The Borrower, for itself, its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Initial Term Loan Note.

Delivery of an executed counterpart of a signature page of this Initial Term Loan Note by fax transmission or other electronic mail transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Initial Term Loan Note.

THIS INITIAL TERM LOAN NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

**BORROWER:**

**UNCLE NEAREST, INC.**,
a Delaware corporation
By: DocuSigned by: FAWN WEAVER 8DC5934F0902430...
Name: Fawn Weaver
Title: President and Secretary

**NEAREST GREEN DISTILLERY, INC.**,
a Delaware corporation
By: DocuSigned by: FAWN WEAVER 8DC5934F0902430...
Name: Fawn Weaver
Title: President and Secretary

**UNCLE NEAREST REAL ESTATE HOLDINGS, LLC**,
a Tennessee limited liability company

By: Uncle Nearest, Inc., its Member

By: DocuSigned by: FAWN WEAVER 8DC5934F0902430...
Name: Fawn Weaver
Title: President and Secretary