**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **FARM CREDIT MID-AMERICA, PCA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNCLE NEAREST, INC., NEAREST GREEN DISTILLERY, INC., UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, FAWN WEAVER and KEITH WEAVER,** | ) | **Case No. _______________** |
| | ) | |
| **Defendants.** | ) | |

# DECLARATION OF BRIAN KLATT IN SUPPORT OF THE VERIFIED COMPLAINT AND EMERGENCY MOTION FOR THE IMMEDIATE APPOINTMENT OF RECEIVER

I, Brian Klatt, pursuant to 28 U.S.C. § 1746, do hereby swear and affirm under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am over 18 years of age and competent to testify in this matter. Based on my personal knowledge I would, if called to testify about the matters set forth herein, be able to do so.

2. I am a Managing Director Food and Agribusiness for Farm Credit Mid-America, PCA ("the Lender" or "Farm Credit").

3. Uncle Nearest, Inc. ("Uncle Nearest, Inc."), Nearest Green Distillery, Inc. (the "Distillery"), Uncle Nearest Real Estate Holdings, LLC ("RE Holdings"), and Fawn and Keith Weaver (in their official and individual capacities) (all collectively "Defendants" or "Uncle Nearest") are obligated to the Lender pursuant to the following:

## B. Uncle Nearest

4. Founded by Fawn and Keith Weaver (the "Weavers") in 2016, Uncle Nearest is a

whiskey company headquartered in Shelbyville, Tennessee that markets and sells eight different whiskeys. Upon information and belief, Uncle Nearest and the Weavers have also acquired the rights to or attempted to develop a vodka line and a cognac division.

5. Located on a farm in Shelbyville, the Weavers built the Nearest Green Distillery. The Nearest Green Distillery hosts tours of the property and tastings of the various whiskeys. Additionally, in order to bring the Uncle Nearest brand to the market, Uncle Nearest relies on outsourcing many key operations to deliver and market its whiskey to its customers.

**C. The Loan Documents**

6. Uncle Nearest and the Lender are parties to (i) that certain Credit Agreement dated July 22, 2022 (as amended by that certain Amendment No. 1 to Credit Agreement dated October 3, 2022, that certain Amendment No. 2 to Credit Agreement dated December 16, 2022, that certain Amendment No. 3 to Credit Agreement dated January 26, 2023, that certain Amendment No. 4 to Credit Agreement dated March 30, 2023, that certain Amendment No. 5 to Credit Agreement dated June 6, 2023, that certain Amendment No. 6 to Credit Agreement and Limited Waiver dated July 26, 2023, that certain Amendment No. 7 to Credit Agreement and Limited Waiver dated December 27, 2023, that certain Amendment No. 8 to Credit Agreement and Forbearance Agreement dated April 15, 2025 (the "Forbearance Agreement"), the "Credit Agreement"),[1] and (ii) the other agreements, documents and instruments executed and delivered in connection with, related to or referenced in the Credit Agreement (collectively and together with the Credit Agreement, the "Loan Documents").[2]

7. Pursuant to the terms of the Credit Agreement, the Lender provided certain loans,

---

[1] Each capitalized term used but not defined herein shall have the same meaning ascribed thereto in the Credit Agreement.

[2] True and correct copies of the Loan Documents are attached as **Exhibit 1** through **Exhibit 9** hereto.

extensions of credit, and financial accommodations to Uncle Nearest. There are three loans in this matter: the Revolving Loan, the Term Loan, and the RELOC Loan (collectively, the "Loans").

8. The Lender has, on occasion, agreed to increase its commitments to provide certain loans to Uncle Nearest and waive Events of Default in reliance upon Uncle Nearest's representations as to its success and strategic growth.

**D. Loan Obligations Secured by Real and Personal Property**

9. Pursuant to the Credit Agreement and as security for repayment of the Loans, Uncle Nearest entered into that certain Security Agreement (the "Security Agreement")[3] dated July 22, 2022, granting a security interest to the Lender in almost all of Uncle Nearest's personal property (the "Personal Property Collateral"), including accounts, accounts receivable, inventory (including, without limitation, spirits, bottles, and barrels), goods and general intangibles.

