# CREDIT AGREEMENT

Dated as of July 22, 2022

among

UNCLE NEAREST, INC.,
NEAREST GREEN DISTILLERY, INC.,
UNCLE NEAREST REAL ESTATE HOLDINGS, LLC
and
THE OTHER BORROWERS PARTY HERETO
as the Borrowers,

FARM CREDIT MID-AMERICA, PCA,
as Administrative Agent,

and

THE OTHER LENDERS PARTY HERETO

FARM CREDIT MID-AMERICA, PCA,
as Sole Lead Arranger and Sole Bookrunner

EXHIBIT
1

**TABLE OF CONTENTS**

**Page**


ARTICLE I DEFINITIONS AND INTERPRETIVE PROVISIONS 1

1.1 Defined Terms ... 1
1.2 Rules of Interpretation ... 26
1.3 Accounting Terms ... 27
1.4 Times of Day ... 27
1.5 Rounding ... 27

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS 28

2.1 Loans ... 28
2.2 Borrowings of Loans ... 28
2.3 Prepayments ... 29
2.4 Termination or Reduction of Commitments ... 30
2.5 Repayment of Loans ... 30
2.6 Interest ... 31
2.7 Fees ... 32
2.8 Computation of Interest and Fees ... 32
2.9 Evidence of Debt ... 32
2.10 Payments Generally; Administrative Agent's Clawback ... 32
2.11 Sharing of Payments by Lenders ... 34
2.12 Defaulting Lenders ... 34
2.13 Increases in Revolving Credit Commitments ... 36
2.14 Company as Borrower Agent; Joint and Several Liability; Borrowers' Waivers and Consents ... 36

ARTICLE III TAXES AND YIELD PROTECTION 39

3.1 Taxes ... 39
3.2 Increased Costs ... 43
3.3 [Reserved] ... 44
3.4 Mitigation Obligations; Replacement of Lenders ... 44
3.5 Survival ... 45

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS 45

4.1 Conditions of Initial Credit Extension ... 45
4.2 Conditions to All Credit Extensions ... 48

ARTICLE V REPRESENTATIONS AND WARRANTIES 49

5.1 Existence, Qualification and Power ... 49
5.2 Authorization; No Contravention ... 49
5.3 Governmental Authorization; Other Consents ... 49
5.4 Binding Effect ... 49
5.5 Financial Statements; No Material Adverse Effect ... 50
5.6 Litigation ... 50
5.7 No Default ... 50





Case 4:25-cv-00038-CEA-CHS Document 4-1 Filed 07/28/25 Page 2 of 135 PageID #: 1417

**TABLE OF CONTENTS**
(continued)

**Page**


5.8 Title to Property ........ 50
5.9 Environmental Compliance ........ 50
5.10 Tax Matters ........ 51
5.11 ERISA Compliance ........ 51
5.12 Ownership of Loan Parties and Subsidiaries ........ 52
5.13 Investment Company Act; Margin Stock ........ 52
5.14 Disclosure ........ 52
5.15 Compliance with Laws ........ 53
5.16 Intellectual Property Matters ........ 53
5.17 Solvency ........ 53
5.18 Casualty, Etc ........ 53
5.19 Anti-Corruption Laws and Sanctions ........ 53
5.20 Beneficial Ownership Certificate ........ 53
5.21 Farm Credit Eligibility ........ 53
5.22 Borrowing Base Assets ........ 53

ARTICLE VI AFFIRMATIVE COVENANTS 54

6.1 Financial Statements ........ 55
6.2 Certificates; Other Information ........ 55
6.3 Notices ........ 57
6.4 Payment of Taxes and Other Obligations ........ 57
6.5 Preservation of Existence, Etc ........ 57
6.6 Maintenance of Property ........ 58
6.7 Maintenance of Insurance ........ 58
6.8 Compliance with Laws ........ 58
6.9 Books and Records ........ 58
6.10 Inspection Rights ........ 58
6.11 Use of Proceeds ........ 58
6.12 Additional Subsidiaries and Real Property ........ 58
6.13 Compliance with Environmental Laws ........ 60
6.14 Further Assurances ........ 60
6.15 Compliance with Anti-Corruption Laws; Beneficial Ownership Regulation, Anti-Money Laundering Laws and Sanctions ........ 60
6.16 Farm Credit Eligibility / Farm Credit Equity ........ 61
6.17 Preparation of Environmental Reports ........ 61
6.18 Compliance with Terms of Leaseholds ........ 62
6.19 Material Agreements ........ 62

ARTICLE VII NEGATIVE COVENANTS 62

7.1 Liens ........ 62
7.2 Indebtedness ........ 63
7.3 Investments ........ 64

## TABLE OF CONTENTS
(continued)

**Page**


7.4 Fundamental Changes ........ 65
7.5 Dispositions ........ 65
7.6 Restricted Payments ........ 66
7.7 Change in Nature of Business ........ 66
7.8 Transactions with Affiliates ........ 66
7.9 Burdensome Agreements ........ 66
7.10 Use of Proceeds ........ 67
7.11 Financial Covenants ........ 67
7.12 Amendments of Organization Documents or Material Agreements ........ 67
7.13 Accounting Changes ........ 67

ARTICLE VIII DEFAULT AND REMEDIES 67

8.1 Events of Default ........ 67
8.2 Remedies Upon Event of Default ........ 70
8.3 Application of Funds ........ 70
8.4 Equity Cure ........ 71

ARTICLE IX ADMINISTRATIVE AGENT 72

9.1 Appointment and Authority ........ 72
9.2 Rights as a Lender ........ 72
9.3 Exculpatory Provisions ........ 72
9.4 Reliance by Administrative Agent ........ 73
9.5 Delegation of Duties ........ 73
9.6 Resignation or Removal of Administrative Agent ........ 74
9.7 Non-Reliance on Administrative Agent and Other Lenders ........ 75
9.8 No Other Duties, Etc ........ 75
9.9 Administrative Agent May File Proofs of Claim ........ 75
9.10 Credit Bidding ........ 75
9.11 Collateral and Guaranty Matters ........ 76
9.12 Certain ERISA Matters ........ 77

ARTICLE X MISCELLANEOUS 78

10.1 Amendments, Etc ........ 78
10.2 Notices; Effectiveness; Electronic Communications ........ 79
10.3 No Waiver; Cumulative Remedies; Enforcement ........ 81
10.4 Expenses; Indemnity; Damage Waiver ........ 81
10.5 Payments Set Aside ........ 83
10.6 Successors and Assigns ........ 83
10.7 Treatment of Certain Information; Confidentiality ........ 87
10.8 Right of Setoff ........ 88
10.9 Survival of Representations and Warranties ........ 89
10.10 Independent Effect of Covenants ........ 89
10.11 Governing Law; Jurisdiction; Etc ........ 89




Case 4:25-cv-00038-CEA-CHS Document 4-1 Filed 07/28/25 Page 4 of 135
PageID #: 1419

**TABLE OF CONTENTS**
(continued)

**Page**


10.12 WAIVER OF JURY TRIAL ........ 90
10.13 Counterparts; Integration; Effectiveness; Electronic Execution ........ 90
10.14 No Advisory or Fiduciary Responsibility ........ 90
10.15 Severability ........ 91
10.16 USA PATRIOT Act ........ 91
10.17 Inconsistencies with Other Documents ........ 91
10.18 Borrower Rights ........ 91

ANNEX


| | |
|---|---|
| A | Commitments and Applicable Percentages |


SCHEDULES


| | |
|---|---|
| 5.3 | Certain Authorizations |
| 5.8 | Real Property |
| 5.11(d) | Existing Pension Plans |
| 5.12 | Ownership of Loan Parties and Subsidiaries |
| 7.1 | Existing Liens |
| 7.2 | Existing Indebtedness |
| 7.3 | Existing Investments |
| 7.9 | Existing Burdensome Agreements |
| 10.6(d) | Specified Voting Participants |


EXHIBITS

***Form of***


| | |
|---|---|
| A | Loan Notice |
| B | Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | United States Tax Compliance Certificate |
| F | Notice of Account Designation |
| G | Borrowing Base Certificate |

CREDIT AGREEMENT

This CREDIT AGREEMENT (this "Agreement") is entered into as of July 22, 2022 among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), EACH OTHER PERSON THAT SHALL BECOME A PARTY HERETO AS A BORROWER PURSUANT TO SECTION 6.12 (each such Person, together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), each lender from time to time party hereto (each, a "Lender" and, collectively, the "Lenders"), and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent.

The Borrowers have requested that the Lenders provide certain credit facilities, and the Lenders have indicated their willingness to provide such credit facilities, in each case, on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETIVE PROVISIONS

1.1 Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"Account" means "accounts" as defined in the UCC.

"Account Debtor" means any Person who is or may become obligated under or on account of any Account, Chattel Paper or General Intangible.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the Closing Date, by which any Loan Party or any Subsidiary thereof (a) acquires assets of another Person which constitute all or substantially all of the assets of such Person or of a division, line of business or other business unit of such Person (whether through purchase of assets, merger or otherwise), or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Equity Interests of a Person which have ordinary voting power for the election of the board of directors or equivalent governing body (other than Equity Interests having such power only by reason of the happening of a contingency that has not occurred).

"Administrative Agent" means FCMA in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address as set forth in Section 10.2, or such other address as the Administrative Agent hereafter may designate by written notice to the Company and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in substantially the form provided by the Administrative Agent to the Lenders or any other form approved by the Administrative Agent.


Case 4:25-cv-00038-CEA-CHS Document 4-1 Filed 07/28/25 Page 7 of 135
PageID #: 1422

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Credit Agreement.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder and the U.K. Bribery Act 2010 and the rules and regulations thereunder.

"Anti-Money Laundering Laws" means all laws, statutes, regulations or obligatory government orders, decrees, ordinances or rules related to terrorism financing, money laundering, any predicate crime to money laundering or any financial record keeping, including any applicable provision of the PATRIOT Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"Applicable Margin" means 0.50% per annum.

"Applicable Percentage" means (a) in respect of the Term Loan Facility, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the sum of the aggregate outstanding Term Loans represented by such Lender's outstanding Term Loan at such time, and (b) in respect of the Revolving Credit Facility, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the aggregate Revolving Credit Commitments represented by such Lender's Revolving Credit Commitment at such time, subject to adjustment as provided in Section 2.12. If the commitment of each Revolving Credit Lender to make Revolving Credit Loans has been terminated pursuant to Section 8.2, or if the Revolving Credit Commitments have expired, then the Applicable Percentage of each Revolving Credit Lender in respect of the Revolving Credit Facility shall be determined based on the Applicable Percentage of such Revolving Credit Lender in respect of the Revolving Credit Facility most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender in respect of each Facility is set forth opposite the name of such Lender on Annex A or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Revolving Credit Percentage" means, with respect to any Lender at any time, such Lender's Applicable Percentage in respect of the Revolving Credit Facility at such time.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arranger" means FCMA, in its capacity as sole lead arranger and sole bookrunner.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.6(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit D or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized

amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease and (c) all Synthetic Debt of such Person.

"Availability Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as the Administrative Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Administrative Agent's ability to realize upon the Collateral consisting of Eligible Accounts or Eligible Inventory, (b) to reflect sums that any Loan Party may be required to pay under any Section of this Agreement or any other Loan Document (including Taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, (c) to reflect amounts for which claims may be reasonably expected to be asserted against the Collateral or the Administrative Agent or any Secured Party or (d) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party. Without limiting the generality of the foregoing, Availability Reserves may include (but are not limited to) reserves based on: (i) Rent and Charges Reserves; (ii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, excise, and other Taxes which might have priority over the interests of the Lender in the Collateral; (iii) any liabilities that are or may become secured by Liens on the Collateral (including Permitted Liens) which might have priority over the Liens or interests of the Administrative Agent in the Collateral; (iv) reserves with respect to the salability of Eligible Inventory or which reflect such other factors as affect the market value of the Eligible Inventory, including obsolescence, seasonality, Shrink, vendor chargebacks, imbalance, change in Inventory character, composition or mix, markdowns and out of date and/or expired Inventory; (v) whiskey storage reserves; and (vi) the Dilution Reserve.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, (b) the interest rate last quoted by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined in good faith by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined in good faith by the Administrative Agent) and (c) 0.00%. Any change in any of the foregoing rates shall take effect at the opening of business on the effective day of such change.

"Base Rate Loan" means any Loan that bears interest based on the Base Rate.

"Baseline Financial Statements" means the company-prepared consolidated balance sheet of the Company and its Subsidiaries for the fiscal year ended December 31, 2021, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, including the notes thereto.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person

whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Borrower" and "Borrowers" have the meaning assigned to such term in the introductory paragraph hereto.

"Borrower Materials" has the meaning assigned to such term in Section 10.2(d)(i).

"Borrowing" means a Revolving Credit Borrowing or a Term Loan Borrowing, as the context may require.

"Borrowing Base" means, as of any time it is to be determined, the sum of:

(a) 75% of the Value of Eligible Accounts; plus

(b) 65% of the Value of all Eligible Inventory consisting of barreled whiskey, finished goods consisting of bottled whiskey or grain inventory; minus

(c) all Availability Reserves.

The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate theretofore delivered to the Administrative Agent with such adjustments as the Administrative Agent deems appropriate in its Permitted Discretion in accordance with the terms of this Agreement; provided that (i) the Administrative Agent shall have the right upon five (5) Business Days' notice to the Company to reduce the advance rates against Eligible Accounts and Eligible Inventory in its Permitted Discretion based on results from any field audit or appraisal of the Collateral and (ii) the Borrowing Base shall be computed only as against and on so much of such Collateral as is included in the Borrowing Base Certificates furnished from time to time by the Company pursuant to this Agreement and, if required by the Administrative Agent pursuant to any of the terms hereof or any Collateral Document, as verified by such other evidence reasonably required to be furnished to the Administrative Agent pursuant hereto or pursuant to any such Collateral Document.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit G.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks or farm credit banks are authorized to close under the Laws of, or are in fact closed in, New York or the state where the Administrative Agent's Office is located, or any other day on which the Administrative Agent's Office is in fact closed.

"Capitalized Leases" means any lease that has been or is required to be, in accordance with GAAP, recorded, classified and accounted for as a capitalized lease or financing lease.

"Cash Equivalents" means any of the following types of Investments, to the extent owned by the Company or any of its Subsidiaries free and clear of all Liens (other than Permitted Liens):

(a) readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(b) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $250,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c) commercial paper issued by any Person organized under the laws of any state of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof; and

(d) Investments, classified in accordance with GAAP as current assets of the Company or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith or in the implementation thereof and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a) any Person (or any group of Affiliates) (other than a Permitted Investor) acquires more than 10% of the voting or economic Equity Interests of the Company;

(b) the Permitted Investors cease to collectively own and control, of record and beneficially, Equity Interests of the Company representing at least 30% of the economic interest of the Company;

(c) the Permitted Investors cease to collectively own and control, of record and beneficially, Equity Interests of the Company representing at least 51.00% of the voting power of the Company entitled to vote in the election of members of the board of directors (or equivalent governing body) of the Company or otherwise ceases to have the power to direct or cause the direction of the management and policies of the Company; or

(d) any Borrower (other than the Company) ceases to be a Wholly-Owned Subsidiary of the Company.

"Closing Date" means July 22, 2022.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all of the property that is or is intended under the terms of the Collateral Documents to be subject to Liens in favor of the Administrative Agent for the benefit of the Secured Parties.

"Collateral Documents" means, collectively, the Security Agreement, the Pledge Agreement, the Mortgages and all of the other mortgages, collateral assignments, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent that create or purport to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"Commitment" means a Revolving Credit Commitment or a Term Loan Commitment, as the context may require.

"Commitment Fee" has the meaning assigned to such term in Section 2.7(a).

"Company" has the meaning assigned to such term in the introductory paragraph hereto.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Net Income" means, for any period, the net income (or loss) of the Company and its Subsidiaries on a consolidated basis in accordance with GAAP for such period; provided that Consolidated Net Income shall exclude (a) the net income (if positive) of any Subsidiary for such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of such net income (i) is not at the time permitted by operation of the terms of its Organization Documents or any agreement, instrument, judgment, decree, order or Law applicable to such Subsidiary or (ii) would be subject to any taxes payable on such dividends or distributions, but in each case only to the extent of such prohibition or taxes, (b) any income (or loss) for such period of any Person if such Person is not a Subsidiary, except that the equity in the net income of any such Person for such period shall be included in Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to the Company or a Subsidiary as a dividend or other distribution (and in the case of a dividend or other distribution to a Subsidiary, such Subsidiary is not precluded from further distributing such amount to the Company as described in clause (a) of this proviso), (c) any income (or loss) for such period of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Company or any of its Subsidiaries or that Person's assets are acquired by the Company or any of its Subsidiaries except to the extent included pursuant to the foregoing clause (b) and (d) any gain or loss from the Disposition of any property to a Person that is not a Loan Party or a Subsidiary (other than the sale of inventory in the ordinary course of business) during such period.

"Consolidated Tangible Net Worth" means, as of any date of determination, for the Company and its Subsidiaries on a consolidated basis, Shareholders' Equity of the Company and its Subsidiaries on that date minus the Intangible Assets of the Company and its Subsidiaries on that date.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Credit Extension" means each of the following: (a) a Revolving Credit Borrowing and (b) a Term Loan Borrowing.

"Crop Sharing Agreement" means the farming arrangement between the Loan Parties and a local farmer with respect to the growing of certain agricultural products on one or more of the properties of the Loan Parties for use in the distilling operations of the Loan Parties, which such arrangement may be evidenced from time to time by a written agreement, a letter of intent and/or such other customary documentation that is reasonably satisfactory to the Administrative Agent.

"Dan Call Farm Mortgage Indebtedness" means the Indebtedness of the Permitted Investors arising under the loan agreements and/or promissory notes entered into prior to the Closing Date in favor of Farm Credit Mid-America, FLCA, as amended, restated, supplemented or otherwise modified from time to time; provided that such Indebtedness shall be subject to the Dan Call Farm Mortgage Indebtedness Intercreditor Agreement and otherwise be on terms reasonably satisfactory to the Administrative Agent.

"Dan Call Farm Mortgage Indebtedness Intercreditor Agreement" means the Intercreditor Agreement dated as of the Closing Date between Farm Credit Mid-America, FLCA and the Administrative Agent.

"Dan Call Farm Property" means the ~314 acres of real property owned by the Permitted Investors located in Moore County, Tennessee, any improvements and fixtures located thereon and any other rights related thereto, all as more particularly described in the mortgage documents securing the Dan Call Farm Mortgage Indebtedness as in effect on the Closing Date.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means, when used with respect to Obligations, an interest rate equal to (a) the Base Rate plus (b) the Applicable Margin plus (c) 2% per annum.

"Defaulting Lender" means, subject to Section 2.12(b), at any time that there is more than one Lender, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Company in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Company or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified

in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Company, to confirm in writing to the Administrative Agent and the Company that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Company) or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.12(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Company and each Lender promptly following such determination.

"Dilution Percent" means the percent, determined for the most recently ended period of four consecutive fiscal quarters, equal to (a) bad debt write-downs or write-offs, discounts, returns, promotions, credits, credit memos and other dilutive items with respect to Accounts, divided by (b) gross sales.

"Dilution Reserve" means, at any date of determination, (a) the percentage amount by which the Dilution Percent exceeds five percent (5%) times (b) the amount of Eligible Accounts of the Borrowers.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Distillery" has the meaning assigned to such term in the introductory paragraph hereto.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"Eligible Accounts" means, as of the date of determination thereof, any Account of a Borrower arising in the ordinary course of business out of the sale of barreled spirits or finished goods inventory delivered to and accepted by, or out of the rendition of services fully performed and accepted by, the Account Debtor on such Account and deemed by the Administrative Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base. Without limiting the generality of the foregoing, unless otherwise approved in writing by the Administrative Agent, none of the following shall be deemed to be an Eligible Account:

(a) Accounts that are not owned by a Borrower free of any title defect or any Liens or interests of others (other than Liens of the type permitted by clause (a) of Section 7.1);

(b) Accounts that are not subject to a perfected, first priority Lien in favor of the Administrative Agent;

(c) Accounts that are not fully earned by performance (or otherwise represent a progress billing or pre-billing) or not evidenced by an invoice which has been delivered to the applicable Account Debtor;

(d) Accounts that are not payable in Dollars;

(e) Accounts arising out of sales to Account Debtors outside the United States, unless payment thereof is (i) assured by an irrevocable letter of credit payable in Dollars issued by a financial institution reasonably acceptable to the Administrative Agent and such irrevocable letter of credit is delivered to the Administrative Agent (including any delivery of an electronic letter of credit) or (ii) insured by a credit insurer reasonably acceptable to the Administrative Agent, in each case on terms satisfactory to the Administrative Agent in its Permitted Discretion;

(f) Accounts that are not the valid, binding and legally enforceable obligation of the Account Debtor obligated thereon;

(g) Accounts due from an Account Debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(h) Accounts that are evidenced by a judgment, instrument or chattel paper, unless the originals of such chattel paper or instrument shall have been endorsed and/or assigned and delivered to the Administrative Agent or, in the case of electronic Chattel Paper, shall be in the control of the Administrative Agent, in each case in a manner satisfactory to the Administrative Agent in its Permitted Discretion;

(i) Accounts that are owing from an Account Debtor who is also (i) a vendor, creditor or supplier of such Person or (ii) a Loan Party or any Affiliate, Subsidiary, officer, employee or equity holder thereof;

(j) Accounts (i) upon which a Borrower's right to receive payment is not absolute (other than as a result of rights to return inventory in the ordinary course of business) or is contingent upon the fulfillment of any condition whatsoever, including cash on delivery and cash in advance transactions, or (ii) as to which a Borrower is not able to bring suit or otherwise enforce its remedies against the related Account Debtor through judicial process;

(k) Accounts that have been outstanding for more than ninety (90) days from the invoice date or more than sixty (60) days past the original due date whichever comes first;

(l) Accounts to the extent relating to payment of interest, fees or late charges;

(m) Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback;

(n) Accounts due from any Account Debtor, 25% or more of whose Accounts are otherwise ineligible under the terms of clause (k) above;

(o) (i) except as otherwise provided in the following clause (ii), Accounts due from an Account Debtor, the aggregate of which Accounts due from such Account Debtor and its Affiliates represents more than 20% of all then outstanding Accounts owed to the Borrowers, but only to the extent of such excess or (ii) Accounts due from an Account Debtor that is either Republic National Distributing Company or an Affiliate thereof, the aggregate of which Accounts due from such Account Debtor and its Affiliates represents more than 50% of all then outstanding Accounts owed to the Borrowers, but only to the extent of such excess;

(p) Accounts arising from a sale on a bill and hold, guaranteed sale, sale or return, sale on approval, consignment or any other repurchase or return basis;

(q) Accounts that remain open after the applicable Account Debtor has made a partial payment in respect of the applicable invoice (whether or not the applicable Account Debtor has provided an explanation for such partial payment);

(r) Accounts where the applicable Account Debtor tendered a check or other item of payment in full or partial satisfaction and such check or other item of payment has been returned by the financial institution on which it is drawn and no such other valid form of payment has been received within five (5) Business Days of such date of incident;

(s) Accounts due from any Governmental Authority, except to the extent that the subject Account Debtor is the federal government of the United States of America and has complied with the Federal Assignment of Claims Act of 1940 and any similar state legislation to the satisfaction of the Administrative Agent in its Permitted Discretion; and

(t) Accounts that do not comply with any representation or warranty contained in this Agreement or any other Loan Document with respect to Accounts in general, or to such Account in particular.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 10.6(b)(iii) and (v) (subject to such consents, if any, as may be required under Section 10.6(b)(iii)).

