```
 1                IN THE UNITED STATES DISTRICT COURT

 2                  EASTERN DISTRICT OF TENNESSEE

 3                       WINCHESTER DIVISION

 4   -------------------------------------------------------
                                      :
 5   FARM CREDIT MID-AMERICA, PCA,    :
                                      :
 6                  Plaintiff,        :
                                      :
 7   v.                               :      4:25-CV-38
                                      :
 8   UNCLE NEAREST, INC., NEAREST GREEN :
     DISTILLERY, INC., UNCLE NEAREST  :
 9   REAL ESTATE HOLDINGS, LLC,       :
     FAWN WEAVER and KEITH WEAVER,    :
10                                    :
                  Defendants.         :
11   -------------------------------------------------------
                          Chattanooga, Tennessee
12                        August 7, 2025

13

14        BEFORE:  THE HONORABLE CHARLES E. ATCHLEY, JR.
                    UNITED STATES DISTRICT JUDGE
15
     APPEARANCES:
16
               FOR THE PLAINTIFF:
17
               DEMETRA LIGGINS
18             McGuire Woods, LLP
               Texas Tower
19             845 Texas Avenue
               Suite 2400
20             Houston, Texas  77002

21             KAREN E. SIEG
               McGuire Woods, LLP
22             Gateway Plaza
               800 East Canal Street
23             Richmond, Virginia  23219

24

25        HEARING ON EMERGENCY MOTION FOR APPOINTMENT OF RECEIVER
```

APPEARANCES: (Continuing)


FOR THE PLAINTIFF:

ERIKA R. BARNES
Stites & Harbison, PLLC
SunTrust Plaza
401 Commerce Street
Suite 800
Nashville, Tennessee  37219-2449


FOR THE DEFENDANTS:

ROCKLAN W. KING, III
STACIA MARIE DAIGLE
Adams and Reese, LLP
1600 West End Avenue
Suite 1400
Nashville, Tennessee  37203


- - -


INDEX OF PROCEEDINGS

BRIAN KLATT
     Direct Examination by Ms. Sieg ........................35
     Cross-Examination by Mr. King .........................36
     Redirect Examination by Ms. Sieg ......................49

KEITH EDWARD WEAVER
     Direct Examination by Mr. King ........................57
     Cross-Examination by Ms. Sieg .........................70

EXHIBITS

(Reference stipulated exhibit list.)

1          THE COURT:  Ms. Laster, would you call the next case,

2   please.

3          THE COURTROOM DEPUTY:  Civil Action 4:25-CV-38, Farm

4   Credit Mid-America, PCA, versus Uncle Nearest, Inc., et al.

5          THE COURT:  All right.  Would counsel please make

6   appearances for the record.

7          (Brief pause.)

8          THE COURT:  Is there somebody here for Farm Credit?

9          MS. BARNES:  Yes, Your Honor.  Erika Barnes of the

10  Nashville bar, with Stites & Harbison, here on behalf of Farm

11  Credit Mid-America, PCA.  With me at counsel table are Demetra

12  Liggins and Beth Sieg from McGuire Woods, who will be making

13  the argument and examining the witnesses today, Your Honor.

14         THE COURT:  Okay.

15         MS. BARNES:  In the courtroom with us as well we have

16  several representatives of Farm Credit as well as the proposed

17  receiver and members of his team.

18         THE COURT:  Okay.  Thank you.

19         MS. BARNES:  Thank you.

20         MR. KING:  Good afternoon, Your Honor.  Rocky King

21  for the borrowers and the defendants in this matter.  I'm

22  joined with my colleague and counsel Stacia Daigle and

23  paralegal Maria Alonso.  And Mr. Weaver is here on behalf of

24  the collective defendants in this matter, Your Honor.

25         THE COURT:  Okay.  Thank you.

```
1              MR. KING:  Thank you, Your Honor.

2              THE COURT:  All right.  Farm Credit, we're here,

3    I guess, on your motion, your emergency motion.  Who's doing

4    the talking?

5              MS. LIGGINS:  I am, Your Honor.

6              THE COURT:  All right.  Come around, ma'am.  Tell

7    me -- tell me where we are.

8              MS. LIGGINS:  Good afternoon, Your Honor.

9              As Ms. Barnes said, Demetra Liggins on behalf of

10   Farm Credit.  We filed a stipulation -- we appreciated

11   Your Honor's order about having a 90-minute hearing, and we're

12   trying to streamline some of the testimony and evidence.  So

13   we worked together with Uncle Nearest's counsel, Mr. King and

14   I, we filed a stipulation right before the hearing, where

15   we've agreed to some exhibits.  The plaintiffs have

16   exhibits -- an exhibit notebook that's filed.  We don't have

17   any objections to our exhibits, so we'd ask for those to be

18   moved into evidence.  We also have exhibits on behalf of the

19   defendants that are unobjected to, and also ask for those to

20   be moved, all of those listed out in the stipulation.  We also

21   had a declaration that was filed --

22             THE COURT:  Mm-hmm.

23             MS. LIGGINS:  -- as a part of the record.  I believe

24   it's Exhibit 1.  It's the declaration of Mr. Klatt, who's an

25   officer with Farm Credit.  And we are going to use that as the
```

```
 1   direct testimony, if it's okay with Your Honor.  And then he
 2   will be available to be crossed by Uncle Nearest's counsel.
 3   And then they will put on their testimony.
 4        So I think we both have some short opening
 5   statements, just to sort of set the stage for the Court, and
 6   then I think we'll be ready to proceed from there.
 7            THE COURT:  All right.
 8            Mr. King, is all that --
 9            MR. KING:  That's in agreement, Your Honor.
10            THE COURT:  Okay.  Very good.  I'll let you
11   streamline things.
12        All right.  Yes, let's go to whatever your
13   opening -- you know, your opening.  Give me an idea -- I've
14   read through everything --
15            MS. LIGGINS:  Okay.
16            THE COURT:  -- more than once.  And so --
17            MS. LIGGINS:  Oh, great.  Thank you, Your Honor.
18   I know it's a lot to read.
19            THE COURT:  So, you know, I have an idea of kind of
20   where we are.
21            MS. LIGGINS:  Okay.
22            THE COURT:  But, you know, that's been a few days.
23   Let me know if there's been any discussions amongst you-all on
24   some of these issues.  And I've got some questions for you,
25   too, that I'll just decide when I want to ask.
```

```
 1              I'll go ahead and tell you, I'm not going to give
 2    you an answer today --
 3              MS. LIGGINS:  Okay.
 4              THE COURT:  -- but I will give you one quickly.
 5              MS. LIGGINS:  Thank you, Your Honor.
 6              THE COURT:  But I want to hear through -- I want to
 7    hear everything, and in particular I want you to address the
 8    factors that I put down in my order.  Okay?
 9              MS. LIGGINS:  Yes, Your Honor.
10              THE COURT:  All right.
11              Any questions about that, Mr. King?
12              MR. KING:  No, Your Honor.  Understood, Your Honor.
13              THE COURT:  All right.  Very good.
14              MS. LIGGINS:  So just to have the record clear, are
15    the exhibits that are stipulated to, are they admitted into
16    evidence?
17              THE COURT:  That's so ordered.  They're --
18              MS. LIGGINS:  Thank you, Your Honor.  All right.
19              THE COURT:  And so do we have a copy of your list so
20    our record's clear and everything as to what's on it?
21              MS. LIGGINS:  Yes, Your Honor.
22              THE COURT:  All right.  They're in the record.
23              MS. LIGGINS:  Thank you so much.  We have a
24    PowerPoint presentation that I'll just walk through as a part
25    of the statement.  I think it will help.  We have had -- you
```

```
1   asked about discussions.  We have been in discussions with the
2   defendants since we filed the receivership, but we don't have
3   any resolution on any of the issues.  We did have some
4   stipulated facts.  That's in the stipulation that we filed.
5   Specifically it is that -- and we can probably get there when
6   we get there, but that Farm Credit was aware of the loan on the
7   Martha's Vineyard house and that Farm Credit employees did in
8   fact visit that house.  Okay.
9               THE COURT:  Okay.
10              MS. LIGGINS:  Okay.  So we're here on a motion, an
11  emergency motion to appoint a receiver.  The defendants in the
12  case are Uncle Nearest.  Uncle Nearest is a whiskey company
13  right here in Tennessee, right up the road in Shelbyville, and
14  it was founded by Fawn and Keith Weaver in 2016.  As the
15  Weavers tell the story, the brand actually honors --
16              THE COURT:  I'm not ignoring you.  I've got a screen
17  here --
18              MS. LIGGINS:  No, you've got a screen, Your Honor.
19              THE COURT:  -- that you can't see.
20              MS. LIGGINS:  I don't feel ignored.
21              THE COURT:  So when you're showing your PowerPoint,
22  I'm listening to you and I'm looking at what you have.
23              MS. LIGGINS:  That is fine, Your Honor.  I do not
24  feel ignored, but thank you.
25              According to the Weavers, the brand was named after
```

an enslaved person named Nathan Nearest Green, who actually
taught Jack Daniels how to distill whiskey.

So Uncle Nearest is a whiskey company that bottles
and sells whiskey in Shelbyville, but they also have a
converted horse farm where they have tours and have
experiences and visit- -- for visitors.  They recently have
made some investments into acquiring rights in addition to
whiskey, to cognac and to vodka.  But our -- our loan is with
respect to their whiskey business.

Farm Credit had three loans.  We have a revolver, a
term loan, and a RELOC.  The revolver is actually fully
matured.  It just matured July 22nd.  It has a balance of
about $65 million.  We also have a term loan.  It has a
balance of about $22 million.  And then we have a RELOC, a
real estate line of credit, with a balance of a little over
15 million.  So we are owed, as of the date that we filed the
receivership, about $108 million.  Of course that number grows
every day, to the tune of $28,000 a day.

Because we're seeking a receivership, we thought it
would be helpful to just outline what our collateral -- what
makes up our collateral package.  We have a first lien on
substantially all of the assets of the company.  So that means
we have accounts.  We have inventories, which, as you would
imagine, it's the barrels and all the raw materials and case
goods.  We have FF&E.  We have general intangibles.  We have

1   the intellectual property, so that's actually the brand.  We

2   have deposit accounts, chattel paper, investment paper,

3   instruments, rights to payments, books and records, and then

4   we have some equity interests that are pledged in the domestic

5   subsidiaries.  And then of course we have the proceeds of all

6   of that.

7           With respect to real estate, there's three pieces of

8   property that are a part of our package.  There's the actual

9   distillery, and that's the primary basis where they run the

10  operations.  It's a 300-acre horse farm, converted horse farm.

11  It has the rickhouse and the bottling facility.  That one is

12  actually -- it actually has a restaurant as well, and a bar.

13  It's owned by RE Holdings, or what we call RE Holdings, which

14  is Uncle Nearest Real Estate Holdings.

15          There is a -- adjacent to the distillery there's a

16  100-acre farm that's actually owned by Mr. Weaver but

17  mortgaged to FCMA, that we will refer to as the Eady Road

18  property.  And then there's the Dan Call farm property, which

19  is where Dan Call owned -- was a -- owned the house there, and

20  it's where Nearest Green and Jack Daniels met.  But that is

21  that property.  So that property is also a part of our

22  collateral package.  FCMA has a lien on that property, but

23  it's owned by Mr. Weaver.

24          So I think this next couple of slides is what's

25  really helpful because it's the timeline of the relationship

1    between Uncle Nearest and FCMA.  So the credit agreement was

2    entered into in July of '22.  The revolver started with about

3    $35 million and a -- for the revolver and a term lean of

4    $20 million.  And there was an amendment done a couple months

5    later, the first amendment.  That one increased the revolver

6    by $3 million, but we also experienced the first late payment

7    there.

8             Then there is a second amendment that was done in

9    December, there it increased the revolver by $5 million.  That

10   was for the purchase of barrels, so increasing the inventory.

11   Then there was a 15 million-dollar increase -- no, a

12   15 million-dollar RELOC that was done in --

13             THE COURT:  We're ready.

14             MS. LIGGINS:  You're ready?  We're -- you know all of

15   this?

16             THE COURT:  I've got this timeline.  (Indicating.)

17             MS. LIGGINS:  Oh, you made your own timeline.  Okay.

18             THE COURT:  And so, you know, I'm -- go over what you

19   need to go over, but we've -- I've been through it.

20             MS. LIGGINS:  Okay.

21             THE COURT:  And so I've got a timeline and everything

22   else.  Let's get to the meat and potatoes.

23             MS. LIGGINS:  Okay.  So I think the meat and potatoes

24   is about once the restructuring efforts started.  I won't walk

25   through the timeline.  I will just sort of point out some

1    things on this one instead of walking specifically through it.

2         Basically in January of '24 the lender receives a

3    report from TDG that there is a barrel discrepancy and they're

4    unclear about what that looks like and what that means.  They

5    start having discussions with the company about that.  They

6    really can't get a --

7         THE COURT:  So it was your-all's understanding that

8    there -- you came to believe that there was less product

9    available than what you were -- you thought.

10        MS. LIGGINS:  Yes, Your Honor.  And it's significant

11   because the barrels are such a big part of the collateral

12   package and certainly serve as a basis in connection with any

13   amendment or increase of the debt.  A big component of that is

14   a affirmation about how many barrels and a continuation to rep

15   and warrant any covenants in the credit agreement about the

16   collateral.

17        And so I will just point out for Your Honor that

18   every time an amendment was done there was, you know, a rep --

19   a bringdown of the rep and warranties in connection with all

20   of those on a timeline.  So the discrepancy ended up being

21   something that was very troubling to FCMA when they learned

22   that the -- you know, that the barrel count was off.  We

23   conducted our own barrel count, realized that it was off, to

24   the tune of $21 million --

25        THE COURT:  Mm-hmm.

1          MS. LIGGINS:  -- so not an insignificant amount of

2    money.  We also learned sort of around that same time that

3    there was a house that -- in the -- a house in Martha's

4    Vineyard that had a mortgage on it that we had not consented

5    to.  And as I'm sure I don't have to tell Your Honor, when we

6    -- when a bank -- there's a loan, the lender provides a loan,

7    they have very specific covenants and reps in the agreement

8    about how other indebtedness can be incurred and that such

9    indebtedness cannot be incurred without our consent and

10   certainly not without our knowledge, which that was.

