UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) |
| Plaintiff, | ) Case No. 4:25-cv-38 |
| v. | ) Judge Atchley |
| UNCLE NEAREST, INC., *et al.*, | ) Magistrate Judge Steger |
| Defendants. | ) |

# RECEIVER'S FIRST QUARTERLY REPORT

Comes now Phillip G. Young, Jr. (the "Receiver"), the court-appointed receiver in this matter, by and through counsel, and offers this quarterly report pursuant to the Court's Order Appointing Receiver (the "Receivership Order") entered on August 22, 2025.

## *INTRODUCTION*

1. This receivership presents some unique challenges given the size and complexity of the operations of Uncle Nearest, Inc. and its affiliates (collectively, the "Company"), the debt structure of the Company, and the high visibility of this matter. However, the Receiver is very encouraged about the long-term viability of the Company based upon what he has learned in the first five weeks of his service in this matter. The Receiver believes that the Company has significant value and can be reorganized, as a going concern, on a relatively quick timeline. The Receiver does not believe that a fire sale liquidation of the Company (be that as part of this Receivership or as part of a bankruptcy proceeding) is necessary or in the best interest of this Company. While some non-income producing assets may be sold as part of this receivership, the Receiver believes that the core of the Company's business can continue with a refinanced debt structure or, alternatively, can be sold as a going concern.

2. Further, the transition to this receivership has been as smooth as one could possibly hope. The founder, management, and employees of the Company have been very cooperative with the Receiver and has granted the Receiver full access to the Company and its records. Due to this cooperation, the Receiver and his team of professionals quickly integrated into the financial and operational control of the Company, and have continued working cooperatively in that regard with the Company's founder and management team. The Receiver has also found the Company's primary secured lender, Farm Credit Mid-America, PCA ("Farm Credit"), to be very cooperative with his efforts. The Receiver has been in frequent contact with counsel for Farm Credit, and the Receiver's financial advisors have been providing bi-weekly, in-depth financial reporting to Farm Credit's financial analysts. In summary, the opportunity for a positive conclusion to this matter is good due to the cooperation of all constituents, and because of the Company's opportunity for future growth.

3. Unless the Court requests a different structure, the Receiver anticipates filing quarterly reports that contain the following sections: Tasks Accomplished; Challenges; Tasks in Progress; Financial Report; and Conclusions, Recommendations and Requests.

## *TASKS ACCOMPLISHED BY THE RECEIVER*

4. The Receiver has been serving in this case for just over five (5) weeks. Here are the major tasks accomplished by the Receiver and his team during that time.

5. The Receiver filed certified copies of this Court's Receivership Order in the United States District Court for the Middle District of Tennessee, and in the United States District Court for the District of Massachusetts. The Company owns assets in both of these districts, thus necessitating these filings. The Receiver has retained counsel in France who is working to translate the Court's Receivership Order into French and file it with a court of competent jurisdiction in the

Cognac region of France.

6. The Receiver gained full access to the physical facilities of the Company and to all software, computer platforms, and records of the Company immediately after his appointment.

7. The Receiver immediately secured multiple bank accounts in the Company's corporate names at three banks, and moved those funds to accounts over which only the Receiver has control. Bank accounts remain in a French bank, over which the Receiver will not have exclusive control until the French courts recognize this Court's Receivership Order. Likewise, the Receiver does not have control over bank accounts in the names of certain entities that are detailed in the Receiver's Motion for Clarification filed with this Court on September 12, 2025.

8. The Receiver interviewed and retained a group of professionals, all of which are detailed in the Receiver's Notice of Receiver's Professionals filed with this Court on September 12, 2025.

9. With the assistance of counsel, the Receiver filed the required regulatory documents with state and federal agencies to notify them of a change of control of the Company. These filings were critical and time-sensitive due to government regulations in the spirits industry.

10. The Receiver met with a large group of Company employees to explain the nature of his role and how that impacts the operations of the Company.

