# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **FARM CREDIT MID-AMERICA, PCA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 4:25-cv-38** |
| | ) | |
| **v.** | ) | **Judge Atchley** |
| | ) | |
| **UNCLE NEAREST, INC., et al.,** | ) | **Magistrate Judge Steger** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## MOTION TO RECONSIDER THE MEMORANDUM OPINION AND ORDER [DKT. 32] AND ORDER APPOINTING RECEIVER [DKT. 39] AND TO STAY ACCESS TO PROPRIETARY INFORMATION

Fawn Weaver and Keith Weaver, co-founders of Uncle Nearest, Inc. (collectively, the "Founders"), and Grant Sidney, Inc., which is wholly-owned by Fawn Weaver and is the single largest shareholder of Uncle Nearest, Inc. (collectively, Grant Sidney, Inc. with the Founders, the "Movants"), by and through their undersigned counsel, hereby move for reconsideration by the Court of (1) the Memorandum Opinion and Order entered August 14, 2025[1] (the "Memorandum Opinion") and (2) the Order Appointing Receiver entered August 22, 2025[2] (the "Receivership Order"). The Movants further request that the Court temporarily stay or enjoin the Receiver and his professionals from providing access to proprietary information to third parties pending a hearing on this Motion. In support of this Motion, the Movants rely upon and incorporate the attached Weaver Declaration and assert and allege as follows:

---

[1] Dkt. 32.
[2] Dkt. 39.

## SUMMARY

1.      This case began with the filing of a Complaint by Farm Credit Mid-America, PCA ("Farm Credit") against Uncle Nearest, Inc., Nearest Green Distillery, Inc., Uncle Nearest Real Estate Holdings, LLC (collectively, the "Company" or the "Uncle Nearest Defendants"), Fawn Weaver and Keith Weaver (collectively, the "Founders," and collectively with the Company, the "Defendants") and an emergency request for the appointment of a receiver (the "Receivership Motion").   The Receivership Hearing was held on extremely short notice and the Court's *Memorandum Opinion and Order*[3] (the "Memorandum Opinion") and the *Order Appointing Receiver*[4] (the "Receivership Order") were entered prior to the Defendants having sufficient time to answer the Complaint or assert defenses, counterclaims, etc. The limited purpose of this Receivership was implied by the Court in its Memorandum Opinion with the express caveat that:

> the Court will tolerate the existence of a receiver only so long as it is necessary. If a material change in circumstances eliminates the need for a receiver, then any party may file a motion to dissolve the receivership.[5]

These and other statements by the Court reflect that the Court did not view the appointment of the Receiver as a prelude to a pre-judgment disposition of all assets of the Defendants or a forced financial restructuring.   Rather, the Receivership was intended to only address the protection of Farm Credit's collateral position based primarily on concerns relating to solvency and adequacy of collateral.

2.      In the time since the Receivership Hearing, practically all of the bases asserted by Farm Credit in support of the appointment of a Receiver have been debunked. The primary finding by the Receiver himself is that Uncle Nearest is valued significantly in excess of the debt of Farm

---

[3] Dkt. 32.
[4] Dkt. 39.
[5] *Id*. at p. 10.

Credit such that there is not, and never has been, any credible risk that Uncle Nearest is insolvent or that the value of Farm Credit's collateral is insufficient to cover its claims. The Receiver has also confirmed that there is not any credible evidence that the Founders and current management team committed any fraud or that any credible risk of any future fraudulent activity exists. Furthermore, the defenses and counterclaims to be asserted by the Uncle Nearest Defendants show that Farm Credit itself has exposure relating to its conduct such that the Farm Credit loans are subject to potentially significant offset. These facts and others, as further set forth in this Motion, clearly show materially different circumstances than were presented to the Court by Farm Credit at the Receivership Hearing.

3.      In addition to the changed circumstances relating to the bases for the Receivership, the conduct of the Receivership itself provides additional evidence that the interests of the parties in interest in this case are best served by the Company's Board being placed back in control of the Company. The Receiver's operating focus on maintaining value through conserving cash has had the opposite effect – it has caused enterprise value to deteriorate. This damage is objectively measurable and accelerating, as detailed in the Weaver Declaration. **The Neilsen data,[6] which is summarized on the chart attached as Exhibit 1, shows a steep decline in retail sales volume by the Company that begins almost immediately at the start of the Receivership and has continued to decline at a substantial rate.** This factor alone should be sufficient cause to terminate the Receivership. As the chart plainly shows, the year over year sales volume during the period after the Farm Credit Complaint and before the Receivership, a period in which the Company's management remained in control, remained significantly positive. The decrease in year

---

[6] The Nielsen data is compiled by NielsenIQ, a leading consumer intelligence company that tracks consumer sales data directly from spirit retailers and is widely used by spirit brands to monitor sales activity at the retailer level. The Nielsen data, including the Uncle Nearest data that is included in Exhibit 1, is publicly available to all distilleries that maintain a NielsenIQ account.

3

over year sales volume begins literally the exact period of the Receiver's appointment and has continued. This decline in sales of Uncle Nearest's products at the retail level is a precursor to a direct decline in the Company's top line revenue and, if not remedied quickly, will materially impact the enterprise value of the Company. The termination of the Receivership is necessary to right this ship.

4.     The Receiver's focus on pursuing a pre-judgment forced sale process for the assets of the Uncle Nearest Defendants has also led directly to uncertainty in the market, a further loss of focus on growth of the brands, and a resulting loss of sales and market share. Further, the purported sale process has created a significant risk of the dissemination of key proprietary information relating to the Company and its brands to direct competitors, which risks material damage to the Company. The Receiver's push for a sale process to benefit Farm Credit has been at the expense of any focus by the Receiver on claims held by the Company, including claims against the former CFO and Farm Credit.

5.     The backdrop of this Motion is recognition that the Founders, the Board, and the management team currently at Uncle Nearest, Inc. are directly responsible for the unprecedented growth of the Company from a start-up with no assets to a brand recognized as perhaps the fastest growing American whiskey **in history**. In eight years, Uncle Nearest grew to be the second largest Tennessee whiskey – ahead of George Dickel and behind only Jack Daniels. It is not hyperbole to say that the level of success achieved by the Company prior to the Receivership is unprecedented in the bourbon world and did not happen by luck or happenstance, but through diligent and capable management by individuals with a deep knowledge of the industry and with the skillset necessary to build a global whiskey brand. The Receiver, while a capable generalist, does not have direct experience of running a spirit company. As a result, the Receiver's management of the business

4

has not been able to successfully keep the Uncle Nearest brand on the upward trajectory that has been its trajectory since its founding. The Founders and management team, which are responsible for the growth of the brand from concept to major brand status, are in the best position to continue to build the brand for the benefit of all stakeholders in this case.

6. This Motion further seeks a temporary stay of sale-related activities that are likely to be prejudicial to the Company and its shareholders. Specifically, the Movants request that the Receiver and his professionals be stayed temporarily from providing access to proprietary Company information to third-parties pending a hearing on this Motion.

## **BACKGROUND**

7. On July 28, 2025, Farm Credit initiated the above captioned case by filing the *Verified Complaint and Request for Appointment of Receiver* (the "Complaint").[7] The Complaint was based on alleged defaults in certain Loan Documents, as defined in the Complaint. In addition to naming certain Defendants that are obligated to Farm Credit under the Loan Documents, the Complaint also personally named Fawn Weaver and Keith Weaver, who are not personally obligated to Farm Credit under the Loan Documents. In conjunction with the Complaint, also on July 28, 2025, Farm Credit filed its *Emergency Motion for the Immediate Appointment of Receiver* (the "Receivership Motion").[8]

8. On July 29, 2025, the Court issued its Order setting a hearing date of August 7, 2025 on the Receivership Motion.[9] On August 4, 2025, the Court issued an Order requiring witness and exhibit lists be filed by August 5, 2025, and allocated 90 minutes for the hearing on the Receivership Motion.[10] While Farm Credit had significant time to prepare for the hearing prior

---

[7] Dkt. 1.
[8] Dkt. 3.
[9] Dkt. 12.
[10] Dkt. 20.

to the filing of the Receivership Motion, the Defendants had significantly less time to investigate and prepare their defenses to the Receivership Motion because they had no advance notice of the filing. That shortened preparation time, along with the Court's limitation on the hearing length, made it very difficult for the Defendants to fully address the issues relating to the Receivership.

9.     Prior to the filing of the Complaint, Defendants were represented by outside counsel in connection with Farm Credit's allegations and were actively engaged in good-faith efforts to resolve the matter through both the forbearance process and ongoing refinancing negotiations.  In the midst of those negotiations and with the Company actively negotiating final terms of a $100 million refinancing, the Defendants were blindsided by the filing of the Complaint and the Receivership Motion. Upon Farm Credit's filing of the Complaint, Defendants' existing counsel advised that it could not continue representation because it was unable to clear conflicts arising from its work for Farm Credit or Farm Credit-related entities. By the time Defendants secured conflict-free counsel, only a week remained before the August 7 hearing. This combination of conflict-induced loss of counsel and compressed timing deprived Defendants of a meaningful opportunity to investigate the allegations, prepare defenses, identify counterclaims, or develop an adequate record in the Receivership Hearing.[11] As a result, the Defendant's counsel simply conceded or couldn't dispute factual allegations made by Farm Credit because those allegations had simply not been adequately investigated prior to the hearing. Most of those prior concessions are now disputed after proper investigation.

10.     The hearing on the Receivership Motion was held on August 7, 2025, and on August 14, 2025, the Court entered its *Memorandum Opinion and Order[12]* (the "Memorandum

---

[11] While the Defendants likely could have requested a continuance of the Receivership Hearing (assuming a continuance would have been granted), that was not done.
[12] Dkt. 32.

Opinion"), which ordered the appointment of a receiver and required the parties to provide additional briefing regarding who should be appointed as receiver. The Memorandum Opinion focuses on the protection of Farm Credit's interest in its collateral and does not suggest that a pre-judgment liquidation of the Defendants' assets or a forced restructuring of the Defendants' capital structure was necessary or required.

11. In compliance with the Memorandum Opinion, the Defendants filed their *Defendants' Brief in Support of the Appointment of Phillip G. Young, Jr. as Receiver*[13] based on representations Mr. Young had made regarding how he would approach the case as follows:

> Upon appointment and subject to the Court's forthcoming order defining the scope of this receivership and receiver's duties, Young plans to implement a strategy that prioritizes the preservation and enhancement of asset value, ensuring that all actions taken under the receivership are calculated to protect and **foster growth of Uncle Nearest** for the benefit of creditors and stakeholders, including, but not limited to the following:
>
> Value Preservation. Young understands that flooding the market with thousands of barrels in a softening bourbon economy through a "Fire Sale" process would guarantee steep discounts and jeopardize brand equity. Instead, Young, with the insights of engaged consultants and current management, intends to focus his efforts on strategic reduction of operating expenses, tracing the use of the loan proceeds, and timing any inventory sales to match market demand, thereby protecting the lender's collateral and **enhancing overall enterprise value**. . . .
>
> Early Mediation. Similarly, Young recognizes that litigation and receivership expenses will erode Defendants' capital, and, as the Court has recognized, contribute to the reputational harm of the Uncle Nearest brand. **To that end, Young intends to convene mediation among himself, the lender, the owners, and investors to explore a commercial resolution.**[14]

12. On August 22, 2025, the Court entered the *Order Appointing Receiver*[15] (the "Receivership Order"), which, in addition to appointing Mr. Young as Receiver, vested the Receiver with exclusive control over the Uncle Nearest Defendants[16] and provided a broad stay of

---

[13] Dkt. 37.
[14] *Id*. at p. 4-5 (emphasis added).
[15] Dkt. 39.
[16] *Id*. at p. 5-12.

litigation applicable to all parties (the "Litigation Stay").[17] The Receiver's exclusive control over the Uncle Nearest Defendants has prevented those entities from answering and defending against the Farm Credit Complaint, or asserting applicable claims and counterclaims.

