# IN THE CHANCERY COURT
## FOR THE SEVENTEENTH JUDICIAL DISTRICT
### AT BEDFORD COUNTY, TENNESSEE

| | |
|---|---|
| **GRANT SIDNEY, INC.,** ) | FILED 12/29/2025 |
| **FAWN WEAVER, and** ) | 1:42 O'clock P m |
| **KEITH WEAVER,** ) | Curt M. Cobb, C & M |
| ) | By [signature] |
| **Plaintiffs,** ) | **CIVIL ACTION** |
| ) | |
| **v.** ) | **Case No. 35594** |
| ) | |
| **MICHAEL SENZAKI, and** ) | |
| **ZMS STRATEGIES, INC.** ) | |
| ) | **JURY DEMAND** |
| ) | |
| **Defendants.** ) | |
| ) | |

## COMPLAINT

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to Tenn. Code Ann. § 16-10-101. This action is brought by Plaintiffs Grant Sidney, Inc., as well as by Fawn Weaver and Keith Weaver in their individual capacities, to redress direct, personal injuries arising from Defendants' tortious misconduct as described in this Complaint.

2. Venue is proper in Bedford County, Tennessee under Tenn. Code Ann. § 20-4-101(a) because the acts and omissions giving rise to Plaintiffs' claims occurred in Bedford County, the personal and professional harm to Plaintiffs was suffered there, Plaintiffs reside in Bedford County and the underlying juridic entity through which the Defendants performed their wrongful acts was founded in and at all times conducted its primary business in Bedford County.

### PARTIES

1

3.     Plaintiff Grant Sidney, Inc. ("Grant Sidney") is a Delaware corporation with its principal place of business in Bedford County, Tennessee. Grant Sidney brings this action in its own right, not derivatively, for direct injuries it sustained as a result of Defendants' misconduct and the conspiracy alleged herein, including the misuse, diversion, and impairment of Grant Sidney's own assets and rights, and harm inflicted on Grant Sidney as a specific, intended target of Defendants conduct.

4.     Plaintiff Fawn Weaver is an individual residing in Bedford County, Tennessee. Ms. Weaver brings this action in her individual capacity for direct personal injuries caused by the diversion of her personal equity interests and fraudulent use of signature authority, false and defamatory statements made against her, and severe reputational and financial harm caused by Defendants' actions and their foreseeable consequences.

5.     Plaintiff Keith Weaver is an individual residing in Bedford County, Tennessee. Mr. Weaver brings this action in his individual capacity for direct personal injuries, including reputational damage, professional harm, and substantial personal financial losses caused by Defendants' conduct and its foreseeable consequences, including actions taken against him personally and with malice.

6.     Defendant Michael Senzaki ("Senzaki") is an individual residing in Las Vegas, Nevada who – at all times material hereto – conducted business in Bedford County, Tennessee as a part of the conspiracy described in this Complaint. At all relevant times, Senzaki occupied a senior finance leadership role in a company founded by Plaintiffs, that afforded Senzaki extraordinary access to Plaintiffs' personal signatures, equity-related instruments, and sensitive personal and financial information. Senzaki abused that access to further a conspiracy to harm

2

Plaintiffs and to advance his and his Co-Conspirators' own personal objectives, including by using corporate and third-party vehicles under his control.

7. Defendant ZMS Strategies, Inc. is a closely held Oregon corporation owned by Senzaki and utilized by him as a co-conspirator in order to further the tortious conduct set forth herein.

8. Unindicted Co-Conspirators. At all relevant times, Senzaki acted in concert with one or more entities and individuals not yet named as defendants, including a corporation he controlled in Oregon named herein as Defendant ZMS Strategies, Inc. and other persons presently unknown to Plaintiffs (collectively, the "Co-Conspirators"). Plaintiffs will amend this Complaint to name such Co-Conspirators when their identities and roles are confirmed through discovery. Hereinafter, the Defendants shall be sometimes collectively referred to as "Co-Conspirators" or "Conspirators."

9. Plaintiffs seek redress solely for the direct and personal harm caused to them, not for generalized injury to Uncle Nearest or its shareholders as a whole.

## PRELIMINARY STATEMENT

10. This case arises from a deliberate and coordinated scheme of actual fraud and fraudulent concealment carried out by the Co-Conspirators—led by Defendant Michael Senzaki, the former Chief Financial Officer of Uncle Nearest, Inc. ("Uncle Nearest")—who abused the extraordinary trust placed in him by Uncle Nearest's founders, Plaintiffs Fawn Weaver, Keith Weaver, and Grant Sidney, Inc. Exercising exclusive control over Uncle Nearest's financial reporting systems, Senzaki knowingly suppressed expenses, concealed material liabilities, and falsified the company's true financial condition as a part of the conspiracy set forth in this Complaint. As part of this scheme, and without the knowledge or consent of the Weavers,

3

Defendants wrongfully hypothecated and pledged Ms. Weaver's equity interests based upon false pretenses and material misrepresentations, thereby exposing Plaintiffs to liabilities they neither approved nor incurred. When the fraud began to unravel, Defendants and their Co-Conspirators intentionally manufactured and disseminated a false public narrative—including the claim that Uncle Nearest had simply overextended itself—to conceal their own misconduct, shift blame to the founders, and legitimize the consequences of the fraud. That narrative was knowingly false, was created at Defendants' behest, and caused Plaintiffs profound reputational, financial, and personal harm, independent of and apart from any privileged litigation activity.

11.     The consequences of Defendants' misconduct were neither abstract nor confined to the corporate entity. They were direct, foreseeable, and profoundly personal. As an intended result of Defendants' fraud, fraudulent concealment, and the unauthorized hypothecation of Ms. Weaver's equity, Defendants and their Co-Conspirators deliberately advanced a false public narrative portraying Ms. Weaver and Mr. Weaver as having personally caused or guaranteed corporate indebtedness they neither approved nor incurred. That narrative—manufactured to conceal Defendants' own misconduct—inflicted both immediate and severe ongoing reputational harm. Ms. Weaver, whose professional credibility and public trust are central to her livelihood, suffered the cancellation of multiple confirmed speaking engagements, and loss of board opportunities, resulting in losses of more than one million dollars $1,000,000 to date. Mr. Weaver likewise sustained substantial personal financial harm when more than $1,750,000 in committed funding for his separate and unrelated business ventures was suspended indefinitely, not because of any wrongdoing on his part, but because Defendants' false narrative created uncertainty and stigma as to his personal financial integrity and obligations.

4

12. Ms. Weaver's equity interests were not incidental compensation; they were the centerpiece of her personal and financial sacrifice, and Defendants knew it. Unlike typical founders who extract value through salary, bonuses, or liquidity events, Ms. Weaver deliberately chose to be compensated almost entirely through equity, receiving between $0 and $90,000 per year in cash compensation, and she never sold a single equity interest for personal gain. Any equity interests that were sold were sold solely for the benefit of Uncle Nearest, with all proceeds loaned back in their entirety. Mr. Weaver likewise subordinated his personal interests, abandoning approximately $1,000,000 in annual compensation beginning in October 2023 to support the company's growth, receiving no ongoing salary, holding no equity interest whatsoever, and serving without personal financial benefit. Defendants and their Co-Conspirators understood that Plaintiffs' earned and vested equity compensation and personal economic interests related to Uncle Nearest represented both extraordinary economic value and deep personal reliance, and they seized upon that reality. By targeting and diluting the very interests Ms. Weaver had chosen in lieu of compensation, Defendants knowingly created conditions in which third parties were more willing to assist in the scheme—understanding that impairing those equity interests would exert maximum leverage, inflict maximum harm, and facilitate participation in transactions that would never have occurred absent the false pretenses and fraudulent concealment orchestrated by Defendants.

