UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE

| | |
|---|---|
| **FARM CREDIT MID-AMERICA, PCA,** | ) <br> ) <br> ) |
| Plaintiff, | ) Case No. 4:25-cv-38 <br> ) |
| v. | ) Judge Atchley <br> ) |
| **UNCLE NEAREST, INC., et al.,** | ) Magistrate Judge Steger <br> ) |
| Defendants. | ) <br> ) <br> ) |

**EMERGENCY MOTION FOR EXPEDITED HEARING ON MOTION TO RECONSIDER [DKT. 91] AND FOR RELATED RELIEF, AND STATEMENT IN SUPPORT OF MAINTAINING FILINGS UNDER SEAL**

Grant Sidney, Inc. ("Grant Sidney"), Fawn Weaver and Keith Weaver (collectively, the "Weavers", and collectively with Grant Sidney, the "Movants"), by and through their undersigned counsel, hereby moves for the scheduling of an expedited hearing, with adequate time for presentation and examination of witnesses, on the Emergency Motion to Reconsider the Memorandum Opinion and Order [Dkt. 32] and Order Appointing Receiver [Dkt. 39] and To Stay Access to Proprietary Information[1] (the "Motion to Reconsider") and provides its statement in support of the filings relating to the Motion to Reconsider to be made under seal. In support of this Motion, the Movants assert and allege as follows:

**I.      Statement in Support of Receiver's and Farm Credit's Motions to Seal**

1.      Movants agree that proceeding under seal is appropriate with respect to sensitive Company information. Matters of this magnitude, where enterprise value, brand equity, confidential financial information, distributor relationships, and third-party stakeholder interests

---
[1] Dkt. 91.

1

are implicated, are routinely addressed under seal to protect the company and its shareholders. Comparable bankruptcy proceedings in the spirits industry, such as the ongoing bankruptcy case of *In re Stoli Group USA*,[2] have been mostly conducted under seal for these same reasons.

2. Although filings earlier in this case were not maintained under seal, Movants believe the Receiver's decision to proceed under seal at this stage reflects a sound and appropriate recognition of the sensitivity of the issues now before the Court. Movants therefore support maintaining the Receiver's Opposition under seal and will likewise continue to file substantive materials in a manner consistent with that approach.

3. Movants will file their Reply relating to the Motion to Reconsider in advance of the January 20, 2026 deadline set by the Court, and will similarly seek for that Reply to be sealed, subject to the conference scheduled by Magistrate Judge Steger to also be held on January 20, 2026. The Movant's decision to also seek to seal its Reply does not lessen the urgency of need for a resolution of the Motion to Reconsider. To the contrary, developments during the Receivership have created a posture in which continued delay risks irreversible harm to the Company's brand and enterprise value. This Motion therefore also seeks an expedited hearing on the Motion to Reconsider so that the Court may address these issues promptly and on a complete record.

## II. Request for an Expedited Hearing on the Motion to Reconsider

4. As set forth in the Motion to Reconsider, the Receivership was imposed based on a limited emergency record, under compressed timelines, and without a developed evidentiary presentation on several issues central to whether extraordinary relief should continue. The Motion to Reconsider does not ask the Court to relitigate the past, but to reassess whether the Receivership remains necessary in light of the current facts, facts that were unknown at the initial Receivership

---

[2] Case No. 8:24-BK-80146 (Bankr. N.D. Tex. 2024) (allowing the sealing of most of the significant pleadings and hearings in the case to protect confidential information from public disclosure).

hearing, and the material developments that have occurred since the imposition of the Receivership. As the Court itself expressly recognized when appointing the Receiver, the Receivership may be terminated or modified upon the occurrence of a material change in circumstances that eliminates the need for continued extraordinary relief.[3] Consistent with that reservation of authority, Federal Rule of Civil Procedure 66 confirms that a federal equity receivership operates entirely under the Court's control and in accordance with traditional equitable practice, preserving the Court's continuing authority to supervise, modify, or limit the scope of such relief as circumstances evolve.[4] As the Supreme Court has long held, a receivership is an extraordinary and provisional remedy, not an end in itself, and must remain ancillary to the equitable relief it is intended to support.[5]

5. Developments during the Receivership have included a precipitous decline in retail sales and enterprise value that is directly attributable to the Receivership itself, the Receiver's lack of experience in running a large-scale whiskey brand, and to strategic decisions made within the Receivership that were contrary to the recommendations of the Company's sales and marketing leadership. As addressed in the Motion to Reconsider, those decisions resulted in, among other things, widespread out-of-stock conditions across the country during a pivotal selling period, further exacerbating brand erosion.

