# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### WINCHESTER DIVISION

| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-38 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| UNCLE NEAREST, INC., *et al.,* | ) | Magistrate Judge Steger |
| | ) | |
| Defendants. | ) | |

## NOTICE OF FILING OF AFFIDAVIT OF PHILLIP G. YOUNG, JR.

Please take notice that Phillip G, Young, Jr., court-appointed receiver herein, hereby files the attached Affidavit of Phillip G. Young, Jr. in relation to the upcoming February 9, 2026 hearings. The Receiver anticipates proffering this Affidavit as his sworn testimony at the hearing.

Dated this 2nd day of February, 2026.

By:     /s/ Justin T. Campbell
Justin T. Campbell, Bar No. 31056
Thompson Burton PLLC
1801 West End Avenue, Suite 1550
Nashville, Tennessee 37203
Voice: (615) 465-6015
Fax:    (615) 807-3048
Justin@thompsonburton.com

*Counsel for Receiver*

## <u>CERTIFICATE OF SERVICE</u>

  I hereby certify that on the date noted below, a true and correct copy of the foregoing listed below was filed and served via the Court's CM/ECF system upon all parties requesting service in the above-listed case.

Dated: February 2, 2026.

/s/ Justin T. Campbell   
Justin T. Campbell

| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-38 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| UNCLE NEAREST, INC., *et al.,* | ) | Magistrate Judge Steger |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF PHILLIP G. YOUNG, JR.

Phillip G. Young, Jr., being duly sworn, states as follows:

1. I am over eighteen years of age and have personal knowledge of the matters set forth herein.

2. I am an attorney licensed to practice law in the state of Tennessee and admitted to practice before the United States District Courts for the Eastern, Middle, and Western Districts of Tennessee, before the Sixth Circuit Court of Appeals, and before the Supreme Court of the United States of America.

3. This Court appointed me to serve as Receiver over Uncle Nearest, Inc, and certain related companies, including Nearest Green Distillery, Inc., Uncle Nearest Real Estate Holdings, LLC, Domaine D'Anatole Inc., Domaine D'Anatole, S.A.S, UNAH, Inc., S1 Organic Vodka, LLC, UN House MV, LLC, Uncle Nearest Ventures, LLC, and the Nearest Green Historical Preservation & Culture Fund (collectively, the "Company").

4. The purpose of this Affidavit is to detail the testimony I would offer with regard to my Motion for Clarification of Receivership Order (Doc. 41) (the "Motion for Clarification") and the Emergency Motion to Reconsider the Memorandum Opinion and Order and

Order Appointing Receiver and to Stay Access to Proprietary Information (Doc. 91) (the "Motion to Reconsider") filed by Grant Sidney, Inc, Fawn Weaver and Keith Weaver (collectively, the "Weaver Parties"). The Motion for Clarification and the Motion to Reconsider are set for hearing on February 9, 2026.

5. In performing my duties as Receiver, I have obtained, reviewed, and caused to be reviewed (a) bank statements and banking records produced by the Weaver Parties and others, (b) the Company's accounting records and general ledger, (c) email accounts and electronically stored information hosted on Company-controlled systems and accounts to which I was granted access as Receiver, and (d) analyses and summaries prepared by professionals retained by me in this receivership. Where I refer to those records and summaries, I do so because they are the types of records maintained and relied upon in the ordinary course of business and in the administration of this receivership. To the extent I refer to communications from retained professionals (including Newpoint Advisors ("Newpoint"), Thompson Burton, PLLC ("TB"), Arlington Capital Advisors ("Arlington"), and Thoroughbred Spirits Group ("Thoroughbred"), I do so because those communications were made to be in the ordinary course of their retained work for the receivership and explain the basis for actions taken or decisions made by me as Receiver.

6. For clarity: (a) I have day-to-day oversight of the receivership and regular communications with retained professionals; (b) those professionals have reported their findings and conclusions to me in the ordinary course of their engagement; and (c) I have reviewed their work product at a level sufficient to adopt the factual summaries referenced in this Affidavit. Where I describe "market feedback" or "bidder communications," I do not offer those statements to prove the truth of every assertion

2

made by third parties, but to explain the diligence conducted, the information available to me at the time, and the basis for my actions and conclusions.

## MOTION FOR CLARIFICATION

7. Based upon my review of records obtained as part of the receivership, including those referenced in Exhibits 1-3, I have concluded that the Company operated in practice as a single enterprise with Shelbyville Barrel House BBQ, LLC ("Barrel House"), Humble Baron, Inc, ("Humble Baron"), Grant Sidney, Inc. ("Grant Sidney"), Quill and Cask Owner, LLC ("Quill and Cask"), Nashwood, Inc. ("Nashwood"), Shelbyville Grand, LLC ("Grand"), and 4 Front Street, LLC ("Front Street") (Barrel House, Humble Baron, Grant Sidney, Quill and Cask, Nashwood, Grand, and Front Street, collectively the "Related Entities"), among other companies.

8. As part of this receivership, I requested that the Weaver Parties provide all bank records for the Related Entities for the past five years. Over several weeks and two separate productions, the Weaver Parties represented that they produced records for all bank accounts for the Related Entities. Professionals that I have retained in this matter, most notably Newpoint Financial Advisors ("Newpoint") and Thompson Burton, PLLC ("TB") have reviewed all documents produced by the Weaver Parties as well as additional relevant documents discovered by TB as part of this receivership.

9. I had a series of communications with counsel for the Weaver Parties about the documents produced by the Weaver Parties, as well as general questions raised by those documents. Counsel for the Weaver Parties has provided explanations of the transfers between the Company and the Related Entities; however, based on the volume, nature, and documentation of the transfers described below, I determined additional records and

transparency are necessary for me to perform my Court-appointed duties, including cash-flow reconstruction, reconciliation of intercompany obligations, and evaluation of potential claims and defenses.

10. Despite the explanations offered by the Related Entities, I believe that full access to the books and records of the Related Entities is necessary to carry out the duties I have been assigned by this Court. Based upon the records that have been produced to me by the Related Entities, it appears that the Related Entities have been substantially commingled with the Company, including through repeated intercompany transfers and the provision of non-cash benefits described herein. Full access to the records of the Related Entities is necessary to develop a complete picture of the Company's cash flow.

11. As an initial matter, despite my repeated requests for all bank account records associated with any of the Related Entities (and requests for confirmation that all records have been produced), I have not received bank statements and records for all bank accounts that appear, from other Company records, to have existed during the relevant period. For example, I was only given records for a single Grant Sidney account, maintained at CalPrivate Bank. That account has only been opened since February 2025. However, within the last two weeks, I have discovered emails in the Company's email system that reflect and indicate that Grant Sidney maintained other bank accounts that were not disclosed by the Weaver Parties. Those documents from the emails are attached hereto as collective Exhibit 1. The first document in this exhibit is a statement from First National Bank of Middle Tennessee listing a number of accounts for entities related to the Company. Included in that list are two bank accounts maintained by Grant Sidney, Account xx168 and Account xx512. Further, my research into former CFO Mike

Senzaki's email account shows that Grant Sidney maintained a bank account in 2021 – 2022. Those emails are included in collective Exhibit 1 (collectively, the "Senzaki Emails"). The Senzaki Emails detail a transfer in 2021 in which funds were transferred from a bank account belonging to Uncle Nearest, Inc., to an account belonging to Fawn Weaver, then to an account belonging to Grant Sidney, and ultimately to a Canadian Company known as LS Crème. While I have some questions about the nature of this transfer generally[1], the more troubling issue is that no Grant Sidney bank account records prior to February 2025 were produced to me despite repeated requests and repeated assurances that all bank account statements were produced.

12. In my capacity as Receiver, I was provided administrative access to certain Company-controlled email accounts and systems, including the accounts used by the Company and/or its employees in the ordinary course of business. The emails attached as Exhibit 1 were obtained from those Company-controlled systems, were maintained in the ordinary course of business, and were accessed by me or at my direction in the ordinary course of my receivership duties. Exhibit 1 is a true and correct copy of the emails and account-related documents as maintained in those systems, or true and correct copies of files attached to those emails.

13. Based upon the records that have been transferred to me by the Related Entities, it appears that the Related Entities have been substantially commingled with the Company. Attached as Exhibit 2 is a summary of the bank account transfers between the Related Entities and the Company that Newpoint, under my direction, and I have noted occurred in the last five years. As the first chart of Exhibit 2 demonstrates, we have identified 498

---

[1] I believe these transfers are related to a loan from Uncle Nearest, Inc. to LS Crème; however, I do not know why the funds flowed through a Grant Sidney account. This picture is further muddied because, upon

cash transfers by and among the Related Entities and the entities comprising the Company. These transfers total $34,105,971.00. Of that amount, $19,978,264 was distributed from Related Entities to the Company, and $1,582,298 was distributed from the Company to the Related Entities. Additionally, the Related Entities paid $22,263,267 directly to third parties on account of debts owed by the Company, which is included in the second chart. Further highlighting the need for additional transparency, the third chart of Exhibit 2 shows that $1,833,402 was transferred from an account belonging to the Company or one of the Related Entities to unknown bank accounts, and they received $5,517,490 in direct transfers from unknown bank accounts. The other charts included in Exhibit 2 shows further detail of each of these transfers.

14. Exhibit 2 was prepared by Newpoint at my request and under my direction from bank statements, transaction histories, and related banking records that were provided in this receivership or otherwise obtained by me, as Receiver, from financial institutions and other custodians. The underlying records are voluminous. Exhibit 2 is intended as an accurate summary of those records for the Court's convenience. I have reviewed Exhibit 2 and discussed it with Newpoint, and to the best of my knowledge it fairly summarizes the underlying records.

15. Additionally, as detailed on Exhibit 3, the Related Entities have been the beneficiaries of a number of transfers from the Company that are not financial transfers. For example, the Company has not collected rent from Humble Baron or Barrel House; the Company has paid for information technology services for Humble Baron, Barrel House, Grant Sidney, and Nashwood; the Company has paid for security services that benefited

---

(continued...)

information and belief, Grant Sidney also purchased shares of LS Crème.

Humble Baron and Barrel House; the Company has paid for utilities for Humble Baron and Barrel House; and the Company has provided social media services for Humble Baron.

16. Exhibit 3 was prepared under my direction based on a review of Company invoices, vendor statements, general ledger entries, contracts (to the extend located), communications maintained in the Company's files, and communications that I, or professionals retained by me, have had with vendors, employees and creditors in the ordinary course of this receivership. To the extent Exhibit 3 reflects that rent or reimbursement was not collected, that statement is based on the absence of corresponding receivables, invoices, deposits, or other documentation in the records reviewed to date, subject to supplementation if additional records are produced.

17. While the Weaver Parties may have explanations for some of the transfers detailed on Exhibit 2 and Exhibit 3, the sheer volume and amount of these transfers demonstrates that these Related Entities were substantially commingled with the Company. Moreover, while some accounting notes existed on the Company's books to show that some of these transfers were treated as loans, those accounting notes do not remotely reconcile with the total balance of the transfers demonstrated on these exhibits.

18. In addition, based on the records reviewed to date, many intercompany transfers appear to lack customary arm's-length documentation (such as promissory notes, stated interest, repayment terms, board approvals, or consistent intercompany accounting), or the documentation located does not reconcile to the volume and amounts of transfers summarized in Exhibits 2 and 3.

19. Based on the records reviewed to date, it appears that the Related Entities and the Company did not maintain customary separateness, and that including the Related Entities is necessary for the Receiver to perform Court-appointed duties, because: (a) there were extensive and recurring intercompany cash transfers and third-party payments on the Company's obligations (Exhibit 2); (b) the Company provided services and other non-cash benefits to the Related Entities without corresponding rent or reimbursement reflected in the Company's records (Exhibit 3 and related accounting records); (c) banking records for at least certain Related Entities appear incomplete despite repeated requests and assurances of completeness (Exhibit 1 and related correspondence); and (d) certain transactions reflect that funds and obligations were routed through Related Entity accounts in a manner that cannot be fully reconciled without full access to the Related Entities' books and records.

20. The single largest transfer is one between Uncle Nearest, Inc. and Grant Sidney for approximately $20 million. I will refer to this as the "Grant Sidney Deal" from this point forward. I have had multiple conversations with Fawn Weaver and her counsel concerning the Grant Sidney Deal, and the Weaver Parties have addressed the Grant Sidney Deal in its pleadings. Therefore, counsel for the Weaver Parties has provided an explanation for this transfer; however, based on the transaction structure and the records reviewed to date, I have been unable to reconcile the full flow of funds and resulting obligations without complete access to Grant Sidney's records. For that reason, and because the transaction bears directly on intercompany obligations and potential claims, I believe it is appropriate for the Court to decide whether Grant Sidney should be included within the scope of the receivership for purposes of records access and administration.

21. The Grant Sidney Deal was complex and deserves to be addressed specifically. In February 2025, Uncle Nearest, Inc. signed two convertible promissory notes, each in an amount of $10 million, in favor of MP-Tenn LLC ("MarcyPen"). Pursuant to the terms of those notes, Uncle Nearest owed a repayment obligation but, upon certain occurrences, the notes could convert to equity. If the notes converted to equity, the deal documents provided that Uncle Nearest would cancel shares held by Grant Sidney in an equal number to those shares being created by the note conversion.[2] In other words, any share dilution would be borne by Grant Sidney, not the other shareholders. After the consummation of this deal, the proceeds from the MarcyPen loans were disbursed to an Uncle Nearest account ending 9873 at CalPrivate Bank. Within days of receiving those loan proceeds, Uncle Nearest routed substantially all proceeds to a Grant Sidney account at CalPrivate Bank, account ending 9881. From there, Grant Sidney transferred most of the funds to an Uncle Nearest bank account at FirstBank (account ending 1189), used other funds to satisfy debts owed by Uncle Nearest to Berlin Packaging and Genesis Global, the Company's payroll processor, and still other funds were transferred to related entities including S1 Organic Vodka, LLC and UNAH, Inc..[3] Uncle Nearest's records originally classified these funds as "barrel sale" revenues, but later booked them as a related-party loan. While the commingling between Uncle Nearest and Grant Sidney is evident in this transaction, without complete access to Grant Sidney's books, records, and bank account statements, these transfers cannot be completely reconciled.

---

[2] The fact that any conversion negatively impacted Grant Sidney, not the note maker Uncle Nearest, is clear evidence that the Weaver Parties treated Grant Sidney and Uncle Nearest as a singular entity.

[3] While it appears that most of the MarcyPen loan proceeds traveled from Uncle Nearest, to Grant Sidney, back to Uncle Nearest, it cannot be completely reconciled without all of Grant Sidney's bank accounts. It appears that Grant Sidney may have retained some portion of the MarcyPen funds (perhaps as much as $5.5 million).

22. I would rely upon the testimony offered herein, together with <u>Exhibits 1-3</u>, to support my request that the Court specifically include the Related Entities as part of this receivership, and to expand the Receivership Order (Doc. 39) accordingly so that I may fully carry out the duties that this Court has assigned me.

## MOTION FOR RECONSIDERATION

23. I have decided to take no position on the Motion for Reconsideration. This Court has appointed me to perform certain duties and will do so until the Court discharges me from that duty. I do not believe it is my charge as the Receiver to advocate for the continuation or cessation of this receivership; I will leave that to the discretion of the Court and to the advocacy of the Weaver Parties and Farm Credit Mid-America, PCA ("Farm Credit"). However, I do believe that I have access to facts that are highly relevant to claims made in the Motion for Reconsideration and the response thereto. I offer the following to address factual assertions raised in the Motion and related filings and to assist the Court in evaluating the receivership's administration.

24. I believe that my Second Quarterly Report (Doc. 97) fairly and accurately describes the current financial and operational status of the Company, as well as actions taken by me as the receiver of the Company. In that regard, I incorporate that Second Quarterly Report herein by reference.

25. However, because additional allegations have been made by the parties since the filing of my Second Quarterly Report, I wish to present the Court with additional facts and/or clarification about facts that I have previously reported to this Court.

26. Based on the records reviewed to date and the Company's ongoing cash needs, the Company appears to be insolvent under both a cash-flow and balance-sheet analysis. The

Company still cannot pay its obligations as they come due. Because of substantial budget cuts I have made to the Company's operations, its monthly losses have been reduced from approximately $1 million per month to approximately $100,000 per month. This is exclusive of professional fees I am incurring as part of this receivership which, as the Weaver Parties correctly note, are substantial. Farm Credit is currently funding those professional fees as well as the operational losses. Based upon my conversations with counsel for Farm Credit, I believe that Farm Credit would immediately cease covering these operational losses and move to foreclose on and repossess its collateral upon the expiration of this receivership. These losses are also exclusive of debt service, depreciation, and other non-cash expenses.

27. As used in this Affidavit, I refer to "insolvent" in two practical senses: (a) the Company's inability to pay obligations as they come due absent continued advances from Farm Credit (cash-flow insolvency), and (b) the apparent excess of liabilities over the realizable value of assets based on market feedback and indications of value (balance-sheet insolvency).

