CREDIT AGREEMENT[1]

Dated as of July 22, 2022

among

UNCLE NEAREST, INC.,
NEAREST GREEN DISTILLERY, INC.,
UNCLE NEAREST REAL ESTATE HOLDINGS, LLC
and
THE OTHER BORROWERS PARTY HERETO
as the Borrowers,

FARM CREDIT MID-AMERICA, PCA,
as Administrative Agent,

and

THE OTHER LENDERS PARTY HERETO

FARM CREDIT MID-AMERICA, PCA,
as Sole Lead Arranger and Sole Bookrunner

---

[1] Composite copy through Amendment No. 8 to Credit Agreement Forbearance Agreement dated as of April 15, 2025.

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
29
4:25-CV-00038

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Credit Agreement.

"Amendment No. 3 Effective Date" means January 26, 2023.

"Amendment No. 4 Effective Date" means March 29, 2023.

"Amendment No. 5 Effective Date" means June 5, 2023.

"Amendment No. 8" means that certain Amendment No. 8 to Credit Agreement and Forbearance Agreement dated as of the Amendment No. 8 Effective Date, among the Borrowers, the Permitted Investors, the Administrative Agent, and the Lenders party thereto.

"Amendment No. 8 Effective Date" means April 15, 2025.

"Amendment No. 8 Effective Date Paydown" has the meaning ascribed thereto in Amendment No. 8.

"Amendment No. 9" means that certain Amendment No. 9 to Credit Agreement dated as of the Amendment No. 9 Effective Date, among the Borrowers, the Receiver, the Administrative Agent, and the Lenders party thereto.

"Amendment No. 9 Effective Date" means September 10, 2025.

"Amendment No. 10" means that certain Amendment No. 10 to Credit Agreement dated as of the Amendment No. 10 Effective Date, among the Borrowers, the Receiver, the Administrative Agent, and the Lenders party thereto.

"Amendment No. 10 Effective Date" means November 19, 2025.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder and the U.K. Bribery Act 2010 and the rules and regulations thereunder.

"Anti-Money Laundering Laws" means all laws, statutes, regulations or obligatory government orders, decrees, ordinances or rules related to terrorism financing, money laundering, any predicate crime to money laundering or any financial record keeping, including any applicable provision of the PATRIOT Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"Applicable Margin" means 0.50% per annum.

"Applicable Percentage" means (a) in respect of the Term Loan Facility, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the sum of the aggregate outstanding Term Loans represented by such Lender's outstanding Term Loan at such time, (b) in respect of the Revolving Credit Facility, with respect to any Lender at any time, the percentage (carried out to the

2

(i) Rent and Charges Reserves; (ii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, excise, and other Taxes which might have priority over the interests of the Lender in the Collateral; (iii) any liabilities that are or may become secured by Liens on the Collateral (including Permitted Liens) which might have priority over the Liens or interests of the Administrative Agent in the Collateral; (iv) reserves with respect to the salability of Eligible Inventory or which reflect such other factors as affect the market value of the Eligible Inventory, including obsolescence, seasonality, Shrink, vendor chargebacks, imbalance, change in Inventory character, composition or mix, markdowns and out of date and/or expired Inventory; (v) whiskey storage reserves; and (vi) the Dilution Reserve.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, (b) the interest rate quoted as of the tenth day (or, if such tenth day is not a Business Day, the first Business Day immediately preceding such tenth day) of the calendar month (such day, the "Prime Rate Determination Date") immediately preceding the month in which such day falls by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) on such Prime Rate Determination Day as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined in good faith by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined in good faith by the Administrative Agent) on such Prime Rate Determination Date; provided that as of the Amendment No. 4 Effective Date, the interest rate for purposes of this clause (b) is 7.75% and (c) 0.00%. Any change in any of the foregoing rates shall take effect at the opening of business on the effective day of such change.

"Base Rate Loan" means any Loan that bears interest based on the Base Rate.

"Baseline Financial Statements" means the company-prepared consolidated balance sheet of the Company and its Subsidiaries for the fiscal year ended December 31, 2021, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, including the notes thereto.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Borrower" and "Borrowers" have the meaning assigned to such term in the introductory paragraph hereto.

"Borrower Materials" has the meaning assigned to such term in Section 10.2(d)(i).

"Borrowing" means a Revolving Credit Borrowing, a Term Loan Borrowing or, a RELOC Borrowing, or a Receivership Line of Credit Borrowing as the context may require.

"Borrowing Base" means, as of any time it is to be determined, the sum of:

205892919

"Commitment" means a Revolving Credit Commitment, a Term Loan Commitment ~~or a RELOC~~, RELOC Commitment, or a Receivership Line of Credit Loan Commitment, as the context may require.

"Company" has the meaning assigned to such term in the introductory paragraph hereto.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Net Income" means, for any period, the net income (or loss) of the Company and its Subsidiaries on a consolidated basis in accordance with GAAP for such period; provided that Consolidated Net Income shall exclude (a) the net income (if positive) of any Subsidiary for such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of such net income (i) is not at the time permitted by operation of the terms of its Organization Documents or any agreement, instrument, judgment, decree, order or Law applicable to such Subsidiary or (ii) would be subject to any taxes payable on such dividends or distributions, but in each case only to the extent of such prohibition or taxes, (b) any income (or loss) for such period of any Person if such Person is not a Subsidiary, except that the equity in the net income of any such Person for such period shall be included in Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to the Company or a Subsidiary as a dividend or other distribution (and in the case of a dividend or other distribution to a Subsidiary, such Subsidiary is not precluded from further distributing such amount to the Company as described in clause (a) of this proviso), (c) any income (or loss) for such period of any Person accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Company or any of its Subsidiaries or that Person's assets are acquired by the Company or any of its Subsidiaries except to the extent included pursuant to the foregoing clause (b) and (d) any gain or loss from the Disposition of any property to a Person that is not a Loan Party or a Subsidiary (other than the sale of inventory in the ordinary course of business) during such period.

