IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNCLE NEAREST, INC., NEAREST | ) | Case No. 4:25-cv-38 |
| GREEN DISTILLERY, INC., UNCLE | ) | |
| NEAREST REAL ESTATE HOLDINGS, | ) | Judge Atchley |
| LLC, FAWN WEAVER and KEITH | ) | |
| WEAVER, | ) | Magistrate Judge Steger |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF KEVIN LARIN IN SUPPORT OF RESPONSE OF FARM CREDIT MID-AMERICA, PCA TO MOTION TO RECONSIDER THE MEMORANDUM OPINION AND ORDER AND ORDER APPOINTING RECEIVER AND TO STAY ACCESS TO PROPRIETARY INFORMATION**

I, Kevin Larin, pursuant to 28 U.S.C. § 1746, do hereby swear and affirm under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am over 18 years of age and competent to testify in this matter. Based on my knowledge, skill, experience, training, and education, I would, if called to testify about the matters set forth herein, be able to do so.

   **A.** **Qualifications**

2. I have over 18 years of experience working in roles of increasing responsibility at leading turnaround and restructuring firms. Currently, I am a Managing Director with the Restructuring and Turnaround practice of Riveron RTS, LLC ("Riveron").[1] Prior to that, I was a

---

[1] Each capitalized term used but not defined herein shall have the meaning ascribed in the *Order Appointing Receiver* [Dkt. No. 39] (the "Receivership Order"), the *Emergency Motion for the Immediate Appointment of Receiver* [Dkt. No. 3] (the "Receivership Motion"), or the *Response of Farm Credit Mid-America, PCA to Motion to Reconsider the Memorandum Opinion and Order and Order Appointing Receiver and to Stay Access to Proprietary Information in*

Senior Director with the North American Corporate Restructuring Group of Alvarez & Marsal. In addition, I also spent several years as a consultant with AlixPartners.[2]

3. In these roles, I have navigated troubled companies through their respective in-court and out-of-court resolutions. Over the years, I have undertaken significant, hands-on roles in financially distressed situations including quantifying and administering claims, stabilizing operations, developing and executing transactions, sizing appropriate capital structures, and securing and negotiating lending agreements.

4. In the early part of my career, I specialized in business valuation and litigation support, providing valuation opinions and forensic investigations for approximately 100 closely held businesses. I am experienced in disputes and investigations, rebuilding financial statements in data deficient environments, developing pricing models in anticipation of private transactions, and providing expert opinions and testimony, which appear to be at least some of the skills necessary to resolve the challenges facing Uncle Nearest and Farm Credit.

5. I am also a licensed attorney in the State of Michigan (Mich. Bar. P63557) and spent approximately two years practicing corporate, transaction, and debtor/creditor law in Detroit, but I am not appearing in this engagement in any legal capacity.

B. **Materials Considered**

6. My opinions are based on my team's pre- and post-receivership work, information and periodic updates provided by the Receiver and his professionals, and review of financial statements, cash flow reports, bank records, aging reports, and borrowing base materials provided by Farm Credit Mid-America, PCA "Farm Credit"), Uncle Nearest, the Receiver and/or his

---

*Support of Motion for Clarification of Receivership Order* [Dkt. No. 91] (the "FCMA Receivership Reconsideration Response").
[2] A true and accurate copy of my curriculum vitae is attached as **Exhibit 3**.

advisors. Where specifically noted, I rely upon certain exhibits and summaries referenced herein. Where applicable, I applied standard financial analysis methodologie**s**.

        C.        **Familiarity with the Borrowers**

7. Riveron was engaged to serve as financial advisor for Farm Credit with respect to its loans to, and relationship with, Uncle Nearest on March 3, 2025.

8. Over the course of approximately five months prior to the receivership, I, along with the Riveron team assigned to the Uncle Nearest engagement, committed nearly 2,000 man-hours of time developing a deep familiarity with the company, its leadership, its personnel, and its operations.

9. That time consisted of extensive review of Uncle Nearest's available financial information, operational reports, as well as on-site and remote interaction with Uncle Nearest leadership before the receivership. Over that time, I developed an understanding of the complex structure and operational practices at Uncle Nearest.

