UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) |
| Plaintiff, | ) Case No. 4:25-cv-38 |
| v. | ) Judge Atchley |
| UNCLE NEAREST, INC., *et al.*, | ) Magistrate Judge Steger |
| Defendants. | ) |

## RECEIVER'S SECOND QUARTERLY REPORT

Comes now Phillip G. Young, Jr. (the "Receiver"), the court-appointed receiver in this matter, by and through counsel, and offers this second quarterly report pursuant to the Court's Order Appointing Receiver (the "Receivership Order") entered on August 22, 2025.[1]

### *INTRODUCTION*

1. The first quarterly report in this case was filed less than six (6) weeks into this receivership matter. Since the filing of the first report, the Receiver has much more clarity on the financial status of Uncle Nearest, Inc. and its affiliates (collectively, the "Company") and some of the causes of its financial decline. The Receiver's findings herein reflect conclusions he has reached in the review of thousands of pages of documents; meetings with employees and former employees; discussions with shareholders, creditors, vendors, distributors, potential lenders, and potential investors; input from consultants retained as part of this Receivership; and his operation of the Company for approximately four (4) months.

---

[1] This report is being filed slightly later than the prior quarterly report because the fourth quarter closed during the holiday season. The Receiver was unable to gather all information relevant to this report prior to January 5, 2026.

1

## TASKS ACCOMPLISHED BY THE RECEIVER

2. The Receiver has assembled a group of professionals to assist with the operation of the Company and the advancement of the tasks established by the Receivership Order. More specifically, the Receiver has retained Newpoint Advisors Corporation ("Newpoint") to serve as his financial consultant. Due to the insufficiency of the Company's accounting team, Newpoint has essentially functioned as the Company's outsourced Chief Financial Officer and accounting department since early in this Receivership. Critically, Newpoint has assisted the Receiver in developing a rolling thirteen-week budget and tracking actual performance versus the budget. The Receiver has also retained Thoroughbred Spirits Group, LLC ("Thoroughbred") to assist him in the operations of the Company. Thoroughbred has extensive experience consulting with and/or operating other spirits companies. Thoroughbred has assisted the Receiver in communications with distributors, making determinations about marketing budgets, evaluating release strategies, and managing the production of the Company's products. The Receiver has likewise retained Arlington Capital Services, LLC ("Arlington") to serve as the Receivership's investment bank. As will be detailed below, Arlington has assisted the Receiver in seeking refinancing of the Company's debts and/or identifying a buyer for substantially all assets. Finally, the Receiver has retained Thompson Burton, PLLC ("TB") to represent him in all legal aspects of this Receivership. The Receiver has employed other professionals to carry out more discrete tasks (e.g., alcoholic beverage counsel, French law counsel, counsel representing the Company in litigation that was pending prior to the Receivership, etc.) but Newpoint, Thoroughbred, Arlington, and TB are the Receiver's primary consultants for this matter.

3. Since October 1, 2025, the Receiver's primary focus has been on stabilizing the cash flow of the Company. When the Receiver assumed control of the Company, it was in

financial shambles. It was unable to make payroll; it was over $1 million in arrears on payments to Tennessee Distilling Group ("TDG"), who stored substantially all of its distilled product, and thus created a large warehouseman's lien; and it was losing approximately $1,000,000 every month, despite making no payments on its secured indebtedness. Moreover, despite the Company's management (including its Chief Executive Office and Chief Financial Officer) representing to the Receiver that the Company's unsecured debt was substantially less than $10,000,000, the Receiver discovered that its unsecured debt eclipsed $50,000,000. After a number of weeks of budget adjustment, and with the assistance of cash injections from the secured lender, the Receiver has been able to reduce the Company's monthly losses. Between October 1, 2025 – December 31, 2025, the Company showed losses (exclusive of professional services expenses) of $1,071,312, or approximately $350,000 per month. The Company remains insolvent on a month-to-month basis but for the financial support of Farm Credit Mid-America, PCA ("Farm Credit").

