UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| FARM CREDIT MID-AMERICA, PCA, ) | |
| ) | |
| Plaintiff, ) | Case No. 4:25-cv-38 |
| ) | |
| v. ) | Judge Atchley |
| ) | |
| UNCLE NEAREST, INC., *et al.,* ) | Magistrate Judge Steger |
| ) | |
| Defendants. ) | |

**RECEIVER'S RESPONSE TO MOTION TO RECONSIDER THE
MEMORANDUM OPINION AND ORDER AND ORDER APPOINTING
RECEIVER AND TO STAY ACCESS TO PROPRIETARY INFORMATION**

**COMES NOW** the court-appointed receiver herein, Phillip G. Young, Jr. ("Receiver"), by and through undersigned counsel, and hereby responds to the Motion to Reconsider the Memorandum Opinion and Order and Order Appointing Receiver and to Stay Access to Proprietary Information (Doc. 91) (the "Motion") filed by Fawn Weaver, Keith Weaver, and Grant Sidney, Inc. (collectively, the "Movants"). In response to the Motion, the Receiver states as follows:

BACKGROUND

The Receiver does not believe that it is his role to defend the existence of this receivership nor to ask for its dissolution. The Receiver was appointed by this Court to carry out certain duties assigned to him by this Court's Order Appointing Receiver (Doc. 39) (the "Receivership Order"). He has done that to the best of his abilities. The Receiver works at the pleasure of the Court, and only the Court; he is otherwise a stranger to these proceedings. He will, therefore, leave arguments concerning the merits of the Motion to the Plaintiff and the Defendants. However, the Receiver

*does* believe that he has an obligation to clarify certain misstatements made in the Motion, especially since he is the sole party in possession of certain relevant information.

Moreover, since the Motion repeatedly cites the Receiver's First Quarterly Report (Doc. 46) (the "First Report"), the Receiver feels it necessary to clarify certain aspects of the First Report. First, as stated repeatedly in that First Report, its statements and conclusions were based upon information gathered by the Receiver in just five (5) weeks of service in this matter. As such, many of the statements and conclusions therein were based primarily upon an initial review of records maintained by Uncle Nearest, Inc. and its affiliates (collectively, the "Company") – records which the Receiver has since learned were unreliable and, in some cases, incorrect. The Receiver's knowledge and information about the Company have expanded exponentially in the three months since filing the First Report. Furthermore, many of the Receiver's statements made in the First Report have been presented out of context in the Motion. Since the relief sought in the Motion relies so heavily upon the Receiver's conclusions about the Company, the Receiver believes his opinion of the Company should be considered by the Court.

The Receiver possesses knowledge about three topics that he believes are relevant to the Court's consideration of the Motion: (1) the current state of the Company; (2) the status of investigations into causes of action related to the Company; and (3) the actions (or inactions) of the Receiver and causes therefore. This Response will focus exclusively on those three topics.

CURRENT STATE OF THE COMPANY

The Motion places a heavy emphasis on the Receiver's initial impression of the value of the Company as stated in the First Report, and how that value compares with the overall indebtedness of the Company. The information concerning the Receiver's current opinion of the

value of the Company, and the factual justification for that opinion, is contained in the Receiver's Second Quarterly Report (Doc. 97) (the "Second Report"), filed under seal on January 6, 2025. The Receiver hereby incorporates the Second Report by reference as a full report of the Company's current state.

Without restating the entirety of the Second Report, the Receiver wishes to give the Court a summary of the facts that relate to the Motion. First, despite contrary assertions in the Motion, the Company is insolvent. Insolvency is determined in two manners: (1) the inability to pay monthly obligations as they come due, and (2) balance sheet insolvency. The Company is insolvent according to both metrics. Regarding the ability to pay monthly obligations, as outlined in the Second Report, the Company is unable to meet its ongoing obligations without cash infusions from Farm Credit Mid-America, PCA ("Farm Credit"), the Company's primary secured creditor. As the Second Report demonstrates, the Receiver has made great strides in correcting the Company's financial path, reducing losses from approximately $1,000,000 per month to average losses of $350,000 per month during this receivership.[1] But the Company, standing on its own, still cannot pay its monthly obligations as they come due – and that is without servicing any secured debt or paying down the unsecured debt that had accumulated prior to the receivership (which is now subject to a stay).

