**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF TENNESSEE**
**WINCHESTER DIVISION**

| | | |
|---|---|---|
| **FARM CREDIT MID-AMERICA, PCA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNCLE NEAREST, INC., NEAREST GREEN** | ) | **Case No. 4:25-cv-38** |
| **DISTILLERY, INC., UNCLE NEAREST** | ) | |
| **REAL ESTATE HOLDINGS, LLC, FAWN** | ) | **Judge Atchley** |
| **WEAVER and KEITH WEAVER,** | ) | |
| | ) | **Magistrate Judge Steger** |
| **Defendants.** | ) | |
| | ) | |

---

**RESPONSE OF FARM CREDIT MID-AMERICA, PCA**
**TO MOTION TO RECONSIDER THE MEMORANDUM OPINION AND ORDER AND**
**ORDER APPOINTING RECEIVER AND TO STAY ACCESS TO PROPRIETARY**
**INFORMATION**
[Relates to Dkt. No. 91, 123]

---

Farm Credit Mid-America, PCA ("FCMA" or the "Lender") submits this response to the

*Motion to Reconsider the Memorandum Opinion and Order*[1] *and Order Appointing Receiver*[2] *and*

*to Stay Access to Proprietary Information* ("Reconsideration Motion") filed by Fawn Weaver,

Keith Weaver (collectively with Fawn Weaver, the "Weavers") and Grant Sidney, Inc ("Grant

Sidney" and collectively with the Weavers, the "Movants").[3]

**INTRODUCTION**

1.      Termination of this Receivership[4] would be unwarranted and premature.  Since the

---

[1] Dkt. No. 32
[2] Dkt. No. 39
[3] Dkt. No. 91.
[4] Each capitalized term used but not defined herein shall have the meaning ascribed in the *Order Appointing Receiver* [Dkt. No. 39] (the "Receivership Order"), the *Emergency Motion for the Immediate Appointment of Receiver* [Dkt. No. 3] (the "Receivership Motion"), or the *Statement of Farm Credit Mid-America, PCA in Support of Motion for Clarification of Receivership Order* [Dkt. No. 44] (the "FCMA Statement in Support").

Receivership Hearing, Uncle Nearest remains unable to service or satisfy its debt to FCMA. Instead, FCMA has advanced funding to Uncle Nearest pursuant to the Receiver's request throughout the course of the Receivership so that operations can continue. Contrary to the Movant's assertion that the Receiver was appointed solely to protect FCMA's Collateral, the Receivership was established to install competent, independent management to halt further dissipation of assets, stabilize the company, and ensure transparent oversight in the face of serious fraud and misconduct concerns. The Receiver has made great strides in these respects, but more work remains that requires that the Receivership should continue.

2. The core grounds for appointing the Receiver still stand and warrant that the Receivership continues. The Receiver's investigations into fraudulent conduct and commingling of the Receivership Assets with the Additional Entities are ongoing. The Weavers' and Grant Sidney's own complaint against the Company's former CFO (the "Senzaki Complaint") amplifies, rather than alleviates, these concerns.[5] In the Senzaki Complaint, the Weavers and Grant Sidney describe a company riddled with fraud and misconduct during the Weavers' tenure at the helm of the company. In addition, they allege that under the Weavers' leadership, multiple instances of fraud were allegedly perpetrated upon FCMA, creditors, and shareholders. If true, the allegations reveal a multitude of victims, including FCMA, investors, and other creditors, and bring the reasons this Receivership is needed into sharp focus: asset integrity, stakeholder protection, and the need for competent, neutral management pending a full investigation.

3. In the short time since the Receiver's appointment, the Receiver, with the aid of the

---

[5] Filed in the action styled *Grant Sidney, Inc., Fawn Weaver, and Keith Weaver v. Michael Senzaki and ZMS Strategies, Inc.*, Case No. 35594, in the Chancery Court for Bedford County, Tennessee. The Senzaki Complaint was inappropriately filed by the Weavers as the claims asserted belong to the Receivership Estate. As such, an attempt to exercise control over the claims violates the non-disturbance and stay provisions of the Court's Receivership Order. Dkt. No. 39 at ¶ 12.

Receivership funding provided by FCMA, imposed financial discipline, transparency, and operational continuity. Terminating the Receivership now would expose the Receivership Assets and creditors to precisely the same mismanagement and asset dissipation which justified the appointment of a receiver in the first place. Indeed, the Receiver believes that Uncle Nearest "would be forced to cease operations within sixty days" without FCMA's continued cash injections, the Receivership Order's litigation stay, and the guidance of the Receiver and his consultants.[6] Furthermore, termination of the Receivership would not cure Uncle Nearest's underlying defaults. FCMA would be entitled to exercise its rights and remedies, including foreclosure. Any suggestion by Movants that termination would simply return control to the pre-receivership management team is misplaced; termination would remove the Court's oversight without altering Uncle Nearest's default status. In short, ending the receivership would not restore business as usual—it would force FCMA to proceed with foreclosure and other remedies. Uncle Nearest remains insolvent and unable to pay its debt, the investigations into fraud and commingling are ongoing, and the Weavers' own admissions confirm substantial governance failures while in control. Accordingly, the Receivership should continue.

      **A.**    <u>**Continuation of the Receivership is warranted**</u>.

4.      In considering whether to appoint a receiver, this Court looked to the factors laid out in *Pension Benefit Guaranty Corp. v. Evans Tempcon, Inc.* 630 F. App'x 410, 414 (6th Cir. 2015).[7] Overall, each factor strongly weighs in favor of continuation of this Receivership.

      a.    <u>Uncle Nearest is insolvent</u>.