10. Specifically, Section B.2 of the Security Agreement states:

> **2. Grant of Security Interest.** Each Grantor hereby grants as collateral security for the payment, performance and satisfaction of the Secured Obligations to the Administrative Agent for the benefit of the Secured Parties a continuing security interest in and to, and collaterally assigns to, the Administrative Agent for the benefit of the Secured Parties, all of the assets of such Grantor or in which such Grantor has or may have or acquire an interest or the power to transfer rights therein, whether now owned or existing or hereafter created, acquired or arising and wheresoever located, including, without limitation, the following:
>
> (a) All accounts, including accounts receivable, contracts, bills, acceptances, choses in action, and other forms of monetary obligations at any time owing to such Grantor arising out of property sold, leased, licensed, assigned or otherwise disposed of or for services rendered or to be rendered by such Grantor, and all of such Grantor's rights with respect to any property the sale, lease or license of which gave rise thereto, whether or not delivered, property returned by customers and all rights as an unpaid vendor or lienor, including rights of stoppage in transit and of recovering possession by proceedings including replevin and reclamation (collectively referred to hereinafter as "Accounts");

[3] A true and accurate copy of the Security Agreement is attached hereto as **Exhibit 10**.

(b) All inventory, including all goods manufactured or acquired for sale or lease (including, without limitation, spirits, beer, malt beverages, wine, wine cooler products, champagne, juices, waters, coffees, tea, soft drinks and other alcoholic and non-alcoholic beverages), and any piece goods, raw materials, work in process and finished merchandise, component materials, and all supplies, bottles, barrels, cans, syrups, draft equipment, pallets, dunnage, cooperage, goods, incidentals, office supplies, packaging materials and any and all items used or consumed in the operation of the business of such Grantor or which may contribute to the finished product or to the sale, promotion and shipment thereof, in which such Grantor now or at any time hereafter may have an interest, whether or not the same is in transit or in the constructive, actual or exclusive occupancy or possession of such Grantor or is held by such Grantor or by others for such Grantor's account (collectively referred to hereinafter as "Inventory");

(c) All goods, including all machinery, equipment, motor vehicles, crops, farm products, parts, supplies, apparatus, appliances, tools, patterns, molds, dies, blueprints, fittings, furniture, furnishings, fixtures and articles of tangible personal property of every description, and all computer programs embedded in any of the foregoing and all supporting information relating to such computer programs (collectively referred to hereinafter as "Equipment");

(d) All general intangibles, including all rights now or hereafter accruing to such Grantor under contracts, leases, agreements or other instruments, including all contracts or contract rights to perform or receive services, to purchase or sell goods, or to hold or use land or facilities, and to enforce all rights thereunder, all causes of action, corporate or business records, inventions, patents and patent rights, rights in mask works, designs, trade names and trademarks and all goodwill associated therewith, trade secrets, trade processes, licenses, permits, franchises, customer lists, computer programs and software, all internet domain names and registration rights thereto, all internet websites and the content thereof, all payment intangibles, all claims under guaranties, tax refund claims, all rights and claims against carriers and shippers, leases, all claims under insurance policies, all interests in general and limited partnerships, limited liability companies, and other Persons not constituting Investment Property (as defined below), all rights to indemnification and all other intangible personal property and intellectual property of every kind and nature (collectively referred to hereinafter as "General Intangibles");

(e) All Copyrights, Patents and Trademarks;

(f) All deposit accounts, including demand, time, savings, passbook, or other similar accounts maintained with any bank by or for the benefit of such Grantor (collectively referred to hereinafter as "Deposit Accounts");

(g) All chattel paper, including tangible chattel paper, electronic chattel paper, or any hybrid thereof (collectively referred to hereinafter as "Chattel Paper");

(h) All investment property, including all securities, security entitlements, securities accounts, commodity contracts and commodity accounts of or maintained for the benefit of such Grantor, but excluding Equity Interests in Subsidiaries (collectively referred to hereinafter as "Investment Property");

(i) All instruments, including all promissory notes (collectively referred to hereinafter as "Instruments");

(j) All documents, including warehouse receipts, bills of lading and other documents of title (collectively referred to hereinafter as "Documents");

(k) All rights to payment or performance under letters of credit including rights to proceeds of letters of credit ("Letter-of-Credit Rights"), and all guaranties, endorsements, Liens, other Guarantee obligations or supporting obligations of any Person securing or supporting the payment, performance, value or liquidation of any of the foregoing (collectively, with Letter-of-Credit Rights, referred to hereinafter as "Supporting Obligations");

(l) The commercial tort claims identified on Schedule 9(i) hereto, as such Schedule may be supplemented from time to time in accordance with the terms hereof (collectively referred to hereinafter as "Commercial Tort Claims");

(m) All books and records relating to any of the foregoing (including customer data, credit files, ledgers, computer programs, printouts, and other computer materials and records (and all media on which such data, files, programs, materials and records are or may be stored)); and

(n) All proceeds, products and replacements of, accessions to, and substitutions for, any of the foregoing, including without limitation proceeds of insurance policies insuring any of the foregoing.