"Eligible Inventory" means, as of the date of determination thereof, any Inventory of a Borrower consisting of barreled spirits (including whisky and bourbon), raw materials that are grain or finished goods (other than packaging, crating, shipping materials, labels, samples, display items or bags and supplies inventory) and deemed by the Administrative Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base. Without limiting the generality of the foregoing, unless otherwise approved in writing by the Administrative Agent, none of the following shall be deemed to be Eligible Inventory:

(a) Inventory that is not owned by a Borrower free of any title defect or any Liens or interests of others (other than Liens of the type permitted by clauses (a) and (j) of Section 7.1);

(b) Inventory that is not subject to a perfected, first priority Lien in favor of the Administrative Agent;

(c) Inventory that is located in a public warehouse or in the possession of a bailee or in a facility leased by a Borrower or any of its Affiliates unless the applicable warehouseman, bailee, lessor or such other applicable third party has delivered to the Administrative Agent a Collateral Access Agreement, together with such other documentation as the Administrative Agent

may reasonably require;

(d) Inventory that is covered by a negotiable document of title (such as a bill of lading or warehouse receipt);

(e) Inventory that is in transit;

(f) Inventory that is not held for sale or use in the ordinary course of a Borrower's business and is not of good and merchantable quality;

(g) Inventory that is not located in the United States of America (excluding territories and possessions thereof);

(h) Inventory that is unsalable, damaged, defective, recalled, used or otherwise unfit for sale, or Inventory that has been returned by the buyer unless such returned items are of good and merchantable quality and held for resale by a Borrower in the ordinary course of business;

(i) Inventory that has been manufactured to the specifications of a particular customer and is not saleable in the ordinary course of business;

(j) Inventory that contains or bears any intellectual property rights licensed to a Borrower unless the Administrative Agent is satisfied in its sole and absolute discretion that it may sell or otherwise dispose of such inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(k) Inventory that is the subject of a consignment by a Borrower as consignor;

(l) Inventory that does not meet all standards imposed by any Governmental Authority;

(m) Inventory that is slow-moving, spoiled or obsolete; and

(n) Inventory that does not comply with any representation or warranty contained in this Agreement or any other Loan Document with respect to Inventory in general, or to such Inventory in particular.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, agreements or governmental restrictions relating to pollution or the protection of the environment or human health (to the extent related to exposure to Hazardous Materials), including those relating to the manufacture, generation, handling, transport, storage, treatment, release or threat of release of Hazardous Materials.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party or any Subsidiary thereof or any Permitted Investor directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) release or threatened release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Company within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan, (b) the withdrawal of the Company or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA, (c) a complete or partial withdrawal by the Company or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization, (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA, (e) the institution by the PBGC of proceedings to terminate a Pension Plan, (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA, (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Company or any ERISA Affiliate or (i) a failure by the Company or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules in respect of a Pension Plan, whether or not waived, or the failure by the Company or any ERISA Affiliate to make any required contribution to a Multiemployer Plan.

"Event of Default" has the meaning assigned to such term in Section 8.1.

"Excluded Asset" means, as to each Loan Party, (a) any lease, license or contract to which such Loan Party is a party, or any license, consent, permit, variance, certification, authorization or approval of any Governmental Authority (or any Person acting on behalf of a Governmental Authority) of which such Loan Party is the owner or beneficiary, or any of its rights or interests thereunder, if and for so long as the grant of a security interest therein shall constitute or result in (i) the abandonment, invalidation or unenforceability of the right, title or interest of such Loan Party therein or (ii) a breach or termination pursuant to the terms of, or a default under, such lease, license or contract or such license, consent, permit, variance, certification, authorization or approval (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the UCC or any other applicable law or principles of equity), (b) any equipment, fixtures or real property (including related attachments, accessories, equipment, tools, parts and replacement thereof and proceeds of the foregoing) owned by such Loan Party on the date hereof or hereafter acquired that is subject to a purchase money Lien or a Lien securing a capital lease or synthetic lease permitted to be incurred under the Loan Documents if the contract or other agreement (or the documentation providing for such purchase money obligation, capital lease or synthetic lease) in which such Lien is granted validly prohibits the creation of any other Lien on such equipment, fixtures or real property (and/or related attachments, accessories, equipment, tools, parts and

replacement thereof and proceeds of the foregoing) if and for so long as the grant of a security interest therein in favor of the Administrative Agent for the benefit of the Secured Parties has not been consented to by the holder of such Lien, (c) any "intent to use" Trademark applications to the extent that, and solely during the period that, the grant of a security interest therein would impair the validity or enforceability or render void or result in the cancellation of, any registration issued as a result of such "intent to use" trademark application under applicable Law; provided that upon the submission and acceptance by the United States Patent and Trademark Office of an amendment to allege or a verified statement of use pursuant to 15 U.S.C. Section 1060, such "intent to use" trademark application shall constitute Collateral and (d) any Equity Interest in any Person that is not a Wholly-Owned Subsidiary, to the extent a Lien thereon is prohibited by or requires consent under the organizational documents of such Person (other than of a Loan Party) and such consent has not been obtained.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or commitment pursuant to a Law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Company under Section 3.4) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.1, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.1(g) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Extraordinary Receipt" means (a) any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments, and (b) in the case of the Dan Call Farm Property, any cash proceeds of insurance or condemnation awards (and payments in lieu thereof) received by or paid to or for the account of any Permitted Investor in respect thereof.

"Facility" means the Revolving Credit Facility and the Term Loan Facility, as the context may require.

"Facility Termination Date" means the date as of which all of the following shall have occurred: (a) the Aggregate Commitments have terminated and (b) all Obligations have been paid in full (other than contingent indemnification and reimbursement obligations).

"Farm Credit Equities" has the meaning assigned to such term in Section 6.16(a).

"Farm Credit Lender" means a federally-chartered Farm Credit System lending institution organized under the Farm Credit Act of 1971, as the same may be amended or supplemented from time to time. When used in this Agreement in reference to the Farm Credit Equities, "Farm Credit Lender" shall also include the affiliate of such Farm Credit Lender in which such Farm Credit Equities are purchased or acquired, as applicable.


Case 4:25-cv-00038-CEA-CHS Document 4-1 Filed 07/28/25 Page 19 of 135 PageID #: 1434

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1).

"FCMA" means Farm Credit Mid-America, PCA and its successors.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to FCMA on such day on such transactions as determined by the Administrative Agent. Notwithstanding the foregoing, if the Federal Funds Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States.

"Fee Letter" means any letter agreement entered into from time to time by one or more of the Borrowers and FCMA, in its capacity as the Administrative Agent, Arranger and/or Lender.

"Foreign Lender" means (a) if the applicable Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the applicable Borrower is not a U.S. Person, a Lender that is resident or organized under laws of a jurisdiction other than that in which such Borrower is resident for tax purposes.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Gross Profit" means, with respect to the Company and its Subsidiaries for any period, the total revenues for such period less the cost of goods for such period.

"Gross Revenue" means, with respect to the Company and its Subsidiaries for any period, the total revenues for such period.

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants including petroleum or petroleum distillates, natural gas, natural gas liquids, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, toxic mold, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants or compounds of any nature in any form regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b) the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c) all net obligations of such Person under any Swap Contract;

(d) all obligations of such Person to pay the deferred purchase price of property or services (including earnouts but excluding trade accounts payable in the ordinary course of business and not more than 90 days past due);

(e) all indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f) all Attributable Indebtedness in respect of Capitalized Leases and Synthetic Lease Obligations of such Person and all Synthetic Debt of such Person;

(g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 10.4(b).

"Information" has the meaning assigned to such term in Section 10.7.

"Intangible Assets" means assets that are considered to be intangible assets under GAAP, including customer lists, goodwill, computer software, copyrights, trade names, trademarks, patents, franchises, licenses, unamortized deferred charges, unamortized debt discount and capitalized research and development costs.

"Interest Payment Date" means, the first day of each calendar quarter and the Maturity Date of the Facility under which such Loan was made.

"Inventory" means "inventory" as defined in the UCC.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment. All Acquisitions shall constitute Investments.

"IRS" means the United States Internal Revenue Service.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed

duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender hereafter may designate by written notice to the Company and the Administrative Agent, which office may include any Affiliate of such Lender or any domestic or foreign branch of such Lender or such Affiliate. Unless the context otherwise requires each reference to a Lender shall include its applicable Lending Office.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, easement, right-of-way or other encumbrance on title to real property, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any financing lease having substantially the same economic effect as any of the foregoing).

"Lien Waiver" means an agreement, in form and substance reasonably satisfactory to the Administrative Agent, by which (a) for any Collateral located on leased premises or premises subject to a mortgage, the lessor or mortgagee, as applicable, agrees to, among other things, waive or subordinate any Lien it may have on the Collateral, and agrees to permit the Administrative Agent to enter upon the premises and remove the Collateral or to use the premises to store or dispose of the Collateral; (b) for any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents (as defined in the UCC) in its possession relating to the Collateral as agent for the Administrative Agent, and agrees to deliver the Collateral to the Administrative Agent upon request; (c) for any material Collateral held by a repairman, mechanic or bailee, such Person acknowledges the Administrative Agent's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver the Collateral to the Administrative Agent upon request; and (d) for any Collateral subject to a licensor's intellectual property rights, such licensor grants to the Administrative Agent the right, vis-à-vis such licensor, to enforce the Administrative Agent's Liens with respect to the Collateral, including the right to dispose of it with the benefit of the intellectual property, whether or not a default exists under any applicable license.

"Line Reserve" means the sum of (a) the Rent and Charges Reserve; (b) the aggregate amount of liabilities at any time secured by Liens upon Collateral that are senior to the Administrative Agent's Liens; (c) sums that any Loan Party may be required to pay under any Section of this Agreement or any other Loan Document (including taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay; and (d) amounts for which claims may be reasonably expected to be asserted against the Collateral.

"Loan" means a Revolving Credit Loan or a Term Loan, as the context may require.

"Loan Documents" means, collectively, this Agreement, the Notes, the Subsidiary Guaranty, the Collateral Documents and the Fee Letter and any amendments, modifications or supplements hereto or to any other Loan Document or waivers hereof or to any other Loan Document.

"Loan Notice" means a notice of (a) a Revolving Credit Borrowing, or (b) the Term Loan Borrowing, pursuant to Section 2.2(a), which shall be substantially in the form of Exhibit A or such other form as may be approved by the Administrative Agent, appropriately completed and signed by a Senior Officer of the Company.


Case 4:25-cv-00038-CEA-CHS Document 4-1 Filed 07/28/25 Page 23 of 135
PageID #: 1438

"Loan Parties" means, collectively, the Borrowers and the Subsidiary Guarantors.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of any Borrower or the Company and its Subsidiaries taken as a whole, (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document, or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

"Material Agreement" means, at any time, (a) any agreement of any Loan Party or any Subsidiary with any customer that in the aggregate produced 5% or more of Gross Revenues or Gross Profit for the four-fiscal quarter period of the Company and its Subsidiaries most recently ended or (b) any other agreement of any Loan Party or any Subsidiary, the breach, non-performance, cancellation or failure to renew of which could reasonably be expected to have a Material Adverse Effect.

"Maturity Date" means (a) with respect to the Revolving Credit Facility, July 22, 2025 and (b) with respect to the Term Loan Facility, July 22, 2027; provided that, in each case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"Maximum Revolving Borrowing Amount" means the lesser of (a) the aggregate Revolving Credit Commitments minus the Line Reserves, if any, and (b) the Borrowing Base.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means any mortgage, deed of trust, deed to secure debt or equivalent document now or hereafter encumbering any fee estate in favor of the Administrative Agent for the benefit of the Secured Parties, as security for any of the Obligations, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent.

"Mortgage Support Documents" means, with respect to any property subject to (or required to be subject to) a Mortgage, each of the following (all of which shall be in form and substance satisfactory to the Administrative Agent):

(a) mortgagee title insurance policies (in amounts and with endorsements reasonably acceptable to the Administrative Agent) issued, coinsured and reinsured by title insurers reasonably acceptable to the Administrative Agent, insuring the applicable Mortgage to be a valid first (or, solely in the case of the Dan Call Farm Property, second) and subsisting Lien on the property described therein, free of any Liens except for Liens permitted by clauses (a), (c), (d) and (g) of Section 7.1 or, in the case of the Dan Farm Property, the Mortgage related thereto;

(b) flood hazard determination certifications, executed acknowledgement from the applicable Loan Party and evidence of flood insurance (if required) and other flood-related documentation as required by applicable Law and as reasonably required by the Administrative Agent and each Lender;

(c) evidence of the insurance with respect to such Mortgaged Property required by this Agreement, together with the endorsements required by this Agreement;

(d) favorable opinions of local counsel to the Loan Parties addressed to the Administrative Agent and the Lenders with respect to such Mortgage and such other matters as the

Administrative Agent shall reasonably request (which such opinions shall expressly permit reliance by permitted successors and assigns of the Administrative Agent and the Lenders);

(e) a survey reasonably acceptable to the Administrative Agent, together with appropriate affidavits of no change and/or indemnities from the Borrower, if applicable, sufficient to both allow the title insurance policies required by the preceding clause (a) without a standard survey exception and, if applicable, satisfy the Administrative Agent's and each Lender's flood insurance diligence;

(f) a Phase I environmental assessment or such other environmental report(s) reasonably requested by the Administrative Agent by an environmental engineering firm acceptable to the Administrative Agent; and

(g) such other real estate related documents as may be reasonably requested by the Administrative Agent (e.g. SNDAs, leases, UCC fixture filings and the like).

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Company or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions or to which the Company or any ERISA Affiliate has any liability (contingent or otherwise).

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including the Company or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Cash Proceeds" means, with respect to any Disposition by the Company or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of the Company or any of its Subsidiaries or any Permitted Investor, the excess, if any, of (a) the sum of cash and Cash Equivalents received in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (b) the sum of (i) the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), (ii) the reasonable and customary out-of-pocket expenses incurred by the Company or such Subsidiary or Permitted Investor, as the case may be, in connection with such transaction and (iii) income taxes reasonably estimated to be actually payable within two years of the date of the relevant transaction as a result of any gain recognized in connection therewith; provided that, if the amount of any estimated taxes pursuant to subclause (iii) exceeds the amount of taxes actually required to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Cash Proceeds.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 10.1 and (b) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, a Lender that is not a Defaulting Lender at such time.

"Non-Guarantor Subsidiary" means any Subsidiary that is not a Subsidiary Guarantor.

"Note" means a promissory note made by a Borrower in favor of a Lender evidencing the Revolving Credit Loans or Term Loans, as the case may be, of such Lender, substantially in the form of Exhibit B.

"Notice of Account Designation" has the meaning assigned to such term in Section 2.2(b).

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party or any Permitted Investor arising under any Loan Document or otherwise with respect to any Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof or any Permitted Investor of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Organization Documents" means, (a) with respect to any corporation, the charter or certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating or limited liability company agreement and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Documents).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.4).

"Outstanding Amount" means, with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Loans occurring on such date.

"Participant" has the meaning assigned to such term in Section 10.6(d).

"Participant Register" has the meaning assigned to such term in Section 10.6(d).

"PATRIOT Act" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by the Company or any ERISA Affiliate or to which the Company or any ERISA Affiliate has any liability (contingent or otherwise) and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Permitted Discretion" means a determination made in good faith, using reasonable business judgment (from the perspective of a secured, asset-based lender).

"Permitted Investors" means, collectively, Fawn Weaver and Keith Weaver.

"Permitted Liens" means Liens permitted pursuant to Section 7.1.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of the Company or any ERISA Affiliate or any such Plan to which the Company or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Platform" means Debt Domain, Intralinks, Syndtrak, kiteworks or a substantially similar electronic transmission system.

"Pledge Agreement" means the Pledge Agreement dated as of the Closing Date by the Loan Parties in favor of the Administrative Agent for the benefit of the Secured Parties, as supplemented from time to time by the execution and delivery of joinders and other documents pursuant to Section 6.12 or otherwise.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning assigned to such term in Section 10.2(d)(ii).

"RE Holdings" has the meaning assigned to such term in the introductory paragraph hereto.

"Recipient" means (a) the Administrative Agent, (b) any Lender or (c) any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder, as applicable.

"Register" has the meaning assigned to such term in Section 10.6(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, consultants, service providers and representatives of such Person and of such Person's Affiliates.

"Rent and Charges Reserve" means the aggregate of (a) all past due rent and other amounts owing by any Borrower to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses any Collateral or could assert a Lien on any Collateral;

and (b) a reserve at least equal to three months' rent and other charges that could be payable to any such Person, unless it has executed a Lien Waiver.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Request for Credit Extension" means, with respect to a Borrowing, conversion or continuation of Loans, a Loan Notice.

"Required Lenders" means, at any time, Lenders having Total Credit Exposures representing more than 50% of the Total Credit Exposures of all Lenders. The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Revolving Credit Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date for the Revolving Credit Facility, (b) the date of termination of all Revolving Credit Commitments pursuant to Section 2.4 and (c) the date of termination of the commitment of each Revolving Lender to make Revolving Credit Loans pursuant to Section 8.2.

"Revolving Credit Borrowing" means a borrowing consisting of simultaneous Revolving Credit Loans made by each of the Revolving Credit Lenders pursuant to Section 2.1(a).

"Revolving Credit Commitment" means, as to each Lender, its obligation to make Revolving Credit Loans to the Borrowers pursuant to Section 2.1(a) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Annex A under the caption "Revolving Credit Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Credit Exposure" means, as to any Lender at any time, the aggregate principal amount at such time of its outstanding Revolving Credit Loans.

"Revolving Credit Facility" means the revolving credit facility established pursuant to Section 2.1(a).

"Revolving Credit Lender" means, at any time, any Lender that has a Revolving Credit Commitment or Revolving Credit Exposure at such time.

"Revolving Credit Loan" has the meaning assigned to such term in Section 2.1(a).

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc., and any successor thereto.

"Sanctioned Country" means, at any time, a country, region or territory which is itself (or whose government is) the subject or target of any Sanctions (including, as of the Closing Date, Cuba, Iran, North Korea, Syria and Crimea).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC (including OFAC's Specially Designated Nationals and Blocked Persons List and OFAC's Consolidated Non-SDN List), the U.S. Department of State, the United Nations Security Council, the European Union, any European member state, Her Majesty's Treasury or other relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any such Person or Persons described in clauses (a) and (b), including a Person that is deemed by OFAC to be a Sanctions target based on the ownership of such legal entity by Sanctioned Person(s) or (d) any Person otherwise a target of Sanctions, including vessels and aircraft, that are designated under any Sanctions program.

"Sanctions" means any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes and restrictions and anti-terrorism laws, including those imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC or the U.S. Department of State), the United Nations Security Council, the European Union, any European member state, Her Majesty's Treasury, or other relevant sanctions authority in any jurisdiction in which (a) the Company or any of its Subsidiaries or Affiliates is located or conducts business, (b) in which any of the proceeds of the Loans will be used, or (c) from which repayment of the Loans will be derived.

"Secured Parties" means, collectively, the Administrative Agent, the Lenders, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.5, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"Security Agreement" means the Security Agreement dated as of the Closing Date by the Loan Parties in favor of the Administrative Agent for the benefit of the Secured Parties, as supplemented from time to time by the execution and delivery of joinders and other documents pursuant to Section 6.12 or otherwise.

"Senior Officer" means, with respect to any Loan Party, the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of such Loan Party, any other officer of such Loan Party as hereafter may be designated by written notice by such Loan Party to the Administrative Agent (so long as such officer is reasonably acceptable to the Administrative Agent) and, solely for purposes of the delivery of incumbency certificates pursuant to Section 4.1, the secretary or any assistant secretary of such Loan Party. Any document delivered hereunder that is signed by a Senior Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Senior Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Company and its Subsidiaries as of that date determined in accordance with GAAP.

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will,

incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Equity Contribution" has the meaning assigned to such term in Section 8.4.

"Specified Equity Contribution Request" has the meaning assigned to such term in Section 8.4.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Company.

"Subsidiary Guarantors" means, collectively, the Subsidiaries from time to time party to the Subsidiary Guaranty.