11         THE COURT:  Let me ask you something.  Okay.  First

12   of all, on the barrel count, they don't deny that it was not

13   accurate.  They say their CFO gave you the wrong barrel count.

14   That's my understanding.  Correct?

15         MS. LIGGINS:  Yes, that's my understanding as well.

16         THE COURT:  Okay.  On the Martha's Vineyard property,

17   were you-all standing first on that?  When you loaned the money

18   for acquisition, did you -- do you have, like, a deed of trust

19   on that property?  Do you stand --

20         MS. LIGGINS:  We do not have a deed of trust on that.

21         THE COURT:  And so they -- they -- it's your belief

22   that they went out and got another mortgage on it standing

23   before your security interest.

24         MS. LIGGINS:  Correct.

25         THE COURT:  Okay.

1     MS. LIGGINS:  So our position -- let me take those in

2     order, so -- or take them in the opposite -- the most recent

3     you said.  On the Martha's Vineyard property, we loaned the

4     money for the purchase of the property.

5          THE COURT:  Mm-hmm.

6     MS. LIGGINS:  We-- That's undisputed.  We understood

7     that they bought the property.  Likewise, undisputed.  The

8     reb- -- the rub comes for us because we end up learning that

9     the property -- they moved the ownership of the property into

10    the name of an entity that we were unaware of, and that entity,

11    as far as we know, is not a part of the Uncle Nearest family,

12    or we don't really understand where it fits in the Uncle

13    Nearest family, because we haven't seen an actual org chart, a

14    recent org chart.  That's one of the things we've been asking

15    for and haven't been able to get.  And then that entity that

16    owns that is not in our borrower group.  So one of the things

17    we've been trying to do is figure out everything around there

18    and then bring that borr- -- bring that entity into borrower

19    group, because putting a loan on that property violates the

20    credit agreement.  Does that make sense, Your Honor?

21         THE COURT:  It does.

22    MS. LIGGINS:  Okay.  So it's not -- it's a rub to say

23    that it's about us not knowing about the property.  We know

24    about the property.  It's about how the property is titled and

25    who has a mortgage on it now that's without our consent.

1          THE COURT:  Who is that mortgage through?

2          MS. LIGGINS:  When we did the lien search, it was

3  called Oak -- Oak Lending.  Oak Lending?  Oaktree Lending.

4  Oaktree Funding.  Oaktree Funding.

5          THE COURT:  How much is it?

6          MS. LIGGINS:  I think it's $2.3 million, which is

7  about the amount that we advanced and increased the revolver

8  for to purchase.

9          THE COURT:  And it's kind of close to the purchase

10  price.

11          MS. LIGGINS:  That's right.  And so we have now --

12  we've seen -- in connection with preparation for the hearing we

13  saw -- because it's an exhibit of the defendants, we saw an

14  offer to purchase the contract in Mr. Weaver's name, but we

15  have not actually seen the actual purchase and sale agreement,

16  and I don't think we've ever seen, like, a closing statement or

17  anything on that.

18          But the lien on the property is one of the reasons

19  why we seek the receivership, because it's an indicator that

20  there are things happening in the company that we're unclear

21  about, and if there -- are there other liens, are there other

22  things that we're just unaware of, are there other entities,

23  you know, that we don't know about.  So that's part of -- one

24  of the reasons that we are here seeking the receivership.

25          We did work with Uncle Nearest.  We asked for them

to put in a chief restructuring officer, so -- you know, in an

effort to avoid something this drastic like a receiver, so

that we could have some visibility and transparency into the

operations and, more importantly, into the financials.  Uncle

Nearest was never able to sort of make that happen.  They did

put in --

THE COURT:  There -- there was someone, but it just

didn't work at all, right?

MS. LIGGINS:  Yes, Your Honor.  And it didn't work

because they never really empowered the CRO to -- well, they

didn't want it to be called a CRO.  I think they actually

called the person a chief growth officer.  And we really didn't

care about the name of it.  We really cared about the

responsibilities and rights that the -- that the officer had.

But the person was never -- Keystone was never actually an

officer of the company, and they were never able to figure that

out.  And Keystone was expressing to us, as we started making

our requests to them for documents and information, that they

were not getting -- that they weren't fully under the tent and

had that information.  So, yes, it didn't work -- it did not

work out.

So after we had Keystone and there was another law

firm that was in place then that we were working with -- and

I would point out that Farm Credit paid Keystone's fees.

Like, we were supportive of them putting someone in.  We were

1   continuing to work with Keystone.  We received a cash flow

2   from Keystone that was forecasting that they were going to be

3   in a negative cash position.  So, again, another really

4   troublesome fact.  And then that's when we learned about the

5   lien.  That was kind of all around the same time.

6           And then the company, after Keystone gave us the

7   cash flow, disputed the cash -- cash flow that their advisor

8   had prepared, said that that wasn't the right cash flow.  Then

9   the next thing that we know Keystone has been terminated, they

10  are not in, they've hired another financial advisor called

11  CR3.  We started talking to CR3.  We engage our own financial

12  advisor.  After Keystone was out, the lender, you know,

13  engaged its own financial advisor.  The lender's financial

14  advisor is, like, going to the property, spending time with

15  management, also trying to get information, unable to do so.

16  And then there was another -- we signed the forbearance

17  agreement, I'm sorry, we signed the forbearance agreement,

18  they make the payment.  There was a payment that was to be

19  paid at time of execution.  That payment was made.  And

20  then --

21          THE COURT:  That was seven and a half million?

22          MS. LIGGINS:  Seven and a half million dollars,

23  Your Honor.  And then there were a number of things that we

24  sort of had been negotiating for weeks or almost months

25  about -- like an independent board member, you know, to the --

 1    to the board of directors, DACAs, looking for bank accounts,

 2    bank account statements.  Think perfection certificates and

 3    things like this.

 4            THE COURT:  But all this was in the lead-up to the

 5    forbearance agreement.

 6            MS. LIGGINS:  Yes.  And because we didn't get it, it

 7    ended up being deliverables very soon after the execution of

 8    the forbearance agreement, so that when the forbearance

 9    agreement was executed, the money was paid, but then almost

10    immediately they're in default because they haven't delivered

11    any of the documents or done -- you know, hit the milestones

12    that they were supposed to hit under the forbearance agreement.

13            The rub that really got us here today, the kind of

14    straw that broke the camel's back, there was a

15    10 million-dollar payment that was due June 16th.  To show you

16    the kind of, you know, conversations we were being in

17    negotiation, we were talking to them as late as that --

18    I think that it was due on a Monday.  We had a meeting with

19    them that Friday afternoon.  We were sending wire

20    instructions.

21            "Is the payment going to be made?

22            "Yes.  Yes.  Yes."

23            No payment made.  Then we were told later that day

24    that new counsel had been engaged and that was Greenberg

25    Traurig.  So then we start working with Greenberg Traurig on

1   restructuring efforts.  Next thing we know, we can't -- we're

2   trying to get there, we can't get there, we get there, and

3   then we're here with you, Your Honor.

4           THE COURT:  So forbearance agreement goes down

5   April 15, 2025.  Now, after that agreement, tell me what

6   they've done to default and why you -- why you need a receiver

7   and exactly -- you know, following the factors in federal law,

8   let's tick them off and talk about how you meet them.

9           MS. LIGGINS:  Okay.  So, Your Honor, we have -- you

10  know, well, there's the summary of the post-forbearance

11  default.  So that's a slide that we -- we've prepared for you.

12          So they failed to meet the January 16th payment

13  under the forbearance agreement.  There's actually another

14  payment that's due next week.  So I would say that's an

15  anticipatory payment default.  I can't imagine that that one's

16  going to be made.

17          THE COURT:  How much is it?

18          MS. LIGGINS:  $10 million.  There are, you know, no

19  interest payments that have been made.  They've missed the

20  quarterly installment payments on the term loans.  They've

21  missed the amortization payment on the RELOC.  They have had

22  a -- the revolver has actually matured since the forbearance

23  agreement was executed.  We still don't have monthly financial

24  statements.  So we're missing March through June.  We don't

25  have the borrowing base certificates.  That's February through

1    June.  We don't have -- we still don't have year-end financials

2    for the fiscal year ending December 31.  And then you've got

3    all of the actual forbearance -- what I just talked about, the

4    milestones, not appointing the board of director, all of those,

5    failure to get us the DACAs, to deliver the executed joinder of

6    the domestic subsidiaries and identify those.

7            And then -- there's one more slide, sorry.

8            Then there is the -- there was, like, a reporting

9    package that they were supposed to give every month so we can

10   kind of have this ability into it and then move on and pursue

11   an acceptable transaction, which we had sort of set up to be a

12   variety of things, a restructure, a potential sale, you know,

13   basically to give the company any opportunity that they could

14   to figure out the best path for them, and then we would

15   support that.

16           With respect to things that we would like the

17   receiver to look into, it would be the Martha's Vineyard

18   property, the cognac venture, get some understanding around

19   the future revenue sales, as we understand that they may have

20   taken out liens on future receipts.  We think that may be,

21   like, $108 million that's gone out of the company, not really

22   sure, and then really get to the bottom of the barrel

23   discrepancy and how that all works.

24           THE COURT:  It sounds like they -- they concede that

25   it wasn't accurate.

1          MS. LIGGINS:  They did concede that, Your Honor, yes.

2     They have conceded that.  I think, you know, a lot of the facts

3     are undisputed, right?  I think it is undisputed that they are

4     in default.  I think it is undisputed that they have not

5     provided, you know, any of the reporting.  I think it is

6     undisputed that a loan has matured.  I think it is undisputed

7     that there was a misstatement made to us.  I think the thing,

8     though, that is troublesome is, you know, they have contend- --

9     they contend that that misstatement was made by their former

10    CFO, Mike Senzaki, and that he's been terminated.  And I feel

11    as though --

12          THE COURT:  Still their -- still their CFO.

13          MS. LIGGINS:  Still their -- that's right, he's

14    still --

15          THE COURT:  Still a member of their C suite at the

16    time, I mean, you know.

17          MS. LIGGINS:  Still a representation from the

18    company, right?

19          THE COURT:  Sure.

20          MS. LIGGINS:  And more troublesome than that, in

21    connection even with the exhibits that were provided for this

22    hearing, all of the e-mails that the defendant submitted were

23    e-mails that were forwarded by Mike Senzaki last Saturday to

24    the company's CEO, of previous e-mails.  I'm not sure how the

25    former CEO, who was allegedly terminated a year and a half

1   ago --

2           THE COURT:  CFO.

3           MS. LIGGINS:  -- CFO, sorry, is sending e-mails.  Not

4   really clear about that.  But also super-troubling is that

5   these discrepancies continued in the borrowing base

6   certificates after the CFO was let go.  So it's -- we're not in

7   a situation where the company was having trouble, they had a

8   bad actor, and since the bad actor's been gone, you know,

9   everything has been better.  They still, you know, completely

10  struggle with, you know, being able to deliver what I would

11  consider normal financial reporting.

12          When we think about a receiver, we understand that a

13  receiver is a drastic action, we understand that it is not

14  something that we take lightly, and we've been working with

15  them for many things, to get -- you know, to not be at this

16  point.

17          With respect to why a receiver is appropriate, I

18  would say the first thing is that we have a contractual right

19  to it.  We negotiated for that in the loan documents, and we

20  should be entitled to the benefit of our bargain in connection

21  with that.  But when you get into the factors, you know, of --

22  if you want me to go through each of the factors now, or would

23  you like for me to wait until the evidence comes in and do it

24  at the end?

25          THE COURT:  Well, you can do it when you sort of sum

1    up --

2             MS. LIGGINS:  Okay.

3             THE COURT:  -- and we'll go through it.  Let me ask

4    you this:  Who is your proposed receiver?

5             MS. LIGGINS:  Okay.  So we're proposing Kevin Larin.

6             THE COURT:  Is he -- he's here today.

7             MS. LIGGINS:  He is, Your Honor, and his team is

8    here.  So they are ready to -- well, we know that you will not

9    be issuing the ruling today.  But we weren't sure if you would,

10   and we wanted to make sure that we had him -- Mr. Larin and his

11   team on site and on the ground if they needed to get to work

12   immediately.

13            THE COURT:  Okay.  All right.  All right.  Did you

14   have any more for your --

15            MS. LIGGINS:  No, Your Honor.  Thank you for your

16   indulgence.

17            THE COURT:  Thank you.

18            Come around, Mr. King.

19            (Brief pause.)

20            MR. KING:  Good afternoon, Your Honor.

21            THE COURT:  Mr. King, are you going to pay that

22   10 million next week?

23            MR. KING:  Me personally, Your Honor?  No, I'm going

24   to be a little shy.

25            THE COURT:  You know what I'm asking.

 1          MR. KING:  I do know, Your Honor.  We do not have

 2     that to pay next week.  At least that's my understanding as of

 3     right now, because it's stacking.

 4          I'd like to talk about -- you asked at the top of

 5     the hearing to talk about the respective factors.  And I'm

 6     going to craft my opening and -- disregard the one I had

 7     prepared and craft it to your request.

 8          The facts, for the most part, are mostly undisputed.

 9     We might have a dispute on time and on who told who on what

10     respective date.  But to the material facts, that there was an

11     overstatement in the barrel inventory, that the Martha's

12     Vineyard property is encumbered, those are facts, those are

13     objective facts that I'm not running from today.

14          I think we are simplifying, Your Honor, the Senzaki

15     issue with the chief financial officer and overstating the

16     actual barrel inventory.  And one of the things that you will

17     hear and see and know from your own respective timeline, this

18     revolving loan started off at $35 million.  And as explained

19     in the respective documents, the only way to increase that

20     revolving loan is based on the barrel inventory.  And so

21     unfortunately during 2023 when the barrel inventory is being

22     increased -- or, excuse me, when it's being overstated by

23     Mr. Senzaki, the revolving loan was going up, and as we've

24     learned through separate counsel, Duane Morris and Kroll

25     Investigations, other vendors weren't being paid, and money

1　was being siphoned out of the respective company.  The client

2　himself, through Duane Morris and through Kroll, was trying to

3　put together a packet, which I'm sure you're familiar with,

4　which we intend to hand off to the authorities for that

5　investigation to go to another --

6　　　　　　THE COURT:  Where did that money go?

7　　　　　　MR. KING:  Your Honor, I'm -- I'm careful to say,

8　because I personally don't know and I don't know the

9　investigation, but I think it's safe to say that it went

10　somewhere with Mr. Senzaki, and that's why he's no longer with

11　us.