11. Critically, with the assistance of his financial advisors, the Receiver developed a thirteen-week budget for the operations of the Company, and presented that budget to Farm Credit for approval. The budget included line items totaling approximately $1 million in immediate cash needs in order to pay delinquent, necessary operating expenses so that the Company could continue its operations somewhat uninterrupted. It also included line items totaling approximately $1.5 million for the estimated professional fees associated with this receivership through that 13-week

budget period. But for these $2.5 million in extraordinary expenses, the budget presented to Farm Credit was a balanced budget, demonstrating that the Company's revenues could cover its operational expenses over the next thirteen weeks. The Receiver reached a forbearance agreement with Farm Credit whereby Farm Credit agreed to fund the $2.5 million deficiency in exchange for the Receiver's agreement to certain operational and financial benchmarks.

12. The Receiver met with Tennessee Distilling Group ("TDG"), an entity which distills, bottles and stores certain of the Company's products. During the meeting with TDG, the Receiver physically inspected the Company's barrels and finished cases of product. From TDG's records, the Receiver was also able to reconcile the Company's barrel count, which the Receiver understands was a key issue in this underlying litigation. The Receiver provided the reconciled barrel count information to Farm Credit.

13. The Receiver met with the Company's largest distributor, once in-person and several times by video conference. From those conversations, the Receiver was able to ascertain and address certain challenges that existed in the Company's relationships with some of its distributors. It is the Receiver's belief that, as a result of those conversations and implementation of certain action items, the Company's distribution network is strong.

14. The Receiver spent a considerable amount of time in video conferences with existing shareholders, answering questions, allaying concerns, and gathering information concerning the Company's prior operations. These conversations have proven very beneficial to the Receiver, and the Receiver believes that the conversations have been beneficial to shareholders as well.

15. The Receiver also spent a considerable amount of time communicating with creditors, by telephone, email and video conference. Paragraph 12 of this Court's Receivership

Order has proven invaluable to the Receiver's ability to carry out the duties assigned to him by the Receivership Order without the distraction of lawsuits and other collection efforts.

16. As indicated in the Receiver's Motion for Clarification, the Receiver investigated the Company's relationship with other entities and has reported those relationships to this Court. If the Court were to include any or all of those additional entities in this matter, the Receiver is prepared to exercise authority over those additional entities.

17. The Receiver obtained the most recent version of the Company's capitalization table from the Company's prior counsel. Based upon conversations with shareholders, the Receiver determined that the capitalization table is incomplete and inaccurate. He and his team have begun the task of reconciling the existing capitalization table with known or ascertainable shareholders.

18. The Receiver, with the assistance of his financial advisors, has begun evaluating the Company's financial statements and reports. The Receiver believes that certain of these financial statements are inaccurate or incomplete; he and his team are working with source data to update the Company's financial reporting.

19. The Receiver has begun an investigation into allegations made by the Company's founder regarding certain financial improprieties committed by a former employee. Based upon the records of the Company, discussions with employees, and his review of third party investigation reports, the Receiver believes that there is validity to some of the allegations. The Receiver will continue his investigation into these matters in future months in order to determine whether this receivership estate has any valid causes of action to pursue.

20. Relatedly, the Receiver has also begun to investigate whether any current employee or member of the management team has misappropriated funds. To date, the Receiver has found

5

Case 4:25-cv-00038-CEA-CHS   Document 46   Filed 10/01/25   Page 5 of 19   PageID #: 2551

no evidence of misappropriation, theft, or financial impropriety by the Company's founder, its management team, or any current employee. While there have been multiple transfers among related entities, the Receiver has found no evidence of defalcation to date.

21. The Receiver met with a number of potential investors, in person, by telephone, and by video conference. Based upon these conversations, the Receiver believes there is significant interest in the market for future investment in the Company, whether by debt refinancing, purchase of stock, or purchase of substantially all assets of the Company as a going concern. The Receiver intends to continue discussions with these parties, though he does not intend to accept offers until his financial advisors have produced independently verifiable financial statements, from which the Receiver can assess the value of the Company and its assets.

22. The Receiver, through counsel, identified all trademarks that belong to the Company, charted their expiration dates, and renewed any expiring trademarks.

23. The Receiver, through counsel, assessed the incorporation status of all entities related to the Company. For any companies whose incorporation status was inactive, the Receiver is taking all necessary steps to return the companies to good standing.