13.     On October 1, 2024, after operating as the Receiver for more than five weeks with full and unfettered access to all of the books and records of the Uncle Nearest Defendants and competent financial advisory team engaged, the Receiver filed the Receiver's *First Quarterly Report*.[18] In the Report, the Receiver made the following preliminary findings and reports: (a) "very encouraged about the long-term viability of the Company"[19]; (b) "the Company has significant value and can be reorganized, as a going concern, on a relatively quick timeline"[20]; (c) "[t]he founder, management, and employees of the Company have been very cooperative with the Receiver and has granted the Receiver full access to the Company and its records."[21]; (d) the Receiver was able to create an operating budget that required no financing except to cover approximately $2.5 million in costs mostly created by the Receivership itself[22]; (e) the Receiver was able to reconcile the barrel count[23]; (f) the Receiver determined that there is "validity" to issues relating to potential fraud by a former officer of the Uncle Nearest companies that were brought to the attention of the Receiver and of which Farm Bank was aware prior to the Receivership[24]; (g) the Receiver found no evidence of misappropriation, theft, or financial impropriety by the Company's founder, its management team, or any current employee[25]; and (h) while there have been multiple transfers among related entities, the Receiver found no evidence of

---

[17] *Id*. at p. 13.
[18] Dkt. 46.
[19] *Id*. at p. 1.
[20] *Id*.
[21] *Id*. at p. 2.
[22] *Id*. at pp. 3-4.
[23] *Id*. at p. 4.
[24] *Id*. at p. 5.
[25] *Id*. at pp. 5-6.

defalcation to date.[26]

14. Notwithstanding these findings, the Receiver is moving beyond simply maintaining the status quo, and towards a permanent disposition of the Defendants' assets prior to an adjudication of Farm Credit's claims and of the Company's defenses and counterclaims. The Receiver has recently retained an investment banker to market the Defendants' assets under two tracks – a potential pre-judgment forced refinance of the Farm Credit loans or sale of substantially all assets of the Debtors.

15. Furthermore, despite the Receiver's pre-appointment representation that he would seek to foster growth of the Company and enhance overall enterprise value, his actual approach to managing operations for the Company has been solely to maintain and preserve assets in preparation for a sale, not to manage the business for growth. However, in the spirits industry, as explained in the Declaration of Fawn Weaver (the "Weaver Declaration"), which is attached as **Exhibit 2,** a spirit brand will inevitably contract if it loses its focus on growth and fails to undertake effective marketing strategies or make targeted and correctly timed marketing expenditures. The Nielsen data, as summarized in **Exhibit 1**, provides objective and startling evidence that the Receivership and the Receiver's approach is causing a serious decline in sales that is having a severe downward impact on enterprise value to the detriment of all stakeholders.

16. The role of Farm Credit and its financial advisor, Riveron, in having to apparently approve expenditures by the Receiver, has also caused severe disruption and delay. The exact arrangement between the Receiver and Farm Credit remains a mystery as neither Farm Credit nor the Receiver has disclosed the Forbearance Agreement they have executed or its terms.[27] Because

---

[26] *Id*. at p. 6.
[27] The Forbearance Agreement is referenced in paragraph 11 of the Receiver's First Quarterly Report [Dkt. 46]. Upon belief, the Forbearance Agreement is outside the ordinary course of business and likely includes financing provisions that would require Court pre-approval on notice to all parties in interest.

9

of the Receiver's role and the necessity that the Receiver obtain approval from Farm Credit on expenditures, the needed marketing expenditures are not being made or are being delayed. While this strategy conserves cash, it creates a loss of market share and a loss of enterprise value that greatly exceeds the benefit of the short-term cash savings, potentially creating as self-fulfilling prophecy of insolvency for Farm Credit.

## ARGUMENT

I. THE COURT HAS INHERENT AUTHORITY TO MODIFY THE RECEIVERSHIP ORDER AND DISSOLVE THE RECEIVERSHIP

17. The Court has inherent authority and discretion to terminate the Receivership where the purpose of the Receivership is no longer needed or appropriate. The limited purpose of this Receivership was indicated by the Court in its Memorandum Opinion, in stating that:

> "The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." *Liberte Capital Grp., LLC, 462 F.3d at 551.* Because a receivership is an extraordinary remedy, it must be employed with the utmost caution and "only in cases of clear necessity to protect the plaintiff's interests in the property." *Pension Benefit Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414 (6th Cir. 2015) (internal quotation marks omitted).[28]

The Court, in granting the receivership request, further stated as follows:

> Balancing the foregoing factors, the Court finds they cumulatively weigh in favor of appointing a receiver. The Court does not reach this decision lightly. It fully appreciates Defendants' concerns and has given them great thought. But these concerns are insufficient to overcome the Court's conclusion that a receiver is necessary to protect Farm Credit's interests at this time. That said, the Court will tolerate the existence of a receiver only so long as it is necessary. If a material change in circumstances eliminates the need for a receiver, then any party may file a motion to dissolve the receivership.[29]

18. These statements by the Court reflect that the Court saw the possibility that the

---

[28] Dkt. 32 at p. 4.
[29] *Id*. at p. 10.

Receivership may be appropriately terminated, perhaps recognizing that the key consideration – potential insolvency of the Company – was an issue that had not been definitively ascertained. Based on a preliminary finding that solvency of the Company was in question, the Receivership was intended to address the protection of Farm Credit's collateral position.

19.     The Court's authority to terminate the receivership where the stated purpose of the Receivership is no longer applicable is clear in the case law.[30] With respect to the "purpose" of this Receivership, the Court should note that there is no monetary judgment being enforced here and the rights of Farm Credit in the alleged collateral have not been adjudicated. The purpose for the Receivership was to ensure that the value of the assets would be preserved pending judgment on the primary premise that the assets were worth less than the alleged outstanding debt to Farm Credit. That "purpose" is no longer relevant as the Receiver himself, after investigating the Company for more than three months, has determined that, in fact, the Company is worth significantly more than the aggregate debts owed by the Company, including the alleged Farm Credit debt. The "purpose" of the Receivership no longer exists, and the continuation of the Receivership will accomplish nothing other than loss of value to the equity holders of the Company. Clearly, the management team that was responsible for the unprecedented growth of the Company from a fledgling start up to one of the most well-known whiskey brands is in the best position to control the Company for the benefit of all of the stakeholders.

II.    **THE FINDINGS OF THE COURT IN ITS MEMORANDUM OPINION NO LONGER SUPPORT THE CONTINUATION OF THE RECEIVERSHIP**

20.     In its Memorandum Opinion, the Court addressed the factors set forth in *Pension Benefit Guaranty Corp. v. Evans Tempcon, Inc.*[31] in determining that the appointment of a receiver

---

[30] *See Consolidated Rail Corp. v. Fore R.R. Co.*, 861 F.2d 322, 327-328 (1st Cir. 1988).
[31] 630 F. App'x 410, 414 (6th Cir. 2015).

should be made: (a) Whether Uncle Nearest was insolvent; (b) Whether Farm Credit was undersecured; (c) Whether Farm Credit lacked an adequate legal remedy; (d) Whether the property at issue is in imminent danger of being lost, concealed, injured, diminished in value, or squandered; (e) Whether the Company would be able to quickly respond to new challenges or opportunities; (f) Whether concerns regarding past or present fraud supported the appointment of a receiver; (g) Whether the receivership would do more good than harm; and (h) Whether the consent to receiver provisions supported the appointment of a receiver over the all of the Uncle Nearest Defendants.

21.    In the time since the Receivership Hearing, practically all of the bases asserted by Farm Credit in support of the appointment of a Receiver, including the allegation of insolvency, have been debunked. The primary finding by the Receiver himself is that Uncle Nearest is valued significantly in excess of the debt of Farm Credit such that there is not, and never has been, any credible risk that Uncle Nearest is insolvent or that the value of Farm Credit's collateral is insufficient to cover its claims. The Receiver has also confirmed that there isn't any credible evidence that the Founders or current management team committed any fraud or that any credible risk of future fraudulent activity exists.  Furthermore, the defenses and counterclaims asserted or to be asserted by the Uncle Nearest Defendants show that the Farm Credit loans may be subject to significant and legitimate dispute or offset.  These facts, as further set forth in this Motion, show materially different circumstances than were presented to the Court at the Receivership Hearing.

    A.   _The Receiver Has Determined that, in Fact, the Company Is Solvent_

22.    The first factor supporting the imposition of the receivership cited by the Court in its Memorandum Opinion was that there was no certainty regarding the solvency of the Company.[32]  While the Movants assert that the burden of proof on lack of solvency remains Farm

---

[32] Dkt. 32, p. 5. Specifically, the Court cited the inability of the Defendant's counsel to state definitively that the Defendants were solvent as the basis for finding that the question of solvency weighed in favor of receivership.  It

Credit's burden, the Receiver has since determined that the Company is clearly solvent in that its value is significantly in excess of all of its combined debts. Tennessee law states that "[a] debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at fair valuation."[33] Here, there is no insolvency.

23.     The evidence of solvency begins with the testimony of Farm Credit's witness, Brian Klatt, at the Receivership Hearing, wherein he testified that "But we -- we feel -- we feel very confident that the value of this business is well in excess above what's owed . . . [and] We believe that the entire value -- the enterprise value of this business is in excess of our obligations."[34] The Receiver's First Quarterly Report then provides further evidence of solvency, wherein the Receiver stated that "[the Receiver is] very encouraged about the long-term viability of the Company"; and "the Company has significant value and can be reorganized, as a going concern, on a relatively quick timeline."[35] The Receiver also put together a budget that required no additional funding from Farm Credit other than $2.5 million to fund a short-term catchup of payables and the administrative costs of the receivership itself.[36] Since that initial funding, no additional funding has been needed from Farm Credit as the cash balance has remained positive in the Receiver's cash forecasts. In further conversations with the Receiver, the Receiver has stated that the value of the Company is significantly in excess of the amount of the combined debt to Farm Credit and all trade creditors.

24.     While the Receiver's cash flow forecasts do not indicate the necessity of material additional funding necessary for current operations once the expenses of the Receivership itself are no longer required, the Founders have identified several sources for funding that can be made

---

should be noted that the Defendants' counsel at the time had been engaged in the case for approximately one week as of that hearing and was clearly unprepared to address the question of solvency.
[33] T.C.A. § 66-3-303(a).
[34] Receivership Hearing Transcript at p. 46.
[35] Dkt. 46, p. 1.
[36] Id. at p. 3-4.

available to ensure the liquidity of the Company until the claims in the pending action are resolved. Additionally, the Founders have obtained the commitment of Felicia Gallagher, a CPA and well-qualified financial expert, to serve as interim CFO until a permanent CFO is employed.[37]

25.    In light of the evidence of solvency of the Company, and considering (a) that the burden of proving insolvency is on Farm Credit, (b) the Company will have access to working capital from sources other than Farm Credit to cover any future cash flow fluctuations, and (c) the Company's management team has an extremely qualified and seasoned financial professional to handle the CFO role for the Company moving forward, there is simply no remaining basis for this Receivership to continue. The Company will be able to provide any needed and required reporting to Farm Credit and the Founders would have no objection to the Company continuing to engage Newpoint Advisors to assist with that function after the Receivership is terminated.