13. During this same period, Ms. Weaver's responsibilities required constant national travel—often five to six days per week, spanning hundreds of markets and more than twenty military bases—where she served as the public face of the brand, meeting with distributors, national account buyers, and community leaders. That work was essential not only to Uncle Nearest's growth and visibility, but to Ms. Weaver's own professional standing and personal reputation. In her unavoidable physical absence from company headquarters, Ms. Weaver

5

reasonably relied on Defendant Senzaki, as Chief Financial Officer, to safeguard financial operations and to act with honesty and fidelity. Instead, Senzaki and his Co-Conspirators knowingly exploited that reliance, abused positions of trust, and orchestrated a scheme that inflicted direct and personal harm on Plaintiffs themselves. The injuries alleged herein—including reputational damage, lost speaking and professional opportunities, personal financial losses, and impairment of individual business relationships—were intended to impact Plaintiffs personally, were suffered by them individually, and did not arise merely from harm to the company. These damages were a foreseeable and deliberate consequence of Defendants' misconduct and were inflicted for the purpose of shifting blame, exerting leverage, and concealing Defendants' own fraud.

## BACKGROUND

### Fraudulent Conduct and Admissions of Defendant

14.     Defendant Senzaki's misconduct inflicted devastating, direct, and deeply personal harm on Plaintiffs Fawn Weaver, Keith Weaver, and Grant Sidney, Inc., wholly independent of any injury to the company Uncle Nearest, itself. Among his most egregious acts was the knowing misappropriation, dilution, and unauthorized transfer of Ms. Weaver's earned and vested equity compensation, which constituted her primary—and deliberately chosen—form of remuneration for years spent building the company and was valued in the tens of millions of dollars. At all relevant times, these equity interests and options were earned, vested, and the personal property of Ms. Weaver, issued to her annually as compensation for services rendered and not subject to revocation, transfer, pledge, or encumbrance without her knowledge and consent. Senzaki nevertheless treated those interests as expendable assets to be leveraged, impaired, and conveyed through false pretenses and material concealment, knowing that targeting Ms. Weaver's equity

6

would inflict maximum personal harm, supply leverage for third-party participation in the scheme, and advance the broader effort to conceal Defendants' fraud. The Co-Conspirators nevertheless treated Ms. Weaver's equity interests as their own, purporting to transfer, pledge, assign, or otherwise dispose of them in their own names and through entities they controlled, and presenting those interests to third parties as though they possessed authority and ownership they did not have.

15. In other instances, an internal investigation confirmed that Senzaki caused Ms. Weaver's earned and vested equity to be transferred without her knowledge or consent through forged stock transfer certificates executed in her name, in direct violation of governing authorization requirements and ownership records. He then leveraged and encumbered portions of this stolen equity for his personal benefit, using it to obtain favorable personal loans and advantages in unrelated financial transactions, all while concealing the transfers and misrepresenting his authority. These acts were intentional, covert, and deeply personal—a calculated abuse of trust by a senior officer and his Co-Conspirators who knowingly converted compensation that did not belong to them, exploited exclusive access to the company's most sensitive ownership records, and enlisted third parties through false pretenses to advance and conceal his misconduct.

16. Senzaki was hired at a moment when Uncle Nearest had no operating revenue and existed solely on initial investor capital—a phase that demanded exceptional financial discipline and absolute integrity from anyone entrusted with control over the company's finances. His engagement was the product of a deliberate and careful decision, not haste or informality. The Weavers' had known Senzaki for more than a decade through his wife, then a close personal friend whom Ms. Weaver reasonably believed to be trustworthy, and whose representations regarding Senzaki's professional background proved consistent over time. Those representations included

7

his work as a Sarbanes–Oxley specialist at Ernst & Young, his participation in taking Baja Fresh public and its subsequent sale to Wendy's, and his later senior financial leadership roles, including at iPayment. Senzaki was thereafter recruited as Chief Financial Officer of Trellis Earth, where he was promoted by the board to serve successively as CFO, COO, and ultimately CEO. The length, consistency, and upward trajectory of Senzaki's career, observed over many years, supported the Weavers' decision to place confidence in him. That confidence was further informed by the company's earliest realities: confidentiality was paramount due to the expectation of a potential intellectual-property dispute with one of the nation's largest spirits conglomerates, making a broad or public executive search impractical. The role therefore required someone already known to the founders—someone with verifiable credentials, demonstrated experience, and whom the Weavers reasonably believed could be trusted with the company's most sensitive financial and ownership information at its most vulnerable stage.

17. As set forth in this Complaint, Senzaki utilized the extraordinary trust placed in him by Plaintiffs and conspired with the Co-Conspirators to implement a brazen and fraudulent scheme involving forged instruments and tens of millions of dollars of diversions of capital and Plaintiffs' earned and vested equity compensation and personal equity interests.

18. **Vendor Diversion Scheme**. For example, as part of a broader, deliberate scheme of actual fraud and fraudulent concealment, Defendant Senzaki exploited his exclusive access to the company's financial systems to divert funds, conceal liabilities, and misappropriate company resources for personal benefit—not by bypassing controls, but by corrupting the very controls the Weavers designed to prevent abuse. In order to effectuate this scheme, Senzaki and the Co-Conspirators dealt in Plaintiffs' personal equity interests, earned and vested equity compensation, and related rights in order to impair those interests and strip them of value.

8

19. **Abuse of Rigorous Executive Approval Process.** Throughout the relevant period, Ms. Weaver implemented and personally enforced a strict, non-delegable approval process for all vendor payments. Each week—despite extensive national travel to build the company's footprint—Ms. Weaver participated in a standing Zoom meeting with the Chief Financial Officer and Comptroller during which every invoice scheduled for payment was reviewed line by line. If Ms. Weaver did not recognize a charge, she required it to be returned to the originating department for explanation and confirmation. No invoice was authorized for payment absent her express approval. The purpose of this process was exacting and unequivocal: no company funds were to be disbursed without the Chief Executive Officer's personal review and consent. Among other things, the Co-Conspirators abused the foregoing process in the following ways:

- **Exploitation of System Access After Approval**. Senzaki exploited the one place concealment was possible—inside the software implementing Ms. Weaver's approved decisions. Using a permissions loophole within the Bill.com platform that was invisible to executive review, Senzaki altered invoices after approval had been given and after Ms. Weaver reasonably believed payments were locked. Immediately following weekly approval meetings, he reopened the payment queue, reduced the amount payable to legitimate vendors, and created mirror entries payable to Co-Conspirators and entities he secretly owned or controlled. The system marked both entries as "paid," falsely reflecting full satisfaction of vendor obligations while concealing the diversion behind the appearance of completed transactions.