6. This divergence is reflected in objective market data. As shown in Exhibit A, Uncle Nearest consistently outperformed the broader American whiskey market from 2023 through August 2025, generating positive growth differentials during periods of both market expansion and contraction. Beginning in September 2025, immediately following the appointment of the

---

[3] *See Order Appointing Receiver*, Dkt. 39, ¶ 25.
[4] Fed. R. Civ. P. 66.
[5] *Gordon v. Washington*, 295 U.S. 30, 37–38 (1935).

Receiver, that relationship reversed. Uncle Nearest began underperforming the market, with negative deltas that widened each successive reporting period through January 2026, despite no material change in broader market conditions. Through the first several weeks of January 2026, Uncle Nearest <u>underperformed</u> the market by 18.3 percentage points, reflecting a 49.5-point reversal from Uncle Nearest's performance in January 2025, when the brand <u>outperformed</u> the market by 31.2 percentage points. These figures are publicly available.

7. Movants respectfully submit that an expedited evidentiary hearing is appropriate so that a full record can be created and the Court may hear directly from qualified witnesses and consider evidence bearing on the continued justification for the Receivership. This includes testimony regarding enterprise value, brand positioning, distribution dynamics, and consumer behavior specific to Uncle Nearest, as well as evidence relevant to governance, collateral protection, operational trajectory, and creditor resolution. The Movants anticipate that they will need two days for the hearing.

8. Had mediation been pursued earlier in the process, as the Receiver indicated would be his initial priority, and had the Receiver been available to work alongside the Company's leadership with greater regularity, Movants believe the current decline in sales and enterprise value could have been avoided. Early engagement and sustained collaboration may have allowed the parties to address concerns, preserve operational momentum, and avoid the market disruption that followed.

9. Because that did not occur, Movants respectfully submit that the need for an expedited hearing is now acute. With each passing day, the Company experiences further erosion in market position and enterprise value following the imposition of the Receivership. An expedited hearing with sufficient time allocated for the presentation of evidence will provide the Court the

best opportunity to assess the appropriate path forward and maximize the likelihood that all stakeholders can be made whole, an outcome that becomes increasingly difficult the longer the current posture persists.

**III.     The Movant's Request at Least Two Days Be Reserved for the Presentation of Evidence**

10.     The Motion to Reconsider brings into play a large number of factual issues that will take some time to move into the record. The emergency hearing with at least two days reserved is necessary to address key issues that continue to affect enterprise value, each of which remains central to whether extraordinary relief should continue.  Courts have consistently recognized that a receivership should not be imposed or continued where less drastic remedies are sufficient to protect the interests involved.[6] In exercising equitable discretion, courts must also weigh whether the harm caused by continued extraordinary relief outweighs its protective benefit.[7] In addition to the matters that are expressly set forth in the Motion to Reconsider, the testimony is also needed to cover the following:

<u>*Market Position, Consumer Behavior, and Enterprise Value*</u>

11.     The Movants intend to present significant evidence relating to Uncle Nearest's market position, industry consumer behavior and the calculation of enterprise value in the spirits industry.  During the pre-Receivership period, when clarity regarding ownership and control was present, Uncle Nearest historically experienced sustained growth. As industry data reflects, that consumer loyalty propelled Uncle Nearest from its market debut in 2017 to ranking among the Top 20 American whiskey brands within five years, according to Nielsen, which is widely regarded as the most authoritative source of sales data in the spirits industry.

---

[6] *See Iroquois Master Fund, Ltd. v. Global ePoint, Inc.*, 2016 U.S. Dist. LEXIS 197714, *10 (C.D. Cal. 2016).
[7] *See Sheet Metal Workers' Local 7 v. Essex Mech., LLC*, 2009 U.S. Dist. LEXIS 93068, *3 (W.D. Mich. 2009).