28. I have read that the Weaver Parties believe that they could balance the Company's budget if they were granted control of the Company. Based upon my analysis of the Company's finances, I do not believe that the Company can operate profitably without a substantial and immediate influx of capital and more financial discipline than has been previously exercised within the Company. If this receivership were ended on February 9, and the Weaver Parties regained control of the Company, I believe that the Company's monthly losses would be approximately $2 million per month. Attached as <u>Exhibit 4</u> is a financial analysis performed by Newpoint under my supervision and at my direction. The first

11

chart on Exhibit 4 shows that, from September 1, 2025, through January 18, 2026, the Company would have likely shown losses totaling $16,309,716 (or approximately $3.2 million per month) had the receivership not been put in place by this Court. The second chart shows the predicted losses of the Company were this receivership ended and the Weaver Parties returned to control. Newpoint's estimate is that the Company would lose $9,842,522 between January 19, 2026, and May 31, 2026, if this receivership is terminated. For the benefit of the doubt, this even assumes that sales during this time would increase by $1,846,596 based upon Fawn Weaver's revenue projections versus my team's projections. As this exhibit shows, not only would the Company lose the financial support of Farm Credit, the termination of the receivership (and the stay that accompanies it) would result in the Company having to service the secured debt of approximately $110 million and the unsecured debt of approximately $54 million – not to mention that the Company, instead of Farm Credit, would have to pay for financial and legal consultants. If this receivership were terminated at this point, the Company would have to hire a new Chief Financial Officer and an entire accounting department; Newpoint has been serving those roles during the receivership, Furthermore, based upon correspondence I have had during this receivership, I anticipate that the Company would immediately be the defendant in dozens of suits by creditors and shareholders across the country. That would likely result in hundreds of thousands of dollars in legal fees each month for which the Company would be solely responsible.

29. Exhibit 4 was prepared by Newpoint under my supervision and at my direction based on actual receipts and disbursements during the receivership, Company historical financial records, and stated assumptions described in Exhibit 4. Exhibit 4 reflects estimates and

projections, which are inherently subject to uncertainty, but I offer it to explain the basis for the receivership's cash needs and the impact of debt service and professional costs if the receivership were terminated.

30. Not only is the Company unable to meet its monthly obligations as they come due, but it is also balance sheet insolvent. The Company's secured debt to Farm Credit now exceeds $110 million. Beyond those debts, the Company currently has approximately $54 million in unsecured debt.[4] The approximate breakdown of that debt is as follows: $21.9 million in vendor debt; $277,000 in credit card debt; $28.1 million in notes payable (including debts of $20 million to MarcyPen/Grant Sidney, $4.1 million to WhistlePig, $1 million to Scarcelli, and $1.1 million to Dash Funding); and a $3.7 loan obligation to Grant Sidney carried on the books since 2023. While the Weaver Parties have argued that $20 million of this should not be included because it is a debt that the Company owes Grant Sidney and that Grant Sidney has allegedly (though informally) waived, I believe that debt is appropriately considered an unsecured debt of the Company. First, the Company signed two Convertible Promissory Notes in favor of MP-Tenn LLC ("MarcyPen") totaling $20 million. Further, to the extent the Weaver Parties contend that it is Grant Sidney who owes MarcyPen $20 million[5], the Company's books and records reflect a debt to Grant Sidney for $18 million, that was not removed from the books prior to the receivership.[6]

---

[4] This is down from $57.7 million reported in the Second Quarterly Report due to a large payment made to Tennessee Distilling Group, a series of real estate payments, and ongoing debt reconciliation. Notably, this does not include debt owed to Advanced Spirits, LLC (discussed below).

[5] Despite the promissory notes being between MarcyPen and Uncle Nearest, there was also a contemporary transaction by which Grant Sidney "purchased" $20 million in barrels from Uncle Nearest, though a debt to Grant Sidney was created on the books as part of this transaction.

[6] In fact, it appears that this $20 million funding was booked both as revenue to the Company (without a $20 million inventory reduction) and as a debt of $18 million to Grant Sidney.

31. Because it is unliquidated at this point, no debt to Advanced Spirits, LLC ("Advanced Spirits") is included in this $54 million unsecured debt calculation, though it appears to be a valid debt of the Company. In January 2024, the Company entered into a series of contracts with Advanced Spirits. These contracts were attached as Exhibit 7 to the Weaver Parties' Reply in Support of Emergency Motion to Reconsider the Memorandum Opinion and Order Appointing Receiver (Doc. 115). The Weaver Parties refer to these Advanced Spirits contracts as "Forward Contracts". While the Court can review the Advanced Spirits contracts for itself, I understand that Advanced Spirits purchased barrels of whiskey from the Company in January 2024 at a reduced price. Pursuant to the terms of the "Forward Contracts", the Company had an obligation to pay for the storage and maintenance of these barrels, even though ownership of them passed to Advanced Spirits. The Company then had an obligation to repurchase all of these barrels from Advanced Spirits over the course of a five-year period, at a predetermined price. The predetermined price ensured that Advanced Spirits received a good return on its investment; in other words, Advanced Spirits expected to profit from the Forward Contracts. Essentially, the Forward Contracts were a way for the Company to borrow against its inventory, even though the transaction was structured as a sale with an obligation to repurchase. Thus, the debt to Advanced Spirits is a valid obligation pursuant to the Company's breach of the Forward Contracts. This debt is expected to be in excess of $10 million, once liquidated.

32. This Court must weigh the value of the Company's assets against the approximately $164 million in total debt in order to determine whether the Company is balance sheet solvent. The best indicator of value is the offers that I have received for substantially all of the

Company's assets. In October, I retained Arlington Capital Advisors ("Arlington") to assist me in (a) identifying opportunities to refinance the Company's debts and/or (b) locating a purchaser for the assets of the Company. Arlington has significant experience advising companies in the spirits industry.

33. Despite reaching out to over 100 parties, Arlington has been unable to find a qualified source willing to refinance even the secured debt, much less the total debt. However, these communications with 100 parties produced approximately 40 parties who had sufficient interest in an asset purchase that they executed a non-disclosure agreement ("NDA") to access some of the Company's financials. From those 40 parties, Arlington received 12 formal, written letters of interest in which the bidder expressed a price range that they would propose to pay for the Company's assets. Except for NexGen 2780, LP, which will be discussed below, no party offered a valuation in excess of the amount of the secured debt. While Arlington continues to work with several bidders to commit to a written, binding offer that is deemed acceptable, no offer currently exists that would indicate that the Company is balance sheet solvent.

34. I have reviewed the correspondence from NexGen 2780 in which they propose to pay $108 million. It is unclear to me whether that proposal is for a purchase of the assets, a purchase of the Company, or a refinancing of the debt. It is not a formal offer and remains subject to due diligence. Arlington has been in contact with NexGen 2780. While an NDA has been executed with NexGen 2780 and they've been given access to the financial information in the data room, Arlington has been unable to confirm the source or reliability of their finances. While Arlington and I will continue to engage with NexGen 2780 in hopes of consummating a deal, we do not consider this to be a legitimate

15

offer at this time because: (1) NexGen 2780 has confirmed they did no due diligence before filing the letter with this Court; (2) their letter does not specify what kind of deal they propose; (3) Arlington has been unable to verify their financial ability to consummate a deal of this magnitude; (4) I have been unable to link NexGen 2780 to any other deals of this size; (5) I received a communication from another smaller spirits brand warning me that NexGen 2780 had committed to a small capital raise for that company but withdrew prior to closing due to lack of funding; (6) I am aware that NexGen 2780 has established a website seeking funding support for this deal from the general public, which is very atypical for a sophisticated investor; and (7) according to emails located in the Uncle Nearest system, an individual named Chuck Speed, who is associated with NexGen 2780, has a prior relationship with the Weaver Parties as a result of his involvement with Square One Vodka, which was purchased by the Company at the direction of Fawn Weaver.

35. To the extent the foregoing includes third-party statements or Arlington's communications I offer it to explain my diligence process and the current state of discussions, and because such information has been communicated to me in the ordinary course by Arlington and other professionals retained by the receivership.

36. I have read the assertion that the assets of this Company should command more than a twelve times multiplier of annual revenue, which leads the Weaver Parties to assume that the Company should be valued at more than $500 million. While I am not an expert on spirit sales, this conflicts with all advice I have been given by both Arlington and Thoroughbred, my spirits business consultant. From the beginning, I was told that spirits

companies could command anywhere from a 2x adjusted revenue[7] multiplier to a 15x adjusted revenue multiplier based upon a variety of factors, including size of business, trajectory of growth, brand appeal, and availability of other brands in the market. Initially, I was optimistic about the prospects of an aggressive sale price because the Company had reported revenues of $75 million for 2024 and there seemed to be excitement about the Uncle Nearest brand. However, many factors impacted that initial optimism. First, my accounting team determined that actual revenues for 2024 were only $41 million, and 2025 revenues are expected to be less than $25 million when totally accounted for. Second, I began receiving feedback from creditors, shareholders, and new potential investors that the constant media coverage of Uncle Nearest, and the Weaver Parties' participation in that media coverage, was damaging the market's view of the brand's viability. Third, the worldwide bourbon and whiskey market went into freefall in the third and fourth quarters of 2025, with multiple bourbon brands filing for bankruptcy protection, others liquidating, others listing their bourbon businesses for sale, and others (including Jim Beam) announcing a cessation of distilling operations. This created a glut in the market such that the Company's assets were no longer attractive.[8]

37. In my discussions with Arlington and with potential bidders, I have come to the conclusion that a 2 – 4 times adjusted revenue multiplier is the most realistic outcome for the Company. As has been relayed to me by a number of interested parties, they view

---

[7] Total revenue must be reduced by any extraordinary revenue, such as barrel sales, plus certain tax payments, according to the receivership's consultants.

[8] The Weaver Parties acknowledge the state of the spirits industry, and argue that this is not a good time to sell whiskey-related assets. I agree and, if there were any other option, I would pursue that alternative. But refinancing is not available, the Company continues to operate at a loss, and this receivership cannot continue in perpetuity for a number of reasons. In my opinion, a sale in the next six months is the only viable option to maximize the value of the Company and its assets.

17

this potential transaction as presenting too much complexity and risk to command top dollar, especially given the overall state of the spirits market.

38. While the best indicator of value is what the market is currently willing to pay, parsing out individual assets, as the Movants suggest in some of their pleadings, would yield an even lower result. The Receiver has slight disagreement with the Movants' valuation of certain assets as disclosed in their pleadings. For example, the Receiver believes that the Martha's Vineyard property is worth less than $2,600,000,[9] not the $4,000,000 that the Movants claim it is worth. The biggest valuation disagreement, however, concerns the value of the approximately 56,000 barrels of whiskey owned by the Company. The Movants claim that those barrels have an aggregate value of $78 million, or approximately $1400 per barrel for 56,000 barrels. The Receiver previously attempted to market a much smaller number of barrels, 10,000, at a price of $1,000 per barrel and received no offers. The only offers the Receiver has received for the Company's barrel stock was an offer of approximately $400 per barrel, for less than 1,000 barrels. Therefore, the Movants' valuation is not supported in the marketplace.

39. Based on the market feedback received by Arlington and by the receivership in connection with attempted barrel sales and based on the lack of offers at previously marketed price points, the receivership has been unable to identify a reliable market for a significant portion of the Company's younger barrel inventory at the values asserted by the Movants.

40. Furthermore, I am aware that a bankruptcy judge in the United States Bankruptcy Court for the Northern District of Texas recently found that barrels of bourbon less than four

---

[9] The Receiver has recently listed the Martha's Vineyard property for sale for $2,595,000, upon the advice of the realtor who represented the Company in the purchase of that real estate.

years old currently have virtually no value because there is no market for young bourbon. *See In re Stoli Group (USA), LLC*, Case No. 24-80146. I reviewed that ruling as part of evaluating market conditions for the Company's barrel inventory. The vast majority of the Company's barrels contain whiskey that was distilled less than four years ago.

41. Unfortunately, whether judged by the interest received by the Receiver in all assets as a whole, or judged by the sum of its parts, the Company's assets are valued at less than the amount of the secured debt and far less than the amount of the total debt. Thus, it is balance sheet insolvent.

42. To further illustrate this point, and to respond to the requests that the Movants made in their pleadings (for the first time) to see certain financial records, attached hereto as collective Exhibit 5 are the Balance Sheet and Income Statement for the Company, as of December 31, 2025. I have not produced these reports as part of my prior status reports to this Court because I do not consider them to contain the most reliable information. To a certain degree, these reports rely upon financial information maintained by the Company prior to this receivership. My financial advisors and I have found that all such financial information is substantially flawed and unreliable. Nevertheless, I attach them here for full transparency.

43. Exhibit 5 consists of financial reports generated from the Company's accounting system(s) as of December 31, 2025, and/or compilations derived from that data. To the extent Exhibit 5 relies on pre-receivership entries, it may require further reconciliation; however, I provide it to show that the Company's systems reflected as of that date and to assist the Court in evaluating the issues raised by the parties.

19

44. The Weaver Parties point to Nielsen data to prove that the Company's revenues have precipitously declined during the receivership. As explained in my report, a decline in revenue is to be expected for multiple reasons: the spirits market as a whole is in decline[10]; one of the Company's largest distributors (RNDC) has its own financial perils; the Company had to replace its California distributor in October, which was very disruptive to business in some of the Company's largest markets; Fawn Weaver's marketing efforts have noticeably declined during Q4 2025; public statements and actions taken by the Weaver Parties have deteriorated the brand; and the negative attention and consumer concern that always accompanies litigation such as this, and especially receivership actions, has predictably affected business. However, I am advised that the Nielsen data that Uncle Nearest uses, xAOC (eXtended All Outlet Combined), is not the best source of information regarding the health of a brand. This set of Nielsen data provides a robust view of off-premises sales, specifically those in liquor stores and retail outlets. Groups in this data set include: large liquor stores (like Total Wine & More and Spec's), grocery stores, drug stores, mass merchandisers (like Wal-Mart), wholesale club stores (like Sam's Club and BJ's), dollar stores (like Dollar General), and military commissaries. This dataset captures approximately 50% of the off-premise retail segment. However, several key market areas are not reflected in the data, including:

- The vast majority of independent liquor stores
- On-premise locations such as bars and restaurants
- Control states, where state authorities regulate sales
- E-commerce sales channels and direct sales from producers.

---

[10] The Weaver Parties allege that the spirits market has not materially declined since August 2025. That is contrary to all data I have reviewed from industry sources such as Mark Brown's *Industry News Updates*, which have consistently reported on the precipitous and continuing decline of spirits sales.

As a result of these exclusions, the Nielsen dataset ultimately represents only about 20-30% of the total U.S. spirits market. Another significant aspect of the Nielsen dataset is the nature of the sales cycles among the groups it covers. Typically, these groups feature a sales cycle lasting between three and six months before new products are introduced in stores that take in a new brand/SKU. Furthermore, product discontinuation in these accounts is generally determined through a rolling 12-month or full annual performance review, based primarily on the brand's sales velocity. Due to these dynamics, major or rapid shifts in product availability within a Nielsen-tracked store are unlikely to be reflected in short periods within the dataset. Therefore, the receivership is very unlikely to affect this channel—positively or negatively—during its engagement period over the last 5 months. A more likely reality for any downward trend in this channel is that many of the accounts tracked in this segment require significant financial and tactical resources, including paid sampling initiatives, in-store displays, and advertising campaigns. Given that Uncle Nearest has faced financial constraints in recent years, some setbacks may be attributed to a lack of such support. In fact, it is worth noting that the UN Brand portfolio is maintaining strong velocity across independent channels, providing further support to the narrative of a lack of support from Uncle Nearest in recent quarters in the Nielsen dataset.

45. I am aware that the Weaver Parties seek to blame me, and actions I have taken as the Receiver, for the decline in revenues of the Company. Based on the revenue and expense information reviewed to date, the timing of the Company's pre-receivership performance decline, and the other factors described above, I do not attribute the Company's revenue declines solely to the receivership.

46. First, the Weaver Parties fail to differentiate between revenues and profitability. It is true that revenues have decreased, for reasons discussed herein and in my Second Quarterly Report. However, as my Second Quarterly Report indicates, profitability has increased. Prior to the receivership, the Company was unprofitable by approximately $1 million per month. Under my guidance, the unprofitability has decreased to $100,000 per month. In other words, the Company's annual profitability has increased by approximately $10.8 million, despite any decrease in sales revenues. Any business in any sector can increase revenues if it is willing to operate at a substantial loss; however, revenues without profitability is not sustainable.

47. Moreover, the historical data shows that the Company was in decline well before this receivership began. The Company's revenues for 2024 were approximately $41 million, which is well below what had been reported as revenue for prior years.[11] Moreover, within roughly two months after I was named as Receiver of the Company, I asked Newpoint to perform an analysis on expected revenues based upon the first two quarters of 2025; Newpoint's conclusion was that revenues would likely be less than $30 million for 2025, based upon the Company's comparative performance in the first two quarters of 2025 (all of which was prior to the receivership). Finally, the gross revenues for Q3 and Q4 2025 were comparable to the revenues for Q1 2025, as demonstrated by the Income Statement by Quarter included in Exhibit 5. Therefore, my conclusion is that the Company's revenues have been on a steady decrease for at least two years.