"Consolidated Tangible Net Worth" means, as of any date of determination, for the Company and its Subsidiaries on a consolidated basis, Shareholders' Equity of the Company and its Subsidiaries on that date minus the Intangible Assets of the Company and its Subsidiaries on that date.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Conversion Date" has the meaning assigned to such term in Section 2.1(c).

"Credit Extension" means each of the following: (a) a Revolving Credit Borrowing, (b) a Term Loan Borrowing and (c) a RELOC Borrowing.

"Crop Sharing Agreement" means the farming arrangement between the Loan Parties and a local farmer with respect to the growing of certain agricultural products on one or more of the properties of the Loan Parties for use in the distilling operations of the Loan Parties, which such arrangement may be

7

would impair the validity or enforceability or render void or result in the cancellation of, any registration issued as a result of such "intent to use" trademark application under applicable Law; provided that upon the submission and acceptance by the United States Patent and Trademark Office of an amendment to allege or a verified statement of use pursuant to 15 U.S.C. Section 1060, such "intent to use" trademark application shall constitute Collateral and (d) any Equity Interest in any Person that is not a Wholly-Owned Subsidiary, to the extent a Lien thereon is prohibited by or requires consent under the organizational documents of such Person (other than of a Loan Party) and such consent has not been obtained.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or commitment pursuant to a Law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Company under Section 3.4) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.1, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.1(g) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Extraordinary Receipt" means (a) any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments, and (b) in the case of the Dan Call Farm Property, any cash proceeds of insurance or condemnation awards (and payments in lieu thereof) received by or paid to or for the account of any Permitted Investor in respect thereof.

"Facility" means the Revolving Credit Facility, the Term Loan Facility or, the RELOC Facility, or the Receivership Facility, as the context may require.

"Facility Termination Date" means the date as of which all of the following shall have occurred: (a) the Aggregate Commitments have terminated and (b) all Obligations have been paid in full (other than contingent indemnification and reimbursement obligations).

"Farm Credit Equities" has the meaning assigned to such term in Section 6.16(a).

"Farm Credit Lender" means a federally-chartered Farm Credit System lending institution organized under the Farm Credit Act of 1971, as the same may be amended or supplemented from time to time. When used in this Agreement in reference to the Farm Credit Equities, "Farm Credit Lender" shall also include the affiliate of such Farm Credit Lender in which such Farm Credit Equities are purchased or acquired, as applicable.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

205892919

enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender hereafter may designate by written notice to the Company and the Administrative Agent, which office may include any Affiliate of such Lender or any domestic or foreign branch of such Lender or such Affiliate. Unless the context otherwise requires each reference to a Lender shall include its applicable Lending Office.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, easement, right-of-way or other encumbrance on title to real property, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any financing lease having substantially the same economic effect as any of the foregoing).

"Lien Waiver" means an agreement, in form and substance reasonably satisfactory to the Administrative Agent, by which (a) for any Collateral located on leased premises or premises subject to a mortgage, the lessor or mortgagee, as applicable, agrees to, among other things, waive or subordinate any Lien it may have on the Collateral, and agrees to permit the Administrative Agent to enter upon the premises and remove the Collateral or to use the premises to store or dispose of the Collateral; (b) for any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents (as defined in the UCC) in its possession relating to the Collateral as agent for the Administrative Agent, and agrees to deliver the Collateral to the Administrative Agent upon request; (c) for any material Collateral held by a repairman, mechanic or bailee, such Person acknowledges the Administrative Agent's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver the Collateral to the Administrative Agent upon request; and (d) for any Collateral subject to a licensor's intellectual property rights, such licensor grants to the Administrative Agent the right, vis-à-vis such licensor, to enforce the Administrative Agent's Liens with respect to the Collateral, including the right to dispose of it with the benefit of the intellectual property, whether or not a default exists under any applicable license.

"Line Reserve" means the sum of (a) the Rent and Charges Reserve; (b) the aggregate amount of liabilities at any time secured by Liens upon Collateral that are senior to the Administrative Agent's Liens; (c) sums that any Loan Party may be required to pay under any Section of this Agreement or any other Loan Document (including taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay; and (d) amounts for which claims may be reasonably expected to be asserted against the Collateral.

"Loan" means a Revolving Credit Loan, a Term Loan, a RELOC Loan ~~or,~~ a RELOC Term Loan, or a Receivership Line of Credit Loan, as the context may require.

"Loan Documents" means, collectively, this Agreement, the Notes, the Subsidiary Guaranty, the Collateral Documents and the Fee Letter and any amendments, modifications or supplements hereto or to any other Loan Document or waivers hereof or to any other Loan Document.

"Loan Notice" means a notice of (a) a Revolving Credit Borrowing, (b) the Term Loan Borrowing ~~or,~~ (c) a RELOC Borrowing, or (d) a Receivership Line of Credit Borrowing pursuant to

Section 2.2(a), which shall be substantially in the form of Exhibit A or such other form as may be approved by the Administrative Agent, appropriately completed and signed by a Senior Officer of the Company or the Receiver, as the context may require.

"Loan Parties" means, collectively, the Borrowers and the Subsidiary Guarantors.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of any Borrower or the Company and its Subsidiaries taken as a whole, (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document, or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

"Material Agreement" means, at any time, (a) any agreement of any Loan Party or any Subsidiary with any customer that in the aggregate produced 5% or more of Gross Revenues or Gross Profit for the four-fiscal quarter period of the Company and its Subsidiaries most recently ended or (b) any other agreement of any Loan Party or any Subsidiary, the breach, non-performance, cancellation or failure to renew of which could reasonably be expected to have a Material Adverse Effect.