10. Uncle Nearest, Inc. ("Uncle Nearest, Inc."), Nearest Green Distillery, Inc. (the "Distillery"), Uncle Nearest Real Estate Holdings, LLC ("RE Holdings"), collectively, the ("Company") and Fawn and Keith Weaver (in their official and individual capacities) (collectively the "Weavers" and together with the Company the "Defendants" or "Uncle Nearest") are obligated to Farm Credit under the credit agreement (the "Credit Agreement") and other agreements, documents, and instruments executed and delivered in connection with, related to or referenced in the Credit Agreement (collectively and together with the Credit Agreement, the "Loan Documents").

11. Since the appointment of the Receiver, the Riveron team has committed an additional approximately 500 man-hours in this matter. Those hours consisted primarily of reviewing information and periodic updates as provided by the Receiver and his professional team,

interpreting that information, and presenting their findings to Farm Credit's counsel and Farm Credit.

12. As a Managing Director who oversees the Riveron team, I have developed a firm understanding of Uncle Nearest's vendor base, inventory composition, and location, flow of funds, financial reporting systems, and key personnel.

### D. Uncle Nearest's Outstanding Obligations to Farm Credit

13. As of February 2, 2026, I understand the total outstanding obligations owed to Farm Credit pursuant to the Loan Documents was approximately $121,000,000, as set forth in further detail below:

| Debt Instrument | Principal | Interest as of 1/31/2025 | Forbearance Fee | Professional Fees and Expenses [1] | Total Legal Obligations |
|---|---|---|---|---|---|
| The Revolving Loan [2] | $ 65,224,031.96 | $ 7,450,966.96 | $ - | $ - | $ 72,674,998.92 |
| The RELOC Loan [3] | 15,000,000.00 | 1,405,553.46 | 700,000.00 | 2,801,008.43 | 19,906,561.89 |
| The Term Loan [3] | 22,045,150.88 | 2,319,833.17 | - | - | 24,364,984.05 |
| The Receivership Line of Credit Loan [3] | 3,800,000.00 | 104,176.30 | - | - | 3,904,176.30 |
| Total | $106,069,182.84 | $ 11,280,529.89 | $ 700,000.00 | $ 2,801,008.43 | $120,850,721.16 |

[1] Billed and unpaid FCMA professional fees and expenses
[2] Maturity Date 7/22/2025
[3] Maturity Date 7/22/2027

14. Uncle Nearest has not made any payments on its debt to Farm Credit during the Receivership.

### E. Uncle Nearest is insolvent.

15. Based upon information obtained throughout the Riveron engagement in this matter, Riveron is of the opinion that Uncle Nearest was insolvent as of the time of the Receivership Hearing and continues to be insolvent to date.

16. In analyzing Uncle Nearest's actual cash flows for the 9-weeks ending June 13, 2025, the Riveron team found that the cash flow was approximately negative $1,215,000.[3] Over this time period, both unsecured and secured debt balances were increasing. Simply put, Uncle Nearest's outflows of cash were exceeding its inflows, and its debt continued to grow pre-receivership. Financials prepared by Uncle Nearest also supported the finding of insolvency pre-receivership. Uncle Nearest's own restructuring plan showed forecasts for an additional need for funding, with an approximately $32 million cash need in 2025 and a $48 million cumulative cash need projected through the first half of 2026.[4] Furthermore, a 13-week cash flow forecast that Uncle Nearest prepared and provided in May of 2025 showed a negative cumulative cash flow of $6,788,000 through the week ending August 8, 2025.[5] Finally, an accounts payable aging report by Uncle Nearest dated June 12, 2025, which showed what amounts Uncle Nearest owed its vendors, provides further support for Uncle Nearest's insolvency. Specifically, the accounts payable aging report showed that Uncle Nearest's trade creditors were collectively owed at least $11,597,565.56 at the time, approximately 90% of which was past due as of that time.[6] Uncle Nearest continues to be insolvent to date. As more fully detailed below, this opinion of insolvency does not change whether measured under the balance sheet standard or the cash flow standard of insolvency.

<u>Balance Sheet Standard of Insolvency</u>

---

[3] A true and accurate copy of the actual cash flow report for the 9-weeks ending 6/13/25 is attached as **Exhibit 4**.
[4] A true and accurate copy of the Keystone Restructuring Plan is attached as **Exhibit 5**.
[5] A true and accurate copy of Uncle Nearest's 13-week cash flow forecast provided in May 2025 is attached as **Exhibit 6**.
[6] A true and accurate copy of the accounts payable aging report dated 6/12/2025 is attached as **Exhibit 7**.