4. Compounding the difficulty of this Receivership was the unreliability of the Company's financial records. The Company's Chief Executive Officer represented to the Receiver in the first few days after his appointment that all of the Company's financial records prior to 2024 had been erased by a former employee.[2] Therefore, the Receiver could base the Company's financial condition and performance only upon its records from 2024 forward. The Receiver quickly found, however, that these financial records were unreliable. For example, the Company reported revenues in excess of $70 million for 2024; in actuality, the revenues for 2024 were $41 million (as calculated based upon source data). The Company's barrel count was also exaggerated by more than 20,000 barrels. The Receiver was able to reconcile the barrel count as the Company

---

[2] The Receiver is working to recover that data as it will be necessary for ongoing investigations into the financial transactions of the Company and its agents.

continued to carry on its books, as inventory, barrels that were sold to third parties (with the reservation of a repurchase right or, in some cases, a repurchase obligation[3]); however, the inventory count was completely unreliable. The Receiver, with the assistance of his financial advisors, have now been able to reconstruct accurate financial records for 2024 and 2025.

5. Not only were the financial records of the Company unreliable, its capitalization table was equally unreliable. Based upon the Receiver's review of hundreds of pages of documents and his conversations with dozens of shareholders, the Receiver has learned that the capitalization table maintained by the Company does not properly reflect the owners of the Company's shares. More specifically, the capitalization table did not capture a number of secondary market transactions, all of which were approved by the Company but not noted on the capitalization table. The Receiver and his legal counsel have been working to correct and update the capitalization table.

6. The Receiver and his consultants continue developing and refining a rolling thirteen-week budget for the Company. The details of this budget and other financial issues are detailed in the Financial Report section below.

7. The Receiver, with financial assistance from Farm Credit, has satisfied all liens maintained by TDG encumbering the inventory of the Company.

8. This quarter, the Receiver has continued his frequent discussions with creditors, vendors, distributors, and shareholders of the Company. While this has occupied a lot of his time, the Receiver felt that these communications were essential in continuing normal business operations despite substantial amounts owed to some of these constituents and concerns about the

---

[3] These repurchase rights or repurchase obligations permitted, or mandated, that the Company repurchase barrels at a substantially higher rate than their sales price. Indeed, the repurchase rate is multiples of the fair market value of whiskey barrels in the market today.

4

viability of the Company. Further, the Receiver believes that these communications have delayed substantial, potentially distracting, litigation against the Company and/or its founders, especially litigation threatened by shareholders who maintain that they were defrauded.

9. The Receiver has taken all steps to maintain the Company's existing intellectual property. He has also taken steps to maintain the Company's relevant licenses with state and federal authorities.

10. The Receiver discovered that the Company has not filed federal tax returns since 2018. He is working with the Company's accountants to develop a timeline and a budget for bringing the Company into compliance with Internal Revenue Service and federal tax law requirements.

11. With the assistance of his team of consultants, the Receiver has continued making all operational and financial decisions for the Company.

## *TASKS IN PROCESS*

12. The Receiver has identified a number of tasks that need to be undertaken and/or completed in the future. Some of these tasks are operational, some financial, and some legal. While some of these tasks will take hours to complete, others will take weeks. Nevertheless, here are the tasks that the Receiver believes lies ahead in this receivership.

13. As mentioned above, the capitalization table is inaccurate. The Receiver and his counsel continue the process of reconciling the capitalization table.

14. The Company is unable to simply "operate" its way out of its current financial condition. Therefore, the Receiver retained Arlington to identify potential refinancing sources for the Company and/or to market the Company's assets for sale, based upon the Receiver's recognition that the Company cannot remain in this Receivership in perpetuity. Arlington

contacted 106 parties that it believed were potential sources of refinancing and/or were potential purchasers of the Debtor's assets. Of the 106 parties contacted, 42 executed non-disclosure agreements and Arlington had follow-up calls with 29 parties. From those 29 parties, 10 submitted a written interest in purchasing the assets of the Company (indicating a valuation range in their written proposals), 4 expressed a willingness to partner with another purchaser (while not making an offer), but no parties expressed an interest in refinancing the Company's debt. While Arlington continues working with the 10 parties who submitted written interest to produce an acceptable offer, none of those parties indicated that it was willing to pay an amount equal to or exceeding Farm Credit's debt.

15. The Receiver identified the Company's assets located in Cognac, France as assets that could be liquidated without impacting the Company's operations, and should be liquidated in order to reduce the Company's indebtedness. Fawn Weaver initially indicated to the Receiver that she had a party that was willing to pay $10,000,000 for the real property in France and the personal and intellectual property associated therewith. The Receiver had subsequent conversations with the potential purchaser, who indicated that he would be willing to pay a reduced price of $7,000,000. After the Receiver performed his due diligence on the value of the assets, and he began pushing the potential purchaser for a written agreement, the potential purchaser indicated that he was no longer interested. The Receiver believes that the potential purchaser backed out at the behest of Fawn Weaver after the Receiver had indicated to Ms. Weaver that the Receiver intended to use the proceeds from the sale to pay down debt of the Company, not for ongoing operations. The Receiver believes that Ms. Weaver intended to use the proceeds from the sale of the French assets as "proof" of the solvency of the Company. After this failed transaction, the Receiver reduced the expenses associated with the French assets as much as possible and is

6

Case 4:25-cv-00038-CEA-CHS   Document 132   Filed 02/03/26   Page 6 of 18
PageID #: 3881

currently utilizing a European connection to market the Cognac assets.