Further, the Company is balance sheet insolvent. The Company's total indebtedness exceeds $160 million. As was discussed in the Second Report, the Receiver has aggressively

---

[1] Indeed, the course correction has been slightly better than it first appears on paper. The Receiver had to invest approximately $1,000,000 in the first month of this receivership to pay back debts that were necessary to ensure the ongoing operation of the Company. If these initial payments are removed from the equation, then the Company's losses have been closer to $100,000 per month during this receivership, a 90% cut to losses.

sought a source of refinancing and/or a potential buyer. No legitimate source of refinancing has been found.[2] To date, no potential purchaser has submitted an offer to purchase the Company's assets for even the amount of Farm Credit's secured debt, much less a price sufficient to pay all indebtedness.[3] Based upon the reaction of the market, the Receiver now believes that the value of the Company is significantly less than the $160 million total indebtedness, and likely less than the total indebtedness to Farm Credit (meaning that Farm Credit is likely undersecured).

Not only is the Company insolvent, but its sales are also struggling. While depletions (that is, the number of cases being purchased by distributors to replace sold units) remains solid and well ahead of its competitors, the Neilson data cited by the Motion correctly shows a decline in sales. This is no surprise to the Receiver. First, as the Receiver shared with Fawn Weaver in one of his first meetings with her, contentious litigation – especially contentious litigation that leads to a receivership – always damages a business. Litigation that is as public as this litigation has become is distracting for the corporate officers and employees, and causes the public to question the ongoing viability of a business. This is why the Receiver has consistently suggested to the Court and to the Movants that he must find an expeditious reorganization strategy for the Company.

---

[2] An entity known as NexGen2780, LP ("NexGen") has recently filed a letter of interest with this Court (Doc. 100) after contacting the Receiver, Farm Credit, and Arlington Capital Advisors, one of the Receiver's professionals. Arlington Capital has had two conversations with NexGen but has been unable to verify that NexGen has assets sufficient to refinance the Company's debt. NexGen also confirmed for Arlington Capital that any offer would be based upon due diligence and that NexGen had done no diligence into the Company's assets, liabilities, revenues, or profitability. Further, after NexGen's filing with this Court, a third party contacted the Receiver to share that NexGen had offered to provide it (much less) financing but backed out days before closing, citing a lack of funding. Finally, the Receiver's research leads him to believe that one of NexGen's partners was previously involved in Square One vodka, a brand owned by the Company; so, this "offer" may not be an arms' length offer. All of this leads the Receiver to be skeptical of the legitimacy of NexGen's "offer".
[3] Arlington Capital is working with several parties to increase their bids, in hopes of presenting this Court an acceptable offer. The Receiver remains optimistic about this process.

Further compounding the effects of this litigation and receivership on sales is the overall plummeting sales in the spirits industry. Hundreds of articles have been written on this topic over the last year, and the Receiver will not attempt to summarize the ins and outs of the decline of the spirits industry; however, its impact is real and is being felt by all liquor manufacturers, including those outside of receivership and litigation.[4] This decline in the spirits industry has also negatively impacted beverage distributors throughout this country, most notably Republic National Distributing Company ("RNDC"). RNDC is the Company's largest distributor and is itself experiencing severe financial crisis. The Receiver believes that RNDC's financial troubles have negatively impacted the Company in that RNDC has taken a more conservative approach in its new orders of the Company's products, and seems less invested in marketing the Company's products due to its own financial condition.

The combination of its current insolvency and its struggling sales leads the Receiver to conclude that the Company cannot simply operate itself out of its current financial condition, as the Movants suggest. Having reached that conclusion by the end of October, the Receiver engaged Arlington Capital Advisors ("Arlington") to assist the Receiver in refinancing the Company's debt or selling its assets, as those are the only two routes that the Receiver believes will ultimately preserve the Company and its brand. The status of that process is detailed in the Second Report and will not be repeated here. However, the Receiver feels it necessary to correct a misimpression left by the Motion. The Movants allege that competitors are being given access to "proprietary information" that could be used to the competitive disadvantage of the Company. That is incorrect on two accounts. First, the Receiver has no "proprietary information" about the Company, he has

---

[4] For example, it has been well publicized that bourbon producer Jim Beam has paused all distillation for 2026 in order to correct for oversupply and changing customer demand.

provided no "proprietary information" to Arlington, so Arlington could provide no "proprietary information" to any third parties. The only information available in Arlington's data room is financial information about the Company's past performance. It contains no secret mash bill nor any secret marketing information – only financial performance data. Second, no party has been given access to Arlington's data room without first signing a robust non-disclosure agreement ("NDA"). If a third party were to use some information in the data room to the competitive disadvantage of the Company, there would be a legal remedy for the misuse of that information.