5.      Insolvency is generally measured by two tests, the balance-sheet test and the equity-insolvency test. Under the balance-sheet test, an entity is insolvent if the sum of the entity's debts

---

[6] Dkt. No. 132 at ¶ 51.
[7] Dkt. No. 32 at 4.

is greater than all of the entity's assets at a fair valuation.[8]  Under the equity-insolvency test, an entity is insolvent if it is unable to meet its obligations as they come due in the ordinary course of business.[9]  Under either test, Uncle Nearest is insolvent.

6.      The Movants offer no evidence that the Receivership Assets at fair value exceed Uncle Nearest's liabilities.  To the contrary, Uncle Nearest has substantial obligations to multiple creditors, including, but not limited to, over $100 million to FCMA.  The Receiver states that "[t]he Company remains insolvent on a month-to-month basis but for the financial support of [FCMA]."[10]  He also reported losses, exclusive of fees for professional services, of $1,071,312 between October 1, 2025 and December 31, 2025.[11]  Furthermore, the Receiver has also stated that Uncle Nearest's "unsecured debt eclipsed $50,000,000" and the 2024 revenues were only $41,000,000.[12]  Even without considering FCMA's debt, which is substantial, Uncle Nearest is insolvent. Further, Uncle Nearest's prior counsel admitted that its solvency is questionable and the business was experiencing cash flow issues.[13]  Taken together, this is irrefutable evidence of balance-sheet insolvency.[14]

7.      Uncle Nearest's insolvency under the equity-insolvency test is likewise clear.

---

[8] *See, e.g., Hamilton Cty. Emergency Communs. Dist. v. Orbacom Communs. Integrator Corp.*, No. 1:04-CV-7, 2006 U.S. Dist. LEXIS 1070, at *19 (E.D. Tenn. Jan. 4, 2006).  *See also Webb Mtn, LLC v. Exec. Realty P'ship, L.P. (In re Webb Mtn LLC)*, 414 B.R. 308, 355 (Bankr. E.D. Tenn. 2009) ("Insolvency is basically a balance sheet test: that is, a debtor is insolvent when the debtor's liabilities exceed the debtor's assets[.]" (cleaned up)).
[9] *Jones v. Buddy Gregg Motor Homes LLC*, No. 3:08-CV-245, 2010 WL 289098, at *2 (E.D. Tenn. Jan. 19, 2010) (*citing Seals v. Roebuck & Co., Inc.,* 688 F. Supp. 1252, 1258 (E.D. Tenn. 1988)).
[10] Dkt. No. 132 at ¶ 3.
[11] *Id.*
[12] *Id.* at ¶¶ 3-4.
[13] Dkt. No. 30 at 93-94.  Specifically, when asked by the Court whether the Uncle Nearest entities are solvent, counsel to Uncle Nearest stated "Your Honor, I believe there is a solvency question as we sit here today."  *Id.* at 93:19-23.  Furthermore, when asked whether the company is turning a profit, counsel to Uncle Nearest stated that "It has not -- I don't believe it – I believe it has turned a profit, but it is -- we're in a cash flow issue. We're in a cash flow issue."  *Id.* at 93:22-94:2.
[14] The Movants' assertion that FCMA is well-secured by the enterprise value of Uncle Nearest, even if true, provides little comfort in light of the prior statement that "the Board never had the intention of selling the company." Dkt. No. 86 at ¶ 14.  A sale of the company may well be the only way for FCMA to maximize the value of its Collateral, and since the Board is unwilling to do that, any alleged solvency is illusory insofar as FCMA is concerned unless the Receiver is permitted to continue his efforts.

Uncle Nearest remains unable to service the three Loans to FCMA and continues to rely on funding from FCMA. The fact that Uncle Nearest was in default of its obligations under the Loan Documents (including failure to make payments) before the Receivership is undisputed. In fact, before the Receivership, Uncle Nearest sold a portion of its future receivables to obtain more funding and continue operations.[15] This took place without FCMA's knowledge or approval.

8. Even post appointment of the Receiver, FCMA has had to fund payments to pay vendors' and other *pre-receivership* expenses. FCMA extended an *additional* $3.8 million in funding to the Receivership Entities, upon the Receiver's request, in order for the Receiver to avoid shutting down operations and make payroll. Indeed, based on reporting provided by the Receiver to date, FCMA anticipates that further funding will be required imminently. Even with the Receiver's operational improvements and stability, the Receiver has further stated that "[t]he Company is unable to simply 'operate' its way out of its current financial condition."[16]

9. The Movants rely on twisted interpretations of forward-looking opinions made months ago without the benefit of detailed information about Uncle Nearest's operations and finances to prove Uncle Nearest is solvent instead of any factual showing of present solvency.[17] As this Court recognized, solvency and adequate security are "the most important factors in evaluating whether to appoint a receiver."[18] Uncle Nearest's insolvency alone strongly weighs in favor of the Receivership's continuation.

10. The Movants claim that the Receiver's initial 13-week budget reflected that no

---

[15] *See* Dkt. No. 30 at 74:22-75:2.
[16] Dkt. No. 132 at ¶ 14.
[17] Specifically, the Movants point to Brian Klatt's testimony at the Receivership Hearing stating that FCMA felt "confident" the value of Uncle Nearest exceeds what is owed. Dkt. No. 91 at ¶ 23. Movants also cite to the Receiver's First Quarterly Report, in which he states that "[the Receiver is] very encouraged about the long-term viability of the Company"; and "the Company has significant value and can be reorganized, as a going concern, on a relatively quick timeline." *Id.* At no point did the Receiver affirmatively represent to this Court or FCMA that Uncle Nearest's assets or value exceed the liabilities to FCMA. FCMA hopes that equity exists, but to date, no facts support that.
[18] Dkt. No. 32 at 5 (citations omitted).