All of the property and interests in property described in subsections (a) through (n) are herein collectively referred to as the "Collateral;" provided that, notwithstanding the foregoing, the Collateral shall not include any Excluded Asset.

11. The Lender has filed and recorded UCC-1 Financing Statements[4] against each of

[4] True and accurate copies of the financing statements are attached hereto collectively as **Exhibit 11**.

Uncle Nearest, Inc., the Distillery and RE Holdings with the office of the secretary of state for their states of incorporation or organization.

12. As additional Collateral to secure the obligations under the Credit Agreement, RE Holdings and the Weavers have executed certain deeds of trust (collectively, the "Deeds of Trust") granting liens in certain real property (the "Real Property Collateral" and together with the Personal Property Collateral, collectively the "Collateral"):

a. RE Holdings executed that certain Deed of Trust, Assignment of Leases, Security Agreement and Financing Statement dated July 22, 2022 (the "Bedford County Deed of Trust").[5] The Bedford County Deed of Trust was recorded in the Bedford County Register of Deeds' Office, Tennessee in Book TD1060, Page 865, as Instrument 22006177. The Bedford County Deed of Trust grants the Lender a first priority lien in the real property under those certain lots, pieces, tracts or parcels of land located in certain cities and/or counties in the State of Tennessee, more particularly described in Exhibit A of the Bedford County Deed of Trust (the "Nearest Green Distillery Property"). The Bedford County Deed of Trust was amended on June 5, 2023, to conform to amendments to the Credit Agreement. The Nearest Green Distillery sits on the Nearest Green Distillery Property. Upon information and belief, the Humble Baron Bar (a restaurant/bar that is purportedly not owned by Uncle Nearest) and Barrel House II BBQ (a second location of a local restaurant that is not owned by Uncle Nearest) were both built on the Nearest Green Distillery Property after the Bedford County Deed of Trust was executed.

b. The Weavers executed that certain Deed of Trust, Assignment of Leases, Security Agreement and Financing Statement dated July 22, 2022 (the "Dan Call Farm Deed of Trust").[6] The Dan Call Farm Deed of Trust was recorded in the Moore County Register of Deeds' Office, Tennessee in Book T174, Page 191, as Instrument 22000783. The Dan Call Farm Deed of Trust grants the Lender a second priority lien[7] in the real property under those certain lots, pieces, tracts or parcels of land located in certain cities and/or counties in the State of Tennessee, more particularly described in Exhibit A of the Dan Call Farm Deed of Trust. The Dan Call Farm Deed of Trust was amended on June 5, 2023, to conform to amendments to the Credit Agreement. The property subject to the Dan Call Farm Deed of Trust is upon information and belief, a historic site where Nathan "Nearest" Green began

[5] True and correct copies of the Bedford County Deed of Trust and all amendments thereto are attached collectively hereto as **Exhibit 12**.

[6] True and correct copies of the Dan Call Farm Deed of Trust and all amendments thereto are attached collectively hereto as **Exhibit 13.**

[7] Farm Credit Mid-America, FLCA, holds the first priority lien in the real property subject to the Dan Call Farm Deed of Trust pursuant to a deed of trust executed to secure the Weavers' obligations under separate, individual loans from Farm Credit Mid-America, FLCA.

distilling whiskey and met Jack Daniel.

c. On June 6, 2023, Mr. Weaver executed that certain Deed of Trust which was recorded in the Bedford County Register of Deeds' Office, Tennessee in Book TD1087, Page 919, as Instrument 23003860 (the "Eady Road Deed of Trust").[8] The Eady Road Deed of Trust grants the Lender a first priority lien in the real property under those certain lots, pieces, tracts or parcels of land located in certain cities and/or counties in the State of Tennessee, more particularly described in Exhibit A of the Eady Road Deed of Trust (the "Eady Road Property"). The Eady Road Property is adjacent to the Nearest Green Distillery Property.