"Subsidiary Guaranty" means the Subsidiary Guaranty Agreement to be entered into after the Closing Date pursuant to the terms hereof (which shall be in form and substance satisfactory to the Administrative Agent) by certain Subsidiaries in favor of the Administrative Agent for the benefit of the Secured Parties, as supplemented from time to time by the execution and delivery of joinders and other documents pursuant to Section 6.12 or otherwise.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Debt" means, as to any Person at a particular time, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"Synthetic Lease Obligation" means, as to any Person at a particular time, the monetary obligation of such Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" has the meaning assigned to such term in Section 2.1(b).

"Term Loan Borrowing" means a borrowing consisting of simultaneous Term Loans made by each of the Term Loan Lenders pursuant to Section 2.1(b).

"Term Loan Commitment" means, as to each Lender, its obligation to make a single Term Loan to the Borrowers pursuant to Section 2.1(b) on the Closing Date in a principal amount not to exceed the amount set forth opposite such Lender's name on Annex A under the caption "Term Loan Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Term Loan Facility" means the term loan facility established pursuant to Section 2.1(b).

"Term Loan Lender" means, at any time, any Lender that has a Term Loan Commitment, all or a portion of which is unused, or an outstanding Term Loan at such time.

"Total Credit Exposure" means, as to any Lender at any time, the unused Commitments, Revolving Credit Exposure and the aggregate outstanding principal amount of Term Loans of such Lender at such time.

"Total Revolving Credit Outstandings" means the aggregate Outstanding Amount of all Revolving Credit Loans.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" and "U.S." mean the United States of America.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.


Case 4:25-cv-00038-CEA-CHS Document 4-1 Filed 07/28/25 Page 31 of 135 PageID #: 1446

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 3.1(g)(ii)(B)(3).

"Value" means:

(a) with respect to Eligible Inventory, for any particular type of Inventory (whether raw materials or finished goods), its value determined on the basis of the lower of cost or market, calculated on a first-in, first-out basis, and excluding any portion of cost attributable to intercompany profit among the Borrowers and their Affiliates; and

(b) with respect to Eligible Accounts, the face amount of such Eligible Account, net of any returns, rebates, discounts (calculated on the shortest terms), credits, allowances or Taxes (including sales, excise or other taxes) that have been or could reasonably be expected to be claimed by the Account Debtor or any other Person.

"Wholly-Owned" means, with respect to a Subsidiary, that all of the Equity Interests of such Subsidiary are, directly or indirectly, owned or controlled by the Company and/or one or more of its Wholly-Owned Subsidiaries (except for directors' qualifying shares or other shares required by applicable Law to be owned by a Person other than the Company and/or one or more of its Wholly-Owned Subsidiaries).

"Withholding Agent" means the Company and the Administrative Agent.

1.2 Rules of Interpretation. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto," "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits, Schedules and Annexes shall be construed to refer to Articles and Sections of, and Exhibits, Schedules and Annexes to, the Loan Document in which such references appear, (v) any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any Law shall, unless otherwise specified, refer to such Law as amended, modified or supplemented from time to time and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c) Article and Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d) Any reference herein to a merger, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, a limited partnership or any other entity, or an allocation of assets to a series of a limited liability company, a limited partnership or any other entity (or the unwinding of such a division or allocation), as if it were a merger, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company, a limited partnership or any other entity shall constitute a separate Person hereunder (and each division of any limited liability company, a limited partnership or any other entity that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

(e) Terms used in this Agreement that are not otherwise expressly defined herein and for which meanings are provided in the UCC, shall have such meanings unless the context requires otherwise.

1.3 Accounting Terms.

(a) Generally. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, and in a manner consistent with that used in preparing the Baseline Financial Statements, except as otherwise specifically prescribed herein. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Company and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b) Changes in GAAP. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Company or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Company shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Company shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

1.4 Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.5 Rounding. Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

ARTICLE II
THE COMMITMENTS AND CREDIT EXTENSIONS

2.1 Loans.

(a) Revolving Credit Borrowing. Subject to the terms and conditions set forth herein, each Revolving Credit Lender severally agrees to make loans (each such loan, a "Revolving Credit Loan") to the Borrowers from time to time on any Business Day during the Revolving Credit Availability Period, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Revolving Credit Commitment; provided that after giving effect to any Revolving Credit Borrowing, (i) the Total Revolving Credit Outstandings shall not exceed the Maximum Revolving Borrowing Amount and (ii) the Revolving Credit Exposure of any Revolving Credit Lender shall not exceed such Lender's Revolving Credit Commitment. Within the limits of each Revolving Credit Lender's Revolving Credit Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.1(a), prepay under Section 2.3 and reborrow under this Section 2.1(a). Revolving Credit Loans shall be Base Rate Loans, as further provided herein.

(b) Term Loan Borrowing. Subject to the terms and conditions set forth herein, each Term Loan Lender severally agrees to make a single loan (each such loan, a "Term Loan") to the Borrowers on the Closing Date in an amount equal to such Term Loan Lender's Term Loan Commitment. The Term Loan Borrowing shall consist of Term Loans made simultaneously by the Term Loan Lenders in accordance with their respective Applicable Percentage of the Term Loan Facility. Amounts borrowed under this Section 2.1(b) and repaid or prepaid may not be reborrowed. Term Loans shall be Base Rate Loans, as further provided herein.

2.2 Borrowings of Loans.

(a) Each Borrowing of Loans shall be made upon the Company's irrevocable written notice to the Administrative Agent in the form of a Loan Notice, which notice must be received by the Administrative Agent not later than 11:00 a.m. (i) one Business Day prior to the requested date of any Revolving Credit Borrowing and (ii) on the requested date of the Term Loan Borrowing. Each Loan Notice shall specify (A) whether the Borrower is requesting a Revolving Credit Borrowing or the Term Loan Borrowing, (B) the requested date of the Borrowing (which shall be a Business Day), (C) the principal amount of Loans to be borrowed, which shall be, (1) with respect to Revolving Credit Loans, a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof, and (2) with respect to the Term Loans, the full amount of the aggregate Term Loan Commitments and (D) the applicable Borrower requesting such Borrowing. The Administrative Agent shall promptly notify the applicable Lenders of each Loan Notice.

(b) Not later than 12:00 p.m. on the Business Day specified in the applicable Loan Notice, each applicable Lender shall make the amount of its Loan available to the Administrative Agent, for the account of the Borrowers, in immediately available funds at the Administrative Agent's Office. Each Borrower hereby irrevocably authorizes the Administrative Agent to disburse the proceeds of each Borrowing requested pursuant to the terms hereof in immediately available funds by crediting or wiring such proceeds to the deposit account of the applicable Borrower or Borrowers identified in the most recent notice substantially in the form attached as Exhibit F (a "Notice of Account Designation") delivered by the Company to the Administrative Agent or as may be otherwise agreed upon by the Company and the Administrative Agent from time to time. Subject to Section 2.10(a)(i), the Administrative Agent shall not be obligated to disburse the portion of the proceeds of any Revolving Credit Loan or Term Loan requested pursuant to this Section to the extent that any Lender has not made available to the Administrative Agent its Applicable Percentage of such Loan.

(c) Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Company, the Administrative Agent, and such Lender.

2.3 Prepayments.

(a) Optional. The Borrowers may, upon notice by the Company to the Administrative Agent, at any time or from time to time voluntarily prepay Revolving Credit Loans in whole or in part without premium or penalty; provided that (i) such notice must be in a form acceptable to the Administrative Agent and be received by the Administrative Agent not later than 11:00 a.m. one Business Day prior to the date of prepayment of Revolving Credit Loans and (ii) any prepayment of Revolving Credit Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. The Administrative Agent will promptly notify each Revolving Credit Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Revolving Credit Percentage, subject to Section 2.12). If such notice is given by the Company, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Subject to Section 2.12, each such prepayment pursuant to this Section 2.3(a) shall be paid to the Revolving Credit Lenders in accordance with their respective Applicable Revolving Credit Percentages. The Company may also, upon notice by the Company to the Administrative Agent, at any time or from time to time voluntarily prepay Term Loans in whole or in part; provided that (i) such notice must be in a form acceptable to the Administrative Agent and be received by the Administrative Agent not later than 11:00 a.m. three Business Days prior to any date of prepayment and (ii) any such prepayment shall be in a principal amount of $2,000,000 or a whole multiple of $1,000,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. The Administrative Agent will promptly notify each Term Loan Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage of the Term Loan Facility). If such notice is given by the Company, the Company shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Term Loan shall be accompanied by all accrued interest on the amount prepaid. Each such prepayment pursuant to this Section 2.3(a) shall be paid to the Term Loan Lenders in accordance with their respective Applicable Percentages of the Term Loan Facility. Each prepayment of the outstanding Term Loans pursuant to this Section 2.3(a) shall be applied to the principal repayment installments of the Term Loans (including the installment due on the Maturity Date of the Term Loan Facility) in inverse order of maturity.

(b) Mandatory.

(i) Overadvances. If for any reason the Total Revolving Credit Outstandings at any time exceed the Maximum Revolving Borrowing Amount at such time, the Borrowers shall immediately prepay Revolving Credit Loans in an aggregate amount equal to such excess.

(ii) Dispositions. If a Disposition occurs with respect to any property of any Loan Party or any of its Subsidiaries (other than any Disposition of any property permitted by any of clauses (a) through (h) of Section 7.5) or the Dan Call Farm Property which results in the realization by such Person or any Permitted Investor of Net Cash Proceeds in excess of $100,000, the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of such Net Cash Proceeds immediately upon receipt thereof by such Person or such Permitted Investor; provided, however, notwithstanding the foregoing, with respect to any Net Cash Proceeds less than $1,000,000 realized in connection with any such Disposition (other than with respect to the Dan

Call Farm Property), at the election of the Borrowers (as notified by the Company to the Administrative Agent on or prior to the date of such Disposition or receipt of proceeds) and so long as no Event of Default shall have occurred and be continuing, such Loan Party or such Subsidiary may reinvest all or any portion of such Net Cash Proceeds in operating assets within 180 days after the receipt of such Net Cash Proceeds (the consummation of such reinvestment to be certified by the Company in writing to the Administrative Agent within such period); provided further however, that any Net Cash Proceeds not so reinvested shall be immediately applied to the prepayment of the Loans as set forth in this Section 2.3(b)(ii).

(iii) Extraordinary Receipts. Upon receipt of any Extraordinary Receipt by any Loan Party or any Subsidiary or any Permitted Investor, not otherwise included in clause (ii) above, the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of the Net Cash Proceeds thereof immediately upon receipt thereof by such Person; provided, however, notwithstanding the foregoing, with respect to any proceeds of insurance, condemnation awards (or payments in lieu thereof) or indemnity payments (other than those related to the Dan Call Farm Property), at the election of the Borrowers (as notified by the Company to the Administrative Agent on or prior to the date of receipt of such insurance proceeds, condemnation awards or indemnity payments), and so long as no Event of Default shall have occurred and be continuing, such Loan Party or such Subsidiary may apply within 180 days after the receipt thereof to replace or repair the equipment, fixed assets or real property in respect of which such proceeds were received; and provided further however, that any such proceeds not so applied shall be immediately applied to the prepayment of the Loans as set forth in this Section 2.3(b)(iii).

(iv) Application of Mandatory Prepayments. Each prepayment of Loans pursuant to the foregoing provisions of this Section 2.3(b) (other than clause (i)) shall be applied, first, to the repayment installments of the Term Loans (including the installment due on the Maturity Date of the Term Loan Facility) in inverse order of maturity, and second, to the outstanding Revolving Credit Loans (without a corresponding reduction in the aggregate Revolving Credit Commitments). Each prepayment of Loans pursuant to the provisions of Section 2.3(b)(i) shall be applied to the outstanding Revolving Credit Loans (without a corresponding reduction in the aggregate Revolving Credit Commitments).

2.4 Termination or Reduction of Commitments. Upon notice to the Administrative Agent, the Company may terminate, or from time to time permanently reduce, the aggregate Revolving Credit Commitments; provided that (a) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five Business Days prior to the date of termination or reduction, (b) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof and (c) the Company shall not terminate or reduce the aggregate Revolving Credit Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Credit Outstandings would exceed the aggregate Revolving Credit Commitments. The Administrative Agent will promptly notify the Lenders of any termination or reduction of the aggregate Revolving Credit Commitments under this Section 2.4. Upon any reduction of the aggregate Revolving Credit Commitments, the Revolving Credit Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. All fees in respect of the Revolving Credit Facility accrued until the effective date of any termination of the aggregate Revolving Credit Commitments shall be paid on the effective date of such termination.

2.5 Repayment of Loans.

(a) Revolving Credit Loans. The Borrowers shall repay to the Revolving Credit Lenders on the Maturity Date for the Revolving Credit Facility the aggregate principal amount of all Revolving Credit Loans outstanding on such date.

(b) Term Loans. The Borrowers shall repay to the Term Loan Lenders the aggregate principal amount of all Term Loans outstanding in quarterly installments of $250,000 on the last day of each calendar quarter (commencing on September 30, 2022) (which installments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.3); provided that the final principal repayment installment of the Term Loans shall be repaid on the Maturity Date for the Term Loan Facility and in any event shall be in an amount equal to the aggregate principal amount of all Term Loans outstanding on such date.

2.6 Interest.

(a) Interest Rate Generally. Subject to the provisions of Section 2.6(b), each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate (as in effect from time to time) plus the Applicable Margin.

(b) Default Rate.

(i) If any amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii) If any amount (other than principal of any Loan) payable by the Borrowers under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then upon the request of the Required Lenders such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii) Upon the request of the Required Lenders, while any Event of Default exists (other than as set forth in the foregoing subsections (i) and (ii)), the Borrowers shall pay interest on the principal amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iv) Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c) Interest Payment Dates. Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d) Maximum Rate. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable

Law, (i) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof and (iii) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

2.7 Fees.

(a) Commitment Fee. The Borrowers shall pay to the Administrative Agent, for the account of each Revolving Credit Lender, a commitment fee (the "Commitment Fee") equal to 0.50% per annum times the actual daily amount by which aggregate Revolving Credit Commitments exceeds the Outstanding Amount of Revolving Credit Loans, subject to adjustment as provided in Section 2.12. The Commitment Fee shall accrue at all times during the Revolving Credit Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the last day of each calendar quarter, commencing on September 30, 2022, and on the last day of the Revolving Credit Availability Period. The Commitment Fee shall be distributed by the Administrative Agent to the Revolving Credit Lenders in accordance with their respective Applicable Percentages, subject to adjustment as provided in Section 2.12.

(b) Arranger, Administrative Agent and Lender Fees. The Borrowers shall pay to the Arranger and the Administrative Agent, for their own respective accounts, fees in the amounts and at the times specified in the Fee Letter. The Borrowers shall pay to the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified (including any upfront fees payable on the Closing Date). All of the foregoing fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

2.8 Computation of Interest and Fees. All computations of interest for Base Rate Loans when the Base Rate is determined by the Prime Rate shall be made on the basis of a year of 365 days and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.9 Evidence of Debt. The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender in the ordinary course of business. The Administrative Agent shall maintain the Register in accordance with Section 10.6(c). The accounts or records maintained by each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the Register, the Register shall control in the absence of manifest error. Upon the request of any Lender made through the Administrative Agent, each Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

2.10 Payments Generally; Administrative Agent's Clawback.

(a) General. All payments to be made by the Borrowers shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage in respect of the relevant Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue, unless otherwise agreed to by the Administrative Agent. If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(i) Funding by Lenders; Presumption by Administrative Agent. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Loans that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.2 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking or farm credit industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Base Rate Loans. If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrowers shall be without prejudice to any claim any Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii) Payments by Borrowers; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Company prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender in immediately available funds, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking or farm credit industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or any Borrower with respect to any amount owing under this subsection (a) shall be conclusive, absent manifest error.

(b) Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the applicable Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(c) Obligations of Lenders Several. The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 10.4(c) are several and not joint or joint and several. The failure of any Lender to make any Loan or to make any payment under Section 10.4(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 10.4(c).

2.11 Sharing of Payments by Lenders. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations (other than pursuant to Sections 3.1, 3.2 or 10.4) greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that:

(i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii) the provisions of this Section shall not be construed to apply to (A) any payment made by or on behalf of a Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to the Company or any of its Subsidiaries or Affiliates, as to which the provisions of this Section shall apply.

Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against such Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

This Section 2.11 shall not apply to any action taken by any Farm Credit Lender with respect to any Farm Credit Equities held by any Borrower.

2.12 Defaulting Lenders.

(a) Adjustments. Notwithstanding anything to the contrary contained in this Agreement, at any time there is more than one Lender, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i) Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.1 and in the definition of "Required Lenders".

(ii) Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.8 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Company may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Company, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default exists, to the payment of any amounts owing to any Borrower as a result of any judgment of a court of competent jurisdiction obtained by a Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (1) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (2) such Loans were made at a time when the conditions set forth in Section 4.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with the Revolving Credit Commitments without giving effect to Section 2.12(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.12(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii) Certain Fees.

(A) No Defaulting Lender shall be entitled to receive any Commitment Fee for any period during which that Lender is a Defaulting Lender (and no Borrower shall be required to pay any such Commitment Fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B) With respect to any Commitment Fee not required to be paid to any Defaulting Lender pursuant to clause (A) above, the Borrowers shall not be required to pay any such fee.

(b) Defaulting Lender Cure. If the Company and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein,

that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Revolving Credit Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to Section 2.12(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Company while that Lender was a Defaulting Lender; and provided further that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

2.13 Increases in Revolving Credit Commitments.

(a) Scheduled Increases. Without notice or action on the part of the Administrative Agent, any Lender or any Borrower, the aggregate Revolving Credit Commitments then in effect shall automatically increase (i) on the first anniversary of the Closing Date by an amount equal to $8,000,000 and (ii) on the second anniversary by an additional amount equal to $4,000,000, in each case, unless the Company has notified the Administrative Agent in writing that the Borrowers do not desire for any such increase to occur or desire for such increase to occur in a lesser amount; provided that (A) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five Business Days prior to the date of such increase and (B) any partial reduction of such contemplated increase shall be in an aggregate amount of $1,000,000 or any whole multiple of $1,000,000 in excess thereof. The Administrative Agent will promptly notify the Lenders of any increase (or reduction of any contemplated increase) of the aggregate Revolving Credit Commitments under this Section 2.13. Upon any increase of the aggregate Revolving Credit Commitments under this Section 2.13, the Revolving Credit Commitment of each Lender shall be increased by such Lender's Applicable Percentage of such increase amount.

(b) Potential Increases. The Borrowers may, by notice to the Administrative Agent from time to time request an increase in the aggregate Revolving Credit Commitments by an amount (for all such requests) not exceeding $3,000,000; provided that (a) no Default or Event of Default exists immediately prior to or after giving effect thereto, (b) the terms and documentation in respect of any such increase shall be satisfactory to the Administrative Agent and the Revolving Credit Lenders and (c) no Lender (including FCMA) will be required, but may elect in its sole discretion, to so increase its Revolving Credit Commitment or the aggregate Revolving Credit Commitments.

2.14 Company as Borrower Agent; Joint and Several Liability; Borrowers' Waivers and Consents.

(a) Each Borrower hereby directs the Administrative Agent to disburse the proceeds of each Loan as specified by the Company, and such distribution will, in all circumstances, be deemed to be made to, or at the direction of, such Borrower. Each Borrower hereby irrevocably designates, appoints, authorizes and directs the Company to act on behalf of such Borrower for the purposes set forth in this Section 2.14, and to act on behalf of such Borrower for purposes of requesting Loans hereunder and for otherwise giving and receiving notices and certifications under this Agreement or any other Loan Document and otherwise for taking all other action contemplated to be taken by the Company hereunder or under any other Loan Document. Each Borrower further appoints the Company as its agent for any service of process. The Administrative Agent is entitled to rely and act on the instructions of the Company, by and through any Senior Officer thereof, on behalf of each Borrower. Without limiting the provisions of Section 10.4, each Borrower covenants and agrees to assume joint and several liability for and to protect, indemnify and hold harmless the Administrative Agent and the Lenders from any and all liabilities, obligations, damages, penalties, claims, causes of action, costs, charges and expenses (including without limitation, attorneys' fees), which may be incurred by, imposed or asserted against the Administrative Agent or any Lender,

howsoever arising or incurred because of, out of or in connection with the disbursements of the Loans in accordance with this Section 2.14; provided that the liability of the Borrowers pursuant to this indemnity shall not extend to any liability, obligation, damage, penalty, claim, cause of action, cost, charge or expense determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of the Administrative Agent or the Lenders.

(b) Notwithstanding any other provision of this Agreement, each Borrower (i) shall be jointly and severally liable with each other Borrower for all Loans and all other Obligations, without regard to the identity of the Borrower in whose name any Loan is made or Obligation is incurred, and (ii) hereby jointly and severally guarantees to the Administrative Agent, for the benefit of the Secured Parties, the payment and performance in full of the Obligations.

(c) The Obligations of each Borrower under this Section 2.14 are independent, and a separate action or actions may be brought and prosecuted against any Borrower whether action is brought against any other Borrower or whether any other Borrower is joined in any such action or actions.