12　　　　　　THE COURT:  Doesn't that kind of support a receiver?

13　　　　　　MR. KING:  Well, Your Honor, we're going to touch on

14　that, because I knew you were going to pivot to that issue.

15　And so when we look at the actors that are now in charge of the

16　company, I think we can say these actors are not acting with

17　misrepresentations.  In fact, as we believe Mr. Weaver will

18　testify before you, we came to the bank with this

19　overstatement.  We discovered it, and as we discovered it we

20　restated the borrowing collateral statements to reflect the

21　accurate barrel count.  You're going to hear evidence today

22　that 55,000 barrels are in or around the inventory.  And that

23　has been the number, Your Honor.  It's been consistent.  It's

24　consistent with the collateral review.  And at no point has

25　Uncle Nearest ever stopped the bank from conducting a

collateral review.  So we have an unfor- -- yes, Your Honor.

THE COURT:  I know, but shouldn't they be able to rely on you to tell the truth?

MR. KING:  Absolutely, Your Honor.  Absolutely.  Not saying that's the case.

THE COURT:  Let's face it.  I mean, what's the old saying?  You owe the bank a million dollars, the bank owns you, and you owe the bank $100 million, you kind of own the bank.

MR. KING:  Yes.  Your Honor --

THE COURT:  They -- they shouldn't have to chase after you to get correct information for that dollar amount out there.

MR. KING:  Absolutely not, Your Honor, and that's not what I'm trying to imply.  What I'm rather saying is, is that the cooperation of this respective defendant -- of these respective leaders in this respective company is going to be forthcoming here.  We're -- we will preserve the collateral.  We will protect the collateral.  The collateral will only be used in the ordinary course of business.

At the end of the day, it's a whiskey company.  And the only way that a whiskey company cash flows is to sell to distributors who then disburse it to respective liquor stores or ultimate consumers, because of the three-tier system that I'm sure Your Honor is aware of.

So other than the ordinary course, Your Honor, that

1 is how the barrels would be preserved.  So when we talk about

2 protecting the collateral, these defendants, these executives,

3 are protecting the respective collateral.  I can't undo the

4 past of what an officer of the company did, and I'm not going

5 to sit here and tiptoe around it, Your Honor.  That happened.

6 But when --

7          THE COURT:  Let me ask you this.  And I'm not -- you

8 know, I'm not making any statement about what I believe the

9 evidence does support or doesn't support.  But whether the

10 current members of the C suite had anything to do with this or

11 not, isn't the fact that they weren't effectively supervising

12 subordinates in the C suite a factor that leans for giving --

13 for putting a receiver in?

14          MR. KING:  Your Honor, I think it's -- it's a little

15 too critical to go back and say that when you have a chief

16 financial officer that seems very credentialed, that has worked

17 at notable companies, that this would happen under his

18 respective watch is something that should have been expected,

19 it's a little bit of the benefit of hindsight.

20          What we can say is, when the problem was learned, a

21 new executive, a senior VP of finance, was put in place to

22 watch that respective person, and that the company -- the fact

23 that they have retained Duane Morris and Kroll, very reputable

24 private investigators, to investigate this, shows that they

25 are trying to ferret out the fraud and the damage that was

respectively done to not only the company but to Farm Credit, vendors, and the unsecured creditors. So I think they've taken it seriously, Your Honor. And so when we look at that factor, as the thought occurred, I think we have to look at it through the lens of who's actually running the house right now. This is not a scenario, Your Honor, where Mr. Senzaki is sitting at the counsel table with me and I'm trying to defend his overstatements. He's no longer part of the company. The only thing we could have done with such a bad actor was to purge him out, which effectively we did.

And so, Your Honor, we also come before the Court today on a lawsuit. So then we also talk about what the legal remedies are. So that's the next factor that the Court enumerates. And so Count 1 is the breach of contract claim against the borrowers, the defendants, and the respective Weavers. So there is a legal remedy that is hanging out there respectively, Your Honor, in this matter. That is Count 1. That is, if they prevail on Count 1 and are able to collect -- are able to articulate their issues or their elements, they'll be able to collect on that respective damage and be -- can be converted to a judgment creditor. And as a secured creditor they're going to have priority over any respective individual.

When we look at what the remedies are and the fact that you said you're not going to make a decision today, I've really come to, you know --

1          THE COURT:  I am -- I am going to give you an order

2    quickly --

3          MR. KING:  I know you are.

4          THE COURT:  -- but you're not going to get one today.

5          MR. KING:  I know you are.  And so when I think about

6    the next few factors, these are what I call the balancing

7    factors——are there less drastic remedies available, are the

8    legal remedies inadequate, and then ultimately, you know, as

9    I like to say it, the physician's oath of the receivership,

10   will the receiver do harm or do good.

11         This is a brand, a company that was started by the

12   Weavers in 2016.  That's an undisputed fact.  This is a brand

13   that has had meteoric growth since its inception.  And as

14   you'll hear from Mr. Weaver, the only reason that they went to

15   Farm Credit -- or that Farm Credit tracks them down is that

16   their prior financing company didn't have sufficient credit to

17   support the growth of the respective company.

18         This brand continues to grow, and it has brand

19   loyalty.  I think the appointment of a receiver -- and what

20   you're not going to hear from the plaintiffs or the receiver

21   is that there's any brand study been done of what the impact

22   will be if you put this matter into receivership as requested

23   by the plaintiffs, will that stop Uncle Nearest liquid going

24   off of the shelves, will it harm the brand, because, again, as

25   I said, the only way that this business can cash flow and the

1   only way that it can hopefully get to a point of -- out of

2   this dispute and positive cash flow is to sell liquor.  And if

3   a receiver comes in and there is a backlash, for which you

4   don't have evidence for -- so that factor's neutral, and in

5   fact I believe Mr. Weaver's going to testify that he believes

6   it will be negative and that we're going to do more harm than

7   good.

8           And so when we think about the power that you hold,

9   the equitable power you hold about what remedy or fashion --

10  you could fashion in this case, we come to the point of you

11  can fashion remedies that compel the parties to produce

12  audited financial information, you can compel -- you asked are

13  the parties talking.  That was your very first question.  The

14  answer is yes, Your Honor.  You can compel the parties to talk

15  to each other for the next seven days before you reach an

16  ultimate conclusion, and in doing so, Your Honor, you craft a

17  remedy that allows the parties to come to a mutually private

18  agreement to potentially resolve this matter.  And ultimately

19  if you don't hear from us or back -- better stated, if we

20  don't respond to a stipulated requirement to let you know if

21  the parties have resolved by a certain date certain, then you

22  enter an order that you're contemplating here today based on

23  the respective evidence.

24          This receivership was filed on the 28th, or this

25  verified petition, all right?  As we sit here today, we're --

we're about one week out, Your Honor. I know that my client

would consent, rep, and include an order to preserve the

collateral. I know that my client will consent, rep, and

warrant to engage in confidential discussions. And I know

that my client will consent, rep, and warrant that any

discussions would remain private and they would not talk to

the media regarding those respective discussions. So when

we're looking at these equitable factors that you have bundled

up, Your Honor, we do have an opportunity where you can craft

a legal remedy in your order to allow these peoples a window

of some to see if they can come to a respective agreement on

their own.

          And, Your Honor, the fact that this case has just

started -- I've been in this case -- it was filed on the 29th,

and I became Uncle Nearest's counsel I think -- very shortly

thereafter, maybe 28th, 29th, maybe the 30th. That was my

first step-in on this matter. And so, Your Honor, we have

Tennessee counsel, we have counsel that can come before you,

no one -- not Greenberg Traurig, not another counsel from out

of the state, but a lawyer you can hail in --

          THE COURT: Doesn't matter where they come from as

long as they're admitted.

          MR. KING: We're admitted here, Your Honor.

          THE COURT: We get them from everywhere.

          MR. KING: I know you do, Your Honor, but I'm

1  admitted here, and I'm admitted just up the road. My point is,

2  we would agree to all of those conditions. So when you think

3  about your powers and the remedies you can have and create,

4  this doesn't have to be binary, it doesn't have to be this than

5  that, you can create windows of time, short windows of time,

6  because we're -- we're conscientious to Farm Credit, and I --

7  that's why you didn't see a motion to continue by us,

8  Your Honor. We're conscientious of the urgency of their

9  concern. So I didn't come in here and ask for a motion to

10  continue this hearing. I asked to come before you, and I'm

11  making this recommendation on these equitable factors because

12  that puts the Court in control of the relief.

13        THE COURT: Mr. King, let me ask you this: So

14  you-all enter this forbearance agreement on April 15th of this

15  year, and now of course we're about -- almost four months

16  outside of that. They allege all these instances where you're

17  now in default of that forbearance agreement. Do you dispute

18  any of that?

19        MR. KING: Your Honor, I don't believe we can dispute

20  that those certain receivables have not been provided. What

21  I can say -- and, again, Your Honor, we have a pre-Adams and

22  Reese and a post-Adams and Reese. I'm saying as part of --

23        THE COURT: Say that again. I'm sorry.

24        MR. KING: We have a pre-Adams and Reese and

25  post-Adams and Reese. I've been in this case, Adams and Reese

1  has been in this case, for all of about seven days, Your Honor.

2  So I can't speak and I will not try to speak to the decisions

3  that were made by prior counsel on -- on those items not being

4  provided.  But what I can say is that if the Court requests,

5  orders, we will make that happen, and that's in connection with

6  the requested informa- -- the discussion of windows of time to

7  negotiate a potential resolution in this case.

8          THE COURT:  Well, one thing the Court doesn't want to

9  do is mediate your-all's business dispute.

10          MR. KING:  I understand.

11          THE COURT:  I mean, that -- look, I -- you know, I

12  don't have time to do that, and, you know, I -- or, you know,

13  run your mediation.  I can't -- I can't do that and negotiate

14  between you-all.

15          So you're in default of your -- of your forbearance

16  agreement.  And that forbearance agreement that you-all agreed

17  to, they can -- they can put a receiver in under that

18  agreement.  Is that correct?

19          MR. KING:  Your Honor, that is a contractual

20  provision with the forbearance.  In Tennessee——we've done the

21  research——it's not dispositive, but obviously it's a factor for

22  the Court to consider.  And I just want to be -- I want to

23  clarify one point, Your Honor.  If it came across that I'm

24  trying to ask the Court to be a mediator in this case, I'm

25  not --

1          THE COURT:  Yeah, my word, not yours.

2          MR. KING:  Yes.  And I'm not trying to ask Your Honor

3     to be the mediator.  I think more when we're talking about

4     those equitable factors, it's that the Court has the

5     opportunity to create a bubble of time, a short bubble, for a

6     mediation to occur.  And if it doesn't occur, Your Honor,

7     I believe you have the information you need to determine

8     whether a receiver is appropriate in this matter.

9          THE COURT:  I have one more question.

10          MR. KING:  Yes, Your Honor.

11          THE COURT:  Then I think we can probably -- we need

12     to go to some proof.  And I'm not trying to get in between you

13     and your client, but, you know, what I have is just what

14     you-all put in front of me.  I don't have access to everything.

15     But I do think it's a fair question to ask you, have you

16     contemplated a Chapter 11 reorganization?

17          MR. KING:  Your Honor, that has been contemplated.

18     We have not -- we have not decided at this time to forge ahead

19     with a Chapter 11.  It is something that's been contemplated,

20     but we just have not made the decision to move ahead with it

21     right now.

22          THE COURT:  Because, you know, you do look like

23     you're out over your skis.