24. The Receiver, his financial advisors, and his operational advisors spent considerable time assessing the current operations of the Company. As a result of those assessments, the Receiver made significant cuts to the operational expenditures of the Company, including reducing its workforce by twelve employees, or 13%. The Receiver continues to evaluate the workforce and expenditures of the Company, in an effort to increase its operational efficiencies and become more profitable.

25. The Receiver also evaluated the Company's performance regarding sales. As mentioned above, the Receiver has made positive steps with regard to the Company's distributors.

The Receiver has been able to partially restore shipments from TDG, who had previously placed the Company on a credit hold in the wake of this matter, though discussions concerning the full release of product being held by TDG is ongoing. The Receiver anticipates new product releases over the next quarter, which should continue to improve sales of the Company's products.

26. The Receiver evaluated certain non-income producing properties owned by the Company. More specifically, the Receiver found that the Company owned non-income producing real estate in Cognac, France; Martha's Vineyard, Massachusetts; as well as multiple properties in Bedford County, Tennessee. The Receiver found that all of these properties were purchased for specific business purposes, and that they all had the possibility of producing revenue (directly or indirectly) in the future. However, given the current cash position of the Company, the Receiver is evaluating which of these properties should be liquidated by the Receiver in order to satisfy existing debt.

27. Among the assets that are not currently producing income are those assets associated with a potential cognac business, which the Company was working to establish. The Receiver traveled to Cognac, France to assess these assets and to determine their marketability. These assets include a chateau, vineyards, and intellectual property associated with a new cognac release. Based upon conversations with the Company's employees, the Receiver's operational consultant, and other resources he spoke with in Cognac, it is the Receiver's opinion that the Company would need to invest between $15 million - $25 million additional funds in order to introduce a cognac line to the market. The Company lacks the ability to make that investment at this time; therefore, the Receiver has determined that these assets should be liquidated. The Receiver has already received one offer for these assets and has received at least two additional inquiries. The Receiver anticipates filing a motion with this Court seeking to sell the assets once

he determines the highest and best binding offer.

28. The Receiver, with the assistance of his financial and operational advisors, assessed and implemented budget cuts. The Receiver made cuts to both administrative and sales budgets.

## *CHALLENGES TO RECEIVERSHIP*

29. While the Receiver is pleased with the progress of this receivership, and the overall opportunities for a successful reorganization, a number of challenges have arisen in the first five weeks that had to be overcome. As demonstrated below, some of these challenges will be ongoing challenges that the Receiver and his team must continue to navigate. The biggest challenges identified by the Receiver to date include the following.

30. Cash flow has been a major challenge to this receivership, especially during the first two weeks of the Receiver's service. Due to a variety of factors (for example, credit holds on product shipment, legal fees incurred by the Company, and the impact of this litigation on sales), revenue collections were down significantly when the Receiver assumed control of the Company. Combined with the fact that a number of critical vendors and other expenses were in significant arrears, it was difficult for the Receiver to continue normal operations during the first two weeks. Fortunately, cash flow concerns have eased considerably during the last two to three weeks. Product is being released to satisfy purchase orders, sales are increasing, expenses are decreasing, and the Receiver has worked with Farm Credit to inject necessary capital in the Company. The Receiver believes that the cash flow crisis has eased, though cash flow will continue to be closely monitored.

31. Another challenge to this receivership is the sheer volume of creditors and shareholders. The Receiver has been contacted by hundreds of constituents asking about the status of the Company and how this receivership impacts their interest in the Company. The Receiver

8

Case 4:25-cv-00038-CEA-CHS   Document 46   Filed 10/01/25   Page 8 of 19   PageID #: 2554

has done his best to correspond and/or speak to all concerned parties and to explain the receivership process. He believes that educating all constituents about this process will ease concerns and will, therefore, increase the viability of the Company's business moving forward. However, these discussions have taken an inordinate amount of the Receiver's time to date, and will likely continue to require considerable time and attention.

32. As discussed in more detail below, the absence of solid financial controls and the unreliability of certain financial records has been a challenge in determining historical sales and expenses that would aid with forecasting future sales and expenses. That challenge has been compounded by the fact that a substantial amount financial records before 2024 were erased from the Company's computer system. According to multiple employees at the Company, those records were erased by a former employee immediately after termination. The Receiver is working to recover some or all of those financial records.