### B.    *The Receiver Has Determined that, in Fact, Farm Credit Is Over-Secured*

26.    The second factor cited by the Court in its Memorandum Opinion was "whether there is adequate security for Farm Credit's loans  . . . ."[38] In finding that there was not adequate security, the Court relied on "the lack of certainty surrounding Uncle Nearest's solvency" and discrepancies with the barrel counts.[39] As noted above, the Receiver has now determined that the Company is solvent by a significant margin. With respect to the barrel counts, the Receiver has confirmed in his First Quarterly Report that all barrels have been reconciled.[40] Consequently, the Receiver's finding of solvency is made based on the actual number of barrels on hand as

---

[37] Ms. Gallagher previously served as Senior Vice President of Finance & Planning for Uncle Nearest and was the executive who first identified and developed the financial evidence that led to the Company's investigation into the fraudulent conduct of its former CFO. She has also served in senior finance leadership roles at publicly traded companies, including as Controller, Comptroller, and Treasurer, and has extensive experience in GAAP compliance, lender reporting, inventory accounting, internal controls, and working capital management.
[38] Dkt. 32, p. 5.
[39] Id. at 5-6.
[40] Dkt. 46, p. 4.

reconciled. Accordingly, there is no lingering question as to the adequacy of Farm Credit's security – Farm Credit is fully secured, and it is not a close question.

C. *Farm Credit Has an Adequate Legal Remedy that Is Subject to the Claims and Counterclaims of the Defendants*

27. The third factor cited by the Court is "whether Farm Credit has an adequate legal remedy."[41] In deciding that this factor weighed in favor of receivership, the Court relied on the "uncertainty surrounding Uncle Nearest's solvency and the lack of adequate security."[42] As noted above, those concerns have been completely alleviated based on the Receiver's determination that the value of Uncle Nearest's assets is significantly greater than the sum of its liabilities. With Farm Credit now being known to be fully secured, Farm Credit has an adequate legal remedy.

28. The claims of Farm Credit are also subject to significant potential offset as a result of affirmative defenses and counterclaims that should be asserted by the Company, and these opposing claims and defenses weigh in favor of terminating the Receivership. Upon termination of the Receivership, the Company will answer and assert affirmative defenses and counterclaims that will have significant impact on this case, including, but not limited to, the following: (a) evidence that the Company's former CFO, who has admitted to significant fraud against the Company, had a close personal relationship with the primary credit manager at Farm Credit leading, upon information and belief, to Farm Credit's failing to exercise the level of care and reasonable due diligence that is expected of a lender with respect to the loans; (b) documentary evidence that Farm Credit, through its potentially conflicted credit officer, approved and funded 28 draws on a working capital line of credit over a 13-month period preceding the Receivership totaling approximately $67 million that were initiated and executed solely by the Company's

---

[41] Dkt. 32, p. 6.
[42] Id.

former CFO, who has admitted to significant fraud, with no confirmation required by Farm Credit of such draws from the CEO Ms. Weaver, who is the sole signatory for the Company on the credit agreements and has been acknowledged by Farm Credit as one of its "primary contacts"; (c) evidence that, at the time the Receivership Motion was filed, the Company was engaged in active refinancing negotiations with a third-party institutional real estate firm with more than $30 billion in assets under management, that written economic terms had been agreed to in principle, and that senior leadership of that firm—including its president and chief operating officer—had conducted an in-person diligence visit as a final step toward issuance of a formal letter of intent; (d) evidence that Farm Credit, knowingly and intentionally, falsely asserted that the Company misrepresented the terms of the acquisition of the Martha's Vineyard Property and falsely alleged that the Company had inappropriately obtained a loan secured by that property, where Farm Credit was made fully aware of such terms at the time of the acquisition and had purposefully not obtained any security interest in that property; and (e) evidence of other false accusations or insinuations by Farm Credit related to this Receivership that, upon belief, were made with an intention of disparaging the Company, its Founders, including Mrs. Weaver, and its management.

29.     In light of the significant losses incurred by the Company that are a direct result of actions taken by Farm Credit, the adjudication of the claims and defenses of the parties is manifestly necessary to determine the extent Farm Credit is entitled to any net claim in this case.

D. *There Is No Imminent Danger to Farm Credit's Collateral (Other than the Risks Arising from Continuation of the Receivership Itself)*

30.     The fourth factor considered by the Court was "whether the at-issue property is in imminent danger of being lost, concealed, injured, diminished in value, or squandered . . . ."[43] On this factor the Court found that the injunction issued by the Court was sufficient to prevent any

---

[43] Dkt. 32, p. 7.

potential imminent danger to the assets such that this factor weighed against imposing the Receivership.[44] In his First Quarterly Report, the Receiver recognized the cooperation of the Founders and Company's management, and found no evidence of fraud by any of the Founders or current management.[45] Indeed, the only current risk to the Company's assets is the continued diminution of value that is occurring as a result of the Receivership itself.

E.  *Whether the Company Would Be Able to Quickly Respond to New Challenges*

31.    On this issue, the Court focused on its belief that the Receiver would be more nimble than the Company itself in responding to evolving situations.[46] Unfortunately that has not been the case, as the Receiver's lack of ability to move quickly and effectively due, in part, to Farm Credit's control over cash and the Receiver's operating focus on preservation rather than growth has resulted in a material decrease in sales, as shown on Exhibit 1. Upon termination of the Receivership, the Board will be in a significantly better position than the Receiver to take needed action to address operating issues and ensure that the Company regains the upward sales trajectory it had prior to the Receivership.

F.  *The Receiver Has Confirmed that the Founder and Current Management Were Not Parties to the Fraud Committed by the Ex-CFO*

32.    The Court also addressed "whether the Defendants engaged in fraudulent conduct" and found that, while the Defendants maintain that they were unaware of the fraudulent activity of Michael Senzaki, the former CFO, principles of agency required the Court to consider the actions of Senzaki attributable to the Company for purposes of the analysis.[47]   The Court, however, recognized that the Defendants' status as unknowing victims of Senzaki's fraud lessened the

---

[44] Id.
[45] Dkt. 46, pp. 2, 5-6.
[46] Dkt. 32, pp. 7-8.
[47] Id. at pp. 8-9.

factor's weight in the analysis.[48]

33.     The Receiver has now confirmed, with the benefit of more than three months of investigation, that there is no evidence that the Founders or any current management had knowledge of or participated in Senzaki's fraudulent activities. Specifically, the Receiver states in his First Quarterly Report that

> The Receiver has begun an investigation into allegations made by the Company's founder regarding certain financial improprieties committed by a former employee. Based upon the records of the Company, discussions with employees, and his review of third party investigation reports, the Receiver believes there is validity to some of the allegations . . . To date, the Receiver has found no evidence of misappropriation, theft, or financial impropriety by the Company's founder, its management team, or any current employee.[49]

The "third party investigation reports" to which the Receiver references were investigative reports resulting from the Company's own internal investigation assisted by Kroll, a global financial advisory firm engaged by the Company prior to the Receiver's appointment, and which investigation was put on hold as a result of the Receiver's appointment. The Company's Board and management team that had removed the former CFO and were in the process of investigating the extent of the fraud are ready to assume full operational control of the Debtors and will be able to directly pursue claims against Mr. Senzaki on behalf of the Company. Consequently, the Receiver's finding of no fraud by the Founders and current management, and fact that the Company can continue its investigation once the Receivership is terminated pushes this factor in favor of dissolving the Receivership.

G.   *The Continuation of the Receivership Will Do More Harm Than Good*

34.     The Court next analyzed "whether the appointment of a receiver would do more

---

[48] Id. at p. 9.
[49] Dkt. 46 at 5-6.

good than harm."[50]   On this factor, the Court made three separate points: (1) on the issue of potential brand damage, the Court was not convinced that the receivership would cause materially more brand damage than such damage that occurred upon the filing of the litigation by Farm Credit; (2) the Court felt that the continued involvement of the Founders would help mitigate brand damage; and (3) the Court felt that the effects of the Receivership on brand image would be outweighed by the Receiver's ability to shepherd the Company through the financial difficulties.

35.     With respect to the first point, while the Court rightfully recognized the immediate and severe brand damage that was a direct result of the filing of the Complaint by Farm Credit, the Company under its existing management was able to counteract much of that negativity and brand damage and was able to grow sales volume prior to the Receiver's appointment, as shown in Exhibit 1.  However, as Exhibit 1 further shows, sales volume began to drop immediately upon the start of the Receivership and has continued, evidencing objectively observable brand damage resulting from the operations under the Receivership and the ongoing perception that the Company is being liquidated.[51] Those actions are also creating significant risks to the equity holders of the Company especially in this recognized down market in the spirits industry. As explained in the Weaver Declaration, the Receiver's focus on maintenance and preservation, rather than growth, is resulting in market share loss and loss of enterprise value, which is in addition to any losses from the initial disruption that was caused upon the filing of the Farm Credit Complaint.  The reversal of retail sales performance since the start of the Receivership is significantly negative and worsening, as shown in **Exhibit 1**.

36.     As to the second point, Ms. Weaver's continued involvement has been helpful in minimizing the damage but has not been enough to eliminate it. As further detailed in the Weaver

---

[50] Dkt. 32, p. 9.
[51] Id. at p. 9.

Declaration, a number of strategic decisions that Ms. Weaver proposed in order to maintain and hopefully grow sales were not approved or were delayed by the Receiver in his effort to maintain and preserve cash. Thus, while Ms. Weaver's involvement has been critical in the effort to maintain sales and enterprise value, the operational issues noted in the Weaver Declaration have served only to reduce the nimbleness of the Company and its ability to respond and adapt to market forces resulting in continuing brand damage and lost sales.

37. As to the Court's third point, the Receiver's involvement in an oversight role has been helpful in mitigating the allegations and misleading inferences in the Farm Credit Complaint. The primary benefit of the Receiver's efforts has been his conclusions that have debunked the claims of Farm Credit that the Company is insolvent and that any of the Founders or existing management were engaged in fraudulent activity. Even with those findings, the Receiver has focused his efforts on activities and investigations that will not benefit the estate, while ignoring processes and investigation of matters that will actually benefit the estate. As examples:

a. The Receiver has not taken the collaborative and value enhancing approach to the case that he indicated would be his approach prior to his appointment. Rather, the operational approach has emphasized cash control and preservation in anticipation of a potential liquidation scenario. As detailed in the Weaver Declaration, while business operations have continued under the Receivership, the absence of industry-specific operational experience and competing demands on the Receiver's time have contributed to the downturn in retail sales.

b. While the Receiver specifically indicated his intent to seek to mediate a commercial resolution of the disputes between Farm Credit, the Founders, and the investors, he has taken no such actions to date. Rather, he has tabled and publicly prejudiced the claims and

defenses of the Company and its equity holders while pushing toward a forced sale of the Company's assets.

      c.    Prior to seeking any preliminary discovery (or simply requesting documents), the Receiver filed a Motion to Clarify[52] that raised an issue as to whether numerous companies that have no liability on the Farm Credit debt should be brought into the receivership. Again, none of these targeted companies had any liability on the Farm Credit debt and, considering that the Company is solvent without regard to the assets and liabilities of these entities, there would be no benefit to the Receivership Estate from the effort to bring any of these entities under the control of the Receiver. While the Receiver has yet to take a position on whether any of these additional entities should be under the Receiver's control, the Motion to Clarify has created significant business uncertainty due to the associated negative publicity and has directly caused the loss of business opportunities for the additional entities amounting to in excess of $1.5 million in value.

      d.    The Receiver has entered into a Forbearance Agreement with Farm Credit without seeking Court approval of the same and without providing notice of the same to parties in interest. It is unclear whether the terms of that Forbearance Agreement have limited the discretion and authority of the Receiver to the detriment of the other parties in interest in the case.

      e.    The Receiver is pursuing a costly pre-judgment sale process of the Company even though there is no insolvency or evidence of fraud to support such an action and even though he has not sought to mediate any commercial resolution among the Parties, as he indicated would be one of his first actions as Receiver. The Receiver's unwarranted sale process has or will include providing proprietary information regarding the Company to competitors,

---

[52] Dkt. 41.

which creates significant risk of material prejudice to the long-term prospects of the Company.

      f.    The Receiver has failed to materially investigate the claims against the former CFO, Michael Senzaki, despite being provided direct evidence of fraud by Mr. Senzaki and, perhaps most significantly, the Receiver has failed to investigate the claims and affirmative defenses held by the Company against Farm Credit. Despite stating that he has made no such investigation, he publicly asserted that such potential claims were "dubious," although then also stating he "could be wrong."[53] Clearly, any claims and counterclaims of the Company against Farm Credit are assets of the Receivership Estate. His public pronouncement denigrating the Company's potential claims and counterclaims, prior to investigation of the same, has prejudiced the rights of the Uncle Nearest Defendants and the assets of the Receivership Estate.