- **Conversion Through Access, Not Inattention**. Senzaki did not exploit inattentiveness or weak oversight; he exploited trust and privileged access. He converted a control process so rigorous that it required the Chief Executive Officer's personal approval into the

9

instrument of his fraud, deliberately defeating safeguards designed to prevent precisely this type of misconduct.

20. **Concealment of Vendor Liabilities**. Following Senzaki's departure in October 2024, Plaintiffs discovered that substantial vendor obligations had been concealed for an extended period, ultimately exceeding $7,000,000, exclusive of principal and interest obligations owed to Farm Credit Mid-America ("FCMA"). To determine the scope of the concealment, Plaintiffs were forced to retain a temporary three-person accounts-payable team to contact nearly four hundred vendors and obtain statements of outstanding invoices. The independent third-party investigation revealed multiple concealment techniques employed by Senzaki, including:

- partially paying vendors while falsely marking invoices as fully satisfied;
- removing invoices from the accounting system altogether; and

failing to enter invoices into the system at all.

- While some concealed amounts were diverted to Co-Conspirators and entities Senzaki owned or controlled, others were hidden to artificially inflate reported performance metrics upon which Senzaki's personal compensation and perceived success depended.

21. Once the scope of the misconduct was uncovered, Plaintiffs were forced to undertake extraordinary, time-consuming, and personally disruptive efforts to identify, trace, and begin recovering equity value and ownership rights that had been wrongfully diverted from them. That work required Plaintiffs themselves—rather than any corporate proxy—to engage investigators, reconstruct financial and ownership records, respond to misinformation, and take corrective action to stabilize their personal and professional standing. In the process, and for the first time in either of their professional careers, Plaintiffs were compelled to make painful and highly visible decisions, including significant cost reductions and workforce changes, under

circumstances created entirely by Defendants' misconduct. These actions subjected the Weavers to intense personal stress, public scrutiny, and reputational harm, and imposed direct financial and emotional burdens that were borne by Plaintiffs individually, independent of and in addition to any injury suffered by the company itself.

22. **Forged Corporate Documents and False Reporting**. Defendants further advanced and concealed their scheme by fabricating corporate records and falsifying documentation to manufacture the appearance of authority and approval they did not possess. They prepared false board minutes purporting to reflect approvals by the Weavers that never occurred, affixed Ms. Weaver's signature to corporate documents without her knowledge or consent, and purported to submit materially false financial reports to FCMA, knowing and intending that those reports would be relied upon in lending decisions, collateral positions, and enforcement posture. These were not clerical errors or isolated lapses. They were deliberate fabrications, undertaken to mislead third parties, to legitimize unauthorized transactions, and to shield Defendants' misconduct from detection by Plaintiffs

23. Defendant and his Co-Conspirators have admitted the foregoing misconduct to third-party investigators retained to examine irregularities in Uncle Nearest's finances and ownership records and surrounding equity transactions and activity under the Co-Conspirators' control. In those admissions, Defendant Senzaki — acting individually and through entities he controlled and in conjunction with Co-Conspirators —acknowledged diverting and impairing Plaintiffs' equity interests and company funds without authorization, confirmed that the misconduct was intentional, sustained over years, and deliberately concealed, and admitted that misappropriated equity value and funds were used to purchase a residence in Las Vegas, acquire vehicles, and engage in gambling activities. Defendant Senzaki and his Co-Conspirators further

11

admitted that the scheme necessarily targeted Ms. Weaver's personal equity interests and Plaintiffs' earned and vested equity compensation, because those interests represented the only meaningful source of value from which Defendants could profit. By diluting, encumbering, pledging, and converting Ms. Weaver's equity (and Plaintiffs' earned and vested equity compensation) without consent, Defendant and his Co-Conspirators acted as unauthorized equity holders, appropriating ownership rights and economic benefits that belonged exclusively to Plaintiffs. These admissions establish that the misconduct was not incidental or collateral, but directed squarely at Plaintiffs' equity and corporate interests in Uncle Nearest, and was undertaken for the specific purpose of enriching Defendant and his Co-Conspirators by stealing, exploiting, and monetizing ownership interests that were not theirs—inflicting direct and personal harm on Plaintiffs as the intended and indispensable result of the scheme.

### Manipulation of Financial Reporting and Unilateral Credit Drawdowns

24.    Between July 2022, when the revolving credit facility for Uncle Nearest was first established at $35,000,000, and August 2023, when FCMA increased that facility to approximately $66,980,000, Defendant and his Co-Conspirators exercised exclusive control over lender-facing reporting and communications in furtherance of a deliberate plan to appropriate and dilute Ms. Weaver's equity interests. During that period, Defendant and his Co-Conspirators concealed legitimate operating expenses, suppressed vendor payables, and distorted the company's bottom-line financial picture—not merely to expand borrowing capacity, but to create the false appearance of financial strength necessary to justify transactions that impaired Ms. Weaver's personal equity interests and earned and vested equity compensation, and transferred economic control to Defendants themselves. These distortions were intentionally withheld from Plaintiffs, while being affirmatively and purportedly presented to the lender as accurate, knowing and intending that

12

FCMA would officially claim reliance on them in setting collateral, leverage, and enforcement posture. The scheme depended on recharacterizing and diminishing Ms. Weaver's equity while Defendants and their affiliates functioned as unauthorized equity holders, extracting value and control that did not belong to them. The resulting lender reliance and downstream actions were not accidental or merely contractual; they were the foreseeable and intended consequences of a plan that required the erosion of Plaintiffs' personal equity interests and earned and vested equity compensation, and they culminated in direct, personal harm to Plaintiffs, including false attributions of responsibility and improper actions taken against the Weavers individually for obligations they neither guaranteed nor incurred.

25. As Chief Financial Officer, Defendant and his Co-Conspirators exercised exclusive control over the preparation, content, and transmission of recurring collateral, covenant, and borrowing-base reports submitted to FCMA, and Defendant routinely acted as the sole point of contact on lender matters that carried direct and foreseeable personal consequences for Ms. Weaver's personal equity interests and Plaintiffs' earned and vested equity compensation. By Defendants' own admissions to independent third-party investigators, key lender-facing submissions were intentionally withheld from Plaintiffs, while purportedly being presented to FCMA in a form that concealed the company's true expense burden and outstanding obligations. Defendant and his Co-Conspirators further misrepresented and suppressed material technical requirements embedded in the loan documentation, including provisions that, if accurately disclosed, would have fundamentally altered Plaintiffs' understanding of risk, exposure, and the vulnerability of Plaintiffs' personal equity interests and earned and vested equity compensation related to Uncle Nearest. Plaintiffs reasonably relied on their Chief Financial Officer to interpret and administer these technical lending provisions in good faith and for the protection of their

13

ownership and associated interests. Defendant and his Co-Conspirators instead exploited that reliance, embedding deception inside the very systems designed to provide oversight and accountability, and doing so in a manner calculated to be undetectable through ordinary executive review, while enabling Defendants to function as unauthorized equity holders by diverting control, value, and economic benefit away from the Weavers and toward themselves.