12. That same consumer base drove Uncle Nearest to become the second-largest Tennessee whiskey brand in the United States, surpassing a legacy Tennessee whiskey brand owned by the world's largest spirits conglomerate that had long occupied that position. It also supported the rise of Nearest Green Distillery to become the seventh most visited distillery in the world, ranking first on Google, TripAdvisor, and Yelp, the three most widely relied-upon platforms for measuring customer satisfaction and visitor experience. The distillery welcomes more than 200,000 visitors annually and ranks just one position behind the Jack Daniel Distillery.

13. The Uncle Nearest leadership team that was responsible for mercurial growth of the Company is best positioned to reverse recent sales declines and to return the Company to the growth trajectory it was on prior to a series of disruptive events, including the emergency request for Receivership. The Movants intend to provide testimony that will address the relationship between consumer confidence, clarity of governance, and brand performance, and will explain why uncertainty surrounding ownership and control has materially impacted recent trends.

*Shareholder Support, Creditor Resolution, and Governance Readiness*

14. Movants also anticipate presenting evidence regarding the interests of existing shareholders. Based on confirmed 2025 financial results and a verified 2026 operating forecast, and notwithstanding understandable skepticism among certain investors, a significant number of current shareholders have communicated their continued support for the Company's leadership and their desire to bring the Receivership to an end as expeditiously as possible and to remain invested as the business stabilizes and returns to growth.

15. Testimony and documentary evidence will further address how, under the forecasted operating scenario, existing shareholders can be made whole while creditors are addressed in an orderly and cooperative manner. This includes presentation of a debt-reduction

6

Case 4:25-cv-00038-CEA-CHS   Document 113   Filed 01/20/26   Page 6 of 18
PageID #: 3027

and balance-sheet stabilization plan, developed using current, independently verified financial data prepared by the Receiver's own professionals. The plan contemplates reductions in outstanding obligations through operational cash flow, negotiated restructuring, and asset-supported repayment, while preserving enterprise value and avoiding liquidation outcomes.

16. The Movants further intend to provide testimony and documentary evidence regarding a finance and governance plan already developed prior to the Receivership, which would be implemented upon termination of the Receivership and will preserve and enhance enterprise value. That plan includes the engagement of a chief financial officer with more than 25 years of financial leadership experience in the beverage industry, including prior service as Chief Financial Officer of one of the world's largest spirits conglomerates, who had agreed in principle to join the Company before the Receivership but was unable to commence due to a temporary non-compete obligation. It further includes the formation of a new finance team subject to the oversight of a Big Four accounting firm that had accepted Uncle Nearest as a client prior to the Receivership and has confirmed its ability to resume engagement immediately upon the return of governance to the Board.

17. Upon restoration of governance authority, decision-making would rest with a duly constituted Board of Directors operating pursuant to the Company's governing documents, with clear authority, appropriate checks and balances, and the ability to act decisively without deadlock. This structure is designed to ensure continuity of operations, financial discipline, and transparency, while protecting the interests of creditors, shareholders, and the enterprise as a whole.

*No Pleaded or Provable Wrongdoing by Fawn Weaver or Grant Sidney, Inc.*[8]

18. The Movants intend to provide testimony and documentary evidence that neither Farm Credit nor the Receiver can properly allege any fraud, misappropriation, or intentional misconduct by Fawn Weaver or Grant Sidney, Inc. The evidence will establish that no claim has ever been pleaded explaining why Ms. Weaver is a defendant, no factual theory has been asserted tying her to wrongdoing, and no evidence exists that would justify the continued impairment of her ownership, control, or reputation through extraordinary equitable relief. The inferences otherwise have had and continue to have a significant negative impact on the enterprise value of the Company and need to be addressed on an expedited basis.

*Absence of Personal Enrichment and Existence of Hard-Asset Over-Collateralization*

19. The Movants intend to provide testimony and documentary evidence establishing that Ms. Weaver did not personally receive or monetarily benefit from any conduct Farm Credit now characterizes as fraudulent, and that loan proceeds were deployed into identifiable hard assets, including distillery construction and whiskey barrels, which serve as collateral and are worth materially more than the outstanding debt. These facts further undermine any equitable justification for continued extraordinary relief, particularly where unsupported inferences are contributing to ongoing erosion of enterprise value. Again, an emergency hearing is necessary because the negative inferences arising from Farm Credit's unfounded accusations are continuing to erode enterprise value.