48. Further, the Weaver Parties allege that I lack experience running a spirits business. On this we agree; I have never operated a spirits business. In recognition of this limitation, I

---

[11] Because I have not been given access to source data for any years prior to 2024, I cannot confirm the accuracy of the Company's reported revenues for 2023 and before.

retained a group of experts to assist me in making sound operational decisions. Thoroughbred has an extensive team of former executives who have started distilleries and brands, run spirits manufacturers, consulted with spirits manufacturers and brand owners, worked for the largest spirits companies in the United States, and worked for distributors. I have leaned heavily upon their advice on operational decisions, which I have found to be very sound. Therefore, I do not believe my lack of prior experience in this particular industry has had any impact on the Company,

49. Similarly, the Weaver Parties accuse me of going against existing management's recommendations and/or not maintaining good relationships with distributors, which they claim led to extraordinary out of stock situations. Based on my records and the communications I participated in during the receivership, I have generally relied on existing management's recommendations for sales and distribution strategy and have limited direct distributor engagement to circumstances where management requested my involvement or where distributors reached out directly. My consulting team and I have relied very heavily upon the existing team in making decisions, especially decisions concerning marketing and distribution. On that point, early in the receivership it was decided that Fawn Weaver and Kate Jerkens, the head of sales, would continue being the primary contacts for all distributors. Ms. Weaver, Ms. Jerkens and I agreed that this was best for continuity of business. Therefore, I have engaged with distributors only when existing management asked me to be involved or when a distributor reached out with questions or concerns. Ms. Jerkens asked me to contact one distributor to clear up some confusion about the Company's receivership, which I did; after that conversation, Ms. Jerkens thanked me and indicated that I had resolved the problem. Another distributor

contacted me on two occasions to answer some questions about the receivership process and its impacts. That distributor's counsel indicated that my answer allayed fears. I have then had approximately six communications with RNDC; about half of those were initiated by Ms. Weaver or Ms. Jerkens and about half were initiated by RNDC. Representatives of RNDC have consistently thanked me for my transparency and willingness to continue a good relationship. Regarding going against existing management's recommendations, I can only recall one specific incident that the Weaver Parties might be referencing. In September, Fawn Weaver suggested that we consider releasing a specially labeled bottle to commemorate breast cancer awareness month in October. I asked Ms. Weaver and her team to develop an estimate of costs and anticipated sales. When I reviewed the costs associated with this limited release and compared it to the anticipated sales, I determined that the profitability was very low. The risk was too high compared to the potential reward, especially since (a) these bottles had a very limited shelf life (since they would be obsolete by late October and (b) management's sales forecasts were typically much more optimistic than realized revenues. Further compounding the complications surrounding this suggested release was that the management suggested that we donate a portion of the profits to a cancer research facility, which would further reduce profitability and also add an extra layer of administrative time to track profits and remit the promised amount to charity.

50. The Weaver Parties also accuse me of failing to engage regularly with leadership, which they say has damaged the Company. From August to late October 2025, I engaged directly with Ms. Weaver quite regularly, and with other members of the management team as needed. The advisors who reported to me on a very frequent basis had daily

interactions with Company's management; they discussed finances, operations and strategies with management, then reported to me so that I could make decisions for the Company accordingly. By late October, as the pleadings in this case reflect, the Weaver Parties became much more adversarial with me and my team. I became much more careful about my direct interactions with Ms. Weaver and, to a lesser extent, her management team due to concerns regarding ethical conflicts. By mid-November, I effectively began engaging with senior management exclusively through my advisors, again for fear of inadvertently violating ethical requirements if discussions about the Company spilled over into discussions about the filings of the Weaver Parties. In late December, as things became even more obviously adversarial, I formalized this policy by informing the Weaver Parties' counsel that I would only address senior management through my consultants and would only address him through my legal counsel. Given my confidence in my advisors and legal counsel, I did not believe this would hinder operations while it would ensure that I met my ethical duties as a licensed attorney in this State.

51. Relatedly, the Weaver Parties complain that I ceased giving them access to my team's internal financial forecasts that were only intended for my use and in order to support requests for additional funding from Farm Credit. It is true that I instructed my professionals in mid-December to stop providing our rolling 13-week forecasts to the Weaver Parties. I gave this instruction after we noticed some anomalies with the sales forecasts being produced by employees of the Company. Kate Jerkens is the employee upon whom we rely to provide sales forecasts for future weeks, which would then be incorporated into our 13-week budget. My financial team and I began noticing that the

sales forecasts for future weeks were becoming increasingly unreliable and overly optimistic. For example, Ms. Jerkens produced sales forecast for January 2026 (one of the weakest months for spirit sales) that showed a 20%+ increase over the actual sales for November 2025 (one of the strongest months for spirit sales). As we looked at these sales forecasts more closely, we realized that the sales forecast was seemingly made to show slight profitability over the expenses that were forecast in prior reports. This led us to conclude that Fawn Weaver was likely transmitting the 13-week budget to Ms. Jerkens with instruction that she "balance the budget" with her sales forecasts. As a result, I asked Ms. Weaver to sign a non-disclosure agreement in which she would agree not to disseminate the 13-week budget to any employee or attach it to pleadings with this Court. She refused, so we ceased sending her those forecasts. While she does not have access to our forecasted budget, she continues to have access to actual performance data.

52. To be clear, my decision to limit dissemination of the receivership's internal rolling 13-week cash forecast was primarily based on maintaining the integrity of the budgeting process. The rolling forecast is a planning tool that is updated frequently as new information becomes available (including sales orders, collections timing, and vendor demands) and is not intended to be a final financial statement. In my judgment, broad distribution of internal working forecasts creates a risk that preliminary assumptions or draft projections will be taken out of context or misconstrued as final, which can undermine the reliability of the forecasting process and the receivership's ability to manage liquidity.

53. The Weaver Parties also allege that I lack the requisite experience in corporate reorganizations to reorganize the Company. They claim that my only experience is in

liquidations. While I do have extensive experience in liquidations, I also have significant experience in reorganizations. The Weaver Partiers should know this, since they and their counsel at the time vetted my experience before recommending me for this position, and their current counsel should know this since we have practiced in many of the same courts for over two decades. In fact, I have represented the debtor in some of the largest Chapter 11 cases in the history of this State, including *In re Service Merchandise, Inc.*, *In re Regal Cinemas, Inc.*, *In re James River Coal Company, Inc.*, and *In re Murray, Inc.* In some of those cases, the debtor successfully reorganized with a restructuring of their existing obligations; in other cases, they sold all of their assets as a going concern to a buyer; in others, the debtor ultimately liquidated. That is to be expected in a reorganization case – sometimes the reorganization plan works but sometimes market factors prevent it from reorganizing. In addition to those large bankruptcies, I've represented a number of debtors in smaller cases. Again, some of those reorganized successfully while others did not. Finally, I have been receiver, and have represented the receiver, in a number of cases – some of which successfully reorganized, some of which sold its assets as a going concern, and some of which liquidated.

54. In this case, my preference was, and remains, to reorganize the Company with a refinancing of its obligations. Despite my team's best efforts, we have yet to locate a lender that is willing to refinance the Company's debts.[12] I do not believe it is possible or advisable to pursue a partial refinancing of debt. If the Company does not refinance the entirety of its debt, it will be left unable to service the remaining debt. Further, we have

---

[12] I note that the Weaver Parties claim to have a refinancing source that is part of their restructuring plan. I have consistently asked Ms. Weaver to direct any potential refinancing sources to me so that my team could discuss with them their ability and interest in refinancing the debt. To be clear, I certainly have no objection to allowing an acquaintance of Ms. Weaver's to provide refinancing and leaving the Company intact. Indeed, that's my preference.

found no source willing to offer subordinate lending in a sufficient amount to resolve the Company's cash flow issues. Finally, while the Weaver Parties allege that I should pursue a refinance of "unsecured assets", I do not believe that any assets should be considered unsecured. As mentioned herein, the Weaver Parties ran all companies as a single enterprise. Any asset that is technically "unsecured", such as the chateau in Cognac, was purchased with funds advanced by Farm Credit.

55. Finally, the Weaver Parties intimate that this matter would have been concluded months ago if I had initiated a mediation between the Company and Farm Credit. First, it is important to note that I never promised to mediate this matter, but I did suggest that it seemed like mediation was a good idea based upon the facts as presented to me prior to my appointment. Indeed, the Company's former counsel told me that this receivership was likely to be over very quickly because an offer to buy out the Farm Credit debt for more than 90% was imminent. Against that backdrop, I agreed that mediation was a good idea, if Farm Credit was unwilling to accept an offer of $100 million to satisfy its debt. After speaking with Farm Credit's counsel, however, it was revealed that they were made frequent promises of refinancing offers that never came to fruition. I asked the Company's counsel to simply provide me a binding offer made by a company with the financial ability to consummate it so that I could try to convince Farm Credit to accept it. At that time, I was told that the receivership had changed things and that the proposed refinancing lender was no longer interested. No viable offer has been received since, thus there has been no basis for a mediation.

56. In their pleadings, the Weaver Parties consistently argue that they could successfully run the Company if the Court were to return them to control. I believe this is unlikely for a

number of reasons. First, as explained in Paragraph 20 above and in Exhibit 4 hereto, the Weaver Parties have failed to consider a number of expenses that they would bear if they were returned to control of the Company. The current and historical numbers show that the Weaver Parties cannot operate the Company profitably.

57. Furthermore, their arguments on this point are premised upon a set of faulty assumptions. First, they say that they have identified a qualified Chief Financial Officer ("CFO") to assist in the management of the Company; however, there are no available funds to pay a qualified CFO. They claim that they have an accounting firm waiting to assist. In fact, that accounting firm is owed a substantial sum of money and has indicated to me that it is unwilling to provide services for the Company without a very substantial retainer, which the Company cannot afford without a further capital infusion from Farm Credit. The Weaver Parties also allege that they have a qualified board of directors that will serve as a check and balance on the business. However, the Weaver Parties themselves make up two of the three board members, and my review of the Company's records indicate that the board never properly fulfilled its duties. In fact, the third board member (and the only board member that is not one of the Weaver Parties) had indicated to me that certain information about the finances of the Company were withheld from him.[13] Finally, the Weaver Parties claim that multiple shareholders are reaching out, asking that Fawn Weaver be returned to control of the Company. That may be true, as the Company has approximately 200 shareholders with various levels of understanding concerning this proceeding and differing levels of loyalty to the Weaver Parties. However, I know that more than a dozen shareholder groups have indicated to me that they do not want me to

---

[13] For clarity, I have neither confirmed nor contradicted that claim as of this date.

take any action that would return Fawn Weaver to control of the Company; many of those shareholders have even threatened suit against the Company and/or the Weaver Parties concerning representations that they allege were fraudulent.

58. Beyond their criticisms of my operations of the Company, the Weaver Parties seem to criticize my forensic investigations. At times they say I am doing too little in this regard; at times they argue that a complete forensic investigation is unnecessary. I wish to clarify the status of these investigations for sake of clarity.

59. With regard to the shareholder capitalization table, Ms. Weaver indicated very early in this receivership that the cap table was incorrect. She blamed the former CFO, Mike Senzaki, for these inaccuracies. I have since learned that the Company's prior counsel had been working on reconciling the cap table for nearly a year. Still, I found that the cap table did not recognize a number of secondary market transactions. As we have had contact from individual shareholders, we have asked them for their documentation and have corrected the cap table to conform to the actual documents. Since we have not had contact with every shareholder (and believe we do not have valid contact information for every shareholder), we are not prepared to declare the existing cap table final and reconciled. It is, however, much more accurate than the cap table that existed prior to my appointment as receiver.

60. The Weaver Parties also criticize me for not yet recovering financial records that were allegedly erased from the Company's computer system in early 2024, under the Weavers' watch. The recovery of that data has proved more difficult because we believe that the Company's financial data was hosted in a QuickBooks account owned by Grant Sidney, not the Company. Since Grant Sidney is not yet a part of this receivership, we cannot

confirm the status of that account with Intuit. There is also some question about who actually deleted the financial records – some employees blame other accounting employees for deleting the records, while some employees blame Ms. Weaver for deleting the records. I am working to recover those records (without the inclusion of Grant Sidney) but that task will be much simpler if this Court grants me authority over Grant Sidney.

61. Regarding the status of investigations into potential causes of action against former employees, officers, directors, or lenders, those investigations only began in earnest approximately four weeks ago. The reason for the delay was simple. My first priority was to stabilize the spending of the Company, which took several weeks; my second priority was to develop accurate financial statements upon which we could depend; my third priority was to begin the process of identifying possible refinancing lenders and/or potential asset purchasers; and then my final priority was to determine why the Company reached the financial situation that it reached and who, if anyone, was legally responsible. Stabilizing the Company had to take priority over legal investigations.

62. At this point in my investigation, I have uncovered a number of questionable financial and legal transactions. I believe I have identified some of the participants in those transactions but, at this juncture, I am not prepared to file causes of action under Rule 11 based upon those transactions. Moreover, I do not believe that I have identified and/or eliminated all potential defendants; until I get further into my investigation of the Company's records it would be imprudent for me to file a complaint that might need to be amended multiple times.

63. For clarity, the receivership's review is ongoing, including related-party transfers and obligations, accounting classification issues, and the completeness of financial records. The fact that review is ongoing means I have not reached final conclusions regarding potential claims, defenses, or parties.

64. More specifically, I am aware that the Weaver Parties have attempted to use statements from prior pleadings to exonerate themselves from any liability. For clarity, based upon my investigations to date, I am not prepared to bring any causes of action against the Weaver parties; neither am I prepared to represent to this Court that they did not personally benefit from the Company (either directly or indirectly, through a company whose financial records I cannot directly access) or otherwise cause redressable injury to the Company. As indicated above, my investigations are ongoing so any such statement would be premature.

65. The same is true for allegations of lender liability. I have yet to conclude my investigation into the relationship between the Company and Farm Credit, which could hinge upon communications between Farm Credit and the Company's CFO. I have recently gained access to the former CFO's email accounts and can begin researching that issue in earnest. Again, I cannot bring any cause of action against Farm Credit under Rule 11 nor can I clear them of any lender liability.

66. Next, I would like to address a couple of criticisms that the Weaver Parties make with regard to our evaluation of potential refinancing sources and/or interested purchasers. First, the Weaver Parties contend that Arlington's outreach was overly broad. Based on my oversight of Arlington's engagement, I disagree; Arlington's mandate was to identify credible refinancing and/or acquisition alternatives, which requires broad but targeted

outreach to potentially qualified parties. Next, they say that they should have been invited to engage with potential buyers. Ideally, I would have preferred that as well. However, given Fawn Weaver's prior comments to me about having no interest in working for someone else and the litigiousness which the Weaver Parties have recently exhibited, I have made the decision to exclude them from the process at this time. If we identify a likely buyer (or buyers), and if those parties are interested in talking to the Weaver Parties about the future of the Company, I will certainly arrange an introduction. At this stage, I have not included the Weaver Parties directly in buyer communications because I determined that doing so could complicate diligence and negotiations while motions seeking to halt or unwind the receivership are pending. If the process reaches a stage where a prospective counterparty requests direct dialogue with the Weaver Parties, I will consider facilitating that dialogue consistent with my duties and with protections for confidentiality and process integrity.

67. Finally, I would like to clarify a few additional items about which the Weaver Parties expressed confusion, or statements they made that require a correction.

68. First, the Weaver Parties indicate that they have been unable to reconcile the amount that Farm Credit has loaned the Company during this receivership. The likely difference between what the Weaver Parties believe has been loaned by Farm Credit, and what has actually been loaned by Farm Credit, involves a $1,095,348.86 payment made by the Receiver to Tennessee Distilling Group ("TDG") on December 18, 2025, in order to satisfy a warehouseman's lien which was entitled to first priority against the barrels of whiskey. The Receiver felt that it was important to represent to potential buyers that Farm Credit held the only lien on the barrels, and to represent that the Company was in

good standing with its distiller. Farm Credit agreed and loaned the Company the funds to retire the warehouseman's lien.

69. The Weaver Parties also attempt to parse my representation that, at the beginning of the receivership, the Company lacked funds to pay its payroll. That is a true statement. On the first Wednesday of this receivership, a representative of Genesis Global (the Company's payroll processor) ("Genesis"), called me and asked if I was aware that payroll was due that day. I said that I was not aware of that and asked how much it would take to fund the payroll. Genesis indicated that payroll was due in the approximate amount of $450,000. I was aware that the Company had only $250,000 in its bank accounts. I asked Genesis how the Company had been making payroll previously; they indicated that they had been fronting the payroll as a loan to the Company and the Weaver Parties. I asked if Genesis would continue that procedure; I was told that they would front the difference in the first payroll only, premised on my promise that I could quickly pay those funds back from Farm Credit advances. I followed through on that promise and have fully funded each payroll since. During my communications with Genesis, I sought to ensure payroll continuity, confirm amounts and timing, and arrange repayment of the initial fronted amount from Farm Credit advances; Gensis has continued to process payroll during the receivership. My relationship with Genesis has been a positive working relationship throughout this receivership.