"Maturity Date" means (a) with respect to the Revolving Credit Facility, July 22, 2025, (b) with respect to the Term Loan Facility, July 22, 2027 and, (c) with respect to the RELOC Facility, July 22, 2027; and (d) with respect to the Receivership Line of Credit Facility, the earlier of (i) the date on which the Court terminates the receivership in accordance with the Receivership Order and (ii) March 1, 2026; provided that, in each case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"Maximum Revolving Borrowing Amount" means the lesser of (a) the aggregate Revolving Credit Commitments minus the Line Reserves, if any, and (b) the Borrowing Base.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means any mortgage, deed of trust, deed to secure debt or equivalent document now or hereafter encumbering any fee estate in favor of the Administrative Agent for the benefit of the Secured Parties, as security for any of the Obligations, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent.

"Mortgage Support Documents" means, with respect to any property subject to (or required to be subject to) a Mortgage, each of the following (all of which shall be in form and substance satisfactory to the Administrative Agent):

(a) mortgagee title insurance policies (in amounts and with endorsements reasonably acceptable to the Administrative Agent) issued, coinsured and reinsured by title insurers reasonably acceptable to the Administrative Agent, insuring the applicable Mortgage to be a valid first (or, solely in the case of the Dan Call Farm Property, second) and subsisting Lien on the property described therein, free of any Liens except for Liens permitted by clauses (a), (c), (d) and (g) of Section 7.1 or, in the case of the Dan Farm Property, the Mortgage related thereto;

(b) flood hazard determination certifications, executed acknowledgement from the applicable Loan Party and evidence of flood insurance (if required) and other flood-related

205892919

in the definition of "Subordinated Debt".

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning assigned to such term in Section 10.2(d)(ii).

"RE Holdings" has the meaning assigned to such term in the introductory paragraph hereto.

"Receiver" means Phillip G. Young, Jr., in his capacity as the receiver of the Borrowers and other assets as set forth in more detail in the *Order Appointing Receiver* [Dkt. No. 39] (the "Receivership Order") entered on August 22, 2025, in that certain litigation stylized as *Farm Credit Mid-America, PCA v. Uncle Nearest, Inc., et al.* (the "Receivership Case") pending in the United States District Court for the Eastern District of Tennessee (the "Court") as Case No. 4:25-cv-38.

"Receivership Line of Credit Availability Period" means the period from and including the Amendment No. 9 Effective Date, to the earliest of (a) November 7, 2025 (b) the date of termination of all Receivership Line of Credit Commitments pursuant to Section 2.4(c), and (c) the date of termination of the commitment of each Receivership Line of Credit Lender to make Receivership Line of Credit Loans pursuant to Section 8.2.

"Receivership Line of Credit Borrowing" means a borrowing consisting of a Receivership Line of Credit Loan made by each of the Receivership Line of Credit Lenders pursuant to Section 2.1(d).

"Receivership Line of Credit Commitment" means, as to each Lender, its obligation to make Receivership Line of Credit Loans to the Borrowers pursuant to Section 2.1(d) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex A under the caption "Receivership Line of Credit Commitment" or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as such amount may be adjusted from time to time in accordance with this Agreement.

"Receivership Line of Credit Facility" means the line of credit facility established pursuant to Section 2.1(d) in an aggregate principal amount not to exceed $3,800,000.

"Receivership Line of Credit Lender" means, at any time, any Lender that has a Receivership Line of Credit Commitment or an outstanding Receivership Line of Credit Loan at such time.

"Receivership Line of Credit Loan" means any loan made by a Receivership Line of Credit Lender to the Borrowers pursuant to Section 2.1(d).

"Recipient" means (a) the Administrative Agent, (b) any Lender or (c) any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder, as applicable.

"Register" has the meaning assigned to such term in Section 10.6(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, consultants, service providers and representatives of such Person and of such Person's Affiliates.

"RELOC Availability Period" means the period from and including the Amendment No. 3 Effective Date to the earliest of (a) the second anniversary of the Amendment No. 3 Effective Date, (b)

205892919

(d)     Receivership Line of Credit Borrowing. Subject to the terms and conditions set forth herein, each Receivership Line of Credit Lender severally agrees to make loans (each such loan, a "Receivership Line of Credit Loan") to the Borrowers during the Receivership Line of Credit Availability Period in accordance with the Approved Cash Flow Budget, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Receivership Line of Credit Commitment. Amounts borrowed under this Section 2.1(d) and repaid or prepaid may not be reborrowed. Receivership Line of Credit Loans shall be Base Rate Loans, as further provided herein.

2.2     Borrowings of Loans.

(a)     Each Borrowing of Loans shall be made upon the Company's irrevocable written notice to the Administrative Agent in the form of a Loan Notice, which notice must be received by the Administrative Agent not later than 11:00 a.m. (i) one Business Day prior to the requested date of any Revolving Credit Borrowing or, RELOC Borrowing, or Receivership Line of Credit Borrowing (other than with respect to the initial Receivership Line of Credit Borrowing, the notice for which may occur on the requested date of such Receivership Line of Credit Borrowing) and (ii) on the requested date of the Term Loan Borrowing.  Each Loan Notice shall specify (A) whether the relevant Borrower is requesting a Revolving Credit Borrowing, a RELOC Borrowing, a Receivership Line of Credit Borrowing or the Term Loan Borrowing, (B) the requested date of the Borrowing (which shall be a Business Day), (C) the principal amount of Loans to be borrowed, which shall be, (1) with respect to Revolving Credit Loans and RELOC Loans, a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof, and (2) with respect to Receivership Line of Credit Loans, a principal amount of no less than $50,000, and (3) with respect to the Term Loans, the full amount of the aggregate Term Loan Commitments and (D) the applicable Borrower requesting such Borrowing.  The Administrative Agent shall promptly notify the applicable Lenders of each Loan Notice. –