17. Generally speaking, under the balance sheet standard of insolvency, a company is considered insolvent if the sum of its liabilities exceeds the sum of its assets at fair value. Based on information known to date, Uncle Nearest is insolvent under the balance sheet standard.

18. Riveron has not received any reliable financial statements since our engagement began, so an exact picture of its liabilities is incomplete. However, based on information provided by the Receiver and his advisors, the Riveron team estimates that Uncle Nearest's current liabilities consist of *at least* $174 million,[7] comprised of:

  (a) $120 million outstanding obligations to Farm Credit;

  (b) $28 million in notes payable, including at least $20 million in unsecured loans to Grant Sidney, Inc. ("Grant Sidney");[8]

  (c) $22 million in trade payables; and

  (d) $4 million in other accrued expenses and other liabilities.

19. While Riveron is not providing a valuation opinion herein, I understand that the Receiver and his financial advisors have conducted an extensive marketing process for a sale or refinancing of Uncle Nearest which has resulted in a number of qualified indications of interest.

20. Based on a summary of those qualified indications of interest as provided by the Receiver, none of the bidding parties has expressed a willingness to pay for the Uncle Nearest assets in an amount that would satisfy the estimated $174 million of known liabilities.

21. Because the price that buyers would be willing to pay for the assets of Uncle Nearest is less than the currently known liabilities, I am of the opinion that Uncle Nearest is insolvent under the balance sheet standard of insolvency.

Cash Flow Standard of Insolvency

---

[7] A true and accurate copy of Uncle Nearest's estimated total liabilities is attached as **Exhibit 8**.
[8] Receivership Hr'g Pl.'s Ex. 9-B, Subordinated Credit Agreement Dated April 15, 2025.

22. Generally speaking, under the cash flow standard of insolvency, a company is considered insolvent if it is unwilling or unable to pay its debts as they become due. Based on information known to date, Uncle Nearest is insolvent under the cash flow standard of insolvency.

23. Prior to the appointment of the Receiver, Uncle Nearest provided Riveron with various financial reports. Among those were reports of actual operating receipts and disbursements from the period of April 12, 2025 through June 13, 2025.[9] During the pre-receivership time period, Uncle Nearest's cumulative receipts were approximately $3.9 million and cumulative operating disbursements were approximately $5.1 million.[10] Therefore, cumulative operating cash flows (i.e. operating receipts less operating disbursements) were *negative* $1.2 million, or approximately *negative* $135,000 per week.[11]

24. In addition, the Receiver and his professionals have provided Riveron with cash flow statements for the 20 weeks since the appointment of the Receiver. Those post-receivership cash flow statements demonstrate that operating cash flows continue to be negative. In particular, cumulative post-receivership cash flows from September 1, 2025 through January 18, 2026 were negative $930,000 or approximately negative $47,000 per week.[12]

25. To reflect a more accurate statement of Uncle Nearest's cash flow in both the pre- and post-receivership time period, the Riveron team excluded the Receiver's professional fees and expenses, and the inflow of cash from the Receivership Line of Credit provided by Farm Credit.

26. Therefore, during both the pre- and post-receivership time period, Uncle Nearest has been unable to generate positive cash flow from operations and therefore is unable to pay its

---

[9] Exhibit 4.
[10] *Id.*
[11] *Id.*
[12] A true and accurate copy of the post-receivership cash flows reported through January 18, 2026 is attached as **Exhibit 9**.

debts as they become due. Moreover, without the Receivership Line of Credit Loans provided by Farm Credit, Uncle Nearest would not have been able to meet its operating expenses or ensure continuity of its operations.

27. Additionally, based on the Receiver's most recent cash flow forecast, I understand that cash flow is projected to continue to be negative and Uncle Nearest will need additional funding, likely from Farm Credit, beginning as early as March 22, 2026, to continue operations.[13]

28. In my opinion, Uncle Nearest is insolvent under the cash flow standard of insolvency because it has been, currently is, and is projected to continue to be unable to meet ordinary course expenses and continue operations without Farm Credit's continued funding and financial support.

29. In addition, during the pre-receivership period, the management team of Uncle Nearest reported to Riveron a trade accounts payable balance of approximately $12 million.[14] However, the Receiver and his professionals have since discovered previously unreported or unknown payables. As such, the unpaid trade payable balance has been revised to approximately $22 million, representing an 83% increase in the previously reported balance.[15]

30. This dramatic increase in trade payables is a further example of Uncle Nearest's inability or unwillingness to pay its debts in the ordinary course and further strengthens my opinion that Uncle Nearest is insolvent under the cash flow standard of insolvency.