16. The Receiver likewise believes that the Company's house in Martha's Vineyard should be liquidated.[4] The Receiver has identified a real estate professional in Martha's Vineyard who has given him an estimated value of the property and has agreed to list the property for sale. The Receiver intends to sign the listing agreement this month.

17. The Receiver is also communicating with two potential parties about the sale or transfer of the Company's assets associated with its vodka product. Based upon conversations with consultants, industry experts, and potential purchasers, he believes that the value of the vodka assets is negligible.

18. In the last month, the Receiver has begun a forensic investigation into the finances and transactions of the Company. This investigation is in its infancy and is expected to take considerable time to complete. The Receiver intends to investigate all allegations that have been brought to his attention: (1) allegations by Fawn Weaver that Farm Credit committed lender liability or breached other duties to the Company; (2) allegations by Fawn Weaver that a former employee (or employees) of the Company were guilty of conversion, fraud, or other financial crimes; and (3) allegations by certain shareholders that they were defrauded by the Company's Chief Executive Officer, Chief Financial Officer, and/or board of directors. While this investigation is only beginning, the Receiver has identified a number of very questionable transactions in 2024 and 2025 involving officers and directors of the Company. The Receiver is not yet able to draw conclusions, nor is he prepared to file causes of action on behalf of the

---

[4] The Receiver is aware of recent pleadings in which Fawn Weaver and Keith Weaver allege that the Martha's Vineyard real estate belongs to Keith Weaver, not the Company. While the Receiver will deal with this in more depth in other pleadings, the Receiver will note that the real estate in Martha's Vineyard was purchased using the Company's funds and that all expenses have been paid by the Company. In fact, as recently as December 31, 2025, Keith Weaver forwarded the tax invoice for the Martha's Vineyard real estate to the Receiver for payment.

7

Company against any third party. In fact, the Receiver believes that pursuit of any such high-profile litigation prior to the sale of the Company's assets or the refinancing of its debt would negatively impact the Company's ability to effectively reorganize and continue operating. Therefore, his primary focus at this time is on the Company's continuing operations, not its potential causes of action.

19. The Receiver also continues his investigation into certain entities that are related to, and appear commingled with, the Company. The Receiver will address these issues in a separate report, pursuant to the Court's prior orders.

## *FINANCIAL REPORT*

20. **Key Financial Metrics.** In accordance with the Receivership Order filed August 22, 2025, the following financial information is provided for the current reporting period (October 1, 2025 – December 28, 2025) and the Receiver period to date (August 23, 2025 – December 28, 2025). Actual results are presented against the original operating budget to provide transparency into performance.

21. **Professional Fees Paid**

**October 1, 2025 – December 28, 2025**

| Firm Name | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Thompson Burton PLLC | 331,021 | 600,000 | (268,979) |
| Newpoint Advisors Corporation | 426,316 | 510,000 | (83,684) |
| Thoroughbred Spirits Group, LLC | 125,008 | 445,000 | (319,992) |
| Other | 77,241 | 18,000 | 59,241 |
| TOTAL | 959,586 | 1,573,000 | (613,414) |

8

**August 23, 2025 – December 30, 2025**

| Firm Name | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Thompson Burton PLLC | 495,711 | 840,000 | (344,289) |
| Newpoint Advisors Corporation | 582,112 | 690,000 | (107,888) |
| Thoroughbred Spirits Group, LLC | 209,893 | 613,000 | (403,107) |
| Other | 77,241 | 18,000 | 59,241 |
| TOTAL | 1,364,957 | 2,161,000 | (796,043) |

22. **Collections Received**

**October 1, 2025 – December 28, 2025**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Collections | 4,063,419 | 5,641,605 | (1,578,186) |
| Farm Credit Mid-America, PCA | 2,100,000 | 2,100,000 | - |
| TOTAL | 6,163,419 | 7,741,605 | (1,578,186) |