Finally, regarding the current state of the Company, the Receiver feels it necessary to clarify some facts regarding certain of the non-income producing assets. More specifically, the Company owns and pays to maintain several parcels of real property that are not central to the Company's operations. These include properties in the Shelbyville area, such as the Dan Call Farm and the Eady Road Farm, as well as properties in Martha's Vineyard, Massachusetts and Cognac, France.[5] It is clear that all of these properties are held in the name of an entity (or individual) other than Uncle Nearest, Inc.; however, it is equally clear that these properties have been purchased and maintained using funds of the Company. The Receiver has multiple financial records to prove as much. Any suggestion that these properties are somehow separate from the Companies, or purchased with assets separate from the Companies, is incorrect.

## STATUS OF INVESTIGATIONS

In addition to relying on statements made by the Receiver in his First Report about the value of the Company, the Motion also relies heavily upon statements made in the First Report

---

[5] As indicated in the Second Report, the Receiver is in the process of marketing some of these properties for sale.

concerning the status of investigations into potential litigation. Again, these statements were made very early in this case and were heavily caveated as such. In order to give the Court a clear picture on where the Receiver's investigation into these matters now stands, he offers this narrative.

The Receiver's investigation into potential causes of action has been necessarily methodical for a variety of reasons. First and foremost, his primary focus for at least the first three months of this receivership was to restore some financial stability to the Company and to identify paths forward for its business. As mentioned in other pleadings, the Receiver believes that it is imprudent and indeed harmful for the Company to engage in open litigation against any third parties at this time, given its financial straits. Beyond timing, the Receiver's investigation into potential causes of action has also been slowed due to the unreliability of the Company's records. The Receiver has found that revenues and assets have been consistently overstated, liabilities were grossly understated, and a substantial number of relevant records have been apparently deleted from the Company's computer systems.[6] Without records upon which he can confidently rely, the Receiver has been cautious about asserting claims against any parties until he has completed a forensic reconstruction of the Debtor's books and records.

That being said, the Receiver has received many complaints (and records purportedly verifying those complaints) about the actions and inactions of various employees, former employees, officers, directors, and creditors. The Court is well aware of allegations made by the Movants that Farm Credit is guilty of fraud and/or lender liability in its relationship with the Company. As previously stated, the Receiver is aware of some peculiarities regarding timing and frequency of draws made against this Farm Credit line of credit but has not yet seen sufficient

---

[6] For example, the Receiver understands that general ledger data for periods prior to 2024 was allegedly erased or is otherwise unavailable.

Page 7 of 11

Case 4:25-cv-00038-CEA-CHS   Document 133   Filed 02/03/26   Page 7 of 11
PageID #: 3900

reliable, admissible evidence that he believes would result in a favorable finding of lender fraud or lender liability.[7] At the appropriate time, the Receiver intends to further investigate the basis for the loan, the Company's internal processes for requesting draws on that loan, which employees/officers approved each draw, and whether he is bound by the prior statements of the Movants concerning the validity of this debt. However, the Receiver is not prepared to take a position on those matters at this time.

The Court is also aware that the Movants have recently filed a complaint in state court alleging that the Company's former CFO, Mike Senzaki, committed fraud, embezzlement, theft, and/or related financial misdeeds. The Receiver is in possession of information and records that lead him to believe that the Company might have valid causes of action against Mr. Senzaki.[8] However, it is yet undetermined the extent of those causes of action, whether Mr. Senzaki is collectible, and/or whether Mr. Senzaki was operating alone or in concert with other employees, officers, directors, or shareholders of the Company. It would be premature at this time for the Receiver, on behalf of the Company, to pursue an action against Mr. Senzaki without further information. The Receiver's investigation into this matter is ongoing.