"additional" funding (other than the $2.5 million loan from FCMA the Movants acknowledge) was needed,[19] but this budget was merely a short-term cash-forecast based on the Receiver's initial understanding of Uncle Nearest's cash needs and is not a demonstration of self-sustaining liquidity. The Movants go on to inaccurately state that "[s]ince that initial funding, no additional funding has been needed from Farm Credit as the cash balance has remained positive in the Receivers' forecast."[20] The budget, however, does not include any debt service to FCMA. As noted above, at the Receiver's request, FCMA increased the line of credit available to the Receivership Entities by $1.3 million on November 19, 2025, for a total line of credit of $3.8 million, to avoid a negative cash balance and ceasing operations.

11.     Further, the Movants' vague claim of potential "funding sources" in the event the Receivership is terminated, even if verified, does not apply to the current analysis. Third-party financing that *might* materialize later is not evidence of current solvency. Moreover, such funding would further deepen the insolvency of the Receivership Entities and likely dissipate or weaken the collateral available to repay current liabilities. As of today, under any insolvency test, Uncle Nearest is insolvent.

        b.    <u>There is inadequate security for the debts.</u>

12.     Because Uncle Nearest is insolvent and the Receiver determined Uncle Nearest inflated the barrel count by over 20,000 barrels, security for the debts to FCMA is inadequate.[21] As discussed above, the Receiver has acknowledged that the Company is insolvent on a month-to-month basis absent FCMA support, and operations generated over $1 million in losses in the fourth

---

[19] Dkt. No. 91 at ¶ 23.
[20] *Id.*
[21] *See* Dkt. No. 32 at 5-6. The Court found this factor weighed in favor of a receivership due to uncertainty regarding Uncle Nearest's solvency and inflations of Uncle Nearest's barrel inventory.

quarter of 2025 exclusive of professional fees.[22]  Those ongoing operating losses necessarily erode the realizable value of FCMA's security.  Therefore, security for FCMA's debt remains inadequate.

                  c.    <u>Legal remedies are inadequate</u>.

13.    Because FCMA is not fully secured (and certainly not irrefutably oversecured as the Movants suggest), legal remedies remain inadequate.  If a money judgment were entered in FCMA's favor, it would not fully recover.[23]  There are also no less drastic equitable remedies available.  With evidence of ongoing commingling between Uncle Nearest and the Additional Entities, relying on an injunction alone to protect FCMA's Collateral from potentially being used by the Additional Entities would be insufficient.  Without the Receiver's powers, FCMA will not be able to determine if its Collateral is being used impermissibly by the Additional Entities.

14.    Movants allege FCMA improperly filed the Receivership in the midst of "actively negotiating final terms of a $100 million refinancing."[24]  Characterizing any of these negotiations as "final" is misleading, and FCMA was and remains entitled to exercise its remedies despite any ongoing and unproductive discussions.

                  d.    <u>Absent this Receivership, FCMA's Collateral is in imminent danger of being lost, concealed, injured, diminished in value, or squandered due to potential commingling of FCMA's Collateral with the Additional Entities</u>.

15.    Early in his appointment, the Receiver identified several Additional Entities that may fall within the scope of the Court's Receivership Order due to, in part, commingling of the Additional Entities' assets with the Receivership Entities.[25]  The Receiver confirmed such

---

[22] Dkt. No. 132 at ¶ 3.
[23] *Id.* at 6.
[24] Dkt. No. 91 at ¶ 9.
[25] Dkt. No. 41.

commingling exists between Uncle Nearest and certain of the Additional Entities as early as his First Quarterly Report,[26] and ultimately confirmed that certain of the Additional Entities[27] have been "significantly commingled" with the Receivership entities.[28]

16.    After reviewing the Additional Entities' provided bank statements, the Receiver requested an additional three years of bank account statements for seven of the Additional Entities. Upon information and belief, some of the requested check copies, certain wire transfer details, and credit details for six accounts were not provided for some of the Additional Entities.[29]  The Receiver reported he is working to compile a list of "questionable transfers" requiring further explanation and documentation.[30]

17.    The lack of visibility, despite the Receiver's and his team's efforts, into the Defendants' and Additional Entities' finances to determine how FCMA's Collateral (which includes cash proceeds) is being, or has been, used is concerning.  FCMA has only been able to view limited financial information from the Defendants, which suggests that at least some of FCMA's Collateral is in imminent danger of being lost, if it has not been already.  This situation is worsened by the fact that a "substantial amount [of] financial records before 2024 were erased from the Company's computer system" under the Weavers' watch.[31]

      e.    <u>Uncle Nearest will not be able to quickly respond to new challenges</u>.

18.    Movants claim FCMA's approval of expenditures by the Receiver has caused

---

[26] In his First Quarterly Report, he stated that "[m]any of the companies that are subject to this receivership action have comingled assets and liabilities to the point in which they are best viewed as a single enterprise." Dkt. No. 46 at ¶ 33.

[27] Specifically, the Receiver stated that the entities of Humble Baron, Inc., Shelbyville Barrel House BBQ, LLC, Grant Sidney, Inc., Quill and Cask Owner, LLC, Nashwood, Inc, Shelbyville Grand, LLC, and 4 Front Street, LLC have been "significantly commingled with the receivership entities." Dkt. No. 98 at 2.

[28] *Id.*

[29] Dkt. No. 82 at 2.

[30] *Id.*

[31] Dkt. No. 46 at ¶ 32.