13. In the regular performance of my job functions, I am familiar with the business records maintained by the Lender, which include the Loan Documents. These records (which include data compilations, electronically imaged documents and others) are made or received and retained at or near the time by, or from information by, persons with knowledge of the activities and transactions reflected in such records and are made and kept in the course of business activity regularly conducted by the Lender. In connection with making this affidavit I have personally examined the Loan Documents regarding the account that forms the basis of the instant action.

**E. The Loan Document Defaults**

14. Uncle Nearest has been in default under the Loans since as early as January 2, 2024, and has continued to incur further defaults over the last eighteen months. One of the most recent defaults occurred as a result of Uncle Nearest's failure to pay the Revolving Loans in full on the applicable Maturity Date of July 22, 2025.

15. As of the date of the execution of the Forbearance Agreement, Uncle Nearest was in default of the terms of the Credit Agreement as a result of, among other things, the following by or against one or more of the Loan Parties (the "Pre-Forbearance Defaults"):

a. Failure to timely repay the outstanding overadvance as required by Section 2.3(b)(i);

b. Failure to timely pay the following amounts of interest on the Loans as required by

[8] A true and correct copy of the Eady Road Deed of Trust is attached hereto as **Exhibit 14**.

Section 2.6(c) on the following Interest Payment Dates:

i. $1,519,542.95 on January 2, 2024;

ii. $1,667,331.68 on July 1, 2024;

iii. $2,417,636.84 on October 1, 2024;

iv. $2,326,636.93 on January 2, 2025;

v. $390,616.44 on February 3, 2025; and

vi. $2,170,372.62 on April 1, 2025;

c. Failure to timely pay the following quarterly installment payments on the aggregate principal amount of all Term Loans outstanding as required by Section 2.5(b) on the first day of each calendar quarter:

i. $293,789.06 on October 1, 2024;

ii. $293,789.06 on January 2, 2025; and

iii. $293,789.06 on April 1, 2025;

d. Failure to timely pay on April 1, 2025, the $250,000 amortization payment on the principal amount of the RELOC Loan outstanding as required by Section 2.5(c) on the first day of each calendar quarter, commencing with April 1, 2025;

e. Failure to timely deliver monthly financial statements required by Section 6.1(b) for one or more months from July 2022 through April 2025;

f. Failure to timely deliver the annual business plan required by Section 6.1(c) for the fiscal years ending December 31, 2023, and December 31, 2024;

g. Failure to timely deliver compliance certificates required by Section 6.2(a) for one or more months from July 2022 through March 2025;

h. Failure to timely deliver Borrowing Base Certificates required by Section 6.2(c) for one or more months from July 2022 through April 2025;

i. Failure to timely deliver the report summarizing the Borrowers' insurance coverage required by Section 6.2(d);

j. Failure to adequately respond to requests for information set forth in that certain letter from the Lender to the Borrowers dated as of January 12, 2024, as required by Section 6.2(h);

k. Failure to timely give notice of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect as required by Section 6.3(b);

l. Failure to observe the covenant to maintain proper books and records set forth in Section 6.9;

m. Failure to maintain a minimum Consolidated Tangible Net Worth of no less than $100,000,000 at all times during the period from December 31, 2023, through December 30, 2024, as required by Section 7.11(a);

n. Failure to maintain a minimum Consolidated Tangible Net Worth of no less than $122,000,000 at all times during the period from December 31, 2024, through the date hereof, as required by Section 7.11(a);

o. Failure to maintain a Consolidated Net Income of no less than $1.00 for each calendar month during the period commencing December 1, 2023, through January 31, 2025, as required by Section 7.11(b);

p. Failure to observe the covenant set forth in Section 7.5 of the Credit Agreement as a result of one or more Loan Parties' Dispositions of property not permitted by Section 7.5, including, without limitation, any bulk sales or other sales of barreled spirits;

q. Failure to timely prepay, as required by Section 2.3(b)(ii), an aggregate principal amount of Loans equal to 100% of Net Cash Proceeds realized by the Borrowers as a result of the Borrowers' Dispositions of property of any Loan Party or any of its Subsidiaries (other than any Disposition of any property permitted by any of clauses (a) through (h) of Section 7.5);