(d) The Obligations of the Borrowers under this Agreement, the other Loan Documents and with respect to the payment and performance of the Obligations shall be joint and several, absolute and unconditional irrespective of, and each Borrower hereby expressly waives, to the extent permitted by law, any defense (other than payment, to the extent thereof) to the payment and performance of the Obligations (including under this Agreement and all the other Loan Documents to which it is a party) by reason of:

(i) any lack of legality, validity or enforceability of this Agreement, of any other Loan Document, or of any other agreement or instrument creating, providing security for, or otherwise relating to any of the Obligations (the Loan Documents and all such other agreements and instruments being collectively referred to as the "Related Agreements");

(ii) any action taken in accordance with any of the Related Agreements, any exercise of any right or power therein conferred, any failure or omission to enforce any right conferred thereby, or any waiver of any covenant or condition therein provided;

(iii) any acceleration of the maturity of any of the Obligations (whether of such Borrower or of any other Borrower) or of any other obligations or liabilities of any Person under any of the Related Agreements;

(iv) any release, exchange, non-perfection, lapse in perfection, disposal, deterioration in value, or impairment of any security for any of the Obligations (whether of such Borrower or of any other Borrower) or for any other obligations or liabilities of any Person under any of the Related Agreements;

(v) any dissolution of any Borrower or any Subsidiary Guarantor or any other party to a Related Agreement, or the combination or consolidation of any Borrower or any Subsidiary Guarantor or any other party to a Related Agreement into or with another entity or any transfer or disposition of any assets of any Borrower or any Subsidiary Guarantor or any other party to a Related Agreement;

(vi) any extension (including without limitation extensions of time for payment), renewal, amendment, restructuring or restatement of, any acceptance of late or partial payments under, or any change in the amount of any borrowings or any credit facilities available under, this Agreement, any Loan Document or any other Related Agreement, in whole or in part;

(vii) the existence, addition, modification, termination, reduction or impairment of value, or release of any other guaranty (or security therefor) of any of the Obligations (whether of such Borrower or of any other Borrower);

(viii) any waiver of, forbearance or indulgence under, or other consent to any change in or departure from any term or provision contained in this Agreement, any other Loan Document or any other Related Agreement, including without limitation any term pertaining to the payment or performance of any of the Obligations (whether of such Borrower or of any other Borrower) or any of the obligations or liabilities of any party to any other Related Agreement; or

(ix) any other circumstance whatsoever (with or without notice to or knowledge of any other Borrower) which may or might in any manner or to any extent vary the risks of such Borrower, or might otherwise constitute a legal or equitable defense available to, or discharge of, a surety or a guarantor, including without limitation any right to require or claim that resort be had to any Borrower or any other Loan Party or to any collateral in respect of the Obligations.

(e) Notwithstanding anything to the contrary elsewhere contained herein or in any other Loan Document to which any Borrower is a party, each Borrower waives any right to assert against any Secured Party as a defense, counterclaim, set-off, recoupment or cross claim in respect of its Obligations, any defense (legal or equitable) or other claim which such Borrower may now or at any time hereafter have against any other Loan Party or any or all of the Secured Parties without waiving any additional defenses, set-offs, counterclaims or other claims otherwise available to such Borrower.

(f) Each Borrower hereby waives to the extent permitted by law notice of the following events or occurrences: (i) the Lenders' heretofore, now or from time to time hereafter making Loans and otherwise loaning monies or giving or extending credit to or for the benefit of any other Borrower or any other Loan Party, or otherwise entering into arrangements with any Loan Party giving rise to Obligations, whether pursuant to this Agreement or any other Loan Document or Related Agreement or any amendments, modifications, or supplements thereto, or replacements or extensions thereof; (ii) presentment, demand, default, non-payment, partial payment and protest; and (iii) any other event, condition, or occurrence described in Section 2.14(d). Each Borrower agrees that each Secured Party may heretofore, now or at any time hereafter do any or all of the foregoing in such manner, upon such terms and at such times as each Secured Party, in its sole and absolute discretion, deems advisable, without in any way or respect impairing, affecting, reducing or releasing such Borrower from its Obligations, and each Borrower hereby consents to each and all of the foregoing events or occurrences.

(g) Each Borrower hereby unconditionally subordinates all present and future debts, liabilities or obligations now or hereafter owing to such Borrower (i) of any other Borrower, to the payment in full of all Obligations (other than contingent indemnification and reimbursement obligations) and the termination of the Aggregate Commitments and (ii) of each other Person now or hereafter constituting a Loan Party, to the payment in full of the obligations of such Loan Party owing to any Secured Party and arising under the Loan Documents. All amounts due under such subordinated debts, liabilities, or obligations shall, upon the occurrence and during the continuance of an Event of Default, be collected and, upon request by the Administrative Agent, paid over forthwith to the Administrative Agent for the benefit of the Secured Parties on account of the Obligations or such other obligations, as applicable, and, after such request and pending such payment, shall be held by such Borrower as agent and bailee of the Secured Parties separate and apart from all other funds, property and accounts of such Borrower.

(h) To the extent that any Borrower shall make a payment (each a "Borrower Payment") of all or any portion of the Obligations, then such Borrower shall be entitled to contribution and indemnification from, and be reimbursed by, the other Borrowers in an amount equal to a fraction of such Borrower

Payment, the numerator of which fraction is such other Borrower's Allocable Amount (as defined below) and the denominator of which is the sum of the Allocable Amounts of all Borrowers. This Section is intended only to define the relative rights of the Borrowers, and nothing set forth in this Section is intended to or shall impair the obligations of the Borrowers, jointly and severally, to pay any amounts, as and when the same shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents. The Borrowers acknowledge that the rights of contribution, indemnification and reimbursement hereunder shall constitute assets in favor of each Borrower to which such contribution, indemnification and reimbursement is owing. Each Borrower hereby agrees that any right of subrogation, contribution, indemnification or reimbursement of such Borrower shall not be exercised until 93 days shall have elapsed following the payment in full of all Obligations (other than contingent indemnification and reimbursement obligations) and the termination of the Aggregate Commitments, without the filing or commencement, by or against any Borrower, any Guarantor or any other Person providing collateral for the Obligations, of any state or federal action, suit, petition or proceeding seeking any reorganization, liquidation or other relief or arrangement in respect of creditors of, or the appointment of a receiver, liquidator, trustee or conservator in respect to, such Person or its assets (and shall be subject and subordinate to the payment in full of all Obligations (other than contingent indemnification and reimbursement obligations) and the termination of the Aggregate Commitments). If an amount shall be paid to any Borrower on account of such rights at any time on or prior to such 93rd day, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Administrative Agent for the benefit of the Secured Parties to be credited and applied upon the Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement or otherwise as the Secured Parties may elect. For purposes of this Section 2.14(h), "Allocable Amount" means, as of any date of determination, for a Borrower, the maximum amount of liability that could be asserted against such Borrower under this Agreement with respect to the applicable Borrower Payment without (i) rendering such Borrower "insolvent" within the meaning of Section 101(31) of the Bankruptcy Code or Section 2 of either the Uniform Fraudulent Transfer Act (as in effect in any applicable State, the "UFTA") or the Uniform Fraudulent Conveyance Act (as in effect in any applicable State, the "UFCA"), (ii) leaving such Borrower with unreasonably small capital, within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA or Section 5 of the UFCA, or (iii) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA or Section 6 of the UFCA.

(i) This Section 2.14 shall survive the termination of the Commitments and the repayment of all Obligations.

## ARTICLE III
## TAXES AND YIELD PROTECTION

3.1 Taxes.

(a) Defined Terms. For purposes of this Section 3.1, the term "applicable Law" includes FATCA.

(b) Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If any applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has

been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.1) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c) Payment of Other Taxes by the Borrowers. Each Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d) Indemnification by the Borrowers. Each Borrower shall, jointly and severally, indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.1) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Company by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e) Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that a Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this subsection (e).

(f) Evidence of Payments. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.1, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g) Status of Lenders; Tax Documentation.

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Company and the Administrative Agent, at the time or times reasonably requested by the Company or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Law or reasonably requested by the Company or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Company or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Company or the Administrative Agent as will enable the Company or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.1(g)(ii)(A), (g)(ii)(B) and (g)(ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing,

(A) any Lender that is a U.S. Person shall deliver to the Company and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable Law or upon the reasonable request of the Company or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable Law or upon the reasonable request of the Company or the Administrative Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such

Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Company on behalf of any Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit such Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Company and the Administrative Agent at the time or times prescribed by Law and at such time or times reasonably requested by the Company or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Company or the Administrative Agent as may be necessary for the Company and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii) Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 3.1 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Company and the Administrative Agent in writing of its legal inability to do so.

(h) Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.1 (including by the payment of additional amounts pursuant to this Section 3.1), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this subsection (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this subsection (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection (h) shall not be construed to require any

indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i) Survival. Each party's obligations under this Section 3.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

3.2 Increased Costs.

(a) Increased Costs Generally. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or such other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or such other Recipient, the Borrowers will pay to such Lender or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b) Capital Requirements. If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c) Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Company, shall be conclusive absent manifest error. The Borrowers will pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d) Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.2 shall not constitute a waiver of such Lender's right to demand such compensation; provided that no Borrower shall be required to compensate a Lender

pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Company of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

3.3 [Reserved].

3.4 Mitigation Obligations; Replacement of Lenders.

(a) Designation of a Different Lending Office. If any Lender requests compensation under Section 3.2, or requires any Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.1, then such Lender shall (at the request of the Company) use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.1 or 3.2, as the case may be, in the future, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b) Replacement of Lenders. If any Lender requests compensation under Section 3.2, or if any Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.1, and in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 3.4(a), or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice by the Company to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.6), all of its interests, rights (other than its existing rights to payments pursuant to Sections 3.1 and 3.2) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i) the Borrowers shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 10.6(b);

(ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(iii) in the case of any such assignment resulting from a claim for compensation under Section 3.2 or payments required to be made pursuant to Section 3.1, such assignment will result in a reduction in such compensation or payments thereafter;

(iv) such assignment does not conflict with applicable Law; and

(v) in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Company to require such assignment and delegation cease to apply.

(c) Selection of Lending Office. Subject to Section 3.4(a), each Lender may make any Loan to the Borrowers through any Lending Office, provided that the exercise of this option shall not affect the obligations of the Borrowers to repay such Loan in accordance with the terms of this Agreement or otherwise alter the rights of the parties hereto.

3.5 Survival. All of the Borrowers' obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

## ARTICLE IV
## CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

4.1 Conditions of Initial Credit Extension. The effectiveness of this Agreement on the Closing Date and the obligation of each Lender as of the Closing Date to make its initial Loan on the Closing Date hereunder are subject to the satisfaction of the following conditions precedent:

(a) Documentation. The Administrative Agent shall have received, in form and substance satisfactory to the Administrative Agent and each Lender, each of the following, duly executed and acknowledged where appropriate by all parties thereto:

(i) this Agreement, a Note in favor of each Lender requesting a Note, the Security Agreement, the Pledge Agreement and a Mortgage with respect to the real property identified on Schedule 5.8 as being subject to a Mortgage on the Closing Date and the Dan Call Farm Property;

(ii) a certificate from a Senior Officer of each Borrower certifying (A) that the representations and warranties of each Borrower contained in Article V and of each Loan Party contained in each other Loan Document are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) on and as of the Closing Date, (B) that no Default exists as of the Closing Date, and no Default shall occur on the Closing Date as a result of making any Credit Extension on the Closing Date or from the application of the proceeds thereof and (C) that there has been no event or circumstance since the date of the Baseline Financial Statements that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect;

(iii) a certificate of a Senior Officer of each Loan Party either (A) certifying that attached thereto are true, correct and complete copies of all consents, licenses and approvals required in connection with the consummation by such Loan Party of the transactions contemplated hereby and the execution, delivery and performance by such Loan Party, and the validity against such Loan Party, of the Loan Documents to which it is a party, and that such consents, licenses and approvals are in full force and effect, or (B) certifying that no such consents, licenses or approvals are so required;

(iv) a certificate of a Senior Officer of each Loan Party certifying as to the incumbency and genuineness of the signature of each officer of such Loan Party executing Loan Documents to which it is a party and certifying that attached thereto are true, correct and complete copies of (A) the Organization Documents of such Loan Party (which, in the case of the articles or certificate of

incorporation or formation (or equivalent), shall be certified as of a recent date by the appropriate Governmental Authority in its jurisdiction of incorporation, organization or formation (or equivalent), as applicable), (B) resolutions duly adopted by the board of directors (or other governing body) of such Loan Party authorizing and approving the transactions contemplated hereunder and the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and (C) certificates as of a recent date of the good standing or existence (as applicable) of such Loan Party under the Laws of its jurisdiction of incorporation, organization or formation (or equivalent), as applicable, and each other jurisdiction where such Loan Party is qualified to do business where the failure to be qualified could reasonably be expected to have a Material Adverse Effect;

(v) favorable opinions of counsel to the Loan Parties and the Permitted Investors addressed to the Administrative Agent and the Lenders with respect to the Loan Parties, the Permitted Investors, the Loan Documents and such other matters as the Administrative Agent shall request (which such opinions shall expressly permit reliance by permitted successors and assigns of the Administrative Agent and the Lenders); and

(vi) a Borrowing Base Certificate duly certified by the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company relating to the initial Credit Extension.

(b) Personal Property Collateral Matters. The Administrative Agent shall have received, in form and substance satisfactory to the Administrative Agent, each of the following:

(i) all filings and recordations that are necessary to perfect the security interests of the Administrative Agent, on behalf of the Secured Parties, in the personal property Collateral and evidence reasonably satisfactory to the Administrative Agent that upon such filings and recordations such security interests constitute valid and perfected first priority Liens thereon (subject to Permitted Liens);

(ii) (A) original stock certificates or other certificates evidencing the certificated Equity Interests pledged pursuant to the Pledge Agreement, together with an undated stock power for each such certificate duly executed in blank by the registered owner thereof, and (B) each original promissory note pledged pursuant to the Security Agreement and required or requested to be delivered to the Administrative Agent pursuant to the terms thereof, together with an undated allonge for each such promissory note duly executed in blank by the holder thereof;

(iii) the results of lien searches made against each Loan Party, each as of a recent date prior to the Closing Date, indicating among other things that the assets of each Loan Party shall be free and clear of any Lien (except for Permitted Liens) as of the Closing Date;

(iv) evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect, together with the certificates of insurance and endorsements to policies, naming the Administrative Agent, on behalf of the Secured Parties, as an additional insured or lender loss payee and mortgagee, as the case may be, under all insurance policies (including flood insurance policies) maintained with respect to the assets and properties of the Loan Parties or the Permitted Investors that constitutes Collateral; and

(v) all such other documents as may be required by or requested under the terms of any of the Collateral Documents with respect to personal property Collateral, including Lien Waivers.

(c) Real Property Collateral Matters. The Administrative Agent shall have received, in form and substance satisfactory to the Administrative Agent, each of the following:

(i) all Mortgage Support Documents requested by the Administrative Agent with respect to each property being encumbered by a Mortgage on the Closing Date; and

(ii) evidence that all other action that the Administrative Agent may deem reasonably necessary or desirable in order to create valid first priority (or, solely in respect of the Dan Call Farm Property, second priority) Liens on the property described in such Mortgages has been taken (including delivery of such Mortgages to a title insurance company (or other applicable Person) for recordation).

(d) Financial Matters.

(i) Financial Statements. The Administrative Agent shall have received (A) the Baseline Financial Statements and (B) such other financial statements and financial information of the Company and its Subsidiaries as the Administrative Agent shall request.

(ii) Notice of Account Designation. The Administrative Agent shall have received a Notice of Account Designation specifying the account or accounts to which the proceeds of any Loans made on or after the Closing Date are to be disbursed.

(e) Due Diligence. The Administrative Agent shall have completed, to its satisfaction, all legal, tax, environmental, business and other due diligence with respect to the business, assets, liabilities, operations and condition (financial or otherwise) of the Company and its Subsidiaries and the Permitted Investors in scope and determination satisfactory to the Administrative Agent in its sole discretion, including, without limitation, the completion of a valuation of all inventory and accounts receivable constituting Collateral (in each case reflecting values that are satisfactory to the Administrative Agent).

(f) Existing Indebtedness. All existing Indebtedness of the Company and its Subsidiaries (excluding Indebtedness permitted pursuant to Section 7.2) shall have been, or concurrently with the closing on the Closing Date will be, repaid in full, all commitments (if any) in respect thereof shall have been, or concurrently with the closing on the Closing Date will be, terminated and all guarantees therefor and security therefor shall have been, or concurrently with the closing on the Closing Date will be, released. The Administrative Agent shall have received pay-off letters in form and substance satisfactory to it evidencing such repayment, termination and release.

(g) Arrangements With Respect to Dan Call Farm Mortgage Indebtedness. The Administrative Agent shall have received copies of an effective amendment with respect to the Dan Call Farm Mortgage Indebtedness and an intercreditor agreement with respect thereto, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent.

(h) Equity Contribution. The Company shall have received not less than $12,500,000 in cash proceeds from a capital contribution to its equity.

(i) Farm Credit Equities. The Borrowers shall have made at least the minimum equity investment in each Farm Credit Lender required by Section 6.16(a), and the Administrative Agent shall have received such other documentation and information requested in connection therewith.

(j) PATRIOT Act, etc. Each Loan Party and each Permitted Investor shall have provided to the Administrative Agent and the Lenders the documentation and other information requested by the

Administrative Agent and the Lenders in order to comply with requirements of applicable "know your customer" rules and regulations and Anti-Money Laundering Laws, including the PATRIOT Act, in each case at least 10 Business Days prior to the Closing Date. At least 10 Business Days prior to the Closing Date, any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall have delivered, to each Lender that so requests, a Beneficial Ownership Certification in relation to such Loan Party.

(k) Payment of Fees and Expenses. The Company shall have paid, or made arrangements to pay concurrently with the closing on the Closing Date, (i) to the Administrative Agent, the Arranger and the Lenders the fees set forth or referenced in Section 2.7(b) and any other accrued and unpaid fees or commissions due hereunder, (ii) all fees, charges and disbursements of counsel to the Administrative Agent (directly to such counsel if requested by the Administrative Agent) to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Company and the Administrative Agent) and (iii) to any other Person such amount as may be due thereto in connection with the transactions contemplated hereby, including all taxes, fees and other charges in connection with the execution, delivery, recording, filing and registration of any of the Loan Documents.

Without limiting the generality of the provisions of Section 9.3, for purposes of determining compliance with the conditions specified in this Section 4.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

4.2 Conditions to All Credit Extensions. The obligation of each Lender to make any Loan hereunder are subject to the satisfaction of the following conditions precedent on the relevant date such Loan is made:

(a) Bring-down of Representations and Warranties. The representations and warranties of each Borrower contained in Article V and of each Loan Party contained in each other Loan Document shall be true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) on and as of the date such Loan is made, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) as of such earlier date.

(b) No Default. No Default shall exist as of the date such Loan is made and no Default shall occur on such date as a result of making such Loan or from the application of the proceeds thereof.

(c) Request for Credit Extension. The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d) Availability. With respect to any requested Revolving Credit Borrowing, after giving effect to such Revolving Credit Borrowing, the Total Revolving Credit Outstandings shall not exceed the Maximum Revolving Borrowing Amount at such time.

The submission by the Company of a Request for Credit Extension with respect to a Borrowing shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) will be satisfied on and as of the relevant date such Loan is made and the making of such Loan shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) are satisfied on and as of such date.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants to the Administrative Agent and the Lenders that:

5.1 Existence, Qualification and Power. Each of the Loan Parties and their respective Subsidiaries (a) is duly organized, validly existing and, to the extent applicable, in good standing under the Laws of the jurisdiction of its organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business as currently conducted and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party and consummate the transactions contemplated thereby and (c) is duly qualified and is licensed and, to the extent applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.2 Authorization; No Contravention. The execution, delivery and performance by each Loan Party of each Loan Document to which it is a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Loan Party's Organization Documents, (b) conflict with or result in any material breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which such Loan Party is a party or affecting such Loan Party or the properties of such Loan Party or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Loan Party or its property is subject or (c) violate any applicable Law in any material respect.

5.3 Governmental Authorization; Other Consents. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party or any Permitted Investor of this Agreement or any other Loan Document or the consummation of the transactions contemplated hereby, (b) the grant by any Loan Party or any Permitted Investor of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection or maintenance of the Liens created under the Collateral Documents or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, other than (i) filings under the UCC, (ii) filings with the United States Copyright Office and/or the United States Patent and Trademark Office, (iii) the consents, authorizations, approvals, actions, notices and filings listed on Schedule 5.3, all of which have been duly obtained, taken, given or made and are in full force and effect, (iv) the recording of Mortgages with the applicable county recording office or register of deeds and (v) any ordinary course of business filings required in connection with the exercise of remedies and the acquisition or disposition of any Loan Party's assets by the Administrative Agent or any Lender.

5.4 Binding Effect. This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto. This

Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to bankruptcy, insolvency, Debtor Relief Laws, and similar laws affecting the enforceability of creditor's rights generally and to general principles of equity.

5.5 Financial Statements; No Material Adverse Effect.

(a) The financial statements delivered pursuant to Section 4.1(d)(i), or after the Closing Date, the most recent audited (or reviewed, as applicable) and unaudited financial statements delivered pursuant to Section 4.1(d)(i), 6.1(a) or 6.1(b), as the case may be, (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, (ii) fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the date thereof and their results of operations, cash flows and changes in shareholders' equity for the period covered thereby (other than customary year-end adjustments for unaudited financial statements and the absence of footnotes from unaudited financial statements) and (iii) show all material indebtedness and other financial liabilities, direct or contingent, of the Company and its Subsidiaries as of the date thereof, including liabilities for Taxes, material commitments and Indebtedness.

(b) Since December 31, 2021, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

5.6 Litigation. There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Borrower after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any Subsidiary or Affiliate thereof or against any of their respective properties or revenues or Collateral that (a) purport to affect or pertain to this Agreement, any other Loan Document or the consummation of the transactions contemplated hereby, or (b) either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

5.7 No Default. Neither any Loan Party nor any Subsidiary or Affiliate thereof is in default under any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

5.8 Title to Property. As of the Closing Date, the real property listed on Schedule 5.8 constitutes all of the real property that is owned, leased, subleased or used by any Loan Party or any of its Subsidiaries. Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business and valid and legal title or leasehold title to all of its personal property and assets, in each case free and clear of all Liens other than Permitted Liens.

5.9 Environmental Compliance.

(a) The properties owned, leased or operated by each Loan Party and each Subsidiary thereof do not presently contain, and to their knowledge have not previously contained, any Hazardous Materials in amounts or concentrations which constitute or constituted a violation of applicable Environmental Laws. For the periods that each Loan Party and each Subsidiary thereof has owned, leased, or operated their respective properties, Hazardous Materials have not been transported or disposed of to or from the properties owned, leased or operated by any Loan Party or any Subsidiary thereof in violation of, or in a manner or to a location which could give rise to liability under, Environmental Laws, nor have any Hazardous Materials been generated, treated, stored or disposed of at, on or under any of such properties in

violation of, or in a manner that could give rise to liability under, any applicable Environmental Laws. There has been no release, or to the best knowledge of each Borrower, threat of release, of Hazardous Materials at or from properties owned, leased or operated by any Loan Party or any Subsidiary, now or, to the best knowledge of each Borrower, in the past, in violation of or in amounts or in a manner that could give rise to liability under applicable Environmental Laws.