24          MR. KING:  Your Honor, I think with a Chapter 11 the

25     concern always is, is that we have investors, we have equity

```
1    owners, and we're trying to do the right thing, to -- to honor
2    their commitments to the respective company.  This is a company
3    that's grown rapidly.  I think that that's uncontested.  You
4    can't get to a number of a 55 million-dollar line of credit in
5    July of 2022 to a 100 million-dollar total credit in July of
6    2023 without the company growing a fair amount, Your Honor.
7    And so -- at the same time, we do have investors and that's
8    being considered.  That's why I talk about bubbles of time to
9    see if other outside Chapter 11 solutions can be satisfactory
10   and can be made, Your Honor.
11              THE COURT:  All right.  Thank you.
12              MR. KING:  Thank you, Your Honor.  Appreciate you.
13              THE COURT:  All right.  Farm Credit, you ready to go
14   to some proof?  Do you have some proof?
15              MS. LIGGINS:  Yes.
16              MS. SIEG:  Yes, Your Honor.
17              (Brief pause.)
18              MS. SIEG:  Good afternoon, Your Honor.  For the
19   record, Beth Sieg of McGuire Woods for Farm Credit Mid-Atlantic
20   this afternoon.  Thank you for entering my order granting my
21   pro hac vice motion.  And thank you, Your Honor, and your
22   staff, for the time this afternoon.
23              We have agreed and stipulated that the declaration
24   of our primary witness will come in as is as his direct
25   testimony as if he were giving it from the stand.
```

```
1            THE COURT:  Is that an exhibit that's in the record?
2            MS. SIEG:  It is, Your Honor.  It should be
3    Exhibit 1, I believe.
4            THE COURT:  Okay.
5            MS. LIGGINS:  It's Exhibit 1.
6            THE COURT:  And I believe you-all agreed that you'd
7    -- you'll proffer this witness if there's any cross-examination
8    that wants to be done.
9            Did you have any that you wanted to do of this
10   witness?
11           MR. KING:  I do have a few questions, Your Honor.
12           THE COURT:  Okay.
13           MS. SIEG:  Thank you, Your Honor.  So we would call
14   -- we would call Brian Klatt to the stand, please.
15           THE COURT:  All right.  Mr. Klatt?
16           MS. SIEG:  Klatt.
17           THE WITNESS:  Yes.
18           THE COURT:  Mr. Klatt, come on up.
19           (The witness was duly sworn.)
20           THE COURTROOM DEPUTY:  Thank you.  You may be seated.
21   And there's water in the pitcher if you need it.
22           THE COURT:  Have a seat.
23           THE WITNESS:  All right.  Thank you.
24           MS. SIEG:  Do you have your -- is your declaration
25   there?
```

```
 1              THE DEFENDANT:  I do.
 2              MS. SIEG:  Thank you, Your Honor.  I'll pass the
 3    witness.
 4              THE COURT:  All right.
 5              Mr. King.
 6              MR. KING:  Thank you, Your Honor.
 7                        CROSS-EXAMINATION
 8    BY MR. KING:
 9    Q        Good afternoon, Mr. Klatt.  My name's Rocky King.  I
10    have a few questions for you today.  If you don't understand
11    my question, which I'm told may happen from time to time, just
12    let me know and I'm happy to rephrase it.  Okay?
13    A        Thank you.
14    Q        All right.  I just want to make sure I've got --
15    there's three total credit lines involved here.  Is that
16    correct?
17    A        That is correct.
18    Q        A revolving, a term loan, and a RELOC, right?
19    A        That's correct.
20    Q        The revolving loan and the term lock were done
21    originally in July of 2022?
22    A        That's correct.
23    Q        All right.  And total -- the total value of credit
24    at that point was $55 million.  Is that right?
25    A        Initially, yes.
```

```
 1   Q        Yeah.  Uncle Nearest had been in existence, however,
 2   for about six years before they came to Farm Credit.  Is that
 3   right?
 4   A        As we understand.
 5   Q        All right.  Did you actually speak and meet with
 6   Uncle Nearest in trying to discuss extending them credit
 7   before July of 2022?  Is that right?
 8   A        Yes.
 9   Q        Okay.  And the basis was that -- is they had
10   outgrown their existing lender.  Is that fair?
11   A        Yes.
12   Q        So you were -- you were in a position where you
13   could offer more money to -- to Uncle Nearest as compared to
14   their prior creditor?
15   A        I don't know about the other creditor.
16   Q        Okay.  Fair enough.
17   A        I do know -- I do know what we can do.
18   Q        Okay.  So you were going to extend about 55 million.
19   Is that correct?
20   A        That's correct.
21   Q        And in doing that, did you do a due diligence of the
22   respective company?
23   A        We did.
24   Q        And there was an ability-to-repay-the-debt analysis
25   done.  Is that right?
```

1    A         Based on the financial information provided by the
2    company, we believe that to be true.
3    Q         And at that point was a barrel inventory conducted
4    by Farm Credit?
5    A         We have a -- we had a barrel count done before we
6    closed, by a third party --
7    Q         Okay.
8    A         -- a third-party contractor.
9    Q         So in July of 2022, third-party contractor does a
10   barrel count.  We can all agree on what the barrel count is.
11   Is that right?
12   A         Normal course, and that's how we started out.
13   Q         All right.  And then I'm not going to go through
14   every respective amendment.  We'll be here for a while and the
15   judge --
16   A         Thank you.
17   Q         -- and the judge will scold me and -- for sure.  But
18   at some point the revolving line starts to increase.  Is that
19   right?
20   A         It -- it did, yes.
21   Q         And it increased to its final number of almost
22   65 million within a one-year period of time, correct?
23   A         Yeah.  More or less, yes.
24   Q         July 2022.  And I think the last amendment before
25   the forbearance is in July of 2023.  Is that correct?

```
 1   A         And that -- and that was the last time we provided
 2   additional credit to Uncle Nearest --
 3   Q         Right.
 4   A         -- that's correct.
 5   Q         And in those amendments the barrel inventory is
 6   important for those increasing -- revolving lines to be
 7   increased, right?
 8   A         We have a -- the credit agreement provides for a
 9   borrowing base --
10   Q         Yes.
11   A         -- which includes eligible accounts receivable and
12   eligible inventory, which includes barrels, bottles, grain
13   inventory.
14   Q         Mm-hmm.
15   A         So it does.  That's one of the premises of lending
16   on this basis --
17   Q         So --
18   A         -- not only cash flow but also the assets and the
19   underlying collateral.  So, yes, the revolving line of credit
20   was dependent upon the number of barrels that the company had
21   in inventory.
22   Q         Right, because if the borrowing base wasn't
23   sufficient, the bank wouldn't extend additional credit.
24   A         The company wouldn't have access to the credit that
25   we had committed to.
```

1  Q        Correct.  So at that point, as each line of credit

2  goes up, you've got to have a borrowing base that satisfies

3  that respective increase.

4  A        Correct.

5  Q        As the credit line was going up, you were relying on

6  borrowing base certificates from the company from January --

7  or July of 2022 to July of 2023.  Is that correct?

8  A        Yeah, would you restate the dates --

9  Q        Sure.

10  A        -- for me, please?

11  Q        Sure.  From the inception of the loan --

12  A        Yes.

13  Q        -- to the final amendment, so just to make it --

14  A        Okay.

15  Q        The final before the forbearance agreement.

16  A        Yes.

17  Q        When the line of credits are increasing, you're

18  relying on the borrowing base certificates provided by the

19  company.

20  A        Along with the third-party review of collateral,

21  which we have another one done during that time.  Between the

22  time that you stated, we also have another collateral

23  inspection done.

24  Q        And that collateral inspection was done on what

25  date?

```
 1   A          I'd have to look, but it was -- we have it on the

 2   timeline.

 3   Q          I believe that was in October of 2024.  Is that

 4   right?

 5   A          No, I don't think so.  I think it was actually

 6   earlier than that, and I -- can you pull the timeline up?  Can

 7   we pull up the timeline, because --

 8   Q          Well, I'll --

 9   A          -- I think we have the note on it on the date.

10   Q          I'm going to let redirect --

11   A          Okay.

12   Q          -- clean that up.

13   A          All right, yeah.  But before we did -- we did a

14   collateral review approximately one year --

15   Q          One.

16   A          -- after the close.  So that would have been in

17   2023, I think in June or July.

18   Q          Okay.

19   A          So it -- we weren't relying just on the borrowing

20   base.

21   Q          All right.  But if you did it one year after, all

22   the amendments had been done prior to that.  Is that fair?

23   Most of the amendments had been done prior to that third-party

24   review.

25   A          No.
```

```
1    Q        Well, I mean --
2    A        No, because that was Amendment Number 4, where we
3    finally went up.  But we're on Amendment Number 8.
4    Q        So when you say about a year, Amendment Number 4 was
5    in March of 2023.  Is that correct?
6    A        I'd have to look.  Can I look at the --
7    Q        Yes.
8    A        -- exhibit on Amendment Number 4?  Amendment
9    Number 4 is dated March 30th of 2023 --
10   Q        Okay.
11   A        -- mm-hmm.
12   Q        And so it's your recollection that in or around
13   March of 2023 there was another barrel inventory.
14   A        It would -- it would have been after.  It would have
15   been slightly after that.
16   Q        Slightly after.
17   A        Mm-hmm.
18   Q        Okay.  Thank you.
19   A        Sure.
20   Q        Now, in addition to the revolving line going up,
21   there was a RELOC also extended.  Is that correct?
22   A        That's correct.
23   Q        And that's another 15 million-dollar line of credit.
24   A        It was a 15 million-dollar line of credit
25   available --
```

1  Q        Right.

2  A        -- to lend and complete Phase II of the physical

3  develop- -- of the development of the physical property,

4  including wastewater, rickhouses, and other things on site in

5  Shelbyville, that's right.

6  Q        So -- so land improvements to the existing property.

7  A        Real estate improvements, buildings --

8  Q        Real estate improvements.

9  A        -- wastewater, those type of things.

10  Q        All right.  So ultimately at the end of July 2023

11  the loan had grown from 55 to approximately 102 million

12  dollars.

13  A        Correct.

14  Q        Do you know, during that time period was Chief

15  Senza- -- or the chief financial officer Mike Senzaki?

16  A        It was.

17  Q        And was that the prior -- your primary point of

18  contact?

19  A        We had contact with Mike Senzaki, Fawn Weaver, and

20  Keith Weaver.

21  Q        Okay.  And Mr. Senza- -- do you know who signed the

22  borrowing base certificates?  Wasn't that Mike Senzaki?

23  A        The borrowing base certificates were signed by Mike

24  Senzaki.  And as we talked about, they were repped and

25  warranted, every time that we signed an amendment, by this

1    chief executive officer of Uncle Nearest, attesting to the

2    accuracy of all of the financial information, including the

3    borrowing base.

4    Q        But ultimately the borrowing base certificate was

5    not signed by Ms. Weaver, correct?

6    A        We saw a borr- -- yeah, during Mr. Senzaki's time

7    they were signed by Mr. Senzaki.

8    Q        Thank you.  Now, I think we've got clarity on the

9    Martha's Vineyard property, but I just want to make sure --

10   A        Sure.

11   Q        -- I understand.  The Martha's Vineyard property was

12   disclosed as a target purchase in March of 2023, correct?

13   A        Yes.

14   Q        All right.  So this is not a scenario that money was

15   used to purchase it without at least notifying the lender that

16   the home was going to be purchased in connection with Uncle

17   Nearest business.

18   A        Our borrower, Uncle Nearest, asked us to lend the

19   money for the purchase of the corporate property --

20   Q        Right.

21   A        -- on Martha's Vineyard.

22   Q        And the -- am I correct that the bank did not take a

23   secured interest in that property?  A deed of trust.

24   A        We did not take a deed of trust.

25   Q        Okay.  And so when that property was closed, the

1  bank did not say, "Here, we'd like this deed of trust

2  recorded" on the respective property.

3  A        Correct.

4  Q        Now, you're here today, looking at your declaration,

5  asking for a receiver to be appointed.  Is that right?

6  A        That's correct.

7  Q        Am I correct that before you made this request, that

8  the bank has not done any kind of analysis of what kind of

9  brand impact a receiver will have on the Uncle Nearest brand?

10 A        Our focus has been on what we think the value of

11 this business has been internally, and we have a very good

12 feel for that.

13 Q        Appreciate that.  But my question was, have you done

14 the brand analysis to assess the impact of the appointment of

15 a receiver?

16 A        We did not hire a third party to evaluate the -- or

17 to give us an estimate of the value.

18 Q        All right.

19 A        Part of that -- part of that -- part of that -- let

20 me tell why, if I may.  Part of that process is, we would need

21 accurate financial statements and accurate inventory numbers

22 to be able to do that.

23 Q        So you would need more information to assess whether

24 a receiver would have a negative impact on the respective

25 brand.

```
1    A         We -- we did the analysis that we think we would be

2    in a better position with people that we can -- with a company

3    that we can get accurate financial information from to

4    determine the value.  But we -- we feel -- we feel very

5    confident that the value of this business is well in excess

6    above what's owed.  It just hasn't been paid.

7    Q         Okay.  So you -- as you sit here today, you believe

8    that the company has the ability, if managed effectively, to

9    repay the debt.

10   A         No, I didn't say that.

11   Q         You said the value exceeds the amount owed.

12   A         The cash flow does not pay -- the ca- -- we get

13   repaid from a couple of things; Number 1 is cash flow.  This

14   company has not demonstrated the ability to cash flow

15   sufficiently to repay our debt.  We believe that the entire

16   value -- the enterprise value of this business is in excess of

17   our obligations.

18   Q         Okay.  So you believe that the enterprise value

19   exceeds the amount owed to Farm Credit.

20   A         But that doesn't mean it's -- yes, that's correct --

21   Q         All right.

22   A         -- but that doesn't mean that they've repaid it or

23   can repay it.

24   Q         All right.  You understand that the -- Ms. Weaver

25   started this respective company with Mr. Weaver.  Is that
```

1   correct?

2   A       I do.

3   Q       And you understand that the entire brand has been

4   constructed by the respective Weavers in this matter.  Is that

5   right?

6           MS. SIEG:  Objection.  That goes beyond the scope of

7   his direct.

8           THE COURT:  I haven't read his declaration.  So

9   let's -- I'm going to give him a little bit of latitude.

10          Let's kind of move on.

11          MR. KING:  Yes, Your Honor.

12  A       Yeah, I mean, I -- yeah, I -- look, I mean, the

13  Weavers, obviously tremendous entrepreneurs.  They found this

14  story.  The value of this brand comes from Nearest Green.

15  Q       Sure, it's -- it comes by Nearest Green.  But there

16  was no Nearest Green without Mr. and Ms. Weaver starting this

17  distillery company.  Is that fair?

18  A       There was no Mr. Green?

19  Q       No, no, there was no Nearest Green Distillery.

20          MS. SIEG:  Objection.  Calls for speculation.

21          THE COURT:  Overruled.

22          Get to it, Mr. King.

23          MR. KING:  I -- Your Honor, I'm trying to get to it.

24  BY MR. KING:

25  Q       I just want to make sure I understand that the

```
 1   person that started this company is the person you're seeking
 2   to replace with the receiver.  Is that fair?
 3   A        We're looking to -- we're looking -- we're looking
 4   for a receiver to come in and provide better management for
 5   this brand, for this company.
 6   Q        I understand that, but you want the receiver to
 7   replace Ms. Weaver as the day-to-day operator of the company.
 8   A        We'd love to have Ms. Weaver marketing the property.
 9   Q        All right.  But you don't --
10   A        We are not comfortable with the management of this
11   company to repay us.
12   Q        Okay.  And the management --
13   A        I'll just be clear on that.
14   Q        I understand you're trying to be clear on that.
15   A        And that's -- and that's why we're asking for a
16   receiver.
17   Q        So you want Ms. Weaver to no longer be in control as
18   the CEO of the company.  You want her removed.  Correct?
19   A        Or -- or on the board of directors.  This isn't
20   pointed at Ms. -- at Ms. Weaver.  This is pointed at the
21   management of this company and their inability to get us
22   repaid.
23   Q        All right.  And I understand your point.  I'm trying
24   to answer my question.  My question is simple.
25   A        Can you make it simpler for me?
```

1    Q        Do you want Ms. Weaver replaced as CEO?

2    A        That's not our intent.

3    Q        Do you want a receiver to come in and take control

4    of the company?

5    A        That's correct.

6    Q        All right.  So you want the receiver to come in and

7    be the person that operates the company on a

8    day-in-and-day-out basis.