33. The absence of the observance of corporate formalities among related entities has been another challenge for the Receiver and his staff. Many of the companies that are subject to this receivership action have comingled assets and liabilities to the point in which they are best viewed as a single enterprise. That has made determination of lien priority, and separation of liabilities among corporations, very difficult.

34. Finally, the unreliability of records relating to shareholders of the Company has been a challenge for the Receiver. While he is in possession of a capitalization table, the Receiver's research and conversations with various constituents leads him to believe that the capitalization table is inaccurate. The Receiver believes that the capitalization table fails to recognize a number of secondary market sales, including certain sales of shares that previously belonged to Fawn Weaver. The Receiver believes the Weaver shares were transferred by a former

9

employee of the Company, perhaps without authority to do so. While the capitalization table does not contain an accurate recitation of the current shareholders of the Company, at this point the Receiver does believe that all shares of the Company are represented on the capitalization table. In other words, the Receiver believes that the capitalization table correctly lists all shares, but incorrectly lists the names of all shareholders.

## *TASKS IN PROCESS*

35. The Receiver has identified a number of tasks that need to be undertaken and/or completed in the future. Some of these tasks are operational, some financial, and some legal. While some of these tasks will take hours to complete, others will take weeks. Nevertheless, here are the tasks that the Receiver believes lies ahead in this receivership.

36. As mentioned above, the capitalization table is inaccurate. The Receiver and his counsel have begun the process of reconciling the capitalization table. As the Receiver has conversations with shareholders, he has begun to ask them for proof of funding and copies of the documents they were given with their purchase of shares. In the near future, the Receiver anticipates that his counsel will attempt to contact all known shareholders (whether listed on the capitalization table or not) in order to gather necessary information to confirm capitalization table information.

37. The Receiver's financial analysts are working on gathering source data to recreate certain financial reports. The Receiver thinks it is critical for the Company to have financial statements that have been created under his independent direction, for which he can verify the accuracy.

38. Once the Receiver has compiled independent financial statements, he intends to reach out to potential investors and/or asset buyers who have shown interest in the Company. Until

the Receiver has financials upon which he can reasonably rely, he has no way to determine the accurate market value of the Company or any of its assets. The Receiver anticipates accepting offers for refinancing debt, purchasing shares of the Company, and/or purchasing substantially all assets of the Company upon the verification of the financial reports. Once the Receiver determines what he believes, in his business judgment, is in the best interest of the Company, he intends to file a motion with this Court recommending that course of action.

39. In the interim, the Receiver is investigating the sale of the non-income producing assets such as the cognac business assets, the vodka business assets, and the real estate that is not essential to the core business of the Company. As mentioned above, the Receiver has already begun receiving offers on the cognac business. He is in the process of obtaining valuations and appraisals on all other non-income producing assets.

40. The Receiver has also begun interviewing investment bankers to potentially assist with the sale of certain assets of the Company. He plans to begin the vetting process over the next month.

41. The Receiver and his legal staff are continuing to assess the incorporation status of the Company's affiliates, and taking steps to ensure that those companies are in good standing in their respective states.

42. The Receiver and his financial staff are also continuing to work on filing all delinquent tax returns, assessing whether taxes are due, and making any necessary payments to taxing authorities.

43. The Receiver's French counsel is in the process of translating this Court's Receivership Order and domesticating that order in the French courts. This is a necessary step in order for the Receiver to sell any of the Company's French assets, including the chateau and

surrounding vineyards that it owns in Cognac, France. Domestication of the Receivership Order is also necessary for the Receiver to exercise control over a bank account maintained by the Company at a French bank; this account is believed to contain a modest amount of funds.

44. The Receiver will continue assessing further budget cuts, and further actions that might be taken in order to increase sales and profitability of the Company. This includes working on cost-saving steps with vendors, and continuing to improve relationships with the Company's distributors.

45. Finally, the Receiver will continue to communicate candidly and transparently with all constituents of the Company, including vendors, creditors, employees, and shareholders. He believes that open and honest communications throughout this process will likely lead to more positive outcomes.