38.    As noted above, the Board was already fully engaged in the investigation of the fraud committed by the former employee and is prepared to defend and assert claims and counterclaims against Farm Credit if placed back in control of the Company. Consequently, the further investigations that are needed are now best handled by the Board, not the Receiver. In sum, the continuation of the Receivership will do more harm than good at this point.

    *H.*  *The "Consent to Receiver" Provisions in the Loan Documents Do Not Support the Continuation of the Receiver in an Operating Capacity*

39.    As noted, the Court referenced the "consent to receiver' provisions in the loan documentation as support for the appointment of the Receiver. However, those consent provisions do not support the continuation of the Receivership at this point. Those provisions do not specify the length of any such receivership and, therefore, are no longer at issue because a receiver was indeed appointed. In any event, a "consent to receiver" provision does not divest the Court of its

---

[53] Dkt. 83, p. 4.

inherent equitable authority to determine whether a receivership or continuation of a receivership is appropriate.

### III. FARM CREDIT'S FALSE ASSERTIONS IN ITS RECEIVERSHIP MOTION EVIDENCE THAT FARM CREDIT HAS UNCLEAN HANDS

40. "No principle is better settled than the maxim that he who comes into equity must come with clean hands and keep them clean throughout the course of the litigation, and that if he violates this rule, he must be denied all relief whatever may have been the merits of his claim."[54] The Receivership, as well as the continuation of the same, is an equitable remedy that is subject to the "clean hands" doctrine. As noted above, Farm Credit's allegations of insolvency and lack of adequate collateral have all been shown to be false. In addition to those false allegations, Farm Credit also made demonstrably false claims relating to the Martha's Vineyard Property. Specifically, Farm Credit asserted:

> Uncle Nearest has engaged in what appears to be another misrepresentation. Despite representing to the Lender that Term Loan proceeds would be used by Uncle Nearest to purchase a $2.225 million home on Martha's Vineyard Island, the property was purchased by an entity whose existence had never been disclosed to the Lender. Additionally, in September 2024, Uncle Nearest mortgaged the Martha's Vineyard property to another lender.

These allegations are patently false and were clearly known to be false by Farm Credit as evidenced by its receipt of the Purchase Agreement that was provided to Farm Credit's loan officer prior to the closing on the purchase, which clearly shows Keith Weaver, individually, not Uncle Nearest, as the Purchaser of the Property. Further evidence of the falsity of Farm Credit's allegation is included in the Weaver Declaration.

41. As detailed in the Weaver Declaration, the Martha's Vineyard property was at all

---

[54] *Gaudiosi v. Mellon*, 269 F.2d 873, 881-82 (3d Cir. 1959) (quoting *Root Refining Co. v. Universal Oil Products Co.*, 169 F.2d 514, 534-35 (3d Cir. 1948), certiorari denied, *Universal Oil Products Co. v. William Whitman Co.*, 335 U.S. 912, rehearing denied 336 U.S. 915).

times privately owned, could not be owned by the Company due to local regulatory restrictions, was fully disclosed to Farm Credit prior to acquisition, was never pledged as collateral to Farm Credit, and was not represented as a Company asset. The Receiver has since confirmed that the property had a legitimate, proper basis and that Farm Credit's contrary allegations were factually incorrect and unrelated to the Company's solvency or its collateral position.

42.     Farm Credit's further insinuation of impropriety regarding the third-party loan on the Martha's Vineyard Property, which loan was used to upgrade the property for its intended uses, was simply an attempt to further mislead the Court. As noted, Farm Credit never required or intended that the Martha's Vineyard Property be collateral for the Farm Credit loans. Farm Credit was fully aware of the intended use of the Martha's Vineyard Property and had no basis to assert that the mortgaging of the property to fund improvements necessary for the business purpose of the property was a "misrepresentation" to the Bank.

43.     These false accusations relating to the Martha's Vineyard property in particular were picked up by the press and media, which latched on to the Bank's intended and foreseeable false insinuation that the Weavers personally diverted loan funds for their personal use. The Bank's false accusation, and the foreseeable publication of those accusations, caused significant and foreseeable financial harm to the Company and financial and emotional harm to the Weavers. These false allegations made by Farm Credit evidence Farm Credit's bad faith and unclean hands, which disqualify Farm Credit from the equitable relief of a Receivership under applicable law.

IV.     **THE COURT SHOULD ENJOIN THE DISTRIBUTION OF THE COMPANY'S PROPRIETARY INFORMATION.**

44.     The Movants request that the Court enjoin the Receiver from providing access to proprietary Company information to third parties as that will likely create material prejudice to the Company. On October 27, 2025, the Receiver filed the *Notice of Additional Professional Retained*

*by Receiver*,[55] which states that "he has retained Arlington Capital Advisors, LLC to advise the Receiver on possible transactions relating to this matter, including refinancing of indebtedness, consummating equity infusions or investments, and /or consummating a sale of some or all of the Receivership Assets."[56] It is obvious that the engaged investment banker would be looking at both potential strategic buyers (i.e., competitors) as well as financial buyers, and the only way to obtain a bona-fide offer is to provide those potential buyers with non-public information.

45. The Receiver's apparent belief that an NDA protects the Uncle Nearest Defendants from competitive damage that would likely result from competitors having access to Uncle Nearest's proprietary information ignores the realities of the ultra-competitive environment in which Uncle Nearest operates. Having knowledge of the Company's proprietary information will allow competitors to have non-public information that will impact how they price and market their competing products to either stop the Company from continuing to gain market share or cause the Company to lose market share. Temporarily enjoining the Receiver from providing such access to third parties pending a hearing is appropriate, especially where the Receiver has not sought or obtained Court approval of any specific sale process.

WHEREFORE, the Grant Sidney, Inc., Fawn Weaver and Keith Weaver, as majority Directors of Uncle Nearest, Inc., hereby respectfully request that the Court (1) terminate the Receivership effective immediately, (2) order that all third parties remain stayed in accordance with the Receivership Stay for 180 days to allow a transition time for return of control to the Board, and (3) grant such other relief as is appropriate.

---

[55] Dkt. 76.
[56] *Id*. at p. 1.

Respectfully submitted,

**MANIER & HEROD, P.C.**

*/s/ Michael E. Collins*

Michael E. Collins  (TN BPR No. 16036)
S. Marc Buchman (TN BPR No. 41598)
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
T: (615) 244-0030
F: (629) 500-1137
mcollins@manierherod.com
mbuchman@manierherod.com

*Counsel for Fawn Weaver, Keith Weaver and Grant Sidney, Inc.*

## CERTIFICATE OF SERVICE

I hereby certify that on December 23, 2025, a copy of the foregoing was served via this Court's CM/ECF system on all parties consenting to receive electronic service.

*/s/ Michael E. Collins*

Michael E. Collins

27

# Motion:
# Exhibit 1



Nielsen Pre-Receivership vs. Post-Receivership
Retail Volume Sales Growth Comparison 2025 to 2024 by 4-Week Period

Post-Receivership (11/29/25 4-Wk Vol Growth) -20.40%
Post-Receivership (11/1/25 4-Wk Vol Growth) -7.10%
Post-Receivership (10/4/25 4-Wk Vol Growth) -13.60%
Post-Receivership * (9/6/25 4-Wk Vol Growth) 7.20%
Receiver Appointed (8/22/25)
Pre-Receivership * (Through 8/9/25 Vol Growth) 15.90%
Lawsuit Filed (7/28/25)
Pre-Receivership (Through 7/12/25 4-Wk Vol...) 9.50%
Pre-Receivership (Through 6/14/25 4-Wk Vol...) 9.30%
Pre-Receivership (Through 5/17/25 4-Wk Vol...) 12.50%
Pre-Receivership (Through 4/19/25 4-Wk Vol...) 9.10%

# Motion: Exhibit 2

## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **FARM CREDIT MID-AMERICA, PCA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 4:25-cv-38** |
| | ) | |
| v. | ) | **Judge Atchley** |
| | ) | |
| **UNCLE NEAREST, INC., et al.,** | ) | **Magistrate Judge Steger** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DECLARATION OF FAWN WEAVER IN SUPPORT OF EMERGENCY MOTION TO RECONSIDER THE MEMORANDUM OPINION AND ORDER [DKT. 32] AND ORDER APPOINTING RECEIVER [DKT. 39]

I, Fawn Weaver, in support of the Emergency Motion to Reconsider the Memorandum Opinion and Order [Dkt. 32] and Order Appointing Receiver [Dkt. 39] (the "Motion to Reconsider"), declare as follows:

1.      I am, and was at all times relevant to this matter, more than eighteen (18) years of age.

2.      I am the Co-Founder and Chief Executive Officer of Uncle Nearest, Inc. I have personal knowledge of the matters set forth in this Declaration and, if called as a witness, could and would competently testify to the facts stated herein.

3.      In my role as CEO, I have led Uncle Nearest, Inc., together with its wholly owned subsidiaries—Nearest Green Distillery, Inc. and Uncle Nearest Real Estate Holdings, LLC (collectively, the "Company")—from a start-up with no assets or operations to a nationally and internationally distributed spirits brand with substantial enterprise value in approximately eight (8) years.

4.     The Company has been and remains solvent. To my knowledge and based on information reviewed by the Receiver and his financial advisors, at all times throughout this case, its market value has exceeded its outstanding debt. In addition, the market value of the collateral securing the Farm Credit loans exceeds the loan balances, rendering Farm Credit oversecured.

5.     The Company is also able to pay its operating expenses as they come due in the ordinary course of business. As discussed further below, the Company has leadership and financing in place and ready to proceed upon termination of the Receivership.

6.     While the Company's solvency and the adequacy of Farm Credit's collateral demonstrate that the principal allegations in Farm Credit's Complaint and Receivership Motion were unfounded, Farm Credit's allegations regarding the Martha's Vineyard property were factually incorrect and contradicted by contemporaneous disclosures. Defendants fully disclosed to Farm Credit the structure under which the Martha's Vineyard property was acquired. Attached hereto as **Exhibit B** are true and correct copies of email communications, with attachments, demonstrating that Defendants disclosed the structure of the acquisition and that Farm Credit's banking officers traveled to and stayed at the property. Despite this full disclosure, and as Farm Credit was aware, due to regulatory restrictions unique to Martha's Vineyard, the property could not be owned by the Company.

7.     Included within **Exhibit B** are the following communications, each of which is a true and accurate copy maintained in the ordinary course of Defendants' business:

      a.  February 23, 2023 email from Mike Senzaki (former CFO) to Jonathan Boyce at Farm Credit transmitting the executed purchase offer for the Martha's Vineyard property, clearly reflecting that the purchaser was Keith Weaver in his individual

capacity.

b. June 13–14, 2023 emails from Jonathan Boyce to Brian Klatt, Rollin Richey, and Mike Senzaki coordinating a visit to the property.

c. June 23, 2023 email from Jonathan Boyce discussing an August 2023 visit to the property.

d. July 31, 2023 email discussing the itinerary for that visit.

e. August 2, 2023 email further discussing the itinerary; and

f. August 10, 2023 emails regarding activities during the visit.