26. Plaintiffs had no knowledge of, and no involvement in, any effort to mislead the lender or include the lender in any of the Co-Conspirators' plans. When Defendant and his Co-Conspirators presented proposed credit-limit increases to Ms. Weaver, for example, those proposals were framed as routine, appropriate, and prudently secured, while material underlying information was intentionally withheld or manipulated. In particular, Defendant and his Co-Conspirators suppressed operating expenses and vendor payables, distorted the company's true bottom-line condition, and concealed risks that directly threatened Plaintiffs' equity and value within Uncle Nearest — thereby inducing purported lender confidence that could not have existed absent the fraud. That false financial narrative was later repurposed and laundered by Defendant and his Co-Conspirators into a public explanation designed to conceal their own misconduct, falsely portraying Plaintiffs or their privies as having caused or guaranteed financial obligations they neither approved nor incurred. This narrative shift was not incidental; it was a necessary component of the scheme, intended to deflect scrutiny from the theft and impairment of Plaintiffs' personal equity interests and earned and vested equity compensation, while enabling Defendant and his Co-Conspirators to continue acting as unauthorized equity holders of Uncle Nearest at Plaintiffs' expense and for the financial benefit of the Co-Conspirators.

27. In reality, the revolving facility expanded through two distinct mechanisms, each of which Defendant and his Co-Conspirators exploited to advance their plan to impair and

14

appropriate Ms. Weaver's equity interests. First, the original July 22, 2022 Credit Agreement embedded automatic credit increases, including an $8,000,000 increase on the first anniversary carrying a $40,000 fee payable to FCMA, that were triggered without any requirement of contemporaneous executive explanation or meaningful review. Second, a series of amendments executed between October 2022 and December 2023 (Amendment Nos. 1–7) required Ms. Weaver's signature, which she provided in good-faith reliance on her Chief Financial Officer's representations regarding risk, compliance, and the protection of her equity position. Defendant and his Co-Conspirators deliberately used the distinction between automatic increases and signature-based amendments to fragment disclosure, suppress material information, and ensure that expansions of borrowing capacity—each of which increased pressure on and vulnerability of Ms. Weaver's equity—did not consistently come before Ms. Weaver for clear, complete, and meaningful evaluation. This structural manipulation was not incidental; it was integral to a scheme that depended on incremental leverage increases occurring without full transparency, thereby enabling Defendant and his Co-Conspirators to continue acting as unauthorized equity holders while steadily diluting and endangering the founders' equity interests in Uncle Nearest including Ms. Weaver's personal equity interests.

28.    Several amendments were deliberately structured to obscure their cumulative effect on ownership, control, and equity exposure, making incremental changes difficult to track in real time and masking their practical impact on Plaintiffs' position. Defendant and his Co-Conspirators exploited this opacity, together with Defendants' exclusive control over the timing, framing, and substance of disclosures to Plaintiffs, to advance transactions that operated as de facto equity reallocations rather than ordinary debt adjustments. This exploitation was particularly consequential because Uncle Nearest's strength and market position were such that the lender did

15

not require personal guarantees from the founders—a circumstance that made equity, not personal liability, the true locus of risk and value. Knowing that meaningful lender participation in a closely held enterprise necessarily implicates equity interests in one form or another, Defendant and his Co-Conspirators used their control to insert themselves and their affiliates into the economic position of equity holders, while simultaneously diluting and impairing Ms. Weaver's ownership without consent. When the resulting consequences began to surface publicly, Defendant and his Co-Conspirators conspired to create a false narrative that portrayed the founders as personally responsible for obligations they neither guaranteed nor incurred. That silence preserved the benefits of the equity theft of the Co-Conspirators while permitting Plaintiffs' goodwill, reputations, and professional standing to absorb the damage necessary to conceal Defendants' misconduct.

29.    Although the amendments Ms. Weaver signed nominally expanded only borrowing capacity, Defendant and his Co-Conspirators ensured that the real transfer of economic power occurred through the execution of twenty-eight (28) individual drawdowns, each undertaken by Defendant Senzaki on his own authority and without full contemporaneous disclosure to Plaintiffs. Under FCMA's written policy procedures, those drawdowns could be requested and funded within twenty-four (24) hours, without independent confirmation from any other company officer and without notice to Ms. Weaver—even though she was the company's principal decisionmaker and sole authorized signatory for material facility changes affecting ownership and control. Defendant and his Co-Conspirators exploited that asymmetry to obtain unchecked access to tens of millions of dollars, which they used not merely to fund operations, but to reshape economic control, impair Plaintiffs' founders interests, and position themselves and their affiliates as de facto equity holders. By separating borrowing authority from ownership oversight, Defendants were able to convert

16

debt drawdowns into instruments of equity dilution and value diversion, concealing the resulting harm until irregularities were uncovered through investigation. This structure—and Defendants' deliberate exploitation of it—was integral to a scheme that depended on stealth, speed, and exclusion of the rightful equity holders in order to succeed.

30.     Documentary evidence confirms that Defendant and his Co-Conspirators exercised unilateral control over drawdowns and routinely executed loan notices without FCMA requiring the knowledge, consent, or confirmation of Ms. Weaver—the company's principal decisionmaker and primary equity holder. By way of example, on May 10, 2023, Defendant emailed FCMA senior credit officer Jonathan Boyce a loan notice requesting a $1,070,000 advance dated May 8, 2023; on July 26, 2023, he transmitted another notice requesting $7,000,000; and on August 1, 2023, he sent two additional notices requesting $930,000 and $1,060,000 within less than two hours of each other. Each notice—titled "Loan Notice [date] revolv.docx"—was executed solely by Defendant in his purported capacity as Chief Financial Officer and contained representations that were treated as binding on Uncle Nearest, notwithstanding their direct and foreseeable impact on Ms. Weaver's equity interests. Over a thirteen (13) month period, Defendant processed twenty-eight (28) such drawdown requests totaling nearly $67,000,000, effectively exercising economic control normally reserved to equity holders while excluding the actual owner from notice, approval, or oversight. At no point did any representative of FCMA contact Ms. Weaver to confirm that she had approved—or was even aware of—these drawdowns, a structural failure that Defendant and his Co-Conspirators knowingly exploited to substitute themselves into the position of equity holders, divert value, and dilute Plaintiffs' personal equity interests and earned and vested equity compensation without consent. Representative loan notices and corresponding communications evidencing this conduct are attached as Exhibits 10—12.

17

**Manufactured False Narrative Regarding Personal Responsibility for Corporate Debt and Resulting Individual Harm**

31.    At no time did Fawn Weaver or Keith Weaver personally guarantee any loan obligations owed to FCMA. They were not borrowers, co-borrowers, or guarantors under the applicable credit agreements, bore no personal contractual liability for the company's indebtedness, and were never advised that their personal assets or credit were at risk.    This phenomenon occurred because of the strength of the brand built by Plaintiffs, unique not only in the spirits industry but in American entrepreneurial history in general.  The only way for the Co-Conspirators to effectuate their scheme was to attack the underbelly of risk involving inherent trust placed in corporate officers and fiduciaries.

32.    Defendant Senzaki and his Co-Conspirators intentionally created, advanced, and allowed to circulate a false narrative portraying Plaintiffs as having personally caused, controlled, or stood behind the company's debt obligations. That narrative was manufactured by Defendants and Co-Conspirators as part of their broader scheme to conceal equity theft, deflect scrutiny from their own misconduct, and legitimize the consequences of transactions that had impaired Plaintiffs' interests. Defendant and his Co-Conspirators communicated this narrative—directly and indirectly, formally and informally—to third parties, including lender representatives, advisors, and market participants, knowing and intending that it would be relied upon, repeated, and acted upon.