---

[8] Mr. Weaver is not addressed in this section because he holds no equity interest in Uncle Nearest, Inc. or in any of the related defendant entities, and therefore does not possess the ownership or control interests that are being impaired by the continued receivership (other than as relates to the Receiver's Motion to Clarify [Dkt. 41]). The relief sought here is directed to the ongoing restraint of equity, governance, and ownership rights, and the evidentiary showing is accordingly focused on those parties whose property interests are directly affected. Nothing in this omission should be construed as an allegation or concession regarding Mr. Weaver, against whom no cause of action has been pleaded.

*Testimony from the Approving Farm Credit Officer Responsible for the Loan Advances*

20. The Movants intend to present testimony and documentary evidence establishing that Farm Credit approved approximately $67 million in loan advances over a thirteen (13) month period, averaging approximately 2.5 million dollars every two weeks. Those approvals were made exclusively through the Company's former Chief Financial Officer.

21. Critically, the Farm Credit officer responsible for authorizing those advances has never provided sworn testimony to this Court, and the Court has never heard directly from the individual who exercised approval authority over that volume and cadence of lending. That Farm Credit officer never contacted Ms. Weaver, despite her status as the sole signatory to the credit agreements, and has not been examined regarding the information relied upon, the internal risk assessments performed, or how those repeated approvals are reconciled with Farm Credit's current narrative of fraud and default by the Company.

22. Movants intend to subpoena this approving Farm Credit officer to testify at the expedited hearing regarding the credit determinations made, the diligence performed, the rationale for continued advances, and the Farm Credit's contemporaneous assessment of the Company's financial condition at the time those approvals were issued. The Farm Credit's conduct leading up to its request for the equitable relief of receivership is a key consideration for the Court in determining whether the Receivership should continue.

*Clarification of Status of Alleged Missing Barrels*

23. The Movants intend to provide testimony and documentary evidence demonstrating that the alleged "missing" $21 million in inventory (approximately 20,000 barrels of whiskey) were not missing at all. Audits will confirm that the barrels were never absent from the Company's inventory, except to the extent Farm Credit required that they be excluded from the borrowing base

9

certificate. Rather, the barrels at issue were purchased by Uncle Nearest pursuant to a forward contract through a third-party, unrelated company that specializes in financing whiskey purchases within the spirits industry. Further testimony will establish that the inclusion of barrels purchased under such forward contracts in inventory is proper and required under GAAP, and that an incomplete audit conducted by Farm Credit led to the erroneous claim that these barrels were missing.

*Incomplete and Misleading Presentation of Payment Default*

24. The Movants intend to provide testimony and contemporaneous payment records relating to the Farm Credit debt to establish that any missed payment in January 2024 was cured on February 1, 2024, that Uncle Nearest made approximately **$15 million** in payments to Farm Credit during the same period it was described as being in default, and that Farm Credit did not distinguish for the Court between a cured payment default and any alleged technical or covenant default.

*Farm Credit's Prior Knowledge of the Source of Alleged Misconduct*

25. Although Movants want to focus on the pathway forward, certain foundational issues must be addressed because they formed the basis upon which the Receivership was granted. Sworn testimony and documentary evidence will establish that, months before seeking emergency relief, a third-party lead investigator hired exclusively by the Uncle Nearest Board of Directors, and whose findings were not disclosed to the Company's Chief Executive Officer in order to preserve impartiality, informed Farm Credit, including its Chief Executive Officer, that the former Chief Financial Officer was responsible for the misconduct now cited as justification for the Receivership. This information was not presented to the Court at the emergency stage. Evidence will further demonstrate that the subsequent decline in business performance is directly attributable

to the uncertainty and disruption created by the Receivership itself, rather than to underlying market conditions or operational deficiencies.