70. I have also never represented, to Genesis or any other party, that the Company was "cash flow positive" but for the receivership expenses. I have represented to a number of parties that it was break even, or close to break even, excluding receivership expenses. Since I have reduced operating losses from $1 million per month to an average of

$100,000 per month, I believe that is a substantially correct statement. In fact, until I drafted the Second Quarterly Report in early January 2026, I believed that losses were closer to zero per month. The December financial reporting showed losses were closer to $100,000 per month.

Dated February 2, 2026

FURTHER AFFIANT SAITH NOT.


_____
Phillip G. Young, Jr.
Thompson Burton, PLLC
6100 Tower Circle, Suite 200
Franklin, TN 37067
615-465-6008
phillip@thompsonburton.com

Receiver

STATE OF TENNESSEE          )
                            )
COUNTY OF WILLIAMSON        )

BEFORE ME, the undersigned Notary Public for the State of Tennessee, at large, personally appeared, Phillip G. Young, Jr. who, being duly sworn, did depose and say that he has personal knowledge of the facts set forth in the foregoing document and that the same are true and correct to the best of his knowledge and belief.

Subscribed and sworn to before me this the 2nd day of February, 2026.

_____
NOTARY PUBLIC
My Commission Expires: 10-21-28

BRITTANY WOOD
STATE OF TENNESSEE
NOTARY PUBLIC
WILLIAMSON COUNTY
My Commission Expires 10-21-2028

35



**A Subsidiary of**

**First McMinnville Corporation**

1700 N. Main St. Shelbyville, TN 37160

www.fnbmt.com

## WIRE INSTRUCTIONS

Please send an individual wire to each account.

### **Receiving Financial Institution:**

First National Bank of Middle Tennessee
200 E. Main St.
McMinnville, TN 37110

Phone: 931-473-4402

### **ABA (Routing Number):**



### **Beneficiary Account Name(s) and Account Numbers:**

Uncle Nearest, Inc. – Account #⬛504
Nearest Green Historical Preservation and Culture Fund – Account #⬛307
Nearest Green Distillery Inc. – Account #⬛079
Nashwood Inc. dba Tolley House B&B – Account # ⬛052
Grant Sidney Inc. – Account # ⬛168
Grant Sidney Inc dba Grant Sidney Publishing – Account # ⬛512
Keith and Fawn Weaver (personal account) – Account # ⬛472



EXHIBIT

1



**UNCLE NEAREST**

Mike Senzaki <mike.senzaki@unclenearest.com>

## Wire from Grant Sidney to LS Cream (Canada)
6 messages

**Mike Senzaki** <mike.senzaki@unclenearest.com>                    Fri, Jan 22, 2021 at 11:03 AM
To: Chris Pepper <cpepper@fnbmt.com>
Cc: Fawn Weaver <fawn.weaver@unclenearest.com>

Chris,

Can you please prepare a wire to the account information below from the Grant Sidney Account for $150,000 USD.

Beneficiary Name: 8407983 Canada Inc.

TRANSIT: 0225
BANK NUMBER: 003
ACCOUNT NUMBER: 1001871

SWITF: ROYCCAT2
ABA: 021000021

BANK ADDRESS: 1958 Boulevard des Laurentides, Vimont, QC H7M 2R3
COMPANY NAME: 8407983 CANADA INC.

Regards,

Mike Senzaki | CFO  | Uncle Nearest, Inc. | Nearest Green Distillery, 3125 Hwy 231 N Shelbyville, TN 37160  | C: 818-877-3282  | mike@unclenearest.com P PLEASE CONSIDER THE ENVIRONMENT BEFORE PRINTING THIS EMAIL

**Fawn Weaver** <fawn.weaver@unclenearest.com>                    Fri, Jan 22, 2021 at 11:13 AM
To: Mike Senzaki <mike.senzaki@unclenearest.com>
Cc: Chris Pepper <cpepper@fnbmt.com>

Chris-

I'm on a flight but wanted to confirm this is approved. Thank you!

Fawn

I'm on the move while typing...please excuse any typos.

> On Jan 22, 2021, at 12:03 PM, Mike Senzaki <mike.senzaki@unclenearest.com> wrote:

[Quoted text hidden]

**Chris Pepper** <cpepper@fnbmt.com>                    Fri, Jan 22, 2021 at 11:18 AM
To: Fawn Weaver <fawn.weaver@unclenearest.com>, Mike Senzaki <mike.senzaki@unclenearest.com>

Thanks, once the deposit hits and funds are available we will work on this.

[Quoted text hidden]

---

**Fawn Weaver** <fawn.weaver@unclenearest.com>                          Fri, Jan 22, 2021 at 11:27 AM
To: Chris Pepper <cpepper@fnbmt.com>
Cc: Mike Senzaki <mike.senzaki@unclenearest.com>

I transferred the funds from the Uncle Nearest before the request was sent and it was immediately available. Not sure what you're waiting for, Chris. Please advise.

I'm on the move while typing...please excuse any typos.

> On Jan 22, 2021, at 12:18 PM, Chris Pepper <cpepper@fnbmt.com> wrote:

[Quoted text hidden]

---

**Chris Pepper** <cpepper@fnbmt.com>                          Fri, Jan 22, 2021 at 11:44 AM
To: Fawn Weaver <fawn.weaver@unclenearest.com>
Cc: Mike Senzaki <mike.senzaki@unclenearest.com>

I see what it is. The deposit went into your and Keith's personal account and we were looking for it in the Grant Sidney Account. I'll get it transferred to Grant Sidney and wire sent.

[Quoted text hidden]

---

**Fawn Weaver** <fawn.weaver@unclenearest.com>                          Fri, Jan 22, 2021 at 11:58 AM
To: Chris Pepper <cpepper@fnbmt.com>
Cc: Mike Senzaki <mike.senzaki@unclenearest.com>

Gotcha! That was correct. I needed to move the $150K to Grant Sidney from my personal for this transaction. Sorry about that, Chris.

I'm on the move while typing...please excuse any typos.

> On Jan 22, 2021, at 12:44 PM, Chris Pepper <cpepper@fnbmt.com> wrote:

[Quoted text hidden]

Exhibit 1 Summary of Receipts by Entity Group

| Entity Group Receiving Funds | Entity Group Disbursing Funds | Total Receipts ($) | Number of Transactions |
|---|---|---|---|
| Additional Entities | Additional Entities | $ 6,068,395 | 311 |
| Additional Entities | Receivership Entities | 1,582,298 | 61 |
| Receivership Entities | Additional Entities | 19,978,264 | 29 |
| Receivership Entities | Receivership Entities | 6,477,014 | 97 |
| **Total Receipts** | | $ 34,105,971 | 498 |

**EXHIBIT**

**2**

Exhibit 2 Summary of Disbursements by Entity Group

| Entity Group Disbursing Funds | Entity Group Receiving Funds | Total Disbursements ($) | Number of Transactions |
|---|---|---|---|
| Additional Entities | Additional Entities | $ 21,997,156 | 173 |
| Additional Entities | Receivership Entities | 22,263,367 | 68 |
| Receivership Entities | Additional Entities | 2,301,756 | 30 |
| Receivership Entities | Receivership Entities | 6,590,829 | 163 |
| **Total Disbursements** | | $ 53,153,107 | 434 |

Exhibit 3 Unknown Bank Account Transfers

| Unknown Accounts | Disbursements ($) | Receipts ($) | Number of Receipts | Number of Disbursements |
|---|---|---|---|---|
| 3472 | $ 899,494 | $ 1,537,260 | 15 | 12 |
| 5024 | 10,000 | 5,000 | 1 | 2 |
| 5297 | 10,000 | 25,633 | 4 | 1 |
| 8865 | 100 | | | 1 |
| 8873 | 100 | | | 1 |
| 8899 | 100 | | | 1 |
| 8915 | 100 | | | 1 |
| 8923 | 15,100 | 15,000 | 3 | 2 |
| 9507 | 18,400 | 222,621 | 18 | 3 |
| 9515 | 176 | 41,125 | 4 | 2 |
| 0209 | 31,500 | | | 1 |
| Unknown | 848,331 | 3,670,850 | 134 | 41 |
| **Total** | **$ 1,833,402** | **$ 5,517,490** | **179** | **68** |

Exhibit 4    Disbursement Matrix    Exhibit 3: Receipt Matrix

| Entity Disbursing Funds | | Additional Entities | | | | | | Entity Receiving Funds | | | | Receiving Entities | | | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Entity Group | Entity | 4 Front Street LLC | Account Not Provided | Clarela Hoya Inc | Gerri Sidney | Humble Baxar | Humble Baxar - Vendor | Nashwood | Shelbyville Barrel House | Shelbyville Gared | Donaline D'Andalis | Nearest Green Distillery | Nearest Green Distillery - Vendor | S1 Organic Vodka | Uncle Nearest | |
| Additional Entities | 4 Front Street LLC | $ - | $ - | $ - | $ - | $ 9,500 | $ - | $ - | $ - | $ 250,000 | $ - | $ 1,302,333 | $ - | $ - | $ 25,000 | $ 36,533 |
| | Account Not Provided | 9,600 | - | - | - | - | - | - | - | - | - | - | - | - | - | 5,516,248 |
| | Clarela Hoya Inc | - | - | 36,000 | - | 3,435,460 | - | 27,500 | - | - | - | - | - | - | 390,000 | 42,585 |
| | Gerri Sidney | - | - | - | - | 15,000 | - | - | - | - | - | 8,460 | - | - | - | 16,689,221 |
| | Gerri Sidney (UN) | - | - | - | - | - | - | - | - | - | 750,000 | - | - | - | - | 42,585 |
| | Humble Baxar | - | - | 17,000 | - | 491,942 | - | 218,340 | 209 | - | 215,100 | 20,000 | - | 1,355 | 960,000 | 572,393 |
| | Halewood | - | - | 15,400 | - | 368,000 | - | 178,000 | 2,163 | - | 313,550 | 460 | - | - | - | 536,511 |
| | Oak and Cask Owner | - | - | - | - | 32,014 | - | 25,600 | 20 | - | - | 504,300 | 1,200,000 | - | 2,332,870 | |
| | Shelbyville Barrel House | - | - | 2,000 | - | 180,000 | - | 59,000 | - | - | - | 3,300 | - | - | - | 241,000 |
| | Shelbyville Gared | 6,600 | - | 99,488 | - | 4,544,016 | - | 980,399 | 2,356 | - | 487,500 | 790,988 | 1,996,183 | 1,250 | 296,000 | 17,076,831 |
| Additional Entities Subtotal | | 6,600 | - | - | - | - | - | - | - | - | - | - | - | - | - | 876,833 |
| Receiving Entities | Donaline D'Andalis | - | - | - | - | 184,380 | - | 190,520 | - | 120,000 | - | - | 78,000 | - | 126,000 | 2,043,019 |
| | Nearest Green Distillery | - | - | - | - | - | - | - | - | - | - | 406 | 2,583,215 | - | 454,533 | 4,912,262 |
| | S1 Organic Vodka | - | - | - | - | - | - | 319,000 | - | - | 130,000 | 738,556 | - | - | - | 108,460 |
| | Uncle Nearest | 20,000 | - | - | - | 736,367 | - | 400,520 | - | - | - | 737,246 | - | - | - | 8,616,311 |
| Receiving Entities Subtotal | | 20,000 | - | - | - | 922,728 | - | 2,613,515 | - | - | - | 454,533 | - | - | - | |
| Total Funds Disbursed | $ 43,000 | $ - | $ 68,489 | $ - | $ 5,440,744 | $ - | $ 1,460,518 | $ 2,385 | $ - | $ 587,600 | $ 1,477,216 | $ 4,583,398 | $ 1,250 | $ 424,533 | $ 19,196,491 | $ 34,103,971 |

Exhibit 5 Receipt Matrix

**Entity Receiving Funds / Entity Disbursing Funds**

| Entity Group | Entity | 4 Front Street LLC | Account Not Provided | Classic Hops Inc. | Grant Sidney | Grant Sidney(NI) | Humble Baron | Nashwood | Quill and Cash Owner | Shelbyville Barrel House | Shelbyville Grand | Domaine D'Anäslä | Nearest Green Distillery | S1 Organic Vodka | Uncle Nearest | Grand Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Additional Entities | 4 Front Street LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | 39,000 | 39,000 |
| | Account No; Provided | - | - | - | - | - | 71,300 | 34,194 | 110,000 | - | 74,897 | 340,861 | 827,590 | - | 231,430 | 1,690,250 |
| | Classic Hops Inc | - | - | 76 | - | - | 17,000 | 19,400 | - | - | 2,000 | - | - | - | - | 38,400 |
| | Grant Sidney | - | - | - | - | 20,003,087 | - | - | - | - | - | - | - | - | - | 20,003,087 |
| | Humble Baron | - | - | - | - | - | - | 226,371 | 380,000 | 57,014 | 183,500 | - | 188,696 | - | 321,337 | 1,360,628 |
| | Humble Baron - Vendor | - | - | 15,000 | - | - | - | - | - | - | - | - | 141,697 | - | 70,833 | 212,500 |
| | Nashwood | - | - | - | 27,500 | - | 228,295 | - | 178,900 | 29,711 | 59,000 | - | - | - | 10,000 | 575,246 |
| | Shelbyville Barrel House | - | - | - | - | - | - | 1,840 | 20 | 100 | - | - | - | - | - | 1,960 |
| | Shelbyville Grand | - | - | - | - | - | 214,100 | 33,500 | - | - | - | - | - | - | - | 377,600 |
| **Additional Entities Subtotal** | | - | 40,440 | 42,576 | 531,795 | 26,003,087 | - | - | - | - | - | - | - | - | - | 24,296,912 |
| Receivable Entities | Domaine D'Anäslä | - | - | - | 750,000 | - | - | - | - | - | - | - | 130,000 | - | 673,610 | 1,476,680 |
| | Nearest Green Distillery | - | - | - | 6,400 | - | - | - | 657,509 | 86,723 | 319,387 | 340,864 | 1,288,263 | 480 | 726,200 | 2,330,501 |
| | Nearest Green Distillery - Vendor | - | - | - | - | - | - | - | - | - | - | - | 70,000 | - | 6,600 | 102,672 |
| | S1 Organic Vodka | - | - | - | 200,000 | - | - | - | - | - | - | - | - | - | 6,650 | 206,650 |
| | Uncle Nearest | - | - | - | 15,721,631 | - | - | 3 | 1,220,000 | - | 25,000 | 1,094,019 | 3,075,466 | 156,015 | 1,469,986 | 21,384,364 |
| | Uncle Nearest - Vendor | - | - | - | 3,343,328 | - | - | - | - | - | - | - | - | - | - | 3,343,328 |
| **Receivable Entities Subtotal** | | - | - | - | 25,033,559 | 26,003,087 | 651,118 | 381,548 | 2,462,870 | 56,625 | 344,307 | 1,434,903 | 4,363,759 | 228,495 | 2,870,425 | 28,834,195 |
| **Total Funds Received** | | - | 40,440 | 42,576 | 25,033,559 | 26,003,087 | 651,118 | 381,548 | 2,462,870 | 56,625 | 344,307 | 1,434,903 | 4,363,759 | 228,495 | 2,870,425 | 53,153,197 |

Exhibit 6 Receipt Name (Count)

| Entity Receiving Funds | | Entity Disbursing Funds | | | | | | | | | | | Receivership Entities | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Additional Entities | | | | | | | | | | | | | | | | |
| Entity Group | Entity | 4 Front Street LLC | Account Not Provided | Classic Hops Inc | Grant Sidney | Grant Sidney (UN) | Humble Baron | Nathwood | Quill and Cask Owner | Shelbyville Barrel House | Shelbyville Grand | Domaine D'Anatolo | Nearest Green Distillery | ST Organic Vodka | Uncle Nearest | Grand Total |
| Additional Entities | 4 Front Street LLC | - | - | - | - | - | - | - | - | - | - | - | - | - | - | $ 1 |
| | Account Not Provided | - | - | - | - | - | - | - | - | - | - | - | - | - | - | 46 |
| | Classic Hops Inc | - | - | - | 1 | - | - | - | - | - | - | - | - | - | 2 | 9 |
| | Grant Sidney | - | - | - | - | - | 2 | 6 | 6 | - | - | - | - | - | - | 6 |
| | Humble Baron | - | - | - | 1 | 6 | 9 | 7 | - | 9 | 7 | 8 | 4 | - | 4 | 55 |
| | Humble Baron - Vendor | - | - | 2 | 2 | - | - | 25 | - | - | - | 5 | 2 | - | 1 | 3 |
| | Natshood | - | - | - | - | - | - | 28 | 1 | 1 | 9 | - | 1 | - | - | 55 |
| | Shelbyville Barrel House | - | - | - | - | - | - | 18 | 3 | - | - | - | - | - | 1 | 3 |
| | Shelbyville Grand | - | - | 2 | - | 6 | - | 58 | 42 | 23 | 15 | 22 | 3 | 18 | 9 | 22 |
| Additional Entities Subtotal | | - | - | 2 | 4 | 6 | 6 | 58 | 42 | 23 | 15 | 22 | 3 | 18 | 9 | 203 |
| Receivership Entities | Domaine D'Aracole | - | - | - | - | - | - | - | - | - | - | - | 3 | 1 | 9 | 7 |
| | Nearest Green Distillery | - | - | 2 | 2 | - | - | 21 | 1 | 2 | 1 | - | 3 | 18 | 4 | 59 |
| | Nearest Green Distillery - Vendor | - | - | - | - | 1 | - | 14 | 6 | 2 | 1 | 1 | - | 1 | 31 | 20 |
| | ST Organic Vodka | - | - | - | 1 | 8 | - | 1 | 1 | - | - | 1 | 5 | 116 | - | 3 |
| | Uncle Nearest | - | - | - | - | 6 | - | 1 | 1 | - | - | - | - | - | 2 | 137 |
| | Uncle Nearest - Vendor | - | - | - | - | 6 | - | 1 | 1 | 2 | - | - | 5 | 3 | - | 5 |
| Receivership Entities Subtotal | | - | - | 2 | 4 | 18 | 6 | 36 | 8 | 4 | 1 | 1 | 5 | 116 | 37 | 231 |
| Total Funds Received (Count) | | - | 2 | 4 | 4 | 18 | 6 | 84 | 50 | 27 | 17 | 23 | 8 | 134 | 46 | 434 |