(b)     Not later than 12:00 p.m. on the Business Day specified in the applicable Loan Notice, each applicable Lender shall make the amount of its Loan available to the Administrative Agent, for the account of the Borrowers, in immediately available funds at the Administrative Agent's Office.  Each Borrower hereby irrevocably authorizes the Administrative Agent to disburse the proceeds of each Borrowing requested pursuant to the terms hereof in immediately available funds by crediting or wiring such proceeds to the deposit account of the applicable Borrower or Borrowers identified in the most recent notice substantially in the form attached as Exhibit F (a "Notice of Account Designation") delivered by the Company to the Administrative Agent or as may be otherwise agreed upon by the Company and the Administrative Agent from time to time.   Subject to Section 2.10(a)(i), the Administrative Agent shall not be obligated to disburse the portion of the proceeds of any Revolving Credit Loan, RELOC Loan or Term Loan requested pursuant to this Section to the extent that any Lender has not made available to the Administrative Agent its Applicable Percentage of such Loan.

(c)     Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Company, the Administrative Agent, and such Lender.

2.3     Prepayments.

(a)     Optional.

    (i)     (a)  Optional.  The Borrowers may, upon notice by the Company to the Administrative Agent, at any time or from time to time voluntarily prepay Revolving Credit Loans, RELOC Loans or RELOC Term Loans in whole or in part without premium or penalty; provided that (i) such notice must be in a form acceptable to the Administrative Agent and be received by the Administrative Agent not later than 11:00 a.m. one Business Day prior to the date of prepayment of such Revolving Credit Loans, RELOC Loans or RELOC Term Loans and (ii) any prepayment of Revolving Credit Loans, RELOC Loans or RELOC Term Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment and the allocation of the prepayment between the outstanding Revolving Credit Loans, RELOC Loans or RELOC Term Loans.  The Administrative Agent will promptly notify each Revolving Credit Lender or RELOC Lender, as the case may be, of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage of the relevant Facility, subject to Section 2.12).  If such notice is given by the Company, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Subject to Section 2.12, each such prepayment pursuant to this Section 2.3(a) shall be paid to the Revolving Credit Lenders or the RELOC Lenders, as applicable, in accordance with their respective Applicable Percentages of the relevant Facility.  The Company may also, upon notice by the Company to the Administrative Agent, at any time or from time to time voluntarily prepay Term Loans in whole or in part; provided that (i) such notice must be in a form acceptable to the Administrative Agent and be received by the Administrative Agent not later than 11:00 a.m. three Business Days prior to any date of prepayment and (ii) any such prepayment shall be in a principal amount of $2,000,000 or a whole multiple of $1,000,000 in excess thereof or, if less, the entire principal amount thereof then outstanding.  Each such notice shall specify the date and amount of such prepayment.  The Administrative Agent will promptly notify each Term Loan Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage of the Term Loan Facility).  If such notice is given by the Company, the Company shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein.  Any prepayment of a Term Loan, RELOC Loan or RELOC Term Loan shall be accompanied by all accrued interest on the amount prepaid.  Each such prepayment pursuant to this Section 2.3(a) shall be paid to the Term Loan Lenders in accordance with their respective Applicable Percentages of the Term Loan Facility.   Each prepayment of the outstanding Term Loans or RELOC Term Loans pursuant to this Section 2.3(a) shall be applied to the principal repayment installments of the Loans being repaid (including the installment due on the Maturity Date of the Term Loan Facility or the RELOC Facility, as the case may be) in inverse order of maturity.

    (ii)     The Receivership Line of Credit Loans may be prepaid at any time without premium or penalty.

(b)     Mandatory.

    (i)     Overadvances.  If for any reason the Total Revolving Credit Outstandings at any time exceed the Maximum Revolving Borrowing Amount at such time, the Borrowers shall immediately prepay Revolving Credit Loans in an aggregate amount equal to such excess.

205892919

(vi)    Equity Issuances. In addition to the foregoing, to the extent the Company issues any Equity Interests, immediately after such issuance, the Borrowers shall make a payment to the Administrative Agent in the amount of one hundred percent (100%) of the aggregate proceeds resulting from such issuance of Equity Interests, which such payment shall be applied by the Administrative Agent to the payment of the Obligations in such manner as the Administrative Agent shall elect in its sole discretion.

2.4    Termination or Reduction of Commitments.

(a)    Revolving Credit Facility.  Upon notice to the Administrative Agent, the Company may terminate, or from time to time permanently reduce, the aggregate Revolving Credit Commitments; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof and (iii) the Company shall not terminate or reduce the aggregate Revolving Credit Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Credit Outstandings would exceed the aggregate Revolving Credit Commitments.  The Administrative Agent will promptly notify the Lenders of any termination or reduction of the aggregate Revolving Credit Commitments under this Section 2.4(a).  Upon any reduction of the aggregate Revolving Credit Commitments, the Revolving Credit Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount.  All fees in respect of the Revolving Credit Facility accrued until the effective date of any termination of the aggregate Revolving Credit Commitments shall be paid on the effective date of such termination.