F. **Security for the debts is inadequate.**

31. Based on information provided by both Uncle Nearest and the Receiver, it is my opinion that Uncle Nearest lacks sufficient asset value to fully secure the Loans.

---

[13] A true and accurate copy of the post-receivership cash flow forecast through April 19, 2026 is attached as **Exhibit 10**.
[14] Exhibit 7.
[15] Exhibit 8.

32. In particular, under the Revolving Line of Credit, Uncle Nearest may be eligible to borrow against the value of specific collateral that has been pledged as security. The amount eligible for borrowing (the "Borrowing Base") is defined by formula in the Loan documents and set forth in summary as follows:

    a. 70% of the value of Eligible Inventory (limited to barreled whiskey, finished goods consisting of bottled whiskey, and grain inventory); plus

    b. 75% of the value of Eligible Accounts; less

    c. Any Availability Reserves.[16]

33. The relationship between the then current balance on the Revolving Line and the eligible Borrowing Base determines whether there is sufficient security for the debts, whether Uncle Nearest would be eligible for additional borrowing, or whether Uncle Nearest is required to repay a portion of the Revolving Line based on the following rubric:

    a. If the Borrowing Base is larger than the then current balance owed on the Revolving Line, there is sufficient collateral coverage and Uncle Nearest would be eligible for additional borrowing up to the Borrowing Base;

    b. If, however, the Borrowing Base is less than the then current balance on the Revolving Line, then there is insufficient collateral coverage, Uncle Nearest would *not* be eligible for additional borrowing, and Uncle Nearest would need to repay any amount in excess of the Borrowing Base (an "Overadvance Position")

34. In my opinion and experience, and commonly known in the restructuring industry, a borrowing base deficiency which places a company in an Overadvance Position is a hallmark of acute liquidity distress. Generally speaking, the larger the Overadvance Position, the greater the liquidity distress. Additionally, if the borrower further lacks either the liquidity to repay the overadvance, or is unable to propose a cogent plan to timely correct the Overadvance Position, financial distress is further exacerbated.

---

[16] Receivership Hr'g Pl.'s Ex. 1, Credit Agreement Date July 22, 2022, at 4.

Uncle Nearest is, and Continues to be, in a Significant Overadvance Position

35. In the pre-receivership time period, Uncle Nearest reported a significant Overadvance Position on the Revolving Line. In particular, the most recent Borrowing Base Certificate was delivered on June 11, 2025 for the month ending March 31, 2025, showing a negative availability of $27,556,484.[17]

36. As of March 31, 2025, Uncle Nearest's Borrowing Base was approximately $37.7 million, and the amount then owed on the Revolving Line was $65.2 million.[18] The Revolving Line was in an Overadvance Position of approximately $27.6 million., or a 73% Overadvance Position. Uncle Nearest lacked sufficient liquidity to repay the Overadvance, and no credible or timely plans to address the Overadvance were presented or communicated to Farm Credit.[19]

37. Moreover, and for illustration purposes, based on the most recent financial data provided by the Receiver, if Uncle Nearest were to provide a Borrowing Base Certificate as of December 31, 2025, its Borrowing Base would be approximately $36.7 million.[20] As of December 31, 2025, the amount then owed on the Revolving Line was $65.2 million.[21] As such, the Revolving Line continues in an Overadvance Position of approximately $28.6 million, or a 78% Overadvance Position.[22]

38. With a current cash position of $1.2 million (as of January 18, 2026), and a projected operating cash loss (exclusive of Receivership fees and expenses) through April 19,

---

[17] A true and accurate copy of the most recent March 31, 2025 Borrowing Base Certificate is attached as **Exhibit 11**.
[18] *Id.*
[19] *Id.*
[20] A true and accurate copy of the analysis of the Borrowing Base as of December 31, 2025 is attached as **Exhibit 12**.
[21] *Id.*
[22] *Id.*

2026, Uncle Nearest lacks sufficient liquidity to address the Overadvance and the acute liquidity distress of Uncle Nearest continues.[23]

39. Of note, however, the Receiver and his financial advisors are continuing to conduct an extensive marketing process for a sale or refinancing of Uncle Nearest. It is my opinion that this process should continue uninterrupted as it presents the only cogent and articulate plan to address the lack of security for the debts, and the significant Overadvance Position. However, as discussed above, I do not believe Uncle Nearest's implied enterprise value would be sufficient to pay Farm Credit's Loans in full.