**August 23, 2025 – December 30, 2025**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Collections | 5,558,584 | 7,111,571 | (1,552,987) |
| Farm Credit Mid-America, PCA | 3,800,000 | 3.800,000 | - |
| TOTAL | 9,358,584 | 10,911,571 | (1,552,987) |

23. **Expenditures**

**October 1, 2025 – December 28, 2025**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Disbursements | 5,134,731 | 6,853,760 | (1,719,029) |
| Professional Service Expenses | 959,586 | 1,573,000 | (613,414) |
| TOTAL | 6,094,317 | 8,426,760 | (2,332,443) |

9

**August 23, 2025 – December 30, 2025**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Disbursements | 7,159,998 | 9,472,306 | (2,312,308) |
| Professional Service Expenses | 1,364,957 | 2,161,000 | (796,043) |
| TOTAL | 8,524,955 | 11,633,306 | (3,108,351) |

The Defendants and the Company's senior lender, Farm Credit, have access to the full details supporting the above figures.

24. **Banking & Disbursement Controls.** Immediately following his appointment, the Receiver took steps to secure all existing bank accounts associated with the Company. This included freezing accounts where appropriate and establishing new Receiver-controlled accounts to ensure that all future transactions are properly monitored and documented. By shifting all financial activity into Receiver-controlled accounts, the risk of unauthorized transfers or unapproved expenditure has been significantly reduced. These activities and policies have continued to be in place and enforced throughout the entire receiver period.

25. Bank accounts with cash balances remain in a French bank, over which the Receiver will not have exclusive control until the French courts officially recognize this Court's Receivership Order. Likewise, the Receiver does not have control over bank accounts in the names of certain entities that are detailed in the Receiver's Motion for Clarification filed with this Court on September 12, 2025.

26. The Receiver has instituted a policy that all significant disbursements must receive explicit approval from the Receiver before release. This control mechanism ensures that cash outflows align with the cash flow budget and that only necessary and authorized expenses are incurred. To reinforce this control, weekly reconciliations are performed for all bank accounts.

These reconciliations serve to verify accuracy, detect any discrepancies, and confirm that no unauthorized transactions have taken place.

27. **Cash Flow Budgeting & Variance Review.** A rolling 13-week cash flow budget has been developed and is updated weekly to reflect the Company's most current operating realities. This budget is reconciled against actual collections and disbursements every week. Any variances greater than 10% between budgeted and actual results are promptly identified, documented, and explained.

28. As part of the secured lender forbearance agreement, the Receiver is required to submit comprehensive bi-weekly reporting packages to Farm Credit, the Company's secured lender. These packages contain detailed variance analyses, operational expense tracking, and updated sales forecasts. By providing this level of detail, the secured lender can closely monitor performance against established targets and evaluate ongoing compliance with the terms of the forbearance agreement. This enhanced reporting process strengthens transparency and accountability, ensuring that stakeholders have timely and accurate insight into the Company's financial position, operational performance, and near-term prospects.

29. **Payroll & Taxes.** The payroll process has been stabilized under the administration of the Company's professional employer organization, Genesis Global. At the time of the appointment, the Receiver identified that the PEO account was underfunded, jeopardizing employee pay continuity. This issue has since been corrected, ensuring that payroll obligations are consistently met.

30. The Receiver has completed a review of payroll taxes, excise taxes, business taxes, and property taxes. Several potential liabilities have been identified, and these obligations have been incorporated into the cash flow budget for planning purposes. Of particular concern is the

discovery that the Company has not filed federal income tax returns since 2018. The Receiver is currently working with appropriate tax authorities and external advisors to address this issue.

31. In addition, the Receiver conducted a review of state-level business, excise and sales tax compliance. Findings indicated that Tennessee and New Jersey have material exposure due to incomplete reporting and unpaid obligations. These issues were corrected for both the states of Delaware and Tennessee during the most recent quarterly period with the Company now in Good Standing. Business, excise and sales taxes are now current for all Receiver entities.

32. **Vendor & Operational Continuity.** The Receiver has established direct lines of communication with key vendors, logistics providers, and employees to maintain uninterrupted operations. This outreach has helped secure the cooperation of critical partners and mitigate risks to the supply chain. All vendor notices are now being directed to the Receiver. This process has revealed several previously unidentified liabilities that were not fully disclosed in the Company's records. The Receiver has also secured and reviewed critical business documents, including supply chain agreements, bottling contracts, and marketing obligations. These reviews aim to identify operational risks and financial commitments that could have a material impact on cash flow.