Beyond allegations of fraud, theft, and lender liability made by the Movants, the Receiver has been contacted by a number of creditors and shareholders who allege that they have been defrauded by the Company and/or its officers, directors, and employees. Over the course of the last three months, the Receiver has collected dozens of documents from the Company's records and from third parties regarding these matters. Again, investigation into these allegations is in its

---

[7] In fact, the Receiver is aware that the Movants have verified the amount of debt owed under oath and have signed acknowledgements that the debt is subject to no defenses.
[8] The Receiver expresses no opinion as to whether the Movants might possess independent causes of action against Mr. Senzaki, and reserves all rights concerning this matter.

infancy and the Receiver lacks evidence to bring any causes of action.[9] However, it is clear that misrepresentations about the finances of the Company were made to creditors and shareholders alike; it is less clear who made those misrepresentations and who possessed the knowledge of the falsity of the information provided.[10] The Receiver will pursue any appropriate causes of action supported by actual facts after an appropriate investigation and at the appropriate time in the life of this case.[11]

## RECEIVERSHIP ACTIONS

Finally, the Receiver wishes to address some allegations made by the Movants that the Receiver has failed in certain of his duties. First, the Movants allege that the Receiver represented that, if appointed, he would seek early mediation. The Receiver is an unabashed proponent of alternative dispute resolution, and he suggested to the Movants' prior counsel that mediation might be successful in this case. That suggestion was made based upon the representations to the Receiver that the Company had a $100 million refinancing package on the table, but that Farm Credit refused to consider it. Upon investigation, the Receiver learned that there was no firm, open offer for a $100 million refinancing. Further, Farm Credit made clear that it was not interested in mediating without a viable financial solution in play. As the Court knows, it is typically fruitless

---

[9] To be clear, the current state of the investigation should not be construed as a finding that no misconduct occurred; rather, the Receiver's ability to confirm or rule out specific misconduct has been materially constrained by the incomplete, unreliable, and non-reconciled books and records.
[10] More specifically and to the point of the Motion, while the Receiver currently has no evidence that any of the Movants had actual knowledge that false financial information was being distributed to creditors and shareholders, it is inaccurate to say that the Receiver has "cleared" any of the Movants of wrongdoing. The Receiver believes that the Movants, in the exercise of their fiduciary duties as officers and directors of the Company, *should have* known of the falsity of information being distributed; but he certainly cannot state that they *did* know.
[11] The Receiver questions whether, outside of a receiver, trustee, or other fiduciary, these allegations will be properly investigated by the Company.

to attempt to force an unwilling party to mediate. Based upon these discoveries, the Receiver made the decision not to pursue a forced mediation.

The Motion also alleges that the Receiver promised to "grow" the Company during the receivership but has failed to do so. The Receiver denies having ever made any assertion that, if appointed, he would "grow" the business. Growth of business is not the purpose of receivership and, in the Receiver's experience, does not occur during receiverships. Growth requires funding and funding is typically in short supply during receiverships. Rather, the Receiver indicated that he would attempt to *protect* the Company, its brand, and its value. The Receiver represents to the Court that he has done so to the best of his abilities (and despite forces beyond his control that, if left unchecked, would have destroyed the value of the Company).

Finally, the Movants allege that the Receiver is a party to a "mysterious" and "undisclosed" forbearance agreement with Farm Credit. In fact, the Receiver has signed a forbearance agreement with Farm Credit; this agreement was the basis for Farm Credit's agreement to fund the Receiver's continued operations of the Company. The forbearance agreement did not require the Movants' signatures, so it was not circulated to Movants for approval.[12] There is nothing secretive about the forbearance agreement, and its terms are quite commonplace; but the Movants have never requested a copy of the forbearance agreement from the Receiver or his counsel, nor is the Receiver certain that they have a right to review it.

---

[12] Having reviewed hundreds of forbearance agreement in their legal careers, the Receiver and his legal counsel certainly did not feel it necessary to get the Movants' input on the terms of this forbearance agreement.

## CONCLUSION

In conclusion, the Receiver defers to the Court's judgment concerning whether it should reconsider or set aside the Receivership Order and all related orders entered herein. However, the Receiver strongly believes that the Court is entitled to full and accurate information concerning the Company before ruling on the Motion; that is the point of this Response

Dated this 13th day of January, 2026.

        By:    /s/ Justin T. Campbell
                 Justin T. Campbell, Tn. Bar No. 31056
                 Thompson Burton PLLC
                 1801 West End Avenue, Suite 1550
                 Nashville, Tennessee 37203
                 Voice: (615) 465-6015
                 Fax:   (615) 807-3048
                 Justin@thompsonburton.com

                 *Counsel for Receiver*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via the Court's ECF system.

This 3rd day of February 2026.

                 /s/ Justin T. Campbell.
                 Justin T. Campbell