"severe disruption and delay," causing "needed marketing expenditures" to not be made or delayed.[32] The Movants argue FCMA's "control over cash" has limited the Receiver's ability to quickly respond to situations.[33] FCMA is unaware of any disruptions or delays caused by the budget approval process in place, which is a standard process for distressed lending facilities. FCMA approves all budgets proposed by the Receiver and his team on a timely basis. In fact, FCMA had pre-approved certain large expenditures well in advance of when payment might be demanded so that when the time came, the Receiver could disburse funds promptly when due. Further, FCMA is not involved in approving marketing expenditures and regardless, does not approve any expenditures on a line-item basis. The alternative to the Receiver running the company is returning control to the Weavers, whose management failures necessitated the receivership,[34] which will force FCMA to exercise its rights and remedies, including foreclosure. Moreover, the dissolution of the non-disturbance and stay provisions in the Receivership Order would very likely lead to additional and distracting litigation from creditors and other stakeholders.

        f.     <u>Investigations into fraudulent conduct remain ongoing</u>.

19.    The Receiver is investigating potentially fraudulent conduct that occurred prior to the Receivership. The Weavers' own Senzaki Complaint explicitly describes a company rife with fraud under the Weavers' leadership. In the Receiver's Second Quarterly Report, he states that he intends to investigate "allegations by certain shareholders that they were defrauded by the Company's Chief Executive Officer, Chief Financial Officer, and/or board of directors."[35] Furthermore, "the Receiver has identified a number of very questionable transactions in 2024 and

---

[32] Dkt. No. 91 at ¶ 16.
[33] *Id.* at ¶ 31.
[34] *See infra* ¶ 26.
[35] Dkt. No. 132 at ¶ 18.

2025 involving officers and directors of the Company."[36]  These investigations should continue and should  obviously be conducted by a neutral officer of the court and not by insiders.[37]

> g.    A substantial likelihood exists that the continuation of a receivership would do more good than harm, as evidenced by the Receiver's performance thus far.

20.    The Receivership is producing concrete benefits that materially outweigh any purported downsides.  As this Court recognized, the Receiver has made "commendable strides in setting these companies on a better course."[38]   In the first five weeks alone, the Receiver accomplished a multitude of important steps including reconciling the inaccurate and incomplete capitalization table; commencing updates to inaccurate and incomplete financial statements; commencing an investigation into financial improprieties committed by a former employee; commencing an investigation of whether any current employee or member of the management team has misappropriated funds; meeting with potential investors to determine opportunities for future investment in Uncle Nearest; commencing the process of returning Defendant Companies to good standing; making significant cuts to Uncle Nearest's operational expenditures; partially restoring shipments from Tennessee Distilling Group; negotiating an amendment to the Credit Agreement,[39] and evaluating certain non-income producing properties Uncle Nearest owns.[40] These are the sort of stabilizing measures this Receivership is intended to accomplish.

---

[36] *Id.*

[37] It is worth noting that, despite discovering the barrel discrepancy created by Michael Senzaki in January 2024, he continued to work for, and/or be paid by the Company, until the end of 2024.  Dkt. No. 30 at 66:2-15; 66:22-67:2.  At the Receivership Hearing, Keith Weaver implied that Michael Senzaki was kept on after being relieved of his financial responsibilities.  Specifically, when asked why Michael Senzaki stopped working for the company at the end of 2024, Keith Weaver stated "[i]nitially the — a host of investors really enjoyed working with Mike. However, we had some pretty clear need to have strong financial leadership. So effectively, like, Felicia Gallagher, our SVP of financial planning, took over the duties at the beginning of — well, really the tail end of 2023, going into 2024." *Id.* at 66:2-10.

[38] Dkt. No. 90 at 6.

[39] The Receiver erroneously described this as a forbearance agreement in his First Quarterly Report.  To clarify, FCMA has entered into two amendments to the Credit Agreement with the Receiver, and not an additional forbearance agreement.

[40] Dkt. No. 46 at ¶¶ 11, 17-21, 23-27.

21. Even with these commendable strides, the Court recently acknowledged that the Receiver's First Quarterly Report reflected that "challenges remain" for Uncle Nearest.[41] In the same five weeks the Receiver made significant progress towards stabilization, he also identified multiple challenges to the Receivership: tight cash flow; absence of reliable financial controls and the overall unreliability of certain financial records; the absence of the observance of corporate formalities among related entities; and the unreliability of records relating to shareholders.[42] Furthermore, in the Receiver's Second Quarterly Report, he stated that the company has not filed federal tax returns since 2018.[43] These are not minor issues. They underscore the advantages of appointing a receiver, who, as a neutral officer of the Court, can assess the company's weaknesses and impose necessary discipline.

22. The Weaver Declaration attempts to attribute all unfavorable aspects of Uncle Nearest to the Receivership itself, while crediting all favorable developments to the Weavers. The allegations in the Weaver Declaration are largely conclusory and ignore the stark realities of how Uncle Nearest came to this point and what the Receiver accomplished. For example, Movants point to the Nielsen Data as evidence the Receivership caused a deterioration in sales volume.[44] However, even after FCMA's initial filing on July 28, 2025, the Movants' own data suggests sales continued on an upward trend.[45] This trend continued through the Receivership Hearing on August 7, 2025, the Agreed Order enjoining Defendants from making public statements regarding the Receivership on August 8, 2025, and into the initial weeks of the Receivership.[46] In fact, between the lawsuit filing and the Agreed Order, it appears that the percentage increase in sales was the

---

[41] Dkt. No. 90 at 6.
[42] *See* Dkt. No. 46 at ¶¶ 30, 32–34.
[43] Dkt. No. 132 at ¶ 10.
[44] Dkt. No. 91 at ¶ 15.
[45] Dkt. No. 91, Exh. 1.
[46] *Id.*

11

highest in the chart.[47]  Additionally, correlation is not causation. Any post-appointment decline in sales cannot be evaluated in a vacuum.  The decrease in sales is likely linked to a wide variety of factors, including the overall downturn in the spirits market[48] and Uncle Nearest's pre-receivership condition.  Indeed, the Receiver stated that revenue collections were significantly down when the Receiver assumed control of Uncle Nearest, and sales continued to be depressed due to the distressed spirit market as a whole, the reduction of worldwide demand for alcohol, the impact of tariffs on international sales, and this litigation.[49]  Uncle Nearest entered this Receivership after failing to pay FCMA and a multitude of other creditors: plain evidence of Uncle Nearest's pre-existing distress.  Clearly, the company was struggling pre-receivership.  The reality of Uncle Nearest's pre-receivership state is a significant factor in the challenges it faces now.