r. Failure to observe the covenant to deliver duly executed joinders of subsidiaries as set forth in Section 6.12;

s. Failure to observe the covenant in Section 7.1 of the Credit Agreement not to create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues except as permitted by Section 7.1, including but not limited to, the following transactions:

   i. Sold $1,021,300 of future revenue stream for a discount of $700,000 less fees pursuant to a contract dated June 26, 2024;

   ii. Sold $2,378,300 of future revenue stream for a discount of $1,700,000 less fees pursuant to a contract dated July 26, 2024; and

   iii. Refinanced $2,658,100 for a discount of $1,900,000 less fees pursuant to a contract dated November 25, 2024.

t. Failure to observe the covenant in Section 7.2 to not create, incur, assume, or suffer to exist any Indebtedness except as permitted by Section 7.2 as a result of the unsecured Indebtedness incurred by the Borrowers to Grant Sidney Inc. pursuant to the Subordinated Debt Documents; and



Case 4:25-cv-00038-CEA-CHS Document 4 Filed 07/28/25 Page 9 of 14 PageID #: 1410

u. Entry of a final judgment in the amount of $2,111,911.60 against Uncle Nearest, Inc. due to Uncle Nearest, Inc.'s failure to pay for goods delivered in the case styled *Berlin Packaging LLC v. Uncle Nearest, Inc.*, Case No. 2024 L 011917 in the Circuit Court of Cook County, Illinois.

16. Within seven days after entering the Forbearance Agreement, Uncle Nearest defaulted. This first "Forbearance Default" (which is also an immediate Event of Default under the Credit Agreement) was due to Uncle Nearest's failure to deliver a weekly cash flow report by the second Business Day of the following calendar week. To date, numerous Forbearance Defaults have occurred and continue. Uncle Nearest is in default under the Forbearance Agreement and further in default under the Credit Agreement for, among other things, the following reasons (such defaults, the "Post-Forbearance Execution Defaults" and, collectively with the Pre-Forbearance Defaults, the "Defaults"):

a. Failure to timely deliver a duly executed and completed perfection certificate to the Lender no later than 14 days following the Effective Date, as required by Section 2(a)(iii) of the Forbearance Agreement;

b. Failure to timely deliver executed Lien Waivers to the Lender with respect to (A) any personal property Collateral located on lease premises or premises subject to a mortgage, (B) any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, (C) any material Collateral held by a repairman, mechanic or bailee, and (D) any Collateral subject to a licensor's intellectual property rights no later than 14 days following the Effective Date, as required by Section 2(a)(iv) of the Forbearance Agreement;

c. Failure to timely deliver executed control agreements in favor of the Lender, with respect to all of the Borrowers' Deposit Accounts no later than 14 days following the Effective Date, as required by Section 2(a)(v) of the Forbearance Agreement;

d. Failure to timely satisfy, or confirm to the Administrative Agent the satisfaction of, the Loan Parties' obligations under the Security Agreement and the Pledge Agreement, including, without limitation, the obligations set forth in Section 3(d) and Section 9(j) of the Security Agreement, as required by Section 2(a)(ii) of the Forbearance Agreement;

e. Failure to timely deliver resolutions adopted by the board of directors of Uncle Nearest, Inc. appointing one (1) Independent Director (as defined [t]herein) to the board of directors of Uncle Nearest, Inc. at all times from and after the Effective Date by May 2, 2025 (extended from April 25, 2025, upon Uncle Nearest's request),

as required by Section 2(a)(viii) of the Forbearance Agreement;

f. Failure to timely deliver to the Lender monthly financial statements required by Section 6.1(b) of the Credit Agreement for the months of March 2025, April 2025, and May 2025;

g. Failure to timely deliver Borrowing Base Certificates for February 2025, March 2025, April 2025, May 2025, and June 2025 in accordance with Section 6.2(c) of the Credit Agreement, as set forth in Section 2(b)(ii)(C) of the Forbearance Agreement;

h. Failure to maintain a minimum amount of $1,500,000 in cash and Cash Equivalents, as required by Section 2(b)(iv) of the Forbearance Agreement;

i. Failure to deliver a plan, in form and substance acceptable to the Lender, to pursue an Acceptable Transaction, together with such supplemental information as the Lender may reasonably request by May 23, 2025, as required by Section 2(b)(vii)(A) of the Forbearance Agreement;