(b) Each Loan Party and each Subsidiary thereof and such properties and all operations conducted in connection therewith are in compliance, and have been in compliance for the last five (5) years, in all material respects with all applicable Environmental Laws, and there is no contamination at, under or about such properties or such operations which could interfere with the continued operation of such properties or impair the fair saleable value thereof.

(c) Neither any Loan Party nor any Subsidiary thereof has received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters, Hazardous Materials, or compliance with Environmental Laws, nor does any Loan Party or any Subsidiary thereof have knowledge or reason to believe that any such notice will be received or is being threatened.

(d) No judicial proceedings or governmental or administrative action is pending, or, to the best knowledge of each Borrower, threatened, under any Environmental Law to which any Loan Party or any Subsidiary thereof is or will be named as a potentially responsible party, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any applicable Environmental Law with respect to any Loan Party, any Subsidiary thereof, with respect to any real property owned, leased or operated by any Loan Party or any Subsidiary thereof or operations conducted in connection therewith.

5.10 Tax Matters. Each of the Loan Parties and their respective Subsidiaries has timely filed all federal, state and other material tax returns and reports required to be filed and has timely paid all federal, state and other material Taxes (whether or not shown on a tax return), including in its capacity as a withholding agent, levied or imposed upon it or its properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. There is no proposed material tax assessment or other claim against, and no material tax audit with respect to, any Loan Party or any Subsidiary thereof. Neither any Loan Party nor any Subsidiary thereof is party to any tax sharing agreement.

5.11 ERISA Compliance.

(a) Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws. Each Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination or opinion or advisory letter from the IRS to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the IRS or is within the applicable remedial amendment period. To the best knowledge of each Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b) There are no pending or, to the best knowledge of each Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c) (i) No ERISA Event has occurred, and neither any Borrower nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan or Multiemployer Plan, (ii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and neither any Borrower nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date, (iii) neither any Borrower nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid, (iv) neither any Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA and (v) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

(d) Neither the Company nor any ERISA Affiliate maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Pension Plan other than (A) on the Closing Date, those listed on Schedule 5.11(d) and (B) thereafter, Pension Plans not otherwise prohibited by this Agreement.

(e) As of the Closing Date, no Borrower is, nor will it be, using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Commitments.

5.12 Ownership of Loan Parties and Subsidiaries. As of the Closing Date, no Loan Party has any Subsidiaries other than those specifically disclosed in Schedule 5.12, and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified in Schedule 5.12 free and clear of all Liens except those created under the Collateral Documents.

5.13 Investment Company Act; Margin Stock.

(a) None of the Company, any Person Controlling the Company, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

(b) Neither the Company nor any Subsidiary is engaged principally or as one of its important activities in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Federal Reserve Board) or extending credit for the purpose of purchasing or carrying margin stock.

5.14 Disclosure. Each Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which any Loan Party or any Subsidiary thereof is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No financial statement, report, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party or any Subsidiary thereof to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document contains any material misstatement of fact or omits any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, each Borrower represents and warrants only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

5.15 Compliance with Laws. Each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties.

5.16 Intellectual Property Matters. Each Loan Party and each Subsidiary thereof owns, or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights that are necessary for the operation of its business, without conflict with the rights of any other Person. To the best knowledge of each Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary thereof infringes upon, or misappropriates or otherwise violates, any rights held by any other Person. No claim or litigation regarding any of the foregoing is pending or, to the best knowledge of any Borrower, threatened, that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.17 Solvency. The Company and its Subsidiaries, on a consolidated basis, are Solvent.

5.18 Casualty, Etc. Neither the businesses nor the properties of any Loan Party or any Subsidiary thereof are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance), condemnation or eminent domain proceeding that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.19 Anti-Corruption Laws and Sanctions.

(a) None of (i) any Loan Party, any Subsidiary thereof or, to the best knowledge of each Borrower, any of the respective directors, officers, employees or Affiliates of any Loan Party or any Subsidiary thereof, or (ii) to the best knowledge of each Borrower, any agent or representative of any Loan Party or any Subsidiary thereof that will act in any capacity in connection with, or benefit from, the credit facilities provided hereunder, (A) is a Sanctioned Person or currently the subject or target of any Sanctions, (B) has its assets located in a Sanctioned Country, (C) is under administrative, civil or criminal investigation for an alleged violation of, or received notice from or made a voluntary disclosure to any governmental entity regarding a possible violation of, Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by a governmental authority that enforces Sanctions or any Anti-Corruption Laws or Anti-Money Laundering Laws, or (D) directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons. Each of the Loan Parties and their respective Subsidiaries, and to the best knowledge of each Borrower, each director, officer, employee, agent and Affiliate of the Loan Parties and their respective Subsidiaries, is in compliance with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(b) No proceeds of any Credit Extension have been used, directly or indirectly, by the Company, any of its Subsidiaries or any of its or their respective directors, officers, employees and agents in violation of Section 7.10(b).

5.20 Beneficial Ownership Certificate. As of the Closing Date, the information included in any Beneficial Ownership Certification, if applicable, is true and correct in all respects.

5.21 Farm Credit Eligibility. Each Borrower is an entity eligible to borrow from Farm Credit Lenders.

5.22 Borrowing Base Assets.

(a) Accounts. With respect to each of its Accounts at the time it is shown as an Eligible Account in a Borrowing Base Certificate:

(i) it is genuine and in all respects what it purports to be;

(ii) it arises out of a completed, *bona fide* sale and delivery of goods or rendition of services in the ordinary course of business, and substantially in accordance with any purchase order, contract or other document relating thereto;

(iii) it is for a sum certain, maturing as stated in the applicable invoice, a copy of which has been furnished or is available to the Administrative Agent on request;

(iv) it is not subject to any offset, Lien (other than the Administrative Agent's Lien), deduction, defense, dispute, counterclaim or other adverse condition except as arising in the ordinary course of business and disclosed to the Administrative Agent or as to any amount thereof not included as an Eligible Account; and it is absolutely owing by the Account Debtor, without contingency in any respect;

(v) no purchase order, agreement, document or applicable Law restricts assignment of the Account to the Administrative Agent (regardless of whether, under the UCC or other applicable Law, the restriction is ineffective), and the applicable Borrower is the sole payee or remittance party shown on the invoice;

(vi) no extension, compromise, settlement, modification, credit, deduction or return has been authorized or is in process with respect to the Account, except discounts or allowances granted in the ordinary course of business for prompt payment that are reflected on the face of the invoice related thereto and in the reports submitted to the Administrative Agent hereunder; and

(vii) to the best of each Borrower's knowledge, as applicable, (A) there are no facts or circumstances that are reasonably likely to impair the enforceability or collectability of such Account; (B) the Account Debtor had the capacity to contract when the Account arose, continues to meet the applicable Borrower's customary credit standards, is Solvent, is not contemplating or subject to any proceeding under any Debtor Relief Laws, and has not failed, or suspended or ceased doing business; and (C) there are no proceedings or actions threatened or pending against any Account Debtor that could reasonably be expected to have a material adverse effect on the Account Debtor's financial condition.

(b) Inventory. As to each item of Inventory that is identified as Eligible Inventory in a Borrowing Base Certificate submitted to the Administrative Agent, as of the date of such Borrowing Base Certificate, such Inventory is (i) of good and merchantable quality, free from known defects, and (ii) not excluded as ineligible by virtue of one or more of the excluding criteria (other than any such criteria requiring the Administrative Agent's discretion) set forth in the definition of Eligible Inventory.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, each Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.1, 6.2, and 6.3) cause each Subsidiary thereof to:

6.1 Financial Statements. Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Administrative Agent:

(a) as soon as practicable and in any event within 120 days (or, in the case of the fiscal year ending December 31, 2022, 150 days) after the end of each fiscal year (commencing with the fiscal year ended December 31, 2022), a consolidated and consolidating balance sheet of the Company and its Subsidiaries as at the end of such fiscal year, and the related consolidated and consolidating statements of income or operations, changes in shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit, and such consolidating statements to be certified by the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Company and its Subsidiaries; provided that, with respect to the financial statements to be delivered hereunder for the fiscal year ending December 31, 2022, the balance sheet for such fiscal year shall be audited and the related statements of income or operations, changes in shareholders' equity and cash flows for such fiscal year may be reviewed;

(b) as soon as practicable and in any event within 30 days after the end of each calendar month of each fiscal year (including the last calendar month of each fiscal year and commencing with the calendar month ended July 31, 2022), a consolidated and consolidating balance sheet of the Company and its Subsidiaries as at the end of such calendar month, and the related consolidated and consolidating statements of income or operations, changes in shareholders' equity and cash flows for such fiscal quarter and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding calendar month of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be certified by the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Company and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and such consolidating statements to be certified by the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Company and its Subsidiaries; and

(c) as soon as practicable and in any event within 60 days after the end of each fiscal year, an annual business plan and budget of the Company and its Subsidiaries on a consolidated basis, including forecasts prepared by management of the Company, in form satisfactory to the Administrative Agent, of consolidated balance sheets and statements of income or operations and cash flows of the Company and its Subsidiaries on an annual basis for the then-current fiscal year (including the fiscal year in which the latest Maturity Date occurs).

6.2 Certificates; Other Information. Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Administrative Agent:

(a) concurrently with the delivery of the financial statements referred to in Sections 6.1(a) and (b), (i) a duly completed Compliance Certificate signed by the chief executive officer, president, chief

financial officer, treasurer, controller or director of finance of the Company and (ii) a copy of management's customary discussion and analysis with respect to such financial statements;

(b) promptly after any request by the Administrative Agent or any Lender, a copy of any detailed audit report, management letter or recommendation submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by independent accountants in connection with the accounts or books of any Loan Party or any Subsidiary thereof, or any audit of any of them;

(c) as soon as available, and in any event no later than 20 days after the last day of each calendar month, a Borrowing Base Certificate showing the computation of the Borrowing Base in reasonable detail as of the close of business on the last day of such month, signed by the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company, together with such supporting materials as the Administrative Agent shall reasonably request (including weekly reporting of rolling forward accounts receivable data by reporting weekly sales, cash collections and credits and monthly reporting of gross inventory, inventory ineligibles and accounts receivable ineligibles);

(d) as soon as available, but in any event within 30 days after the end of each fiscal year, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably specify;

(e) promptly after the written assertion or occurrence thereof, notice of any action or proceeding against or of any noncompliance by any Loan Party or any Subsidiary thereof with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect or (ii) cause any property described in any Mortgage to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(f) promptly after any request therefor, a listing of each Borrower's trade payables, specifying the trade creditor and balance due, and a detailed trade payable aging, all in form satisfactory to the Administrative Agent in its Permitted Discretion;

(g) promptly after any request therefor, such other information and documentation required by bank regulatory authorities under applicable "know your customer" and Anti-Money Laundering Laws (including the PATRIOT Act and the Beneficial Ownership Regulation), as the Administrative Agent or any Lender may from time to time reasonably request; and

(h) promptly after any request therefor, such other information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.1(a) or (b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted by or on behalf of the Company on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that (x) the Company shall deliver paper copies of such documents to the Administrative Agent or any Lender upon its request to the Company to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (y) the Company shall notify the Administrative Agent and each Lender (by facsimile or e-mail) of the posting of any such documents and provide to the Administrative Agent by e-

mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of, or to maintain paper copies of, the documents referred to above and, in any event, shall have no responsibility to monitor compliance by the Company with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

6.3 Notices. Promptly (but in no event later than seven (7) days after any Senior Officer of any Loan Party obtains knowledge thereof) notify the Administrative Agent and each Lender of:

(a) the occurrence of any Default;

(b) any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party or any Subsidiary thereof, (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(c) the occurrence of any ERISA Event;

(d) any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(e) any loss, termination, suspension, revocation or modification of any alcoholic beverage license or permit used by any Loan Party or Subsidiary of any Loan Party in operation of its business or any other license or permit required for the lawful production or sale of Inventory of any Loan Party or any Subsidiary thereof or the ownership or operation of any facility in connection therewith; and

(f) any redesignation of the improvements on any real property subject to a Mortgage into or out of a special flood hazard area.

Each notice pursuant to this Section 6.3 (other than Section 6.3(f)) shall be accompanied by a statement of a Senior Officer of the Company setting forth the details of the occurrence referred to therein and stating what action the Company has taken and proposes to take with respect thereto. Each notice pursuant to Section 6.3(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

6.4 Payment of Taxes and Other Obligations. (a) Pay and discharge (i) as the same shall become due and payable all federal, state and other material Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted (which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien) and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP and (ii) all other Indebtedness, obligations and liabilities in accordance with customary trade practices and (b) timely file all federal, state and other material tax returns required to be filed.

6.5 Preservation of Existence, Etc. (a) Preserve, renew and maintain in full force and effect its legal existence and, to the extent applicable, good standing under the Laws of the jurisdiction of its organization, except in a transaction permitted by Section 7.4 or 7.5, (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material

Adverse Effect and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

6.6 Maintenance of Property. (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted and (b) make all necessary repairs thereto and renewals and replacements thereof, except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.7 Maintenance of Insurance.

(a) Maintain with financially sound and reputable insurance companies not Affiliates of the Company, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances and locations by such other Persons, which such insurance shall (i) provide for not less than 30 days' (or 10 days' in the case of non-payment) prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance, (ii) in the case of property insurance, name the Administrative Agent for the benefit of the Secured Parties, as mortgagee and/or lender's loss payee, as applicable, (iii) in the case of liability insurance, name the Administrative Agent for the benefit of the Secured Parties, as additional insured and (iv) be reasonably satisfactory in all other respects to the Administrative Agent.

(b) Without limiting the foregoing, if any portion of the improvements on any real property subject to a Mortgage is at any time located in a special flood hazard area with respect to which flood insurance has been made available, maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in such form, on such terms and in such amounts required by Law or as otherwise required by the Administrative Agent.

6.8 Compliance with Laws. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property.

6.9 Books and Records. Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Borrower or such Subsidiary, as the case may be.

6.10 Inspection Rights. Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to audit and appraise the Collateral, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Company; provided that when an Event of Default exists the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours and without advance notice.

6.11 Use of Proceeds. Use the proceeds of the Credit Extensions for general corporate purposes, including working capital, capital purchases and refinancing of certain Indebtedness as contemplated by Section 4.1, not in contravention of any Law or of any Loan Document.

6.12 Additional Subsidiaries and Real Property.

(a) Additional Domestic Subsidiaries. Promptly following the date any Person becomes a Domestic Subsidiary (whether by creation, acquisition or otherwise) and in any event within 30 days after such date (as such time period may be extended by the Administrative Agent in its sole discretion), (i) cause such Person to (A) become a Subsidiary Guarantor (or, with the consent of the Administrative Agent if such Subsidiary is to own any assets of the type included in the Borrowing Base, a Borrower hereunder) by delivering to the Administrative Agent a duly executed joinder to the Subsidiary Guaranty (or, in the case of the first such Subsidiary, a duly executed Subsidiary Guaranty) or this Agreement, as applicable, or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, (B) grant a security interest in all of its tangible and intangible personal property now owned or hereafter acquired (other than Excluded Assets) by such Person by delivering to the Administrative Agent a duly executed joinder to each of the Security Agreement and the Pledge Agreement or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, (C) deliver to the Administrative Agent such opinions, documents and certificates referred to in Section 4.1 as may be reasonably requested by the Administrative Agent and (D) deliver to the Administrative Agent such other documents as may be reasonably requested by the Administrative Agent in connection with the foregoing, all in form, content and scope reasonably satisfactory to the Administrative Agent and (ii) cause each Loan Party owning Equity Interests in such Subsidiary to deliver to the Administrative Agent (A) a duly executed joinder or supplement to the Pledge Agreement pledging (or evidencing a prior pledge of) 100% of the total Equity Interests in such Subsidiary or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, together with all original certificates (or equivalent document), if any, evidencing such Equity Interests and appropriate undated stock or other transfer powers for each such certificate duly executed in blank by the registered owner thereof, (B) such opinions, documents and certificates referred to in Section 4.1 as may be reasonably requested by the Administrative Agent and (C) such other documents as may be reasonably requested by the Administrative Agent in connection with the foregoing, all in form, content and scope reasonably satisfactory to the Administrative Agent.

(b) Additional Foreign Subsidiaries. Promptly following the date any Person becomes a Foreign Subsidiary (whether by creation, acquisition or otherwise) and in any event within 30 days after such date (as such time period may be extended by the Administrative Agent in its sole discretion), (i) to the extent no material adverse Tax consequences would result therefrom, cause such Person to (A) become a Subsidiary Guarantor by delivering to the Administrative Agent a duly executed joinder to the Subsidiary Guaranty (or, in the case of the first such Subsidiary, a duly executed Subsidiary Guaranty) or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, (B) grant a security interest in all of its tangible and intangible personal property now owned or hereafter acquired (other than Excluded Assets) by such Person by delivering to the Administrative Agent a duly executed joinder to each of the Security Agreement and the Pledge Agreement or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, (C) deliver to the Administrative Agent such opinions, documents and certificates referred to in Section 4.1 as may be reasonably requested by the Administrative Agent and (D) deliver to the Administrative Agent such other documents as may be reasonably requested by the Administrative Agent in connection with the foregoing, all in form, content and scope reasonably satisfactory to the Administrative Agent and (ii) cause each Loan Party owning Equity Interests in such Subsidiary to deliver to the Administrative Agent (i) a duly executed joinder or supplement to the Pledge Agreement pledging (or evidencing a prior pledge of) 65% of the total outstanding voting Equity Interests (and 100% of the non-voting Equity Interests) or, to the extent no material adverse Tax consequences would result therefrom, 100% of the total Equity Interests, in such Subsidiary or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, together with all original certificates (or equivalent document), if any, evidencing such Equity Interests and appropriate undated stock or other transfer powers for each such certificate duly executed in blank by the registered owner thereof (or such other documents consistent with the practices of any relevant foreign jurisdiction), (ii) such opinions, documents and certificates referred to in Section 4.1 as may be reasonably requested by the Administrative Agent and (iii) such other documents as may be reasonably requested by the Administrative Agent in

connection with the foregoing, all in form, content and scope reasonably satisfactory to the Administrative Agent.

(c) Additional Real Property. Promptly following the date any Loan Party acquires any fee simple interest in real property or any Person that owns any fee simple interest in real property becomes a Loan Party pursuant to this Section 6.12, and in any event within 30 days after such date (as such time period may be extended by the Administrative Agent in its sole discretion), unless any such requirement is waived by the Administrative Agent in its sole discretion, cause to be delivered to the Administrative Agent with respect to such real property (i) a Mortgage and evidence of the proper recordation of such Mortgage in the appropriate filing office (or of delivery to the relevant title company for such recordation) and (ii) the Mortgage Support Documents with respect thereto as may be requested by the Administrative Agent.

6.13 Compliance with Environmental Laws. (a) Comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits, (b) obtain and renew all Environmental Permits necessary for its operations and properties and (c) conduct any investigation, study, sampling and testing, and undertake any cleanup, response or other corrective action necessary to address all Hazardous Materials at, on, under or emanating from any of properties owned, leased or operated by it in accordance with the requirements of all Environmental Laws.

6.14 Further Assurances. Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof and (b) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable Law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party.

6.15 Compliance with Anti-Corruption Laws; Beneficial Ownership Regulation, Anti-Money Laundering Laws and Sanctions.

(a) Enforce compliance by the Company, its Subsidiaries and their respective directors, officers, employees and agents with all Anti-Corruption Laws, Anti-Money Laundering Laws and applicable Sanctions.

(b) Notify the Administrative Agent and each Lender that previously received a Beneficial Ownership Certification (or a certification that a Borrower qualifies for an express exclusion to the "legal entity customer" definition under the Beneficial Ownership Regulation) of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified therein (or, if applicable, any Borrower ceasing to fall within an express exclusion to the definition of "legal entity customer" under the Beneficial Ownership Regulation).

(c) Promptly upon the reasonable request of the Administrative Agent or any Lender, provide the Administrative Agent or directly to such Lender, as the case may be, any information or documentation requested by it for purposes of complying with the Beneficial Ownership Regulation.

6.16 Farm Credit Eligibility / Farm Credit Equity.

(a) So long as a Farm Credit Lender is a Lender hereunder, (i) maintain its status as an entity eligible to borrow from such Farm Credit Lenders (including by maintaining the Crop Sharing Agreement in full force and effect), and (ii) acquire equity in such Farm Credit Lenders in such amounts and at such times as each Farm Credit Lender may require in accordance with its bylaws and capital plan (as each may be amended or otherwise modified from time to time), except that the maximum amount of equity that the Borrowers may be required to purchase in each Farm Credit Lender in connection with the Loans made by such Farm Credit Lender may not exceed the maximum amount permitted by the bylaws and capital plan of such Farm Credit Lender on the Closing Date. Each Borrower acknowledges receipt of a copy of (x) the most recent annual report, and if more recent, latest quarterly report for each Farm Credit Lender, (y) any notice to stockholders provided by the Farm Credit Lenders and (z) the bylaws and capital plan of each Farm Credit Lender, which describe the nature of all of the applicable Borrower's cash patronage, stock and other equities in each Farm Credit Lender acquired in connection with its patronage loan from such Farm Credit Lenders (the "Farm Credit Equities") as well as capitalization requirements, and agrees to be bound by the terms thereof.

(b) Each party hereto acknowledges that the bylaws and capital plan (as each may be amended from time to time) of each Farm Credit Lender shall govern (i) the rights and obligations of the parties with respect to the Farm Credit Equities and any patronage refunds or other distributions made on account thereof or on account of any Borrower's patronage with such Farm Credit Lender, (ii) any Borrower's eligibility for patronage distributions from each Farm Credit Lender (in the form of equities and cash) and (iii) patronage distributions, if any, in the event of a sale of a participation interest. Each Farm Credit Lender reserves the right to assign or sell participations in all or any part of its Commitments or outstanding Loans hereunder on a non-patronage basis.