9    A        That's correct.

10   Q        All right.  And that effectively would remove the

11   Weavers from controlling the respective company.  Is that

12   correct?

13   A        That's correct.

14   Q        And those are the people that actually started this

15   company, correct?

16   A        That's correct.

17            MR. KING:  Thank you, Your Honor.

18            THE COURT:  All right.  Thank you.

19            Do you have anything?

20            MS. SIEG:  I do have brief redirect, Your Honor.

21            THE COURT:  All right.

22                       REDIRECT EXAMINATION

23   BY MS. SIEG:

24   Q        Would you recognize Ms. Weaver if she was in the

25   courtroom here today?

1    A        I would.

2    Q        And do you see her anywhere in here?

3    A        I do not.

4    Q        Okay.  You were mentioning -- trying to answer one

5    of the questions before about when the -- when the internal

6    collateral review was performed.  I'll pull up very quickly

7    for you the timeline.

8             At Slide 9, please.  And I have a copy I can hand up

9    if it's easier to see.

10            May I approach?

11            THE COURT:  No.  (Indicating.)

12            MS. SIEG:  Oh.  I'll approach her.  Thank you, Judge.

13            THE WITNESS:  Thank you.

14   BY MS. SIEG:

15   Q        And does this refresh your recollection about the

16   internal -- or the -- yeah, the internal collateral review

17   that you were trying to recall?

18   A        Yeah.  This was a third-party collateral inspection

19   performed in June of 2023.

20   Q        Okay.

21   A        That was -- that was done by a third party outside.

22   Q        And were -- did Farm Credit perform an internal

23   collateral review at any point?

24   A        We did.  We performed a internal review and

25   collateral account.  I believe it was on January -- in

1    January -- like, January 31st of 2024, after the Weavers had

2    not -- Uncle Nearest had not made the payment for January of

3    2024.

4    Q         You were asked a lot of questions about Farm

5    Credit's reliance on various borrowing base certificates.  Do

6    you recall those?

7    A         I do.

8    Q         And to your understanding, when was the former CFO

9    terminated by the company?

10   A         We understand that Mike Senzaki was terminated in

11   January 2024.

12   Q         And has the company -- did the company submit a

13   borrowing base certificate in April of this year, April of

14   2025?

15   A         It did.

16   Q         And was that borrowing base certificate correct?

17   A         It was incorrect.

18   Q         And that was submitted to the --

19   A         To my -- to my knowledge, I -- without seeing it,

20   but, yeah.

21   Q         Is it your understanding that the mismanagement in

22   regard to the tracking of the inventory has continued after

23   the former CFO has allegedly departed the company?

24   A         Yeah.  There's a long list -- there's a long list of

25   inaccuracies in the borrowing basis that were signed not only

1  by Mike Senzaki but by Felicia Gallagher after Mr. Senzaki was

2  gone.

3  Q        And -- and as we were reminded a moment ago, that's

4  all been under Ms. Weaver's watch, correct?

5  A        That's correct.

6  Q        Okay.  Can you explain to the judge, what is the

7  significance of the barrels that are -- the whiskey barrels

8  that are part of the company -- the bank's collateral?

9  A        Yeah, the -- the inventory barrels represents the

10 ability to -- for this company to cash flow as they convert

11 those barrels into bottles and those bottles are then sold.

12 That's our collateral that gets converted into income, of

13 which we are entitled to receive.  And that income is to be

14 used to repay our debt.  It's the source -- it's the source --

15 it's the source of cash flow for repayment of all of your

16 debts, not only the revolving line of credit but the profits

17 from those are to repay the -- make interest payments as well

18 as to repay the term debt.

19 Q        And where does the company acquire those barrels of

20 whiskey typically?

21 A        Generally in the past that company has sourced their

22 barrels from two places; Number 1, a third party that's

23 manufactured, distilled, and does some bottling as well as

24 barreling inventory for them, and then we were also told that

25 the company buys barrels on the secondary market from other

1    barrel investors.

2    Q         So it's fair to say the company goes out, acquires

3    barrels of whiskey, and then they're in the business of

4    selling the bottled product.

5    A         That's correct.

6    Q         And they're not in the business of selling whiskey

7    barrels, are they?

8    A         They are not.

9    Q         Are they permitted to do that under the loan terms,

10   to your knowledge?

11   A         They are not.

12   Q         And can you explain to the Court why they're not

13   permitted to do that, why that was an important part of the

14   deal?

15   A         Yeah, that would be selling our assets and our

16   collateral that we have in the borrowing base, and it is not

17   in the ordinary course of business.

18   Q         And how does the sale of whiskey barrels generally

19   compare to the margin that's obtainable when you're selling

20   bottled whiskey?

21   A         It would be considerably less.

22   Q         So if a company were to be out selling barrels that

23   they had acquired and paid a third party for and then they

24   turn around and sell those barrels, Number 1, it's not

25   permitted under the -- your deal, right?

1    A        That's correct.

2    Q        And, Number 2, would that signal financial distress?

3             MR. KING:  Objection, Your Honor.  That's

4    speculation.

5             THE COURT:  Overruled.  He can give his opinion on

6    it.

7             Let's get to the point.  I understand they got to

8    sell the inventory to make money to cash flow the loan.

9    I also understand that if you sell a big barrel of whiskey

10   you're not going to make as much per ounce as you're going to

11   sell for a bottle of it.  I've got all that down.

12            MS. SIEG:  Thank you, Judge.

13   BY MS. SIEG:

14   Q        There have been discrepancies in the inventory

15   reported on the borrowing base certificates, correct?

16   A        That's true.

17   Q        Okay.  Are there -- what would be -- strike that.

18   Let me start over.  One reason for that discrepancy could be

19   that they're misreporting what they purchased from third party

20   as barrel inventory, correct?

21   A        Correct.

22   Q        Another reason for such a disparity could be that

23   the company is impermissibly selling the barrel inventory to

24   third parties.

25   A        That could be.

Klatt - Redirect Examination

```
 1   Q          Thank you.  Very quickly, if I could get you to turn
 2   to Tab 41 in your exhibit binder.  And when you get there, let
 3   me know if you recognize that document.
 4   A          I've looked at this document.
 5   Q          And this is the -- the mortgage to Oaktree.
 6   A          Correct.
 7   Q          Who's the borrower listed on that?  It's on the
 8   second page of the exhibit.
 9   A          Yeah, the borrower is listed as UN House MV, LLC.
10   Q          And that's not one of your borrowers, is it?
11   A          It is not.
12   Q          Okay.  And then if you could flip to the end of this
13   document where it is signed -- let's see if I can find it
14   here.  There is -- well, these don't have -- don't have a
15   Bates number, but --
16   A          I found the signature.
17   Q          You did?
18   A          Yeah.
19   Q          And whose signature is that?
20   A          It appears to be Michael Senzaki, managing member.
21   Q          The -- the former CEO that the Weavers allege is
22   responsible for all of the inaccurate reporting to the bank.
23   A          Correct.
24   Q          And -- and when was this mortgage dated?  You can
25   find it on Page 3.  Is it around September 20, 2024?
```

```
 1    A          Yes, I see the date, September 20th, 2024.

 2    Q          So a good nine months after he was allegedly

 3    terminated for this alleged malfeasance?

 4    A          Yes.

 5    Q          Okay.  And the Martha's Vineyard property that we've

 6    all been referring to it colloquially, that's a property that,

 7    to your knowledge, the Weavers reside at, correct, for a

 8    portion of time during the year?

 9    A          Yes.

10    Q          And do you have any reason to believe that

11    Mr. Senzaki is no longer associated with that borrower,

12    that -- the borrow- -- not your borrower, the borrower on that

13    mortgage?

14    A          I'm sorry, can you ask the question again?

15    Q          As far as you know, the entity that was the borrower

16    on that mortgage, Mr. Senzaki is still today the managing

17    member of that entity.

18    A          I -- I don't know the answer to that.

19               MS. SIEG:  Thank you, Judge.  That's all I have --

20               THE COURT:  Thank you.

21               MS. SIEG:  -- of this witness.

22               THE COURT:  Anything more, Mr. King?

23               MR. KING:  No, Your Honor.

24               THE COURT:  All right.  Thank you.

25               Thank you, sir.
```

```
 1                   (Witness excused.)

 2           THE COURT:  Do you have any other proof?

 3           MS. SIEG:  No, Your Honor.

 4           THE COURT:  Okay.

 5           MS. SIEG:  We reserve the right to cross any defense

 6   witnesses.

 7           THE COURT:  Do you have some witnesses?

 8           MR. KING:  Just Mr. Weaver, Your Honor.

 9           THE COURT:  All right.  Bring him on.

10                   (The witness was duly sworn.)

11           THE COURTROOM DEPUTY:  Thank you.  You may be seated.

12   There's water in the pitcher if you need it.

13           THE WITNESS:  Thank you.

14                     KEITH EDWARD WEAVER,

15   called as a witness at the instance of the defense, having been

16   first duly sworn, was examined, and testified as follows:

17                     DIRECT EXAMINATION

18   BY MR. KING:

19   Q       Mr. Weaver, would you state your name to the Court.

20   A       Keith Edward Weaver.

21   Q       And what's your current role at Uncle Nearest?

22   A       Cofounder, board member, and COO.

23   Q       And what are your duties as COO?

24   A       I oversee the distillery operation, supply chain

25   management, whiskey development, and -- that's essentially it.
```

```
 1   Q          Okay.  We're -- I'm going to be a little
 2   executive-level and move around --
 3   A          Mm-hmm.
 4   Q          -- just to identify some issues, because I know the
 5   Court understands some of the issues already.  Just to make
 6   sure, you've read the complaint in this case?
 7   A          Yes.
 8   Q          When did you -- when did Uncle Nearest first start
 9   working with Farm Credit?
10   A          In 2022, to around June --
11   Q          And why --
12   A          -- approximately June.
13   Q          Uncle Nearest was founded in 2016.  Why did they
14   come to Farm Credit in 2022?
15   A          Uncle Nearest, in its founding, we grew pretty
16   rapidly, so we had triple-digit quarter-over-quarter growth,
17   and our credit partners, our bank partners, we outgrew them.
18   And one of the representatives from the bank solicited us.
19              THE COURT:  No, sir.  I'm just listening.
20              THE WITNESS:  Okay.  He was doing his head, so --
21              (Laughter.)
22              MR. KING:  We -- the judge is the one that matters
23   here.
24              THE WITNESS:  Yes.  Yeah.
25   BY MR. KING:
```

1    Q        When you said one of the banks solicited, are you

2    talking Farm Credit?

3    A        Correct, through one of their employees.

4    Q        Since its founding, how much has Uncle Nearest

5    grown?

6    A        Rapidly.  So it's the fastest growing whiskey or

7    bourbon company in American history, to this point.  So the

8    first few years of the company's history minimally had

9    triple-digit quarter-over-quarter growth.

10           From that point forward we're still seeing growth,

11   including very difficult time last year we had year-over-year

12   growth.  We're one of five brands that had year-over-year

13   growth last year.

14   Q        And how many barrels are currently in the Uncle

15   Nearest inventory?

16   A        Approximately 55,000.

17   Q        And how many bottles are in the inventory?

18   A        Unfortunately I don't know as we -- as I sit here

19   how many bottles are there.

20   Q        What's the other component that's measured?  Is it

21   barrel based -- assets that have been converted into bottles?

22   A        So it would be barrels of whiskey, of course,

23   finished case goods of the different expressions, bottles,

24   empty bottles, empty barrels.

25   Q        Finished case goods, can you tell me what that is?

1    A          Finished case goods are when you've converted a

2    barrel of whiskey, you've rectified it, you've processed it,

3    you've bottled it, you've labeled the bottle, you've put the

4    cork on it, you've put it in a shipper case, and you've taped

5    it and put it on a crate to leave.

6    Q          All right.  Within the last 48 hours, has any of

7    your distributor partners sold out of Uncle Nearest?

8    A          Yes, fortunately.  Our distributor partner in

9    Massachusetts has sold out.

10   Q          Okay.  One of the things that -- I'm going to jump

11   around a little bit.  There was a reference to some of the

12   e-mail exhibits in this matter.  I want to just bring up for

13   identification purposes initially Exhibit B --

14   A          Mm-hmm.

15   Q          -- on the screen.

16   A          It's loading.

17              THE COURT:  Did you say D?

18              MR. KING:  B.

19              THE COURT:  B?

20              MR. KING:  B, Your Honor.  And this is just for

21   identification purposes.

22   BY MR. KING:

23   Q          There was a reference that the top of the e-mail

24   shows a Mr. Senzaki at Uncle Nearest forwarding an e-mail to

25   Fawn Weaver on August 2nd, 2025.  Do you know how that

 1  occurred?

 2  A        Yes.

 3  Q        Can you explain to the Court how that occurred?

 4  A        Once there was an issue --

 5            MS. SIEG:  Objection, Your Honor.  Before we start

 6  asking the witness about what is in the content of this

 7  document, we need to be heard on whether it should come into

 8  evidence.

 9            THE COURT:  Isn't it -- wasn't it already filed in a

10  responsive pleading?

11            MS. SIEG:  It was -- it was attached to a declaration

12  that is not this witness's declaration.  And it's not --

13            THE COURT:  Let me ask you this:  Do you dispute --

14  do you dispute whether or not this is an authentic document?

15            MS. SIEG:  Your Honor, we have not -- there -- if

16  you'll look at the top line, what this document is, it's dated

17  this past Saturday, from the former CFO --

18            THE COURT:  I see that.

19            MS. SIEG:  -- to Fawn Weaver, and it's forwarded this

20  old e-mail --

21            THE COURT:  Well, it's a forward of an e-mail from a

22  Jonathan Boyce, from June 14th of 2023, to several individuals.

23  And it appears that Senzaki then forward his copy of it to Fawn

24  Weaver.

25            MS. SIEG:  Okay.

1          THE COURT:  And so let me ask you this:  Do you

2     dispute -- do you think this is a forgery or some sort of

3     counterfeit, not an authentic document?