46. The Receiver believes that the goals and objectives of this receivership, as established by the Receivership Order and as explained in this report, can be achieved by the conclusion of the first quarter of 2026. While this schedule is somewhat aggressive, the positive outlook for this company's future makes this an achievable goal in the Receiver's opinion. He believes that it is in the best interest of the Company, its creditors, and its shareholders to not linger in receivership, due to the business interruption caused thereby.

*FINANCIAL REPORT*

47. In accordance with the Receivership Order, the following financial information is provided for the reporting period. Actual results are presented against the original operating budget to provide transparency into performance.

48. **Professional Fees Paid**

| Firm Name | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Thompson Burton PLLC | 164,690 | 240,000 | (75,310) |
| Newpoint Advisors Corporation | 155,795 | 180,000 | (24,205) |
| Thoroughbred Spirits Group, LLC | 84,885 | 168,000 | (83,115) |
| TOTAL | 405,370 | 588,000 | (182,630) |

49. **Collections Received**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Collections | 1,451,747 | 1,469,966 | (18,219) |
| Farm Credit Mid-America, PCA | 1,700,000 | 0 | 1,700,000 |
| TOTAL | 3,151,747 | 1,469,966 | 1,681,781 |

13

50. **Expenditures**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Disbursements | 2,081,796 | 2,618,546 | (536,750) |
| Professional Service Expenses | 405,370 | 588,000 | (182,630) |
| TOTAL | 2,487,166 | 3,206,546 | (719,380) |

51. The Company and its senior lender, Farm Credit, have access to the full details supporting the above figures.

**Banking & Disbursement Controls**

52. Immediately following his appointment, the Receiver took steps to secure all existing bank accounts associated with the Company. This included freezing accounts where appropriate and establishing new Receiver-controlled accounts to ensure that all future transactions are properly monitored and documented. By shifting all financial activity into Receiver-controlled accounts, the risk of unauthorized transfers or unapproved expenditures has been significantly reduced.

53. The Receiver has instituted a policy that all significant disbursements must receive explicit approval from the Receiver before release. This control mechanism ensures that cash outflows align with the cash flow budget and that only necessary and authorized expenses are incurred. To reinforce this control, weekly reconciliations are performed for all bank accounts. These reconciliations serve to verify accuracy, detect any discrepancies, and confirm that no unauthorized transactions have taken place.

**Cash Flow Budgeting & Variance Review**

54. A rolling 13-week cash flow budget has been developed and is updated weekly to reflect the Company's most current operating realities. This budget is reconciled against actual collections and disbursements every week. Any variances greater than 10% between budgeted and actual results are promptly identified, documented, and explained.

55. As part of the secured lender forbearance agreement, the Receiver is required to submit comprehensive bi-weekly reporting packages to Farm Credit, the Company's secured lender. These packages contain detailed variance analyses, operational expense tracking, and updated sales forecasts. By providing this level of detail, the secured lender can closely monitor performance against established targets and evaluate ongoing compliance with the terms of the forbearance agreement.

56. This enhanced reporting process strengthens transparency and accountability, ensuring that stakeholders have timely and accurate insight into the Company's financial position, operational performance, and near-term prospects.

**Payroll & Taxes**

57. The payroll process has been stabilized under the administration of the Company's professional employer organization, Genesis Global. At the time of the appointment, the Receiver identified that the PEO account was underfunded, jeopardizing employee pay continuity. This issue has since been corrected, ensuring that payroll obligations are consistently met.

58. The Receiver has completed an initial review of payroll taxes, excise taxes, business taxes, and property taxes. Several potential liabilities have been identified, and these obligations have been incorporated into the cash flow budget for planning purposes. The Receiver is currently working with appropriate tax authorities and external advisors to address all issues.

59. In addition, the Receiver is conducting an ongoing review of state-level excise and sales tax compliance. Preliminary findings indicate that Tennessee and New Jersey may have material exposure due to incomplete reporting and unpaid obligations. These issues will be prioritized in subsequent reporting periods. The Receiver may be filing a motion in the future seeking approval to pay taxes as a priority expense.

**Vendor & Operational Continuity**

60. The Receiver has established direct lines of communication with key vendors, logistics providers, and employees to maintain uninterrupted operations. This outreach has helped secure the cooperation of critical partners and mitigate risks to the supply chain.