8. At all times, Defendants were transparent with Farm Credit regarding the acquisition and use of the Martha's Vineyard property. Farm Credit neither requested nor, to my knowledge and belief, took any steps to perfect a security interest in that property. The false allegation that Keith Weaver or I made misrepresentations relating to the Martha's Vineyard property has caused significant harm to my and Mr. Weaver's professional reputations and has harmed the Company.

9. To my knowledge, Farm Credit never requested that Defendants perfect any additional real property as collateral beyond the properties it elected to secure. It was not Defendants' responsibility to propose or initiate the perfection of collateral absent such a request. Farm Credit never asked Defendants to perfect a security interest in the additional properties, including properties located in Cognac, France; Martha's Vineyard, Massachusetts; Lois, Tennessee; Lynchburg, Tennessee; or the parcel immediately adjacent to the south of the distillery in Shelbyville, Tennessee. Accordingly, Farm Credit's later assertions regarding alleged misrepresentations and collateral insufficiency were not the result of any failure by Defendants to disclose or perfect collateral, but rather the result of Farm Credit's own collateral

3

decisions.

10. Since the commencement of this matter, I have continued to perform my duties as Chief Executive Officer consistent with the Court's orders. During this period, I have traveled more than fifty (50) days, visiting retailers, bars, restaurants, national account buyers, and distributors to preserve the brand under the cloud of this litigation. I have personally met with more than 200 retailers, distributor leaders, investors, and sales professionals to maintain confidence in the brand despite the allegations made by Farm Credit and the operational disruption resulting from the Court's orders. I have also met with numerous Uncle Nearest shareholders, as well as more than 2,000 consumers in cities nationwide, listening directly to their views regarding the brand. As a result of my role and these direct interactions across all levels of the market, I have comprehensive first-hand knowledge of the adverse impact these proceedings—and the operating decisions made pursuant to them—are having on the Company and its shareholders.

11. To provide additional context regarding the Company's expense reductions and cash management, many of the cost reductions reflected in the Company's financial performance following the appointment of the Receiver were not initiated as part of the Receivership, but were the result of a comprehensive cost-reduction initiative that management began in July 2024. By the time Farm Credit filed its lawsuit, the Company had already reduced operating expenses by more than forty percent (40%) year-over-year, with an additional approximately twenty percent (20%) reduction actively underway, although not yet fully implemented. The creditor stay entered by the Court provided necessary stability while the Company addressed legacy payables that management was previously unaware existed and that were uncovered following the separation of the Company's former Chief Financial Officer in October 2024. That stability

allowed the Receiver and management to focus on current operating obligations and forward-looking cash management, rather than diverting resources to multiple competing creditor actions, and enabled a clearer and more accurate assessment of the Company's financial position.

12.     I want to be clear that my request for termination of the Receivership is not borne out of any disrespect for the Receiver or his efforts. I recognize that the Receiver has acted in accordance with his understanding of his mandate and under apparent constraints imposed by Farm Credit. My concern is not with the Receiver personally, but with the structural reality that a receivership framework designed to preserve value in liquidation contexts is being applied to a viable, operating company in a manner that is actively eroding shareholder value. Terminating the Receivership and restoring governance to the Company's Board of Directors would halt this erosion and is necessary to preserve the Company's going-concern value for the benefit of all stakeholders.

13.     Nielsen data reflects a clear change in trajectory following the appointment of the Receiver. The figures described below reflect year-over-year comparisons of 2025 versus the corresponding four-week periods in 2024. In the four weeks ending April 19, 2025, as shown in Exhibit A, Uncle Nearest experienced 16.8% volume growth, which remained positive through successive four-week periods ending May 17, 2025 (12.5%), June 14, 2025 (9.3%), and July 12, 2025 (9.5%). Even after the lawsuit was filed on July 28, 2025, volume growth through August 9, 2025 remained strong at 15.9%. Following the Receiver's appointment on August 22, 2025, growth slowed to 7.2% for the four weeks ending September 6, 2025, before turning sharply negative: −13.6% (October 4, 2025), −7.1% (November 1, 2025), and −20.4% (November 29, 2025).

14.     The Nielsen results, which only reflect actual sales at the retail level demonstrate

that the Company's sales decline coincides directly with the Receivership and worsened as it continued unresolved. Following the imposition of the Receivership, this trajectory reversed abruptly and materially, as reflected in Nielsen reporting. In August 2025, revenue declined approximately 8.2%. In September 2025, revenue declined approximately 24.9%, with volume declining approximately 13.2%. In October 2025, revenue declined approximately 24.3%, with volume declining approximately 20.4%. In November 2025, revenue declined approximately 23.8%, with volume declining approximately 19.9%.

15. The Nielsen results, which reflect only actual sales at the retail level and do not include inventory shipments, distributor stock levels, or forward-looking projections, demonstrate that the Company's sales decline coincides directly with the Receivership and worsened as it continued unresolved. Because Nielsen reporting captures sell-through at the point of sale, it provides an objective measure of consumer demand and market performance. Following the imposition of the Receivership, this trajectory reversed abruptly and materially, as reflected in month-over-month Nielsen reporting.

16. In every market I have visited, consumers have consistently told me that a primary reason they purchase Uncle Nearest is because it is independently owned and the consumers direct connection to the Founders. This connection has developed as consumers have watched—openly and in real time—the brand being built from the ground up through social media engagement and national press coverage. In 2023, I visited 121 cities in 100 days, meeting directly with buyers and consumers in each market and documenting those visits through social media and other public channels. In 2024, I visited 42 military bases across the country to thank and honor service members. For years, consumers have observed me traveling approximately 300 days per year in service of the brand.

6

17.     As a result, the imposition of the Receivership has created widespread confusion regarding whether I remain an owner of Uncle Nearest, directly undermining consumer trust and brand loyalty. In the spirits industry, authenticity and founder-led continuity are core components of brand equity, and once eroded, they cannot be readily restored through financial means alone.

18.     That connection was further confirmed during two bottle signings I held in Georgia this December, as independently observed by the spirits consultant retained by the Receiver, who independently spoke with consumers in attendance. At the first signing, attendance nearly set the State of Georgia's all-time record for the largest bottle signing; the following day, that record was exceeded. Consumers' loyalty and enthusiasm were inseparably linked to my leadership and ownership, underscoring the irreparable harm being inflicted on the Company's goodwill and shareholder value.

19.     The Receivership is causing material and measurable damage to the Company and its shareholders. As demonstrated by the pre- and post-Receivership performance data described above, the abrupt reversal from sustained growth to sustained decline has immediate and predictable consequences in the spirits industry, including:

   a.   distributors cutting orders and reducing commitments to the brand;

   b.   retailers reducing shelf placement or moving products to less advantageous locations;

   c.   key accounts discontinuing the brand altogether; and

   d.   competitors permanently capturing market share during periods of supply disruption and brand uncertainty.

7

20.     The Receiver's decision to forego bottling in an effort to conserve cash coincided with the loss of two national accounts. Prior to the Receivership, the Company had never lost a national account.

21.     The Company's valuation continues to decline as marketing opportunities are delayed or abandoned and production is constrained. In the spirits industry, valuations are driven by top-line sales and growth multiples. For brands like Uncle Nearest, those multiples can range from 13x to 25x. As a result, each dollar of lost revenue does not merely reduce cash flow—it erodes shareholder equity value by a multiple of that amount. The Receivership's emphasis on short-term cash preservation has therefore resulted in a disproportionate and continuing loss of value to shareholders and is incompatible with preserving a high-growth going concern.

22.     Beyond the declines reflected in syndicated data, the Company has experienced measurable and confirmed losses of business that coincided with uncertainty following the lawsuit and the Receivership. Distributor depletion data across the Company's open states reflects a clear reversal following the filing of the lawsuit. Through July 2025, depletions in those states were up approximately 18%. From August 2025 through mid-December 2025, depletions declined by approximately 11%, an approximately 29% reversal that coincides directly with heightened market uncertainty as a result of the Receivership and reflects lost sales that cannot be recaptured retroactively.

23.     The Company has also suffered confirmed losses of specific on-premise, off-premise, and distributor-supported business following concerns regarding perceived financial instability, including:

        a.  the removal of Uncle Nearest from cocktail menus and brand programs at a luxury hotel property in Chicago due to perceived financial instability;

8

b. the removal of the brand from a high-end on-premise account in Oregon following exposure to recent news coverage;

c. the suspension of programming, incentives, and brand support by a major distributor due to concerns regarding ongoing issues, resulting in materially negative depletions;

d. the elimination of all shelf placements at a large regional grocery chain across multiple core SKUs, which represented more than 500 retail locations for the Company, including in markets where prior sales performance had been strong; and

e. the cancellation or decline of planned single-barrel purchases by retailers in multiple states due to expressed concerns regarding the Company's stability, resulting in immediate lost revenue and additional downstream impact.

24. This market hesitation is also reflected in state-level performance. In Tennessee, the Company's home market, performance shifted from approximately 21% growth through July 2025 to a decline of approximately 29% from August through mid-December 2025, corresponding with a significant impairment of sales momentum and shareholder value.

25. In addition to these confirmed losses, the Company is experiencing broader market hesitation evidenced by reduced communication, canceled tastings, suspended programs, and buyer reluctance. In some cases, accounts have ceased communicating altogether, which depletion trends suggest reflects additional lost business not captured in standard reporting. Once these effects take hold, they are difficult to reverse and are associated with lasting impairment to the Company's revenue base, growth trajectory, and shareholder equity value.

26. Distributor leadership has begun to express concern regarding the uncertainty

associated with the Receivership and its impact on production and supply continuity. Because the Company is legally prohibited from selling directly to on-premise or off-premise accounts, it is entirely dependent on distributors to bring its products to market.

27.     When distributor confidence is undermined, the resulting loss of focus and shelf priority is not temporary. Distributors rarely reallocate resources back to a brand once trust and momentum are lost. Prior to the Receivership, every distributor prioritized Uncle Nearest due to its revenue growth, volume, and velocity, achieved during one of the most severe downturns in the spirits industry's history. Once distributors deprioritize a brand and shelf space is lost, the resulting decline in distribution footprint effectively impairs revenue potential, which in turn directly and irreversibly reduces shareholder value. Based on the Company's historical performance prior to the Receivership, termination of the Receivership would remove the primary source of distributor uncertainty and allow the brand to resume its prior growth trajectory.

28.     Numerous strategic initiatives proposed by management to stabilize and grow sales were denied or delayed in an effort to preserve cash, including the following:

### *Bottling Capacity Issues and Out-of-Stocks*

29.     The Company's inability to supply sufficient finished product to the market during the Receivership was not the result of insufficient inventory or lack of consumer demand, but rather restrictions imposed on the Company's ability to convert existing barrel inventory into finished goods. During this period, the Company was constrained from bottling additional product because Farm Credit took the position that the Company should not monetize its barrels through finished-goods sales and instead treated the barrels as more valuable if liquidated. As a result, the Company was limited in its ability to bring sufficient finished product to market,

which constrained production capacity and impaired the Company's ability to fulfill distributor and retailer orders in a timely manner. These constraints contributed to widespread out-of-stocks across major markets and coincided with the loss of national accounts. Out-of-stocks are not simply operational inconveniences; once shelf space is reduced or eliminated due to supply unreliability, it is often permanently reassigned to competing brands, resulting in non-recoverable losses of future revenue and shareholder value.

30.     Additionally, because spirits are consumables, any unavailability of the product in the market represents lost sales that are never recovered by the Company. A consumer, who is unable to find Uncle Nearest products on the shelf at their local liquor store will likely buy a competing product.   Consequently, the out-of-stock situation is associated with an immediate loss of revenue to the Company, erodes brand loyalty, and creates a risk of losing customers completely, including the loss of future sales to that customer. A lingering out-of-stock situation creates a strong risk that retailers will pull shelf space for the product, causing further erosion of current and future sales.