33.    Although the precise contents, timing, and recipients of each publication are presently known only to Defendants and their Co-Conspirators, Plaintiffs allege upon information and belief that Defendant and his Co-Conspirators disseminated and reinforced this false narrative through oral statements, written communications, and strategic omissions, both before and outside

18

of any judicial proceeding. Defendant further affirmatively chose silence at moments when correction was necessary and expected, knowing that such silence would be understood as confirmation and would permit the narrative to harden and spread. Plaintiffs allege these publications and omissions according to proof and will seek leave to amend to identify specific speakers, recipients, and republications as discovery proceeds.

34.     The personal consequences of this narrative were immediate and severe. As a direct result of being falsely portrayed as personally responsible for corporate financial misconduct, Ms. Weaver suffered the cancellation of confirmed speaking engagements and professional opportunities, resulting in losses of more than $1,000,000 to date. Those engagements and opportunities constituted a significant portion of her personal income and were distinct from, and independent of, any role she held at Uncle Nearest.

35.     Mr. Weaver likewise sustained substantial individual harm. As a foreseeable result of the same false narrative, $9,750,000 in committed funding for his separate and unrelated business ventures was placed on indefinite hold. Those ventures have no operational, financial, or ownership connection to Uncle Nearest, and the funding freeze arose solely from reputational uncertainty created by Defendants' misconduct and the false portrayal of Mr. Weaver's personal financial responsibility.

36.     All Plaintiffs suffered additional harm according to proof as a result of the Co-Conspirators intentional publications designed to cover up and perfect their theft and impairment of Plaintiffs' personal equity interests and earned and vested equity compensation related to Uncle Nearest.

37.     Plaintiffs seek redress solely for the direct, personal harm caused by Defendant and his Co-Conspirators' intentional creation and dissemination of a false and defamatory narrative,

and their knowing failure to correct it, which inflicted reputational and financial injury on Plaintiffs in their individual capacities and was an essential component of the conspiracy to appropriate and exploit Plaintiffs' equity interests.

## Unauthorized Transfer of Mrs. Weaver's Stock Options

38.     Defendant Senzaki and his Co-Conspirators further harmed Plaintiffs by knowingly converting, transferring, and encumbering Ms. Weaver's earned and vested equity compensation — valued in the tens of millions of dollars — without her knowledge or consent, as part of their broader scheme to appropriate and exploit Ms. Weaver's ownership interests. These equity interests were not incidental holdings; they constituted Ms. Weaver's principal form of compensation from the company's founding forward. Ms. Weaver deliberately limited her cash salary to between $0 and $90,000 per year, choosing instead to build long-term value through equity in reliance on the integrity of the company's financial leadership. At no time did the company's official corporate records reflect any authorized transfer, reassignment, pledge, or encumbrance of these equity interests. Only after Senzaki's separation from the company were forged stock transfer certificates discovered, purporting to evidence reassignments of Ms. Weaver's equity that had never been approved, executed, or disclosed. Those certificates were fabricated to appear legitimate, were created and deployed by Defendant and his Co-Conspirators to insert themselves into the economic position of equity holders, and were used to enrich Defendants while deliberately concealing the theft from Ms. Weaver and the company's leadership. This misconduct targeted Ms. Weaver's compensation and ownership directly and was an essential component of the conspiracy to steal, dilute, and monetize equity that did not belong to Defendants.

20

39. The forged stock transfer certificates were fabricated, executed, and circulated by Defendant and his Co-Conspirators without notice to Ms. Weaver or Plaintiffs, without board authorization, and without any legitimate supporting documentation, and were never reflected in the company's lawful corporate records. Their existence came to light only after Senzaki's departure, when company leadership obtained and reviewed the documents and confirmed that no authorized corporate officer had approved, issued, or ratified any such transfers. The certificates bore forged or falsified signatures purporting to authorize transactions that never occurred and were created to manufacture the appearance of legitimate equity reallocation – all of which hypothecated not only Ms. Weaver's equity interest but Plaintiffs' founders' interests in Uncle Nearest as well. These documents were not ancillary misconduct; they were central instruments of a calculated scheme to misappropriate Plaintiffs' equity compensation and to substitute Defendant and his Co-Conspirators into the economic position of equity holders. The threatened loss and impairment of those interests represents not only a substantial financial injury to Plaintiffs, but the intentional conversion of their primary form of compensation and a profound breach of trust by an executive who knowingly abused long-standing personal and professional access. This conduct formed an integral part of the same coordinated pattern of fraud, concealment, and deception through which Defendant and his Co-Conspirators advanced their own interests by stealing, diluting, and monetizing equity that belonged exclusively to Plaintiffs.

**Additional Forged Documents and Unauthorized Use of Ms. Weaver's Signature**

40. Defendant and his Co-Conspirators engaged in additional acts of forgery and falsification by applying Ms. Weaver's signature to material financial documents without her knowledge, authorization, or consent, as part of the same scheme to conceal liabilities and appropriate control and equity value. In one such instance, after affirmatively confirming to Ms.

21

Weaver in writing that no loans existed outside of the company's primary credit facility, Defendant used the DocuSign platform to fraudulently affix Ms. Weaver's signature to an amendment to a bridge-loan agreement in the principal amount of approximately $2,525,000. Ms. Weaver did not authorize the amendment, was not informed of its execution, and did not consent to the transaction. The falsification was undertaken to manufacture apparent approval, conceal additional indebtedness that directly threatened Ms. Weaver's equity interests, and further Defendants' and his Co-Conspirators' ability to act as unauthorized equity holders by shifting risk, control, and value away from the rightful owners and toward themselves.

41. The forged amendment was discovered only after Defendants' departure, when an investor sought clarification regarding rights purportedly granted under the amended agreement— rights that directly affected ownership, control, and priority interests. An internal review, followed by an independent third-party investigation, confirmed that the digital signature did not originate from Ms. Weaver's DocuSign account and had been applied without her authorization or knowledge. The use of Ms. Weaver's forged signature manufactured consent where none existed, created obligations and concessions she never approved, and further evidenced that Defendant and his Co-Conspirators were willing to impersonate her approval whenever necessary to advance their objectives. This conduct was not opportunistic or isolated; it was consistent with a broader pattern in which Defendant and his Co-Conspirators substituted themselves for the rightful equity holders by falsifying authority, concealing risk, and reallocating economic rights through deception.

42. The forged amendment remains the subject of an ongoing independent investigation, the results of which have already confirmed that Defendants' misconduct was not isolated, inadvertent, or technical, but deliberate, calculated, and repeated over time. Defendant and his Co-Conspirators repeatedly treated Ms. Weaver's consent and Plaintiffs' involvement in

the transfer, impairment, or encumbrance of their personal equity interests and earned and vested equity compensation as optional, forging Ms. Weaver's signature, fabricating approvals, and misrepresenting Plaintiffs' assent whenever doing so advanced their objectives. This conduct was undertaken knowingly and systematically, and reflects a conscious decision to displace Ms. Weaver's authority as lead equity holder, to bypass lawful governance, and to reallocate economic rights of Plaintiffs through deception. These acts were integral components of a sustained pattern of fraud, concealment, and abuse of trust that underlies Plaintiffs' claims and through which Defendant and his Co-Conspirators sought to enrich themselves at Plaintiffs' direct expense.