*Facts Relating to the Independent Board Member Requested by Farm Credit*

26. The Movants intend to provide testimony and evidence that Farm Credit's allegations relating to an allegation that the Company had failed to engage an independent board member were misleading. From the time the candidate was recommended, Farm Credit was made aware that the Uncle Nearest Board had approved her appointment, and Farm Credit was kept informed throughout the process, both by the Company and by the candidate directly, regarding the status of the appointment. Sworn testimony and documentary evidence will establish that the timing of the formal appointment was driven solely by the candidate's own desire to become fully informed of the Company's status before accepting the role, including meeting with members of the Uncle Nearest leadership team, and by her request that a directors and officers insurance policy be put in place at a coverage level five times greater than what existed at the time. While the Company worked to secure that enhanced coverage, the candidate began working collaboratively alongside the Company in anticipation of formal appointment. That process was stopped by Farm Credit as a result of the filing of the Complaint and the appointment of the Receiver. Movants look forward to the possibility of completing her appointment upon termination of the Receivership and anticipate that her more than 25 years of banking experience will materially assist the Company as it navigates the current financial landscape.

*Shareholder Concern Regarding the Receivership Process and Exclusion of Company Leadership.*

27. Movants anticipate presenting evidence that shareholders are increasingly contacting the Weavers to express concern regarding the process currently being conducted through Arlington Capital. Shareholders have conveyed that, while a broad outreach may be

appropriate in some circumstances, the process as currently structured casts a wide net among parties who do not necessarily understand the business model, consumer dynamics, or operational realities that allowed Uncle Nearest to succeed in an industry where independent whiskey brands rarely survive absent acquisition.

28. Shareholders have further expressed concern that the restructuring and outreach process has proceeded without involvement of the Company's leadership team, including the Chief Executive Officer and senior executives who built the brand and have been with the Company since its inception. Without even an introductory role for that leadership team, external parties are left without the context necessary to understand how the Company achieved scale, loyalty, and distribution against long odds in a highly consolidated industry.

29. As the nearly 200 Uncle Nearest shareholders (not including the hundreds of beneficial owners within special purpose vehicles on the cap table) observe declining reported performance during the Receivership, at a pace materially exceeding broader American whiskey market trends, have become increasingly alarmed that a forced restructuring or sale conducted without leadership support and participation will undervalue the enterprise and will fail to make existing shareholders whole.

*Liquidation-Oriented Posture Inconsistent with the Company's Solvency and Viability as a Going Concern.*

30. Movants anticipate presenting evidence that the Receiver's professional experience is primarily rooted in Chapter 7 liquidation contexts rather than Chapter 11 reorganizations designed to restructure and reorganize companies. While the Receiver initially expressed confidence that he could oversee this matter in a status quo or growth-oriented posture, certain decisions made during the Receivership reflect an approach more consistent with liquidation practice than with enterprise preservation.

31. By way of example, Movants will present evidence that the Receiver declined to provide financial materials demonstrating the Company's solvency unless Movants agreed to a non-disclosure agreement and further agreed not to file those materials with the Court. That posture is consistent with liquidation-oriented processes, but is in tension with reorganization frameworks in which transparency, court oversight, and stakeholder confidence are central to preserving enterprise value.

32. Movants will further demonstrate that they have sought to move the Receiver away from a liquidation-style posture and toward a framework focused on stabilization, creditor cooperation, and value preservation. Uncle Nearest remains a solvent and viable company, and is poised for growth even in a challenging market, once governance authority is returned to its Board and leadership team. The power to appoint a receiver necessarily includes the power to vacate that appointment and to terminate the receivership when the necessity for such relief no longer exists.[9]

## IV. Proposed Interim and Alternative Relief to Prevent Further Harm Pending Adjudication

33. Movants respectfully request that the Court set an expedited evidentiary hearing on this Motion and the pending Motion to Reconsider, and that such hearing be scheduled for two consecutive days within the next two weeks, if the Court's calendar permits. As detailed above, Movants are prepared to present testimony and documentary evidence demonstrating that the factual predicates relied upon to impose extraordinary equitable relief have been materially undermined, and that continued delay is causing ongoing and compounding harm to the enterprise value, reputation, and commercial relationships of Uncle Nearest.

34. Movants recognize, however, that the Court's calendar and competing judicial obligations may not permit a multi-day evidentiary hearing to be set on such an expedited basis.

---

[9] *Skirvin v. Mesta*, 141 F.2d 668, 673 (10th Cir. 1944).

In that event, Movants respectfully request alternative interim relief designed to prevent further harm while the Court hears and adjudicates the claims and counterclaims presently before it, including the Motion to Reconsider.