Exhibit 7 Disbursement Matrix (Count)

| Entity Disbursing Funds | | Entity Receiving Funds | | | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Additional Entities | | | | | | | | | Domaine D'Aiutele | Receivership Entities | | | | | Grand Total |
| Entity Group | Entity | 4 Front Street LLC | Account Not Provided | Classic Hops Inc | Grant Sidney | Humble Baron | Humble Baron - Vendor | Neatwood | Shelbyville Barrel House | Shelbyville Grand | | Nearest Green Distillery | Nearest Green Distillery - Vendor | St Organic Vodka | Uncle Nearest | Uncle Nearest - Vendor | |
| Additional Entities | 4 Front Street LLC | | | | | 1 | | | | | | | | | 1 | | 2 |
| | Account Not Provided | 3 | | | | | | | | | | | | | | | 3 |
| | Classic Hops Inc | | | 1 | | | | | | | | | | | | | 12 |
| | Grant Sidney | | | | 2 | 12 | | 43 | | | 11 | 7 | | | 8 | | 51 |
| | Grant Sidney/JW | | | | 6 | 1 | | 26 | 2 | 18 | 3 | 1 | | | 1 | | 45 |
| | Humble Baron | | | | | 33 | | 7 | 1 | | | 2 | 1 | | 1 | | 21 |
| | Neatwood | | | | | 9 | | 9 | 2 | | | 2 | | | 2 | | 16 |
| | Quill and Cask Owner | | | | 1 | 7 | | 6 | | | | 1 | | | | | 13 |
| | Shelbyville Barrel House | | | | 10 | 170 | | 91 | 5 | 32 | 2 | 13 | | 1 | 12 | | 340 |
| | Shelbyville Grand | | | | | | | | | | | | | | 6 | | |
| Additional Entities Subtotal | | 3 | | 10 | | | | | | | | | 2 | | | 1 | 540 |
| Receivership Entities | Domaine D'Aiutele | | | | | | | | | | | 1 | | | 23 | | 6 |
| | Nearest Green Distillery | | 1 | | | 9 | | 20 | | 1 | 1 | 1 | | 1 | 1 | | 53 |
| | St Organic Vodka | | | | | | | 14 | | | | 54 | | 6 | | | 3 |
| | Uncle Nearest | 1 | | | | 15 | | 34 | | 1 | | 55 | | 6 | 30 | | 96 |
| Receivership Entities Subtotal | | | 1 | | | | | | | | 5 | 5 | | | 7 | | 158 |
| Total Funds Disbursed (Count) | | 4 | 1 | 10 | | 184 | | 125 | 5 | 33 | 8 | 68 | 1 | 7 | 42 | | 698 |

## EXHIBIT 3

In addition to the actual movement of cash, the Receivership and Additional Entities share many other resources and services that do not entail actual cash transactions. The Receiver Entities Uncle Nearest, Inc. and Nearest Green Distillery, Inc. provide and pay for the following services which benefit the Additional Entities:

- Maintenance
- Security
- IT Services
- Marketing
- Social Media
- Equipment and Capital Improvements
- Janitorial
- Utilities (electric, water, etc.)
- Trash disposal
- Landscaping services
- General Supervision
- Accounting Services
- Favorable Rental Agreement

**EXHIBIT**

**3**

tabbies®

| Summary of Adjustments to Cash Flow 9/1/25 - 1/18/26 | | | |
|---|---|---|---|
| Description of Adjustment | Direction | Amount ($) | Cumulative Effect ($) |
| **Original Cash Flow (Base Model)** | - | $ - | $ 1,139,039 |
| FCMA Receivership Funding | Decrease | (3,800,000) | |
| Receivership Professional Fees | Increase | 1,729,259 | |
| FCMA P&I Payments | Decrease | (6,576,705) | |
| Whistle Pig Loan | Decrease | (4,068,560) | |
| Dash Funding MCA Payments | Decrease | (1,065,920) | |
| Stayed Vendor Payments | Decrease | (3,666,830) | |
| **Adjusted Net Cash Flow** | | | $ (16,309,716) |



EXHIBIT

4

| Summary of Adjustments to Cash Flow 1/19/26 - 5/31/26 | | | |
|---|---|---|---|
| **Description of Adjustment** | Direction | Amount ($) | Cumulative Effect ($) |
| **Original Cash Flow (Base Model)** | - | - | $ (3,081,406) |
| Fawn Weaver Increased Sales Collections | Increase | 1,846,596 | |
| Receivership Professional Fees | Increase | 2,500,000 | |
| FCMA P&I Payments | Decrease | (2,519,586) | |
| Whistle Pig Loan | Decrease | (4,068,560) | |
| Dash Funding MCA Payments | Decrease | (852,736) | |
| Stayed Vendor Payments | Decrease | (3,666,830) | |
| **Adjusted Net Cash Flow** | | | $ (9,842,522) |

## Uncle Nearest, Inc. - 001 (Consolidated)
## Income Statement
## From Jan 2025 to Dec 2025 by Quarter

| Financial Row | Q1 2025 Amount | Q2 2025 Amount | Q3 2025 Amount | Q4 2025 Amount | Total Amount |
|---|---|---|---|---|---|
| **Income** | | | | | |
| 4000 · Income | | | | | |
| 4000 · Income | $0.00 | $6,769.60 | $15,726.82 | $286,080.50 | $308,576.92 |
| 4005 · Sales | $5,605,636.42 | $7,548,126.17 | $5,721,267.01 | $6,341,030.19 | $25,216,059.79 |
| 4100 · Sales : Barrels | $0.00 | $7,499,194.43 | $0.00 | $0.00 | $7,499,194.43 |
| 4900 · Other Revenue | $27,143.30 | $26,117.46 | $45,200.39 | $0.00 | $98,461.15 |
| **Total - 4000 · Income** | $5,632,779.72 | $15,080,207.66 | $5,782,194.22 | $6,627,110.69 | $33,122,292.29 |
| **Cost Of Sales** | | | | | |
| 5000 · Cost of Goods Sold | | | | | |
| 5000 · Cost of Goods Sold | $10,093.68 | $5,037.90 | $9,299.33 | $2,257.88 | $26,688.79 |
| 5005 · Cost of Goods Sold : Love & Whiskey | $52,080.75 | $55,705.75 | $90.54 | $0.00 | $107,877.04 |
| 5015 · Cost of Goods Sold: Retail and Tours | $68,473.85 | $122,590.63 | $85,345.23 | $69,026.66 | $345,436.37 |
| 5050 · Cost of Goods Sold: Spirits | $4,923,616.40 | $10,946,889.54 | $3,137,087.01 | $4,252,773.68 | $23,260,366.63 |
| 5650 · Cost of Goods Sold : Merchant Fees | $7,785.14 | $2,370.87 | $2,160.38 | $1,490.36 | $13,806.75 |
| 5800 · Cost of Goods Sold: Manufacturing | $438,484.08 | $621,909.77 | $194,915.97 | $101,649.59 | $1,356,959.41 |
| **Total - 5000 · Cost of Goods Sold** | $5,500,533.90 | $11,754,504.46 | $3,428,898.46 | $4,427,198.17 | $25,111,134.99 |
| **Gross Profit** | $132,245.82 | $3,325,703.20 | $2,353,295.76 | $2,199,912.52 | $8,011,157.30 |
| **Expense** | | | | | |
| 6000 · Indirect Costs | | | | | |
| 6002 · Miscellaneous Expense | $66.41 | $106.22 | $184.09 | $0.00 | $356.72 |
| 6100 · MFG Expense | $443,857.54 | $449,281.89 | $403,431.48 | $388,335.89 | $1,684,906.80 |
| 6600 · Sales Expense | $974,223.30 | $970,865.83 | $390,082.86 | $142,618.18 | $2,477,790.17 |
| 6901 · Store Expense | $33,852.24 | $9,892.56 | $8,824.98 | $21,188.29 | $73,758.07 |
| **Total - 6000 · Indirect Costs** | $1,451,999.49 | $1,430,146.50 | $802,523.41 | $552,142.36 | $4,236,811.76 |
| 6900 · Marketing | $1,451,016.99 | $1,155,046.28 | $596,619.72 | $217,232.75 | $3,409,915.74 |
| 7000 · Operating Expenses | | | | | |
| 7100 · General & Administrative | $500,610.18 | $221,489.54 | $235,268.00 | $306,590.74 | $1,263,958.47 |
| 7300 · Other Professional Services | $1,250,461.12 | $1,051,195.06 | $1,357,742.01 | $1,208,526.44 | $4,867,924.63 |
| 7500 · Payroll Expenses | $2,663,844.73 | $2,343,925.01 | $2,170,209.99 | $1,737,674.21 | $8,915,653.94 |
| 7600 · Computer Maintenance | $92,194.23 | $76,108.29 | $74,605.98 | $86,550.47 | $329,458.97 |
| 7700 · Vehicle Expenses | $3,177.04 | $4,079.14 | $1,734.50 | $19,727.34 | $28,718.02 |
| 8000 · Occupancy Expense | $273,510.80 | $250,567.42 | $155,571.91 | $106,238.98 | $785,889.11 |
| **Total - 7000 · Operating Expenses** | $4,783,798.11 | $3,947,364.46 | $3,995,132.39 | $3,465,308.18 | $16,191,603.14 |
| **Total - Expense** | $7,686,814.59 | $6,532,557.24 | $5,384,275.51 | $4,234,683.29 | $23,838,330.64 |



EXHIBIT
5

| | | | | | |
|---|---|---|---|---|---|
| **Net Ordinary Income** | ($7,554,568.77) | ($3,206,854.04) | ($3,030,979.75) | ($2,034,770.77) | ($15,827,173.34) |
| **Other Income and Expenses** | | | | | |
| **Other Income** | | | | | |
| 9000 - Other Income | $645.77 | $715.96 | $352,135.93 | $0.00 | $353,497.66 |
| Total - Other Income | $645.77 | $715.96 | $352,135.93 | $0.00 | $353,497.66 |
| **Other Expense** | | | | | |
| **9500 - Other Expense** | | | | | |
| 9500 - Other Expense | $2,650.28 | $0.00 | $0.00 | $0.00 | $2,650.28 |
| 9505 - Depreciation | $1,044,619.77 | $1,044,619.77 | $1,044,619.77 | $1,044,619.77 | $4,178,479.08 |
| 9550 - Other Miscellaneous Expense | $598.00 | $10,611.09 | $151,898.64 | $1,881.00 | $164,988.73 |
| 9570 - Late Fees & Penalties | $15,739.90 | $4,996.58 | $13,870.06 | $1,983.94 | $36,590.48 |
| 9575 - Sales Tax Expense | $9,107.65 | $10,289.97 | $88,115.49 | $2,331.13 | $109,844.24 |
| 9580 - Property Taxes | $9,348.00 | $11,357.54 | $4,359.09 | $0.00 | $25,064.63 |
| 9585 - Business Tax | $20,983.62 | $0.00 | $0.00 | $0.00 | $20,983.62 |
| 9590 - Interest Expense | $3,031,546.16 | $2,943,832.99 | $2,360,307.69 | $2,365,774.32 | $10,701,461.16 |
| 9595 - Other Non Operating Costs | $0.00 | $0.00 | $48,605.95 | $0.00 | $48,605.95 |
| **Total - 9500 - Other Expense** | $4,134,593.38 | $4,025,707.94 | $3,711,776.69 | $3,416,590.16 | $15,288,668.17 |
| 9600 - Realized Gain/Loss | ($643.83) | $345.01 | $0.00 | $0.00 | ($298.82) |
| 999999 - Uncategorized Expense | $2,213.83 | $0.00 | $0.00 | $0.00 | $2,213.83 |
| **Total - Other Expense** | $4,136,163.38 | $4,026,052.95 | $3,711,776.69 | $3,416,590.16 | $15,290,583.18 |
| **Net Other Income** | ($4,135,517.61) | ($4,025,336.99) | ($3,359,640.76) | ($3,416,590.16) | ($14,937,085.52) |
| **Net Income** | ($11,690,086.38) | ($7,232,191.03) | ($6,390,620.51) | ($5,451,360.93) | ($30,764,258.86) |

# Uncle Nearest, Inc. - 001 (Consolidated)
## Income Statement
### From Jan 2025 to Dec 2025 by Quarter (Detailed)

| Financial Row | Q1 2025 Amount | Q2 2025 Amount | Q3 2025 Amount | Q4 2025 Amount | Total Amount |
|---|---|---|---|---|---|
| **Ordinary Income/Expense** | | | | | |
| **Income** | | | | | |
| **4000 - Income** | | | | | |
| 4000 - Income | $0.00 | $6,769.60 | $15,726.82 | $286,080.50 | $308,576.92 |
| **4005 - Sales** | | | | | |
| 4005 - Sales : Tours | ($732.44) | ($29,696.70) | $0.00 | $0.00 | ($30,429.14) |
| 4010 - Sales : Tours | $218,723.50 | $377,281.66 | $371,358.82 | $0.00 | $967,363.98 |
| **4020 - Sales : Merchandise** | | | | | |
| 4020 - Sales : Merchandise | $164,011.75 | $256,486.25 | $245,363.29 | $130,305.96 | $795,167.25 |
| 4025 - Sales : Merchandise : Discounts & Returns | ($1,365.50) | ($4,474.75) | ($3,642.15) | ($1,688.42) | ($11,170.82) |
| **Total - 4020 - Sales : Merchandise** | **$162,646.25** | **$251,011.50** | **$241,721.14** | **$128,617.54** | **$783,996.43** |
| **4030 - Sales : Spirits** | | | | | |
| 4030 - Sales : Spirits | $404,078.27 | $1,215,075.66 | $685,714.38 | $444,797.19 | $2,749,665.50 |
| 4031 - Sales : Spirits : 1884 | $1,864,294.69 | $2,405,831.78 | $1,121,664.68 | $0.00 | $5,391,791.15 |
| 4032 - Sales : Spirits : 1856 | $1,313,407.32 | $1,439,258.79 | $1,009,852.10 | $0.00 | $3,762,518.21 |
| 4033 - Sales : Spirits : Straight Rye | $224,612.22 | $241,831.58 | $165,671.34 | $0.00 | $632,115.14 |
| 4034 - Sales : Spirits : Single Barrel | $414,824.57 | $458,187.14 | $273,298.67 | $0.00 | $1,146,310.38 |
| 4036 - Sales : Spirits : Net Distribution | $2,196.95 | $426.91 | $1,371,793.19 | $5,767,395.46 | $7,141,812.51 |
| 4037 - Sales : Spirits : 777 Anniversary Blend | $5,564.20 | $928.27 | $66.31 | $0.00 | $7,558.78 |
| 4038 - Sales : Spirits : Master Blend | $5,346.00 | $553,906.30 | $123,669.94 | $0.00 | $682,922.24 |
| 4039 - Sales : Spirits : NG 84 Tennessee Whiskey | $1,066,707.01 | $703,476.66 | $397,642.01 | $0.00 | $2,167,825.68 |
| 4620 - Sales : Spirits : Discounts | ($77,762.12) | ($69,793.38) | ($41,835.57) | $0.00 | ($189,391.07) |
| **Total - 4030 - Sales : Spirits** | **$5,224,269.11** | **$6,949,129.71** | **$5,107,537.05** | **$6,212,192.65** | **$23,493,128.52** |
| 4035 - Sales : Tastings | $730.00 | $400.00 | $650.00 | $220.00 | $2,000.00 |
| **Total - 4005 - Sales** | **$5,605,636.42** | **$7,548,126.17** | **$5,721,267.01** | **$6,341,030.19** | **$25,216,059.79** |
| 4100 - Sales : Barrels | $0.00 | $7,499,194.43 | $0.00 | $0.00 | $7,499,194.43 |
| 4900 - Other Revenue | $27,143.30 | $26,117.46 | $45,200.39 | $0.00 | $98,461.15 |
| **Total - 4000 - Income** | **$5,632,779.72** | **$15,080,207.66** | **$5,782,194.22** | **$6,627,110.69** | **$33,122,292.29** |
| **Total - Income** | **$5,632,779.72** | **$15,080,207.66** | **$5,782,194.22** | **$6,627,110.69** | **$33,122,292.29** |
| **Cost Of Sales** | | | | | |
| **5000 - Cost of Goods Sold** | | | | | |
| 5000 - Cost of Goods Sold | $10,093.68 | $5,037.90 | $9,299.33 | $2,257.88 | $26,688.79 |
| 5005 - Cost of Goods Sold : Love & Whiskey | $52,080.75 | $55,705.75 | $90.54 | $0.00 | $107,877.04 |
| **5015 - Cost of Goods Sold: Retail and Tours** | | | | | |