(b)    RELOC Facility.  Upon notice to the Administrative Agent, the Company may terminate, or from time to time permanently reduce, the aggregate RELOC Commitments; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five Business Days prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $1,000,000 in excess thereof.  In addition to the foregoing, any unused portion of the aggregate RELOC Commitments shall be automatically and permanently terminated on the last day of the RELOC Availability Period.  The Administrative Agent will promptly notify the Lenders of any termination or reduction of the aggregate RELOC Commitments under this Section 2.4(b).  Upon any reduction of the aggregate RELOC Commitments, the RELOC Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount.  All fees in respect of the RELOC Facility accrued until the effective date of any termination of the aggregate RELOC Commitments shall be paid on the effective date of such termination.

(c)    Receivership Line of Credit Facility.  Upon notice to the Administrative Agent, the Company may terminate, or from time to time permanently reduce, the aggregate Receivership Line of Credit Commitments; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five Business Days prior to the date of termination or reduction.  In addition, any unused portion of the aggregate Receivership Line of Credit Commitments shall be automatically and permanently terminated on the last day of the Receivership Line of Credit Availability Period.

2.5    Repayment of Loans.

205892919

(a)    Revolving Credit Loans.  The Borrowers shall repay to the Revolving Credit Lenders on the Maturity Date for the Revolving Credit Facility the aggregate principal amount of all Revolving Credit Loans outstanding on such date.

(b)    Term Loans.  From and after the Amendment No. 5 Effective Date, the Borrowers shall repay to the Term Loan Lenders the aggregate principal amount of all Term Loans outstanding in quarterly installments of $293,789.06 (commencing on July 1, 2023) on the first day of each calendar quarter (which installments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.3); provided that the final principal repayment installment of the Term Loans shall be repaid on the Maturity Date for the Term Loan Facility and in any event shall be in an amount equal to the aggregate principal amount of all Term Loans outstanding on such date.

(c)    RELOC Loans / RELOC Term Loans. With respect to the RELOC Term Loans, promptly following the Conversion Date, the Administrative Agent shall calculate and deliver to the RELOC Lenders and the Company an amortization schedule with respect to the RELOC Term Loans providing for annual "straight-line" amortization of principal over a 15-year amortization period with principal due on the first day of each calendar quarter (commencing April 1, 2025).  The Borrowers shall repay to the RELOC Lenders the aggregate principal amount of all RELOC Term Loans as set forth in such amortization schedule (which installments shall be reduced as a result of the application of prepayments in accordance with Section 2.3); provided that the final principal repayment installment of the RELOC Term Loans shall be repaid on the Maturity Date applicable thereto and in any event shall be in an amount equal to the aggregate principal amount all RELOC Term Loans outstanding on such date. To the extent not converted to RELOC Term Loans pursuant to Section 2.1(c)(ii) for any reason, the Borrowers shall repay to the RELOC Lenders on the Conversion Date the aggregate principal amount of all RELOC Loans outstanding on such date.

(d)    The Borrowers shall repay to the Receivership Line of Credit Lenders on the Maturity Date for the Receivership Line of Credit the aggregate principal amount of all Receivership Line of Credit Loans outstanding on such date.

2.6    Interest.

(a)    Interest Rate Generally.  Subject to the provisions of Section 2.6(b), each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate (as in effect from time to time) plus the Applicable Margin.

(b)    Default Rate.

(i)    If any amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    If any amount (other than principal of any Loan) payable by the Borrowers under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then upon the request of the Required Lenders such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii)    Upon the request of the Required Lenders, while any Event of Default exists (other than as set forth in the foregoing subsections (i) and (ii)), the Borrowers shall pay interest

36

205892919

on the principal amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iv)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(v)    Notwithstanding anything to the contrary herein, the Receivership Line of Credit Loans shall bear interest equal to the Default Rate to the fullest extent permitted by applicable Laws.

(c)    Interest Payment Dates.  Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law. Notwithstanding anything to the contrary herein, interest on any Receivership Line of Credit Loan shall be capitalized and added to the outstanding balance of such Receivership Line of Credit Loans, and shall thereafter bear interest as principal. No cash payments of interest shall be required on Receivership Line of Credit Loans prior to the Maturity Date.

(d)    Maximum Rate.  Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate").  If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers.  In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (i) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof and (iii) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

2.7    Fees.

(a)    Revolving Commitment Fee.  The Borrowers shall pay to the Administrative Agent, for the account of each Revolving Credit Lender, a commitment fee (the "Revolving Commitment Fee") equal to 0.50% per annum times the actual daily amount by which aggregate Revolving Credit Commitments exceeds the Outstanding Amount of Revolving Credit Loans, subject to adjustment as provided in Section 2.12.  The Revolving Commitment Fee shall accrue at all times during the Revolving Credit Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the first day of each calendar quarter and on the last day of the Revolving Credit Availability Period.  The Revolving Commitment Fee shall be distributed by the Administrative Agent to the Revolving Credit Lenders in accordance with their respective Applicable Percentages, subject to adjustment as provided in Section 2.12.

(b)    RELOC Commitment Fee.  The Borrowers shall pay to the Administrative Agent, for the account of each RELOC Lender, a commitment fee (the "RELOC Commitment Fee") equal to 0.50% per annum times the actual daily amount of the unused portion of the aggregate RELOC Commitments.  The RELOC Commitment Fee shall accrue at all times during the RELOC Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the first day of each calendar quarter, commencing on April 1, 2023, and on the last day of the RELOC Availability Period.  The RELOC Commitment Fee shall be calculated

205892919

Date, any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall have delivered, to each Lender that so requests, a Beneficial Ownership Certification in relation to such Loan Party.