### G. Uncle Nearest cannot satisfy a money judgment in Farm Credit's favor.

40. If a money judgment were entered in Farm Credit's favor today for the full amount of Uncle Nearest's obligations to it, as described above, Uncle Nearest would not have cash or assets to fully satisfy any such money judgment. A sale of Uncle Nearest and/or its assets akin to the transaction the Receiver is marketing appears to be the only mechanism for Farm Credit to recover even a meaningful percentage of its damages. Any such sale would be unlikely without the Receivership. Farm Credit's alternatives to the receivership would include exercising other rights and remedies under the Loan Documents, including foreclosure.

### H. Less drastic equitable remedies are not available.

41. The receivership has been central to preventing further dissipation of Farm Credit's Collateral, right-sizing operations and expenditures, and providing transparency as to Uncle Nearest's financial state and operations. Based on my experience with Uncle Nearest prior to the receivership, I do not believe that anything short of a court-ordered receiver would provide the

---

[23] Exhibit 10.

same necessary operational and financial oversight to preserve Farm Credit's Collateral and Uncle Nearest's chance of emerging from its currently distressed situation.

## I. Absent this Receivership, Farm Credit's Collateral is in imminent danger of being lost, concealed, injured, diminished in value, or squandered.

Payment of Non-Loan Party obligations

42. On March 18, 2025, a settlement agreement was entered by and among Levy Premium Foodservice Limited Partnership ("Levy") on the one hand, and Shelbyville Barrel House BBQ LLC ("Barrel House") and Humble Baron, on the other hand (the "Levy Settlement").[24]

43. The Levy Settlement called for installment payments to be made to Levy. Neither Uncle Nearest, nor any other loan party, were a party to the settlement agreement or the underlying suit.

44. On April 16, 2025, Defendant Nearest Green paid the installment amount to Levy.[25] Nearest Green transferred the funds one day after the payment date agreed upon in the Levy Settlement.

The Unauthorized Incurrence of Debt

45. Uncle Nearest is prohibited from incurring debts under the credit agreement documents without FCMA's express written approval.[26]

46. In at least four instances, Uncle Nearest incurred debt in contravention to the Loan Documents. The prohibited borrowings resulted in at least $1.8 million of FCMA's Collateral to be diverted to other parties, including:[27]

---

[24] A copy of which will be introduced at the hearing scheduled for Monday, February 9, 2026 at 10 a.m. (the "Combined Hearing") as **Exhibit 13**.
[25] A true and accurate copy of the First Bank statement for Nearest Green Distillery, Inc. dated April 1, 2025 through April 30, 2025 will be introduced at the Combined Hearing as **Exhibit 14**.
[26] Receivership Hr'g Pl.'s Ex. 1, Credit Agreement Date July 22, 2022. Section 7.2 of the Credit Agreement states that no Borrower shall "[c]reate, incur, assume or suffer to exist any Indebtedness," except as to specified baskets.
[27] Agreements underlying certain of these transactions and a chart showing select borrowings and disbursements are attached as **Exhibits 15-18**.

     (1)  $111,395 to ByzFunder;

     (2)  $1,208,000 to Dash Funding;

     (3)  $388,215.79 to Diverse Capital; and

     (4)  $115,162.65 to Green Note.

<u>Customary Budget-Approval Process</u>

  47.  The Receiver's budgeting process mitigates risks of further dissipation of FCMA's Collateral, due to the added oversight and transparency into Uncle Nearest's financials.

  48.  The Receiver has instituted and remains compliant with a budgeting process required under the Loan Documents. Under that process, the Receiver presents a 13-week proposed cash flow budget to Farm Credit for review and approval and Farm Credit has 5 Business Days from the receipt of the budget to approve it. The cash flow budgets present proposed and forecasted receipts and disbursements by category, including operating and marketing expenses, up to an aggregate limit per category. Farm Credit does not approve the budget on a line-item basis; the Receiver retains discretion to allocate expenses within each category. To date, Farm Credit has timely approved each budget request. Further, for time-sensitive disbursements such as to Tennessee Distilling Group, the Receiver has requested and Farm Credit has provided advanced approvals and additional financing to ensure timely disbursement and operational stability.

  49.  That budgeting provides (i) a process for stabilizing operations through access to credit from Farm Credit; (ii) mitigation of risks of further commingling due to oversight; and (iii) much needed transparency into Uncle Nearest's financial condition, outlook, and strategic alternatives. In my 18 years of experience, this approach is typical for distressed lending facilities, providing transparency to the senior secured lender funding ongoing operations.