33. An initial review of inventory storage agreements and bailment warehouse contracts was completed with follow-up currently underway. This is necessary to confirm lien positions, assess obligations, and evaluate any potential risks associated with warehouse-held inventory.

34. **Financial and Accounting Observations.** The Company's existing accounting records are materially unreliable and cannot be relied upon for accurate financial reporting. Key deficiencies identified include:

- Non-reconciled balances create uncertainty about the accuracy of financial statements.

- Unusual accounting entries lack proper documentation.
- Improper revenue recognition practices that distort the Company's financial performance.

35. The absence of solid financial controls and the unreliability of certain financial records have been a challenge in determining historical sales and expenses that would aid with forecasting future sales and expenses. That challenge has been compounded by the fact that a substantial number of financial records before 2024 were erased from the Company's computer system. According to multiple employees at the Company, those records were erased by a former employee immediately after termination. The Receiver is working to recover some or all of those financial records.

36. The Receiver has also identified related-party transactions involving Grant Sydney, Inc. and Quill and Cask Owner, LLC, both entities owned by the Weavers. These transactions were reviewed via the use of external records and supporting documentation to determine their accuracy, legitimacy, and whether they represent potential improper transfers. Irregularities were found and continued review and investigation is in process. Since many of the companies that are subject to this receivership action have comingled assets and liabilities with other non-receiver entities, it has made determination of lien priority, and separation of liabilities among corporations, very difficult.

37. The Receiver has engaged a third-party CPA bookkeeping firm to assist in the ongoing completion of accounting records and preparation of financial statements for the Receivership period. This activity has resulted in the reconciliation of all cash activity for the YTD period October 31, 2025, with the remaining 2025 almost completed. Monthly financial statements are currently being finalized for the August – October 2025 period.

38. In addition, the Receivership team is working on gathering source data to recreate certain financial reports. The Receiver thinks it is critical for the Company to have financial

statements that have been created under his independent direction, for which he can verify the accuracy.

39.     Overall, cash resources remain limited, necessitating tight cash management and prioritization of critical expenses.

40.     **Next Steps – Stakeholder Communications.**  The Receiver will continue to provide bi-weekly reporting to Farm Credit, including detailed variance reports, expense reviews, and sales forecasts. Regular updates will also be provided to the Court and other key stakeholders. Direct engagement with vendors, customers, and employees will continue to maintain operational stability and foster transparency.

41.     **Asset Recovery & Preservation of Value.**  The Receiver will continue to secure and monitor the Company's cash, accounts receivable, inventory, leased equipment, and other assets. To ensure accurate reporting and valuation, updated inventory counts and appraisals will be commissioned as necessary. Bailment warehouse records have been reviewed to confirm lien positions and ensure obligations are properly disclosed and managed.

42.     **Cash Management.**  The Receiver will continue to have a rigorous oversight of all disbursements, requiring prior approval for significant expenses. Bank accounts will be reconciled on a daily and weekly basis to ensure the integrity of records and detect irregularities promptly. Forward-looking projections will continue to be refined and stress-tested to account for potential sales fluctuations, ensuring that the Company remains prepared for varying operational outcomes. The Receivership team spent considerable time assessing the current operations of the Company. As a result of those assessments, the Receiver made significant cuts to the operational expenditure of the Company, including reducing its workforce by twenty-eight employees, or 30%.  Some of the more recent headcount reductions include reductions in security staffing and the outsourcing

of janitorial services at half the cost of prior internal services.

43. The Receiver continues to evaluate the workforce and expenditures of the Company, in an effort to increase its operational efficiencies and become more profitable. This has led the Receiver to make additional spending cuts to both administrative and sales budgets to improve overall business efficiency and maintain cash liquidity. These activities include an increased focus on working capital management in the areas of accounts receivable and inventory.

44. **Investigation & Forensic Review.** As indicated above, the Receiver will continue his review of historical financial records and intercompany transfers to uncover any irregularities or potential recovery opportunities. Special focus will be placed on officer and insider compensation, travel and marketing expenditures, and the identification of potential preferential or fraudulent transfers.

45. As necessary, tax advisors will be engaged to quantify exposures associated with the unfiled federal and state income tax returns dating back to 2018. The Receiver will also evaluate potential claims or causes of action that could be pursued for the benefit of creditors, with a focus on maximizing recovery and ensuring equitable treatment of all stakeholders.