23.     The claim that the Receivership has undermined the value of the brand also disregards Fawn Weaver's public campaigns and commentary, which have eroded confidence in the brand.  In the weeks preceding the Court's appointment of the Receiver, Fawn Weaver repeatedly violated the Court's Order regarding publication of statements, even making light of her obligations under it, resulting in the Court's admonishment.[50]  Additionally, Fawn Weaver's "Follow the Case" page portrays the receivership as an adversarial battle between herself on the one hand, and the Receiver and FCMA on the other.[51]  The site's tone conveys the Receivership as a detriment to Fawn Weaver and Uncle Nearest.[52]  This is not accurate given the Receiver's

---

[47] *Id.*

[48] *See* John Mariani, *With Bankruptcies and Lower Demand, America's Whiskey Industry Faces Strong Headwinds in 2026*, FORBES, ww.forbes.com/sites/johnmariani/2026/01/01/with-bankruptcies-and-lower-demand-americas-whiskey-industry-faces-strong-headwinds-in-2026/ (Jan. 1, 2026); *see also* Daniel Kline, *Troubled whiskey brand falls into Chapter 7-like liquidation*, THESTREET, https://www.thestreet.com/retail/250m-distillery-collapses-into-bankruptcy-like-receivership (Jan, 7, 2026).

[49] Dkt. No. 132 at ¶ 48.

[50] Dkt. No. 38 at 2, n.1.

[51] *Follow the Case*, FAWN WEAVER, https://fawnweaver.com/follow-the-case/.

[52] Indeed, the page goes so far as to portray the Receivership as a biblical Job-like trial visited upon her personally, creating a polarizing narrative that invites confusion among consumers, vendors, investors, and shareholders. *Id.*

progress, and at a juncture where stability is paramount to maintain stakeholder confidence in the brand, these public comments threaten to unravel the Receiver's progress in stabilizing the business.

24. The claim that the Receiver has caused the value of the enterprise to deteriorate through his conservation of cash ignores the logical realities of confirming massive barrel misstatements. Where Uncle Nearest was over-valued pre-receivership due to the barrel count inflation, the Receiver's work to reconcile the barrel inventory to its true un-inflated value will necessarily lower the valuation. This is a correction of prior inflation, not of the Receiver damaging the company's intrinsic value.[53]

25. To the extent Movants point to Uncle Nearest's ability to pay its operating expenses as they come due as an indicator that the Receivership is no longer necessary, they omit the operative cause of that liquidity: the Receiver's meticulously crafted budget and entering into amendments to the Credit Agreement, under which FCMA provided an additional $3.8 million in desperately needed funding. As stated by the Receiver, who has an intimate understanding of Uncle Nearest's financials, "[t]his receivership is currently dependent upon the financial support of the Receivership Entities' largest secured creditor."[54] Furthermore, the Receiver has stated that the "Company is only able to maintain operations" due to FCMA's cash infusions, reductions in operational expenses, and professional fees coming in below budget.[55] Finally, Uncle Nearest still has not serviced its debt to FCMA and interest continues to accrue. This fact remains unchanged since the Receivership Hearing.

---

[53] Indeed, the Senzaki Complaint recognizes this phenomenon, stating Michael Senzaki and his Co-Conspirators "distorted the company's true bottom-line condition, and concealed risks that directly threatened Plaintiff's equity and value within Uncle Nearest – thereby inducing purported lender confidence that could not have existed absent the fraud." Senzaki Complaint at ¶ 26.
[54] Dkt. No. 83 at 2.
[55] Dkt. No. 132 at ¶ 47.

26.     Movants' assertions[56] that the pre-receivership management team is in fact in the best position to oversee the management of Uncle Nearest and continue the Receiver's investigations is contrary to the record. Implied by Defendants' own admissions in the Senzaki Complaint, proper oversight controls were materially deficient at a time when the company's financial condition demanded the highest level of rigor.[57] The Senzaki Complaint asserts that, at this critical juncture the pre-receivership management team delegated comprehensive authority over the company's financial systems to a single individual, allowing him "exclusive access."[58] The consequences of those failures are undisputed. The suggestion that the same management team that oversaw these deficiencies, among others, should now be entrusted to unwind them, or continue investigations into misconduct that occurred on their watch, is concerning. The extent of the alleged rampant fraud alone under the Weavers' control is justification for the Receivership continuing.

B.      **Termination of the Receivership is premature**.

27.     Termination is premature given Uncle Nearest's continued insolvency and the Receiver's ongoing investigations. The Receivership Order permits only FCMA or the Defendants to file a motion to terminate the receivership "upon the occurrence of any material change in circumstances that eliminates the need for a receivership."[59] Even ignoring that the Receivership Order does not permit the Movants to file a termination motion, the Movants failed to establish any such material change warranting termination. As discussed above, the core conditions that warranted appointment persist: Uncle Nearest remains insolvent, it continues to carry substantial

---

[56] *See* Dkt. No. 91 at ¶¶ 3, 5, 19, and 39.
[57] The Weavers and Grant Sidney recognized that "exceptional financial discipline" was required to oversee finances at the point when "Uncle Nearest had no operating revenue and existed solely on initial investor capital." Senzaki Complaint at ¶ 16.
[58] *Id.* at ¶ 18. In fact, the Senzaki Complaint reveals that Mr. Senzaki was expressly authorized to sign on behalf of the Weavers. *See* Senzaki Complaint at ¶¶ 51, 58, and 65.
[59] *Id.* at ¶ 25.

obligations to multiple creditors, and Uncle Nearest cannot service its loans. Those facts defeat any claim of a material change and confirm that termination now would be premature.