j. Failure to no later than 60 days following the Effective Date of the Forbearance Agreement, comply with the Forbearance Milestone set forth in Section 2(a)(vi) of the Forbearance Agreement to make a $10,000,000 paydown;

k. On April 22, 2025, and April 29, 2025, and from May 6, 2025, through July 22, 2025, failure to comply with the Forbearance Covenant set forth in Section 2(b)(ii) of the Forbearance Agreement to deliver a Reporting Package, in form and detail satisfactory to the Lender;

l. Failure to timely deliver to the Lender, 120 days after the end of the fiscal year ending December 31, 2024, in form and detail satisfactory to the Lender, the financial statements and information required by Section 6.1(a) of the Credit Agreement;

m. Failure to timely pay the following amounts of interest on the Loans as required by Section 2.6(c) of the Credit Agreement on the following Interest Payment Dates:

    i. $283,327.43 on May 1, 2025; and

    ii. $892,043.12 on July 1, 2025;

n. Failure to timely pay on July 1, 2025, the quarterly installment in the amount of $293,789.06 on the aggregate principal amount of all Term Loans outstanding as required by Section 2.5(b) of the Credit Agreement;

o. Failure to timely pay on July 1, 2025, the $250,000 amortization payment on the principal amount of the RELOC Loan outstanding as required by Section 2.5(c) of the Credit Agreement; and

p. Failure to repay the aggregate principal amount of all Revolving Credit Loans outstanding on the Maturity Date for the Revolving Credit Facility (which occurred on July 22, 2025).

17. As more fully described in the Verified Complaint, Uncle Nearest's need for oversight is evident as its financial problems threaten the continued operation of Uncle Nearest and, by extension, the viability of the Collateral. Given the lack of any reliable financial information and uncertainty with respect to any verifiable source of capital to keep Uncle Nearest maintaining business operations, a receiver is necessary to take over managerial control of Uncle Nearest. The receiver will be able to review the true financial condition of the company and determine the best path forward for all constituents. The Credit Agreement provides that the Lender is entitled to recover from Uncle Nearest jointly and severally all costs and expenses, including but not limited to, reasonable attorneys' fees, incurred by the Lender in enforcement of its rights under the Credit Agreement or any other Loan Document.

18. As of July 28, 2025, the following amounts are due from and payable by Uncle Nearest pursuant to the Loan Documents:

**Uncle Nearest Outstanding Principal and Interest as of July 28, 2025**

| **Loan Type** | **Principal Amount** | **Accrued Interest** | **Total Principal and Accrued Interest Outstanding** | **Maturity Date** |
|---|---|---|---|---|
| The Revolving Loan | $65,224,031.96 | $4,109,352.17 | $69,333,384.13 | July 22, 2025 |
| The Term Loan | $22,045,150.88 | $1,214,102.77 | $23,259,253.65 | July 22, 2027 |
| The RELOC Loan | $15,000,000 | $653,190.44 | $15,653,190.44 | July 22, 2027 |
| **Totals** | **$102,269,182.84** | **$5,976,645.38** | **$108,245,828.22** | |

19. In addition, Uncle Nearest is obligated to pay the Lender all costs, fees and expenses incurred by or otherwise owing to the Lender in connection with the Loan Documents, including but not limited to at least $1,265,519.01 in accrued and unpaid fees and all outstanding attorney's fees and costs.

20. Given the lack of transparency and minimal communication with the Lender by

Uncle Nearest, the Lender must exercise its rights and remedies under the Loan Documents and requests that this Court appoint Kevin Larin, a Managing Director with Riveron,[9] as receiver over Uncle Nearest and its assets in order to preserve Uncle Nearest's assets and maximize the value of the Collateral.

---

[9] Riveron was engaged on March 3, 2025, by counsel to the Lender, McGuireWoods LLP, to serve as financial advisor to the Lender. However, the engagement will cease to the extent Riveron is appointed as receiver. Moreover, as described above, pursuant to Section 8(d) of the Forbearance Agreement, Uncle Nearest waived its right to object to Riveron's appointment as receiver on the basis of Riveron's independence or disinterestedness.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: July 28, 2025

Name: Brian Klatt
Title: Managing Director Food and Agribusiness
Farm Credit Mid-America, PCA