(c) Each party hereto acknowledges that pursuant to the Farm Credit Act of 1971 (as amended or otherwise modified from time to time) each applicable Farm Credit Lender has a statutory first Lien on its Farm Credit Equities that any Borrower may now own or hereafter acquire, which statutory Lien shall be for each applicable Farm Credit Lender's sole and exclusive benefit. The Farm Credit Equities shall not constitute or form a part of the Collateral. To the extent that any of the Loan Documents create a Lien on the Farm Credit Equities of the applicable Farm Credit Lender or on patronage accrued by the applicable Farm Credit Lender for the account of any Borrower or proceeds thereof, such Lien shall be for each applicable Farm Credit Lender's sole and exclusive benefit and no other Secured Party shall have any right, title or interest therein. Neither the Farm Credit Equities nor any accrued patronage thereon shall be offset against the Obligations, except that, in the event of an Event of Default, each applicable Farm Credit Lender may elect to apply the cash portion of any patronage distribution or retirement of equity to amounts owed to such Farm Credit Lender under this Agreement, whether or not such amounts are currently due and payable. Each Borrower acknowledges that any corresponding tax liability associated with such application is the sole responsibility of the Borrowers. No applicable Farm Credit Lender shall have any obligation to retire its Farm Credit Equities at any time, including during the continuance of any Default or Event of Default, either for application to the Obligations or otherwise.

6.17 Preparation of Environmental Reports. At the request of the Required Lenders from time to time, provide to the Lenders within 60 days after such request, at the expense of the Borrowers, an environmental site assessment report for any properties subject to a Mortgage or otherwise owned, leased or operated by it described in such request, prepared by an environmental consulting firm, and of scope,

acceptable to the Administrative Agent, indicating the presence or absence of Hazardous Materials and compliance or noncompliance with Environmental Law and the estimated cost of any investigation, study, sampling and testing, cleanup, removal, remedial, corrective or other response action to address any Hazardous Materials on, or noncompliance with Environmental Law, with respect to such properties; without limiting the generality of the foregoing, if the Administrative Agent determines at any time that a material risk exists that any such report will not be provided within the time referred to above, the Administrative Agent may retain an environmental consulting firm to prepare such report at the expense of the Borrowers, and each Borrower hereby grants and agrees to cause any Subsidiary that owns, leases or operates any property described in such request to grant at the time of such request to the Administrative Agent, the Lenders, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants or necessary consent of landlords, to enter onto their respective properties to undertake such an assessment.

6.18 Compliance with Terms of Leaseholds. Make all payments and otherwise perform all obligations in respect of all leases of real property to which any Borrower or any Subsidiary is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify the Administrative Agent of any default by any party with respect to such leases and cooperate with the Administrative Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.

6.19 Material Agreements. Perform and observe all the terms and provisions of each Material Agreement to be performed or observed by it, maintain each such Material Agreement in full force and effect, enforce each such Material Agreement in accordance with its terms, take all such action to such end as may be from time to time requested by the Administrative Agent and, upon request of the Administrative Agent, make to each other party to each such Material Agreement such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Agreement, except, in any case, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, no Borrower shall, nor shall it permit any Subsidiary thereof to, directly or indirectly:

7.1 Liens. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, except:

(a) Liens pursuant to any Loan Document;

(b) Liens existing on the Closing Date and described on Schedule 7.1 and any refinancings, renewals or extensions thereof; provided that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased except as contemplated by Section 7.2(b), (iii) the direct or any contingent obligor with respect thereto is not changed and (iv) any renewal or extension of the obligations secured or benefited thereby is permitted by Section 7.2(b);

(c) Liens for ad valorem property taxes not yet due or Liens for taxes which are being contested in good faith and by appropriate proceedings diligently conducted (which proceedings have the effect of

preventing the forfeiture or sale of the property or assets subject to any such Lien), if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d) carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's, agricultural supply dealer's, harvester's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted (which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien), if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA or, with respect to any Plan, the Code;

(f) deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g) easements, rights-of-way, restrictions and other similar encumbrances affecting real property which, in the aggregate, do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h) Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.1(h);

(i) Liens securing Indebtedness permitted under Section 7.2(c); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of acquisition;

(j) statutory Liens of each applicable Farm Credit Lender in its Farm Credit Equities;

(k) Liens arising from the filing of precautionary UCC financing statements relating solely to personal property leased pursuant to operating leases entered into in the ordinary course of business; and

(l) other Liens securing Indebtedness outstanding in an aggregate principal amount not to exceed $250,000; provided that no such Lien shall extend to or cover any Collateral.

7.2 Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except:

(a) Indebtedness under the Loan Documents;

(b) Indebtedness existing on the Closing Date and described on Schedule 7.2 and any refinancing, refunding, renewal or extension thereof; provided that the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder and the direct or any contingent obligor with respect thereto is not changed, as a result of or in connection with such refinancing, refunding, renewal or extension; and provided further that the terms relating to principal amount, amortization, maturity, collateral (if any) and subordination (if any), and other material terms taken as a whole, of any such refinancing, refunding, renewing or extending Indebtedness,

and of any agreement entered into and of any instrument issued in connection therewith, are no less favorable in any material respect to the Loan Parties or the Lenders than the terms of any agreement or instrument governing the Indebtedness being refinanced, refunded, renewed or extended and the interest rate applicable to any such refinancing, refunding, renewing or extending Indebtedness does not exceed the then applicable market interest rate;

(c) Indebtedness not otherwise permitted by this Section 7.2 in respect of Capitalized Leases, Synthetic Lease Obligations and purchase money obligations for fixed or capital assets (including real estate) within the limitations set forth in Section 7.1(i); provided that the aggregate amount of all such Indebtedness at any one time outstanding shall not exceed $1,000,000;

(d) Indebtedness owing under any Swap Contract entered into in order to manage existing or anticipated interest rate, exchange rate or commodity price risks and not for speculative purposes;

(e) Guarantees made by a Loan Party with respect to Indebtedness permitted pursuant to the foregoing clauses (a) through (d);

(f) unsecured intercompany Indebtedness (i) owed by any Loan Party to another Loan Party, (ii) owed by any Loan Party to any Non-Guarantor Subsidiary so long as such Indebtedness is subordinated to the Obligations in a manner satisfactory to the Administrative Agent, and (iii) owed by any Non-Guarantor Subsidiary to any other Non-Guarantor Subsidiary;

(g) Indebtedness under performance bonds, surety bonds, bid bonds, release, appeal and similar bonds, statutory obligations or with respect to workers' compensation claims, in each case incurred in the ordinary course of business, and reimbursement obligations in respect of any of the foregoing;

(h) unsecured Indebtedness in an aggregate principal amount not to exceed $500,000 at any time outstanding.

7.3 Investments. Make or hold any Investments, except:

(a) Investments in the form of cash or Cash Equivalents;

(b) loans and advances to officers, directors and employees of any Loan Party or any Subsidiary thereof in an aggregate amount not to exceed $50,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes;

(c) (i) Investments existing on the Closing Date in Subsidiaries existing on the Closing Date and described on Schedule 5.12, (ii) Investments made after the Closing Date by any Loan Party in any other Loan Party, (iii) Investments made after the Closing Date by any Non-Guarantor Subsidiary in any other Non-Guarantor Subsidiary and (iv) Investments made after the Closing Date by any Non-Guarantor Subsidiary in any Loan Party;

(d) Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(e) Guarantees permitted by Section 7.2;

(f) Investments existing on the Closing Date and set forth on Schedule 7.3;

(g) the Farm Credit Equities and any other equity interests of, or Investments in, any Farm Credit Lender or their investment services or programs; and

(h) other Investments not exceeding $250,000 in the aggregate at any time.

7.4 Fundamental Changes. Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a) any Subsidiary may merge or consolidate with or into (i) the Company; provided that the Company shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries; provided that (A) when any Loan Party is merging with another Subsidiary, such Loan Party shall be the continuing or surviving Person and (B) when any wholly-owned Subsidiary is merging with a non-wholly-owned Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person;

(b) any Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to another Loan Party and may thereafter dissolve and liquidate; and

(c) any Non-Guarantor Subsidiary may Dispose of all or substantially all its assets (upon voluntary liquidation or otherwise) to a Loan Party or another Non-Guarantor Subsidiary and may thereafter dissolve and liquidate; provided that the amount paid by any Loan Party in connection with such Disposition shall not exceed the fair market value of the assets purchased in such Disposition as determined by the board of directors (or other equivalent governing body) of such Loan Party in good faith.

7.5 Dispositions. Make any Disposition, except:

(a) Dispositions of obsolete or worn-out property, whether now owned or hereafter acquired, in the ordinary course of business;

(b) Dispositions of inventory in the ordinary course of business;

(c) non-exclusive licenses and sublicenses of intellectual property rights in the ordinary course of business not interfering, individually or in the aggregate, in any material respect with the conduct of the business of the Company and its Subsidiaries;

(d) the write-off, discount, sale or other disposition of defaulted or past-due receivables and similar obligations in the ordinary course of business and not undertaken as part of an accounts receivable financing transaction;

(e) dispositions of Investments in cash and Cash Equivalents;

(f) Dispositions of property by (i) any Loan Party to any other Loan Party, (ii) any Non-Guarantor Subsidiary to any Loan Party; provided that the amount paid by any Loan Party in connection with such Disposition shall not exceed the fair market value of the assets purchased in such Disposition as determined by the board of directors (or other equivalent governing body) of such Loan Party in good faith and (iii) any Non-Guarantor Subsidiary to any other Non-Guarantor Subsidiary;

(g) Dispositions permitted by Section 7.4;

(h) Investments permitted by Section 7.3; and

(i) Dispositions not otherwise permitted under this Section 7.5; provided that (i) at the time of such Disposition, no Default shall exist or would result from such Disposition and (ii) the aggregate book value of all property Disposed of in reliance on this clause (i) in any fiscal year shall not exceed $250,000.

7.6 Restricted Payments. Declare or make, directly or indirectly, any Restricted Payment, except that:

(a) (i) each Subsidiary Guarantor may declare and make Restricted Payments to the Company or another Subsidiary Guarantor and (ii) any Non-Guarantor Subsidiary may declare and make Restricted Payments to the Company, any other Subsidiary and any other Person that owns a direct Equity Interest in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made;

(b) the Company and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person; and

(c) the Company may declare and make cash dividend payments or other cash distributions from the aggregate cash distributions received by the Company and its Subsidiaries from Uncle Nearest Ventures, LLC, a Delaware limited liability company ("UN Ventures"), in an aggregate amount during the term of this Agreement not to exceed $1,000,000, so long as no Default or Event of Default has occurred and is continuing or would result therefrom and UN Ventures has not become a Subsidiary.

The parties hereto acknowledge and agree that any other Restricted Payment not expressly permitted above shall be subject to the prior written consent of the Required Lenders made in accordance with Section 10.1.

7.7 Change in Nature of Business. Engage in any material line of business substantially different from those lines of business conducted by the Company and its Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

7.8 Transactions with Affiliates. Enter into any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to such Borrower or such Subsidiary as would be obtainable by the Company or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate; provided that the foregoing restriction shall not apply to transactions between or among the Loan Parties. As used in this Section 7.8, the term "Affiliate" shall have the meaning given in Section 1.1 and also shall include (i) any officer, director, member or stockholder of any Loan Party or any Affiliate or Subsidiary of any Loan Party and (ii) any natural person related to any of the foregoing within the third degree of consanguinity.

7.9 Burdensome Agreements. Enter into or permit to exist any Contractual Obligation (other than any Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments to the Company or any other Loan Party or to otherwise transfer property to or invest in the Company or any other Loan Party, except for any agreement in effect (A) on the date hereof and set forth on Schedule 7.9 or (B) at the time any Person becomes a Subsidiary, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary, (ii) of any Subsidiary to Guarantee the Indebtedness of the Company or (iii) of the Company or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person; provided that this clause (iii) shall not prohibit (A) any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under Section 7.2(i) solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness or (B) any negative pledge binding on any Person at the time it becomes a Subsidiary, so long as such negative pledge was not incurred or provided solely in contemplation of such Person becoming a Subsidiary

or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

7.10 Use of Proceeds.

(a) Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the Federal Reserve Board) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

(b) Use the proceeds of any Credit Extension, whether directly or indirectly, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Laws or Anti-Money Laundering Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

7.11 Financial Covenants.

(a) Consolidated Tangible Net Worth. Permit Consolidated Tangible Net Worth at any time during any period set forth below to be less than the amount set forth below opposite such period:

| Period | Minimum Consolidated Tangible Net Worth |
|---|---|
| Closing Date through December 30, 2022 | $58,000,000 |
| December 31, 2022 through December 30, 2023 | $66,000,000 |
| December 31, 2023 through December 30, 2024 | $82,000,000 |
| December 31, 2024 through December 30, 2025 | $101,000,000 |
| December 31, 2025 and thereafter | $126,000,000 |

(b) Consolidated Net Income. Permit Consolidated Net Income for any calendar month (measured on a monthly basis and commencing with the calendar month ending August 31, 2022) to be less than $1.00.

7.12 Amendments of Organization Documents or Material Agreements. Amend any of its Organization Documents or Material Agreements in any manner adverse, in any material respect, to the rights or interests of the Administrative Agent or any Lender.

7.13 Accounting Changes. Change its fiscal year end, or make (without the consent of the Administrative Agent) any material change in its accounting treatment and reporting practices except as required by GAAP.

## ARTICLE VIII
## DEFAULT AND REMEDIES

8.1 Events of Default. Each of the following shall constitute an event of default (each, an "Event of Default"):

(a) Non-Payment. Any Loan Party fails to (i) pay when and as required to be paid herein, any amount of principal of any Loan or (ii) pay within three days after the same becomes due, any interest on any Loan, any fee due hereunder or any other amount payable hereunder or under any other Loan Document.

(b) Specific Covenants. (i) Any Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.1, 6.2, 6.3, 6.5, 6.10, 6.11, 6.12, 6.15, 6.16 or Article VII or (ii) any "Event of Default" (as defined in any Collateral Document) shall occur.

(c) Other Defaults. Any Loan Party or any Permitted Investor fails to perform or observe any covenant or agreement (other than those specified in Section 8.1(a) or (b)) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier to occur of (i) a Senior Officer of a Loan Party or any Permitted Investor becoming aware of such failure and (ii) the Company or any Permitted Investor receiving notice thereof from the Administrative Agent.

(d) Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party or any Permitted Investor in this Agreement, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect (or, in the case of any such representation, warranty, certification or statement of fact that is subject to materiality or Material Adverse Effect qualifications, in any respect) when made or deemed made.

(e) Cross-Default. (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, but giving effect to any applicable grace period with respect thereto) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $250,000, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by such Loan Party or such Subsidiary as a result thereof is greater than $250,000; or (iii) any Permitted Investor (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, but giving effect to any applicable grace period with respect thereto) in respect of any Dan Call Farm Mortgage Indebtedness, or (B) fails to observe or perform any other agreement or condition relating to any Dan Call Farm Mortgage Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders thereof (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, any Dan Call Farm Mortgage Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or

otherwise), or an offer to repurchase, prepay, defease or redeem any Dan Call Farm Mortgage Indebtedness to be made, prior to its stated maturity.

(f) Voluntary Bankruptcy Proceeding. Any Loan Party or any Subsidiary thereof or any Permitted Investor shall (i) commence a voluntary case under any Debtor Relief Laws, (ii) file a petition seeking to take advantage of any Debtor Relief Laws, (iii) consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under any Debtor Relief Laws, (iv) apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign, (v) admit in writing its inability or fails generally to pay its debts as they become due, (vi) make a general assignment for the benefit of creditors or (vii) take any corporate action for the purpose of authorizing any of the foregoing.

(g) Involuntary Bankruptcy Proceeding. A case or other proceeding shall be commenced against any Loan Party or any Subsidiary thereof or any Permitted Investor in any court of competent jurisdiction seeking (i) relief under any Debtor Relief Laws, or (ii) the appointment of a trustee, receiver, custodian, liquidator or the like for any Loan Party or any Subsidiary thereof or any Permitted Investor or for all or any substantial part of their respective assets, domestic or foreign, and such case or proceeding shall continue without dismissal or stay for a period of 60 consecutive days, or an order granting the relief requested in such case or proceeding (including, but not limited to, an order for relief under such federal bankruptcy Laws) shall be entered.

(h) Judgments. There is entered against any Loan Party or any Subsidiary thereof or any Permitted Investor (i) one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $250,000 (to the extent not covered by independent third-party insurance as to which the insurer has been notified of the potential claim and does not dispute coverage) or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order or (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect.

(i) ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or any Subsidiary thereof to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $250,000 or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $250,000.

(j) Invalidity of Loan Documents. (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted thereunder, ceases to be in full force and effect, (ii) any Loan Party, any Permitted Investor or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document or (iii) any Loan Party or any Permitted Investor denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document.

(k) Change of Control. There occurs any Change of Control.

(l) Collateral Documents. Any Collateral Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien (subject to Permitted Liens) on the Collateral purported to be covered thereby; provided that solely while any Lien on any Collateral exists

which is created under the mortgage documents securing the Dan Call Farm Mortgage Indebtedness, any Lien on such Collateral created under any Collateral Document shall be permitted to be a junior priority Lien as opposed to a first priority Lien;

(m) Material Agreements. (i) Any Loan Party or any Subsidiary shall be notified in writing by any customer that any Loan Party or any Subsidiary is in default under any Material Agreement beyond any applicable cure period or (ii) any Material Agreement shall at any time be terminated for any reason or shall at any time for any reason cease to be in full force and effect; provided that there shall be no Event of Default under clause (i) or (ii) hereof if within forty-five (45) days after the applicable notification, termination or expiration, the applicable Loan Party or Subsidiary shall have furnished the Administrative Agent with satisfactory evidence (A) that one or more replacement agreements with customers have been entered into such that Gross Revenues and Gross Profits are not reasonably estimated to be reduced by 7.5% or more in the forthcoming four fiscal quarters of the Company and its Subsidiaries ending after such date or (B) that such default has been cured or waived.

(n) Material Licenses and Permits. Any alcoholic beverage license or permit or any other license or permit required for the lawful production or sale of Inventory of any Loan Party or any Subsidiary thereof, or the ownership or operation of any facility in connection therewith, is suspended, terminated, revoked or otherwise lapses and such license is not replaced or reinstated, or such suspension is not lifted, within fifteen (15) days from the date of such suspension, termination, revocation or lapse, as the case may be.

8.2 Remedies Upon Event of Default. If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a) declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Company; and

(c) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents;

provided that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Company under the Bankruptcy Code of the United States, the obligation of each Lender to make Loans shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

8.3 Application of Funds. After the exercise of remedies provided for in Section 8.2 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.2), any amounts received on account of the Obligations shall, subject to the provisions of Section 2.12, be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders under the Loan Documents (including fees, charges and disbursements of counsel to the respective Lenders and amounts payable under Article III), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations arising under the Loan Documents, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders, in proportion to the respective amounts described in this clause Fourth held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Company or as otherwise required by applicable Law.

8.4 Equity Cure. Notwithstanding anything to the contrary in this Agreement, upon the Borrowers' failure to comply with Section 7.11(a) as of the last day of any calendar month or fiscal year of the Company, as the case may be, the parties hereto acknowledge and agree that the Company shall have the right at any time from and after the last day of such calendar month or fiscal year until the date that is ten (10) Business Days after the date on which financial statements are required to be delivered for such calendar month or fiscal year, pursuant to a written request therefor by the Company (the "Specified Equity Contribution Request") that is received by the Administrative Agent on or prior to the day that is five (5) Business Days after the day on which financial statements are required to be delivered with respect to such calendar month or fiscal year, to issue common Equity Interests of the Company the proceeds of which will be contributed in full in cash to the Company (any such equity issuance and related contribution, a "Specified Equity Contribution"). The amount of such Specified Equity Contribution will be included in the calculation of Consolidated Tangible Net Worth in the amount of such Specified Equity Contribution for the purposes of determining compliance with Section 7.11(a) at the end of such calendar month or fiscal year; provided that no more than one (1) Specified Equity Contribution may be made over the term of this Agreement. If, after giving effect to the foregoing recalculation, the requirements of Section 7.11(a) would be satisfied, then the Borrowers shall be deemed to have satisfied the requirements of Section 7.11(a) as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date and the applicable Default or Event of Default that had occurred shall be deemed waived and not to have occurred for all purposes of this Agreement and the other Loan Documents. Upon the Administrative Agent's receipt of a Specified Equity Contribution Request until the tenth (10th) Business Day after the day on which financial statements are required to be delivered with respect to such calendar month or fiscal year, neither the Administrative Agent nor any other Secured Party shall exercise any right to accelerate the Loans, terminate the Commitments or exercise any right to foreclose or take possession of any Collateral or any other remedy under the Loan Documents, in each case on the basis of any actual or purported Event of Default under Section 8.1(b) (solely as a result of a breach of Section 7.11(a)); provided that (i) during the period set forth in this sentence, an Event of Default shall nevertheless be deemed to have occurred and be continuing for all other purposes under the Loan Documents (including restrictions on Credit Extensions) and (ii) this sentence shall not affect the rights of the Administrative Agent or any other Secured Party with respect to any other Default under the Loan Documents.

## ARTICLE IX
## ADMINISTRATIVE AGENT

9.1 Appointment and Authority.

(a) Each of the Lenders hereby irrevocably appoints FCMA to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and under the intercreditor and subordination agreements contemplated hereby and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX are solely for the benefit of the Administrative Agent and the Lenders, and neither any Loan Party nor any Subsidiary or Affiliate thereof shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b) The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.5 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article IX and Article X (including Section 10.4(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

9.2 Rights as a Lender. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

9.3 Exculpatory Provisions.

(a) The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by

the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Company or any of its Subsidiaries or Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b) The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.1 and 8.2) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction by a final and nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by the Company or a Lender.