4          MS. SIEG:  Well, Your Honor, according to the

5     defendants' allegations, this is the fraudster.  We haven't

6     been able to verify the contents of this document as of today,

7     and we think it should be a -- we think it should be excluded,

8     both under Rule 1002 but also because it's cumulative.  We've

9     already stipulated that employees of the bank went to visit the

10    property in August of 2023.

11         THE COURT:  All right.

12         MR. KING:  Your Honor, may I be heard?  This is

13    actually a limited inquiry.  You heard in opening that

14    Mr. Senzaki was forwarding e-mails on August 2nd.  I'm simply

15    asking the predicate of how this came about, just --

16         THE COURT:  Mr. King.

17         I'm going to let him do some of this.  I understand

18    your objection --

19         MS. SIEG:  Thank you, Judge.

20         THE COURT:  -- and your point, but I -- you know, I'm

21    going to allow him to do this for the limited purposes that he

22    has put forth to the Court.  But I would -- I would tell

23    you-all something.  This is an emergency hearing, and we're

24    talking about documents that have already been filed in the

25    court record.

1          MS. SIEG:  Thank you, Judge.

2          THE COURT:  Now, you know, when we get to a

3   full-blown trial or some sort of big evidentiary hearing, then

4   we can be a little pedantic about some of these rules of

5   evidence.  But let's kind of get to where we are so I can make

6   a decision on some of this.

7          MS. SIEG:  Understood, Judge.

8          THE COURT:  Okay.

9   BY MR. KING:

10  Q        Mr. Weaver, do you know how it came about that this

11  e-mail was forwarded from mike.senzaki@unclenearest to

12  Ms. Weaver on Saturday August 2nd?

13  A        Yes.  I have access to Mike Senzaki's e-mail.

14  Q        All right.  So this is not a scenario where

15  Mr. Senzaki is still with the company and sent this e-mail to

16  Ms. Weaver?

17  A        Correct.

18         MR. KING:  Thank you.

19         Your Honor, that's all I wanted to show to the

20  Court.

21         THE COURT:  All right.

22  BY MR. KING:

23  Q        All right.  So back to -- back to some of the other

24  questions.  I want to talk about the Martha's Vineyard

25  property for a minute.  Do you reside at that property with

1    Ms. Weaver?

2    A        I do not.

3    Q        How often do you go to the Martha's Vineyard

4    property?

5    A        Once a year.

6    Q        Once a year?  And what's the basis for you attending

7    the Martha's Vineyard property once a year?

8    A        In the month of August there's a convening of a lot

9    of people who have great influence over how whiskey sales go.

10   And those are whiskey purchasers, people who own hotel groups,

11   restaurant chains.  Essentially people who are very

12   influential in the sale of whiskey, and spirits generally,

13   convene one space.  So the idea is, it's one-stop shopping to

14   get great capacity.  So instead of calling a thousand people,

15   they're all there in one small area.

16   Q        Okay.  And this property -- when was this property

17   purchased?

18   A        It was purchased in 2023, early 2023.

19   Q        Who at Uncle Nearest spoke to the bank about

20   purchasing this property?

21   A        Myself.

22   Q        Who did you speak to at the bank?

23   A        Brian Klatt, Jonathan Boyce, Roland Ritchey.

24   Q        And who is the owner of this respective property?

25   A        Myself, through a single-member LLC.

K. Weaver - Direct Examination

```
 1    Q         And who's the -- who's the single member of that
 2    LLC?
 3    A         Myself.
 4    Q         All right.  There's a line of credit -- or, excuse
 5    me, a second -- first deed of trust on the property.  What was
 6    the proceeds from that money used for?
 7    A         Renovations.  So upon purchasing the property, it
 8    was greatly dis- -- depressed.  So property renovations to the
 9    ground and the property itself, the house itself.
10    Q         All right.  Do you know if anyone at Uncle Nearest
11    disclosed these renovations to the bank?
12    A         Yes.
13    Q         Who did that?
14    A         Myself and then Mike Senzaki.
15    Q         And who did you tell at the bank?
16    A         Jonathan Boyce and Brian Klatt.
17    Q         And I believe you've stipulated that officers of the
18    bank have attended the Martha's Vineyard property.  When was
19    that?
20    A         That was in August of 2023.
21    Q         You mentioned be about his one-stop-shop marketing
22    experience.  Was that the one-stop-shop marketing experience
23    in August of 2023?
24    A         Indeed it was.
25    Q         Is Mr. Senzaki still with the respective company?
```

1  A        He is not.

2  Q        When did he stop working fully for the company?

3  A        The tail end of 2024.

4  Q        All right.  Why was it the tail end of 2024?

5  A        Initially the -- a host of investors really enjoyed

6  working with Mike.  However, we had some pretty clear need to

7  have strong financial leadership.  So effectively, like,

8  Felicia Gallagher, our SVP of financial planning, took over

9  the duties at the beginning of -- well, really the tail end of

10 2023, going into 2024.

11 Q        So is it fair that Mr. Senzaki's financial officer

12 duties were relieved in January -- or, excuse me, end of 2023,

13 early 2024, and then he was phased out of the company the

14 latter part of Septe- -- of 2024?

15 A        That's correct.

16 Q        When the revolving credit lines were being

17 increased, who was in charge of providing the borrowing

18 certificate to the -- to the bank?

19 A        Initially Mike Senzaki.  Subsequently, towards the

20 tail end of 2023, starting in 2024, it became Felicia

21 Gallagher.

22 Q        Was there ever a time that Uncle Nearest discovered

23 that the barrel count that Mr. Senzaki had offered was an

24 overstatement?

25 A        Yes.

1    Q         When was that?

2    A         It was early 2024, and I believe it was January.

3    Q         Did you notify -- did anyone at Uncle Nearest notify

4    Farm Credit?

5    A         Effectively, yes, because the way in which the

6    information was provided came from us.  So monthly we have

7    reports due to the bank, on the 24th of each month.  And as a

8    part of that financial reporting package it includes a host of

9    things.  One of them is a list of inventory which we get from

10   our third-party partner, which is Tennessee Distilling Group.

11   We either can just forward that simply straightaway to the

12   bank or attach -- detach the attachment and attach it to the

13   overall report.

14   Q         Has Uncle Nearest done anything to investigate

15   privately what kind of improprieties Mr. Senzaki committed

16   while he was the chief financial officer?

17   A         We have.  So --

18   Q         Tell the Court about those.

19   A         As -- with this particular person we had a host of

20   errors that demonstrated that he wasn't fit for purpose for

21   his role.  We thought they were accidents or errors or just

22   technical incompetence.  As the year progressed in 2024, we

23   had deeper concerns.  And at a later point in the year we

24   hired Kroll, investigatory services firm, to engage and look

25   at whether there were things that were going on beyond sloppy

1   work.

2   Q        And is that investigation still ongoing?

3   A        It is.

4   Q        What is your intent when that investigation is

5   concluded?

6   A        The investigation is at the behest of Uncle Nearest.

7   The first step would be for -- to go to the board, and then

8   the board to make determinations of what course of action, the

9   degree of materiality that's there.  And there is a referral

10  to the SEC, potentially, and the DOJ, subject to what the

11  findings of the investigation are.

12  Q        Who is currently operating as the financial officer

13  for the company?

14  A        Right now it's a gentleman named Carlos Flores,

15  who's our interim chief financial officer.

16  Q        And what is Mr. Flores's background and credentials?

17  A        He has a background working for Deloitte.  He's

18  worked for Coca-Cola.  He's worked through different firms for

19  Ford Motor Company.  So a pretty extensive history over his

20  30-plus-year career.

21  Q        Since Mr. Senzaki's no longer been with the company,

22  has the company alienated or sold any of its inventory out of

23  the ordinary course of business?

24  A        We have not.

25  Q        Okay.  What are barrel sales?

```
 1   A          Barrel sales are a part of a business life cycle if
 2   you're in spirits.  So for an aged whiskey company, you're
 3   trying to do a forecast of what consumers will ultimately
 4   consume four, five, six years out.  And a lot of businesses
 5   always project a upward hockey stick.  So when sales aren't as
 6   strong, they get balanced out sometimes with barrel sales.
 7   And so many companies do it.  Diageo does it.  It's on their
 8   10Ks and 10Qs.  Buffalo Trace does it, which is a Sazerac
 9   company.  Other companies do it as a part of the ordinary
10   course of business activity.
11   Q          Okay.  What loan payments did Uncle Nearest make in
12   2024?
13   A          In 2024 -- I don't have the record of all of the
14   payments.  Since that time -- it was approximately
15   9 million-plus dollars back through 2024.
16   Q          Okay.  Have they made a loan payment today --
17   through today?  Through 2025, excuse me.
18   A          Through 2025, yes, approximately seven and a half
19   million dollars, or exactly seven and a half million dollars.
20   Q          Do you have an opinion on what would happen to the
21   Uncle Nearest brand if a receiver is appointed?
22   A          It would be catastrophic.
23   Q          Why do you hold that opinion?
24   A          The -- the essence of the company, what causes the
25   bottles to be sold, is, we spend very little money on sales
```

1    and marketing, but the driver of the brand are people.  And so

2    the key person is -- is Fawn Weaver, who's our cofounder, my

3    wife, and our CEO.

4    Q        All right.  And if she's no longer involved as CEO,

5    do you believe that will injure the company?

6    A        A hundred percent.

7             MR. KING:  Your Honor, with that, we'll -- we'll

8    reserve redirect.

9             Thank you, Mr. Weaver.

10            THE WITNESS:  Thank you.

11            THE COURT:  All right.

12            Any questions?

13            MS. SIEG:  Yes, Your Honor.

14                     CROSS-EXAMINATION

15   BY MS. SIEG:

16   Q        Good afternoon, Mr. Weaver.

17   A        Good afternoon.

18   Q        My name is Beth Sieg.  I'm representing Farm Credit

19   at the hearing.  We haven't met before today, have we?

20   A        I don't believe so.

21   Q        Okay.  And you're -- we've spoken a lot about Fawn.

22   Fawn is your wife, correct?

23   A        She is.

24   Q        And where is she today?

25   A        She is -- I'm not sure exactly.  I think she's in

1    Pensacola selling whiskey.

2    Q        Would it be important to know where a CEO is on the

3    day a receiver is sought to be import- -- appointed?

4    A        I don't know.  We seem pretty close to one another.

5    Q        And you and Fawn are both on the board of directors,

6    correct?

7    A        That's correct.

8    Q        And you were just talking -- explaining to the Court

9    about an investigation that was being conducted by Kroll and

10   the results would be presented to the board.  Do you recall

11   that testimony?

12   A        I do.

13   Q        And you and Fawn sit on the board, right?

14   A        Correct.

15   Q        Who is investigating your conduct and Fawn's conduct

16   in connection with the incorrect borrowing base certificates

17   and the other defaults?

18   A        It's -- it's Kroll, and it's through -- it's got

19   oversight by Duane Morris.  And the attorney leading that is

20   Lee Skipper.

21            The report from Kroll is not going to me or Fawn.

22   We are, ourselves, as well as the other board member -- one of

23   the board members, subject to the investigation.  The board's

24   find- -- the report's findings will go to an independent board

25   member --

```
 1   Q          And who is that?

 2   A          -- which is Mark McCallum, the former president of

 3   Jack Daniels.

 4   Q          And he's currently a board member?

 5   A          He currently is a board member.

 6   Q          So committee of one?

 7   A          Committee of one.  There are four board members

 8   today, three of whom are part of the board -- of the

 9   investigation.  So it would go to this committee of one.

10   Q          Do you have any knowledge about whether Mr. Senzaki

11   is or has been under criminal investigation by any entity?

12   A          I have no awareness of that.

13   Q          Are you under any criminal investigation, to your

14   knowledge?

15   A          Not to my knowledge.

16   Q          And how about Ms. Weaver?

17   A          Not to my knowledge.

18   Q          Did you hear your counsel ask the bank's witness

19   about whether it had undertaken a third-party brand study

20   about the impact of the current financial distress?

21   A          I did.

22   Q          And has the company undertaken a third-party brand

23   study of its own?

24   A          We have not.

25   Q          Okay.  And you understand that the Uncle Nearest
```

```
 1    entities took out all these loans from Farm Credit and as of

 2    today there's nearly $110 million due and owing, all of it,

 3    today, correct?

 4    A         I do.

 5    Q         The Uncle Nearest entities haven't made all of the

 6    required payments on those leans, have they?

 7    A         That's correct.

 8    Q         And that means they're in default on all of the

 9    loans, correct?

10    A         I don't know about def- -- can you rephrase?  I just

11    want to make sure I understand correctly.

12    Q         You don't understand what a default is under the

13    loan documents?

14    A         No, I understand a default.  I was trying to

15    understand the question as you framed it.  It was unclear.

16    Q         Is Uncle Nearest, Inc., in default under its loan

17    agreements with Farm Credit?

18    A         Yes.

19    Q         Is Nearest Green Distillery, Inc., in default under

20    its loan agreements with Farm Credit?

21    A         Yes.

22    Q         And is Uncle Nearest Real Estate Holdings, LLC, also

23    in default under its loan agreements with Farm Credit?

24    A         Yes.

25    Q         Okay.  That's not good for the brand, is it?
```

1  A          It is not.

2  Q          And the maturity date for the revolving loan, the

3  65 million and change that we've heard talk about today, that

4  matured at the end of July of this year, did it not?

5  A          As far as I recall, yes.

6  Q          This isn't a billion-dollar company, is it?

7  A          It depends on how you derive value.  Value for

8  companies of this kind have shifted over time.  And so there's

9  been a great deal of analysis, by those who have expertise in

10  the area, around how companies are value -- valued.  So for

11  this sector sometimes you'll have EBITDA multiples, but in

12  this case it could be top line revenue.  It really just

13  varies.  And it shifts depending on the market.

14  Q          Mm-hmm.  And typically a billion-dollar company

15  could pay its debts when they come due, generally speaking,

16  don't you agree?

17  A          Depends on what -- how you derive value.  And -- and

18  the value is really informed by cash flow, in some ways.

19  Q          Are you aware of any billion-dollar companies that

20  take out loans on future revenue?

21  A          I am not aware.

22  Q          It's kind of like taking out a payday loan, in -- in

23  layman-speak, right?

24  A          I don't know.  That's your analogy, not mine.

25  Q          Well, you're taking out a loan based on what you

1    expect to receive in the future, correct?