61. All vendor notices are now being directed to the Receiver. This process has revealed several previously unidentified liabilities that were not adequately disclosed in the Company's records. The Receiver has also secured and begun reviewing critical business documents, including supply chain agreements, bottling contracts, and marketing obligations. These reviews aim to identify operational risks and financial commitments that could have a material impact on cash flow.

62. An initial review of inventory storage agreements and bailment warehouse contracts is underway. This is necessary to confirm lien positions, assess obligations, and evaluate any potential risks associated with warehouse-held inventory. The Receiver may be filing a motion in the future seeking approval to pay warehouseman's liens as a priority expense.

**Financial and Accounting Observations**

63. The Receiver has determined that the Company's accounting records cannot be relied upon for accurate financial reporting. Key deficiencies identified include:

- Non-reconciled balances create uncertainty about the accuracy of financial statements.

- Unusual accounting entries are lacking proper documentation.
- Improper revenue recognition practices may inflate the Company's perceived financial performance.

64. The Receiver has also identified related-party transactions involving Grant Sydney, Inc. and Quill and Cask Owner, LLC, both insider entities. These transactions require further review of external records and supporting documentation, since these were not arms-length transactions.

65. Overall, cash resources remain limited, necessitating tight cash management and prioritization of critical expenses.

**Stakeholder Communications**

66. The Receiver will continue to provide bi-weekly reporting to Farm Credit, including detailed variance reports, expense reviews, and sales forecasts. Regular updates will also be provided to the Court and other key stakeholders. Direct engagement with vendors, customers, and employees will continue to maintain operational stability and foster transparency.

**Asset Recovery & Preservation of Value**

67. The Receiver will continue to secure and monitor the Company's cash, accounts receivable, inventory, leased equipment, and other assets. To ensure accurate reporting and valuation, updated inventory counts and appraisals will be commissioned as necessary. Bailment warehouse records are being reviewed to confirm lien positions and ensure obligations are properly disclosed and managed.

**Cash Management**

68. The Receiver will continue rigorous oversight of all disbursements, requiring prior approval for significant expenses. Bank accounts will be reconciled on a daily and weekly basis to

17

ensure the integrity of records and detect irregularities promptly. Forward-looking projections will continue to be refined and stress-tested to account for potential sales fluctuations, ensuring that the Company remains prepared for varying operational outcomes.

**Investigation & Forensic Review**

69. The Receiver will expand his review of historical financial records to uncover any irregularities or potential recovery opportunities. Special focus will be placed on officer and insider compensation and/or expenditures, unusual financial transactions conducted by a former employee, and the identification of potential avoidable transfers.

70. Tax advisors will be engaged to quantify exposures associated with any unfiled federal and state income tax returns. The Receiver will also evaluate potential claims or causes of action that could be pursued for the benefit of creditors, with a focus on maximizing recovery and ensuring equitable treatment of all stakeholders.

**Conclusion**

71. The Receiver has implemented robust controls to stabilize operations, enhance transparency, and identify key risks. Substantial challenges remain, particularly in areas such as tax compliance, accounts payable, and related-party transactions. The Receiver will continue to prioritize transparency, creditor protection, and preservation of value while working closely with all stakeholders to achieve the best possible outcome for the estate.

*CONCLUSIONS, RECOMMENDATIONS AND REQUESTS*

72. The Receiver believes that this receivership is progressing smoothly and that the opportunity for the Company's successful emergence from receivership is very good. While challenges lie ahead, the outlook is positive. The Receiver hopes to present the Court with motions to sell non-essential, non-income producing assets over the next quarter, with plans to conclude

this receivership in the following quarter via a total refinancing of the Company's debt or a sale of the Company as a going concern.

Dated this 1st day of October, 2025.

Respectfully submitted,

/s/ Justin T. Campbell
Justin T. Campbell
Thompson Burton PLLC
1801 West End Avenue, Suite 1550
Nashville, Tennessee 37203
(615) 465-6015 (phone)
justin@thompsonburton.com

Counsel for the Receiver

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all parties having made an appearance herein, via the Court's CM/ECF system.

This 1st day of October, 2025.

/s/ Justin T. Campbell.
Justin T. Campbell