### Limited-Time Offers (LTOs)

31.     LTOs are unique bottle offering that are only available in very limited supply and are specifically desirable to consumers because of their scarcity. Uncle Nearest's Limited-Time Offers have historically sold out within minutes online and within as few as 24 hours in key markets. For example, the July 2024 release of the "777" LTO sold out online in under five minutes and cleared the market shortly thereafter, with distributors requesting additional inventory. These LTOs do not require material incremental marketing or production costs beyond those associated with the Company's standard SKUs; however, they routinely generate two to three times the revenue of standard releases. As such, LTOs have historically represented

a disproportionate, high-margin contribution to shareholder value.

32.     For the second half of 2025, management planned to introduce four LTOs, including Cognac Cask and Toasted Barrel, into both the distillery and the broader market between September and December. Delays associated with the Receivership and lender approvals prevented these releases from proceeding as scheduled. As a result, only two LTOs were approved, with Toasted Barrel delayed by approximately one month and approved with only days' notice prior to bottling and distribution, eliminating the opportunity for meaningful pre-launch marketing.

33.     In 2024, Toasted Barrel was the Company's second most popular LTO and sold out quickly with four weeks of advance marketing. In contrast, the 2025 release was launched with virtually no advance marketing following delays in approval during the Receivership. This resulted in delayed and materially lower sales, and damaged credibility with consumers and distributors who had come to expect disciplined, reliable releases. The delays eliminated necessary marketing lead time, depressed demand, forced internal tradeoffs, and materially harmed both near-term performance and long-term enterprise value for the Company and its shareholders.

34.     Uncle Nearest's management was also preparing multiple limited releases intended to drive high-margin revenue and reinforce brand momentum. Among these was Cognac Cask, which, once released, sold out immediately at price points of $149 and $189, reflecting exceptional consumer demand. Demand for Cognac Cask was so strong that management reallocated a portion of the cases originally planned for sale at the distillery to the Company's top on-premise and off-premise accounts as a gesture of appreciation for their continued support during this period of uncertainty, and those allocations also sold out

immediately in the market.

35.     To preserve Cognac Cask's planned four-week pre-launch marketing window, management coordinated its release timing around the Company's established seasonal demand patterns. Toasted Barrel was scheduled for release during the final high-traffic tourism weekend in October before a customary four-week slowdown leading into Thanksgiving. Management communicated that planned timing to the Receiver in advance. Approval to proceed, however, was not received until after that peak weekend had passed and the Company had entered the slower four-week period. As a result, the opportunity to market Toasted Barrel during its optimal pre-release window was lost, and the product entered the market with only one day of advance awareness among consumers. At that point, management was required to shift immediately to marketing Cognac Cask, which was four weeks from its Black Friday launch, in order to avoid compounding timing and demand disruptions across both releases.

*Operational Issues*

36.     In addition to a strategic approach focused on short-term cash preservation, the Company's operations during the Receivership have experienced operational issues and inefficiencies. For example, during the first three months following the appointment of the Receiver, regular weekly senior management meetings were not held. The absence of these meetings led to disjointed decision-making, reduced alignment across teams, delays, diminished morale, and other operational inefficiencies.

37.     Weekly senior management meetings involving the Company's key financial, operational, and regulatory leaders are particularly important for any company operating in a distressed or highly constrained environment. After the need for regular weekly meetings was raised in November 2025, one such meeting was scheduled and held and proved productive.

Thereafter, although weekly meetings were placed on the calendar, the meetings did not take place. On multiple occasions, I followed up in advance of the scheduled meetings to confirm that they would proceed. Each time, I was informed that the meeting could not take place because the meetings required participation from all key stakeholders and could not proceed effectively in the absence of full attendance.

38.     Based on my experience in the spirits industry and my detailed knowledge of the Company's operations, it is my opinion that the Receivership is not merely causing short-term financial disruption, but is inflicting ongoing and material harm to the Company's going-concern value, goodwill, market position, and shareholder equity value, to the detriment of all stakeholders.

39.     Prior to the Receivership, Farm Credit required the Company to appoint a specific individual to its Board of Directors. Although the appointment of this additional director had been delayed due to matters requested by the candidate herself, the Directors were and remain prepared to appoint the individual to the Board. Her more than 35 years of experience at one of the world's largest financial institutions is particularly valuable to the Company at this time.

40.     The ongoing loss of shareholder value caused by the Receivership is not readily remedied through damages or post-hoc financial adjustments. Once market position, distribution priority, shelf space, and brand momentum are lost, they cannot be fully restored. Continued maintenance of the Receivership therefore risks materially impairing the Company's equity value to the detriment of all shareholders whose interests the Receivership was intended to protect.

41.     I have identified several sources of potential operational financing, subject to Board approval, sufficient to cover the Company's operating expenses, including from existing

Uncle Nearest shareholders, on termination of the Receivership, without the need for any future funding from Farm Credit. As indicated by the cash flow forecast prepared by the Receiver's financial advisor, Newpoint Advisors, only very limited funding for operations would be necessary once the expenses of the Receiver and his professionals are no longer accruing.

42.     The Company's projected cash needs are modest for a business of its size and are primarily associated with sales disruption arising from the Receivership, rather than from any underlying operational weakness in the Company's operations, management, or financial controls. As described above, the Company has continued to meet its operating obligations as they come due, including payroll, benefits, and ordinary-course vendor obligations, and forecasted cash flow deficits have not materialized to date based on current forecasts and actual operating results. Once the Receivership is terminated, the Company would be positioned to resolve the legal issues with Farm Credit and work toward a financial restructuring that is orderly, value-preserving, and beneficial to all stakeholders. By contrast, continued delay under the Receivership risks further erosion of enterprise value and stakeholder recoveries, not because of any deficiency in the Company's underlying business, but due to the ongoing constraints and uncertainty imposed by the Receivership itself.

I declare under penalty of perjury that the foregoing information is true and correct to the best of my knowledge, information and belief.

FURTHER, AFFIANT SAYETH NOT.

_____
FAWN WEAVER

SWORN AND SUBSCRIBED before me this _25th_ day of _December_, 2025.

_____
Notary Public

My commission expires: _July 11, 2029_



# Declaration Exhibit A:



Nielsen Pre-Receivership vs. Post-Receivership
Retail Volume Sales Growth Comparison 2025 to 2024 by 4-Week Period

Post-Receivership (11/29/25 4-Wk Vol Growth) -20.40%
Post-Receivership (11/1/25 4-Wk Vol Growth) -7.10%
Post-Receivership (10/04/25 4-Wk Vol Growth) -13.60%
Post-Receivership* (9/6/25 4-Wk Vol Growth) 7.20%
Receiver Appointed (8/22/25)
Pre-Receivership* (Through 8/9/25 Vol Growth) 15.90%
Lawsuit Filed (7/28/25)
Pre-Receivership (Through 7/12/25 4-Wk Vol... 9.50%
Pre-Receivership (Through 6/14/25 4-Wk Vol... 9.30%
Pre-Receivership (Through 5/17/25 4-Wk Vol... 12.50%
Pre-Receivership (Through 4/19/25 4-Wk Vol... 9.10%

# Declaration: Exhibit B

 **Outlook**

---

## Fwd: Martha's Vineyard

---

**From** Mike Senzaki <mike.senzaki@unclenearest.com>

**Date** Sat 8/2/2025 12:12 PM

**To** Fawn Weaver <fawn.weaver@unclenearest.com>

📎 1 attachment (4 MB)

Fully executed Codman Offer & Addendum (version 5) (3).pdf;

---------- Forwarded message ---------
From: **Mike Senzaki** <mike.senzaki@unclenearest.com>
Date: Thu, Feb 23, 2023 at 11:39 AM
Subject: Martha's Vineyard
To: Jonathan Boyce <Jonathan.Boyce@e-farmcredit.com>

dotloop signature verification: dtlp.us/VNNI-2Z1a-5hLm



# CONTRACT TO PURCHASE REAL ESTATE  #501  (Page 1 of 2)

**(With Contingencies)**

**(Binding Contract. If Legal Advice Is Desired, Consult An Attorney.)**



**MASSACHUSETTS**
ASSOCIATION OF REALTORS®

| | | | |
|---|---|---|---|
| **From:** | **BUYER(S):** | **To:** | **OWNER OF RECORD ("SELLER"):** |
| Name(s): | Keith Weaver | Name(s): | Roundabout Holdings LLC |
| Address: | 600 North Main Street Suite 2000 Shelbyville, TN 37160 | Address: | Heirs of Vincent Sophia 225 NE Minzer Blvd, #770 Boca Raton, FL 33432 |

The agent Jennifer B. DaSilva _____ is operating in this transaction as:

☑ Buyer's Agent     ☐ Seller's Agent     ☐ Facilitator     ☐ Dual Agent

on behalf of Point B Compass, 19 Winter Street, Edgartown, MA 02539

*This provision does not eliminate the requirement to have a signed Mandatory Real Estate Licensee-Consumer Relationship Disclosure, but acts to satisfy Standard of Practice 16-10 in the REALTOR® Code of Ethics.*

The **BUYER** offers to purchase the real property described as 10 Codman Springs, Edgartown, MA 02539

_____ together with all buildings and improvements thereon (the "Premises")

to which I have been introduced by Point B Compass _____ upon the following terms and conditions:

**1. Purchase Price:** The BUYER agrees to pay the sum of $2,275,000 _____ to the SELLER for the purchase of the Premises (the "Offer"), due as follows:

    i.  $ 10,000 _____ as a deposit to bind this Offer

        ☐ and delivered herewith to the Seller or Seller's agent

        ☑ or to be delivered forthwith upon receipt of written acceptance

    ii.  $ 217,500 _____ as an additional deposit upon executing the Purchase And Sale Agreement;

    iii.  Balance by bank's, cashier's, treasurer's or certified check or wire transfer at time for closing.

**2. Duration Of Offer.** This Offer is valid until 9:00 _____ a.m./p.m. on 01/28/2023 ☑a.m./☐p.m. _____ by which time a copy of this Offer shall be signed by the SELLER, accepting this Offer and returned to the BUYER, otherwise this Offer shall be deemed rejected and the money tendered herewith shall be returned to the BUYER. Upon written notice to the BUYER or BUYER'S agent of the SELLER'S acceptance, the accepted Offer shall form a binding agreement. Time is of the essence as to each provision.

**3. Purchase And Sale Agreement.** The SELLER and the BUYER shall, on or before 5:00 _____ a.m./p.m on 02/16/2023 _____ execute the Standard Purchase and Sale Agreement of the MASSACHUSETTS ASSOCIATION OF REALTORS® or substantial equivalent which, when executed, shall become the entire agreement between the parties and this Offer shall have no further force and effect.

**4. Closing.** The SELLER agrees to deliver a good and sufficient deed conveying good and clear record and marketable title at 12:00 _____ a.m./p.m. on 03/28/2023 _____ at the Dukes _____ County Registry of Deeds or such other time ☐a.m./☑p.m. or place as may be mutually agreed upon by the parties.

**5. Escrow.** The deposit shall be held by Compass Massachusetts LLC _____, as escrow agent, subject to the terms hereof. Endorsement or negotiation of this deposit by the real estate broker shall not be deemed acceptance of the terms of the Offer. In the event of any disagreement between the parties concerning to whom escrowed funds should be paid, the escrow agent may retain said deposit pending written instructions mutually given by the BUYER and SELLER. The escrow agent shall abide by any Court decision concerning to whom the funds shall be paid and shall not be made a party to a pending lawsuit solely as a result of holding escrowed funds. Should the escrow agent be made a party in violation of this paragraph, the escrow agent shall be dismissed and the party asserting a claim against the escrow agent shall pay the agent's reasonable attorneys' fees and costs.