### Conspiracy and Concerted Action with Unindicted Co-Conspirators

43. Defendant Senzaki did not act in isolation. At all relevant times, he knowingly acted in concert not only with his company ZMS Strategies, Inc. but with one or more individuals and entities whose identities are presently unknown to Plaintiffs in furtherance of a coordinated scheme that caused direct, foreseeable, and personal harm to Plaintiffs Fawn Weaver, Keith Weaver, and Grant Sidney, Inc.

44. The object of the conspiracy was not merely concealment of internal misconduct, but the advancement of Defendants' personal objectives through the misappropriation and impairment of Plaintiffs' personal equity interests and earned and vested equity compensation, the impersonation of Ms. Weaver's consent through forged and falsified documents, and the manufacture and maintenance of a false narrative designed to deflect scrutiny from Defendants' actions while shifting blame and reputational harm onto Plaintiffs personally.

45. In furtherance of the conspiracy, Defendant and the Co-Conspirators committed overt acts, including but not limited to:

(a) preparing, circulating, and relying upon forged and falsified documents purporting to evidence approvals by Ms. Weaver that never occurred;

(b) misrepresenting ownership, authority, and control over equity and contractual rights belonging to Plaintiffs;

(c) concealing, altering, or manipulating financial information after it had passed through ordinary executive review; and

(d) defaming Plaintiffs and then strategically withholding corrective information that Defendant and the Co-Conspirators knew would have prevented Plaintiffs from being falsely portrayed as absentee business leaders and personally responsible for financial misconduct.

46. Defendant further advanced the conspiracy by maintaining exclusive control over communications with third parties whose actions he knew—or deliberately avoided knowing—would carry serious personal consequences for Plaintiffs. Defendant understood that his false statements, omissions, and calculated silence would foreseeably result in Plaintiffs being treated as personally culpable for obligations they did not incur and wrongdoing they did not commit, and he chose not to correct the record because the persistence of that false narrative served his own interests.

47. Certain Co-Conspirators occupied positions within or adjacent to the company's finance and reporting functions, reporting directly or indirectly to Defendant, and thereby enabled him to neutralize internal controls, suppress dissent, and embed deception within systems specifically designed to ensure accuracy and accountability. Other Co-Conspirators operated outside the company, receiving and acting upon misrepresented or incomplete information supplied by Defendant in ways that predictably amplified the personal harm to Plaintiffs.

24

48. Plaintiffs do not presently name all of the Co-Conspirators as defendants because the full scope of their identities, roles, and knowing participation remains uniquely within Defendants' possession and control. Plaintiffs expressly reserve the right to amend this Complaint to add additional defendants and allegations as discovery reveals further facts confirming participation in the conspiracy alleged herein.

49. As a direct and proximate result of the conspiracy and the overt acts taken in furtherance of it, Plaintiffs suffered severe, measurable, and personal injuries, including the loss and impairment of earned and vested equity compensation and personal equity interests, reputational destruction, loss of professional income, and the freezing of guaranteed funding for unrelated business ventures. These injuries were not incidental, but were the intended and foreseeable consequences of Defendants' conduct and the concerted actions of his Co-Conspirators.

## COUNT ONE: BREACH OF LOYALTY (DIRECT)

50. The Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

51. By virtue of his position as Chief Financial Officer, Defendant Senzaki owed direct duties of loyalty, honesty, and good faith to Plaintiffs, including Fawn Weaver, Keith Weaver and Grant Sidney, Inc., arising from the extraordinary personal trust placed in him, his access to Plaintiffs' personal signatures and earned and vested equity compensation and personal equity interests, and his role as the sole interpreter and gatekeeper of critical financial and lending information with foreseeable personal consequences for Plaintiffs.

52. Those duties required Defendant to act with undivided loyalty toward Plaintiffs, to disclose material facts known to him that affected Plaintiffs personally, to refrain from

25

impersonating Plaintiffs' consent, and to refrain from using his position of trust, authority, and access to advance his own interests at Plaintiffs' expense.

53. Defendant breached those duties in multiple deliberate and self-interested ways, including by: (a) converting and misappropriating Plaintiffs' earned and vested equity compensation and personal equity interests for his own benefit; (b) forging or falsifying documents purporting to evidence authorization by Ms. Weaver that never occurred; (c) diverting approved payments to entities he secretly controlled; (d) concealing material financial information after it had passed through executive review; and (e) maintaining deliberate silence while a false narrative formed that Defendants knew or intended would cause direct personal harm to Plaintiffs.

54. Defendants' breach of loyalty was not limited to internal deception. Knowing that his misconduct had defamed Plaintiffs and created a false financial narrative, Defendant further breached his duties by allowing that narrative to be relied upon by third parties whose actions he knew would have severe personal consequences for Plaintiffs, including the public accusation of wrongdoing and the improper personal naming of non-guarantors in litigation. Defendant Senzaki could have corrected the record and protected Plaintiffs' reputations. He chose not to do so but instead continued to conspire with the Co-Conspirators to defame Plaintiffs in hopes to get away with his unlawful misappropriation.

55. Defendants' conduct was intentional, willful, and malicious. They acted with the knowledge that his disloyalty would cause direct and foreseeable harm to Plaintiffs, including the loss of earned and vested equity compensation, reputational destruction, loss of professional income, and the freezing of guaranteed funding for unrelated business ventures.

56. As a direct and proximate result of Defendants' breach of loyalty owed to Plaintiffs after Plaintiffs placed them in a position of trust as to Plaintiffs' personal equity interests and

26

earned and vested equity compensation related to Uncle Nearest, Plaintiffs have suffered substantial personal damages, including economic loss, reputational harm, loss of professional standing, and emotional distress. Plaintiffs are entitled to recover compensatory and punitive damages, together with such equitable and injunctive relief as the Court deems just and proper.

## COUNT TWO: BREACH OF FIDUCIARY DUTY

57.    The Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

58.    By virtue of his role and the extraordinary personal trust placed in him by Plaintiffs by allowing him access to and control over Plaintiffs' personal equity interests and signature authority, Defendant Senzaki owed direct fiduciary duties to Plaintiffs, including duties of honesty, candor, good faith, and loyalty arising from his access to Plaintiffs' personal signatures, earned and vested equity compensation, and his exclusive control over financial information and third-party communications that carried foreseeable personal consequences for Plaintiffs.

59.    These fiduciary duties required Defendant to act with complete honesty toward Plaintiffs, to disclose material facts affecting them personally, to refrain from impersonating Plaintiffs' consent or misrepresenting their authorization, and to avoid using his position, access, or superior information to advance his own interests at Plaintiffs' expense.

60.    Defendant breached these fiduciary duties through a sustained course of intentional misconduct, and conspired with the Co-Conspirators to aggravate the breaches in the following ways, including but not limited:

a. converting and misappropriating Plaintiffs' earned and vested equity compensation and personal equity interests for their own benefit;

27

b. forging or falsifying documents purporting to evidence authorization by Ms. Weaver that never occurred, including the misuse of her signature;

c. diverting funds and value approved to entities Defendants owned or controlled;

d. concealing material financial information after it had passed through executive review and withholding information Defendant knew Plaintiffs needed in order to protect themselves personally;

e. misrepresenting and allowing through defamatory means the persistence of a false narrative that Defendant knew would result in Plaintiffs being publicly accused of financial misconduct and named personally in litigation relating to obligations they did not guarantee; and

f. deliberately remaining silent when Defendant had the ability and obligation to correct false impressions that were causing Plaintiffs direct personal harm, but instead conspiring to expand the defamation against Plaintiffs and with malice and intent to injure Plaintiffs.