35. Specifically, if the Court determines that a prompt evidentiary hearing cannot be scheduled, Movants request that the Court exercise its equitable authority to limit the scope of the receivership on an interim basis, by restricting the Receiver's role to monitoring, reporting, and preservation of assets only, while restoring day to day operational, commercial, and reputational control to the Company's duly constituted Board of Directors and leadership team.

36. Such interim relief would ensure that the Company's assets remain protected under Court supervision, while allowing management to take immediate steps to stabilize sales, repair distributor and retail relationships, address market perception, and halt the ongoing erosion of enterprise value that has occurred during the Receivership. The Court would retain full oversight authority, including the ability to receive reports from the Receiver, approve or disapprove material transactions, and modify the scope of relief as circumstances warrant.

37. This alternative interim relief constitutes a less intrusive and more proportionate exercise of equity where, as here, continued full receivership control risks working oppressively against the parties whose property interests are restrained, and where the necessity for extraordinary relief has materially changed. In determining whether a receivership should continue, courts review whether the circumstances that justified the appointment in the first instance still exist and terminate or limit such relief when they do not.[10] Movants do not seek to prejudge the ultimate merits of the claims or counterclaims pending before the Court, but

---

[10] *Compass-Charlotte 1031, LLC v. Prime Cap. Ventures, LLC*, 2024 U.S. Dist. LEXIS 110357, at *6–7 (N.D.N.Y. 2024).

14

respectfully request a temporary recalibration of equitable control to prevent further irreparable harm while those matters are adjudicated.

38. Movants respectfully submit that both forms of relief requested, an expedited evidentiary hearing or, in the alternative, interim limitation of the receivership to a monitoring role, fall squarely within the Court's broad and continuing equitable authority, and are necessary to ensure that the Receivership remains proportional, ancillary, and directed toward preserving, rather than impairing, the value of the enterprise during the pendency of these proceedings.

WHEREFORE, the Movants respectfully request that the Court set an expedited hearing at its earliest availability, limit to the Receiver to a monitoring role pending a final determination on the Motion to Reconsider in order to minimize the risk of further erosion to brand and enterprise value while the Motion to Reconsider remains pending, and that the Court grant such other and further relief as is appropriate.

Respectfully submitted,

**MANIER & HEROD, P.C.**

*/s/ Michael E. Collins*
Michael E. Collins (TN BPR No. 16036)
S. Marc Buchman (TN BPR No. 41598)
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
T: (615) 244-0030
F: (629) 500-1137
mcollins@manierherod.com
mbuchman@manierherod.com

*Counsel for the Movants*

## CERTIFICATE OF SERVICE

I hereby certify that on January 20, 2026, a true and correct copy of the foregoing was served on all parties receiving electronic notice via the CM/ECF system.

*/s/ Michael E. Collins*
Michael E. Collins

# EXHIBIT A

**EXHIBIT A - NIELSEN (NIQ) RETAIL SCAN DATA**

| Period | Uncle Nearest $ Growth | Market $ Growth | Delta |
|---|---|---|---|
| January 2025 | 30.2% | -1.0% | **31.2 pts** |
| February 2025 | 5.4% | -7.1% | **12.5 pts** |
| March 2025 | -1.1% | -4.3% | **3.2 pts** |
| April 2025 | 7.0% | -4.9% | **11.9 pts** |
| May 2025 | 1.3% | -5.0% | **6.3 pts** |
| June 2025 | 1.3% | -0.4% | **1.7 pts** |
| July 2025 | 0.7% | -4.6% | **5.3 pts** |
| **Bank Lawsuit Announced** | | | |
| August 2025 | 7.2% | -0.6% | **7.8 pts** |
| **Receiver Appointed** | | | |
| September 2025 | -8.2% | -6.8% | **-1.4 pts** |
| October 2025 | -25.3% | -11.0% | **-14.3 pts** |
| November 2025 | -14.8% | -7.7% | **-7.1 pts** |
| December 2025 | -23.8% | -9.0% | **-14.8 pts** |
| January 2026 | -26.8% | -8.5% | **-18.3 pts** |

*The 2024 Year in Review analyzes 52 weeks ending 12/27/2027, aligning with Nielsen (NIQ) scan data.