| Account | | | | | |
|---|---|---|---|---|---|
| 5015 - Cost of Goods Sold: Retail and Tours | $0.00 | $1,590.72 | $679.15 | $803.40 | $3,073.27 |
| 5025 - Cost of Goods Sold: Retail and Tours : Shrinkage | $2,751.40 | $15,349.86 | ($27,041.96) | $13,477.16 | $4,536.46 |
| 5030 - Cost of Goods Sold: Retail and Tours: Over & Sho | ($546.28) | ($54.67) | $82.17 | $30.24 | $11.46 |
| 5040 - Cost of Goods Sold: Retail and Tours: Merchandis | $62,421.35 | $101,986.86 | $104,537.26 | $53,439.48 | $322,384.95 |
| 5499 - Cost of Goods Sold: Retail and Tours: Freight | $3,347.38 | $3,717.86 | $7,088.61 | $1,276.38 | $15,430.23 |
| **Total - 5015 - Cost of Goods Sold: Retail and Tours** | **$68,473.85** | **$122,590.63** | **$85,345.23** | **$69,026.66** | **$345,436.37** |
| **5050 - Cost of Goods Sold : Spirits** | | | | | |
| 5050 - Cost of Goods Sold: Spirits | $0.00 | $0.00 | $0.00 | $132,951.69 | $132,951.69 |
| 5051 - Cost of Goods Sold: Spirits: UN: Whiskey | $3,603,522.54 | $9,873,996.73 | $1,991,286.39 | $3,130,192.20 | $18,598,997.86 |
| 5055 - Cost of Goods Sold: Spirits: UN: Taxes & Escrow | $355,539.83 | $144,401.17 | $90,709.86 | $0.00 | $590,450.86 |
| **5060 - Cost of Goods Sold : Park Street : Fees** | | | | | |
| 5061 - Cost of Goods Sold : Park Street : Fees : Brand f | $7,167.41 | $4,566.05 | $6,348.78 | $4,986.37 | $23,068.61 |
| 5063 - Cost of Goods Sold: Park Street : Fees : Bank F | $0.00 | $0.00 | $6.54 | | $6.54 |
| 5066 - Cost of Goods Sold: Spirits: Park Street: Charge | $519,071.44 | $367,010.41 | $548,573.86 | $499,729.43 | $1,934,385.14 |
| 5069 - Cost of Goods Sold: Spirits: Park Street: Freight | $59,719.33 | $40,787.56 | $11,906.59 | $0.00 | $112,413.46 |
| **5070 - Cost of Goods Sold : Park Street : Fees : Incentive** | | | | | |
| 5072 - Cost of Goods Sold : Park Street : Fees : Logist | $52,495.17 | $42,968.37 | $72,762.59 | $188,959.99 | $357,186.12 |
| **Total - 5070 - Cost of Goods Sold : Park Street : Fe** | **$52,495.17** | **$42,968.37** | **$72,762.59** | **$188,959.99** | **$357,186.12** |
| 5071 - Cost of Goods Sold : Park Street : Fees : Insurance | $5,596.00 | $0.00 | $0.00 | $7,326.00 | $12,922.00 |
| 5077 - Cost of Goods Sold : Park Street : Fees : Sample | $631.04 | $0.00 | $0.00 | $0.00 | $631.04 |
| 5079 - Cost of Goods Sold : Park Street : Fees : Storage | $102,354.93 | $99,065.94 | $40,292.08 | $34,014.75 | $275,727.70 |
| 5080 - Cost of Goods Sold : Park Street : Fees : Tasting | $0.00 | $0.00 | $0.00 | $540.00 | $540.00 |
| 5081 - Cost of Goods Sold : Park Street : Taxes | $3,855.60 | $3,060.20 | $1,429.55 | $2,209.28 | $10,554.63 |
| **Total - 5060 - Cost of Goods Sold : Park Street : Fee** | **$750,890.92** | **$557,458.53** | **$681,319.99** | **$737,765.82** | **$2,727,435.26** |
| **5095 - Cost of Goods Sold: Spirits: Retail** | | | | | |
| 5095 - Cost of Goods Sold: Spirits: Retail | $206,168.62 | $370,315.01 | $373,876.56 | $248,213.97 | $1,198,574.16 |
| 5095.02 - Cost of Goods Sold : Spirits : Donations | $0.00 | $718.10 | ($105.79) | $0.00 | $612.31 |
| 5097 - Cost of Goods Sold: Spirits: Retail : Fees | $7,694.49 | $0.00 | $0.00 | $0.00 | $7,694.49 |
| **Total - 5095 - Cost of Goods Sold: Spirits: Retail** | **$213,863.11** | **$371,033.11** | **$373,770.77** | **$248,213.97** | **$1,206,880.96** |
| 5099 - Cost of Goods Sold: Spirits: Retail: Freight | $0.00 | $0.00 | $0.00 | $3,650.00 | $3,650.00 |
| **Total - 5050 - Cost of Goods Sold: Spirits** | **$4,923,616.40** | **$10,946,889.54** | **$3,137,087.01** | **$4,252,773.68** | **$23,260,366.63** |
| **5000 - Cost of Goods Sold : Merchant Fees** | | | | | |
| 5660 - Cost of Goods Sold : Merchant Fees | ($9.48) | $0.00 | $0.00 | $2.75 | ($6.73) |
| 5665 - Cost of Goods Sold: Merchant Fees: Credit Card f | $6,000.61 | $0.00 | $0.00 | $0.00 | $6,000.61 |
| 5690 - Cost of Goods Sold: Merchant Fees: AnyRoad Fe | $1,670.46 | $2,296.79 | $2,160.38 | $0.00 | $6,127.63 |
| 5665 - Cost of Goods Sold: Merchant Fees: Square Fees | $123.55 | $74.08 | $0.00 | $1,487.61 | $1,685.24 |
| **Total - 5650 - Cost of Goods Sold : Merchant Fees** | **$7,785.14** | **$2,370.87** | **$2,160.38** | **$1,490.36** | **$13,806.75** |
| **5000 - Cost of Goods Sold: Manufacturing** | | | | | |
| 5805 - Cost of Goods Sold: Manufacturing: Supplies | $74,194.95 | $92,722.09 | $20,675.29 | $3,861.11 | $191,453.44 |
| 5810 - Cost of Goods Sold: Manufacturing: Machine Sup | ($546.08) | $0.00 | $0.00 | $0.00 | ($546.08) |
| 5812 - Cost of Goods Sold: Manufacturing: Equipment Re | $2,434.82 | $1,325.30 | $1,304.43 | $22,310.40 | $27,374.95 |
| 5815 - Cost of Goods Sold: Manufacturing : Overhead La | $1,580.00 | $0.00 | $0.00 | $0.00 | $1,580.00 |

| Account | | | | | |
|---|---|---|---|---|---|
| 5820 - Cost of Goods Sold: Manufacturing Freight | $39,289.41 | $30,023.32 | $23,558.05 | $1,329.83 | $94,200.61 |
| 5825 - Cost of Goods Sold : Manufacturing : Packing Sup | $5,463.82 | $93.63 | $1,450.60 | $19.80 | $7,003.85 |
| 5827 - Cost of Goods Sold : Manufacturing : Customs & I | $0.00 | $0.00 | $18,500.00 | $63,467.26 | $81,967.26 |
| 5890 - Cost of Goods Sold: Manufacturing : Contract Labo | $12,000.64 | $0.00 | $0.00 | $857.39 | $12,858.03 |
| 5895 - Cost of Goods Sold: Manufacturing : Miscellaneous | $275,037.41 | $481,830.23 | $79,264.63 | $0.00 | $836,132.27 |
| 5899 - Cost of Goods Sold: Manufacturing : Shipping & F | $28,529.11 | $15,939.20 | $50,162.97 | $9,803.80 | $104,435.08 |
| Total - 5890 - Cost of Goods Sold: Manufacturing | $438,484.08 | $621,909.77 | $194,915.97 | $101,649.59 | $1,356,959.41 |
| Total - 5000 - Cost of Goods Sold | $5,500,533.90 | $11,754,504.46 | $3,428,898.46 | $4,427,198.17 | $25,111,134.99 |
| Total - Cost Of Sales | $5,500,533.90 | $11,754,504.46 | $3,428,898.46 | $4,427,198.17 | $25,111,134.99 |
| Gross Profit | $132,245.82 | $3,325,703.20 | $2,353,295.76 | $2,199,912.52 | $8,011,157.30 |
| Expense | | | | | |
| 6000 - Indirect Costs | | | | | |
| 6002 - Miscellaneous Expense | $66.41 | $106.22 | $184.09 | $0.00 | $356.72 |
| 6100 - MFG Expense | | | | | |
| 6103 - MFG. Storage | $434,163.73 | $403,622.19 | $349,132.75 | $333,839.32 | $1,520,757.99 |
| 6104 - MFG. Insurance | $0.00 | $43,361.75 | $52,692.12 | $52,692.12 | $148,745.99 |
| 6105 - MFG Maintenance | $2,921.05 | $882.74 | $248.17 | $90.00 | $4,141.96 |
| 6185 - MFG. Distillery Equipment | $6,522.22 | $143.21 | $1,250.64 | $1,714.45 | $9,630.52 |
| 6195 - MFG. Equipment Maintenance | $250.54 | $1,272.00 | $107.80 | $0.00 | $1,630.34 |
| Total - 6100 - MFG Expense | $443,857.54 | $449,281.89 | $403,431.48 | $388,335.89 | $1,684,906.80 |
| 6600 - Sales Expense | | | | | |
| 6600 - Sales Expense | $0.00 | $0.00 | $0.00 | $40.00 | $40.00 |
| Total - 6600 - Sales Expense | $0.00 | $0.00 | $0.00 | $40.00 | $40.00 |
| 6605 - Sales Support | | | | | |
| 6605 - Sales Support | $368,265.03 | $310,439.11 | $132,459.95 | $423.48 | $811,587.57 |
| 6607 - Account Support | $4,078.18 | $14,361.42 | $10,288.71 | $6,904.44 | $35,632.75 |
| 6608 - Account Support Supplies | $11,736.83 | $14,867.23 | $11.73 | $191.00 | $26,806.79 |
| 6609 - Account Support Meals | $23,773.98 | $29,186.44 | $15,346.98 | $6,352.64 | $74,659.04 |
| 6610 - Account Drinks | $18,491.22 | $19,643.09 | $6,327.45 | $7,736.44 | $52,198.20 |
| 6611 - Sales Sample Purchases | $4,822.53 | $1,670.40 | $1,373.09 | $1,743.13 | $9,609.15 |
| 6612 - Trade Advocacy | $3,699.08 | $0.00 | $0.00 | $0.00 | $3,699.08 |
| Total - 6605 - Sales Support | $434,866.85 | $390,167.69 | $165,806.91 | $23,351.13 | $1,014,192.58 |
| 6620 - Commissions and Incentives | | | | | |
| 6621 - Park Street Commissions | $176,981.23 | $141,950.80 | $29,302.38 | $0.00 | $348,234.41 |
| 6622 - Park Street Incentives | $64,208.06 | $67,013.32 | $18,320.70 | $0.00 | $149,542.08 |
| Total - 6620 - Commissions and Incentives | $241,189.29 | $208,964.12 | $47,623.08 | $0.00 | $497,776.49 |
| 6645 - Sales Printing & Stationary | $3,473.84 | $4,387.67 | $4,730.92 | $2,419.56 | $15,011.99 |
| 6650 - Sales Storage | $18,305.78 | $13,561.90 | $12,029.03 | $7,109.23 | $51,005.94 |
| 6700 - Travel and Entertainment | | | | | |
| 6700 - Travel and Entertainment | $76.32 | $0.00 | $0.00 | $0.00 | $76.32 |
| 6702 - Entertainment | $7,821.00 | $1,937.78 | $158.07 | $0.00 | $9,916.85 |
| 6705 - Fuel | $20,505.01 | $20,912.67 | $40,727.82 | $13,599.06 | $95,744.56 |
| 6710 - Mileage | $0.00 | $392.56 | $0.00 | $0.00 | $392.56 |

| Account | | | | | |
|---|---|---|---|---|---|
| 6715 - Parking & Tolls | $6,674.64 | $7,690.84 | $4,146.31 | $3,199.30 | $21,711.09 |
| 6716 - Rentals, Cabs, Trains & Uber | $39,864.07 | $48,057.97 | $26,170.78 | $14,820.02 | $128,912.84 |
| 6720 - Hotels | $85,228.28 | $90,599.01 | $44,466.80 | $36,868.88 | $257,132.97 |
| 6725 - Airfare | $69,267.30 | $113,276.58 | $25,862.15 | $21,782.09 | $230,188.12 |
| 6730 - Vehicle Rental | $0.00 | $244.56 | $304.09 | $0.00 | $548.65 |
| 6740 - Meals | $43,623.63 | $68,964.92 | $15,128.94 | $19,111.51 | $146,829.00 |
| 6745 - Travel Other Expense | $3,327.29 | $1,697.56 | $2,927.96 | $357.40 | $8,310.21 |
| **Total - 6700 - Travel and Entertainment** | $276,387.54 | $353,744.45 | $159,892.92 | $109,738.26 | $899,763.17 |
| **Total - 6600 - Sales Expense** | $374,223.30 | $970,865.83 | $390,082.86 | $742,618.18 | $2,477,790.17 |
| **6901 - Store Expense** | | | | | |
| 6050 - Retail Shipping | $0.00 | ($705.25) | $0.00 | $0.00 | ($705.25) |
| 6305 - Supplies & Materials | $33,852.24 | $10,597.81 | $8,824.98 | $21,188.29 | $74,463.32 |
| **Total - 6901 - Store Expense** | $33,852.24 | $9,892.56 | $8,824.98 | $21,188.29 | $73,758.07 |
| **Total - 6000 - Indirect Costs** | $1,451,999.49 | $1,430,146.50 | $802,523.41 | $552,142.36 | $4,236,811.76 |
| **6900 - Marketing** | | | | | |
| 6900 - Marketing | $8,652.30 | $4,551.27 | $7,464.27 | $5,269.68 | $25,937.52 |
| **Total - 6900 - Marketing** | $8,652.30 | $4,551.27 | $7,464.27 | $5,269.68 | $25,937.52 |
| **6205 - Advertising** | | | | | |
| 6205 - Advertising | $115,105.53 | $53,147.95 | $61,437.14 | $8,749.62 | $238,440.24 |
| 6206 - Advertisement : Paper | $14,808.82 | $59,382.47 | $9,420.17 | $1,000.00 | $84,611.46 |
| 6207 - Advertisement : Online | $58,742.31 | $74,835.56 | $15,960.43 | $0.00 | $149,538.30 |
| 6208 - Billboards | $274,286.44 | $182,495.60 | $38,807.57 | $0.00 | $495,589.61 |
| 6235 - Social Media | $105.96 | $1,355.12 | $484.59 | $0.00 | $1,945.67 |
| **Total - 6205 - Advertising** | $463,049.06 | $371,216.70 | $126,109.90 | $9,749.62 | $970,125.28 |
| 6210 - Branding | $0.00 | $0.00 | $0.00 | $15,078.85 | $15,078.85 |
| 6220 - Videography | $1,992.68 | $476.08 | $0.00 | $0.00 | $2,468.76 |
| 6225 - Public Relations | $88,841.35 | $83,319.28 | $44,956.79 | $0.00 | $217,113.77 |
| 6245 - Signage | $528.67 | $0.00 | $0.00 | $1,373.00 | $1,901.67 |
| 6285 - Design | $40,109.32 | $36,213.98 | $21,929.32 | $0.00 | $98,252.62 |
| 6290 - Marketing Items | $0.00 | $0.00 | $0.00 | $340.29 | $340.29 |
| 6295 - Stationery & Printing | $4,757.98 | $1,666.16 | $21.45 | $0.00 | $6,445.59 |
| 6320 - Client Gifts | $1,335.89 | $1,556.52 | $752.74 | $1,070.87 | $4,716.02 |
| **6980 - Promotional** | | | | | |
| 6980 - Promotional | $451,547.99 | $307,343.01 | $124,966.52 | $11.36 | $883,868.88 |
| 6240 - Photography | $1,232.88 | $1,448.71 | $0.00 | $0.00 | $2,681.59 |
| 6322 - Love & Whiskey Book | $44,344.15 | $32,902.35 | $17,273.99 | $9,681.21 | $104,201.70 |
| 6989 - Brand Awareness | $12,620.23 | $11,614.76 | $12,315.95 | $667.47 | $37,118.41 |
| **6990 - Events** | | | | | |
| 6990 - Events | $45,683.89 | $9,606.24 | $7,230.29 | $1,590.92 | $64,111.34 |
| 6985 - Sponsorships | $46,421.64 | $38,364.59 | $48,372.02 | $137,151.77 | $270,310.02 |
| 6982 - Event, Equipment Rental | $5,599.30 | $29,231.40 | $45,246.76 | $0.00 | $80,067.46 |
| 6983 - Event, Supplies | $28,141.91 | $44,307.25 | $37,385.51 | $8,485.24 | $118,319.91 |
| 6994 - Event, Catering | $2,962.25 | $7,887.97 | $9,396.81 | $0.00 | $20,247.03 |