(k)     Payment of Fees and Expenses. The Company shall have paid, or made arrangements to pay concurrently with the closing on the Closing Date, (i) to the Administrative Agent, the Arranger and the Lenders the fees set forth or referenced in Section 2.7(c) and any other accrued and unpaid fees or commissions due hereunder, (ii) all fees, charges and disbursements of counsel to the Administrative Agent (directly to such counsel if requested by the Administrative Agent) to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Company and the Administrative Agent) and (iii) to any other Person such amount as may be due thereto in connection with the transactions contemplated hereby, including all taxes, fees and other charges in connection with the execution, delivery, recording, filing and registration of any of the Loan Documents.

Without limiting the generality of the provisions of Section 9.3, for purposes of determining compliance with the conditions specified in this Section 4.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

4.2     Conditions to All Credit Extensions. The obligation of each Lender to make any Loan hereunder areis subject to the satisfaction of the following conditions precedent on the relevant date such Loan is made:

(a)     Bring-down of Representations and Warranties. The representations and warranties of each Borrower contained in Article V and of each Loan Party contained in each other Loan Document shall be true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) on and as of the date such Loan is made, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) as of such earlier date.

(b)     No Default. No Default shall exist as of the date such Loan is made and no Default shall occur on such date as a result of making such Loan or from the application of the proceeds thereof.

(c)     Request for Credit Extension. The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d)     Availability. With respect to any requested Revolving Credit Borrowing, after giving effect to such Revolving Credit Borrowing, the Total Revolving Credit Outstandings shall not exceed the Maximum Revolving Borrowing Amount at such time.

(e)     RELOC Borrowings. In the case of any RELOC Borrowing, (i) at least three (3) Business Days prior to the date on which the RELOC Lenders are being asked to make each RELOC Borrowing (or such shorter period as the Administrative Agent shall permit in its sole discretion), the Company shall have notified the Administrative Agent of the proposed RELOC Borrowing and the

205892919

Administrative Agent shall have received all material documents relating to the improvement contemplated with respect thereto (including construction documents and project budgets), all of which shall be in form and substance reasonably satisfactory to the Administrative Agent and (ii) at least three (3) Business Days prior to the date on which the RELOC Lenders are being asked to make a RELOC Borrowing for the purpose of financing any costs or expenses with respect to improvements or the construction or renovation thereof, the Administrative Agent shall have received evidence satisfactory to the Administrative Agent as to such costs and expenses (which shall then be due and payable and evidenced by reasonably detailed invoices).

(f)     Receivership Line of Credit Borrowings. Notwithstanding anything to the contrary herein, with respect to any requested Receivership Line of Credit Borrowing, the obligation of each Receivership Line of Credit Lender to make any Receivership Line of Credit Loan hereunder is subject solely to the satisfaction of the condition precedent set forth in Section 4.2(c) and the following conditions precedent on the relevant date such Loan is made:

(i)     The Borrowers shall be in compliance with Section 6.21 and Section 7.16 of this Credit Agreement; and

(ii)     Either (A) the requested Receivership Line of Credit Borrowing shall be reflected in the Cash Flow Budget or (B) to the extent not reflected in the Cash Flow Budget, the Company shall have provided to the Administrative Agent written evidence (including by electronic mail) satisfactory to the Administrative Agent of a demand from Tennessee Distilling Group, LLC (the "Warehouser") to the Company for payment of amounts owed to the Warehouser by the Company arising from services provided prior to the Receivership Case ("Warehouser Demanded Amounts"), in the amount of, or a portion of, the requested Receivership Line of Credit Borrowing, which requested Receivership Line of Credit Borrowings, or portions thereof, requested to satisfy the Warehouser Demanded Amounts (whether included in the Cash Flow Budget or not) shall not exceed, in the aggregate, $1,100,000, and any other portion of a requested Receivership Line of Credit Borrowing in excess of the Warehouser Demanded Amounts shall be reflected in the Cash Flow Budget. Notwithstanding anything to the contrary herein or in any other Loan Document, the initial Receivership Line of Credit Borrowing shall occur on the Amendment No. 9 Effective Date in an amount of no more than $1,700,000, and the second Receivership Line of Credit Borrowing shall occur no earlier than October 6, 2025, and shall be in an amount of no more than $600,000.

The Other than with respect to a submission of a Request for Credit Extension with respect to a Receivership Line of Credit Borrowing, the submission by the Company of a Request for Credit Extension with respect to a Borrowing shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) will be satisfied on and as of the relevant date such Loan is made and the making of such Loan shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) are satisfied on and as of such date.

ARTICLE V
REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants to the Administrative Agent and the Lenders that:

5.1     Existence, Qualification and Power.  Each of the Loan Parties and their respective Subsidiaries (a) is duly organized, validly existing and, to the extent applicable, in good standing under the Laws of the jurisdiction of its organization, (b) has all requisite power and authority and all requisite

55

Loan Document, (ii) use the proceeds of the portion of the Term Loan Facility advanced on the Amendment No. 4 Effective Date to purchase the fee-owned real property interest as discussed with the Administrative Agent and (iii) use the proceeds of the portion of the Term Loan Facility advanced on the Amendment No. 5 Effective Date to repay Revolving Credit Loans.

(b)　Use the proceeds of the RELOC Facility to finance the construction and build-out of the distillery on the real property currently subject to a Mortgage to be used in the operation of the Borrowers' business as previously discussed with the Administrative Agent, not in contravention of any Law or of any Loan Document.

(c)　Use the proceeds of the Receivership Line of Credit Facility to finance the expenses of the Receivership Estate either (i) in accordance with the Cash Flow Budget, subject to Permitted Variances, or, (ii) to the extent not reflected in the Cash Flow Budget, to satisfy the Warehouser Demanded Amounts. For the avoidance of doubt any proceeds of any Receivership Line of Credit Borrowing requested to satisfy the Warehouser Demanded Amounts shall only be used to satisfy the Warehouser Demanded Amounts.