### J. The Record Reflects that Uncle Nearest engaged in fraudulent conduct.

50. By the Weavers' own admission in their complaint against the Company's former CFO (the "Senzaki Complaint"),[28] Uncle Nearest, Inc. perpetrated fraud on Farm Credit. The Senzaki Complaint states that Michael Senzaki and his Co-Conspirators "distorted the company's true bottom-line condition, and concealed risks that directly threatened Plaintiff's equity and value within Uncle Nearest – thereby inducing purported lender confidence that could not have existed absent the fraud."[29]

### K. Termination of the Receivership would do more harm than good.

51. For the reasons set forth below, and others not specifically mentioned herein, I am of the opinion that terminating the Receivership at this time would inflict concrete, immediate harm to Farm Credit and other parties.

52. Uncle Nearest's pre-receivership posture was defined by an environment of opacity and mismanagement. Uncle Nearest management could not, or would not, provide transparency into the following: its bank accounts and cash transactions; its operational metrics; a full accounting for its liabilities; and an accurate accounting for barrel collateral.

53. In the pre-receivership period, Uncle Nearest's practices regularly included failure to deliver accurate, timely financial statements, maintain adequate internal controls, and meet ordinary-course obligations to creditors.

54. As previously described, Uncle Nearest's pre-receivership accounting records were at best unreliable due in part to non-reconciled balances, unusual journal entries, incomplete

---

[28] A true and accurate copy of the Senzaki Complaint is attached as **Exhibit 19**.
[29] *Id.* at ¶ 26.

accounting for liabilities, and distorted revenue recognition practices.[30] No financials that the Riveron team was provided could be relied upon.

55. Moreover, as reported by the Receiver, Uncle Nearest had substantial tax compliance issues.[31] Uncle Nearest had not filed federal and state income tax returns since 2018. This failure created significant historical exposure. Upon information and belief, the Receiver has worked to bring business, excise, and sales taxes current.[32]

56. Were the Receivership to be terminated, Uncle Nearest would likely return to its practice of not filing financial statements, unreliable reporting that grossly overstated collateral value, a breakdown of basic corporate controls, and violations of the Loan Documents.

Improvements Made under Receivership

57. Since his appointment, the Receiver's oversight has improved financial transparency, discipline around cash usage, and collateral protection. For example, since the Receivership began, Farm Credit consistently receives the financial reporting documents the Loan Documents require.

58. Upon information and belief, the Receiver has conducted important stabilizing measures for Uncle Nearest, including making strides toward reconciling the inaccurate and incomplete capitalization table, updating inaccurate and incomplete financial statements, investigating financial improprieties committed by a former employee, investigating whether any current member of the management team has misappropriated funds, meeting with potential investors to determine opportunities for future investment, commencing the process of returning Defendant Companies to good standing, making significant cuts to Uncle Nearest's operational

---

[30] A true and accurate copy of the Receiver's Second Quarterly Report is attached as **Exhibit 20**. Second Quarterly Report at ¶ 34.
[31] *Id.* at ¶ 34.
[32] *Id.*

expenditures, partially restoring shipments from Tennessee Distilling Group, negotiating an amendment to the Credit Agreement, and evaluating certain non-income producing properties Uncle Nearest owns.[33]

59. Furthermore, Uncle Nearest's insolvency during the Receivership cannot be attributed to the Receiver. Rather, Uncle Nearest's financial condition is linked to a wide variety of factors, including an overall downturn in the spirits market. The Receiver took over at a time when the spirits industry as a whole is in a distressed state. Given Uncle Nearest's pre-receivership insolvency and governance deficiencies, the deterioration in financial performance during the receivership is not a function of the Receivership, but a function of Uncle Nearest's preexisting financial condition.

60. Without the Receivership, Farm Credit would have been compelled to accelerate its remedies earlier, resulting in low recoveries. Termination now would reverse the Receiver's progress regarding financial discipline and transparency, further impairing Farm Credit's ultimate recovery.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: February 2, 2026     */s/ Kevin Larin*

                                            Name: Kevin Larin
                                            Title: Managing Director, Restructuring and Turnaround
                                            Riveron RTS, LLC

---

[33] A true and accurate copy of the Receiver's First Quarterly Report is attached as **Exhibit 21**.