46. **Conclusion.** The Receiver has implemented robust controls to stabilize operations, enhance transparency, and identify key risks. Substantial challenges remain, particularly in areas such as tax compliance, accounts payable, and related-party transactions. The Receiver will continue to prioritize transparency, creditor protection, and preservation of value while working closely with all stakeholders to achieve the best possible outcome for the estate.

*CHALLENGES TO RECEIVERSHIP*

47. Cash flow continues to be a major challenge to this receivership. As demonstrated by the data included in the Financial Report above, the Company continues operating at a loss. At

15

this juncture, the Company is only able to maintain operations due to (a) cash infusions by Farm Credit, (b) significant reductions to operational expenses, and (c) professional fees coming in substantially below budget.

48. Due to a variety of factors (for example, credit holds on product shipment, legal fees incurred by the Company, and the impact of this litigation on sales), revenue collections were down significantly when the Receiver assumed control of the Company. The distress of the spirits market as a whole, the reduction of worldwide demand for alcohol, and the impact of tariffs on international sales continue to depress sales. Moreover, litigation such as this always has a negative impact on sales, as a company's employees, vendors, and business partners grow concerned about the long-term viability of a company in receivership. Recent pleadings filed in this Court by Fawn Weaver and Keith Weaver, as well as a recent complaint filed by Fawn Weaver, Keith Weaver, and Grant Sidney, Inc. in the Chancery Court for Bedford County, Tennessee against the Company's former CFO, Mike Senzaki, has further damaged the value of the brand. The Receiver bases this conclusion upon his conversations with creditors, vendors, employees, shareholders, Receivership consultants, and potential investors.

49. Relatedly, the adversarial nature and tone of recent pleadings filed by Fawn Weaver and Keith Weaver have created the potential for substantial practical and ethical conflicts. The Defendants' pleadings have muddled legal issues and operational issues to such an extent that the Receiver has become uncomfortable speaking directly to Fawn Weaver or Keith Weaver without their counsel being present, and has become uncomfortable speaking directly with their counsel without his legal counsel being present. In order to avoid these potential conflicts, the Receiver has advised counsel for the Defendants that he wishes to communicate with Fawn Weaver and Keith Weaver exclusively through his consultants, and he wishes to communicate with

Defendants' counsel exclusively through the Receiver's legal counsel.[5]

50. Another challenge to this receivership is the threat of significant litigation. As mentioned above and in prior pleadings, the Receiver has fielded dozens of calls and emails from creditors and shareholders threatening the Company and/or its officers and directors with litigation. The continued stay of litigation, as provided for in the Receivership Order, is critical to maintaining normal operations of the Company. Even with the imposition of the stay, the Receiver believes that litigation initiated by (or potentially against) Fawn Weaver and Keith Weaver poses a threat to the Company, both in terms of value of the brand and in terms of focus of officers, directors and employees.

*CONCLUSIONS, RECOMMENDATIONS AND REQUESTS*

51. The Company cannot operate in this Receivership in perpetuity. However, the Company is insolvent. The Receiver believes that the Company would be forced to cease operations within sixty days without: (a) continued cash injections by Farm Credit; (b) the stay of litigation provided for in the Receivership Order; and (c) the legal, financial, and operational guidance of the Receiver and his team of consultants. The cessation of business would cause the loss of nearly 70 jobs and the disappearance of a brand with significant social and cultural value.

52. While the Receiver's opinion of value has been significantly adjusted based upon discovery of the Company's accurate, historical revenues (which were just over half of what was reported) and the offers he has received in the market, the Receiver continues to believe that the Company's business and brand have a future. In order to maximize that value, the Receiver believes that all non-essential, non-income producing assets must be liquidated as soon as possible,

---

[5] While this development is unfortunate and less than ideal, it is the best way to reduce potential ethical violations. Moreover, the Receiver believes this is a temporary solution. Within thirty days, the Receiver believes this Court will either have dissolved this Receivership, as the Defendants request, or will have authorized the Receiver to move forward with his attempts to stabilize the Company through the refinancing of its debt or a sale of its assets.

and a total refinancing of the Company's debt or a sale of the Company as a going concern must be completed by no later than the second quarter of 2026.

Dated this 6th day of January 2026.

Respectfully submitted,

/s/ Justin T. Campbell
Justin T. Campbell
Thompson Burton PLLC
1801 West End Avenue, Suite 1550
Nashville, Tennessee 37203
(615) 465-6015 (phone)
justin@thompsonburton.com

Counsel for the Receiver

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via via the Court's ECF system.

This 3rd day of February, 2026.

/s/ Justin T. Campbell.
Justin T. Campbell