28. The Movants contend the Receivership's purpose is fulfilled because FCMA is oversecured.[60] This contention is conclusory and has not been proven.[61] However, even assuming FCMA is oversecured, that would not obviate the continuing need for a receiver, whose purpose is to safeguard and administer assets—functions that do not turn on the company's collateral value.[62] The Receiver is still administering the assets and, thus, the receivership should continue. The Movants argue that "the Receiver has confirmed in his First Quarterly Report that all barrels have been reconciled", and, accordingly, Uncle Nearest is solvent and FCMA is secured.[63] This misconstrues the Receiver's First Quarterly Report and the meaning of the word "reconcile." The Receiver simply stated that the Receiver "was also able to reconcile the Company's barrel count";[64] he did not state that his reconciliation showed the 20,000 missing barrels were properly included in the inventory count. The Receiver's statement that he essentially solved the mystery of where the discrepancy in the barrel count came from does not lead to the conclusion that there was no misstatement of barrel inventory. In his Second Quarterly Report, the Receiver clarified that his reconciliation showed that the barrels were indeed overinflated by more than 20,000 barrels.[65] The Receiver stated his reconciliation showed that Uncle Nearest carried these barrels as inventory despite the fact that Uncle Nearest sold them to third parties and he emphasized that the inventory

---

[60] Dkt. No. 91 at ¶ 19. *See also id.* at ¶ 26.

[61] *See supra* ¶¶ 6-7.

[62] *See, e.g., Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) ("The receiver's role, and the district court's purpose in the appointment, is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary."). *See also Ev Transp. Servs. v. Mich. Income & Principal-Protected Growth Fund, LP*, No. 22-cv-10950, 2023 U.S. Dist. LEXIS 25720, at *16 (E.D. Mich. Feb. 15, 2023) (citations omitted) ("The purpose of appointing a receiver is to preserve property and to dispose of it under the order of the court.").

[63] *See* Dkt. No. 91 at ¶ 26.

[64] Dkt. No. 46 at ¶ 12.

[65] Dkt. No. 132 at ¶ 4.

15

counts were completely unreliable.[66]  However, even if that discrepancy were resolved, it was only

one of a multitude of issues supporting appointment.  Nothing in the Receiver's reports suggest

that there were not inventory discrepancies.  Conclusory allegations that "'[t]he Receiver plays no

constructive role' simply do not state a legal basis for terminating the Receivership."[67]

29.     The Receiver's investigations into potential fraud and the extent of commingling

of receivership assets remain ongoing, which further necessitates the continuation of the

receivership.  In *Stooksbury v. Ross*,[68] the Court denied a motion to terminate the receivership as

not appropriate because the "purpose and role of the Receiver has not yet been fulfilled," citing

the receiver's ongoing investigation into fraudulent conveyances, a prior sale of a receivership

asset, and insider conduct aimed at thwarting plaintiff's collection.[69]  Similarly, the Receiver

continues to investigate potential fraudulent conduct and trace the extent of commingling.

Consistent with *Stooksbury,* termination now would be premature; there, the court terminated the

receivership only after the receiver completed its administration of virtually all assets, completed

the sale of a majority of the assets, and resolved disputes.[70]

C.     __To the extent the Reconsideration Motion raises issues already decided by the Court in prior orders, the Reconsideration Motion should be denied__.

30.     To the extent the Weavers filed the Reconsideration Motion in their capacity as the

board of directors or individual directors of Uncle Nearest, the Reconsideration Motion should be

stricken.  Movants' Reconsideration Motion requests that "Grant Sidney, Inc., Fawn Weaver and

Keith Weaver, *as majority Directors of Uncle Nearest, Inc.*" terminate the Receivership.[71]  This

---

[66] *Id.* at ¶ 4.
[67] *Stooksbury v. Ross*, 2013 WL 12043465 at *4 (E.D. Tenn. Mar. 4, 2013).
[68] 2013 WL 12043465 (E.D. Tenn. Mar. 4, 2013).
[69] *Id.* at *4.
[70] *Stooksbury v. Ross*, 2016 WL 158533 (E.D. Tenn. Jan. 13, 2016).
[71] Dkt. No. 91 at 25. (Emphasis added).

Court previously struck the Directors' Response as improperly filed.[72]  Specifically, this Court stated that "to the extent the Weavers have legal standing to participate in this litigation separately as 'the majority directors of Defendant Uncle Nearest, Inc.,' the directors of Defendant Uncle Nearest, Inc., whether individually or collectively as the board of directors, are not parties to this litigation."[73]  Accordingly, the "directors" of Uncle Nearest are not parties to this litigation and may not participate separately unless and until they become parties.

D.  **Movants have failed to meet their burden in raising the defense of unclean hands**.

31.  Courts in the Sixth Circuit deny injunctive relief under the unclean hands doctrine where the party seeking relief "is guilty of conduct involving fraud, deceit, unconscionability, or bad faith related to the matter at issue to the detriment of the other party."[74]  Furthermore, "[t]here must be a nexus between the alleged misconduct and the conduct that is at issue in the case."[75]  In other words, the doctrine requires that the "the alleged misconduct on the part of the plaintiff relate directly to the transaction about which the plaintiff has made a complaint."[76]

32.  Movants have not shown any fraud, deceit, unconscionability, or bad faith by FCMA that establishes the required nexus to the MV Property dispute. Bare accusations that FCMA's claim is false (which FCMA disputes) does not rise to the standard required, which must be proven by clear, unequivocal, and convincing evidence.[77]  At most, Movants criticize FCMA

---

[72] Dkt. No. 89.