(c) The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in, or in connection with, this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

9.4 Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.5 Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related

Parties. The exculpatory provisions of this Article IX shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for in this Agreement as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

9.6 Resignation or Removal of Administrative Agent.

(a) The Administrative Agent may at any time give notice of its resignation to the Lenders and the Company. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Company, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that in no event shall any such successor Administrative Agent be a Defaulting Lender. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b) If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable Law, by notice in writing to the Company and such Person remove such Person as Administrative Agent and, in consultation with the Company, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c) With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than as provided in Section 3.1(i) and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Company to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Company and such successor. After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 10.4 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them (i)

while the retiring or removed Administrative Agent was acting as Administrative Agent and (ii) after such resignation or removal for as long as any of them continues to act in any capacity hereunder or under the other Loan Documents, including (A) acting as collateral agent or otherwise holding any collateral security on behalf of any of the Lenders and (B) in respect of any actions taken in connection with transferring the agency to any successor Administrative Agent.

9.7 Non-Reliance on Administrative Agent and Other Lenders. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

9.8 No Other Duties, Etc. Anything herein to the contrary notwithstanding, none of the arranger(s), bookrunner(s), syndication agent(s) or documentation agent(s) listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

9.9 Administrative Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on any Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.7 and 10.4) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.7 and 10.4.

9.10 Credit Bidding.

(a) The Administrative Agent, on behalf of the Secured Parties, shall have the right, at the direction of the Required Lenders, to credit bid and purchase for the benefit of the Secured Parties all or any portion of Collateral at any sale thereof conducted by the Administrative Agent or otherwise under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof

conducted under the provisions of the Bankruptcy Code of the United States, including Section 363 thereof, or a sale under a plan of reorganization, or at any other sale or foreclosure conducted by the Administrative Agent or otherwise (whether by judicial action or otherwise) in accordance with applicable Law. Such credit bid or purchase may be completed through one or more acquisition vehicles formed by the Administrative Agent to make such credit bid or purchase and, in connection therewith, the Administrative Agent is authorized, on behalf of the Secured Parties, to adopt documents providing for the governance of the acquisition vehicle or vehicles, and assign the applicable Obligations to any such acquisition vehicle in exchange for Equity Interests and/or debt issued by the applicable acquisition vehicle (which shall be deemed to be held for the ratable account of the applicable Secured Parties on the basis of the Obligations so assigned by each Secured Party); provided that any actions by the Administrative Agent with respect to such acquisition vehicle, including any disposition of the assets of Equity Interests thereof, shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions of the Required Lenders in Section 10.1.

(b) Each Lender hereby agrees, on behalf of itself and each of its Affiliates that is a Secured Party, that, except as otherwise provided in any Loan Document or with the written consent of the Administrative Agent and the Required Lenders, it will not take any enforcement action, accelerate obligations under any of the Loan Documents, or exercise any right that it might otherwise have under applicable Law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral.

9.11 Collateral and Guaranty Matters.

(a) The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion, to:

(i) release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (A) upon the occurrence of the Facility Termination Date, (B) that is Disposed of or to be Disposed of as part of or in connection with any Disposition permitted hereunder or under any other Loan Document to a Person that is not a Loan Party or (C) subject to Section 10.1, if approved, authorized or ratified in writing by the Required Lenders;

(ii) subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.1(i) or, with respect to the Dan Call Farm Property, the Mortgage with respect thereto; and

(iii) release any Subsidiary Guarantor from its obligations under any Loan Document if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Subsidiary Guarantor from its obligations under the Loan Documents to which it is a party pursuant to this Section 9.11.

(b) The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

9.12 Certain ERISA Matters.

(a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that at least one of the following is and will be true:

(i) such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement;

(ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement;

(iii) (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

(iv) such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b) In addition, unless either (1) sub-clause (i) in the immediately preceding subsection (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with the immediately preceding subsection (a)(iv), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

ARTICLE X
MISCELLANEOUS

10.1 Amendments, Etc. Except as otherwise expressly provided hereunder or thereunder, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Borrower or any other Loan Party or, in the case of the Mortgage on the Dan Call Farm Property, any Permitted Investor therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) and the Borrowers or the applicable Loan Party or the Permitted Investors, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that no such amendment, waiver or consent shall:

(a) waive any condition set forth in Section 4.1 or, in the case of the initial Credit Extension, Section 4.2, without the written consent of each Lender;

(b) extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.2), without the written consent of such Lender;

(c) postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Document, without the written consent of each Lender entitled to such payment;

(d) reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.1) any fees or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender entitled to such amount; provided that only the consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder;

(e) change Section 8.3 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender;

(f) change any provision of this Section 10.1 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(g) release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender, except to the extent such release is permitted pursuant to Section 9.11 (in which case such release may be made by the Administrative Agent acting alone or at the direction of the Required Lenders); or

(h) release all of the Subsidiary Guarantors or Subsidiary Guarantors comprising substantially all of the value of the Subsidiary Guaranty, in any case, from the Subsidiary Guaranty, without the written consent of each Lender, except to the extent such release is permitted pursuant to Section 9.11 (in which case such release may be made by the Administrative Agent acting alone or at the direction of the Required Lenders);

provided further that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document and (ii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and the maturity date of any of its Loans may not be extended, the rate of interest on any of its Loans may not be reduced and the principal amount of any of its Loans may not be forgiven, in each case and (y) any waiver, amendment, consent or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding any provision herein to the contrary, if the Administrative Agent and the Company acting together identify any ambiguity, omission, mistake, typographical error or other defect in any provision of this Agreement or any other Loan Document (including the schedules and exhibits thereto), then the Administrative Agent and the Company shall be permitted to amend, modify or supplement such provision to cure such ambiguity, omission, mistake, typographical error or other defect, and such amendment shall become effective without any further action or consent of any other party to this Agreement.

10.2 Notices; Effectiveness; Electronic Communications.

(a) Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i) if to any Borrower or any other Loan Party, to Uncle Nearest, Inc. at 3125 US 231 N, Shelbyville TN 37160, Attention of Mike Senzaki (Facsimile No. (818) 450-0821);

(ii) if to the Administrative Agent, to Farm Credit Mid-America, PCA at 12501 Lakefront Place, Louisville, Kentucky 40299, Attention of Capital Markets (Facsimile No. (502) 420-3691; email Syndications@e-farmcredit.com), with a copy to Farm Credit Mid-America, PCA at P.O. Box 34390, Louisville, Kentucky 40232, Attention of Capital Markets (Facsimile No. (502) 420-3691; email Syndications@e-farmcredit.com); and

(iii) if to a Lender, to it at its address (or facsimile number) set forth in its Administrative Questionnaire for deliveries of documentation that may contain material non-public information.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b) Electronic Communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under Article II by electronic communication. The Administrative Agent or the Company may each, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both of the foregoing clauses (i) and (ii), if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice, e-mail or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c) Change of Address, Etc. Each of the Borrowers and the Administrative Agent may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Company and the Administrative Agent.

(d) Platform.

(i) Each Borrower hereby acknowledges that the Administrative Agent and/or the Arranger may, but shall not be obligated to, make any materials provided by, or on behalf of, any Loan Party hereunder or under any other Loan Document (collectively, the "Borrower Materials") available to the Lenders by posting the Borrower Materials on the Platform.

(ii) Each Borrower hereby acknowledges that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect to the Borrower or its securities) (each, a "Public Lender"). Each Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arranger and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to any Borrower or its securities for purposes of United States federal and state securities laws (provided that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.7); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

(iii) The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Borrower Materials or the Platform and expressly

disclaim liability for errors or omissions in the Borrower Materials. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Borrower Materials or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Borrower, any other Loan Party, any Lender or any other Person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Borrower's, any other Loan Party's or any Agent Party's transmission of communications through the Platform.

(e) Private Side Designation. Each Public Lender agrees to cause at least one individual at, or on behalf of, such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to any Loan Party or its securities for purposes of United States federal or state securities Laws.

10.3 No Waiver; Cumulative Remedies; Enforcement.

(a) No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege under this Agreement or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege under this Agreement or any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges under this Agreement and each other Loan Document are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

(b) Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the authority to enforce rights and remedies under this Agreement and the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.2 for the benefit of all the Lenders; provided that the foregoing shall not prohibit (i) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) under this Agreement and the other Loan Documents, (ii) any Lender from exercising setoff rights in accordance with Section 10.8 (subject to the terms of Section 2.11) or (iii) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided further that if at any time there is no Person acting as Administrative Agent under this Agreement and the other Loan Documents, then (x) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.2 and (y) in addition to the matters set forth in clauses (ii) and (iii) of the preceding proviso and subject to Section 2.11, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

10.4 Expenses; Indemnity; Damage Waiver.

(a) Costs and Expenses. The Borrowers shall, jointly and severally, pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent), in connection with the syndication of

the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section or (B) in connection with Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b) Indemnification by the Borrowers. The Borrowers shall, jointly and severally indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Borrower or any other Loan Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned, leased or operated by any Loan Party or any Subsidiary or Affiliate thereof or that is otherwise Collateral, or any Environmental Liability related in any way to any Loan Party or any Subsidiary or Affiliate thereof or to any Collateral or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. This Section 10.4(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c) Reimbursement by Lenders. To the extent that the Borrowers for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the Administrative Agent (or any sub-agent thereof) or any Related Party of the Administrative Agent, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposure at such time, or if the Total Credit Exposure has been reduced to zero, then based on such Lender's share of the Total Credit Exposure immediately prior to such reduction) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided that, the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.10(c).

(d) Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable Law, no Borrower shall assert, and each Borrower hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or

any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e) Payments. All amounts due under this Section 10.4 shall be payable not later than 10 Business Days after demand therefor.

(f) Survival. Each party's obligations under this Section shall survive the termination of the Loan Documents and payment of the obligations hereunder.

10.5 Payments Set Aside. To the extent that any payment by or on behalf of any Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

10.6 Successors and Assigns.

(a) Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (e) of this Section. Any other attempted assignment or transfer by any party hereto shall be null and void. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans; provided that any such assignment shall be subject to the following conditions:

(i) Minimum Amounts.

(A) in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under any Facility and/or the Loans at the time owing to it (in each case with respect to any Facility) or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in clause (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B) in any case not described in clause (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Company otherwise consents (each such consent not to be unreasonably withheld or delayed); provided that the Company shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof.

(ii) Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among the separate credit facilities provided hereunder on a non-pro rata basis.

(iii) Required Consents. No consent shall be required for any assignment except to the extent required by clause (b)(i)(B) of this Section and, in addition:

(A) the consent of the Company (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that the Company shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof; and provided further that the Company's consent shall not be required during the primary syndication of the credit facilities provided herein; and

(B) the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (1) the Revolving Credit Facility or any unfunded Commitment with respect to the Term Loan Facility if such assignment is to a Person that is not a Lender with a Commitment in respect of such Facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender or (2) any Term Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund; provided that the consent of the Administrative Agent (which may withheld in the Administrative Agent's sole discretion) shall be required for any assignment to any Person that is not a Farm Credit Lender.

(iv) Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing

and recordation fee in the amount of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v) No Assignment to Certain Persons. No such assignment shall be made to (A) the Company or any of the Company's Affiliates or Subsidiaries, (B) any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof or (C) a natural Person (or a holding company, investment vehicle or trust for, or owned and operated by or for the primary benefit of, one or more natural Persons).

(vi) Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Company and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (A) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any other Lender hereunder (and interest accrued thereon) and (B) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.1, 3.2 and 10.4 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection (b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section (other than a proposed assignment to the Company or any of its Subsidiaries or Affiliates or to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person), which, in each case, shall be null and void).

(c) Register. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the

Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers and any Lender (but only to the extent of the entries therein that are directly applicable to such Lender), at any reasonable time and from time to time upon reasonable prior notice.

(d) Participations. Any Lender may at any time, without the consent of, or notice to, any Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated by or for the primary benefit of, one or more natural Persons, a Defaulting Lender or the Company or any of the Company's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 10.4(c) without regard to the existence of any participation.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.1 that affects such Participant. Each Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.1 and 3.2 (subject to the requirements and limitations therein, including the requirements under Section 3.1(g) (it being understood that the documentation required under Section 3.1(g) shall be delivered to the Lender who sells the participation)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Section 3.4 as if it were an assignee under subsection (b) of this Section and (B) shall not be entitled to receive any greater payment under Sections 3.1 or 3.2, with respect to any participation, than the Lender from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Company's request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 3.4 with respect to any Participant. To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 10.8 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.11 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative

Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

Notwithstanding anything in this subsection (d) to the contrary, any Participant that is a Farm Credit Lender that (i) has purchased a participation from a Lender that is a Farm Credit Lender in a minimum amount of $5,000,000 (in the aggregate across all Facilities), (ii) has been designated as a voting Participant (a "Voting Participant") in a notice (a "Voting Participant Notice") sent by the relevant Lender (including any existing Voting Participant) to the Administrative Agent and (iii) receives, prior to becoming a Voting Participant, the consent of the Administrative Agent (such Administrative Agent consent to be required only to the extent and under the circumstances it would be required if such Voting Participant were to become a Lender pursuant to an assignment in accordance with Section 10.6(b) and such consent is not required for an assignment to an existing Voting Participant), shall be entitled to vote as if such Voting Participant were a Lender on all matters subject to a vote by Lenders, and the voting rights of the selling Lender (including any existing Voting Participant) shall be correspondingly reduced, on a dollar-for-dollar basis. Each Voting Participant Notice shall include, with respect to each Voting Participant, the information that would be included by a prospective Lender in an Assignment and Assumption. Notwithstanding the foregoing, each Farm Credit Lender designated as a Voting Participant in Schedule 10.6(d) shall be a Voting Participant without delivery of a Voting Participant Notice and without the prior written consent of the Administrative Agent. The selling Lender and the Voting Participant shall notify the Administrative Agent and the Company within three Business Days of any termination of, or reduction or increase in the amount of, such participation and shall promptly upon request of the Administrative Agent update or confirm there has been no change in the information set forth in Schedule 10.6(d) or delivered in connection with any Voting Participant Notice. The Company and the Administrative Agent shall be entitled to conclusively rely on information provided by a Lender identifying itself or its participant as a Farm Credit Lender without verification thereof and may also conclusively rely on the information set forth in Schedule 10.6(d), delivered in connection with any Voting Participant Notice or otherwise furnished pursuant to this paragraph and, unless and until notified thereof in writing by the selling Lender, may assume that there have been no changes in the identity of Voting Participants, the Dollar amount of participations, the contact information of the participants or any other information furnished to the Company or the Administrative Agent pursuant to this paragraph. The voting rights hereunder of each Voting Participant are solely for the benefit of such Voting Participant and shall not inure to any assignee or participant of a Voting Participant.

(e) Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or, with respect to any Farm Credit Lender, the Federal Farm Credit Banks Funding Corporation or such other funding lender with respect to such Farm Credit Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

10.7 Treatment of Certain Information; Confidentiality. Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, its auditors and its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) in connection with the credit facilities provided for herein, this Agreement, the transactions contemplated hereby or in connection with marketing of services by such Affiliate or Related Party to the Company or any of its Subsidiaries, (b) to the extent required or requested by any supervisory authority or regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Law or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies

hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement or any Eligible Assignee invited to be a Lender pursuant to Section 2.13 or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to a Borrower and its obligations, this Agreement or payments hereunder, (g) on a confidential basis to (i) any rating agency in connection with rating the Company or its Subsidiaries or the credit facilities provided hereunder or (ii) the CUSIP Service Bureau or any similar agency in connection with the, application, issuance, publishing and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder, (h) with the consent of the Company or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Company or (z) is independently discovered or developed by a party hereto without utilizing any Information received from the Company or violating the terms of this Section. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and customary information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent and the Lenders in connection with the administration of this Agreement, the other Loan Documents, and the Commitments.

For purposes of this Section, "Information" means all information received from any Loan Party or any of their respective Subsidiaries relating to any Loan Party or any of their respective Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by such Loan Party or such Subsidiary; provided that, in the case of information received from any Loan Party or any of their respective Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

10.8 Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower against any and all of the obligations of such Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender or their respective Affiliates, irrespective of whether or not such Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Borrower may be contingent or unmatured or are owed to a branch or office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.12 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have. Each Lender agrees to notify the Company and the Administrative Agent promptly

after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application. This Section 10.8 shall not apply to any action taken by any Farm Credit Lender with respect to any Farm Credit Equities held by any Borrower.

10.9 Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

10.10 Independent Effect of Covenants. Each Borrower expressly acknowledges and agrees that each covenant contained in Articles VI or VII shall be given independent effect. Accordingly, no Borrower shall engage in any transaction or other act otherwise permitted under any covenant contained in Articles VI or VII, if before or after giving effect to such transaction or act such Borrower shall or would be in breach of any other covenant contained in Articles VI or VII.

10.11 Governing Law; Jurisdiction; Etc.

(a) Governing Law. This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York.

(b) Submission to Jurisdiction. Each Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, any Lender, or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any court thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York state court or, to the fullest extent permitted by applicable Law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Borrower or its properties in the courts of any jurisdiction.

(c) Waiver of Venue. Each Borrower irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in subsection (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Service of Process. Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10.2. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable Law.

10.12 WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.13 Counterparts; Integration; Effectiveness; Electronic Execution.

(a) Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent or the Arranger, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.1, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g. "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b) Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act.

10.14 No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Arranger, and the Lenders are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent, the Arranger, and the Lenders, on the other hand, (B) each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Loan Parties is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated by this Agreement and by the other Loan Documents; (ii) (A) the Administrative Agent, the Arranger and the Lenders each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting

as an advisor, agent or fiduciary for any Loan Party or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent, the Arranger nor any Lender has any obligation to any Loan Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth in this Agreement and in the other Loan Documents; and (iii) the Administrative Agent, the Arranger, the Lenders, and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent, the Arranger nor any Lender has any obligation to disclose any of such interests to any Loan Party or any of their respective Affiliates. To the fullest extent permitted by Law, each of the Loan Parties hereby waives and releases any claims that it may have against the Administrative Agent, the Arranger and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

10.15 Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.15, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

10.16 USA PATRIOT Act. The Administrative Agent (for itself and not on behalf of any Lender), if it is subject to the PATRIOT Act, and each Lender that is subject to the PATRIOT Act hereby notifies the Borrowers that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the PATRIOT Act. Each Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

10.17 Inconsistencies with Other Documents. In the event there is a conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall control; provided that any provision of the Collateral Documents which imposes additional burdens on the Company or any of its Subsidiaries or Affiliates or further restricts the rights of the Company or any of its Subsidiaries or Affiliates or gives the Administrative Agent or Lenders additional rights shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.

10.18 Borrower Rights. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, the rights and obligations of the Administrative Agent, the other Secured Parties and the Loan Parties under this Agreement and the other Loan Documents (including those set forth in Article VIII) are subject to the Farm Credit Act of 1971 and the rules and regulations promulgated thereunder (including the borrower rights set forth in 12 CFR § 617 (the "Borrower Rights")), as the same may be amended or supplemented from time to time. The Administrative Agent has provided a written summary description of the Borrower Rights to the Borrowers and the Lenders prior to the Closing Date and, upon request, will provide the same summary description to any Lender becoming a party hereto after the Closing Date.

[Signature pages follow.]

*IN WITNESS WHEREOF,* the parties hereto have caused this Agreement to be duly executed as of the date first above written.

BORROWERS:

UNCLE NEAREST, INC.

By:________________________________
Name: Fawn Weaver
Title: President and Secretary

NEAREST GREEN DISTILLERY, INC.

By:________________________________
Name: Fawn Weaver
Title: President and Secretary

UNCLE NEAREST REAL ESTATE HOLDINGS, LLC
By: Uncle Nearest, Inc., its Member

By:________________________________
Name: Fawn Weaver
Title: President and Secretary

ADMINISTRATIVE AGENT AND LENDER(S):

FARM CREDIT MID-AMERICA, PCA, as
Administrative Agent

By: Jonathan Boyce
Name: Jonathan Boyce
Title: Financial Officer

FARM CREDIT MID-AMERICA, PCA, as a Lender

By: Jonathan Boyce
Name: Jonathan Boyce
Title: Financial Officer

**COMMITMENTS**
**AND APPLICABLE PERCENTAGES**

| Lender | Revolving Credit Commitment[1] | Applicable Percentage (Revolving Credit Facility) | Term Loan Commitment | Applicable Percentage (Term Loan Facility) |
|---|---|---|---|---|
| Farm Credit Mid-America, PCA | $35,000,000.00 | 100.000000000% | $20,000,000.00 | 100.000000000% |
| **Total** | **$35,000,000.00** | **100.000000000%** | **$20,000,000.00** | **100.000000000%** |

[1] As of the Closing Date, which such amount may be increased pursuant to Section 2.13(a) of the Credit Agreement.

**Schedule 5.3**
**Certain Authorizations**

None.

**Schedule 5.8**
**Real Property**

**Properties Owned by the Loan Parties:**

| Owner | Address | County | State | Mortgage in favor of Administrative Agent? (Y/N) |
|---|---|---|---|---|
| Uncle Nearest Real Estate Holdings, LLC | 3125 Hwy 231, Shelbyville, TN 37160 | Bedford | TN | Y |

**Properties Leased by the Loan Parties:**

| Owner | Address | County | State |
|---|---|---|---|
| None | N/A | N/A | N/A |

**Schedule 5.11(d)**
**Existing Pension Plans**

None.

**Schedule 5.12**
**Ownership of Loan Parties and Subsidiaries**

| Legal Name of Loan Party or Subsidiary | Jurisdiction of Organization | Total Authorized, Issued and Outstanding Equity Interests | Holder of Equity Interests | Percentage of Equity Interests Held |
|---|---|---|---|---|
| Uncle Nearest Real Estate Holdings, LLC | Tennessee | 100% Membership Interests | Uncle Nearest, Inc. | 100% |
| Nearest Green Distillery, Inc. | Delaware | 1,000 | Uncle Nearest, Inc. | 100% |
| | | | | |

**Schedule 7.1**
**Existing Liens**

None.