2    A          Mm-hmm.

3    Q          And would you expect a billion-dollar company to

4    need to do that?

5    A          I'm not sure I have expectations around that.

6    Q          So you're not generally familiar with how

7    billion-dollar companies are valued or what their typical

8    financial hygiene and practices are, do you?

9    A          Generally how they're valued, it's varied, just

10   because I understand this sector and entertainment and the

11   hospital sector, industries in which I've had expertise.

12              In terms of the practices, I am.  I was a

13   16(b)-level executive for a Fortune 100 company.  So in that

14   respect, yes.

15   Q          Have you ever conducted a valuation of any asset or

16   company?

17   A          Of any asset, yes.  And so that was done in the

18   context of Uncle Nearest --

19   Q          Okay.

20   A          -- in earlier stages, a 409A valuation, and also in

21   a prior context which was in the fitness sector.

22   Q          Understood.  And you told the Court that you think

23   this company has grown faster than any company ever in the

24   United States.  Was that your testimony?

25   A          That was not my testimony at all.

1   Q        Tell me again.  What did -- what was it you said?

2   You said something about, "This is the fastest growing company

3   ever."  What was that?  What did you say?

4   A        I said -- I didn't say the fastest company ever.

5   That would be Nvidia or Ap- -- something else.  I said for the

6   time since we started, for spirits, we're the fastest growing

7   whiskey or bourbon company in American history to this point,

8   important qualifiers.

9   Q        And the company doesn't have complete financial

10  statements, does it?

11  A        I'm not aware of that, that's true.

12  Q        Is there a completed audited financial statement for

13  year ended December 31, 2024?

14  A        Not yet.  It's imminent.  We're a few weeks away

15  from our audit completion.

16  Q        Who is the company's current auditor?

17  A        I don't recall the name of the auditor firm -- audit

18  firm.

19  Q        Does the company have a current auditor engaged in

20  active -- in reviewing these financial statements that you say

21  exist?

22  A        Yes.  That's how we're nearing completion, they're

23  already engaged.

24  Q        Okay.  And you don't know who that is?

25  A        Not me personally.  It's not part of my duties.

1  Q        How much cash is in the bank today?

2  A        I don't know how much cash is in the bank as I sit

3  here today.

4  Q        You don't have any kind of ballpark?  Is it -- is it

5  2 million?  1 million?  Ten dollars?  No idea?

6  A        I -- it's not a part of my daily duties.  So I don't

7  know how much as we sit here today.

8  Q        Okay.  How many employees are on the payroll?

9  A        It's approximately 100.  We -- I don't know exactly,

10 because we've gone through significant cost-cutting measures,

11 including initiatives through third-party firms and also some

12 head count reduction.  So there've been a host of efforts,

13 including those that happened at the distillery itself.  And

14 then the sales force, there have been a number of reductions.

15 So I don't know fully.  I do know that for some of those cuts,

16 which are substantial, people -- in some cases they're working

17 through their severance as part of their exit agreements, and

18 others have already been realized.  So it's a moving declining

19 target.

20 Q        When did the company initiate a severance benefits

21 program?

22 A        The company initiated upon the retention of our

23 payroll company, which serves as our PEO.  So the PEO, Genesis

24 Global, steps in the shoes as the employer.  And so upon

25 retaining Genesis as the PEO provider, then that severance

```
 1    benefit program is a part of essentially their package.  So
 2    Genesis and Glob- -- Global is the employer of record.
 3    Q          And so you're telling the Court as you sit here
 4    today, as a result of this financial distress the company has
 5    terminated or laid off certain of its employees that were
 6    previously on the payroll.  Is that correct?
 7    A          Correct.
 8    Q          Okay.  And when, approximately, did those layoffs
 9    and terminations begin?
10    A          We've been starting cuts for about eight or nine
11    months already.  Could be longer than that.  The industry, the
12    sector overall, had seen some challenge and some decline, and
13    our piece within it as well, and so we wanted to make sure
14    that we made smart changes for the company, which included
15    some overall expense reductions but also some employee
16    reductions as well.
17    Q          Fair to say those haven't solved the problem,
18    though, right?  Company's still in default.  Payments aren't
19    being made.  Right?
20    A          I would say something different, which is, we have
21    responded to those challenges with smart cuts.  We also have a
22    host of, prayerfully, nonrecurring expenses that the company's
23    had, including Kroll and Lee Skipper and audit firms -- well,
24    not so much the audit firms, but just specialized services
25    related to the challenge, including financial advisory firms,
```

1  that have just continued on throughout the process.

2          The company actually has seen growth, as I mentioned

3  for last year.  And over the last week year-to-date we're up

4  38 percent in Ohio, we're up 44 percent year-over-year in

5  DC/Maryland/Virginia, we're 33 percent up in Texas.  In fact,

6  for the month ending July we're 50 percent year-over-year

7  growth.  So the combination of having careful, guided

8  leadership that my cofounder and wife Fawn Weaver has led and

9  working very closely with the distributors and with the

10  salespeople and doing ride-alongs with distributors throughout

11  the country has resulted in tremendous outcome and growth for

12  the company.  And like I said, once we're beyond hopefully not

13  recurring expenses, the company will be, you know, very, very

14  solid and see growth again this year.

15  Q       And yet you don't have a single piece of paper that

16  you can show to this Court to substantiate all of that massive

17  growth that you're talking about.

18  A       We do.

19  Q       With all of that going on -- well, where is it?  You

20  didn't bring it here today.  You didn't do --

21  A       So --

22  Q       -- a declaration, did you?

23  A       So where it would be would be -- I love your

24  hostility.  It's 30-watt.  But --

25          THE COURT:  Now, hold on.  Hold on, hold on.

1          THE WITNESS:  Sorry, sir.

2          THE COURT:  Bring the temperature down.  You're past

3     90 minutes.

4          MS. SIEG:  Oh.  Thank you.  Someone was supposed to

5     cough twice when we got there.

6          THE COURT:  So -- so let's -- let's kind of get to

7     what you want to show.  We're here for a very limited purpose.

8          MS. SIEG:  Thank you.

9          THE COURT:  We're not trying a case.

10          MS. SIEG:  Thank you, Judge.

11          THE COURT:  You wanted an emergency hearing.  I'm

12     giving you one.  Let's get to the point.  I understand what you

13     want.  And I understand what you want.  I understand more about

14     this than you-all realize, although I don't know everything.  I

15     want you to cover what you really need to cover.  This isn't a

16     discovery depo.

17          MS. SIEG:  Thank you, Judge.  I will -- I will get to

18     it and wrap this up.

19     BY MS. SIEG:

20     Q          When the company does prepare the financial records

21     that you were mentioning it -- it's been preparing over the

22     last months, are you involved in that directly?

23     A          I am involved to a certain extent.  It's -- it's,

24     you know, somewhat limited.

25     Q          Okay.  And what's your role generally?  What do you

1   do to help prepare those financial statements?

2   A        I don't do anything in preparing the financial

3   statements, but what I do is work with the team around supply

4   chain management, what are the needs that we'll need for

5   production, barrels, bottles, whatever, and what's happening

6   on the sales front.  So the retail space that we operate has

7   t-shirts, hats, and all that sort of stuff.  So we have to

8   time, for limited source reasons, when an expenditure would be

9   made.

10  Q        And we -- I think you heard earlier testimony about

11  part of the business of the Uncle Nearest entities is to go

12  and purchase barrels from third parties.  Did you hear that

13  testimony?

14  A        I did hear that testimony.

15  Q        Is that part of what the company does?

16  A        It is not any longer.

17  Q        Okay.  I will come -- circle back to that in just a

18  second.  When it did, when it was in the business of

19  purchasing barrels from third parties, you were involved in

20  the negotiations of those purchases, correct?

21  A        To a certain extent.

22  Q        To what extent would you say?

23  A        It was -- as the company had a forecast of what its

24  anticipated needs would be for production, for finished case

25  goods, as -- as my counsel sort of walked me -- or had me walk

1  through, then you have to understand how many barrels of

2  whiskey you need.

3          For our business, which we're a little bit older

4  than eight years now, and there's not time travel yet, you

5  have to have barrels of whiskey that are aged long enough for

6  them to be useful for the product.  So early into our tenure

7  we were purchasing those third-party barrels from vendors.

8  Also early into our company's history we retained a really

9  great production partner, Tennessee Distilling Group, and

10  starting producing our own whiskey through Tennessee

11  Distilling Group, which we don't consider a third-party

12  purchase.  They're essentially hand-in-glove with us, they're

13  a partner.

14  Q        Okay.  But TDG is not affiliated with Uncle Nearest,

15  correct?

16  A        They are not --

17  Q        Okay.

18  A        -- although we have our own alternative --

19  alternating proprietorship that sits at Tennessee Distilling

20  Group, which is our own DSP that's housed within their

21  location.

22  Q        I don't think I understand what you said just.  Can

23  you explain what you mean by you have your own entity that's

24  housed within TDG?

25  A        Sure.  So for whiskey and bourbon consumers, more

1   than any other space within spirits, consumers care about

2   where the product is made, where it's sold, where the

3   distillery is.

4            And as of now, since our distillery is not

5   operational, people want to know where it's made.  And so

6   there's two benefits to it, having, through federal law,

7   prescribed a alternating proprietorship company——it's actually

8   state——sitting at Tennessee Distilling Group, we have offices

9   there, we're very involved in the process of it, so it gives

10  authenticity for the consumers.

11           But the other piece of it is actually more

12  practical.  There's a federal excise tax benefit for the first

13  100 proof gallons of whiskey made if you make it under your

14  own DSP, which is through this alternat- -- alternating

15  proprietorship relationship.

16  Q       Okay.  So you're -- you've said in your testimony

17  just now, to sum up, the company used to be but is no longer

18  in the business of buying barrels from third parties and its

19  distillery that it owns isn't operational, correct?

20  A       That's correct.  The only exception would be, is,

21  there are occasions where you have a certain LTO, limited time

22  offer, where there's a barrel finish.  And so we might buy a

23  cask, a cognac cask, or French oak, and have a secondary aging

24  in there, but that's -- that's pretty limited.  And --

25  Q       So --

84

```
1    A          -- and, yes --

2              THE COURT:  Thank you, Ms. Sieg.  Thank you.

3              MS. SIEG:  Thank you.

4              THE COURT:  Do you have any more?

5              MR. KING:  No, Your Honor, I don't.

6              THE COURT:  All right.  Thank you, sir.

7              THE WITNESS:  Oh, thank you, Your Honor.

8              (Witness excused.)

9              THE COURT:  I gave you 90 minutes.  I told you on the

10   front end what your time limit was.

11             MS. LIGGINS:  You did, Your Honor.

12             THE COURT:  Now let's sum it up.

13             MS. LIGGINS:  Okay.

14             THE COURT:  Do you have more proof?

15             MR. KING:  Your Honor, I was standing up to say we're

16   done with our proof.  We made our points on the front end,

17   Your Honor, to walk through the factors.  I'm fine wrapping up

18   the hearing, because you were very clear.  I think the parties

19   have made their points.  We've submitted our submissions.

20             THE COURT:  Go ahead and sum up, hit what you want --

21   trust me, I know more about this than you think I do.

22             MS. LIGGINS:  I understand that, and I appreciate

23   that.

24             THE COURT:  We've spent a lot of time talking about

25   stuff I already know.
```

1          MS. LIGGINS:  Okay.

2          THE COURT:  I gave you 90 minutes for your emergency

3    hearing.  You spent most of it talking about stuff that doesn't

4    matter.

5          MS. LIGGINS:  Thank you, Your Honor.

6          So I just want to talk about the factors in

7    conclusion.  You know, the case law is very clear about what

8    it takes to have a receiver and that a receiver is an

9    extraordinary remedy.  I think the facts are undisputed that

10   Uncle Nearest is in default.  I think the facts are undis- --

11   under the loan documents the facts are undisputed that it is

12   in dispute -- it is in default under the forbearance

13   agreement.  I think the facts are also undisputed that they're

14   in a questionable financial position.  They're not able to pay

15   our debts, pay off default judgments.  They have a rogue CFO.

16   They're unable to produce financial statements.  They don't

17   have great hygiene.  The COO doesn't even know how much money

18   is in the bank, at a receivership hearing.  All right?

19   That -- I think that's what -- that goes without saying.

20         I think the facts have also demonstrated that less

21   intrusive remedies have been tried.  There's been a CRO,

22   there's been a financial advisor, there has been multiple

23   counsels, there's been multiple negotiations, all of that.

24   What is also fair is that if there are other remedies that's

25   not a receiver, that's foreclosure.  Foreclosure is in this

```
 1   case a little bit different than other cases where the
 2   receiver is the option that will preserve more value for the
 3   company, more value for FCMA.  If the receivership is denied
 4   and FCMA starts foreclosing, you're talking about liquidating
 5   assets.  Right now what we're asking is to get in there, see
 6   what's going on, and see if there's more value to be
 7   preserved.  Both people testified that they think there's
 8   value there.  What we need is an adult in the room to figure
 9   out if that's true.  And that's what we're asking for with the
10   receiver.
11            THE COURT:  Let me ask you this.  In your filings --
12   and I've got them here, but I've not got -- I'm not going
13   through them -- do you -- do you list exactly what you want a
14   receiver to do?
15            MS. LIGGINS:  Yes, Your Honor.  We have a proposed
16   order that we filed with it.
17            THE COURT:  I saw that.
18            MS. LIGGINS:  Yes, and it has -- it outlines it.
19            THE COURT:  Okay.  Do you agree that I can
20   basically -- if I -- if I do chose to put a receiver in place,
21   the Court can however -- fashion it how -- in whatever way.
22            MS. LIGGINS:  Yes, Your Honor, we believe that you
23   have the discretion.
24            THE COURT:  You agree to that.
25            MS. LIGGINS:  Yes, Your Honor.  We believe you have
```

1  whatever discretion.  We believe that you can take everything

2  we ask, you could pick and choose what you would like, you can

3  give us everything we ask with somebody else.  We believe that

4  you can fashion the remedy in any way that you feel fit.

5          Your Honor, I think it's also undisputed that the

6  property would be well-served with someone else managing.  I

7  don't think that there's any dispute about the fact that there

8  is -- there is difficulty managing this.  We need someone who

9  can take control of the operations.  We need someone who can

10  exercise financial hygiene.  We need someone who can pursue

11  claims against a rogue CRO.  We haven't heard any testimony --

12  we need someone who can wrap up that Kroll investigation.  We

13  need safeguards and protection of collateral.  I think -- and

14  then finally, Your Honor, the case law is equally clear that

15  aside from all those factors, one of the most important

16  factors that weighs in favor of a receivement -- receiver is

17  agreement.  We have that, too.

18          Let me also say this.  You know, Mr. King -- you

19  asked Mr. King about Chapter 11.  You asked him have they

20  considered --

21          THE COURT:  Say that again.

22          MS. LIGGINS:  You asked Mr. King about Chapter 11.

23  You asked him why they hadn't considered it.  Mr. King also

24  said that they were very conscientious about FCMA.  But yet his

25  response was about equity holders.  And we all know that in the

1  law and when it comes to distributions, that creditors come

2  before equity, that when you're concerned about your ability to

3  reorganize you pay the people that you had loan -- that you got

4  the money from first.  You get money from people, you pay them

5  first.  Equity is not the priority, creditors are.  That's who

6  your duty is, and you have a fiduciary duty with that.

7         There was also testimony about the Weavers starting

8  the brand and what would the brand be like without them.  A

9  receiver can be in place, and the CEO can still market, sell,

10  do, you know -- and promote this brand.  That doesn't mean

11  that she has to be the day-to-day operator.  Those are two

12  different things.  They are not mutually exclusive.

13         Finally, Your Honor, I will say this.  There's been

14  all this talk about growth.  What we didn't hear is that that

15  growth is revenue and that that revenue makes it to the

16  lender.  And that's what matters.  And we need to have someone

17  who can figure out how to take the massive growth that they

18  say this company has and turn it into cash that can be used to

19  pay creditors, including FCMA.

20         Lastly I'll say this.  I know you're not going to

21  rule today, Your Honor, and we appreciate that.  We would ask,

22  Your Honor, though, while you are taking the time to rule,

23  that there is an order that preserves this collateral, that

24  instructs this borrower not to do anything to dissipate or

25  devalue the collateral.

1        We would also ask, Your Honor, while everyone is

2  talking about the brand and how much the brand matters, that

3  we have -- and I think this was offered by Mr. King, that we

4  have a ceasing of discussions of our negotiations.  We've had

5  the CEO publicly disclose settlement negotiations and terms.

6  We've had her do that on social media.  We've had her talk

7  about things in the me- -- in the press.  And we need to make

8  sure that while we're waiting for your ruling, that there's

9  also a prohibition on that as well.  Thank you, Your Honor.

10        THE COURT:  Thank you.

11        Mr. King?

12        Let me ask you something, Mr. King.  And I don't

13  want you to read too much into this question.

14        MR. KING:  Sure, Your Honor.

15        THE COURT:  But I do want to ask you something,

16  because I haven't made a decision yet.  But if the Court were

17  to appoint a receiver, do you oppose this specific proposed

18  receiver?

19        MR. KING:  Your Honor, we think bringing a receiver

20  from Texas is a problem.  That's never worked in this business.

21  There's Phillip Young, who's with the Thompson Burton firm and

22  is located in Colombia, Tennessee, next to the plant.  We --

23  he's been a receiver.  He's working with Chapter 7 trustees.

24  I'm happy to submit him.  But I think he would be a better

25  alternative than someone that's not familiar with this industry

1   or familiar with the operations here in Tennessee.

2         Your Honor, I'm going to be even more succinct,

3   because I think my opening outlined our respective positions

4   on these issues.  I think the biggest thing that we're talking

5   about today, Your Honor, is whether a receiver does more harm

6   than it does good.  I understand that the Court can fashion

7   any remedy.  I agree with opposing counsel on this.  You can

8   fashion the remedy in this respective matter.  The offer here,

9   and looking at those respectable equitable factors, whether

10   the legal remedies are unavailable, they are available here in

11   this case, Your Honor.  There is Count 1.  There was a lawsuit

12   filed.  Whether there are less drastic measures, there are,

13   Your Honor.  There are injunctions that you can enter

14   compelling certain arguments or certain production of

15   information.  And there's a carrot and a stick aspect to that,

16   Your Honor.  If there's an injunction that says you're going

17   to do this, and then if there -- if you don't do it, there's a

18   stick that hits you and say, "I'm going to appoint a

19   receiver."  That hasn't been support yet, Your Honor.

20         Also, there's just that opportunity of creating a

21   window.  And I know, Your Honor, by saying today that you're

22   not ruling from the bench, you're automatically doing that,

23   you're creating a winnow for the parties to respectively talk,

24   I think we just need to be conscious of that.

25         Your Honor, the last thing I'll say is, in that

```
1   window of time we are agreeable to -- if the parties are
2   ordered.  We'd like to have an order compelling us to go to
3   mediation, to sit down in front of each other and talk.
4   There's been a lot of game of telephone.  Me and my opposing
5   counsel, we've spent more time on the phone than my -- me and
6   my wife, and she's got --
7           THE COURT:  Surely with a hundred million dollars out
8   there you don't need me to order you -- to tell you to get
9   together and talk.
10          MR. KING:  Your Honor, I --
11          THE COURT:  I mean, I would think you'd be doing that
12  on your own.
13          MR. KING:  Your Honor, I think the decision-makers
14  need to be compelled to be in a room, because the game of
15  telephone is tough, and I think a lot of times it makes it
16  easier to walk away.  You put -- you put people in chairs by
17  court order, it makes it more difficult to walk away.  But,
18  Your Honor, that's -- that's my perspective.  If you share that
19  perspective, I understand; if you don't, I understand.
20          Your Honor, when we ultimately look at this, we're
21  going at that last one, which is, is it going to do more harm
22  than good.  I think there is going to be brand damage.  The
23  owner of the company, one of the founders, thinks it's going
24  to do brand damage, and you have no countervailing proof.
25  Here, respectively, Your Honor, we don't think this all favors
```

```
1   a receiver.  We think there are other remedies the Court can
2   assail itself to to avoid it, to preserve the collateral.
3   We've already said we're going to do that, Your Honor.  So if
4   you order us to, we're going to do what we say and do -- and
5   say what we did.
6              THE COURT:  I -- I do, I understand that.  I'm also
7   aware of the brand damage issue.
8              MR. KING:  Yeah.
9              THE COURT:  I mean, it's just -- it's out there.
10             MR. KING:  Right.
11             THE COURT:  You know, I -- you have to be concerned
12  that there's already some damage done.
13             MR. KING:  I do.  And Your Honor --
14             THE COURT:  I do my best not to read the newspaper at
15  all, but I imagine this has been in this newspaper.
16             MR. KING:  It may, Your Honor.  But -- and the last
17  thing I'll say on Chapter 11, because I don't want my words
18  twisted, and I believe they were.  It's not that we're not --
19  unconcerned about our creditors, Your Honor, but a Chapter 11
20  does the effective same thing as a receivership does to a
21  certain extent as well.  So it puts the company in a position
22  of insolvency and trying to work around.  It's in the press.
23  We're trying to --
24             THE COURT:  I tell you one thing it does is, it gets
25  it out of my court and into bankruptcy.
```

1          (Laughter.)

2          MR. KING:  Well, Your Honor -- you know, Your Honor,

3    every -- I think every judge loves the suggestion --

4          THE COURT:  Kick it over there across the street.

5          (Laughter.)

6          MR. KING:  Every judge loves the suggestion of

7    bankruptcy, because it's just a closed file and a good file is

8    a closed file.  And so I understand that, Your Honor, but I

9    don't want my words to be twisted, and I don't want it -- I

10   don't want the individuals from Farm Credit to come out here

11   and believe that I don't understand the fiduciary duties that

12   are owed to creditors.  We do, Your Honor.  We're in a

13   situation where we're trying to appease all parties in this

14   respective transaction, including primarily Farm Credit as

15   well.

16         Your Honor, if you have any questions for me, I'm

17   happy to answer them, but I believe we've said our piece.

18   Yes, Your Honor.

19         THE COURT:  Got two questions.  Number 1, these three

20   Uncle Nearest entities that we've been discussing, are they

21   solvent?

22         MR. KING:  Your Honor, I believe there is a solvency

23   question as we sit here today.

24         THE COURT:  Is this company turning a profit at all?

25         MR. KING:  It has not -- I don't believe it -- I

```
 1    believe it has turned a profit, but it is -- we're in a cash
 2    flow issue.  We're in a cash flow issue.
 3            THE COURT:  The industry is kind of depressed right
 4    now anyway.
 5            MR. KING:  Well, the industry is kind of depressed,
 6    Your Honor.  That's one issue.  But Uncle Nearest has actually
 7    grown in that, as you heard.  I think the bigger issue here is,
 8    you know, we've unraveled the Senzaki issue.  When you think
 9    you've paid vendors and you haven't paid vendors, that creates
10    a problem, because the money that ultimately would have been
11    used to generate cash flow to pay the debt is now going in all
12    different directions to make sure you're not in default at all
13    -- on all of the obligations.  The problem is, you're trying to
14    keep all the balls up in the air.  And that's why I think the
15    parties, if we have a window, can hopefully come to --
16            THE COURT:  I think you're being about as candid as
17    you can be and still represent your client.  I understand what
18    you're saying, Mr. King.
19            MR. KING:  Thank you, Your Honor.
20            THE COURT:  All right.  Thank you.
21            MR. KING:  Thank you.
22            THE COURT:  All right.  Listen, thank both of you.
23    I appreciate all the hard work that's gone into this.  I may
24    have fussed at you a little bit, but I'm allowed to do that in
25    an emergency hearing.  All right?
```

1          I'm will be -- I'm going to move as quickly as I can

2  to get you a decision on all these.  I'm going to get you a

3  decision on the receiver issue as quickly as I can.  And I'm

4  taking to heart, also, the asset preservation order request

5  that you've made, also.

6          Is there anything else before I adjourn court?

7          MS. LIGGINS:  The only thing I would add, Your Honor,

8  is that also the prohibition of the talking in the media and

9  the press about the litigation and settlement negotiations.

10          THE COURT:  I mean, I will tell you, I'm not --

11  there's not been any briefing on that tissue.  And the First

12  Amendment is an issue that the Court's a little wary of.

13          MS. LIGGINS:  But --

14          THE COURT:  I certainly don't want to put down an

15  order where -- where I'm infringing on anyone's First Amendment

16  rights.  Are you asking me to gag somebody?

17          MS. LIGGINS:  Well, about the settlement discussions,

18  yes, Your Honor, yes.  When we have -- if you want -- if

19  parties are going to have settlement negotiations and be able

20  to reach an agreement --

21          THE COURT:  Well, I assume you-all are going to

22  continue to talk while I'm working on these issues.

23          MS. LIGGINS:  Yes.  We would like that.  But what we

24  would not -- like to stop happening is, after we talk we hear

25  about what we've discussed in the public.

1          THE COURT:  Okay.  So -- Mr. King?

2          MR. KING:  Your Honor, this kind of comes back to

3    effectively my requested order of three things, preserve the

4    collateral, order the parties to mediate, or an in-person

5    settlement discussion with all the decision-makers, and we will

6    keep confidential those things.  That's that trio together,

7    Your Honor.

8          THE COURT:  So -- so I'm going to go ahead and tell

9    you, I'm not going to order you-all to -- you-all are big

10   people.  I'm not going to order you-all to mediate.  It's a lot

11   of money out here, a lot going on.  You should have plenty of

12   incentive to continue to be talking.  No one ever wins when

13   anything comes into court, except the lawyers, I guess they do

14   okay.  But I'm not going to order you to do that.

15         I am very seriously considering putting down an

16   order that preserves these assets pending a decision on this

17   receivership.

18         Now, on this media issue, if -- if -- do I really

19   need to put down an order telling you-all to keep your mouth

20   shut about what's said?

21         MS. LIGGINS:  Yes, Your Honor, I believe you do.

22         THE COURT:  I mean, if you're talking about worrying

23   about damaging your brand, I can't imagine a quicker way to do

24   it.

25         MS. LIGGINS:  I -- yes, I think that that would be

appropriate, Your Honor. And we do not have an opposition from
Uncle Nearest with respect to that order, but I do think that
they need a -- we need an order that prohibits parties from
speaking, yes.

THE COURT: Okay. So I tell you what I am going
to -- what I am going to go ahead and order you-all to do right
now is to -- counsel, to meet and confer about the status of
this issue, discuss it, and submit a proposed order on that
issue.

MS. LIGGINS: The good news is, Mr. King and I have
already worked out language on that.

MR. KING: We've worked out language.

THE COURT: Okay. Good. So it shouldn't be too hard
to get it done.

MS. LIGGINS: No, it will not, Your Honor.

THE COURT: And so if you get it to me by close of
business tomorrow.

MS. LIGGINS: Yes, Your Honor.

MR. KING: Yes, Your Honor.

THE COURT: That sound fair?

MS. SIEG: Yes, Your Honor.

MR. KING: Yes, Your Honor.

THE COURT: Okay. Great. All right. Any other
issues?

MS. LIGGINS: No, Your Honor. I just -- I just want

1   to say thank you for the emergency hearing and indulging us as

2   we went past your time.  Thank you very much.

3          THE COURT:  No, I'm glad to do it.  Now, I'm going to

4   be in trouble with my wife, but --

5          MS. LIGGINS:  Please apologize.

6          THE COURT:  -- I pretty well much stay in trouble

7   with her, anyway.

8          (Laughter.)

9          MR. KING:  All right.  Thank you.

10          THE COURT:  All right.  So let's recess.

11          MR. KING:  Thank you, Your Honor.

12                    END OF PROCEEDINGS

13

14

15          I, Elizabeth B. Coffey, do hereby certify that I

16   reported by mechanical stenography the proceedings held on this

17   date in the above-styled cause, and that this transcript,

18   produced by computer, is an accurate record of said

19   proceedings.

20

                                    *Elizabeth B. Coffey*
21                    _____

22                    Elizabeth B. Coffey,
                      Official Court Reporter
                      United States District Court
23

24

25