**6. Contingencies.** It is agreed that the BUYER'S obligations under this Offer and any Purchase and Sale Agreement signed pursuant to this Offer are expressly conditioned upon the following terms and conditions:

    ~~a. Mortgage.~~ (Delete If Waived) The BUYER'S obligation to purchase is conditioned upon obtaining a written commitment for financing in the amount of $ n/a _____ at prevailing rates, terms and conditions by n/a _____

. The BUYER shall have an obligation to act reasonably diligently to satisfy any condition within the BUYER'S control. If, despite reasonable efforts, the BUYER has been unable to obtain such written commitment the BUYER may terminate this agreement by giving written notice that is received by 5:00 p.m. on the calendar day after the date set forth above. In the event that notice has not been received, this condition is deemed waived. In the event that due notice has been received, the obligations of the parties shall cease and this agreement shall be void; and all monies deposited by the BUYER shall be returned. In no event shall the BUYER be deemed to have used

**MASSFORMS™**
Statewide Standard Real Estate Forms

©1999, 2000, 2001, 2002, 2007, 2010, 2012, 2013, 2014, 2017 MASSACHUSETTS ASSOCIATION OF REALTORS®
10.22.2014(03021)

dotloop signature verification: dtlp.us/VNNI-2Z1a-ShLm



## CONTRACT TO PURCHASE REAL ESTATE #501 (Page 2 of 2)
**(With Contingencies)**

**MASSACHUSETTS**
ASSOCIATION OF REALTORS®

reasonable efforts to obtain financing unless the BUYER has submitted one application by n/a _____ and acted reasonably promptly in providing additional information requested by the mortgage lender.

**b. Inspections.** (Delete If Waived) The BUYER'S obligations under this agreement are subject to the right to obtain inspection(s) of the Premises or any aspect thereof, including, but not limited to, home, pest, radon, lead paint, energy usage/efficiency, septic/sewer, water quality, and water drainage by consultant(s) regularly in the business of conducting said inspections, of BUYER'S own choosing, and at BUYER'S sole cost by 02/10/2023 _____ . If the results are not satisfactory to BUYER, in BUYER'S sole discretion, BUYER shall have the right to give written notice received by the SELLER or SELLER'S agent by 5:00 p.m. on the calendar day after the date set forth above, terminating this agreement. Upon receipt of such notice this agreement shall be void and all monies deposited by the BUYER shall be returned. Failure to provide timely notice of termination shall constitute a waiver. In the event that the BUYER does not exercise the right to have such inspection(s) or to so terminate, the SELLER and the listing broker are each released from claims relating to the condition of the Premises that the BUYER or the BUYER'S consultants could reasonably have discovered.

**7. Representations/Acknowledgments.** The BUYER acknowledges receipt of an agency disclosure, lead paint disclosure (for residences built before 1978) and Home Inspectors Facts For Consumers brochure (prepared by the Office of Consumer Affairs). The BUYER is not relying upon any representation, verbal or written, from any real estate broker or licensee concerning legal use. Any reference to the category (single family, multi-family, residential, commercial) or the use of this property in any advertisement or listing sheet, including the number of units, number of rooms or other classification is not a representation concerning legal use or compliance with zoning by-laws, building code, sanitary code or other public or private restrictions by the broker. The BUYER understands that if this information is important to BUYER, it is the duty of the BUYER to seek advice from an attorney or written confirmation from the municipality. In addition, the BUYER acknowledges that there are no warranties or representations made by the SELLER or any broker on which BUYER relies in making this Offer, except those previously made in writing and the following: (if none, write "NONE"):

**8. Buyer's Default.** If the BUYER defaults in BUYER'S obligations, all monies tendered as a deposit shall be paid to the SELLER as liquidated damages and this shall be SELLER'S sole remedy.

**9. Additional Terms.**
See Addendum

*Keith Weaver*

BUYER _____ Date _____       _____

**SELLER'S REPLY**

SELLER(S): (check one and sign below)
- ☑ (a) ACCEPT(S) the Offer as set forth above at X _____ a.m./p.m. on this 01/28/2023 ___ day of X _____
- ☐ (b) REJECT(S) the Offer.
- ☐ (c) Reject(s) the Offer and MAKE(S) A COUNTEROFFER on the following terms:

*Joseph Anzalone, Managing Member*
This Counteroffer shall expire at _____ a.m./p.m. on _____ if not withdrawn earlier.

SELLER, or spouse _____ Date _____   SELLER _____ Date _____

**(IF COUNTEROFFER FROM SELLER) BUYER'S REPLY**

The BUYER: (check one and sign below):
- ☐ (a) ACCEPT(S) the Counteroffer as set forth above at _____ a.m./p.m. on this _____ day of _____ .
- ☐ (b) REJECT(S) the Counteroffer.

BUYER _____ Date _____   BUYER _____ Date _____

**RECEIPT FOR DEPOSIT**

I hereby acknowledge receipt of a deposit in the amount of $ _____ from the BUYER this _____ day of _____

_____   Escrow Agent or Authorized Representative

**MASSFORMS™** Statewide Standard Real Estate Forms   ©1999, 2000, 2001, 2002, 2007, 2010, 2012, 2013, 2014, 2017 MASSACHUSETTS ASSOCIATION OF REALTORS® 10.22 2014/403031



dotloop signature verification: dtlp.us/VNNI-2Z1a-ShLm



# ADDENDUM

Date 01/26/2023

Page 3 of 3 Pages

This is an Addendum to the Real Estate Purchase Contract between the parties dated 01/26/2023
pertaining to the property located at 10 Codman Spring Rd, Edgartown, MA 02539

1. SELLER shall by appointment have access to the premises for the purpose of making measurements, inspections and the like. Said access shall be at a reasonable time, by appointment and in the presence of SELLER or SELLER'S agent.

2. RIGHT TO ASSIGN – BUYERS shall have the right to assign this contract to BUYER'S spouse, issue, a partnership, corporation, limited liability partnership or limited liability company in which the BUYER, BUYER'S spouse or BUYER'S issue have an interest, or to any trust for the benefit of one or more of the BUYER, the BUYER's spouse or BUYER'S issue.

3. PURCHASE & SALES AGREEMENT – This offer is subject to a mutually agreeable Purchase & Sales Agreement, subject to attorney review, which once executed shall supersede this agreement and be the sole agreement among the parties. BUYER's Attorney shall review the title issue that affects the property to the satisfaction of the BUYER.

4. LAND BANK – BUYERS acknowledges that the purchase is subject to a fee of 2% of the purchase price. The fee is payable by the BUYER to the Martha's Vineyard Land Bank at the time of closing.

5. AGENCY DISCLOSURE – Compass Massachusetts LLC is acting as a Buyer's and Seller's Agent in this transaction. Both parties are obligated to act honestly and ethically with all parties throughout the transaction.

6. PROFESSIONAL FEES - SELLER shall pay Compass Massachusetts LLC in accordance to the executed listing agreement at closing a fee equal to 5.0% of the purchase price.

---

*Keith Weaver*
dotloop verified
01/26/23 6:18 PM EST
VFJB-Y4S6-MCH1-D4Z5

(Buyer)       (Date)

*Joseph Anzalone, Managing Member*
dotloop verified
01/28/23 6:04 AM AST
DGPI-TQLO-WRT6-Y5LM

01/28/2023

(Seller)       (Date)

(Buyer)       (Date)

(Seller)       (Date)

# MASSFORMS™
Statewide Standard Real Estate Forms

©1999 MASSACHUSETTS ASSOCIATION OF REALTORS®



 Outlook

---

## Fwd: Martha Vineyard

**From** Mike Senzaki <mike.senzaki@unclenearest.com>

**Date** Sat 8/2/2025 12:19 PM

**To** Fawn Weaver <fawn.weaver@unclenearest.com>

---

---------- Forwarded message ---------
From: **Jonathan Boyce** <Jonathan.Boyce@fcma.com>
Date: Wed, Jun 14, 2023 at 9:57 AM
Subject: Martha Vineyard
To: Brian Klatt <Brian.Klatt@e-farmcredit.com>, Rollin Richey <Rollin.Richey@e-farmcredit.com>,
mike.senzaki@unclenearest.com <mike.senzaki@unclenearest.com>

Good morning,

Coordinating with Keith this morning and he gave me two sets of dates for us to come... August 10-12
or August 17-19.

I'm checking my calendar now.

**Jonathan Boyce**
NMLS 1450590
Financial Officer | Jonathan.Boyce@fcma.com
1908 Madison St Shelbyville, TN 37160
T 931-684-3291 F 931-684-1099 | fcma.com



This communication is intended for the exclusive use of the addressee(s). It may contain information that is privileged, confidential and/or protected
from disclosure, and that may be subject to the Electronic Communications Privacy Act of 1986, as amended. If you are not the intended recipient, any
review, dissemination, distribution or copying of the communication is strictly prohibited. Please notify us immediately by telephone and/or reply e-mail
and destroy this message and attachments. Farm Credit Mid-America, ACA

 Outlook

## Fwd: Martha Vineyard

**From** Mike Senzaki <mike.senzaki@unclenearest.com>

**Date** Sat 8/2/2025 12:19 PM

**To** Fawn Weaver <fawn.weaver@unclenearest.com>

---------- Forwarded message ---------
From: **Jonathan Boyce** <Jonathan.Boyce@fcma.com>
Date: Wed, Jun 14, 2023 at 9:57 AM
Subject: Martha Vineyard
To: Brian Klatt <Brian.Klatt@e-farmcredit.com>, Rollin Richey <Rollin.Richey@e-farmcredit.com>, mike.senzaki@unclenearest.com <mike.senzaki@unclenearest.com>

Good morning,

Coordinating with Keith this morning and he gave me two sets of dates for us to come... August 10-12 or August 17-19.

I'm checking my calendar now.

**Jonathan Boyce**
NMLS 1450590
Financial Officer | Jonathan.Boyce@fcma.com
1908 Madison St Shelbyville, TN 37160
T 931-684-3291 F 931-684-1099 | fcma.com



This communication is intended for the exclusive use of the addressee(s). It may contain information that is privileged, confidential and/or protected from disclosure, and that may be subject to the Electronic Communications Privacy Act of 1986, as amended. If you are not the intended recipient, any review, dissemination, distribution or copying of the communication is strictly prohibited. Please notify us immediately by telephone and/or reply e-mail and destroy this message and attachments. Farm Credit Mid-America, ACA

Case 4:25-cv-00389-CEA-CHS    Document 11-1    Filed 08/03/25    Page 55 of 72
PageID #: 2894
about:blank?windowId=SecondaryReadingPane15                              1/1

 **Outlook**

---

## Fwd: Falmouth Reservation

**From** Mike Senzaki <mike.senzaki@unclenearest.com>

**Date** Sat 8/2/2025 12:13 PM

**To** Fawn Weaver <fawn.weaver@unclenearest.com>

---------- Forwarded message ---------
From: **Jonathan Boyce** <Jonathan.Boyce@fcma.com>
Date: Fri, Jun 23, 2023 at 10:28 AM
Subject: Falmouth Reservation
To: Mike Senzaki <mike.senzaki@unclenearest.com>, Mike Senzaki <mike@unclenearest.com>, Brian Klatt <Brian.Klatt@e-farmcredit.com>

Good Morning

Booked a place in Falmouth since I couldn't find anything in Martha's Vineyard.  Checking in on August 17th and checking out on August 21st.

Looking forward to it!

**Jonathan Boyce**
NMLS 1450590
Financial Officer | Jonathan.Boyce@fcma.com
1908 Madison St Shelbyville, TN 37160
T 931-684-3291 F 931-684-1099 | fcma.com

This communication is intended for the exclusive use of the addressee(s). It may contain information that is privileged, confidential and/or protected from disclosure, and that may be subject to the Electronic Communications Privacy Act of 1986, as amended. If you are not the intended recipient, any review, dissemination, distribution or copying of the communication is strictly prohibited. Please notify us immediately by telephone and/or reply e-mail and destroy this message and attachments. Farm Credit Mid-America, ACA

---

**From:** Vrbo <sender@messages.homeaway.com>
**Sent:** Friday, June 23, 2023 9:21 AM
**To:** Jonathan Boyce <Jonathan.Boyce@e-farmcredit.com>
**Subject:** Your reservation has been confirmed

====EXTERNAL EMAIL====







**Know before you go**
Check Covid restrictions [here](here)

Reservation confirmed

# Your reservation has been confirmed

Jonathan Boyce, get ready for your trip to East Falmouth, Massachusetts, United States of America! You can now access your booking details and other important information about your trip.

Travelling with a group? Invite friends and family to join your trip so they can access basic booking information whenever they need it.

 Invite friends

[Manage your trip](#)



**Property** #2501908

**Reservation ID** HA-1JVH6R

**Arrive**                                               Aug 17, 2023

_____

**Depart**                                               Aug 21, 2023

_____

**Nights**                                                          4

_____

**Guests**                                                 3 adults

_____

# Charges

| | |
|---|---|
| $540.00 x 4 nights | $2,160.00 |
| Cleaning Fee | $250.00 |
| Service Fee | $343.00 |
| Lodging Tax | $397.81 |

---

| | |
|---|---|
| Total | $3,150.81 |

---

| | |
|---|---|
| Due on June 23, 2023 Paid | $1,985.60 |
| Due on July 18, 2023 | $1,165.21 |

[Pay now]

# Charges

If you incur incidental fees or cause damage to the rental property, your credit card may be charged up to $500. Learn more about policies on our [Help Center.](#)

---

# House Rules

**Check in** after 3:00 PM

**Check out** before 11:00 AM

Maximum overnight guests: 8 (sleeps up to 8 adults)

- 

Minimum age to rent: 25

- 

Children allowed

- 

No events

- 
- 
- 

No pets

- No pets

Smoking allowed: outside

Case 4:25-cv-00389-CEA-CHS   Document 1-11   Filed 08/20/25   Page 61 of 72
Page ID #: 2300
about:blank?windowId=SecondaryReadingPane4&fdId=1SecondaryReadingPane4&fd...   6/9

- 
- 
- Backyard is fine, just please clean up. Thanks



# Need to cancel?

We know plans change. That's why we made it easy to update or cancel your booking if you need to.

(Psst...don't forget, you can cancel for a 100% refund until Aug 3)

Image removed by sender.
100% refund

50% refund

No refund

Image removed by sender.

Image removed by sender.

Image removed by sender.

Aug 3

Aug 10

Aug 17
**Check in**

[Change or cancel trip](#)

Image removed by sender. Navigate to the Vrbo Homepage.

We're here to help. Visit our [Help Center](#) for useful info and FAQs

Image removed by sender. Download on the App Store.
Image removed by sender. Get it on Google Play.

© 2023 [Vrbo](#). All rights reserved.

Vrbo and the Vrbo logos are trademarks of Vrbo. Vrbo is located at 11920 Alterra Pkwy, Austin, TX 78758

View, save or print our [Terms & Conditions](#).
[Contact Us](#) | [Privacy Policy](#)

Image removed by sender. Image removed by sender.

Case 4:25-cv-00389-CEA-CHS    Document 1-11    Filed 10/23/25    Page 63 of 72
about:blank?windowId=SecondaryReadingPane4&fdId=1SecondaryReadingPane#12800
PageID #: 800
8/9

 **Outlook**

---

## Fwd: Itinerary

---

**From** Mike Senzaki <mike.senzaki@unclenearest.com>

**Date** Sat 8/2/2025 12:11 PM

**To** Fawn Weaver <fawn.weaver@unclenearest.com>

📎 1 attachment (55 KB)

Itinerary.docx;

---------- Forwarded message ---------
From: **Jonathan Boyce** <Jonathan.Boyce@fcma.com>
Date: Mon, Jul 31, 2023 at 6:45 PM
Subject: Itinerary
To: Mike Senzaki <mike@unclenearest.com>, Mike Senzaki <mike.senzaki@unclenearest.com>

Here is the travel itinerary.

**Jonathan Boyce**
NMLS 1450590
Financial Officer | Jonathan.Boyce@fcma.com
1908 Madison St Shelbyville, TN 37160
T 931-684-3291 F 931-684-1099 | fcma.com

This communication is intended for the exclusive use of the addressee(s). It may contain information that is privileged, confidential and/or protected from disclosure, and that may be subject to the Electronic Communications Privacy Act of 1986, as amended. If you are not the intended recipient, any review, dissemination, distribution or copying of the communication is strictly prohibited. Please notify us immediately by telephone and/or reply e-mail and destroy this message and attachments. Farm Credit Mid-America, ACA

# Farm Credit Mid America

| Itinerary | For Name |
|-----------|----------|
| **Trip Description** | Martha's Vineyard |
| **Departure Date** | August 17th |
| **Departure Airline** | JetBlue from Nashville, TN |
| **Departure Time** | 1:40 pm Central |
| **Arrival Time** | 5:26 pm Eastern to Boston, MA |
| **Hotel** | Falmouth, MA |
| **Return Date** | August 21st |
| **Return Airline** | JetBlue |
| **Return Departure Time** | 11:10 am Eastern |
| **Arrival Time** | 1:05 pm Central to Nashville, Tn |

 Outlook

---

## Fwd: Itinerary for MV

**From** Mike Senzaki <mike.senzaki@unclenearest.com>

**Date** Sat 8/2/2025 12:11 PM

**To** Fawn Weaver <fawn.weaver@unclenearest.com>

📎 1 attachment (55 KB)
Itinerary.docx;

---

---------- Forwarded message ---------
From: **Jonathan Boyce** <Jonathan.Boyce@fcma.com>
Date: Wed, Aug 2, 2023 at 1:31 PM
Subject: Itinerary for MV
To: Brian Klatt <Brian.Klatt@e-farmcredit.com>, Mike Senzaki <mike.senzaki@unclenearest.com>

Here is basic itinerary for MV trip.

Brian – we have a meeting scheduled with Keith and Fawn on the 18th but not time set yet. Mike's coming in on the 19th.

I have registered us for UN events on 18th, 19th, and 20th.

Mike – I haven't sent this to Keith or Fawn so please forward to them if think appropriate.

Thanks

**Jonathan Boyce**
NMLS 1450590
Financial Officer | Jonathan.Boyce@fcma.com
1908 Madison St Shelbyville, TN 37160
T 931-684-3291 F 931-684-1099 | fcma.com



Case 4:25-cv-00039-CEA-CHS   Document 1-11   Filed 02/07/25   Page 67 of 72
PageID #: 2806
about:blank?windowId=SecondaryReadingPane8                                      1/2



This communication is intended for the exclusive use of the addressee(s). It may contain information that is privileged, confidential and/or protected from disclosure, and that may be subject to the Electronic Communications Privacy Act of 1986, as amended. If you are not the intended recipient, any review, dissemination, distribution or copying of the communication is strictly prohibited. Please notify us immediately by telephone and/or reply e-mail and destroy this message and attachments. Farm Credit Mid-America, ACA

Case 4:25-cv-00038-CEA-CHS    Document 19-11    Filed 08/02/25    Page 68 of 72
PageID #: 2805
about:blank?windowId=SecondaryReadingPane8                                        2/2

# Uncle Nearest

| Itinerary | For Name |
|---|---|
| **Trip Description** | Martha's Vineyard |
| **Departure Date** | August 17th |
| **Departure Airline** | JetBlue from Nashville, TN |
| **Departure Time** | 1:40 pm Central |
| **Arrival Time** | 5:26 pm Eastern to Boston, MA |
| **Hotel** | Falmouth, MA |
| **Return Date** | August 21st |
| **Return Airline** | JetBlue |
| **Return Departure Time** | 11:10 am Eastern |
| **Arrival Time** | 1:05 pm Central to Nashville, Tn |

# August 18th

| Itinerary | For Name |
|---|---|
| **Client Visit** | Meeting with Keith and Fawn at 471 West Tisbury Rd, Edgartown, MA |
| **Meeting Time** | TBD – Fawn has confirmed meeting just no time yet. Our 3rd quarter meeting. |
| **UN Event** | Cocktails from 2-7 pm – RSVP'd |

# August 19ᵗʰ

| Itinerary | For Name |
|---|---|
| Client Visit | Mike's arriving early morning – touch base with him.  Get him access to the home |
| Meeting Time | No UN meeting schedule for today |
| UN Event | G Garvin and Jazz 5-8pm – RSVP'd |
|  |  |

# August 20th

| Itinerary | For Name |
|---|---|
| Client Visit | TBD – See what the day holds |
| Meeting Time | No UN meeting schedule for today |
| UN Event | Gospel Brunch with Weavers, 1-3 pm – RSVP'd |
|  |  |

 **Outlook**

---

## Fwd: Bike rentals

---

**From** Mike Senzaki <mike.senzaki@unclenearest.com>

**Date** Sat 8/2/2025 12:13 PM

**To** Fawn Weaver <fawn.weaver@unclenearest.com>

---------- Forwarded message ---------
From: **Brian Klatt** <Brian.Klatt@fcma.com>
Date: Thu, Aug 10, 2023 at 10:35 AM
Subject: Bike rentals
To: Mike Senzaki <mike.senzaki@unclenearest.com>, Jonathan Boyce <Jonathan.Boyce@fcma.com>

I made reservations for bikes on MV for Friday-Sunday.  Helmets and locks included.  Bring your
padded bike shorts and sunscreen.

**Brian Klatt**
Vice President Corporate Originations | Brian.Klatt@fcma.com
12501 Lakefront Place Louisville, KY 40299
T 303-550-8463 F 502-450-9357 | fcma.com

This communication is intended for the exclusive use of the addressee(s). It may contain information that is privileged, confidential and/or protected
from disclosure, and that may be subject to the Electronic Communications Privacy Act of 1986, as amended. If you are not the intended recipient, any
review, dissemination, distribution or copying of the communication is strictly prohibited. Please notify us immediately by telephone and/or reply e-mail
and destroy this message and attachments. Farm Credit Mid-America, ACA

 **Outlook**

---

## Fwd: shoes

---

**From** Mike Senzaki <mike.senzaki@unclenearest.com>

**Date** Sat 8/2/2025 12:15 PM

**To** Fawn Weaver <fawn.weaver@unclenearest.com>

---------- Forwarded message ---------
From: **Brian Klatt** <Brian.Klatt@fcma.com>
Date: Thu, Aug 10, 2023 at 10:44 AM
Subject: shoes
To: Mike Senzaki <mike.senzaki@unclenearest.com>
Cc: Jonathan Boyce <Jonathan.Boyce@fcma.com>

WTH....you're didn't think to set me up with a pair of Air Force One's?  Size 10

**Brian Klatt**
Vice President Corporate Originations | Brian.Klatt@fcma.com
12501 Lakefront Place Louisville, KY 40299
T 303-550-8463 F 502-450-9357 | fcma.com

This communication is intended for the exclusive use of the addressee(s). It may contain information that is privileged, confidential and/or protected from disclosure, and that may be subject to the Electronic Communications Privacy Act of 1986, as amended. If you are not the intended recipient, any review, dissemination, distribution or copying of the communication is strictly prohibited. Please notify us immediately by telephone and/or reply e-mail and destroy this message and attachments. Farm Credit Mid-America, ACA

Case 4:25-cv-00389-CEA-CHS   Document 1-1   Filed 08/02/25   Page 72 of 72
about:blank?windowId=SecondaryReadingPane6&fdId=1SecondaryReadingPane#13   PageID #: 869

1/1