61.    Defendants' fiduciary breaches were intentional, willful, and undertaken in bad faith. Defendant knew that his misrepresentations, impersonation, and deliberate silence would cause direct and foreseeable harm to Plaintiffs, including the loss of earned and vested equity compensation, reputational destruction, loss of professional income, emotional distress, and the freezing of guaranteed funding for unrelated business ventures.

62.    As a direct and proximate result of Defendants' breach of fiduciary duties owed to Plaintiffs, Plaintiffs have suffered substantial personal damages, including economic loss, reputational harm, loss of professional standing, emotional distress, and costs incurred to investigate and remediate Defendants' misconduct.

28

63.    Plaintiffs are entitled to recover compensatory and punitive damages resulting from Defendants' breach of fiduciary duty, together with pre- and post-judgment interest, costs, and such equitable and injunctive relief as the Court deems just and proper.

## COUNT THREE: FRAUD (DIRECT)

64.    The Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 63 as if fully set forth herein.

65.    Defendant Senzaki knowingly and intentionally made false representations of material fact to Plaintiffs, and knowingly concealed material information from Plaintiffs, in circumstances where he had a duty of honesty and full disclosure arising from the personal trust placed in him, his exclusive control over critical financial information, and his access to Plaintiffs' personal signatures and earned and vested equity compensation.   In all instances, these misrepresentations set forth below were made in conjunction with the Co-Conspirators.

66.    Defendants' misrepresentations and omissions included, but were not limited to:

a. falsely representing that approved vendor payments were being disbursed as authorized when they had diverted funds to entities they owned or controlled;

b. concealing legitimate operating expenses and vendor payables after they had passed through executive review, thereby presenting a false bottom-line financial picture to Plaintiffs;

c. forging or falsifying documents and digital signatures, including Ms. Weaver's signature, to authorize transactions, amendments, and equity transfers that Plaintiffs never approved;

d. falsely representing that all borrowings and financial obligations had been properly disclosed and approved by Plaintiffs when they had not; and

29

e. assuring Plaintiffs that no loan obligations existed outside of the primary credit facility when Defendant had, in fact, forged Ms. Weaver's signature on a separate bridge-loan amendment.

67. Defendants made these misrepresentations and omissions intentionally, with the purpose of deceiving Plaintiffs, concealing their own misconduct, converting Plaintiffs' earned and vested equity compensation and personal equity interests, securing unearned bonuses and compensation, and preserving their position and authority for pecuniary gain through theft and diversion.

68. Plaintiffs reasonably relied on Defendants' misrepresentations and omissions. Ms. Weaver, as Chief Executive Officer, signed documents and made decisions based on Defendants' false assurances that financial information had been accurately reported and that no undisclosed obligations or unauthorized transactions existed. Plaintiffs had no reasonable means of discovering the truth due to Defendants' concealment and manipulation of systems under his exclusive control.

69. Defendants knew or should have known that Plaintiffs would rely on his representations and omissions, and that such reliance would expose Plaintiffs to direct and foreseeable personal harm, including the loss of earned and vested equity compensation, reputational destruction, loss of professional income, emotional distress, and exposure to false public accusations.

70. Defendants' fraudulent conduct was willful, malicious, and undertaken with reckless disregard for the truth.

71. As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered substantial personal damages, including economic loss, loss of earned and vested equity compensation, reputational harm, loss of professional standing and income, emotional distress, and consequential damages.

30

72.    Plaintiffs are entitled to recover compensatory and punitive damages resulting from Defendants' fraud, together with pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

## COUNT FOUR: INJUNCTIVE RELIEF (DIRECT)

73.    The Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 72 as if fully set forth herein.

74.    Through the fraudulent, disloyal, and deceptive conduct described above, Defendant Senzaki – for himself and for the benefit of all Co-Conspirators – obtained substantial personal benefits and property, including assets and proceeds traceable to the misappropriation of Plaintiffs' earned and vested equity compensation, the diversion of funds, and the use of forged and falsified documents.

75.    Defendant Senzaki has demonstrated a pattern of concealment and evasive conduct, including altering accounting entries, deleting records, forging digital signatures, and misrepresenting authorization, all for the purpose of hiding misconduct and preventing its detection. Based on this demonstrated pattern, there is a substantial and immediate risk that Defendant Senzaki will further conceal, dissipate, transfer, or encumber assets traceable to his misconduct before final judgment can be entered.

76.    Plaintiffs lack an adequate remedy at law to prevent the irreparable harm that would result from the loss, concealment, or dissipation of such assets. Once transferred or concealed, assets obtained through Defendants' misconduct may be impossible to trace or recover, rendering any later monetary judgment ineffective.

77.    Absent injunctive relief, Defendants are likely to continue engaging in conduct designed to frustrate this Court's jurisdiction and Plaintiffs' ability to obtain effective relief,

including the transfer or concealment of assets obtained through fraud, breach of fiduciary duty, and conversion.

78.   Plaintiffs therefore seek preliminary and permanent injunctive relief narrowly tailored to preserve the status quo, including an order restraining Defendants, and those acting in concert with them, from transferring, concealing, dissipating, or otherwise disposing of assets reasonably traceable to Defendants' fraudulent and disloyal conduct, pending resolution of this action or further order of the Court. Plaintiffs do not seek to restrain assets unrelated to Defendants' misconduct.

## COUNT FIVE: DEFAMATION AND INJURY TO REPUTATION (DIRECT)

79.   The Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 78 as if fully set forth herein.

80.   Defendant Senzaki, in conjunction with the Co-Conspirators, knowingly created, disseminated, and allowed to persist false statements and false implications concerning Plaintiffs Fawn Weaver and Keith Weaver, including through falsified accounting records, forged documents, manipulated financial data, and deliberate omissions that portrayed Plaintiffs as having engaged in financial misconduct they did not commit.

81.   Defendants made and perpetuated these false statements and implications with the intent, or at minimum the reckless disregard, that they would be relied upon by third parties and would result in Plaintiffs being publicly accused of dishonesty, mismanagement, and misuse of funds. Defendant knew that his falsifications and silence would foreseeably lead to Plaintiffs' reputations being harmed when those false narratives were repeated by others.

82.   As a direct and foreseeable result of Defendants' conduct, false and defamatory statements and implications concerning Plaintiffs were published and widely disseminated,

32

including allegations that Plaintiffs had misappropriated company funds, concealed liabilities, or acted improperly in managing financial affairs. These publications constituted republications of Defendants' falsehoods and omissions and were traceable to the fabricated records and misrepresentations Defendant created and allowed to stand uncorrected.

83. The defamatory statements and implications were false. Plaintiffs did not misappropriate funds, misuse assets, or engage in financial misconduct. Defendant knew these statements and implications were false or acted with reckless disregard for their truth and for the damage they would cause.

84. Defendants' conduct constitutes defamation per se and false light under Tennessee law because it imputed conduct incompatible with honesty, integrity, and ethical business practices to Plaintiffs, who are widely known public figures within their professional and community spheres.

85. As a direct and proximate result of Defendants' defamation and related misconduct, Plaintiffs Fawn Weaver and Keith Weaver have suffered severe and lasting reputational harm, loss of professional opportunities, loss of income, public humiliation, emotional distress, and damage to the goodwill they had built over decades of professional and charitable work.

86. Defendants' actions were willful, malicious, and undertaken with knowledge of their likely consequences. Plaintiffs are entitled to recover compensatory and punitive damages, together with pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

## COUNT SIX: CONVERSION (DIRECT)

33

87.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 86 as if fully set forth herein.

88.    Ms. Weaver owned earned and vested equity compensation, including stock options and related equity interests, issued to her annually as compensation for her services and constituting her personal property. These equity interests were not discretionary, contingent, or subject to Defendants' control.

89.    Defendant Senzaki intentionally exercised dominion and control over Ms. Weaver's personal equity interests without authorization, including by purporting to transfer, pledge, assign, or otherwise dispose of those interests as if they belonged to him, and by forging or falsifying documents purporting to evidence Ms. Weaver's consent to transactions she never approved.  Senzaki's misconduct was effectuated in accordance with the conspiracy and for the benefit of all Co–Conspirators.

90.    Defendants' conduct was unauthorized, wrongful, and inconsistent with Ms. Weaver's ownership rights. Defendant knew the equity interests were Ms. Weaver's personal property and not his to use, transfer, or encumber, yet deliberately treated them as his own to advance his personal financial interests.

91.    Defendants' conversion included, but was not limited to, the misuse of Ms. Weaver's equity interests to obtain personal benefits, favorable loan terms, and other advantages unrelated to any legitimate corporate purpose, while concealing his actions through falsified records and forged documentation.

92.    Ms. Weaver did not consent to Defendants' acts, did not authorize the transfer or encumbrance of her equity interests, and did not ratify Defendants' conduct at any time. Defendants' conversion was willful, knowing, and undertaken in bad faith.

34

93. As a direct and proximate result of Defendants' conversion, Plaintiffs have suffered substantial personal damages, including the loss or impairment of earned and vested equity compensation, economic loss, reputational harm, emotional distress, and costs incurred to investigate and remediate Defendants' misconduct.

94. Defendants' conduct was malicious and warrants the imposition of punitive damages to deter similar misconduct and to hold Defendant accountable for the intentional conversion of Ms. Weaver's personal property. Plaintiffs are entitled to recover compensatory and punitive damages, together with interest, costs, and such other relief as the Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Plaintiffs respectfully pray that this Court enter judgment in their favor and against Defendants as follows:

95. Issue process and have it served upon Defendants, requiring them to answer this Complaint within the time provided by law;

96. Find that Defendants breached duties of loyalty, honesty, candor, and good faith owed directly to Plaintiffs, including through the misuse of Plaintiffs' trust, access, signatures, and earned and vested equity compensation;

97. Find that Defendants breached fiduciary duties owed directly to Plaintiffs, causing them personal, reputational, and financial harm;

98. Find that Defendants committed fraud by knowingly falsifying and concealing material information, forging documents and signatures, and deceiving Plaintiffs for his personal gain;

35

99. Find that Defendants are liable for defamation per se and false light, and for the extensive reputational and economic injuries their false statements, implications, and deliberate silence foreseeably caused to Plaintiffs Fawn Weaver and Keith Weaver;

100. Award Plaintiffs compensatory damages in an amount to be proven at trial for direct, personal injuries, including but not limited to: the loss or impairment of Ms. Weaver's earned and vested equity compensation; loss of professional income and opportunities; reputational harm; emotional distress; loss or impairment of Plaintiffs' earned and vested equity compensation and personal economic interests; and other consequential damages suffered by Plaintiffs as a direct result of Defendants' misconduct;

101. Award punitive damages sufficient to punish Defendants and to deter similar misconduct in the future;

102. Grant injunctive relief restraining Defendants, and all those acting in concert with them, from transferring, concealing, dissipating, or otherwise disposing of assets reasonably traceable to Defendants' fraudulent, disloyal, or tortious conduct, and ordering such assets preserved pending resolution of this action or further order of the Court;

103. Award Plaintiffs their costs of suit, including reasonable attorneys' fees (where recoverable by law), expert fees, and pre- and post-judgment interest as permitted by law; and

104. Grant such other and further relief as the Court deems just and proper under law and equity.

## TABLE OF EXHIBITS

Exhibit 1 – Credit Agreement dated July 22, 2022 (as amended through Amendment No. 5)

Exhibit 2 – Amendment No. 1 to Credit Agreement (October 3, 2022)

Exhibit 3 – Amendment No. 2 to Credit Agreement (December 16, 2022)

Exhibit 4 – Amendment No. 3 to Credit Agreement (January 26, 2023)

Exhibit 5 – Amendment No. 4 to Credit Agreement (March 30, 2023)

Exhibit 6 – Amendment No. 5 to Credit Agreement (composite version included in Exhibit 1)

Exhibit 7 – Amendment No. 6 to Credit Agreement (July 26, 2023)

Exhibit 8 – Amendment No. 7 to Credit Agreement (December 27, 2023)

Exhibit 9 – Loan Distribution and Fee Chart compiled from company records and lender-provided statements

Exhibit 10 – Email from Defendant Michael Senzaki to Farm Credit Mid-America senior credit officer Jonathan Boyce dated May 10, 2023, with attached Loan Notice dated May 8, 2023 ($1,070,000)

Exhibit 11 – Email from Defendant Michael Senzaki to Farm Credit Mid-America senior credit officer Jonathan Boyce dated July 26, 2023, with attached Loan Notice dated July 25, 2023 ($7,000,000)

Exhibit 12 – Emails from Defendant Michael Senzaki to Farm Credit Mid-America senior credit officer Jonathan Boyce dated August 1, 2023, with attached Loan Notices dated August 1, 2023 ($930,000 and $1,060,000)

The foregoing exhibits include representative examples of twenty-eight (28) similar drawdown requests executed solely by Defendant Senzaki and processed without notice to or approval by Ms. Weaver. Certain exhibits contain limited redactions of confidential financial information. All exhibits are incorporated herein by reference as if fully set forth in this Complaint.

Respectfully submitted,

**MANIER & HEROD, P.C.**

Michael E. Collins (BPR No. 16036)
S. Marc Buchman (BPR No. 41598)
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
T: (615) 244-0030
F: (629) 500-1137
mcollins@manierherod.com
mbuchman@manierherod.com

-and-

**CHEHARDY, SHERMAN, WILLIAMS,
RECILE, & HAYES, LLP**

James M. Williams (*pro hac vice* forthcoming)
Inemesit U. O'Boyle (*pro hac vice* forthcoming)
Erin Rigsby Hawkins (*pro hac vice* forthcoming)
One Galleria Boulevard, Suite 1100
Metairie, Louisiana 70001
T: (504) 833-5600
F: (629) 833-8080
james@thetrialteam.com
inem@thetrialteam.com
erin@thetrialteam.com

*Counsel for the Plaintiffs*