| Account | | | | | |
|---|---|---|---|---|---|
| 6995 - Event, Contract Labor | $203,205.50 | $188,340.01 | $83,197.40 | $11,866.12 | $486,609.03 |
| **Total - 6990 - Events** | **$332,004.49** | **$317,737.46** | **$230,828.79** | **$159,094.05** | **$1,039,664.79** |
| **Total - 6980 - Promotional** | **$941,749.74** | **$671,046.29** | **$385,385.25** | **$169,354.09** | **$2,067,535.37** |
| **Total - 6900 - Marketing** | **$1,451,016.99** | **$1,155,046.28** | **$586,619.72** | **$217,232.75** | **$3,409,915.74** |
| **7000 - Operating Expenses** | | | | | |
| 7100 - General & Administrative | | | | | |
| 7100 - General & Administrative | $5.49 | $0.00 | $184.52 | $0.00 | $190.01 |
| 7105 - Postage | $5,517.86 | $3,713.06 | $1,518.89 | $577.05 | $11,326.86 |
| 7110 - Bank Fees | | | | | |
| 7110 - Bank Fees | $55,760.40 | $45,100.46 | ($1,681.71) | $21.68 | $99,200.83 |
| 7111 - Payable Fees | $214,492.89 | $398.38 | ($25.00) | $0.00 | $214,866.27 |
| 7112 - Bank Service Fees | $2,515.67 | ($10,763.10) | $17,282.04 | $14,643.95 | $23,678.56 |
| 7113 - Park Street Margin Fees | $70,187.43 | $46,302.88 | $11,203.89 | $0.00 | $127,694.00 |
| **Total - 7110 - Bank Fees** | **$342,956.39** | **$81,038.42** | **$26,779.22** | **$14,665.63** | **$465,439.66** |
| 7115 - Dues & Subscriptions | $29,372.62 | $19,873.15 | $8,964.99 | $8,443.65 | $66,654.01 |
| 7120 - Donations & Charity | $8,397.25 | $1,981.74 | $30,555.71 | $100.00 | $41,034.70 |
| 7150 - Insurance | $103,878.77 | $101,747.21 | $153,169.28 | $272,636.54 | $631,431.80 |
| 7170 - Office Supplies | $8,484.98 | $12,765.53 | $11,914.83 | $5,238.62 | $38,403.96 |
| 7175 - Office Equipment Rental | $306.63 | $120.44 | | $54.53 | $481.60 |
| 7190 - Licenses & Fees | $1,690.19 | $250.00 | $2,180.96 | $4,874.72 | $8,995.87 |
| **Total - 7100 - General & Administrative** | **$500,610.18** | **$221,489.54** | **$235,268.00** | **$306,590.74** | **$1,263,958.47** |
| 7300 - Other Professional Services | | | | | |
| 7300 - Other Professional Services | $2,081.09 | $2,333.33 | $3,625.91 | $12,979.82 | $21,020.15 |
| 7301 - Consulting Services | $1,088,152.11 | $386,226.65 | $509,364.98 | $95,944.62 | $2,079,688.36 |
| 7302 - Contract Admin | $41,720.43 | $948.50 | $0.00 | $0.00 | $42,668.93 |
| 7310 - Marketing Consultant | $5,238.75 | $3,506.25 | $20,082.50 | $30,000.00 | $58,827.50 |
| 7350 - Legal Fees | $112,768.75 | $657,862.06 | $824,668.62 | $1,069,602.00 | $2,664,901.42 |
| 7395 - Research & Development | $500.00 | $318.27 | $0.00 | $0.00 | $818.27 |
| **Total - 7300 - Other Professional Services** | **$1,250,461.12** | **$1,051,195.06** | **$1,357,742.01** | **$1,208,526.44** | **$4,867,924.63** |
| 7500 - Payroll Expenses | | | | | |
| 7500 - Payroll Expenses | $0.00 | $0.00 | $698,068.93 | $1,739,259.89 | $2,437,328.82 |
| 7505 - Salaries & Wages | | | | | |
| 7506 - Wages, Bottling | $137,909.17 | $158,041.33 | $117,239.28 | $0.00 | $413,189.78 |
| 7508 - Wages, Guides | $45,288.88 | $52,271.24 | $36,035.29 | $0.00 | $133,595.41 |
| 7509 - Wages, Janitorial | $57,843.49 | $58,711.35 | $29,157.77 | $0.00 | $145,712.61 |
| 7510 - Wages, Maintenance | $87,063.69 | $90,186.18 | $60,124.12 | $0.00 | $237,373.99 |
| 7511 - Wages, Management | $96,920.60 | $102,399.24 | $94,872.29 | $0.00 | $294,192.13 |
| 7512 - Wages, Operations | $253,004.45 | $212,837.04 | $117,852.89 | $0.00 | $583,694.38 |
| 7513 - Wages, Retail | $109,922.51 | $120,285.80 | $85,717.81 | $0.00 | $315,926.12 |
| 7514 - Wages, Security | $115,022.39 | $116,528.09 | $74,924.87 | $0.00 | $306,475.35 |
| 7515 - Wages, Accounting | $170,974.01 | $40,769.29 | $23,076.96 | $0.00 | $234,820.26 |
| 7517 - Wages, Distillery Ops | $20,027.48 | $20,769.27 | $13,846.16 | $0.00 | $54,642.91 |

| Account | | | | | |
|---|---|---|---|---|---|
| 7518 - Wages, Marketing | $137,894.75 | $137,141.15 | $96,558.63 | $0.00 | $371,594.53 |
| **Total - 7505 - Salaries & Wages** | **$1,231,871.42** | **$1,109,939.98** | **$749,406.07** | **$0.00** | **$3,091,217.47** |
| **7520 - Wages, Sales** | | | | | |
| 7520 - Wages, Sales | $40,170.00 | $7,725.00 | $0.00 | $0.00 | $47,895.00 |
| 7521 - Wages, Sales-East | $159,170.61 | $154,110.77 | $89,396.41 | $0.00 | $402,677.79 |
| 7522 - Wages, Sales-West | $286,043.29 | $304,682.27 | $194,573.01 | $0.00 | $785,298.57 |
| 7525 - Wages, Sales Ops | $131,022.35 | $133,041.70 | $90,926.43 | $0.00 | $354,990.48 |
| **Total - 7520 - Wages, Sales** | **$616,406.25** | **$599,559.74** | **$374,895.85** | **$0.00** | **$1,590,861.84** |
| **7570 - Employee Benefits** | | | | | |
| 7572 - Education | $12,690.00 | $5,620.00 | $8,430.00 | ($1,667.71) | $25,072.29 |
| 7575 - Employee Uniforms | $135.41 | $326.01 | $207.27 | $82.03 | $750.76 |
| 7576 - Employee Relations | $1,625.04 | $1,381.05 | $723.38 | $0.00 | $3,729.47 |
| 7577 - Health Insurance | $352,417.83 | $268,346.47 | $105,093.32 | $0.00 | $725,857.62 |
| 7580 - Wages, Emp. Auto | $42,900.00 | $33,475.00 | $21,000.00 | $0.00 | $97,375.00 |
| 7581 - Wages, Emp. Cellular | $9,410.00 | $7,835.00 | $4,590.00 | $0.00 | $21,835.00 |
| 7582 - Wages, Emp. Internet | $4,900.00 | $3,525.00 | $2,300.00 | $0.00 | $10,725.00 |
| **Total - 7570 - Employee Benefits** | **$424,078.28** | **$320,508.57** | **$142,343.97** | **($1,585.68)** | **$885,345.14** |
| 7599 - Payroll Fees | $391,488.78 | $313,916.72 | $205,495.17 | $0.00 | $910,900.67 |
| **Total - 7500 - Payroll Expenses** | **$2,663,844.73** | **$2,343,925.01** | **$2,170,209.99** | **$1,737,674.21** | **$8,915,653.94** |
| **7600 - Computer Maintenance** | | | | | |
| 7600 - Computer Maintenance | $28,550.91 | $23,221.69 | $24,073.74 | $15,230.59 | $91,076.93 |
| 7605 - Software & Licenses | $62,635.57 | $52,886.60 | $50,532.24 | $71,001.88 | $237,056.29 |
| 7610 - Technology Contract | $1,007.75 | $0.00 | $0.00 | $318.00 | $1,325.75 |
| **Total - 7600 - Computer Maintenance** | **$92,194.23** | **$76,108.29** | **$74,605.98** | **$86,550.47** | **$329,458.97** |
| **7700 - Vehicle Expenses** | | | | | |
| 7700 - Vehicle Expenses | $851.00 | $0.00 | $16.00 | $353.75 | $1,220.77 |
| 7705 - Vehicle Wash & Road Services | $499.82 | $373.47 | $431.84 | $1,379.78 | $2,684.91 |
| 7710 - Vehicle Repairs | $1,522.49 | $3,695.19 | $770.37 | $257.83 | $6,245.88 |
| 7785 - Vehicle Registration | $247.11 | $10.48 | $516.27 | $17,735.98 | $18,509.84 |
| 7790 - Vehicle Fines & Penalties | $56.62 | $0.00 | $0.00 | $0.00 | $56.62 |
| **Total - 7700 - Vehicle Expenses** | **$3,177.04** | **$4,079.14** | **$1,734.50** | **$19,727.34** | **$28,718.02** |
| **8000 - Occupancy Expense** | | | | | |
| 8002 - Rent | $32,674.79 | $27,085.10 | $9,056.93 | $0.00 | $68,816.82 |
| **Total - 8000 - Occupancy Expense** | **$32,674.79** | **$27,085.10** | **$9,056.93** | **$0.00** | **$68,816.82** |
| **8005 - Maintenance** | | | | | |
| 8005 - Maintenance | $13,538.74 | $41,906.67 | $200.00 | $331.00 | $55,976.42 |
| 8006 - Maintenance Contract labor | $627.00 | $50,902.53 | $10,694.46 | $0.00 | $62,223.99 |
| 8010 - Maintenance Service Contract | $30,943.68 | $25,350.25 | $17,982.39 | $9,937.07 | $84,213.39 |
| 8011 - Maintenance Supplies | $3,183.71 | $5,879.53 | $7,042.78 | $3,237.70 | $19,343.72 |
| 8012 - Building Maintenance | $3,602.73 | $917.46 | ($44.80) | $436.80 | $4,912.19 |
| 8013 - Repairs & Maintenance | $17,769.12 | $2,595.00 | $11,974.47 | $19,085.50 | $51,424.09 |
| **Total - 8005 - Maintenance** | **$69,664.97** | **$127,551.45** | **$47,849.30** | **$33,028.07** | **$278,093.79** |
| **8015 - Lawn Expense** | | | | | |

| Account | | | | | |
|---|---|---|---|---|---|
| 8015 · Lawn Expense | $13,070.00 | $3,975.00 | $55.91 | $309.48 | $17,410.39 |
| 8016 · Groundskeeper Contract Labor | $0.00 | $3,697.78 | $0.00 | $0.00 | $3,697.78 |
| 8020 · Landscape Improvements | $0.00 | $2,073.05 | $1,868.75 | $0.00 | $3,941.80 |
| Total · 8015 · Lawn Expense | $13,070.00 | $9,745.83 | $1,924.66 | $309.48 | $25,049.97 |
| 8045 · Janitorial | | | | | |
| 8045 · Janitorial | $959.54 | $1,197.80 | $475.78 | $286.00 | $2,919.12 |
| 8046 · Janitorial Supplies | $9,915.78 | $6,739.94 | $4,170.78 | $372.94 | $21,199.44 |
| 8065 · Pest Control | $7,063.94 | $4,050.65 | $2,346.92 | $3,119.76 | $16,581.27 |
| Total · 8045 · Janitorial | $17,939.26 | $11,988.39 | $6,993.48 | $3,778.70 | $40,699.83 |
| 8070 · Security | | | | | |
| 8070 · Security | $1,612.65 | $100.58 | $10,000.00 | $0.00 | $11,713.23 |
| 8071 · Security Equipment Rental | $33,896.02 | $6,392.10 | $3,783.34 | $329.26 | $44,390.72 |
| 8072 · Security Uniforms | $0.00 | $87.78 | $0.00 | $0.00 | $87.78 |
| 8073 · Security Contract Labor | $22,365.00 | $19,282.90 | $21,771.25 | $0.00 | $63,418.75 |
| 8075 · Security, Maintenance | $4,813.08 | $2,083.71 | $3,332.30 | $781.90 | $11,010.99 |
| Total · 8070 · Security | $62,676.75 | $27,946.67 | $38,886.89 | $1,111.16 | $130,621.47 |
| 8500 · Utilities | | | | | |
| 8500 · Utilities | $494.19 | $1,236.12 | $157.88 | $436.72 | $2,324.91 |
| 8505 · Telephone | $20,110.94 | $16,667.26 | $18,183.41 | $19,751.45 | $74,713.06 |
| 8510 · Electric | $36,365.32 | $10,877.41 | $20,980.79 | $22,007.37 | $90,230.89 |
| 8520 · Water/Sewer | $13,877.25 | $5,538.92 | $410.57 | $9,344.03 | $29,170.77 |
| 8525 · Rubbish | $2,940.00 | $10,528.81 | $10,888.00 | $16,200.00 | $40,556.81 |
| 8545 · Cellular | $2,796.70 | $879.96 | $0.00 | $0.00 | $3,676.66 |
| 8550 · Internet | $900.63 | $521.50 | $240.00 | $272.00 | $1,934.13 |
| Total · 8500 · Utilities | $77,485.03 | $46,249.98 | $50,860.65 | $68,011.57 | $242,607.23 |
| Total · 8000 · Occupancy Expense | $273,510.80 | $250,567.42 | $155,571.91 | $106,238.98 | $785,889.11 |
| Total · 7000 · Operating Expenses | $4,783,798.11 | $3,947,364.46 | $3,995,132.39 | $3,465,308.18 | $16,191,603.14 |
| Total · Expense | $7,686,814.59 | $6,532,557.24 | $5,384,275.51 | $4,234,683.29 | $23,838,330.64 |
| Net Ordinary Income | ($7,554,568.77) | ($3,206,854.04) | ($3,030,979.75) | ($2,034,770.77) | ($15,827,173.34) |
| Other Income and Expenses | | | | | |
| Other Income | | | | | |
| 9000 · Other Income | | | | | |
| 9005 · Interest Income | $645.77 | $24.61 | $15.28 | $0.00 | $685.66 |
| 9010 · Other Misc. Income | $0.00 | $691.35 | $352,120.65 | $0.00 | $352,812.00 |
| Total · 9000 · Other Income | $645.77 | $715.96 | $352,135.93 | $0.00 | $353,497.66 |
| Total · Other Income | $645.77 | $715.96 | $352,135.93 | $0.00 | $353,497.66 |
| Other Expense | | | | | |
| 9500 · Other Expense | | | | | |
| 9500 · Other Expense | $2,650.28 | $0.00 | $0.00 | $0.00 | $2,650.28 |
| 9505 · Depreciation | $1,044,619.77 | $1,044,619.77 | $1,044,619.77 | $1,044,619.77 | $4,178,479.08 |
| 9550 · Other Miscellaneous Expense | $598.00 | $10,611.09 | $151,898.64 | $1,881.00 | $164,988.73 |
| 9570 · Late Fees & Penalties | $15,739.90 | $4,996.58 | $13,870.06 | $1,983.94 | $36,590.48 |

| | | | | |
|---|---|---|---|---|
| 9575 - Sales Tax Expense | $9,107.65 | $10,289.97 | $88,115.49 | $2,331.13 | $109,844.24 |
| 9580 - Property Taxes | $9,348.00 | $11,357.54 | $4,359.09 | $0.00 | $25,064.63 |
| 9585 - Business Tax | $20,983.62 | $0.00 | $0.00 | $0.00 | $20,983.62 |
| 9590 - Interest Expense | $3,031,546.16 | $2,943,832.99 | $2,360,307.69 | $2,365,774.32 | $10,701,461.16 |
| 9595 - Other Non Operating Costs | $0.00 | $0.00 | $48,605.95 | $0.00 | $48,605.95 |
| **Total - 9500 - Other Expense** | **$4,134,593.38** | **$4,025,707.94** | **$3,711,776.69** | **$3,416,590.16** | **$15,288,668.17** |
| **9800 - Realized Gain/Loss** | | | | | |
| 9900 - Realized Gain/Loss | ($643.82) | $345.01 | $0.00 | $0.00 | ($298.81) |
| 9905 - Rounding Gain/Loss | ($0.01) | $0.00 | $0.00 | $0.00 | ($0.01) |
| **Total - 9800 - Realized Gain/Loss** | **($643.83)** | **$345.01** | **$0.00** | **$0.00** | **($298.82)** |
| 999999 - Uncategorized Expense | $2,213.83 | $0.00 | $0.00 | $0.00 | $2,213.83 |
| **Total - Other Expense** | **$4,136,163.38** | **$4,026,052.95** | **$3,711,776.69** | **$3,416,590.16** | **$15,290,583.18** |
| **Net Other Income** | **($4,135,517.61)** | **($4,025,336.99)** | **($3,359,640.76)** | **($3,416,590.16)** | **($14,937,085.52)** |
| **Net Income** | **($11,690,086.38)** | **($7,232,191.03)** | **($6,390,620.51)** | **($5,451,360.93)** | **($30,764,258.86)** |

# Uncle Nearest, Inc. - 001 (Consolidated)
## Balance Sheet
## as of December 31, 2025

| Financial Row | Amount |
|---|---|
| **ASSETS** | |
| **Current Assets** | |
| **Bank** | |
| **1000 - Cash on hand** | |
| 1001 - Cash on hand : Cash NGD: First Nat'l Bank Operating 750 | $153,618.98 |
| 1011 - Cash on Hand: Cash NGD: First Bank 0979 | $11,452.00 |
| 1021 - Cash Anatole: Banque Populaire | ($1,872.21) |
| 1022 - Cash on Hand: Cash UN: First Bank 2292 | $302,185.37 |
| 1023 - Cash on Hand: CashNGD: First Bank 2151 | $549,759.01 |
| **1060 - Park Street** | |
| 1062 - Park Street : Cash | $544,223.09 |
| **Total - 1060 - Park Street** | **$544,223.09** |
| **Total - 1000 - Cash on hand** | **$1,559,366.24** |
| **Total Bank** | **$1,559,366.24** |
| **Accounts Receivable** | |
| **1200 - Accounts Receivable** | |
| 1202 - Accounts Receivable : AR: Park Street | $3,607,059.35 |
| 1205 - Accounts Receivable: AR: Miscellaneous | $142.66 |
| **Total - 1200 - Accounts Receivable** | **$3,607,202.01** |
| 1201 - IC Receivable | $12,394,530.71 |
| **Total Accounts Receivable** | **$16,001,732.72** |
| **Other Current Asset** | |
| **1206 - AR Other** | |
| 1206 - AR Other | $507.95 |
| 1207 - AR Other : Employee Receivables | $862.25 |
| **1215 - Nashwood** | |
| 1215 - Nashwood | $1,048.46 |
| 1216 - Humble Baron | $1,276,916.35 |
| 1217 - Tolley House | $57,522.96 |
| 1218 - Barrel House BBQ II | $50,906.53 |
| 1219 - Classic Hops | $7,128.62 |
| **Total - 1215 - Nashwood** | **$1,393,522.92** |
| **Total - 1206 - AR Other** | **$1,394,893.12** |
| **1300 - Due from Affiliates** | |
| 1305 - Due from Affiliates: Due from: Dan Call Farm | $74.29 |
| 1325 - Due from Affiliates: Due From Shelbyville Grand -US Ban | $5,880.00 |
| 1327 - Due from Affiliates: Due from: Classic Hops | $361.47 |
| 1330 - Due from Affiliates: Due from: Stillpoint | $14,106.10 |
| 1335 - Due from Affiliates: Due from: 152 Eady Rd (Kweaver) | $1,804,122.12 |
| 1345 - Due from Affiliates: Due from: Cedar Ridge (Kweaver) | $7,564.86 |
| 1347 - Due from Affiliates: Due from: Domaine d'Anatole | ($145,035.15) |
| 1348 - Due from Affiliates: Due from: Nearest Green Distillery, Ir | $665,346.33 |
| 1350 - Due from Affiliates: Due from: UN MV House, LLC | $3,560,390.01 |
| 1355 - Due From SquareOne | ($65,713.56) |
| **1380 - Due from Affiliates: Due from: UN Ventures, LLC** | |
| 1380 - Due from Affiliates: Due from: UN Ventures, LLC | $1,015.85 |
| 1381 - Due from Affiliates: Due from: Equiano | $851,610.68 |
| 1382 - Due from Affiliates: Due from: Freeland Spirits | $765,000.00 |
| 1383 - Due from Affiliates: Due from: Sorel | $2,678,619.37 |
| **Total - 1380 - Due from Affiliates: Due from: UN Ventures, I** | **$4,296,245.90** |
| **Total - 1300 - Due from Affiliates** | **$10,143,342.37** |

| | |
|---|---|
| 1650 - Vendor Deposits | $4,137.50 |
| **1700 - Inventory** | |
| 1700 - Inventory | $166,105.74 |
| **1701 - Inventory : WIP : Barrels Aging** | |
| 1702 - Inventory : WIP : Advanced Spirits | $3,257,512.71 |
| 1703 - Inventory : WIP : Customer Procured | $357,650.00 |
| 1704 - Inventory : WIP : TDG | $42,845,586.72 |
| 1705 - Inventory : WIP : Suspense | ($2,527,107.11) |
| 1706 - Inventory WIP: NGD | $1,096,599.28 |
| **Total - 1701 - Inventory : WIP : Barrels Aging** | **$45,030,241.60** |
| 1707 - Inventory : Raw Materials | $3,414,391.84 |
| 1710 - Inventory : Finished Goods | $5,128,524.68 |
| **1725 - Inventory : Bottling** | |
| 1725 - Inventory : Bottling | $624.26 |
| 1726 - Inventory : Assembly Items | $147,456.48 |
| **Total - 1725 - Inventory : Bottling** | **$148,080.74** |
| 1790 - Inventory : Retail : Merchandise | $283,556.42 |
| 1795 - Inventory : Retail : Spirits | $85,746.74 |
| 1797 - Inventory : Retail : Tastings | ($27,543.31) |
| **Total - 1700 - Inventory** | **$54,229,104.45** |
| VAT on Purchases | ($0.00) |
| **Accumulated Depreciation** | |
| 1930 - Accumulated Depreciation/Amortization : Humble Baron | ($489,778.74) |
| **Total - Accumulated Depreciation** | **($489,778.74)** |
| **Total Other Current Asset** | **$65,281,698.70** |
| **Total Current Assets** | **$82,842,797.65** |
| **Fixed Assets** | |
| **1800 - Fixed Assets** | |
| 1801 - Fixed Assets : Retail | $48,656.60 |
| 1805 - Fixed Assets : Design & Engineering | $776,321.78 |
| 1810 - Fixed Assets : Equipment | $4,719,786.38 |
| 1815 - Fixed Assets : Building | $2,617,046.62 |
| 1820 - Fixed Assets : Computer Technology | $184,952.34 |
| 1825 - Fixed Assets : Furniture & Fixtures | $15,745.50 |
| 1830 - Fixed Assets : Humble Baron | $1,711,848.41 |
| 1885 - Fixed Assets : Land Improvements | $60,935,735.65 |
| 1895 - Fixed Assets : Vehicles | $375,883.75 |
| **Total - 1800 - Fixed Assets** | **$71,385,977.03** |
| **1900 - Accumulated Depreciation/Amortization** | |
| 1901 - Accumulated Depreciation/Amortization : Retail | ($27,812.18) |
| 1905 - Accumulated Depreciation/Amortization : Design & Enginee | ($220,786.88) |
| 1910 - Accumulated Depreciation/Amortization : Equipment | ($4,718,538.82) |
| 1915 - Accumulated Depreciation/Amortization : Building | ($748,766.02) |
| 1920 - Accumulated Depreciation/Amortization : Technology | ($184,952.34) |
| 1925 - Accumulated Depreciation/Amortization : Furniture & Fixtur | ($17,403.49) |
| 1975 - Accumulated Depreciation/Amortization : Intangible Assets | ($17,083.33) |
| 1985 - Accumulated Depreciation/Amortization : Land Improveme | ($34,331,713.91) |
| 1995 - Accumulated Depreciation/Amortization : Vehicles | ($375,883.75) |
| **Total - 1900 - Accumulated Depreciation/Amortization** | **($40,642,940.72)** |
| **Total Fixed Assets** | **$30,743,036.31** |
| **Other Assets** | |
| **2000 - Long Term Assets** | |
| **2005 - Investments** | |
| 2010 - Investments : Equiano | $4,109,604.30 |
| 2020 - Investments : Hella Bitters | $5,000,000.00 |
| 2030 - Investments : Sorel | $2,500,000.00 |
| 2040 - Investments : Freeland Spirits | $2,235,000.00 |
| **Total - 2005 - Investments** | **$13,844,604.30** |

| | |
|---|---:|
| 2045 - Note Receivable | $1,600,000.00 |
| **Total - 2000 - Long Term Assets** | **$15,444,604.30** |
| **Total Other Assets** | **$15,444,604.30** |
| **Total ASSETS** | **$129,030,438.26** |
| **Liabilities & Equity** | |
| **Current Liabilities** | |
| **Accounts Payable** | |
| **2100 - Accounts Payable** | |
| 2100 - Accounts Payable | $20,143,518.23 |
| 2105 - Accounts Payable: Park Street | $1,697,088.16 |
| 2110 - Accounts Payable: Square One | $43,434.89 |
| 2120 - Accounts Payable: Cognac | $48,097.34 |
| **Total - 2100 - Accounts Payable** | **$21,932,138.62** |
| 2103 - IC Payable | $11,994,457.66 |
| **Total Accounts Payable** | **$33,926,596.28** |
| **Credit Card** | |
| **2700.01 - Credit Cards : UN** | |
| 2708 - Credit Cards : UN : American Express - Bonvoy | $10,117.36 |
| 2709 - Credit Cards : UN : American Express - DeltaSky | $18,918.75 |
| 2710 - Credit Cards : UN : American Express - Plum | $104,104.64 |
| 2712 - Credit Cards : UN : American Express - Delta Reserve | $39,643.86 |
| 2717 - Credit Cards: UN: Visa - Ramp | $104,456.34 |
| **Total - 2700.01 - Credit Cards : UN** | **$277,240.95** |
| **Total Credit Card** | **$277,240.95** |
| **Other Current Liability** | |
| **2505 - Sales Tax Payables** | |
| 2505.01 - Sales Taxes Payable : TN | $19,659.00 |
| **Total - 2505 - Sales Tax Payables** | **$19,659.00** |
| 2550 - Accrued : Interest | $9,883,101.70 |
| **2600 - Due to Affiliates** | |
| 2606 - Due to Affiliates : Uncle Nearest | $17,025,028.03 |
| **Total - 2600 - Due to Affiliates** | **$17,025,028.03** |
| **2800 - Notes Payable** | |
| 2800.01 - Notes Payable : Ford Credit : Expedition | $40,455.88 |
| 2800.02 - Notes Payable : Ford Credit : F150 2024 | $83,718.49 |
| 2800.03 - Ford Credit : F150 2021 | $30,054.99 |
| 2800.04 - Ford Credit : 2024 FORD MUSTG | $47,771.75 |
| 2802 - Notes Payable : Mercedes | $36,610.20 |
| 2803 - Notes Payable: Dash Funding | $1,078,434.85 |
| 2805 - Notes Payable : NGD : Farm Credit Lease | $31,522.07 |
| 2806 - Notes Payable : Farm Credit -Bronco | $8,585.19 |
| 2807 - Equity Partners | $1,000,000.00 |
| 2812 - Notes Payable : North Mill Equipment Finance | $28,539.60 |
| 2815 - Notes Payable : Huntington Bank | $3,375.84 |
| 2820 - Scarcelli Promissory Note | $1,000,000.00 |
| 2821 - WhistlePig Barrel Loan | $4,068,560.18 |
| 2823 - FCMA - Dan Call Farm Loan | $624,426.37 |
| 2824 - Grant Sidney Investment Loan | $20,026,270.00 |
| **Total - 2800 - Notes Payable** | **$28,108,325.41** |
| **2950 - Current Portion of Long-Term Debt** | |
| 2951 - Current Portion of Long-Term Debt: Farm Credit | $3,800,000.00 |
| **Total - 2950 - Current Portion of Long-Term Debt** | **$3,800,000.00** |
| **Total Other Current Liability** | **$58,836,114.14** |
| **Total Current Liabilities** | **$93,039,951.37** |
| **Long Term Liabilities** | |
| 2601 - DUE TO AFFILIATES: OWNERS | $575,183.81 |
| **3000 - Long-Term Debt** | |
| **3009 - Other Loans** | |

| | |
|---|---:|
| 3011 - Grant Sidney Inc (GSI) Loan Payable | $3,689,313.74 |
| **Total - 3009 - Other Loans** | **$3,689,313.74** |
| **Total - 3000 - Long-Term Debt** | **$3,689,313.74** |
| **3005 - Farm Credit Loan** | |
| 3006 - Farm Credit: Working Capital | $65,224,031.96 |
| 3007 - Farm Credit: Construction Loan | $15,000,000.00 |
| 3008 - Farm Credit: Term Loan | $22,045,150.88 |
| **Total - 3005 - Farm Credit Loan** | **$102,269,182.84** |
| 3013 - Oaktree Funding: MV House | $1,495,148.25 |
| **Total Long Term Liabilities** | **$108,028,828.64** |
| **Equity** | |
| 3105 - Preferred stock | $19,908,250.91 |
| 3200 - Opening Balance | $58,540,656.85 |
| Retained Earnings | ($119,719,424.52) |
| Net Income | ($30,764,258.86) |
| Cumulative Translation Adjustment | ($3,566.13) |
| **Total Equity** | **($72,038,341.75)** |
| **Total Liabilities & Equity** | **$129,030,438.26** |

**Uncle Nearest, Inc. - 001 (Consolidated)**
# List of Unsecured Debt
## as of December 31, 2025

| Financial Row | Amount |
|---|---:|
| **2100 - Accounts Payable** | |
| 2100 - Accounts Payable | $20,143,518.23 |
| 2105 - Accounts Payable: Park Street | $1,697,088.16 |
| 2110 - Accounts Payable: Square One | $43,434.89 |
| 2120 - Accounts Payable: Cognac | $48,097.34 |
| **Total - 2100 - Accounts Payable** | **$21,932,138.62** |
| | |
| **2700.01 - Credit Cards : UN** | |
| 2708 - Credit Cards : UN : American Express - Bonvoy | $10,117.36 |
| 2709 - Credit Cards : UN : American Express - DeltaSky | $18,918.75 |
| 2710 - Credit Cards : UN : American Express - Plum | $104,104.64 |
| 2712 - Credit Cards : UN : American Express - Delta Rese | $39,643.86 |
| 2717 - Credit Cards: UN: Visa - Ramp | $104,456.34 |
| **Total - 2700.01 - Credit Cards : UN** | **$277,240.95** |
| | |
| 2505.01 - Sales Taxes Payable : TN | $19,659.00 |
| **Total - 2505 - Sales Tax Payables** | **$19,659.00** |
| | |
| **2800 - Notes Payable** | |
| 2800.01 - Notes Payable : Ford Credit : Expedition | $40,455.88 |
| 2800.02 - Notes Payable : Ford Credit : F150 2024 | $83,718.49 |
| 2800.03 - Ford Credit : F150 2021 | $30,054.99 |
| 2800.04 - Ford Credit : 2024 FORD MUSTG | $47,771.75 |
| 2802 - Notes Payable : Mercedes | $36,610.20 |
| 2803 - Notes Payable: Dash Funding | $1,078,434.85 |
| 2805 - Notes Payable : NGD : Farm Credit Lease | $31,522.07 |
| 2806 - Notes Payable : Farm Credit -Bronco | $8,585.19 |
| 2807 - Equity Partners | $1,000,000.00 |
| 2812 - Notes Payable : North Mill Equipment Finance | $28,539.60 |
| 2815 - Notes Payable : Huntington Bank | $3,375.84 |
| 2820 - Scarcelli Promissory Note | $1,000,000.00 |
| 2821 - WhistlePig Barrel Loan | $4,068,560.18 |
| 2823 - FCMA - Dan Call Farm Loan | $624,426.37 |
| 2824 - Grant Sidney Investment Loan | $20,026,270.00 |
| **Total - 2800 - Notes Payable** | **$28,108,325.41** |
| | |
| **3009 - Other Loans** | |
| 3011 - Grant Sidney Inc (GSI) 2023 Loan Payable | $3,689,313.74 |
| **Total - 3009 - Other Loans** | **$3,689,313.74** |
| | |
| **TOTAL UNSECURED DEBT AS OF 12/31/2025** | **$54,026,677.72** |