6.12　Additional Subsidiaries and Real Property.

(a)　Additional Domestic Subsidiaries.　Promptly following the date any Person becomes a Domestic Subsidiary (whether by creation, acquisition or otherwise) and in any event within 30 days after such date (as such time period may be extended by the Administrative Agent in its sole discretion), (i) cause such Person to (A) become a Subsidiary Guarantor (or, with the consent of the Administrative Agent if such Subsidiary is to own any assets of the type included in the Borrowing Base, a Borrower hereunder) by delivering to the Administrative Agent a duly executed joinder to the Subsidiary Guaranty (or, in the case of the first such Subsidiary, a duly executed Subsidiary Guaranty) or this Agreement, as applicable, or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, (B) grant a security interest in all of its tangible and intangible personal property now owned or hereafter acquired (other than Excluded Assets) by such Person by delivering to the Administrative Agent a duly executed joinder to each of the Security Agreement and the Pledge Agreement or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, (C) deliver to the Administrative Agent such opinions, documents and certificates referred to in Section 4.1 as may be reasonably requested by the Administrative Agent and (D) deliver to the Administrative Agent such other documents as may be reasonably requested by the Administrative Agent in connection with the foregoing, all in form, content and scope reasonably satisfactory to the Administrative Agent and (ii) cause each Loan Party owning Equity Interests in such Subsidiary to deliver to the Administrative Agent (A) a duly executed joinder or supplement to the Pledge Agreement pledging (or evidencing a prior pledge of) 100% of the total Equity Interests in such Subsidiary or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, together with all original certificates (or equivalent document), if any, evidencing such Equity Interests and appropriate undated stock or other transfer powers for each such certificate duly executed in blank by the registered owner thereof, (B) such opinions, documents and certificates referred to in Section 4.1 as may be reasonably requested by the Administrative Agent and (C) such other documents as may be reasonably requested by the Administrative Agent in connection with the foregoing, all in form, content and scope reasonably satisfactory to the Administrative Agent.

(b)　Additional Foreign Subsidiaries.　Promptly following the date any Person becomes a Foreign Subsidiary (whether by creation, acquisition or otherwise) and in any event within 30 days after such date (as such time period may be extended by the Administrative Agent in its sole discretion), (i) to the extent no material adverse Tax consequences would result therefrom, cause such Person, except in the case of the French Subsidiary, to (A) become a Subsidiary Guarantor by delivering to the

66

Receivership Covenants. Until the date on which the Court terminates the receivership in accordance with the Receivership Order:

(a) Bi-Weekly Reporting. Commencing with November 26, 2025, and every second Wednesday thereafter, the Receiver shall deliver to the Administrative Agent, in form and detail satisfactory to the Administrative Agent, a reporting package (the "Reporting Package") detailing, at a minimum:

(i) A rolling 13-week forecast of cash flows for the 13-week period commencing with the week of the delivery of the Reporting Package, substantially in the form of and with detail consistent with the Cash Flow Budget (for the avoidance of doubt, such updated 13-week cash flow forecast shall solely be used for reporting purposes and shall not replace or amend the Cash Flow Budget);

(ii) Reconciliation of actual cash receipts and disbursements for (A) the immediately preceding two weeks (ending the immediately preceding Friday) (each such period, an "Incremental Budget Period"; provided, that, for the first Reporting Package delivered after the Amendment No. 10 Effective Date, the Incremental Budget Period shall begin on the Amendment No. 10 Effective Date) against the Cash Flow Budget (as such term is defined in Amendment No. 10) for such Incremental Budget Period, and (B) the cumulative period from the Amendment No. 10 Effective Date through the immediately preceding Friday (each such period, a "Cumulative Budget Period") against the Cash Flow Budget for such Cumulative Budget Period, including a narrative explanation of any variance of 10% or more in any line item category;

(iii) Information regarding the current status of, and updates regarding, sales of product and inventory, employee headcount and reduction efforts, expense reductions, the amount and location of inventory (both raw and finished goods), any processes to consummate a transaction to sell any assets of the Receivership Estate, including, without limitation, any Sale Transaction(s) (as defined below), and copies of any materials prepared to provide to potential purchasers in any Sale Transaction(s) and any indications of interest, letters of intent, term sheets, purchase agreements, or other materials received by the Receiver, Borrowers, or the Investment Banker from interested parties in connection with the Sale Transaction(s); and

(iv) Any such additional information or reconciliations as the Administrative Agent may reasonably request.

(b) Cash Flow Budget Covenants.

(i) The Receiver and Company shall use all cash and Cash Equivalents of the Company, including, without limitation, any cash in deposit accounts of the Company and proceeds of any Loans hereunder (collectively, the "Cash Collateral"), in accordance with the Cash Flow Budget, subject to the Permitted Variances.

70

(ii) The permitted variances listed below (collectively, the "Permitted Variances") shall be tested on a cumulative basis from the Amendment No. 10 Effective Date through the last day of the applicable Cumulative Budget Period (the "Testing Period"), which shall first be reported on November 26, 2025, and on the Wednesday of every second week thereafter (each such date, a "Testing Date"). The Receiver and Company shall only expend Cash Collateral and proceeds thereof in accordance with the purposes set forth in the Cash Flow Budget, subject to the following Permitted Variances: (x) aggregate actual disbursements may not be more than 110% of the projected aggregate disbursements set forth in the Cash Flow Budget for the applicable Testing Period and (y) aggregate actual cash receipts may not be less than 90% of the projected aggregate cash receipts set forth in the Cash Flow Budget for the applicable Testing Period; *provided, that*, (A) the Receiver and Company may pay Warehouser Demanded Amounts during a week other than the week originally set forth in the Cash Flow Budget, and (B) for purposes of testing the Permitted Variances on each Testing Date, the projected disbursements in the Cash Flow Budget for such Warehouser Demanded Amounts shall be deemed reallocated from the week(s) originally budgeted to the week(s) in which such amounts were actually paid, with a corresponding reduction to the projected disbursements in the originally budgeted week(s), so that no variance arises solely due to such timing reallocation on a cumulative basis for the applicable Testing Period.

(iii) No later than the Wednesday of the tenth week following the delivery of the then-applicable Cash Flow Budget, the Receiver shall deliver to the Administrative Agent a revised weekly budget of consolidated cash flows of the Receivership Estate (as such term is defined in Amendment No. 9), including, without limitation, the receipt and use of the proceeds of the Receivership Line of Credit during such 13-week period, in form and detail satisfactory to the Administrative Agent, prepared by the Receiver or his professionals for the 13-week period immediately following the date on which the then-applicable Cash Flow Budget ends (each a "Proposed Cash Flow Budget").

(iv) The Administrative Agent shall have five (5) Business Days from receipt of any Proposed Cash Flow Budget to approve such Proposed Cash Flow Budget (such approval to not be unreasonably withheld, conditioned or delayed) (such approved Proposed Cash Flow Budget shall become the "Cash Flow Budget").

(c) Milestones.

205892919

(i) By no later than October 24, 2025, the Receiver, on behalf of the Receivership Estate, shall have engaged an investment banker acceptable to the Administrative Agent, and on terms and conditions acceptable to the Administrative Agent (the "Investment Banker"), for the purpose of marketing and selling all or substantially all of the Receivership Assets (the "Sale Transaction(s)"). The Receiver shall provide an executed copy of the engagement letter with the Investment Banker to the Administrative Agent promptly upon execution of the engagement agreement.

(ii) From and after the engagement of the Investment Banker, the Receiver shall, and shall cause the Investment Banker to, in good faith, use best efforts to (A) pursue Sale Transaction(s) which provides for a cash purchase price(s) sufficient to yield net cash proceeds in the aggregate which are sufficient to repay in full and in cash all Obligations, and (B) consummate all such Sale Transaction(s) by no later than April 8, 2026.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, no Borrower shall, nor shall it permit any Subsidiary thereof to, directly or indirectly:

7.1 <u>Liens</u>. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, except:

(a) Liens pursuant to any Loan Document;

(b) Liens existing on the Closing Date and described on <u>Schedule 7.1</u> and any refinancings, renewals or extensions thereof; <u>provided</u> that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased except as contemplated by <u>Section 7.2(b)</u>, (iii) the direct or any contingent obligor with respect thereto is not changed and (iv) any renewal or extension of the obligations secured or benefited thereby is permitted by <u>Section 7.2(b)</u>;

(c) Liens for <u>ad valorem</u> property taxes not yet due or Liens for taxes which are being contested in good faith and by appropriate proceedings diligently conducted (which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien), if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d) carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's, agricultural supply dealer's, harvester's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted (which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien), if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA or, with respect to any Plan, the Code;

205892919

(a)     Amend or modify, or waive any of its rights under, any Subordinated Debt Document, except as expressly permitted by the Subordination Agreement applicable thereto.

(b)     Prepay, redeem, repurchase or otherwise acquire for value any Subordinated Debt, or make any principal, interest, or other prepayments on any Subordinated Debt, except as expressly permitted by the Subordination Agreement applicable thereto.

7.15    Compensation.  Permit the aggregate compensation, including, without limitation, all base pay, bonuses, fees and other similar or comparable items, paid to the Permitted Investors, collectively, exceed $7,917 per calendar month (which on an annualized basis would be $95,000 per calendar year).

7.16    Barrel Conversion. During the Receivership Line of Credit Availability Period, neither the Company nor the Receiver shall permit the conversion of any barrels of spirits to bottles or to cases without prior written consent of the Administrative Agent.

ARTICLE VIII
DEFAULT AND REMEDIES

8.1    Events of Default.  Each of the following shall constitute an event of default (each, an "Event of Default"):

(a)     Non-Payment.  Any Loan Party fails to (i) pay when and as required to be paid herein, any amount of principal of any Loan or (ii) pay within three days after the same becomes due, any interest on any Loan, any fee due hereunder or any other amount payable hereunder or under any other Loan Document.

(b)     Specific Covenants.  (i) Any Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.1, 6.2, 6.3, 6.5, 6.10, 6.11, 6.12, 6.15, 6.16, 6.21 or Article VII or (ii) any "Event of Default" (as defined in any Collateral Document) shall occur.

(c)     Other Defaults.  Any Loan Party or any Permitted Investor fails to perform or observe any covenant or agreement (other than those specified in Section 8.1(a) or (b)) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier to occur of (i) a Senior Officer of a Loan Party or any Permitted Investor becoming aware of such failure and (ii) the Company or any Permitted Investor receiving notice thereof from the Administrative Agent.

(d)     Representations and Warranties.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party or any Permitted Investor in this Agreement, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect (or, in the case of any such representation, warranty, certification or statement of fact that is subject to materiality or Material Adverse Effect qualifications, in any respect) when made or deemed made.

(e)     Cross-Default.  (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, but giving effect to any applicable grace period with respect thereto) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $250,000, or (B) fails to observe or perform any other agreement or condition relating to any such

78

205892919

Part 4

| Lender | Receivership Line of Credit Commitment | Applicable Percentage (Receivership Line of Credit Facility) |
|---|---|---|
| Farm Credit Mid-America, PCA | $3,800,000.00 | 100.000000000% |
| **Total** | **$3,800,00.00** | **100.000000000%** |

205892919