[73] *Id.* at 5.

[74] *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995) (*citing Novus Franchising, Inc. v. Taylor,* 795 F.Supp. 122, 126 (M.D. Pa.1992)).

[75] *Diamond Resorts U.S. Collection Dev., LLC v. Wesley Fin. Grp., LLC*, No. 3:20-CV-251-DCLC-DCP, 2021 WL 3277260, at *6 (E.D. Tenn. July 14, 2021), *report and recommendation adopted*, No. 320CV00251DCLCDCP, 2021 WL 3278034 (E.D. Tenn. July 30, 2021) (*citing Coca-Cola Co. v. O-company N.V.*, No. 3-08-0745, 2009 WL 10728548, at *3 (M.D. Tenn. May 11, 2009)).

[76] *Performance Unlimited, Inc.*, 52 F.3d at 1383 (citation omitted).

[77] *See, e.g., Kearney & Trecker Corp. v. Cincinnati Milacron Inc.,* 562 F.2d 365, 371 (6th Cir. 1977) (quoting *Schnadig Corp. v. Gaines Mfg. Co.,* 494 F.2d 383, 392 (6th Cir. 1974) ("Fraud or unclean hands are not to be lightly inferred. They must be established by 'clear, unequivocal and convincing' evidence.")).

for not requiring the MV Property as collateral for its Loans. FCMA was aware that the MV Property would be purchased using proceeds of FCMA's Loans and it did not require a mortgage in its favor on the MV Property at that time. What FCMA was *not* aware of was that the MV Property would be purchased by an entity other than any of the Borrowers and later mortgaged to an entirely different lender. FCMA relied on the terms of the Credit Agreement, which obligated the *Borrowers* to use the proceeds of the Loans to purchase the MV Property, to ensure that the MV Property was still effectively part of its Collateral pool as an asset of the Borrowers.[78] Moreover, the Court has already noted the MV Property purchase is neutral to the relief at issue.[79]

33. Movants assert that the MV Property was at all times privately owned and could not be owned by the company due to local regulatory restrictions. This contradicts Keith Weaver's testimony at the Receivership Hearing that although the owner of the MV Property was Keith, he was such owner through a single-member LLC.[80] Furthermore, the Receiver noted that the MV Property "was purchased using the Company's funds and that all expenses have been paid by the Company."[81] Additionally, if there were regulatory constraints on the Borrowers' ability to do what they agreed to do in the Credit Agreement, this is information that should have been shared with FCMA at the time they executed the amendment providing the funds for purchase.

**E.** **The Court should not enjoin the distribution of Uncle Nearest's information in the ordinary course of a potential sale or refinancing process.**

34. A non-disclosure agreement ("NDA") is standard practice for exploring and

---

[78] Section 6.11 of the Credit Agreement provides that the Borrowers shall, or shall cause Subsidiaries to, use the proceeds advanced for the MV Property "to purchase the fee-owned real property interest as discussed with the Administrative Agent." Dkt. No. 1, Exh. 5. Section 6.12(a) requires that "Domestic Subsidiaries" (as defined in the Credit Agreement) join the Subsidiary Guaranty and become party to the Loan Documents. Dkt. No. 1, Exh. 1. Further, Section 7.1 prohibits the Borrowers and any Subsidiaries to incur liens, other than specifically enumerated exceptions. *See id.*

[79] The Court expressly stated the nature of the MV Property purchase "does not weigh either in favor or against the appointment of receiver given the outstanding factual disputes surrounding it." Dkt. No. 32 at 9, n.6.

[80] Dkt. No. 30 at 64:24.

[81] Dkt. No. 132 at ¶ 16, n. 4.

negotiating corporate transactions and is inherently designed to protect an entity's confidential information. Far from ignoring the "realities of the ultra-competitive environment in which Uncle Nearest operates,"[82] the Receiver has taken all steps necessary to ensure Uncle Nearest's information remains confidential. The Receiver has asked each party to sign an NDA prior to receiving even preliminary information about the Receivership Entities, and has instructed his investment bankers to keep the name of interested parties confidential.[83]

35. The Defendants' multiple filings are a transparent effort to halt the sale or refinancing process and have potentially reduced recovery under either process.[84] Throughout the course of this Receivership, Defendants have filed multiple filings under a different pretense, but with the hidden agenda of stopping the sale process.[85] The Receiver was clear that litigation at this time negatively impacts his reorganization efforts.[86] Defendants' filing of the Senzaki Complaint is their latest move with severe ramifications for the sale or refinancing process. After conversations with creditors, vendors, employees, shareholders, Receivership consultants, and potential investors, the Receiver has assessed that the Weavers' recent pleadings filed in this Court, as well as their filing of the Senzaki Complaint, "has further damaged the value of the brand."[87] The Receiver has stated that any high-profile litigation prior to the sale of the Receivership Assets or Uncle Nearest's refinancing of its debt would negatively impact Uncle Nearest's ability to effectively reorganize and continue operations.[88] Enjoining the Receiver's sale or refinancing

---

[82] Dkt. No. 91 at ¶ 45.
[83] Dkt No. 83 at 6.
[84] Despite the individual Movants' fiduciary duties to the Company, its creditors, and its investors, all of these actions appear to be motivated by Movants' self-interest.
[85] *See, e.g.,* Dkt. No. 80 at ¶¶ 8-9. Defendants raised concerns regarding selling Uncle Nearest and also introduced the idea that competitors in the spirit industry are seeking access to Uncle Nearest's data room for nefarious motives.
[86] *See* Dkt No. 83 at 2, stating opposition to the Emergency Motion because litigation "would be extremely disruptive and damaging to the ongoing business of the Receivership Entities," and we are at a "critical juncture in this case and the future of this business."
[87] Dkt. No. 132 at ¶ 48.
[88] *Id.* at ¶ 18.

process now would detrimentally affect the traction the Receiver has gained.

36.     In the same vein, the Senzaki action not only undermines market confidence but also impermissibly attempts to appropriate Receivership Assets, directly conflicting with the Receivership Order and the Receiver's exclusive mandate, and hindering ongoing sale and refinancing efforts.  The Senzaki Complaint alleges multiple causes of action including breach of loyalty, breach of fiduciary duty, fraud, and conversion.  These causes of action are corporate and derivative, not individual, claims[89] and belong to the Receivership Estate, as the Receiver stated.[90] The Court vested exclusive corporate authority in the Receiver and enjoined Uncle Nearest, the Subject Entities, their officers and directors, and any persons acting on their behalf or in concert with them from, among other things, impairing Receivership Assets, modifying contracts related to those assets, or interfering with the Receiver's administration.[91]  Accordingly, any corporate claims may be asserted only by the Receiver.  Filings by the Weavers purporting to advance corporate claims or otherwise interfere with the Receiver's processes violate the Order on its face.

## CONCLUSION

For the foregoing reasons, the Reconsideration Motion should be denied.  Movants have not shown any material change in circumstances that would eliminate the need for court supervision, and the record increasingly demonstrates the opposite: Uncle Nearest remains insolvent under both balance-sheet and equity-insolvency tests; FCMA's Collateral is inadequately

---

[89] *See, e.g, Keller v. Est. of McRedmond*, 495 S.W.3d 852, 869 (Tenn. 2016) ("[A] claim based on directors' or officers' breach of fiduciary duty to the corporation through mismanagement of the corporation, waste of corporate assets, or self-dealing is usually considered derivative in nature").

[90] Specifically, the Receiver has stated these causes of action "seem to be derivative of those belonging to the receivership entities." Dkt. No. 98 at 3.  The Receiver also stated that if those causes of action "have value for Grant Sidney, Inc., separate and apart from any value that might exist for Uncle Nearest, Inc., then that value should be realized by this receivership estate as a result of the commingling of Uncle Nearest, Inc. and Grant Sidney, Inc." *Id.*

[91] The Receivership Order provides that the Receiver is "exclusively vested" with all powers of officers, directors, members, and managers of Uncle Nearest and the Subject Entities and authorizes him to prosecute, settle, and enforce any claims or causes of action by Uncle Nearest or any Subject Entity, as well as to defend, compromise, or dispose of actions concerning Uncle Nearest, the Subject Entities, or any Receivership Asset. Dkt. No. 39 at ¶ 9.

protected amid continuing commingling concerns and incomplete financial records; legal and equitable remedies short of a receivership are insufficient; and the Receiver's investigations into suspected misconduct and restructuring alternatives are ongoing. The Receiver has delivered measurable, court-recognized progress while stabilizing operations and preserving value in the face of significant headwinds. Termination now would jeopardize that progress, risk further dissipation of collateral, and undermine an orderly path to a value-maximizing resolution. The Court should deny the Reconsideration Motion and permit the Receiver to continue administering the estate, including exploring refinancing or a going-concern sale under appropriate confidentiality protections.

## <u>PRAYER</u>

**WHEREFORE**, for the reasons set forth above, FCMA respectfully requests that this Court enter an Order denying the Reconsideration Motion. FCMA also requests that the Court order such other and further relief as this Court deems just and proper.

Respectfully submitted,

*/s/ Erika R. Barnes*
Erika R. Barnes (TN Bar No. 028628)
STITES & HARBISON PLLC
401 Commerce St., Suite 800
Nashville, TN 37219
Telephone: (615) 782-2252

Email: ebarnes@stites.com

- and-

Demetra Liggins (admitted *pro hac vice*)
Dairanetta S. Spain (TN Bar No. 039981)
McGUIREWOODS LLP
Texas Tower
845 Texas Ave., Suite 2400
Houston, TX 77002
Telephone: (713) 353-6661
Email: dliggins@mcguirewoods.com

dspain@mcguirewoods.com

M. Alexandra Shipley (admitted *pro hac vice*)
McGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601
Telephone: (312) 849-8253
Email: ashipley@mcguirewoods.com

*Attorneys for Farm Credit Mid-America, PCA*

Dated: February 3, 2026

## CERTIFICATE OF SERVICE

I certify that on February 3, 2026, a true and correct copy of the foregoing was served on all parties entitled to service via this Court's ECF/CMF system, via U.S. Mail and electronic mail (where available) upon the following:

Michael E. Collins
S. Marc Buchman
Manier & Herod, P.C.
1201 Demonbreun Street, Suite 900
Nashville, TN 37203
mcollins@manierherod.com
mbuchman@manierherod.com

Uncle Nearest, Inc.
600 N. Main St.
Shelbyville, TN 38106

Nearest Green Distillery, Inc.
600 N. Main St.
Shelbyville, TN 38106

Uncle Nearest Real Estate Holdings, LLC
3125 Highway 231 N.
Shelbyville, TN 37160

Phillip G. Young, Jr.
Justin T. Campbell
Thompson Burton PLLC
1801 West End Avenue, Suite 1550
Nashville, TN 37203
phillip@thompsonburton.com
Justin@thompsonburton.com

Lucas A. Davidson, Esq.
Oren Bitan
Tennessee Distilling Group, LLC
1 Music Circle South, Suite 300
Nashville, TN 37203
ldavidson@buchalter.com
obitan@buchalter.com

*/s/ Erika R. Barnes*
Erika R. Barnes