**Schedule 7.2**
**Existing Indebtedness**

None.

**Schedule 7.3**
**Existing Investments**

Uncle Nearest, Inc. has a 5% ownership interest in Uncle Nearest Ventures, LLC.

**Schedule 7.9**
**Existing Burdensome Agreements**

None.

**Schedule 10.6(d)**
**Specified Voting Participants**

None as of the Closing Date.

*EXHIBIT A*

**FORM OF LOAN NOTICE**

Date: __________, _____

To: Farm Credit Mid-America, PCA, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of July 22, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement;" the terms defined therein being used herein as therein defined), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), each lender from time to time party thereto (the "Lenders") and FARM CREDIT MID-AMERICA, PCA, as administrative agent (in such capacity, the "Administrative Agent").

The Company hereby requests a Borrowing of [Revolving Credit Loans] [Term Loans] to be made to [____][[1]]:

1. On ________________________ (a Business Day).

2. In the amount of _____________________________________.

The submission by the Company of this Loan Notice with respect to the Borrowing contemplated herein shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement will be satisfied on and as of the relevant date such Borrowing is made, and the making of such Borrowing shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement are satisfied on and as of such date.

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this notice.

[Signature page follows]

[1] Specify the Borrower requesting the Borrowing.


Case 4:25-cv-00038-CEA-CHS Document 4-1 Filed 07/28/25 Page 111 of 135
PageID #: 1526

**UNCLE NEAREST, INC.**

By:___________________________________
Name:
Title:

***EXHIBIT B***

**FORM OF NOTE**

[__________], 20[__]

FOR VALUE RECEIVED, the undersigned hereby promise to pay to [_______________] (the "Lender") or its registered assigns, in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of each Revolving Credit Loan and Term Loan made by the Lender to the Borrowers from time to time under that certain Credit Agreement dated as of July 22, 2022 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement;" the terms defined therein being used herein as therein defined), among Uncle Nearest, Inc., a Delaware corporation (the "Company"), Nearest Green Distillery, Inc., a Delaware corporation ("Distillery"), Uncle Nearest Real Estate Holdings, LLC, a Tennessee limited liability company ("RE Holdings"), and each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the Lenders from time to time party thereto, and Farm Credit Mid-America, PCA, in its capacity as Administrative Agent.

Each Borrower hereby promises to pay interest on the unpaid principal amount of each Revolving Credit Loan and Term Loan from the date of such Revolving Credit Loan or Term Loan, as the case may be, until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement. All payments of principal and interest shall be made to the Administrative Agent for the account of the Lender as provided in the Credit Agreement. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This Note is one of the Notes referred to in the Credit Agreement, is entitled to the benefits thereof and may be repaid, prepaid and reborrowed in whole or in part subject to the terms and conditions provided therein. This Note is also entitled to the benefits of the other Loan Documents and is secured by the Collateral. Upon the occurrence and continuation of one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this Note may become, or may be declared to be, as applicable, immediately due and payable, in either case, pursuant to, and in accordance with, the terms and conditions set forth in the Credit Agreement. The Loans made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this Note and endorse thereon the date, amount and maturity of each such Loan and payments with respect thereto.

Each Borrower, for itself and its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this Note.

[Signature page follows]

THIS NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

**UNCLE NEAREST, INC.**

By:____________________________________
Name:
Title:

**NEAREST GREEN DISTILLERY, INC.**

By:____________________________________
Name:
Title:

**UNCLE NEAREST REAL ESTATE HOLDINGS, LLC**

By:____________________________________
Name:
Title:

*EXHIBIT C*

**FORM OF COMPLIANCE CERTIFICATE**

Financial Statement Date: __________, _____

To: Farm Credit Mid-America, PCA, as Administrative Agent
The Lenders party to the Credit Agreement referenced below

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of July 22, 2022 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement;" the terms defined therein being used herein as therein defined), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), each lender from time to time party thereto (the "Lenders") and FARM CREDIT MID-AMERICA, PCA, as administrative agent (in such capacity, the "Administrative Agent").

The undersigned hereby certifies as of the date hereof that he/she is the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company, and that, on behalf of the Company, in such capacity, he/she is authorized to execute and deliver this Compliance Certificate to the Administrative Agent and the Lenders on the behalf of the Borrowers, and that:

*[Use following paragraph 1 for fiscal* ***year-end*** *financial statements]*

1. The Company has delivered:

(a) the year-end audited financial statements required by Section 6.1(a) of the Credit Agreement for the fiscal year of the Company and its Subsidiaries ended as of the above date, audited by an independent certified public accountant and accompanied by a report and opinion of such accountant, as required by such Section.[[2]] Such consolidated financial statements fairly present in all material respects the financial condition, results of operations, and cash flows of the Company and its Subsidiaries in accordance with GAAP and such consolidating statements are certified to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Company and its Subsidiaries.

(b) the annual business plan and budget of the Company and its Subsidiaries on a consolidated basis, including forecasts prepared by management of the Company, presented on an annual basis for the current fiscal year as required by Section 6.1(c) of the Credit Agreement.

[2] Notwithstanding anything to the contrary herein, with respect to the financial statements to be delivered pursuant to Section 6.1(a) of the Credit Agreement for the fiscal year ending December 31, 2022, the balance sheet for such fiscal year shall be audited and the related statements of income and operations, changes in shareholders' equity and cash flows for such fiscal year may be reviewed.

*[Use following paragraph 1 for calendar **month-end** financial statements]*

1. The Company has delivered the unaudited consolidated and consolidating financial statements required by Section 6.1(b) of the Credit Agreement for the calendar month ended as of the above date. Such consolidated financial statements fairly present in all material respects the financial condition, results of operations, and cash flows of the Company and its Subsidiaries in accordance with GAAP, subject only to normal year-end adjustments and the absence of footnotes and such consolidating statements are certified to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Company and its Subsidiaries.

2. The undersigned has reviewed and is familiar with the terms of the Credit Agreement and has made, or has caused to be made under his/her supervision, a review of the transactions and condition (financial or otherwise) of the Company and its Subsidiaries during the accounting period covered by such financial statements.

3. The financial covenant analyses and information set forth on Schedules 1 and 2 attached hereto are true and accurate on and as of the date of this Compliance Certificate.

4. Attached hereto as Schedule 3 is a copy of management's customary discussion and analysis with respect to such financial statements.

5. Attached hereto as Schedule 4 are supplements to Schedules 9(j) and 9(k) of the Security Agreement with respect to Patents, Trademarks and Copyrights issued and/or registered with the United States Patent and Trademark Office or United States Copyright Office, as the case may be, since the Closing Date or the most recent date Schedules 9(j) and 9(k) of the Security Agreement, as applicable, has been updated, which are necessary to keep the representations and warranties in Sections 9(j) and 9(k) of the Security Agreement true and complete.

6. A review of the activities of the Company and its Subsidiaries during such fiscal period has been made under the supervision of the undersigned with a view to determining whether during such fiscal period the Company and its Subsidiaries performed and observed all of their respective Obligations under the Loan Documents, and

***[select one:]***

**[during such fiscal period, each of Company and its Subsidiaries performed and observed each covenant and agreement of the Loan Documents applicable to it, and no Default has occurred and is continuing.]**

***--or--***

**[during such fiscal period, the following covenants or agreements have not been performed or observed and the following is a list of each such Default and its nature and status:]**

[*signature page follows*]

*IN WITNESS WHEREOF,* the undersigned has executed, in his capacity as a Senior Officer and not in his individual capacity, this Compliance Certificate as of __________, _____.

**UNCLE NEAREST, INC.**

By:____________________________________
Name:__________________________________
Title: __________________________________

For the Calendar Month/Fiscal Year ended ____________("Statement Date")

**SCHEDULE 1**
**to the Compliance Certificate**

**I. Section 7.11(a) – Consolidated Tangible Net Worth.**

A. Shareholders' Equity of the Company and its Subsidiaries on the Statement Date: $_______________

B. Intangible Assets of the Company and its Subsidiaries on the Statement Date: $_______________

C. Consolidated Tangible Net Worth

(Line I.A – Line I.B): $_______________

D. In compliance? [Yes][No]

E. At any time since the delivery of the most recent Compliance Certificate, has the Consolidated Tangible Net Worth been less than the applicable minimum Consolidated Tangible Net Worth set forth below? [Yes][No]

| Period | Minimum Consolidated Tangible Net Worth |
|---|---|
| Closing Date through December 30, 2022 | $58,000,000 |
| December 31, 2022 through December 30, 2023 | $66,000,000 |
| December 31, 2023 through December 30, 2024 | $82,000,000 |
| December 31, 2024 through December 30, 2025 | $101,000,000 |
| December 31, 2025 and thereafter | $126,000,000 |

**II. Section 7.11(b) – Consolidated Net Income.**[3]

Consolidated Net Income for the calendar month ending on the Statement Date: $_______________

*Minimum permitted:* *$1.00*

[3] To be calculated on a monthly basis commencing with the calendar month ending August 31, 2022.

**SCHEDULE 3**
**to the Compliance Certificate**

**Management's Discussion and Analysis**

*To be attached*

**SCHEDULE 4**
**to the Compliance Certificate**

**Supplements to Schedules 9(j) and 9(k) to the Security Agreement**

*To be attached.*

***EXHIBIT D***

**FORM OF ASSIGNMENT AND ASSUMPTION**

This Assignment and Assumption (the "Assignment and Assumption") is dated as of the Effective Date set forth below and is entered into by and between **[***INSERT NAME OF ASSIGNOR***]** (the "Assignor") and the parties identified on the Schedules hereto and **[**the**]** **[**each**]**[1] Assignee identified on the Schedules hereto as "Assignee" or as "Assignees" (collectively, the "Assignees" and each, an "Assignee"). **[**It is understood and agreed that the rights and obligations of the Assignees[2] hereunder are several and not joint.**]**[3] Capitalized terms used but not defined herein shall have the meanings given to them in the Credit Agreement identified below (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), receipt of a copy of which is hereby acknowledged by **[**the**]** **[**each**]** Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the **[**Assignee**]** **[**respective Assignees**]**, and **[**the**]** **[**each**]** Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of the Assignor under the respective facilities identified below (including without limitation any letters of credit and guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable Law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned to **[**the**]** **[**any**]** Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as, **[**the**]** **[**an**]** "Assigned Interest"). Each such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

| | | |
|---|---|---|
| 1. | Assignor: | **[***INSERT NAME OF ASSIGNOR***]** |
| 2. | Assignee(s): | *See Schedules attached hereto* |
| 3. | Borrowers: | UNCLE NEAREST, INC., a Delaware corporation; NEAREST GREEN DISTILLERY, INC., a Delaware corporation; UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company; and each other Person that that shall |

[1] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language. If the assignment is to multiple Assignees, choose the second bracketed language.

[2] Select as appropriate.

[3] Include bracketed language if there are multiple Assignees.

| | | |
|---|---|---|
| | | become a Borrower pursuant to <u>Section 6.12</u> of the Credit Agreement |
| 4. | Administrative Agent: | FARM CREDIT MID-AMERICA, PCA, as the administrative agent under the Credit Agreement |
| 5. | Credit Agreement: | Credit Agreement dated as of July 22, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among the Borrowers, the Lenders from time to time party thereto and the Administrative Agent |
| 6. | Assigned Interest: | *See Schedules attached hereto* |
| [7. | Trade Date: | ______________][4] |

*[Remainder of Page Intentionally Left Blank]*

[4] To be completed if the Assignor and the Assignees intend that the minimum assignment amount is to be determined as of the Trade Date.

Effective Date: _____________ ___, 2____ [*TO BE INSERTED BY THE ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR*]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR
[NAME OF ASSIGNOR]

By:____________________________________
Name:
Title:

ASSIGNEES

*See Schedules attached hereto*

[Consented to and][5] Accepted:

FARM CREDIT MID-AMERICA, PCA,
as Administrative Agent

By:_________________________________
Name:
Title:

[Consented to:][6]

UNCLE NEAREST, INC.

By:________________________________
Name:
Title:

---

[5] To be added only if the consent of the Administrative Agent is required by the terms of the Credit Agreement. May also use a Master Consent to Assignment.

[6] To be added only if the consent of the Borrowers is required by the terms of the Credit Agreement. May also use a Master Consent to Assignment.

SCHEDULE 1
to Assignment and Assumption

By its execution of this Schedule, the Assignee identified on the signature block below agrees to the terms set forth in the attached Assignment and Assumption.

**Assigned Interests:**

| Facility Assigned[1] | Aggregate Amount of Commitments/ Loans for all Lenders[2] | Amount of Commitment/ Loans Assigned[3] | Percentage Assigned of Commitment/ Loans[4] | CUSIP Number |
|---|---|---|---|---|
| | $ | $ | % | |
| | $ | $ | % | |
| | $ | $ | % | |

[*NAME OF ASSIGNEE*][5]
[and is an Affiliate/Approved Fund of [*identify Lender*][6]]

By:______________________________
Title:

[1] Fill in the appropriate terminology for the types of facilities under the Credit Agreement that are being assigned under this Agreement (e.g. "Revolving Credit Facility", "Term Loan Facility", etc.)

[2] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[3] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[4] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[5] Add additional signature blocks, as needed.

[6] Select as appropriate.

ANNEX 1
to Assignment and Assumption

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. Representations and Warranties.

1.1 Assignor. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the] [the relevant] Assigned Interest, (ii) [the] [such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and (iv) it is [not] a Defaulting Lender; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of any Borrower, any Subsidiary or Affiliate of any Borrower or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by any Borrower, any Subsidiary or Affiliate of any Borrower or any other Person of any of their respective obligations under any Loan Document.

1.2. Assignee[s]. [The] [Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it meets the requirements of an Eligible Assignee under the Credit Agreement (subject to such consents, if any, as may be required under Section 10.6(b) of the Credit Agreement), (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of [the] [the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire [the] [such] Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Credit Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to [Section 4.1] [Section 6.1][16] thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the] [such] Assigned Interest, (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the] [such] Assigned Interest, and (vii) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by [the] [such] Assignee; and (b) agrees that (i) it will, independently and without reliance upon the Administrative Agent, [the] [any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. Payments. From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the] [each] Assigned Interest (including payments of principal, interest, fees and

[16] Update as necessary to refer to appropriate Financial Statement delivery Section in Credit Agreement.

other amounts) to [the] [the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the] [the relevant] Assignee for amounts which have accrued from and after the Effective Date.

3. General Provisions. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy or electronic transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

*EXHIBIT E-1*

**FORM OF UNITED STATES TAX COMPLIANCE CERTIFICATE**
**(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Credit Agreement dated as of July 22, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the Lenders from time to time party thereto and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

Pursuant to the provisions of Section 3.1(g)(ii)(B)(3) of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (b) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (c) it is not a ten percent (10%) shareholder of any Borrower within the meaning of Section 881(c)(3)(B) of the Code and (d) it is not a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrowers with a certificate of its non-U.S. Person status on IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (a) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrowers and the Administrative Agent and (b) the undersigned shall have at all times furnished the Borrowers and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

[NAME OF LENDER]

By: ___________________________________
Name: _________________________________
Title: __________________________________

Date: ________ __, 20[ ]

*EXHIBIT E-2*

**FORM OF UNITED STATES TAX COMPLIANCE CERTIFICATE**
**(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Credit Agreement dated as of July 22, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the Lenders from time to time party thereto and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

Pursuant to the provisions of Section 3.1(g)(ii)(B)(4) of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (b) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (c) it is not a ten percent (10%) shareholder of any Borrower within the meaning of Section 881(c)(3)(B) of the Code and (d) it is not a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN-E. By executing this certificate, the undersigned agrees that (a) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing and (b) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: ___________________________________
Name: _________________________________
Title: _________________________________

Date: ________ __, 20[ ]

**FORM OF UNITED STATES TAX COMPLIANCE CERTIFICATE**
**(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Credit Agreement dated as of July 22, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the Lenders from time to time party thereto and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

Pursuant to the provisions of Section 3.1(g)(ii)(B)(4) of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record owner of the participation in respect of which it is providing this certificate, (b) its direct or indirect partners/members are the sole beneficial owners of such participation, (c) with respect to such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (d) none of its direct or indirect partners/members is a ten percent (10%) shareholder of any Borrower within the meaning of Section 881(c)(3)(B) of the Code and (e) none of its direct or indirect partners/members is a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (a) an IRS Form W-8BEN-E or (b) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (i) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (ii) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

[NAME OF PARTICIPANT]

By: ___________________________________
Name: _________________________________
Title: _________________________________

Date: ________ __, 20[ ]

*EXHIBIT E-4*

**FORM OF UNITED STATES TAX COMPLIANCE CERTIFICATE**
**(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)**

Reference is hereby made to the Credit Agreement dated as of July 22, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the Lenders from time to time party thereto and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

Pursuant to the provisions of Section 3.1(g)(ii)(B)(4) of the Credit Agreement, the undersigned hereby certifies that (a) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (b) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (c) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (d) none of its direct or indirect partners/members is a ten percent (10%) shareholder of any Borrower within the meaning of Section 881(c)(3)(B) of the Code and (e) none of its direct or indirect partners/members is a controlled foreign corporation related to any Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrowers with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (a) an IRS Form W-8BEN-E or (b) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN-E from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (i) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrowers and the Administrative Agent and (ii) the undersigned shall have at all times furnished the Borrowers and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two (2) calendar years preceding such payments.

[NAME OF LENDER]

By: ___________________________________
Name: _________________________________
Title: __________________________________

Date: ________ __, 20[ ]

*EXHIBIT F*

**FORM OF NOTICE OF ACCOUNT DESIGNATION**

Dated as of: _________, 20__

Farm Credit Mid-America, PCA,
as Administrative Agent
12501 Lakefront Place
Louisville, Kentucky 40299
Attention of: Capital Markets
Email: Syndications@e-farmcredit.com
Facsimile No.: 502.420.3691

Farm Credit Mid-America, PCA,
as Administrative Agent
P.O. Box 34390
Louisville, Kentucky 40232
Attention of: Capital Markets
Email: Syndications@e-farmcredit.com
Facsimile No.: 502.420.3691

Ladies and Gentlemen:

This Notice of Account Designation is delivered to you pursuant to Section 2.2(b) of the Credit Agreement dated as of July 22, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the lenders from time to time party thereto, as Lenders, and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

1. The Administrative Agent is hereby authorized to disburse all Loan proceeds payable to the Borrowers into the following account of one or more of the Borrowers:

______________________________

______________________________
ABA Routing Number: _________
Account Number: _____________

2. This authorization shall remain in effect until revoked or until a subsequent Notice of Account Designation is provided to the Administrative Agent.

[Remainder of page intentionally left blank; signature page follows]

IN WITNESS WHEREOF, the undersigned has executed this Notice of Account Designation as of the day and year first written above.

**UNCLE NEAREST, INC.**

By:______________________________
Name:
Title:

*EXHIBIT G*

**FORM OF BORROWING BASE CERTIFICATE**

Date: ______, 20__

To: Farm Credit Mid-America, PCA, as the Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of July 22, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the lenders from time to time party thereto, as Lenders, and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

The undersigned hereby certifies as of the date hereof that he/she is the ____________________________[17] of the Company, and that, as such, he/she is authorized to execute and deliver this Borrowing Base Certificate to the Administrative Agent on the behalf of the Company, and that the analysis and information set forth in this Borrowing Base Certificate is true and accurate on and as of the date hereof.

Borrowing Base / Availability Calculations

| | |
|---|---|
| Eligible Accounts | 0 |
| Advance Rate | 75% |
| **Accounts Borrowing Base** | 0 |
| | |
| Eligible Inventory consisting of barreled whiskey, finished goods consisting of bottled whiskey or grain inventory | 0 |
| Advance Rate | 65% |
| **Inventory Borrowing Base** | 0 |
| | |
| *Availability Reserves*: | |
| Less: Rent and Charge Reserves | 0 |
| Less: outstanding Taxes and other governmental charges | 0 |
| Less: liabilities that are or may become secured by Liens on the Collateral (including Permitted Liens) which might have priority over the Liens or interests of the Lender in the Collateral | 0 |
| Less: reserves with respect to the salability of Eligible Inventory or which reflect such other factors as affect the market value of the Eligible Inventory, including obsolescence, seasonality, Shrink; vendor chargebacks, imbalance, change in | |

[17] To be the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company.


Case 4:25-cv-00038-CEA-CHS Document 4-1 Filed 07/28/25 Page 133 of 135
PageID #: 1548

| | |
|---|---|
| Inventory character, composition or mix, markdowns and out of date and/or expired Inventory | 0 |
| Less: whiskey storage reserves | 0 |
| Less: the Dilution Reserve | 0 |
| Less: [Others TBD] | |
| **Total Availability Reserves** | 0 |
| | |
| **Borrowing Base** (Accounts Borrowing Base + Inventory Borrowing Base – Total Availability Reserves) | 0 |
| | |
| *Line Reserves*: | |
| Rent and Charges Reserve | 0 |
| Plus: aggregate amount of liabilities at any time secured by Liens upon Collateral that are senior to the Administrative Agent's Liens | 0 |
| Plus: sums that any Loan Party may be required to pay under any Section of the Credit Agreement or any other Loan Document and has failed to pay | 0 |
| Plus: amounts for which claims may be reasonably expected to be asserted against the Collateral | 0 |
| | |
| aggregate Revolving Credit Commitments | 0 |
| Less Line Reserves | 0 |
| | |
| **Maximum Borrowing Amount** (the lesser of (the aggregate Revolving Credit Commitments – Line Reserves) and the Borrowing Base) | 0 |
| Less the Outstanding Amount of all Revolving Loans | 0 |
| **Availability** | 0 |

[*signature page follows*]

*IN WITNESS WHEREOF,* the undersigned has executed this Borrowing Base Certificate as of __________________________, __________.

**UNCLE NEAREST, INC.**

By:______________________________
Name:
Title: