IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | | |
|---|---|---|
| **FARM CREDIT MID-AMERICA, PCA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**UNCLE NEAREST, INC., NEAREST GREEN DISTILLERY, INC., UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, FAWN WEAVER and KEITH WEAVER,**<br><br>**Defendants.** | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **Case No. 4:25-cv-38**<br><br>**Judge Atchley**<br><br>**Magistrate Judge Steger** |

## DECLARATION OF KEVIN LARIN IN SUPPORT OF RESPONSE OF FARM CREDIT MID-AMERICA, PCA TO MOTION TO RECONSIDER THE MEMORANDUM OPINION AND ORDER AND ORDER APPOINTING RECEIVER AND TO STAY ACCESS TO PROPRIETARY INFORMATION

I, Kevin Larin, pursuant to 28 U.S.C. § 1746, do hereby swear and affirm under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

1. I am over 18 years of age and competent to testify in this matter. Based on my knowledge, skill, experience, training, and education, I would, if called to testify about the matters set forth herein, be able to do so.

### A. Qualifications

2. I have over 18 years of experience working in roles of increasing responsibility at leading turnaround and restructuring firms. Currently, I am a Managing Director with the Restructuring and Turnaround practice of Riveron RTS, LLC ("Riveron").[1] Prior to that, I was a

[1] Each capitalized term used but not defined herein shall have the meaning ascribed in the *Order Appointing Receiver* [Dkt. No. 39] (the "Receivership Order"), the *Emergency Motion for the Immediate Appointment of Receiver* [Dkt. No. 3] (the "Receivership Motion"), or the *Response of Farm Credit Mid-America, PCA to Motion to Reconsider the Memorandum Opinion and Order and Order Appointing Receiver and to Stay Access to Proprietary Information in*

Senior Director with the North American Corporate Restructuring Group of Alvarez & Marsal. In addition, I also spent several years as a consultant with AlixPartners.[2]

3. In these roles, I have navigated troubled companies through their respective in-court and out-of-court resolutions. Over the years, I have undertaken significant, hands-on roles in financially distressed situations including quantifying and administering claims, stabilizing operations, developing and executing transactions, sizing appropriate capital structures, and securing and negotiating lending agreements.

4. In the early part of my career, I specialized in business valuation and litigation support, providing valuation opinions and forensic investigations for approximately 100 closely held businesses. I am experienced in disputes and investigations, rebuilding financial statements in data deficient environments, developing pricing models in anticipation of private transactions, and providing expert opinions and testimony, which appear to be at least some of the skills necessary to resolve the challenges facing Uncle Nearest and Farm Credit.

5. I am also a licensed attorney in the State of Michigan (Mich. Bar. P63557) and spent approximately two years practicing corporate, transaction, and debtor/creditor law in Detroit, but I am not appearing in this engagement in any legal capacity.

**B. Materials Considered**

6. My opinions are based on my team's pre- and post-receivership work, information and periodic updates provided by the Receiver and his professionals, and review of financial statements, cash flow reports, bank records, aging reports, and borrowing base materials provided by Farm Credit Mid-America, PCA "Farm Credit"), Uncle Nearest, the Receiver and/or his

---

*Support of Motion for Clarification of Receivership Order* [Dkt. No. 91] (the "FCMA Receivership Reconsideration Response").

[2] A true and accurate copy of my curriculum vitae is attached as **Exhibit 3**.

advisors. Where specifically noted, I rely upon certain exhibits and summaries referenced herein. Where applicable, I applied standard financial analysis methodologies.

**C. Familiarity with the Borrowers**

7. Riveron was engaged to serve as financial advisor for Farm Credit with respect to its loans to, and relationship with, Uncle Nearest on March 3, 2025.

8. Over the course of approximately five months prior to the receivership, I, along with the Riveron team assigned to the Uncle Nearest engagement, committed nearly 2,000 man-hours of time developing a deep familiarity with the company, its leadership, its personnel, and its operations.

9. That time consisted of extensive review of Uncle Nearest's available financial information, operational reports, as well as on-site and remote interaction with Uncle Nearest leadership before the receivership. Over that time, I developed an understanding of the complex structure and operational practices at Uncle Nearest.

10. Uncle Nearest, Inc. ("Uncle Nearest, Inc."), Nearest Green Distillery, Inc. (the "Distillery"), Uncle Nearest Real Estate Holdings, LLC ("RE Holdings"), collectively, the ("Company") and Fawn and Keith Weaver (in their official and individual capacities) (collectively the "Weavers" and together with the Company the "Defendants" or "Uncle Nearest") are obligated to Farm Credit under the credit agreement (the "Credit Agreement") and other agreements, documents, and instruments executed and delivered in connection with, related to or referenced in the Credit Agreement (collectively and together with the Credit Agreement, the "Loan Documents").

11. Since the appointment of the Receiver, the Riveron team has committed an additional approximately 500 man-hours in this matter. Those hours consisted primarily of reviewing information and periodic updates as provided by the Receiver and his professional team,

interpreting that information, and presenting their findings to Farm Credit's counsel and Farm Credit.

12. As a Managing Director who oversees the Riveron team, I have developed a firm understanding of Uncle Nearest's vendor base, inventory composition, and location, flow of funds, financial reporting systems, and key personnel.

### D. Uncle Nearest's Outstanding Obligations to Farm Credit

13. As of February 2, 2026, I understand the total outstanding obligations owed to Farm Credit pursuant to the Loan Documents was approximately $121,000,000, as set forth in further detail below:

| Debt Instrument | Principal | Interest as of 1/31/2025 | Forbearance Fee | Professional Fees and Expenses [1] | Total Legal Obligations |
|---|---|---|---|---|---|
| The Revolving Loan [2] | $ 65,224,031.96 | $ 7,450,966.96 | $ - | $ - | $ 72,674,998.92 |
| The RELOC Loan [3] | 15,000,000.00 | 1,405,553.46 | 700,000.00 | 2,801,008.43 | 19,906,561.89 |
| The Term Loan [3] | 22,045,150.88 | 2,319,833.17 | - | - | 24,364,984.05 |
| The Receivership Line of Credit Loan [3] | 3,800,000.00 | 104,176.30 | - | - | 3,904,176.30 |
| **Total** | **$106,069,182.84** | **$ 11,280,529.89** | **$ 700,000.00** | **$ 2,801,008.43** | **$120,850,721.16** |

[1] Billed and unpaid FCMA professional fees and expenses

[2] Maturity Date 7/22/2025

[3] Maturity Date 7/22/2027

14. Uncle Nearest has not made any payments on its debt to Farm Credit during the Receivership.

### E. Uncle Nearest is insolvent.

15. Based upon information obtained throughout the Riveron engagement in this matter, Riveron is of the opinion that Uncle Nearest was insolvent as of the time of the Receivership Hearing and continues to be insolvent to date.

16. In analyzing Uncle Nearest's actual cash flows for the 9-weeks ending June 13, 2025, the Riveron team found that the cash flow was approximately negative $1,215,000.[3] Over this time period, both unsecured and secured debt balances were increasing. Simply put, Uncle Nearest's outflows of cash were exceeding its inflows, and its debt continued to grow pre-receivership. Financials prepared by Uncle Nearest also supported the finding of insolvency pre-receivership. Uncle Nearest's own restructuring plan showed forecasts for an additional need for funding, with an approximately $32 million cash need in 2025 and a $48 million cumulative cash need projected through the first half of 2026.[4] Furthermore, a 13-week cash flow forecast that Uncle Nearest prepared and provided in May of 2025 showed a negative cumulative cash flow of $6,788,000 through the week ending August 8, 2025.[5] Finally, an accounts payable aging report by Uncle Nearest dated June 12, 2025, which showed what amounts Uncle Nearest owed its vendors, provides further support for Uncle Nearest's insolvency. Specifically, the accounts payable aging report showed that Uncle Nearest's trade creditors were collectively owed at least $11,597,565.56 at the time, approximately 90% of which was past due as of that time.[6] Uncle Nearest continues to be insolvent to date. As more fully detailed below, this opinion of insolvency does not change whether measured under the balance sheet standard or the cash flow standard of insolvency.

Balance Sheet Standard of Insolvency

[3] A true and accurate copy of the actual cash flow report for the 9-weeks ending 6/13/25 is attached as **Exhibit 4**.
[4] A true and accurate copy of the Keystone Restructuring Plan is attached as **Exhibit 5**.
[5] A true and accurate copy of Uncle Nearest's 13-week cash flow forecast provided in May 2025 is attached as **Exhibit 6**.
[6] A true and accurate copy of the accounts payable aging report dated 6/12/2025 is attached as **Exhibit 7**.

17. Generally speaking, under the balance sheet standard of insolvency, a company is considered insolvent if the sum of its liabilities exceeds the sum of its assets at fair value. Based on information known to date, Uncle Nearest is insolvent under the balance sheet standard.

18. Riveron has not received any reliable financial statements since our engagement began, so an exact picture of its liabilities is incomplete. However, based on information provided by the Receiver and his advisors, the Riveron team estimates that Uncle Nearest's current liabilities consist of *at least* $174 million,[7] comprised of:

(a) $120 million outstanding obligations to Farm Credit;

(b) $28 million in notes payable, including at least $20 million in unsecured loans to Grant Sidney, Inc. ("Grant Sidney");[8]

(c) $22 million in trade payables; and

(d) $4 million in other accrued expenses and other liabilities.

19. While Riveron is not providing a valuation opinion herein, I understand that the Receiver and his financial advisors have conducted an extensive marketing process for a sale or refinancing of Uncle Nearest which has resulted in a number of qualified indications of interest.

20. Based on a summary of those qualified indications of interest as provided by the Receiver, none of the bidding parties has expressed a willingness to pay for the Uncle Nearest assets in an amount that would satisfy the estimated $174 million of known liabilities.

21. Because the price that buyers would be willing to pay for the assets of Uncle Nearest is less than the currently known liabilities, I am of the opinion that Uncle Nearest is insolvent under the balance sheet standard of insolvency.

Cash Flow Standard of Insolvency

---

[7] A true and accurate copy of Uncle Nearest's estimated total liabilities is attached as **Exhibit 8**.
[8] Receivership Hr'g Pl.'s Ex. 9-B, Subordinated Credit Agreement Dated April 15, 2025.

22. Generally speaking, under the cash flow standard of insolvency, a company is considered insolvent if it is unwilling or unable to pay its debts as they become due. Based on information known to date, Uncle Nearest is insolvent under the cash flow standard of insolvency.

23. Prior to the appointment of the Receiver, Uncle Nearest provided Riveron with various financial reports. Among those were reports of actual operating receipts and disbursements from the period of April 12, 2025 through June 13, 2025.[9] During the pre-receivership time period, Uncle Nearest's cumulative receipts were approximately $3.9 million and cumulative operating disbursements were approximately $5.1 million.[10] Therefore, cumulative operating cash flows (i.e. operating receipts less operating disbursements) were *negative* $1.2 million, or approximately *negative* $135,000 per week.[11]

24. In addition, the Receiver and his professionals have provided Riveron with cash flow statements for the 20 weeks since the appointment of the Receiver. Those post-receivership cash flow statements demonstrate that operating cash flows continue to be negative. In particular, cumulative post-receivership cash flows from September 1, 2025 through January 18, 2026 were negative $930,000 or approximately negative $47,000 per week.[12]

25. To reflect a more accurate statement of Uncle Nearest's cash flow in both the pre- and post-receivership time period, the Riveron team excluded the Receiver's professional fees and expenses, and the inflow of cash from the Receivership Line of Credit provided by Farm Credit.

26. Therefore, during both the pre- and post-receivership time period, Uncle Nearest has been unable to generate positive cash flow from operations and therefore is unable to pay its

---

[9] Exhibit 4.
[10] *Id.*
[11] *Id.*
[12] A true and accurate copy of the post-receivership cash flows reported through January 18, 2026 is attached as **Exhibit 9**.

debts as they become due. Moreover, without the Receivership Line of Credit Loans provided by Farm Credit, Uncle Nearest would not have been able to meet its operating expenses or ensure continuity of its operations.

27. Additionally, based on the Receiver's most recent cash flow forecast, I understand that cash flow is projected to continue to be negative and Uncle Nearest will need additional funding, likely from Farm Credit, beginning as early as March 22, 2026, to continue operations.[13]

28. In my opinion, Uncle Nearest is insolvent under the cash flow standard of insolvency because it has been, currently is, and is projected to continue to be unable to meet ordinary course expenses and continue operations without Farm Credit's continued funding and financial support.

29. In addition, during the pre-receivership period, the management team of Uncle Nearest reported to Riveron a trade accounts payable balance of approximately $12 million.[14] However, the Receiver and his professionals have since discovered previously unreported or unknown payables. As such, the unpaid trade payable balance has been revised to approximately $22 million, representing an 83% increase in the previously reported balance.[15]

30. This dramatic increase in trade payables is a further example of Uncle Nearest's inability or unwillingness to pay its debts in the ordinary course and further strengthens my opinion that Uncle Nearest is insolvent under the cash flow standard of insolvency.

**F. <u>Security for the debts is inadequate.</u>**

31. Based on information provided by both Uncle Nearest and the Receiver, it is my opinion that Uncle Nearest lacks sufficient asset value to fully secure the Loans.

---

[13] A true and accurate copy of the post-receivership cash flow forecast through April 19, 2026 is attached as **Exhibit 10**.
[14] Exhibit 7.
[15] Exhibit 8.

32. In particular, under the Revolving Line of Credit, Uncle Nearest may be eligible to borrow against the value of specific collateral that has been pledged as security. The amount eligible for borrowing (the "Borrowing Base") is defined by formula in the Loan documents and set forth in summary as follows:

a. 70% of the value of Eligible Inventory (limited to barreled whiskey, finished goods consisting of bottled whiskey, and grain inventory); plus

b. 75% of the value of Eligible Accounts; less

c. Any Availability Reserves.[16]

33. The relationship between the then current balance on the Revolving Line and the eligible Borrowing Base determines whether there is sufficient security for the debts, whether Uncle Nearest would be eligible for additional borrowing, or whether Uncle Nearest is required to repay a portion of the Revolving Line based on the following rubric:

a. If the Borrowing Base is larger than the then current balance owed on the Revolving Line, there is sufficient collateral coverage and Uncle Nearest would be eligible for additional borrowing up to the Borrowing Base;

b. If, however, the Borrowing Base is less than the then current balance on the Revolving Line, then there is insufficient collateral coverage, Uncle Nearest would *not* be eligible for additional borrowing, and Uncle Nearest would need to repay any amount in excess of the Borrowing Base (an "Overadvance Position")

34. In my opinion and experience, and commonly known in the restructuring industry, a borrowing base deficiency which places a company in an Overadvance Position is a hallmark of acute liquidity distress. Generally speaking, the larger the Overadvance Position, the greater the liquidity distress. Additionally, if the borrower further lacks either the liquidity to repay the overadvance, or is unable to propose a cogent plan to timely correct the Overadvance Position, financial distress is further exacerbated.

---

[16] Receivership Hr'g Pl.'s Ex. 1, Credit Agreement Date July 22, 2022, at 4.

Uncle Nearest is, and Continues to be, in a Significant Overadvance Position

35. In the pre-receivership time period, Uncle Nearest reported a significant Overadvance Position on the Revolving Line. In particular, the most recent Borrowing Base Certificate was delivered on June 11, 2025 for the month ending March 31, 2025, showing a negative availability of $27,556,484.[17]

36. As of March 31, 2025, Uncle Nearest's Borrowing Base was approximately $37.7 million, and the amount then owed on the Revolving Line was $65.2 million.[18] The Revolving Line was in an Overadvance Position of approximately $27.6 million., or a 73% Overadvance Position. Uncle Nearest lacked sufficient liquidity to repay the Overadvance, and no credible or timely plans to address the Overadvance were presented or communicated to Farm Credit.[19]

37. Moreover, and for illustration purposes, based on the most recent financial data provided by the Receiver, if Uncle Nearest were to provide a Borrowing Base Certificate as of December 31, 2025, its Borrowing Base would be approximately $36.7 million.[20] As of December 31, 2025, the amount then owed on the Revolving Line was $65.2 million.[21] As such, the Revolving Line continues in an Overadvance Position of approximately $28.6 million, or a 78% Overadvance Position.[22]

38. With a current cash position of $1.2 million (as of January 18, 2026), and a projected operating cash loss (exclusive of Receivership fees and expenses) through April 19,

---

[17] A true and accurate copy of the most recent March 31, 2025 Borrowing Base Certificate is attached as **Exhibit 12**.
[18] *Id.*
[19] *Id.*
[20] A true and accurate copy of the analysis of the Borrowing Base as of December 31, 2025 is attached as **Exhibit 13**.
[21] *Id.*
[22] *Id.*

2026, Uncle Nearest lacks sufficient liquidity to address the Overadvance and the acute liquidity distress of Uncle Nearest continues.[23]

39. Of note, however, the Receiver and his financial advisors are continuing to conduct an extensive marketing process for a sale or refinancing of Uncle Nearest. It is my opinion that this process should continue uninterrupted as it presents the only cogent and articulate plan to address the lack of security for the debts, and the significant Overadvance Position. However, as discussed above, I do not believe Uncle Nearest's implied enterprise value would be sufficient to pay Farm Credit's Loans in full.

**G. Uncle Nearest cannot satisfy a money judgment in Farm Credit's favor.**

40. If a money judgment were entered in Farm Credit's favor today for the full amount of Uncle Nearest's obligations to it, as described above, Uncle Nearest would not have cash or assets to fully satisfy any such money judgment. A sale of Uncle Nearest and/or its assets akin to the transaction the Receiver is marketing appears to be the only mechanism for Farm Credit to recover even a meaningful percentage of its damages. Any such sale would be unlikely without the Receivership. Farm Credit's alternatives to the receivership would include exercising other rights and remedies under the Loan Documents, including foreclosure.

**H. Less drastic equitable remedies are not available.**

41. The receivership has been central to preventing further dissipation of Farm Credit's Collateral, right-sizing operations and expenditures, and providing transparency as to Uncle Nearest's financial state and operations. Based on my experience with Uncle Nearest prior to the receivership, I do not believe that anything short of a court-ordered receiver would provide the

[23] Exhibit 10.

same necessary operational and financial oversight to preserve Farm Credit's Collateral and Uncle Nearest's chance of emerging from its currently distressed situation.

## I. Absent this Receivership, Farm Credit's Collateral is in imminent danger of being lost, concealed, injured, diminished in value, or squandered.

Payment of Non-Loan Party obligations

42. On March 18, 2025, a settlement agreement was entered by and among Levy Premium Foodservice Limited Partnership ("Levy") on the one hand, and Shelbyville Barrel House BBQ LLC ("Barrel House") and Humble Baron, on the other hand (the "Levy Settlement").[24]

43. The Levy Settlement called for installment payments to be made to Levy. Neither Uncle Nearest, nor any other loan party, were a party to the settlement agreement or the underlying suit.

44. On April 16, 2025, Defendant Nearest Green paid the installment amount to Levy.[25] Nearest Green transferred the funds one day after the payment date agreed upon in the Levy Settlement.

The Unauthorized Incurrence of Debt

45. Uncle Nearest is prohibited from incurring debts under the credit agreement documents without FCMA's express written approval.[26]

46. In at least four instances, Uncle Nearest incurred debt in contravention to the Loan Documents. The prohibited borrowings resulted in at least $1.8 million of FCMA's Collateral to be diverted to other parties, including:[27]

---

[24] A copy of which will be introduced at the hearing scheduled for Monday, February 9, 2026 at 10 a.m. (the "~~Combined Hearing~~") as **Exhibit 14**.
[25] A true and accurate copy of the First Bank statement for Nearest Green Distillery, Inc. dated April 1, 2025 through April 30, 2025 will be introduced at the Combined Hearing as **Exhibit 15**.
[26] Receivership Hr'g Pl.'s Ex. 1, Credit Agreement Date July 22, 2022. Section 7.2 of the Credit Agreement states that no Borrower shall "[c]reate, incur, assume or suffer to exist any Indebtedness," except as to specified baskets.
[27] Agreements underlying certain of these transactions and a chart showing select borrowings and disbursements are attached as **Exhibits 16-19**.

(1) $111,395 to ByzFunder;

(2) $1,208,000 to Dash Funding;

(3) $388,215.79 to Diverse Capital; and

(4) $115,162.65 to Green Note.

Customary Budget-Approval Process

47. The Receiver's budgeting process mitigates risks of further dissipation of FCMA's Collateral, due to the added oversight and transparency into Uncle Nearest's financials.

48. The Receiver has instituted and remains compliant with a budgeting process required under the Loan Documents. Under that process, the Receiver presents a 13-week proposed cash flow budget to Farm Credit for review and approval and Farm Credit has 5 Business Days from the receipt of the budget to approve it. The cash flow budgets present proposed and forecasted receipts and disbursements by category, including operating and marketing expenses, up to an aggregate limit per category. Farm Credit does not approve the budget on a line-item basis; the Receiver retains discretion to allocate expenses within each category. To date, Farm Credit has timely approved each budget request. Further, for time-sensitive disbursements such as to Tennessee Distilling Group, the Receiver has requested and Farm Credit has provided advanced approvals and additional financing to ensure timely disbursement and operational stability.

49. That budgeting provides (i) a process for stabilizing operations through access to credit from Farm Credit; (ii) mitigation of risks of further commingling due to oversight; and (iii) much needed transparency into Uncle Nearest's financial condition, outlook, and strategic alternatives. In my 18 years of experience, this approach is typical for distressed lending facilities, providing transparency to the senior secured lender funding ongoing operations.

## J. The Record Reflects that Uncle Nearest engaged in fraudulent conduct.

50. By the Weavers' own admission in their complaint against the Company's former CFO (the "Senzaki Complaint"),[28] Uncle Nearest, Inc. perpetrated fraud on Farm Credit. The Senzaki Complaint states that Michael Senzaki and his Co-Conspirators "distorted the company's true bottom-line condition, and concealed risks that directly threatened Plaintiff's equity and value within Uncle Nearest – thereby inducing purported lender confidence that could not have existed absent the fraud."[29]

## K. Termination of the Receivership would do more harm than good.

51. For the reasons set forth below, and others not specifically mentioned herein, I am of the opinion that terminating the Receivership at this time would inflict concrete, immediate harm to Farm Credit and other parties.

52. Uncle Nearest's pre-receivership posture was defined by an environment of opacity and mismanagement. Uncle Nearest management could not, or would not, provide transparency into the following: its bank accounts and cash transactions; its operational metrics; a full accounting for its liabilities; and an accurate accounting for barrel collateral.

53. In the pre-receivership period, Uncle Nearest's practices regularly included failure to deliver accurate, timely financial statements, maintain adequate internal controls, and meet ordinary-course obligations to creditors.

54. As previously described, Uncle Nearest's pre-receivership accounting records were at best unreliable due in part to non-reconciled balances, unusual journal entries, incomplete

---

[28] A true and accurate copy of the Senzaki Complaint is attached as **Exhibit 20**.
[29] *Id.* at ¶ 26.

accounting for liabilities, and distorted revenue recognition practices.[30] No financials that the Riveron team was provided could be relied upon.

55. Moreover, as reported by the Receiver, Uncle Nearest had substantial tax compliance issues.[31] Uncle Nearest had not filed federal and state income tax returns since 2018. This failure created significant historical exposure. Upon information and belief, the Receiver has worked to bring business, excise, and sales taxes current.[32]

56. Were the Receivership to be terminated, Uncle Nearest would likely return to its practice of not filing financial statements, unreliable reporting that grossly overstated collateral value, a breakdown of basic corporate controls, and violations of the Loan Documents.

Improvements Made under Receivership

57. Since his appointment, the Receiver's oversight has improved financial transparency, discipline around cash usage, and collateral protection. For example, since the Receivership began, Farm Credit consistently receives the financial reporting documents the Loan Documents require.

58. Upon information and belief, the Receiver has conducted important stabilizing measures for Uncle Nearest, including making strides toward reconciling the inaccurate and incomplete capitalization table, updating inaccurate and incomplete financial statements, investigating financial improprieties committed by a former employee, investigating whether any current member of the management team has misappropriated funds, meeting with potential investors to determine opportunities for future investment, commencing the process of returning Defendant Companies to good standing, making significant cuts to Uncle Nearest's operational

---

[30] A true and accurate copy of the Receiver's Second Quarterly Report is attached as **Exhibit 11**. Second Quarterly Report at ¶ 34.
[31] *Id.* at ¶ 34.
[32] *Id.*

expenditures, partially restoring shipments from Tennessee Distilling Group, negotiating an amendment to the Credit Agreement, and evaluating certain non-income producing properties Uncle Nearest owns.[33]

59. Furthermore, Uncle Nearest's insolvency during the Receivership cannot be attributed to the Receiver. Rather, Uncle Nearest's financial condition is linked to a wide variety of factors, including an overall downturn in the spirits market. The Receiver took over at a time when the spirits industry as a whole is in a distressed state. Given Uncle Nearest's pre-receivership insolvency and governance deficiencies, the deterioration in financial performance during the receivership is not a function of the Receivership, but a function of Uncle Nearest's preexisting financial condition.

60. Without the Receivership, Farm Credit would have been compelled to accelerate its remedies earlier, resulting in low recoveries. Termination now would reverse the Receiver's progress regarding financial discipline and transparency, further impairing Farm Credit's ultimate recovery.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct to the best of my knowledge, information, and belief.

Date: February 2, 2026 *<u>/s/ Kevin Larin</u>*

Name: Kevin Larin
Title: Managing Director, Restructuring and Turnaround
Riveron RTS, LLC

---

[33] A true and accurate copy of the Receiver's First Quarterly Report is attached as **Exhibit 21**.

# Kevin L. Larin

Managing Director, Riveron
Restructuring & Turnaround Services

---

## SUMMARY STATEMENT

- Seasoned restructuring & turnaround professional drawing on over 25 years of financial, executive, operational, valuation, and legal experience.
- Skilled at guiding corporate entities, executive teams, lenders, stakeholders and their respective advisors through varying degrees of corporate change.
- Experienced in all aspects of corporate oversight including executive management, financial management, legal review, business valuation, and transaction structuring.

## RELEVANT EMPLOYMENT HISTORY

- Riveron Consulting (2025 to Present)
  - Managing Director, Restructuring & Turnaround Services
- Alvarez & Marsal (2007 to 2013, and 2016 to 2024)
  - Senior Director, North American Corporate Restructuring
- Kerr Russell & Webber (2005 to 2007)
  - Attorney at Law (*Michigan*), Debtor / Creditor and Corporate Transactional Law
- AlixPartners, LLC (2002 to 2005)
  - Associate, Turnaround & Restructuring Group
- Various financial, executive and consulting roles including:
  - *EMS USA, Inc.*, VP Special Projects (2014 to 2016)
  - *Black Elk Energy, LLC*, VP Special Projects (2013 to 2014)
  - *Ford Motor Company*, Treasury Analyst (2000 to 2001)
  - *Larin Financial, LLC*, Valuation Consultant (1999 to 2000)
  - *The Lefko Group*, Valuation Associate (1997 to 1999)

## EDUCATION

- University of Detroit Mercy, School Of Law
  - Juris Doctor (2004)
  - Michigan Bar License - P63557 (*active and in good standing since 2025*)
- University of Michigan - Dearborn
  - Master of Science in Finance (2001)
- Western Michigan University
  - Bachelor of Business Administration, Finance (1996)

## SELECT RELEVANT PROFESSIONAL EXPERIENCE

- Financial Advisor to multi-billion dollar global consumer disposable company (confidential)
  - Advised company on out of court restructuring with specific oversight with regard to global supply chain optimization, litigation portfolio management, & balance sheet restructuring
- Financial Advisor to the Trustee of the $70mm Tower Automotive Post-Confirmation Trust
  - Responsible for final claim analysis, negotiation & settlement with monthly stakeholder reporting
- Financial Advisor Imperial Sugar Company through its sale to Louis Dreyfus Commodities, LLC
  - Advised on financial and supply chain stabilization, ultimately allowing the company to transact at a >50% premium to its per share price and assumption of $125mm of debt
- Financial Advisor to Art Van Furniture (including, in part, Levin Furniture and Wolf Furniture affiliates)
  - Advised a major Midwest furniture retailer with over 140 retail locations across six states on its Chapter 11 bankruptcy and its structured liquidation / going-out-of-business sales.
- Financial Advisor to Cox Operating, LLC (a/k/a MLCJR, LLC)
  - Financial advisor and senior member of the office of the Chief Restructuring Officer for an offshore exploration and production company, guiding the company through operational stabilization and ultimate series of section 363 sales generating over $95mm in transaction proceeds.

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
3
4:25-CV-00038

**Pre-Receivership Reported Cash Flows**

| | WE 4/18 | WE 4/25 | WE 5/2 | WE 5/9 | WE 5/16 | WE 5/23 | WE 5/30 | WE 6/6 | WE 6/13 |
|---|---|---|---|---|---|---|---|---|---|
| Park Street Collections | 275,000 | 250,000 | 110,000 | 175,000 | 92,000 | 165,000 | 991,244 | 145,894 | 713,094 |
| Retail & Tours | 88,749 | 74,062 | 102,093 | 85,382 | 79,788 | 114,541 | 121,842 | 123,098 | 71,336 |
| Other Collections | 13,793 | - | 6 | 27,383 | 3,192 | 16,198 | 17,505 | 4,003 | 17,956 |
| Total Cash In | 377,542 | 324,062 | 212,099 | 287,765 | 174,980 | 295,739 | 1,130,591 | 272,995 | 802,386 |
| | | | | | | | | | |
| Payroll & Benefits | (489,667) | - | - | (575,000) | - | - | (341,096) | - | - |
| RAMP Card | - | - | - | - | - | - | - | - | - |
| NGD_Production | (4,483) | (380,863) | (9,622) | (200,000) | (204,248) | - | (17,912) | - | - |
| UN_S&M | (85,623) | (152,251) | (19,106) | - | - | (3,249) | - | (51,218) | (35,754) |
| UN_Corporate | (2,535) | (27,131) | (54,175) | (4,376) | (12,677) | (20,487) | (126,251) | (65,779) | - |
| NGD_Corporate | (1,575) | (63,572) | (32,318) | (25,000) | (1,575) | (15,173) | (28,341) | (25,000) | (23,404) |
| Finance | - | (16,678) | - | - | - | (1,678) | (987) | - | (5,800) |
| NGD_S&M | - | - | - | - | - | - | (5,193) | (2,947) | (5,726) |
| NGD_Facilities | - | (7,442) | (3,530) | - | (5,200) | (1,125) | (18,120) | (17,560) | - |
| NGD_Retail | (41,429) | - | (800) | (25,652) | - | (2,176) | (18,270) | (36,399) | (9,596) |
| Security | - | (4,883) | - | (3,870) | - | - | (1,665) | - | (5,333) |
| Cognac | - | (191) | (5,457) | (11,957) | (3,659) | (1,726) | (4,823) | (23,408) | (781) |
| Other / Uncategorized | (89,413) | (187,095) | (383,734) | (11,671) | (49,157) | (49,029) | (71,676) | (212,261) | (3,070) |
| Other Obligations | (69,950) | (69,950) | (69,950) | (69,950) | (69,950) | (82,924) | - | (139,900) | (69,950) |
| | - | - | - | - | - | - | - | - | - |
| Net Operating Cash Flows | (407,134) | (585,994) | (366,594) | (639,711) | (171,486) | 118,171 | 496,258 | (301,477) | 642,973 |
| | | | | | | | | | |
| Cumulative Net Operating Cash Flows | $ (407,134) | $ (993,128) | $(1,359,722) | $(1,999,433) | $(2,170,919) | $(2,052,748) | $(1,556,490) | $(1,857,966) | $(1,214,994) |

Average weekly cash burn of $ (134,999)

Farm Credit v Uncle Nearest, et al
**Plaintiff's Exhibit**
**4**
**4:25-CV-00038**

THE KEYSTONE GROUP

*making a **difference***





## Business Review with Farm Credit Mid-America

# Uncle Nearest

## Restructuring Plan

February 11, 2025

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
5
4:25-CV-00038

# Executive Summary

- The Uncle Nearest brand is strong with 16% L6M revenue growth (YOY) compared to a market that has declined 2%.
- Given the revenue growth, brand recognition and well-connected management & investor group, the company has received significant funding to support cash burn and grow the asset base.
- Additional debt funding has over-levered the company, creating a significant debt service burden.
- The company has had delayed financials with accuracy issues leading to challenges in understanding the company's profitability and B/S.
- Based on inaccurate reporting of the borrowing base, the company has reached a $20M+ over-advance position on the revolver and is past-due on $7M+ of principal and interest payments.
- Current cash-on-hand is ~$1M, and AP vendors have been stretched significantly, including a judgment on Berlin's AP.
- 2024 EBITDA is forecasted to be -$17M. Even a major business turnaround plan will require 12+ months and require runway to fund cash burn of $1M+ per month.
- To alleviate the short-term cash need, the company has arranged the sale of $23M of barrels – representing $6M of collateral on the FCMA borrowing base.
  - We have proposed splitting the proceeds of this sale 58%/42% to replace the collateral value and pay down past due P&I – while maintaining capital for short-term operations.
- **The restructuring plan includes three steps (and requires $50M in capital):**
  - **Phase I: Short-term liquidity support through emergency cash injection ($2-4M) and barrel sales proceeds ($9M)**
  - **Phase II: Mid-term loan from owners ($30M-$40M), FCMA debt replacement by private investors, profit improvement initiatives, and additional barrel sales ($10M-$20M)**
  - **Phase III: Equity raise from current and new investors ($20M-30M) and an institutional refi process**
- The company will begin outreach immediately to private investors to potentially take out FCMA debt (partial or whole), with an institutional refinance effort to begin TBD.

| | |
|---|---|
| 1 | **Background - Sales** |
| 2 | Background - Financial |
| 3 | Restructuring Plan |
| 4 | Liquidity Position |
| 5 | Next Steps |


Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 21 of 384
PageID #: 4264

# Sales Background

*Sales Strategy*

**Uncle Nearest is positioned for growth in 2025, with increasing focus and commitment from RNDC.**







- Uncle Nearest is RNDC's third-best selling brand of premium whiskey, behind only Four Roses and Woodford Reserve
- RNDC has made Uncle Nearest one of only two companies allowed to directly incentivize their state leaders to drive UN sales
- RNDC has granted Uncle Nearest direct access to the RNDC state leadership
- One of RNDC's primary goals for H1 2025 is increasing Uncle Nearest sales volume by 20-40%
- RNDC has streamlined its "corporate portfolio" from almost 2,000 brands to just 79 – which includes Uncle Nearest
- 1856 and Single Barrel are rolling out to all Costco locations in the Southeast; Costco expects this to drive significant volume




- RNDC's top priority in H1 2025 is getting Nearest Green into 100% of locations which already carry 1884, which represents 11,817 points of distribution
- Nearest Green has been mandated for rollout this spring into 246 of the 269 Meijer grocery stores in the Midwest
- Nearest Green will also be launching into all 277 Total Wine stores across the USA
- Nearest Green has been picked up by all Trader Joe's locations in California (205 stores), with adoption expected to continue nationwide
- Nearest Green has been picked up for all Spec's locations in Texas (200 stores). Spec's dominates the Texas market and serves as the primary on-premise supplier
- ABC Fine Wine & Spirits (127 stores) is a dominant player in the Florida market, and just picked up Nearest Green

# Sales Background

*Sales Strategy*

**Driven by a strong marketing presence, national recognition, and new product development, Uncle Nearest is forecasting 33% YoY revenue growth from FY2024 to FY2025.**

- 7th Most Visited Distillery in the US
- 230K Guests Visited the Tasting Room
- 158 Bourbon Awards
- 39 National and Global Partners
- 34B Monthly Media Impressions
- 1,821 Media Placements
- 622K Social Media Followers
- 9.2M Social Media Views
- 303K Social Media Interactions
- Love & Whiskey Sustained 7 weeks on NYT Business Best Sellers List

**Successful marketing initiatives in 2024 are driving growth across the entire business**

*Source: December 2024 Investor Presentation*

Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 23 of 384
PageID #: 4266

# Sales Background

*Commercial Trends*

## Despite recent industry headwinds, Uncle Nearest has delivered consistent and continued sales growth through nationwide distribution.

| Selected Brand Families | L6M Retail Sales - Open States ($M) | | Growth vs Year Ago |
|---|---|---|---|
| Jack Daniel's | $ | 187 | -7% |
| Jim Beam | $ | 104 | -2% |
| Buffalo Trace | $ | 76 | 13% |
| Basil Hayden | $ | 55 | -5% |
| Blanton's | $ | 51 | 9% |
| Whistlepig | $ | 28 | -18% |
| **Uncle Nearest** | **$** | **13** | **16%** |
| Willett | $ | 11 | -28% |
| Heaven Hill | $ | 9 | -13% |
| Breckenridge | $ | 5 | -28% |
| **Total Whiskey Market** | **$** | **3,225** | **-2%** |

Despite US whiskey market headwinds, **UN retail sales up 16%** in Last 6 Months vs one year ago

**Park Street - Annual Sales since Launch**




**42%**
Sales CAGR, 2019 - 2024

Park Street - 2024 UN Sales by State




**TTM Sales via Park Street - 2022 - 2024**




**2024** has represented a **sales rebound** despite slowdown in 2023

# Sales Background

*New Products - Nearest Green*

**Nearest Green launched in October of 2024 achieving $1.5M in revenue in Q4 alone. Nearest Green provides Uncle Nearest with a competitive product in the $2B+ premium segment of whiskey.**







**Super-Premium Segment**
$75+
Single Barrel & 777




**High-End Premium Segment**
$40-75
1884, 1856, & Rye




**Premium Segment**
$20-40
Nearest Green *(New)*

*Source: December 2024 Investor Presentation*

# Sales Background

*Business Valuation*

**Celebrity-owned and "storied" spirits brands have recently sold for revenue multiples ranging from 12-24x with continued investment and rebounding M&A activity in the industry.[1]**

**Enterprise Value ($M)**

| Revenue Multiple | Annual Revenue: $40M | $60M | $80M |
|---|---|---|---|
| 12x | $480 | $720 | $960 |
| 18x | $720 | $1,080 | $1,440 |
| 24x | $960 | $1,440 | $1,920 |

- Diageo purchased Casamigos Tequila for $1B in 2017 (George Clooney);
- Aviation Gin (Ryan Reynolds) sold for $610M in 2020 at 24x revenue,
- Proper No. Twelve (Conor McGregor) sold for $600M at 12x revenue in 2021
- Diageo purchased Don Papa Rum for $280M at 12.5x revenue in 2021with additional performance rewards

1 *Alcohol Disruption Sparks Increase Beverage Market M&A: Beverage Sector Update,* Capstone Partners, February 2025

| | |
|---|---|
| 1 | Background - Sales |
| **2** | **Background - Financial** |
| 3 | Restructuring Plan |
| 4 | Liquidity Position |
| 5 | Next Steps |

# Financial Background

*2024 Estimated Financials*

**In 2024, excluding barrel sales without any profit improvement initiatives beyond Q3 run-rate, implies a preliminary EBITDA loss of -$14M.***

| ($M) | Q1 *Adj.* | Q2 *Adj.* | Q3 *Adj.* | Q4 *Est.* | FY2024 *Total* | Run-Rate *w/o barrels* |
|---|---|---|---|---|---|---|
| **Sales[1]** | **$15.3** | **$11.0** | **$9.7** | **$7.6** | **$43.6** | **$40.0** |
| **COGS[2]** | **$5.1** | **$4.3** | **$4.2** | **$3.5** | **$17.1** | **$16.4** |
| **Gross Profit** | **$10.2** | **$6.6** | **$5.5** | **$4.2** | **$26.5** | **$23.6** |
| *Gross Margin %* | *66%* | *60%* | *57%* | *55%* | *61%* | *59%* |
| Payroll[5] | $3.2 | $3.5 | $3.1 | $2.7 | $12.4 | $11.7 |
| Marketing | $4.6 | $3.5 | $2.8 | $2.8 | $13.7 | $11.3 |
| Sales Support | $2.5 | $2.2 | $1.5 | $1.7 | $7.9 | $7.0 |
| Manufacturing | $0.8 | $0.4 | $0.4 | $0.4 | $2.0 | $1.6 |
| Other[4] | $2.1 | $2.0 | $1.6 | $1.6 | $7.2 | $6.2 |
| **Operating Expenses[3]** | **$13.1** | **$11.6** | **$9.3** | **$9.2** | **$43.3** | **$37.8** |
| **EBITDA** | **($2.9)** | **($5.0)** | **($3.8)** | **($5.0)** | **($16.8)** | **($14.2)** |

*[1]Sales for all quarters include actuals received from Park St (distribution) and NetSuite (retail); $23M in barrel sales excluded in financials*
*[2]Q4 spirit COGS projected from Q3 average COGS / case sold*
*[3]Q4 operating expenses assumes trends of prior 3 months, except for Park St fees which are a projection based on Q3 average operating expense / Park St case sold*
*[4]Largest items in other OpEx are insurance, dues & subscriptions, professional services, computer services, and occupancy expenses (rent, janitorial, security, etc.). Run-rate Other excludes consulting payments to vodka consultant ($45k)*
*[5]Run-Rate excludes $350k expenses for cognac businesses president*

***2024 financial statements are currently being finalized. Preliminary view assumes Q1-Q3 actuals and forecasted Q4 at actual sales / margin from Park St data and similar operating expenses as Q3.***

Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 28 of 384 PageID #: 4271

# Financial Background

*Capital Requirement*

**Assuming preliminary 2024 run-rate* and $23M of barrel sales, the company will require $50M of additional capital to support operations and debt service through Q2 2026.**

| ($M) | 2024 Total ACT/FCST | 2025 Total FCST | 2026 Q1/Q2 FCST |
|---|---|---|---|
| EBITDA | (19) | (14) | (7) |
| Profitability Improvements | | 4 | 2 |
| **Proforma EBITDA** | **(19)** | **(11)** | **(5)** |
| Barrel Sales Margin | 2 | 15 | - |
| **Cash Flow after Barrel Sales** | **(17)** | **4** | **(5)** |
| AR | | (0) | (2) |
| Inv | | 4 | (0) |
| AP | | (11) | (0) |
| **Change in Working Capital** | **8** | **(8)** | **(2)** |
| Debt Service | (10) | (15) | (7) |
| Past Due Debt Service | - | (13) | - |
| CapEx | (3) | (1) | (1) |
| **Total Fixed Charges** | **(13)** | **(29)** | **(8)** |
| Net Cash Infusions | 24 | | |
| Loan to Owners | (2) | | |
| **Net Cash Flow** | **0** | **(32)** | **(15)** |
| **Net Cash Need (cumulative)** | **-** | **(32)** | **(48)** |

**Assumptions**

**Income Statement**

- Run-rate based on 2024 with constant YOY sales and no operational improvements
- Assumes 59% average GM%
- Profitability improvements assume 15% YOY growth in 2025/2026 with 59% gross margin
- Assumes $23M of barrel sales in Feb-Apr 2023 – proceeds split based on revised proposal (58% FCMA / 42% UN)

**Balance Sheet**

- AR based on DSO of 15
- Inventory assumes no additional barrel purchases and sell finished goods on hand with minimal additional production
- AP includes $11M of paydown in 2025
- Debt service assumes catch-up payments for past due interest and principal in Q1/Q2 2025, as well as $6M revolver pay down with barrel sales
- CapEx is limited at $100K / month

**Other**

- 2024 cash based on bank transactions
- Excludes investment required for vodka and cognac launches
- Assumes refinance of FCMA debt in H1 2026

***2024 financial statements are currently being finalized. Preliminary view assumes Q1-Q3 actuals and forecasted Q4 at actual sales / margin from Park St data and similar operating expenses as Q3.***

Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 29 of 384 PageID #: 4272

| | |
|---|---|
| 1 | Background - Sales |
| 2 | Background - Financial |
| **3** | **Restructuring Plan** |
| 4 | Liquidity Position |
| 5 | Next Steps |

# Restructuring Plan

*Estimated Timeline*

**The recapitalization plan requires a multi-step approach to secure capital to continue funding business operations through a turnaround plan.**

| 2025 | | | | 2026 | |
|---|---|---|---|---|---|
| Q1 | Q2 | Q3 | Q4 | Q1 | Q2 |

Legend:
- Equity / Debt Capital Raise
- Business Processes
- Asset Sales
- Debt Replacement

| Item | Notes |
|---|---|
| Emergency Cash - $2M-$4M | Loan from Weavers |
| Close 2024 Financials | Target completion mid March |
| Barrel Sales - $23M | Based on current agreement with Q&Cask |
| Loan from Owners - $30M-$40M | Loan from Weavers |
| Investor debt replacement - $60M-$100M | Began conversations with current investors with capacity to take out FCMA debt; *Possible to take out FCMA revolver and term debt in phases?* |
| Profit Improvement Plan | Includes sales growth; In process of expense review for cost reduction plan |
| Additional barrel sales - $10M-$20M | Based on excess barrel capacity dependent on product maturity date |
| Current Investors - $5M-10M | Following finalization of 2024 financials and evidence of turnaround plan |
| New Investors - $5M-10M | Following finalization of 2024 financials and evidence of turnaround plan |
| Institutional Refinance Process- $60M-$100M | If investor debt replacement does not take out FCMA, work with investment bank for institutional debt – requires evidence of turnaround |

Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 31 of 384 PageID #: 4274

# Restructuring Plan

*Barrel Sales*

**The company arranged a sale of 21K barrels with Q&Cask, which has since been revised to 13K barrels for $23M and will drive $15M of profit for the company.**

| Barrel Year | TDG Barrels in Inventory | Barrels for Sale | TDG Barrels Remaining | Original Cost | Q&Cask Buy Price | Total Revenue ($M) | Total COGS ($M) | Total Margin ($M) |
|---|---|---|---|---|---|---|---|---|
| 2018 | 56 | 56 | - | $ 650 | $ 1,800 | $ 0.1 | $ 0.0 | $ 0.1 |
| 2019 | 2,034 | 2,034 | - | $ 650 | $ 1,800 | $ 3.7 | $ 1.3 | $ 2.3 |
| 2020 | 2,761 | 2,761 | - | $ 650 | $ 1,800 | $ 5.0 | $ 1.8 | $ 3.2 |
| 2021 | 9,028 | 8,125 | 903 | $ 671 | $ 1,800 | $ 14.6 | $ 5.5 | $ 9.2 |
| 2022 | 25,130 | - | 25,130 | $ 671 | $ 1,800 | $ - | $ - | $ - |
| 2023 | 14,054 | - | 14,054 | $ 674 | $ 1,800 | $ - | $ - | $ - |
| **Total** | **53,063** | **12,976** | **40,087** | | | **$ 23.4** | **$ 8.6** | **$ 14.7** |

- Title and product was intended to transfer to Q&Cask by the end of 2024; however, transfer has been on hold to negotiate terms with FCMA, and the barrels still appear on UN TDG barrel reports
- Buyer responsible for all shipping, handling and storage charges after transfer
- Cash to be provided by Q&Cask upon sale to third parties

# Restructuring Plan

## *Additional Barrel Sales*

**UN's on-hand supply of barrels exceeds projected demand in 2025 and 2026 so the excess barrels could be sold to generate additional runway.**

- After accounting for the proposed $23M barrel sale, Uncle Nearest holds 46,000 barrels in inventory at TDG and at the distillery
- Assuming 50% sales growth each year, Uncle Nearest would have sufficient inventory to sell off barrels maturing in 2025 and 2026
- Although the barrel supply may be tight in 2025, 2026 is projected to have a significant amount of excess barrels, which could be sold to generate runway in 2025
- Potential buyers of additional barrels would include J.B. Thome, Brindiamo Group, Q&Cask, and Iron Cask

As of: Nov-24

| Fill Year | Mature Year | Barrels On-Hand | Planned for Direct Sale | Barrels Remaining | Case Equivalents |
|---|---|---|---|---|---|
| 2017 | 2021 | 35 | | 35 | 1,558 |
| 2018 | 2022 | 317 | (57) | 260 | 11,575 |
| 2019 | 2023 | 2,573 | (2,034) | 539 | 23,996 |
| 2020 | 2024 | 7,639 | (2,761) | 4,878 | 217,169 |
| 2021 | 2025 | 9,364 | (8,125) | 1,239 | 55,160 |
| 2022 | 2026 | 25,132 | | 25,132 | 1,118,877 |
| 2023 | 2027 | 14,054 | | 14,054 | 625,684 |
| **Total** | | **59,114** | **(12,977)** | **46,137** | **2,054,019** |

| Mature Year | Case Sales | *Proj. Growth over PY* | Proj. Case Sales | Cases Available | Excess Cases | Excess Barrels | Est. Price per Barrel | Potential Sale Value |
|---|---|---|---|---|---|---|---|---|
| 2024 | 183,902 | | | | | | | |
| 2025 | | *50%* | 275,853 | 309,459 | 33,605 | 755 | $ 1,950 | $ 1,471,925 |
| 2026 | | *50%* | 413,780 | 1,118,877 | 705,097 | 15,838 | $ 1,700 | $ 26,924,175 |
| **Total** | | | | | **738,702** | **16,593** | | **$ 28,396,100** |
| Collateral Value (70% of Book Value) | | | | | | | $ 469 | $ 7,781,922 |
| **Net Proceeds to Business** | | | | | | | | **$ 20,614,179** |

*Note: barrels on-hand does not include Customer-Procured barrels stored at TDG.*
*Barrel to case conversion assumes 25% angel's share, converting one 53-gallon barrel into ~44.5 4.5-liter cases.*
*Assumes a weighted average cost of $670 per barrel, based on TDG historical costs*

Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 33 of 384
PageID #: 4276

| | |
|---|---|
| 1 | Background - Sales |
| 2 | Background - Financial |
| 3 | Restructuring Plan |
| 4 | **Liquidity Position** |
| 5 | Next Steps |

Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 34 of 384
PageID #: 4277

# Liquidity Position

*Proposal Overview*

**Here is a revised plan for the use of ~$23M barrel proceeds, based on our updated view of current cash burn and high priority AP payments necessary.**

| | FCMA Proposal | Uncle Nearest Revised Proposal |
|---|---|---|
| Split of Proceeds | ▪ $17M of proceeds wired to FCMA<br>▪ $6M remain with UN for payment of payroll, TDG, TDG – Tax & Escrow and other critical AP | ▪ Split $13.6M / $9.4M - (58% FCMA / 42% UN)<br>▪ In total once $23M is sold, FCMA receives 58% of sales proceeds, including $1.7M of previously received proceeds – will cover $7.6M of P&I through 2/1 and $6M of barrel collateral (scaling payments as more barrels are sold)<br>▪ In total, 42% of barrel sales remain with UN |
| Terms | ▪ FCMA will review barrel sales contract and take assignment within 7 days<br>▪ TKG under D&O and remains engaged as CXO<br>▪ Complete perfection certificate and grant security interest in unencumbered assets<br>▪ Provide debt restructuring plan | ▪ Same<br>▪ Retain advisor<br>▪ Same<br>▪ Same |
| Additional Debt Relief | ▪ N/A | ▪ 4/1 principal and interest is deferred to be paid upon equity event |

Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 35 of 384
PageID #: 4278

# Liquidity Position

*Proceeds Split*

**In order to provide necessary cash to the business out of the gate, the proposal applies initial proceeds to the revolver to replace the barrel collateral with remaining proceeds going to UN. Then starting the week ending 3/14, proceeds will also begin paying past due P&I. Overall, the split will be 58% FCMA / 42% UN.**




Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 36 of 384
PageID #: 4279

# Liquidity Position

*Cash Flow Overview*

**The proposed split of proceeds will provide enough cash for the company to stabilize operations and effect a broader restructuring plan, while improving FCMA's current overadvance situation.**




**Cash Flow Assumptions**

- Sales forecast based on avg sales per workday from Apr – Dec 2024
- Assumed 24% reduction of Park Street sales to collections to account for fees & chargebacks
- Disbursements include TDG, TTB and TN State tax payments, monthly Ramp card payments, Professional Fees, and IT, insurance, and lease payments
- Includes payments to secondary lenders (Dash Funding, etc.; total $1M)
- Minimal payments for CapEx ($100K monthly) and marketing ($25K weekly), with limited investment into vodka or cognac

**UN Barrel Proceeds Split Proposal**

- Includes $2.5M of cash infusion from UN owners for immediate cash needs
- Barrel Sales ($20.4M) spread evenly from week of 2/28 through end of April; UN receives 42% of proceeds in total
- FCMA is paid off based on related barrel collateral and growing P&I repayments
- Additional A/P paydown ($3.2M) for high-priority vendors is included in weeks 2/14 – 5/9
- Does not include payment of P&I of $2.7M on 4/1

# Liquidity Position

*13-Week Cashflow Base Case (pre-cash infusions)*

**The "Base Case" Model (before barrel sales or cash infusions) forecasts negative cash in Week 1 with net cash balance decreasing to $4M by Week 13. This requires significant AP stretch as well.**

| Cash Flow Week | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Act | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Forecast |
| $ 000's Week Ending: | 02/07 | 02/14 | 02/21 | 02/28 | 03/07 | 03/14 | 03/21 | 03/28 | 04/04 | 04/11 | 04/18 | 04/25 | 05/02 | 5/9/2025 | 05/09 |
| ***Total Sales*** | *570* | *649* | *519* | *649* | *649* | *649* | *649* | *649* | *649* | *649* | *649* | *649* | *649* | *649* | *8,302* |
| **Cash Receipts:** | | | | | | | | | | | | | | | |
| Park Street Collections | - | - | - | - | - | 396 | 456 | 365 | 456 | 456 | 456 | 456 | 456 | 456 | 3,953 |
| Retail & Tour Sales | 15 | 49 | 39 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 622 |
| Other Cash Infusions (Equity, Debt, Barrels) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| All Other | 24 | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Receipts** | **39** | **49** | **39** | **49** | **49** | **445** | **505** | **413** | **505** | **505** | **505** | **505** | **505** | **505** | **4,575** |
| **Cash Disbursements:** | | | | | | | | | | | | | | | |
| Payroll | 859 | 0 | - | 450 | - | 450 | - | 450 | - | 450 | - | 450 | - | 450 | 2,700 |
| Other Debt Service & Leases | 118 | 232 | 70 | 70 | 92 | 70 | 70 | 70 | 92 | 70 | 70 | 70 | 70 | 92 | 1,137 |
| Operations | 100 | 37 | 15 | 137 | 843 | 37 | 15 | 37 | 343 | 15 | 37 | 15 | 22 | 30 | 1,585 |
| Marketing | - | 27 | 46 | 127 | 77 | 27 | 46 | 127 | 77 | 46 | 27 | 127 | 25 | 25 | 805 |
| Other OpEx | 187 | 368 | 144 | 455 | 150 | 149 | 122 | 455 | 150 | 149 | 122 | 130 | 419 | 130 | 2,943 |
| Capital Expenditures | 130 | - | - | - | 700 | - | - | - | 700 | - | - | - | - | 100 | 1,500 |
| AP Paydown / (Stretch) | - | (45) | (65) | (145) | (1,493) | (45) | (65) | (145) | (993) | (65) | (45) | (145) | | | (3,251) |
| **Total Disbursements** | **1,394** | **619** | **211** | **1,094** | **369** | **688** | **189** | **994** | **369** | **666** | **211** | **647** | **536** | **827** | **7,419** |
| **Operating Net Cashflow** | **(1,356)** | **(570)** | **(172)** | **(1,045)** | **(320)** | **(243)** | **316** | **(581)** | **136** | **(161)** | **294** | **(142)** | **(31)** | **(322)** | **(2,844)** |
| **FC P&I Payment** | - | - | - | - | - | - | - | - | - | - | - | - | | | - |
| **Net Cashflow** | **(1,356)** | **(570)** | **(172)** | **(1,045)** | **(320)** | **(243)** | **316** | **(581)** | **136** | **(161)** | **294** | **(142)** | **(31)** | **(322)** | **(2,844)** |
| **Ending Cash Balance** | **(1,190)** | **(1,761)** | **(1,933)** | **(2,978)** | **(3,298)** | **(3,542)** | **(3,226)** | **(3,806)** | **(3,671)** | **(3,832)** | **(3,538)** | **(3,681)** | **(3,712)** | **(4,035)** | **(4,035)** |

Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 38 of 384
PageID #: 4281

# Liquidity Position

*13-Week Cashflow Subsequent Forecast (after barrel sales and split of proceeds)*

**Layering in immediate cash infusions of $2.5M with revised terms of a 58% / 42% split of barrel sales and deferred P&I on 4/1 allows the company to maintain positive cash through the 13-week outlook.**

| Cash Flow Week | 0 | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Act | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Fcst | Forecast | Forecast | Forecast |
| $ 000's Week Ending: | 02/07 | 02/14 | 02/21 | 02/28 | 03/07 | 03/14 | 03/21 | 03/28 | 04/04 | 04/11 | 04/18 | 04/25 | 05/02 | 5/9/2025 | 05/09 |
| **Uncle Nearest Revised Proposal - 58/42 Split** | | | | | | | | | | | | | | | |
| **Impact to Uncle Nearest Cash Balance** | | | | | | | | | | | | | | | |
| **Base Case - Cash Balance** | **(1,190)** | **(1,761)** | **(1,933)** | **(2,978)** | **(3,298)** | **(3,542)** | **(3,226)** | **(3,806)** | **(3,671)** | **(3,832)** | **(3,538)** | **(3,681)** | **(3,712)** | **(4,035)** | **(4,035)** |
| **Base Case - Net Weekly Cashflow** | **(1,356)** | **(570)** | **(172)** | **(1,045)** | **(320)** | **(243)** | **316** | **(581)** | **136** | **(161)** | **294** | **(142)** | **(31)** | **(322)** | **(2,844)** |
| + Immediate Cash Infusion | 1,459 | 1,000 | - | - | - | - | - | - | - | - | - | - | - | - | 2,459 |
| ***Planned Barrel Sales*** | | | | | | | | | | | | | | | |
| + Cash Proceeds from Barrel Sales | - | - | - | 2,262 | 2,262 | 2,262 | 2,262 | 2,262 | 2,262 | 2,262 | 2,262 | 2,262 | - | - | 20,357 |
| - Barrel Sale Repayment to FC | - | - | - | (583) | (583) | (1,520) | (1,520) | (1,520) | (1,520) | (2,100) | (2,100) | (2,100) | - | | (13,547) |
| - A/P Paydown and Payment Plans | - | (263) | (235) | (334) | (253) | (253) | (253) | (253) | (228) | (223) | (223) | (223) | (223) | (223) | (3,185) |
| **Revised Plan - Ending Cash Balance** | **269** | **435** | **28** | **327** | **1,432** | **1,678** | **2,483** | **2,391** | **3,041** | **2,819** | **3,052** | **2,849** | **2,594** | **2,049** | **2,049** |
| *Variance to Base Case* | *1,459* | *2,196* | *1,960* | *3,305* | *4,731* | *5,220* | *5,709* | *6,198* | *6,712* | *6,651* | *6,590* | *6,529* | *6,307* | *6,084* | *6,084* |

Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 39 of 384 PageID #: 4282

# Liquidity Position

*Cash Collections*

**Park Street manages chargebacks and other expenses directly for Uncle Nearest. Because they handle these expenses, there is a "gross-to-net" reduction of sales from Park Street to what is available for collection.**

**Park Street Sales vs Cash Inflows**

| ($ 000's) | Sales | Collections | Variance | Variance % |
|---|---|---|---|---|
| **2023** | $ 24,237 | $ 17,808 | $ 6,428 | 27% |
| **2024** | $ 34,896 | $ 27,665 | $ 7,231 | 21% |
| | | | | |
| **2024-Q1** | $ 11,851 | $ 10,210 | $ 1,641 | 14% |
| **2024-Q2** | $ 8,849 | $ 6,875 | $ 1,974 | 22% |
| **2024-Q3** | $ 8,054 | $ 6,130 | $ 1,924 | 24% |
| **2024-Q4** | $ 6,201 | $ 4,650 | $ 1,551 | 25% |

- Based on historical analysis of sales through Park Street vs actual cash pulled from Park Street, an average 21% of sale proceeds are used to pay Park Street fees, vendor chargebacks, and freight and storage fees
- The 13-week cash flow model assumes a 24% gross-to-net reduction of Park Street sales to collections
- Because of a chargeback balance exceeding the Park Street Cash balance, we have assumed a 4-week pause in Park Street collections to pay down urgent chargebacks
- Recent sales weeks have performed below forecast, lowering expected collections for the 13-week period

# Liquidity Position

*High-Priority Accounts Payable Detail*

**The company has identified top vendors that require payment of past-due payables during the 13-week period. These AP balances are currently under review for confirmation prior to payment.**

| High-Priority Vendors | Category | Current | 0-30 Days Past Due | 30-60 Days Past Due | 60-90 Days Past Due | 90+ Days Past Due | Total |
|---|---|---|---|---|---|---|---|
| Genesis Global Recruiting Inc. | Payroll Provider | 532 | 605 | 253 | | | 1,390 |
| Tennessee Distilling Group | Distilling, Storage, Bottling | | 221 | 93 | 111 | 689 | 1,114 |
| Tennessee Distilling Group - Tax & Escrow | Taxes for TDG Production | | 12 | | 161 | 701 | 874 |
| Marabou, Inc F/S/O Jeffrey Wright | Advertising | | 600 | | | | 600 |
| Tricorbraun Inc | Glass for Nearest Green line | | | 146 | | 248 | 393 |
| Clear Channel Outdoor | Advertising | 6 | | 28 | 49 | 244 | 327 |
| 1099 Contractors | Various | 0 | 34 | 71 | 30 | 109 | 244 |
| Blue Label Packaging | Bottling Materials | | | | | 213 | 213 |
| Deluxe | PoS System and Distillery Retail Items | | | | 17 | 185 | 202 |
| Advanced Spirits, LLC | Barrel Production Options | | 181 | | | | 181 |
| Procopio | Legal | | | 2 | 2 | 123 | 127 |
| Morgan, Lewis & Bockius LLP | Legal | 0 | 6 | | | 117 | 123 |
| *All Other* | | *0* | *91* | *35* | *33* | *667* | *825* |
| **Total High-Priority** | | **539** | **1,750** | **627** | **402** | **3,297** | **6,615** |

**Total Past Due: $6,076**

| | |
|---|---|
| 1 | Background - Sales |
| 2 | Background - Financial |
| 3 | Restructuring Plan |
| 4 | Liquidity Position |
| 5 | **Next Steps** |


Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 42 of 384
PageID #: 4285

# Next Steps

**Our next steps will focus on the following items:**

- Provide diligence list requested by McGuireWoods
  - CXO position for Keystone
  - Perfection certificate
- Finalize barrel proceeds split
- Finalize 2024 financial statements
- Begin debt raise process
- Determine length of extension to credit agreement
- Continue legal negotiations with Berlin

13-Week Cash Flow
Provided by Uncle Nearest

| Week Ending --> | 16-May | 23-May | 30-May | 6-Jun | 13-Jun | 20-Jun | 27-Jun | 4-Jul | 11-Jul | 18-Jul | 25-Jul | 1-Aug | 8-Aug | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Forecast Week #--> | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 13-Week Total |
| **Total Cash In** | **$235,000** | **$235,000** | **$235,000** | **$235,000** | **$250,000** | **$250,000** | **$250,000** | **$250,000** | **$270,000** | **$270,000** | **$270,000** | **$270,000** | **$300,000** | **$3,320,000** |
| **Payroll (Genesis)** | $270,000 | $270,000 | $270,000 | $270,000 | $265,000 | $265,000 | $265,000 | $265,000 | $260,000 | $260,000 | $260,000 | $260,000 | $255,000 | $3,435,000 |
| **Ramp** | $102,000 | $102,000 | $102,000 | $102,000 | $95,000 | $95,000 | $95,000 | $95,000 | $90,000 | $90,000 | $90,000 | $90,000 | $85,000 | $1,233,000 |
| **Invoices Paid Total** | $420,000 | $420,000 | $420,000 | $420,000 | $420,000 | $420,000 | $420,000 | $420,000 | $420,000 | $420,000 | $420,000 | $420,000 | $400,000 | $5,440,000 |
| NGD_Production | $163,494 | $163,494 | $163,494 | $163,494 | $163,494 | $163,494 | $163,494 | $163,494 | $163,494 | $163,494 | $163,494 | $163,494 | $155,709 | $2,117,641 |
| UN_S&M | $94,387 | $94,387 | $94,387 | $94,387 | $94,387 | $94,387 | $94,387 | $94,387 | $94,387 | $94,387 | $94,387 | $94,387 | $89,893 | $1,222,541 |
| UN_Corporate | $65,403 | $65,403 | $65,403 | $65,403 | $65,403 | $65,403 | $65,403 | $65,403 | $65,403 | $65,403 | $65,403 | $65,403 | $62,289 | $847,124 |
| NGD_Corporate | $41,316 | $41,316 | $41,316 | $41,316 | $41,316 | $41,316 | $41,316 | $41,316 | $41,316 | $41,316 | $41,316 | $41,316 | $39,348 | $535,139 |
| Finance | $25,091 | $25,091 | $25,091 | $25,091 | $25,091 | $25,091 | $25,091 | $25,091 | $25,091 | $25,091 | $25,091 | $25,091 | $23,896 | $324,988 |
| NGD_S&M | $13,171 | $13,171 | $13,171 | $13,171 | $13,171 | $13,171 | $13,171 | $13,171 | $13,171 | $13,171 | $13,171 | $13,171 | $12,544 | $170,596 |
| NGD_Facilities | $6,635 | $6,635 | $6,635 | $6,635 | $6,635 | $6,635 | $6,635 | $6,635 | $6,635 | $6,635 | $6,635 | $6,635 | $6,319 | $85,937 |
| NGD_Retail | $9,123 | $9,123 | $9,123 | $9,123 | $9,123 | $9,123 | $9,123 | $9,123 | $9,123 | $9,123 | $9,123 | $9,123 | $8,689 | $118,167 |
| Security | $1,379 | $1,379 | $1,379 | $1,379 | $1,379 | $1,379 | $1,379 | $1,379 | $1,379 | $1,379 | $1,379 | $1,379 | $1,314 | $17,867 |
| **Total Cash Out** | **$792,000** | **$792,000** | **$792,000** | **$792,000** | **$780,000** | **$780,000** | **$780,000** | **$780,000** | **$770,000** | **$770,000** | **$770,000** | **$770,000** | **$740,000** | **$10,108,000** |
| **Operational Cash Flow** | **($557,000)** | **($557,000)** | **($557,000)** | **($557,000)** | **($530,000)** | **($530,000)** | **($530,000)** | **($530,000)** | **($500,000)** | **($500,000)** | **($500,000)** | **($500,000)** | **($440,000)** | **($6,788,000)** |

**Farm Credit v Uncle Nearest, et al**
**Plaintiff's Exhibit**
**6**
**4:25-CV-00038**

**The Weaver Companies**
**Uncle Nearest, Inc. - 001 (Consolidated)**
**Custom A/P Aging Detail w/Memo**
**As of June 12, 2025**

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | 6/12/2025 Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| **3 Tier Beverages** | | | | | | | - | |
| | Bill | 6/1/2024 | 4627 | 6/1/2024 | 376 | $826.88 | 826.88 | 376 |
| | Bill | 1/29/2025 | 5108 | 1/29/2025 | 134 | $868.22 | 868.22 | 134 |
| | Bill | 4/29/2025 | 6031 | 4/29/2025 | 44 | $868.22 | 868.22 | 44 |
| **Total - 3 Tier Beverages** | | | | | | **$2,563.32** | - | |
| **3 Tier Compliance** | | | | | | | - | |
| | Bill | 10/1/2024 | 1024 | 10/1/2024 | 254 | $3,750.00 | 3,750.00 | 254 |
| **Total - 3 Tier Compliance** | | | | | | **$3,750.00** | - | |
| **360 Marketing & Events** | | | | | | | - | |
| | Bill | 4/3/2024 | 11003A | 4/3/2024 | 435 | $3,000.00 | 3,000.00 | 435 |
| **Total - 360 Marketing & Events** | | | | | | **$3,000.00** | - | |
| **5475 Days LLC** | | | | | | | - | |
| | Bill | 9/19/2024 | 1706 | 9/19/2024 | 266 | $500.00 | 500.00 | 266 |
| | Bill | 10/2/2024 | 1707 | 10/2/2024 | 253 | $500.00 | 500.00 | 253 |
| **Total - 5475 Days LLC** | | | | | | **$1,000.00** | - | |
| **90 Proff, LLC** | | | | | | | - | |
| | Bill | 7/11/2024 | 24-9120 | 7/11/2024 | 336 | $5,000.00 | 5,000.00 | 336 |
| **Total - 90 Proff, LLC** | | | | | | **$5,000.00** | - | |
| **Adams & Reese LLP** | | | | | | | - | |
| | Bill | 10/7/2024 | 1301734 | 10/7/2024 | 248 | $814.50 | 814.50 | 248 |
| | Bill | 10/7/2024 | 1301707 | 10/7/2024 | 248 | $279.00 | 279.00 | 248 |
| | Bill | 10/7/2024 | 1301706 | 10/7/2024 | 248 | $265.00 | 265.00 | 248 |
| | Bill | 10/7/2024 | 1301745 | 10/7/2024 | 248 | $1,431.00 | 1,431.00 | 248 |
| | Bill | 10/7/2024 | 1301797 | 10/7/2024 | 248 | $14,410.00 | 14,410.00 | 248 |
| | Bill | 10/7/2024 | 1301729 | 10/7/2024 | 248 | $596.38 | 596.38 | 248 |
| | Bill | 10/10/2024 | 1301709 | 10/10/2024 | 245 | $297.50 | 297.50 | 245 |
| | Bill | 10/16/2024 | 1304771 | 10/16/2024 | 239 | $4,420.00 | 4,420.00 | 239 |
| | Bill | 11/8/2024 | 1301727 | 11/8/2024 | 216 | $530.00 | 530.00 | 216 |
| | Bill | 11/11/2024 | 1308727 | 11/11/2024 | 213 | $3,189.00 | 3,189.00 | 213 |
| | Bill | 11/12/2024 | 1308985 | 11/12/2024 | 212 | $76.50 | 76.50 | 212 |
| | Bill | 11/12/2024 | 1308983 | 11/12/2024 | 212 | $1,227.00 | 1,227.00 | 212 |
| | Bill | 11/12/2024 | 1309034 | 11/12/2024 | 212 | $391.00 | 391.00 | 212 |
| | Bill | 11/12/2024 | 1308986 | 11/12/2024 | 212 | $803.00 | 803.00 | 212 |
| | Bill | 11/12/2024 | 1308987 | 11/12/2024 | 212 | $668.00 | 668.00 | 212 |
| | Bill | 12/11/2024 | 1314808 | 12/11/2024 | 183 | $1,806.68 | 1,806.68 | 183 |
| | Bill | 12/11/2024 | 1314805 | 12/11/2024 | 183 | $329.00 | 329.00 | 183 |
| | Bill | 12/11/2024 | 1314809 | 12/11/2024 | 183 | $5,429.00 | 5,429.00 | 183 |
| | Bill | 12/11/2024 | 1314800 | 12/11/2024 | 183 | $8,645.00 | 8,645.00 | 183 |
| **Total - Adams & Reese LLP** | | | | | | **$45,607.56** | - | |
| **Advanced Spirits, LLC** | | | | | | | - | |
| | Bill | 4/16/2025 | 1395 | 5/1/2025 | 42 | $193,531.99 | 193,531.99 | 42 |
| **Total - Advanced Spirits, LLC** | | | | | | **$193,531.99** | - | |
| **Affinity Technology Partners** | | | | | | | - | |
| | Bill | 1/31/2025 | 31949 | 1/31/2025 | 132 | $578.19 | 578.19 | 132 |
| | Bill | 1/31/2025 | 31938 | 1/31/2025 | 132 | $109.03 | 109.03 | 132 |
| | Bill | 2/1/2025 | 32006 | 2/1/2025 | 131 | $10,342.65 | 10,342.65 | 131 |
| | Bill | 2/27/2025 | 32200 | 2/27/2025 | 105 | $15.00 | 15.00 | 105 |
| | Bill | 3/1/2025 | 32199 | 3/1/2025 | 103 | $10,342.65 | 10,342.65 | 103 |
| **Total - Affinity Technology Partners** | | | | | | **$21,387.52** | - | |
| **AG&E Associates** | | | | | | | - | |
| | Bill | 6/1/2024 | 17265 *06.28.2023* | 6/1/2024 | 376 | $6,000.00 | 6,000.00 | 376 |
| **Total - AG&E Associates** | | | | | | **$6,000.00** | - | |
| **Agency 21 Consulting LLC** | | | | | | | - | |
| | Bill | 6/1/2024 | INV00787 | 7/31/2024 | 316 | $7,000.00 | 7,000.00 | 316 |
| | Bill | 6/1/2024 | INV00777 | 7/31/2024 | 316 | $7,500.00 | 7,500.00 | 316 |
| | Bill | 10/1/2024 | INV00778 | 11/30/2024 | 194 | $7,500.00 | 7,500.00 | 194 |
| | Bill | 10/1/2024 | INV00788 | 10/1/2024 | 254 | $11,500.00 | 11,500.00 | 254 |
| **Total - Agency 21 Consulting LLC** | | | | | | **$33,500.00** | - | |
| **Alchemy Merch** | | | | | | | - | |
| | Bill | 6/3/2025 | 8030 | 6/3/2025 | 9 | $2,250.00 | 2,250.00 | 9 |
| **Total - Alchemy Merch** | | | | | | **$2,250.00** | - | |
| **Alexander Albregts** | | | | | | | - | |
| | Bill | 5/2/2025 | 217502 | 5/2/2025 | 41 | $1,393.99 | 1,393.99 | 41 |
| **Total - Alexander Albregts** | | | | | | **$1,393.99** | - | |

Farm Credit v Uncle Nearest, et al
**Plaintiff's Exhibit**
**7**
**4:25-CV-00038**

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| Alicia Cole | | | | | | | - | |
| | Bill | 4/28/2025 | 002 | 4/28/2025 | 45 | $200.00 | 200.00 | 45 |
| **Total - Alicia Cole** | | | | | | **$200.00** | - | |
| **All Star Fire Protection, Inc.** | | | | | | | - | |
| | Bill | 1/31/2024 | 47271 | 3/6/2024 | 463 | $6,362.00 | 6,362.00 | 463 |
| **Total - All Star Fire Protection, Inc.** | | | | | | **$6,362.00** | - | |
| **American Express Corporate Card** | | | | | | | - | |
| | Bill | 4/29/2025 | 4.29.2025 | 4/29/2025 | | $14,467.49 | 14,467.49 | 44 |
| **Total - American Express Corporate Card** | | | | | | **$14,467.49** | - | |
| **American Wine & Spirits** | | | | | | | - | |
| | Bill | 1/2/2025 | 250111 | 2/1/2025 | 131 | $1,500.00 | 1,500.00 | 131 |
| **Total - American Wine & Spirits** | | | | | | **$1,500.00** | - | |
| **Another Round Another Rally** | | | | | | | - | |
| | Bill | 6/11/2024 | 1202 | 6/11/2024 | 366 | $5,000.00 | 5,000.00 | 366 |
| | Bill | 7/1/2024 | 1226 | 8/30/2024 | 286 | $5,000.00 | 5,000.00 | 286 |
| **Total - Another Round Another Rally** | | | | | | **$10,000.00** | - | |
| **Arrow Utility Resources, LLC** | | | | | | | - | |
| | Bill | 3/31/2025 | CO700 | 3/31/2025 | 73 | $4,500.00 | 4,500.00 | 73 |
| | Bill | 4/30/2025 | CO715 | 4/30/2025 | 43 | $4,500.00 | 4,500.00 | 43 |
| | Bill | 5/30/2025 | CO730 | 5/30/2025 | 13 | $4,500.00 | 4,500.00 | 13 |
| **Total - Arrow Utility Resources, LLC** | | | | | | **$13,500.00** | - | |
| **Ateic Ã‰lectricitÃ©** | | | | | | | - | |
| | Bill | 6/10/2024 | F240247 | 6/10/2024 | 367 | $1,284.69 | 1,284.69 | 367 |
| **Total - Ateic Ã‰lectricitÃ©** | | | | | | **$1,284.69** | - | |
| **Austin Gray Design Group - AGDG** | | | | | | | - | |
| | Bill | 9/24/2024 | 68 | 9/24/2024 | 261 | $2,120.00 | 2,120.00 | 261 |
| **Total - Austin Gray Design Group - AGDG** | | | | | | **$2,120.00** | - | |
| **Auto Chlor** | | | | | | | - | |
| | Bill | 5/2/2025 | 257800500089 | 5/2/2025 | 41 | $287.60 | 287.60 | 41 |
| | Bill | 6/2/2025 | 257805600066 | 6/2/2025 | 10 | $289.79 | 289.79 | 10 |
| **Total - Auto Chlor** | | | | | | **$577.39** | - | |
| **Avid Marketing Group** | | | | | | | - | |
| | Bill | 9/1/2024 | INV48981W original inv dat | 7/27/2024 | 320 | $11,630.00 | 11,630.00 | 320 |
| | Bill | 9/26/2024 | INV50577W | 10/26/2024 | 229 | $28,959.28 | 28,959.28 | 229 |
| | Bill | 10/31/2024 | INV51514W | 10/31/2024 | 224 | $288.80 | 288.80 | 224 |
| | Bill | 1/10/2025 | 51909W | 1/10/2025 | 153 | $19,143.11 | 19,143.11 | 153 |
| **Total - Avid Marketing Group** | | | | | | **$60,021.19** | - | |
| **Axper USA Inc.** | | | | | | | - | |
| | Bill | 1/15/2025 | 2966 | 2/14/2025 | 118 | $1,380.00 | 1,380.00 | 118 |
| **Total - Axper USA Inc.** | | | | | | **$1,380.00** | - | |
| **BCI Buckeye Corrugated** | | | | | | | - | |
| | Bill | 4/29/2024 | 03-318444 | 5/29/2024 | 379 | $14,330.25 | 14,330.25 | 379 |
| | Bill | 5/6/2024 | 03-318628 | 6/6/2024 | 371 | $14,070.00 | 14,070.00 | 371 |
| | Bill | 7/2/2024 | 03-320006 | 8/2/2024 | 314 | $4,431.24 | 4,431.24 | 314 |
| **Total - BCI Buckeye Corrugated** | | | | | | **$32,831.49** | - | |
| **BCUD 0049-04100-004** | | | | | | | - | |
| | Bill | 10/29/2024 | 10.29.2024 | 10/29/2024 | 226 | $20.58 | 20.58 | 226 |
| **Total - BCUD 0049-04100-004** | | | | | | **$20.58** | - | |
| **Beaver Engineering, Inc.** | | | | | | | - | |
| | Bill | 8/26/2024 | 14613 | 8/26/2024 | 290 | $7,961.49 | 7,961.49 | 290 |
| | Bill | 11/29/2024 | 14615 * 09/06/2024 | 11/29/2024 | 195 | $7,004.40 | 7,004.40 | 195 |
| | Bill | 11/29/2024 | 14595 * 05/31/2024 | 11/29/2024 | 195 | $5,536.59 | 5,536.59 | 195 |
| | Bill | 11/29/2024 | 14603 * 07/10/2024 | 11/29/2024 | 195 | $11,163.24 | 11,163.24 | 195 |
| | Bill | 12/19/2024 | 14625 * 10/16/2024 | 12/19/2024 | 175 | $892.04 | 892.04 | 175 |
| **Total - Beaver Engineering, Inc.** | | | | | | **$32,557.76** | - | |
| **Belmark Inc** | | | | | | | - | |
| | Bill | 6/11/2024 | 1880235 | 7/11/2024 | 336 | $21,216.00 | 21,216.00 | 336 |
| | Bill | 3/3/2025 | 1961862 | 4/2/2025 | 71 | $1,580.00 | 1,580.00 | 71 |
| **Total - Belmark Inc** | | | | | | **$22,796.00** | - | |
| **Berlin Packaging, LLC** | | | | | | | - | |
| | Bill | 4/28/2025 | 9-0188964 | 5/28/2025 | 15 | $14,540.19 | 14,540.19 | 15 |
| | Bill | 4/28/2025 | 9-0188962 | 5/28/2025 | 15 | $36,730.87 | 36,730.87 | 15 |
| | Bill | 4/28/2025 | 9-0188963 | 5/28/2025 | 15 | $36,730.87 | 36,730.87 | 15 |
| | Bill | 4/29/2025 | 9-0189007 | 5/29/2025 | 14 | $36,936.75 | 36,936.75 | 14 |
| | Bill | 4/30/2025 | 9-0189060 | 5/30/2025 | 13 | $36,730.87 | 36,730.87 | 13 |
| | Bill | 4/30/2025 | 9-0189061 | 5/30/2025 | 13 | $36,730.87 | 36,730.87 | 13 |
| | Bill | 4/30/2025 | 9-0189062 | 5/30/2025 | 13 | $36,730.87 | 36,730.87 | 13 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| **Total - Berlin Packaging, LLC** | | | | | | **$235,131.29** | - | |
| **Better Business Solutions** | | | | | | | - | |
| | Bill | 3/14/2025 | AR113253 | 3/14/2025 | 90 | $135.94 | 135.94 | 90 |
| **Total - Better Business Solutions** | | | | | | **$135.94** | - | |
| **Big G Warehousing LLC** | | | | | | | - | |
| | Bill | 1/31/2025 | IVC00000003217 | 3/2/2025 | 102 | $495.00 | 495.00 | 102 |
| | Bill | 2/3/2025 | IVC00000003220 | 3/5/2025 | 99 | $528.08 | 528.08 | 99 |
| | Bill | 2/6/2025 | IVC00000003221 | 3/8/2025 | 96 | $528.08 | 528.08 | 96 |
| | Bill | 2/28/2025 | IVC00000003233 | 3/30/2025 | 74 | $495.00 | 495.00 | 74 |
| **Total - Big G Warehousing LLC** | | | | | | **$2,046.16** | - | |
| **Big Picture International - Yen** | | | | | | | - | |
| | Bill | 2/16/2025 | UN-86 | 3/3/2025 | 101 | $1,000.00 | 1,000.00 | 101 |
| | Bill | 3/3/2025 | UN-87 | 3/18/2025 | 86 | $994.44 | 994.44 | 86 |
| | Bill | 4/1/2025 | UN-88 | 4/16/2025 | 57 | $1,002.51 | 1,002.51 | 57 |
| | Bill | 6/2/2025 | UN-90 | 6/17/2025 | -5 | $1,049.40 | - | (5) |
| **Total - Big Picture International - Yen** | | | | | | **$4,046.35** | - | |
| **Billups, LLC** | | | | | | | - | |
| | Bill | 5/29/2024 | 289503-2826-12 | 6/28/2024 | 349 | $19,319.00 | 19,319.00 | 349 |
| | Bill | 5/29/2024 | 372936-5223-1 | 6/28/2024 | 349 | $4,262.00 | 4,262.00 | 349 |
| | Bill | 8/1/2024 | 289503-2826-13 original in | 8/22/2024 | 294 | $19,319.00 | 19,319.00 | 294 |
| | Bill | 8/26/2024 | 373255-5234-1 | 9/25/2024 | 260 | $14,786.86 | 14,786.86 | 260 |
| | Bill | 9/1/2024 | 289503-2826-14 | 9/8/2024 | 277 | $19,319.00 | 19,319.00 | 277 |
| | Bill | 9/5/2024 | 289503-2826-15 | 10/5/2024 | 250 | $4,532.00 | 4,532.00 | 250 |
| | Bill | 10/11/2024 | 373255-5234-3 | 11/10/2024 | 214 | $14,786.86 | 14,786.86 | 214 |
| | Bill | 10/11/2024 | 289503-2826-17 | 11/10/2024 | 214 | $4,532.00 | 4,532.00 | 214 |
| | Bill | 11/1/2024 | 289503-2826-16 *09/26/20: | 12/1/2024 | 193 | $4,532.00 | 4,532.00 | 193 |
| | Bill | 11/1/2024 | 373255-5234-2 *09/26/24* | 12/1/2024 | 193 | $14,786.86 | 14,786.86 | 193 |
| | Bill | 11/15/2024 | 373255-5234-4 | 12/15/2024 | 179 | $11,829.49 | 11,829.49 | 179 |
| | Bill | 11/15/2024 | 289503-2826-18 | 12/15/2024 | 179 | $4,532.00 | 4,532.00 | 179 |
| | Bill | 11/15/2024 | 373255-5234-4 | 12/15/2024 | 179 | $2,957.37 | 2,957.37 | 179 |
| | Bill | 12/13/2024 | 289503-2826-19 | 1/12/2025 | 151 | $4,532.00 | 4,532.00 | 151 |
| | Bill | 12/13/2024 | 289503-2826-9 12.13.2024 | 1/12/2025 | 151 | $4,532.00 | 4,532.00 | 151 |
| | Bill | 12/13/2024 | 373255-5234-5 *12.13.202 | 1/12/2025 | 151 | $14,786.86 | 14,786.86 | 151 |
| | Bill | 1/16/2025 | 373255-5234-6 | 2/15/2025 | 117 | $14,786.86 | 14,786.86 | 117 |
| | Bill | 1/16/2025 | 289503-2826-20 | 2/15/2025 | 117 | $4,532.00 | 4,532.00 | 117 |
| | Bill | 2/24/2025 | 289503-2826-21 | 3/26/2025 | 78 | $4,532.00 | 4,532.00 | 78 |
| | Bill | 2/24/2025 | 373255-5234-7 | 3/26/2025 | 78 | $14,786.86 | 14,786.86 | 78 |
| | Bill | 3/24/2025 | 373255-5234-8 | 4/23/2025 | 50 | $29,573.72 | 29,573.72 | 50 |
| | Bill | 3/24/2025 | 289503-2826-22 | 4/23/2025 | 50 | $9,064.00 | 9,064.00 | 50 |
| | Bill | 4/15/2025 | 289503-2826-23 | 5/15/2025 | 28 | $7,931.00 | 7,931.00 | 28 |
| | Bill | 4/15/2025 | 373255-5234-9 | 5/15/2025 | 28 | $25,876.96 | 25,876.96 | 28 |
| **Total - Billups, LLC** | | | | | | **$274,428.70** | - | |
| **Black Rodeo USA Foundation** | | | | | | | - | |
| | Bill | 4/9/2025 | 202248 | 4/9/2025 | 64 | $8,000.00 | 8,000.00 | 64 |
| **Total - Black Rodeo USA Foundation** | | | | | | **$8,000.00** | - | |
| **Blue Kangaroo Design LTD** | | | | | | | - | |
| | Bill | 5/1/2024 | INV-5646 | 5/1/2024 | 407 | $4,322.99 | 4,322.99 | 407 |
| **Total - Blue Kangaroo Design LTD** | | | | | | **$4,322.99** | - | |
| **Blue Label Packaging** | | | | | | | - | |
| | Bill | 6/7/2024 | 263403 | 7/7/2024 | 340 | $22,965.77 | 22,965.77 | 340 |
| | Bill | 6/21/2024 | 264284 | 7/21/2024 | 326 | $277.32 | 277.32 | 326 |
| | Bill | 7/5/2024 | 265052 | 8/4/2024 | 312 | $61,008.57 | 61,008.57 | 312 |
| | Bill | 7/8/2024 | 265179 | 8/7/2024 | 309 | $3,432.75 | 3,432.75 | 309 |
| | Bill | 7/8/2024 | 265148 | 8/7/2024 | 309 | $49,822.09 | 49,822.09 | 309 |
| | Bill | 8/1/2024 | 265627 inv original date 07 | 8/15/2024 | 301 | $901.86 | 901.86 | 301 |
| | Bill | 8/19/2024 | 267725 | 9/18/2024 | 267 | $657.84 | 657.84 | 267 |
| | Bill | 8/20/2024 | 267830 | 9/19/2024 | 266 | $386.55 | 386.55 | 266 |
| | Bill | 8/21/2024 | 267935 | 9/20/2024 | 265 | $425.19 | 425.19 | 265 |
| | Bill | 8/26/2024 | 268156 | 9/25/2024 | 260 | $1,629.85 | 1,629.85 | 260 |
| | Bill | 8/27/2024 | 268257 | 9/26/2024 | 259 | $7,921.25 | 7,921.25 | 259 |
| | Bill | 8/30/2024 | 268586 | 9/29/2024 | 256 | $384.76 | 384.76 | 256 |
| | Bill | 9/1/2024 | 265934 original inv dated 0 | 10/1/2024 | 254 | $299.52 | 299.52 | 254 |
| | Bill | 9/1/2024 | 265762 original inv dated 0 | 10/1/2024 | 254 | $362.46 | 362.46 | 254 |
| | Bill | 9/9/2024 | 268960 | 10/9/2024 | 246 | $515.39 | 515.39 | 246 |
| | Bill | 9/10/2024 | 269036 | 10/10/2024 | 245 | $1,901.20 | 1,901.20 | 245 |
| | Bill | 9/11/2024 | 269124 | 10/11/2024 | 244 | $647.66 | 647.66 | 244 |
| | Bill | 9/20/2024 | 269859 | 10/20/2024 | 235 | $297.33 | 297.33 | 235 |
| | Bill | 9/23/2024 | 269917 | 10/23/2024 | 232 | $417.48 | 417.48 | 232 |
| | Bill | 9/23/2024 | 269918 | 10/23/2024 | 232 | $261.68 | 261.68 | 232 |
| | Bill | 10/7/2024 | 270775 | 11/6/2024 | 218 | $6,637.28 | 6,637.28 | 218 |
| | Bill | 10/11/2024 | 271141 | 11/10/2024 | 214 | $1,050.00 | 1,050.00 | 214 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| | Bill | 10/11/2024 | 271088 | 11/10/2024 | 214 | $352.02 | 352.02 | 214 |
| | Bill | 10/30/2024 | 272181 | 11/29/2024 | 195 | $2,170.64 | 2,170.64 | 195 |
| | Bill | 11/19/2024 | 273342 | 12/19/2024 | 175 | $728.51 | 728.51 | 175 |
| | Bill | 11/26/2024 | 273825 | 12/26/2024 | 168 | $5,240.80 | 5,240.80 | 168 |
| | Bill | 5/9/2025 | 282707 | 6/8/2025 | 4 | $431.68 | 431.68 | 4 |
| **Total - Blue Label Packaging** | | | | | | **$171,127.45** | - | |
| **Brandon Wright** | | | | | | | - | |
| | Bill | 6/3/2025 | 326 | 6/3/2025 | 9 | $103.59 | 103.59 | 9 |
| | Bill | 6/3/2025 | 325 | 6/3/2025 | 9 | $735.00 | 735.00 | 9 |
| **Total - Brandon Wright** | | | | | | **$838.59** | - | |
| **Butler Snow LLP** | | | | | | | - | |
| | Bill | 7/1/2024 | 10432825 | 6/25/2024 | 352 | $10,292.28 | 10,292.28 | 352 |
| | Bill | 7/19/2024 | 10436131 | 7/19/2024 | 328 | $3,043.35 | 3,043.35 | 328 |
| | Bill | 8/19/2024 | 10439353 | 8/19/2024 | 297 | $5,500.22 | 5,500.22 | 297 |
| | Bill | 9/20/2024 | 10444421 | 9/20/2024 | 265 | $3,061.75 | 3,061.75 | 265 |
| | Bill | 10/14/2024 | 10447568 | 10/14/2024 | 241 | $1,491.90 | 1,491.90 | 241 |
| | Bill | 12/19/2024 | 10456642 | 12/19/2024 | 175 | $2,636.50 | 2,636.50 | 175 |
| **Total - Butler Snow LLP** | | | | | | **$26,026.00** | - | |
| **Carroll's MVRT** | | | | | | | - | |
| | Bill | 9/1/2024 | 39916 original inv dated 08 | 9/1/2024 | 284 | $1,174.50 | 1,174.50 | 284 |
| | Bill | 9/1/2024 | 39853 original inv dated 08 | 9/1/2024 | 284 | $1,175.00 | 1,175.00 | 284 |
| | Bill | 10/1/2024 | FC5913 | 10/1/2024 | 254 | $7.80 | 7.80 | 254 |
| | Bill | 11/6/2024 | FC6358 | 11/6/2024 | 218 | $4.41 | 4.41 | 218 |
| | Bill | 12/11/2024 | FC6768 | 12/11/2024 | 183 | $4.30 | 4.30 | 183 |
| | Bill | 1/14/2025 | FC7015 | 1/14/2025 | 149 | $4.19 | 4.19 | 149 |
| **Total - Carroll's MVRT** | | | | | | **$2,370.20** | - | |
| **Cass Services** | | | | | | | - | |
| | Bill | 4/1/2025 | 5629 | 4/1/2025 | 72 | $2,940.00 | 2,940.00 | 72 |
| | Bill | 5/2/2025 | 5792 | 5/2/2025 | 41 | $3,234.00 | 3,234.00 | 41 |
| | Bill | 6/2/2025 | 5986 | 6/2/2025 | 10 | $2,940.00 | 2,940.00 | 10 |
| **Total - Cass Services** | | | | | | **$9,114.00** | - | |
| **Catalyst Design Group** | | | | | | | - | |
| | Bill | 8/14/2024 | 13883 | 8/14/2024 | 302 | $900.00 | 900.00 | 302 |
| | Bill | 9/10/2024 | 14016 | 9/10/2024 | 275 | $1,800.00 | 1,800.00 | 275 |
| | Bill | 10/14/2024 | 14325 | 10/14/2024 | 241 | $900.00 | 900.00 | 241 |
| **Total - Catalyst Design Group** | | | | | | **$3,600.00** | - | |
| **Center Stage Merchandising** | | | | | | | - | |
| | Bill | 2/27/2025 | 2038 | 3/29/2025 | 75 | $2,753.52 | 2,753.52 | 75 |
| | Bill | 2/27/2025 | 2039 | 3/29/2025 | 75 | $1,632.48 | 1,632.48 | 75 |
| | Bill | 2/27/2025 | 2040 | 3/29/2025 | 75 | $2,753.52 | 2,753.52 | 75 |
| | Bill | 3/18/2025 | 2071 | 4/17/2025 | 56 | $2,533.58 | 2,533.58 | 56 |
| | Bill | 3/18/2025 | 2069 | 4/17/2025 | 56 | $3,876.40 | 3,876.40 | 56 |
| | Bill | 3/18/2025 | 2072 | 4/17/2025 | 56 | $2,882.33 | 2,882.33 | 56 |
| | Bill | 3/18/2025 | 2070 | 4/17/2025 | 56 | $3,694.72 | 3,694.72 | 56 |
| | Bill | 5/29/2025 | 2278 | 6/28/2025 | -16 | $4,470.60 | - | (16) |
| **Total - Center Stage Merchandising** | | | | | | **$24,597.15** | - | |
| **Charles Ann Enterprises Inc. DBA Units of Nashville** | | | | | | | - | |
| | Bill | 10/9/2024 | 6170 | 10/9/2024 | 246 | $266.26 | 266.26 | 246 |
| **Total - Charles Ann Enterprises Inc. DBA Units of Nashville** | | | | | | **$266.26** | - | |
| **Charrise Gordon** | | | | | | | - | |
| | Bill | 4/21/2025 | 2075 | 4/21/2025 | 52 | $700.00 | 700.00 | 52 |
| **Total - Charrise Gordon** | | | | | | **$700.00** | - | |
| **Cincy Black Travel** | | | | | | | - | |
| | Bill | 6/3/2024 | CAFEAFD1-0003 | 6/30/2024 | 347 | $750.00 | 750.00 | 347 |
| | Bill | 9/1/2024 | CAFEAFD1-0002 | 9/1/2024 | 284 | $750.00 | 750.00 | 284 |
| | Bill | 9/30/2024 | 20512280-0001 | 10/4/2024 | 251 | $750.00 | 750.00 | 251 |
| **Total - Cincy Black Travel** | | | | | | **$2,250.00** | - | |
| **Clark's Garage Door Company** | | | | | | | - | |
| | Bill | 5/16/2025 | 24-366 | 5/16/2025 | 27 | $95.00 | 95.00 | 27 |
| **Total - Clark's Garage Door Company** | | | | | | **$95.00** | - | |
| **Clear Channel Outdoor** | | | | | | | - | |
| | Bill | 2/12/2025 | 790120823 | 2/12/2025 | 120 | $1,491.25 | 1,491.25 | 120 |
| | Bill | 2/21/2025 | 790120854 | 2/21/2025 | 111 | $7,150.00 | 7,150.00 | 111 |
| | Bill | 2/21/2025 | 790120853 | 2/21/2025 | 111 | $2,722.50 | 2,722.50 | 111 |
| | Bill | 2/21/2025 | 790120852 | 2/21/2025 | 111 | $8,580.00 | 8,580.00 | 111 |
| | Bill | 2/24/2025 | 36176949 | 2/24/2025 | 108 | $3,665.00 | 3,665.00 | 108 |
| | Bill | 3/3/2025 | 36177269 | 3/3/2025 | 101 | $3,695.00 | 3,695.00 | 101 |
| | Bill | 3/3/2025 | 790120873 | 3/3/2025 | 101 | $6,435.00 | 6,435.00 | 101 |
| | Bill | 3/10/2025 | 790120886 | 3/10/2025 | 94 | $5,505.50 | 5,505.50 | 94 |
| | Bill | 3/12/2025 | 790120885 | 3/12/2025 | 92 | $12,190.75 | 12,190.75 | 92 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| | Bill | 3/24/2025 | 36177834 | 3/24/2025 | 80 | $3,665.00 | 3,665.00 | 80 |
| | Bill | 3/24/2025 | 790120904 | 3/24/2025 | 80 | $2,722.50 | 2,722.50 | 80 |
| | Bill | 3/24/2025 | 790120905 | 3/24/2025 | 80 | $7,150.00 | 7,150.00 | 80 |
| | Bill | 3/30/2025 | 790120903 | 3/30/2025 | 74 | $8,580.00 | 8,580.00 | 74 |
| | Bill | 3/31/2025 | 790120934 | 3/31/2025 | 73 | $7,078.50 | 7,078.50 | 73 |
| | Bill | 3/31/2025 | 36178212 | 3/31/2025 | 73 | $3,695.00 | 3,695.00 | 73 |
| | Bill | 4/7/2025 | 790120945 | 4/7/2025 | 66 | $5,505.50 | 5,505.50 | 66 |
| | Bill | 4/9/2025 | 790120944 | 4/9/2025 | 64 | $12,190.75 | 12,190.75 | 64 |
| | Bill | 4/21/2025 | 36178876 | 4/21/2025 | 52 | $3,665.00 | 3,665.00 | 52 |
| | Bill | 4/21/2025 | 790120963 | 4/21/2025 | 52 | $2,722.50 | 2,722.50 | 52 |
| | Bill | 4/21/2025 | 790120964 | 4/21/2025 | 52 | $7,150.00 | 7,150.00 | 52 |
| | Bill | 4/27/2025 | 790120962 | 4/27/2025 | 46 | $9,438.00 | 9,438.00 | 46 |
| | Bill | 4/28/2025 | 36179114 | 4/28/2025 | 45 | $3,695.00 | 3,695.00 | 45 |
| | Bill | 4/28/2025 | 790120985 | 4/28/2025 | 45 | $7,078.50 | 7,078.50 | 45 |
| | Bill | 5/5/2025 | 790121008 | 5/5/2025 | 38 | $5,505.50 | 5,505.50 | 38 |
| | Bill | 5/7/2025 | 790121007 | 5/7/2025 | 36 | $12,190.75 | 12,190.75 | 36 |
| | Bill | 5/19/2025 | 36179905 | 5/19/2025 | 24 | $3,665.00 | 3,665.00 | 24 |
| | Bill | 5/19/2025 | 790121032 | 5/19/2025 | 24 | $7,150.00 | 7,150.00 | 24 |
| | Bill | 5/19/2025 | 790121031 | 5/19/2025 | 24 | $2,722.50 | 2,722.50 | 24 |
| | Bill | 5/25/2025 | 790121030 | 5/25/2025 | 18 | $9,438.00 | 9,438.00 | 18 |
| | Bill | 5/26/2025 | 36180282 | 5/26/2025 | 17 | $3,695.00 | 3,695.00 | 17 |
| | Bill | 5/26/2025 | 790121075 | 5/26/2025 | 17 | $7,078.50 | 7,078.50 | 17 |
| | Bill | 6/2/2025 | 790121093 | 6/2/2025 | 10 | $5,505.50 | 5,505.50 | 10 |
| | Bill | 6/4/2025 | 790121092 | 6/4/2025 | 8 | $12,190.75 | 12,190.75 | 8 |
| **Total - Clear Channel Outdoor** | | | | | | **$204,912.75** | - | |
| **COLLIGNON SEBASTIEN** | | | | | | | - | |
| | Bill | 5/31/2025 | 230608 | 5/31/2025 | 12 | $924.19 | 924.19 | 12 |
| **Total - COLLIGNON SEBASTIEN** | | | | | | **$924.19** | - | |
| **Conceptual Concrete Design LLC** | | | | | | | - | |
| | Bill | 8/19/2024 | 63 | 8/19/2024 | 297 | $7,200.00 | 7,200.00 | 297 |
| **Total - Conceptual Concrete Design LLC** | | | | | | **$7,200.00** | - | |
| **Concur Technologies, Inc** | | | | | | | - | |
| | Bill | 3/5/2024 | 101900255964 | 4/4/2024 | 434 | $4,316.32 | 4,316.32 | 434 |
| **Total - Concur Technologies, Inc** | | | | | | **$4,316.32** | - | |
| **Contemporary Media, Inc.** | | | | | | | - | |
| | Bill | 5/1/2024 | 1262353 | 5/31/2024 | 377 | $500.00 | 500.00 | 377 |
| **Total - Contemporary Media, Inc.** | | | | | | **$500.00** | - | |
| **Conversant** | | | | | | | - | |
| | Bill | 4/5/2024 | 1279774158 | 5/5/2024 | 403 | $72,308.38 | 72,308.38 | 403 |
| | Bill | 5/2/2024 | 1279774333 | 6/1/2024 | 376 | $70,229.31 | 70,229.31 | 376 |
| | Bill | 5/2/2024 | 1279774331 | 6/1/2024 | 376 | $16,291.47 | 16,291.47 | 376 |
| | Bill | 6/10/2024 | 1279774621 | 7/10/2024 | 337 | $16,276.60 | 16,276.60 | 337 |
| | Bill | 6/10/2024 | 1279774620 | 7/10/2024 | 337 | $71,078.09 | 71,078.09 | 337 |
| | Bill | 6/10/2024 | 1279774619 | 7/10/2024 | 337 | $19,874.91 | 19,874.91 | 337 |
| | Bill | 7/15/2024 | 1279774869 | 8/14/2024 | 302 | $4,693.81 | 4,693.81 | 302 |
| | Bill | 7/15/2024 | 1279774871 | 8/14/2024 | 302 | $15,987.33 | 15,987.33 | 302 |
| | Bill | 7/15/2024 | 1279774870 | 8/14/2024 | 302 | $53,147.07 | 53,147.07 | 302 |
| | Bill | 7/15/2024 | 1279774868 | 8/14/2024 | 302 | $75,278.12 | 75,278.12 | 302 |
| **Total - Conversant** | | | | | | **$415,165.09** | - | |
| **CORE (Children of Restaurant Employees)** | | | | | | | - | |
| | Bill | 7/12/2024 | 2116 | 7/12/2024 | 335 | $2,500.00 | 2,500.00 | 335 |
| **Total - CORE (Children of Restaurant Employees)** | | | | | | **$2,500.00** | - | |
| **Corkcicle** | | | | | | | - | |
| | Bill | 2/14/2025 | 1255644 | 2/14/2025 | 118 | $5,168.77 | 5,168.77 | 118 |
| **Total - Corkcicle** | | | | | | **$5,168.77** | - | |
| **Crown Packaging Corp.** | | | | | | | - | |
| | Bill | 8/1/2024 | 3563139 | 8/1/2024 | 315 | $19,450.60 | 19,450.60 | 315 |
| **Total - Crown Packaging Corp.** | | | | | | **$19,450.60** | - | |
| **Cursive Solutions, Inc.** | | | | | | | - | |
| | Bill | 2/28/2025 | INV003148 | 2/28/2025 | 104 | $25,621.02 | 25,621.02 | 104 |
| | Bill | 3/6/2025 | INV003185 | 3/6/2025 | 98 | $70.33 | 70.33 | 98 |
| | Bill | 3/11/2025 | INV003207 | 3/11/2025 | 93 | $28,650.45 | 28,650.45 | 93 |
| | Bill | 3/11/2025 | INV003225 | 3/11/2025 | 93 | $560.83 | 560.83 | 93 |
| | Bill | 3/11/2025 | INV003234 | 3/11/2025 | 93 | $562.81 | 562.81 | 93 |
| | Bill | 3/13/2025 | INV003241 | 3/13/2025 | 91 | $1,154.22 | 1,154.22 | 91 |
| | Bill | 4/22/2025 | INV003398 | 4/22/2025 | 51 | $577.05 | 577.05 | 51 |
| | Bill | 4/29/2025 | INV003420 | 4/29/2025 | 44 | $2,830.67 | 2,830.67 | 44 |
| | Bill | 4/29/2025 | INV003430 | 4/29/2025 | 44 | $740.89 | 740.89 | 44 |
| | Bill | 4/30/2025 | INV003441 | 4/30/2025 | 43 | $1,150.00 | 1,150.00 | 43 |
| **Total - Cursive Solutions, Inc.** | | | | | | **$61,918.27** | - | |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| **DC Arena LP DBA Monumental Sports and Entertainment** | | | | | | | - | |
| | Bill | 7/31/2024 | SPON20240978 | 7/31/2024 | 316 | $13,750.00 | 13,750.00 | 316 |
| | Bill | 8/14/2024 | SPON20250066 | 8/14/2024 | 302 | $14,437.50 | 14,437.50 | 302 |
| | Bill | 12/11/2024 | SPON20250384 | 12/11/2024 | 183 | $14,437.50 | 14,437.50 | 183 |
| | Bill | 3/5/2025 | SPON20250637 | 3/5/2025 | 99 | $14,437.50 | 14,437.50 | 99 |
| | Bill | 3/5/2025 | SPON20250637 | 3/5/2025 | 99 | $14,437.50 | 14,437.50 | 99 |
| | Bill | 3/5/2025 | SPON20250637 | 3/5/2025 | 99 | $14,437.50 | 14,437.50 | 99 |
| **Total - DC Arena LP DBA Monumental Sports and Entertainment** | | | | | | **$85,937.50** | - | |
| **Deluxe** | | | | | | | - | |
| | Bill | 6/27/2024 | 1748472 | 7/27/2024 | 320 | $23,458.21 | 23,458.21 | 320 |
| | Bill | 6/28/2024 | 1749450 | 7/28/2024 | 319 | $116.45 | 116.45 | 319 |
| | Bill | 7/1/2024 | 1748738 | 7/26/2024 | 321 | $32,780.00 | 32,780.00 | 321 |
| | Bill | 7/1/2024 | *06.26.2024* 1748474 | 7/26/2024 | 321 | $7,108.76 | 7,108.76 | 321 |
| | Bill | 7/1/2024 | 1748739 | 7/26/2024 | 321 | $19,069.92 | 19,069.92 | 321 |
| | Bill | 7/1/2024 | 1748471 | 7/26/2024 | 321 | $18,135.12 | 18,135.12 | 321 |
| | Bill | 7/1/2024 | 1749571 | 7/28/2024 | 319 | $1,278.55 | 1,278.55 | 319 |
| | Bill | 7/2/2024 | 1749951 | 8/2/2024 | 314 | $4,256.36 | 4,256.36 | 314 |
| | Bill | 7/3/2024 | 1750388 | 8/3/2024 | 313 | $10,189.35 | 10,189.35 | 313 |
| | Bill | 7/3/2024 | 1750389 | 8/3/2024 | 313 | $266.40 | 266.40 | 313 |
| | Bill | 7/12/2024 | 1752101 | 8/12/2024 | 304 | $181.72 | 181.72 | 304 |
| | Bill | 7/16/2024 | 1752931 | 8/16/2024 | 300 | $10,693.60 | 10,693.60 | 300 |
| | Bill | 7/16/2024 | 1752837-2 | 8/16/2024 | 300 | $1,970.54 | 1,970.54 | 300 |
| | Bill | 7/16/2024 | 1752837 | 8/16/2024 | 300 | $1,970.54 | 1,970.54 | 300 |
| | Bill | 7/17/2024 | 1753201 | 8/17/2024 | 299 | $7,405.99 | 7,405.99 | 299 |
| | Bill | 7/17/2024 | 1753073 | 8/17/2024 | 299 | $429.13 | 429.13 | 299 |
| | Bill | 7/26/2024 | 1755919 | 8/26/2024 | 290 | $2,452.10 | 2,452.10 | 290 |
| | Bill | 8/1/2024 | 1756149 | 8/29/2024 | 287 | $1,046.03 | 1,046.03 | 287 |
| | Bill | 8/6/2024 | 1759408 | 9/6/2024 | 279 | $180.53 | 180.53 | 279 |
| | Bill | 8/6/2024 | 1759407 | 9/6/2024 | 279 | $23.80 | 23.80 | 279 |
| | Bill | 8/9/2024 | 1761117 | 9/8/2024 | 277 | $10,280.08 | 10,280.08 | 277 |
| | Bill | 8/12/2024 | 1761523 | 9/11/2024 | 274 | $1,339.91 | 1,339.91 | 274 |
| | Bill | 8/13/2024 | 1761955 | 9/12/2024 | 273 | $1,893.60 | 1,893.60 | 273 |
| | Bill | 8/14/2024 | 1762335 | 9/13/2024 | 272 | $798.27 | 798.27 | 272 |
| | Bill | 8/14/2024 | 1762336 | 8/14/2024 | 302 | $677.05 | 677.05 | 302 |
| | Bill | 8/14/2024 | 1762204 | 9/13/2024 | 272 | $63.63 | 63.63 | 272 |
| | Bill Cred | 8/19/2024 | 1749951-A | 8/19/2024 | 297 | ($316.44) | (316.44) | 297 |
| | Bill | 8/20/2024 | 1763716 | 9/20/2024 | 265 | $1,052.33 | 1,052.33 | 265 |
| | Bill | 9/9/2024 | 1768643 | 10/8/2024 | 247 | $668.58 | 668.58 | 247 |
| | Bill | 9/16/2024 | 1770542 | 9/16/2024 | 269 | $2,365.60 | 2,365.60 | 269 |
| | Bill | 10/14/2024 | 1777573 | 10/14/2024 | 241 | $4,243.69 | 4,243.69 | 241 |
| | Bill | 10/15/2024 | 1777652 | 11/14/2024 | 210 | $4,656.07 | 4,656.07 | 210 |
| | Bill | 10/22/2024 | 1780283 | 10/22/2024 | 233 | $3,977.07 | 3,977.07 | 233 |
| | Bill | 10/23/2024 | 1780449 | 11/22/2024 | 202 | $4,885.98 | 4,885.98 | 202 |
| | Bill | 10/28/2024 | 1781495 | 10/28/2024 | 227 | $5,173.10 | 5,173.10 | 227 |
| | Bill | 10/29/2024 | 1782676 | 10/29/2024 | 226 | $335.47 | 335.47 | 226 |
| | Bill | 10/29/2024 | 1782411 | 10/29/2024 | 226 | $779.00 | 779.00 | 226 |
| | Bill | 10/29/2024 | 1782664 | 11/29/2024 | 195 | $1,736.25 | 1,736.25 | 195 |
| | Bill | 10/30/2024 | 1782823 | 10/30/2024 | 225 | $1,132.99 | 1,132.99 | 225 |
| | Bill | 10/30/2024 | 1782920 | 10/30/2024 | 225 | $720.92 | 720.92 | 225 |
| | Bill | 10/31/2024 | 1783283 | 10/31/2024 | 224 | $4,242.46 | 4,242.46 | 224 |
| | Bill | 10/31/2024 | 1783282 | 10/31/2024 | 224 | $3,262.65 | 3,262.65 | 224 |
| | Bill | 11/1/2024 | 1783602 | 11/1/2024 | 223 | $7,940.16 | 7,940.16 | 223 |
| | Bill | 11/5/2024 | 1784211 | 12/5/2024 | 189 | $4,218.72 | 4,218.72 | 189 |
| | Bill | 11/6/2024 | 1785441 | 11/6/2024 | 218 | $838.07 | 838.07 | 218 |
| | Bill | 11/6/2024 | 1785442 | 11/6/2024 | 218 | $1,485.43 | 1,485.43 | 218 |
| | Bill | 11/8/2024 | 1777410 | 11/8/2024 | 216 | $4,635.15 | 4,635.15 | 216 |
| | Bill | 11/12/2024 | 1787437 | 11/12/2024 | 212 | $1,278.55 | 1,278.55 | 212 |
| | Bill | 12/2/2024 | 1795502 | 12/2/2024 | 192 | $1,936.38 | 1,936.38 | 192 |
| | Bill | 12/4/2024 | 1796220 | 12/4/2024 | 190 | $6,655.00 | 6,655.00 | 190 |
| | Bill | 12/9/2024 | 1798750 | 12/9/2024 | 185 | $2,501.76 | 2,501.76 | 185 |
| **Total - Deluxe** | | | | | | **$228,470.58** | - | |
| **Deluxe- 20UNCNEA** | | | | | | | - | |
| | Bill | 2/1/2024 | 1708363 | 3/2/2024 | 467 | $23,678.50 | 23,678.50 | 467 |
| | Bill | 3/1/2024 | 1713702 | 3/31/2024 | 438 | $208,256.77 | 208,256.77 | 438 |
| | Bill | 4/1/2024 | 1721233 | 5/1/2024 | 407 | $85,202.94 | 85,202.94 | 407 |
| | Bill | 5/1/2024 | 1737291 | 5/31/2024 | 377 | $119,297.86 | 119,297.86 | 377 |
| | Bill | 7/1/2024 | 1751331 | 7/31/2024 | 316 | $149,292.11 | 149,292.11 | 316 |
| | Bill | 9/1/2024 | 1769718 | 10/1/2024 | 254 | $54,492.98 | 54,492.98 | 254 |
| | Bill | 9/1/2024 | 1744422 original inv dated | 7/1/2024 | 346 | $63,798.12 | 63,798.12 | 346 |
| | Bill | 9/1/2024 | 1763142 original invoice da | 10/1/2024 | 254 | $77,400.94 | 77,400.94 | 254 |
| | Bill | 10/1/2024 | 1776811 | 10/31/2024 | 224 | $46,677.59 | 46,677.59 | 224 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| | Bill | 11/1/2024 | 1788003 | 12/1/2024 | 193 | $31,597.68 | 31,597.68 | 193 |
| **Total - Deluxe- 20UNCNEA** | | | | | | **$859,695.49** | - | |
| **Distilled Resources, Inc.** | | | | | | | - | |
| | Bill | 7/9/2024 | 17626 | 7/9/2024 | 338 | $378.00 | 378.00 | 338 |
| | Bill | 7/9/2024 | IN 17626 | 7/9/2024 | 338 | $378.00 | 378.00 | 338 |
| | Bill | 8/7/2024 | 17699 | 8/7/2024 | 309 | $216.00 | 216.00 | 309 |
| | Bill | 9/4/2024 | 17768 | 9/4/2024 | 281 | $216.00 | 216.00 | 281 |
| | Bill | 9/10/2024 | 17775 | 9/10/2024 | 275 | $42,966.89 | 42,966.89 | 275 |
| | Bill | 10/7/2024 | 17838 | 10/7/2024 | 248 | $216.00 | 216.00 | 248 |
| | Bill | 11/6/2024 | 17918 | 11/6/2024 | 218 | $216.00 | 216.00 | 218 |
| | Bill | 12/11/2024 | 18018 | 12/11/2024 | 183 | $234.00 | 234.00 | 183 |
| | Bill | 1/13/2025 | 18088 | 1/13/2025 | 150 | $216.00 | 216.00 | 150 |
| | Bill | 2/26/2025 | 18185 | 2/26/2025 | 106 | $234.00 | 234.00 | 106 |
| | Bill | 3/31/2025 | 18272 | 3/31/2025 | 73 | $234.00 | 234.00 | 73 |
| | Bill | 4/28/2025 | 18339 | 4/28/2025 | 45 | $234.00 | 234.00 | 45 |
| **Total - Distilled Resources, Inc.** | | | | | | **$45,738.89** | - | |
| **Distilled Spirits Council of the United States** | | | | | | | - | |
| | Bill | 5/1/2024 | 202401425 | 4/13/2024 | 425 | $15,000.00 | 15,000.00 | 425 |
| | Bill | 2/6/2025 | 202502023 | 3/8/2025 | 96 | $7,500.00 | 7,500.00 | 96 |
| | Bill | 4/14/2025 | 202502094 | 5/14/2025 | 29 | $7,500.00 | 7,500.00 | 29 |
| | Bill | 4/14/2025 | 202502095 | 5/14/2025 | 29 | $7,500.00 | 7,500.00 | 29 |
| | Bill | 4/14/2025 | 202502096 | 5/14/2025 | 29 | $7,500.00 | 7,500.00 | 29 |
| | Bill Cred | 4/16/2025 | 202401425 | 4/16/2025 | 57 | ($15,000.00) | (15,000.00) | 57 |
| **Total - Distilled Spirits Council of the United States** | | | | | | **$30,000.00** | - | |
| **Donald R Perdue III** | | | | | | | - | |
| | Bill | 6/10/2025 | 6.08.2025 | 6/10/2025 | 2 | $315.00 | 315.00 | 2 |
| **Total - Donald R Perdue III** | | | | | | **$315.00** | - | |
| **Dragon Spirits Marketing, Inc.** | | | | | | | - | |
| | Bill | 1/9/2025 | 5088 | 1/9/2025 | 154 | $5,107.03 | 5,107.03 | 154 |
| **Total - Dragon Spirits Marketing, Inc.** | | | | | | **$5,107.03** | - | |
| **DTALS Incorporated** | | | | | | | - | |
| | Bill | 9/1/2024 | 6718 original inv dated 03/2 | 9/1/2024 | 284 | $1,089.00 | 1,089.00 | 284 |
| | Bill | 9/1/2024 | 6804 original inv dated 06/1 | 9/1/2024 | 284 | $1,625.00 | 1,625.00 | 284 |
| **Total - DTALS Incorporated** | | | | | | **$2,714.00** | - | |
| **Duck River Electric Membership Corp. -3002** | | | | | | | - | |
| | Bill | 5/21/2025 | 6.17.2025 | 6/5/2025 | 7 | $39.54 | 39.54 | 7 |
| **Total - Duck River Electric Membership Corp. -3002** | | | | | | **$39.54** | - | |
| **DWR Enterprises** | | | | | | | - | |
| | Bill | 1/15/2025 | 125 | 1/15/2025 | 148 | $2,550.00 | 2,550.00 | 148 |
| **Total - DWR Enterprises** | | | | | | **$2,550.00** | - | |
| **Ecolab Pest** | | | | | | | - | |
| | Bill | 1/3/2025 | 6350060104 | 2/2/2025 | 130 | $1,314.20 | 1,314.20 | 130 |
| | Bill | 3/25/2025 | 7527290 | 4/24/2025 | 49 | $1,285.66 | 1,285.66 | 49 |
| | Bill Cred | 4/16/2025 | 1400389617 | 4/16/2025 | 57 | ($98.74) | (98.74) | 57 |
| | Bill | 4/24/2025 | 7760712 | 5/24/2025 | 19 | $1,282.91 | 1,282.91 | 19 |
| | Bill | 5/27/2025 | 7996792 | 6/26/2025 | -14 | $1,282.91 | - | (14) |
| **Total - Ecolab Pest** | | | | | | **$5,066.94** | - | |
| **Edgartown Water Department** | | | | | | | - | |
| | Bill | 1/16/2025 | 1.16.2025 | 1/16/2025 | 147 | $444.03 | 444.03 | 147 |
| **Total - Edgartown Water Department** | | | | | | **$444.03** | - | |
| **Elyse V Ruinn** | | | | | | | - | |
| | Bill | 7/24/2024 | Humble Baron at TOTC 24 | 7/24/2024 | 323 | $500.00 | 500.00 | 323 |
| **Total - Elyse V Ruinn** | | | | | | **$500.00** | - | |
| **Entreprise David Patrick** | | | | | | | - | |
| | Bill | 1/1/2024 | 1661 | 1/1/2024 | 528 | $2,415.17 | 2,415.17 | 528 |
| | Bill | 3/5/2024 | 1684 | 3/5/2024 | 464 | $2,115.57 | 2,115.57 | 464 |
| | Bill | 3/5/2024 | 1685 | 3/5/2024 | 464 | $990.52 | 990.52 | 464 |
| **Total - Entreprise David Patrick** | | | | | | **$5,521.26** | - | |
| **Environnement XO Groupe artifex** | | | | | | | - | |
| | Bill | 1/1/2024 | 23/12/FA18024 | 1/1/2024 | 528 | $1,600.85 | 1,600.85 | 528 |
| **Total - Environnement XO Groupe artifex** | | | | | | **$1,600.85** | - | |
| **Epic Packaging Group** | | | | | | | - | |
| | Bill | 8/1/2024 | 2220 - original inv date 06/2 | 7/25/2024 | 322 | $39,822.84 | 39,822.84 | 322 |
| **Total - Epic Packaging Group** | | | | | | **$39,822.84** | - | |
| **Epsilon Lambda Charitable Foundation** | | | | | | | - | |
| | Bill | 4/25/2024 | 0105 | 5/7/2024 | 401 | $2,500.00 | 2,500.00 | 401 |
| **Total - Epsilon Lambda Charitable Foundation** | | | | | | **$2,500.00** | - | |
| **Eureke** | | | | | | | - | |
| | Bill | 4/22/2024 | 220424PTA2 | 4/22/2024 | 416 | $2,500.00 | 2,500.00 | 416 |
| **Total - Eureke** | | | | | | **$2,500.00** | - | |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| Exchange Media Group, Inc | | | | | | | - | |
| | Bill | 3/4/2025 | 27041 | 4/3/2025 | 70 | $1,429.00 | 1,429.00 | 70 |
| | Bill | 6/3/2025 | 28696 | 7/3/2025 | -21 | $3,154.00 | - | (21) |
| Total - Exchange Media Group, Inc | | | | | | $4,583.00 | - | |
| Firebirds International, LLC | | | | | | | - | |
| | Bill | 4/23/2024 | REG-25975 | 4/23/2024 | 415 | $2,500.00 | 2,500.00 | 415 |
| Total - Firebirds International, LLC | | | | | | $2,500.00 | - | |
| Fogel & Potamianos, LLP | | | | | | | - | |
| | Bill | 2/3/2025 | 1243 | 2/18/2025 | 114 | $525.00 | 525.00 | 114 |
| | Bill | 3/7/2025 | 1260 | 3/22/2025 | 82 | $7,087.50 | 7,087.50 | 82 |
| | Bill | 4/3/2025 | 1268 | 4/18/2025 | 55 | $1,540.00 | 1,540.00 | 55 |
| Total - Fogel & Potamianos, LLP | | | | | | $9,152.50 | - | |
| Forklift Systems Inc. | | | | | | | - | |
| | Bill | 4/17/2025 | 11004695 | 5/17/2025 | 26 | $202.66 | 202.66 | 26 |
| Total - Forklift Systems Inc. | | | | | | $202.66 | - | |
| Franklin Chamber of Commerce | | | | | | | - | |
| | Bill | 2/20/2025 | 2059 | 2/20/2025 | 112 | $5,000.00 | 5,000.00 | 112 |
| Total - Franklin Chamber of Commerce | | | | | | $5,000.00 | - | |
| FT Publications Inc | | | | | | | - | |
| | Bill | 8/1/2024 | 2120887067 | 3/6/2024 | 463 | $8,333.00 | 8,333.00 | 463 |
| Total - FT Publications Inc | | | | | | $8,333.00 | - | |
| Genesis Global Recruiting Inc. | | | | | | | - | |
| | Bill | 4/11/2025 | 788232rw | 5/26/2025 | 17 | $145,049.66 | 145,049.66 | 17 |
| | Bill | 4/11/2025 | 788235rw | 5/26/2025 | 17 | $213,637.22 | 213,637.22 | 17 |
| | Bill | 4/27/2025 | 788429rw | 6/11/2025 | 1 | $142,633.40 | 142,633.40 | 1 |
| | Bill | 4/27/2025 | 788430rw | 6/11/2025 | 1 | $186,453.72 | 186,453.72 | 1 |
| | Bill | 5/5/2025 | 788580rw | 6/19/2025 | -7 | $57,426.58 | - | (7) |
| | Bill | 5/5/2025 | 788585rw | 6/19/2025 | -7 | $50,187.61 | - | (7) |
| | Bill | 5/10/2025 | 788632rw | 6/24/2025 | -12 | $200,584.70 | - | (12) |
| | Bill | 5/10/2025 | 788631rw | 6/24/2025 | -12 | $143,656.94 | - | (12) |
| | Bill | 5/22/2025 | 788914rw | 7/6/2025 | -24 | $50,610.97 | - | (24) |
| | Bill | 5/22/2025 | 788907rw | 7/6/2025 | -24 | $57,426.58 | - | (24) |
| | Bill | 5/23/2025 | 788925as | 7/7/2025 | -25 | $146,561.71 | - | (25) |
| | Bill | 5/23/2025 | 788923as | 7/7/2025 | -25 | $181,840.50 | - | (25) |
| Total - Genesis Global Recruiting Inc. | | | | | | $1,576,069.59 | - | |
| Goo Goo Cluster | | | | | | | - | |
| | Bill | 4/18/2025 | ARI-279340 | 4/18/2025 | 55 | $1,692.72 | 1,692.72 | 55 |
| Total - Goo Goo Cluster | | | | | | $1,692.72 | - | |
| Green Note Capital | | | | | | | - | |
| | Bill | 9/13/2024 | 09132024 | 9/13/2024 | 272 | $13,263.64 | 13,263.64 | 272 |
| | Bill | 9/20/2024 | 09202024 | 9/20/2024 | 265 | $13,263.64 | 13,263.64 | 265 |
| Total - Green Note Capital | | | | | | $26,527.28 | - | |
| GREENBERG TRAURIG LLP | | | | | | | - | |
| | Bill | 2/28/2025 | 1000939367 | 3/30/2025 | 74 | $3,049.25 | 3,049.25 | 74 |
| | Bill | 3/21/2025 | 1000962462 | 4/20/2025 | 53 | $16,237.00 | 16,237.00 | 53 |
| | Bill | 4/22/2025 | 1000987818 | 5/22/2025 | 21 | $13,874.00 | 13,874.00 | 21 |
| | Bill | 6/4/2025 | 1001042344 | 7/4/2025 | -22 | $13,078.00 | - | (22) |
| Total - GREENBERG TRAURIG LLP | | | | | | $46,238.25 | - | |
| GS1 US | | | | | | | - | |
| | Bill | 4/26/2025 | SO-1894603 | 4/26/2025 | 47 | $150.00 | 150.00 | 47 |
| Total - GS1 US | | | | | | $150.00 | - | |
| Gunderson Dettmer | | | | | | | - | |
| | Bill | 3/8/2024 | 630412 | 4/7/2024 | 431 | $2,325.00 | 2,325.00 | 431 |
| | Bill | 3/8/2024 | 630388 | 4/7/2024 | 431 | $19,642.50 | 19,642.50 | 431 |
| | Bill | 4/10/2024 | 635079 | 5/10/2024 | 398 | $6,456.00 | 6,456.00 | 398 |
| | Bill | 4/10/2024 | 635052 | 5/10/2024 | 398 | $16,305.50 | 16,305.50 | 398 |
| | Bill | 5/16/2024 | 640986 | 6/15/2024 | 362 | $10,201.50 | 10,201.50 | 362 |
| | Bill | 5/16/2024 | 641016 | 6/15/2024 | 362 | $2,508.00 | 2,508.00 | 362 |
| | Bill | 6/24/2024 | 645666 | 7/24/2024 | 323 | $3,069.00 | 3,069.00 | 323 |
| | Bill | 6/24/2024 | 645688 | 7/24/2024 | 323 | $3,021.00 | 3,021.00 | 323 |
| | Bill | 7/11/2024 | 647998 | 8/10/2024 | 306 | $1,602.00 | 1,602.00 | 306 |
| | Bill | 9/1/2024 | 651363 original inv date 08 | 10/1/2024 | 254 | $571.50 | 571.50 | 254 |
| | Bill | 9/1/2024 | 651336 original inv date 08 | 10/1/2024 | 254 | $1,869.00 | 1,869.00 | 254 |
| | Bill | 9/11/2024 | 655719 | 10/11/2024 | 244 | $534.00 | 534.00 | 244 |
| | Bill | 10/14/2024 | 660729 | 11/13/2024 | 211 | $11,080.50 | 11,080.50 | 211 |
| | Bill | 11/5/2024 | 663716 | 12/5/2024 | 189 | $15,157.50 | 15,157.50 | 189 |
| | Bill | 12/20/2024 | 668539 | 1/19/2025 | 144 | $5,278.50 | 5,278.50 | 144 |
| | Bill | 1/24/2025 | 674282 | 2/23/2025 | 109 | $12,592.50 | 12,592.50 | 109 |
| | Bill | 2/21/2025 | 678469 | 3/23/2025 | 81 | $7,533.50 | 7,533.50 | 81 |
| | Bill | 3/27/2025 | 683313 | 4/26/2025 | 47 | $14,622.00 | 14,622.00 | 47 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| **Total - Gunderson Dettmer** | | | | | | **$134,369.50** | - | |
| **Hella Cocktail Co.** | | | | | | | - | |
| | Bill | 8/26/2024 | 47131 | 9/25/2024 | 260 | $2,729.25 | 2,729.25 | 260 |
| **Total - Hella Cocktail Co.** | | | | | | **$2,729.25** | - | |
| **Herring Technology** | | | | | | | - | |
| | Bill | 10/14/2024 | 15551 | 11/14/2024 | 210 | $81,018.00 | 81,018.00 | 210 |
| | Bill | 2/12/2025 | 16083 | 2/12/2025 | 120 | $395.00 | 395.00 | 120 |
| **Total - Herring Technology** | | | | | | **$81,413.00** | - | |
| **Himmels Architectural Door and Hardware** | | | | | | | - | |
| | Bill | 8/28/2024 | 440683 | 8/28/2024 | 288 | $5,196.26 | 5,196.26 | 288 |
| **Total - Himmels Architectural Door and Hardware** | | | | | | **$5,196.26** | - | |
| **HNB-Huntington Bank** | | | | | | | - | |
| | Bill | 5/28/2025 | 1847787 | 5/28/2025 | 15 | $1,125.28 | 1,125.28 | 15 |
| **Total - HNB-Huntington Bank** | | | | | | **$1,125.28** | - | |
| **Hopkins Farms Broadcasting, Inc.** | | | | | | | - | |
| | Bill | 9/24/2024 | 0645-010 | 9/24/2024 | 261 | $250.00 | 250.00 | 261 |
| **Total - Hopkins Farms Broadcasting, Inc.** | | | | | | **$250.00** | - | |
| **Hosni Khaled** | | | | | | | - | |
| | Bill | 1/1/2024 | 1 | 1/1/2024 | 528 | $978.30 | 978.30 | 528 |
| | Bill | 6/9/2024 | 5 | 6/9/2024 | 368 | $2,078.88 | 2,078.88 | 368 |
| **Total - Hosni Khaled** | | | | | | **$3,057.18** | - | |
| **Hotel Chais Monnet Cognac** | | | | | | | - | |
| | Bill | 1/19/2024 | Room 9020 | 1/19/2024 | 510 | $1,264.56 | 1,264.56 | 510 |
| | Bill | 4/24/2024 | 7708 | 4/24/2024 | 414 | $3,191.69 | 3,191.69 | 414 |
| **Total - Hotel Chais Monnet Cognac** | | | | | | **$4,456.25** | - | |
| **Hudson Group (HG) Retail LLC** | | | | | | | - | |
| | Bill | 3/20/2025 | 20251548 | 3/20/2025 | 84 | $13,000.00 | 13,000.00 | 84 |
| **Total - Hudson Group (HG) Retail LLC** | | | | | | **$13,000.00** | - | |
| **Hue & Cry Limited** | | | | | | | - | |
| | Bill | 10/9/2024 | HUE005433 | 10/9/2024 | 246 | $1,084.00 | 1,084.00 | 246 |
| | Bill | 12/18/2024 | HUE005500 | 12/18/2024 | 176 | $6,994.74 | 6,994.74 | 176 |
| | Bill | 1/10/2025 | HUE005487 | 1/10/2025 | 153 | $274.68 | 274.68 | 153 |
| **Total - Hue & Cry Limited** | | | | | | **$8,353.42** | - | |
| **Humble Baron** | | | | | | | - | |
| | Bill | 9/24/2024 | 0143 | 10/24/2024 | 231 | $3,455.03 | 3,455.03 | 231 |
| | Bill | 2/3/2025 | 1017 | 2/3/2025 | 129 | $1,880.37 | 1,880.37 | 129 |
| | Bill | 2/4/2025 | 1018 | 2/4/2025 | 128 | $678.75 | 678.75 | 128 |
| | Bill | 2/21/2025 | 1026 | 2/21/2025 | 111 | $135.75 | 135.75 | 111 |
| | Bill | 5/17/2025 | E00014 | 5/17/2025 | 26 | $7,887.97 | 7,887.97 | 26 |
| **Total - Humble Baron** | | | | | | **$14,037.87** | - | |
| **iGo Marketing & Entertainment** | | | | | | | - | |
| | Bill | 1/1/2024 | WHX24-133 | 10/1/2024 | 254 | $13,333.33 | 13,333.33 | 254 |
| **Total - iGo Marketing & Entertainment** | | | | | | **$13,333.33** | - | |
| **iHeartMedia** | | | | | | | - | |
| | Bill | 8/13/2024 | 8821696186 *8.13.2024* | 9/12/2024 | 273 | $19,396.61 | 19,396.61 | 273 |
| | Bill | 8/20/2024 | 8821706152- orginal inv# 8 | 9/19/2024 | 266 | $3,805.54 | 3,805.54 | 266 |
| | Bill | 9/12/2024 | 8821813525 | 10/12/2024 | 243 | $30,403.24 | 30,403.24 | 243 |
| **Total - iHeartMedia** | | | | | | **$53,605.39** | - | |
| **Imbibe Media, Inc.** | | | | | | | - | |
| | Bill | 3/21/2024 | 3392 | 4/20/2024 | 418 | $7,750.00 | 7,750.00 | 418 |
| | Bill | 5/31/2024 | 3408 | 6/30/2024 | 347 | $8,425.00 | 8,425.00 | 347 |
| | Bill | 8/1/2024 | 3423 | 8/31/2024 | 285 | $5,930.00 | 5,930.00 | 285 |
| **Total - Imbibe Media, Inc.** | | | | | | **$22,105.00** | - | |
| **Incorporating Services, Ltd** | | | | | | | - | |
| | Bill | 7/10/2024 | 006174776 | 7/10/2024 | 337 | $12,799.55 | 12,799.55 | 337 |
| | Bill | 11/14/2024 | 1317515 | 11/14/2024 | 210 | $86.94 | 86.94 | 210 |
| | Bill | 11/15/2024 | 1322539 | 11/15/2024 | 209 | $122.68 | 122.68 | 209 |
| | Bill | 11/15/2024 | 1322541 | 11/15/2024 | 209 | $122.68 | 122.68 | 209 |
| | Bill | 11/15/2024 | 1322542 | 11/15/2024 | 209 | $122.68 | 122.68 | 209 |
| | Bill | 11/15/2024 | 1322540 | 11/15/2024 | 209 | $122.68 | 122.68 | 209 |
| | Bill | 12/17/2024 | 1332051 | 12/17/2024 | 177 | $120.00 | 120.00 | 177 |
| | Bill | 1/15/2025 | 1340522 | 1/15/2025 | 148 | $120.00 | 120.00 | 148 |
| | Bill | 1/15/2025 | 1340523 | 1/15/2025 | 148 | $120.00 | 120.00 | 148 |
| **Total - Incorporating Services, Ltd** | | | | | | **$13,737.21** | - | |
| **Ingram Content Group** | | | | | | | - | |
| | Bill | 10/29/2024 | 84503713 | 10/29/2024 | 226 | $8,123.00 | 8,123.00 | 226 |
| | Bill | 10/29/2024 | 84503713 | 10/29/2024 | 226 | $1,152.07 | 1,152.07 | 226 |
| | Bill | 11/7/2024 | 84670912 | 11/7/2024 | 217 | $218.63 | 218.63 | 217 |
| | Bill | 11/29/2024 | 85036670 | 11/29/2024 | 195 | $4,063.00 | 4,063.00 | 195 |
| | Bill | 1/17/2025 | 86080517 | 1/17/2025 | 146 | $1,627.00 | 1,627.00 | 146 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| | Bill | 1/23/2025 | 86199188 | 1/23/2025 | 140 | $1,162.20 | 1,162.20 | 140 |
| | Bill | 1/28/2025 | 86284636 | 1/28/2025 | 135 | $1,627.00 | 1,627.00 | 135 |
| **Total - Ingram Content Group** | | | | | | **$17,972.90** | - | |
| **Intelligent Office Nashville** | | | | | | | - | |
| | Bill | 5/1/2025 | VO-11771 | 5/1/2025 | 42 | $1,002.00 | 1,002.00 | 42 |
| | Bill | 6/1/2025 | VO-11852 | 6/1/2025 | 11 | $1,039.80 | 1,039.80 | 11 |
| **Total - Intelligent Office Nashville** | | | | | | **$2,041.80** | - | |
| **Irell & Manella LLP** | | | | | | | - | |
| | Bill | 6/1/2024 | 8501988 | 6/1/2024 | 376 | $880.00 | 880.00 | 376 |
| | Bill | 6/1/2024 | 8501987 | 6/1/2024 | 376 | $110.00 | 110.00 | 376 |
| | Bill | 6/24/2024 | 8502165 | 6/24/2024 | 353 | $13,070.00 | 13,070.00 | 353 |
| | Bill | 7/24/2024 | 8502401 | 7/24/2024 | 323 | $3,020.00 | 3,020.00 | 323 |
| | Bill | 8/27/2024 | 8502607 | 8/27/2024 | 289 | $4,115.00 | 4,115.00 | 289 |
| | Bill | 9/26/2024 | 8502871 | 9/26/2024 | 259 | $1,905.00 | 1,905.00 | 259 |
| | Bill | 9/26/2024 | 8502870 | 9/26/2024 | 259 | $2,356.12 | 2,356.12 | 259 |
| | Bill | 10/14/2024 | 8503042 | 10/14/2024 | 241 | $9,126.00 | 9,126.00 | 241 |
| | Bill | 10/14/2024 | 8503044 | 10/14/2024 | 241 | $982.50 | 982.50 | 241 |
| | Bill | 11/25/2024 | 8503271 | 11/25/2024 | 199 | $5,140.00 | 5,140.00 | 199 |
| | Bill | 1/17/2025 | 8503708 | 1/17/2025 | 146 | $2,013.97 | 2,013.97 | 146 |
| | Bill | 6/2/2025 | 163441-0001b | 6/2/2025 | 10 | $450.00 | 450.00 | 10 |
| **Total - Irell & Manella LLP** | | | | | | **$43,168.59** | - | |
| **Irell and Manella LLP** | | | | | | | - | |
| | Bill | 7/31/2024 | 8502608 | 7/31/2024 | 316 | $3,799.00 | 3,799.00 | 316 |
| | Bill | 5/23/2025 | 8503711 | 5/23/2025 | 20 | $3,602.50 | 3,602.50 | 20 |
| | Bill | 5/23/2025 | 8504520 | 5/23/2025 | 20 | $6,624.00 | 6,624.00 | 20 |
| **Total - Irell and Manella LLP** | | | | | | **$14,025.50** | - | |
| **Isabelle Couprie** | | | | | | | - | |
| | Bill | 5/31/2025 | F202505004 | 5/31/2025 | 12 | $20,010.60 | 20,010.60 | 12 |
| **Total - Isabelle Couprie** | | | | | | **$20,010.60** | - | |
| **IST Services & Communications** | | | | | | | - | |
| | Bill | 8/26/2024 | *02012024* 196852 | 2/1/2024 | 497 | $2,532.00 | 2,532.00 | 497 |
| | Bill | 8/26/2024 | *02.01.2024* 196853 | 2/1/2024 | 497 | $702.40 | 702.40 | 497 |
| | Bill | 8/26/2024 | *03.01.2024* 196982 | 3/1/2024 | 468 | $2,532.00 | 2,532.00 | 468 |
| | Bill | 8/26/2024 | *03.01.2024* 196983 | 3/1/2024 | 468 | $702.40 | 702.40 | 468 |
| **Total - IST Services & Communications** | | | | | | **$6,468.80** | - | |
| **ITNOLAP Pallet & Crafting, Inc.** | | | | | | | - | |
| | Bill | 11/27/2024 | 32107 | 12/7/2024 | 187 | $1,137.50 | 1,137.50 | 187 |
| **Total - ITNOLAP Pallet & Crafting, Inc.** | | | | | | **$1,137.50** | - | |
| **Jessica Guerard Redeuil EI** | | | | | | | - | |
| | Bill | 5/14/2025 | 332025 | 5/14/2025 | 29 | $897.70 | 897.70 | 29 |
| **Total - Jessica Guerard Redeuil EI** | | | | | | **$897.70** | - | |
| **Jonas Velarde** | | | | | | | - | |
| | Bill | 4/25/2025 | 05042025 | 4/25/2025 | 48 | $337.50 | 337.50 | 48 |
| | Bill | 4/25/2025 | 04242025 | 4/25/2025 | 48 | $180.00 | 180.00 | 48 |
| **Total - Jonas Velarde** | | | | | | **$517.50** | - | |
| **Jose Rolando Garza** | | | | | | | - | |
| | Bill | 6/10/2025 | 6.06.2025 | 6/10/2025 | 2 | $405.00 | 405.00 | 2 |
| **Total - Jose Rolando Garza** | | | | | | **$405.00** | - | |
| **Journey For Good Foundation** | | | | | | | - | |
| | Bill | 6/2/2025 | UN2025 | 6/2/2025 | 10 | $6,000.00 | 6,000.00 | 10 |
| **Total - Journey For Good Foundation** | | | | | | **$6,000.00** | - | |
| **JumpCrew LLC** | | | | | | | - | |
| | Bill | 6/1/2024 | INV11265 | 6/11/2024 | 366 | $4,000.00 | 4,000.00 | 366 |
| **Total - JumpCrew LLC** | | | | | | **$4,000.00** | - | |
| **Katie Acs / KACS Marketing** | | | | | | | - | |
| | Bill | 5/3/2025 | 2025-013 | 5/3/2025 | 40 | $5,000.00 | 5,000.00 | 40 |
| | Bill | 5/31/2025 | 2025-017 | 5/31/2025 | 12 | $5,000.00 | 5,000.00 | 12 |
| **Total - Katie Acs / KACS Marketing** | | | | | | **$10,000.00** | - | |
| **Katsky Korins LLP** | | | | | | | - | |
| | Bill | 3/13/2025 | 28662820 | 4/12/2025 | 61 | $10,064.00 | 10,064.00 | 61 |
| | Bill | 5/13/2025 | 28664733 | 6/12/2025 | 0 | $2,998.80 | 2,998.80 | - |
| **Total - Katsky Korins LLP** | | | | | | **$13,062.80** | - | |
| **Kristin Collignon** | | | | | | | - | |
| | Bill | 4/29/2025 | 1109 | 4/29/2025 | 44 | $295.00 | 295.00 | 44 |
| **Total - Kristin Collignon** | | | | | | **$295.00** | - | |
| **Lakeway Publishers** | | | | | | | - | |
| | Bill | 8/31/2024 | 12842693 | 8/31/2024 | 285 | $695.00 | 695.00 | 285 |
| | Bill | 8/31/2024 | 12842692 | 8/31/2024 | 285 | $800.00 | 800.00 | 285 |
| | Bill | 11/30/2024 | 12855024 | 11/30/2024 | 194 | $600.00 | 600.00 | 194 |
| | Bill | 11/30/2024 | 12856023 | 11/30/2024 | 194 | $600.00 | 600.00 | 194 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| | Bill | 11/30/2024 | 12856022 | 11/30/2024 | 194 | $650.00 | 650.00 | 194 |
| **Total - Lakeway Publishers** | | | | | | **$3,345.00** | - | |
| **Lamar Companies** | | | | | | | - | |
| | Bill | 6/4/2024 | 116018345 | 7/4/2024 | 343 | $9,375.00 | 9,375.00 | 343 |
| | Bill | 7/2/2024 | 116105398 | 8/1/2024 | 315 | $9,375.00 | 9,375.00 | 315 |
| | Bill | 8/1/2024 | 116184110 original inv date | 8/31/2024 | 285 | $9,375.00 | 9,375.00 | 285 |
| | Bill | 8/27/2024 | 116270454 | 9/26/2024 | 259 | $9,375.00 | 9,375.00 | 259 |
| | Bill | 9/1/2024 | 116336607 original inv date | 10/18/2024 | 237 | $7,031.25 | 7,031.25 | 237 |
| **Total - Lamar Companies** | | | | | | **$44,531.25** | - | |
| **Landreau Agro** | | | | | | | - | |
| | Bill | 3/31/2025 | 110543 | 3/31/2025 | 73 | $273.30 | 273.30 | 73 |
| | Bill | 5/28/2025 | 120495 | 5/28/2025 | 15 | $1,000.53 | 1,000.53 | 15 |
| | Bill | 5/31/2025 | 121733 | 5/31/2025 | 12 | $4,508.33 | 4,508.33 | 12 |
| | Bill | 6/1/2025 | 001558 | 6/1/2025 | 11 | $14,966.72 | 14,966.72 | 11 |
| **Total - Landreau Agro** | | | | | | **$20,748.88** | - | |
| **Launi King** | | | | | | | - | |
| | Bill | 12/1/2024 | 120124001 | 12/16/2024 | 178 | $1,575.00 | 1,575.00 | 178 |
| | Bill | 12/5/2024 | 100124-001 *12.5.2024* | 12/20/2024 | 174 | $2,925.00 | 2,925.00 | 174 |
| | Bill | 1/1/2025 | 010125004 | 1/16/2025 | 147 | $8,325.00 | 8,325.00 | 147 |
| | Bill | 1/14/2025 | 110124-002 | 1/29/2025 | 134 | $2,175.00 | 2,175.00 | 134 |
| | Bill | 5/1/2025 | 010125006 | 5/16/2025 | 27 | $7,575.00 | 7,575.00 | 27 |
| | Bill | 5/2/2025 | 010125008 | 5/17/2025 | 26 | $975.00 | 975.00 | 26 |
| **Total - Launi King** | | | | | | **$23,550.00** | - | |
| **Lease Direct** | | | | | | | - | |
| | Bill | 5/7/2025 | 590151061 | 5/7/2025 | 36 | $318.10 | 318.10 | 36 |
| | Bill | 6/6/2025 | 590450744 | 6/6/2025 | 6 | $318.10 | 318.10 | 6 |
| **Total - Lease Direct** | | | | | | **$636.20** | - | |
| **LED Marquee** | | | | | | | - | |
| | Bill | 8/28/2024 | 509 | 9/11/2024 | 274 | $1,761.66 | 1,761.66 | 274 |
| **Total - LED Marquee** | | | | | | **$1,761.66** | - | |
| **Lee Company** | | | | | | | - | |
| | Bill | 7/11/2024 | LEE-001049030 | 7/11/2024 | 336 | $1,761.05 | 1,761.05 | 336 |
| | Bill | 7/28/2024 | LEE-001063882 | 7/28/2024 | 319 | $943.06 | 943.06 | 319 |
| | Bill | 7/31/2024 | LEE-001067473 | 7/31/2024 | 316 | $5,880.00 | 5,880.00 | 316 |
| | Bill | 8/30/2024 | LEE-001089652 | 8/30/2024 | 286 | $1,844.00 | 1,844.00 | 286 |
| **Total - Lee Company** | | | | | | **$10,428.11** | - | |
| **LeisureMedia360 Inc.** | | | | | | | - | |
| | Bill | 12/12/2024 | 83316 | 1/11/2025 | 152 | $4,345.00 | 4,345.00 | 152 |
| **Total - LeisureMedia360 Inc.** | | | | | | **$4,345.00** | - | |
| **Levi Gotsman** | | | | | | | - | |
| | Bill | 5/3/2025 | 67 | 5/3/2025 | 40 | $225.00 | 225.00 | 40 |
| | Bill | 5/4/2025 | 68 | 5/4/2025 | 39 | $337.50 | 337.50 | 39 |
| | Bill | 5/5/2025 | 69 | 5/5/2025 | 38 | $360.00 | 360.00 | 38 |
| | Bill | 5/7/2025 | 70 | 5/7/2025 | 36 | $135.00 | 135.00 | 36 |
| **Total - Levi Gotsman** | | | | | | **$1,057.50** | - | |
| **Levy / Humble Baron, Inc.** | | | | | | | - | |
| | Bill | 11/6/2023 | Uncle-387812-1 | 11/6/2023 | 584 | $275.43 | 275.43 | 584 |
| | Bill | 12/8/2023 | Uncle-387828-1 | 12/8/2023 | 552 | $36,599.30 | 36,599.30 | 552 |
| | Bill | 1/22/2024 | UNCLE-411199-1 | 1/31/2024 | 498 | $182.61 | 182.61 | 498 |
| | Bill | 1/24/2024 | UNCLE-411203-1 | 1/24/2024 | 505 | $182.61 | 182.61 | 505 |
| | Bill | 6/1/2024 | UNCLE-405872-1 | 4/16/2024 | 422 | $57,776.43 | 57,776.43 | 422 |
| | Bill | 6/1/2024 | UNCLE-411393-1 | 6/1/2024 | 376 | $1,873.93 | 1,873.93 | 376 |
| | Bill | 7/1/2024 | *01.23.2024* UNCLE-4113 | 1/23/2024 | 506 | $1,873.92 | 1,873.92 | 506 |
| | Bill | 7/1/2024 | *11.24.2023* UNCLE-3976 | 11/24/2023 | 566 | $2,636.94 | 2,636.94 | 566 |
| | Bill | 7/1/2024 | *05.11.2024* UNCLE-4093 | 5/11/2024 | 397 | $7,868.45 | 7,868.45 | 397 |
| | Bill | 7/1/2024 | *05.04.2024* UNCLE-4399 | 5/4/2024 | 404 | $3,318.44 | 3,318.44 | 404 |
| | Bill | 7/1/2024 | *04.17.2024* UNCLE-4364 | 4/17/2024 | 421 | $2,118.79 | 2,118.79 | 421 |
| | Bill | 7/1/2024 | *05.04.2024* UNCLE-4407 | 5/4/2024 | 404 | $1,221.08 | 1,221.08 | 404 |
| | Bill | 7/1/2024 | *05.25.2024* UNCLE-4439 | 5/25/2024 | 383 | $5,978.67 | 5,978.67 | 383 |
| | Bill | 7/1/2024 | *06.30.2024* UNCLE-4465 | 6/30/2024 | 347 | $11,517.34 | 11,517.34 | 347 |
| | Bill | 7/1/2024 | *04.24.2024* UNCLE-4395 | 4/24/2024 | 414 | $1,077.12 | 1,077.12 | 414 |
| **Total - Levy / Humble Baron, Inc.** | | | | | | **$134,501.06** | - | |
| **Liquidity- Liquid Luxury** | | | | | | | - | |
| | Bill | 4/30/2025 | 80764 | 4/30/2025 | 43 | $320.28 | 320.28 | 43 |
| **Total - Liquidity- Liquid Luxury** | | | | | | **$320.28** | - | |
| **Liquor Bottle Packaging International, LLC** | | | | | | | - | |
| | Bill | 4/24/2024 | PS-INV2400737 | 5/24/2024 | 384 | $11,446.88 | 11,446.88 | 384 |
| | Bill | 6/24/2024 | PS-INV2401288 | 7/24/2024 | 323 | $570.64 | 570.64 | 323 |
| | Bill | 8/27/2024 | PS-INV2401740 | 9/26/2024 | 259 | $390.00 | 390.00 | 259 |
| | Bill | 8/28/2024 | PS-INV2401753 | 9/27/2024 | 258 | $6,159.17 | 6,159.17 | 258 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| | Bill | 10/2/2024 | PS-INV2401967 | 11/1/2024 | 223 | $11,215.94 | 11,215.94 | 223 |
| **Total - Liquor Bottle Packaging International, LLC** | | | | | | **$29,782.63** | - | |
| **LocaliQ USA Today Network - acct 1142698** | | | | | | | - | |
| | Bill | 3/31/2024 | 0006346960 | 4/15/2024 | 423 | $14,400.00 | 14,400.00 | 423 |
| | Bill | 5/1/2024 | 0006356579 | 5/20/2024 | 388 | $2,890.00 | 2,890.00 | 388 |
| | Bill | 7/1/2024 | 6545126 + finanace charge | 7/16/2024 | 331 | $5,722.50 | 5,722.50 | 331 |
| | Bill | 11/11/2024 | 1302072S | 11/26/2024 | 198 | $216.75 | 216.75 | 198 |
| | Bill | 3/1/2025 | 6948757 | 3/16/2025 | 88 | $43.35 | 43.35 | 88 |
| | Bill | 4/1/2025 | 7001778 | 4/16/2025 | 57 | $43.35 | 43.35 | 57 |
| | Bill | 5/1/2025 | 7055545 | 5/16/2025 | 27 | $43.35 | 43.35 | 27 |
| | Bill | 6/1/2025 | 7109008-finance chg | 6/16/2025 | -4 | $43.35 | - | (4) |
| **Total - LocaliQ USA Today Network - acct 1142698** | | | | | | **$23,402.65** | - | |
| **Loomis** | | | | | | | - | |
| | Bill | 8/31/2024 | 13567050 | 9/15/2024 | 270 | $336.34 | 336.34 | 270 |
| | Bill | 10/31/2024 | 13607001 | 11/15/2024 | 209 | $334.93 | 334.93 | 209 |
| | Bill | 11/30/2024 | 13627906 | 12/15/2024 | 179 | $334.93 | 334.93 | 179 |
| | Bill | 12/31/2024 | 13645642 | 1/15/2025 | 148 | $384.18 | 384.18 | 148 |
| | Bill | 1/31/2025 | 13667519 | 2/15/2025 | 117 | $396.87 | 396.87 | 117 |
| **Total - Loomis** | | | | | | **$1,787.25** | - | |
| **Lumenate** | | | | | | | - | |
| | Bill | 1/6/2025 | 5252-1 | 1/6/2025 | 157 | $31,250.00 | 31,250.00 | 157 |
| **Total - Lumenate** | | | | | | **$31,250.00** | - | |
| **Lush Tastings LLC** | | | | | | | - | |
| | Bill | 6/10/2024 | LLP-1958 | 6/10/2024 | 367 | $3,500.00 | 3,500.00 | 367 |
| **Total - Lush Tastings LLC** | | | | | | **$3,500.00** | - | |
| **Lymion Group Inc DBA Overproof** | | | | | | | - | |
| | Bill | 6/6/2024 | INV-1227 | 6/6/2024 | 371 | $2,553.75 | 2,553.75 | 371 |
| | Bill | 9/1/2024 | INV-1336 original inv dated | 8/6/2024 | 310 | $2,553.75 | 2,553.75 | 310 |
| | Bill | 9/1/2024 | INV-1335 original inv dated | 7/6/2024 | 341 | $2,553.75 | 2,553.75 | 341 |
| | Bill | 9/6/2024 | INV-1337 | 9/6/2024 | 279 | $2,553.75 | 2,553.75 | 279 |
| | Bill | 10/6/2024 | INV-1461 | 10/6/2024 | 249 | $2,553.75 | 2,553.75 | 249 |
| | Bill | 11/6/2024 | INV-1462 | 11/6/2024 | 218 | $2,553.75 | 2,553.75 | 218 |
| | Bill | 12/6/2024 | INV-1463 | 12/6/2024 | 188 | $2,553.75 | 2,553.75 | 188 |
| | Bill | 1/6/2025 | INV-1464 | 1/6/2025 | 157 | $2,553.75 | 2,553.75 | 157 |
| **Total - Lymion Group Inc DBA Overproof** | | | | | | **$20,430.00** | - | |
| **Main Street Murfreesboro** | | | | | | | - | |
| | Bill | 7/30/2024 | FRIDAYNIGHTLIVE | 7/30/2024 | 317 | $3,000.00 | 3,000.00 | 317 |
| **Total - Main Street Murfreesboro** | | | | | | **$3,000.00** | - | |
| **Mandlik & Rhodes** | | | | | | | - | |
| | Bill | 5/1/2024 | 500466 | 5/1/2024 | 407 | $386.25 | 386.25 | 407 |
| | Bill | 6/5/2024 | 500991 | 6/5/2024 | 372 | $461.25 | 461.25 | 372 |
| | Bill | 7/3/2024 | 501507 | 7/3/2024 | 344 | $386.25 | 386.25 | 344 |
| **Total - Mandlik & Rhodes** | | | | | | **$1,233.75** | - | |
| **Maplebear Inc. DBA Instacart** | | | | | | | - | |
| | Bill Cred | 4/12/2024 | 1036463487TC | 4/12/2024 | 426 | ($0.01) | (0.01) | 426 |
| | Bill Cred | 4/15/2024 | 170706 | 4/15/2024 | 423 | ($81.24) | (81.24) | 423 |
| | Bill Cred | 4/15/2024 | 170711 | 4/15/2024 | 423 | ($53.12) | (53.12) | 423 |
| | Bill | 5/10/2024 | 302743 | 6/9/2024 | 368 | $3,609.89 | 3,609.89 | 368 |
| | Bill | 6/10/2024 | 309739 | 7/10/2024 | 337 | $3,634.81 | 3,634.81 | 337 |
| | Bill | 7/10/2024 | 316078 | 8/9/2024 | 307 | $3,637.81 | 3,637.81 | 307 |
| | Bill | 9/1/2024 | 322499 original inv date 08 | 9/8/2024 | 277 | $3,606.46 | 3,606.46 | 277 |
| | Bill | 9/10/2024 | 329629 | 10/10/2024 | 245 | $3,628.50 | 3,628.50 | 245 |
| | Bill | 10/10/2024 | 338047 | 11/9/2024 | 215 | $2,629.11 | 2,629.11 | 215 |
| **Total - Maplebear Inc. DBA Instacart** | | | | | | **$20,612.21** | - | |
| **Marabou, Inc F/S/O Jeffrey Wright** | | | | | | | - | |
| | Bill | 4/15/2024 | 007 | 1/31/2025 | 132 | $600,000.00 | 600,000.00 | 132 |
| **Total - Marabou, Inc F/S/O Jeffrey Wright** | | | | | | **$600,000.00** | - | |
| **MarkeTeam, Inc** | | | | | | | - | |
| | Bill | 3/20/2025 | INV-38926 | 4/19/2025 | 54 | $2,600.00 | 2,600.00 | 54 |
| **Total - MarkeTeam, Inc** | | | | | | **$2,600.00** | - | |
| **Marshall's Haute Sauce** | | | | | | | - | |
| | Bill | 5/6/2025 | 5529 | 5/6/2025 | 37 | $545.00 | 545.00 | 37 |
| **Total - Marshall's Haute Sauce** | | | | | | **$545.00** | - | |
| **Matanguy SAS** | | | | | | | - | |
| | Bill | 1/30/2024 | 1 | 1/30/2024 | 499 | $267.03 | 267.03 | 499 |
| | Bill | 5/31/2025 | 20 | 5/31/2025 | 12 | $10,005.30 | 10,005.30 | 12 |
| **Total - Matanguy SAS** | | | | | | **$10,272.33** | - | |
| **MCC Magazines, LLC** | | | | | | | - | |
| | Bill | 4/30/2024 | 92765580 | 5/30/2024 | 378 | $3,500.00 | 3,500.00 | 378 |
| **Total - MCC Magazines, LLC** | | | | | | **$3,500.00** | - | |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| Mercedes Benz Henderson | | | | | | | - | |
| | Bill | 6/4/2025 | 6.22.2025 | 6/4/2025 | 8 | $1,306.48 | 1,306.48 | 8 |
| **Total - Mercedes Benz Henderson** | | | | | | **$1,306.48** | - | |
| Mercury Design Studio | | | | | | | - | |
| | Bill | 7/24/2024 | C-070224-006 | 7/24/2024 | 323 | $12,500.00 | 12,500.00 | 323 |
| **Total - Mercury Design Studio** | | | | | | **$12,500.00** | - | |
| Metro Lynchburg | | | | | | | - | |
| | Bill | 4/30/2025 | 4.30.2025 | 4/30/2025 | 43 | $29.17 | 29.17 | 43 |
| **Total - Metro Lynchburg** | | | | | | **$29.17** | - | |
| Metropolitan Moore Co Utility | | | | | | | - | |
| | Bill | 4/30/2025 | 5.29.2025 | 5/30/2025 | 13 | $74.29 | 74.29 | 13 |
| **Total - Metropolitan Moore Co Utility** | | | | | | **$74.29** | - | |
| Midwest Promotional Models Inc | | | | | | | - | |
| | Bill | 6/10/2024 | 11415 | 6/20/2024 | 357 | $826.00 | 826.00 | 357 |
| | Bill | 7/1/2024 | 11432 | 7/31/2024 | 316 | $1,538.00 | 1,538.00 | 316 |
| | Bill | 9/4/2024 | 11507 | 9/4/2024 | 281 | $1,980.19 | 1,980.19 | 281 |
| **Total - Midwest Promotional Models Inc** | | | | | | **$4,344.19** | - | |
| Milano Promotional Services, Inc | | | | | | | - | |
| | Bill | 4/19/2024 | 161022R | 5/4/2024 | 404 | $246.92 | 246.92 | 404 |
| | Bill | 6/24/2024 | 162250R | 7/9/2024 | 338 | $83.27 | 83.27 | 338 |
| | Bill | 7/24/2024 | 162930R | 8/5/2024 | 311 | $192.20 | 192.20 | 311 |
| | Bill | 8/26/2024 | 163565R | 9/10/2024 | 275 | $31.90 | 31.90 | 275 |
| **Total - Milano Promotional Services, Inc** | | | | | | **$554.29** | - | |
| Monalto Corporate Events Inc | | | | | | | - | |
| | Bill | 11/30/2023 | 13300 | 12/30/2023 | 530 | $331,222.09 | 331,222.09 | 530 |
| | Bill | 2/22/2024 | 13377 | 3/23/2024 | 446 | $0.01 | 0.01 | 446 |
| | Bill | 4/22/2024 | 13451 | 5/22/2024 | 386 | $138,704.32 | 138,704.32 | 386 |
| | Bill | 6/7/2024 | 13518 | 7/7/2024 | 340 | $187,531.25 | 187,531.25 | 340 |
| | Bill | 8/31/2024 | 13627 | 9/30/2024 | 255 | $89,816.07 | 89,816.07 | 255 |
| | Bill | 9/1/2024 | 13561 original inv dated 07 | 7/22/2024 | 325 | $110,802.60 | 110,802.60 | 325 |
| | Bill | 9/11/2024 | 13629 | 10/11/2024 | 244 | $108,938.89 | 108,938.89 | 244 |
| | Bill | 9/30/2024 | 13663 | 10/30/2024 | 225 | $119,041.63 | 119,041.63 | 225 |
| | Bill | 10/31/2024 | 13704 | 11/30/2024 | 194 | $121,069.44 | 121,069.44 | 194 |
| **Total - Monalto Corporate Events Inc** | | | | | | **$1,207,126.30** | - | |
| Monique Henderson | | | | | | | - | |
| | Bill | 4/14/2025 | HEND-041425 | 4/14/2025 | 59 | $665.00 | 665.00 | 59 |
| **Total - Monique Henderson** | | | | | | **$665.00** | - | |
| Monumental Sports and Entertainment | | | | | | | - | |
| | Bill | 3/5/2025 | SPON20250637 | 3/5/2025 | 99 | $14,437.50 | 14,437.50 | 99 |
| **Total - Monumental Sports and Entertainment** | | | | | | **$14,437.50** | - | |
| Mora Chagoya | | | | | | | - | |
| | Bill | 3/6/2025 | 0001 | 4/5/2025 | 68 | $459.50 | 459.50 | 68 |
| **Total - Mora Chagoya** | | | | | | **$459.50** | - | |
| Morgan, Lewis & Bockius LLP | | | | | | | - | |
| | Bill | 6/1/2024 | 5440293 | 6/28/2024 | 349 | $12,757.90 | 12,757.90 | 349 |
| | Bill | 8/1/2024 | 5479936 original inv date 0 | 8/31/2024 | 285 | $1,176.00 | 1,176.00 | 285 |
| | Bill | 9/1/2024 | 5497088 original inv dated | 10/1/2024 | 254 | $31,500.40 | 31,500.40 | 254 |
| | Bill | 9/17/2024 | 5518821 | 10/17/2024 | 238 | $13,231.50 | 13,231.50 | 238 |
| | Bill | 10/7/2024 | 5528957 | 11/6/2024 | 218 | $1,899.50 | 1,899.50 | 218 |
| | Bill | 12/23/2024 | 5578428 | 1/22/2025 | 141 | $195.00 | 195.00 | 141 |
| | Bill | 12/23/2024 | 5578427 | 1/22/2025 | 141 | $4,095.00 | 4,095.00 | 141 |
| | Bill | 1/10/2025 | 5587701 | 2/9/2025 | 123 | $2,000.00 | 2,000.00 | 123 |
| | Bill | 1/22/2025 | 5596893 | 2/21/2025 | 111 | $487.50 | 487.50 | 111 |
| | Bill | 2/21/2025 | 5612843 | 3/23/2025 | 81 | $876.00 | 876.00 | 81 |
| | Bill | 2/21/2025 | 5612844 | 3/23/2025 | 81 | $438.00 | 438.00 | 81 |
| | Bill | 3/17/2025 | 5631040 | 4/16/2025 | 57 | $1,314.00 | 1,314.00 | 57 |
| | Bill | 4/9/2025 | 5645788 | 5/9/2025 | 34 | $1,107.00 | 1,107.00 | 34 |
| **Total - Morgan, Lewis & Bockius LLP** | | | | | | **$71,077.80** | - | |
| Movie Prod | | | | | | | - | |
| | Bill | 2/21/2024 | I-24-02-3 | 2/21/2024 | 477 | $712.87 | 712.87 | 477 |
| | Bill | 3/31/2024 | I-24-03-7 | 3/31/2024 | 438 | $712.34 | 712.34 | 438 |
| | Bill | 10/9/2024 | 24-10-171 | 10/9/2024 | 246 | $1,184.40 | 1,184.40 | 246 |
| | Bill | 11/28/2024 | 24-11-178 | 11/28/2024 | 196 | $722.71 | 722.71 | 196 |
| **Total - Movie Prod** | | | | | | **$3,332.32** | - | |
| Mustard Seed Restaurant 2 LLC dba Daisy's Po'Boy & Tavern | | | | | | | - | |
| | Bill | 4/30/2025 | 1006 | 5/30/2025 | 13 | $2,000.00 | 2,000.00 | 13 |
| **Total - Mustard Seed Restaurant 2 LLC dba Daisy's Po'Boy & Tavern** | | | | | | **$2,000.00** | - | |
| Myers Concert Productions | | | | | | | - | |
| | Bill | 6/1/2024 | 5584 | 6/1/2024 | 376 | $500.00 | 500.00 | 376 |
| **Total - Myers Concert Productions** | | | | | | **$500.00** | - | |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| Nantur Protection Incendie | | | | | | | - | |
| | Bill | 1/1/2024 | FAC232402997 | 1/1/2024 | 528 | $1,830.97 | 1,830.97 | 528 |
| **Total - Nantur Protection Incendie** | | | | | | **$1,830.97** | - | |
| **Nashville Communications** | | | | | | | - | |
| | Bill | 12/10/2024 | 135000027-1 | 12/10/2024 | 184 | $275.66 | 275.66 | 184 |
| | Bill | 1/2/2025 | 130002232-1 | 1/2/2025 | 161 | $320.63 | 320.63 | 161 |
| | Bill | 1/3/2025 | 80001313 | 1/3/2025 | 160 | $2,354.16 | 2,354.16 | 160 |
| | Bill | 2/4/2025 | 80001325 | 2/4/2025 | 128 | $2,354.16 | 2,354.16 | 128 |
| | Bill Cred | 2/12/2025 | VRMA160-01 | 2/12/2025 | 120 | ($16.47) | (16.47) | 120 |
| | Bill | 3/5/2025 | 80001340 | 3/5/2025 | 99 | $1,712.10 | 1,712.10 | 99 |
| | Bill | 4/2/2025 | 80001357 | 4/2/2025 | 71 | $1,712.10 | 1,712.10 | 71 |
| **Total - Nashville Communications** | | | | | | **$8,712.34** | - | |
| **Nashwood** | | | | | | | - | |
| | Bill | 4/1/2024 | April 2024 | 5/1/2024 | 407 | $10,000.00 | 10,000.00 | 407 |
| | Bill | 5/1/2024 | May 2024 | 6/1/2024 | 376 | $10,000.00 | 10,000.00 | 376 |
| | Bill | 6/1/2024 | June 2024 | 7/1/2024 | 346 | $10,000.00 | 10,000.00 | 346 |
| | Bill | 7/1/2024 | July 2024 | 8/1/2024 | 315 | $10,000.00 | 10,000.00 | 315 |
| | Bill | 9/1/2024 | Aug 2024 | 9/1/2024 | 284 | $10,000.00 | 10,000.00 | 284 |
| **Total - Nashwood** | | | | | | **$50,000.00** | - | |
| **National Museum of African American Music** | | | | | | | - | |
| | Bill | 5/9/2025 | 10009 | 5/9/2025 | 34 | $5,000.00 | 5,000.00 | 34 |
| **Total - National Museum of African American Music** | | | | | | **$5,000.00** | - | |
| **Nationwide Distribution Services, Inc** | | | | | | | - | |
| | Bill | 3/1/2025 | I07933 | 3/31/2025 | 73 | $1,927.20 | 1,927.20 | 73 |
| | Bill | 4/1/2025 | I08030 | 5/1/2025 | 42 | $1,927.20 | 1,927.20 | 42 |
| | Bill | 4/30/2025 | I08093 | 5/30/2025 | 13 | $2,079.00 | 2,079.00 | 13 |
| | Bill | 5/1/2025 | I08128 | 5/31/2025 | 12 | $3,313.20 | 3,313.20 | 12 |
| | Bill | 5/2/2025 | I08124 | 6/1/2025 | 11 | $792.00 | 792.00 | 11 |
| | Bill | 5/9/2025 | I08155 | 6/8/2025 | 4 | $5.50 | 5.50 | 4 |
| **Total - Nationwide Distribution Services, Inc** | | | | | | **$10,044.10** | - | |
| **Nicholas A Sensley** | | | | | | | - | |
| | Bill | 10/8/2024 | 0001 | 10/8/2024 | 247 | $21,049.00 | 21,049.00 | 247 |
| **Total - Nicholas A Sensley** | | | | | | **$21,049.00** | - | |
| **Nicole Rush** | | | | | | | - | |
| | Bill | 5/6/2025 | 114 | 5/6/2025 | 37 | $2,000.00 | 2,000.00 | 37 |
| | Bill | 5/7/2025 | 115 | 5/7/2025 | 36 | $180.00 | 180.00 | 36 |
| **Total - Nicole Rush** | | | | | | **$2,180.00** | - | |
| **Nuso, LLC** | | | | | | | - | |
| | Bill | 2/7/2025 | 130992233 | 2/22/2025 | 110 | $1,059.43 | 1,059.43 | 110 |
| | Bill | 6/1/2025 | 131038073 | 6/16/2025 | -4 | $1,071.58 | - | (4) |
| **Total - Nuso, LLC** | | | | | | **$2,131.01** | - | |
| **Oakdale Golf & Country Club** | | | | | | | - | |
| | Bill | 4/8/2024 | 40824 | 4/8/2024 | 430 | $2,600.00 | 2,600.00 | 430 |
| **Total - Oakdale Golf & Country Club** | | | | | | **$2,600.00** | - | |
| **Oracle America Inc** | | | | | | | - | |
| | Bill | 5/13/2025 | 2168117 | 6/12/2025 | 0 | $3,832.25 | 3,832.25 | - |
| | Bill | 5/15/2025 | 2173961 | 6/14/2025 | -2 | $104,877.52 | - | (2) |
| **Total - Oracle America Inc** | | | | | | **$108,709.77** | - | |
| **OS3D Visualization & Design INC** | | | | | | | - | |
| | Bill | 5/8/2024 | 0401824 | 5/8/2024 | 400 | $4,100.00 | 4,100.00 | 400 |
| **Total - OS3D Visualization & Design INC** | | | | | | **$4,100.00** | - | |
| **Otis and Rosie Brown Foundation, Inc** | | | | | | | - | |
| | Bill | 10/11/2024 | Invoice #0000087 | 10/11/2024 | 244 | $500.00 | 500.00 | 244 |
| **Total - Otis and Rosie Brown Foundation, Inc** | | | | | | **$500.00** | - | |
| **Overwatch TN Security company** | | | | | | | - | |
| | Bill | 12/6/2024 | 20242175 | 12/6/2024 | 188 | $1,685.00 | 1,685.00 | 188 |
| **Total - Overwatch TN Security company** | | | | | | **$1,685.00** | - | |
| **Pacers Basketball LLC** | | | | | | | - | |
| | Bill | 9/27/2024 | 8480 | 10/27/2024 | 228 | $5,356.00 | 5,356.00 | 228 |
| | Bill | 10/25/2024 | 8481 | 11/24/2024 | 200 | $5,356.00 | 5,356.00 | 200 |
| | Bill | 1/13/2025 | 8482 | 2/12/2025 | 120 | $5,356.00 | 5,356.00 | 120 |
| **Total - Pacers Basketball LLC** | | | | | | **$16,068.00** | - | |
| **Packaging Corporation of America** | | | | | | | - | |
| | Bill | 9/26/2024 | 346-10061898 | 10/26/2024 | 229 | $2,250.00 | 2,250.00 | 229 |
| | Bill | 10/4/2024 | 346-10062117 | 11/3/2024 | 221 | $9,875.64 | 9,875.64 | 221 |
| | Bill | 10/11/2024 | 346-10062271 | 11/10/2024 | 214 | $46,266.00 | 46,266.00 | 214 |
| | Bill | 10/29/2024 | 346-10062575 | 11/28/2024 | 196 | $725.01 | 725.01 | 196 |
| | Bill | 10/29/2024 | 346-10062576 | 11/28/2024 | 196 | $725.01 | 725.01 | 196 |
| **Total - Packaging Corporation of America** | | | | | | **$59,841.66** | - | |
| **Patrick Henry Creative Promotions** | | | | | | | - | |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| | Bill | 5/1/2025 | 14546 | 5/1/2025 | 42 | $607.09 | 607.09 | 42 |
| | Bill | 5/16/2025 | 14825 | 5/16/2025 | 27 | $1,500.00 | 1,500.00 | 27 |
| **Total - Patrick Henry Creative Promotions** | | | | | | **$2,107.09** | - | |
| **PayBev LLC** | | | | | | | - | |
| | Bill | 4/24/2025 | 18976 | 5/24/2025 | 19 | $1,030.00 | 1,030.00 | 19 |
| | Bill | 4/24/2025 | 18975 | 5/24/2025 | 19 | $9,880.00 | 9,880.00 | 19 |
| | Bill | 4/24/2025 | 18977 | 5/24/2025 | 19 | $500.00 | 500.00 | 19 |
| | Bill | 5/1/2025 | 19089 | 5/31/2025 | 12 | $6,230.00 | 6,230.00 | 12 |
| | Bill | 5/30/2025 | 19639 | 6/29/2025 | -17 | $3,500.00 | - | (17) |
| **Total - PayBev LLC** | | | | | | **$21,140.00** | - | |
| **Pendleton Group LLC** | | | | | | | - | |
| | Bill | 4/25/2024 | 100 | 5/3/2024 | 405 | $2,000.00 | 2,000.00 | 405 |
| **Total - Pendleton Group LLC** | | | | | | **$2,000.00** | - | |
| **Pennsylvania Wine & Spirits Association** | | | | | | | - | |
| | Bill | 5/1/2024 | 386 | 2/6/2024 | 492 | $500.00 | 500.00 | 492 |
| **Total - Pennsylvania Wine & Spirits Association** | | | | | | **$500.00** | - | |
| **Pj's Hvac and Repair** | | | | | | | - | |
| | Bill | 7/8/2024 | 3610 | 7/8/2024 | 339 | $3,346.00 | 3,346.00 | 339 |
| **Total - Pj's Hvac and Repair** | | | | | | **$3,346.00** | - | |
| **PKF Arsilon** | | | | | | | - | |
| | Bill | 7/10/2024 | 16250000169 | 7/10/2024 | 337 | $222.34 | 222.34 | 337 |
| | Bill | 9/24/2024 | 16250000600 | 9/24/2024 | 261 | $222.34 | 222.34 | 261 |
| | Bill | 11/18/2024 | 16250001361 | 11/18/2024 | 206 | $222.34 | 222.34 | 206 |
| | Bill | 1/31/2025 | 16250002317 | 1/31/2025 | 132 | $222.34 | 222.34 | 132 |
| **Total - PKF Arsilon** | | | | | | **$889.36** | - | |
| **Pollinate Inc.** | | | | | | | - | |
| | Bill | 2/1/2024 | INV-1487 | 3/2/2024 | 467 | $16,800.00 | 16,800.00 | 467 |
| | Bill | 2/29/2024 | INV-1572 | 3/30/2024 | 439 | $19,701.00 | 19,701.00 | 439 |
| | Bill | 2/29/2024 | INV-1573 | 3/30/2024 | 439 | $4,260.92 | 4,260.92 | 439 |
| | Bill | 3/31/2024 | INV-1617 | 4/30/2024 | 408 | $9,446.25 | 9,446.25 | 408 |
| | Bill | 3/31/2024 | INV-1618 | 4/30/2024 | 408 | $4,272.63 | 4,272.63 | 408 |
| | Bill | 5/1/2024 | INV-1679 | 5/31/2024 | 377 | $11,244.75 | 11,244.75 | 377 |
| | Bill | 5/1/2024 | INV-1678 | 5/31/2024 | 377 | $4,364.19 | 4,364.19 | 377 |
| | Bill | 5/1/2024 | INV-1658 | 5/31/2024 | 377 | $16,800.00 | 16,800.00 | 377 |
| | Bill | 5/31/2024 | INV-1713 | 6/30/2024 | 347 | $6,859.05 | 6,859.05 | 347 |
| | Bill | 5/31/2024 | INV-1714 | 6/30/2024 | 347 | $4,576.74 | 4,576.74 | 347 |
| | Bill | 7/1/2024 | INV-1773 | 7/31/2024 | 316 | $8,959.50 | 8,959.50 | 316 |
| | Bill | 7/1/2024 | INV-1774 | 8/14/2024 | 302 | $4,548.55 | 4,548.55 | 302 |
| | Bill | 8/31/2024 | INV-1851 | 9/30/2024 | 255 | $5,940.00 | 5,940.00 | 255 |
| | Bill | 8/31/2024 | INV-1852 | 9/30/2024 | 255 | $4,301.02 | 4,301.02 | 255 |
| | Bill | 9/1/2024 | INV-1801 original inv dated | 10/1/2024 | 254 | $4,288.23 | 4,288.23 | 254 |
| | Bill | 9/1/2024 | INV-1800 original inv dated | 10/1/2024 | 254 | $15,468.75 | 15,468.75 | 254 |
| | Bill | 9/1/2024 | INV-1788 original inv date ( | 8/31/2024 | 285 | $11,800.00 | 11,800.00 | 285 |
| | Bill | 10/9/2024 | INV-1903 | 11/8/2024 | 216 | $15,000.00 | 15,000.00 | 216 |
| | Bill | 10/30/2024 | INV-1938 | 11/29/2024 | 195 | $10,230.00 | 10,230.00 | 195 |
| | Bill | 10/31/2024 | INV-1939 | 11/30/2024 | 194 | $4,318.67 | 4,318.67 | 194 |
| | Bill | 10/31/2024 | INV-1937 | 11/30/2024 | 194 | $82.50 | 82.50 | 194 |
| | Bill | 11/30/2024 | INV-1968 | 12/30/2024 | 164 | $1,196.25 | 1,196.25 | 164 |
| | Bill | 12/13/2024 | Inv - 1966 | 12/30/2024 | 164 | $3,588.75 | 3,588.75 | 164 |
| | Bill | 12/13/2024 | 1967 | 12/30/2024 | 164 | $5,882.87 | 5,882.87 | 164 |
| | Bill | 1/14/2025 | inv-2000 | 2/13/2025 | 119 | $4,371.90 | 4,371.90 | 119 |
| | Bill | 1/14/2025 | INV-1999 | 2/13/2025 | 119 | $3,795.00 | 3,795.00 | 119 |
| | Bill | 1/14/2025 | 1898 *9/30/2024* | 2/13/2025 | 119 | $6,765.00 | 6,765.00 | 119 |
| | Bill | 1/14/2025 | 1896 *9/30/2024* | 2/13/2025 | 119 | $866.25 | 866.25 | 119 |
| | Bill | 1/14/2025 | 1997 *12/31/2024* | 2/13/2025 | 119 | $371.25 | 371.25 | 119 |
| | Bill | 1/14/2025 | 1899 | 2/13/2025 | 119 | $4,283.43 | 4,283.43 | 119 |
| | Bill Cred | 1/15/2025 | 1659 *5/1/2024* | 1/15/2025 | 148 | ($11,200.00) | (11,200.00) | 148 |
| | Bill | 1/31/2025 | INV-2045 | 3/2/2025 | 102 | $1,139.13 | 1,139.13 | 102 |
| | Bill | 1/31/2025 | INV-2046 | 3/2/2025 | 102 | $4,292.57 | 4,292.57 | 102 |
| | Bill | 1/31/2025 | INV-2036 | 3/2/2025 | 102 | $3,135.00 | 3,135.00 | 102 |
| | Bill | 2/28/2025 | INV-2077 | 3/30/2025 | 74 | $701.25 | 701.25 | 74 |
| | Bill | 2/28/2025 | INV-2080 | 3/30/2025 | 74 | $165.00 | 165.00 | 74 |
| | Bill | 2/28/2025 | INV-2079 | 3/30/2025 | 74 | $2,450.43 | 2,450.43 | 74 |
| | Bill | 3/10/2025 | INV-2081 | 4/9/2025 | 64 | $4,424.00 | 4,424.00 | 64 |
| | Bill | 3/31/2025 | INV-2113 | 4/30/2025 | 43 | $3,725.03 | 3,725.03 | 43 |
| | Bill | 3/31/2025 | INV-2110 | 4/30/2025 | 43 | $165.00 | 165.00 | 43 |
| | Bill | 4/1/2025 | INV-2099 | 5/1/2025 | 42 | $4,424.00 | 4,424.00 | 42 |
| | Bill | 4/30/2025 | INV-2140 | 5/30/2025 | 13 | $1,714.26 | 1,714.26 | 13 |
| | Bill | 4/30/2025 | INV-2139 | 5/30/2025 | 13 | $2,598.75 | 2,598.75 | 13 |
| | Bill | 5/31/2025 | INV-2163 | 6/30/2025 | -18 | $206.25 | - | (18) |
| | Bill | 5/31/2025 | INV-2168 | 6/30/2025 | -18 | $290.34 | - | (18) |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| **Total - Pollinate Inc.** | | | | | | **$232,614.46** | - | |
| **Pratt Corrugated Holdings, Inc** | | | | | | | - | |
| | Bill | 8/1/2024 | 1264841 original inv date 0 | 8/15/2024 | 301 | $25,245.55 | 25,245.55 | 301 |
| **Total - Pratt Corrugated Holdings, Inc** | | | | | | **$25,245.55** | - | |
| **Questex LLC** | | | | | | | - | |
| | Bill | 6/9/2025 | INV-100002 | 6/9/2025 | 3 | $1,520.96 | 1,520.96 | 3 |
| **Total - Questex LLC** | | | | | | **$1,520.96** | - | |
| **Randstad** | | | | | | | - | |
| | Bill | 7/28/2024 | R34959825 | 7/28/2024 | 319 | $11,478.74 | 11,478.74 | 319 |
| | Bill | 8/4/2024 | R34980348 | 8/4/2024 | 312 | $5,945.77 | 5,945.77 | 312 |
| | Bill | 8/11/2024 | R35007108 | 8/11/2024 | 305 | $6,397.35 | 6,397.35 | 305 |
| | Bill | 8/18/2024 | R35036537 | 8/18/2024 | 298 | $8,621.82 | 8,621.82 | 298 |
| | Bill | 8/25/2024 | R35063957 | 8/25/2024 | 291 | $9,608.92 | 9,608.92 | 291 |
| | Bill | 9/1/2024 | R35090131 | 9/1/2024 | 284 | $7,228.36 | 7,228.36 | 284 |
| | Bill | 9/8/2024 | R35124157 | 9/8/2024 | 277 | $6,060.76 | 6,060.76 | 277 |
| | Bill | 9/8/2024 | R35108402 | 9/8/2024 | 277 | $247.63 | 247.63 | 277 |
| | Bill | 9/15/2024 | R35154283 | 9/15/2024 | 270 | $4,303.63 | 4,303.63 | 270 |
| | Bill | 9/22/2024 | R35179542 | 9/22/2024 | 263 | $4,229.23 | 4,229.23 | 263 |
| | Bill | 9/29/2024 | R35217123 | 9/29/2024 | 256 | $3,051.26 | 3,051.26 | 256 |
| | Bill | 10/6/2024 | R35243783 | 10/6/2024 | 249 | $222.00 | 222.00 | 249 |
| | Bill | 10/6/2024 | R35243782 | 10/6/2024 | 249 | $4,010.60 | 4,010.60 | 249 |
| | Bill | 10/13/2024 | R35269576 | 10/13/2024 | 242 | $4,223.34 | 4,223.34 | 242 |
| | Bill | 10/20/2024 | R35312914 | 10/20/2024 | 235 | $5,386.86 | 5,386.86 | 235 |
| | Bill | 10/27/2024 | R35344535 | 10/27/2024 | 228 | $3,524.25 | 3,524.25 | 228 |
| | Bill | 11/3/2024 | R35359400 | 11/3/2024 | 221 | $2,764.01 | 2,764.01 | 221 |
| | Bill | 11/10/2024 | R35388891 | 11/10/2024 | 214 | $2,824.17 | 2,824.17 | 214 |
| | Bill | 11/17/2024 | R35413087 | 11/17/2024 | 207 | $1,140.85 | 1,140.85 | 207 |
| **Total - Randstad** | | | | | | **$91,269.55** | - | |
| **ReserveBar Holdings Corp** | | | | | | | - | |
| | Bill | 4/18/2025 | 2053824 | 5/18/2025 | 25 | $3,000.00 | 3,000.00 | 25 |
| **Total - ReserveBar Holdings Corp** | | | | | | **$3,000.00** | - | |
| **Roaring Fork Insurance LLC** | | | | | | | - | |
| | Bill | 8/27/2024 | 24-25 Surety Bond | 9/16/2024 | 269 | $2,110.00 | 2,110.00 | 269 |
| | Bill | 10/8/2024 | *092724*Late | 10/8/2024 | 247 | $25.00 | 25.00 | 247 |
| **Total - Roaring Fork Insurance LLC** | | | | | | **$2,135.00** | - | |
| **Robert L Taylor Jr** | | | | | | | - | |
| | Bill | 6/10/2025 | 6.07.2025 | 6/10/2025 | 2 | $427.50 | 427.50 | 2 |
| **Total - Robert L Taylor Jr** | | | | | | **$427.50** | - | |
| **Rose Construction** | | | | | | | - | |
| | Bill | 3/6/2025 | INT-04 | 3/6/2025 | 98 | $3,400.11 | 3,400.11 | 98 |
| **Total - Rose Construction** | | | | | | **$3,400.11** | - | |
| **Rusken Packaging** | | | | | | | - | |
| | Bill | 10/7/2024 | 32003478 | 10/7/2024 | 248 | $2,362.50 | 2,362.50 | 248 |
| | Bill | 10/7/2024 | 32003547 | 10/7/2024 | 248 | $5,155.50 | 5,155.50 | 248 |
| | Bill | 10/7/2024 | 32003477 | 10/7/2024 | 248 | $1,356.25 | 1,356.25 | 248 |
| **Total - Rusken Packaging** | | | | | | **$8,874.25** | - | |
| **Rutherford County Chamber of Commerce** | | | | | | | - | |
| | Bill | 2/22/2024 | 62535 | 4/1/2024 | 437 | $10,000.00 | 10,000.00 | 437 |
| **Total - Rutherford County Chamber of Commerce** | | | | | | **$10,000.00** | - | |
| **Salary.com LLC** | | | | | | | - | |
| | Bill | 2/4/2025 | INV71359 | 2/4/2025 | 128 | $7,999.50 | 7,999.50 | 128 |
| **Total - Salary.com LLC** | | | | | | **$7,999.50** | - | |
| **Samantha Franklin** | | | | | | | - | |
| | Bill | 5/9/2025 | 17 | 5/9/2025 | 34 | $1,074.60 | 1,074.60 | 34 |
| **Total - Samantha Franklin** | | | | | | **$1,074.60** | - | |
| **San Diego Spirits Festival** | | | | | | | - | |
| | Bill | 9/1/2024 | SDSF2024-Uncle Nearest, | 9/1/2024 | 284 | $8,280.00 | 8,280.00 | 284 |
| **Total - San Diego Spirits Festival** | | | | | | **$8,280.00** | - | |
| **Sarah d Sousa** | | | | | | | - | |
| | Bill | 4/15/2025 | 0334 | 4/15/2025 | 58 | $5,000.00 | 5,000.00 | 58 |
| | Bill | 5/15/2025 | 0335 | 5/15/2025 | 28 | $5,000.00 | 5,000.00 | 28 |
| **Total - Sarah d Sousa** | | | | | | **$10,000.00** | - | |
| **Sarl eta Pierra Baudin** | | | | | | | - | |
| | Bill | 1/1/2024 | 2 | 1/1/2024 | 528 | $1,694.05 | 1,694.05 | 528 |
| | Bill | 5/28/2025 | 30 | 5/28/2025 | 15 | $25,680.18 | 25,680.18 | 15 |
| **Total - Sarl eta Pierra Baudin** | | | | | | **$27,374.23** | - | |
| **Sarl Louvet Assurances** | | | | | | | - | |
| | Bill | 1/12/2024 | DFRC01 - 12/01/2024 | 1/12/2024 | 517 | $813.82 | 813.82 | 517 |
| **Total - Sarl Louvet Assurances** | | | | | | **$813.82** | - | |
| **Savariau** | | | | | | | - | |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| | Bill | 8/30/2024 | 21001 | 8/30/2024 | 286 | $5,347.99 | 5,347.99 | 286 |
| | Bill | 11/29/2024 | 21223 | 11/29/2024 | 195 | $845.11 | 845.11 | 195 |
| **Total - Savariau** | | | | | | **$6,193.10** | - | |
| **Scorp Promo, Inc.** | | | | | | | - | |
| | Bill | 3/16/2025 | 264 | 3/16/2025 | 88 | $460.24 | 460.24 | 88 |
| | Bill | 4/10/2025 | 266 | 4/10/2025 | 63 | $2,132.50 | 2,132.50 | 63 |
| | Bill | 5/2/2025 | 269 | 5/2/2025 | 41 | $2,129.14 | 2,129.14 | 41 |
| **Total - Scorp Promo, Inc.** | | | | | | **$4,721.88** | - | |
| **Selas FTPA** | | | | | | | - | |
| | Bill | 5/21/2025 | 25010152 | 5/21/2025 | 22 | $1,580.89 | 1,580.89 | 22 |
| | Bill | 5/21/2025 | 25040230 | 5/21/2025 | 22 | $1,806.17 | 1,806.17 | 22 |
| | Bill | 5/21/2025 | 25050195 | 5/21/2025 | 22 | $766.25 | 766.25 | 22 |
| | Bill | 5/21/2025 | 25020171 | 5/21/2025 | 22 | $564.92 | 564.92 | 22 |
| **Total - Selas FTPA** | | | | | | **$4,718.23** | - | |
| **SevenFifty** | | | | | | | - | |
| | Bill | 6/1/2024 | INV79577 | 12/1/2023 | 559 | $800.00 | 800.00 | 559 |
| **Total - SevenFifty** | | | | | | **$800.00** | - | |
| **Shared Spirits, LLC.** | | | | | | | - | |
| | Bill | 2/8/2024 | 1208 | 2/8/2024 | 490 | $10,000.00 | 10,000.00 | 490 |
| | Bill | 8/6/2024 | 1422 | 8/21/2024 | 295 | $225.00 | 225.00 | 295 |
| **Total - Shared Spirits, LLC.** | | | | | | **$10,225.00** | - | |
| **Shedd Aquarium** | | | | | | | - | |
| | Bill | 4/30/2024 | 24-9018 | 4/30/2024 | 408 | $5,000.00 | 5,000.00 | 408 |
| **Total - Shedd Aquarium** | | | | | | **$5,000.00** | - | |
| **Shelbyville Grand** | | | | | | | - | |
| | Bill | 11/1/2024 | 1004 | 12/1/2024 | 193 | $6,500.00 | 6,500.00 | 193 |
| | Bill | 12/1/2024 | 1005 | 1/1/2025 | 162 | $6,500.00 | 6,500.00 | 162 |
| **Total - Shelbyville Grand** | | | | | | **$13,000.00** | - | |
| **Shelbyville Lions Club** | | | | | | | - | |
| | Bill | 8/14/2024 | *08.14.2024* | 8/14/2024 | 302 | $650.00 | 650.00 | 302 |
| **Total - Shelbyville Lions Club** | | | | | | **$650.00** | - | |
| **Shelbyville-Bedford Partnership** | | | | | | | - | |
| | Bill | 7/23/2024 | 55 | 7/23/2024 | 324 | $20,000.00 | 20,000.00 | 324 |
| **Total - Shelbyville-Bedford Partnership** | | | | | | **$20,000.00** | - | |
| **Sheralyn Bradley** | | | | | | | - | |
| | Bill | 4/26/2025 | 3003 | 4/26/2025 | 47 | $1,485.08 | 1,485.08 | 47 |
| | Bill | 5/13/2025 | 3004 | 5/13/2025 | 30 | $219.00 | 219.00 | 30 |
| **Total - Sheralyn Bradley** | | | | | | **$1,704.08** | - | |
| **Signet** | | | | | | | - | |
| | Bill | 5/31/2024 | DESDFM1 | 5/31/2024 | 377 | $1,977.00 | 1,977.00 | 377 |
| **Total - Signet** | | | | | | **$1,977.00** | - | |
| **Slicker Beverage Insights** | | | | | | | - | |
| | Bill | 4/20/2025 | 001931 | 4/20/2025 | 53 | $212.20 | 212.20 | 53 |
| | Bill | 4/22/2025 | 001937 | 4/22/2025 | 51 | $951.72 | 951.72 | 51 |
| | Bill | 4/25/2025 | 001947 | 4/25/2025 | 48 | $658.00 | 658.00 | 48 |
| | Bill | 5/1/2025 | 001949 | 5/1/2025 | 42 | $5,000.00 | 5,000.00 | 42 |
| | Bill | 5/14/2025 | 001955 | 5/14/2025 | 29 | $600.00 | 600.00 | 29 |
| | Bill | 5/19/2025 | 001964 | 5/19/2025 | 24 | $1,913.33 | 1,913.33 | 24 |
| | Bill | 5/27/2025 | 001978 | 5/27/2025 | 16 | $150.00 | 150.00 | 16 |
| | Bill | 6/11/2025 | 001989 | 6/11/2025 | 1 | $150.00 | 150.00 | 1 |
| | Bill | 6/11/2025 | 001990 | 6/11/2025 | 1 | $40.00 | 40.00 | 1 |
| **Total - Slicker Beverage Insights** | | | | | | **$9,675.25** | - | |
| **Social Coast Mobile Beverage Co.** | | | | | | | - | |
| | Bill | 9/9/2024 | 08092024 | 9/9/2024 | 276 | $19,851.00 | 19,851.00 | 276 |
| **Total - Social Coast Mobile Beverage Co.** | | | | | | **$19,851.00** | - | |
| **Spector** | | | | | | | - | |
| | Bill | 5/29/2025 | 1338514 *11.20.2023* | 6/28/2025 | -16 | $797.46 | - | (16) |
| **Total - Spector** | | | | | | **$797.46** | - | |
| **Speed Rack Inc** | | | | | | | - | |
| | Bill | 8/27/2024 | 133 | 8/27/2024 | 289 | $4,000.00 | 4,000.00 | 289 |
| | Bill | 9/27/2024 | 134 | 9/27/2024 | 258 | $4,000.00 | 4,000.00 | 258 |
| | Bill | 10/27/2024 | 135 | 10/27/2024 | 228 | $4,000.00 | 4,000.00 | 228 |
| | Bill | 5/19/2025 | 162 | 5/19/2025 | 24 | $4,000.00 | 4,000.00 | 24 |
| **Total - Speed Rack Inc** | | | | | | **$16,000.00** | - | |
| **Square One Organic Spirits** | | | | | | | - | |
| | Bill | 8/1/2024 | 21012953 | 9/1/2024 | 284 | $10,000.00 | 10,000.00 | 284 |
| | Bill | 9/1/2024 | 21012958 | 10/1/2024 | 254 | $10,000.00 | 10,000.00 | 254 |
| | Bill | 10/1/2024 | 21012964 | 10/1/2024 | 254 | $10,000.00 | 10,000.00 | 254 |
| | Journal | 10/18/2024 | JE150-2154 | 10/18/2024 | 237 | ($20,015.00) | (20,015.00) | 237 |
| | Bill | 12/18/2024 | 21012979 | 12/18/2024 | 176 | $5,871.04 | 5,871.04 | 176 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| **Total - Square One Organic Spirits** | | | | | | **$15,856.04** | - | |
| **SquareWorks Consulting** | | | | | | | - | |
| | Bill | 3/18/2025 | 205597 | 4/2/2025 | 71 | $15,518.00 | 15,518.00 | 71 |
| | Bill | 4/7/2025 | 205790 | 4/22/2025 | 51 | $5,487.50 | 5,487.50 | 51 |
| **Total - SquareWorks Consulting** | | | | | | **$21,005.50** | - | |
| **State of Tennessee Elevator Unit** | | | | | | | - | |
| | Bill | 1/7/2025 | 874638 | 1/7/2025 | 156 | $90.00 | 90.00 | 156 |
| **Total - State of Tennessee Elevator Unit** | | | | | | **$90.00** | - | |
| **Straight Up Collective, LLC** | | | | | | | - | |
| | Bill | 6/12/2024 | SCA_0165 | 7/19/2024 | 328 | $2,500.00 | 2,500.00 | 328 |
| | Bill | 11/12/2024 | SCA_0684 | 12/12/2024 | 182 | $5,900.00 | 5,900.00 | 182 |
| | Bill | 2/5/2025 | SuCo2021 | 3/7/2025 | 97 | $1,200.00 | 1,200.00 | 97 |
| | Bill | 4/10/2025 | SuCo2057 | 5/10/2025 | 33 | $1,300.00 | 1,300.00 | 33 |
| **Total - Straight Up Collective, LLC** | | | | | | **$10,900.00** | - | |
| **Sysco** | | | | | | | - | |
| | Bill | 5/29/2025 | 460708905 | 5/29/2025 | 14 | $903.64 | 903.64 | 14 |
| **Total - Sysco** | | | | | | **$903.64** | - | |
| **System Scales Corp - Construction** | | | | | | | - | |
| | Bill | 11/20/2024 | INV-215797 | 11/20/2024 | 204 | $1,239.00 | 1,239.00 | 204 |
| **Total - System Scales Corp - Construction** | | | | | | **$1,239.00** | - | |
| **T2D Concepts LLC** | | | | | | | - | |
| | Bill | 10/1/2024 | 2024-SFW3 | 10/1/2024 | 254 | $2,000.00 | 2,000.00 | 254 |
| **Total - T2D Concepts LLC** | | | | | | **$2,000.00** | - | |
| **Tales of the Cocktail Foundation** | | | | | | | - | |
| | Bill | 2/29/2024 | 56497 | 5/24/2024 | 384 | $3,244.50 | 3,244.50 | 384 |
| | Bill | 8/29/2024 | 56482 | 8/29/2024 | 287 | $104.96 | 104.96 | 287 |
| | Bill | 2/7/2025 | 56538 | 2/7/2025 | 125 | $3,455.39 | 3,455.39 | 125 |
| **Total - Tales of the Cocktail Foundation** | | | | | | **$6,804.85** | - | |
| **Taxi 2000** | | | | | | | - | |
| | Bill | 1/1/2024 | F-000182 | 1/1/2024 | 528 | $1,317.36 | 1,317.36 | 528 |
| | Bill | 4/15/2024 | F-000252 | 4/15/2024 | 423 | $1,884.33 | 1,884.33 | 423 |
| **Total - Taxi 2000** | | | | | | **$3,201.70** | - | |
| **Taylor Wessing** | | | | | | | - | |
| | Bill | 9/30/2024 | 112503171 | 9/30/2024 | 255 | $2,117.69 | 2,117.69 | 255 |
| | Bill | 9/30/2024 | 112502820 | 9/30/2024 | 255 | $1,163.19 | 1,163.19 | 255 |
| | Bill | 5/18/2025 | 112407545 | 5/18/2025 | 25 | $2,489.67 | 2,489.67 | 25 |
| **Total - Taylor Wessing** | | | | | | **$5,770.55** | - | |
| **Tennessee Department of Revenue** | | | | | | | - | |
| | Bill | 10/2/2024 | Sept 24 | 10/15/2024 | 240 | $35,484.00 | 35,484.00 | 240 |
| | Bill | 4/10/2025 | Dec 2024 | 4/10/2025 | 63 | $528.93 | 528.93 | 63 |
| **Total - Tennessee Department of Revenue** | | | | | | **$36,012.93** | - | |
| **Tennessee Distilling Group** | | | | | | | - | |
| | Bill Cred | 3/31/2024 | CM10 | 3/31/2024 | 438 | ($3,375.00) | (3,375.00) | 438 |
| | Bill | 5/31/2024 | 2024-552 | 6/30/2024 | 347 | $33,538.69 | 33,538.69 | 347 |
| | Bill | 6/1/2024 | 2024-608 | 6/30/2024 | 347 | $104,093.86 | 104,093.86 | 347 |
| | Bill | 6/12/2024 | 2024-610 | 7/12/2024 | 335 | $15,288.00 | 15,288.00 | 335 |
| | Bill | 6/24/2024 | 2024-642 | 7/24/2024 | 323 | $16,015.31 | 16,015.31 | 323 |
| | Bill | 6/24/2024 | 2024-643 | 7/9/2024 | 338 | $55,836.00 | 55,836.00 | 338 |
| | Bill | 7/1/2024 | 2024-728 | 7/31/2024 | 316 | $104,304.85 | 104,304.85 | 316 |
| | Bill | 7/1/2024 | 2024-718 | 7/18/2024 | 329 | $8,534.56 | 8,534.56 | 329 |
| | Bill Cred | 7/1/2024 | CM27 | 7/1/2024 | 346 | ($42,800.00) | (42,800.00) | 346 |
| | Bill | 7/2/2024 | 2024-667 | 8/1/2024 | 315 | $56,619.96 | 56,619.96 | 315 |
| | Bill | 7/9/2024 | 2024-733 | 7/24/2024 | 323 | $59,123.40 | 59,123.40 | 323 |
| | Bill | 7/17/2024 | 2024-779 | 8/16/2024 | 300 | $14,232.94 | 14,232.94 | 300 |
| | Bill | 7/17/2024 | 2024-782 | 8/1/2024 | 315 | $15,776.04 | 15,776.04 | 315 |
| | Bill | 8/1/2024 | 2024-796 original inv dated | 8/7/2024 | 309 | $2,253.72 | 2,253.72 | 309 |
| | Bill Cred | 8/1/2024 | CM52 original date of credi | 8/1/2024 | 315 | ($69,300.00) | (69,300.00) | 315 |
| | Bill | 8/1/2024 | 2024-824 | 8/20/2024 | 296 | $103,635.60 | 103,635.60 | 296 |
| | Bill | 8/15/2024 | 2024-884 | 9/14/2024 | 271 | $2,253.72 | 2,253.72 | 271 |
| | Bill | 8/15/2024 | 2024-883 | 8/30/2024 | 286 | $2,253.72 | 2,253.72 | 286 |
| | Bill Cred | 8/31/2024 | CM57 | 8/31/2024 | 285 | ($97,700.00) | (97,700.00) | 285 |
| | Bill | 8/31/2024 | 2024-979 | 9/30/2024 | 255 | $101,452.10 | 101,452.10 | 255 |
| | Bill | 9/11/2024 | 2024-993 | 10/11/2024 | 244 | $780.56 | 780.56 | 244 |
| | Bill | 9/28/2024 | 2024-1014 | 10/13/2024 | 242 | $15,776.04 | 15,776.04 | 242 |
| | Bill | 9/30/2024 | 2024-1034 9/30/2024 | 10/30/2024 | 225 | $130.00 | 130.00 | 225 |
| | Bill | 9/30/2024 | 2024-1048 9/30/2024 | 10/30/2024 | 225 | $101,928.00 | 101,928.00 | 225 |
| | Bill Cred | 10/15/2024 | CM64 | 10/15/2024 | 240 | ($15,000.00) | (15,000.00) | 240 |
| | Bill | 10/17/2024 | 2024-1099 | 11/16/2024 | 208 | $6,761.16 | 6,761.16 | 208 |
| | Bill | 10/31/2024 | 2024-1124 | 11/30/2024 | 194 | $9,177.69 | 9,177.69 | 194 |
| | Bill | 10/31/2024 | 2024-1190 | 2/7/2025 | 125 | $16,939.27 | 16,939.27 | 125 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| | Bill | 10/31/2024 | 2024-1189 | 11/23/2024 | 201 | $101,303.65 | 101,303.65 | 201 |
| | Bill | 11/19/2024 | 2024-1213 | 12/19/2024 | 175 | $33,208.32 | 33,208.32 | 175 |
| | Bill | 11/22/2024 | 2024-1234 | 12/7/2024 | 187 | $97.50 | 97.50 | 187 |
| | Bill | 11/30/2024 | 2024-1243 11/30/2024 | 12/30/2024 | 164 | $32,170.56 | 32,170.56 | 164 |
| | Bill | 12/10/2024 | 2024-1303 | 1/9/2025 | 154 | $27,857.37 | 27,857.37 | 154 |
| | Bill | 12/19/2024 | 2024-1302 | 1/18/2025 | 145 | $102,428.09 | 102,428.09 | 145 |
| | Bill | 12/31/2024 | 2024-1385 | 1/30/2025 | 133 | $101,628.35 | 101,628.35 | 133 |
| | Bill Cred | 12/31/2024 | CM118 | 12/31/2024 | 163 | ($6,900.00) | (6,900.00) | 163 |
| | Bill | 1/31/2025 | 2025-0119 | 3/2/2025 | 102 | $101,149.50 | 101,149.50 | 102 |
| | Bill | 2/20/2025 | 2025-0141 | 3/22/2025 | 82 | $63,699.48 | 63,699.48 | 82 |
| | Bill | 2/28/2025 | 2025-0200 | 3/30/2025 | 74 | $1,966.80 | 1,966.80 | 74 |
| | Bill | 2/28/2025 | 2025-0197 | 3/30/2025 | 74 | $98,397.30 | 98,397.30 | 74 |
| | Bill | 3/31/2025 | 2025-0297 | 4/30/2025 | 43 | $97,844.65 | 97,844.65 | 43 |
| | Bill | 3/31/2025 | 2025-0347 | 4/30/2025 | 43 | $57,342.25 | 57,342.25 | 43 |
| | Bill | 4/2/2025 | 2025-0251 | 5/2/2025 | 41 | $6,523.20 | 6,523.20 | 41 |
| | Bill | 4/24/2025 | 2025-0351 | 5/24/2025 | 19 | $64,434.72 | 64,434.72 | 19 |
| | Bill Cred | 4/30/2025 | 2025-0429- Credit memo | 4/30/2025 | 43 | ($19,300.00) | (19,300.00) | 43 |
| | Bill | 4/30/2025 | 2025-0368 | 5/30/2025 | 13 | $4,500.00 | 4,500.00 | 13 |
| | Bill | 4/30/2025 | 2025-0451 | 5/30/2025 | 13 | $25,230.59 | 25,230.59 | 13 |
| | Bill | 4/30/2025 | 2025-0434 | 5/30/2025 | 13 | $99,559.90 | 99,559.90 | 13 |
| | Bill | 5/7/2025 | 2025-0421 | 6/6/2025 | 6 | $4,439.44 | 4,439.44 | 6 |
| | Bill | 5/28/2025 | 2025-0497 | 6/27/2025 | -15 | $6,761.16 | - | (15) |
| **Total - Tennessee Distilling Group** | | | | | | **$1,622,873.02** | - | |
| **Tennessee Distilling Group - Tax & Escrow** | | | | | | | - | |
| | Bill | 3/10/2025 | 2025-0212 | 3/10/2025 | 94 | $18,034.18 | 18,034.18 | 94 |
| | Bill | 3/13/2025 | 2025-0214 | 3/13/2025 | 91 | $6,393.91 | 6,393.91 | 91 |
| | Bill | 3/14/2025 | 2025-0216 | 3/14/2025 | 90 | $5,115.13 | 5,115.13 | 90 |
| | Bill | 3/27/2025 | 2025-0236 | 3/27/2025 | 77 | $6,121.46 | 6,121.46 | 77 |
| | Bill | 4/1/2025 | 2025-0247 | 4/1/2025 | 72 | $1,585.86 | 1,585.86 | 72 |
| | Bill | 4/9/2025 | 2025-0305 | 4/9/2025 | 64 | $5,381.54 | 5,381.54 | 64 |
| | Bill | 5/7/2025 | 2025-0427 | 5/7/2025 | 36 | $18,597.33 | 18,597.33 | 36 |
| | Bill | 5/7/2025 | 2025-0426 | 5/7/2025 | 36 | $8,051.26 | 8,051.26 | 36 |
| | Bill | 5/21/2025 | 2025-0487 | 5/21/2025 | 22 | $29,497.40 | 29,497.40 | 22 |
| | Bill | 5/21/2025 | 2025-0477 | 5/21/2025 | 22 | $9,895.89 | 9,895.89 | 22 |
| | Bill | 6/11/2025 | 2025-0568 | 6/11/2025 | 1 | $1,474.87 | 1,474.87 | 1 |
| **Total - Tennessee Distilling Group - Tax & Escrow** | | | | | | **$110,148.83** | - | |
| **Tennessee Logos, LLC** | | | | | | | - | |
| | Bill | 10/1/2024 | 116382824 | 10/1/2024 | 254 | $1,373.00 | 1,373.00 | 254 |
| **Total - Tennessee Logos, LLC** | | | | | | **$1,373.00** | - | |
| **Terracon Consultants, Inc** | | | | | | | - | |
| | Bill | 11/26/2024 | TN04050 | 11/26/2024 | 198 | $3,600.00 | 3,600.00 | 198 |
| | Bill | 12/19/2024 | TN16337 | 12/19/2024 | 175 | $35,500.00 | 35,500.00 | 175 |
| **Total - Terracon Consultants, Inc** | | | | | | **$39,100.00** | - | |
| **The Brand Guild** | | | | | | | - | |
| | Bill | 10/21/2024 | 10253 | 11/20/2024 | 204 | $3,060.00 | 3,060.00 | 204 |
| | Bill | 11/26/2024 | 10412 | 12/26/2024 | 168 | $11,277.39 | 11,277.39 | 168 |
| | Bill | 12/20/2024 | 10512 | 1/19/2025 | 144 | $395.00 | 395.00 | 144 |
| | Bill | 1/7/2025 | 10548 | 2/6/2025 | 126 | $4,423.07 | 4,423.07 | 126 |
| | Bill | 1/9/2025 | 10552 | 2/8/2025 | 124 | $7,225.00 | 7,225.00 | 124 |
| | Bill | 1/14/2025 | 10540 | 2/13/2025 | 119 | $11,220.00 | 11,220.00 | 119 |
| | Bill | 1/21/2025 | 10595 | 2/20/2025 | 112 | $15,300.00 | 15,300.00 | 112 |
| | Bill | 1/21/2025 | 10598 | 2/20/2025 | 112 | $11,304.66 | 11,304.66 | 112 |
| | Bill | 2/19/2025 | 10674 | 3/21/2025 | 83 | $7,643.30 | 7,643.30 | 83 |
| | Bill | 2/25/2025 | 10716 | 3/27/2025 | 77 | $15,300.00 | 15,300.00 | 77 |
| | Bill | 2/25/2025 | 10717 | 3/27/2025 | 77 | $11,304.66 | 11,304.66 | 77 |
| | Bill | 3/10/2025 | 10765 | 4/9/2025 | 64 | $2,938.80 | 2,938.80 | 64 |
| | Bill | 3/20/2025 | 10807 | 4/19/2025 | 54 | $15,300.00 | 15,300.00 | 54 |
| | Bill | 3/20/2025 | 10806 | 4/19/2025 | 54 | $11,304.66 | 11,304.66 | 54 |
| | Bill | 4/21/2025 | 10916 | 5/21/2025 | 22 | $15,300.00 | 15,300.00 | 22 |
| | Bill | 4/21/2025 | 10917 | 5/21/2025 | 22 | $11,304.66 | 11,304.66 | 22 |
| | Bill | 5/23/2025 | 11019 | 6/22/2025 | -10 | $15,300.00 | - | (10) |
| | Bill | 5/23/2025 | 11020 | 6/22/2025 | -10 | $11,304.66 | - | (10) |
| **Total - The Brand Guild** | | | | | | **$181,205.86** | - | |
| **The Celebration** | | | | | | | - | |
| | Bill | 7/1/2024 | *07.01.2024* | 7/1/2024 | 346 | $30,000.00 | 30,000.00 | 346 |
| **Total - The Celebration** | | | | | | **$30,000.00** | - | |
| **The Cocktail Guru** | | | | | | | - | |
| | Bill | 6/3/2025 | 2749 | 6/3/2025 | 9 | $4,000.00 | 4,000.00 | 9 |
| **Total - The Cocktail Guru** | | | | | | **$4,000.00** | - | |
| **The Express** | | | | | | | - | |
| | Bill | 2/10/2025 | 1729 | 2/10/2025 | 122 | $274.38 | 274.38 | 122 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| **Total - The Express** | | | | | | **$274.38** | - | |
| **The Formulation Group** | | | | | | | - | |
| | Bill | 8/2/2024 | 48 | 9/1/2024 | 284 | $42,000.00 | 42,000.00 | 284 |
| **Total - The Formulation Group** | | | | | | **$42,000.00** | - | |
| **The Keystone Group** | | | | | | | - | |
| | Bill | 4/8/2025 | UNCLE-2025-04-07 (Final) | 4/8/2025 | 65 | $6,542.00 | 6,542.00 | 65 |
| **Total - The Keystone Group** | | | | | | **$6,542.00** | - | |
| **The Mather Group LLC** | | | | | | | - | |
| | Bill | 6/1/2024 | 8606 | 7/1/2024 | 346 | $3,000.00 | 3,000.00 | 346 |
| | Bill | 7/1/2024 | 8691 | 7/31/2024 | 316 | $3,000.00 | 3,000.00 | 316 |
| | Bill | 8/1/2024 | 8767 | 8/31/2024 | 285 | $3,000.00 | 3,000.00 | 285 |
| | Bill | 9/1/2024 | 8845 | 10/1/2024 | 254 | $3,000.00 | 3,000.00 | 254 |
| | Bill | 10/1/2024 | 8967 | 10/31/2024 | 224 | $3,000.00 | 3,000.00 | 224 |
| | Bill | 11/1/2024 | 9013 | 12/1/2024 | 193 | $3,000.00 | 3,000.00 | 193 |
| **Total - The Mather Group LLC** | | | | | | **$18,000.00** | - | |
| **The Monroe Companies, LLC** | | | | | | | - | |
| | Bill | 7/15/2024 | 1092 | 7/25/2024 | 322 | $3,000.00 | 3,000.00 | 322 |
| **Total - The Monroe Companies, LLC** | | | | | | **$3,000.00** | - | |
| **The Only IMPACT Magazine LLC** | | | | | | | - | |
| | Bill | 6/20/2024 | 321 | 6/20/2024 | 357 | $1,000.00 | 1,000.00 | 357 |
| **Total - The Only IMPACT Magazine LLC** | | | | | | **$1,000.00** | - | |
| **The UPS Store** | | | | | | | - | |
| | Bill | 4/30/2025 | 1878572009 | 4/30/2025 | 43 | $332.06 | 332.06 | 43 |
| | Bill | 4/30/2025 | 1878657801 | 4/30/2025 | 43 | $298.47 | 298.47 | 43 |
| | Bill | 5/10/2025 | 0000XY5949195 | 5/10/2025 | 33 | $13.02 | 13.02 | 33 |
| | Bill | 5/10/2025 | 0000H4R768195 | 5/10/2025 | 33 | $42.05 | 42.05 | 33 |
| | Bill | 5/13/2025 | 1882600916 | 5/13/2025 | 30 | $84.75 | 84.75 | 30 |
| | Bill | 5/19/2025 | 0000XY5949205 | 5/19/2025 | 24 | $119.39 | 119.39 | 24 |
| | Bill | 5/31/2025 | 0000Y58F14225 | 5/31/2025 | 12 | $739.07 | 739.07 | 12 |
| | Bill | 5/31/2025 | 0000H4R768225 | 5/31/2025 | 12 | $17.22 | 17.22 | 12 |
| | Bill | 5/31/2025 | 0000XY5949225 | 5/31/2025 | 12 | $224.58 | 224.58 | 12 |
| | Bill | 6/7/2025 | 0000XY5949235 | 6/7/2025 | 5 | $108.55 | 108.55 | 5 |
| | Bill | 6/7/2025 | 0000Y58F14235 | 6/7/2025 | 5 | $646.35 | 646.35 | 5 |
| | Bill | 6/7/2025 | 0000H4R768235 | 6/7/2025 | 5 | $15.55 | 15.55 | 5 |
| **Total - The UPS Store** | | | | | | **$2,641.06** | - | |
| **Thousand Oaks Barrel Co.** | | | | | | | - | |
| | Bill | 4/10/2025 | TOB102145 | 4/10/2025 | 63 | $3,417.95 | 3,417.95 | 63 |
| **Total - Thousand Oaks Barrel Co.** | | | | | | **$3,417.95** | - | |
| **Threds Inc** | | | | | | | - | |
| | Bill | 7/23/2024 | 769233 | 8/31/2024 | 285 | $500.04 | 500.04 | 285 |
| | Bill | 11/21/2024 | 776751 | 12/21/2024 | 173 | $289.28 | 289.28 | 173 |
| | Bill | 3/13/2025 | 784988 | 3/13/2025 | 91 | $508.08 | 508.08 | 91 |
| **Total - Threds Inc** | | | | | | **$1,297.40** | - | |
| **TN Dept of Environment & Conservation** | | | | | | | - | |
| | Bill | 8/31/2024 | INV00000000820386 | 8/31/2024 | 285 | $1,866.39 | 1,866.39 | 285 |
| **Total - TN Dept of Environment & Conservation** | | | | | | **$1,866.39** | - | |
| **TN Labor & Workforce Development** | | | | | | | - | |
| | Bill | 9/16/2024 | 874638 | 9/16/2024 | 269 | $60.00 | 60.00 | 269 |
| **Total - TN Labor & Workforce Development** | | | | | | **$60.00** | - | |
| **Top Shelf Promotions, Inc.** | | | | | | | - | |
| | Bill | 12/8/2024 | 3464 | 1/7/2025 | 156 | $3,998.67 | 3,998.67 | 156 |
| | Bill | 1/16/2025 | 3548 | 1/16/2025 | 147 | $3,729.13 | 3,729.13 | 147 |
| | Bill | 3/10/2025 | 3643 | 3/10/2025 | 94 | $283.95 | 283.95 | 94 |
| | Bill | 4/9/2025 | 3690 | 4/9/2025 | 64 | $803.65 | 803.65 | 64 |
| | Bill | 5/12/2025 | 3745 | 5/12/2025 | 31 | $1,037.41 | 1,037.41 | 31 |
| **Total - Top Shelf Promotions, Inc.** | | | | | | **$9,852.81** | - | |
| **Total Quality Logistics** | | | | | | | - | |
| | Bill | 4/2/2025 | 31722762 | 4/2/2025 | 71 | $1,150.00 | 1,150.00 | 71 |
| | Bill | 4/7/2025 | 31214967 | 4/7/2025 | 66 | $1,000.00 | 1,000.00 | 66 |
| | Bill | 4/10/2025 | 31713158 | 4/10/2025 | 63 | $800.00 | 800.00 | 63 |
| | Bill | 4/14/2025 | 31214968 | 4/14/2025 | 59 | $1,150.00 | 1,150.00 | 59 |
| | Bill | 4/21/2025 | 31928882 | 4/21/2025 | 52 | $525.00 | 525.00 | 52 |
| | Bill | 5/9/2025 | 32166247 | 5/9/2025 | 34 | $525.00 | 525.00 | 34 |
| | Bill | 5/12/2025 | 32166248 | 5/12/2025 | 31 | $525.00 | 525.00 | 31 |
| | Bill | 5/27/2025 | 32339111 | 5/27/2025 | 16 | $525.00 | 525.00 | 16 |
| | Bill | 5/28/2025 | 32339112 | 5/28/2025 | 15 | $1,050.00 | 1,050.00 | 15 |
| **Total - Total Quality Logistics** | | | | | | **$7,250.00** | - | |
| **Town of Edgartown** | | | | | | | - | |
| | Bill | 1/1/2025 | 3308-3rd QTR | 1/1/2025 | 162 | $127.65 | 127.65 | 162 |
| | Bill | 1/1/2025 | 6175-3rd Qtr | 1/1/2025 | 162 | $2,223.15 | 2,223.15 | 162 |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| | Bill | 4/1/2025 | 3308-4th QTR | 4/1/2025 | 72 | $43.21 | 43.21 | 72 |
| | Bill | 4/4/2025 | 6175-4th Qtr | 4/4/2025 | 69 | $2,239.60 | 2,239.60 | 69 |
| **Total - Town of Edgartown** | | | | | | **$4,633.61** | - | |
| **Tri Star Outdoors** | | | | | | | - | |
| | Bill | 1/13/2025 | 1292 | 1/13/2025 | 150 | $300.00 | 300.00 | 150 |
| **Total - Tri Star Outdoors** | | | | | | **$300.00** | - | |
| **Tricorbraun Inc** | | | | | | | - | |
| | Bill | 3/12/2025 | INV004525395 | 4/11/2025 | 62 | $35,368.36 | 35,368.36 | 62 |
| | Bill | 3/24/2025 | INV004528611 | 4/23/2025 | 50 | $34,469.69 | 34,469.69 | 50 |
| | Bill | 3/25/2025 | 31680960 | 4/24/2025 | 49 | $250.00 | 250.00 | 49 |
| | Bill | 3/26/2025 | INV004528999 | 4/25/2025 | 48 | $34,469.69 | 34,469.69 | 48 |
| | Bill | 4/1/2025 | INV004531077 | 5/1/2025 | 42 | $34,469.69 | 34,469.69 | 42 |
| | Bill | 4/7/2025 | INV004531725 | 5/7/2025 | 36 | $34,469.69 | 34,469.69 | 36 |
| | Bill | 4/11/2025 | INV004533289 | 5/11/2025 | 32 | $1,123.61 | 1,123.61 | 32 |
| **Total - Tricorbraun Inc** | | | | | | **$174,620.73** | - | |
| **True North Consulting, LLC** | | | | | | | - | |
| | Bill | 11/1/2024 | NGD MPD 019 | 12/1/2024 | 193 | $19,500.00 | 19,500.00 | 193 |
| | Bill | 1/2/2025 | NGD MPD 021 | 2/1/2025 | 131 | $19,500.00 | 19,500.00 | 131 |
| | Bill | 2/3/2025 | NGD MPD 020 | 3/5/2025 | 99 | $19,500.00 | 19,500.00 | 99 |
| **Total - True North Consulting, LLC** | | | | | | **$58,500.00** | - | |
| **Tylar Ray Prosser** | | | | | | | - | |
| | Bill | 6/10/2025 | 6.5.2025 | 6/10/2025 | 2 | $450.00 | 450.00 | 2 |
| **Total - Tylar Ray Prosser** | | | | | | **$450.00** | - | |
| **Uline** | | | | | | | - | |
| | Bill | 12/6/2024 | 186543387 | 12/6/2024 | 188 | $863.17 | 863.17 | 188 |
| **Total - Uline** | | | | | | **$863.17** | - | |
| **UN/Empire** | | | | | | | - | |
| | Bill Cred | 12/31/2023 | 709701500 | 12/31/2023 | 529 | ($9,150.65) | (9,150.65) | 529 |
| | Bill Payr | 5/1/2024 | | 5/1/2024 | 407 | ($2,165.29) | (2,165.29) | 407 |
| | Bill | 11/1/2024 | UN 160-187 | 11/1/2024 | 223 | $43,226.00 | 43,226.00 | 223 |
| | Bill | 11/19/2024 | UN 160-216 | 11/19/2024 | 205 | $15,884.24 | 15,884.24 | 205 |
| | Bill | 11/27/2024 | UN 160-219 | 11/27/2024 | 197 | $18,525.00 | 18,525.00 | 197 |
| | Bill | 11/27/2024 | UN 160-221 | 11/27/2024 | 197 | $20,400.00 | 20,400.00 | 197 |
| | Bill | 11/27/2024 | UN 160-210 | 11/27/2024 | 197 | $68,675.00 | 68,675.00 | 197 |
| | Bill | 12/6/2024 | UN 160-225 | 12/6/2024 | 188 | $8,925.00 | 8,925.00 | 188 |
| | Bill | 12/6/2024 | UN 160-229 | 12/6/2024 | 188 | $8,634.24 | 8,634.24 | 188 |
| | Bill | 12/6/2024 | UN 160-228 | 12/6/2024 | 188 | $5,760.00 | 5,760.00 | 188 |
| | Bill | 1/24/2025 | UN 160-233 | 1/24/2025 | 139 | $56,485.00 | 56,485.00 | 139 |
| | Bill | 1/30/2025 | UN 160-235 | 1/30/2025 | 133 | $26,987.84 | 26,987.84 | 133 |
| **Total - UN/Empire** | | | | | | **$262,186.38** | - | |
| **Unifirst Coporation** | | | | | | | - | |
| | Bill | 2/17/2025 | 1800295801 | 3/19/2025 | 85 | $284.94 | 284.94 | 85 |
| | Bill | 2/24/2025 | 1800297988 | 3/26/2025 | 78 | $284.94 | 284.94 | 78 |
| | Bill | 3/3/2025 | 1800300119 | 4/2/2025 | 71 | $284.94 | 284.94 | 71 |
| | Bill | 3/10/2025 | 1800302205 | 4/9/2025 | 64 | $297.58 | 297.58 | 64 |
| | Bill | 3/17/2025 | 1800304228 | 4/16/2025 | 57 | $284.94 | 284.94 | 57 |
| | Bill | 3/24/2025 | 1800306471 | 4/23/2025 | 50 | $284.94 | 284.94 | 50 |
| | Bill | 3/31/2025 | 1800308597 | 4/30/2025 | 43 | $284.94 | 284.94 | 43 |
| | Bill | 4/7/2025 | 1800310721 | 5/7/2025 | 36 | $284.94 | 284.94 | 36 |
| | Bill | 4/14/2025 | 1800312783 | 5/14/2025 | 29 | $284.94 | 284.94 | 29 |
| | Bill | 4/21/2025 | 1800314876 | 5/21/2025 | 22 | $284.94 | 284.94 | 22 |
| | Bill | 4/28/2025 | 1800316840 | 5/28/2025 | 15 | $284.94 | 284.94 | 15 |
| | Bill | 5/5/2025 | 1800318952 | 6/4/2025 | 8 | $302.23 | 302.23 | 8 |
| | Bill | 5/12/2025 | 1800321135 | 6/11/2025 | 1 | $284.94 | 284.94 | 1 |
| | Bill | 5/19/2025 | 1800323169 | 6/18/2025 | -6 | $284.94 | - | (6) |
| | Bill | 5/26/2025 | 1800325032 | 6/25/2025 | -13 | $284.94 | - | (13) |
| | Bill | 6/2/2025 | 1800327403 | 7/2/2025 | -20 | $284.94 | - | (20) |
| | Bill | 6/9/2025 | 1800329274 | 7/9/2025 | -27 | $323.60 | - | (27) |
| **Total - Unifirst Coporation** | | | | | | **$4,912.57** | - | |
| **United States Bartenders' Guild Inc.** | | | | | | | - | |
| | Bill | 6/18/2024 | 26481 | 7/18/2024 | 329 | $1,500.00 | 1,500.00 | 329 |
| **Total - United States Bartenders' Guild Inc.** | | | | | | **$1,500.00** | - | |
| **US Event Management** | | | | | | | - | |
| | Bill | 10/22/2024 | 27183 | 10/22/2024 | 233 | $580.90 | 580.90 | 233 |
| | Bill | 11/27/2024 | 27336 | 11/27/2024 | 197 | $784.00 | 784.00 | 197 |
| **Total - US Event Management** | | | | | | **$1,364.90** | - | |
| **US Standard Products Corp** | | | | | | | - | |
| | Bill | 10/21/2024 | 789987 | 11/2/2024 | 222 | $1,560.90 | 1,560.90 | 222 |
| **Total - US Standard Products Corp** | | | | | | **$1,560.90** | - | |
| **Verizon Business** | | | | | | | - | |

| Vendor | Transac | Date | Document Number | Due Date | Age | Open Balance | Past Due as of 6/12/25 | Days Past Due |
|---|---|---|---|---|---|---|---|---|
| | Bill | 1/9/2025 | 6103209961 | 1/9/2025 | 154 | $3,625.49 | 3,625.49 | 154 |
| | Bill | 2/9/2025 | 6105654527 | 2/9/2025 | 123 | $4,188.63 | 4,188.63 | 123 |
| **Total - Verizon Business** | | | | | | **$7,814.12** | - | |
| **Vermont Information Processing, Inc,** | | | | | | | - | |
| | Bill | 3/21/2025 | 802012 | 3/21/2025 | 83 | $141.68 | 141.68 | 83 |
| | Bill | 5/23/2025 | 805815 | 5/23/2025 | 20 | $3,725.39 | 3,725.39 | 20 |
| **Total - Vermont Information Processing, Inc,** | | | | | | **$3,867.07** | - | |
| **VersaPay Fees** | | | | | | | - | |
| | Bill | 1/5/2025 | 1.5.2025 | 1/5/2025 | 158 | $6,000.61 | 6,000.61 | 158 |
| **Total - VersaPay Fees** | | | | | | **$6,000.61** | - | |
| **Villela CPA PLLC** | | | | | | | - | |
| | Bill | 5/1/2025 | 708 | 5/1/2025 | 42 | $15,000.00 | 15,000.00 | 42 |
| **Total - Villela CPA PLLC** | | | | | | **$15,000.00** | - | |
| **Wedland Group** | | | | | | | - | |
| | Bill | 10/23/2024 | 2613 | 10/23/2024 | 232 | $15,890.84 | 15,890.84 | 232 |
| | Bill | 10/23/2024 | 2656 | 10/23/2024 | 232 | $12,000.00 | 12,000.00 | 232 |
| | Bill | 10/28/2024 | 2619 | 10/28/2024 | 227 | $14,573.10 | 14,573.10 | 227 |
| | Bill | 10/28/2024 | 2632 | 10/28/2024 | 227 | $16,397.77 | 16,397.77 | 227 |
| | Bill | 11/1/2024 | 2660 | 11/1/2024 | 223 | $14,819.75 | 14,819.75 | 223 |
| | Bill | 12/1/2024 | 2664 | 12/1/2024 | 193 | $13,864.84 | 13,864.84 | 193 |
| | Bill | 1/1/2025 | 2670 | 1/1/2025 | 162 | $12,609.34 | 12,609.34 | 162 |
| | Bill | 4/1/2025 | 2683 | 4/1/2025 | 72 | $13,500.00 | 13,500.00 | 72 |
| **Total - Wedland Group** | | | | | | **$113,655.64** | - | |
| **Whiskey Riot Productions LLC** | | | | | | | - | |
| | Bill Cred | 2/15/2025 | | 2/15/2025 | 117 | ($1,428.57) | (1,428.57) | 117 |
| **Total - Whiskey Riot Productions LLC** | | | | | | **($1,428.57)** | - | |
| **WhistlePig, LLC** | | | | | | | - | |
| | Bill | 5/1/2024 | 43162 | 5/30/2024 | 378 | $1,966.80 | 1,966.80 | 378 |
| | Bill | 5/31/2024 | 43599 | 6/30/2024 | 347 | $1,966.80 | 1,966.80 | 347 |
| | Bill | 7/1/2024 | 44107 | 7/31/2024 | 316 | $1,966.80 | 1,966.80 | 316 |
| | Bill | 8/31/2024 | 45232 | 9/30/2024 | 255 | $1,966.80 | 1,966.80 | 255 |
| | Bill | 9/1/2024 | 44648 original inv dated 07 | 10/1/2024 | 254 | $1,966.80 | 1,966.80 | 254 |
| | Bill | 9/24/2024 | 45537 | 10/24/2024 | 231 | $1,629.50 | 1,629.50 | 231 |
| | Bill | 9/24/2024 | 45536 | 10/24/2024 | 231 | $4,344.00 | 4,344.00 | 231 |
| | Bill | 9/24/2024 | 45538 | 10/24/2024 | 231 | $804.00 | 804.00 | 231 |
| | Bill | 9/24/2024 | 45532 | 10/24/2024 | 231 | $444.50 | 444.50 | 231 |
| | Bill | 9/30/2024 | 45813 | 10/30/2024 | 225 | $1,966.80 | 1,966.80 | 225 |
| | Bill | 11/1/2024 | INV-50017 | 12/1/2024 | 193 | $1,966.80 | 1,966.80 | 193 |
| | Bill | 12/20/2024 | 50191 | 1/19/2025 | 144 | $1,966.80 | 1,966.80 | 144 |
| | Bill | 12/31/2024 | INV-50469 | 1/30/2025 | 133 | $1,966.80 | 1,966.80 | 133 |
| | Bill | 1/31/2025 | INV-50769 | 3/2/2025 | 102 | $1,966.80 | 1,966.80 | 102 |
| | Bill | 2/28/2025 | INV-50971 | 3/30/2025 | 74 | $546.15 | 546.15 | 74 |
| | Bill | 3/31/2025 | INV-51197 | 4/30/2025 | 43 | $546.15 | 546.15 | 43 |
| | Bill | 4/30/2025 | INV-51440 | 5/30/2025 | 13 | $546.15 | 546.15 | 13 |
| **Total - WhistlePig, LLC** | | | | | | **$28,528.45** | - | |
| **White Door Events** | | | | | | | - | |
| | Bill | 12/4/2024 | 41362-2 | 12/4/2024 | 190 | $1,168.98 | 1,168.98 | 190 |
| **Total - White Door Events** | | | | | | **$1,168.98** | - | |
| **Willscot - Mobile Mini** | | | | | | | - | |
| | Bill | 10/11/2024 | 9022136851 | 10/11/2024 | 244 | $2,426.83 | 2,426.83 | 244 |
| | Bill | 3/28/2025 | 9023399715 | 3/28/2025 | 76 | $2,357.41 | 2,357.41 | 76 |
| | Bill | 4/25/2025 | 9023595238 | 4/25/2025 | 48 | $2,357.41 | 2,357.41 | 48 |
| | Bill | 5/23/2025 | 9023794612 | 5/23/2025 | 20 | $2,913.39 | 2,913.39 | 20 |
| **Total - Willscot - Mobile Mini** | | | | | | **$10,055.04** | - | |
| **Zucconi Idea Agency Inc** | | | | | | | - | |
| | Bill | 2/28/2025 | 63-0001 | 3/30/2025 | 74 | $3,500.00 | 3,500.00 | 74 |
| **Total - Zucconi Idea Agency Inc** | | | | | | **$3,500.00** | - | |
| | | | | | | | | % Total |
| **Total** | | | | | | **$ 11,597,565.56** | **$10,540,904.32** | **91%** |

| Aging Buckets | Total | % Total |
|---|---|---|
| Current | 920,368.96 | 8% |
| 0-30 Days Past Due | 1,660,281.22 | 14% |
| 31-60 Days Past Due | 763,764.56 | 7% |
| 60-90 days Past Due | 462,214.80 | 4% |
| Over 90 Days Past Due | 7,790,936.02 | 67% |
| | 11,597,565.56 | 100% |

| Financial Row | Amount |
|---|---|
| **Liabilities & Equity** | |
| **Current Liabilities** | |
| **2800 - Notes Payable** | |
| 2800.01 - Notes Payable : Ford Credit : Expedition | $40,455.88 |
| 2800.02 - Notes Payable : Ford Credit : F150 2024 | $83,718.49 |
| 2800.03 - Ford Credit : F150 2021 | $30,054.99 |
| 2800.04 - Ford Credit : 2024 FORD MUSTG | $47,771.75 |
| 2802 - Notes Payable : Mercedes | $36,610.20 |
| 2803 - Notes Payable: Dash Funding | $1,078,434.85 |
| 2805 - Notes Payable : NGD : Farm Credit Lease | $31,522.07 |
| 2806 - Notes Payable : Farm Credit -Bronco | $8,585.19 |
| 2807 - Equity Partners | $1,000,000.00 |
| 2812 - Notes Payable : North Mill Equipment Finance | $28,539.60 |
| 2815 - Notes Payable : Huntington Bank | $3,375.84 |
| 2820 - Scarcelli Promissory Note | $1,000,000.00 |
| 2821 - WhistlePig Barrel Loan | $4,068,560.18 |
| 2823 - FCMA - Dan Call Farm Loan | $624,426.37 |
| 2824 - Grant Sidney Investment Loan | $20,026,270.00 |
| **Total - 2800 - Notes Payable** | **$28,108,325.41** |
| **Accounts Payable** | |
| **2100 - Accounts Payable** | |
| 2100 - Accounts Payable | $20,143,518.23 |
| 2105 - Accounts Payable: Park Street | $1,697,088.16 |
| 2110 - Accounts Payable: Square One | $43,434.89 |
| 2120 - Accounts Payable: Cognac | $48,097.34 |
| **Total - 2100 - Accounts Payable** | **$21,932,138.62** |
| **Other Current Liability** | |
| **Credit Card** | |
| **2700.01 - Credit Cards : UN** | |
| 2708 - Credit Cards : UN : American Express - Bonvoy | $10,117.36 |
| 2709 - Credit Cards : UN : American Express - DeltaSky | $18,918.75 |
| 2710 - Credit Cards : UN : American Express - Plum | $104,104.64 |
| 2712 - Credit Cards : UN : American Express - Delta Reserve | $39,643.86 |
| 2717 - Credit Cards: UN: Visa - Ramp | $104,456.34 |
| **Total - 2700.01 - Credit Cards : UN** | **$277,240.95** |
| **Total Credit Card** | **$277,240.95** |
| **Other Current Liability** | |
| **2505 - Sales Tax Payables** | |
| 2505.01 - Sales Taxes Payable : TN | $19,659.00 |
| **Total - 2505 - Sales Tax Payables** | **$19,659.00** |
| **2950 - Current Portion of Long-Term Debt** | |
| 2951 - Current Portion of Long-Term Debt: Farm Credit | $3,800,000.00 |
| **Total - 2950 - Current Portion of Long-Term Debt** | **$3,800,000.00** |
| **Total Other Current Liability** | **$4,096,899.95** |
| **Total Liabilities** | **$54,137,363.98** |

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
8
4:25-CV-00038

**Post Receivership Reported Cash Flows**

| UN Cash Flows | 9/1<br>9/7<br>Actual | 9/8<br>9/14<br>Actual | 9/15<br>9/21<br>Actual | 9/22<br>9/28<br>Actual | 9/29<br>10/5<br>Actual | 10/6<br>10/12<br>Actual | 10/13<br>10/19<br>Actual | 10/20<br>10/26<br>Actual | 10/27<br>11/2<br>Actual | 11/3<br>11/9<br>Actual |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cumulative** | | | | | | | | | | |
| Cumulative Net Cash Flow Reported | 234,767 | 1,590,271 | 1,143,992 | 764,527 | 1,105,232 | 983,425 | 1,284,483 | 848,840 | 784,321 | 743,282 |
| Add back: Cumulative Receivership Fees | - | - | 247,505 | 405,370 | 543,981 | 624,496 | 700,087 | 772,651 | 844,652 | 942,125 |
| Less: Cumulative FCMA Funding | - | (1,700,000) | (1,700,000) | (1,700,000) | (1,700,000) | (2,300,000) | (2,300,000) | (2,300,000) | (2,300,000) | (2,300,000) |
| Cumulative Net Cash Flow - Adjusted | $ 234,767 | $ (109,729) | $ (308,504) | $ (530,103) | $ (50,787) | $ (692,079) | $ (315,430) | $ (678,509) | $ (671,026) | $ (614,594) |

| UN Cash Flows | 11/10<br>11/16<br>Actual | 11/17<br>11/23<br>Actual | 11/24<br>11/30<br>Actual | 12/1<br>12/7<br>Actual | 12/8<br>12/14<br>Actual | 12/15<br>12/21<br>Actual | 12/22<br>12/28<br>Actual | 12/29<br>1/4<br>Actual | 1/5<br>1/11<br>Actual | 1/12<br>1/18<br>Actual |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cumulative** | | | | | | | | | | |
| Cumulative Net Cash Flow Reported | 981,656 | 781,923 | 738,970 | 1,040,587 | 1,535,431 | 2,132,573 | 952,779 | 1,527,194 | 1,503,888 | 1,137,212 |
| Add back: Cumulative Receivership Fees | 1,065,463 | 1,136,146 | 1,207,912 | 1,294,549 | 1,350,158 | 1,390,434 | 1,426,273 | 1,474,971 | 1,571,089 | 1,729,259 |
| Less: Cumulative FCMA Funding | (2,300,000) | (2,500,000) | (2,500,000) | (2,500,000) | (2,723,805) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) |
| Cumulative Net Cash Flow - Adjusted | $ (252,881) | $ (581,930) | $ (553,118) | $ (164,865) | $ 161,784 | $ (276,993) | $(1,420,948) | $ (797,835) | $ (725,023) | $ (933,529) |

Average weekly cash burn of $ (46,676)

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
9
4:25-CV-00038

| UN Cash Flows<br>Week Start<br>Week End<br>Actual/Projected | Week 20<br>1/12<br>1/18<br>Actual | Week 21<br>1/19<br>1/25<br>Projected | Week 22<br>1/26<br>2/1<br>Projected | Week 23<br>2/2<br>2/8<br>Projected | Week 24<br>2/9<br>2/15<br>Projected | Week 25<br>2/16<br>2/22<br>Projected | Week 26<br>2/23<br>3/1<br>Projected | Week 27<br>3/2<br>3/8<br>Projected | Week 28<br>3/9<br>3/15<br>Projected | Week 29<br>3/16<br>3/22<br>Projected | Week 30<br>3/23<br>3/29<br>Projected | Week 31<br>3/30<br>4/5<br>Projected | Week 32<br>4/6<br>4/12<br>Projected | Week 33<br>4/13<br>4/19<br>Projected |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Cumulative Net Cash Flow **Reported** | $1,137,212 | $1,435,899 | $945,088 | $793,099 | $846,957 | $860,301 | $479,180 | $519,487 | $285,703 | $187,900 | $(220,927) | $(290,534) | $(509,998) | $(706,088) |
| Add back: Cumulative Receivership Fees | 1,729,259 | 1,856,531 | 2,026,531 | 2,186,531 | 2,346,531 | 2,521,531 | 2,691,531 | 2,851,531 | 3,011,531 | 3,186,531 | 3,356,531 | 3,516,531 | 3,676,531 | 3,851,531 |
| Less: Cumulative FCMA Funding | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) | (3,800,000) |
| Cumulative Net Cash Flow - **Adjusted** | $(933,529) | $(507,571) | $(828,381) | $(820,370) | $(606,512) | $(418,169) | $(629,290) | $(428,982) | $(502,766) | $(425,569) | $(664,396) | $(574,003) | $(633,467) | $(654,557) |
| Avg Weekly Burn | (46,676) | (24,170) | (37,654) | (35,668) | (25,271) | (16,727) | (24,203) | (15,888) | (17,956) | (14,675) | (22,147) | (18,516) | (19,796) | (19,835) |
| | | | | | | | | | | | | | | |
| Ending Cash | $1,201,448 | $1,500,135 | $1,009,324 | $857,335 | $911,193 | $924,537 | $543,416 | $583,723 | $349,939 | $252,136 | $(156,691) | $(226,298) | $(445,762) | $(641,852) |

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
10
4:25-CV-00038

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**WINCHESTER DIVISION**

| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-38 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| UNCLE NEAREST, INC., *et al.,* | ) | Magistrate Judge Steger |
| | ) | |
| Defendants. | ) | |

## **RECEIVER'S SECOND QUARTERLY REPORT**

Comes now Phillip G. Young, Jr. (the "Receiver"), the court-appointed receiver in this matter, by and through counsel, and offers this second quarterly report pursuant to the Court's Order Appointing Receiver (the "Receivership Order") entered on August 22, 2025.[1]

### *INTRODUCTION*

1. The first quarterly report in this case was filed less than six (6) weeks into this receivership matter. Since the filing of the first report, the Receiver has much more clarity on the financial status of Uncle Nearest, Inc. and its affiliates (collectively, the "Company") and some of the causes of its financial decline. The Receiver's findings herein reflect conclusions he has reached in the review of thousands of pages of documents; meetings with employees and former employees; discussions with shareholders, creditors, vendors, distributors, potential lenders, and potential investors; input from consultants retained as part of this Receivership; and his operation of the Company for approximately four (4) months.

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
11
4:25-CV-00038

[1] This report is being filed slightly later than the prior quarterly report because the fourth quarter closed during the holiday season. The Receiver was unable to gather all information relevant to this report prior to January 5, 2026.

*TASKS ACCOMPLISHED BY THE RECEIVER*

2. The Receiver has assembled a group of professionals to assist with the operation of the Company and the advancement of the tasks established by the Receivership Order. More specifically, the Receiver has retained Newpoint Advisors Corporation ("Newpoint") to serve as his financial consultant. Due to the insufficiency of the Company's accounting team, Newpoint has essentially functioned as the Company's outsourced Chief Financial Officer and accounting department since early in this Receivership. Critically, Newpoint has assisted the Receiver in developing a rolling thirteen-week budget and tracking actual performance versus the budget. The Receiver has also retained Thoroughbred Spirits Group, LLC ("Thoroughbred") to assist him in the operations of the Company. Thoroughbred has extensive experience consulting with and/or operating other spirits companies. Thoroughbred has assisted the Receiver in communications with distributors, making determinations about marketing budgets, evaluating release strategies, and managing the production of the Company's products. The Receiver has likewise retained Arlington Capital Services, LLC ("Arlington") to serve as the Receivership's investment bank. As will be detailed below, Arlington has assisted the Receiver in seeking refinancing of the Company's debts and/or identifying a buyer for substantially all assets. Finally, the Receiver has retained Thompson Burton, PLLC ("TB") to represent him in all legal aspects of this Receivership. The Receiver has employed other professionals to carry out more discrete tasks (e.g., alcoholic beverage counsel, French law counsel, counsel representing the Company in litigation that was pending prior to the Receivership, etc.) but Newpoint, Thoroughbred, Arlington, and TB are the Receiver's primary consultants for this matter.

3. Since October 1, 2025, the Receiver's primary focus has been on stabilizing the cash flow of the Company. When the Receiver assumed control of the Company, it was in

financial shambles. It was unable to make payroll; it was over $1 million in arrears on payments to Tennessee Distilling Group ("TDG"), who stored substantially all of its distilled product, and thus created a large warehouseman's lien; and it was losing approximately $1,000,000 every month, despite making no payments on its secured indebtedness. Moreover, despite the Company's management (including its Chief Executive Office and Chief Financial Officer) representing to the Receiver that the Company's unsecured debt was substantially less than $10,000,000, the Receiver discovered that its unsecured debt eclipsed $50,000,000. After a number of weeks of budget adjustment, and with the assistance of cash injections from the secured lender, the Receiver has been able to reduce the Company's monthly losses. Between October 1, 2025 – December 31, 2025, the Company showed losses (exclusive of professional services expenses) of $1,071,312, or approximately $350,000 per month. The Company remains insolvent on a month-to-month basis but for the financial support of Farm Credit Mid-America, PCA ("Farm Credit").

4. Compounding the difficulty of this Receivership was the unreliability of the Company's financial records. The Company's Chief Executive Officer represented to the Receiver in the first few days after his appointment that all of the Company's financial records prior to 2024 had been erased by a former employee.[2] Therefore, the Receiver could base the Company's financial condition and performance only upon its records from 2024 forward. The Receiver quickly found, however, that these financial records were unreliable. For example, the Company reported revenues in excess of $70 million for 2024; in actuality, the revenues for 2024 were $41 million (as calculated based upon source data). The Company's barrel count was also exaggerated by more than 20,000 barrels. The Receiver was able to reconcile the barrel count as the Company

[2] The Receiver is working to recover that data as it will be necessary for ongoing investigations into the financial transactions of the Company and its agents.

continued to carry on its books, as inventory, barrels that were sold to third parties (with the reservation of a repurchase right or, in some cases, a repurchase obligation[3]); however, the inventory count was completely unreliable. The Receiver, with the assistance of his financial advisors, have now been able to reconstruct accurate financial records for 2024 and 2025.

5. Not only were the financial records of the Company unreliable, its capitalization table was equally unreliable. Based upon the Receiver's review of hundreds of pages of documents and his conversations with dozens of shareholders, the Receiver has learned that the capitalization table maintained by the Company does not properly reflect the owners of the Company's shares. More specifically, the capitalization table did not capture a number of secondary market transactions, all of which were approved by the Company but not noted on the capitalization table. The Receiver and his legal counsel have been working to correct and update the capitalization table.

6. The Receiver and his consultants continue developing and refining a rolling thirteen-week budget for the Company. The details of this budget and other financial issues are detailed in the Financial Report section below.

7. The Receiver, with financial assistance from Farm Credit, has satisfied all liens maintained by TDG encumbering the inventory of the Company.

8. This quarter, the Receiver has continued his frequent discussions with creditors, vendors, distributors, and shareholders of the Company. While this has occupied a lot of his time, the Receiver felt that these communications were essential in continuing normal business operations despite substantial amounts owed to some of these constituents and concerns about the

[3] These repurchase rights or repurchase obligations permitted, or mandated, that the Company repurchase barrels at a substantially higher rate than their sales price. Indeed, the repurchase rate is multiples of the fair market value of whiskey barrels in the market today.

viability of the Company. Further, the Receiver believes that these communications have delayed substantial, potentially distracting, litigation against the Company and/or its founders, especially litigation threatened by shareholders who maintain that they were defrauded.

9. The Receiver has taken all steps to maintain the Company's existing intellectual property. He has also taken steps to maintain the Company's relevant licenses with state and federal authorities.

10. The Receiver discovered that the Company has not filed federal tax returns since 2018. He is working with the Company's accountants to develop a timeline and a budget for bringing the Company into compliance with Internal Revenue Service and federal tax law requirements.

11. With the assistance of his team of consultants, the Receiver has continued making all operational and financial decisions for the Company.

*TASKS IN PROCESS*

12. The Receiver has identified a number of tasks that need to be undertaken and/or completed in the future. Some of these tasks are operational, some financial, and some legal. While some of these tasks will take hours to complete, others will take weeks. Nevertheless, here are the tasks that the Receiver believes lies ahead in this receivership.

13. As mentioned above, the capitalization table is inaccurate. The Receiver and his counsel continue the process of reconciling the capitalization table.

14. The Company is unable to simply "operate" its way out of its current financial condition. Therefore, the Receiver retained Arlington to identify potential refinancing sources for the Company and/or to market the Company's assets for sale, based upon the Receiver's recognition that the Company cannot remain in this Receivership in perpetuity. Arlington

contacted 106 parties that it believed were potential sources of refinancing and/or were potential purchasers of the Debtor's assets. Of the 106 parties contacted, 42 executed non-disclosure agreements and Arlington had follow-up calls with 29 parties. From those 29 parties, 10 submitted a written interest in purchasing the assets of the Company (indicating a valuation range in their written proposals), 4 expressed a willingness to partner with another purchaser (while not making an offer), but no parties expressed an interest in refinancing the Company's debt. While Arlington continues working with the 10 parties who submitted written interest to produce an acceptable offer, none of those parties indicated that it was willing to pay an amount equal to or exceeding Farm Credit's debt.

15. The Receiver identified the Company's assets located in Cognac, France as assets that could be liquidated without impacting the Company's operations, and should be liquidated in order to reduce the Company's indebtedness. Fawn Weaver initially indicated to the Receiver that she had a party that was willing to pay $10,000,000 for the real property in France and the personal and intellectual property associated therewith. The Receiver had subsequent conversations with the potential purchaser, who indicated that he would be willing to pay a reduced price of $7,000,000. After the Receiver performed his due diligence on the value of the assets, and he began pushing the potential purchaser for a written agreement, the potential purchaser indicated that he was no longer interested. The Receiver believes that the potential purchaser backed out at the behest of Fawn Weaver after the Receiver had indicated to Ms. Weaver that the Receiver intended to use the proceeds from the sale to pay down debt of the Company, not for ongoing operations. The Receiver believes that Ms. Weaver intended to use the proceeds from the sale of the French assets as "proof" of the solvency of the Company. After this failed transaction, the Receiver reduced the expenses associated with the French assets as much as possible and is

currently utilizing a European connection to market the Cognac assets.

16. The Receiver likewise believes that the Company's house in Martha's Vineyard should be liquidated.[4] The Receiver has identified a real estate professional in Martha's Vineyard who has given him an estimated value of the property and has agreed to list the property for sale. The Receiver intends to sign the listing agreement this month.

17. The Receiver is also communicating with two potential parties about the sale or transfer of the Company's assets associated with its vodka product. Based upon conversations with consultants, industry experts, and potential purchasers, he believes that the value of the vodka assets is negligible.

18. In the last month, the Receiver has begun a forensic investigation into the finances and transactions of the Company. This investigation is in its infancy and is expected to take considerable time to complete. The Receiver intends to investigate all allegations that have been brought to his attention: (1) allegations by Fawn Weaver that Farm Credit committed lender liability or breached other duties to the Company; (2) allegations by Fawn Weaver that a former employee (or employees) of the Company were guilty of conversion, fraud, or other financial crimes; and (3) allegations by certain shareholders that they were defrauded by the Company's Chief Executive Officer, Chief Financial Officer, and/or board of directors. While this investigation is only beginning, the Receiver has identified a number of very questionable transactions in 2024 and 2025 involving officers and directors of the Company. The Receiver is not yet able to draw conclusions, nor is he prepared to file causes of action on behalf of the

[4] The Receiver is aware of recent pleadings in which Fawn Weaver and Keith Weaver allege that the Martha's Vineyard real estate belongs to Keith Weaver, not the Company. While the Receiver will deal with this in more depth in other pleadings, the Receiver will note that the real estate in Martha's Vineyard was purchased using the Company's funds and that all expenses have been paid by the Company. In fact, as recently as December 31, 2025, Keith Weaver forwarded the tax invoice for the Martha's Vineyard real estate to the Receiver for payment.

Company against any third party. In fact, the Receiver believes that pursuit of any such high-profile litigation prior to the sale of the Company's assets or the refinancing of its debt would negatively impact the Company's ability to effectively reorganize and continue operating. Therefore, his primary focus at this time is on the Company's continuing operations, not its potential causes of action.

19. The Receiver also continues his investigation into certain entities that are related to, and appear commingled with, the Company. The Receiver will address these issues in a separate report, pursuant to the Court's prior orders.

*FINANCIAL REPORT*

20. **Key Financial Metrics.** In accordance with the Receivership Order filed August 22, 2025, the following financial information is provided for the current reporting period (October 1, 2025 – December 28, 2025) and the Receiver period to date (August 23, 2025 – December 28, 2025). Actual results are presented against the original operating budget to provide transparency into performance.

21. **Professional Fees Paid**

**October 1, 2025 – December 28, 2025**

| **Firm Name** | **Actual $'s** | **Budgeted $'s** | **Variance $'s** |
|---|---|---|---|
| Thompson Burton PLLC | 331,021 | 600,000 | (268,979) |
| Newpoint Advisors Corporation | 426,316 | 510,000 | (83,684) |
| Thoroughbred Spirits Group, LLC | 125,008 | 445,000 | (319,992) |
| Other | 77,241 | 18,000 | 59,241 |
| TOTAL | 959,586 | 1,573,000 | (613,414) |

**August 23, 2025 – December 30, 2025**

| Firm Name | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Thompson Burton PLLC | 495,711 | 840,000 | (344,289) |
| Newpoint Advisors Corporation | 582,112 | 690,000 | (107,888) |
| Thoroughbred Spirits Group, LLC | 209,893 | 613,000 | (403,107) |
| Other | 77,241 | 18,000 | 59,241 |
| TOTAL | 1,364,957 | 2,161,000 | (796,043) |

22. **Collections Received**

**October 1, 2025 – December 28, 2025**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Collections | 4,063,419 | 5,641,605 | (1,578,186) |
| Farm Credit Mid-America, PCA | 2,100,000 | 2,100,000 | - |
| TOTAL | 6,163,419 | 7,741,605 | (1,578,186) |

**August 23, 2025 – December 30, 2025**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Collections | 5,558,584 | 7,111,571 | (1,552,987) |
| Farm Credit Mid-America, PCA | 3,800,000 | 3.800,000 | - |
| TOTAL | 9,358,584 | 10,911,571 | (1,552,987) |

23. **Expenditures**

**October 1, 2025 – December 28, 2025**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Disbursements | 5,134,731 | 6,853,760 | (1,719,029) |
| Professional Service Expenses | 959,586 | 1,573,000 | (613,414) |
| TOTAL | 6,094,317 | 8,426,760 | (2,332,443) |

**August 23, 2025 – December 30, 2025**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Disbursements | 7,159,998 | 9,472,306 | (2,312,308) |
| Professional Service Expenses | 1,364,957 | 2,161,000 | (796,043) |
| TOTAL | 8,524,955 | 11,633,306 | (3,108,351) |

The Defendants and the Company's senior lender, Farm Credit, have access to the full details supporting the above figures.

24. **Banking & Disbursement Controls.** Immediately following his appointment, the Receiver took steps to secure all existing bank accounts associated with the Company. This included freezing accounts where appropriate and establishing new Receiver-controlled accounts to ensure that all future transactions are properly monitored and documented. By shifting all financial activity into Receiver-controlled accounts, the risk of unauthorized transfers or unapproved expenditure has been significantly reduced. These activities and policies have continued to be in place and enforced throughout the entire receiver period.

25. Bank accounts with cash balances remain in a French bank, over which the Receiver will not have exclusive control until the French courts officially recognize this Court's Receivership Order. Likewise, the Receiver does not have control over bank accounts in the names of certain entities that are detailed in the Receiver's Motion for Clarification filed with this Court on September 12, 2025.

26. The Receiver has instituted a policy that all significant disbursements must receive explicit approval from the Receiver before release. This control mechanism ensures that cash outflows align with the cash flow budget and that only necessary and authorized expenses are incurred. To reinforce this control, weekly reconciliations are performed for all bank accounts.

These reconciliations serve to verify accuracy, detect any discrepancies, and confirm that no unauthorized transactions have taken place.

27. **Cash Flow Budgeting & Variance Review.** A rolling 13-week cash flow budget has been developed and is updated weekly to reflect the Company's most current operating realities. This budget is reconciled against actual collections and disbursements every week. Any variances greater than 10% between budgeted and actual results are promptly identified, documented, and explained.

28. As part of the secured lender forbearance agreement, the Receiver is required to submit comprehensive bi-weekly reporting packages to Farm Credit, the Company's secured lender. These packages contain detailed variance analyses, operational expense tracking, and updated sales forecasts. By providing this level of detail, the secured lender can closely monitor performance against established targets and evaluate ongoing compliance with the terms of the forbearance agreement. This enhanced reporting process strengthens transparency and accountability, ensuring that stakeholders have timely and accurate insight into the Company's financial position, operational performance, and near-term prospects.

29. **Payroll & Taxes.** The payroll process has been stabilized under the administration of the Company's professional employer organization, Genesis Global. At the time of the appointment, the Receiver identified that the PEO account was underfunded, jeopardizing employee pay continuity. This issue has since been corrected, ensuring that payroll obligations are consistently met.

30. The Receiver has completed a review of payroll taxes, excise taxes, business taxes, and property taxes. Several potential liabilities have been identified, and these obligations have been incorporated into the cash flow budget for planning purposes. Of particular concern is the

discovery that the Company has not filed federal income tax returns since 2018. The Receiver is currently working with appropriate tax authorities and external advisors to address this issue.

31. In addition, the Receiver conducted a review of state-level business, excise and sales tax compliance. Findings indicated that Tennessee and New Jersey have material exposure due to incomplete reporting and unpaid obligations. These issues were corrected for both the states of Delaware and Tennessee during the most recent quarterly period with the Company now in Good Standing. Business, excise and sales taxes are now current for all Receiver entities.

32. **Vendor & Operational Continuity.** The Receiver has established direct lines of communication with key vendors, logistics providers, and employees to maintain uninterrupted operations. This outreach has helped secure the cooperation of critical partners and mitigate risks to the supply chain. All vendor notices are now being directed to the Receiver. This process has revealed several previously unidentified liabilities that were not fully disclosed in the Company's records. The Receiver has also secured and reviewed critical business documents, including supply chain agreements, bottling contracts, and marketing obligations. These reviews aim to identify operational risks and financial commitments that could have a material impact on cash flow.

33. An initial review of inventory storage agreements and bailment warehouse contracts was completed with follow-up currently underway. This is necessary to confirm lien positions, assess obligations, and evaluate any potential risks associated with warehouse-held inventory.

34. **Financial and Accounting Observations.** The Company's existing accounting records are materially unreliable and cannot be relied upon for accurate financial reporting. Key deficiencies identified include:

- Non-reconciled balances create uncertainty about the accuracy of financial statements.

- Unusual accounting entries lack proper documentation.
- Improper revenue recognition practices that distort the Company's financial performance.

35. The absence of solid financial controls and the unreliability of certain financial records have been a challenge in determining historical sales and expenses that would aid with forecasting future sales and expenses. That challenge has been compounded by the fact that a substantial number of financial records before 2024 were erased from the Company's computer system. According to multiple employees at the Company, those records were erased by a former employee immediately after termination. The Receiver is working to recover some or all of those financial records.

36. The Receiver has also identified related-party transactions involving Grant Sydney, Inc. and Quill and Cask Owner, LLC, both entities owned by the Weavers. These transactions were reviewed via the use of external records and supporting documentation to determine their accuracy, legitimacy, and whether they represent potential improper transfers. Irregularities were found and continued review and investigation is in process. Since many of the companies that are subject to this receivership action have comingled assets and liabilities with other non-receiver entities, it has made determination of lien priority, and separation of liabilities among corporations, very difficult.

37. The Receiver has engaged a third-party CPA bookkeeping firm to assist in the ongoing completion of accounting records and preparation of financial statements for the Receivership period. This activity has resulted in the reconciliation of all cash activity for the YTD period October 31, 2025, with the remaining 2025 almost completed. Monthly financial statements are currently being finalized for the August – October 2025 period.

38. In addition, the Receivership team is working on gathering source data to recreate certain financial reports. The Receiver thinks it is critical for the Company to have financial

statements that have been created under his independent direction, for which he can verify the accuracy.

39. Overall, cash resources remain limited, necessitating tight cash management and prioritization of critical expenses.

40. **Next Steps – Stakeholder Communications.** The Receiver will continue to provide bi-weekly reporting to Farm Credit, including detailed variance reports, expense reviews, and sales forecasts. Regular updates will also be provided to the Court and other key stakeholders. Direct engagement with vendors, customers, and employees will continue to maintain operational stability and foster transparency.

41. **Asset Recovery & Preservation of Value.** The Receiver will continue to secure and monitor the Company's cash, accounts receivable, inventory, leased equipment, and other assets. To ensure accurate reporting and valuation, updated inventory counts and appraisals will be commissioned as necessary. Bailment warehouse records have been reviewed to confirm lien positions and ensure obligations are properly disclosed and managed.

42. **Cash Management.** The Receiver will continue to have a rigorous oversight of all disbursements, requiring prior approval for significant expenses. Bank accounts will be reconciled on a daily and weekly basis to ensure the integrity of records and detect irregularities promptly. Forward-looking projections will continue to be refined and stress-tested to account for potential sales fluctuations, ensuring that the Company remains prepared for varying operational outcomes. The Receivership team spent considerable time assessing the current operations of the Company. As a result of those assessments, the Receiver made significant cuts to the operational expenditure of the Company, including reducing its workforce by twenty-eight employees, or 30%. Some of the more recent headcount reductions include reductions in security staffing and the outsourcing

of janitorial services at half the cost of prior internal services.

43. The Receiver continues to evaluate the workforce and expenditures of the Company, in an effort to increase its operational efficiencies and become more profitable. This has led the Receiver to make additional spending cuts to both administrative and sales budgets to improve overall business efficiency and maintain cash liquidity. These activities include an increased focus on working capital management in the areas of accounts receivable and inventory.

44. **Investigation & Forensic Review.** As indicated above, the Receiver will continue his review of historical financial records and intercompany transfers to uncover any irregularities or potential recovery opportunities. Special focus will be placed on officer and insider compensation, travel and marketing expenditures, and the identification of potential preferential or fraudulent transfers.

45. As necessary, tax advisors will be engaged to quantify exposures associated with the unfiled federal and state income tax returns dating back to 2018. The Receiver will also evaluate potential claims or causes of action that could be pursued for the benefit of creditors, with a focus on maximizing recovery and ensuring equitable treatment of all stakeholders.

46. **Conclusion.** The Receiver has implemented robust controls to stabilize operations, enhance transparency, and identify key risks. Substantial challenges remain, particularly in areas such as tax compliance, accounts payable, and related-party transactions. The Receiver will continue to prioritize transparency, creditor protection, and preservation of value while working closely with all stakeholders to achieve the best possible outcome for the estate.

*CHALLENGES TO RECEIVERSHIP*

47. Cash flow continues to be a major challenge to this receivership. As demonstrated by the data included in the Financial Report above, the Company continues operating at a loss. At

this juncture, the Company is only able to maintain operations due to (a) cash infusions by Farm Credit, (b) significant reductions to operational expenses, and (c) professional fees coming in substantially below budget.

48. Due to a variety of factors (for example, credit holds on product shipment, legal fees incurred by the Company, and the impact of this litigation on sales), revenue collections were down significantly when the Receiver assumed control of the Company. The distress of the spirits market as a whole, the reduction of worldwide demand for alcohol, and the impact of tariffs on international sales continue to depress sales. Moreover, litigation such as this always has a negative impact on sales, as a company's employees, vendors, and business partners grow concerned about the long-term viability of a company in receivership. Recent pleadings filed in this Court by Fawn Weaver and Keith Weaver, as well as a recent complaint filed by Fawn Weaver, Keith Weaver, and Grant Sidney, Inc. in the Chancery Court for Bedford County, Tennessee against the Company's former CFO, Mike Senzaki, has further damaged the value of the brand. The Receiver bases this conclusion upon his conversations with creditors, vendors, employees, shareholders, Receivership consultants, and potential investors.

49. Relatedly, the adversarial nature and tone of recent pleadings filed by Fawn Weaver and Keith Weaver have created the potential for substantial practical and ethical conflicts. The Defendants' pleadings have muddled legal issues and operational issues to such an extent that the Receiver has become uncomfortable speaking directly to Fawn Weaver or Keith Weaver without their counsel being present, and has become uncomfortable speaking directly with their counsel without his legal counsel being present. In order to avoid these potential conflicts, the Receiver has advised counsel for the Defendants that he wishes to communicate with Fawn Weaver and Keith Weaver exclusively through his consultants, and he wishes to communicate with

Defendants' counsel exclusively through the Receiver's legal counsel.[5]

50. Another challenge to this receivership is the threat of significant litigation. As mentioned above and in prior pleadings, the Receiver has fielded dozens of calls and emails from creditors and shareholders threatening the Company and/or its officers and directors with litigation. The continued stay of litigation, as provided for in the Receivership Order, is critical to maintaining normal operations of the Company. Even with the imposition of the stay, the Receiver believes that litigation initiated by (or potentially against) Fawn Weaver and Keith Weaver poses a threat to the Company, both in terms of value of the brand and in terms of focus of officers, directors and employees.

*CONCLUSIONS, RECOMMENDATIONS AND REQUESTS*

51. The Company cannot operate in this Receivership in perpetuity. However, the Company is insolvent. The Receiver believes that the Company would be forced to cease operations within sixty days without: (a) continued cash injections by Farm Credit; (b) the stay of litigation provided for in the Receivership Order; and (c) the legal, financial, and operational guidance of the Receiver and his team of consultants. The cessation of business would cause the loss of nearly 70 jobs and the disappearance of a brand with significant social and cultural value.

52. While the Receiver's opinion of value has been significantly adjusted based upon discovery of the Company's accurate, historical revenues (which were just over half of what was reported) and the offers he has received in the market, the Receiver continues to believe that the Company's business and brand have a future. In order to maximize that value, the Receiver believes that all non-essential, non-income producing assets must be liquidated as soon as possible,

[5] While this development is unfortunate and less than ideal, it is the best way to reduce potential ethical violations. Moreover, the Receiver believes this is a temporary solution. Within thirty days, the Receiver believes this Court will either have dissolved this Receivership, as the Defendants request, or will have authorized the Receiver to move forward with his attempts to stabilize the Company through the refinancing of its debt or a sale of its assets.

and a total refinancing of the Company's debt or a sale of the Company as a going concern must be completed by no later than the second quarter of 2026.

Dated this 6th day of January 2026.

Respectfully submitted,

/s/ Justin T. Campbell
Justin T. Campbell
Thompson Burton PLLC
1801 West End Avenue, Suite 1550
Nashville, Tennessee 37203
(615) 465-6015 (phone)
justin@thompsonburton.com

Counsel for the Receiver

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served via electronic mail on Mike Collins (mcollins@manierherod.com), Erika Barnes (ebarnes@stites.com) and Demetra Liggins (dliggins@mcguirewoods.com).

This 6th day of January 2026.

/s/ Justin T. Campbell.
Justin T. Campbell

# FORM OF BORROWING BASE CERTIFICATE

Date: March 31, 2025

To: Farm Credit Mid-America, PCA, as the Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of July 13, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware Corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the lenders from time to time party thereto, as Lenders, and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

The undersigned hereby certifies as of the date hereof that he/she is the Interim CFO of the Company, and that, as such, he/she is authorized to execute and deliver this Borrowing Base Certificate to the Administrative Agent on the behalf of the Company, and that the analysis and information set forth in this Borrowing Base Certificate is true and accurate on and as of the date hereof.

## Borrowing Base / Availability Calculations

Eligible Accounts: $1,145,730
Accounts Advance Rate: 75%
**Accounts Borrowing Base: $859,297**

Eligible Inventory: $52,583,215
Inventory Advance Rate: 70%
**Inventory Borrowing Base: $36,808,250**

***Availability Reserves:***

Less: Rent and Charge Reserves: $0
Less Outstanding Taxes and other Government charges: $0
Less: Liabilities that are or may become secured by Liens on the Collateral (including Permitted Liens) which might have priority over the Liens or interests of the Lender in the Collateral: $0

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
12
4:25-CV-00038

Less: Reserves with respect to the salability of Eligible Inventory or which reflect such other factors as affect the market value of the Eligible Inventory, including obsolescence, seasonality, Shrink, vendor chargebacks, imbalance, change in Inventory character, composition or mix, markdowns and out of date and/or expired Inventory: $0
Less: Whiskey storage reserves: $0
Less: the Dilution Reserve: $0
Less: [Other TBD]: $0
**Total Availability Reserves: $0**

**Borrowing Base** (Accounts Borrowing Base + Inventory Borrowing Base – Total Availability Reserves): **$37,667,548**

***Line Reserves:***
Rent and Charges Reserve: $0
Plus: Aggregate amount of liabilities at any time secured by Liens upon collateral that are Senior to the Administrative Agent's Liens: $0
Plus: Sums that any Loan Party may be required to pay under any Section of the Credit Agreement or any other Loan Document and has failed to pay: $0
Plus: Amounts for which claims may be reasonably expected to be asserted against the Collateral: $0

Aggregate Revolving Credits Commitments: $0
Less: Line Reserves: $0

**Maximum Borrowing Amount** (the lesser of the aggregate Revolving Credit Commitments – Line Reserves) and the Borrowing Base): **$**

**Less the Outstanding Amount of all Revolving Loans: ($65,224,032)**

**Availability: ($27,556,484)**

## Certification

IN WITNESS WHEREOF, the undersigned has executed this Borrowing Base Certificate as of June 11, 2025.

**UNCLE NEAREST, INC.**

Carlos Flores
Interim CFO

Mar-25

| Barrels Held at TDG | # Barrels | Cost/Barrel | Inventory Value |
|---|---|---|---|
| TDG Distilled 2018 Barrels- Silver | 96 | $2,700 | $259,200 |
| TDG Distilled 2018 Barrels- (77/15/8) | 31 | $2,700 | $83,700 |
| TDG Distilled 2018 Barrels- Bourbon (70/22/8) | 1 | $2,070 | $2,070 |
| TDG Distilled 2018 Barrels- (80/10/10) | 7 | $650 | $4,550 |
| TDG Distilled 2018 Barrels- (84/8/8) | 18 | $650 | $11,700 |
| TDG Distilled 2019 Barrels- (77/15/8) | 660 | $650 | $429,000 |
| TDG Distilled 2019 Barrels- Bourbon (70/22/8) | 1000 | $650 | $650,000 |
| TDG Distilled 2019 Barrels -(80/10/10) | 121 | $650 | $78,650 |
| TDG Distilled 2019 Barrels- (84/8/8) | 89 | $650 | $57,850 |
| TDG Distilled 2020 Barrels -(80/10/10) | 2314 | $650 | $1,504,100 |
| TDG Distilled 2020 Barrels- (84/8/8) | 4502 | $2,400 | $10,804,800 |
| TDG Distilled 2020 Barrels-Rye | 63 | $3,000 | $189,000 |
| TDG Distilled 2021 Barrels- (84/8/8) | 9028 | $650 | $5,868,200 |
| TDG Distilled 2022 Barrels-(80/10/10) | 12505 | $650 | $8,128,250 |
| TDG Distilled 2022 Barrels- (84/8/8) | 12625 | $650 | $8,206,250 |
| TDG Distilled 2023 Barrels-(80/10/10) | 5650 | $650 | $3,672,500 |
| TDG Distilled 2023 Barrels- (84/8/8) | 8404 | $650 | $5,462,600 |
| **Total TDG Distilled** | **57,114** | | **$45,412,420** |

| Barrels Held at NGD | # Barrels | Cost/Barrel | Inventory Value |
|---|---|---|---|
| 1820 Single Barrel | 336 | $650 | $218,400 |
| 1856 | 214 | $650 | $139,100 |
| 1884 | 371 | $650 | $241,150 |
| Single Barrel | 33 | $650 | $21,450 |
| Single Barrel Rye | 93 | $3,000 | $279,000 |
| UN UNCUT/UNFILTERED | 3 | $3,000 | $9,000 |
| **Total NGD Distilled** | **1,050** | | **$908,100** |

| Other Barrels - Held Offsite | # Barrels | Cost/Barrel | Inventory Value |
|---|---|---|---|
| Customer Procured Barrels | 138 | $3,200 | $441,600 |
| Rye Whiskey - Whistlepig (Held Offisite) | 1,192 | $1,967 | $2,344,676 |
| **Total Other Barrels** | **1,330** | | **$2,786,276** |

| Bulk Inventory | # PG | Cost/PG | Inventory Value |
|---|---|---|---|
| NGD | 7,076 | $ 44 | $311,361 |
| TDG - Tank | - | $ 44 | $0 |
| TDG - Totes | 23 | $ 44 | $1,012 |
| **Total Bulk** | **$7,099** | | **$312,373** |

| | Finished Case Inventory | # Cases | Unit Price | Inventory Value |
|---|---|---|---|---|
| Park Street | Nearest Green Tennessee Whiskey TDG 750mL/: | 4,291 | $18.88 | $81,009 |
| Park Street | Uncle Nearest 1856 Aged Whiskey 6/750mL 50° | 14,815 | $37.76 | $559,402 |
| Park Street | Uncle Nearest NG 1884 Small Batch Whiskey 6/ | 4,385 | $36.90 | $161,794 |
| Park Street | Uncle Nearest Single Barrel Premium Whiskey (I | 12,005 | $43.75 | $525,204 |
| Park Street | Uncle Nearest Straight Rye Whiskey 6/750mL 5( | 20,007 | $35.24 | $705,041 |
| | **Total** | **55,502** | | **$2,032,450** |
| | | | | |
| TDG | UN 1856 Aged Whiskey 6/750mL 100PF | 12,470 | $37.76 | $470,867 |
| TDG | UN 1884 Whiskey 6/750mL 93PF | 7,147 | $36.90 | $263,724 |
| TDG | UN Rye 6/750ML 100PF | 547 | $96.06 | $52,545 |
| | **Total** | **20,164** | | **$787,136** |
| | | | | |
| NGD | 1856 V2 | 3290 | $37.76 | $124,230 |
| NGD | 1884 V2 | 1310 | $36.90 | $48,339 |
| NGD | Straight Rye | 474 | $90.52 | $42,906 |
| NGD | Single Barrel | 1656 | $43.75 | $72,450 |
| NGD | Nearest Green | 914 | $18.88 | $17,256 |
| NGD | Single Barrel Rye | 381 | $103.09 | $39,277 |
| | **Total** | **8,025** | | **$344,459** |
| | | | | |
| | **Total Finished Cases** | **83,691** | | **$3,164,046** |

| Accounts Receivable | A/R Value |
|---|---|
| Park Street A/R Balance | $2,221,430 |
| Less: A/P | $1,075,700 |
| **Remaining Eligible Balance** | **$1,145,730** |

| Category | Inventory Value | Advance Rate | Collateral Base |
|---|---|---|---|
| Total TDG Distilled | $45,412,420 | 70% | $31,788,694 |
| Total NGD Distilled | $908,100 | 70% | $635,670 |
| Total Other Barrels | $2,786,276 | 70% | $1,950,393 |
| Total Bulk | $312,373 | 70% | $218,661 |
| Total Finished Cases | $3,164,046 | 70% | $2,214,832 |
| **Total Inventory** | **$52,583,215** | | **$36,808,250** |
| | | | |
| **A/R Balance** | **$1,145,730** | 75% | **$859,297** |
| **Total Collateral Available** | **$53,728,945** | | **$37,667,548** |
| | | | |
| **Revolver Balance** | | | **$65,224,032** |
| | | | |
| **Availability** | | | **($27,556,484)** |

DRAFT
Calculated Borrowing Base using 12/31 collateral balances

## Barrel Inventory Held at Tennessee Distilling Group (TDG)

**TDG Distilled**

| | # of Barrels | Cost per Barrel | Inventory Value |
|---|---|---|---|
| TDG Distilled 2018 Barrels- Silver | 96 | $ 2,700 | $ 259,200 |
| TDG Distilled 2018 Barrels- (77/15/8) | 31 | 2,700 | $ 83,700 |
| TDG Distilled 2018 Barrels- Bourbon (70/22/8) | 1 | 2,070 | $ 2,070 |
| TDG Distilled 2018 Barrels- (80/10/10) | 7 | 650 | $ 4,550 |
| TDG Distilled 2018 Barrels- (84/8/8) | 18 | 650 | $ 11,700 |
| TDG Distilled 2019 Barrels- (77/15/8) | 660 | 650 | $ 429,000 |
| TDG Distilled 2019 Barrels- Bourbon (70/22/8) | 1,000 | 650 | $ 650,000 |
| TDG Distilled 2019 Barrels -(80/10/10) | 121 | 650 | $ 78,650 |
| TDG Distilled 2019 Barrels- (84/8/8) | 89 | 650 | $ 57,850 |
| TDG Distilled 2020 Barrels -(80/10/10) | 1,898 | 650 | $ 1,233,700 |
| TDG Distilled 2020 Barrels- (84/8/8) | 4,364 | 2,400 | $ 10,473,600 |
| TDG Distilled 2020 Barrels-Rye | 63 | 3,000 | $ 189,000 |
| TDG Distilled 2021 Barrels- (84/8/8) | 9,028 | 650 | $ 5,868,200 |
| TDG Distilled 2022 Barrels-(80/10/10) | 11,405 | 650 | $ 7,413,250 |
| TDG Distilled 2022 Barrels- (84/8/8) | 12,625 | 650 | $ 8,206,250 |
| TDG Distilled 2023 Barrels-(80/10/10) | 5,650 | 650 | $ 3,672,500 |
| TDG Distilled 2023 Barrels- (84/8/8) | 8,404 | 650 | $ 5,462,600 |
| **Total TDG Distilled** | **55,460** | **$ 795** | **$ 44,095,820** |

**Customer Procured Inventory - Held at TDG**

| | # of Barrels | Cost per Barrel | Inventory Value |
|---|---|---|---|
| Tennessee Whiskey | 1 | 2,300 | $ 2,300 |
| Tennessee Whiskey | 1 | 750 | $ 750 |
| Tennessee Whiskey-Corsair | 6 | 3,100 | $ 18,600 |
| Rye Whiskey | 50 | 3,000 | $ 150,000 |
| Rye Whiskey | 20 | 3,000 | $ 60,000 |
| Rye Whiskey | 6 | 3,000 | $ 18,000 |
| Rye Whiskey | 30 | 3,000 | $ 90,000 |
| UN Project-Silver | 23 | 750 | $ 17,250 |
| UN Project-Silver #74252 | 1 | 750 | $ 750 |
| **Total Customer Procured - Held at TDG** | **138** | **$ 2,592** | **$ 357,650** |
| **Total Barrel Inventory at TDG** | **55,598** | | **$ 44,453,470** |

| Category | Inventory Value | Advance Rate | Collateral Base |
|---|---|---|---|
| Barrels at TDG | $44,453,470 | 70% | $31,117,429 |
| Barrels at NGD | $417,300 | 70% | $292,110 |
| Other barrels | $0 | 70% | $0 |
| Bulk | $67,003 | 70% | $46,902 |
| Finished Goods | $3,454,227 | 70% | $2,417,959 |
| **Total Inventory** | **$48,392,001** | | **$33,874,401** |
| **A/R Balance** | **$3,723,433** | **75%** | **$2,792,575** |
| **Total Collateral Available** | **$52,115,434** | | **$36,666,975** |
| **Revolver Balance** | | | **$65,224,032** |
| **Availability** | | | **($28,557,057)** |

## Barrel Inventory Held at NG Distillery

| | # of Barrels | Cost per Barrel | Inventory Value |
|---|---|---|---|
| Tennessee Whiskey | 451 | $ 650.00 | $ 293,150 |
| Tennessee Whiskey | 191 | $ 650.00 | $ 124,150 |
| **Total NG Distillery Barrel Inventory** | **642** | **$ 650** | **$ 417,300** |

## Other Barrels - Held Offsite

| | # of Barrels | Cost per Barrel | Inventory Value |
|---|---|---|---|
| Rye Whiskey - Whistlepig | - | $ 1,967.01 | $ - |
| **Total Other Offsite Barrels** | **-** | | **$ -** |

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
13
4:25-CV-00038

| Bulk Inventory | | | |
|---|---|---|---|
| **Location** | **PGs** | **Cost per PG** | **Inventory Value** |
| TDG Totes | 1,537 | $ 43.58 | $ 67,002 |
| TDG Tank | 0 | $ 43.58 | $ 1 |
| **Total Bulk Inventory** | **1,537** | | **$ 67,003** |

| FINISHED CASE INVENTORY | | | |
|---|---|---|---|
| **Location** | **Qty** | **Unit Price** | **Inventory Value** |
| Park Street - 1820 | 7 | $ 112.56 | $ 732 |
| Park Street - 1856 | 6,144 | 37.76 | 232,003 |
| Park Street - 1884 | 5,989 | 36.90 | 220,988 |
| Park Street - 777 | 1 | 109.88 | 110 |
| Park Street - MBE | 4 | 41.39 | 166 |
| Park Street - NG84 | 9,062 | 72.96 | 661,152 |
| Park Street - Single Barrel | 13,475 | 43.75 | 589,532 |
| Park Street - SB Rye | 39 | 96.06 | 3,746 |
| Park Street - Rye | 17,567 | 90.52 | 1,590,120 |
| Park Street - UnUn Rye | - | 96.06 | - |
| Park Street - 1856-375 | 722 | 18.88 | 13,623 |
| Park Street - 1884-375 | 851 | 18.45 | 15,695 |
| Park Street - Cognac LTO | 150 | 109.88 | 16,482 |
| Park Street - Toasted LTO | 1,000 | 109.88 | 109,880 |
| TDG - 1820 | *incl in PS* | 112.56 | na |
| TDG - 1856 | *incl in PS* | 37.76 | na |
| TDG - 1884 | *incl in PS* | 36.90 | na |
| TDG - 777 | *incl in PS* | 109.88 | na |
| TDG - MBE | *incl in PS* | 41.39 | na |
| TDG - NG84 | *incl in PS* | 72.96 | na |
| TDG - Single Barrel | *incl in PS* | 43.75 | na |
| TDG - SB Rye | *incl in PS* | 96.06 | na |
| TDG - Rye | *incl in PS* | 90.52 | na |
| TDG - UnUn Rye | *incl in PS* | 96.06 | na |
| **Total Finished Case Inventory** | **55,009** | | **$ 3,454,227** |

Uncle Nearest - Historical Bank Transactions
Select Historical Transfers

| Date | Description | Originating Account | Dollar Value | Total Net $$ | In/Out | Weeknum | Outflow Name | Out-SubCategory |
|---|---|---|---|---|---|---|---|---|
| 9/10/2024 | BOOK TRANSFER CREDIT B/O: BYZFUNDER NY LLC NEW YORK NY 10018- US REF: FINANCI | COMMERCIAL CHECKING (...1065) | $202,705.00 | | Inflow | 37 | Byzfunder | Other Lender Funding |
| 9/13/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:240912 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 37 | BYZFUNDER | Other Lender - Debt Service |
| 9/20/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:240919 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 38 | BYZFUNDER | Other Lender - Debt Service |
| 9/27/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:240926 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 39 | BYZFUNDER | Other Lender - Debt Service |
| 10/4/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241003 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 40 | BYZFUNDER | Other Lender - Debt Service |
| 10/11/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241010 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 41 | BYZFUNDER | Other Lender - Debt Service |
| 10/18/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241017 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 42 | BYZFUNDER | Other Lender - Debt Service |
| 10/25/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241024 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 43 | BYZFUNDER | Other Lender - Debt Service |
| 11/1/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241031 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 44 | BYZFUNDER | Other Lender - Debt Service |
| 11/8/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241107 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 45 | BYZFUNDER | Other Lender - Debt Service |
| 11/15/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241114 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 46 | BYZFUNDER | Other Lender - Debt Service |
| 11/19/2024 | ORIG CO NAME:Byzfunder DB ORIG ID:1016207445 DESC DATE:SD1800 CO ENTRY DESCR | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 47 | Byzfunder | Other Lender - Debt Service |
| 11/22/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241121 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | ($111,395.00) | Outflow | 47 | BYZFUNDER | Other Lender - Debt Service |
| 11/29/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241128 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 48 | BYZFUNDER | Other Lender - Debt Service |
| 12/6/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241205 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 49 | BYZFUNDER | Other Lender - Debt Service |
| 12/13/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241212 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 50 | BYZFUNDER | Other Lender - Debt Service |
| 12/20/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241219 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 51 | BYZFUNDER | Other Lender - Debt Service |
| 12/27/2024 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:241226 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 52 | BYZFUNDER | Other Lender - Debt Service |
| 1/3/2025 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:250102 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 1 | BYZFUNDER | Other Lender - Debt Service |
| 1/10/2025 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:250109 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 2 | BYZFUNDER | Other Lender - Debt Service |
| 1/17/2025 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:250116 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 3 | BYZFUNDER | Other Lender - Debt Service |
| 1/24/2025 | ORIG CO NAME:BYZFUNDER ORIG ID:9000083D02 DESC DATE:250123 CO ENTRY DESCR:F | COMMERCIAL CHECKING (...1065) | ($13,650.00) | | Outflow | 4 | BYZFUNDER | Other Lender - Debt Service |
| 2/4/2025 | DIRECT PAY Byzfunder DB CCD 25020413002847T UNCLE NEAREST | xxxx1189 | ($13,650.00) | | Outflow | | Byzfunder | Other Lender - Debt Service |
| 2/7/2025 | PAYMENTS BYZFUNDER CCD 000000000000210 UNCLE NEAREST INC | xxxx1189 | ($13,650.00) | | Outflow | | Byzfunder | Other Lender - Debt Service |
| 2/14/2025 | PAYMENTS BYZFUNDER CCD 000000000000218 UNCLE NEAREST INC | xxxx1189 | ($150.00) | | Outflow | | Byzfunder | Other Lender - Debt Service |

Farm Credit v Uncle Nearest, et al
**Plaintiff's Exhibit**
**16**
**4:25-CV-00038**

Uncle Nearest - Historical Bank Transactions
Select Historical Transfers

| Date | Description | Originating Account | Dollar Value | Total Net $$ | In/Out | Weeknum | Outflow Name | Out-SubCategory |
|---|---|---|---|---|---|---|---|---|
| 6/7/2024 | ORIG CO NAME:DASH FUNDING SOU ORIG ID:4756172314 DESC DATE: CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | $950,000.00 | | Inflow | 23 | Dash Funding | Other Lender Funding |
| 6/14/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($39,971.00) | | Outflow | 24 | Dash Funding | Other Lender - Debt Service |
| 6/21/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($39,971.00) | | Outflow | 25 | Dash Funding | Other Lender - Debt Service |
| 6/28/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($39,971.00) | | Outflow | 26 | Dash Funding | Other Lender - Debt Service |
| 7/8/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($39,971.00) | | Outflow | 28 | Dash Funding | Other Lender - Debt Service |
| 7/12/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($39,971.00) | | Outflow | 28 | Dash Funding | Other Lender - Debt Service |
| 7/19/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($39,971.00) | | Outflow | 29 | Dash Funding | Other Lender - Debt Service |
| 7/26/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($39,971.00) | | Outflow | 30 | Dash Funding | Other Lender - Debt Service |
| 7/29/2024 | ORIG CO NAME:DASH FUNDING SOU ORIG ID:4756172314 DESC DATE: CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | $505,826.00 | | Inflow | 31 | Dash Funding | Other Lender Funding |
| 8/2/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 31 | Dash Funding | Other Lender - Debt Service |
| 8/9/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 32 | Dash Funding | Other Lender - Debt Service |
| 8/16/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 33 | Dash Funding | Other Lender - Debt Service |
| 8/23/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 34 | Dash Funding | Other Lender - Debt Service |
| 8/30/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 35 | Dash Funding | Other Lender - Debt Service |
| 9/6/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 36 | Dash Funding | Other Lender - Debt Service |
| 9/13/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 37 | Dash Funding | Other Lender - Debt Service |
| 9/20/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 38 | Dash Funding | Other Lender - Debt Service |
| 9/27/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 39 | Dash Funding | Other Lender - Debt Service |
| 10/4/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 40 | Dash Funding | Other Lender - Debt Service |
| 10/11/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 41 | Dash Funding | Other Lender - Debt Service |
| 10/18/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 42 | Dash Funding | Other Lender - Debt Service |
| 10/25/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 43 | Dash Funding | Other Lender - Debt Service |
| 11/1/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 44 | Dash Funding | Other Lender - Debt Service |
| 11/8/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 45 | Dash Funding | Other Lender - Debt Service |
| 11/15/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 46 | Dash Funding | Other Lender - Debt Service |
| 11/18/2024 | REVERSAL OF ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO EN | COMMERCIAL CHECKING (...1065) | $65,000.00 | | Inflow | 47 | Dash Funding | Other Lender - Debt Service |
| 11/22/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | | Outflow | 47 | Dash Funding | Other Lender - Debt Service |
| 11/22/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($65,000.00) | ($1,208,000.00) | Outflow | 47 | Dash Funding | Other Lender - Debt Service |
| 11/27/2024 | ORIG CO NAME:DASH FUNDING SOU ORIG ID:4756172314 DESC DATE: CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | $609,621.00 | | Inflow | 48 | Dash Funding | Other Lender Funding |
| 11/29/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($69,950.00) | | Outflow | 48 | Dash Funding | Other Lender - Debt Service |
| 12/6/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($69,950.00) | | Outflow | 49 | Dash Funding | Other Lender - Debt Service |
| 12/13/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($69,950.00) | | Outflow | 50 | Dash Funding | Other Lender - Debt Service |
| 12/20/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($69,950.00) | | Outflow | 51 | Dash Funding | Other Lender - Debt Service |
| 12/27/2024 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($69,950.00) | | Outflow | 52 | Dash Funding | Other Lender - Debt Service |
| 1/3/2025 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($69,950.00) | | Outflow | 1 | Dash Funding | Other Lender - Debt Service |
| 1/10/2025 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($69,950.00) | | Outflow | 2 | Dash Funding | Other Lender - Debt Service |
| 1/17/2025 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($69,950.00) | | Outflow | 3 | Dash Funding | Other Lender - Debt Service |
| 1/24/2025 | ORIG CO NAME:DashFundingSour ORIG ID:9475617234 DESC DATE: CO ENTRY DESCR:84 | COMMERCIAL CHECKING (...1065) | ($69,950.00) | | Outflow | 4 | Dash Funding | Other Lender - Debt Service |
| 2/10/2025 | 8446663274 DashFundingSour CCD 123244468 UNCLE NEAREST 3 | xxxx1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 2/10/2025 | 8446663274 DashFundingSour CCD 123244469 UNCLE NEAREST 3 | xxxx1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 2/14/2025 | Payment DASH FUNDING SOU CCD UNCLE NEAREST 3 | xxxx1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 2/21/2025 | Payment DASH FUNDING SOU CCD UNCLE NEAREST 3 | xxxx1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 2/28/2025 | Payment DASH FUNDING SOU CCD UNCLE NEAREST 3 | xxxx1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 3/7/2025 | Payment DASH FUNDING SOU CCD UNCLE NEAREST 3 | xxxx1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 4/4/2025 | Payment DASH FUNDING SOU CCD UNCLE NEAREST 3 | xxxx1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 4/11/2025 | Payment DASH FUNDING SOU CCD UNCLE NEAREST 3 | xxxx1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 4/18/2025 | ACH Debit Payment DASH FUNDING SOU, CCD, UNCLE NEAREST 3 | ****1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 4/25/2025 | ACH Debit Payment DASH FUNDING SOU, CCD, UNCLE NEAREST 3 | ****1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 5/2/2025 | ACH Debit Payment DASH FUNDING SOU, CCD, UNCLE NEAREST 3 | ****1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 5/9/2025 | ACH Debit Payment DASH FUNDING SOU, CCD, UNCLE NEAREST 3 | ****1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 5/16/2025 | ACH Debit Payment DASH FUNDING SOU, CCD, UNCLE NEAREST 3 | ****1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 5/23/2025 | ACH Debit Payment DASH FUNDING SOU, CCD, UNCLE NEAREST 3 | ****1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 5/30/2025 | ACH Debit Payment DASH FUNDING SOU, CCD, UNCLE NEAREST 3 | ****1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 6/6/2025 | ACH Debit Payment DASH FUNDING SOU, CCD, UNCLE NEAREST 3 | ****1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 6/6/2025 | ACH Debit 8446663274 DashFundingSour, CCD, 127663443, UNCLE NEAREST 3 | ****1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |
| 6/13/2025 | ACH Debit Payment DASH FUNDING SOU, CCD, UNCLE NEAREST 3 | ****1189 | ($69,950.00) | | Outflow | | Dash Funding | Other Lender - Debt Service |

Uncle Nearest - Historical Bank Transactions
Select Historical Transfers

| Date | Description | Originating Account | Dollar Value | Total Net $$ | In/Out | Weeknum | Outflow Name | Out-SubCategory |
|---|---|---|---|---|---|---|---|---|
| 7/1/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Jul 01 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | $665,000.00 | | Inflow | 27 | Diverse Capital | Other Lender Funding |
| 7/5/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Jul 05 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 27 | Diverse Capital | Other Lender - Debt Service |
| 7/12/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Jul 12 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 28 | Diverse Capital | Other Lender - Debt Service |
| 7/19/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Jul 19 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 29 | Diverse Capital | Other Lender - Debt Service |
| 7/26/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Jul 26 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 30 | Diverse Capital | Other Lender - Debt Service |
| 8/2/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Aug 2 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 31 | Diverse Capital | Other Lender - Debt Service |
| 8/9/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Aug 9 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 32 | Diverse Capital | Other Lender - Debt Service |
| 8/16/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Aug 16 CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 33 | Diverse Capital | Other Lender - Debt Service |
| 8/23/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Aug 23 CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 34 | Diverse Capital | Other Lender - Debt Service |
| 8/30/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Aug 30 CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 35 | Diverse Capital | Other Lender - Debt Service |
| 9/6/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Sep 6 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 36 | Diverse Capital | Other Lender - Debt Service |
| 9/13/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Sep 13 CO ENTRY DESCR:I | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 37 | Diverse Capital | Other Lender - Debt Service |
| 9/20/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Sep 20 CO ENTRY DESCR:I | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 38 | Diverse Capital | Other Lender - Debt Service |
| 9/27/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Sep 27 CO ENTRY DESCR:I | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 39 | Diverse Capital | Other Lender - Debt Service |
| 10/4/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Oct 4 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 40 | Diverse Capital | Other Lender - Debt Service |
| 10/11/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Oct 11 CO ENTRY DESCR:I | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 41 | Diverse Capital | Other Lender - Debt Service |
| 10/18/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Oct 18 CO ENTRY DESCR:I | COMMERCIAL CHECKING (...1065) | ($31,915.63) | ($388,215.79) | Outflow | 42 | Diverse Capital | Other Lender - Debt Service |
| 10/25/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Oct 25 CO ENTRY DESCR:I | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 43 | Diverse Capital | Other Lender - Debt Service |
| 11/1/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Nov 1 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 44 | Diverse Capital | Other Lender - Debt Service |
| 11/8/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Nov 8 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 45 | Diverse Capital | Other Lender - Debt Service |
| 11/15/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Nov 15 CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 46 | Diverse Capital | Other Lender - Debt Service |
| 11/20/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Nov 20 CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 47 | Diverse Capital | Other Lender - Debt Service |
| 11/22/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Nov 22 CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 47 | Diverse Capital | Other Lender - Debt Service |
| 11/29/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Nov 29 CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 48 | Diverse Capital | Other Lender - Debt Service |
| 12/6/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Dec 6 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 49 | Diverse Capital | Other Lender - Debt Service |
| 12/13/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Dec 13 CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 50 | Diverse Capital | Other Lender - Debt Service |
| 12/20/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Dec 20 CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 51 | Diverse Capital | Other Lender - Debt Service |
| 12/27/2024 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Dec 27 CO ENTRY DESCR: | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 52 | Diverse Capital | Other Lender - Debt Service |
| 1/3/2025 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Jan 3 CO ENTRY DESCR:UI | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 1 | Diverse Capital | Other Lender - Debt Service |
| 1/10/2025 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Jan 10 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 2 | Diverse Capital | Other Lender - Debt Service |
| 1/17/2025 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Jan 17 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 3 | Diverse Capital | Other Lender - Debt Service |
| 1/24/2025 | ORIG CO NAME:Diverse Capital ORIG ID:851969968 DESC DATE:Jan 24 CO ENTRY DESCR:U | COMMERCIAL CHECKING (...1065) | ($31,915.63) | | Outflow | 4 | Diverse Capital | Other Lender - Debt Service |
| 2/4/2025 | Memo Debit, Diverse Capital UNCLE NEAR ACH Entry Memo Posted Today | xxxx1189 | ($31,915.63) | | Outflow | | Diverse capital | Other Lender - Debt Service |
| 2/7/2025 | UNCLE NEAR Diverse Capital CCD UNCLE NEAREST INC | xxxx1189 | ($31,915.63) | | Outflow | | Diverse capital | Other Lender - Debt Service |
| 9/20/2024 | FEDWIRE CREDIT VIA: OPTIMUMBANK/067015096 B/O: GREEN NOTE CAPITAL PARTNERS | COMMERCIAL CHECKING (...1065) | $190,000.00 | | Inflow | 38 | Green Note | Other Lender Funding |
| 9/27/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:240926 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 39 | Green Note | Other Lender - Debt Service |
| 10/4/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241003 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 40 | Green Note | Other Lender - Debt Service |
| 10/11/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241010 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 41 | Green Note | Other Lender - Debt Service |
| 10/18/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241017 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 42 | Green Note | Other Lender - Debt Service |
| 10/25/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241025 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 43 | Green Note | Other Lender - Debt Service |
| 11/1/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241031 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 44 | Green Note | Other Lender - Debt Service |
| 11/8/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241107 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 45 | Green Note | Other Lender - Debt Service |
| 11/15/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241114 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 46 | Green Note | Other Lender - Debt Service |
| 11/22/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241121 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 47 | Green Note | Other Lender - Debt Service |
| 11/29/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241129 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 48 | Green Note | Other Lender - Debt Service |
| 12/6/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241205 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 49 | Green Note | Other Lender - Debt Service |
| 12/13/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241212 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | ($115,163.65) | Outflow | 50 | Green Note | Other Lender - Debt Service |
| 12/20/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241219 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 51 | Green Note | Other Lender - Debt Service |
| 12/27/2024 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:241226 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 52 | Green Note | Other Lender - Debt Service |
| 1/3/2025 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:250102 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 1 | Green Note | Other Lender - Debt Service |
| 1/10/2025 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:250109 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 2 | Green Note | Other Lender - Debt Service |
| 1/17/2025 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:250116 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 3 | Green Note | Other Lender - Debt Service |
| 1/24/2025 | ORIG CO NAME:GREEN NOTE CAP ORIG ID:RPP4730677 DESC DATE:250123 CO ENTRY DE | COMMERCIAL CHECKING (...1065) | ($13,263.64) | | Outflow | 4 | Green Note | Other Lender - Debt Service |
| 2/6/2025 | GREEN NOTE GREEN NOTE CAP CCD 8874 UNCLE NEAREST, INC | xxxx1189 | ($13,263.64) | | Outflow | | Green Note | Other Lender - Debt Service |
| 2/7/2025 | GREEN NOTE GREEN NOTE CAP CCD 8874 UNCLE NEAREST, INC | xxxx1189 | ($13,263.64) | | Outflow | | Green Note | Other Lender - Debt Service |
| 2/14/2025 | GREEN NOTE GREEN NOTE CAP CCD 8874 UNCLE NEAREST, INC | xxxx1189 | ($13,263.64) | | Outflow | | Green Note | Other Lender - Debt Service |
| 2/21/2025 | GREEN NOTE GREEN NOTE CAP CCD 8874 UNCLE NEAREST, INC | xxxx1189 | ($13,263.64) | | Outflow | | Green Note | Other Lender - Debt Service |
| 2/28/2025 | GREEN NOTE GREEN NOTE CAP CCD 8874 UNCLE NEAREST, INC | xxxx1189 | ($13,263.64) | | Outflow | | Green Note | Other Lender - Debt Service |
| 3/7/2025 | GREEN NOTE GREEN NOTE CAP CCD 8874 UNCLE NEAREST, INC | xxxx1189 | ($99.93) | | Outflow | | Green Note | Other Lender - Debt Service |

DIVERSE CAPITAL

# SALE OF FUTURE RECEIPTS AGREEMENT

PHONE: (833) 373-7220 | EMAIL: SUBMIT@DIVERSECAPITALLLC.COM

This Sale of Future Receipts Agreement ("Agreement") effective, 06/26/2024, is made by and between Diverse Capital, LLC ("Buyer"), the business identified below ("Seller"), and each Guarantor identified below (each a "Guarantor").

| | |
|---|---|
| Seller's Legal Name(s) | UNCLE NEAREST, INC (AND ALL ENTITIES LISTED IN APPENDIX H) |
| Form of Business Entity | CORPORATION |
| D/B/A | UNCLE NEAREST |
| Seller's Tax ID | [redacted]5348 |
| Primary Seller(s) Address | 600 N MAIN ST STE 2000 |
| City, State | SHELBYVILLE, TN |
| Zip | 37160 |
| State of Incorporation | TN |
| Primary Seller(s) Mailing Address | 315 DEADERICK ST STE 1550 |
| City, State | NASHVILLE, TN |
| Zip | 37238 |

**Primary Contact Person**

| Name | Title | Phone Number | Email | Social Security |
|---|---|---|---|---|
| FAWN EVETTE WEAVER | OWNER/AGENT/MANAGER | (931) 808-5378 | fawn.weaver@unclenearest.com. | [redacted]-1336 |

## Purchase Information

The transaction contemplated by this Agreement is a purchase of Future Receipts. "Future Receipts" means all payments received by Seller, or its right to receive such payments, in the ordinary course of Seller's business, including but not limited to (a) payments made by cash, check, Automated Clearing House ("ACH") or other electronic transfer; (b) payments, or rights to payments, made by credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card"); or (c) payments made by any other form. The term "Future Receipts" includes Seller's accounts and payment intangibles. You will deliver the entire Purchased Amount of Future Receipts to us over time by allowing us to debit the Periodic Amount (which is subject to adjustment) on each Remittance Day. We will debit the Periodic Amount from one or more deposit accounts authorized by you for this purpose (each, an "Authorized Account") – (Appendix A).

| Purchase Price Paid to Seller | Purchased Amount of Future Receipts | Specified Percentage | Periodic Frequency |
|---|---|---|---|
| $ 700,000.00 | $ 1,021,300.00 | 20% | Weekly |

| Periodic Amount | How we calculated the Periodic Amount |
|---|---|
| $ 31,915.63 | The Periodic Amount is an estimate of the Specified Percentage of the average sales revenue we expect you will receive in the future. We based the Periodic Amount on information you made available to us to calculate your average revenue over a period of time prior to the date of this Agreement. Beginning on the first Remittance Day, the Periodic Amount will be the amount identified here. You have the right to adjust the Periodic Amount to better reflect actual revenue as it changes over time. Please refer to Section 7 (Reconciliation Process) for how you can adjust the Periodic Amount. |

**Remittance Days will occur (The option marked ☒ applies):**

☐ Every Business Day (i.e., Monday through Friday, excluding bank holidays)
☒ Weekly*
☐ Monthly*

*We will notify you of the day or days on which each Remittance Day will occur.

**Amounts Deducted from Purchase Price:**

| | | |
|---|---|---|
| **Purchase Price** | $ 700,000.00 | |
| Prior Balance(s) | - $ 0.00 | (If applicable) paid to Buyer and/or third parties |
| Wire Fee | - $ 0.00 | (If applicable) |
| Origination Fee | - $ 35,000.00 | |
| **Net Amount Funded to Seller** | $ 665,000.00 | This is the Purchase Price minus the Total Amount Deducted from Purchase Price. This is the total dollar amount of funds to be deposited into your Authorized Account. |

1. **Sale of Future Receipts.** Seller hereby sells and assigns to Buyer, without recourse, the Purchased Amount of Future Receipts described above. As payment for the Purchased Amount, Buyer agrees to pay Seller the Purchase Pr[DS] [DS] d Seller will receive funds equal to the Net Funded Amount.

FEW FEW

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
17
4:25-CV-00038

2. **Multiple Sellers.** If more than one person or entity is listed as a Seller above, then the term "Seller" refers collectively to all Sellers who have signed the signature page of this Agreement. The term "Future Receipts" refers to the Future Receipts of each Seller and the calculation of the initial Periodic Amount and any adjustment to the Periodic Amount shall be based on an aggregate of the actual or projected sales revenue of all the Sellers. Each Seller agrees that Buyer's purchase of Future Receipts hereunder constitutes a purchase of the Future Receipts of all the Sellers. Each Seller agrees that it is jointly and severally liable to Buyer for the obligation to deliver the Purchased Amount from its own Future Receipts. Each Seller agrees that the release of any other Seller from any obligations under this Agreement, whether in whole or in part, will not limit, reduce, release, or impair such Seller's obligations to Buyer, including the obligation to deliver the undelivered balance of the Purchased Amount. Each Seller designates the Primary Contact Person identified above as its authorized representative for all purposes related to this Agreement and any related transactions. Buyer may treat any notice or instruction received from the Primary Contact Person as a notice or instruction from all Sellers.

3. **Buyer's Acceptance of Agreement.** The obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Net Amount Funded to Seller, shown above. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to Seller's Account, shown above (the "Account") and the ability to withdraw the Initial Periodic Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

4. **Delivery of Purchased Amount.** If Remittance Days are to occur weekly or bi-weekly, then Buyer will notify Seller on or before the date Buyer has accepted this Agreement, of the day of the week on which Remittance Days will occur. The Purchased Amount will be delivered to Buyer each Remittance Day in a series of remittances each equal to the Periodic Amount. Seller authorizes Buyer to debit an Authorized Account on each Remittance Day, by initiating an ACH debit entry or by creating a remotely created check or electronically created item, in the amount of the initial Periodic Amount or, following any adjustment pursuant to Section 7 (Reconciliation Process) the adjusted Periodic Amount. For this purpose, Seller shall provide Buyer with all required account information and will provide an appropriate ACH authorization to Buyer. Seller agrees not to change any account information without prior written consent from Buyer. If a Remittance Day occurs on a bank holiday, Seller authorizes Buyer to debit the Periodic Amount on the next day on which Seller's bank is open. If any ACH entry, check, or electronically created item is returned or rejected for insufficient funds, then Seller will pay Buyer a returned entry fee of $50. In addition, Seller will reimburse Buyer for any charges incurred by Buyer resulting from the returned ACH entry, check, or electronically created item. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement.

5. **Early Delivery Option.** Seller may at its option elect to pay the remaining balance of the Purchased Amount to Buyer on an accelerated basis in a discounted amount described in the Early Delivery Schedule attached to this Agreement (the "Early Delivery Option"). The Early Delivery Option is subject to the following conditions: (a) the funds used to pay the discounted amount must not have been obtained from Buyer; and (b) Seller is not in breach of this Agreement at the time Seller exercises the Early Delivery Option.

6. **Changing the Remittance Day.** The parties may change the frequency of the Remittance Day pursuant to this Section. The effective date of any change to the Remittance Day is referred to herein as the "Change Effective Date". Any change to the Remittance Day will be accompanied by a change to the Periodic Amount immediately following the Change Effective Date. The process for requesting changes to the Remittance Day and calculation of the Periodic Amount is described below.

   a. Changing Remittance Day to occur each Business Day. Either Buyer or Seller may request that a weekly or monthly Remittance Day be changed to occur on each Business Day. The party requesting a change must notify the other party in accordance with Section 22 (Notices). The Change Effective Date shall take effect promptly, but no later than one week from the date such notice is either sent or received by Buyer. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to: (a) the Periodic Amount immediately prior to the Change Effective Date, divided by five (in the case of a change from a weekly Remittance Day) or twenty (in the case of a change from a monthly Remittance Day).

   b. Changing Remittance Day to occur weekly or monthly. When the Remittance Day is scheduled to occur each Business Day, the Remittance Day may be changed to occur weekly or monthly, but only if both parties agree to such change in writing (which may be memorialized in an electronic record, including email). To be effective, both parties must agree on the day each Remittance Day will occur. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to: (a) the Periodic Amount immediately prior to the Change Effective Date, multiplied

by five (in the case of a change to a weekly Remittance Day) or twenty (in the case of a change to a monthly Remittance Day).

c. Effect on reconciliation. Following any Change Effective Date, subsequent adjustments to the Periodic Amount pursuant to Section 7 (Reconciliation Process) shall account for the change in the frequency of the Remittance Day as described above.

d. In the event that Seller changes or permits changes to the Account or the ACH authorization approved by the Buyer or adds an additional bank account, Buyer shall have the right, without waiving any of its rights and remedies and without notice to Seller or any Guarantor, to notify the new or additional bank of this Agreement and to direct such new or additional bank to remit to the Buyer all or any portion of the amounts received by such bank. Any such new account shall be deemed an Account.

7. **Reconciliation and Adjusting the Periodic Amount (IMPORTANT PROTECTION FOR SELLER).** The initial Periodic Amount is intended to represent the Specified Percentage of Seller's Future Receipts. At any time, Seller or Buyer may request a reconciliation of Seller's actual revenue to adjust the Periodic Amount to more closely reflect the Seller's actual Future Receipts times the Specified Percentage.

a. **How Seller may Request a Reconciliation**. Call Buyer at [631-520-0020] or email [submit@diversecapitalllc.com].

b. **How Buyer may Request a Reconciliation.** Buyer may request a reconciliation in writing via regular mail or e-mail.

c. **Reconciliation Review.** After receiving or making a request for reconciliation pursuant to this Agreement, Buyer shall calculate Seller's average revenue for the 30-day period preceding the reconciliation request (the "Review Period"). Seller shall cooperate with any reconciliation by providing bank statements or other records of Seller's actual revenue received during the Review Period ("Reconciliation Information"). Seller shall also provide Buyer with any assistance or other information needed to access or view any Reconciliation Information. Upon receipt of the Reconciliation Information, Buyer shall promptly (but no later than 3 calendar days following such receipt) calculate whether the total of all Periodic Amounts remitted to Buyer during the Review Period was greater than the Specified Percentage of Seller's actual revenue during the Review Period (an "excess") or less than the Specified Percentage of Seller's actual revenue during the Review Period (a "shortfall").

d. **Adjusting the Periodic Amount.** Within three (3) calendar days of Buyer's reasonable verification of the Reconciliation Information, Buyer shall adjust the Periodic Amount on a going-forward basis to more closely reflect Seller's actual Receipts times the Specified Percentage. Buyer will notify Seller prior to any such adjustment. After each adjustment made pursuant to this paragraph, the new dollar amount will be deemed the updated Periodic Amount until any subsequent adjustment.

e. **Failure to Provide Reconciliation Information.** If Seller requests a reconciliation and fails to provide the Reconciliation Information within three (3) calendar days after Seller's reconciliation request, Buyer may consider Seller's reconciliation request withdrawn. If Buyer requests a reconciliation and Seller fails to provide the Reconciliation Information within three (3) calendar days after Buyer's reconciliation request, Buyer may adjust the Periodic Amount based on the best information reasonably available to Buyer.

8. **Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN).** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer. Buyer assumes the risk that Future Receipts may be remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business went bankrupt or Seller otherwise ceased operations in the ordinary course of business. Buyer is buying the Purchased Amount knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein.

9. **Fees and Charges.** A list of all fees and charges applicable under this Agreement is contained in Appendix B. Some or all of the Origination Fee may be paid to a broker. Otherwise, Buyer is NOT CHARGING ANY BROKER FEES to Seller. If Seller is charged another such fee, Seller acknowledges that it is not being charged by Buyer.

DS DS
FEW KEW

10. **Credit Report and Other Authorizations.** Seller and each of the Guarantors signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of the Guarantors for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by the Seller in the Application, at any time now or for so long as Seller and/or Guarantors continue to have any obligations to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

11. **Authorization to Contact Current and Prior Banks.** Seller hereby authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collections and in order to confirm that Seller is exclusively using the Account identified above, or any other account approved by Buyer, for the deposit of all business receipts.

12. **Right to Cancel.** Seller understands that Buyer offers Seller a right to cancel this Agreement at any time within one (1) calendar days after Buyer has delivered the Net Amount Funded. Seller may exercise this right by notifying Buyer that it is cancelling this Agreement and returning the Net Amount Funded to Buyer. For the Seller's right to cancel to be effective, Buyer must receive both the notice and the return of the Net Amount Funded within two (2) calendar days after the Buyer has delivered the Net Amount Funded.

13. **Financial Information.** Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, banking or financial statements, tax returns, etc., as Buyer deems necessary and reasonable prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

14. **Transactional History.** Seller authorizes all of its banks and brokers and its Payment Card processor(s) to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon a breach of this Agreement.

15. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

16. **Representations, Warranties and Covenants of Seller.** As of the date of this Agreement and, unless expressly stated otherwise, continuing until Buyer has received 1) the Purchased Amount and 2) all fees and charges due under this Agreement, Seller represents, warrants and covenants to Buyer as follows:

    a. **No Diversion of Future Receipts.** Seller must deposit all Future Receipts into the Account on a daily basis and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into the Account on a daily basis. Seller agrees not to (i) change the Account, (ii) add an additional Account, (iii) revoke Buyer's authorization to debit the Account, (iv) close the Account without the express written consent of Buyer or, (v) take any other action with the intent to interfere with Buyer's right to collect the purchased Future Receipts.

    b. **Stacking Prohibited.** Seller shall not enter into any merchant cash advance or any loan agreement that relates to or encumbers its Future Receipts or requires daily payments with any party other than Buyer for the duration of this Agreement. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

    c. **Financial Condition and Financial Information.** Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly represent the financial condition of Seller at such dates. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations at the time they are provided. Seller further agrees to authorize the release of any past or future tax returns to Buyer.

d. **Governmental Approvals.** Seller is in compliance and shall comply with all applicable federal, state and local laws, rules and regulations and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the businesses in which it is presently engaged and/or will engage in hereafter.

e. **Authority to Enter Into This Agreement.** Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

f. **Change of Name or Location or Sale or Closing of Business.** Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. Except as disclosed to Buyer in writing, Seller has no current plans to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller will not voluntarily close its business on a temporary basis for renovations, repairs, or any other voluntary purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer 5 calendar days' notice to the extent practicable.

g. **No Pending or Contemplated Bankruptcy as of the Date of this Agreement.** As of the date of this Agreement, Seller does not contemplate and has not filed any petition for bankruptcy protection under Title 11 of the United States Code and there has been no involuntary petition brought or pending against Seller. Seller represents that it has not consulted with a bankruptcy attorney within six months prior to the date of this Agreement. Seller further warrants that as of the date of this Agreement (i) it does not anticipate filing a bankruptcy petition and (ii) it does not anticipate that an involuntary petition will be filed against it.

h. **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes, including but not limited to employment and sales and use taxes.

i. **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement will not conflict with any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement that prohibits the sale or pledge of Seller's Future Receipts.

j. **Seller's Knowledge and Representation.** Seller represents, warrants, and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

k. **Accurate and Complete Information.** Seller represents, warrants, and agrees that all information provided to Buyer and all statements made to Buyer relating to this transaction in any way have been truthful, accurate, and complete. Seller further agrees that Seller will be truthful in all future statements to Buyer, and will provide Buyer with accurate and complete information regarding Seller's business as required by this Agreement.

**17. Rights of Buyer.**

a. **Acknowledgment of Security Interest and Security Agreement.** The Future Receipts sold by Seller to Buyer pursuant to this Agreement shall constitute and shall be construed and treated for all purposes as a true and complete sale, conveying good title to the Future Receipts free and clear of any liens and encumbrances, from Seller to Buyer. To the extent the Future Receipts are "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the Seller is located ("UCC") then: (i) the sale of the Future Receipts creates a security interest as defined in the UCC, (ii) this Agreement constitutes a "security agreement" under the UCC, and (iii) Buyer has all the rights of a secured party under the UCC with respect to such Future Receipts. Seller further agrees that, with or without a breach of this Agreement, Buyer may notify account debtors, or other persons obligated on the Future Receipts, or holding the Future Receipts, of Seller's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Buyer.

b. **Financing Statements.** Seller authorizes Buyer to file one or more UCC-1 forms consistent with the UCC to give notice that the Purchased Amount of Future Receipts is the sole property of Buyer. The UCC filing may stat[DS FEW] [DS KEW] tended

to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit the Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

c. **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter during regular business hours, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer; and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

d. **Phone Recordings and Contact.** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions, (ii) that such communications and contacts are not unsolicited or inconvenient, and (iii) that any such contact may be made at any phone number, email address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

e. **ACH Authorization.** Seller represents and warrants that (i) the Account is solely owned by Seller; (ii) the person executing this Authorization on behalf of Seller is an authorized signer on the Account and has the power and authority to authorize Buyer to initiate ACH transactions to and from the Account, and (iii) the Account is a legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes. If an ACH transaction is rejected by Seller's financial institution for any reason other than a stop payment order placed by Seller with its financial institution, including without limitation insufficient funds, Seller agrees that Buyer may resubmit up to two times any ACH transaction that is dishonored. Seller's bank may charge Seller fees for unsuccessful ACH entries. Seller agrees that Buyer will have no liability to Seller for such fees. In the event Buyer makes an error in processing any payment or credit, Seller authorizes Buyer to initiate ACH entries to or from the Account to correct the error. Seller acknowledges that the origination of ACH entries to and from the Account must comply with applicable law and applicable network rules. Seller agrees to be bound by the Rules and Operating Guidelines of NACHA (formerly known as the National Automated Clearing House Association). Seller will not dispute any ACH transaction initiated pursuant to this Authorization, provided the transaction corresponds to the terms of this Authorization. Seller requests the financial institution that holds the Account to honor all ACH entries initiated in accordance with this Authorization.

18. **Remedies for Seller's Breach of this Agreement.** If Seller violates any term or covenant in this Agreement, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

a. The Specified Percentage shall equal 100%. The full undelivered Purchased Amount plus all fees and charges (including legal fees) assessed under this Agreement will become due and payable in full immediately.

b. Buyer may enforce the provisions of the Personal Guaranty of Performance against each Guarantor.

c. Seller shall pay to Buyer all reasonable costs associated with Seller's breach. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover Judgment against Seller, Seller shall be liable for all of Buyer's costs, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

d. Buyer may debit depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on any of Seller's banking accounts for all sums due to Buyer.

e. Subject to arbitration as provided in Section 30 of this Agreement, all rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of breach, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

19. **Modifications, Amendments.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same is in writing and signed by Buyer.

**20. Assignment.** Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

**21. Personal Guaranty of Performance.** Guarantor agrees to irrevocably, absolutely and unconditionally guarantee to Buyer prompt and complete performance of the following obligations of Seller (the "Guaranteed Obligations"):

a. Seller's obligation to not (i) change the Account, (ii) add an additional Account, (iii) revoke Buyer's authorization to debit the Account, (iv) close the Account without the express written consent of Buyer or (v) take any other action with the intent to interfere with Buyer's right to collect the purchased Future Receipts;

b. Seller's obligation to not conduct Seller's businesses under any name other than as disclosed to Buyer;

c. Seller's obligation to not change any of its places of business without prior written consent by Buyer;

d. Seller's obligation to not voluntarily sell, dispose, transfer or otherwise convey its business or substantially all business assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer;

e. Seller's obligation to not enter into any merchant cash advance or any loan agreement that relates to or encumbers its Future Receipts with any party other than Buyer for the duration of this Agreement without Buyer's prior written consent; and

f. Seller's obligation to provide truthful, accurate, and complete information as required by this Agreement.

**22. Guarantor Waivers.** Buyer does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under the Agreement and this Personal Guaranty of Performance if it is not notified of: (i) Seller's failure to timely perform any obligation under the Agreement, (ii) any adverse change in Seller 's financial condition or business, (iii) Buyer's acceptance of the Agreement, and (iv) any renewal, extension or other modification of the Agreement or Seller 's other obligations to Buyer. In addition, Buyer may take any of the following actions without releasing Guarantor from any of its obligations under the Agreement and this Performance Guaranty: (i) renew, extend or otherwise modify the Agreement or Seller's other obligations to Buyer, and (ii) release Seller from its obligations to Buyer. Guarantor shall not seek reimbursement from Seller or any other guarantor for any amounts paid by it under the Agreement or this Performance Guaranty. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Seller, or any other guarantor, for any amounts paid by it, or acts performed by it, under the Agreement or this Performance Guaranty: (i) subrogation, (ii) reimbursement, (iii) performance, (iv) indemnification, or (v) contribution.

**23. Guarantor Acknowledgement**. Guarantor acknowledges that Guarantor understands the seriousness of the provisions of the Agreement, including the Jury Waiver, Class Action Waiver and Arbitration sections, and has had a full opportunity to consult with counsel their choice, and have consulted with counsel or have decided not to avail themselves of that opportunity.

**24. Notices.**

**a. Notices from Buyer.** Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller by regular mail or by e-mail, at Buyer's option and Seller consents to such electronic delivery. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to Seller's address set forth in this Agreement.

**b. Notices from Seller and Guarantor.** Subject to Section 4 of this Agreement, Seller and Guarantor may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller and Guarantor to Buyer must be delivered by certified mail, return receipt requested, to Buyer's address set forth in this Agreement. Notices sent to Buyer shall become effective only upon receipt by Buyer.

**25. Binding Effect, Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer, Guarantor and their respective successors and assigns, except that Seller shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of Buyer which consent may b[DS] [DS] 's sole

FEW KEW

discretion. Except as set forth in the Arbitration section, this Agreement shall be governed by and construed in accordance with the laws of the state of New York and Florida, without regard to any applicable principles of conflicts of law. Seller and Guarantor understand and agrees that (i) Buyer is located in New York and Florida, (ii) Buyer makes all decisions from Buyer's office in New York, (iii) the Agreement is made in New York and Florida (that is, no binding contract will be formed until Buyer receives and accepts Seller's signed Agreement in New York and Florida), and (iv) Seller's payments are not accepted until received by Buyer in New York. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Seller and Guarantor agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Seller and Guarantor waive any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum. Seller and Guarantor further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

26. **Survival of Representations, Warranties and Covenants.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

27. **Interpretation.** All parties hereto have had the opportunity to review this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice or have been provided sufficient opportunity to have an attorney of their choosing review the Agreement. No construction determinations shall be made against either Party hereto as drafter.

28. **Entire Agreement and Severability.** This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

29. **Execution.** Facsimile signatures, or any other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes. The parties agree that if a duly authorized representative of each of the parties signs this Agreement and transmits such Agreement to the other party via facsimile or electronically transmitted portable document format, such transmission shall be treated in all manner and respects as an original signature (or counterpart thereof) and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of a party hereto, each other party hereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine or electronic transmission in portable document format to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or electronic transmission in portable document format as a defense to this Agreement and each such party forever waives any such defense. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement.

30. **Authorization to Contact. Monitoring, Recording, and Solicitations.**

    a. **Authorization to Contact by Phone.** Seller and Guarantor authorize Buyer, its affiliates, agents and independent contractors to contact Seller or Guarantor at any telephone number Seller or Guarantor provide to Buyer or from which Seller or Guarantor places a call to Buyer, or any telephone number where Buyer believes it may reach Seller or Guarantor, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller or Guarantor incurs charges for receiving such communications.

    b. **Authorization to Contact by Other Means.** Seller and Guarantor also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller and Guarantor. Seller and Guarantor expressly consent to conduct business by electronic means.

31. **Events of Default.** An "Event of Default" may be considered to have taken place if any of the following occur: (1) Any Merchant violates any term or covenant in this Agreement; (2) Any representation or warranty by any Merchant in any Agreement with DIVERSE CAPITAL, LLC that has not been terminated proves to have been incorrect, false, or misleading in any material respect when made; (3) Any Merchant fails to provide DIVERSE CAPITAL, LLC with written notice of any material change in its financial condition, operation, or ownership within seven days thereafter (unless a different notice period [DS FEW] [DS KEW] ded for

elsewhere in this Agreement; (4) the sending of notice of termination by any Merchant or Guarantor; (5) Any Merchant transports, moves, interrupts, suspends, dissolves, or terminates its business without the prior written consent of DIVERSE CAPITAL LLC other than a bankruptcy filing; (6) Any Merchant transfers or sells all or substantially all of its assets without the prior written consent of DIVERSE CAPITAL, LLC (7) Any Merchant makes or sends notice of any intended bulk sale or transfer by any Merchant without the prior written consent of DIVERSE CAPITAL, LLC; (8) Any Merchant uses multiple depository accounts without the prior written consent of DIVERSE CAPITAL, LLC; (9) Any Merchant changes the Account without the prior written consent of DIVERSE CAPITAL, LLC (10) DIVERSE CAPITAL, LLC is not provided with updated login or password information for the Account within one business day after any such change is made by any Merchant; (11) Any Merchant fails to send bank statements, merchant account statements, or bank login information for the Account within two business days after a written request for same is made by DIVERSE CAPITAL, LLC; (12) Any Merchant performs any act that reduces the value of any Collateral granted under this Agreement; (13) Any Merchant fails to deposit its Receivables into the Account; (14) Any Merchant causes any ACH debit to the Account by DIVERSE CAPITAL, LLC to be blocked or stopped without providing any advance written notice to DIVERSE CAPITAL, LLC, which notice may be given by e-mail to submit@diversecapitalllc.com; or (15) Any Merchant prevents DIVERSE CAPITAL, LLC from collecting any part of the Receivables Purchased Amount; (16) Any Merchant causes any ACH debit to the Account to be stopped or otherwise returned that would result in an ACH Return Code of R08, R10, or R29 and that Merchant does not within two business days thereafter provide DIVERSE CAPITAL, LLC with written notice thereof explaining why that Merchant caused the ACH debit to be stopped or otherwise returned, which notice may be given by e-mail to submit@diversecapitalllc.com; or (17) Any Merchant defaults under any of the terms, covenants, and conditions of any other agreement with DIVERSE CAPITAL, LLC.

32. **<u>JURY WAIVER</u>. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH PARTY MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ACKNOWLEDGE THEIR RIGHT TO REVIEW THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

33. **<u>CLASS ACTION WAIVER</u>. BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTIES AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR A COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT), AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

34. **<u>ARBITRATION</u>. IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR THE FORUM. BUYER WILL PROMPTLY REIMBURSE SELLER OR GUARANTOR FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR FORUM RULES. SELLER AND GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGU**

DS FEW DS KEW **TION**

**OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.**

**35. RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: DIVERSE CAPITAL, LLC, 323 SUNNY ISLES BLVD STE 503. SUNNY ISLES BEACH, FL 33160, AND 244 5TH AVENUE, SUITE P297, NEW YORK, NY 10001, ATTENTION: ARBITRATION OPT-OUT.**

---

## Signature Section to Sale of Future Receipts Agreement

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes.

**Seller:** UNCLE NEAREST, INC (AND ALL ENTITIES LISTED IN APPENDIX II)

Agreed to by: FAWN EVETTE WEAVER **Signature** DocuSigned by: FAWN EVETTE WEAVER 4F66E8E540E849E...

**Agreement of Each Guarantor:** By signing below each Guarantor agrees to the terms and conditions contained in this Agreement, including those terms and conditions on the following pages, and further agrees that this transaction is for business purposes.

| | |
|---|---|
| **Notice:** | This agreement contains a personal guaranty of performance and by signing below you agree that you will be personally liable for the prompt and complete performance of certain obligations of Seller as described in this Agreement. |

**[Guarantor #1]**

Name: FAWN EVETTE WEAVER Social Security Number: [redacted]-1336 **Signature** DocuSigned by: FAWN EVETTE WEAVER 4F66E8E540E849E...

Date: 06/26/2024 **Initials;** FEW

**[Guarantor #2]**

Name: KEITH EDWARD WEAVER Social Security Number: [redacted]-8741 **Signature;** DocuSigned by: KEITH EDWARD WEAVER 4EA04C160F5440B...

Date: 06/26/2024 **Initials;** KEW

***If Applicable:***

**[Guarantor #3]**

Name:________ Social Security Number:________ **Signature;**________

Date:______ **Initials;**______

**[Guarantor #4]**

Name:________ Social Security Number:________ **Signature;**________

Date:______ **Initials;**______

DIVERSE CAPITAL

**APPENDIX A to Authorization Agreement**

## Additional Authorized Accounts

[ UNCLE NEAREST, INC (AND ALL ENTITIES LISTED IN APPENDIX H) ] ("Seller") agrees that each of the following is an "Authorized Account" account as described in the Authorization Agreement between Seller and Diverse Capital, LLC ("Buyer"):

| | |
|---|---|
| **Account Name:** (Name of account exactly as it appears on Seller's bank statement) | Uncle Nearest, inc. |
| **Bank Name:** | JP Morgan Chase |
| **ABA Transit/Routing Number:** | [redacted]0021 |
| **Account Number:** | [redacted]1065 |

| | |
|---|---|
| **Account Name:** (Name of account exactly as it appears on Seller's bank statement) | |
| **Bank Name:** | |
| **ABA Transit/Routing Number:** | |
| **Account Number:** | |

| | |
|---|---|
| **Account Name:** (Name of account exactly as it appears on Seller's bank statement) | |
| **Bank Name:** | |
| **ABA Transit/Routing Number:** | |
| **Account Number:** | |

**Seller Information:**

Seller's Name: UNCLE NEAREST, INC (AND ALL ENTITIES LISTED IN APPENDIX H)

Signature of Authorized Representative: DocuSigned by: FAWN EVETTE WEAVER 4F66E8E540E849E...

Print Name: FAWN EVETTE WEAVER Title: OWNER/AGENT/MANAGER

Seller's Tax ID: [redacted]5348 Date: 06/26/2024

DIVERSE CAPITAL

APPENDIX B

# LIST OF FEES AND CHARGES

The Agreement provides that Seller shall be liable for the following amounts, in addition to the Purchased Amount of Future Receipts:

1. **Origination Fee as set forth on Page 1 of the Agreement.**

2. **The Wire Fee as set forth on Page 1 of the Agreement.**

3. **All costs Buyer incurs because Seller fails to notify Buyer in a timely manner that the Initial Periodic Amount if any subsequent Periodic Amount will not be available in the Account.**

4. **All costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.**

5. **If Seller breaches the Agreement, all costs of collections, including attorney fees and all costs related to the enforcement of any other remedies available to Buyer.**

6. **In addition to the remedies that are afforded to Buyer as set forth in Section 15 of the Agreement, upon the occurrence of an event of default SET FORTH IN SECTION 31, Buyer shall be entitled to a Default Fee in the amount of $5,000 or 33% of the remaining balance of the Purchased Amount of Future Receipts, whichever is greater.**

7. **ACH Program fee: $299.00 per month for the duration of the Agreement. See Appendix D.**

DIVERSE CAPITAL

APPENDIX C

# AUTHORIZATION AGREEMENT FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

This Authorization Agreement is provided by [UNCLE NEAREST, INC (AND ALL ENTITIES LISTED IN APPENDIX H)] ("Seller") to Diverse Capital, LLC ("Buyer") pursuant to the Purchase and Sale of Future Receipts Agreement (the "Purchase Agreement") entered into between Seller and Buyer (the "Purchase Agreement"). Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Purchase Agreement.

Name of Bank: JPMorgan Chase Bank, N.A.

ABA Transit/Routing #: [redacted]0326

Checking Account #: [redacted]1065

Seller hereby authorizes Buyer to present automated clearing house (ACH) debits to the account identified above or to any other account specified in Appendix A to this Authorization Agreement in the amount of any Periodic Amount due on a Remittance, or any other amount due to Buyer from Seller (or otherwise authorized to be debited) under the terms of Purchase Agreement, as it may be amended, supplemented or replaced from time to time. Seller acknowledges that each such identified account is an "Authorized Account" as defined in the Purchase Agreement. Seller also authorizes Buyer to initiate credit entries to deliver the Net Funded Amount to Seller and authorizes Buyer to initiate additional entries (debits and credits) to any Authorized Account to correct any erroneous transfers.

If Seller breaches the Purchase Agreement, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Purchase Agreement.

Seller authorizes Buyer to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the Authorized Account and to correct any missing, erroneous or out-of-date information.

Seller represents and warrants that each Authorized Account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller agrees to be bound by the Rules and Operating Guidelines of Nacha. Seller understands and agrees that any revocation or attempted revocation of this Authorization Agreement will constitute a breach of the Purchase Agreement. In the event that Seller closes an Authorized Account, or the Authorized Account has insufficient funds for any ACH transaction under this Authorization Agreement, Seller authorizes Buyer to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization Agreement to such additional account(s). To the extent necessary, Seller grants Buyer a limited Power of Attorney to take action in Seller's name to facilitate this Authorization Agreement.

Seller understands that the Authorization Agreement is a fundamental condition to induce Buyer to enter into the Purchase Agreement. Consequently, this Authorization Agreement is intended to be irrevocable during the course of the Purchase Agreement and shall remain in full force and effect until Buyer has received all amounts due or that may become due to Buyer under the Purchase Agreement

**Seller Information:** Seller's Name: UNCLE NEAREST, INC (AND ALL ENTITIES LISTED IN APPENDIX H)

Signature of Authorized Representative: DocuSigned by: FAWN EVETTE WEAVER 4F66E8E540E849E...

Print Name: FAWN EVETTE WEAVER Title: OWNER/AGENT/MANAGER

Seller's Tax ID: [redacted]5348 Date: 06/26/2024

**[Provide Voided Check]**

DIVERSE CAPITAL

APPENDIX D

# DC FUND ADDENDUM

This Appendix D is entered on 06/26/2024,
by and among Diverse Capital, LLC, ("Buyer"), UNCLE NEAREST, INC (AND ALL ENTITIES LISTED IN APPENDIX H) ("Seller"), and DC Fund, LLC ("DC Fund").

Should any terms of this Appendix D conflict with the Agreement dated as of the date hereof (together with the Agreement Terms and Conditions attached thereto and the appendices attached thereto, and as may be amended, restated or otherwise modified from time to time, the "Agreement"), by and among Buyer, Seller and the Guarantor(s) party thereto, to which this Appendix D is attached, the terms of this Appendix D shall govern and be controlling. Capitalized terms used herein, but not otherwise defined, shall have the same definition as in the Agreement.

Seller represents and warrants that it understands that Buyer must engage a third-party, namely DC Fund, to manage the ACH withdrawals, reporting and deal tracking. For this service, Seller agrees to pay DC Fund a nominal fee of $299.00 per month. This amount is due on the first day of the Agreement and every subsequent thirty days until the Purchased Amount is paid in full to Buyer.

IN WITNESS WHEREOF, the parties hereto have caused this Appendix D to be duly executed as of the date first above written.

**Seller:** UNCLE NEAREST, INC (AND ALL ENTITIES LISTED IN APPENDIX H)

Agreed to by: FAWN EVETTE WEAVER **Signature;** DocuSigned by: FAWN EVETTE WEAVER 4F66E8E540E849E...

**[Guarantor #1]**

Name: FAWN EVETTE WEAVER **Signature;** DocuSigned by: FAWN EVETTE WEAVER 4F66E8E540E849E... DS FEW

**[Guarantor #2]**

Name: KEITH EDWARD WEAVER **Signature;** DocuSigned by: KEITH EDWARD WEAVER 4EA04C160F5440B... Date: 06/26/2024 **Initials;** DS KEW

***If Applicable:***

**[Guarantor #3]**

Name:________ **Signature;**________ Date:______ **Initials;**______

**[Guarantor #4]**

Name:________ **Signature;**________ Date:______ **Initials;**______

**DC Fund, LLC**: ________ **Signature;**________, its ________(Title)

DS FEW DS KEW

DIVERSE CAPITAL

APPENDIX E

# BANK PORTAL INFORMATION

Thank you for accepting an offer from Diverse Capital, LLC. We are looking forward to building a relationship with your business that allows you to reach and exceed your goals. Please note that prior to funding your account, our Underwriting Department needs to see the most recent balance and activity information in real-time as a fraud countermeasure and in order to ensure the health of your business aligns with the terms of your offer. For your convenience, we have three secure options for you to choose from to complete this step. After being completed and executed, please e-mail this Appendix E to your funding specialist.

**Please provide information required for read-only access* to your business account.**

**Be sure to indicate capital or lower-case letters.*

**Bank Portal Website:** 00

**Username:** 0

**Password:** 0

**Security Question/Answer 1:** 0

**Security Question/Answer 2:** 0

**Security Question/Answer 3:** 0

**Any other information necessary to access your account:**

0

0

DIVERSE CAPITAL

APPENDIX F

# CREDIT REPORT AUTHORIZATION FORM

Seller hereby authorizes Diverse Capital, LLC and its designated agents and representatives to conduct a comprehensive review of Seller's (and that of any guarantor's or co-obligor's) background through a credit report and/or an investigative credit report to be generated for the underwriting/application process in connection with this Agreement, as well as a subsequent renewal of this Agreement and/or any collection action related to same. Seller understands that the scope of the credit report/investigative credit report may include, but is not limited to, the following areas: verification of Social Security number; current and previous residences; employment history, including all personnel files; education; references; credit history and reports; criminal history, including records from any criminal justice agency in any or all federal, state or county jurisdictions; birth records; motor vehicle records, including traffic citations and registration; and any other public records.

Seller hereby authorizes the complete release of these records or data pertaining to Seller that an individual, company, firm, corporation or public agency may have. Seller hereby authorizes and requests any present or former employer, school, police department, financial institution or other persons having personal knowledge of Seller to furnish Diverse Capital, LLC or its designated agents with any and all information in their possession regarding Seller. Seller hereby authorizes that a photocopy of this authorization be accepted with the same authority as the original.

Seller understands that, if any adverse action is to be taken based upon the credit report, a copy of the report and a summary of Seller's rights will be provided to Seller.

Thank you,

**Seller:** UNCLE NEAREST, INC (AND ALL ENTITIES LISTED IN APPENDIX H)

Agreed to by: FAWN EVETTE WEAVER **Signature** DocuSigned by: FAWN EVETTE WEAVER 4F66E8E540E849E...

DIVERSE CAPITAL

APPENDIX G

# EMERGENCY CONTACT PAGE

Dear Seller,

We are glad to welcome you to our unique financing program. The program will go into effect immediately after you return a signed agreement and will continue to be in effect until, we receive the full Purchased Amount according to the agreement. After we receive the full agreement amount, we will close off your account and deliver you a $0 balance letter for your future reference.

In order to assure the maintenance and servicing of your account please keep these service lines in your contacts for any service or maintenance request. Please note: due to a large amount of accounts and the difficulties of keeping track we sometime have accounting problems with the daily ACH debits. If you do have any debit that you think was incorrect you agree to contact us immediately to notify us about the incorrect debits:

[**833-373-7220**] or email [**submit@diversecapitalllc.com**]

*We also require an active point of contact during the Term of the agreement. By providing your contact info below you agree to be contacted in regards to your account during the Term of the agreement. In case of an Emergency please list a secondary point of contact (***required**): Keith Weaver

Please note all necessary information in regards to reaching you or your staff, in case of a problem:

0

0

0

If we experienced any issues with your account and we cannot reach you or your point of contact, we will enforce all legal remedies available to us, under the Agreement. We are always available to assist you with any service request that you may need.

**Please make sure to call us if any problems come up.**

| | |
|---|---|
| Contact Name; | Email; |
| Felicia Gallagher | felicia.gallagher@unclenearest.com |
| Phone; | Cell Phone; |
| 772.210.5991 | 931.808.5378 |

DIVERSE CAPITAL

APPENDIX H

# ADDITIONAL ENTITIES

This Appendix H is entered on 06/26/2024, shall serve to modify the Sale of Future Receipts Agreement ("Agreement"), is made by and between Diverse Capital, LLC ("Buyer"), UNCLE NEAREST, INC (AND ALL ENTITIES LISTED IN APPENDIX H) ("Seller"), and all the entities listed on this Addendum (understood as additional Sellers/Guarantors to the contract).

## LIST OF ADDITIONAL PARTIES IN WHOSE ASSETS SELLER HAS GRANTED BUYER

A BLANKET SECURITY INTEREST:

**BUSINESS LEGAL NAME**: NEAREST GREEN DISTILLERY, INC.

**D/B/A**: NEAREST GREEN DISTILLERY **EIN:** 0

**PHYSICAL ADDRESS**: 315 DEADRICK STREET CITY, STATE: NASHVILLE, TN ZIP: 37238

**FORM OF BUSINESS ENTITY**: CORPORATION

Agreed to by: FAWN EVETTE WEAVER **Signature**; DocuSigned by: FAWN EVETTE WEAVER 4F66E8E540E849E...

("Seller #2"); and

**BUSINESS LEGAL NAME**: UNCLE NEAREST REAL ESTATE HOLDINGS, LLC

**D/B/A**: UNCLE NEAREST REAL ESTATE HOLDINGS **EIN:** 0

**PHYSICAL ADDRESS**: 3125 US 231 N CITY, STATE: SHELBYVILLE, TN ZIP: 37160

**FORM OF BUSINESS ENTITY**: LIMITED LIABILITY COMPAN

Agreed to by: FAWN EVETTE WEAVER **Signature** DocuSigned by: FAWN EVETTE WEAVER 4F66E8E540E849E...

("Seller #3"); and

**BUSINESS LEGAL NAME**: ______

**D/B/A**: ______ **EIN:** ______

**PHYSICAL ADDRESS**: ______ CITY, STATE: ______ ZIP: ______

**FORM OF BUSINESS ENTITY**: CORPORATION

Agreed to by: ______ **Signature**; ______, its ______(Title)

("Seller #4"); and

**BUSINESS LEGAL NAME**: ______

**D/B/A**: ______ **EIN:** ______

**PHYSICAL ADDRESS**: ______ CITY, STATE: ______ ZIP: ______

**FORM OF BUSINESS ENTITY**: CORPORATION

Agreed to by: ______ **Signature**; ______, its ______(Title)

("Seller #5"); and

Initials DS FEW DS KEW

DIVERSE CAPITAL

# Early Delivery Schedule

Subject to the conditions described in the Agreement, if during any Early Delivery Window described below, the sum of all Future Receipts that Seller has delivered to Buyer by Seller is equal to the applicable Discounted Purchase Amount described below, then Buyer will accept the Discounted Purchase Amount in full satisfaction of Seller's contractual obligations under the Agreement.

| EARLY DELIVERY WINDOW<br>Calendar days immediately following disbursement of funds | DISCOUNTED PURCHASE AMOUNT |
|---|---|
| | $ |
| | $ |
| | $ |

Seller's right to exercise the Early Delivery Option offer is subject to the following additional conditions:

- Seller must remit (and Buyer must receive) funds in the amount of the applicable Discounted Purchase Amount not later than 11:59 pm of the last date of the applicable Early Delivery Window.
- Seller's right to exercise the Early Delivery Option terminates immediately after the last day of the last Early Delivery Window.

DASH FUNDING SOURCE

# REVENUE PURCHASE AGREEMENT

This Revenue Purchase Agreement and Security Agreement and Guaranty of Performance ("Agreement") dated 07/26/2024 between Dash Funding Source ("FUNDER") the Merchant(s) listed below (**Merchant**") and the Individual(s) listed below ("Guarantor").

## MERCHANT INFORMATION

**Merchant's Legal Name:** UNCLE NEAREST, INC

**D/B/A:** UNCLE NEAREST

**State of Incorporation / Organization:** TN

**Type of Entity:** Corporation

**Physical Address:** 315 Deaderick Street

**City:** Nashville **State:** TN **Zip:** 37238 **Business Phone:**

**Guarantor(s) Name:** FAWN EVETTE WEAVER **Cellphone Number:** **Email Address:**

**Mailing Address:** 315 Deaderick Street **City:** Nashville **State:** TN **Zip:** 37238

**Purchase Price:** $1,700,000.00 **Purchased Percent:** 3.37% **Purchased Amount:** $2,378,300.00

**Payment Frequency:** weekly **Remittance:** $65,000.00

In consideration of payment by FUNDER to Merchant of the Purchase Price set forth above, Merchant hereby sells, assigns and transfers to FUNDER (making FUNDER the absolute owner) the Purchased Percentage of all of Merchant's payments, receipts, settlements and funds paid to or received by or for the account of Merchant from time to time on and after the date hereof in payment or settlement of Merchant's existing and future accounts, payment intangibles, credit, debit and/or stored value card transactions, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other payors or obligors (the "Future Receipts" defined as all payments made by cash, check, clearinghouse settlement, electronic transfer or other form of monetary payment), for the payments to Merchant as a result of Merchant's sale of goods and/or services (the "Transactions") until the Purchased Amount has been delivered by or on behalf of Merchant to FUNDER.

Merchant is selling a portion of a future revenue stream to FUNDER at a discount, and is not borrowing money from FUNDER, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by FUNDER. The Remittance is a good faith estimate of FUNDER's share of the future revenue stream. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. FUNDER is entering this Agreement knowing the risks that Merchant's business may not perform as expected or fail, and FUNDER assumes these risks based on Merchant's representations, warranties and covenants in this Agreement, which are designed to give FUNDER a reasonable and fair opportunity to receive the benefit of its bargain. FUNDER acknowledges that it may never receive the Purchased Amount in the event that the Merchant does not generate sufficient revenue. Merchant and Guarantor(s)(s) are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth in Paragraph 1.4 and Paragraph 1.5.

FUNDER will debit the Remittance each business day from only one depositing bank account, which account must be acceptable to, and pre-approved by, FUNDER (the "Account") into which Merchant and Merchant's customers shall remit the Receipts from each Transaction, until such time as FUNDER receives payment in full of the Purchased Amount. Merchant hereby authorizes FUNDER to ACH debit the agreed Remittance from the Account on the agreed upon Payment Frequency; a daily basis means any day that is not a United States banking holiday. Merchant agrees not to make or cause debits to the Account (other than in favor of FUNDER) at any time that would cause the balance therein on any business day to be insufficient to fund payment in full of the agreed Remittance. The Account may not be used for any personal, family or household purposes. Merchant will provide FUNDER with all required access codes and monthly bank statements regarding the Account so that FUNDER may monitor the Account. FUNDER payment of the Purchase Price shall be deemed the acceptance and performance by FUNDER of this Agreement. Merchant understands that it is responsible for ensuring that the agreed Remittance to be debited by FUNDER remains in the Account and will be held responsible for any fees incurred by FUNDER resulting from a rejected ACH attempt or an Event of Default. FUNDER is not responsible for any overdrafts or rejected transactions that may result from FUNDER's ACH debiting the agreed Remittance under the terms of this Agreement. Notwithstanding anything to the contrary in this Agreement or any other agreement between FUNDER and Merchant, upon the occurrence of an Event of Default of the MERCHANT AGREEMENT TERMS AND CONDITIONS the Purchased Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

**THE MERCHANT AGREEMENT "TERMS AND CONDITIONS", THE "SECURITY AGREEMENT AND GUARANTY" AND THE "ADMINISTRATIVE FORM HEREOF, ARE ALL HEREBY INCORPORATED IN AND MADE A PART OF THIS MERCHANT AGREEMENT.**

**FOR THE MERCHANT(#1) By:** FAWN EVETTE WEAVER, Owner (Print Name and Title) — DocuSigned by: FAWN EVETTE WEAVER AB9494805F4142...

**FOR THE MERCHANT(#2) By:** KEITH EDWARD WEAVER, Owner (Print Name and Title) — DocuSigned by: KEITH EDWARD WEAVE 4DE05F18EE5C40E...

**BY THE GUARANTOR (#1) By:** FAWN EVETTE WEAVER, Owner (Print Name and Title) — DocuSigned by: FAWN EVETTE WEAVER AB9494805F41424...

**BY THE GUARANTOR (#2) By:** KEITH EDWARD WEAVER, Owner (Print Name and Title) — DocuSigned by: KEITH EDWARD WEAV 4DE05F18EE5C40E...

(Signature)

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
18
4:25-CV-00038

Initial: DS FEW DS KEW

**MERCHANT AGREEMENT TERMS AND CONDITIONS**

**1 TERMS OF ENROLLMENT IN PROGRAM**

1.1 **Merchant Deposit Agreement and Processor**. Merchant shall (A) execute an agreement acceptable to FUNDER with a Bank acceptable to FUNDER to obtain electronic fund transfer services for the Account, and (B) if applicable, execute an agreement acceptable to FUNDER with a credit and debit card processor (the "Processor") instructing the Processor to deposit all Receipts into the Account. Merchant shall provide FUNDER and/or its authorized agent(s) with all of the information, authorizations and passwords necessary for verifying Merchant's receivables, receipts, deposits and withdrawals into and from the Account. Merchant hereby authorizes FUNDER and/or its agent(s) to withdraw from the Account via ACH debit the amounts owed to FUNDER for the receipts as specified herein and to pay such amounts to FUNDER. These authorizations apply not only to the approved Account but also to any subsequent or alternate account used by the Merchant for these deposits, whether pre- approved by FUNDER or not. This additional authorization is not a waiver of FUNDER's entitlement to declare this Agreement breached by Merchant as a result of its usage of an account which FUNDER did not first pre- approve in writing prior to Merchant's usage thereof. The aforementioned authorizations shall be irrevocable without the written consent of FUNDER.

1.2 **Term of Agreement**. This Agreement shall remain in full force and effect until the entire Purchased Amount and any other amounts due are received by FUNDER as per the terms of this Agreement.

1.3 **Reconciliation**. As long as an Event of Default, or breach of this agreement, has not occurred, Merchant may request a retroactive reconciliation of the total Remittance Amount. All requests hereunder must be in writing to . Said request must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding if applicable, from the date of this Agreement through and including the date the request is made. FUNDER retains the right the request additional reasonable documentation including without limitation bank login or access to view Merchant's accounts using third party software, and Merchant's refusal to provide access shall be a breach of this Agreement and FUNDER shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by FUNDER within two (2) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total amount debited by FUNDER shall equal the Specific Percentage of the Future Receipts that Merchant collected during the requested month. Nothing set forth in this section shall be deemed to provide Merchant with the right to interfere with FUNDER's right and ability to debit Merchant's Account while the request is pending or to unilaterally modify the Remittance Amount, in any method other than the ones listed in this Agreement.

1.4 **Adjustments to the Remittance**. As long an Event of Default, or breach of this agreement, has not occurred, Merchant may give notice to FUNDER to request a decrease in the Remittance, should they experience a decrease in its Future Receipts. All requests hereunder must be in writing to and must include copies of all of Merchant's bank account statements, credit card processing statements, and accounts receivable report outstanding from the date of this Agreement through and including the date the request is made. FUNDER retains the right the request additional reasonable documentation including without limitation bank login or 3rd party software access to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and FUNDER shall have no obligation to reconcile. The Remittance shall be modified to more closely reflect the Merchant's actual receipts by multiplying the Merchant's actual receipts by the Purchased Percentage divided by the number of business days in the previous (2) calendar weeks. Merchant shall provide FUNDER with viewing access to their bank account as well as all information reasonably requested by FUNDER to properly calculate the Merchant's Remittance. At the end of the two (2) calendar weeks the Merchant may request another adjustment pursuant to this paragraph or it is agreed that the Merchant's Remittance shall return to the Remittance as agreed upon on Page 1 of this Agreement.

1.5 **Financial Condition**. Merchant and Guarantor(s)(s) (as hereinafter defined and limited) authorize FUNDER and its agents to investigate their financial responsibility and history, and will provide to FUNDER any authorizations, bank or financial statements, tax returns, etc., as FUNDER requests in its sole and absolute discretion prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed as acceptable as an authorization for release of financial and credit information. FUNDER is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

1.6 **Transactional History**. Merchant authorizes all of its banks, brokers and processor to provide FUNDER with Merchant's banking, brokerage and/or processing history to determine qualification or continuation in this program and for collections purposes. Merchant shall provide FUNDER with copies of any documents related to Merchant's card processing activity or financial and banking affairs within five days after a request from FUNDER.

1.7 **Indemnification**. Merchant and Guarantor(s)(s) hereby jointly and severally indemnify and hold harmless FUNDER and each Processor, their respective officers, directors, agents and representatives, and shareholders against all losses, damages, claims, liabilities and expenses (including reasonable attorney's fees) incurred by any such indemnitee as a direct or indirect result of (a) claims asserted by FUNDER for monies owed to FUNDER from Merchant and (b) actions taken by indemnitee in reliance upon any fraudulent, misleading or deceptive information or instructions provided by FUNDER.

1.8 **No Liability**. In no event will FUNDER be liable for any claims asserted by Merchant or Guarantor(s)s under any legal or equitable theory for lost profits, lost revenues, lost business opportunities, exemplary, punitive, special, incidental, indirect or consequential damages, each of which is waived by both Merchant and Guarantor(s)(s). In the event these claims are nonetheless raised, Merchant and Guarantor(s)s will be jointly liable for all of FUNDER's attorney's fees and expenses resulting therefrom.

1.9 **Reliance on Terms**. Section 1.1, 1.6, 1.7, 1.8 and 2.5 of this Agreement are agreed to for the benefit of Merchant, FUNDER, Processor, and Merchant's bank and notwithstanding the fact that Processor and the bank is not a party of this Agreement, Processor and the bank may rely upon their terms and raise them as a defense in any action.

1.10 **Sale of Receipts**. Merchant and FUNDER agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount, and that such Purchase Price is not intended to be, nor shall it be construed as a loan from FUNDER to Merchant. Merchant agrees that the Purchase Price is in exchange for the Receipts pursuant to this Agreement, and that it equals the fair market value of such Receipts. FUNDER has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created. Merchant acknowledges that FUNDER's share of Receipts collected are being held by Merchant in trust and are the sole property of FUNDER until they are remitted to FUNDER. Payments made to FUNDER in respect to the full amount of the Receipts shall be conditioned upon Merchant's sale of products and services, and the payment therefore by Merchant's customers. By this Agreement, Merchant transfers to FUNDER full and complete ownership of the Purchased Amount and Merchant retains no legal or equitable interest therein. FUNDER hereby appoints Merchant, and Merchant accepts appointment, as servicer for and on behalf of FUNDER for the purpose of collecting and delivering Receipts to FUNDER as required by this Agreement until FUNDER has received the Receipts Purchased Amount, and Merchant agrees that all such Receipts shall be received and held in trust for the benefit of SPFL for purposes of carrying out the terms of this Agreement. Merchant agrees that it will treat the amounts received and the Purchased Receipts delivered to FUNDER under this Agreement in a manner consistent with a sale in its accounting records and tax returns. Merchant agrees that FUNDER is entitled to audit Merchant's accounting records upon reasonable notice in order to verify compliance. Merchant waives any rights of privacy, confidentiality or taxpayer privilege in any such litigation or arbitration in which Merchant asserts that this transaction is anything other than a sale of future receipts. In no event shall the aggregate of all amounts or any portion thereof be deemed as interest hereunder, and in the event it is found to be interest despite the parties hereto specifically representing that it is NOT interest, it shall be found that no sum charged or collected hereunder shall exceed the highest rate permissible at law. In the event that a court nonetheless determines that FUNDER has charged or received interest hereunder in excess of the highest applicable rate, the rate in effect hereunder shall automatically be reduced to the maximum rate permitted by applicable law and FUNDER shall promptly refund to Merchant any interest received by FUNDER in excess of the maximum lawful rate, it being intended that Merchant not pay or contract to pay, and that FUNDER not receive or contract to receive, directly or indirectly in any manner whatsoever, interest in excess of that which may be paid by Merchant under applicable law. As a result thereof, Merchant knowingly and willingly waives the defense of Usury in any action or proceeding.

1.11 **Power of Attorney**. Merchant irrevocably appoints FUNDER and its agents and representatives, as its agent and attorney-in-fact with full authority to take any action or execute any instrument or document to settle all obligations due to FUNDER from Processor, or in the case of a violation by Merchant of Section 1or the occurrence of an Event of Default under Section 3 hereof, including without limitation (i) to obtain and adjust insurance; (ii) to collect monies due or to become due under or in respect of any of the Collateral; (iii) to receive, endorse and collect any checks, notes, drafts, instruments, documents or chattel paper in connection with clause (i) or clause (ii) above; (iv) to sign Merchant's name on any invoice, bill of lading, or assignment directing customers or account debtors to make payment directly to FUNDER; and (v) to contact Merchant's banks and financial institutions using Merchant and Guarantor(s)(s) personal information to verify the existence of an account and obtain account balances (vi) to file any claims or take any action or institute any proceeding which FUNDER may deem necessary for the collection of any of the unpaid Purchased Amount from the Collateral, or otherwise to enforce its rights with respect to payment of the Purchased Amount. In connection therewith, all costs, expenses and fees, including legal fees, shall be payable by merchant.

1.12 **Protections against Default**. The following Protections 1 through 8 may be invoked by FUNDER immediately and without notice to Merchant in the event: (a) Merchant takes any action to discourage the use of electronic check processing that are settled through Processor, or permits any event to occur that could have an adverse effect on the use, acceptance, or authorization of checks or other payments or deposits for the purchase of Merchant's services and products including but not limited to direct deposit of any checks into a bank account without scanning into the FUNDER electronic check processor; (b) Merchant changes its arrangements with Processor or the Bank in any way that is adverse or unacceptable to FUNDER; (c) Merchant changes the electronic check processor through which the Receipts are settled from Processor to another

Initial: DS FEW DS KEW

electronic check processor, or permits any event to occur that could cause diversion of any of Merchant's check or deposit transactions to another processor; (d) Merchant intentionally interrupts or ceases the operation of this business transfers, moves, sells, disposes, or otherwise conveys its business and/or assets without (i) the express prior written consent of FUNDER, and (ii) the written agreement of any FUNDER or transferee to the assumption of all of Merchant's obligations under this Agreement pursuant to documentation satisfactory to FUNDER;(e) Merchant takes any action, fails to take any action, or offers any incentive—economic or otherwise—the result of which will be to induce any customer or customers to pay for Merchant's services with any means other than payments, checks or deposits that are settled through Processor; (f) Merchant fails to provide FUNDER with copies of any documents related to Merchant's card processing activity of financial and banking affairs within five days after a request from FUNDER, or (g) Merchant breaches any terms of this Agreement, including but not limited any of the Events of Default contained in Section 3.1 herein. These protections arein addition to any other remedies available to FUNDER at law, in equity or otherwise pursuant to this Agreement.

**Protection 1**. The full uncollected Purchased Amount plus all fees (including attorney's fees and costs of collection in the amount of 30% of the Purchased Amount then outstanding due under this Agreement and the attached Security Agreement become due and payable in full immediately.

**Protection 2**. FUNDER may enforce the provisions of the Limited Personal Guaranty of Performance against the Guarantor(s).

**Protection 3**. Merchant hereby authorizes FUNDER to execute in the name of the Merchant a Confession of Judgment in favor of FUNDER pursuant to the terms of the Confession of Judgment. Upon an Event of Default, FUNDER may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon.

**Protection 4**. FUNDER may enforce its security interest in the Collateral including sending demand letters to account debtors and credit card processors.

**Protection 5**. FUNDER may exercise any and all rights and remedies of a secured party under Uniform Commercial Code Article 9

**Protection 6**. FUNDER may proceed to protect and enforce its right and remedies by lawsuit. In any such lawsuit, if FUNDER recovers a Judgment against Merchant, Merchant shall be liable for all of FUNDER's costs of the lawsuit, including but not limited to all reasonable attorneys' fees and court costs.

**Protection 7**. This Agreement shall be deemed Merchant's Assignment of Merchant's Lease of Merchant's business premises to FUNDER. Upon breach of any provision in this Agreement, FUNDER may exercise its rights under this Assignment of Lease without prior Notice to Merchant. Protection 8. FUNDER may debit Merchant's depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to FUNDER.

**Protection 8.** FUNDER may debit Merchant's depository accounts wherever situated in such amounts as determined by FUNDER in its sole discretion for purposes of collecting funds for application to the unrealized Purchased Amount and other amounts owed by Merchant to FUNDER by means of ACH debit or facsimile signature on a computer-generated check drawn on Merchant's bank account or otherwise for all sums due to FUNDER.

1.13 **Protection of Information.** Merchant and each person signing this Agreement on behalf of Merchant and/or as Owner or Guarantor(s), in respect of himself or herself personally, authorizes FUNDER to disclose information concerning Merchant's and each Owner's and each Guarantor(s)'s credit standing (including credit bureau reports that FUNDER obtains) and business conduct only to agents, affiliates, subsidiaries, and credit reporting bureaus. Merchant and each Owner and each Guarantor(s) hereby and each waives to the maximum extent permitted by law any claim for damages against FUNDER or any of its affiliates relating to any (i)investigation undertaken by or on behalf of FUNDER as permitted by this Agreement or (ii) disclosure of information as permitted by this Agreement.

1.14 **Confidentiality**. Merchant understands and agrees that the terms and conditions of the products and services offered by FUNDER, including this Agreement and any other FUNDER documents (collectively, "Confidential Information") are proprietary and confidential information of FUNDER. Accordingly, unless disclosure is required by law or court order, Merchant shall not disclose Confidential Information of FUNDER to any person other than an attorney, accountant, financial advisor or employee of Merchant who needs to know such information for the purpose of advising Merchant ("Advisor"), provided such Advisor uses such information solely for the purpose of advising Merchant and first agrees in writing to be bound by the terms of this section. A breach hereof entitles FUNDER to not only damages and reasonable attorney's fees but also to both a Temporary Restraining Order and a Preliminary Injunction without Bond or Security.

1.15 **Publicity**. Merchant and each of Merchant's Owners and all Guarantor(s)s heretoall hereby authorizes FUNDER to use its, his or her name in listings of clients and in advertising and marketing materials.

1.16 **D/B/A's.** Merchant hereby acknowledges and agrees that FUNDER may be using "doing business as" or "d/b/a" names in connection with various matters relating to the transaction between FUNDER and Merchant, including the filing of UCC-1 financing statements and other notices or filings.

## 2 REPRESENTATIONS, WARRANTIES AND COVENANTS

Merchant represents warrants and covenants that, as of this date and during the term of this Agreement:

2.1 **Financial Condition and Financial Information**. Merchant's and Guarantor(s)s' bank and financial statements, copies of which have been furnished to FUNDER, and future statements which will be furnished hereafter at the discretion of FUNDER, fairly represent the financial condition of Merchant at such dates, and since those dates there has been no material adverse changes, financial or otherwise, in such condition, operation or ownership of Merchant. Merchant and Guarantor(s)s have a continuing, affirmative obligation to advise FUNDER of any material adverse change in their financial condition, operation or ownership. FUNDER may request statements at any time during the performance of this Agreement and the Merchant and Guarantor(s)s shall provide them to FUNDER within five business days after request from FUNDER. Merchant's or Guarantor(s)s' failure to do so is a material breach of this Agreement.

2.2 **Governmental Approvals**. Merchant is in compliance and shall comply with all laws and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the business in which it is presently engaged and/or will engage in hereafter.

2.3 **Authorization**. Merchant, and the person(s) signing this Agreement on behalf of Merchant, have full power and authority to incur and perform the obligations under this Agreement, all of which have been dulyauthorized.

2.4 **Use of Funds**. Merchant agrees that it shall use the Purchase Price for business purposes and not for personal, family, or household purposes.

2.5 **Electronic Check Processing Agreement.** Merchant will not change its Processor, add terminals, change its financial institution or bank account(s)or take any other action that could have any adverse effect upon Merchant's obligations under this Agreement, without FUNDER's prior written consent. Any such changes shall be a material breach of this Agreement.

2.6 **Change of Name or Location**. Merchant will not conduct Merchant's businesses under any name other than as disclosed to the Processor and FUNDER, nor shall Merchant change any of its places of business without prior written consent by FUNDER.

2.7 **Daily Batch Out**. Merchant will batch out receipts with the Processor on a daily basis ifapplicable.

2.8 **Estoppel Certificate**. Merchant will at every and all times, and from time to time, upon at least one (1) day's prior notice from FUNDER to Merchant, execute, acknowledge and deliver to FUNDER and/or to any other person, firm or corporation specified by FUNDER, a statement certifying that this Agreement is unmodified and in full force and effect (or, if there have been modifications, that the same is in full force and effect as modified and stating the modifications) and stating the dates which the Purchased Amount or any portion thereof has been repaid.

2.9 **No Bankruptcy**. As of the date of this Agreement, Merchant is not insolvent and does not contemplate filing for bankruptcy in the next six months and has not consulted with a bankruptcy attorney or filed any petition for bankruptcy protection pursuant to the United States Bankruptcy Code and there has been no involuntary petition brought or pending against Merchant. Merchant further warrants that it does not anticipate filing any such bankruptcy petition and it does not anticipate that an involuntary petition will be filed against it.

2.10 **Unencumbered Receipts**. Merchant has good, complete, unencumbered and marketable title to all Receipts and all collateral in which FUNDER has been granted a security interest under the Security Agreement, free and clear of any and all liabilities, liens, claims, charges, restrictions, conditions, options, rights, mortgages, security interests, equities, pledges and encumbrances of any kind or nature whatsoever other than in favor of FUNDER or any other rights or interests that may be inconsistent with the transactions contemplated with, or adverse to the interests of FUNDER.

2.11 **Business Purpose**. Merchant is a valid business in good standing under the laws of the jurisdictions in which it is organized and/or operates, and Merchant is entering into this Agreement for business purposes and not as a consumer for personal, family or household purposes.

2.12 **Defaults under Other Contracts**. Merchant's execution of, and/or performance under this Agreement, will not cause or create an event of default by Merchant under any contract with another person or entity.

2.13 **Good Faith**. Merchant and Guarantor(s)s hereby affirm that Merchant is receiving the Purchase Price and selling FUNDER the Purchased Amount in good faith and will use the Purchase Price funds to maintain and grow Merchant's business

## 3 EVENTS OF DEFAULT AND REMEDIES

3.1 **Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" hereunder:

(a) Merchant or Guarantor(s) shall violate any term or covenant in this Agreement;

(b) Any representation or warranty by Merchant or Guarantor(s) in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made;

Initial: DS DS

(c) the sending of notice of termination by Merchant or verbally notifying FUNDER of its intent to breach this Agreement;
(d) the Merchant fails to give FUNDER 24 hours advance notice that there will be insufficient funds in the account such that the ACH of the Remittance amount will not be honored by Merchant's bank, the Merchant fails to supply all requested documentation and allow for daily and/or real time monitoring of its bank account;
(e) Merchant fails to provide its bank statements, and/or month to date bank activity, and/or accounts receivable reports, and/or bank login information within two (2) business days of a request by FUNDER,
(f) Merchant shall voluntarily transfer or sell all or substantially all of its assets;
(g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant;
(h) Merchant shall use multiple depository accounts without the prior written consent of FUNDER or takes any other action that intentionally interferes with or prevents FUNDER from receiving the Purchased Amount in accordance with the terms of this Agreement;
(i) Merchant shall enter into any financing agreements with any other party including but not limited to: Loans, Merchant Cash Advances, Receivables financing, or any other agreement that will increase the total debt owed by Merchant to any other party.
(j) Merchant shall change its depositing account without the prior written consent of FUNDER; or
(k) Merchant shall close its depositing account used for ACH debits without the prior written consent of FUNDER
(l) Merchant's bank returns a code other than NSF cutting FUNDER from its collections
(m) Merchant or any Owner/Guarantor(s), directly or indirectly, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, which operates a business similar to or competitive with that of Merchant;
(n) Merchant shall default under any of the terms, covenants and conditions of any other agreement with FUNDER.

3.2 **Limited Personal Guaranty** Upon the occurrence of an Event of Default, FUNDER will enforce its rights against the Guarantor(s)s of this transaction. Said Guarantor(s)s will be jointly and severally liable to FUNDER for all of FUNDER's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement.

3.3 **Remedies**. Upon the occurrence of an Event of Default occurs and is not waived pursuant to Section 4.4. hereof, FUNDER may proceed to protect and enforce its rights or remedies by suit in equity or by action at law, or both, whether for the specific performance of any covenant, agreement or other provision contained herein, or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy, including but not limited to filing the Confession of Judgment and executing thereon, and enforcing the Security Agreement contained herein. All rights, powers and remedies of FUNDER in connection with this Agreement may be exercised at any time by FUNDER after the occurrence of an Event of Default, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

3.4 **Attorney's Fees**. Upon the occurrence of an Event of Default, and Funder retains an attorney or law firm to enforce this Agreement, Merchant and Guarantor(s) agree that a fee equal to 30% of the Remaining Balance (purchased amount less amount remitted by Merchant) ("Attorney's Fees") shall be immediately assessed Merchant and Guarantor(s) agree that the calculation for Attorney's Fees is reasonable.

3.5 **Costs**. Merchant shall pay to FUNDER all reasonable costs associated with (a) an Event or Default, (b) breach by Merchant of the Covenants in this Agreement and the enforcement thereof, and(c) the enforcement of FUNDER's remedies set forth in this Agreement, including but not limited to court costs and attorneys' fees.

3.6 **Required Notifications**. Merchant is required to give FUNDER written notice within 24 hours of any filing under Title 11 of the United States Code. Merchant is required to give FUNDER seven days' written notice prior to the closing of any sale of all or substantially all of the Merchant's assets or stock.

## 4 MISCELLANEOUS

4.1 **Modifications; Agreements**. No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same shall be in writing and signed by FUNDER.

4.2 **Assignment**. FUNDER may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part.

4.3 **Notices**. All notices, requests, consents, demands and other communications hereunder shall be delivered by certified mail, return receipt requested, to the respective parties to this Agreement at the addresses set forth in this Agreement. Notices to FUNDER shall become effective only upon receipt by FUNDER. Notices to Merchant shall become effective three days after mailing.

4.4 **Waiver Remedies**. No failure on the part of FUNDER to exercise, and no delay in exercising any right under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right under this Agreement preclude any other or further exercise thereof or the exercise of any other right. The remedies provided hereunder are cumulative and not exclusive of any remedies provided by law or equity.

4.5 **Binding Effect; Governing Law, Venue and Jurisdiction**. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums attachments, exhibits, and other documents relating to this Agreement in any way, shall be binding upon and inure to the benefit of Merchant and Guarantor(s) on the one hand, and FUNDER and their respective successors and assigns, except that Merchant and Guarantor(s) shall not have the right to assign its rights hereunder or any interest herein without the prior written consent of FUNDER which consent may be withheld in FUNDER's sole discretion. FUNDER reserves the rights to assign this Agreement with or without prior written notice to Merchant. This Agreement, Security Agreement and Guaranty, Guaranty of Performance, and any and all addendums, attachments, exhibits, and other documents relating to this Agreement in any way, shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if FUNDER so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). All Parties to this Agreement, including but not limited to, Merchant, Guarantor(s), Corporate Guarantor(s) Merchant and Guarantor(s) that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant and Guarantor(s) waives any right to oppose any motion or application made by FUNDER to transfer such proceeding to an Acceptable Forum. **Merchant and Guarantor(s) hereby agree that the mailing of any Summons and Complaint in any proceeding commenced by FUNDER by certified or registered mail, return receipt requested to the Mailing Address listed on this Agreement, or via email to the Email Address listed on this Agreement, or any other process required by any such court will constitute valid and lawful service of process against them without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.**

4.6 **Survival of Representation**, etc. All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full and this Agreement shall have terminated.

4.7 **Interpretation**. All Parties hereto have reviewed this Agreement with attorney of their own choosing and have relied only on their own attorneys' guidance and advice. No construction determinations shall be made against either Party hereto as drafter.

4.8 **Severability**. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected orimpaired.

4.9 **Entire Agreement**. Any provision hereof prohibited by law shall be ineffective only to the extent of such prohibition without invalidating the remaining provisions hereof. This Agreement and the Security Agreement and Guaranty hereto embody the entire agreement between Merchant Guarantor(s) and Corporate Guarantor(s)s and FUNDER and supersede all prior agreements and understandings relating to the subject matter hereof.

4.10 **JURY TRIAL WAIVER**. THE PARTIES HERETO WAIVE TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING INCONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OR THEENFORCEMENT HEREOF. THE PARTIES HERETO ACKNOWLEDGE THAT EACH MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ONLY AFTER EXTENSIVE CONSIDERATION OF THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.

4.11 **CLASS ACTION WAIVER**. THE PARTIES HERETO WAIVE ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTY AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW AS AGAINST PUBLIC POLICY. TO THE EXTENT EITHER PARTY IS PERMITTED BY LAW OR COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES HEREBY AGREE THAT: (1) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT); AND ( 2) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.

4.12 **Facsimile & Digital Acceptance**. Facsimile signatures and digital signatures hereon shall be deemed acceptable for all purposes.

Initial: DS EW DS EW

# SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE

THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH IN THE "MERCHANT AGREEMENT", INCLUDING THE "TERMS AND CONDITIONS", ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS SECURITY AGREEMENT AND GUARANTY OF PERFORMANCE. CAPITALIZED TERMS NOT DEFINED IN THIS SECURITY AGREEMENT AND GUARANTY, SHALL HAVE THE MEANING SET FORTH IN THE MERCHANT AGREEMENT, INCLUDING THE TERMS AND CONDITIONS.

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Merchant's Legal Name: | UNCLE NEAREST, INC | | | | | | |
| D/B/A: | UNCLE NEAREST | | | | | | |
| Physical Address: | 315 Deaderick Street | City: | Nashville | State: | TN | Zip: | 37238 |

## SECURITY AGREEMENT

**Security Interest.** This Agreement will constitute a security agreement under the Uniform Commercial Code. To secure Merchant's obligations under the Revenue Purchase Agreement to make available or deliver Purchased Amount to FUNDER and FUNDER's right to realize the Purchased Amount, as and to the extent required by the terms of the Revenue Purchase Agreement, and performance of and compliance by Merchant with its other undertakings and agreements herein, Merchant and Guarantor(s)(s) grants to FUNDER a security interest in and lien upon: (a) all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory, as those terms are each defined in Article 9 of the Uniform Commercial Code (the "UCC"), now or hereafter owned or acquired by Merchant and/or Guarantor(s)(s), (b) all proceeds, as that term is defined in Article 9 of the UCC (c) all funds at any time in the Merchant's and/or Guarantor(s)(s) Account, regardless of the source of such funds, (d) present and future Electronic Check Transactions, and (e) any amount which may be due to FUNDER under this Agreement, including but not limited to all rights to receive any payments or credits under this Agreement (collectively, the "Secured Assets"). Merchant agrees to provide other security to FUNDER upon request to secure Merchant's obligations under this Agreement. Merchant agrees that, if at any time there are insufficient funds in Merchant's Account to cover FUNDER's entitlements under this Agreement, FUNDER is granted a further security interest in all of Merchant's assets of any kind whatsoever, and such assets shall then become Secured Assets. These security interests and liens will secure all of FUNDER's entitlements under this Agreement and any other agreements now existing or later entered into between Merchant, FUNDER or an affiliate of FUNDER is authorized to file any and all notices or filings it deems necessary or appropriate to enforce its entitlements hereunder.

In the event Merchant, any of its officers or directors or any Owner/Guarantor(s), during the term of the Revenue Purchase Agreement or while Merchant remains liable to FUNDER for any obligations under the Revenue Purchase Agreement, directly or indirectly, including acting by, through or in conjunction with any other person, causes to be formed a new entity or otherwise becomes associated with any new or existing entity, whether corporate, partnership, limited liability company or otherwise, which operates a business similar to or competitive with that of Merchant, such entity shall be deemed to have expressly assumed the obligations due FUNDER under the Revenue Purchase Agreement. With respect to any such entity, FUNDER shall be deemed to have been granted an irrevocable power of attorney with authority to file, naming such newly formed or existing entity as debtor, an initial UCC financing Statement and to have it filed with any and all appropriate UCC filing offices. FUNDER shall be held harmless by Merchant and each Owner/Guarantor(s) and be relieved of any liability as a result of any such authentication and filing of any such Financing Statement or the resulting perfection of its ownership rights or security interests in such entity's assets. FUNDER shall have the right to notify such entity's payors or account debtor (as defined by the UCC) of FUNDER's rights, including without limitation, FUNDER's right to collect all accounts, and to notify any payment card processor or creditor of such entity that FUNDER has such rights in such entity's assets. Merchant also agrees that, at the FUNDER's discretion, FUNDER may choose to amend any existing financing statement to include any such newly formed entity as debtor.

This security interest may be exercised by FUNDER without notice or demand of any kind by making an immediate withdrawal or freezing the Secured Assets. FUNDER shall have the right to notify account debtors at any time. Pursuant to Article 9 of the Uniform Commercial Code, as amended from time to time, FUNDER has control over and may direct the disposition of the Secured Assets, without further consent of Merchant. Merchant hereby represents and warrants that no other person or entity has a security interest in the Secured Assets.
With respect to such security interests and liens, FUNDER will have all rights afforded under the Uniform Commercial Code, any other applicable law and in equity. Merchant will obtain from FUNDER written consent prior to granting a security interest of any kind in the Secured Assets to a third party. Merchant and Guarantor(s) (s) agree(s) that this is a contract of recoupment and FUNDER is not required to file a motion for relief from a bankruptcy action automatic stay to realize on any of the Secured Assets. Nevertheless, Merchant and Guarantor(s)(s) agree(s) not to contest or object to any motion for relief from the automatic stay filed by FUNDER. Merchant and Guarantor(s)(s) agree(s) to execute and deliver to FUNDER such instruments and documents FUNDER may reasonably request to perfect and confirm the lien, security interest and right of setoff set forth in this Agreement. FUNDER is authorized to execute all such instruments and documents in Merchant's and Guarantor(s)(s) name.

Merchant and Guarantor(s)(s) each acknowledge and agree that any security interest granted to FUNDER under any other agreement between Merchant or Guarantor(s)(s) and FUNDER (the "Cross-Collateral") will secure the obligations hereunder and under the Merchant Agreement. Merchant and Guarantor(s)(s) each agrees to execute any documents or take any action in connection with this Agreement as FUNDER deems necessary to perfect or maintain FUNDER's first priority security interest in the Collateral and the Additional Collateral, including the execution of any account control agreements. Merchant and Guarantor(s)(s) each hereby authorizes FUNDER to file any financing statements deemed necessary by FUNDER to perfect or maintain FUNDER's security interest. Merchant and Guarantor(s)(s) shall be liable for, and FUNDER may charge and collect, all costs and expenses, including but not limited to attorney's fees, which may be incurred by FUNDER in protecting, preserving and enforcing FUNDER's security interest and rights.

**Negative Pledge.** Merchant and Guarantor(s)(s) each agrees not to create, incur, assume, or permit to exist, directly or indirectly, any lien on or with respect to any of the Collateral or the Additional Collateral, as applicable.

**Consent to Enter Premises and Assign Lease**. FUNDER shall have the right to cure Merchant's default in the payment of rent on the following terms. In the event Merchant is served with papers in an action against Merchant for nonpayment of rent or for summary eviction, FUNDER may execute its rights and remedies under the Assignment of Lease. Merchant also agrees that FUNDER may enter into an agreement with Merchant's landlord giving FUNDER the right: (a) to enter Merchant's premises and to take possession of the fixtures and equipment therein for the purpose of protecting and preserving same; and/or (b) to assign Merchant's lease to another qualified business capable of operating a business comparable to Merchant's at such premises.

**Remedies.** Upon any Event of Default, FUNDER may pursue any remedy available at law (including those available under the provisions of the UCC), or in equity to collect, enforce, or satisfy any obligations then owing to FUNDER, whether by acceleration or otherwise.

Initial: DS FEW DS KEW

**GUARANTY OF PERFORMANCE**

As an additional inducement for FUNDER to enter into the Revenue Purchase Agreement, the undersigned Guarantor(s)(s) hereby provides FUNDER with this Guaranty. Guarantor(s)(s) will not be personally liable for any amount due under the Revenue Purchase Agreement unless Merchant commits an Event of Default pursuant to Paragraph 3.1 of the Revenue Purchase Agreement. Each Guarantor(s) shall be jointly and severally liable for all amounts owed to FUNDER in the Event of Default. Guarantor(s)(s) guarantee Merchant's good faith, truthfulness and performance of all of the representations, warranties, covenants made by Merchant in this Agreement including the Merchant's full and timely delivery of the Purchased Amount pursuant to (and limited by) the Revenue Purchase Agreement, in each case as each may be renewed, amended, extended or otherwise modified (the "Guaranteed Obligations"). Guarantor(s)'s obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement.

**Guarantor(s) Waivers**. In the event of a breach of the above, FUNDER may seek recovery from Guarantor(s)s for all of FUNDER's losses and damages by enforcement of FUNDER's rights under this Agreement without first seeking to obtain payment from Merchant, any other Guarantor(s), or any Collateral or Additional Collateral FUNDER may hold pursuant to this Agreement or any other guaranty. In addition, Section 4.5, 4.10 and 4.11 are expressly reiterated in the Security Agreement and Guaranty herein. FUNDER is not required to notify Guarantor(s) of any of the following events and Guarantor(s) will not be released from its obligations under this Agreement if it is not notified of: (i) Merchant's failure to pay timely any amount required under the Merchant Agreement; (ii) any adverse change in Merchant's financial condition or business; (iii) any sale or other disposition of any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; (iv) FUNDER's acceptance of this Agreement; and (v) any renewal, extension or other modification of the Merchant Agreement or Merchant's other obligations to FUNDER. In addition, FUNDER may take any of the following actions without releasing Guarantor(s) from any of its obligations under this Agreement: (i) renew, extend or otherwise modify the Merchant Agreement or Merchant's other obligations to FUNDER; (ii) release Merchant from its obligations to FUNDER; (iii) sell, release, impair, waive or otherwise fail to realize upon any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations; and (iv) foreclose on any collateral securing the Guaranteed Obligations or any other guaranty of the Guaranteed Obligations in a manner that impairs or precludes the right of Guarantor(s) to obtain reimbursement for payment under this Agreement. Until the Purchased Amount and Merchant's other obligations to FUNDER under the Merchant Agreement and this Agreement are paid in full, Guarantor(s) shall not seek reimbursement from Merchant or any other Guarantor(s) for any amounts paid by it under this Agreement. Guarantor(s) permanently waives and shall not seek to exercise any of the following rights that it may have against Merchant, any other Guarantor(s), or any collateral provided by Merchant or any other Guarantor(s), for any amounts paid by it, or acts performed by it, under this Agreement: (i) subrogation; (ii) reimbursement; (iii) performance; (iv) indemnification; or (v) contribution. In the event that FUNDER must return any amount paid by Merchant or any other Guarantor(s) of the Guaranteed Obligations because that person has become subject to a proceeding under the United States Bankruptcy Code or any similar law, Guarantor(s)'s obligations under this Agreement shall include that amount.

Guarantor(s) Acknowledgement. Guarantor(s) acknowledges that: (i) He/She is bound by the Class Action Waiver provision in the Merchant Agreement Terms and Conditions; (ii) He/She understands the seriousness of the provisions of this Agreement; (ii) He/She has had a full opportunity to consult with counsel of his/her choice; and (iv) He/She has consulted with counsel of its choice or has decided not to avail himself/herself of that opportunity.

This Security Agreement and Guaranty and Guaranty of Performance shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principals of conflicts of law. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach hereof, shall, if Funder so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submits to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Merchant, Guarantor and Corporate Guarantors agree that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, Merchant, Guarantor and Corporate Guarantors waives any right to oppose any motion or application made by Funder to transfer such proceeding to an Acceptable Forum.

The Merchant Guarantor(s) and Corporate Guarantor(s) acknowledge that they have read Paragraph 4.5 of this Agreement in its entirety and understand that they are waiving their right to Service of Process by traditional manners and will accept process of any Summons and Complaint or other legal process by certified mail return receipt requested to the Mailing Address on Page 1 of this Agreement.

**FOR ALL THE MERCHANTS (#1)** By: FAWN EVETTE WEAVER, Owner (Print Name and Title)
DocuSigned by: FAWN EVETTE WEAVER AB9494805F41424... (Signature)

SSN #: [redacted]1336

**FOR ALL THE MERCHANTS (#2)** By: KEITH EDWARD WEAVER, Owner (Print Name and Title)
DocuSigned by: KEITH EDWARD WEAVER 4DE05F18EE5C40E... (Signature)

SSN #: [redacted]8741

**GUARANTORS (#1)** By: FAWN EVETTE WEAVER, Owner (Print Name and Title)
DocuSigned by: FAWN EVETTE WEAVER AB9494805F41424... (Signature)

SSN #: [redacted]1336

**GUARANTORS (#2)** By: KEITH EDWARD WEAVER, Owner (Print Name and Title)
DocuSigned by: KEITH EDWARD WEAVER 4DE05F18EE5C40E... (Signature)

SSN #: [redacted]8741

Initial: DS FEW DS KEW

## APPENDIX A - THE FEE STRUCTURE:

A. Underwriting Fee: N/A to cover underwriting and related expenses.

B. Origination Fee $35,000.00 to cover cost of Origination and ACH Setup
C. NSF Fee (Standard) 50 (each)

D. Rejected ACH / Blocked ACH / Default Fee $5,000.00 When Merchant BLOCKS Account from our Debit ACH, or when Merchant directs the bank to reject our Debit ACH, which places them in default (per contract). When Merchant changes bank Account cutting us off from our collections.

E. Bank Change Fee $50.00. When Merchant requires a change of Bank Account to be Debited, requiring us to adjust our system.

F. Wire Fee - Each Merchant shall receive their funding electronically to their designated bank account and will be charged $50.00 for a Fed Wire or$0.00 for a bank ACH.

G. Attorney's Fee: 30% of the Remaining Balance. When merchant breaches any term of this Agreement and FUNDER is required to retain counsel to enforce, defend or collect any term of this Agreement.

**FOR THE MERCHANT(#1)** By: FAWN EVETTE WEAVER, Owner (Print Name and Title)

DocuSigned by: FAWN EVETTE WEAVER AB9494805F41424... (Signature)

**FOR THE MERCHANT(#2)** By: KEITH EDWARD WEAVER, Owner (Print Name and Title)

DocuSigned by: KEITH EDWARD WEAVER 4DE05F18EE5C40E... (Signature)

Initial: DS FEW DS KEW

**AUTHORIZATION AGREEMENT FOR DIRECT DEPOSIT (ACH CREDIT) AND DIRECT PAYMENTS (ACH DEBITS)**

**Merchant:** UNCLE NEAREST, INC
(Merchant's Legal Name)

**Merchant Agreement:** Merchant Agreement between Funder and Merchant, dated as of 07/26/2024.

Designated Checking Account:

| | | | |
|---|---|---|---|
| Bank Name: | JPMORGAN CHASE | Branch: | |
| Tax ID: | [redacted]5348 | | |
| ABA Routing: | [redacted]0326 | DDA Account: | [redacted]1065 |

Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Merchant Agreement.

By signing below, Merchant attests that the Designated Checking Account was established for business purposes and not primarily for personal, family or household purposes. **This Authorization Agreement for Direct Deposit (ACH Credit) and Direct Payments (ACH Debits) is part of (and incorporated by reference into) the Merchant Agreement. Merchant should keep a copy of this important legal document for Merchant's records.**

**DISBURSEMENT OF ADVANCE PROCEEDS.** By signing below, Merchant authorizes Funder to disburse the Advance proceeds less the amount of any applicable fees upon Advance approval by initiating ACH credits to the Designated Checking Account, in the amounts and at the times specified in the Merchant Agreement. **By signing below, Merchant also authorizes Funder to collect amounts due from Merchant under the Merchant Agreement by initiating ACH debits to the Designated Checking Account, as follows:**

In the amount of: $65,000.00

(Or) Percentage of each Banking Deposit:3.37%

On the Following Days: weekly.

If any payment date falls on a weekend or holiday, I understand and agree that the payment may be executed on the next business day. If a payment is rejected by Merchant's financial institution for any reason, including without limitation insufficient funds, Merchant understands that Funder may, at its discretion, attemptto process the payment again as permitted under applicable ACH rules. Merchant also authorizes Funder to initiate ACH entries to correct any erroneous payment transaction.

**MISCELLANEOUS.** Funder is not responsible for any fees charged by Merchant's bank as the result of credits or debits initiated under this Authorization Agreement. The origination of ACH debits and credits to the Designated Checking Account must comply with applicable provisions of state and federal law, and the rules and operating guidelines of NACHA (formerly known as the National Automated Clearing House Association). This Authorization Agreementis to remain in full force and effect until Funder has received written notification from Merchant at the address set forth below at least 5 banking days prior of its termination to afford Funder a reasonable opportunity to act on it. The individual signing below on behalf of Merchant certifies that he/she is an authorized signer on the Designated Checking Account. Merchant will not dispute any ACH transaction initiated pursuant to this Authorization Agreement, provided the transaction corresponds to the terms of this Authorization Agreement. Merchant requests the financial institution that holds the Designated Checking Account to honor all ACH entries initiated in accordance with this Authorization Agreement.

| | | | |
|---|---|---|---|
| Merchant: | UNCLE NEAREST, INC<br>(Merchant's Legal Name) | Date | 07/26/2024 |
| Title: | Owner | | |
| Print Name: | FAWN EVETTE WEAVER | Signature: | DocuSigned by: FAWN EVETTE WEAVER<br>AB9494805F41424... |

Initial: DS FEW DS FEW

**Bank Login Information**

Dear Merchant,

Thank you for accepting this offer from Dash Funding Source . We look forward to being your funding partner for as long as you need.

**Daily ACH Program:**

Dash Funding Source will require viewing access s to your bank account, each business day, in order to verify the amount of your daily payment. Please be assured that we carefully safeguard your confidential information, and only essential personnel will have access to it.

Dash Funding Source will also require viewing access to your bank account, prior to funding, as part of our underwriting process. Please fill out the form below with the information necessary to access your account.

* Be sure to indicate capital or lower case letters.

Name of Bank: ______________________

Bank portal website: ______________________

Username: ______________________

Password: ______________________

Security Question / Answer 1: ______________________

Security Question / Answer 2: ______________________

Security Question / Answer 3: ______________________

Any other information necessary to access your account: ______________________

DocuSigned by:
FAWN EVETTE WEAVER
AB9494805F41424...

Merchant / Owner Signature

07/26/2024

Date

# STACKING PENALTY AGREEMENT

In association with the Dash Funding Source agreement dated 07/26/2024, (the "Merchant Agreement"), I, FAWN EVETTE WEAVER, a Principal of UNCLE NEAREST, INC (the "Company"), located at 315 Deaderick Street, Nashville, TN 37238 do hereby attest and agree to the following terms and conditions:

- I represent that if the Company or any affiliated entities take any further financing from any other company, in any form whatsoever, without express written consent from Dash Funding Source that this action
  - (i) will be deemed an event of default of the Merchant Agreement and all balances plus fees will be immediately due; and
  - (ii) in addition, I agree to pay, and i give my full consent for Dash Funding Source to immediately debit my account, a penalty of 10% of the payback amount.

I hereby represent this statement to be true and accurate:

AGREED AND ACKNOWLEDGED:

| | Principal #1 | Principal #2 |
|---|---|---|
| Signature: | DocuSigned by: FAWN EVETTE WEAVER AB9494805F41424... | DocuSigned by: KEITH EDWARD WEAVER 4DE05F18EE5C40E... |
| Print Name: | FAWN EVETTE WEAVER | KEITH EDWARD WEAVER |
| Date: | 07/26/2024 | 07/26/2024 |

Initial: DS FEW DS KEW

# CLOSING STATEMENT

Merchant: UNCLE NEAREST, INC

| | |
|---|---|
| PURCHASE PRICE | $1,700,000.00 |
| ORIGINATION FEE | $35,000.00 |
| PAYING OFF EXISTING ADVANCE | $1,159,174.00 |
| SELLER TO RECEIVE | $505,826.00 |

By signing below, I agree to the above Closing Statement, and acknowledge that I am to receive the amount stated above, and fully understand the distribution of proceeds from the sale.

1. FAWN EVETTE WEAVER

DocuSigned by:
FAWN EVETTE WEAVER
AB9494805F41424...

Guarantor, individually and on behalf of Merchant

2. KEITH EDWARD WEAVER

DocuSigned by:
KEITH EDWARD WEAVER
4DE05F18EE5C40E...

Guarantor, individually and on behalf of Merchant

Dated: 07/26/2024

# Emergency Contacts

**3 emergency contacts are required to receive funding. Contacts are used if you cannot be reached and can be an employee, friend or family member.**

**Contacts will be verified.**

Name: FAWN EVETTE WEAVER

Relation: CEO

Phone Number: 6159777701

Email Address: fawn.weaver@unclenearest.com

Name:

Relation:

Phone Number:

Email Address:

Name:

Relation:

Phone Number:

Email Address:

# Dash Funding Source

## Balance Transfer Form

Merchant Legal Name ("Merchant"): FAWN EVETTE WEAVER
Merchant Title: Owner
Business Legal Name ("Business"): UNCLE NEAREST, INC
DBA: UNCLE NEAREST
Physical Address: 315 Deaderick Street
City: Nashville
State: TN
Zip: 37238

Date: 07/26/2024

Dash Funding Source

Date of new secured agreement: 07/26/2024
Date of previous secured agreement: 06/06/2024
Remaining RTR Balance: $1,159,174.00

To Whom It May Concern:

I, Merchant, on behalf of business, hereby authorize Company to debit the remaining RTR balance which is currently due and owing to Company pursuant to the previous secured merchant agreement, entered into by and between Company and business.

I acknowledge that as a result of the above-referenced debit, the amount paid to business by Company pursuant to the new secured agreement will be reduced by the amount of the remaining RTR.

Thank you,
By: DocuSigned by: FAWN EVETTE WEAVER AB9494805F41424...
Merchant Legal Name: FAWN EVETTE WEAVER
Title: Owner

DASH FUNDING SOURCE

# Sale of Future Receipts Agreement

This Sale of Future Receipts Agreement ("Agreement") effective, 11/25/2024, is made by and between Dash Funding Source ("Buyer", "we", or "us"), with its principal address at , each Seller identified below ("Seller" or "you"), and each person who signs this Agreement as a Guarantor (each a "Guarantor").

## Seller and Guarantor Information

| Seller Legal Name(s) | D/B/A | Entity type/where organized |
|---|---|---|
| UNCLE NEAREST | UNCLE NEAREST | Corporation/ TN |

| | |
|---|---|
| **Seller address** | 315 Deaderick Street, Nashville, TN 37238 |
| **Primary Contact Person For Sellers** | Name/title: FAWN EVETTE WEAVER, Owner<br>Address: 1409 Tennessee 82, Shelbyville, TN, 37160<br>Phone:<br>Email: |
| **Guarantor(s)** | FAWN EVETTE WEAVER<br>KEITH EDWARD WEAVER |

## Purchase Information

The transaction contemplated by this Agreement is a purchase of Future Receipts. "Future Receipts" means all payments received by Seller, or its right to receive such payments, in the ordinary course of Seller's business, including but not limited to (a) payments made by cash, check, Automated Clearing House ("ACH") or other electronic transfer; (b) payments, or rights to payments, made by credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card"); (c) accounts and payment intangibles; and (d) payments made by any other form. You will deliver the entire Purchased Amount of Future Receipts to us over time by allowing us to debit the Periodic Amount (which is subject to adjustment) on each Remittance Day. We will debit the Periodic Amount from one or more deposit accounts authorized by you for this purpose (each, an "Authorized Account").

| | |
|---|---|
| **Purchased Amount of Future Receipts**<br>$2,658,100.00 | **How we calculated the Periodic Amount**<br>The Periodic Amount is the Specified Percentage of the average sales revenue we estimate you will receive. Our estimate is based on a review of your past revenue. We used information you provided to us to make this estimate. Beginning on the first Remittance Day, the Periodic Amount will be the amount identified on this page. You have the right to adjust the Periodic Amount to better reflect actual revenue as it changes over time. Please refer to Section 4 (Reconciliation Process) to learn how you can adjust the Periodic Amount. |
| **Purchase Price**<br>$1,900,000.00 | |
| **Periodic Amount**<br>$69,950.00 | **Remittance Days will occur** (The option marked ☒ applies):<br>☐ Every Week Day (i.e., Monday through Friday)<br>☑ Weekly*<br>*We will notify you of the day or days on which each Remittance Day will occur. |
| **Specified Percentage**<br>5.41% | |

| **Amounts Deducted from Purchase Price:** | |
|---|---|
| Prior balance paid to Buyer | $1,233,379.00 |
| Prior balance paid to third parties | $0.00 |
| Origination fee | $57,000.00 |
| Total Amount Deducted From Purchase Price | $1,290,379.00 |
| **Net Funded Amount**<br>This is the Purchase Price minus the Total Amount Deducted from Purchase Price. This is the total dollar amount of funds to be deposited into your Authorized Account.<br>The Net Funded Amount may change if the amounts needed to satisfy any prior balances changes between when we prepared this Agreement and funding. | $609,621.00 |

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
19
4:25-CV-00038



Initial ial
Initials

1. **Sale of Future Receipts.** Seller hereby sells and assigns to Buyer, without recourse, the Purchased Amount of Future Receipts described above. As payment for the Purchased Amount, Buyer agrees to pay Seller the Purchase Price shown above and Seller will receive funds equal to the Net Funded Amount.

2. **Buyer's Acceptance of Agreement.** The obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Net Funded Amount, shown above, into any Authorized Account. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to any Authorized Account and the ability to withdraw the initial Periodic Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

3. **Delivery of Purchased Amount.** If Remittance Days are to occur on a frequency other than daily, then Buyer will notify Seller on or before the date Buyer has accepted this Agreement, of the day of the week or month (as applicable) on which Remittance Days will occur. The Purchased Amount will be delivered to Buyer each Remittance Day in a series of remittances each equal to the Periodic Amount. Seller authorizes Buyer to debit an Authorized Account on each Remittance Day, by initiating an ACH debit entry or by creating a remotely created check or electronically created item, in the amount of the initial Periodic Amount or, following any adjustment pursuant to Section 4 (Reconciliation Process), the adjusted Periodic Amount. For this purpose, Seller shall provide Buyer with all required account information and will provide an appropriate ACH authorization to Buyer. Seller agrees not to change any account information without prior written consent from Buyer. If a Remittance Day occurs on a bank holiday, Seller authorizes Buyer to initiate a debit entry on the next day on which Seller's bank is open in an amount equal to the Periodic Amount and, if Remittance Days are scheduled to occur every Week Day, Buyer may initiate the debit entry in an amount equal to the Periodic Amount scheduled for the next day, plus the Periodic Amount that would have been debited on the preceding bank holiday. If any ACH entry, check, or electronically created item is returned or rejected for insufficient funds, then Seller will pay Buyer a returned entry fee of $30. In addition, Seller will reimburse Buyer for any charges incurred by Buyer resulting from the returned ACH entry, check, or electronically created item. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement.

4. **Reconciliation Process (IMPORTANT PROTECTION FOR SELLER).** The Periodic Amount is based on an estimate of the Specified Percentage of Seller's Future Receipts. At any time, Seller or Buyer have the right to require a new review of Seller's revenue for the purpose of evaluating whether the Periodic Amount continues to accurately reflect the Specified Percentage of Seller's actual revenue for the period reviewed (a "reconciliation").

   a. **How Seller may Request a Reconciliation**. Seller may request a reconciliation in writing via regular mail or email to .

   b. **How Buyer may Request a Reconciliation.** Buyer may request a reconciliation in writing via regular mail or e-mail.

   c. **Reconciliation Review.** After receiving or making a request for reconciliation pursuant to this Agreement, Buyer shall calculate Seller's average revenue for the 30-day period preceding the reconciliation request (the "Review Period"). Seller shall cooperate with any reconciliation by providing bank statements or other records of Seller's actual revenue received during the Review Period ("Reconciliation Information"). Reconciliation Information may be provided electronically. Seller shall also provide Buyer with any assistance or other information needed to access or view any Reconciliation Information. Upon receipt of the Reconciliation Information, Buyer shall promptly (but no later than 3 calendar days following such receipt) calculate whether the total of all Periodic Amounts remitted to Buyer during the Review Period was greater than the Specified Percentage of Seller's actual revenue during the Review Period (an "excess") or less than the Specified Percentage of Seller's actual revenue during the Review Period (a "shortfall").

   d. **Adjusting the Periodic Amount.** If there was an excess, then Buyer shall decrease the Periodic Amount for each subsequent Remittance Day. If there was a shortfall, then Buyer may (but is not required to) increase the Periodic Amount for each subsequent Remittance Day. In either case, Buyer shall adjust the Periodic Amount to an amount equal to the Specified Percentage of Seller's reasonably anticipated average revenue, based on the Reconciliation Information. After an adjustment, the Periodic Amount shall remain unchanged until a subsequent adjustment occurs in accordance with this Section.

   e. **Failure to Provide Reconciliation Information.** If Seller requests a reconciliation and fails to provide the Reconciliation Information within 10 calendar days after Seller's reconciliation request, Buyer may consider Seller's reconciliation request withdrawn. If Buyer requests a reconciliation and Seller fails to provide the Reconciliation Information within 10 calendar days after Buyer's reconciliation request, Buyer may adjust the Periodic Amount based on the best information reasonably available to Buyer.

   f. **Additional Reconciliation.** In addition to adjusting the Periodic Amount as described above, either party may, in connection with any reconciliation, request an additional reconciliation. Upon such a request, Buyer will review the Reconciliation Information and calculate the excess or shortfall for the prior month, if any, as described above. Within 5 business days after making that calculation, Buyer shall credit the amount of any excess, or debit the amount of any shortfall, by initiating the appropriate credit or debit entry to the Authorized Account.

5. **Changing the Remittance Day.** The parties may change the frequency of the Remittance Day pursuant to this Section. The effective date of any change to the Remittance Day is referred to herein as the "Change Effective Date". Any change to the Remittance Day will be accompanied by a change to the Periodic Amount immediately following the Change Effective Date. The process for requesting changes to the Remittance Day and calculation of the Periodic Amount is described below.

   a. Changing Remittance Day to occur each Week Day. Either Buyer or Seller may request that a weekly Remittance Day be changed to occur on each Week Day. The party requesting a change must notify the other party in accordance with Section 19 (Notices). The Change Effective Date shall take effect promptly, but no later than one week from the date such notice is either sent or received by Buyer. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to the Periodic Amount immediately prior to the Change Effective Date, divided by five.

   b. Changing Remittance Day to occur weekly. When the Remittance Day is scheduled to occur each Week Day, the Remittance Day may be changed to occur weekly, but only if both parties agree to such change in writing (which may be memorialized in an electronic record, including email). To be effective, both parties must agree on the day each Remittance Day will occur. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to the Periodic Amount immediately prior to the Change Effective Date, multiplied by five.

   c. Effect on reconciliation. Following any Change Effective Date, subsequent adjustments to the Periodic Amount pursuant to Section 4 (Reconciliation Process) shall account for the change in the frequency of the Remittance Day as described above.

6. **Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN).** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer. Buyer assumes the risk that Future Receipts may be remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business goes bankrupt or Seller otherwise ceased operations in the ordinary course of business. Buyer is buying the Purchased Amount knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount and Seller retains no legal or equitable interest therein.

7. **Fees and Charges.** The fees and charges owed by Seller are as described in this Agreement. Some or all of the Origination Fee may be paid to a broker. Otherwise, Buyer is NOT CHARGING ANY BROKER FEES to Seller. If Seller is charged another such fee, Seller acknowledges that it is not being charged by Buyer.

8. **Early Delivery Option.** If this Agreement contains an Early Delivery Schedule, then Seller may at its option elect to pay the remaining balance of the Purchased Amount to Buyer on an accelerated basis in a discounted amount described in the Early Delivery Schedule attached to this Agreement (the "Early Delivery Option"). The Early Delivery Option is subject to any conditions identified in the Early Delivery Schedule.

9. **Credit Report and Financial Information Authorizations.**

   a. Seller and each of the Guarantors signing above authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of the Guarantors for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its owners, and (iii) to contact personal and business references provided by Seller to Buyer, at any time now or for so long as Seller and/or Guarantors continue to have any obligations to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

   b. Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, banking or financial statements, tax returns, etc., as Buyer deems necessary and reasonable prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate.

   c. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

10. **Authorization to Contact Current and Prior Banks.** Seller authorizes all of its banks and brokers and its Payment Card processor(s) to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon a breach of this Agreement. Seller hereby further authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collection purposes and in order to confirm that Seller is exclusively using an Authorized Account for the deposit of all Future Receipts of the Seller.

11. **Right to Cancel.** Seller understands that Buyer offers Seller a right to cancel this Agreement at any time within 3 calendar days after Buyer has delivered the Net Funded Amount to Seller. Seller may exercise this right by notifying Buyer that it is cancelling this Agreement and paying to Buyer the following amount in immediately available U.S. funds: (a) the Net Funded Amount, and (b) any portion of the Purchase Price that was advanced to third parties. Seller's right to cancel shall be effective only if Buyer receives both the notice and the required payment no later than 5:00 PM Eastern Time on the third calendar day following the date on which Seller received the Net Funded Amount.

12. **Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

13. **Representations, Warranties and Covenants of Seller.** As of the date of this Agreement and, unless expressly stated otherwise, continuing until Buyer has received the Purchased Amount and all fees and charges due under this Agreement, Seller represents, warrants and covenants to Buyer as follows:

    a. **No Interference.** Seller must deposit all Future Receipts into an Authorized Account on a daily basis and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into an Authorized Account on a daily basis. Seller agrees not to (i) change any Authorized Account without the express written consent of Buyer, (ii) create any new depository account, (iii) revoke Buyer's authorization to debit an Authorized Account, (iv) close an Authorized Account without the express written consent of Buyer or, (v) take any other action that denies, or interferes with, Buyer's rights under this Agreement, including but not limited to Buyer's right to receive its share of revenue received by Seller.

    b. **Stacking Prohibited.** Seller shall not, without Buyer's prior written consent, enter into: (a) any other agreement for the sale of Future Receipts, or (b) any loan agreement that encumbers Seller's Future Receipts or requires daily payments. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

    c. **Financial Condition and Financial Information.** Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly and accurately represent the financial condition of Seller at such dates. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations at the time they are provided. Seller further agrees to authorize the release of any past or future tax returns to Buyer.

    d. **Compliance with Law and Governmental Approvals.** Seller is in compliance and shall comply with all applicable federal, state and local laws, rules and regulations and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the businesses in which it is presently engaged and/or will engage in hereafter.

    e. **Authority to Enter Into This Agreement.** Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

    f. **Change of Name or Location or Sale or Closing of Business.** Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. As of the date of this Agreement, Seller does not plan to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller will not voluntarily close its business on a temporary basis for renovations, repairs, or any other voluntary purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health

of fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer 10 calendar days' notice to the extent practicable.

g. **No Pending or Contemplated Bankruptcy as of the Date of this Agreement.** As of the date of this Agreement: (a) Seller has not filed, and does not plan to file, any petition for bankruptcy protection under Title 11 of the United States Code, (b) there has been no involuntary petition brought or pending against Seller, and (c) Seller has not received any communication from any third party indicating that an involuntary petition will be filed against Seller. Seller has not consulted with a bankruptcy attorney or a debt relief organization within six months prior to the date of this Agreement. Seller further warrants that, as of the date of this Agreement, it does not plan to engage the services of a debt relief organization.

h. **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes and other assessments, including but not limited to employment, sales and use taxes.

i. **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement does not conflict with and will not violate any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement that prohibits the sale or pledge of Seller's Future Receipts.

j. **Seller's Knowledge and Representation.** Seller represents, warrants, and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

k. **Accurate and Complete Information.** Seller represents, warrants, and agrees that all information provided to Buyer and all statements made to Buyer relating to this transaction in any way have been truthful, accurate, and complete. Seller further agrees that Seller will be truthful in all future statements to Buyer, and will provide Buyer with accurate and complete information regarding Seller's business as required by this Agreement.

l. **Seller as a Commercial Entity.** Seller is a sophisticated business entity familiar with the type of transaction described under this Agreement, and has had a full opportunity to consult with counsel of their choice, and has consulted with counsel or has decided not to avail themselves of that opportunity.

**14. Rights of Buyer.**

a. **Acknowledgment of Security Interest and Security Agreement.** The sale of Future Receipts pursuant to this Agreement shall constitute and shall be construed and treated for all purposes as a true and complete sale from Seller to Buyer, conveying good title to the Future Receipts free and clear of any liens and encumbrances. To the extent the Future Receipts include any "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the Seller is located ("UCC") then: (i) the sale of such accounts or payment intangibles creates a security interest as defined in the UCC, (ii) this Agreement constitutes a security agreement under the UCC, and (iii) Buyer has all the rights of a secured party under the UCC with respect to such accounts or payment intangibles. Seller further agrees that, with or without a breach of this Agreement, Buyer may notify account debtors, or other persons obligated on the Future Receipts, or holding the Future Receipts, of Seller's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Buyer.

b. **Financing Statements.** Seller authorizes Buyer to file one or more UCC-1 forms consistent with the UCC to give notice that the Purchased Amount is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit any Authorized Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

c. **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter during regular business hours, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer; and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

d. **Phone Recordings and Contact.** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions, (ii)


Initial
Initial
FEW

that such communications and contacts are not unsolicited or inconvenient, and (iii) that any such contact may be made at any phone number, email address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

e. **ACH Authorization.** Seller represents and warrants that, with respect to any authorization provided by Seller to permit Buyer to initiate ACH debit or credit entries to an Authorized Account ("ACH Authorization"): (i) each Authorized Account is solely owned by Seller; (ii) any person executing an ACH Authorization on behalf of Seller is an authorized signer on the Authorized Account and has the power and authority to authorize Buyer to initiate ACH transactions to and from the Authorized Account, and (iii) the Authorized Account is a legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes. If an ACH entry is rejected by Seller's bank for any reason other than a stop payment order placed by Seller with its bank, including without limitation insufficient funds, Seller agrees that Buyer may resubmit up to two times any ACH entry that is dishonored. Seller's bank may charge Seller fees for unsuccessful ACH entries. Seller agrees that Buyer will have no liability to Seller for such fees. In the event Buyer makes an error in processing any ACH entry, Seller authorizes Buyer to initiate ACH entries to the applicable Authorized Account to correct the error. Seller acknowledges that the origination of ACH entries to and from an Authorized Account must comply with applicable law and applicable network rules. Seller agrees to be bound by the Rules and Operating Guidelines of Nacha (formerly known as the National Automated Clearing House Association). Seller will not dispute any ACH entry initiated pursuant to an ACH Authorization, provided the entry corresponds to the terms of the ACH Authorization. Seller requests the bank that holds the Authorized Account honor all ACH entries initiated in accordance with an ACH Authorization.

15. **Remedies for Seller's Breach of this Agreement.** If Seller violates or fails to comply with any term or covenant in this Agreement, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

a. Buyer may increase the Specified Percentage to 100% and may adjust the Periodic Amount to reflect the new Specified Percentage.

b. Buyer shall have the right to collect the full undelivered Purchased Amount plus all fees and charges (including collection and legal fees as more fully described in this Agreement) assessed under this Agreement, which will become due and payable in full immediately.

c. Buyer may enforce the provisions of the Guaranty of Performance against each Guarantor.

d. Buyer may require Seller to pay Buyer all reasonable costs associated with Seller's breach. If demanded by Buyer, Seller shall pay Buyer a collection charge in an amount equal to 25% of the undelivered balance of the Purchased Amount (the "Default Charge") which shall be applied to Buyer's actual costs to enforce its rights under this Agreement. In the event the Default Charge exceeds Buyer's actual costs of enforcement, Seller shall be entitled to a refund of any excess. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover judgment against Seller, Seller shall be liable for all of Buyer's costs, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

e. Buyer may debit depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on any of Seller's banking accounts for all sums due to Buyer.

f. Subject to the arbitration provisions of this Agreement, all rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of breach, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

16. **Modifications, Amendments.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same is in writing and signed by Buyer.

17. **Assignment.** Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

18. **Multiple Sellers.** If more than one person or entity is listed as a Seller above, then the term "Seller" refers collectively to all Sellers who have signed the signature page of this Agreement. The term "Future Receipts" refers to the Future Receipts of each Seller and the calculation of the initial Periodic Amount and any adjustment to the Periodic Amount shall be based on an aggregate of the actual or projected sales revenue of all the Sellers. Each Seller agrees that Buyer's purchase of Future Receipts hereunder constitutes a purchase of the Future Receipts of all the Sellers. Each Seller agrees that it is jointly and severally liable



Initial

Initial

to Buyer for the obligation to deliver the Purchased Amount from its own Future Receipts. Each Seller agrees that the release of any other Seller from any obligations under this Agreement, whether in whole or in part, will not limit, reduce, release, or impair such Seller's obligations to Buyer, including the obligation to deliver the undelivered balance of the Purchased Amount. Each Seller designates the Primary Contact Person identified above as its authorized representative for all purposes related to this Agreement and any related transactions. Buyer may treat any notice or instruction received from the Primary Contact Person as a notice or instruction from all Sellers.

**19. Notices.**

a. **Notices from Buyer.** Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller and Guarantor (as applicable) by regular mail or (at Buyer's option) by e-mail to the Primary Contact Person. Seller and each Guarantor agrees that the Primary Contact Person is authorized to receive all communications on behalf of Seller and each Guarantor. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to the Primary Contact Person at the address set forth above or such new address communicated by the Primary Contact Person to Buyer pursuant to this Section.

b. **Notices from Seller and Guarantor.** Unless another method of notice to Buyer is specifically described in this Agreement, Seller and Guarantor may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller and Guarantor to Buyer must be delivered by certified mail, return receipt requested, to Buyer at 366 N. Broadway, Jerico, NY 11753. Notices sent to Buyer shall become effective only upon receipt by Buyer.

**20. Binding Effect, Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer, Guarantor and their respective successors and assigns, except that neither Seller nor Guarantor shall have the right to assign its respective rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. Except as set forth in the Arbitration section, this Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regard to any applicable principles of conflicts of law. Each Seller and Guarantor understands and agrees that (i) Buyer is located in New York, (ii) Buyer makes all decisions from Buyer's office in New York, (iii) the Agreement is made in New York (that is, no binding contract will be formed until Buyer receives and accepts Seller's signed Agreement in New York, and (iv) Seller's payments are not accepted until received by Buyer in New York. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Each Seller and Guarantor agrees that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, each Seller and Guarantor waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum. Unless prohibited by law, Buyer, Seller and Guarantor further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**21. Survival of Representations, Warranties and Covenants.** All representations, warranties and covenants herein of the parties shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

**22. Interpretation.** All parties hereto have had the opportunity to review this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice or have been provided sufficient opportunity to have an attorney of their choosing review the Agreement. No construction determinations shall be made against Buyer as drafter.

**23. Entire Agreement and Severability.** This Agreement embodies the entire agreement among Seller, Guarantor, and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**24. Execution.** Facsimile signatures, or any other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes. The parties agree that if a duly authorized representative of each of the parties signs this Agreement and transmits such Agreement to the other party via facsimile or electronically transmitted portable document format, such transmission shall be treated in all manner and respects as an original signature (or counterpart thereof) and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of a party hereto, each other party hereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine or electronic transmission in portable document format to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or electronic transmission


Initial Initials Initial FEW

Docusign Envelope ID: E279D22A-E423-4B4A-9BDA-842BD7BDCC03

in portable document format as a defense to this Agreement and each such party forever waives any such defense. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement.

**25. Authorization to Contact.**

a. **Authorization to Contact by Phone.** Seller and Guarantor authorize Buyer, its affiliates, agents and independent contractors to contact Seller or Guarantor at any telephone number Seller or Guarantor provide to Buyer or from which Seller or Guarantor places a call to Buyer, or any telephone number where Buyer believes it may reach Seller or Guarantor, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller or Guarantor incurs charges for receiving such communications.

b. **Authorization to Contact by Other Means.** Seller and Guarantor also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller and Guarantor. Seller and Guarantor expressly consent to conduct business by electronic means.

**26.** Service of Process. Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the address(es) set forth on the first page of this Agreement or any other address(es) provided in writing to the Purchaser by any Merchant or Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the address(es) set forth on the first page of this Agreement if it does not furnish a certified mail receipt signed by the Purchaser that the Purchaser was provided with notice of a change in the contact address(es).

**27. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH PARTY MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ACKNOWLEDGE THEIR RIGHT TO REVIEW THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**28. CLASS ACTION WAIVER. BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTIES AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR A COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT), AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**29. ARBITRATION. IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. IF BUYER, SELLER OR ANY GUARANTOR DO NOT REACH AN AGREEMENT TO RESOLVE THE CLAIM WITHIN 30 DAYS AFTER THE NOTICE IS RECEIVED, BUYER, SELLER OR ANY GUARANTOR MAY COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR THE FORUM. BUYER WILL PROMPTLY REIMBURSE SELLER OR GUARANTOR FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR FORUM RULES. SELLER AND GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS**

Docusign Envelope ID: E279D22A-E423-4B4A-9BDA-842BD7BDCC03

**PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.**

30. **RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: DASH FUNDING SOURCE, 366 N. BROADWAY, JERICO, NY 11753 ATTENTION: ARBITRATION OPT-OUT.**

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, and further agrees that this transaction is for business purposes.

**Seller: UNCLE NEAREST**

Name: FAWN EVETTE WEAVER

Title: Owner

Address: 315 Deaderick Street, Nashville, TN 37238

TAX ID: [redacted]5348

By: Signed by: FAWN EVETTE WEAVER AB9494805F41424... (signature)

**Agreement of Guarantor:** By signing below each Guarantor agrees to the terms and conditions contained in this Agreement, and further agrees that this transaction is for business purposes.

Notice: This Agreement contains a guaranty of performance, and by signing below, you agree that you will be personally liable for the prompt and complete performance of the Guaranteed Obligations as described in the GUARANTY OF PERFORMANCE section above.

Guarantor Name: FAWN EVETTE WEAVER Guarantor Signature: Signed by: FAWN EVETTE WEAVER AB9494805F41424...

Signer's Title Owner

Guarantor Name: KEITH EDWARD WEAVER Guarantor Signature: Signed by: KEITH EDWARD WEAVER 4DE05F18EE5C40E...

Signer's Title Owner

**GUARANTY OF PERFORMANCE – Each of the undersigned Guarantors agrees to the following terms:**

31. **Guaranteed Obligations.** Guarantor agrees to irrevocably, absolutely and unconditionally guarantee to Buyer prompt and complete performance of the following obligations of Seller (the "Guaranteed Obligations"):

    a. Seller's obligation to not (i) change any Authorized Account without the express written consent of Buyer, (ii) create any new depository account, (iii) revoke Buyer's authorization to debit an Authorized Account, (iv) close an Authorized Account

without the express written consent of Buyer or (v) take any other action that denies, or interferes with, Buyer's rights under this Agreement, including but not limited to Buyer's right to receive its share of revenue received by Seller;

b. Seller's obligation to not conduct Seller's businesses under any name other than as disclosed to Buyer;

c. Seller's obligation to not change any of its places of business without prior written consent by Buyer;

d. Seller's obligation to not voluntarily sell, dispose, transfer or otherwise convey its business or substantially all business assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer;

e. Seller's obligation to not enter into any other agreement for the sale of Future Receipts, or any loan agreement that encumbers Seller's Future Receipts or requires daily payments with any party other than Buyer without Buyer's prior written consent for the duration of this Agreement; and

f. Seller's obligation to provide truthful, accurate, complete and timely information as required by this Agreement.

32. **Guarantor Waivers.** Buyer does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under the Agreement and this Guaranty of Performance if it is not notified of: (i) Seller's failure to timely perform any obligation under the Agreement, (ii) any adverse change in Seller 's financial condition or business, (iii) Buyer's acceptance of the Agreement, and (iv) any renewal, extension or other modification of the Agreement or Seller 's other obligations to Buyer. In addition, Buyer may take any of the following actions without releasing Guarantor from any of its obligations under the Agreement and this Guaranty of Performance: (i) renew, extend or otherwise modify the Agreement or Seller's other obligations to Buyer, and (ii) release Seller from its obligations to Buyer. Guarantor shall not seek reimbursement from Seller or any other guarantor for any amounts paid by it under the Agreement or this Guaranty of Performance. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Seller, or any other guarantor, for any amounts paid by it, or acts performed by it, under the Agreement or this Guaranty of Performance: (i) subrogation, (ii) reimbursement, (iii) performance, (iv) indemnification, or (v) contribution.

33. **Guarantor Acknowledgement**. Each Guarantor acknowledges that Guarantor understands the seriousness of the provisions of the Agreement, including the following Sections: Credit Report and Financial Information Authorizations; Notices; Binding Effect, Governing Law, Venue and Jurisdiction; Survival of Representations, Warranties and Covenants; Interpretation; Entire Agreement and Severability; Execution; Authorization to Contact; Jury Waiver; Class Action Waiver; Arbitration; and Right to Opt Out of Arbitration.

34. **Service of Process**. Each Merchant and each Guarantor consent to service of process and legal notices made by First Class or Priority Mail delivered by the United States Postal Service and addressed to the address(es) set forth on the first page of this Agreement or any other address(es) provided in writing to the Purchaser by any Merchant or Guarantor, and unless applicable law or rules provide otherwise, any such service will be deemed complete upon dispatch. Each Merchant and each Guarantor agrees that it will be precluded from asserting that it did not receive service of process or any other notice mailed to the address(es) set forth on the first page of this Agreement if it does not furnish a certified mail receipt signed by the Purchaser that the Purchaser was provided with notice of a change in the contact address(es).

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK. SIGNATURE PAGE FOLLOWS.]**



Initial als Initial FEW

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, and further agrees that this transaction is for business purposes.

**Seller:** **UNCLE NEAREST**

Name: FAWN EVETTE WEAVER

Title: Owner

By:________ Signed by: FAWN EVETTE WEAVER AB9494805F41424... _____ (signature)

**Agreement of Guarantor:** By signing below each Guarantor agrees to the terms and conditions contained in this Agreement, and further agrees that this transaction is for business purposes.

Notice: This Agreement contains a guaranty of performance, and by signing below, you agree that you will be personally liable for the prompt and complete performance of the Guaranteed Obligations as described in the GUARANTY OF PERFORMANCE section above.

Guarantor Name: FAWN EVETTE WEAVER Guarantor Signature: _ Signed by: FAWN EVETTE WEAVER AB9494805F41424... ____________

Signer's Title Owner

Guarantor Name: KEITH EDWARD WEAVER Guarantor Signature: _ Signed by: KEITH EDWARD WEAVER 4DE05F18EE5C40E... ____________

Signer's Title Owner





Initials: FEW

## AUTHORIZATION AGREEMENT
## FOR AUTOMATED CLEARING HOUSE TRANSACTIONS

This Authorization Agreement is provided to Dash Funding Source ("Buyer") by each Seller identified on the Signature Page to this Authorization Agreement. This Authorization Agreement is provided pursuant to the Sale of Future Receipts Agreement (the "Sale Agreement") entered into between such Seller and the Buyer. Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Sale Agreement.

By signing this Authorization Agreement, each Seller agrees to the following:

Seller hereby authorizes Buyer to present automated clearing house (ACH) debits to the account identified on the Signature Page to this Authorization Agreement in the amount of any Periodic Amount due on a Remittance Day, or any other amount due to Buyer from Seller (or otherwise authorized to be debited) under the terms of the Sale Agreement, as it may be amended, supplemented or replaced from time to time. Seller acknowledges that each such identified account is an "Authorized Account" as defined in the Sale Agreement. Seller also authorizes Buyer to initiate credit entries to deliver the Net Funded Amount to Seller and authorizes Buyer to initiate additional entries (debits and credits) to any Authorized Account to correct any erroneous transfers.

If Seller breaches the Sale Agreement, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Sale Agreement.

Seller authorizes Buyer to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the Authorized Account and to correct any missing, erroneous or out-of-date information.

Seller represents and warrants that each Authorized Account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller agrees to be bound by the Rules and Operating Guidelines of Nacha. Seller understands and agrees that any revocation or attempted revocation of this Authorization Agreement will constitute a breach of the Sale Agreement. In the event that Seller closes an Authorized Account, or the Authorized Account has insufficient funds for any ACH transaction under this Authorization Agreement, Seller authorizes Buyer to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization Agreement to such additional account(s). To the extent necessary, Seller grants Buyer a limited Power of Attorney to take action in Seller's name to facilitate this Authorization Agreement.

Seller understands that the Authorization Agreement is a fundamental condition to induce Buyer to enter into the Sale Agreement. Consequently, this Authorization Agreement is intended to be irrevocable during the course of the Sale Agreement and shall remain in full force and effect until Buyer has received all amounts due or that may become due to Buyer under the Sale Agreement.

[Signature Page follows]



Initial ials Initial FEW

## Signature Page to Authorization Agreement

By signing below, each Seller represents that it is the holder of the account identified immediately above its signature, and agrees that such account is an "Authorized Account" account as described in the Authorization Agreement.

| | |
|---|---|
| **Account Name:** **(Name of account exactly as it appears on Seller's bank statement)** | UNCLE NEAREST |
| **Bank Name:** | JPMORGAN CHASE |
| **ABA Transit/Routing Number:** | [redacted]0326 |
| **Account Number:** | [redacted]1065 |
| **Seller Signature** | UNCLE NEAREST<br>Signature: Signed by: FAWN EVETTE WEAVER AB9494805F41424...<br>Name/Title of Signer: FAWN EVETTE WEAVER, Owner |

# Emergency Contacts

**3 emergency contacts are required to receive funding. Contacts are used if you cannot be reached and can be an employee, friend or family member.**

**Contacts will be verified.**

Name: FAWN EVETTE WEAVER

Relation: self

Phone Number: 9319281917

Email Address: fawn.weaver@unclenearest.com

Name:

Relation:

Phone Number:

Email Address:

Name:

Relation:

Phone Number:

Email Address:

# Dash Funding Source

## Balance Transfer Form

Merchant Legal Name ("Merchant"): FAWN EVETTE WEAVER
Merchant Title: Owner
Business Legal Name ("Business"): UNCLE NEAREST
DBA: UNCLE NEAREST
Physical Address: 315 Deaderick Street
City: Nashville
State: TN
Zip: 37238

Date: 11/25/2024

Dash Funding Source ("Company")

Date of new secured agreement: 11/25/2024
Date of previous secured agreement: 06/27/2024
Remaining RTR Balance: $1,233,379.00

To Whom It May Concern:

I, Merchant, on behalf of business, hereby authorize Company to debit the remaining RTR balance which is currently due and owing to Company pursuant to the previous secured merchant agreement, entered into by and between Company and business.

I acknowledge that as a result of the above-referenced debit, the amount paid to business by Company pursuant to the new secured agreement will be reduced by the amount of the remaining RTR.

Thank you,
By: Signed by: FAWN EVETTE WEAVER AB9494805F41424...
Merchant Legal Name: FAWN EVETTE WEAVER
Title: Owner

COPY

IN THE CHANCERY COURT
FOR THE SEVENTEENTH JUDICIAL DISTRICT
AT BEDFORD COUNTY, TENNESSEE

| | | |
|---|---|---|
| **GRANT SIDNEY, INC., FAWN WEAVER, and KEITH WEAVER,** | ) | FILED 12/29/2025 1:42 O'clock P m Curt M. Cobb, C & M By Mia Cantrell |
| **Plaintiffs,** | ) | **CIVIL ACTION** |
| **v.** | ) | **Case No.** 35594 |
| **MICHAEL SENZAKI, and ZMS STRATEGIES, INC.** | ) | **JURY DEMAND** |
| **Defendants.** | ) | |

## COMPLAINT

### JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to Tenn. Code Ann. § 16-10-101. This action is brought by Plaintiffs Grant Sidney, Inc., as well as by Fawn Weaver and Keith Weaver in their individual capacities, to redress direct, personal injuries arising from Defendants' tortious misconduct as described in this Complaint.

2. Venue is proper in Bedford County, Tennessee under Tenn. Code Ann. § 20-4-101(a) because the acts and omissions giving rise to Plaintiffs' claims occurred in Bedford County, the personal and professional harm to Plaintiffs was suffered there, Plaintiffs reside in Bedford County and the underlying juridic entity through which the Defendants performed their wrongful acts was founded in and at all times conducted its primary business in Bedford County.

### PARTIES

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
20

3. Plaintiff Grant Sidney, Inc. ("Grant Sidney") is a Delaware corporation with its principal place of business in Bedford County, Tennessee. Grant Sidney brings this action in its own right, not derivatively, for direct injuries it sustained as a result of Defendants' misconduct and the conspiracy alleged herein, including the misuse, diversion, and impairment of Grant Sidney's own assets and rights, and harm inflicted on Grant Sidney as a specific, intended target of Defendants conduct.

4. Plaintiff Fawn Weaver is an individual residing in Bedford County, Tennessee. Ms. Weaver brings this action in her individual capacity for direct personal injuries caused by the diversion of her personal equity interests and fraudulent use of signature authority, false and defamatory statements made against her, and severe reputational and financial harm caused by Defendants' actions and their foreseeable consequences.

5. Plaintiff Keith Weaver is an individual residing in Bedford County, Tennessee. Mr. Weaver brings this action in his individual capacity for direct personal injuries, including reputational damage, professional harm, and substantial personal financial losses caused by Defendants' conduct and its foreseeable consequences, including actions taken against him personally and with malice.

6. Defendant Michael Senzaki ("Senzaki") is an individual residing in Las Vegas, Nevada who – at all times material hereto – conducted business in Bedford County, Tennessee as a part of the conspiracy described in this Complaint. At all relevant times, Senzaki occupied a senior finance leadership role in a company founded by Plaintiffs, that afforded Senzaki extraordinary access to Plaintiffs' personal signatures, equity-related instruments, and sensitive personal and financial information. Senzaki abused that access to further a conspiracy to harm

Plaintiffs and to advance his and his Co-Conspirators' own personal objectives, including by using corporate and third-party vehicles under his control.

7. Defendant ZMS Strategies, Inc. is a closely held Oregon corporation owned by Senzaki and utilized by him as a co-conspirator in order to further the tortious conduct set forth herein.

8. Unindicted Co-Conspirators. At all relevant times, Senzaki acted in concert with one or more entities and individuals not yet named as defendants, including a corporation he controlled in Oregon named herein as Defendant ZMS Strategies, Inc. and other persons presently unknown to Plaintiffs (collectively, the "Co-Conspirators"). Plaintiffs will amend this Complaint to name such Co-Conspirators when their identities and roles are confirmed through discovery. Hereinafter, the Defendants shall be sometimes collectively referred to as "Co-Conspirators" or "Conspirators."

9. Plaintiffs seek redress solely for the direct and personal harm caused to them, not for generalized injury to Uncle Nearest or its shareholders as a whole.

## PRELIMINARY STATEMENT

10. This case arises from a deliberate and coordinated scheme of actual fraud and fraudulent concealment carried out by the Co-Conspirators—led by Defendant Michael Senzaki, the former Chief Financial Officer of Uncle Nearest, Inc. ("Uncle Nearest")—who abused the extraordinary trust placed in him by Uncle Nearest's founders, Plaintiffs Fawn Weaver, Keith Weaver, and Grant Sidney, Inc. Exercising exclusive control over Uncle Nearest's financial reporting systems, Senzaki knowingly suppressed expenses, concealed material liabilities, and falsified the company's true financial condition as a part of the conspiracy set forth in this Complaint. As part of this scheme, and without the knowledge or consent of the Weavers,

Defendants wrongfully hypothecated and pledged Ms. Weaver's equity interests based upon false pretenses and material misrepresentations, thereby exposing Plaintiffs to liabilities they neither approved nor incurred. When the fraud began to unravel, Defendants and their Co-Conspirators intentionally manufactured and disseminated a false public narrative—including the claim that Uncle Nearest had simply overextended itself—to conceal their own misconduct, shift blame to the founders, and legitimize the consequences of the fraud. That narrative was knowingly false, was created at Defendants' behest, and caused Plaintiffs profound reputational, financial, and personal harm, independent of and apart from any privileged litigation activity.

11. The consequences of Defendants' misconduct were neither abstract nor confined to the corporate entity. They were direct, foreseeable, and profoundly personal. As an intended result of Defendants' fraud, fraudulent concealment, and the unauthorized hypothecation of Ms. Weaver's equity, Defendants and their Co-Conspirators deliberately advanced a false public narrative portraying Ms. Weaver and Mr. Weaver as having personally caused or guaranteed corporate indebtedness they neither approved nor incurred. That narrative—manufactured to conceal Defendants' own misconduct—inflicted both immediate and severe ongoing reputational harm. Ms. Weaver, whose professional credibility and public trust are central to her livelihood, suffered the cancellation of multiple confirmed speaking engagements, and loss of board opportunities; resulting in losses of more than one million dollars $1,000,000 to date. Mr. Weaver likewise sustained substantial personal financial harm when more than $1,750,000 in committed funding for his separate and unrelated business ventures was suspended indefinitely, not because of any wrongdoing on his part, but because Defendants' false narrative created uncertainty and stigma as to his personal financial integrity and obligations.

12. Ms. Weaver's equity interests were not incidental compensation; they were the centerpiece of her personal and financial sacrifice, and Defendants knew it. Unlike typical founders who extract value through salary, bonuses, or liquidity events, Ms. Weaver deliberately chose to be compensated almost entirely through equity, receiving between $0 and $90,000 per year in cash compensation, and she never sold a single equity interest for personal gain. Any equity interests that were sold were sold solely for the benefit of Uncle Nearest, with all proceeds loaned back in their entirety. Mr. Weaver likewise subordinated his personal interests, abandoning approximately $1,000,000 in annual compensation beginning in October 2023 to support the company's growth, receiving no ongoing salary, holding no equity interest whatsoever, and serving without personal financial benefit. Defendants and their Co-Conspirators understood that Plaintiffs' earned and vested equity compensation and personal economic interests related to Uncle Nearest represented both extraordinary economic value and deep personal reliance, and they seized upon that reality. By targeting and diluting the very interests Ms. Weaver had chosen in lieu of compensation, Defendants knowingly created conditions in which third parties were more willing to assist in the scheme—understanding that impairing those equity interests would exert maximum leverage, inflict maximum harm, and facilitate participation in transactions that would never have occurred absent the false pretenses and fraudulent concealment orchestrated by Defendants.

13. During this same period, Ms. Weaver's responsibilities required constant national travel—often five to six days per week, spanning hundreds of markets and more than twenty military bases—where she served as the public face of the brand, meeting with distributors, national account buyers, and community leaders. That work was essential not only to Uncle Nearest's growth and visibility, but to Ms. Weaver's own professional standing and personal reputation. In her unavoidable physical absence from company headquarters, Ms. Weaver

reasonably relied on Defendant Senzaki, as Chief Financial Officer, to safeguard financial operations and to act with honesty and fidelity. Instead, Senzaki and his Co-Conspirators knowingly exploited that reliance, abused positions of trust, and orchestrated a scheme that inflicted direct and personal harm on Plaintiffs themselves. The injuries alleged herein—including reputational damage, lost speaking and professional opportunities, personal financial losses, and impairment of individual business relationships—were intended to impact Plaintiffs personally, were suffered by them individually, and did not arise merely from harm to the company. These damages were a foreseeable and deliberate consequence of Defendants' misconduct and were inflicted for the purpose of shifting blame, exerting leverage, and concealing Defendants' own fraud.

## BACKGROUND

### Fraudulent Conduct and Admissions of Defendant

14. Defendant Senzaki's misconduct inflicted devastating, direct, and deeply personal harm on Plaintiffs Fawn Weaver, Keith Weaver, and Grant Sidney, Inc., wholly independent of any injury to the company Uncle Nearest, itself. Among his most egregious acts was the knowing misappropriation, dilution, and unauthorized transfer of Ms. Weaver's earned and vested equity compensation, which constituted her primary—and deliberately chosen—form of remuneration for years spent building the company and was valued in the tens of millions of dollars. At all relevant times, these equity interests and options were earned, vested, and the personal property of Ms. Weaver, issued to her annually as compensation for services rendered and not subject to revocation, transfer, pledge, or encumbrance without her knowledge and consent. Senzaki nevertheless treated those interests as expendable assets to be leveraged, impaired, and conveyed through false pretenses and material concealment, knowing that targeting Ms. Weaver's equity

would inflict maximum personal harm, supply leverage for third-party participation in the scheme, and advance the broader effort to conceal Defendants' fraud. The Co-Conspirators nevertheless treated Ms. Weaver's equity interests as their own, purporting to transfer, pledge, assign, or otherwise dispose of them in their own names and through entities they controlled, and presenting those interests to third parties as though they possessed authority and ownership they did not have.

15. In other instances, an internal investigation confirmed that Senzaki caused Ms. Weaver's earned and vested equity to be transferred without her knowledge or consent through forged stock transfer certificates executed in her name, in direct violation of governing authorization requirements and ownership records. He then leveraged and encumbered portions of this stolen equity for his personal benefit, using it to obtain favorable personal loans and advantages in unrelated financial transactions, all while concealing the transfers and misrepresenting his authority. These acts were intentional, covert, and deeply personal—a calculated abuse of trust by a senior officer and his Co-Conspirators who knowingly converted compensation that did not belong to them, exploited exclusive access to the company's most sensitive ownership records, and enlisted third parties through false pretenses to advance and conceal his misconduct.

16. Senzaki was hired at a moment when Uncle Nearest had no operating revenue and existed solely on initial investor capital—a phase that demanded exceptional financial discipline and absolute integrity from anyone entrusted with control over the company's finances. His engagement was the product of a deliberate and careful decision, not haste or informality. The Weavers' had known Senzaki for more than a decade through his wife, then a close personal friend whom Ms. Weaver reasonably believed to be trustworthy, and whose representations regarding Senzaki's professional background proved consistent over time. Those representations included

his work as a Sarbanes–Oxley specialist at Ernst & Young, his participation in taking Baja Fresh public and its subsequent sale to Wendy's, and his later senior financial leadership roles, including at iPayment. Senzaki was thereafter recruited as Chief Financial Officer of Trellis Earth, where he was promoted by the board to serve successively as CFO, COO, and ultimately CEO. The length, consistency, and upward trajectory of Senzaki's career, observed over many years, supported the Weavers' decision to place confidence in him. That confidence was further informed by the company's earliest realities: confidentiality was paramount due to the expectation of a potential intellectual-property dispute with one of the nation's largest spirits conglomerates, making a broad or public executive search impractical. The role therefore required someone already known to the founders—someone with verifiable credentials, demonstrated experience, and whom the Weavers reasonably believed could be trusted with the company's most sensitive financial and ownership information at its most vulnerable stage.

17. As set forth in this Complaint, Senzaki utilized the extraordinary trust placed in him by Plaintiffs and conspired with the Co-Conspirators to implement a brazen and fraudulent scheme involving forged instruments and tens of millions of dollars of diversions of capital and Plaintiffs' earned and vested equity compensation and personal equity interests.

18. **Vendor Diversion Scheme**. For example, as part of a broader, deliberate scheme of actual fraud and fraudulent concealment, Defendant Senzaki exploited his exclusive access to the company's financial systems to divert funds, conceal liabilities, and misappropriate company resources for personal benefit—not by bypassing controls, but by corrupting the very controls the Weavers designed to prevent abuse. In order to effectuate this scheme, Senzaki and the Co-Conspirators dealt in Plaintiffs' personal equity interests, earned and vested equity compensation, and related rights in order to impair those interests and strip them of value.

19. **Abuse of Rigorous Executive Approval Process.** Throughout the relevant period, Ms. Weaver implemented and personally enforced a strict, non-delegable approval process for all vendor payments. Each week—despite extensive national travel to build the company's footprint—Ms. Weaver participated in a standing Zoom meeting with the Chief Financial Officer and Comptroller during which every invoice scheduled for payment was reviewed line by line. If Ms. Weaver did not recognize a charge, she required it to be returned to the originating department for explanation and confirmation. No invoice was authorized for payment absent her express approval. The purpose of this process was exacting and unequivocal: no company funds were to be disbursed without the Chief Executive Officer's personal review and consent. Among other things, the Co-Conspirators abused the foregoing process in the following ways:

- **Exploitation of System Access After Approval.** Senzaki exploited the one place concealment was possible—inside the software implementing Ms. Weaver's approved decisions. Using a permissions loophole within the Bill.com platform that was invisible to executive review, Senzaki altered invoices after approval had been given and after Ms. Weaver reasonably believed payments were locked. Immediately following weekly approval meetings, he reopened the payment queue, reduced the amount payable to legitimate vendors, and created mirror entries payable to Co-Conspirators and entities he secretly owned or controlled. The system marked both entries as "paid," falsely reflecting full satisfaction of vendor obligations while concealing the diversion behind the appearance of completed transactions.

- **Conversion Through Access, Not Inattention.** Senzaki did not exploit inattentiveness or weak oversight; he exploited trust and privileged access. He converted a control process so rigorous that it required the Chief Executive Officer's personal approval into the

instrument of his fraud, deliberately defeating safeguards designed to prevent precisely this type of misconduct.

20. **Concealment of Vendor Liabilities.** Following Senzaki's departure in October 2024, Plaintiffs discovered that substantial vendor obligations had been concealed for an extended period, ultimately exceeding $7,000,000, exclusive of principal and interest obligations owed to Farm Credit Mid-America ("FCMA"). To determine the scope of the concealment, Plaintiffs were forced to retain a temporary three-person accounts-payable team to contact nearly four hundred vendors and obtain statements of outstanding invoices. The independent third-party investigation revealed multiple concealment techniques employed by Senzaki, including:

- partially paying vendors while falsely marking invoices as fully satisfied;
- removing invoices from the accounting system altogether; and

failing to enter invoices into the system at all.

- While some concealed amounts were diverted to Co-Conspirators and entities

Senzaki owned or controlled, others were hidden to artificially inflate reported performance metrics upon which Senzaki's personal compensation and perceived success depended.

21. Once the scope of the misconduct was uncovered, Plaintiffs were forced to undertake extraordinary, time-consuming, and personally disruptive efforts to identify, trace, and begin recovering equity value and ownership rights that had been wrongfully diverted from them. That work required Plaintiffs themselves—rather than any corporate proxy—to engage investigators, reconstruct financial and ownership records, respond to misinformation, and take corrective action to stabilize their personal and professional standing. In the process, and for the first time in either of their professional careers, Plaintiffs were compelled to make painful and highly visible decisions, including significant cost reductions and workforce changes, under

circumstances created entirely by Defendants' misconduct. These actions subjected the Weavers to intense personal stress, public scrutiny, and reputational harm, and imposed direct financial and emotional burdens that were borne by Plaintiffs individually, independent of and in addition to any injury suffered by the company itself.

22. **Forged Corporate Documents and False Reporting**. Defendants further advanced and concealed their scheme by fabricating corporate records and falsifying documentation to manufacture the appearance of authority and approval they did not possess. They prepared false board minutes purporting to reflect approvals by the Weavers that never occurred, affixed Ms. Weaver's signature to corporate documents without her knowledge or consent, and purported to submit materially false financial reports to FCMA, knowing and intending that those reports would be relied upon in lending decisions, collateral positions, and enforcement posture. These were not clerical errors or isolated lapses. They were deliberate fabrications, undertaken to mislead third parties, to legitimize unauthorized transactions, and to shield Defendants' misconduct from detection by Plaintiffs

23. Defendant and his Co-Conspirators have admitted the foregoing misconduct to third-party investigators retained to examine irregularities in Uncle Nearest's finances and ownership records and surrounding equity transactions and activity under the Co-Conspirators' control. In those admissions, Defendant Senzaki — acting individually and through entities he controlled and in conjunction with Co-Conspirators —acknowledged diverting and impairing Plaintiffs' equity interests and company funds without authorization, confirmed that the misconduct was intentional, sustained over years, and deliberately concealed, and admitted that misappropriated equity value and funds were used to purchase a residence in Las Vegas, acquire vehicles, and engage in gambling activities. Defendant Senzaki and his Co-Conspirators further

admitted that the scheme necessarily targeted Ms. Weaver's personal equity interests and Plaintiffs' earned and vested equity compensation, because those interests represented the only meaningful source of value from which Defendants could profit. By diluting, encumbering, pledging, and converting Ms. Weaver's equity (and Plaintiffs' earned and vested equity compensation) without consent, Defendant and his Co-Conspirators acted as unauthorized equity holders, appropriating ownership rights and economic benefits that belonged exclusively to Plaintiffs. These admissions establish that the misconduct was not incidental or collateral, but directed squarely at Plaintiffs' equity and corporate interests in Uncle Nearest, and was undertaken for the specific purpose of enriching Defendant and his Co-Conspirators by stealing, exploiting, and monetizing ownership interests that were not theirs—inflicting direct and personal harm on Plaintiffs as the intended and indispensable result of the scheme.

**Manipulation of Financial Reporting and Unilateral Credit Drawdowns**

24. Between July 2022, when the revolving credit facility for Uncle Nearest was first established at $35,000,000, and August 2023, when FCMA increased that facility to approximately $66,980,000, Defendant and his Co-Conspirators exercised exclusive control over lender-facing reporting and communications in furtherance of a deliberate plan to appropriate and dilute Ms. Weaver's equity interests. During that period, Defendant and his Co-Conspirators concealed legitimate operating expenses, suppressed vendor payables, and distorted the company's bottom-line financial picture—not merely to expand borrowing capacity, but to create the false appearance of financial strength necessary to justify transactions that impaired Ms. Weaver's personal equity interests and earned and vested equity compensation, and transferred economic control to Defendants themselves. These distortions were intentionally withheld from Plaintiffs, while being affirmatively and purportedly presented to the lender as accurate, knowing and intending that

FCMA would officially claim reliance on them in setting collateral, leverage, and enforcement posture. The scheme depended on recharacterizing and diminishing Ms. Weaver's equity while Defendants and their affiliates functioned as unauthorized equity holders, extracting value and control that did not belong to them. The resulting lender reliance and downstream actions were not accidental or merely contractual; they were the foreseeable and intended consequences of a plan that required the erosion of Plaintiffs' personal equity interests and earned and vested equity compensation, and they culminated in direct, personal harm to Plaintiffs, including false attributions of responsibility and improper actions taken against the Weavers individually for obligations they neither guaranteed nor incurred.

25. As Chief Financial Officer, Defendant and his Co-Conspirators exercised exclusive control over the preparation, content, and transmission of recurring collateral, covenant, and borrowing-base reports submitted to FCMA, and Defendant routinely acted as the sole point of contact on lender matters that carried direct and foreseeable personal consequences for Ms. Weaver's personal equity interests and Plaintiffs' earned and vested equity compensation. By Defendants' own admissions to independent third-party investigators, key lender-facing submissions were intentionally withheld from Plaintiffs, while purportedly being presented to FCMA in a form that concealed the company's true expense burden and outstanding obligations. Defendant and his Co-Conspirators further misrepresented and suppressed material technical requirements embedded in the loan documentation, including provisions that, if accurately disclosed, would have fundamentally altered Plaintiffs' understanding of risk, exposure, and the vulnerability of Plaintiffs' personal equity interests and earned and vested equity compensation related to Uncle Nearest. Plaintiffs reasonably relied on their Chief Financial Officer to interpret and administer these technical lending provisions in good faith and for the protection of their

ownership and associated interests. Defendant and his Co-Conspirators instead exploited that reliance, embedding deception inside the very systems designed to provide oversight and accountability, and doing so in a manner calculated to be undetectable through ordinary executive review, while enabling Defendants to function as unauthorized equity holders by diverting control, value, and economic benefit away from the Weavers and toward themselves.

26. Plaintiffs had no knowledge of, and no involvement in, any effort to mislead the lender or include the lender in any of the Co-Conspirators' plans. When Defendant and his Co-Conspirators presented proposed credit-limit increases to Ms. Weaver, for example, those proposals were framed as routine, appropriate, and prudently secured, while material underlying information was intentionally withheld or manipulated. In particular, Defendant and his Co-Conspirators suppressed operating expenses and vendor payables, distorted the company's true bottom-line condition, and concealed risks that directly threatened Plaintiffs' equity and value within Uncle Nearest — thereby inducing purported lender confidence that could not have existed absent the fraud. That false financial narrative was later repurposed and laundered by Defendant and his Co-Conspirators into a public explanation designed to conceal their own misconduct, falsely portraying Plaintiffs or their privies as having caused or guaranteed financial obligations they neither approved nor incurred. This narrative shift was not incidental; it was a necessary component of the scheme, intended to deflect scrutiny from the theft and impairment of Plaintiffs' personal equity interests and earned and vested equity compensation, while enabling Defendant and his Co-Conspirators to continue acting as unauthorized equity holders of Uncle Nearest at Plaintiffs' expense and for the financial benefit of the Co-Conspirators.

27. In reality, the revolving facility expanded through two distinct mechanisms, each of which Defendant and his Co-Conspirators exploited to advance their plan to impair and

appropriate Ms. Weaver's equity interests. First, the original July 22, 2022 Credit Agreement embedded automatic credit increases, including an $8,000,000 increase on the first anniversary carrying a $40,000 fee payable to FCMA, that were triggered without any requirement of contemporaneous executive explanation or meaningful review. Second, a series of amendments executed between October 2022 and December 2023 (Amendment Nos. 1–7) required Ms. Weaver's signature, which she provided in good-faith reliance on her Chief Financial Officer's representations regarding risk, compliance, and the protection of her equity position. Defendant and his Co-Conspirators deliberately used the distinction between automatic increases and signature-based amendments to fragment disclosure, suppress material information, and ensure that expansions of borrowing capacity—each of which increased pressure on and vulnerability of Ms. Weaver's equity—did not consistently come before Ms. Weaver for clear, complete, and meaningful evaluation. This structural manipulation was not incidental; it was integral to a scheme that depended on incremental leverage increases occurring without full transparency, thereby enabling Defendant and his Co-Conspirators to continue acting as unauthorized equity holders while steadily diluting and endangering the founders' equity interests in Uncle Nearest including Ms. Weaver's personal equity interests.

28. Several amendments were deliberately structured to obscure their cumulative effect on ownership, control, and equity exposure, making incremental changes difficult to track in real time and masking their practical impact on Plaintiffs' position. Defendant and his Co-Conspirators exploited this opacity, together with Defendants' exclusive control over the timing, framing, and substance of disclosures to Plaintiffs, to advance transactions that operated as de facto equity reallocations rather than ordinary debt adjustments. This exploitation was particularly consequential because Uncle Nearest's strength and market position were such that the lender did

not require personal guarantees from the founders—a circumstance that made equity, not personal liability, the true locus of risk and value. Knowing that meaningful lender participation in a closely held enterprise necessarily implicates equity interests in one form or another, Defendant and his Co-Conspirators used their control to insert themselves and their affiliates into the economic position of equity holders, while simultaneously diluting and impairing Ms. Weaver's ownership without consent. When the resulting consequences began to surface publicly, Defendant and his Co-Conspirators conspired to create a false narrative that portrayed the founders as personally responsible for obligations they neither guaranteed nor incurred. That silence preserved the benefits of the equity theft of the Co-Conspirators while permitting Plaintiffs' goodwill, reputations, and professional standing to absorb the damage necessary to conceal Defendants' misconduct.

29. Although the amendments Ms. Weaver signed nominally expanded only borrowing capacity, Defendant and his Co-Conspirators ensured that the real transfer of economic power occurred through the execution of twenty-eight (28) individual drawdowns, each undertaken by Defendant Senzaki on his own authority and without full contemporaneous disclosure to Plaintiffs. Under FCMA's written policy procedures, those drawdowns could be requested and funded within twenty-four (24) hours, without independent confirmation from any other company officer and without notice to Ms. Weaver—even though she was the company's principal decisionmaker and sole authorized signatory for material facility changes affecting ownership and control. Defendant and his Co-Conspirators exploited that asymmetry to obtain unchecked access to tens of millions of dollars, which they used not merely to fund operations, but to reshape economic control, impair Plaintiffs' founders interests, and position themselves and their affiliates as de facto equity holders. By separating borrowing authority from ownership oversight, Defendants were able to convert

debt drawdowns into instruments of equity dilution and value diversion, concealing the resulting harm until irregularities were uncovered through investigation. This structure—and Defendants' deliberate exploitation of it—was integral to a scheme that depended on stealth, speed, and exclusion of the rightful equity holders in order to succeed.

30. Documentary evidence confirms that Defendant and his Co-Conspirators exercised unilateral control over drawdowns and routinely executed loan notices without FCMA requiring the knowledge, consent, or confirmation of Ms. Weaver—the company's principal decisionmaker and primary equity holder. By way of example, on May 10, 2023, Defendant emailed FCMA senior credit officer Jonathan Boyce a loan notice requesting a $1,070,000 advance dated May 8, 2023; on July 26, 2023, he transmitted another notice requesting $7,000,000; and on August 1, 2023, he sent two additional notices requesting $930,000 and $1,060,000 within less than two hours of each other. Each notice—titled "Loan Notice [date] revolv.docx"—was executed solely by Defendant in his purported capacity as Chief Financial Officer and contained representations that were treated as binding on Uncle Nearest, notwithstanding their direct and foreseeable impact on Ms. Weaver's equity interests. Over a thirteen (13) month period, Defendant processed twenty-eight (28) such drawdown requests totaling nearly $67,000,000, effectively exercising economic control normally reserved to equity holders while excluding the actual owner from notice, approval, or oversight. At no point did any representative of FCMA contact Ms. Weaver to confirm that she had approved—or was even aware of—these drawdowns, a structural failure that Defendant and his Co-Conspirators knowingly exploited to substitute themselves into the position of equity holders, divert value, and dilute Plaintiffs' personal equity interests and earned and vested equity compensation without consent. Representative loan notices and corresponding communications evidencing this conduct are attached as Exhibits 10—12.

**Manufactured False Narrative Regarding Personal Responsibility for Corporate Debt and Resulting Individual Harm**

31. At no time did Fawn Weaver or Keith Weaver personally guarantee any loan obligations owed to FCMA. They were not borrowers, co-borrowers, or guarantors under the applicable credit agreements, bore no personal contractual liability for the company's indebtedness, and were never advised that their personal assets or credit were at risk. This phenomenon occurred because of the strength of the brand built by Plaintiffs, unique not only in the spirits industry but in American entrepreneurial history in general. The only way for the Co-Conspirators to effectuate their scheme was to attack the underbelly of risk involving inherent trust placed in corporate officers and fiduciaries.

32. Defendant Senzaki and his Co-Conspirators intentionally created, advanced, and allowed to circulate a false narrative portraying Plaintiffs as having personally caused, controlled, or stood behind the company's debt obligations. That narrative was manufactured by Defendants and Co-Conspirators as part of their broader scheme to conceal equity theft, deflect scrutiny from their own misconduct, and legitimize the consequences of transactions that had impaired Plaintiffs' interests. Defendant and his Co-Conspirators communicated this narrative—directly and indirectly, formally and informally—to third parties, including lender representatives, advisors, and market participants, knowing and intending that it would be relied upon, repeated, and acted upon.

33. Although the precise contents, timing, and recipients of each publication are presently known only to Defendants and their Co-Conspirators, Plaintiffs allege upon information and belief that Defendant and his Co-Conspirators disseminated and reinforced this false narrative through oral statements, written communications, and strategic omissions, both before and outside

of any judicial proceeding. Defendant further affirmatively chose silence at moments when correction was necessary and expected, knowing that such silence would be understood as confirmation and would permit the narrative to harden and spread. Plaintiffs allege these publications and omissions according to proof and will seek leave to amend to identify specific speakers, recipients, and republications as discovery proceeds.

34. The personal consequences of this narrative were immediate and severe. As a direct result of being falsely portrayed as personally responsible for corporate financial misconduct, Ms. Weaver suffered the cancellation of confirmed speaking engagements and professional opportunities, resulting in losses of more than $1,000,000 to date. Those engagements and opportunities constituted a significant portion of her personal income and were distinct from, and independent of, any role she held at Uncle Nearest.

35. Mr. Weaver likewise sustained substantial individual harm. As a foreseeable result of the same false narrative, $9,750,000 in committed funding for his separate and unrelated business ventures was placed on indefinite hold. Those ventures have no operational, financial, or ownership connection to Uncle Nearest, and the funding freeze arose solely from reputational uncertainty created by Defendants' misconduct and the false portrayal of Mr. Weaver's personal financial responsibility.

36. All Plaintiffs suffered additional harm according to proof as a result of the Co-Conspirators intentional publications designed to cover up and perfect their theft and impairment of Plaintiffs' personal equity interests and earned and vested equity compensation related to Uncle Nearest.

37. Plaintiffs seek redress solely for the direct, personal harm caused by Defendant and his Co-Conspirators' intentional creation and dissemination of a false and defamatory narrative,

and their knowing failure to correct it, which inflicted reputational and financial injury on Plaintiffs in their individual capacities and was an essential component of the conspiracy to appropriate and exploit Plaintiffs' equity interests.

**Unauthorized Transfer of Mrs. Weaver's Stock Options**

38. Defendant Senzaki and his Co-Conspirators further harmed Plaintiffs by knowingly converting, transferring, and encumbering Ms. Weaver's earned and vested equity compensation — valued in the tens of millions of dollars — without her knowledge or consent, as part of their broader scheme to appropriate and exploit Ms. Weaver's ownership interests. These equity interests were not incidental holdings; they constituted Ms. Weaver's principal form of compensation from the company's founding forward. Ms. Weaver deliberately limited her cash salary to between $0 and $90,000 per year, choosing instead to build long-term value through equity in reliance on the integrity of the company's financial leadership. At no time did the company's official corporate records reflect any authorized transfer, reassignment, pledge, or encumbrance of these equity interests. Only after Senzaki's separation from the company were forged stock transfer certificates discovered, purporting to evidence reassignments of Ms. Weaver's equity that had never been approved, executed, or disclosed. Those certificates were fabricated to appear legitimate, were created and deployed by Defendant and his Co-Conspirators to insert themselves into the economic position of equity holders, and were used to enrich Defendants while deliberately concealing the theft from Ms. Weaver and the company's leadership. This misconduct targeted Ms. Weaver's compensation and ownership directly and was an essential component of the conspiracy to steal, dilute, and monetize equity that did not belong to Defendants.

39. The forged stock transfer certificates were fabricated, executed, and circulated by Defendant and his Co-Conspirators without notice to Ms. Weaver or Plaintiffs, without board authorization, and without any legitimate supporting documentation, and were never reflected in the company's lawful corporate records. Their existence came to light only after Senzaki's departure, when company leadership obtained and reviewed the documents and confirmed that no authorized corporate officer had approved, issued, or ratified any such transfers. The certificates bore forged or falsified signatures purporting to authorize transactions that never occurred and were created to manufacture the appearance of legitimate equity reallocation – all of which hypothecated not only Ms. Weaver's equity interest but Plaintiffs' founders' interests in Uncle Nearest as well. These documents were not ancillary misconduct; they were central instruments of a calculated scheme to misappropriate Plaintiffs' equity compensation and to substitute Defendant and his Co-Conspirators into the economic position of equity holders. The threatened loss and impairment of those interests represents not only a substantial financial injury to Plaintiffs, but the intentional conversion of their primary form of compensation and a profound breach of trust by an executive who knowingly abused long-standing personal and professional access. This conduct formed an integral part of the same coordinated pattern of fraud, concealment, and deception through which Defendant and his Co-Conspirators advanced their own interests by stealing, diluting, and monetizing equity that belonged exclusively to Plaintiffs.

**Additional Forged Documents and Unauthorized Use of Ms. Weaver's Signature**

40. Defendant and his Co-Conspirators engaged in additional acts of forgery and falsification by applying Ms. Weaver's signature to material financial documents without her knowledge, authorization, or consent, as part of the same scheme to conceal liabilities and appropriate control and equity value. In one such instance, after affirmatively confirming to Ms.

Weaver in writing that no loans existed outside of the company's primary credit facility, Defendant used the DocuSign platform to fraudulently affix Ms. Weaver's signature to an amendment to a bridge-loan agreement in the principal amount of approximately $2,525,000. Ms. Weaver did not authorize the amendment, was not informed of its execution, and did not consent to the transaction. The falsification was undertaken to manufacture apparent approval, conceal additional indebtedness that directly threatened Ms. Weaver's equity interests, and further Defendants' and his Co-Conspirators' ability to act as unauthorized equity holders by shifting risk, control, and value away from the rightful owners and toward themselves.

41. The forged amendment was discovered only after Defendants' departure, when an investor sought clarification regarding rights purportedly granted under the amended agreement—rights that directly affected ownership, control, and priority interests. An internal review, followed by an independent third-party investigation, confirmed that the digital signature did not originate from Ms. Weaver's DocuSign account and had been applied without her authorization or knowledge. The use of Ms. Weaver's forged signature manufactured consent where none existed, created obligations and concessions she never approved, and further evidenced that Defendant and his Co-Conspirators were willing to impersonate her approval whenever necessary to advance their objectives. This conduct was not opportunistic or isolated; it was consistent with a broader pattern in which Defendant and his Co-Conspirators substituted themselves for the rightful equity holders by falsifying authority, concealing risk, and reallocating economic rights through deception.

42. The forged amendment remains the subject of an ongoing independent investigation, the results of which have already confirmed that Defendants' misconduct was not isolated, inadvertent, or technical, but deliberate, calculated, and repeated over time. Defendant and his Co-Conspirators repeatedly treated Ms. Weaver's consent and Plaintiffs' involvement in

the transfer, impairment, or encumbrance of their personal equity interests and earned and vested equity compensation as optional, forging Ms. Weaver's signature, fabricating approvals, and misrepresenting Plaintiffs' assent whenever doing so advanced their objectives. This conduct was undertaken knowingly and systematically, and reflects a conscious decision to displace Ms. Weaver's authority as lead equity holder, to bypass lawful governance, and to reallocate economic rights of Plaintiffs through deception. These acts were integral components of a sustained pattern of fraud, concealment, and abuse of trust that underlies Plaintiffs' claims and through which Defendant and his Co-Conspirators sought to enrich themselves at Plaintiffs' direct expense.

**Conspiracy and Concerted Action with Unindicted Co-Conspirators**

43. Defendant Senzaki did not act in isolation. At all relevant times, he knowingly acted in concert not only with his company ZMS Strategies, Inc. but with one or more individuals and entities whose identities are presently unknown to Plaintiffs in furtherance of a coordinated scheme that caused direct, foreseeable, and personal harm to Plaintiffs Fawn Weaver, Keith Weaver, and Grant Sidney, Inc.

44. The object of the conspiracy was not merely concealment of internal misconduct, but the advancement of Defendants' personal objectives through the misappropriation and impairment of Plaintiffs' personal equity interests and earned and vested equity compensation, the impersonation of Ms. Weaver's consent through forged and falsified documents, and the manufacture and maintenance of a false narrative designed to deflect scrutiny from Defendants' actions while shifting blame and reputational harm onto Plaintiffs personally.

45. In furtherance of the conspiracy, Defendant and the Co-Conspirators committed overt acts, including but not limited to:

(a) preparing, circulating, and relying upon forged and falsified documents purporting to evidence approvals by Ms. Weaver that never occurred;

(b) misrepresenting ownership, authority, and control over equity and contractual rights belonging to Plaintiffs;

(c) concealing, altering, or manipulating financial information after it had passed through ordinary executive review; and

(d) defaming Plaintiffs and then strategically withholding corrective information that Defendant and the Co-Conspirators knew would have prevented Plaintiffs from being falsely portrayed as absentee business leaders and personally responsible for financial misconduct.

46. Defendant further advanced the conspiracy by maintaining exclusive control over communications with third parties whose actions he knew—or deliberately avoided knowing—would carry serious personal consequences for Plaintiffs. Defendant understood that his false statements, omissions, and calculated silence would foreseeably result in Plaintiffs being treated as personally culpable for obligations they did not incur and wrongdoing they did not commit, and he chose not to correct the record because the persistence of that false narrative served his own interests.

47. Certain Co-Conspirators occupied positions within or adjacent to the company's finance and reporting functions, reporting directly or indirectly to Defendant, and thereby enabled him to neutralize internal controls, suppress dissent, and embed deception within systems specifically designed to ensure accuracy and accountability. Other Co-Conspirators operated outside the company, receiving and acting upon misrepresented or incomplete information supplied by Defendant in ways that predictably amplified the personal harm to Plaintiffs.

48. Plaintiffs do not presently name all of the Co-Conspirators as defendants because the full scope of their identities, roles, and knowing participation remains uniquely within Defendants' possession and control. Plaintiffs expressly reserve the right to amend this Complaint to add additional defendants and allegations as discovery reveals further facts confirming participation in the conspiracy alleged herein.

49. As a direct and proximate result of the conspiracy and the overt acts taken in furtherance of it, Plaintiffs suffered severe, measurable, and personal injuries, including the loss and impairment of earned and vested equity compensation and personal equity interests, reputational destruction, loss of professional income, and the freezing of guaranteed funding for unrelated business ventures. These injuries were not incidental, but were the intended and foreseeable consequences of Defendants' conduct and the concerted actions of his Co-Conspirators.

**COUNT ONE: BREACH OF LOYALTY (DIRECT)**

50. The Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 49 as if fully set forth herein.

51. By virtue of his position as Chief Financial Officer, Defendant Senzaki owed direct duties of loyalty, honesty, and good faith to Plaintiffs, including Fawn Weaver, Keith Weaver and Grant Sidney, Inc., arising from the extraordinary personal trust placed in him, his access to Plaintiffs' personal signatures and earned and vested equity compensation and personal equity interests, and his role as the sole interpreter and gatekeeper of critical financial and lending information with foreseeable personal consequences for Plaintiffs.

52. Those duties required Defendant to act with undivided loyalty toward Plaintiffs, to disclose material facts known to him that affected Plaintiffs personally, to refrain from

impersonating Plaintiffs' consent, and to refrain from using his position of trust, authority, and access to advance his own interests at Plaintiffs' expense.

53. Defendant breached those duties in multiple deliberate and self-interested ways, including by: (a) converting and misappropriating Plaintiffs' earned and vested equity compensation and personal equity interests for his own benefit; (b) forging or falsifying documents purporting to evidence authorization by Ms. Weaver that never occurred; (c) diverting approved payments to entities he secretly controlled; (d) concealing material financial information after it had passed through executive review; and (e) maintaining deliberate silence while a false narrative formed that Defendants knew or intended would cause direct personal harm to Plaintiffs.

54. Defendants' breach of loyalty was not limited to internal deception. Knowing that his misconduct had defamed Plaintiffs and created a false financial narrative, Defendant further breached his duties by allowing that narrative to be relied upon by third parties whose actions he knew would have severe personal consequences for Plaintiffs, including the public accusation of wrongdoing and the improper personal naming of non-guarantors in litigation. Defendant Senzaki could have corrected the record and protected Plaintiffs' reputations. He chose not to do so but instead continued to conspire with the Co-Conspirators to defame Plaintiffs in hopes to get away with his unlawful misappropriation.

55. Defendants' conduct was intentional, willful, and malicious. They acted with the knowledge that his disloyalty would cause direct and foreseeable harm to Plaintiffs, including the loss of earned and vested equity compensation, reputational destruction, loss of professional income, and the freezing of guaranteed funding for unrelated business ventures.

56. As a direct and proximate result of Defendants' breach of loyalty owed to Plaintiffs after Plaintiffs placed them in a position of trust as to Plaintiffs' personal equity interests and

earned and vested equity compensation related to Uncle Nearest, Plaintiffs have suffered substantial personal damages, including economic loss, reputational harm, loss of professional standing, and emotional distress. Plaintiffs are entitled to recover compensatory and punitive damages, together with such equitable and injunctive relief as the Court deems just and proper.

**COUNT TWO: BREACH OF FIDUCIARY DUTY**

57. The Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 56 as if fully set forth herein.

58. By virtue of his role and the extraordinary personal trust placed in him by Plaintiffs by allowing him access to and control over Plaintiffs' personal equity interests and signature authority, Defendant Senzaki owed direct fiduciary duties to Plaintiffs, including duties of honesty, candor, good faith, and loyalty arising from his access to Plaintiffs' personal signatures, earned and vested equity compensation, and his exclusive control over financial information and third-party communications that carried foreseeable personal consequences for Plaintiffs.

59. These fiduciary duties required Defendant to act with complete honesty toward Plaintiffs, to disclose material facts affecting them personally, to refrain from impersonating Plaintiffs' consent or misrepresenting their authorization, and to avoid using his position, access, or superior information to advance his own interests at Plaintiffs' expense.

60. Defendant breached these fiduciary duties through a sustained course of intentional misconduct, and conspired with the Co-Conspirators to aggravate the breaches in the following ways, including but not limited:

a. converting and misappropriating Plaintiffs' earned and vested equity compensation and personal equity interests for their own benefit;

b. forging or falsifying documents purporting to evidence authorization by Ms. Weaver that never occurred, including the misuse of her signature;

c. diverting funds and value approved to entities Defendants owned or controlled;

d. concealing material financial information after it had passed through executive review and withholding information Defendant knew Plaintiffs needed in order to protect themselves personally;

e. misrepresenting and allowing through defamatory means the persistence of a false narrative that Defendant knew would result in Plaintiffs being publicly accused of financial misconduct and named personally in litigation relating to obligations they did not guarantee; and

f. deliberately remaining silent when Defendant had the ability and obligation to correct false impressions that were causing Plaintiffs direct personal harm, but instead conspiring to expand the defamation against Plaintiffs and with malice and intent to injure Plaintiffs.

61. Defendants' fiduciary breaches were intentional, willful, and undertaken in bad faith. Defendant knew that his misrepresentations, impersonation, and deliberate silence would cause direct and foreseeable harm to Plaintiffs, including the loss of earned and vested equity compensation, reputational destruction, loss of professional income, emotional distress, and the freezing of guaranteed funding for unrelated business ventures.

62. As a direct and proximate result of Defendants' breach of fiduciary duties owed to Plaintiffs, Plaintiffs have suffered substantial personal damages, including economic loss, reputational harm, loss of professional standing, emotional distress, and costs incurred to investigate and remediate Defendants' misconduct.

63. Plaintiffs are entitled to recover compensatory and punitive damages resulting from Defendants' breach of fiduciary duty, together with pre- and post-judgment interest, costs, and such equitable and injunctive relief as the Court deems just and proper.

**COUNT THREE: FRAUD (DIRECT)**

64. The Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 63 as if fully set forth herein.

65. Defendant Senzaki knowingly and intentionally made false representations of material fact to Plaintiffs, and knowingly concealed material information from Plaintiffs, in circumstances where he had a duty of honesty and full disclosure arising from the personal trust placed in him, his exclusive control over critical financial information, and his access to Plaintiffs' personal signatures and earned and vested equity compensation. In all instances, these misrepresentations set forth below were made in conjunction with the Co-Conspirators.

66. Defendants' misrepresentations and omissions included, but were not limited to:

a. falsely representing that approved vendor payments were being disbursed as authorized when they had diverted funds to entities they owned or controlled;

b. concealing legitimate operating expenses and vendor payables after they had passed through executive review, thereby presenting a false bottom-line financial picture to Plaintiffs;

c. forging or falsifying documents and digital signatures, including Ms. Weaver's signature, to authorize transactions, amendments, and equity transfers that Plaintiffs never approved;

d. falsely representing that all borrowings and financial obligations had been properly disclosed and approved by Plaintiffs when they had not; and

e. assuring Plaintiffs that no loan obligations existed outside of the primary credit facility when Defendant had, in fact, forged Ms. Weaver's signature on a separate bridge-loan amendment.

67. Defendants made these misrepresentations and omissions intentionally, with the purpose of deceiving Plaintiffs, concealing their own misconduct, converting Plaintiffs' earned and vested equity compensation and personal equity interests, securing unearned bonuses and compensation, and preserving their position and authority for pecuniary gain through theft and diversion.

68. Plaintiffs reasonably relied on Defendants' misrepresentations and omissions. Ms. Weaver, as Chief Executive Officer, signed documents and made decisions based on Defendants' false assurances that financial information had been accurately reported and that no undisclosed obligations or unauthorized transactions existed. Plaintiffs had no reasonable means of discovering the truth due to Defendants' concealment and manipulation of systems under his exclusive control.

69. Defendants knew or should have known that Plaintiffs would rely on his representations and omissions, and that such reliance would expose Plaintiffs to direct and foreseeable personal harm, including the loss of earned and vested equity compensation, reputational destruction, loss of professional income, emotional distress, and exposure to false public accusations.

70. Defendants' fraudulent conduct was willful, malicious, and undertaken with reckless disregard for the truth.

71. As a direct and proximate result of Defendants' fraud, Plaintiffs have suffered substantial personal damages, including economic loss, loss of earned and vested equity compensation, reputational harm, loss of professional standing and income, emotional distress, and consequential damages.

72. Plaintiffs are entitled to recover compensatory and punitive damages resulting from Defendants' fraud, together with pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT FOUR: INJUNCTIVE RELIEF (DIRECT)**

73. The Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 72 as if fully set forth herein.

74. Through the fraudulent, disloyal, and deceptive conduct described above, Defendant Senzaki – for himself and for the benefit of all Co-Conspirators – obtained substantial personal benefits and property, including assets and proceeds traceable to the misappropriation of Plaintiffs' earned and vested equity compensation, the diversion of funds, and the use of forged and falsified documents.

75. Defendant Senzaki has demonstrated a pattern of concealment and evasive conduct, including altering accounting entries, deleting records, forging digital signatures, and misrepresenting authorization, all for the purpose of hiding misconduct and preventing its detection. Based on this demonstrated pattern, there is a substantial and immediate risk that Defendant Senzaki will further conceal, dissipate, transfer, or encumber assets traceable to his misconduct before final judgment can be entered.

76. Plaintiffs lack an adequate remedy at law to prevent the irreparable harm that would result from the loss, concealment, or dissipation of such assets. Once transferred or concealed, assets obtained through Defendants' misconduct may be impossible to trace or recover, rendering any later monetary judgment ineffective.

77. Absent injunctive relief, Defendants are likely to continue engaging in conduct designed to frustrate this Court's jurisdiction and Plaintiffs' ability to obtain effective relief,

including the transfer or concealment of assets obtained through fraud, breach of fiduciary duty, and conversion.

78. Plaintiffs therefore seek preliminary and permanent injunctive relief narrowly tailored to preserve the status quo, including an order restraining Defendants, and those acting in concert with them, from transferring, concealing, dissipating, or otherwise disposing of assets reasonably traceable to Defendants' fraudulent and disloyal conduct, pending resolution of this action or further order of the Court. Plaintiffs do not seek to restrain assets unrelated to Defendants' misconduct.

**COUNT FIVE: DEFAMATION AND INJURY TO REPUTATION (DIRECT)**

79. The Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 78 as if fully set forth herein.

80. Defendant Senzaki, in conjunction with the Co-Conspirators, knowingly created, disseminated, and allowed to persist false statements and false implications concerning Plaintiffs Fawn Weaver and Keith Weaver, including through falsified accounting records, forged documents, manipulated financial data, and deliberate omissions that portrayed Plaintiffs as having engaged in financial misconduct they did not commit.

81. Defendants made and perpetuated these false statements and implications with the intent, or at minimum the reckless disregard, that they would be relied upon by third parties and would result in Plaintiffs being publicly accused of dishonesty, mismanagement, and misuse of funds. Defendant knew that his falsifications and silence would foreseeably lead to Plaintiffs' reputations being harmed when those false narratives were repeated by others.

82. As a direct and foreseeable result of Defendants' conduct, false and defamatory statements and implications concerning Plaintiffs were published and widely disseminated,

including allegations that Plaintiffs had misappropriated company funds, concealed liabilities, or acted improperly in managing financial affairs. These publications constituted republications of Defendants' falsehoods and omissions and were traceable to the fabricated records and misrepresentations Defendant created and allowed to stand uncorrected.

83. The defamatory statements and implications were false. Plaintiffs did not misappropriate funds, misuse assets, or engage in financial misconduct. Defendant knew these statements and implications were false or acted with reckless disregard for their truth and for the damage they would cause.

84. Defendants' conduct constitutes defamation per se and false light under Tennessee law because it imputed conduct incompatible with honesty, integrity, and ethical business practices to Plaintiffs, who are widely known public figures within their professional and community spheres.

85. As a direct and proximate result of Defendants' defamation and related misconduct, Plaintiffs Fawn Weaver and Keith Weaver have suffered severe and lasting reputational harm, loss of professional opportunities, loss of income, public humiliation, emotional distress, and damage to the goodwill they had built over decades of professional and charitable work.

86. Defendants' actions were willful, malicious, and undertaken with knowledge of their likely consequences. Plaintiffs are entitled to recover compensatory and punitive damages, together with pre- and post-judgment interest, costs, and such other relief as the Court deems just and proper.

**COUNT SIX: CONVERSION (DIRECT)**

87. Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1 through 86 as if fully set forth herein.

88. Ms. Weaver owned earned and vested equity compensation, including stock options and related equity interests, issued to her annually as compensation for her services and constituting her personal property. These equity interests were not discretionary, contingent, or subject to Defendants' control.

89. Defendant Senzaki intentionally exercised dominion and control over Ms. Weaver's personal equity interests without authorization, including by purporting to transfer, pledge, assign, or otherwise dispose of those interests as if they belonged to him, and by forging or falsifying documents purporting to evidence Ms. Weaver's consent to transactions she never approved. Senzaki's misconduct was effectuated in accordance with the conspiracy and for the benefit of all Co–Conspirators.

90. Defendants' conduct was unauthorized, wrongful, and inconsistent with Ms. Weaver's ownership rights. Defendant knew the equity interests were Ms. Weaver's personal property and not his to use, transfer, or encumber, yet deliberately treated them as his own to advance his personal financial interests.

91. Defendants' conversion included, but was not limited to, the misuse of Ms. Weaver's equity interests to obtain personal benefits, favorable loan terms, and other advantages unrelated to any legitimate corporate purpose, while concealing his actions through falsified records and forged documentation.

92. Ms. Weaver did not consent to Defendants' acts, did not authorize the transfer or encumbrance of her equity interests, and did not ratify Defendants' conduct at any time. Defendants' conversion was willful, knowing, and undertaken in bad faith.

93. As a direct and proximate result of Defendants' conversion, Plaintiffs have suffered substantial personal damages, including the loss or impairment of earned and vested equity compensation, economic loss, reputational harm, emotional distress, and costs incurred to investigate and remediate Defendants' misconduct.

94. Defendants' conduct was malicious and warrants the imposition of punitive damages to deter similar misconduct and to hold Defendant accountable for the intentional conversion of Ms. Weaver's personal property. Plaintiffs are entitled to recover compensatory and punitive damages, together with interest, costs, and such other relief as the Court deems just and proper.

**PRAYER FOR RELIEF**

WHEREFORE, premises considered, Plaintiffs respectfully pray that this Court enter judgment in their favor and against Defendants as follows:

95. Issue process and have it served upon Defendants, requiring them to answer this Complaint within the time provided by law;

96. Find that Defendants breached duties of loyalty, honesty, candor, and good faith owed directly to Plaintiffs, including through the misuse of Plaintiffs' trust, access, signatures, and earned and vested equity compensation;

97. Find that Defendants breached fiduciary duties owed directly to Plaintiffs, causing them personal, reputational, and financial harm;

98. Find that Defendants committed fraud by knowingly falsifying and concealing material information, forging documents and signatures, and deceiving Plaintiffs for his personal gain;

99. Find that Defendants are liable for defamation per se and false light, and for the extensive reputational and economic injuries their false statements, implications, and deliberate silence foreseeably caused to Plaintiffs Fawn Weaver and Keith Weaver;

100. Award Plaintiffs compensatory damages in an amount to be proven at trial for direct, personal injuries, including but not limited to: the loss or impairment of Ms. Weaver's earned and vested equity compensation; loss of professional income and opportunities; reputational harm; emotional distress; loss or impairment of Plaintiffs' earned and vested equity compensation and personal economic interests; and other consequential damages suffered by Plaintiffs as a direct result of Defendants' misconduct;

101. Award punitive damages sufficient to punish Defendants and to deter similar misconduct in the future;

102. Grant injunctive relief restraining Defendants, and all those acting in concert with them, from transferring, concealing, dissipating, or otherwise disposing of assets reasonably traceable to Defendants' fraudulent, disloyal, or tortious conduct, and ordering such assets preserved pending resolution of this action or further order of the Court;

103. Award Plaintiffs their costs of suit, including reasonable attorneys' fees (where recoverable by law), expert fees, and pre- and post-judgment interest as permitted by law; and

104. Grant such other and further relief as the Court deems just and proper under law and equity.

**TABLE OF EXHIBITS**

Exhibit 1 – Credit Agreement dated July 22, 2022 (as amended through Amendment No. 5)

Exhibit 2 – Amendment No. 1 to Credit Agreement (October 3, 2022)

Exhibit 3 – Amendment No. 2 to Credit Agreement (December 16, 2022)

Exhibit 4 – Amendment No. 3 to Credit Agreement (January 26, 2023)

Exhibit 5 – Amendment No. 4 to Credit Agreement (March 30, 2023)

Exhibit 6 – Amendment No. 5 to Credit Agreement (composite version included in Exhibit 1)

Exhibit 7 – Amendment No. 6 to Credit Agreement (July 26, 2023)

Exhibit 8 – Amendment No. 7 to Credit Agreement (December 27, 2023)

Exhibit 9 – Loan Distribution and Fee Chart compiled from company records and lender-provided statements

Exhibit 10 – Email from Defendant Michael Senzaki to Farm Credit Mid-America senior credit officer Jonathan Boyce dated May 10, 2023, with attached Loan Notice dated May 8, 2023 ($1,070,000)

Exhibit 11 – Email from Defendant Michael Senzaki to Farm Credit Mid-America senior credit officer Jonathan Boyce dated July 26, 2023, with attached Loan Notice dated July 25, 2023 ($7,000,000)

Exhibit 12 – Emails from Defendant Michael Senzaki to Farm Credit Mid-America senior credit officer Jonathan Boyce dated August 1, 2023, with attached Loan Notices dated August 1, 2023 ($930,000 and $1,060,000)

The foregoing exhibits include representative examples of twenty-eight (28) similar drawdown requests executed solely by Defendant Senzaki and processed without notice to or approval by Ms. Weaver. Certain exhibits contain limited redactions of confidential financial information. All exhibits are incorporated herein by reference as if fully set forth in this Complaint.

Respectfully submitted,

**MANIER & HEROD, P.C.**

Michael E. Collins (BPR No. 16036)
S. Marc Buchman (BPR No. 41598)
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
T: (615) 244-0030
F: (629) 500-1137
mcollins@manierherod.com
mbuchman@manierherod.com

-and-

**CHEHARDY, SHERMAN, WILLIAMS, RECILE, & HAYES, LLP**

James M. Williams (*pro hac vice* forthcoming)
Inemesit U. O'Boyle (*pro hac vice* forthcoming)
Erin Rigsby Hawkins (*pro hac vice* forthcoming)
One Galleria Boulevard, Suite 1100
Metairie, Louisiana 70001
T: (504) 833-5600
F: (629) 833-8080
james@thetrialteam.com
inem@thetrialteam.com
erin@thetrialteam.com

*Counsel for the Plaintiffs*

# EXHIBIT 1

COPY

FILED 12/29/2025
1:42 O'clock p m
Curt M. Cobb C & M
By [signature]

COPY

FILED 12/29/2025 1:42 O'clock P.m.
Curt M. Cobb C & M
By [signature]

CREDIT AGREEMENT[1]

Dated as of July 22, 2022

among

UNCLE NEAREST, INC.,
NEAREST GREEN DISTILLERY, INC.,
UNCLE NEAREST REAL ESTATE HOLDINGS, LLC
and
THE OTHER BORROWERS PARTY HERETO
as the Borrowers,

FARM CREDIT MID-AMERICA, PCA,
as Administrative Agent,

and

THE OTHER LENDERS PARTY HERETO

FARM CREDIT MID-AMERICA, PCA,
as Sole Lead Arranger and Sole Bookrunner

[1] Composite copy through Amendment No. 5 to Credit Agreement dated as of May [__], 2023.

173891512

## TABLE OF CONTENTS

Page


ARTICLE I DEFINITIONS AND INTERPRETIVE PROVISIONS 1

1.1 Defined Terms ... 1
1.2 Rules of Interpretation ... 27
1.3 Accounting Terms ... 28
1.4 Times of Day ... 28
1.5 Rounding ... 28

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS 28

2.1 Loans ... 28
2.2 Borrowings of Loans ... 29
2.3 Prepayments ... 30
2.4 Termination or Reduction of Commitments ... 31
2.5 Repayment of Loans ... 32
2.6 Interest ... 33
2.7 Fees ... 33
2.8 Computation of Interest and Fees ... 34
2.9 Evidence of Debt ... 34
2.10 Payments Generally; Administrative Agent's Clawback ... 34
2.11 Sharing of Payments by Lenders ... 36
2.12 Defaulting Lenders ... 36
2.13 Increases in Revolving Credit Commitments ... 38
2.14 Company as Borrower Agent; Joint and Several Liability; Borrowers' Waivers and Consents ... 38

ARTICLE III TAXES AND YIELD PROTECTION 41

3.1 Taxes ... 41
3.2 Increased Costs ... 45
3.3 [Reserved] ... 46
3.4 Mitigation Obligations; Replacement of Lenders ... 46
3.5 Survival ... 47

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS 47

4.1 Conditions of Initial Credit Extension ... 47
4.2 Conditions to All Credit Extensions ... 50

ARTICLE V REPRESENTATIONS AND WARRANTIES 51

5.1 Existence, Qualification and Power ... 51
5.2 Authorization; No Contravention ... 51
5.3 Governmental Authorization; Other Consents ... 51
5.4 Binding Effect ... 52
5.5 Financial Statements; No Material Adverse Effect ... 52
5.6 Litigation ... 52
5.7 No Default ... 52

## TABLE OF CONTENTS
(continued)

**Page**


| | | |
|---|---|---|
| 5.8 | Title to Property | 52 |
| 5.9 | Environmental Compliance | 53 |
| 5.10 | Tax Matters | 53 |
| 5.11 | ERISA Compliance | 53 |
| 5.12 | Ownership of Loan Parties and Subsidiaries | 54 |
| 5.13 | Investment Company Act; Margin Stock | 54 |
| 5.14 | Disclosure | 55 |
| 5.15 | Compliance with Laws | 55 |
| 5.16 | Intellectual Property Matters | 55 |
| 5.17 | Solvency | 55 |
| 5.18 | Casualty, Etc | 55 |
| 5.19 | Anti-Corruption Laws and Sanctions | 55 |
| 5.20 | Beneficial Ownership Certificate | 56 |
| 5.21 | Farm Credit Eligibility | 56 |
| 5.22 | Borrowing Base Assets | 56 |
| ARTICLE VI | AFFIRMATIVE COVENANTS | 57 |
| 6.1 | Financial Statements | 57 |
| 6.2 | Certificates; Other Information | 58 |
| 6.3 | Notices | 59 |
| 6.4 | Payment of Taxes and Other Obligations | 60 |
| 6.5 | Preservation of Existence, Etc | 60 |
| 6.6 | Maintenance of Property | 60 |
| 6.7 | Maintenance of Insurance | 60 |
| 6.8 | Compliance with Laws | 60 |
| 6.9 | Books and Records | 60 |
| 6.10 | Inspection Rights | 61 |
| 6.11 | Use of Proceeds | 61 |
| 6.12 | Additional Subsidiaries and Real Property | 62 |
| 6.13 | Compliance with Environmental Laws | 62 |
| 6.14 | Further Assurances | 62 |
| 6.15 | Compliance with Anti-Corruption Laws; Beneficial Ownership Regulation, AntiMoney Laundering Laws and Sanctions | 63 |
| 6.16 | Farm Credit Eligibility / Farm Credit Equity | 63 |
| 6.17 | Preparation of Environmental Reports | 64 |
| 6.18 | Compliance with Terms of Leaseholds | 64 |
| 6.19 | | 64 |
| 6.20 | Material Agreements | 64 |
| ARTICLE VII | NEGATIVE COVENANTS | 65 |
| 7.1 | Liens | 65 |
| 7.2 | Indebtedness | 66 |




173891512

**TABLE OF CONTENTS**
(continued)

**Page**


7.3 Investments ........ 66
7.4 Fundamental Changes ........ 67
7.5 Dispositions ........ 68
7.6 Restricted Payments ........ 68
7.7 Change in Nature of Business ........ 69
7.8 Transactions with Affiliates ........ 69
7.9 Burdensome Agreements ........ 69
7.10 Use of Proceeds ........ 69
7.11 Financial Covenants ........ 69
7.12 Amendments of Organization Documents or Material Agreements ........ 70
7.13 Accounting Changes ........ 70

ARTICLE VIII DEFAULT AND REMEDIES 70

8.1 Events of Default ........ 70
8.2 Remedies Upon Event of Default ........ 72
8.3 Application of Funds ........ 73
8.4 Equity Cure ........ 73

ARTICLE IX ADMINISTRATIVE AGENT 74

9.1 Appointment and Authority ........ 74
9.2 Rights as a Lender ........ 75
9.3 Exculpatory Provisions ........ 75
9.4 Reliance by Administrative Agent ........ 76
9.5 Delegation of Duties ........ 76
9.6 Resignation or Removal of Administrative Agent ........ 76
9.7 Non-Reliance on Administrative Agent and Other Lenders ........ 77
9.8 No Other Duties, Etc ........ 77
9.9 Administrative Agent May File Proofs of Claim ........ 77
9.10 Credit Bidding ........ 78
9.11 Collateral and Guaranty Matters ........ 78
9.12 Certain ERISA Matters ........ 79

ARTICLE X MISCELLANEOUS 80

10.1 Amendments, Etc ........ 80
10.2 Notices; Effectiveness; Electronic Communications ........ 81
10.3 No Waiver; Cumulative Remedies; Enforcement ........ 81
10.4 Expenses; Indemnity; Damage Waiver ........ 83
10.5 Payments Set Aside ........ 84
10.6 Successors and Assigns ........ 85
10.7 Treatment of Certain Information; Confidentiality ........ 90
10.8 Right of Setoff ........ 91
10.9 Survival of Representations and Warranties ........ 91
10.10 Independent Effect of Covenants ........ 91

**TABLE OF CONTENTS**
(continued)

**Page**


10.11 Governing Law; Jurisdiction; Etc ........ 91
10.12 WAIVER OF JURY TRIAL ........ 92
10.13 Counterparts; Integration; Effectiveness; Electronic Execution ........ 93
10.14 No Advisory or Fiduciary Responsibility ........ 94
10.15 Severability ........ 94
10.16 USA PATRIOT Act ........ 94
10.17 Inconsistencies with Other Documents ........ 95

ANNEX


| | |
|---|---|
| A | Commitments and Applicable Percentages |


SCHEDULES


| | |
|---|---|
| 5.3 | Certain Authorizations |
| 5.8 | Real Property |
| 5.11(d) | Existing Pension Plans |
| 5.12 | Ownership of Loan Parties and Subsidiaries |
| 7.1 | Existing Liens |
| 7.2 | Existing Indebtedness |
| 7.3 | Existing Investments |
| 7.9 | Existing Burdensome Agreements |
| 10.6(d) | Specified Voting Participants |


EXHIBITS

***Form of***


| | |
|---|---|
| A | Loan Notice |
| B-1 | Note |
| B-2 | RELOC Loan Note |
| C | Compliance Certificate |
| D | Assignment and Assumption |
| E | United States Tax Compliance Certificate |
| F | Notice of Account Designation |
| G | Borrowing Base Certificate |

# CREDIT AGREEMENT

This CREDIT AGREEMENT (this "Agreement") is entered into as of July 22, 2022 among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), EACH OTHER PERSON THAT SHALL BECOME A PARTY HERETO AS A BORROWER PURSUANT TO SECTION 6.12 (each such Person, together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), each lender from time to time party hereto (each, a "Lender" and, collectively, the "Lenders"), and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent.

The Borrowers have requested that the Lenders provide certain credit facilities, and the Lenders have indicated their willingness to provide such credit facilities, in each case, on the terms and subject to the conditions set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETIVE PROVISIONS

1.1 Defined Terms. As used in this Agreement, the following terms shall have the meanings set forth below:

"Account" means "accounts" as defined in the UCC.

"Account Debtor" means any Person who is or may become obligated under or on account of any Account, Chattel Paper or General Intangible.

"Acquisition" means any transaction, or any series of related transactions, consummated on or after the Closing Date, by which any Loan Party or any Subsidiary thereof (a) acquires assets of another Person which constitute all or substantially all of the assets of such Person or of a division, line of business or other business unit of such Person (whether through purchase of assets, merger or otherwise), or (b) directly or indirectly acquires (in one transaction or as the most recent transaction in a series of transactions) at least a majority (in number of votes) of the Equity Interests of a Person which have ordinary voting power for the election of the board of directors or equivalent governing body (other than Equity Interests having such power only by reason of the happening of a contingency that has not occurred).

"Administrative Agent" means FCMA in its capacity as administrative agent under any of the Loan Documents, or any successor administrative agent.

"Administrative Agent's Office" means the Administrative Agent's address as set forth in Section 10.2, or such other address as the Administrative Agent hereafter may designate by written notice to the Company and the Lenders.

"Administrative Questionnaire" means an Administrative Questionnaire in substantially the form provided by the Administrative Agent to the Lenders or any other form approved by the Administrative Agent.

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Credit Agreement.

"Amendment No. 3 Effective Date" means January 26, 2023.

"Amendment No. 4 Effective Date" means March 29, 2023.

"Amendment No. 5 Effective Date" means May [__], 2023.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder and the U.K. Bribery Act 2010 and the rules and regulations thereunder.

"Anti-Money Laundering Laws" means all laws, statutes, regulations or obligatory government orders, decrees, ordinances or rules related to terrorism financing, money laundering, any predicate crime to money laundering or any financial record keeping, including any applicable provision of the PATRIOT Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"Applicable Margin" means 0.50% per annum.

"Applicable Percentage" means (a) in respect of the Term Loan Facility, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the sum of the aggregate outstanding Term Loans represented by such Lender's outstanding Term Loan at such time, (b) in respect of the Revolving Credit Facility, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the aggregate Revolving Credit Commitments represented by such Lender's Revolving Credit Commitment at such time, subject to adjustment as provided in Section 2.12 and (c) in respect of the RELOC Facility, with respect to any Lender at any time, (i) in the case of unused aggregate RELOC Commitments, the percentage (carried out to the ninth decimal place) of the aggregate unused RELOC Commitments represented by such Lender's unused RELOC Commitment at such time, (ii) in the case of outstanding RELOC Loans, the percentage (carried out to the ninth decimal place) of the sum of the aggregate RELOC Loans represented by such Lender's outstanding RELOC Loans at such time and (iii) in the case of outstanding RELOC Term Loans, the percentage (carried out to the ninth decimal place) of the sum of the aggregate RELOC Term Loans represented by such Lender's outstanding RELOC Term Loan at such time. If the commitment of each Revolving Credit Lender to make Revolving Credit Loans has been terminated pursuant to Section 8.2, or if the Revolving Credit Commitments have expired, then the Applicable Percentage of each Revolving Credit Lender in respect of the Revolving Credit Facility shall be determined based on the Applicable Percentage of such Revolving Credit Lender in respect of the Revolving Credit Facility most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender in respect of each Facility is set forth opposite the name of such Lender on Annex A or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Applicable Revolving Credit Percentage" means, with respect to any Lender at any time, such Lender's Applicable Percentage in respect of the Revolving Credit Facility at such time.

"Approved Fund" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"Arranger" means FCMA, in its capacity as sole lead arranger and sole bookrunner.

"Assignment and Assumption" means an assignment and assumption entered into by a Lender and an Eligible Assignee (with the consent of any party whose consent is required by Section 10.6(b)), and accepted by the Administrative Agent, in substantially the form of Exhibit D or any other form approved by the Administrative Agent.

"Attributable Indebtedness" means, on any date, (a) in respect of any Capitalized Lease of any Person, the capitalized amount thereof that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP, (b) in respect of any Synthetic Lease Obligation, the capitalized amount of the remaining lease or similar payments under the relevant lease or other applicable agreement or instrument that would appear on a balance sheet of such Person prepared as of such date in accordance with GAAP if such lease or other agreement or instrument were accounted for as a Capitalized Lease and (c) all Synthetic Debt of such Person.

"Availability Reserves" means, without duplication of any other Reserves or items that are otherwise addressed or excluded through eligibility criteria, such reserves as the Administrative Agent from time to time determines in its Permitted Discretion as being appropriate (a) to reflect the impediments to the Administrative Agent's ability to realize upon the Collateral consisting of Eligible Accounts or Eligible Inventory, (b) to reflect sums that any Loan Party may be required to pay under any Section of this Agreement or any other Loan Document (including Taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay, (c) to reflect amounts for which claims may be reasonably expected to be asserted against the Collateral or the Administrative Agent or any Secured Party or (d) to reflect criteria, events, conditions, contingencies or risks which adversely affect any component of the Borrowing Base, or the assets, business, financial performance or financial condition of any Loan Party. Without limiting the generality of the foregoing, Availability Reserves may include (but are not limited to) reserves based on: (i) Rent and Charges Reserves; (ii) outstanding Taxes and other governmental charges, including, without limitation, ad valorem, real estate, personal property, sales, excise, and other Taxes which might have priority over the interests of the Lender in the Collateral; (iii) any liabilities that are or may become secured by Liens on the Collateral (including Permitted Liens) which might have priority over the Liens or interests of the Administrative Agent in the Collateral; (iv) reserves with respect to the salability of Eligible Inventory or which reflect such other factors as affect the market value of the Eligible Inventory, including obsolescence, seasonality, Shrink, vendor chargebacks, imbalance, change in Inventory character, composition or mix, markdowns and out of date and/or expired Inventory; (v) whiskey storage reserves; and (vi) the Dilution Reserve.

"Base Rate" means, for any day, a fluctuating rate per annum equal to the highest of (a) the Federal Funds Rate plus 0.50%, (b) the interest rate quoted as of the tenth day (or, if such tenth day is not a Business Day, the first Business Day immediately preceding such tenth day) of the calendar month (such day, the "Prime Rate Determination Date") immediately preceding the month in which such day falls by The Wall Street Journal as the "Prime Rate" in the United States or, if The Wall Street Journal ceases to quote such rate, the highest per annum interest rate published by the Federal Reserve Board in Federal Reserve Statistical Release H.15 (519) (Selected Interest Rates) on such Prime Rate Determination Day as the "bank prime loan" rate or, if such rate is no longer quoted therein, any similar rate quoted therein (as determined in good faith by the Administrative Agent) or any similar release by the Federal Reserve Board (as determined in good faith by the Administrative Agent) on such Prime Rate Determination Date; provided that as of the Amendment No. 4 Effective Date, the interest rate for purposes of this clause (b) is 7.75% and

(c) 0.00%. Any change in any of the foregoing rates shall take effect at the opening of business on the effective day of such change.

"Base Rate Loan" means any Loan that bears interest based on the Base Rate.

"Baseline Financial Statements" means the company-prepared consolidated balance sheet of the Company and its Subsidiaries for the fiscal year ended December 31, 2021, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year, including the notes thereto.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation.

"Beneficial Ownership Regulation" means 31 C.F.R. § 1010.230.

"Benefit Plan" means any of (a) an "employee benefit plan" (as defined in ERISA) that is subject to Title I of ERISA, (b) a "plan" as defined in and subject to Section 4975 of the Code or (c) any Person whose assets include (for purposes of ERISA Section 3(42) or otherwise for purposes of Title I of ERISA or Section 4975 of the Code) the assets of any such "employee benefit plan" or "plan".

"Borrower" and "Borrowers" have the meaning assigned to such term in the introductory paragraph hereto.

"Borrower Materials" has the meaning assigned to such term in Section 10.2(d)(i).

"Borrowing" means a Revolving Credit Borrowing, a Term Loan Borrowing or a RELOC Borrowing, as the context may require.

"Borrowing Base" means, as of any time it is to be determined, the sum of:

(a) 75% of the Value of Eligible Accounts; plus

(b) 70% of the Value of all Eligible Inventory consisting of barreled whiskey, finished goods consisting of bottled whiskey or grain inventory; minus

(c) all Availability Reserves.

The Borrowing Base at any time shall be determined by reference to the most recent Borrowing Base Certificate theretofore delivered to the Administrative Agent with such adjustments as the Administrative Agent deems appropriate in its Permitted Discretion in accordance with the terms of this Agreement; provided that (i) the Administrative Agent shall have the right upon five (5) Business Days' notice to the Company to reduce the advance rates against Eligible Accounts and Eligible Inventory in its Permitted Discretion based on results from any field audit or appraisal of the Collateral and (ii) the Borrowing Base shall be computed only as against and on so much of such Collateral as is included in the Borrowing Base Certificates furnished from time to time by the Company pursuant to this Agreement and, if required by the Administrative Agent pursuant to any of the terms hereof or any Collateral Document, as verified by such other evidence reasonably required to be furnished to the Administrative Agent pursuant hereto or pursuant to any such Collateral Document.

"Borrowing Base Certificate" means a certificate substantially in the form of Exhibit G.

"Business Day" means any day other than a Saturday, Sunday or other day on which commercial banks or farm credit banks are authorized to close under the Laws of, or are in fact closed in, New York or the state where the Administrative Agent's Office is located, or any other day on which the Administrative Agent's Office is in fact closed.

"Capitalized Leases" means any lease that has been or is required to be, in accordance with GAAP, recorded, classified and accounted for as a capitalized lease or financing lease.

"Cash Equivalents" means any of the following types of Investments, to the extent owned by the Company or any of its Subsidiaries free and clear of all Liens (other than Permitted Liens):

(a) readily marketable obligations issued or directly and fully guaranteed or insured by the United States or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States is pledged in support thereof;

(b) time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $250,000,000, in each case with maturities of not more than 180 days from the date of acquisition thereof;

(c) commercial paper issued by any Person organized under the laws of any state of the United States and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 180 days from the date of acquisition thereof; and

(d) Investments, classified in accordance with GAAP as current assets of the Company or any of its Subsidiaries, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation, implementation or application thereof by any Governmental Authority or (c) the making or issuance of any request, rule, guideline or directive (whether or not having the force of law) by any Governmental Authority; provided that notwithstanding anything herein to the contrary, (x) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith or in the implementation thereof and (y) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Change of Control" means an event or series of events by which:

(a) any Person (or any group of Affiliates) (other than a Permitted Investor) acquires more than 10% of the voting or economic Equity Interests of the Company;

(b) the Permitted Investors cease to collectively own and control, of record and beneficially, Equity Interests of the Company representing at least 30% of the economic interest of the Company;

(c) the Permitted Investors cease to collectively own and control, of record and beneficially, Equity Interests of the Company representing at least 51.00% of the voting power of the Company entitled to vote in the election of members of the board of directors (or equivalent governing body) of the Company or otherwise ceases to have the power to direct or cause the direction of the management and policies of the Company; or

(d) any Borrower (other than the Company) ceases to be a Wholly-Owned Subsidiary of the Company.

"Closing Date" means July 22, 2022.

"Code" means the Internal Revenue Code of 1986.

"Collateral" means all of the property that is or is intended under the terms of the Collateral Documents to be subject to Liens in favor of the Administrative Agent for the benefit of the Secured Parties.

"Collateral Documents" means, collectively, the Security Agreement, the Pledge Agreement, the Mortgages and all of the other mortgages, collateral assignments, security agreements, pledge agreements or other similar agreements delivered to the Administrative Agent that create or purport to create a Lien in favor of the Administrative Agent for the benefit of the Secured Parties.

"Commitment" means a Revolving Credit Commitment, a Term Loan Commitment or a RELOC Commitment, as the context may require.

"Company" has the meaning assigned to such term in the introductory paragraph hereto.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Consolidated Net Income" means, for any period, the net income (or loss) of the Company and its Subsidiaries on a consolidated basis in accordance with GAAP for such period; provided that Consolidated Net Income shall exclude (a) the net income (if positive) of any Subsidiary for such period to the extent that the declaration or payment of dividends or similar distributions by such Subsidiary of such net income (i) is not at the time permitted by operation of the terms of its Organization Documents or any agreement, instrument, judgment, decree, order or Law applicable to such Subsidiary or (ii) would be subject to any taxes payable on such dividends or distributions, but in each case only to the extent of such prohibition or taxes, (b) any income (or loss) for such period of any Person if such Person is not a Subsidiary, except that the equity in the net income of any such Person for such period shall be included in Consolidated Net Income up to the aggregate amount of cash actually distributed by such Person during such period to the Company or a Subsidiary as a dividend or other distribution (and in the case of a dividend or other distribution to a Subsidiary, such Subsidiary is not precluded from further distributing such amount to the Company as described in clause (a) of this proviso), (c) any income (or loss) for such period of any Person

accrued prior to the date it becomes a Subsidiary or is merged into or consolidated with the Company or any of its Subsidiaries or that Person's assets are acquired by the Company or any of its Subsidiaries except to the extent included pursuant to the foregoing clause (b) and (d) any gain or loss from the Disposition of any property to a Person that is not a Loan Party or a Subsidiary (other than the sale of inventory in the ordinary course of business) during such period.

"Consolidated Tangible Net Worth" means, as of any date of determination, for the Company and its Subsidiaries on a consolidated basis, Shareholders' Equity of the Company and its Subsidiaries on that date minus the Intangible Assets of the Company and its Subsidiaries on that date.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"Conversion Date" has the meaning assigned to such term in Section 2.1(c).

"Credit Extension" means each of the following: (a) a Revolving Credit Borrowing, (b) a Term Loan Borrowing and (c) a RELOC Borrowing.

"Crop Sharing Agreement" means the farming arrangement between the Loan Parties and a local farmer with respect to the growing of certain agricultural products on one or more of the properties of the Loan Parties for use in the distilling operations of the Loan Parties, which such arrangement may be evidenced from time to time by a written agreement, a letter of intent and/or such other customary documentation that is reasonably satisfactory to the Administrative Agent.

"Dan Call Farm Mortgage Indebtedness" means the Indebtedness of the Permitted Investors arising under the loan agreements and/or promissory notes entered into prior to the Closing Date in favor of Farm Credit Mid-America, FLCA, as amended, restated, supplemented or otherwise modified from time to time; provided that such Indebtedness shall be subject to the Dan Call Farm Mortgage Indebtedness Intercreditor Agreement and otherwise be on terms reasonably satisfactory to the Administrative Agent.

"Dan Call Farm Mortgage Indebtedness Intercreditor Agreement" means the Intercreditor Agreement dated as of the Closing Date between Farm Credit Mid-America, FLCA and the Administrative Agent.

"Dan Call Farm Property" means the ~314 acres of real property owned by the Permitted Investors located in Moore County, Tennessee, any improvements and fixtures located thereon and any other rights related thereto, all as more particularly described in the mortgage documents securing the Dan Call Farm Mortgage Indebtedness as in effect on the Closing Date.

"Debtor Relief Laws" means the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief Laws of the United States or other applicable jurisdictions from time to time in effect.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means, when used with respect to Obligations, an interest rate equal to (a) the Base Rate plus (b) the Applicable Margin plus (c) 2% per annum.

"Defaulting Lender" means, subject to Section 2.12(b), at any time that there is more than one Lender, any Lender that (a) has failed to (i) fund all or any portion of its Loans within two Business Days of the date such Loans were required to be funded hereunder unless such Lender notifies the Administrative Agent and the Company in writing that such failure is the result of such Lender's determination that one or more conditions precedent to funding (each of which conditions precedent, together with any applicable default, shall be specifically identified in such writing) has not been satisfied, or (ii) pay to the Administrative Agent or any other Lender any other amount required to be paid by it hereunder within two Business Days of the date when due, (b) has notified the Company or the Administrative Agent in writing that it does not intend to comply with its funding obligations hereunder, or has made a public statement to that effect (unless such writing or public statement relates to such Lender's obligation to fund a Loan hereunder and states that such position is based on such Lender's determination that a condition precedent to funding (which condition precedent, together with any applicable default, shall be specifically identified in such writing or public statement) cannot be satisfied), (c) has failed, within three Business Days after written request by the Administrative Agent or the Company, to confirm in writing to the Administrative Agent and the Company that it will comply with its prospective funding obligations hereunder (provided that such Lender shall cease to be a Defaulting Lender pursuant to this clause (c) upon receipt of such written confirmation by the Administrative Agent and the Company) or (d) has, or has a direct or indirect parent company that has, (i) become the subject of a proceeding under any Debtor Relief Law or (ii) had appointed for it a receiver, custodian, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or assets, including the Federal Deposit Insurance Corporation or any other state or federal regulatory authority acting in such a capacity; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any Equity Interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority so long as such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made with such Lender. Any determination by the Administrative Agent that a Lender is a Defaulting Lender under any one or more of clauses (a) through (d) above, and of the effective date of such status, shall be conclusive and binding absent manifest error, and such Lender shall be deemed to be a Defaulting Lender (subject to Section 2.12(b)) as of the date established therefor by the Administrative Agent in a written notice of such determination, which shall be delivered by the Administrative Agent to the Company and each Lender promptly following such determination.

"Dilution Percent" means the percent, determined for the most recently ended period of four consecutive fiscal quarters, equal to (a) bad debt write-downs or write-offs, discounts, returns, promotions, credits, credit memos and other dilutive items with respect to Accounts, divided by (b) gross sales.

"Dilution Reserve" means, at any date of determination, (a) the percentage amount by which the Dilution Percent exceeds five percent (5%) times (b) the amount of Eligible Accounts of the Borrowers.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person, including any sale, assignment, transfer or other disposal, with or without recourse, of any notes or accounts receivable or any rights and claims associated therewith.

"Distillery" has the meaning assigned to such term in the introductory paragraph hereto.

"Dollar" and "$" mean lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary that is organized under the laws of any political subdivision of the United States.

"Eligible Accounts" means, as of the date of determination thereof, any Account of a Borrower arising in the ordinary course of business out of the sale of barreled spirits or finished goods inventory delivered to and accepted by, or out of the rendition of services fully performed and accepted by, the Account Debtor on such Account and deemed by the Administrative Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base. Without limiting the generality of the foregoing, unless otherwise approved in writing by the Administrative Agent, none of the following shall be deemed to be an Eligible Account:

(a) Accounts that are not owned by a Borrower free of any title defect or any Liens or interests of others (other than Liens of the type permitted by clause (a) of Section 7.1);

(b) Accounts that are not subject to a perfected, first priority Lien in favor of the Administrative Agent;

(c) Accounts that are not fully earned by performance (or otherwise represent a progress billing or pre-billing) or not evidenced by an invoice which has been delivered to the applicable Account Debtor;

(d) Accounts that are not payable in Dollars;

(e) Accounts arising out of sales to Account Debtors outside the United States, unless payment thereof is (i) assured by an irrevocable letter of credit payable in Dollars issued by a financial institution reasonably acceptable to the Administrative Agent and such irrevocable letter of credit is delivered to the Administrative Agent (including any delivery of an electronic letter of credit) or (ii) insured by a credit insurer reasonably acceptable to the Administrative Agent, in each case on terms satisfactory to the Administrative Agent in its Permitted Discretion;

(f) Accounts that are not the valid, binding and legally enforceable obligation of the Account Debtor obligated thereon;

(g) Accounts due from an Account Debtor which is the subject of any bankruptcy or insolvency proceeding, has had a trustee or receiver appointed for all or a substantial part of its property, has made an assignment for the benefit of creditors or has suspended its business;

(h) Accounts that are evidenced by a judgment, instrument or chattel paper, unless the originals of such chattel paper or instrument shall have been endorsed and/or assigned and delivered to the Administrative Agent or, in the case of electronic Chattel Paper, shall be in the control of the Administrative Agent, in each case in a manner satisfactory to the Administrative Agent in its Permitted Discretion;

(i) Accounts that are owing from an Account Debtor who is also (i) a vendor, creditor or supplier of such Person or (ii) a Loan Party or any Affiliate, Subsidiary, officer, employee or equity holder thereof;

(j) Accounts (i) upon which a Borrower's right to receive payment is not absolute (other than as a result of rights to return inventory in the ordinary course of business) or is

contingent upon the fulfillment of any condition whatsoever, including cash on delivery and cash in advance transactions, or (ii) as to which a Borrower is not able to bring suit or otherwise enforce its remedies against the related Account Debtor through judicial process;

(k) Accounts that have been outstanding for more than ninety (90) days from the invoice date or more than sixty (60) days past the original due date whichever comes first;

(l) Accounts to the extent relating to payment of interest, fees or late charges;

(m) Accounts which are disputed or with respect to which a claim, counterclaim, offset or chargeback has been asserted, but only to the extent of such dispute, counterclaim, offset or chargeback;

(n) Accounts due from any Account Debtor, 25% or more of whose Accounts are otherwise ineligible under the terms of clause (k) above;

(o) (i) except as otherwise provided in the following clause (ii), Accounts due from an Account Debtor, the aggregate of which Accounts due from such Account Debtor and its Affiliates represents more than 20% of all then outstanding Accounts owed to the Borrowers, but only to the extent of such excess or (ii) Accounts due from an Account Debtor that is either Republic National Distributing Company or an Affiliate thereof, the aggregate of which Accounts due from such Account Debtor and its Affiliates represents more than 50% of all then outstanding Accounts owed to the Borrowers, but only to the extent of such excess;

(p) Accounts arising from a sale on a bill and hold, guaranteed sale, sale or return, sale on approval, consignment or any other repurchase or return basis;

(q) Accounts that remain open after the applicable Account Debtor has made a partial payment in respect of the applicable invoice (whether or not the applicable Account Debtor has provided an explanation for such partial payment);

(r) Accounts where the applicable Account Debtor tendered a check or other item of payment in full or partial satisfaction and such check or other item of payment has been returned by the financial institution on which it is drawn and no such other valid form of payment has been received within five (5) Business Days of such date of incident;

(s) Accounts due from any Governmental Authority, except to the extent that the subject Account Debtor is the federal government of the United States of America and has complied with the Federal Assignment of Claims Act of 1940 and any similar state legislation to the satisfaction of the Administrative Agent in its Permitted Discretion; and

(t) Accounts that do not comply with any representation or warranty contained in this Agreement or any other Loan Document with respect to Accounts in general, or to such Account in particular.

"Eligible Assignee" means any Person that meets the requirements to be an assignee under Section 10.6(b)(iii) and (v) (subject to such consents, if any, as may be required under Section 10.6(b)(iii)).

"Eligible Inventory" means, as of the date of determination thereof, any Inventory of a Borrower consisting of barreled spirits (including whisky and bourbon), raw materials that are grain or finished goods (other than packaging, crating, shipping materials, labels, samples, display items or bags and supplies

inventory) and deemed by the Administrative Agent in its Permitted Discretion to be eligible for inclusion in the calculation of the Borrowing Base. Without limiting the generality of the foregoing, unless otherwise approved in writing by the Administrative Agent, none of the following shall be deemed to be Eligible Inventory:

(a) Inventory that is not owned by a Borrower free of any title defect or any Liens or interests of others (other than Liens of the type permitted by clauses (a) and (j) of Section 7.1);

(b) Inventory that is not subject to a perfected, first priority Lien in favor of the Administrative Agent;

(c) Inventory that is located in a public warehouse or in the possession of a bailee or in a facility leased by a Borrower or any of its Affiliates unless the applicable warehouseman, bailee, lessor or such other applicable third party has delivered to the Administrative Agent a Collateral Access Agreement, together with such other documentation as the Administrative Agent may reasonably require;

(d) Inventory that is covered by a negotiable document of title (such as a bill of lading or warehouse receipt);

(e) Inventory that is in transit;

(f) Inventory that is not held for sale or use in the ordinary course of a Borrower's business and is not of good and merchantable quality;

(g) Inventory that is not located in the United States of America (excluding territories and possessions thereof);

(h) Inventory that is unsalable, damaged, defective, recalled, used or otherwise unfit for sale, or Inventory that has been returned by the buyer unless such returned items are of good and merchantable quality and held for resale by a Borrower in the ordinary course of business;

(i) Inventory that has been manufactured to the specifications of a particular customer and is not saleable in the ordinary course of business;

(j) Inventory that contains or bears any intellectual property rights licensed to a Borrower unless the Administrative Agent is satisfied in its sole and absolute discretion that it may sell or otherwise dispose of such inventory without (i) infringing the rights of such licensor, (ii) violating any contract with such licensor, or (iii) incurring any liability with respect to payment of royalties other than royalties incurred pursuant to sale of such Inventory under the current licensing agreement;

(k) Inventory that is the subject of a consignment by a Borrower as consignor;

(l) Inventory that does not meet all standards imposed by any Governmental Authority;

(m) Inventory that is slow-moving, spoiled or obsolete; and

(n) Inventory that does not comply with any representation or warranty contained in this Agreement or any other Loan Document with respect to Inventory in general, or to such Inventory in particular.

"Environmental Laws" means any and all federal, state, local, and foreign statutes, laws, regulations, ordinances, rules, judgments, orders, decrees, permits, agreements or governmental restrictions relating to pollution or the protection of the environment or human health (to the extent related to exposure to Hazardous Materials), including those relating to the manufacture, generation, handling, transport, storage, treatment, release or threat of release of Hazardous Materials.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of any Loan Party or any Subsidiary thereof or any Permitted Investor directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Materials, (c) exposure to any Hazardous Materials, (d) release or threatened release of any Hazardous Materials or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with the Company within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan, (b) the withdrawal of the Company or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which such entity was a "substantial employer" as defined in Section 4001(a)(2) of ERISA or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA, (c) a complete or partial withdrawal by the Company or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization, (d) the filing of a notice of intent to terminate, the treatment of a Pension Plan amendment as a termination under Section 4041 or 4041A of ERISA, (e) the institution by the PBGC of proceedings to terminate a Pension Plan, (f) any event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan, (g) the determination that any Pension Plan is considered an at-risk plan or a plan in endangered or critical status within the meaning of Sections 430, 431 and 432 of the Code or Sections 303, 304 and 305 of ERISA, (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon the Company or any ERISA Affiliate or (i) a failure by the Company or any ERISA Affiliate to meet all applicable requirements under the Pension Funding Rules in respect of a Pension Plan, whether or not waived, or the failure by the Company or any ERISA Affiliate to make any required contribution to a Multiemployer Plan.

"Event of Default" has the meaning assigned to such term in Section 8.1.

"Excluded Asset" means, as to each Loan Party, (a) any lease, license or contract to which such Loan Party is a party, or any license, consent, permit, variance, certification, authorization or approval of

any Governmental Authority (or any Person acting on behalf of a Governmental Authority) of which such Loan Party is the owner or beneficiary, or any of its rights or interests thereunder, if and for so long as the grant of a security interest therein shall constitute or result in (i) the abandonment, invalidation or unenforceability of the right, title or interest of such Loan Party therein or (ii) a breach or termination pursuant to the terms of, or a default under, such lease, license or contract or such license, consent, permit, variance, certification, authorization or approval (other than to the extent that any such term would be rendered ineffective pursuant to Section 9-406, 9-407, 9-408 or 9-409 of the UCC or any other applicable law or principles of equity), (b) any equipment, fixtures or real property (including related attachments, accessories, equipment, tools, parts and replacement thereof and proceeds of the foregoing) owned by such Loan Party on the date hereof or hereafter acquired that is subject to a purchase money Lien or a Lien securing a capital lease or synthetic lease permitted to be incurred under the Loan Documents if the contract or other agreement (or the documentation providing for such purchase money obligation, capital lease or synthetic lease) in which such Lien is granted validly prohibits the creation of any other Lien on such equipment, fixtures or real property (and/or related attachments, accessories, equipment, tools, parts and replacement thereof and proceeds of the foregoing) if and for so long as the grant of a security interest therein in favor of the Administrative Agent for the benefit of the Secured Parties has not been consented to by the holder of such Lien, (c) any "intent to use" Trademark applications to the extent that, and solely during the period that, the grant of a security interest therein would impair the validity or enforceability or render void or result in the cancellation of, any registration issued as a result of such "intent to use" trademark application under applicable Law; provided that upon the submission and acceptance by the United States Patent and Trademark Office of an amendment to allege or a verified statement of use pursuant to 15 U.S.C. Section 1060, such "intent to use" trademark application shall constitute Collateral and (d) any Equity Interest in any Person that is not a Wholly-Owned Subsidiary, to the extent a Lien thereon is prohibited by or requires consent under the organizational documents of such Person (other than of a Loan Party) and such consent has not been obtained.

"Excluded Taxes" means any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or commitment pursuant to a Law in effect on the date on which (i) such Lender acquires such interest in the Loan or Commitment (other than pursuant to an assignment request by the Company under Section 3.4) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to Section 3.1, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office, (c) Taxes attributable to such Recipient's failure to comply with Section 3.1(g) and (d) any U.S. federal withholding Taxes imposed pursuant to FATCA.

"Extraordinary Receipt" means (a) any cash received by or paid to or for the account of any Person not in the ordinary course of business, including tax refunds, pension plan reversions, proceeds of insurance (other than proceeds of business interruption insurance to the extent such proceeds constitute compensation for lost earnings), condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments, and (b) in the case of the Dan Call Farm Property, any cash proceeds of insurance or condemnation awards (and payments in lieu thereof) received by or paid to or for the account of any Permitted Investor in respect thereof.

"Facility" means the Revolving Credit Facility, the Term Loan Facility or the RELOC Facility, as the context may require.

"Facility Termination Date" means the date as of which all of the following shall have occurred: (a) the Aggregate Commitments have terminated and (b) all Obligations have been paid in full (other than contingent indemnification and reimbursement obligations).

"Farm Credit Equities" has the meaning assigned to such term in Section 6.16(a).

"Farm Credit Lender" means a federally-chartered Farm Credit System lending institution organized under the Farm Credit Act of 1971, as the same may be amended or supplemented from time to time. When used in this Agreement in reference to the Farm Credit Equities, "Farm Credit Lender" shall also include the affiliate of such Farm Credit Lender in which such Farm Credit Equities are purchased or acquired, as applicable.

"FASB ASC" means the Accounting Standards Codification of the Financial Accounting Standards Board.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1).

"FCMA" means Farm Credit Mid-America, PCA and its successors.

"Federal Funds Rate" means, for any day, the rate per annum equal to the weighted average of the rates on overnight federal funds transactions with members of the Federal Reserve System, as published by the Federal Reserve Bank of New York on the Business Day next succeeding such day; provided that (a) if such day is not a Business Day, the Federal Funds Rate for such day shall be such rate on such transactions on the next preceding Business Day as so published on the next succeeding Business Day and (b) if no such rate is so published on such next succeeding Business Day, the Federal Funds Rate for such day shall be the average rate (rounded upward, if necessary, to a whole multiple of 1/100 of 1%) charged to FCMA on such day on such transactions as determined by the Administrative Agent. Notwithstanding the foregoing, if the Federal Funds Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement.

"Federal Reserve Board" means the Board of Governors of the Federal Reserve System of the United States.

"Fee Letter" means any letter agreement entered into from time to time by one or more of the Borrowers and FCMA, in its capacity as the Administrative Agent, Arranger and/or Lender.

"Foreign Lender" means (a) if the applicable Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if the applicable Borrower is not a U.S. Person, a Lender that is resident or organized under laws of a jurisdiction other than that in which such Borrower is resident for tax purposes.

"Foreign Subsidiary" means any Subsidiary that is not a Domestic Subsidiary.

"Fund" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified

Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or such other principles as may be approved by a significant segment of the accounting profession in the United States, that are applicable to the circumstances as of the date of determination, consistently applied.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government (including any supra-national bodies such as the European Union or the European Central Bank).

"Gross Profit" means, with respect to the Company and its Subsidiaries for any period, the total revenues for such period less the cost of goods for such period.

"Gross Revenue" means, with respect to the Company and its Subsidiaries for any period, the total revenues for such period.

"Guarantee" means, as to any Person, (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation payable or performable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness or other obligation of the payment or performance of such Indebtedness or other obligation, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness or other obligation of the payment or performance thereof or to protect such obligee against loss in respect thereof (in whole or in part) or (b) any Lien on any assets of such Person securing any Indebtedness or other obligation of any other Person, whether or not such Indebtedness or other obligation is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee shall be deemed to be an amount equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances, wastes or other pollutants including petroleum or petroleum distillates, natural gas, natural gas liquids, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, toxic mold, infectious or medical wastes and all other substances, wastes, chemicals, pollutants, contaminants or compounds of any nature in any form regulated pursuant to any Environmental Law.

"Indebtedness" means, as to any Person at a particular time, without duplication, all of the following, whether or not included as indebtedness or liabilities in accordance with GAAP:

(a) all obligations of such Person for borrowed money and all obligations of such Person evidenced by bonds, debentures, notes, loan agreements or other similar instruments;

(b) the maximum amount of all direct or contingent obligations of such Person arising under letters of credit (including standby and commercial), bankers' acceptances, bank guaranties, surety bonds and similar instruments;

(c) all net obligations of such Person under any Swap Contract;

(d) all obligations of such Person to pay the deferred purchase price of property or services (including earnouts but excluding trade accounts payable in the ordinary course of business and not more than 90 days past due);

(e) all indebtedness (excluding prepaid interest thereon) secured by a Lien on property owned or being purchased by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not such indebtedness shall have been assumed by such Person or is limited in recourse;

(f) all Attributable Indebtedness in respect of Capitalized Leases and Synthetic Lease Obligations of such Person and all Synthetic Debt of such Person;

(g) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Equity Interest in such Person or any other Person or any warrant, right or option to acquire such Equity Interest, valued, in the case of a redeemable preferred interest, at the greater of its voluntary or involuntary liquidation preference plus accrued and unpaid dividends; and

(h) all Guarantees of such Person in respect of any of the foregoing.

For all purposes hereof, the Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture (other than a joint venture that is itself a corporation or limited liability company) in which such Person is a general partner or a joint venturer, unless such Indebtedness is expressly made non-recourse to such Person. The amount of any net obligation under any Swap Contract on any date shall be deemed to be the Swap Termination Value thereof as of such date.

"Indemnified Taxes" means (a) Taxes other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Loan Party under any Loan Document and (b) to the extent not otherwise described in clause (a), Other Taxes.

"Indemnitee" has the meaning assigned to such term in Section 10.4(b).

"Information" has the meaning assigned to such term in Section 10.7.

"Intangible Assets" means assets that are considered to be intangible assets under GAAP, including customer lists, goodwill, computer software, copyrights, trade names, trademarks, patents, franchises, licenses, unamortized deferred charges, unamortized debt discount and capitalized research and development costs.

"Interest Payment Date" means, the first day of each calendar quarter and the Maturity Date of the Facility under which such Loan was made.

"Inventory" means "inventory" as defined in the UCC.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or interest in, another Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a

substantial part of the business of, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment. All Acquisitions shall constitute Investments.

"IRS" means the United States Internal Revenue Service.

"Laws" means, collectively, all international, foreign, federal, state and local statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means, as to any Lender, the office or offices of such Lender described as such in such Lender's Administrative Questionnaire, or such other office or offices as a Lender hereafter may designate by written notice to the Company and the Administrative Agent, which office may include any Affiliate of such Lender or any domestic or foreign branch of such Lender or such Affiliate. Unless the context otherwise requires each reference to a Lender shall include its applicable Lending Office.

"Lien" means any mortgage, pledge, hypothecation, assignment, deposit arrangement, encumbrance, easement, right-of-way or other encumbrance on title to real property, lien (statutory or other), charge, or preference, priority or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any financing lease having substantially the same economic effect as any of the foregoing).

"Lien Waiver" means an agreement, in form and substance reasonably satisfactory to the Administrative Agent, by which (a) for any Collateral located on leased premises or premises subject to a mortgage, the lessor or mortgagee, as applicable, agrees to, among other things, waive or subordinate any Lien it may have on the Collateral, and agrees to permit the Administrative Agent to enter upon the premises and remove the Collateral or to use the premises to store or dispose of the Collateral; (b) for any Collateral held by a warehouseman, processor, shipper, customs broker or freight forwarder, such Person waives or subordinates any Lien it may have on the Collateral, agrees to hold any Documents (as defined in the UCC) in its possession relating to the Collateral as agent for the Administrative Agent, and agrees to deliver the Collateral to the Administrative Agent upon request; (c) for any material Collateral held by a repairman, mechanic or bailee, such Person acknowledges the Administrative Agent's Lien, waives or subordinates any Lien it may have on the Collateral, and agrees to deliver the Collateral to the Administrative Agent upon request; and (d) for any Collateral subject to a licensor's intellectual property rights, such licensor grants to the Administrative Agent the right, vis-à-vis such licensor, to enforce the Administrative Agent's Liens with respect to the Collateral, including the right to dispose of it with the benefit of the intellectual property, whether or not a default exists under any applicable license.

"Line Reserve" means the sum of (a) the Rent and Charges Reserve; (b) the aggregate amount of liabilities at any time secured by Liens upon Collateral that are senior to the Administrative Agent's Liens; (c) sums that any Loan Party may be required to pay under any Section of this Agreement or any other Loan Document (including taxes, assessments, insurance premiums, or, in the case of leased assets, rents or other amounts payable under such leases) and has failed to pay; and (d) amounts for which claims may be reasonably expected to be asserted against the Collateral.

"Loan" means a Revolving Credit Loan, a Term Loan, a RELOC Loan or a RELOC Term Loan, as the context may require.

"Loan Documents" means, collectively, this Agreement, the Notes, the Subsidiary Guaranty, the Collateral Documents and the Fee Letter and any amendments, modifications or supplements hereto or to any other Loan Document or waivers hereof or to any other Loan Document.

"Loan Notice" means a notice of (a) a Revolving Credit Borrowing, (b) the Term Loan Borrowing or (c) a RELOC Borrowing, pursuant to Section 2.2(a), which shall be substantially in the form of Exhibit A or such other form as may be approved by the Administrative Agent, appropriately completed and signed by a Senior Officer of the Company.

"Loan Parties" means, collectively, the Borrowers and the Subsidiary Guarantors.

"Material Adverse Effect" means (a) a material adverse change in, or a material adverse effect upon, the operations, business, properties, liabilities (actual or contingent) or condition (financial or otherwise) of any Borrower or the Company and its Subsidiaries taken as a whole, (b) a material impairment of the rights and remedies of the Administrative Agent or any Lender under any Loan Document, or of the ability of any Loan Party to perform its obligations under any Loan Document to which it is a party or (c) a material adverse effect upon the legality, validity, binding effect or enforceability against any Loan Party of any Loan Document to which it is a party.

"Material Agreement" means, at any time, (a) any agreement of any Loan Party or any Subsidiary with any customer that in the aggregate produced 5% or more of Gross Revenues or Gross Profit for the four-fiscal quarter period of the Company and its Subsidiaries most recently ended or (b) any other agreement of any Loan Party or any Subsidiary, the breach, non-performance, cancellation or failure to renew of which could reasonably be expected to have a Material Adverse Effect.

"Maturity Date" means (a) with respect to the Revolving Credit Facility, July 22, 2025, (b) with respect to the Term Loan Facility, July 22, 2027 and (c) with respect to the RELOC Facility, July 22, 2027; provided that, in each case, if such date is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"Maximum Revolving Borrowing Amount" means the lesser of (a) the aggregate Revolving Credit Commitments minus the Line Reserves, if any, and (b) the Borrowing Base.

"Moody's" means Moody's Investors Service, Inc. and any successor thereto.

"Mortgage" means any mortgage, deed of trust, deed to secure debt or equivalent document now or hereafter encumbering any fee estate in favor of the Administrative Agent for the benefit of the Secured Parties, as security for any of the Obligations, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent.

"Mortgage Support Documents" means, with respect to any property subject to (or required to be subject to) a Mortgage, each of the following (all of which shall be in form and substance satisfactory to the Administrative Agent):

(a) mortgagee title insurance policies (in amounts and with endorsements reasonably acceptable to the Administrative Agent) issued, coinsured and reinsured by title insurers reasonably acceptable to the Administrative Agent, insuring the applicable Mortgage to be a valid first (or, solely in the case of the Dan Call Farm Property, second) and subsisting Lien on the property

described therein, free of any Liens except for Liens permitted by clauses (a), (c), (d) and (g) of Section 7.1 or, in the case of the Dan Farm Property, the Mortgage related thereto;

(b) flood hazard determination certifications, executed acknowledgement from the applicable Loan Party and evidence of flood insurance (if required) and other flood-related documentation as required by applicable Law and as reasonably required by the Administrative Agent and each Lender;

(c) evidence of the insurance with respect to such Mortgaged Property required by this Agreement, together with the endorsements required by this Agreement;

(d) favorable opinions of local counsel to the Loan Parties addressed to the Administrative Agent and the Lenders with respect to such Mortgage and such other matters as the Administrative Agent shall reasonably request (which such opinions shall expressly permit reliance by permitted successors and assigns of the Administrative Agent and the Lenders);

(e) a survey reasonably acceptable to the Administrative Agent, together with appropriate affidavits of no change and/or indemnities from the Borrower, if applicable, sufficient to both allow the title insurance policies required by the preceding clause (a) without a standard survey exception and, if applicable, satisfy the Administrative Agent's and each Lender's flood insurance diligence;

(f) a Phase I environmental assessment or such other environmental report(s) reasonably requested by the Administrative Agent by an environmental engineering firm acceptable to the Administrative Agent; and

(g) such other real estate related documents as may be reasonably requested by the Administrative Agent (e.g. SNDAs, leases, UCC fixture filings and the like).

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which the Company or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions or to which the Company or any ERISA Affiliate has any liability (contingent or otherwise).

"Multiple Employer Plan" means a Plan which has two or more contributing sponsors (including the Company or any ERISA Affiliate) at least two of whom are not under common control, as such a plan is described in Section 4064 of ERISA.

"Net Cash Proceeds" means, with respect to any Disposition by the Company or any of its Subsidiaries, or any Extraordinary Receipt received or paid to the account of the Company or any of its Subsidiaries or any Permitted Investor, the excess, if any, of (a) the sum of cash and Cash Equivalents received in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) over (b) the sum of (i) the principal amount of any Indebtedness that is secured by the applicable asset and that is required to be repaid in connection with such transaction (other than Indebtedness under the Loan Documents), (ii) the reasonable and customary out-of-pocket expenses incurred by the Company or such Subsidiary or Permitted Investor, as the case may be, in connection with such transaction and (iii) income taxes reasonably estimated to be actually payable within two years of the date of the relevant transaction as a result of any gain recognized in connection therewith; provided that, if the amount of any estimated taxes pursuant to subclause (iii) exceeds the amount of taxes actually required

to be paid in cash in respect of such Disposition, the aggregate amount of such excess shall constitute Net Cash Proceeds.

"Non-Consenting Lender" means any Lender that does not approve any consent, waiver or amendment that (a) requires the approval of all Lenders or all affected Lenders in accordance with the terms of Section 10.1 and (b) has been approved by the Required Lenders.

"Non-Defaulting Lender" means, at any time, a Lender that is not a Defaulting Lender at such time.

"Non-Guarantor Subsidiary" means any Subsidiary that is not a Subsidiary Guarantor.

"Note" means a promissory note made by a Borrower in favor of a Lender evidencing (a) the Revolving Credit Loans or Term Loans, as the case may be, of such Lender, substantially in the form of Exhibit B-1 or (b) the RELOC Loans or RELOC Term Loans, as the case may be, of such Lender, substantially in the form of Exhibit B-2.

"Notice of Account Designation" has the meaning assigned to such term in Section 2.2(b).

"Obligations" means all advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party or any Permitted Investor arising under any Loan Document or otherwise with respect to any Loan, in each case whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Loan Party or any Affiliate thereof or any Permitted Investor of any proceeding under any Debtor Relief Laws naming such Person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceeding.

"OFAC" means the Office of Foreign Assets Control of the United States Department of the Treasury.

"Organization Documents" means, (a) with respect to any corporation, the charter or certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction), (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating or limited liability company agreement and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Documents).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 3.4).

"Outstanding Amount" means, with respect to Loans on any date, the aggregate outstanding principal amount thereof after giving effect to any borrowings and prepayments or repayments of such Loans occurring on such date.

"Participant" has the meaning assigned to such term in Section 10.6(d).

"Participant Register" has the meaning assigned to such term in Section 10.6(d).

"PATRIOT Act" means the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Act" means the Pension Protection Act of 2006.

"Pension Funding Rules" means the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and set forth in, with respect to plan years ending prior to the effective date of the Pension Act, Section 412 of the Code and Section 302 of ERISA, each as in effect prior to the Pension Act and, thereafter, Section 412, 430, 431, 432 and 436 of the Code and Sections 302, 303, 304 and 305 of ERISA.

"Pension Plan" means any employee pension benefit plan (including a Multiple Employer Plan or a Multiemployer Plan) that is maintained or is contributed to by the Company or any ERISA Affiliate or to which the Company or any ERISA Affiliate has any liability (contingent or otherwise) and is either covered by Title IV of ERISA or is subject to the minimum funding standards under Section 412 of the Code.

"Permitted Discretion" means a determination made in good faith, using reasonable business judgment (from the perspective of a secured, asset-based lender).

"Permitted Investors" means, collectively, Fawn Weaver and Keith Weaver.

"Permitted Liens" means Liens permitted pursuant to Section 7.1.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee benefit plan within the meaning of Section 3(3) of ERISA (including a Pension Plan), maintained for employees of the Company or any ERISA Affiliate or any such Plan to which the Company or any ERISA Affiliate is required to contribute on behalf of any of its employees.

"Platform" means Debt Domain, Intralinks, Syndtrak, kiteworks or a substantially similar electronic transmission system.

"Pledge Agreement" means the Pledge Agreement dated as of the Closing Date by the Loan Parties in favor of the Administrative Agent for the benefit of the Secured Parties, as supplemented from time to time by the execution and delivery of joinders and other documents pursuant to Section 6.12 or otherwise.

"PTE" means a prohibited transaction class exemption issued by the U.S. Department of Labor, as any such exemption may be amended from time to time.

"Public Lender" has the meaning assigned to such term in Section 10.2(d)(ii).

"RE Holdings" has the meaning assigned to such term in the introductory paragraph hereto.

"Recipient" means (a) the Administrative Agent, (b) any Lender or (c) any other recipient of any payment to be made by or on account of any obligation of any Loan Party hereunder, as applicable.

"Register" has the meaning assigned to such term in Section 10.6(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, trustees, administrators, managers, advisors, consultants, service providers and representatives of such Person and of such Person's Affiliates.

"RELOC Availability Period" means the period from and including the Amendment No. 3 Effective Date to the earliest of (a) the second anniversary of the Amendment No. 3 Effective Date, (b) the date of termination of all RELOC Commitments pursuant to Section 2.4(b) and (c) the date of termination of the commitment of each RELOC Lender to make RELOC Loans pursuant to Section 8.2.

"RELOC Borrowing" means a borrowing consisting of simultaneous RELOC Loans (or, from and after the Conversion Date, RELOC Term Loans) made by each of the RELOC Lenders pursuant to Section 2.1(c).

"RELOC Commitment" means, as to each Lender, its obligation to make RELOC Loans to the Borrowers pursuant to Section 2.1(c) in an aggregate principal amount not to exceed the amount set forth opposite such Lender's name on Annex A under the caption "RELOC Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"RELOC Commitment Fee" has the meaning assigned to such term in Section 2.7(b).

"RELOC Facility" means the real estate line of credit facility established pursuant to Section 2.1(c).

"RELOC Lender" means, at any time, any Lender that has a RELOC Commitment or an outstanding RELOC Loan or RELOC Term Loan at such time.

"RELOC Loan" has the meaning assigned to such term in Section 2.1(c)(i).

"RELOC Term Loan" has the meaning assigned to such term in Section 2.1(c)(ii).

"Rent and Charges Reserve" means the aggregate of (a) all past due rent and other amounts owing by any Borrower to any landlord, warehouseman, processor, repairman, mechanic, shipper, freight forwarder, broker or other Person who possesses any Collateral or could assert a Lien on any Collateral; and (b) a reserve at least equal to three months' rent and other charges that could be payable to any such Person, unless it has executed a Lien Waiver.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30 day notice period has been waived.

"Request for Credit Extension" means, with respect to a Borrowing, conversion or continuation of Loans, a Loan Notice.

"Required Lenders" means, at any time, Lenders having Total Credit Exposures representing more than 50% of the Total Credit Exposures of all Lenders. The Total Credit Exposure of any Defaulting Lender shall be disregarded in determining Required Lenders at any time.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of any Person or any of its Subsidiaries, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to any Person's stockholders, partners or members (or the equivalent of any thereof), or any option, warrant or other right to acquire any such dividend or other distribution or payment.

"Revolving Commitment Fee" has the meaning assigned to such term in Section 2.7(a).

"Revolving Credit Availability Period" means the period from and including the Closing Date to the earliest of (a) the Maturity Date for the Revolving Credit Facility, (b) the date of termination of all Revolving Credit Commitments pursuant to Section 2.4(a) and (c) the date of termination of the commitment of each Revolving Lender to make Revolving Credit Loans pursuant to Section 8.2.

"Revolving Credit Borrowing" means a borrowing consisting of simultaneous Revolving Credit Loans made by each of the Revolving Credit Lenders pursuant to Section 2.1(a).

"Revolving Credit Commitment" means, as to each Lender, its obligation to make Revolving Credit Loans to the Borrowers pursuant to Section 2.1(a) in an aggregate principal amount at any one time outstanding not to exceed the amount set forth opposite such Lender's name on Annex A under the caption "Revolving Credit Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Revolving Credit Exposure" means, as to any Lender at any time, the aggregate principal amount at such time of its outstanding Revolving Credit Loans.

"Revolving Credit Facility" means the revolving credit facility established pursuant to Section 2.1(a).

"Revolving Credit Lender" means, at any time, any Lender that has a Revolving Credit Commitment or Revolving Credit Exposure at such time.

"Revolving Credit Loan" has the meaning assigned to such term in Section 2.1(a).

"S&P" means Standard & Poor's Financial Services LLC, a subsidiary of S&P Global Inc., and any successor thereto.

"Sanctioned Country" means, at any time, a country, region or territory which is itself (or whose government is) the subject or target of any Sanctions (including, as of the Closing Date, Cuba, Iran, North Korea, Syria and Crimea).

"Sanctioned Person" means, at any time, (a) any Person listed in any Sanctions-related list of designated Persons maintained by OFAC (including OFAC's Specially Designated Nationals and Blocked Persons List and OFAC's Consolidated Non-SDN List), the U.S. Department of State, the United Nations Security Council, the European Union, any European member state, Her Majesty's Treasury or other

relevant sanctions authority, (b) any Person operating, organized or resident in a Sanctioned Country, (c) any Person owned or controlled by, or acting or purporting to act for or on behalf of, directly or indirectly, any such Person or Persons described in clauses (a) and (b), including a Person that is deemed by OFAC to be a Sanctions target based on the ownership of such legal entity by Sanctioned Person(s) or (d) any Person otherwise a target of Sanctions, including vessels and aircraft, that are designated under any Sanctions program.

"Sanctions" means any and all economic or financial sanctions, sectoral sanctions, secondary sanctions, trade embargoes and restrictions and anti-terrorism laws, including those imposed, administered or enforced from time to time by the U.S. government (including those administered by OFAC or the U.S. Department of State), the United Nations Security Council, the European Union, any European member state, Her Majesty's Treasury, or other relevant sanctions authority in any jurisdiction in which (a) the Company or any of its Subsidiaries or Affiliates is located or conducts business, (b) in which any of the proceeds of the Loans will be used, or (c) from which repayment of the Loans will be derived.

"Secured Parties" means, collectively, the Administrative Agent, the Lenders, each co-agent or sub-agent appointed by the Administrative Agent from time to time pursuant to Section 9.5, and the other Persons the Obligations owing to which are or are purported to be secured by the Collateral under the terms of the Collateral Documents.

"Security Agreement" means the Security Agreement dated as of the Closing Date by the Loan Parties in favor of the Administrative Agent for the benefit of the Secured Parties, as supplemented from time to time by the execution and delivery of joinders and other documents pursuant to Section 6.12 or otherwise.

"Senior Officer" means, with respect to any Loan Party, the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of such Loan Party, any other officer of such Loan Party as hereafter may be designated by written notice by such Loan Party to the Administrative Agent (so long as such officer is reasonably acceptable to the Administrative Agent) and, solely for purposes of the delivery of incumbency certificates pursuant to Section 4.1, the secretary or any assistant secretary of such Loan Party. Any document delivered hereunder that is signed by a Senior Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Senior Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Shareholders' Equity" means, as of any date of determination, consolidated shareholders' equity of the Company and its Subsidiaries as of that date determined in accordance with GAAP.

"Solvent" and "Solvency" mean, with respect to any Person on any date of determination, that on such date (a) the fair value of the property of such Person is greater than the total amount of liabilities, including contingent liabilities, of such Person, (b) the present fair salable value of the assets of such Person is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured, (c) such Person does not intend to, and does not believe that it will, incur debts or liabilities beyond such Person's ability to pay such debts and liabilities as they mature, (d) such Person is not engaged in business or a transaction, and is not about to engage in business or a transaction, for which such Person's property would constitute an unreasonably small capital and (e) such Person is able to pay its debts and liabilities, contingent obligations and other commitments as they mature in the ordinary course of business. The amount of contingent liabilities at any time shall be computed as the amount that, in the light of all the facts and circumstances existing at such time, represents the amount that can reasonably be expected to become an actual or matured liability.

"Specified Equity Contribution" has the meaning assigned to such term in Section 8.4.

"Specified Equity Contribution Request" has the meaning assigned to such term in Section 8.4.

"Subsidiary" of a Person means a corporation, partnership, joint venture, limited liability company or other business entity of which a majority of the shares of securities or other interests having ordinary voting power for the election of directors or other governing body (other than securities or interests having such power only by reason of the happening of a contingency) are at the time beneficially owned, or the management of which is otherwise controlled, directly, or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise specified, all references herein to a "Subsidiary" or to "Subsidiaries" shall refer to a Subsidiary or Subsidiaries of the Company.

"Subsidiary Guarantors" means, collectively, the Subsidiaries from time to time party to the Subsidiary Guaranty.

"Subsidiary Guaranty" means the Subsidiary Guaranty Agreement to be entered into after the Closing Date pursuant to the terms hereof (which shall be in form and substance satisfactory to the Administrative Agent) by certain Subsidiaries in favor of the Administrative Agent for the benefit of the Secured Parties, as supplemented from time to time by the execution and delivery of joinders and other documents pursuant to Section 6.12 or otherwise.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Debt" means, as to any Person at a particular time, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"Synthetic Lease Obligation" means, as to any Person at a particular time, the monetary obligation of such Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating

obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" has the meaning assigned to such term in Section 2.1(b).

"Term Loan Borrowing" means a borrowing consisting of simultaneous Term Loans made by each of the Term Loan Lenders pursuant to Section 2.1(b).

"Term Loan Commitment" means, as to each Lender, its obligation to make a single Term Loan to the Borrowers pursuant to Section 2.1(b) on the Amendment No. 5 Effective Date in a principal amount not to exceed the amount set forth opposite such Lender's name on Annex A under the caption "Term Loan Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

"Term Loan Facility" means the term loan facility established pursuant to Section 2.1(b).

"Term Loan Lender" means, at any time, any Lender that has a Term Loan Commitment, all or a portion of which is unused, or an outstanding Term Loan at such time.

"Total Credit Exposure" means, as to any Lender at any time, the unused Commitments, Revolving Credit Exposure and the aggregate outstanding principal amount of Term Loans, RELOC Loans and RELOC Term Loans of such Lender at such time.

"Total Revolving Credit Outstandings" means the aggregate Outstanding Amount of all Revolving Credit Loans.

"UCC" means the Uniform Commercial Code as in effect in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States" and "U.S." mean the United States of America.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"U.S. Tax Compliance Certificate" has the meaning assigned to such term in Section 3.1(g)(ii)(B)(3).

"Value" means:

(a) with respect to Eligible Inventory, for any particular type of Inventory (whether raw materials or finished goods), its value determined on the basis of the lower of cost or market,

calculated on a first-in, first-out basis, and excluding any portion of cost attributable to intercompany profit among the Borrowers and their Affiliates; and

(b) with respect to Eligible Accounts, the face amount of such Eligible Account, net of any returns, rebates, discounts (calculated on the shortest terms), credits, allowances or Taxes (including sales, excise or other taxes) that have been or could reasonably be expected to be claimed by the Account Debtor or any other Person.

"Wholly-Owned" means, with respect to a Subsidiary, that all of the Equity Interests of such Subsidiary are, directly or indirectly, owned or controlled by the Company and/or one or more of its Wholly-Owned Subsidiaries (except for directors' qualifying shares or other shares required by applicable Law to be owned by a Person other than the Company and/or one or more of its Wholly-Owned Subsidiaries).

"Withholding Agent" means the Company and the Administrative Agent.

1.2 Rules of Interpretation. With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a) The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "hereto," "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits, Schedules and Annexes shall be construed to refer to Articles and Sections of, and Exhibits, Schedules and Annexes to, the Loan Document in which such references appear, (v) any reference to any Law shall include all statutory and regulatory provisions consolidating, amending, replacing or interpreting such Law and any reference to any Law shall, unless otherwise specified, refer to such Law as amended, modified or supplemented from time to time and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b) In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c) Article and Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

(d) Any reference herein to a merger, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, shall be deemed to apply to a division of or by a limited liability company, a limited partnership or any other entity, or an allocation of assets to a series of a limited liability company, a limited partnership or any other entity (or the unwinding of such a division or allocation), as if

it were a merger, amalgamation, consolidation, assignment, sale, disposition or transfer, or similar term, as applicable, to, of or with a separate Person. Any division of a limited liability company, a limited partnership or any other entity shall constitute a separate Person hereunder (and each division of any limited liability company, a limited partnership or any other entity that is a Subsidiary, joint venture or any other like term shall also constitute such a Person or entity).

(e) Terms used in this Agreement that are not otherwise expressly defined herein and for which meanings are provided in the UCC, shall have such meanings unless the context requires otherwise.

1.3 Accounting Terms.

(a) Generally. All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, and in a manner consistent with that used in preparing the Baseline Financial Statements, except as otherwise specifically prescribed herein. Notwithstanding the foregoing, for purposes of determining compliance with any covenant (including the computation of any financial covenant) contained herein, Indebtedness of the Company and its Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b) Changes in GAAP. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Company or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Company shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Company shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

1.4 Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.5 Rounding. Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

## ARTICLE II
## THE COMMITMENTS AND CREDIT EXTENSIONS

2.1 Loans.

(a) Revolving Credit Borrowing. Subject to the terms and conditions set forth herein, each Revolving Credit Lender severally agrees to make loans (each such loan, a "Revolving Credit Loan") to the Borrowers from time to time on any Business Day during the Revolving Credit Availability Period, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Revolving Credit Commitment; provided that after giving effect to any Revolving Credit Borrowing, (i) the Total Revolving Credit Outstandings shall not exceed the Maximum Revolving Borrowing Amount and (ii) the Revolving

Credit Exposure of any Revolving Credit Lender shall not exceed such Lender's Revolving Credit Commitment. Within the limits of each Revolving Credit Lender's Revolving Credit Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.1(a), prepay under Section 2.3 and reborrow under this Section 2.1(a). Revolving Credit Loans shall be Base Rate Loans, as further provided herein.

(b) Term Loan Borrowing. On the Closing Date and on the Amendment No. 4 Effective Date, each Lender made loans to the Borrowers (each such loan, an "Existing Term Loan") pursuant to this Section 2.01(b) and, as of the Amendment No. 5 Effective Date, the aggregate outstanding principal amount of the Existing Term Loans is held by the Lenders on the Amendment No. 5 Effective Date as set forth opposite each Lender's name on Annex A. Subject to the terms and conditions set forth herein, each Term Loan Lender severally agrees to make a single additional loan to the Borrowers (each such additional term loan made by a Lender and each Existing Term Loan of a Lender shall be referred to herein as a "Term Loan" of such Lender) on the Amendment No. 5 Effective Date in an amount equal to such Lender's Term Loan Commitment as set forth on Annex A. Each Term Loan Borrowing shall consist of Term Loans made simultaneously by the Term Loan Lenders in accordance with their respective Applicable Percentage of the Term Loan Facility. Amounts borrowed under this Section 2.1(b) and repaid or prepaid may not be reborrowed. Term Loans shall be Base Rate Loans, as further provided herein.

(c) RELOC Borrowing.

(i) Subject to the terms and conditions set forth herein, each RELOC Lender severally agrees to make loans (each such loan, a "RELOC Loan") to the Borrowers from time to time on any Business Day during the RELOC Availability Period, in an aggregate amount not to exceed the amount of such Lender's RELOC Commitment. Amounts borrowed under this Section 2.1(c)(i) and repaid or prepaid may not be reborrowed. RELOC Loans shall be Base Rate Loans, as further provided herein.

(ii) On the second anniversary of the Amendment No. 3 Effective Date (such date, the "Conversion Date"), each RELOC Lender severally agrees that its then outstanding RELOC Loans shall automatically be converted into a single term loan (such term loan, the "RELOC Term Loan") of such Lender having an original principal amount equal to the aggregate outstanding principal amount (immediately prior to conversion) of such Lender's RELOC Loans so converted. Amounts repaid or prepaid with respect to the RELOC Term Loans may not be reborrowed. RELOC Term Loans shall be Base Rate Loans, as further provided herein.

2.2 Borrowings of Loans.

(a) Each Borrowing of Loans shall be made upon the Company's irrevocable written notice to the Administrative Agent in the form of a Loan Notice, which notice must be received by the Administrative Agent not later than 11:00 a.m. (i) one Business Day prior to the requested date of any Revolving Credit Borrowing or RELOC Borrowing and (ii) on the requested date of the Term Loan Borrowing. Each Loan Notice shall specify (A) whether the relevant Borrower is requesting a Revolving Credit Borrowing, a RELOC Borrowing or the Term Loan Borrowing, (B) the requested date of the Borrowing (which shall be a Business Day), (C) the principal amount of Loans to be borrowed, which shall be, (1) with respect to Revolving Credit Loans and RELOC Loans, a principal amount of $1,000,000 or a whole multiple of $500,000 in excess thereof, and (2) with respect to the Term Loans, the full amount of the aggregate Term Loan Commitments and (D) the applicable Borrower requesting such Borrowing. The Administrative Agent shall promptly notify the applicable Lenders of each Loan Notice.

(b) Not later than 12:00 p.m. on the Business Day specified in the applicable Loan Notice, each applicable Lender shall make the amount of its Loan available to the Administrative Agent, for the account of the Borrowers, in immediately available funds at the Administrative Agent's Office. Each Borrower hereby irrevocably authorizes the Administrative Agent to disburse the proceeds of each Borrowing requested pursuant to the terms hereof in immediately available funds by crediting or wiring such proceeds to the deposit account of the applicable Borrower or Borrowers identified in the most recent notice substantially in the form attached as Exhibit F (a "Notice of Account Designation") delivered by the Company to the Administrative Agent or as may be otherwise agreed upon by the Company and the Administrative Agent from time to time. Subject to Section 2.10(a)(i), the Administrative Agent shall not be obligated to disburse the portion of the proceeds of any Revolving Credit Loan, RELOC Loan or Term Loan requested pursuant to this Section to the extent that any Lender has not made available to the Administrative Agent its Applicable Percentage of such Loan.

(c) Notwithstanding anything to the contrary in this Agreement, any Lender may exchange, continue or rollover all or a portion of its Loans in connection with any refinancing, extension, loan modification or similar transaction permitted by the terms of this Agreement, pursuant to a cashless settlement mechanism approved by the Company, the Administrative Agent, and such Lender.

2.3 Prepayments.

(a) Optional. The Borrowers may, upon notice by the Company to the Administrative Agent, at any time or from time to time voluntarily prepay Revolving Credit Loans, RELOC Loans or RELOC Term Loans in whole or in part without premium or penalty; provided that (i) such notice must be in a form acceptable to the Administrative Agent and be received by the Administrative Agent not later than 11:00 a.m. one Business Day prior to the date of prepayment of such Revolving Credit Loans, RELOC Loans or RELOC Term Loans and (ii) any prepayment of Revolving Credit Loans, RELOC Loans or RELOC Term Loans shall be in a principal amount of $1,000,000 or a whole multiple of $100,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment and the allocation of the prepayment between the outstanding Revolving Credit Loans, RELOC Loans or RELOC Term Loans. The Administrative Agent will promptly notify each Revolving Credit Lender or RELOC Lender, as the case may be, of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage of the relevant Facility, subject to Section 2.12). If such notice is given by the Company, the Borrowers shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Subject to Section 2.12, each such prepayment pursuant to this Section 2.3(a) shall be paid to the Revolving Credit Lenders or the RELOC Lenders, as applicable, in accordance with their respective Applicable Percentages of the relevant Facility. The Company may also, upon notice by the Company to the Administrative Agent, at any time or from time to time voluntarily prepay Term Loans in whole or in part; provided that (i) such notice must be in a form acceptable to the Administrative Agent and be received by the Administrative Agent not later than 11:00 a.m. three Business Days prior to any date of prepayment and (ii) any such prepayment shall be in a principal amount of $2,000,000 or a whole multiple of $1,000,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment. The Administrative Agent will promptly notify each Term Loan Lender of its receipt of each such notice, and of the amount of such Lender's ratable portion of such prepayment (based on such Lender's Applicable Percentage of the Term Loan Facility). If such notice is given by the Company, the Company shall make such prepayment and the payment amount specified in such notice shall be due and payable on the date specified therein. Any prepayment of a Term Loan, RELOC Loan or RELOC Term Loan shall be accompanied by all accrued interest on the amount prepaid. Each such prepayment pursuant to this Section 2.3(a) shall be paid to the Term Loan Lenders in accordance with their respective Applicable Percentages of the Term Loan Facility. Each prepayment of the outstanding Term Loans or RELOC Term Loans

pursuant to this Section 2.3(a) shall be applied to the principal repayment installments of the Loans being repaid (including the installment due on the Maturity Date of the Term Loan Facility or the RELOC Facility, as the case may be) in inverse order of maturity.

(b) Mandatory.

(i) Overadvances. If for any reason the Total Revolving Credit Outstandings at any time exceed the Maximum Revolving Borrowing Amount at such time, the Borrowers shall immediately prepay Revolving Credit Loans in an aggregate amount equal to such excess.

(ii) Dispositions. If a Disposition occurs with respect to any property of any Loan Party or any of its Subsidiaries (other than any Disposition of any property permitted by any of clauses (a) through (h) of Section 7.5) or the Dan Call Farm Property which results in the realization by such Person or any Permitted Investor of Net Cash Proceeds in excess of $100,000, the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of such Net Cash Proceeds immediately upon receipt thereof by such Person or such Permitted Investor; provided, however, notwithstanding the foregoing, with respect to any Net Cash Proceeds less than $1,000,000 realized in connection with any such Disposition (other than with respect to the Dan Call Farm Property), at the election of the Borrowers (as notified by the Company to the Administrative Agent on or prior to the date of such Disposition or receipt of proceeds) and so long as no Event of Default shall have occurred and be continuing, such Loan Party or such Subsidiary may reinvest all or any portion of such Net Cash Proceeds in operating assets within 180 days after the receipt of such Net Cash Proceeds (the consummation of such reinvestment to be certified by the Company in writing to the Administrative Agent within such period); provided further however, that any Net Cash Proceeds not so reinvested shall be immediately applied to the prepayment of the Loans as set forth in this Section 2.3(b)(ii).

(iii) Extraordinary Receipts. Upon receipt of any Extraordinary Receipt by any Loan Party or any Subsidiary or any Permitted Investor, not otherwise included in clause (ii) above, the Borrowers shall prepay an aggregate principal amount of Loans equal to 100% of the Net Cash Proceeds thereof immediately upon receipt thereof by such Person; provided, however, notwithstanding the foregoing, with respect to any proceeds of insurance, condemnation awards (or payments in lieu thereof) or indemnity payments (other than those related to the Dan Call Farm Property), at the election of the Borrowers (as notified by the Company to the Administrative Agent on or prior to the date of receipt of such insurance proceeds, condemnation awards or indemnity payments), and so long as no Event of Default shall have occurred and be continuing, such Loan Party or such Subsidiary may apply within 180 days after the receipt thereof to replace or repair the equipment, fixed assets or real property in respect of which such proceeds were received; and provided further however, that any such proceeds not so applied shall be immediately applied to the prepayment of the Loans as set forth in this Section 2.3(b)(iii).

(iv) Application of Mandatory Prepayments. Each prepayment of Loans pursuant to the foregoing provisions of this Section 2.3(b) (other than clause (i)) shall be applied, first, ratably, to the repayment installments of each of the Term Loans and the RELOC Term Loans (if any) (including the installment due on the respective Maturity Dates therefor) in inverse order of maturity, second, to the outstanding RELOC Loans and third, to the outstanding Revolving Credit Loans (without a corresponding reduction in the aggregate Revolving Credit Commitments). Each prepayment of Loans pursuant to the provisions of Section 2.3(b)(i) shall be applied to the outstanding Revolving Credit Loans (without a corresponding reduction in the aggregate Revolving Credit Commitments).

2.4 Termination or Reduction of Commitments.

(a) Revolving Credit Facility. Upon notice to the Administrative Agent, the Company may terminate, or from time to time permanently reduce, the aggregate Revolving Credit Commitments; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five Business Days prior to the date of termination or reduction, (ii) any such partial reduction shall be in an aggregate amount of $10,000,000 or any whole multiple of $1,000,000 in excess thereof and (iii) the Company shall not terminate or reduce the aggregate Revolving Credit Commitments if, after giving effect thereto and to any concurrent prepayments hereunder, the Total Revolving Credit Outstandings would exceed the aggregate Revolving Credit Commitments. The Administrative Agent will promptly notify the Lenders of any termination or reduction of the aggregate Revolving Credit Commitments under this Section 2.4(a). Upon any reduction of the aggregate Revolving Credit Commitments, the Revolving Credit Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. All fees in respect of the Revolving Credit Facility accrued until the effective date of any termination of the aggregate Revolving Credit Commitments shall be paid on the effective date of such termination.

(b) RELOC Facility. Upon notice to the Administrative Agent, the Company may terminate, or from time to time permanently reduce, the aggregate RELOC Commitments; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five Business Days prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $1,000,000 in excess thereof. In addition to the foregoing, any unused portion of the aggregate RELOC Commitments shall be automatically and permanently terminated on the last day of the RELOC Availability Period. The Administrative Agent will promptly notify the Lenders of any termination or reduction of the aggregate RELOC Commitments under this Section 2.4(b). Upon any reduction of the aggregate RELOC Commitments, the RELOC Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. All fees in respect of the RELOC Facility accrued until the effective date of any termination of the aggregate RELOC Commitments shall be paid on the effective date of such termination.

2.5 Repayment of Loans.

(a) Revolving Credit Loans. The Borrowers shall repay to the Revolving Credit Lenders on the Maturity Date for the Revolving Credit Facility the aggregate principal amount of all Revolving Credit Loans outstanding on such date.

(b) Term Loans. From and after the Amendment No. 5 Effective Date, the Borrowers shall repay to the Term Loan Lenders the aggregate principal amount of all Term Loans outstanding in quarterly installments of $293,789.06 (commencing on July 1, 2023) on the first day of each calendar quarter (which installments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.3); provided that the final principal repayment installment of the Term Loans shall be repaid on the Maturity Date for the Term Loan Facility and in any event shall be in an amount equal to the aggregate principal amount of all Term Loans outstanding on such date.

(c) RELOC Loans / RELOC Term Loans. With respect to the RELOC Term Loans, promptly following the Conversion Date, the Administrative Agent shall calculate and deliver to the RELOC Lenders and the Company an amortization schedule with respect to the RELOC Term Loans providing for annual "straight-line" amortization of principal over a 15-year amortization period with principal due on the first day of each calendar quarter (commencing April 1, 2025). The Borrowers shall repay to the RELOC

Lenders the aggregate principal amount of all RELOC Term Loans as set forth in such amortization schedule (which installments shall be reduced as a result of the application of prepayments in accordance with Section 2.3); provided that the final principal repayment installment of the RELOC Term Loans shall be repaid on the Maturity Date applicable thereto and in any event shall be in an amount equal to the aggregate principal amount all RELOC Term Loans outstanding on such date. To the extent not converted to RELOC Term Loans pursuant to Section 2.1(c)(ii) for any reason, the Borrowers shall repay to the RELOC Lenders on the Conversion Date the aggregate principal amount of all RELOC Loans outstanding on such date.

2.6 Interest.

(a) Interest Rate Generally. Subject to the provisions of Section 2.6(b), each Base Rate Loan shall bear interest on the outstanding principal amount thereof from the applicable borrowing date at a rate per annum equal to the Base Rate (as in effect from time to time) plus the Applicable Margin.

(b) Default Rate.

(i) If any amount of principal of any Loan is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(ii) If any amount (other than principal of any Loan) payable by the Borrowers under any Loan Document is not paid when due (without regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then upon the request of the Required Lenders such amount shall thereafter bear interest at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iii) Upon the request of the Required Lenders, while any Event of Default exists (other than as set forth in the foregoing subsections (i) and (ii)), the Borrowers shall pay interest on the principal amount of all outstanding Obligations hereunder at a fluctuating interest rate per annum at all times equal to the Default Rate to the fullest extent permitted by applicable Laws.

(iv) Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c) Interest Payment Dates. Interest on each Loan shall be due and payable in arrears on each Interest Payment Date applicable thereto and at such other times as may be specified herein. Interest hereunder shall be due and payable in accordance with the terms hereof before and after judgment, and before and after the commencement of any proceeding under any Debtor Relief Law.

(d) Maximum Rate. Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "Maximum Rate"). If the Administrative Agent or any Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Borrowers. In determining whether the interest contracted for, charged, or received by the Administrative Agent or a Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (i) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (ii) exclude voluntary prepayments and the effects thereof and (iii) amortize, prorate, allocate, and spread

in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

2.7 Fees.

(a) Revolving Commitment Fee. The Borrowers shall pay to the Administrative Agent, for the account of each Revolving Credit Lender, a commitment fee (the "Revolving Commitment Fee") equal to 0.50% per annum times the actual daily amount by which aggregate Revolving Credit Commitments exceeds the Outstanding Amount of Revolving Credit Loans, subject to adjustment as provided in Section 2.12. The Revolving Commitment Fee shall accrue at all times during the Revolving Credit Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the first day of each calendar quarter and on the last day of the Revolving Credit Availability Period. The Revolving Commitment Fee shall be distributed by the Administrative Agent to the Revolving Credit Lenders in accordance with their respective Applicable Percentages, subject to adjustment as provided in Section 2.12.

(b) RELOC Commitment Fee. The Borrowers shall pay to the Administrative Agent, for the account of each RELOC Lender, a commitment fee (the "RELOC Commitment Fee") equal to 0.50% per annum times the actual daily amount of the unused portion of the aggregate RELOC Commitments. The RELOC Commitment Fee shall accrue at all times during the RELOC Availability Period, including at any time during which one or more of the conditions in Article IV is not met, and shall be due and payable quarterly in arrears on the first day of each calendar quarter, commencing on April 1, 2023, and on the last day of the RELOC Availability Period. The RELOC Commitment Fee shall be calculated quarterly in arrears. The RELOC Commitment Fee shall be distributed by the Administrative Agent to the RELOC Lenders in accordance with their respective Applicable Percentages.

(c) Arranger, Administrative Agent and Lender Fees. The Borrowers shall pay to the Arranger and the Administrative Agent, for their own respective accounts, fees in the amounts and at the times specified in the Fee Letter. The Borrowers shall pay to the Lenders such fees as shall have been separately agreed upon in writing in the amounts and at the times so specified (including any upfront fees payable on the Closing Date). All of the foregoing fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

2.8 Computation of Interest and Fees. All computations of interest for Base Rate Loans when the Base Rate is determined by the Prime Rate shall be made on the basis of a year of 365 days and actual days elapsed. All other computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed (which results in more fees or interest, as applicable, being paid than if computed on the basis of a 365-day year). Interest shall accrue on each Loan for the day on which the Loan is made, and shall not accrue on a Loan, or any portion thereof, for the day on which the Loan or such portion is paid; provided that any Loan that is repaid on the same day on which it is made shall, subject to Section 2.10(a), bear interest for one day. Each determination by the Administrative Agent of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.9 Evidence of Debt. The Credit Extensions made by each Lender shall be evidenced by one or more accounts or records maintained by such Lender in the ordinary course of business. The Administrative Agent shall maintain the Register in accordance with Section 10.6(c). The accounts or records maintained by each Lender shall be conclusive absent manifest error of the amount of the Credit Extensions made by the Lenders to the Borrowers and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrowers hereunder to pay any amount owing with respect to the Obligations. In the event of any conflict between the accounts and records maintained by any Lender and the Register, the Register shall control in the

absence of manifest error. Upon the request of any Lender made through the Administrative Agent, each Borrower shall execute and deliver to such Lender (through the Administrative Agent) a Note, which shall evidence such Lender's Loans in addition to such accounts or records. Each Lender may attach schedules to its Note and endorse thereon the date, amount and maturity of its Loans and payments with respect thereto.

2.10 Payments Generally; Administrative Agent's Clawback.

(a) General. All payments to be made by the Borrowers shall be made free and clear of and without condition or deduction for any counterclaim, defense, recoupment or setoff. Except as otherwise expressly provided herein, all payments by the Borrowers hereunder shall be made to the Administrative Agent, for the account of the respective Lenders to which such payment is owed, at the Administrative Agent's Office in Dollars and in immediately available funds not later than 2:00 p.m. on the date specified herein. The Administrative Agent will promptly distribute to each Lender its Applicable Percentage in respect of the relevant Facility (or other applicable share as provided herein) of such payment in like funds as received by wire transfer to such Lender's Lending Office. All payments received by the Administrative Agent after 2:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue, unless otherwise agreed to by the Administrative Agent. If any payment to be made by the Borrowers shall come due on a day other than a Business Day, payment shall be made on the next following Business Day, and such extension of time shall be reflected in computing interest or fees, as the case may be.

(i) Funding by Lenders; Presumption by Administrative Agent. Unless the Administrative Agent shall have received notice from a Lender prior to the proposed date of any Borrowing of Loans that such Lender will not make available to the Administrative Agent such Lender's share of such Borrowing, the Administrative Agent may assume that such Lender has made such share available on such date in accordance with Section 2.2 and may, in reliance upon such assumption, make available to the Borrowers a corresponding amount. In such event, if a Lender has not in fact made its share of the applicable Borrowing available to the Administrative Agent, then the applicable Lender and the Borrowers severally agree to pay to the Administrative Agent forthwith on demand such corresponding amount in immediately available funds with interest thereon, for each day from and including the date such amount is made available to the Borrowers to but excluding the date of payment to the Administrative Agent, at (A) in the case of a payment to be made by such Lender, the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking or farm credit industry rules on interbank compensation, plus any administrative, processing or similar fees customarily charged by the Administrative Agent in connection with the foregoing, and (B) in the case of a payment to be made by the Borrowers, the interest rate applicable to Base Rate Loans. If the Borrowers and such Lender shall pay such interest to the Administrative Agent for the same or an overlapping period, the Administrative Agent shall promptly remit to the Borrowers the amount of such interest paid by the Borrowers for such period. If such Lender pays its share of the applicable Borrowing to the Administrative Agent, then the amount so paid shall constitute such Lender's Loan included in such Borrowing. Any payment by the Borrowers shall be without prejudice to any claim any Borrower may have against a Lender that shall have failed to make such payment to the Administrative Agent.

(ii) Payments by Borrowers; Presumptions by Administrative Agent. Unless the Administrative Agent shall have received notice from the Company prior to the time at which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrowers will not make such payment, the Administrative Agent may assume that the Borrowers have made such payment on such date in accordance herewith and may, in reliance upon such

assumption, distribute to the Lenders the amount due. In such event, if the Borrowers have not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender in immediately available funds, with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the greater of the Federal Funds Rate and a rate determined by the Administrative Agent in accordance with banking or farm credit industry rules on interbank compensation.

A notice of the Administrative Agent to any Lender or any Borrower with respect to any amount owing under this subsection (a) shall be conclusive, absent manifest error.

(b) Failure to Satisfy Conditions Precedent. If any Lender makes available to the Administrative Agent funds for any Loan to be made by such Lender as provided in the foregoing provisions of this Article II, and such funds are not made available to the applicable Borrower by the Administrative Agent because the conditions to the applicable Credit Extension set forth in Article IV are not satisfied or waived in accordance with the terms hereof, the Administrative Agent shall return such funds (in like funds as received from such Lender) to such Lender, without interest.

(c) Obligations of Lenders Several. The obligations of the Lenders hereunder to make Loans and to make payments pursuant to Section 10.4(c) are several and not joint or joint and several. The failure of any Lender to make any Loan or to make any payment under Section 10.4(c) on any date required hereunder shall not relieve any other Lender of its corresponding obligation to do so on such date, and no Lender shall be responsible for the failure of any other Lender to so make its Loan, to purchase its participation or to make its payment under Section 10.4(c).

2.11 Sharing of Payments by Lenders. If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender receiving payment of a proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations (other than pursuant to Sections 3.1, 3.2 or 10.4) greater than its pro rata share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing them; provided that:

(i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

(ii) the provisions of this Section shall not be construed to apply to (A) any payment made by or on behalf of a Borrower pursuant to and in accordance with the express terms of this Agreement (including the application of funds arising from the existence of a Defaulting Lender) or (B) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than an assignment to the Company or any of its Subsidiaries or Affiliates, as to which the provisions of this Section shall apply.

Each Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may

exercise against such Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of such Borrower in the amount of such participation.

This Section 2.11 shall not apply to any action taken by any Farm Credit Lender with respect to any Farm Credit Equities held by any Borrower.

2.12 Defaulting Lenders.

(a) Adjustments. Notwithstanding anything to the contrary contained in this Agreement, at any time there is more than one Lender, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i) Waivers and Amendments. Such Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Agreement shall be restricted as set forth in Section 10.1 and in the definition of "Required Lenders".

(ii) Defaulting Lender Waterfall. Any payment of principal, interest, fees or other amounts received by the Administrative Agent for the account of such Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to Article VIII or otherwise) or received by the Administrative Agent from a Defaulting Lender pursuant to Section 10.8 shall be applied at such time or times as may be determined by the Administrative Agent as follows: first, to the payment of any amounts owing by such Defaulting Lender to the Administrative Agent hereunder; second, as the Company may request (so long as no Default exists), to the funding of any Loan in respect of which such Defaulting Lender has failed to fund its portion thereof as required by this Agreement, as determined by the Administrative Agent; third, if so determined by the Administrative Agent and the Company, to be held in a deposit account and released pro rata in order to satisfy such Defaulting Lender's potential future funding obligations with respect to Loans under this Agreement; fourth, to the payment of any amounts owing to the Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; fifth, so long as no Default exists, to the payment of any amounts owing to any Borrower as a result of any judgment of a court of competent jurisdiction obtained by a Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Agreement; and sixth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction; provided that if (1) such payment is a payment of the principal amount of any Loans in respect of which such Defaulting Lender has not fully funded its appropriate share, and (2) such Loans were made at a time when the conditions set forth in Section 4.2 were satisfied or waived, such payment shall be applied solely to pay the Loans of all Non-Defaulting Lenders on a pro rata basis prior to being applied to the payment of any Loans of such Defaulting Lender until such time as all Loans are held by the Lenders pro rata in accordance with their respective applicable Commitments without giving effect to Section 2.12(a)(iv). Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender pursuant to this Section 2.12(a)(ii) shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(iii) Certain Fees.

(A) No Defaulting Lender shall be entitled to receive any Revolving Commitment Fee or RELOC Commitment Fee for any period during which that Lender is a Defaulting Lender (and no Borrower shall be required to pay any such Revolving

Commitment Fee or RELOC Commitment Fee that otherwise would have been required to have been paid to that Defaulting Lender).

(B) With respect to any Revolving Commitment Fee or RELOC Commitment Fee not required to be paid to any Defaulting Lender pursuant to clause (A) above, the Borrowers shall not be required to pay any such fee.

(b) Defaulting Lender Cure. If the Company and the Administrative Agent agree in writing that a Lender is no longer a Defaulting Lender, the Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein, that Lender will, to the extent applicable, purchase at par that portion of outstanding Loans of the other Lenders or take such other actions as the Administrative Agent may determine to be necessary to cause the Revolving Credit Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages (without giving effect to Section 2.12(a)(iv)), whereupon such Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Company while that Lender was a Defaulting Lender; and provided further that except to the extent otherwise expressly agreed by the affected parties, no change hereunder from Defaulting Lender to Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender having been a Defaulting Lender.

2.13 Increases in Revolving Credit Commitments.

(a) [Reserved].

(b) Potential Increases. The Borrowers may, by notice to the Administrative Agent from time to time request an increase in the aggregate Revolving Credit Commitments by an amount (for all such requests) not exceeding $3,000,000; provided that (a) no Default or Event of Default exists immediately prior to or after giving effect thereto, (b) the terms and documentation in respect of any such increase shall be satisfactory to the Administrative Agent and the Revolving Credit Lenders and (c) no Lender (including FCMA) will be required, but may elect in its sole discretion, to so increase its Revolving Credit Commitment or the aggregate Revolving Credit Commitments.

2.14 Company as Borrower Agent; Joint and Several Liability; Borrowers' Waivers and Consents.

(a) Each Borrower hereby directs the Administrative Agent to disburse the proceeds of each Loan as specified by the Company, and such distribution will, in all circumstances, be deemed to be made to, or at the direction of, such Borrower. Each Borrower hereby irrevocably designates, appoints, authorizes and directs the Company to act on behalf of such Borrower for the purposes set forth in this Section 2.14, and to act on behalf of such Borrower for purposes of requesting Loans hereunder and for otherwise giving and receiving notices and certifications under this Agreement or any other Loan Document and otherwise for taking all other action contemplated to be taken by the Company hereunder or under any other Loan Document. Each Borrower further appoints the Company as its agent for any service of process. The Administrative Agent is entitled to rely and act on the instructions of the Company, by and through any Senior Officer thereof, on behalf of each Borrower. Without limiting the provisions of Section 10.4, each Borrower covenants and agrees to assume joint and several liability for and to protect, indemnify and hold harmless the Administrative Agent and the Lenders from any and all liabilities, obligations, damages, penalties, claims, causes of action, costs, charges and expenses (including without limitation, attorneys' fees), which may be incurred by, imposed or asserted against the Administrative Agent or any Lender, howsoever arising or incurred because of, out of or in connection with the disbursements of the Loans in accordance with this Section 2.14; provided that the liability of the Borrowers pursuant to this indemnity

shall not extend to any liability, obligation, damage, penalty, claim, cause of action, cost, charge or expense determined by a court of competent jurisdiction by a final and non-appealable judgment to have resulted from the gross negligence or willful misconduct of the Administrative Agent or the Lenders.

(b) Notwithstanding any other provision of this Agreement, each Borrower (i) shall be jointly and severally liable with each other Borrower for all Loans and all other Obligations, without regard to the identity of the Borrower in whose name any Loan is made or Obligation is incurred, and (ii) hereby jointly and severally guarantees to the Administrative Agent, for the benefit of the Secured Parties, the payment and performance in full of the Obligations.

(c) The Obligations of each Borrower under this Section 2.14 are independent, and a separate action or actions may be brought and prosecuted against any Borrower whether action is brought against any other Borrower or whether any other Borrower is joined in any such action or actions.

(d) The Obligations of the Borrowers under this Agreement, the other Loan Documents and with respect to the payment and performance of the Obligations shall be joint and several, absolute and unconditional irrespective of, and each Borrower hereby expressly waives, to the extent permitted by law, any defense (other than payment, to the extent thereof) to the payment and performance of the Obligations (including under this Agreement and all the other Loan Documents to which it is a party) by reason of:

(i) any lack of legality, validity or enforceability of this Agreement, of any other Loan Document, or of any other agreement or instrument creating, providing security for, or otherwise relating to any of the Obligations (the Loan Documents and all such other agreements and instruments being collectively referred to as the "Related Agreements");

(ii) any action taken in accordance with any of the Related Agreements, any exercise of any right or power therein conferred, any failure or omission to enforce any right conferred thereby, or any waiver of any covenant or condition therein provided;

(iii) any acceleration of the maturity of any of the Obligations (whether of such Borrower or of any other Borrower) or of any other obligations or liabilities of any Person under any of the Related Agreements;

(iv) any release, exchange, non-perfection, lapse in perfection, disposal, deterioration in value, or impairment of any security for any of the Obligations (whether of such Borrower or of any other Borrower) or for any other obligations or liabilities of any Person under any of the Related Agreements;

(v) any dissolution of any Borrower or any Subsidiary Guarantor or any other party to a Related Agreement, or the combination or consolidation of any Borrower or any Subsidiary Guarantor or any other party to a Related Agreement into or with another entity or any transfer or disposition of any assets of any Borrower or any Subsidiary Guarantor or any other party to a Related Agreement;

(vi) any extension (including without limitation extensions of time for payment), renewal, amendment, restructuring or restatement of, any acceptance of late or partial payments under, or any change in the amount of any borrowings or any credit facilities available under, this Agreement, any Loan Document or any other Related Agreement, in whole or in part;

(vii) the existence, addition, modification, termination, reduction or impairment of value, or release of any other guaranty (or security therefor) of any of the Obligations (whether of such Borrower or of any other Borrower);

(viii) any waiver of, forbearance or indulgence under, or other consent to any change in or departure from any term or provision contained in this Agreement, any other Loan Document or any other Related Agreement, including without limitation any term pertaining to the payment or performance of any of the Obligations (whether of such Borrower or of any other Borrower) or any of the obligations or liabilities of any party to any other Related Agreement; or

(ix) any other circumstance whatsoever (with or without notice to or knowledge of any other Borrower) which may or might in any manner or to any extent vary the risks of such Borrower, or might otherwise constitute a legal or equitable defense available to, or discharge of, a surety or a guarantor, including without limitation any right to require or claim that resort be had to any Borrower or any other Loan Party or to any collateral in respect of the Obligations.

(e) Notwithstanding anything to the contrary elsewhere contained herein or in any other Loan Document to which any Borrower is a party, each Borrower waives any right to assert against any Secured Party as a defense, counterclaim, set-off, recoupment or cross claim in respect of its Obligations, any defense (legal or equitable) or other claim which such Borrower may now or at any time hereafter have against any other Loan Party or any or all of the Secured Parties without waiving any additional defenses, set-offs, counterclaims or other claims otherwise available to such Borrower.

(f) Each Borrower hereby waives to the extent permitted by law notice of the following events or occurrences: (i) the Lenders' heretofore, now or from time to time hereafter making Loans and otherwise loaning monies or giving or extending credit to or for the benefit of any other Borrower or any other Loan Party, or otherwise entering into arrangements with any Loan Party giving rise to Obligations, whether pursuant to this Agreement or any other Loan Document or Related Agreement or any amendments, modifications, or supplements thereto, or replacements or extensions thereof; (ii) presentment, demand, default, non-payment, partial payment and protest; and (iii) any other event, condition, or occurrence described in Section 2.14(d). Each Borrower agrees that each Secured Party may heretofore, now or at any time hereafter do any or all of the foregoing in such manner, upon such terms and at such times as each Secured Party, in its sole and absolute discretion, deems advisable, without in any way or respect impairing, affecting, reducing or releasing such Borrower from its Obligations, and each Borrower hereby consents to each and all of the foregoing events or occurrences.

(g) Each Borrower hereby unconditionally subordinates all present and future debts, liabilities or obligations now or hereafter owing to such Borrower (i) of any other Borrower, to the payment in full of all Obligations (other than contingent indemnification and reimbursement obligations) and the termination of the Aggregate Commitments and (ii) of each other Person now or hereafter constituting a Loan Party, to the payment in full of the obligations of such Loan Party owing to any Secured Party and arising under the Loan Documents. All amounts due under such subordinated debts, liabilities, or obligations shall, upon the occurrence and during the continuance of an Event of Default, be collected and, upon request by the Administrative Agent, paid over forthwith to the Administrative Agent for the benefit of the Secured Parties on account of the Obligations or such other obligations, as applicable, and, after such request and pending such payment, shall be held by such Borrower as agent and bailee of the Secured Parties separate and apart from all other funds, property and accounts of such Borrower.

(h) To the extent that any Borrower shall make a payment (each a "Borrower Payment") of all or any portion of the Obligations, then such Borrower shall be entitled to contribution and indemnification from, and be reimbursed by, the other Borrowers in an amount equal to a fraction of such Borrower

Payment, the numerator of which fraction is such other Borrower's Allocable Amount (as defined below) and the denominator of which is the sum of the Allocable Amounts of all Borrowers. This Section is intended only to define the relative rights of the Borrowers, and nothing set forth in this Section is intended to or shall impair the obligations of the Borrowers, jointly and severally, to pay any amounts, as and when the same shall become due and payable in accordance with the terms of this Agreement and the other Loan Documents. The Borrowers acknowledge that the rights of contribution, indemnification and reimbursement hereunder shall constitute assets in favor of each Borrower to which such contribution, indemnification and reimbursement is owing. Each Borrower hereby agrees that any right of subrogation, contribution, indemnification or reimbursement of such Borrower shall not be exercised until 93 days shall have elapsed following the payment in full of all Obligations (other than contingent indemnification and reimbursement obligations) and the termination of the Aggregate Commitments, without the filing or commencement, by or against any Borrower, any Guarantor or any other Person providing collateral for the Obligations, of any state or federal action, suit, petition or proceeding seeking any reorganization, liquidation or other relief or arrangement in respect of creditors of, or the appointment of a receiver, liquidator, trustee or conservator in respect to, such Person or its assets (and shall be subject and subordinate to the payment in full of all Obligations (other than contingent indemnification and reimbursement obligations) and the termination of the Aggregate Commitments). If an amount shall be paid to any Borrower on account of such rights at any time on or prior to such 93rd day, such amount shall be held in trust for the benefit of the Secured Parties and shall forthwith be paid to the Administrative Agent for the benefit of the Secured Parties to be credited and applied upon the Obligations, whether matured or unmatured, in accordance with the terms of the Credit Agreement or otherwise as the Secured Parties may elect. For purposes of this Section 2.14(h), "Allocable Amount" means, as of any date of determination, for a Borrower, the maximum amount of liability that could be asserted against such Borrower under this Agreement with respect to the applicable Borrower Payment without (i) rendering such Borrower "insolvent" within the meaning of Section 101(31) of the Bankruptcy Code or Section 2 of either the Uniform Fraudulent Transfer Act (as in effect in any applicable State, the "UFTA") or the Uniform Fraudulent Conveyance Act (as in effect in any applicable State, the "UFCA"), (ii) leaving such Borrower with unreasonably small capital, within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA or Section 5 of the UFCA, or (iii) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA or Section 6 of the UFCA.

(i) This Section 2.14 shall survive the termination of the Commitments and the repayment of all Obligations.

## ARTICLE III
## TAXES AND YIELD PROTECTION

3.1 Taxes.

(a) Defined Terms. For purposes of this Section 3.1, the term "applicable Law" includes FATCA.

(b) Payments Free of Taxes. Any and all payments by or on account of any obligation of any Loan Party under any Loan Document shall be made without deduction or withholding for any Taxes, except as required by applicable Law. If any applicable Law (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Loan Party shall be increased as necessary so that after such deduction or withholding has

been made (including such deductions and withholdings applicable to additional sums payable under this Section 3.1) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(c) Payment of Other Taxes by the Borrowers. Each Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable Law, or at the option of the Administrative Agent timely reimburse it for the payment of, any Other Taxes.

(d) Indemnification by the Borrowers. Each Borrower shall, jointly and severally, indemnify each Recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 3.1) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Company by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(e) Indemnification by the Lenders. Each Lender shall severally indemnify the Administrative Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that a Loan Party has not already indemnified the Administrative Agent for such Indemnified Taxes and without limiting the obligation of the Loan Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 10.6(d) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by the Administrative Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Administrative Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Administrative Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Administrative Agent to the Lender from any other source against any amount due to the Administrative Agent under this subsection (e).

(f) Evidence of Payments. As soon as practicable after any payment of Taxes by any Loan Party to a Governmental Authority pursuant to this Section 3.1, such Loan Party shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(g) Status of Lenders; Tax Documentation.

(i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Company and the Administrative Agent, at the time or times reasonably requested by the Company or the Administrative Agent, such properly completed and executed documentation prescribed by applicable Law or reasonably requested by the Company or the Administrative Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Company or the Administrative Agent, shall deliver such other documentation prescribed by applicable Law or reasonably requested by the Company or the Administrative Agent as will enable the Company or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 3.1(g)(ii)(A), (g)(ii)(B) and (g)(ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii) Without limiting the generality of the foregoing,

(A) any Lender that is a U.S. Person shall deliver to the Company and the Administrative Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable Law or upon the reasonable request of the Company or the Administrative Agent), executed copies of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter as prescribed by applicable Law or upon the reasonable request of the Company or the Administrative Agent), whichever of the following is applicable:

(1) in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN-E (or W-8BEN, as applicable) establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(2) executed copies of IRS Form W-8ECI;

(3) in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit E-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of any Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN-E (or W-8BEN, as applicable); or

(4) to the extent a Foreign Lender is not the beneficial owner, executed copies of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN-E (or W-8BEN, as applicable), a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-2 or Exhibit E-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such

Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit E-4 on behalf of each such direct and indirect partner;

(C) any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Company and the Administrative Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Company on behalf of any Borrower or the Administrative Agent), executed copies of any other form prescribed by applicable Law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable Law to permit such Borrower or the Administrative Agent to determine the withholding or deduction required to be made; and

(D) if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Company and the Administrative Agent at the time or times prescribed by Law and at such time or times reasonably requested by the Company or the Administrative Agent such documentation prescribed by applicable Law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Company or the Administrative Agent as may be necessary for the Company and the Administrative Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

(iii) Each Lender agrees that if any form or certification it previously delivered pursuant to this Section 3.1 expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Company and the Administrative Agent in writing of its legal inability to do so.

(h) Treatment of Certain Refunds. If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 3.1 (including by the payment of additional amounts pursuant to this Section 3.1), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section with respect to the Taxes giving rise to such refund), net of all out-of-pocket expenses (including Taxes) of such indemnified party and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this subsection (h) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this subsection (h), in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this subsection (h) the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund had not been deducted, withheld or otherwise imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection (h) shall not be construed to require any

indemnified party to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to the indemnifying party or any other Person.

(i) Survival. Each party's obligations under this Section 3.1 shall survive the resignation or replacement of the Administrative Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all other Obligations.

3.2 Increased Costs.

(a) Increased Costs Generally. If any Change in Law shall:

(i) impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(ii) subject any Recipient to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto; or

(iii) impose on any Lender or the London interbank market any other condition, cost or expense (other than Taxes) affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender or such other Recipient of making, converting to, continuing or maintaining any Loan or of maintaining its obligation to make any such Loan, or to reduce the amount of any sum received or receivable by such Lender or such other Recipient hereunder (whether of principal, interest or any other amount) then, upon request of such Lender or such other Recipient, the Borrowers will pay to such Lender or such other Recipient, as the case may be, such additional amount or amounts as will compensate such Lender or such other Recipient, as the case may be, for such additional costs incurred or reduction suffered.

(b) Capital Requirements. If any Lender determines that any Change in Law affecting such Lender or any Lending Office of such Lender or such Lender's holding company, if any, regarding capital or liquidity requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrowers will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c) Certificates for Reimbursement. A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in subsection (a) or (b) of this Section and delivered to the Company, shall be conclusive absent manifest error. The Borrowers will pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d) Delay in Requests. Failure or delay on the part of any Lender to demand compensation pursuant to the foregoing provisions of this Section 3.2 shall not constitute a waiver of such Lender's right to demand such compensation; provided that no Borrower shall be required to compensate a Lender

pursuant to this Section for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Company of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

3.3 [Reserved].

3.4 Mitigation Obligations; Replacement of Lenders.

(a) Designation of a Different Lending Office. If any Lender requests compensation under Section 3.2, or requires any Borrower to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.1, then such Lender shall (at the request of the Company) use reasonable efforts to designate a different Lending Office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 3.1 or 3.2, as the case may be, in the future, and (ii) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender. The Borrowers hereby agree to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b) Replacement of Lenders. If any Lender requests compensation under Section 3.2, or if any Borrower is required to pay any Indemnified Taxes or additional amounts to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 3.1, and in each case, such Lender has declined or is unable to designate a different lending office in accordance with Section 3.4(a), or if any Lender is a Defaulting Lender or a Non-Consenting Lender, then the Borrowers may, at their sole expense and effort, upon notice by the Company to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in, and consents required by, Section 10.6), all of its interests, rights (other than its existing rights to payments pursuant to Sections 3.1 and 3.2) and obligations under this Agreement and the related Loan Documents to an Eligible Assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that:

(i) the Borrowers shall have paid to the Administrative Agent the assignment fee (if any) specified in Section 10.6(b);

(ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder and under the other Loan Documents from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrowers (in the case of all other amounts);

(iii) in the case of any such assignment resulting from a claim for compensation under Section 3.2 or payments required to be made pursuant to Section 3.1, such assignment will result in a reduction in such compensation or payments thereafter;

(iv) such assignment does not conflict with applicable Law; and

(v) in the case of an assignment resulting from a Lender becoming a Non-Consenting Lender, the applicable assignee shall have consented to the applicable amendment, waiver or consent.

A Lender shall not be required to make any such assignment or delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Company to require such assignment and delegation cease to apply.

(c) Selection of Lending Office. Subject to Section 3.4(a), each Lender may make any Loan to the Borrowers through any Lending Office, provided that the exercise of this option shall not affect the obligations of the Borrowers to repay such Loan in accordance with the terms of this Agreement or otherwise alter the rights of the parties hereto.

3.5 Survival. All of the Borrowers' obligations under this Article III shall survive termination of the Aggregate Commitments, repayment of all other Obligations hereunder, and resignation of the Administrative Agent.

ARTICLE IV
CONDITIONS PRECEDENT TO CREDIT EXTENSIONS

4.1 Conditions of Initial Credit Extension. The effectiveness of this Agreement on the Closing Date and the obligation of each Lender as of the Closing Date to make its initial Loan on the Closing Date hereunder are subject to the satisfaction of the following conditions precedent.

(a) Documentation. The Administrative Agent shall have received, in form and substance satisfactory to the Administrative Agent and each Lender, each of the following, duly executed and acknowledged where appropriate by all parties thereto:

(i) this Agreement, a Note in favor of each Lender requesting a Note, the Security Agreement, the Pledge Agreement and a Mortgage with respect to the real property identified on Schedule 5.8 as being subject to a Mortgage on the Closing Date and the Dan Call Farm Property;

(ii) a certificate from a Senior Officer of each Borrower certifying (A) that the representations and warranties of each Borrower contained in Article V and of each Loan Party contained in each other Loan Document are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) on and as of the Closing Date, (B) that no Default exists as of the Closing Date, and no Default shall occur on the Closing Date as a result of making any Credit Extension on the Closing Date or from the application of the proceeds thereof and (C) that there has been no event or circumstance since the date of the Baseline Financial Statements that has had or could be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect;

(iii) a certificate of a Senior Officer of each Loan Party either (A) certifying that attached thereto are true, correct and complete copies of all consents, licenses and approvals required in connection with the consummation by such Loan Party of the transactions contemplated hereby and the execution, delivery and performance by such Loan Party, and the validity against such Loan Party, of the Loan Documents to which it is a party, and that such consents, licenses and approvals are in full force and effect, or (B) certifying that no such consents, licenses or approvals are so required;

(iv) a certificate of a Senior Officer of each Loan Party certifying as to the incumbency and genuineness of the signature of each officer of such Loan Party executing Loan Documents to which it is a party and certifying that attached thereto are true, correct and complete copies of (A) the Organization Documents of such Loan Party (which, in the case of the articles or certificate of

incorporation or formation (or equivalent), shall be certified as of a recent date by the appropriate Governmental Authority in its jurisdiction of incorporation, organization or formation (or equivalent), as applicable), (B) resolutions duly adopted by the board of directors (or other governing body) of such Loan Party authorizing and approving the transactions contemplated hereunder and the execution, delivery and performance of this Agreement and the other Loan Documents to which it is a party and (C) certificates as of a recent date of the good standing or existence (as applicable) of such Loan Party under the Laws of its jurisdiction of incorporation, organization or formation (or equivalent), as applicable, and each other jurisdiction where such Loan Party is qualified to do business where the failure to be qualified could reasonably be expected to have a Material Adverse Effect;

(v) favorable opinions of counsel to the Loan Parties and the Permitted Investors addressed to the Administrative Agent and the Lenders with respect to the Loan Parties, the Permitted Investors, the Loan Documents and such other matters as the Administrative Agent shall request (which such opinions shall expressly permit reliance by permitted successors and assigns of the Administrative Agent and the Lenders); and

(vi) a Borrowing Base Certificate duly certified by the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company relating to the initial Credit Extension.

(b) Personal Property Collateral Matters. The Administrative Agent shall have received, in form and substance satisfactory to the Administrative Agent, each of the following:

(i) all filings and recordations that are necessary to perfect the security interests of the Administrative Agent, on behalf of the Secured Parties, in the personal property Collateral and evidence reasonably satisfactory to the Administrative Agent that upon such filings and recordations such security interests constitute valid and perfected first priority Liens thereon (subject to Permitted Liens);

(ii) (A) original stock certificates or other certificates evidencing the certificated Equity Interests pledged pursuant to the Pledge Agreement, together with an undated stock power for each such certificate duly executed in blank by the registered owner thereof, and (B) each original promissory note pledged pursuant to the Security Agreement and required or requested to be delivered to the Administrative Agent pursuant to the terms thereof, together with an undated allonge for each such promissory note duly executed in blank by the holder thereof;

(iii) the results of lien searches made against each Loan Party, each as of a recent date prior to the Closing Date, indicating among other things that the assets of each Loan Party shall be free and clear of any Lien (except for Permitted Liens) as of the Closing Date;

(iv) evidence that all insurance required to be maintained pursuant to the Loan Documents has been obtained and is in effect, together with the certificates of insurance and endorsements to policies, naming the Administrative Agent, on behalf of the Secured Parties, as an additional insured or lender loss payee and mortgagee, as the case may be, under all insurance policies (including flood insurance policies) maintained with respect to the assets and properties of the Loan Parties or the Permitted Investors that constitutes Collateral; and

(v) all such other documents as may be required by or requested under the terms of any of the Collateral Documents with respect to personal property Collateral, including Lien Waivers.

(c) Real Property Collateral Matters. The Administrative Agent shall have received, in form and substance satisfactory to the Administrative Agent, each of the following:

(i) all Mortgage Support Documents requested by the Administrative Agent with respect to each property being encumbered by a Mortgage on the Closing Date; and

(ii) evidence that all other action that the Administrative Agent may deem reasonably necessary or desirable in order to create valid first priority (or, solely in respect of the Dan Call Farm Property, second priority) Liens on the property described in such Mortgages has been taken (including delivery of such Mortgages to a title insurance company (or other applicable Person) for recordation).

(d) Financial Matters.

(i) Financial Statements. The Administrative Agent shall have received (A) the Baseline Financial Statements and (B) such other financial statements and financial information of the Company and its Subsidiaries as the Administrative Agent shall request.

(ii) Notice of Account Designation. The Administrative Agent shall have received a Notice of Account Designation specifying the account or accounts to which the proceeds of any Loans made on or after the Closing Date are to be disbursed.

(e) Due Diligence. The Administrative Agent shall have completed, to its satisfaction, all legal, tax, environmental, business and other due diligence with respect to the business, assets, liabilities, operations and condition (financial or otherwise) of the Company and its Subsidiaries and the Permitted Investors in scope and determination satisfactory to the Administrative Agent in its sole discretion, including, without limitation, the completion of a valuation of all inventory and accounts receivable constituting Collateral (in each case reflecting values that are satisfactory to the Administrative Agent).

(f) Existing Indebtedness. All existing Indebtedness of the Company and its Subsidiaries (excluding Indebtedness permitted pursuant to Section 7.2) shall have been, or concurrently with the closing on the Closing Date will be, repaid in full, all commitments (if any) in respect thereof shall have been, or concurrently with the closing on the Closing Date will be, terminated and all guarantees therefor and security therefor shall have been, or concurrently with the closing on the Closing Date will be, released. The Administrative Agent shall have received pay-off letters in form and substance satisfactory to it evidencing such repayment, termination and release.

(g) Arrangements With Respect to Dan Call Farm Mortgage Indebtedness. The Administrative Agent shall have received copies of an effective amendment with respect to the Dan Call Farm Mortgage Indebtedness and an intercreditor agreement with respect thereto, each of which shall be in form and substance reasonably satisfactory to the Administrative Agent.

(h) Equity Contribution. The Company shall have received not less than $12,500,000 in cash proceeds from a capital contribution to its equity.

(i) Farm Credit Equities. The Borrowers shall have made at least the minimum equity investment in each Farm Credit Lender required by Section 6.16(a), and the Administrative Agent shall have received such other documentation and information requested in connection therewith.

(j) PATRIOT Act, etc. Each Loan Party and each Permitted Investor shall have provided to the Administrative Agent and the Lenders the documentation and other information requested by the

Administrative Agent and the Lenders in order to comply with requirements of applicable "know your customer" rules and regulations and Anti-Money Laundering Laws, including the PATRIOT Act, in each case at least 10 Business Days prior to the Closing Date. At least 10 Business Days prior to the Closing Date, any Loan Party that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall have delivered, to each Lender that so requests, a Beneficial Ownership Certification in relation to such Loan Party.

(k) Payment of Fees and Expenses. The Company shall have paid, or made arrangements to pay concurrently with the closing on the Closing Date, (i) to the Administrative Agent, the Arranger and the Lenders the fees set forth or referenced in Section 2.7(c) and any other accrued and unpaid fees or commissions due hereunder, (ii) all fees, charges and disbursements of counsel to the Administrative Agent (directly to such counsel if requested by the Administrative Agent) to the extent invoiced prior to or on the Closing Date, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Company and the Administrative Agent) and (iii) to any other Person such amount as may be due thereto in connection with the transactions contemplated hereby, including all taxes, fees and other charges in connection with the execution, delivery, recording, filing and registration of any of the Loan Documents.

Without limiting the generality of the provisions of Section 9.3, for purposes of determining compliance with the conditions specified in this Section 4.1, each Lender that has signed this Agreement shall be deemed to have consented to, approved or accepted or to be satisfied with, each document or other matter required thereunder to be consented to or approved by or acceptable or satisfactory to a Lender unless the Administrative Agent shall have received notice from such Lender prior to the proposed Closing Date specifying its objection thereto.

4.2 Conditions to All Credit Extensions. The obligation of each Lender to make any Loan hereunder are subject to the satisfaction of the following conditions precedent on the relevant date such Loan is made:

(a) Bring-down of Representations and Warranties. The representations and warranties of each Borrower contained in Article V and of each Loan Party contained in each other Loan Document shall be true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) on and as of the date such Loan is made, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) as of such earlier date.

(b) No Default. No Default shall exist as of the date such Loan is made and no Default shall occur on such date as a result of making such Loan or from the application of the proceeds thereof.

(c) Request for Credit Extension. The Administrative Agent shall have received a Request for Credit Extension in accordance with the requirements hereof.

(d) Availability. With respect to any requested Revolving Credit Borrowing, after giving effect to such Revolving Credit Borrowing, the Total Revolving Credit Outstandings shall not exceed the Maximum Revolving Borrowing Amount at such time.



Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 237 of 384 PageID #: 4480

(e) RELOC Borrowings. In the case of any RELOC Borrowing, (i) at least three (3) Business Days prior to the date on which the RELOC Lenders are being asked to make each RELOC Borrowing (or such shorter period as the Administrative Agent shall permit in its sole discretion), the Company shall have notified the Administrative Agent of the proposed RELOC Borrowing and the Administrative Agent shall have received all material documents relating to the improvement contemplated with respect thereto (including construction documents and project budgets), all of which shall be in form and substance reasonably satisfactory to the Administrative Agent and (ii) at least three (3) Business Days prior to the date on which the RELOC Lenders are being asked to make a RELOC Borrowing for the purpose of financing any costs or expenses with respect to improvements or the construction or renovation thereof, the Administrative Agent shall have received evidence satisfactory to the Administrative Agent as to such costs and expenses (which shall then be due and payable and evidenced by reasonably detailed invoices).

The submission by the Company of a Request for Credit Extension with respect to a Borrowing shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) will be satisfied on and as of the relevant date such Loan is made and the making of such Loan shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) are satisfied on and as of such date.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants to the Administrative Agent and the Lenders that:

5.1 Existence, Qualification and Power. Each of the Loan Parties and their respective Subsidiaries (a) is duly organized, validly existing and, to the extent applicable, in good standing under the Laws of the jurisdiction of its organization, (b) has all requisite power and authority and all requisite governmental licenses, authorizations, consents and approvals to (i) own or lease its assets and carry on its business as currently conducted and (ii) execute, deliver and perform its obligations under the Loan Documents to which it is a party and consummate the transactions contemplated thereby and (c) is duly qualified and is licensed and, to the extent applicable, in good standing under the Laws of each jurisdiction where its ownership, lease or operation of properties or the conduct of its business requires such qualification or license, except in each case referred to in clause (b)(i) or (c), to the extent that failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

5.2 Authorization; No Contravention. The execution, delivery and performance by each Loan Party of each Loan Document to which it is a party have been duly authorized by all necessary corporate or other organizational action, and do not and will not (a) contravene the terms of any of such Loan Party's Organization Documents, (b) conflict with or result in any material breach or contravention of, or the creation of any Lien under, or require any payment to be made under (i) any material Contractual Obligation to which such Loan Party is a party or affecting such Loan Party or the properties of such Loan Party or any of its Subsidiaries or (ii) any order, injunction, writ or decree of any Governmental Authority or any arbitral award to which such Loan Party or its property is subject or (c) violate any applicable Law in any material respect.

5.3 Governmental Authorization; Other Consents. No approval, consent, exemption, authorization, or other action by, or notice to, or filing with, any Governmental Authority or any other Person is necessary or required in connection with (a) the execution, delivery or performance by, or enforcement against, any Loan Party or any Permitted Investor of this Agreement or any other Loan Document or the consummation of the transactions contemplated hereby, (b) the grant by any Loan Party or any Permitted Investor of the Liens granted by it pursuant to the Collateral Documents, (c) the perfection

or maintenance of the Liens created under the Collateral Documents or (d) the exercise by the Administrative Agent or any Lender of its rights under the Loan Documents or the remedies in respect of the Collateral pursuant to the Collateral Documents, other than (i) filings under the UCC, (ii) filings with the United States Copyright Office and/or the United States Patent and Trademark Office, (iii) the consents, authorizations, approvals, actions, notices and filings listed on Schedule 5.3, all of which have been duly obtained, taken, given or made and are in full force and effect, (iv) the recording of Mortgages with the applicable county recording office or register of deeds and (v) any ordinary course of business filings required in connection with the exercise of remedies and the acquisition or disposition of any Loan Party's assets by the Administrative Agent or any Lender.

5.4 Binding Effect. This Agreement has been, and each other Loan Document, when delivered hereunder, will have been, duly executed and delivered by each Loan Party that is party thereto. This Agreement constitutes, and each other Loan Document when so delivered will constitute, a legal, valid and binding obligation of such Loan Party, enforceable against each Loan Party that is party thereto in accordance with its terms, subject to bankruptcy, insolvency, Debtor Relief Laws, and similar laws affecting the enforceability of creditor's rights generally and to general principles of equity.

5.5 Financial Statements; No Material Adverse Effect.

(a) The financial statements delivered pursuant to Section 4.1(d)(i), or after the Closing Date, the most recent audited (or reviewed, as applicable) and unaudited financial statements delivered pursuant to Section 4.1(d)(i), 6.1(a) or 6.1(b), as the case may be, (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, (ii) fairly present in all material respects the financial condition of the Company and its Subsidiaries as of the date thereof and their results of operations, cash flows and changes in shareholders' equity for the period covered thereby (other than customary year-end adjustments for unaudited financial statements and the absence of footnotes from unaudited financial statements) and (iii) show all material indebtedness and other financial liabilities, direct or contingent, of the Company and its Subsidiaries as of the date thereof, including liabilities for Taxes, material commitments and Indebtedness.

(b) Since December 31, 2021, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect.

5.6 Litigation. There are no actions, suits, proceedings, claims or disputes pending or, to the knowledge of any Borrower after due and diligent investigation, threatened or contemplated, at law, in equity, in arbitration or before any Governmental Authority, by or against any Loan Party or any Subsidiary or Affiliate thereof or against any of their respective properties or revenues or Collateral that (a) purport to affect or pertain to this Agreement, any other Loan Document or the consummation of the transactions contemplated hereby, or (b) either individually or in the aggregate could reasonably be expected to have a Material Adverse Effect.

5.7 No Default. Neither any Loan Party nor any Subsidiary or Affiliate thereof is in default under any Contractual Obligation that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect. No Default has occurred and is continuing or would result from the consummation of the transactions contemplated by this Agreement or any other Loan Document.

5.8 Title to Property. As of the Closing Date, the real property listed on Schedule 5.8 constitutes all of the real property that is owned, leased, subleased or used by any Loan Party or any of its Subsidiaries. Each Loan Party and each of its Subsidiaries has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its



Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 239 of 384
PageID #: 4482

business and valid and legal title or leasehold title to all of its personal property and assets, in each case free and clear of all Liens other than Permitted Liens.

5.9 Environmental Compliance.

(a) The properties owned, leased or operated by each Loan Party and each Subsidiary thereof do not presently contain, and to their knowledge have not previously contained, any Hazardous Materials in amounts or concentrations which constitute or constituted a violation of applicable Environmental Laws. For the periods that each Loan Party and each Subsidiary thereof has owned, leased, or operated their respective properties, Hazardous Materials have not been transported or disposed of to or from the properties owned, leased or operated by any Loan Party or any Subsidiary thereof in violation of, or in a manner or to a location which could give rise to liability under, Environmental Laws, nor have any Hazardous Materials been generated, treated, stored or disposed of at, on or under any of such properties in violation of, or in a manner that could give rise to liability under, any applicable Environmental Laws. There has been no release, or to the best knowledge of each Borrower, threat of release, of Hazardous Materials at or from properties owned, leased or operated by any Loan Party or any Subsidiary, now or, to the best knowledge of each Borrower, in the past, in violation of or in amounts or in a manner that could give rise to liability under applicable Environmental Laws.

(b) Each Loan Party and each Subsidiary thereof and such properties and all operations conducted in connection therewith are in compliance, and have been in compliance for the last five (5) years, in all material respects with all applicable Environmental Laws, and there is no contamination at, under or about such properties or such operations which could interfere with the continued operation of such properties or impair the fair saleable value thereof.

(c) Neither any Loan Party nor any Subsidiary thereof has received any notice of violation, alleged violation, non-compliance, liability or potential liability regarding environmental matters, Hazardous Materials, or compliance with Environmental Laws, nor does any Loan Party or any Subsidiary thereof have knowledge or reason to believe that any such notice will be received or is being threatened.

(d) No judicial proceedings or governmental or administrative action is pending, or, to the best knowledge of each Borrower, threatened, under any Environmental Law to which any Loan Party or any Subsidiary thereof is or will be named as a potentially responsible party, nor are there any consent decrees or other decrees, consent orders, administrative orders or other orders, or other administrative or judicial requirements outstanding under any applicable Environmental Law with respect to any Loan Party, any Subsidiary thereof, with respect to any real property owned, leased or operated by any Loan Party or any Subsidiary thereof or operations conducted in connection therewith.

5.10 Tax Matters. Each of the Loan Parties and their respective Subsidiaries has timely filed all federal, state and other material tax returns and reports required to be filed and has timely paid all federal, state and other material Taxes (whether or not shown on a tax return), including in its capacity as a withholding agent, levied or imposed upon it or its properties, income or assets otherwise due and payable, except those which are being contested in good faith by appropriate proceedings diligently conducted and for which adequate reserves have been provided in accordance with GAAP. There is no proposed material tax assessment or other claim against, and no material tax audit with respect to, any Loan Party or any Subsidiary thereof. Neither any Loan Party nor any Subsidiary thereof is party to any tax sharing agreement.

5.11 ERISA Compliance.

(a) Each Plan is in compliance in all material respects with the applicable provisions of ERISA, the Code and other federal or state Laws. Each Plan that is intended to be a qualified plan under Section 401(a) of the Code has received a favorable determination or opinion or advisory letter from the IRS to the effect that the form of such Plan is qualified under Section 401(a) of the Code and the trust related thereto has been determined by the IRS to be exempt from federal income tax under Section 501(a) of the Code, or an application for such a letter is currently being processed by the IRS or is within the applicable remedial amendment period. To the best knowledge of each Borrower, nothing has occurred that would prevent or cause the loss of such tax-qualified status.

(b) There are no pending or, to the best knowledge of each Borrower, threatened claims, actions or lawsuits, or action by any Governmental Authority, with respect to any Plan that could reasonably be expected to have a Material Adverse Effect. There has been no prohibited transaction or violation of the fiduciary responsibility rules with respect to any Plan that has resulted or could reasonably be expected to result in a Material Adverse Effect.

(c) (i) No ERISA Event has occurred, and neither any Borrower nor any ERISA Affiliate is aware of any fact, event or circumstance that could reasonably be expected to constitute or result in an ERISA Event with respect to any Pension Plan or Multiemployer Plan, (ii) as of the most recent valuation date for any Pension Plan, the funding target attainment percentage (as defined in Section 430(d)(2) of the Code) is 60% or higher and neither any Borrower nor any ERISA Affiliate knows of any facts or circumstances that could reasonably be expected to cause the funding target attainment percentage for any such plan to drop below 60% as of the most recent valuation date, (iii) neither any Borrower nor any ERISA Affiliate has incurred any liability to the PBGC other than for the payment of premiums, and there are no premium payments which have become due that are unpaid, (iv) neither any Borrower nor any ERISA Affiliate has engaged in a transaction that could be subject to Section 4069 or Section 4212(c) of ERISA and (v) no Pension Plan has been terminated by the plan administrator thereof nor by the PBGC, and no event or circumstance has occurred or exists that could reasonably be expected to cause the PBGC to institute proceedings under Title IV of ERISA to terminate any Pension Plan.

(d) Neither the Company nor any ERISA Affiliate maintains or contributes to, or has any unsatisfied obligation to contribute to, or liability under, any active or terminated Pension Plan other than (A) on the Closing Date, those listed on Schedule 5.11(d) and (B) thereafter, Pension Plans not otherwise prohibited by this Agreement.

(e) As of the Closing Date, no Borrower is, nor will it be, using "plan assets" (within the meaning of 29 CFR § 2510.3-101, as modified by Section 3(42) of ERISA) of one or more Benefit Plans in connection with the Loans or the Commitments.

5.12 Ownership of Loan Parties and Subsidiaries. As of the Closing Date, no Loan Party has any Subsidiaries other than those specifically disclosed in Schedule 5.12, and all of the outstanding Equity Interests in such Subsidiaries have been validly issued, are fully paid and non-assessable and are owned by a Loan Party in the amounts specified in Schedule 5.12 free and clear of all Liens except those created under the Collateral Documents.

5.13 Investment Company Act; Margin Stock.

(a) None of the Company, any Person Controlling the Company, or any Subsidiary is or is required to be registered as an "investment company" under the Investment Company Act of 1940.

(b) Neither the Company nor any Subsidiary is engaged principally or as one of its important activities in the business of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Federal Reserve Board) or extending credit for the purpose of purchasing or carrying margin stock.

5.14 Disclosure. Each Borrower has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which any Loan Party or any Subsidiary thereof is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No financial statement, report, certificate or other information furnished (whether in writing or orally) by or on behalf of any Loan Party or any Subsidiary thereof to the Administrative Agent or any Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Loan Document contains any material misstatement of fact or omits any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, each Borrower represents and warrants only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

5.15 Compliance with Laws. Each Loan Party and each Subsidiary thereof is in compliance in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its properties.

5.16 Intellectual Property Matters. Each Loan Party and each Subsidiary thereof owns, or possesses the right to use, all of the trademarks, service marks, trade names, copyrights, patents, patent rights, franchises, licenses and other intellectual property rights that are necessary for the operation of its business, without conflict with the rights of any other Person. To the best knowledge of each Borrower, no slogan or other advertising device, product, process, method, substance, part or other material now employed, or now contemplated to be employed, by any Loan Party or any Subsidiary thereof infringes upon, or misappropriates or otherwise violates, any rights held by any other Person. No claim or litigation regarding any of the foregoing is pending or, to the best knowledge of any Borrower, threatened, that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.17 Solvency. The Company and its Subsidiaries, on a consolidated basis, are Solvent.

5.18 Casualty, Etc. Neither the businesses nor the properties of any Loan Party or any Subsidiary thereof are affected by any fire, explosion, accident, strike, lockout or other labor dispute, drought, storm, hail, earthquake, embargo, act of God or of the public enemy or other casualty (whether or not covered by insurance), condemnation or eminent domain proceeding that, either individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

5.19 Anti-Corruption Laws and Sanctions.

(a) None of (i) any Loan Party, any Subsidiary thereof or, to the best knowledge of each Borrower, any of the respective directors, officers, employees or Affiliates of any Loan Party or any Subsidiary thereof, or (ii) to the best knowledge of each Borrower, any agent or representative of any Loan Party or any Subsidiary thereof that will act in any capacity in connection with, or benefit from, the credit facilities provided hereunder, (A) is a Sanctioned Person or currently the subject or target of any Sanctions, (B) has its assets located in a Sanctioned Country, (C) is under administrative, civil or criminal investigation for an alleged violation of, or received notice from or made a voluntary disclosure to any governmental entity regarding a possible violation of, Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by a governmental authority that enforces Sanctions or any Anti-Corruption Laws or Anti-Money Laundering Laws, or (D) directly or indirectly derives revenues from investments in, or transactions with, Sanctioned Persons. Each of the Loan Parties and their respective Subsidiaries, and to the best knowledge

of each Borrower, each director, officer, employee, agent and Affiliate of the Loan Parties and their respective Subsidiaries, is in compliance with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.

(b) No proceeds of any Credit Extension have been used, directly or indirectly, by the Company, any of its Subsidiaries or any of its or their respective directors, officers, employees and agents in violation of Section 7.10(b).

5.20 Beneficial Ownership Certificate. As of the Closing Date, the information included in any Beneficial Ownership Certification, if applicable, is true and correct in all respects.

5.21 Farm Credit Eligibility. Each Borrower is an entity eligible to borrow from Farm Credit Lenders.

5.22 Borrowing Base Assets.

(a) Accounts. With respect to each of its Accounts at the time it is shown as an Eligible Account in a Borrowing Base Certificate:

(i) it is genuine and in all respects what it purports to be;

(ii) it arises out of a completed, *bona fide* sale and delivery of goods or rendition of services in the ordinary course of business, and substantially in accordance with any purchase order, contract or other document relating thereto;

(iii) it is for a sum certain, maturing as stated in the applicable invoice, a copy of which has been furnished or is available to the Administrative Agent on request;

(iv) it is not subject to any offset, Lien (other than the Administrative Agent's Lien), deduction, defense, dispute, counterclaim or other adverse condition except as arising in the ordinary course of business and disclosed to the Administrative Agent or as to any amount thereof not included as an Eligible Account; and it is absolutely owing by the Account Debtor, without contingency in any respect;

(v) no purchase order, agreement, document or applicable Law restricts assignment of the Account to the Administrative Agent (regardless of whether, under the UCC or other applicable Law, the restriction is ineffective), and the applicable Borrower is the sole payee or remittance party shown on the invoice;

(vi) no extension, compromise, settlement, modification, credit, deduction or return has been authorized or is in process with respect to the Account, except discounts or allowances granted in the ordinary course of business for prompt payment that are reflected on the face of the invoice related thereto and in the reports submitted to the Administrative Agent hereunder; and

(vii) to the best of each Borrower's knowledge, as applicable, (A) there are no facts or circumstances that are reasonably likely to impair the enforceability or collectability of such Account; (B) the Account Debtor had the capacity to contract when the Account arose, continues to meet the applicable Borrower's customary credit standards, is Solvent, is not contemplating or subject to any proceeding under any Debtor Relief Laws, and has not failed, or suspended or ceased doing business; and (C) there are no proceedings or actions threatened or pending against any

Account Debtor that could reasonably be expected to have a material adverse effect on the Account Debtor's financial condition.

(b) Inventory. As to each item of Inventory that is identified as Eligible Inventory in a Borrowing Base Certificate submitted to the Administrative Agent, as of the date of such Borrowing Base Certificate, such Inventory is (i) of good and merchantable quality, free from known defects, and (ii) not excluded as ineligible by virtue of one or more of the excluding criteria (other than any such criteria requiring the Administrative Agent's discretion) set forth in the definition of Eligible Inventory.

## ARTICLE VI
## AFFIRMATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, each Borrower shall, and shall (except in the case of the covenants set forth in Sections 6.1, 6.2, and 6.3) cause each Subsidiary thereof to:

6.1 Financial Statements. Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Administrative Agent:

(a) as soon as practicable and in any event within 120 days (or, in the case of the fiscal year ending December 31, 2022, 180 days) after the end of each fiscal year (commencing with the fiscal year ended December 31, 2022), a consolidated and consolidating balance sheet of the Company and its Subsidiaries as at the end of such fiscal year, and the related consolidated and consolidating statements of income or operations, changes in shareholders' equity and cash flows for such fiscal year, setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be audited and accompanied by a report and opinion of an independent certified public accountant of nationally recognized standing reasonably acceptable to the Administrative Agent, which report and opinion shall be prepared in accordance with generally accepted auditing standards and shall not be subject to any "going concern" or like qualification or exception or any qualification or exception as to the scope of such audit, and such consolidating statements to be certified by the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Company and its Subsidiaries; provided that, with respect to the financial statements to be delivered hereunder for the fiscal year ending December 31, 2022, the balance sheet for such fiscal year shall be audited and the related statements of income or operations, changes in shareholders' equity and cash flows for such fiscal year may be reviewed;

(b) as soon as practicable and in any event within 30 days after the end of each calendar month of each fiscal year (including the last calendar month of each fiscal year and commencing with the calendar month ended July 31, 2022), a consolidated and consolidating balance sheet of the Company and its Subsidiaries as at the end of such calendar month, and the related consolidated and consolidating statements of income or operations, changes in shareholders' equity and cash flows for such fiscal quarter and for the portion of the fiscal year then ended, setting forth in each case in comparative form the figures for the corresponding calendar month of the previous fiscal year and the corresponding portion of the previous fiscal year, all in reasonable detail and prepared in accordance with GAAP, such consolidated statements to be certified by the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company as fairly presenting in all material respects the financial condition, results of operations, shareholders' equity and cash flows of the Company and its Subsidiaries in accordance with GAAP, subject only to normal year-end audit adjustments and the absence of footnotes and such consolidating statements to be certified by the chief executive officer, president, chief financial officer,

treasurer, controller or director of finance of the Company to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Company and its Subsidiaries; and

(c) as soon as practicable and in any event within 60 days after the end of each fiscal year, an annual business plan and budget of the Company and its Subsidiaries on a consolidated basis, including forecasts prepared by management of the Company, in form satisfactory to the Administrative Agent, of consolidated balance sheets and statements of income or operations and cash flows of the Company and its Subsidiaries on an annual basis for the then-current fiscal year (including the fiscal year in which the latest Maturity Date occurs).

6.2 Certificates; Other Information. Deliver to the Administrative Agent and each Lender, in form and detail satisfactory to the Administrative Agent:

(a) concurrently with the delivery of the financial statements referred to in Sections 6.1(a) and (b), (i) a duly completed Compliance Certificate signed by the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company and (ii) a copy of management's customary discussion and analysis with respect to such financial statements,

(b) promptly after any request by the Administrative Agent or any Lender, a copy of any detailed audit report, management letter or recommendation submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by independent accountants in connection with the accounts or books of any Loan Party or any Subsidiary thereof, or any audit of any of them;

(c) as soon as available, and in any event no later than 25 days after the last day of each calendar month, a Borrowing Base Certificate showing the computation of the Borrowing Base in reasonable detail as of the close of business on the last day of such month, signed by the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company, together with such supporting materials as the Administrative Agent shall reasonably request (including weekly reporting of rolling forward accounts receivable data by reporting weekly sales, cash collections and credits and monthly reporting of gross inventory, inventory ineligibles and accounts receivable ineligibles);

(d) as soon as available, but in any event within 30 days after the end of each fiscal year, a report summarizing the insurance coverage (specifying type, amount and carrier) in effect for each Loan Party and its Subsidiaries and containing such additional information as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably specify;

(e) promptly after the written assertion or occurrence thereof, notice of any action or proceeding against or of any noncompliance by any Loan Party or any Subsidiary thereof with any Environmental Law or Environmental Permit that could (i) reasonably be expected to have a Material Adverse Effect or (ii) cause any property described in any Mortgage to be subject to any restrictions on ownership, occupancy, use or transferability under any Environmental Law;

(f) promptly after any request therefor, a listing of each Borrower's trade payables, specifying the trade creditor and balance due, and a detailed trade payable aging, all in form satisfactory to the Administrative Agent in its Permitted Discretion;

(g) promptly after any request therefor, such other information and documentation required by bank regulatory authorities under applicable "know your customer" and Anti-Money Laundering Laws

(including the PATRIOT Act and the Beneficial Ownership Regulation), as the Administrative Agent or any Lender may from time to time reasonably request; and

(h) promptly after any request therefor, such other information regarding the business, financial, legal or corporate affairs of any Loan Party or any Subsidiary thereof, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may from time to time reasonably request.

Documents required to be delivered pursuant to Section 6.1(a) or (b) may be delivered electronically and if so delivered, shall be deemed to have been delivered on the date on which such documents are posted by or on behalf of the Company on an Internet or intranet website, if any, to which each Lender and the Administrative Agent have access (whether a commercial, third-party website or whether sponsored by the Administrative Agent); provided that (x) the Company shall deliver paper copies of such documents to the Administrative Agent or any Lender upon its request to the Company to deliver such paper copies until a written request to cease delivering paper copies is given by the Administrative Agent or such Lender and (y) the Company shall notify the Administrative Agent and each Lender (by facsimile or e-mail) of the posting of any such documents and provide to the Administrative Agent by e-mail electronic versions (i.e., soft copies) of such documents. The Administrative Agent shall have no obligation to request the delivery of, or to maintain paper copies of, the documents referred to above and, in any event, shall have no responsibility to monitor compliance by the Company with any such request by a Lender for delivery, and each Lender shall be solely responsible for requesting delivery to it or maintaining its copies of such documents.

6.3 Notices. Promptly (but in no event later than seven (7) days after any Senior Officer of any Loan Party obtains knowledge thereof) notify the Administrative Agent and each Lender of:

(a) the occurrence of any Default;

(b) any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect, including (i) breach or non-performance of, or any default under, a Contractual Obligation of any Loan Party or any Subsidiary thereof, (ii) any dispute, litigation, investigation, proceeding or suspension between any Loan Party or any Subsidiary thereof and any Governmental Authority or (iii) the commencement of, or any material development in, any litigation or proceeding affecting any Loan Party or any Subsidiary thereof, including pursuant to any applicable Environmental Laws;

(c) the occurrence of any ERISA Event;

(d) any material change in accounting policies or financial reporting practices by any Loan Party or any Subsidiary thereof;

(e) any loss, termination, suspension, revocation or modification of any alcoholic beverage license or permit used by any Loan Party or Subsidiary of any Loan Party in operation of its business or any other license or permit required for the lawful production or sale of Inventory of any Loan Party or any Subsidiary thereof or the ownership or operation of any facility in connection therewith; and

(f) any redesignation of the improvements on any real property subject to a Mortgage into or out of a special flood hazard area.

Each notice pursuant to this Section 6.3 (other than Section 6.3(f)) shall be accompanied by a statement of a Senior Officer of the Company setting forth the details of the occurrence referred to therein and stating what action the Company has taken and proposes to take with respect thereto. Each notice

pursuant to Section 6.3(a) shall describe with particularity any and all provisions of this Agreement and any other Loan Document that have been breached.

6.4 Payment of Taxes and Other Obligations. (a) Pay and discharge (i) as the same shall become due and payable all federal, state and other material Tax liabilities, assessments and governmental charges or levies upon it or its properties or assets, unless the same are being contested in good faith by appropriate proceedings diligently conducted (which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien) and adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP and (ii) all other Indebtedness, obligations and liabilities in accordance with customary trade practices and (b) timely file all federal, state and other material tax returns required to be filed.

6.5 Preservation of Existence, Etc. (a) Preserve, renew and maintain in full force and effect its legal existence and, to the extent applicable, good standing under the Laws of the jurisdiction of its organization, except in a transaction permitted by Section 7.4 or 7.5, (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary or desirable in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect and (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect.

6.6 Maintenance of Property. (a) Maintain, preserve and protect all of its material properties and equipment necessary in the operation of its business in good working order and condition, ordinary wear and tear excepted and (b) make all necessary repairs thereto and renewals and replacements thereof, except, in each case, where the failure to do so could not reasonably be expected to have a Material Adverse Effect.

6.7 Maintenance of Insurance.

(a) Maintain with financially sound and reputable insurance companies not Affiliates of the Company, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by Persons engaged in the same or similar business, of such types and in such amounts as are customarily carried under similar circumstances and locations by such other Persons, which such insurance shall (i) provide for not less than 30 days' (or 10 days' in the case of non-payment) prior notice to the Administrative Agent of termination, lapse or cancellation of such insurance, (ii) in the case of property insurance, name the Administrative Agent for the benefit of the Secured Parties, as mortgagee and/or lender's loss payee, as applicable, (iii) in the case of liability insurance, name the Administrative Agent for the benefit of the Secured Parties, as additional insured and (iv) be reasonably satisfactory in all other respects to the Administrative Agent.

(b) Without limiting the foregoing, if any portion of the improvements on any real property subject to a Mortgage is at any time located in a special flood hazard area with respect to which flood insurance has been made available, maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in such form, on such terms and in such amounts required by Law or as otherwise required by the Administrative Agent.

6.8 Compliance with Laws. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property.

6.9 Books and Records. Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Borrower or such Subsidiary, as the case may be.

6.10 Inspection Rights. Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to audit and appraise the Collateral, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Company; provided that when an Event of Default exists the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours and without advance notice.

6.11 Use of Proceeds.

(a) (i) Use the proceeds of the Revolving Credit Facility and the Term Loan Facility for general corporate purposes, including working capital, capital purchases and refinancing of certain Indebtedness as contemplated by Section 4.1, not in contravention of any Law or of any Loan Document, (ii) use the proceeds of the portion of the Term Loan Facility advanced on the Amendment No. 4 Effective Date to purchase the fee-owned real property interest as discussed with the Administrative Agent and (iii) use the proceeds of the portion of the Term Loan Facility advanced on the Amendment No. 5 Effective Date to repay Revolving Credit Loans.

(b) Use the proceeds of the RELOC Facility to finance the construction and build-out of the distillery on the real property currently subject to a Mortgage to be used in the operation of the Borrowers' business as previously discussed with the Administrative Agent, not in contravention of any Law or of any Loan Document.

6.12 Additional Subsidiaries and Real Property.

(a) Additional Domestic Subsidiaries. Promptly following the date any Person becomes a Domestic Subsidiary (whether by creation, acquisition or otherwise) and in any event within 30 days after such date (as such time period may be extended by the Administrative Agent in its sole discretion), (i) cause such Person to (A) become a Subsidiary Guarantor (or, with the consent of the Administrative Agent if such Subsidiary is to own any assets of the type included in the Borrowing Base, a Borrower hereunder) by delivering to the Administrative Agent a duly executed joinder to the Subsidiary Guaranty (or, in the case of the first such Subsidiary, a duly executed Subsidiary Guaranty) or this Agreement, as applicable, or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, (B) grant a security interest in all of its tangible and intangible personal property now owned or hereafter acquired (other than Excluded Assets) by such Person by delivering to the Administrative Agent a duly executed joinder to each of the Security Agreement and the Pledge Agreement or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, (C) deliver to the Administrative Agent such opinions, documents and certificates referred to in Section 4.1 as may be reasonably requested by the Administrative Agent and (D) deliver to the Administrative Agent such other documents as may be reasonably requested by the Administrative Agent in connection with the foregoing, all in form, content and scope reasonably satisfactory to the Administrative Agent and (ii) cause each Loan Party owning Equity Interests in such Subsidiary to deliver to the Administrative Agent (A) a duly executed joinder or supplement to the Pledge Agreement pledging (or evidencing a prior pledge of) 100% of the total Equity Interests in such Subsidiary or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, together with all original certificates (or equivalent document), if any, evidencing such Equity Interests and appropriate undated stock or other transfer powers for each such certificate duly executed in blank by the registered owner thereof, (B) such opinions, documents and certificates referred to in Section 4.1 as may be reasonably requested by the Administrative Agent and (C) such other documents as may be reasonably

requested by the Administrative Agent in connection with the foregoing, all in form, content and scope reasonably satisfactory to the Administrative Agent.

(b) Additional Foreign Subsidiaries. Promptly following the date any Person becomes a Foreign Subsidiary (whether by creation, acquisition or otherwise) and in any event within 30 days after such date (as such time period may be extended by the Administrative Agent in its sole discretion), (i) to the extent no material adverse Tax consequences would result therefrom, cause such Person to (A) become a Subsidiary Guarantor by delivering to the Administrative Agent a duly executed joinder to the Subsidiary Guaranty (or, in the case of the first such Subsidiary, a duly executed Subsidiary Guaranty) or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, (B) grant a security interest in all of its tangible and intangible personal property now owned or hereafter acquired (other than Excluded Assets) by such Person by delivering to the Administrative Agent a duly executed joinder to each of the Security Agreement and the Pledge Agreement or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, (C) deliver to the Administrative Agent such opinions, documents and certificates referred to in Section 4.1 as may be reasonably requested by the Administrative Agent and (D) deliver to the Administrative Agent such other documents as may be reasonably requested by the Administrative Agent in connection with the foregoing, all in form, content and scope reasonably satisfactory to the Administrative Agent and (ii) cause each Loan Party owning Equity Interests in such Subsidiary to deliver to the Administrative Agent (i) a duly executed joinder or supplement to the Pledge Agreement pledging (or evidencing a prior pledge of) 65% of the total outstanding voting Equity Interests (and 100% of the non-voting Equity Interests) or, to the extent no material adverse Tax consequences would result therefrom, 100% of the total Equity Interests, in such Subsidiary or such other document(s) as the Administrative Agent shall deem appropriate for such purpose, together with all original certificates (or equivalent document), if any, evidencing such Equity Interests and appropriate undated stock or other transfer powers for each such certificate duly executed in blank by the registered owner thereof (or such other documents consistent with the practices of any relevant foreign jurisdiction), (ii) such opinions, documents and certificates referred to in Section 4.1 as may be reasonably requested by the Administrative Agent and (iii) such other documents as may be reasonably requested by the Administrative Agent in connection with the foregoing, all in form, content and scope reasonably satisfactory to the Administrative Agent.

(c) Additional Real Property. Promptly following the date any Loan Party acquires any fee simple interest in real property or any Person that owns any fee simple interest in real property becomes a Loan Party pursuant to this Section 6.12, and in any event within 30 days after such date (as such time period may be extended by the Administrative Agent in its sole discretion), unless any such requirement is waived by the Administrative Agent in its sole discretion, cause to be delivered to the Administrative Agent with respect to such real property (i) a Mortgage and evidence of the proper recordation of such Mortgage in the appropriate filing office (or of delivery to the relevant title company for such recordation) and (ii) the Mortgage Support Documents with respect thereto as may be requested by the Administrative Agent.

6.13 Compliance with Environmental Laws. (a) Comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits, (b) obtain and renew all Environmental Permits necessary for its operations and properties and (c) conduct any investigation, study, sampling and testing, and undertake any cleanup, response or other corrective action necessary to address all Hazardous Materials at, on, under or emanating from any of properties owned, leased or operated by it in accordance with the requirements of all Environmental Laws.

6.14 Further Assurances. Promptly upon request by the Administrative Agent, or any Lender through the Administrative Agent, (a) correct any material defect or error that may be discovered in any Loan Document or in the execution, acknowledgment, filing or recordation thereof and (b) do, execute,

acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as the Administrative Agent, or any Lender through the Administrative Agent, may reasonably require from time to time in order to (i) carry out more effectively the purposes of the Loan Documents, (ii) to the fullest extent permitted by applicable Law, subject any Loan Party's or any of its Subsidiaries' properties, assets, rights or interests to the Liens now or hereafter intended to be covered by any of the Collateral Documents, (iii) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (iv) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Secured Parties the rights granted or now or hereafter intended to be granted to the Secured Parties under any Loan Document or under any other instrument executed in connection with any Loan Document to which any Loan Party or any of its Subsidiaries is or is to be a party.

6.15 Compliance with Anti-Corruption Laws; Beneficial Ownership Regulation, Anti-Money Laundering Laws and Sanctions.

(a) Enforce compliance by the Company, its Subsidiaries and their respective directors, officers, employees and agents with all Anti-Corruption Laws, Anti-Money Laundering Laws and applicable Sanctions.

(b) Notify the Administrative Agent and each Lender that previously received a Beneficial Ownership Certification (or a certification that a Borrower qualifies for an express exclusion to the "legal entity customer" definition under the Beneficial Ownership Regulation) of any change in the information provided in the Beneficial Ownership Certification that would result in a change to the list of beneficial owners identified therein (or, if applicable, any Borrower ceasing to fall within an express exclusion to the definition of "legal entity customer" under the Beneficial Ownership Regulation).

(c) Promptly upon the reasonable request of the Administrative Agent or any Lender, provide the Administrative Agent or directly to such Lender, as the case may be, any information or documentation requested by it for purposes of complying with the Beneficial Ownership Regulation.

6.16 Farm Credit Eligibility / Farm Credit Equity.

(a) So long as a Farm Credit Lender is a Lender hereunder, (i) maintain its status as an entity eligible to borrow from such Farm Credit Lenders (including by maintaining the Crop Sharing Agreement in full force and effect), and (ii) acquire equity in such Farm Credit Lenders in such amounts and at such times as each Farm Credit Lender may require in accordance with its bylaws and capital plan (as each may be amended or otherwise modified from time to time), except that the maximum amount of equity that the Borrowers may be required to purchase in each Farm Credit Lender in connection with the Loans made by such Farm Credit Lender may not exceed the maximum amount permitted by the bylaws and capital plan of such Farm Credit Lender on the Closing Date. Each Borrower acknowledges receipt of a copy of (x) the most recent annual report, and if more recent, latest quarterly report for each Farm Credit Lender, (y) any notice to stockholders provided by the Farm Credit Lenders and (z) the bylaws and capital plan of each Farm Credit Lender, which describe the nature of all of the applicable Borrower's cash patronage, stock and other equities in each Farm Credit Lender acquired in connection with its patronage loan from such Farm Credit Lenders (the "Farm Credit Equities") as well as capitalization requirements, and agrees to be bound by the terms thereof.

(b) Each party hereto acknowledges that the bylaws and capital plan (as each may be amended from time to time) of each Farm Credit Lender shall govern (i) the rights and obligations of the parties with respect to the Farm Credit Equities and any patronage refunds or other distributions made on account thereof or on account of any Borrower's patronage with such Farm Credit Lender, (ii) any Borrower's eligibility

for patronage distributions from each Farm Credit Lender (in the form of equities and cash) and (iii) patronage distributions, if any, in the event of a sale of a participation interest. Each Farm Credit Lender reserves the right to assign or sell participations in all or any part of its Commitments or outstanding Loans hereunder on a non-patronage basis.

(c) Each party hereto acknowledges that pursuant to the Farm Credit Act of 1971 (as amended or otherwise modified from time to time) each applicable Farm Credit Lender has a statutory first Lien on its Farm Credit Equities that any Borrower may now own or hereafter acquire, which statutory Lien shall be for each applicable Farm Credit Lender's sole and exclusive benefit. The Farm Credit Equities shall not constitute or form a part of the Collateral. To the extent that any of the Loan Documents create a Lien on the Farm Credit Equities of the applicable Farm Credit Lender or on patronage accrued by the applicable Farm Credit Lender for the account of any Borrower or proceeds thereof, such Lien shall be for each applicable Farm Credit Lender's sole and exclusive benefit and no other Secured Party shall have any right, title or interest therein. Neither the Farm Credit Equities nor any accrued patronage thereon shall be offset against the Obligations, except that, in the event of an Event of Default, each applicable Farm Credit Lender may elect to apply the cash portion of any patronage distribution or retirement of equity to amounts owed to such Farm Credit Lender under this Agreement, whether or not such amounts are currently due and payable. Each Borrower acknowledges that any corresponding tax liability associated with such application is the sole responsibility of the Borrowers. No applicable Farm Credit Lender shall have any obligation to retire its Farm Credit Equities at any time, including during the continuance of any Default or Event of Default, either for application to the Obligations or otherwise.

6.17 Preparation of Environmental Reports. At the request of the Required Lenders from time to time, provide to the Lenders within 60 days after such request, at the expense of the Borrowers, an environmental site assessment report for any properties subject to a Mortgage or otherwise owned, leased or operated by it described in such request, prepared by an environmental consulting firm, and of scope, acceptable to the Administrative Agent, indicating the presence or absence of Hazardous Materials and compliance or noncompliance with Environmental Law and the estimated cost of any investigation, study, sampling and testing, cleanup, removal, remedial, corrective or other response action to address any Hazardous Materials on, or noncompliance with Environmental Law, with respect to such properties; without limiting the generality of the foregoing, if the Administrative Agent determines at any time that a material risk exists that any such report will not be provided within the time referred to above, the Administrative Agent may retain an environmental consulting firm to prepare such report at the expense of the Borrowers, and each Borrower hereby grants and agrees to cause any Subsidiary that owns, leases or operates any property described in such request to grant at the time of such request to the Administrative Agent, the Lenders, such firm and any agents or representatives thereof an irrevocable non-exclusive license, subject to the rights of tenants or necessary consent of landlords, to enter onto their respective properties to undertake such an assessment.

6.18 Compliance with Terms of Leaseholds. Make all payments and otherwise perform all obligations in respect of all leases of real property to which any Borrower or any Subsidiary is a party, keep such leases in full force and effect and not allow such leases to lapse or be terminated or any rights to renew such leases to be forfeited or cancelled, notify the Administrative Agent of any default by any party with respect to such leases and cooperate with the Administrative Agent in all respects to cure any such default, and cause each of its Subsidiaries to do so, except, in any case, where the failure to do so, either individually or in the aggregate, could not be reasonably likely to have a Material Adverse Effect.

6.20 Material Agreements. Perform and observe all the terms and provisions of each Material Agreement to be performed or observed by it, maintain each such Material Agreement in full force and effect, enforce each such Material Agreement in accordance with its terms, take all such action to such end as may be from time to time requested by the Administrative Agent and, upon request of the Administrative

Agent, make to each other party to each such Material Agreement such demands and requests for information and reports or for action as any Loan Party or any of its Subsidiaries is entitled to make under such Material Agreement, except, in any case, where the failure to do so, either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

## ARTICLE VII
## NEGATIVE COVENANTS

So long as any Lender shall have any Commitment hereunder or any Loan or other Obligation hereunder shall remain unpaid or unsatisfied, no Borrower shall, nor shall it permit any Subsidiary thereof to, directly or indirectly:

7.1 Liens. Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, except:

(a) Liens pursuant to any Loan Document;

(b) Liens existing on the Closing Date and described on Schedule 7.1 and any refinancings, renewals or extensions thereof, provided that (i) the property covered thereby is not changed, (ii) the amount secured or benefited thereby is not increased except as contemplated by Section 7.2(b), (iii) the direct or any contingent obligor with respect thereto is not changed and (iv) any renewal or extension of the obligations secured or benefited thereby is permitted by Section 7.2(b);

(c) Liens for ad valorem property taxes not yet due or Liens for taxes which are being contested in good faith and by appropriate proceedings diligently conducted (which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien), if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(d) carriers', warehousemen's, mechanics', materialmen's, repairmen's, landlord's, agricultural supply dealer's, harvester's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted (which proceedings have the effect of preventing the forfeiture or sale of the property or assets subject to any such Lien), if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e) pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA or, with respect to any Plan, the Code;

(f) deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature incurred in the ordinary course of business;

(g) easements, rights-of-way, restrictions and other similar encumbrances affecting real property which, in the aggregate, do not in any case materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the applicable Person;

(h) Liens securing judgments for the payment of money not constituting an Event of Default under Section 8.1(h);

(i) Liens securing Indebtedness permitted under Section 7.2(c); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness and (ii) the Indebtedness secured thereby does not exceed the cost or fair market value, whichever is lower, of the property being acquired on the date of acquisition;

(j) statutory Liens of each applicable Farm Credit Lender in its Farm Credit Equities;

(k) Liens arising from the filing of precautionary UCC financing statements relating solely to personal property leased pursuant to operating leases entered into in the ordinary course of business; and

(l) other Liens securing Indebtedness outstanding in an aggregate principal amount not to exceed $250,000; provided that no such Lien shall extend to or cover any Collateral.

7.2 Indebtedness. Create, incur, assume or suffer to exist any Indebtedness, except:

(a) Indebtedness under the Loan Documents;

(b) Indebtedness existing on the Closing Date and described on Schedule 7.2 and any refinancing, refunding, renewal or extension thereof; provided that the amount of such Indebtedness is not increased at the time of such refinancing, refunding, renewal or extension except by an amount equal to a reasonable premium or other reasonable amount paid, and fees and expenses reasonably incurred, in connection with such refinancing and by an amount equal to any existing commitments unutilized thereunder and the direct or any contingent obligor with respect thereto is not changed, as a result of or in connection with such refinancing, refunding, renewal or extension; and provided further that the terms relating to principal amount, amortization, maturity, collateral (if any) and subordination (if any), and other material terms taken as a whole, of any such refinancing, refunding, renewing or extending Indebtedness, and of any agreement entered into and of any instrument issued in connection therewith, are no less favorable in any material respect to the Loan Parties or the Lenders than the terms of any agreement or instrument governing the Indebtedness being refinanced, refunded, renewed or extended and the interest rate applicable to any such refinancing, refunding, renewing or extending Indebtedness does not exceed the then applicable market interest rate;

(c) Indebtedness not otherwise permitted by this Section 7.2 in respect of Capitalized Leases, Synthetic Lease Obligations and purchase money obligations for fixed or capital assets (including real estate) within the limitations set forth in Section 7.1(i); provided that the aggregate amount of all such Indebtedness at any one time outstanding shall not exceed $1,000,000;

(d) Indebtedness owing under any Swap Contract entered into in order to manage existing or anticipated interest rate, exchange rate or commodity price risks and not for speculative purposes;

(e) Guarantees made by a Loan Party with respect to Indebtedness permitted pursuant to the foregoing clauses (a) through (d);

(f) unsecured intercompany Indebtedness (i) owed by any Loan Party to another Loan Party, (ii) owed by any Loan Party to any Non-Guarantor Subsidiary so long as such Indebtedness is subordinated to the Obligations in a manner satisfactory to the Administrative Agent, and (iii) owed by any Non-Guarantor Subsidiary to any other Non-Guarantor Subsidiary;

(g) Indebtedness under performance bonds, surety bonds, bid bonds, release, appeal and similar bonds, statutory obligations or with respect to workers' compensation claims, in each case incurred in the ordinary course of business, and reimbursement obligations in respect of any of the foregoing;

(h) unsecured Indebtedness in an aggregate principal amount not to exceed $500,000 at any time outstanding.

7.3 Investments. Make or hold any Investments, except:

(a) Investments in the form of cash or Cash Equivalents;

(b) loans and advances to officers, directors and employees of any Loan Party or any Subsidiary thereof in an aggregate amount not to exceed $50,000 at any time outstanding, for travel, entertainment, relocation and analogous ordinary business purposes;

(c) (i) Investments existing on the Closing Date in Subsidiaries existing on the Closing Date and described on Schedule 5.12, (ii) Investments made after the Closing Date by any Loan Party in any other Loan Party, (iii) Investments made after the Closing Date by any Non-Guarantor Subsidiary in any other Non-Guarantor Subsidiary and (iv) Investments made after the Closing Date by any Non-Guarantor Subsidiary in any Loan Party;

(d) Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

(e) Guarantees permitted by Section 7.2;

(f) Investments existing on the Closing Date and set forth on Schedule 7.3;

(g) the Farm Credit Equities and any other equity interests of, or Investments in, any Farm Credit Lender or their investment services or programs; and

(h) other Investments not exceeding $250,000 in the aggregate at any time.

7.4 Fundamental Changes. Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except that, so long as no Default exists or would result therefrom:

(a) any Subsidiary may merge or consolidate with or into (i) the Company; provided that the Company shall be the continuing or surviving Person, or (ii) any one or more other Subsidiaries; provided that (A) when any Loan Party is merging with another Subsidiary, such Loan Party shall be the continuing or surviving Person and (B) when any wholly-owned Subsidiary is merging with a non-wholly-owned Subsidiary, the wholly-owned Subsidiary shall be the continuing or surviving Person;

(b) any Loan Party may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to another Loan Party and may thereafter dissolve and liquidate; and

(c) any Non-Guarantor Subsidiary may Dispose of all or substantially all its assets (upon voluntary liquidation or otherwise) to a Loan Party or another Non-Guarantor Subsidiary and may thereafter dissolve and liquidate; provided that the amount paid by any Loan Party in connection with such Disposition shall not exceed the fair market value of the assets purchased in such Disposition as determined by the board of directors (or other equivalent governing body) of such Loan Party in good faith.

7.5 Dispositions. Make any Disposition, except:

(a) Dispositions of obsolete or worn-out property, whether now owned or hereafter acquired, in the ordinary course of business;

(b) Dispositions of inventory in the ordinary course of business;

(c) non-exclusive licenses and sublicenses of intellectual property rights in the ordinary course of business not interfering, individually or in the aggregate, in any material respect with the conduct of the business of the Company and its Subsidiaries;

(d) the write-off, discount, sale or other disposition of defaulted or past-due receivables and similar obligations in the ordinary course of business and not undertaken as part of an accounts receivable financing transaction;

(e) dispositions of Investments in cash and Cash Equivalents;

(f) Dispositions of property by (i) any Loan Party to any other Loan Party, (ii) any Non-Guarantor Subsidiary to any Loan Party, provided that the amount paid by any Loan Party in connection with such Disposition shall not exceed the fair market value of the assets purchased in such Disposition as determined by the board of directors (or other equivalent governing body) of such Loan Party in good faith and (iii) any Non-Guarantor Subsidiary to any other Non-Guarantor Subsidiary;

(g) Dispositions permitted by Section 7.4;

(h) Investments permitted by Section 7.3; and

(i) Dispositions not otherwise permitted under this Section 7.5; provided that (i) at the time of such Disposition, no Default shall exist or would result from such Disposition and (ii) the aggregate book value of all property Disposed of in reliance on this clause (i) in any fiscal year shall not exceed $250,000.

7.6 Restricted Payments. Declare or make, directly or indirectly, any Restricted Payment, except that:

(a) (i) each Subsidiary Guarantor may declare and make Restricted Payments to the Company or another Subsidiary Guarantor and (ii) any Non-Guarantor Subsidiary may declare and make Restricted Payments to the Company, any other Subsidiary and any other Person that owns a direct Equity Interest in such Subsidiary, ratably according to their respective holdings of the type of Equity Interest in respect of which such Restricted Payment is being made;

(b) the Company and each Subsidiary may declare and make dividend payments or other distributions payable solely in the common stock or other common Equity Interests of such Person; and

(c) the Company may declare and make cash dividend payments or other cash distributions from the aggregate cash distributions received by the Company and its Subsidiaries from Uncle Nearest Ventures, LLC, a Delaware limited liability company ("UN Ventures"), in an aggregate amount during the term of this Agreement not to exceed $1,000,000, so long as no Default or Event of Default has occurred and is continuing or would result therefrom and UN Ventures has not become a Subsidiary.

The parties hereto acknowledge and agree that any other Restricted Payment not expressly permitted above shall be subject to the prior written consent of the Required Lenders made in accordance with Section 10.1.

7.7 Change in Nature of Business. Engage in any material line of business substantially different from those lines of business conducted by the Company and its Subsidiaries on the Closing Date or any business substantially related or incidental thereto.

7.8 Transactions with Affiliates. Enter into any transaction of any kind with any Affiliate of any Loan Party, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to such Borrower or such Subsidiary as would be obtainable by the Company or such Subsidiary at the time in a comparable arm's length transaction with a Person other than an Affiliate; provided that the foregoing restriction shall not apply to transactions between or among the Loan Parties. As used in this Section 7.8, the term "Affiliate" shall have the meaning given in Section 1.1 and also shall include (i) any officer, director, member or stockholder of any Loan Party or any Affiliate or Subsidiary of any Loan Party and (ii) any natural person related to any of the foregoing within the third degree of consanguinity.

7.9 Burdensome Agreements. Enter into or permit to exist any Contractual Obligation (other than any Loan Document) that (a) limits the ability (i) of any Subsidiary to make Restricted Payments to the Company or any other Loan Party or to otherwise transfer property to or invest in the Company or any other Loan Party, except for any agreement in effect (A) on the date hereof and set forth on Schedule 7.9 or (B) at the time any Person becomes a Subsidiary, so long as such agreement was not entered into solely in contemplation of such Person becoming a Subsidiary, (ii) of any Subsidiary to Guarantee the Indebtedness of the Company or (iii) of the Company or any Subsidiary to create, incur, assume or suffer to exist Liens on property of such Person; provided that this clause (iii) shall not prohibit (A) any negative pledge incurred or provided in favor of any holder of Indebtedness permitted under Section 7.2(i) solely to the extent any such negative pledge relates to the property financed by or the subject of such Indebtedness or (B) any negative pledge binding on any Person at the time it becomes a Subsidiary, so long as such negative pledge was not incurred or provided solely in contemplation of such Person becoming a Subsidiary or (b) requires the grant of a Lien to secure an obligation of such Person if a Lien is granted to secure another obligation of such Person.

7.10 Use of Proceeds.

(a) Use the proceeds of any Credit Extension, whether directly or indirectly, and whether immediately, incidentally or ultimately, to purchase or carry margin stock (within the meaning of Regulation U of the Federal Reserve Board) or to extend credit to others for the purpose of purchasing or carrying margin stock or to refund indebtedness originally incurred for such purpose.

(b) Use the proceeds of any Credit Extension, whether directly or indirectly, or lend, contribute or otherwise make available such proceeds to any Subsidiary, joint venture partner or other Person, (i) in furtherance of an offer, payment, promise to pay or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any applicable Anti-Corruption Laws or Anti-Money Laundering Laws, (ii) for the purpose of funding, financing or facilitating any activities, business or transaction of or with any Sanctioned Person, or in any Sanctioned Country or (iii) in any manner that would result in the violation of any Sanctions applicable to any party hereto.

7.11 Financial Covenants.

(a) Consolidated Tangible Net Worth. Permit Consolidated Tangible Net Worth at any time during any period set forth below to be less than the amount set forth below opposite such period:

| Period | Minimum Consolidated Tangible Net Worth |
| --- | --- |
| Closing Date through December 30, 2022 | $58,000,000 |
| December 31, 2022 through December 30, 2023 | $66,000,000 |
| December 31, 2023 through December 30, 2024 | $82,000,000 |
| December 31, 2024 through December 30, 2025 | $101,000,000 |
| December 31, 2025 and thereafter | $126,000,000 |

(b) Consolidated Net Income. Permit Consolidated Net Income for any calendar month (measured on a monthly basis and commencing with the calendar month ending August 31, 2022) to be less than $1.00.

7.12 Amendments of Organization Documents or Material Agreements. Amend any of its Organization Documents or Material Agreements in any manner adverse, in any material respect, to the rights or interests of the Administrative Agent or any Lender.

7.13 Accounting Changes. Change its fiscal year end, or make (without the consent of the Administrative Agent) any material change in its accounting treatment and reporting practices except as required by GAAP.

ARTICLE VIII
DEFAULT AND REMEDIES

8.1 Events of Default. Each of the following shall constitute an event of default (each, an "Event of Default"):

(a) Non-Payment. Any Loan Party fails to (i) pay when and as required to be paid herein, any amount of principal of any Loan or (ii) pay within three days after the same becomes due, any interest on any Loan, any fee due hereunder or any other amount payable hereunder or under any other Loan Document.

(b) Specific Covenants. (i) Any Borrower fails to perform or observe any term, covenant or agreement contained in any of Section 6.1, 6.2, 6.3, 6.5, 6.10, 6.11, 6.12, 6.15, 6.16 or Article VII or (ii) any "Event of Default" (as defined in any Collateral Document) shall occur.

(c) Other Defaults. Any Loan Party or any Permitted Investor fails to perform or observe any covenant or agreement (other than those specified in Section 8.1(a) or (b)) contained in any Loan Document on its part to be performed or observed and such failure continues for 30 days after the earlier to occur of (i) a Senior Officer of a Loan Party or any Permitted Investor becoming aware of such failure and (ii) the Company or any Permitted Investor receiving notice thereof from the Administrative Agent.

(d) Representations and Warranties. Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of any Loan Party or any Permitted Investor in this Agreement, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect (or, in the case of any such representation, warranty, certification or statement of fact that is subject to materiality or Material Adverse Effect qualifications, in any respect) when made or deemed made.

(e) Cross-Default. (i) Any Loan Party or any Subsidiary thereof (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, but

giving effect to any applicable grace period with respect thereto) in respect of any Indebtedness or Guarantee (other than Indebtedness hereunder and Indebtedness under Swap Contracts) having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than $250,000, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; (ii) there occurs under any Swap Contract an Early Termination Date (as defined in such Swap Contract) resulting from (A) any event of default under such Swap Contract as to which a Loan Party or any Subsidiary thereof is the Defaulting Party (as defined in such Swap Contract) or (B) any Termination Event (as so defined) under such Swap Contract as to which a Loan Party or any Subsidiary thereof is an Affected Party (as so defined) and, in either event, the Swap Termination Value owed by such Loan Party or such Subsidiary as a result thereof is greater than $250,000; or (iii) any Permitted Investor (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise, but giving effect to any applicable grace period with respect thereto) in respect of any Dan Call Farm Mortgage Indebtedness, or (B) fails to observe or perform any other agreement or condition relating to any Dan Call Farm Mortgage Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders thereof (or a trustee or agent on behalf of such holder or holders) to cause, with the giving of notice if required, any Dan Call Farm Mortgage Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem any Dan Call Farm Mortgage Indebtedness to be made, prior to its stated maturity.

(f) Voluntary Bankruptcy Proceeding. Any Loan Party or any Subsidiary thereof or any Permitted Investor shall (i) commence a voluntary case under any Debtor Relief Laws, (ii) file a petition seeking to take advantage of any Debtor Relief Laws, (iii) consent to or fail to contest in a timely and appropriate manner any petition filed against it in an involuntary case under any Debtor Relief Laws, (iv) apply for or consent to, or fail to contest in a timely and appropriate manner, the appointment of, or the taking of possession by, a receiver, custodian, trustee, or liquidator of itself or of a substantial part of its property, domestic or foreign, (v) admit in writing its inability or fails generally to pay its debts as they become due, (vi) make a general assignment for the benefit of creditors or (vii) take any corporate action for the purpose of authorizing any of the foregoing.

(g) Involuntary Bankruptcy Proceeding. A case or other proceeding shall be commenced against any Loan Party or any Subsidiary thereof or any Permitted Investor in any court of competent jurisdiction seeking (i) relief under any Debtor Relief Laws, or (ii) the appointment of a trustee, receiver, custodian, liquidator or the like for any Loan Party or any Subsidiary thereof or any Permitted Investor or for all or any substantial part of their respective assets, domestic or foreign, and such case or proceeding shall continue without dismissal or stay for a period of 60 consecutive days, or an order granting the relief requested in such case or proceeding (including, but not limited to, an order for relief under such federal bankruptcy Laws) shall be entered.

(h) Judgments. There is entered against any Loan Party or any Subsidiary thereof or any Permitted Investor (i) one or more final judgments or orders for the payment of money in an aggregate amount (as to all such judgments and orders) exceeding $250,000 (to the extent not covered by independent

third-party insurance as to which the insurer has been notified of the potential claim and does not dispute coverage) or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, in either case, (A) enforcement proceedings are commenced by any creditor upon such judgment or order or (B) there is a period of 30 consecutive days during which a stay of enforcement of such judgment, by reason of a pending appeal or otherwise, is not in effect.

(i) ERISA. (i) An ERISA Event occurs with respect to a Pension Plan or Multiemployer Plan which has resulted or could reasonably be expected to result in liability of any Loan Party or any Subsidiary thereof to the Pension Plan, Multiemployer Plan or the PBGC in an aggregate amount in excess of $250,000 or (ii) any Loan Party or any ERISA Affiliate fails to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan in an aggregate amount in excess of $250,000.

(j) Invalidity of Loan Documents. (i) Any provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted thereunder, ceases to be in full force and effect, (ii) any Loan Party, any Permitted Investor or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document or (iii) any Loan Party or any Permitted Investor denies that it has any or further liability or obligation under any provision of any Loan Document, or purports to revoke, terminate or rescind any provision of any Loan Document.

(k) Change of Control. There occurs any Change of Control.

(l) Collateral Documents. Any Collateral Document shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien (subject to Permitted Liens) on the Collateral purported to be covered thereby; provided that solely while any Lien on any Collateral exists which is created under the mortgage documents securing the Dan Call Farm Mortgage Indebtedness, any Lien on such Collateral created under any Collateral Document shall be permitted to be a junior priority Lien as opposed to a first priority Lien;

(m) Material Agreements. (i) Any Loan Party or any Subsidiary shall be notified in writing by any customer that any Loan Party or any Subsidiary is in default under any Material Agreement beyond any applicable cure period or (ii) any Material Agreement shall at any time be terminated for any reason or shall at any time for any reason cease to be in full force and effect; provided that there shall be no Event of Default under clause (i) or (ii) hereof if within forty-five (45) days after the applicable notification, termination or expiration, the applicable Loan Party or Subsidiary shall have furnished the Administrative Agent with satisfactory evidence (A) that one or more replacement agreements with customers have been entered into such that Gross Revenues and Gross Profits are not reasonably estimated to be reduced by 7.5% or more in the forthcoming four fiscal quarters of the Company and its Subsidiaries ending after such date or (B) that such default has been cured or waived.

(n) Material Licenses and Permits. Any alcoholic beverage license or permit or any other license or permit required for the lawful production or sale of Inventory of any Loan Party or any Subsidiary thereof, or the ownership or operation of any facility in connection therewith, is suspended, terminated, revoked or otherwise lapses and such license is not replaced or reinstated, or such suspension is not lifted, within fifteen (15) days from the date of such suspension, termination, revocation or lapse, as the case may be.

8.2 Remedies Upon Event of Default. If any Event of Default occurs and is continuing, the Administrative Agent shall, at the request of, or may, with the consent of, the Required Lenders, take any or all of the following actions:

(a) declare the commitment of each Lender to make Loans to be terminated, whereupon such commitments and obligation shall be terminated;

(b) declare the unpaid principal amount of all outstanding Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Company; and

(c) exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents;

provided that upon the occurrence of an actual or deemed entry of an order for relief with respect to the Company under the Bankruptcy Code of the United States, the obligation of each Lender to make Loans shall automatically terminate and the unpaid principal amount of all outstanding Loans and all interest and other amounts as aforesaid shall automatically become due and payable, in each case without further act of the Administrative Agent or any Lender.

8.3 Application of Funds. After the exercise of remedies provided for in Section 8.2 (or after the Loans have automatically become immediately due and payable as set forth in the proviso to Section 8.2), any amounts received on account of the Obligations shall, subject to the provisions of Section 2.12, be applied by the Administrative Agent in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (including fees, charges and disbursements of counsel to the Administrative Agent and amounts payable under Article III) payable to the Administrative Agent in its capacity as such;

Second, to payment of that portion of the Obligations constituting fees, indemnities and other amounts (other than principal and interest) payable to the Lenders under the Loan Documents (including fees, charges and disbursements of counsel to the respective Lenders and amounts payable under Article III), ratably among them in proportion to the respective amounts described in this clause Second payable to them;

Third, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans and other Obligations arising under the Loan Documents, ratably among the Lenders in proportion to the respective amounts described in this clause Third payable to them;

Fourth, to payment of that portion of the Obligations constituting unpaid principal of the Loans, ratably among the Lenders, in proportion to the respective amounts described in this clause Fourth held by them; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full, to the Company or as otherwise required by applicable Law.

8.4 Equity Cure. Notwithstanding anything to the contrary in this Agreement, upon the Borrowers' failure to comply with Section 7.11(a) as of the last day of any calendar month or fiscal year of the Company, as the case may be, the parties hereto acknowledge and agree that the Company shall have the right at any time from and after the last day of such calendar month or fiscal year until the date that is ten (10) Business Days after the date on which financial statements are required to be delivered for such calendar month or fiscal year, pursuant to a written request therefor by the Company (the "Specified Equity Contribution Request") that is received by the Administrative Agent on or prior to the day that is five (5) Business Days after the day on which financial statements are required to be delivered with respect to such

calendar month or fiscal year, to issue common Equity Interests of the Company the proceeds of which will be contributed in full in cash to the Company (any such equity issuance and related contribution, a "Specified Equity Contribution"). The amount of such Specified Equity Contribution will be included in the calculation of Consolidated Tangible Net Worth in the amount of such Specified Equity Contribution for the purposes of determining compliance with Section 7.11(a) at the end of such calendar month or fiscal year; provided that no more than one (1) Specified Equity Contribution may be made over the term of this Agreement. If, after giving effect to the foregoing recalculation, the requirements of Section 7.11(a) would be satisfied, then the Borrowers shall be deemed to have satisfied the requirements of Section 7.11(a) as of the relevant date of determination with the same effect as though there had been no failure to comply therewith at such date and the applicable Default or Event of Default that had occurred shall be deemed waived and not to have occurred for all purposes of this Agreement and the other Loan Documents. Upon the Administrative Agent's receipt of a Specified Equity Contribution Request until the tenth (10th) Business Day after the day on which financial statements are required to be delivered with respect to such calendar month or fiscal year, neither the Administrative Agent nor any other Secured Party shall exercise any right to accelerate the Loans, terminate the Commitments or exercise any right to foreclose or take possession of any Collateral or any other remedy under the Loan Documents, in each case on the basis of any actual or purported Event of Default under Section 8.1(b) (solely as a result of a breach of Section 7.11(a)); provided that (i) during the period set forth in this sentence, an Event of Default shall nevertheless be deemed to have occurred and be continuing for all other purposes under the Loan Documents (including restrictions on Credit Extensions) and (ii) this sentence shall not affect the rights of the Administrative Agent or any other Secured Party with respect to any other Default under the Loan Documents.

# ARTICLE IX
# ADMINISTRATIVE AGENT

## 9.1 Appointment and Authority.

(a) Each of the Lenders hereby irrevocably appoints FCMA to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and under the intercreditor and subordination agreements contemplated hereby and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto. The provisions of this Article IX are solely for the benefit of the Administrative Agent and the Lenders, and neither any Loan Party nor any Subsidiary or Affiliate thereof shall have rights as a third party beneficiary of any of such provisions. It is understood and agreed that the use of the term "agent" herein or in any other Loan Documents (or any other similar term) with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable Law. Instead such term is used as a matter of market custom, and is intended to create or reflect only an administrative relationship between contracting parties.

(b) The Administrative Agent shall also act as the "collateral agent" under the Loan Documents, and each of the Lenders hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral granted by any of the Loan Parties to secure any of the Obligations, together with such powers and discretion as are reasonably incidental thereto. In this connection, the Administrative Agent, as "collateral agent" and any co-agents, sub-agents and attorneys-in-fact appointed by the Administrative Agent pursuant to Section 9.5 for purposes of holding or enforcing any Lien on the Collateral (or any portion thereof) granted under the Collateral Documents, or for exercising any rights and remedies thereunder at the direction of the Administrative Agent, shall be entitled to the benefits of all provisions of this Article IX and Article X (including Section 10.4(c), as though such co-agents, sub-agents and attorneys-in-fact were the "collateral agent" under the Loan Documents) as if set forth in full herein with respect thereto.

9.2 Rights as a Lender. The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with any Loan Party or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

9.3 Exculpatory Provisions.

(a) The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents, and its duties hereunder shall be administrative in nature. Without limiting the generality of the foregoing, the Administrative Agent:

(i) shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(ii) shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Loan Documents that the Administrative Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the other Loan Documents); provided that the Administrative Agent shall not be required to take any action that, in its opinion or the opinion of its counsel, may expose the Administrative Agent to liability or that is contrary to any Loan Document or applicable Law, including for the avoidance of doubt any action that may be in violation of the automatic stay under any Debtor Relief Law or that may effect a forfeiture, modification or termination of property of a Defaulting Lender in violation of any Debtor Relief Law; and

(iii) shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Company or any of its Subsidiaries or Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

(b) The Administrative Agent shall not be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary, or as the Administrative Agent shall believe in good faith shall be necessary, under the circumstances as provided in Sections 10.1 and 8.2) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction by a final and nonappealable judgment. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until notice describing such Default is given to the Administrative Agent in writing by the Company or a Lender.

(c) The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in, or in connection with, this Agreement or any other Loan Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Loan Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth

in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent.

9.4 Reliance by Administrative Agent. The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of a Loan, that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrowers), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

9.5 Delegation of Duties. The Administrative Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any other Loan Document by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties. The exculpatory provisions of this Article IX shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for in this Agreement as well as activities as Administrative Agent. The Administrative Agent shall not be responsible for the negligence or misconduct of any sub-agents except to the extent that a court of competent jurisdiction determines in a final and nonappealable judgment that the Administrative Agent acted with gross negligence or willful misconduct in the selection of such sub-agents.

9.6 Resignation or Removal of Administrative Agent.

(a) The Administrative Agent may at any time give notice of its resignation to the Lenders and the Company. Upon receipt of any such notice of resignation, the Required Lenders shall have the right, in consultation with the Company, to appoint a successor, which shall be a bank with an office in the United States, or an Affiliate of any such bank with an office in the United States. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation, (or such earlier day as shall be agreed by the Required Lenders) (the "Resignation Effective Date"), then the retiring Administrative Agent may (but shall not be obligated to), on behalf of the Lenders, appoint a successor Administrative Agent meeting the qualifications set forth above; provided that in no event shall any such successor Administrative Agent be a Defaulting Lender. Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b) If the Person serving as Administrative Agent is a Defaulting Lender pursuant to clause (d) of the definition thereof, the Required Lenders may, to the extent permitted by applicable Law, by notice in writing to the Company and such Person remove such Person as Administrative Agent and, in consultation with the Company, appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders) (the "Removal Effective Date"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.

(c) With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security held by the Administrative Agent on behalf of the Lenders under any of the Loan Documents, the retiring or removed Administrative Agent shall continue to hold such collateral security until such time as a successor Administrative Agent is appointed) and (ii) except for any indemnity payments or other amounts then owed to the retiring or removed Administrative Agent, all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time, if any, as the Required Lenders appoint a successor Administrative Agent as provided for above. Upon the acceptance of a successor's appointment as Administrative Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or removed) Administrative Agent (other than as provided in Section 3.1(i) and other than any rights to indemnity payments or other amounts owed to the retiring or removed Administrative Agent as of the Resignation Effective Date or the Removal Effective Date, as applicable), and the retiring or removed Administrative Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents. The fees payable by the Company to a successor Administrative Agent shall be the same as those payable to its predecessor unless otherwise agreed between the Company and such successor. After the retiring or removed Administrative Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 10.4 shall continue in effect for the benefit of such retiring or removed Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them (i) while the retiring or removed Administrative Agent was acting as Administrative Agent and (ii) after such resignation or removal for as long as any of them continues to act in any capacity hereunder or under the other Loan Documents, including (A) acting as collateral agent or otherwise holding any collateral security on behalf of any of the Lenders and (B) in respect of any actions taken in connection with transferring the agency to any successor Administrative Agent.

9.7 Non-Reliance on Administrative Agent and Other Lenders. Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

9.8 No Other Duties, Etc. Anything herein to the contrary notwithstanding, none of the arranger(s), bookrunner(s), syndication agent(s) or documentation agent(s) listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the other Loan Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder.

9.9 Administrative Agent May File Proofs of Claim. In case of the pendency of any proceeding under any Debtor Relief Law or any other judicial proceeding relative to any Loan Party, the Administrative Agent (irrespective of whether the principal of any Loan shall then be due and payable as herein expressed or by declaration or otherwise and irrespective of whether the Administrative Agent shall have made any demand on any Borrower) shall be entitled and empowered (but not obligated) by intervention in such proceeding or otherwise:

(a) to file and prove a claim for the whole amount of the principal and interest owing and unpaid in respect of the Loans and all other Obligations that are owing and unpaid and to file such other documents as may be necessary or advisable in order to have the claims of the Lenders and the

Administrative Agent (including any claim for the reasonable compensation, expenses, disbursements and advances of the Lenders and the Administrative Agent and their respective agents and counsel and all other amounts due the Lenders and the Administrative Agent under Sections 2.7 and 10.4) allowed in such judicial proceeding; and

(b) to collect and receive any monies or other property payable or deliverable on any such claims and to distribute the same;

and any custodian, receiver, assignee, trustee, liquidator, sequestrator or other similar official in any such judicial proceeding is hereby authorized by each Lender to make such payments to the Administrative Agent and, in the event that the Administrative Agent shall consent to the making of such payments directly to the Lenders, to pay to the Administrative Agent any amount due for the reasonable compensation, expenses, disbursements and advances of the Administrative Agent and its agents and counsel, and any other amounts due the Administrative Agent under Sections 2.7 and 10.4.

9.10 Credit Bidding.

(a) The Administrative Agent, on behalf of the Secured Parties, shall have the right, at the direction of the Required Lenders, to credit bid and purchase for the benefit of the Secured Parties all or any portion of Collateral at any sale thereof conducted by the Administrative Agent or otherwise under the provisions of the UCC, including pursuant to Sections 9-610 or 9-620 of the UCC, at any sale thereof conducted under the provisions of the Bankruptcy Code of the United States, including Section 363 thereof, or a sale under a plan of reorganization, or at any other sale or foreclosure conducted by the Administrative Agent or otherwise (whether by judicial action or otherwise) in accordance with applicable Law. Such credit bid or purchase may be completed through one or more acquisition vehicles formed by the Administrative Agent to make such credit bid or purchase and, in connection therewith, the Administrative Agent is authorized, on behalf of the Secured Parties, to adopt documents providing for the governance of the acquisition vehicle or vehicles, and assign the applicable Obligations to any such acquisition vehicle in exchange for Equity Interests and/or debt issued by the applicable acquisition vehicle (which shall be deemed to be held for the ratable account of the applicable Secured Parties on the basis of the Obligations so assigned by each Secured Party); provided that any actions by the Administrative Agent with respect to such acquisition vehicle, including any disposition of the assets of Equity Interests thereof, shall be governed, directly or indirectly, by the vote of the Required Lenders, irrespective of the termination of this Agreement and without giving effect to the limitations on actions of the Required Lenders in Section 10.1.

(b) Each Lender hereby agrees, on behalf of itself and each of its Affiliates that is a Secured Party, that, except as otherwise provided in any Loan Document or with the written consent of the Administrative Agent and the Required Lenders, it will not take any enforcement action, accelerate obligations under any of the Loan Documents, or exercise any right that it might otherwise have under applicable Law to credit bid at foreclosure sales, UCC sales or other similar dispositions of Collateral.

9.11 Collateral and Guaranty Matters.

(a) The Lenders irrevocably authorize the Administrative Agent, at its option and in its discretion, to:

(i) release any Lien on any property granted to or held by the Administrative Agent under any Loan Document (A) upon the occurrence of the Facility Termination Date, (B) that is Disposed of or to be Disposed of as part of or in connection with any Disposition permitted hereunder or under any other Loan Document to a Person that is not a Loan Party or (C) subject to Section 10.1, if approved, authorized or ratified in writing by the Required Lenders;

(ii) subordinate any Lien on any property granted to or held by the Administrative Agent under any Loan Document to the holder of any Lien on such property that is permitted by Section 7.1(i) or, with respect to the Dan Call Farm Property, the Mortgage with respect thereto; and

(iii) release any Subsidiary Guarantor from its obligations under any Loan Document if such Person ceases to be a Subsidiary as a result of a transaction permitted under the Loan Documents.

Upon request by the Administrative Agent at any time, the Required Lenders will confirm in writing the Administrative Agent's authority to release or subordinate its interest in particular types or items of property, or to release any Subsidiary Guarantor from its obligations under the Loan Documents to which it is a party pursuant to this Section 9.11.

(b) The Administrative Agent shall not be responsible for or have a duty to ascertain or inquire into any representation or warranty regarding the existence, value or collectability of the Collateral, the existence, priority or perfection of the Administrative Agent's Lien thereon, or any certificate prepared by any Loan Party in connection therewith, nor shall the Administrative Agent be responsible or liable to the Lenders for any failure to monitor or maintain any portion of the Collateral.

9.12 Certain ERISA Matters.

(a) Each Lender (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that at least one of the following is and will be true:

(i) such Lender is not using "plan assets" (within the meaning of Section 3(42) of ERISA or otherwise) of one or more Benefit Plans with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments or this Agreement;

(ii) the transaction exemption set forth in one or more PTEs, such as PTE 84-14 (a class exemption for certain transactions determined by independent qualified professional asset managers), PTE 95-60 (a class exemption for certain transactions involving insurance company general accounts), PTE 90-1 (a class exemption for certain transactions involving insurance company pooled separate accounts), PTE 91-38 (a class exemption for certain transactions involving bank collective investment funds) or PTE 96-23 (a class exemption for certain transactions determined by in-house asset managers), is applicable with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement;

(iii) (A) such Lender is an investment fund managed by a "Qualified Professional Asset Manager" (within the meaning of Part VI of PTE 84-14), (B) such Qualified Professional Asset Manager made the investment decision on behalf of such Lender to enter into, participate in, administer and perform the Loans, the Commitments and this Agreement, (C) the entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement satisfies the requirements of sub-sections (b) through (g) of Part I of PTE 84-14 and (D) to the best knowledge of such Lender, the requirements of subsection (a) of Part I of PTE 84-

14 are satisfied with respect to such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement; or

(iv) such other representation, warranty and covenant as may be agreed in writing between the Administrative Agent, in its sole discretion, and such Lender.

(b) In addition, unless either (1) sub-clause (i) in the immediately preceding subsection (a) is true with respect to a Lender or (2) a Lender has provided another representation, warranty and covenant in accordance with the immediately preceding subsection (a)(iv), such Lender further (x) represents and warrants, as of the date such Person became a Lender party hereto, to, and (y) covenants, from the date such Person became a Lender party hereto to the date such Person ceases being a Lender party hereto, for the benefit of, the Administrative Agent and not, for the avoidance of doubt, to or for the benefit of any Borrower or any other Loan Party, that the Administrative Agent is not a fiduciary with respect to the assets of such Lender involved in such Lender's entrance into, participation in, administration of and performance of the Loans, the Commitments and this Agreement (including in connection with the reservation or exercise of any rights by the Administrative Agent under this Agreement, any Loan Document or any documents related hereto or thereto).

# ARTICLE X
# MISCELLANEOUS

10.1 Amendments, Etc. Except as otherwise expressly provided hereunder or thereunder, no amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by any Borrower or any other Loan Party or, in the case of the Mortgage on the Dan Call Farm Property, any Permitted Investor therefrom, shall be effective unless in writing signed by the Required Lenders (or by the Administrative Agent with the consent of the Required Lenders) and the Borrowers or the applicable Loan Party or the Permitted Investors, as the case may be, and acknowledged by the Administrative Agent, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given; provided that no such amendment, waiver or consent shall:

(a) waive any condition set forth in Section 4.1 or, in the case of the initial Credit Extension, Section 4.2, without the written consent of each Lender;

(b) extend or increase the Commitment of any Lender (or reinstate any Commitment terminated pursuant to Section 8.2), without the written consent of such Lender;

(c) postpone any date fixed by this Agreement or any other Loan Document for any payment (excluding mandatory prepayments) of principal, interest, fees or other amounts due to the Lenders (or any of them) hereunder or under such other Loan Document, without the written consent of each Lender entitled to such payment;

(d) reduce the principal of, or the rate of interest specified herein on, any Loan, or (subject to clause (iii) of the second proviso to this Section 10.1) any fees or other amounts payable hereunder or under any other Loan Document, without the written consent of each Lender entitled to such amount; provided that only the consent of the Required Lenders shall be necessary (i) to amend the definition of "Default Rate" or to waive any obligation of the Borrowers to pay interest at the Default Rate or (ii) to amend any financial covenant hereunder (or any defined term used therein) even if the effect of such amendment would be to reduce the rate of interest on any Loan or to reduce any fee payable hereunder;

(e) change Section 8.3 in a manner that would alter the pro rata sharing of payments required thereby without the written consent of each Lender;

(f) change any provision of this Section 10.1 or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to amend, waive or otherwise modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender;

(g) release all or substantially all of the Collateral in any transaction or series of related transactions, without the written consent of each Lender, except to the extent such release is permitted pursuant to Section 9.11 (in which case such release may be made by the Administrative Agent acting alone or at the direction of the Required Lenders); or

(h) release all of the Subsidiary Guarantors or Subsidiary Guarantors comprising substantially all of the value of the Subsidiary Guaranty, in any case, from the Subsidiary Guaranty, without the written consent of each Lender, except to the extent such release is permitted pursuant to Section 9.11 (in which case such release may be made by the Administrative Agent acting alone or at the direction of the Required Lenders);

provided further that (i) no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent in addition to the Lenders required above, affect the rights or duties of the Administrative Agent under this Agreement or any other Loan Document and (ii) the Fee Letter may be amended, or rights or privileges thereunder waived, in a writing executed only by the parties thereto. Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender and the maturity date of any of its Loans may not be extended, the rate of interest on any of its Loans may not be reduced and the principal amount of any of its Loans may not be forgiven, in each case and (y) any waiver, amendment, consent or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely relative to other affected Lenders shall require the consent of such Defaulting Lender.

Notwithstanding any provision herein to the contrary, if the Administrative Agent and the Company acting together identify any ambiguity, omission, mistake, typographical error or other defect in any provision of this Agreement or any other Loan Document (including the schedules and exhibits thereto), then the Administrative Agent and the Company shall be permitted to amend, modify or supplement such provision to cure such ambiguity, omission, mistake, typographical error or other defect, and such amendment shall become effective without any further action or consent of any other party to this Agreement.

10.2 Notices; Effectiveness; Electronic Communications.

(a) Notices Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in subsection (b) below), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by facsimile as follows, and all notices and other communications expressly permitted hereunder to be given by telephone shall be made to the applicable telephone number, as follows:

(i) if to any Borrower or any other Loan Party, to Uncle Nearest, Inc. at 3125 US 231 N, Shelbyville TN 37160, Attention of Mike Senzaki (Facsimile No. (818) 450-0821);

(ii) if to the Administrative Agent, to Farm Credit Mid-America, PCA at 12501 Lakefront Place, Louisville, Kentucky 40299, Attention of Capital Markets (Facsimile No. (502) 420-3691; email Syndications@e-farmcredit.com), with a copy to Farm Credit Mid-America, PCA at P.O. Box 34390, Louisville, Kentucky 40232, Attention of Capital Markets (Facsimile No. (502) 420-3691; email Syndications@e-farmcredit.com); and

(iii) if to a Lender, to it at its address (or facsimile number) set forth in its Administrative Questionnaire for deliveries of documentation that may contain material non-public information.

Notices and other communications sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices and other communications sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next Business Day for the recipient). Notices and other communications delivered through electronic communications to the extent provided in subsection (b) below shall be effective as provided in such subsection (b).

(b) Electronic Communications. Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent; provided that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under Article II by electronic communication. The Administrative Agent or the Company may each, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it; provided that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient, at its e-mail address as described in the foregoing clause (i), of notification that such notice or communication is available and identifying the website address therefor; provided that, for both of the foregoing clauses (i) and (ii), if such notice, e-mail or other communication is not sent during the normal business hours of the recipient, such notice, e-mail or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c) Change of Address, Etc. Each of the Borrowers and the Administrative Agent may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the other parties hereto. Each other Lender may change its address, facsimile or telephone number for notices and other communications hereunder by notice to the Company and the Administrative Agent.

(d) Platform.

(i) Each Borrower hereby acknowledges that the Administrative Agent and/or the Arranger may, but shall not be obligated to, make any materials provided by, or on behalf of, any Loan Party hereunder or under any other Loan Document (collectively, the "Borrower Materials") available to the Lenders by posting the Borrower Materials on the Platform.

(ii) Each Borrower hereby acknowledges that certain of the Lenders may be "public-side" Lenders (i.e., Lenders that do not wish to receive material non-public information with respect

to the Borrower or its securities) (each, a "Public Lender"). Each Borrower hereby agrees that it will use commercially reasonable efforts to identify that portion of the Borrower Materials that may be distributed to the Public Lenders and that (w) all such Borrower Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, means that the word "PUBLIC" shall appear prominently on the first page thereof; (x) by marking Borrower Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Arranger and the Lenders to treat such Borrower Materials as not containing any material non-public information (although it may be sensitive and proprietary) with respect to any Borrower or its securities for purposes of United States federal and state securities laws (provided that to the extent such Borrower Materials constitute Information, they shall be treated as set forth in Section 10.7); (y) all Borrower Materials marked "PUBLIC" are permitted to be made available through a portion of the Platform designated "Public Side Information;" and (z) the Administrative Agent and the Arranger shall be entitled to treat any Borrower Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of the Platform not designated "Public Side Information."

(iii) The Platform is provided "as is" and "as available." The Agent Parties (as defined below) do not warrant the adequacy of the Borrower Materials or the Platform and expressly disclaim liability for errors or omissions in the Borrower Materials. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third party rights or freedom from viruses or other code defects, is made by any Agent Party in connection with the Borrower Materials or the Platform. In no event shall the Administrative Agent or any of its Related Parties (collectively, the "Agent Parties") have any liability to any Borrower, any other Loan Party, any Lender or any other Person for damages of any kind, including direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Borrower's, any other Loan Party's or any Agent Party's transmission of communications through the Platform.

(e) Private Side Designation. Each Public Lender agrees to cause at least one individual at, or on behalf of, such Public Lender to at all times have selected the "Private Side Information" or similar designation on the content declaration screen of the Platform in order to enable such Public Lender or its delegate, in accordance with such Public Lender's compliance procedures and applicable Law, including United States federal and state securities Laws, to make reference to Borrower Materials that are not made available through the "Public Side Information" portion of the Platform and that may contain material non-public information with respect to any Loan Party or its securities for purposes of United States federal or state securities Laws.

10.3 No Waiver; Cumulative Remedies; Enforcement.

(a) No failure by any Lender or the Administrative Agent to exercise, and no delay by any such Person in exercising, any right, remedy, power or privilege under this Agreement or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege under this Agreement or any other Loan Document preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges under this Agreement and each other Loan Document are cumulative and not exclusive of any rights, remedies, powers and privileges provided by Law.

(b) Notwithstanding anything to the contrary contained in this Agreement or any other Loan Document, the authority to enforce rights and remedies under this Agreement and the other Loan Documents against the Loan Parties or any of them shall be vested exclusively in, and all actions and proceedings at law in connection with such enforcement shall be instituted and maintained exclusively by, the Administrative Agent in accordance with Section 8.2 for the benefit of all the Lenders; provided that

the foregoing shall not prohibit (i) the Administrative Agent from exercising on its own behalf the rights and remedies that inure to its benefit (solely in its capacity as Administrative Agent) under this Agreement and the other Loan Documents, (ii) any Lender from exercising setoff rights in accordance with Section 10.8 (subject to the terms of Section 2.11) or (iii) any Lender from filing proofs of claim or appearing and filing pleadings on its own behalf during the pendency of a proceeding relative to any Loan Party under any Debtor Relief Law; and provided further that if at any time there is no Person acting as Administrative Agent under this Agreement and the other Loan Documents, then (x) the Required Lenders shall have the rights otherwise ascribed to the Administrative Agent pursuant to Section 8.2 and (y) in addition to the matters set forth in clauses (ii) and (iii) of the preceding proviso and subject to Section 2.11, any Lender may, with the consent of the Required Lenders, enforce any rights and remedies available to it and as authorized by the Required Lenders.

10.4 Expenses; Indemnity; Damage Waiver.

(a) Costs and Expenses. The Borrowers shall, jointly and severally, pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent), in connection with the syndication of the credit facilities provided for herein, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents, or any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated) and (ii) all out-of-pocket expenses incurred by the Administrative Agent or any Lender (including the fees, charges and disbursements of any counsel for the Administrative Agent or any Lender), in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section or (B) in connection with Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

(b) Indemnification by the Borrowers. The Borrowers shall, jointly and severally indemnify the Administrative Agent (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, penalties, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any Person (including any Borrower or any other Loan Party) arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned, leased or operated by any Loan Party or any Subsidiary or Affiliate thereof or that is otherwise Collateral, or any Environmental Liability related in any way to any Loan Party or any Subsidiary or Affiliate thereof or to any Collateral or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee. This Section 10.4(b) shall not apply with respect to Taxes other than any Taxes that represent losses, claims, damages, etc. arising from any non-Tax claim.

(c) Reimbursement by Lenders. To the extent that the Borrowers for any reason fail to indefeasibly pay any amount required under subsection (a) or (b) of this Section to be paid by it to the

Administrative Agent (or any sub-agent thereof) or any Related Party of the Administrative Agent, each Lender severally agrees to pay to the Administrative Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought based on each Lender's share of the Total Credit Exposure at such time, or if the Total Credit Exposure has been reduced to zero, then based on such Lender's share of the Total Credit Exposure immediately prior to such reduction) of such unpaid amount (including any such unpaid amount in respect of a claim asserted by such Lender); provided that, the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for the Administrative Agent (or any such sub-agent) in connection with such capacity. The obligations of the Lenders under this subsection (c) are subject to the provisions of Section 2.10(c).

(d) Waiver of Consequential Damages, Etc. To the fullest extent permitted by applicable Law, no Borrower shall assert, and each Borrower hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof. No Indemnitee referred to in subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e) Payments. All amounts due under this Section 10.4 shall be payable not later than 10 Business Days after demand therefor.

(f) Survival. Each party's obligations under this Section shall survive the termination of the Loan Documents and payment of the obligations hereunder.

10.5 Payments Set Aside. To the extent that any payment by or on behalf of any Borrower is made to the Administrative Agent or any Lender, or the Administrative Agent or any Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Administrative Agent or such Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then (a) to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred and (b) each Lender severally agrees to pay to the Administrative Agent upon demand its applicable share (without duplication) of any amount so recovered from or repaid by the Administrative Agent, plus interest thereon from the date of such demand to the date such payment is made at a rate per annum equal to the Federal Funds Rate from time to time in effect. The obligations of the Lenders under clause (b) of the preceding sentence shall survive the payment in full of the Obligations and the termination of this Agreement.

10.6 Successors and Assigns.

(a) Successors and Assigns Generally. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that no Borrower may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or

otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of subsection (b) of this Section, (ii) by way of participation in accordance with the provisions of subsection (d) of this Section or (iii) by way of pledge or assignment of a security interest subject to the restrictions of subsection (e) of this Section. Any other attempted assignment or transfer by any party hereto shall be null and void. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in subsection (d) of this Section and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b) Assignments by Lenders. Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment(s) and the Loans; provided that any such assignment shall be subject to the following conditions:

(i) Minimum Amounts.

(A) in the case of an assignment of the entire remaining amount of the assigning Lender's Commitment under any Facility and/or the Loans at the time owing to it (in each case with respect to any Facility) or contemporaneous assignments to related Approved Funds (determined after giving effect to such assignments) that equal at least the amount specified in clause (b)(i)(B) of this Section in the aggregate or in the case of an assignment to a Lender, an Affiliate of a Lender or an Approved Fund, no minimum amount need be assigned; and

(B) in any case not described in clause (b)(i)(A) of this Section, the aggregate amount of the Commitment (which for this purpose includes Loans outstanding thereunder) or, if the applicable Commitment is not then in effect, the principal outstanding balance of the Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent or, if "Trade Date" is specified in the Assignment and Assumption, as of the Trade Date) shall not be less than $5,000,000, unless each of the Administrative Agent and, so long as no Event of Default has occurred and is continuing, the Company otherwise consents (each such consent not to be unreasonably withheld or delayed); provided that the Company shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof.

(ii) Proportionate Amounts. Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned, except that this clause (ii) shall not prohibit any Lender from assigning all or a portion of its rights and obligations among the separate credit facilities provided hereunder on a non-pro rata basis.

(iii) Required Consents. No consent shall be required for any assignment except to the extent required by clause (b)(i)(B) of this Section and, in addition:

(A) the consent of the Company (such consent not to be unreasonably withheld or delayed) shall be required unless (1) an Event of Default has occurred and is continuing at the time of such assignment or (2) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that the Company shall be deemed to have

consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within five Business Days after having received notice thereof; and provided further that the Company's consent shall not be required during the primary syndication of the credit facilities provided herein; and

(B) the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments in respect of (1) the Revolving Credit Facility or any unfunded Commitment with respect to the Term Facility or the RELOC Facility if such assignment is to a Person that is not a Lender with a Commitment in respect of such Facility, an Affiliate of such Lender or an Approved Fund with respect to such Lender or (2) any Term Loan, RELOC Loan or RELOC Term Loan to a Person that is not a Lender, an Affiliate of a Lender or an Approved Fund; provided that the consent of the Administrative Agent (which may withheld in the Administrative Agent's sole discretion) shall be required for any assignment to any Person that is not a Farm Credit Lender.

(iv) Assignment and Assumption. The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee in the amount of $3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment. The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(v) No Assignment to Certain Persons. No such assignment shall be made to (A) the Company or any of the Company's Affiliates or Subsidiaries, (B) any Defaulting Lender or any of its Subsidiaries, or any Person who, upon becoming a Lender hereunder, would constitute a Defaulting Lender or a Subsidiary thereof or (C) a natural Person (or a holding company, investment vehicle or trust for, or owned and operated by or for the primary benefit of, one or more natural Persons).

(vi) Certain Additional Payments. In connection with any assignment of rights and obligations of any Defaulting Lender hereunder, no such assignment shall be effective unless and until, in addition to the other conditions thereto set forth herein, the parties to the assignment shall make such additional payments to the Administrative Agent in an aggregate amount sufficient, upon distribution thereof as appropriate (which may be outright payment, purchases by the assignee of participations or subparticipations, or other compensating actions, including funding, with the consent of the Company and the Administrative Agent, the applicable pro rata share of Loans previously requested but not funded by the Defaulting Lender, to each of which the applicable assignee and assignor hereby irrevocably consent), to (A) pay and satisfy in full all payment liabilities then owed by such Defaulting Lender to the Administrative Agent or any other Lender hereunder (and interest accrued thereon) and (B) acquire (and fund as appropriate) its full pro rata share of all Loans in accordance with its Applicable Percentage. Notwithstanding the foregoing, in the event that any assignment of rights and obligations of any Defaulting Lender hereunder shall become effective under applicable Law without compliance with the provisions of this paragraph, then the assignee of such interest shall be deemed to be a Defaulting Lender for all purposes of this Agreement until such compliance occurs.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to subsection (c) of this Section, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning

Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 3.1, 3.2 and 10.4 with respect to facts and circumstances occurring prior to the effective date of such assignment; provided that except to the extent otherwise expressly agreed by the affected parties, no assignment by a Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising from that Lender's having been a Defaulting Lender. Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this subsection (b) shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with subsection (d) of this Section (other than a proposed assignment to the Company or any of its Subsidiaries or Affiliates or to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person), which, in each case, shall be null and void).

(c) Register. The Administrative Agent, acting solely for this purpose as a non-fiduciary agent of the Borrowers (and such agency being solely for tax purposes), shall maintain at the Administrative Agent's Office a copy of each Assignment and Assumption delivered to it (or the equivalent thereof in electronic form) and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts (and stated interest) of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register"). The entries in the Register shall be conclusive absent manifest error, and the Borrowers, the Administrative Agent and the Lenders shall treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement. The Register shall be available for inspection by the Borrowers and any Lender (but only to the extent of the entries therein that are directly applicable to such Lender), at any reasonable time and from time to time upon reasonable prior notice.

(d) Participations. Any Lender may at any time, without the consent of, or notice to, any Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated by or for the primary benefit of, one or more natural Persons, a Defaulting Lender or the Company or any of the Company's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrowers, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement. For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 10.4(c) without regard to the existence of any participation.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 10.1 that affects such Participant. Each Borrower agrees that each Participant shall be entitled to the benefits of Sections 3.1 and 3.2 (subject to the requirements and limitations therein, including the requirements under Section 3.1(g) (it being understood that the documentation required under Section 3.1(g) shall be delivered to the Lender who sells the participation)) to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to subsection (b) of this Section; provided that such Participant (A) agrees to be subject to the provisions of Section 3.4 as if it were an assignee under subsection (b) of this Section and (B) shall not be entitled to receive any greater payment under Sections 3.1 or 3.2, with respect to any participation, than the Lender

from whom it acquired the applicable participation would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation. Each Lender that sells a participation agrees, at the Company's request and expense, to use reasonable efforts to cooperate with the Borrowers to effectuate the provisions of Section 3.4 with respect to any Participant. To the extent permitted by Law, each Participant also shall be entitled to the benefits of Section 10.8 as though it were a Lender; provided that such Participant agrees to be subject to Section 2.11 as though it were a Lender. Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrowers, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary. For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

Notwithstanding anything in this subsection (d) to the contrary, any Participant that is a Farm Credit Lender that (i) has purchased a participation from a Lender that is a Farm Credit Lender in a minimum amount of $5,000,000 (in the aggregate across all Facilities), (ii) has been designated as a voting Participant (a "Voting Participant") in a notice (a "Voting Participant Notice") sent by the relevant Lender (including any existing Voting Participant) to the Administrative Agent and (iii) receives, prior to becoming a Voting Participant, the consent of the Administrative Agent (such Administrative Agent consent to be required only to the extent and under the circumstances it would be required if such Voting Participant were to become a Lender pursuant to an assignment in accordance with Section 10.6(b) and such consent is not required for an assignment to an existing Voting Participant), shall be entitled to vote as if such Voting Participant were a Lender on all matters subject to a vote by Lenders, and the voting rights of the selling Lender (including any existing Voting Participant) shall be correspondingly reduced, on a dollar-for-dollar basis. Each Voting Participant Notice shall include, with respect to each Voting Participant, the information that would be included by a prospective Lender in an Assignment and Assumption. Notwithstanding the foregoing, each Farm Credit Lender designated as a Voting Participant in Schedule 10.6(d) shall be a Voting Participant without delivery of a Voting Participant Notice and without the prior written consent of the Administrative Agent. The selling Lender and the Voting Participant shall notify the Administrative Agent and the Company within three Business Days of any termination of, or reduction or increase in the amount of, such participation and shall promptly upon request of the Administrative Agent update or confirm there has been no change in the information set forth in Schedule 10.6(d) or delivered in connection with any Voting Participant Notice. The Company and the Administrative Agent shall be entitled to conclusively rely on information provided by a Lender identifying itself or its participant as a Farm Credit Lender without verification thereof and may also conclusively rely on the information set forth in Schedule 10.6(d), delivered in connection with any Voting Participant Notice or otherwise furnished pursuant to this paragraph and, unless and until notified thereof in writing by the selling Lender, may assume that there have been no changes in the identity of Voting Participants, the Dollar amount of participations, the contact information of the participants or any other information furnished to the Company or the Administrative Agent pursuant to this paragraph. The voting rights hereunder of each Voting Participant are solely for the benefit of such Voting Participant and shall not inure to any assignee or participant of a Voting Participant.

(e) Certain Pledges. Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement (including under its Note, if any) to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank or, with respect to any Farm Credit Lender, the Federal Farm Credit Banks Funding Corporation or such other funding lender with respect to such Farm Credit Lender; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

10.7 Treatment of Certain Information; Confidentiality. Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates, its auditors and its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential) in connection with the credit facilities provided for herein, this Agreement, the transactions contemplated hereby or in connection with marketing of services by such Affiliate or Related Party to the Company or any of its Subsidiaries, (b) to the extent required or requested by any supervisory authority or regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable Law or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and obligations under this Agreement or any Eligible Assignee invited to be a Lender pursuant to Section 2.13 or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to a Borrower and its obligations, this Agreement or payments hereunder, (g) on a confidential basis to (i) any rating agency in connection with rating the Company or its Subsidiaries or the credit facilities provided hereunder or (ii) the CUSIP Service Bureau or any similar agency in connection with the, application, issuance, publishing and monitoring of CUSIP numbers or other market identifiers with respect to the credit facilities provided hereunder, (h) with the consent of the Company or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Company or (z) is independently discovered or developed by a party hereto without utilizing any Information received from the Company or violating the terms of this Section. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and customary information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Administrative Agent and the Lenders in connection with the administration of this Agreement, the other Loan Documents, and the Commitments.

For purposes of this Section, "Information" means all information received from any Loan Party or any of their respective Subsidiaries relating to any Loan Party or any of their respective Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by such Loan Party or such Subsidiary; provided that, in the case of information received from any Loan Party or any of their respective Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

10.8 Right of Setoff. If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, after obtaining the prior written consent of the Administrative Agent, to the fullest extent permitted by applicable Law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or any such Affiliate to or for the credit or the account of any Borrower against any and all of the obligations of such Borrower now or hereafter existing under this Agreement or any other Loan Document to such Lender or their respective Affiliates, irrespective of whether or not such Lender or such Affiliate shall have made any demand under this Agreement or any other Loan Document and although such obligations of such Borrower may be contingent or unmatured or are owed to a branch or office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness; provided that in the event that any Defaulting Lender shall exercise any such right of setoff, (x) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of Section 2.12 and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent and the Lenders and (y) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff. The rights of each Lender and their respective Affiliates under this Section are in addition to other rights and remedies (including other rights of setoff) that such Lender or their respective Affiliates may have. Each Lender agrees to notify the Company and the Administrative Agent promptly after any such setoff and application; provided that the failure to give such notice shall not affect the validity of such setoff and application. This Section 10.8 shall not apply to any action taken by any Farm Credit Lender with respect to any Farm Credit Equities held by any Borrower.

10.9 Survival of Representations and Warranties. All representations and warranties made hereunder and in any other Loan Document or other document delivered pursuant hereto or thereto or in connection herewith or therewith shall survive the execution and delivery hereof and thereof. Such representations and warranties have been or will be relied upon by the Administrative Agent and each Lender, regardless of any investigation made by the Administrative Agent or any Lender or on their behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default at the time of any Credit Extension, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

10.10 Independent Effect of Covenants. Each Borrower expressly acknowledges and agrees that each covenant contained in Articles VI or VII shall be given independent effect. Accordingly, no Borrower shall engage in any transaction or other act otherwise permitted under any covenant contained in Articles VI or VII, if before or after giving effect to such transaction or act such Borrower shall or would be in breach of any other covenant contained in Articles VI or VII.

10.11 Governing Law; Jurisdiction; Etc.

(a) Governing Law. This Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document (except, as to any other Loan Document, as expressly set forth therein) and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York.

(b) Submission to Jurisdiction. Each Borrower irrevocably and unconditionally agrees that it will not commence any action, litigation or proceeding of any kind or description, whether in law or equity, whether in contract or in tort or otherwise, against the Administrative Agent, any Lender, or any Related Party of the foregoing in any way relating to this Agreement or any other Loan Document or the transactions

relating hereto or thereto, in any forum other than the courts of the State of New York sitting in New York County and of the United States District Court of the Southern District of New York, and any appellate court from any court thereof, and each of the parties hereto irrevocably and unconditionally submits to the jurisdiction of such courts and agrees that all claims in respect of any such action, litigation or proceeding may be heard and determined in such New York state court or, to the fullest extent permitted by applicable Law, in such federal court. Each of the parties hereto agrees that a final judgment in any such action, litigation or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law. Nothing in this Agreement or in any other Loan Document shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against any Borrower or its properties in the courts of any jurisdiction.

(c) Waiver of Venue. Each Borrower irrevocably and unconditionally waives, to the fullest extent permitted by applicable Law, any objection that it may now or hereafter have to the laying of venue of any action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in subsection (b) of this Section. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by applicable Law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d) Service of Process. Each party hereto irrevocably consents to service of process in the manner provided for notices in Section 10.2. Nothing in this Agreement will affect the right of any party hereto to serve process in any other manner permitted by applicable Law.

10.12 WAIVER OF JURY TRIAL. EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

10.13 Counterparts; Integration; Effectiveness; Electronic Execution.

(a) Counterparts; Integration; Effectiveness. This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent or the Arranger, constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof. Except as provided in Section 4.1, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (e.g. "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

(b) Electronic Execution of Assignments. The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable Law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state Laws based on the Uniform Electronic Transactions Act.

10.14 No Advisory or Fiduciary Responsibility. In connection with all aspects of each transaction contemplated hereby (including in connection with any amendment, waiver or other modification hereof or of any other Loan Document), each Loan Party acknowledges and agrees, and acknowledges its Affiliates' understanding, that: (i) (A) the arranging and other services regarding this Agreement provided by the Administrative Agent, the Arranger, and the Lenders are arm's-length commercial transactions between the Loan Parties and their respective Affiliates, on the one hand, and the Administrative Agent, the Arranger, and the Lenders, on the other hand, (B) each of the Loan Parties has consulted its own legal, accounting, regulatory and tax advisors to the extent it has deemed appropriate, and (C) each of the Loan Parties is capable of evaluating, and understands and accepts, the terms, risks and conditions of the transactions contemplated by this Agreement and by the other Loan Documents; (ii) (A) the Administrative Agent, the Arranger and the Lenders each is and has been acting solely as a principal and, except as expressly agreed in writing by the relevant parties, has not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party or any of their respective Affiliates, or any other Person and (B) neither the Administrative Agent, the Arranger nor any Lender has any obligation to any Loan Party or any of their respective Affiliates with respect to the transactions contemplated hereby except those obligations expressly set forth in this Agreement and in the other Loan Documents; and (iii) the Administrative Agent, the Arranger, the Lenders, and their respective Affiliates may be engaged in a broad range of transactions that involve interests that differ from those of the Loan Parties and their respective Affiliates, and neither the Administrative Agent, the Arranger nor any Lender has any obligation to disclose any of such interests to any Loan Party or any of their respective Affiliates. To the fullest extent permitted by Law, each of the Loan Parties hereby waives and releases any claims that it may have against the Administrative Agent, the Arranger and the Lenders with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby.

10.15 Severability. If any provision of this Agreement or the other Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of this Agreement and the other Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. Without limiting the foregoing provisions of this Section 10.15, if and to the extent that the enforceability of any provisions in this Agreement relating to Defaulting Lenders shall be limited by Debtor Relief Laws, as determined in good faith by the Administrative Agent, then such provisions shall be deemed to be in effect only to the extent not so limited.

10.16 USA PATRIOT Act. The Administrative Agent (for itself and not on behalf of any Lender), if it is subject to the PATRIOT Act, and each Lender that is subject to the PATRIOT Act hereby notifies the Borrowers that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies each Loan Party, which information includes the name and address of each Loan Party and other information that will allow such Lender or the Administrative Agent, as applicable, to identify each Loan Party in accordance with the PATRIOT Act. Each Borrower shall, promptly following a request by the Administrative Agent or any Lender, provide all documentation and other information that the Administrative Agent or such Lender requests in order to comply with its ongoing

obligations under applicable "know your customer" and anti-money laundering rules and regulations, including the PATRIOT Act.

10.17 Inconsistencies with Other Documents. In the event there is a conflict or inconsistency between this Agreement and any other Loan Document, the terms of this Agreement shall control; provided that any provision of the Collateral Documents which imposes additional burdens on the Company or any of its Subsidiaries or Affiliates or further restricts the rights of the Company or any of its Subsidiaries or Affiliates or gives the Administrative Agent or Lenders additional rights shall not be deemed to be in conflict or inconsistent with this Agreement and shall be given full force and effect.

10.18 Borrower Rights. Notwithstanding anything to the contrary in this Agreement or any other Loan Document, the rights and obligations of the Administrative Agent, the other Secured Parties and the Loan Parties under this Agreement and the other Loan Documents (including those set forth in Article VIII) are subject to the Farm Credit Act of 1971 and the rules and regulations promulgated thereunder (including the borrower rights set forth in 12 CFR § 617 (the "Borrower Rights")), as the same may be amended or supplemented from time to time. The Administrative Agent has provided a written summary description of the Borrower Rights to the Borrowers and the Lenders prior to the Closing Date and, upon request, will provide the same summary description to any Lender becoming a party hereto after the Closing Date.

[Signature pages omitted.]

**COMMITMENTS**
**AND APPLICABLE PERCENTAGES**

| Lender | Revolving Credit Commitment | Applicable Percentage (Revolving Credit Facility) | Term Loan Commitment[2] | Outstanding Amount of Existing Term Loans[3] | Applicable Percentage (Term Loan Facility) |
|---|---|---|---|---|---|
| Farm Credit Mid-America, PCA | $59,000,000.00 | 100.000000000% | $1,700,000 | $21,803,125.00 | 100.000000000% |
| **Total** | **$59,000,000.00** | **100.000000000%** | $1,700,000 | **$21,803,125.00** | **100.000000000%** |

| Lender | RELOC Commitment[4] | Applicable Percentage (RELOC Facility) |
|---|---|---|
| Farm Credit Mid-America, PCA | $15,000,000.00 | 100.000000000% |
| **Total** | **$15,000,000.00** | **100.000000000%** |

[2] As of the Amendment No. 5 Effective Date, which such amount does not reflect the outstanding principal amount of the Existing Term Loans.

[3] As of the Amendment No. 5 Effective Date, prior to giving effect to the funding of the additional Terms Loans on such date.

[4] As of the Amendment No. 3 Effective Date.

# EXHIBIT 2

COPY

FILED 12/29/2025
1:42 O'clock P m
Curt M. Cobb C & M
By Tina Cantrell

COPY

## AMENDMENT NO. 1 TO CREDIT AGREEMENT

THIS AMENDMENT NO. 1 TO CREDIT AGREEMENT dated as of October 3, 2022 (this "Amendment"), is among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company (together with the Company and Distillery, collectively, the "Borrowers" and each, a "Borrower"), FARM CREDIT MID-AMERICA, PCA, in its capacity as administrative agent (in such capacity, the "Administrative Agent"), and each of the Lenders (as defined below) party hereto.

### RECITALS:

A. The Borrowers, the lenders party thereto (collectively, the "Lenders") and the Administrative Agent have entered into that certain Credit Agreement dated as of July 22, 2022 (as amended, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement (as defined below).

B. The Borrowers have requested certain amendments to the Existing Credit Agreement (including an increase in the Revolving Credit Commitments pursuant to Section 2.13 of the Existing Credit Agreement) as more particularly set forth below.

C. Subject to the terms and conditions set forth below, the Lenders party hereto have agreed to make such amendments.

In furtherance of the foregoing, the parties agree as follows:

**Section 1. AMENDMENT(S).** Subject to the terms and conditions set forth herein and in reliance upon the representations and warranties set forth herein, the Existing Credit Agreement is hereby amended (as so amended, the "Credit Agreement") as follows:

(a) The aggregate Revolving Credit Commitments are increased, as reflected on Annex A attached thereto, from $35,000,000 to $38,000,000, with the entirety of such $3,000,000 increase being held by Farm Credit Mid-America, PCA. The increase contemplated by this Section 1(a) is made pursuant to Section 2.13(b) of the Existing Credit Agreement.

(b) Clause (b) of the definition of "Borrowing Base" in Section 1.1 is hereby amended and restated in its entirety to read as follows:

> "(b) 70% of the Value of all Eligible Inventory consisting of barreled whiskey, finished goods consisting of bottled whiskey or grain inventory; minus"

(c) Exhibit G (Borrowing Base Certificate) to the Existing Credit Agreement is hereby amended in its entirety to read in the form attached hereto as Annex A.

Each of the parties hereto acknowledges and agrees that the amendment(s) to the Existing Credit Agreement are limited to the extent specifically set forth in this Section 1 and no other terms, covenants or provisions of the Loan Documents are intended to be affected hereby.

FILED 12/29/2025 1:42 o'clock P m
Curt M. Cobb C & M
By Nicki Cantrell

**Section 2. CONDITIONS PRECEDENT.** The parties hereto agree that this Amendment and the amendment(s) set forth in Section 1 above shall be effective as of the date first written above upon satisfaction of the following conditions precedent:

(a) Documentation. The Administrative Agent shall have received (a) this Amendment, duly executed by each Borrower, the Administrative Agent and the Lenders party hereto and (b) a certificate of each Borrower signed by a Senior Officer of such Borrower certifying and attaching the resolutions adopted by the board of directors (or other equivalent governing body) of such Borrower authorizing and approving this Amendment and the amendments contemplated hereby (including the increase in the aggregate Revolving Credit Commitments).

(b) Fees. The Borrower shall have paid to the Administrative Agent, for the account of the Lenders, an upfront/amendment fee in an amount equal to $15,000.

The parties hereto acknowledge and agree that the amendment set forth in Section 1(b) above shall apply, and be effective, with respect to the Borrowing Base Certificate most recently delivered prior to the date of this Amendment.

**Section 3. REPRESENTATIONS AND WARRANTIES.** In order to induce the Administrative Agent and the Lenders party hereto to enter into this Amendment, each Borrower represents and warrants to the Administrative Agent and the Lenders party hereto as follows:

(a) The representations and warranties of each Borrower contained in Article V of the Credit Agreement and in each other Loan Document are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) as of such earlier date;

(b) Since December 31, 2021, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect;

(c) No Default exists on the date hereof immediately prior to or after giving effect to this Amendment and the amendment(s) contemplated hereby (including the increase in the aggregate Revolving Credit Commitments).

(d) This Amendment has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation.

**Section 4. MISCELLANEOUS.**

(a) **Ratification and Confirmation of Loan Documents.** Each Borrower hereby consents, acknowledges and agrees to the amendment(s) set forth herein and hereby confirms and ratifies in all respects the Loan Documents to which such Borrower is a party (including without limitation, the continuation of its payment and performance obligations thereunder and the continuation and extension of the liens granted under the Collateral Documents to secure the Obligations), in each case upon and after the effectiveness of the amendment(s) contemplated hereby.

(b) **Fees and Expenses.** The Borrowers shall pay all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and

disbursements of counsel for the Administrative Agent) in connection with the preparation, negotiation, execution and delivery of this Amendment and any other documents prepared in connection herewith.

(c) **Governing Law; Waiver of Jury Trial**. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York, and shall be further subject to the provisions of Sections 10.11 and 10.12 of the Credit Agreement.

(d) **Counterparts**. This Amendment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Amendment by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Amendment.

(e) **Entire Agreement**. This Amendment, together with all the Loan Documents (collectively, the "Relevant Documents"), sets forth the entire understanding and agreement of the parties hereto in relation to the subject matter hereof and supersedes any prior negotiations and agreements among the parties relating to such subject matter. No promise, condition, representation or warranty, express or implied, not set forth in the Relevant Documents shall bind any party hereto, and no such party has relied on any such promise, condition, representation or warranty. Each of the parties hereto acknowledges that, except as otherwise expressly stated in the Relevant Documents, no representations, warranties or commitments, express or implied, have been made by any party to the other. None of the terms or conditions of this Amendment may be changed, modified, waived or canceled orally or otherwise except in a writing and in accordance with Section 10.1 of the Credit Agreement. This Amendment is a Loan Document.

(f) **Severability**. If any provision of this Amendment is held to be illegal, invalid or unenforceable, (i) the legality, validity and enforceability of the remaining provisions of this Amendment shall not be affected or impaired thereby and (ii) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(g) **Successors and Assigns**. This Amendment shall be binding upon and inure to the benefit of each party hereto and their respective successors and assigns (subject to Section 10.6 of the Credit Agreement).

***[Remainder of Page Intentionally Left Blank; Signature Pages Follow]***

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 1 to Credit Agreement to be executed by their duly authorized officers, all as of the date and year first written above.

**BORROWERS:**

**UNCLE NEAREST, INC.**

By:____________________
Name: Fawn Weaver
Title: President and Secretary

**NEAREST GREEN DISTILLERY, INC.**

By:____________________
Name: Fawn Weaver
Title: President and Secretary

**UNCLE NEAREST REAL ESTATE HOLDINGS, LLC**

By: Uncle Nearest, Inc., its Member

By:____________________
Name: Fawn Weaver
Title: President and Secretary

**ADMINISTRATIVE AGENT / LENDERS:**

**FARM CREDIT MID-AMERICA, PCA,**
as Administrative Agent and a Lender

By: ______________________
Name: Jonathan Boyce
Title: Financial Officer

**Annex A**

Revised Exhibit G

*See attached.*

*EXHIBIT G*

# FORM OF BORROWING BASE CERTIFICATE

Date: ______, 20__

To: Farm Credit Mid-America, PCA, as the Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of July 22, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the lenders from time to time party thereto, as Lenders, and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

The undersigned hereby certifies as of the date hereof that he/she is the ________________________[1] of the Company, and that, as such, he/she is authorized to execute and deliver this Borrowing Base Certificate to the Administrative Agent on the behalf of the Company, and that the analysis and information set forth in this Borrowing Base Certificate is true and accurate on and as of the date hereof.

Borrowing Base / Availability Calculations

| | |
|---|---|
| Eligible Accounts | 0 |
| Advance Rate | 75% |
| **Accounts Borrowing Base** | 0 |
| | |
| Eligible Inventory consisting of barreled whiskey, finished goods consisting of bottled whiskey or grain inventory | 0 |
| Advance Rate | 70% |
| **Inventory Borrowing Base** | 0 |
| | |
| *Availability Reserves*: | |
| Less: Rent and Charge Reserves | 0 |
| Less: outstanding Taxes and other governmental charges | 0 |
| Less: liabilities that are or may become secured by Liens on the Collateral (including Permitted Liens) which might have priority over the Liens or interests of the Lender in the Collateral | 0 |
| Less: reserves with respect to the salability of Eligible Inventory or which reflect such other factors as affect the market value of the Eligible Inventory, including obsolescence, seasonality, Shrink; vendor chargebacks, imbalance, change in Inventory character, composition or mix, markdowns and out of date and/or | |

[1] To be the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company.

| | |
|---|---|
| expired Inventory | 0 |
| Less: whiskey storage reserves | 0 |
| Less: the Dilution Reserve | 0 |
| Less: [Others TBD] | |
| **Total Availability Reserves** | 0 |
| **Borrowing Base** (Accounts Borrowing Base + Inventory Borrowing Base – Total Availability Reserves) | 0 |
| *Line Reserves*: | |
| Rent and Charges Reserve | 0 |
| Plus: aggregate amount of liabilities at any time secured by Liens upon Collateral that are senior to the Administrative Agent's Liens | 0 |
| Plus: sums that any Loan Party may be required to pay under any Section of the Credit Agreement or any other Loan Document and has failed to pay | 0 |
| Plus: amounts for which claims may be reasonably expected to be asserted against the Collateral | 0 |
| aggregate Revolving Credit Commitments | 0 |
| Less Line Reserves | 0 |
| **Maximum Borrowing Amount** (the lesser of (the aggregate Revolving Credit Commitments – Line Reserves) and the Borrowing Base) | 0 |
| Less the Outstanding Amount of all Revolving Loans | 0 |
| **Availability** | 0 |

[*signature page follows*]

*IN WITNESS WHEREOF,* the undersigned has executed this Borrowing Base Certificate as of ______________________, __________.

**UNCLE NEAREST, INC.**

By:______________________________
Name:
Title:

# EXHIBIT 3

COPY

FILED 12/29/2025
1:42 O'clock P m
Curt M. Cobb C & M
By

*Execution Version*

COPY

# AMENDMENT NO. 2 TO CREDIT AGREEMENT

THIS AMENDMENT NO. 2 TO CREDIT AGREEMENT dated as of December 16, 2022 (this "Amendment"), is among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company (together with the Company and Distillery, collectively, the "Borrowers" and each, a "Borrower"), FARM CREDIT MID-AMERICA, PCA, in its capacity as administrative agent (in such capacity, the "Administrative Agent"), and each of the Lenders (as defined below) party hereto.

## RECITALS:

A. The Borrowers, the lenders party thereto (collectively, the "Lenders") and the Administrative Agent have entered into that certain Credit Agreement dated as of July 22, 2022 (as amended, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement (as defined below).

B. The Borrowers have requested certain amendments to the Existing Credit Agreement to increase the Revolving Credit Commitments as more particularly set forth below.

C. Subject to the terms and conditions set forth below, the Lenders party hereto have agreed to make such amendments.

In furtherance of the foregoing, the parties agree as follows:

**Section 1. AMENDMENT(S).** Subject to the terms and conditions set forth herein and in reliance upon the representations and warranties set forth herein, the Existing Credit Agreement is hereby amended (as so amended, the "Credit Agreement") as follows:

(a) The aggregate Revolving Credit Commitments are increased, as reflected on Annex A attached thereto, from $38,000,000 to $43,000,000, with the entirety of such $5,000,000 increase being held by Farm Credit Mid-America, PCA.

Each of the parties hereto acknowledges and agrees that the amendment(s) to the Existing Credit Agreement are limited to the extent specifically set forth in this Section 1 and no other terms, covenants or provisions of the Loan Documents are intended to be affected hereby.

**Section 2. CONDITION(S) PRECEDENT.** The parties hereto agree that this Amendment and the amendment(s) set forth in Section 1 above shall be effective as of the date first written above upon the receipt by the Administrative Agent of this Amendment, duly executed by each Borrower, the Administrative Agent and the Lenders party hereto.

**Section 3. REPRESENTATIONS AND WARRANTIES.** In order to induce the Administrative Agent and the Lenders party hereto to enter into this Amendment, each Borrower represents and warrants to the Administrative Agent and the Lenders party hereto as follows:

FILED 12/29/2025
1:42 o'clock P m
Cari M. Cobble C & M.
By

168366992

(a) The representations and warranties of each Borrower contained in Article V of the Credit Agreement and in each other Loan Document are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) as of such earlier date;

(b) Since December 31, 2021, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect;

(c) No Default exists on the date hereof immediately prior to or after giving effect to this Amendment and the amendment(s) contemplated hereby (including the increase in the aggregate Revolving Credit Commitments).

(d) This Amendment has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation.

Section 4. MISCELLANEOUS.

(a) **Ratification and Confirmation of Loan Documents**. Each Borrower hereby consents, acknowledges and agrees to the amendment(s) set forth herein and hereby confirms and ratifies in all respects the Loan Documents to which such Borrower is a party (including without limitation, the continuation of its payment and performance obligations thereunder and the continuation and extension of the liens granted under the Collateral Documents to secure the Obligations), in each case upon and after the effectiveness of the amendment(s) contemplated hereby.

(b) **Fees and Expenses**. The Borrowers shall pay all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent) in connection with the preparation, negotiation, execution and delivery of this Amendment and any other documents prepared in connection herewith.

(c) **Governing Law; Waiver of Jury Trial**. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York, and shall be further subject to the provisions of Sections 10.11 and 10.12 of the Credit Agreement.

(d) **Counterparts**. This Amendment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Amendment by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Amendment.

(e) **Entire Agreement**. This Amendment, together with all the Loan Documents (collectively, the "Relevant Documents"), sets forth the entire understanding and agreement of the parties hereto in relation to the subject matter hereof and supersedes any prior negotiations and agreements among the parties relating to such subject matter. No promise, condition, representation or warranty, express or implied, not set forth in the Relevant Documents shall bind any party hereto, and no such party has relied on any such promise, condition, representation or warranty. Each of the parties hereto acknowledges that, except as otherwise expressly stated in the Relevant Documents, no representations, warranties or commitments, express or implied, have been made by any party to the other. None of the terms or conditions of this Amendment may be changed, modified, waived or canceled orally or

otherwise except in a writing and in accordance with Section 10.1 of the Credit Agreement. This Amendment is a Loan Document.

(f) **Severability**. If any provision of this Amendment is held to be illegal, invalid or unenforceable, (i) the legality, validity and enforceability of the remaining provisions of this Amendment shall not be affected or impaired thereby and (ii) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(g) **Successors and Assigns**. This Amendment shall be binding upon and inure to the benefit of each party hereto and their respective successors and assigns (subject to Section 10.6 of the Credit Agreement).

(h) **Amendment Fee**. In consideration of the amendments contemplated hereby, the Borrowers agree to pay to FCMA, for its own account, an amendment fee in an amount equal to $25,000. Such fee has been fully earned on the date hereof and shall be due and payable in full in cash on or prior to the earlier of (i) the closing of the contemplated Amendment No. 3 to Credit Agreement and (ii) January 31, 2023.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 2 to Credit Agreement to be executed by their duly authorized officers, all as of the date and year first written above.

**BORROWERS:**

**UNCLE NEAREST, INC.**

By:________________________________
Name: Fawn Weaver
Title: President and Secretary

**NEAREST GREEN DISTILLERY, INC.**

By:________________________________
Name: Fawn Weaver
Title: President and Secretary

**UNCLE NEAREST REAL ESTATE HOLDINGS, LLC**

By: Uncle Nearest, Inc., its Member

By:________________________________
Name: Fawn Weaver
Title: President and Secretary

**ADMINISTRATIVE AGENT / LENDERS:**

**FARM CREDIT MID-AMERICA, PCA**,
as Administrative Agent and a Lender

By: Jonathan Boyce
Name: Jonathan Boyce
Title: Financial Officer

# EXHIBIT 4

COPY

FILED 12/29/2025
1:42 O'clock P m
Curt M. Cobb C & M
By [signature]

COPY

*Execution Version*

# AMENDMENT NO. 3 TO CREDIT AGREEMENT

THIS AMENDMENT NO. 3 TO CREDIT AGREEMENT dated as of January 26, 2023 (this "Amendment"), is among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company (together with the Company and Distillery, collectively, the "Borrowers" and each, a "Borrower"), FARM CREDIT MID-AMERICA, PCA, in its capacity as administrative agent (in such capacity, the "Administrative Agent"), and each of the Lenders (as defined below) party hereto.

## RECITALS:

A. The Borrowers, the lenders party thereto (collectively, the "Lenders") and the Administrative Agent have entered into that certain Credit Agreement dated as of July 22, 2022 (as amended, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement (as defined below).

B. The Borrowers have requested certain amendments to the Existing Credit Agreement (including an increase in the Commitments thereunder) as more particularly set forth below.

C. Subject to the terms and conditions set forth below, the Lenders party hereto have agreed to make such amendments.

In furtherance of the foregoing, the parties agree as follows:

**Section 1.** AMENDMENT(S). Subject to the terms and conditions set forth herein and in reliance upon the representations and warranties set forth herein, the Existing Credit Agreement is hereby amended (as so amended, the "Credit Agreement") as follows:

(a) The Existing Credit Agreement (other than the Schedules and Exhibits thereto) is hereby amended in its entirety to read in the form of Annex A attached hereto (as so amended, the "Credit Agreement").

(b) Exhibit A (Loan Notice) to the Existing Credit Agreement is hereby amended in its entirety to read in the form attached hereto as Annex B.

(c) Exhibit B (Note) to the Existing Credit Agreement is hereby amended to be Exhibit B-1 and a new Exhibit B-2 to the Credit Agreement is hereby added to read in the form attached hereto as Annex C.

Each of the parties hereto acknowledges and agrees that the amendment(s) to the Existing Credit Agreement are limited to the extent specifically set forth in this Section 1 and no other terms, covenants or provisions of the Loan Documents are intended to be affected hereby.

FILED 12/29/2025
1:42 O'clock P.m
Clerk M. Gibbs, C. & M.
By [signature]

**Section 2. CONDITIONS PRECEDENT.** The parties hereto agree that this Amendment and the amendment(s) set forth in Section 1 above shall be effective as of the date first written above upon satisfaction of the following conditions precedent:

(a) Documentation. The Administrative Agent shall have received, in form and substance satisfactory to the Administrative Agent, each of the following:

(i) this Amendment, duly executed by each Borrower, the Administrative Agent and the Lenders party hereto;

(ii) a RELOC Loan Note in favor of each Lender requesting a RELOC Loan Note;

(iii) a certificate of a Senior Officer of each Loan Party certifying as to the incumbency and genuineness of the signature of each officer of such Loan Party executing Loan Documents to which it is a party (to the extent there have been any changes since the last delivery) and certifying that attached thereto are true, correct and complete copies of (A) resolutions duly adopted by the board of directors (or other governing body) of such Loan Party authorizing and approving this Amendment and the transactions contemplated hereby (including the increase in the aggregate Commitments) and (B) certificates as of a recent date of the good standing or existence (as applicable) of such Loan Party under the Laws of its jurisdiction of incorporation, organization or formation (or equivalent), as applicable, and each other jurisdiction where such Loan Party is qualified to do business where the failure to be qualified could reasonably be expected to have a Material Adverse Effect;

(iv) original stock certificates or other certificates evidencing the certificated Equity Interests pledged pursuant to the Pledge Agreement; and

(v) with respect to each property subject to a Mortgage, the final mortgagee title insurance policies in the form previously agreed on the Closing Date.

(b) Fees. The Borrowers shall have paid, or made arrangements to pay concurrently with the closing on the date hereof, to FCMA, for its own account, (i) the amendment fee of $25,000, which was previously agreed to be paid in consideration of Amendment No. 2 to Credit Agreement, and (ii) the arrangement fee of $75,000, which was previously agreed to be paid in consideration of this Amendment.

(c) Expenses. The Company shall have paid, or made arrangements to pay concurrently with the closing on the date hereof, all fees, charges and disbursements of counsel to the Administrative Agent (directly to such counsel if requested by the Administrative Agent) to the extent invoiced prior to or on the date hereof, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Company and the Administrative Agent).

**Section 3. REPRESENTATIONS AND WARRANTIES.** In order to induce the Administrative Agent and the Lenders party hereto to enter into this Amendment, each Borrower represents and warrants to the Administrative Agent and the Lenders party hereto as follows:



Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 301 of 384
PageID #: 4544

(a) The representations and warranties of each Borrower contained in Article V of the Credit Agreement and in each other Loan Document are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) as of such earlier date;

(b) Since December 31, 2021, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect;

(c) No Default exists on the date hereof immediately prior to or after giving effect to this Amendment and the amendment(s) contemplated hereby (including the increase in the Commitments).

(d) This Amendment has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation.

Section 4. MISCELLANEOUS.

(a) Ratification and Confirmation of Loan Documents. Each Borrower hereby consents, acknowledges and agrees to the amendment(s) set forth herein and hereby confirms and ratifies in all respects the Loan Documents to which such Borrower is a party (including without limitation, the continuation of its payment and performance obligations thereunder and the continuation and extension of the liens granted under the Collateral Documents to secure the Obligations), in each case upon and after the effectiveness of the amendment(s) contemplated hereby.

(b) **Fees and Expenses.** The Borrowers shall pay all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent) in connection with the preparation, negotiation, execution and delivery of this Amendment and any other documents prepared in connection herewith.

(c) **Governing Law; Waiver of Jury Trial.** This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York, and shall be further subject to the provisions of Sections 10.11 and 10.12 of the Credit Agreement.

(d) **Counterparts.** This Amendment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Amendment by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Amendment.

(e) **Entire Agreement.** This Amendment, together with all the Loan Documents (collectively, the "Relevant Documents"), sets forth the entire understanding and agreement of the parties hereto in relation to the subject matter hereof and supersedes any prior negotiations and agreements among the parties relating to such subject matter. No promise, condition, representation or warranty, express or implied, not set forth in the Relevant Documents shall bind any party hereto, and no such party has relied on any such promise, condition, representation or warranty. Each of the parties hereto acknowledges that, except as otherwise expressly stated in the Relevant Documents, no representations, warranties or commitments, express or implied, have been made by any party to the other. None of the terms or conditions of this Amendment may be changed, modified, waived or canceled orally or



Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 302 of 384
PageID #: 4545

otherwise except in a writing and in accordance with <u>Section 10.1</u> of the Credit Agreement. This Amendment is a Loan Document.

(f) **Severability**. If any provision of this Amendment is held to be illegal, invalid or unenforceable, (i) the legality, validity and enforceability of the remaining provisions of this Amendment shall not be affected or impaired thereby and (ii) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(g) **Successors and Assigns**. This Amendment shall be binding upon and inure to the benefit of each party hereto and their respective successors and assigns (subject to <u>Section 10.6</u> of the Credit Agreement).

(h) **Post-Closing Action**. The Borrowers shall deliver, or cause to be delivered, within ten (10) Business Days of the effective date hereof (or such later date as the Administrative Agent shall permit in its sole discretion) an original undated stock power for each stock certificate evidencing the certificated Equity Interests pledged pursuant to the Pledge Agreement.

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 3 to Credit Agreement to be executed by their duly authorized officers, all as of the date and year first written above.

**BORROWERS:**

**UNCLE NEAREST, INC.**

By: ______________________
Name: Fawn Weaver
Title: Chief Executive Office, President, Secretary and Treasurer

**NEAREST GREEN DISTILLERY, INC.**

By: ______________________
Name: Fawn Weaver
Title: President, Secretary and Treasurer

UNCLE NEAREST REAL ESTATE HOLDINGS, LLC

By: Uncle Nearest, Inc., its Member

By: ______________________
Name: Fawn Weaver
Title: Chief Executive Office, President, Secretary and Treasurer

ADMINISTRATIVE AGENT / LENDERS:

FARM CREDIT MID-AMERICA, PCA,
as Administrative Agent and a Lender

By: [signature]
Name: Jonathan Boyce
Title: Financial Officer

AMENDMENT NO. 3 TO CREDIT AGREEMENT
Signature Page

**Annex A**

Credit Agreement

*See attached.*

COMMITMENTS
AND APPLICABLE PERCENTAGES

| Lender | Revolving Credit Commitment[2] | Applicable Percentage (Revolving Credit Facility) | Term Loan Commitment[3] | Applicable Percentage (Term Loan Facility) |
|---|---|---|---|---|
| Farm Credit Mid-America, PCA | $43,000,000.00 | 100.000000000% | $20,000,000.00 | 100.000000000% |
| Total | $43,000,000.00 | 100.000000000% | $20,000,000.00 | 100.000000000% |

| Lender | RELOC Commitment | Applicable Percentage (RELOC Facility) |
|---|---|---|
| Farm Credit Mid-America, PCA | $15,000,000.00 | 100.000000000% |
| Total | $15,000,000.00 | 100.000000000% |

[2] As of the Amendment No. 3 Effective Date, which such amount may be increased pursuant to Section 2.13(a) of the Credit Agreement.

[3] Term Loan Commitment amount is as of the Closing Date. As of the Amendment No. 3 Effective Date, the Term Loan Commitment has been reduced to zero as a result of the prior advance of the Term Loan.

**Annex B**

Amended Exhibit A to Credit Agreement

*See attached.*

## Annex B

Amended Exhibit A to Credit Agreement

*See attached.*

*EXHIBIT A*

**FORM OF LOAN NOTICE**

Date: ____________, ______

To: Farm Credit Mid-America, PCA, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of July 22, 2022 (as amended restated, supplemented or otherwise modified from time to time, the "Credit Agreement;" the terms defined therein being used herein as therein defined), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), each lender from time to time party thereto (the "Lenders") and FARM CREDIT MID-AMERICA, PCA, as administrative agent (in such capacity, the "Administrative Agent").

The Company hereby requests a Borrowing of [Revolving Credit Loans] [Term Loans] [RELOC Loans] to be made to [_____][1]:

1. On __________________________ (a Business Day).

2. In the amount of _________________________________________.

The submission by the Company of this Loan Notice with respect to the Borrowing contemplated herein shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement will be satisfied on and as of the relevant date such Borrowing is made, and the making of such Borrowing shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement are satisfied on and as of such date.

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this notice.

[Signature page follows]

[1] Specify the Borrower requesting the Borrowing.

UNCLE NEAREST, INC.

By:________________________________________
Name:
Title:

**Annex C**

Exhibit B-2 to Credit Agreement

*See attached.*

**FORM OF RELOC LOAN NOTE**

[__________], 20[__]

FOR VALUE RECEIVED, the undersigned hereby promise to pay to [______________] (the "Lender") or its registered assigns, in accordance with the provisions of the Credit Agreement (as hereinafter defined), the principal amount of each RELOC Loan and RELOC Term Loan made by the Lender to the Borrowers from time to time under that certain Credit Agreement dated as of July 22, 2022 (as the same may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement;" the terms defined therein being used herein as therein defined), among Uncle Nearest, Inc., a Delaware corporation (the "Company"), Nearest Green Distillery, Inc., a Delaware corporation ("Distillery"), Uncle Nearest Real Estate Holdings, LLC, a Tennessee limited liability company ("RE Holdings"), and each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the Lenders from time to time party thereto, and Farm Credit Mid-America, PCA, in its capacity as Administrative Agent.

Each Borrower hereby promises to pay interest on the unpaid principal amount of each RELOC Loan and RELOC Term Loan from the date of such RELOC Loan or RELOC Term Loan, as the case may be, until such principal amount is paid in full, at such interest rates and at such times as provided in the Credit Agreement. All payments of principal and interest shall be made to the Administrative Agent for the account of the Lender as provided in the Credit Agreement. If any amount is not paid in full when due hereunder, such unpaid amount shall bear interest, to be paid upon demand, from the due date thereof until the date of actual payment (and before as well as after judgment) computed at the per annum rate set forth in the Credit Agreement.

This RELOC Loan Note is one of the Notes referred to in the Credit Agreement, is entitled to the benefits thereof and may be repaid, prepaid and reborrowed in whole or in part subject to the terms and conditions provided therein. This RELOC Loan Note is also entitled to the benefits of the other Loan Documents and is secured by the Collateral. Upon the occurrence and continuation of one or more of the Events of Default specified in the Credit Agreement, all amounts then remaining unpaid on this RELOC Loan Note may become, or may be declared to be, as applicable, immediately due and payable, in either case, pursuant to, and in accordance with, the terms and conditions set forth in the Credit Agreement. The Loans made by the Lender shall be evidenced by one or more loan accounts or records maintained by the Lender in the ordinary course of business. The Lender may also attach schedules to this RELOC Loan Note and endorse thereon the date, amount and maturity of each such Loan and payments with respect thereto.

Each Borrower, for itself and its successors and assigns, hereby waives diligence, presentment, protest and demand and notice of protest, demand, dishonor and non-payment of this RELOC Loan Note.

[Signature page follows]

THIS RELOC LOAN NOTE SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK.

UNCLE NEAREST, INC.

By:______________________________
Name:
Title:

NEAREST GREEN DISTILLERY, INC.

By:______________________________
Name:
Title:

UNCLE NEAREST REAL ESTATE HOLDINGS, LLC

By:______________________________
Name:
Title:

# EXHIBIT 5

COPY

FILED 12/29/2025
1:42 O'clock P.m
Curt M. Cobb C & M
By Jodi Catricola

COPY

*Execution Version*

# AMENDMENT NO. 4 TO CREDIT AGREEMENT

THIS AMENDMENT NO. 4 TO CREDIT AGREEMENT dated as of March 30, 2023 (this "Amendment"), is among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company (together with the Company and Distillery, collectively, the "Borrowers" and each, a "Borrower"), FARM CREDIT MID-AMERICA, PCA, in its capacity as administrative agent (in such capacity, the "Administrative Agent"), and each of the Lenders (as defined below) party hereto.

## RECITALS:

A. The Borrowers, the lenders party thereto (collectively, the "Lenders") and the Administrative Agent have entered into that certain Credit Agreement dated as of July 22, 2022 (as amended, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement (as defined below).

B. The Borrowers have requested certain amendments to the Existing Credit Agreement (including an increase in the Commitments thereunder) as more particularly set forth below.

C. Subject to the terms and conditions set forth below, the Lenders party hereto have agreed to make such amendments.

In furtherance of the foregoing, the parties agree as follows:

**Section 1. AMENDMENT(S).** Subject to the terms and conditions set forth herein and in reliance upon the representations and warranties set forth herein, the Existing Credit Agreement (other than the Schedules and Exhibits thereto) is hereby amended in its entirety to read in the form of Annex A attached hereto (as so amended, the "Credit Agreement").

Each of the parties hereto acknowledges and agrees that the amendment(s) to the Existing Credit Agreement are limited to the extent specifically set forth in this Section 1 and no other terms, covenants or provisions of the Loan Documents are intended to be affected hereby.

**Section 2. CONDITIONS PRECEDENT.** The parties hereto agree that this Amendment and the amendment(s) set forth in Section 1 above shall be effective as of the date first written above upon satisfaction of the following conditions precedent:

FILED 12/29/2025
1:42 O'clock P.m
[illegible] M. Cobb C & M
By [signature]

(a) Documentation. The Administrative Agent shall have received, in form and substance satisfactory to the Administrative Agent, each of the following:

(i) this Amendment, duly executed by each Borrower, the Administrative Agent and the Lenders party hereto;

(ii) a Loan Notice, duly executed by the Company, with respect to the Term Borrowing occurring on the date hereof; and

(iii) resolutions duly adopted by the board of directors (or other governing body) of each Loan Party authorizing and approving this Amendment and the transactions contemplated hereby (including the increase in the aggregate Commitments).

(b) Fees. The Borrowers shall have paid, or made arrangements to pay concurrently with the closing on the date hereof, to FCMA, for its own account, an upfront fee of $31,500.

(c) Expenses. The Company shall have paid, or made arrangements to pay concurrently with the closing on the date hereof, all fees, charges and disbursements of counsel to the Administrative Agent (directly to such counsel if requested by the Administrative Agent) to the extent invoiced prior to or on the date hereof, plus such additional amounts of such fees, charges and disbursements as shall constitute its reasonable estimate of such fees, charges and disbursements incurred or to be incurred by it through the closing proceedings (provided that such estimate shall not thereafter preclude a final settling of accounts between the Company and the Administrative Agent).

**Section 3. REPRESENTATIONS AND WARRANTIES.** In order to induce the Administrative Agent and the Lenders party hereto to enter into this Amendment, each Borrower represents and warrants to the Administrative Agent and the Lenders party hereto as follows:

(a) The representations and warranties of each Borrower contained in Article V of the Credit Agreement and in each other Loan Document are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) on and as of the date hereof, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) as of such earlier date;

(b) Since December 31, 2021, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect;

(c) No Default exists on the date hereof immediately prior to or after giving effect to this Amendment and the amendment(s) contemplated hereby (including the increase in the Commitments).

(d) This Amendment has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation.

(e) Attached hereto as Annex B are true, correct and complete copies of the resolutions referenced in Section 2(a)(ii) above.

**Section 4. MISCELLANEOUS.**

(a) **Ratification and Confirmation of Loan Documents**. Each Borrower hereby consents, acknowledges and agrees to the amendment(s) set forth herein and hereby confirms and ratifies in all respects the Loan Documents to which such Borrower is a party (including without limitation, the continuation of its payment and performance obligations thereunder and the continuation and extension of the liens granted under the Collateral Documents to secure the Obligations), in each case upon and after the effectiveness of the amendment(s) contemplated hereby.

(b) **Fees and Expenses**. The Borrowers shall pay all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent) in connection with the preparation, negotiation, execution and delivery of this Amendment and any other documents prepared in connection herewith.

(c) **Governing Law; Waiver of Jury Trial**. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York, and shall be further subject to the provisions of Sections 10.11 and 10.12 of the Credit Agreement.

(d) **Counterparts**. This Amendment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Amendment by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Amendment.

(e) **Entire Agreement**. This Amendment, together with all the Loan Documents (collectively, the "Relevant Documents"), sets forth the entire understanding and agreement of the parties hereto in relation to the subject matter hereof and supersedes any prior negotiations and agreements among the parties relating to such subject matter. No promise, condition, representation or warranty, express or implied, not set forth in the Relevant Documents shall bind any party hereto, and no such party has relied on any such promise, condition, representation or warranty. Each of the parties hereto acknowledges that, except as otherwise expressly stated in the Relevant Documents, no representations, warranties or commitments, express or implied, have been made by any party to the other. None of the terms or conditions of this Amendment may be changed, modified, waived or canceled orally or otherwise except in a writing and in accordance with Section 10.1 of the Credit Agreement. This Amendment is a Loan Document.

(f) **Severability**. If any provision of this Amendment is held to be illegal, invalid or unenforceable, (i) the legality, validity and enforceability of the remaining provisions of this Amendment shall not be affected or impaired thereby and (ii) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(g) **Successors and Assigns**. This Amendment shall be binding upon and inure to the benefit of each party hereto and their respective successors and assigns (subject to Section 10.6 of the Credit Agreement).

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

[illegible]

BORROWERS

UNCLE NEAREST, INC.

By: [illegible]

Title: Chief [illegible]

[illegible]

[illegible]

[illegible]

By: [illegible]

Name: [illegible] Weaver

Title: Chief [illegible] Officer, President, Secretary and Treasurer

[illegible]

COPY

# EXHIBIT 6

FILED 12/29/2025
1:42 O'clock P.m
Scott M. Bohler & M
By: [signature]

COPY

FILED 12/29/2025 1:42 O'clock p m
Curt M. Cobb C & M
By [signature]

CREDIT AGREEMENT[1]

Dated as of July 22, 2022

among

UNCLE NEAREST, INC.,
NEAREST GREEN DISTILLERY, INC.,
UNCLE NEAREST REAL ESTATE HOLDINGS, LLC
and
THE OTHER BORROWERS PARTY HERETO
as the Borrowers,

FARM CREDIT MID-AMERICA, PCA,
as Administrative Agent,

and

THE OTHER LENDERS PARTY HERETO

FARM CREDIT MID-AMERICA, PCA,
as Sole Lead Arranger and Sole Bookrunner

[1] Composite copy through Amendment No. 45 to Credit Agreement dated as of ~~March 29~~May [   ], 2023.

**TABLE OF CONTENTS**

**Page**

ARTICLE I DEFINITIONS AND INTERPRETIVE PROVISIONS 1

1.1 Defined Terms 1
1.2 Rules of Interpretation 27
1.3 Accounting Terms 28
1.4 Times of Day 28
1.5 Rounding 28

ARTICLE II THE COMMITMENTS AND CREDIT EXTENSIONS 28

2.1 Loans 28
2.2 Borrowings of Loans 29
2.3 Prepayments 30
2.4 Termination or Reduction of Commitments 31
2.5 Repayment of Loans 32
2.6 Interest 33
2.7 Fees 33
2.8 Computation of Interest and Fees 34
2.9 Evidence of Debt 34
2.10 Payments Generally; Administrative Agent's Clawback 34
2.11 Sharing of Payments by Lenders 36
2.12 Defaulting Lenders 36
2.13 Increases in Revolving Credit Commitments 38
2.14 Company as Borrower Agent; Joint and Several Liability; Borrowers' Waivers and Consents 38

ARTICLE III TAXES AND YIELD PROTECTION 41

3.1 Taxes 41
3.2 Increased Costs 45
3.3 [Reserved] 46
3.4 Mitigation Obligations; Replacement of Lenders 46
3.5 Survival 47

ARTICLE IV CONDITIONS PRECEDENT TO CREDIT EXTENSIONS 47

4.1 Conditions of Initial Credit Extension 47
4.2 Conditions to All Credit Extensions 50

ARTICLE V REPRESENTATIONS AND WARRANTIES 51

5.1 Existence, Qualification and Power 51
5.2 Authorization; No Contravention 51
5.3 Governmental Authorization; Other Consents 51
5.4 Binding Effect 52
5.5 Financial Statements; No Material Adverse Effect 52
5.6 Litigation 52
5.7 No Default 52



~~172068606~~173891512

"Affiliate" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"Aggregate Commitments" means the Commitments of all the Lenders.

"Agreement" means this Credit Agreement.

"Amendment No. 3 Effective Date" means January 26, 2023.

"Amendment No. 4 Effective Date" means March 29, 2023.

"Amendment No. 5 Effective Date" means May [ ], 2023.

"Anti-Corruption Laws" means all laws, rules, and regulations of any jurisdiction from time to time concerning or relating to bribery or corruption, including the United States Foreign Corrupt Practices Act of 1977 and the rules and regulations thereunder and the U.K. Bribery Act 2010 and the rules and regulations thereunder.

"Anti-Money Laundering Laws" means all laws, statutes, regulations or obligatory government orders, decrees, ordinances or rules related to terrorism financing, money laundering, any predicate crime to money laundering or any financial record keeping, including any applicable provision of the PATRIOT Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12 U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"Applicable Margin" means 0.50% per annum.

"Applicable Percentage" means (a) in respect of the Term Loan Facility, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the sum of the aggregate outstanding Term Loans represented by such Lender's outstanding Term Loan at such time, (b) in respect of the Revolving Credit Facility, with respect to any Lender at any time, the percentage (carried out to the ninth decimal place) of the aggregate Revolving Credit Commitments represented by such Lender's Revolving Credit Commitment at such time, subject to adjustment as provided in Section 2.12 and (c) in respect of the RELOC Facility, with respect to any Lender at any time, (i) in the case of unused aggregate RELOC Commitments, the percentage (carried out to the ninth decimal place) of the aggregate unused RELOC Commitments represented by such Lender's unused RELOC Commitment at such time, (ii) in the case of outstanding RELOC Loans, the percentage (carried out to the ninth decimal place) of the sum of the aggregate RELOC Loans represented by such Lender's outstanding RELOC Loans at such time and (iii) in the case of outstanding RELOC Term Loans, the percentage (carried out to the ninth decimal place) of the sum of the aggregate RELOC Term Loans represented by such Lender's outstanding RELOC Term Loan at such time. If the commitment of each Revolving Credit Lender to make Revolving Credit Loans has been terminated pursuant to Section 8.2, or if the Revolving Credit Commitments have expired, then the Applicable Percentage of each Revolving Credit Lender in respect of the Revolving Credit Facility shall be determined based on the Applicable Percentage of such Revolving Credit Lender in respect of the Revolving Credit Facility most recently in effect, giving effect to any subsequent assignments. The initial Applicable Percentage of each Lender in respect of each Facility is set forth opposite the name of such Lender on Annex A or in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable.

"Swap Contract" means (a) any and all rate swap transactions, basis swaps, credit derivative transactions, forward rate transactions, commodity swaps, commodity options, forward commodity contracts, equity or equity index swaps or options, bond or bond price or bond index swaps or options or forward bond or forward bond price or forward bond index transactions, interest rate options, forward foreign exchange transactions, cap transactions, floor transactions, collar transactions, currency swap transactions, cross-currency rate swap transactions, currency options, spot contracts, or any other similar transactions or any combination of any of the foregoing (including any options to enter into any of the foregoing), whether or not any such transaction is governed by or subject to any master agreement, and (b) any and all transactions of any kind, and the related confirmations, which are subject to the terms and conditions of, or governed by, any form of master agreement published by the International Swaps and Derivatives Association, Inc., any International Foreign Exchange Master Agreement, or any other master agreement (any such master agreement, together with any related schedules, a "Master Agreement"), including any such obligations or liabilities under any Master Agreement.

"Swap Termination Value" means, in respect of any one or more Swap Contracts, after taking into account the effect of any legally enforceable netting agreement relating to such Swap Contracts, (a) for any date on or after the date such Swap Contracts have been closed out and termination value(s) determined in accordance therewith, such termination value(s), and (b) for any date prior to the date referenced in clause (a), the amount(s) determined as the mark-to-market value(s) for such Swap Contracts, as determined based upon one or more mid-market or other readily available quotations provided by any recognized dealer in such Swap Contracts (which may include a Lender or any Affiliate of a Lender).

"Synthetic Debt" means, as to any Person at a particular time, all obligations of such Person in respect of transactions entered into by such Person that are intended to function primarily as a borrowing of funds but are not otherwise included in the definition of "Indebtedness" or as a liability on the consolidated balance sheet of such Person and its Subsidiaries in accordance with GAAP.

"Synthetic Lease Obligation" means, as to any Person at a particular time, the monetary obligation of such Person under (a) a so-called synthetic, off-balance sheet or tax retention lease or (b) an agreement for the use or possession of property (including sale and leaseback transactions), in each case, creating obligations that do not appear on the balance sheet of such Person but which, upon the application of any Debtor Relief Laws to such Person, would be characterized as the indebtedness of such Person (without regard to accounting treatment).

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Term Loan" has the meaning assigned to such term in Section 2.1(b).

"Term Loan Borrowing" means a borrowing consisting of simultaneous Term Loans made by each of the Term Loan Lenders pursuant to Section 2.1(b).

"Term Loan Commitment" means, as to each Lender, its obligation to make a single Term Loan to the Borrowers pursuant to Section 2.1(b) on the Amendment No. 45 Effective Date in a principal amount not to exceed the amount set forth opposite such Lender's name on Annex A under the caption "Term Loan Commitment" or opposite such caption in the Assignment and Assumption pursuant to which such Lender becomes a party hereto, as applicable, as such amount may be adjusted from time to time in accordance with this Agreement.

Subsidiaries shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB ASC 825 and FASB ASC 470-20 on financial liabilities shall be disregarded.

(b) Changes in GAAP. If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Company or the Required Lenders shall so request, the Administrative Agent, the Lenders and the Company shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Required Lenders); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Company shall provide to the Administrative Agent and the Lenders financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

1.4 Times of Day. Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

1.5 Rounding. Any financial ratios required to be maintained by the Borrowers pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

ARTICLE II
THE COMMITMENTS AND CREDIT EXTENSIONS

2.1 Loans.

(a) Revolving Credit Borrowing. Subject to the terms and conditions set forth herein, each Revolving Credit Lender severally agrees to make loans (each such loan, a "Revolving Credit Loan") to the Borrowers from time to time on any Business Day during the Revolving Credit Availability Period, in an aggregate amount not to exceed at any time outstanding the amount of such Lender's Revolving Credit Commitment; provided that after giving effect to any Revolving Credit Borrowing, (i) the Total Revolving Credit Outstandings shall not exceed the Maximum Revolving Borrowing Amount and (ii) the Revolving Credit Exposure of any Revolving Credit Lender shall not exceed such Lender's Revolving Credit Commitment. Within the limits of each Revolving Credit Lender's Revolving Credit Commitment, and subject to the other terms and conditions hereof, the Borrowers may borrow under this Section 2.1(a), prepay under Section 2.3 and reborrow under this Section 2.1(a). Revolving Credit Loans shall be Base Rate Loans, as further provided herein.

(b) Term Loan Borrowing. On the Closing Date and on the Amendment No. 4 Effective Date, each Lender made ~~a loan~~loans to the Borrowers (each such loan, an "Existing Term Loan") pursuant to this Section 2.01(b) and, as of the Amendment No. ~~4~~5 Effective Date, the aggregate outstanding principal amount of the Existing Term Loans is held by the Lenders on the Amendment No. ~~4~~5 Effective Date as set forth opposite each Lender's name on Annex A. Subject to the terms and conditions set forth herein, each Term Loan Lender severally agrees to make a single additional loan to the Borrowers (each such additional term loan made by a Lender and each Existing Term Loan of a Lender shall be referred to herein as a "Term Loan" of such Lender) on the Amendment No. ~~4~~5 Effective Date in an amount equal to such Lender's Term Loan Commitment as set forth on Annex A. Each Term Loan Borrowing shall consist of Term Loans made simultaneously by the Term Loan Lenders in accordance with their respective Applicable Percentage of the Term Loan Facility. Amounts borrowed

Credit Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. All fees in respect of the Revolving Credit Facility accrued until the effective date of any termination of the aggregate Revolving Credit Commitments shall be paid on the effective date of such termination.

(b) RELOC Facility. Upon notice to the Administrative Agent, the Company may terminate, or from time to time permanently reduce, the aggregate RELOC Commitments; provided that (i) any such notice shall be received by the Administrative Agent not later than 11:00 a.m. five Business Days prior to the date of termination or reduction and (ii) any such partial reduction shall be in an aggregate amount of $1,000,000 or any whole multiple of $1,000,000 in excess thereof. In addition to the foregoing, any unused portion of the aggregate RELOC Commitments shall be automatically and permanently terminated on the last day of the RELOC Availability Period. The Administrative Agent will promptly notify the Lenders of any termination or reduction of the aggregate RELOC Commitments under this Section 2.4(b). Upon any reduction of the aggregate RELOC Commitments, the RELOC Commitment of each Lender shall be reduced by such Lender's Applicable Percentage of such reduction amount. All fees in respect of the RELOC Facility accrued until the effective date of any termination of the aggregate RELOC Commitments shall be paid on the effective date of such termination.

2.5 Repayment of Loans.

(a) Revolving Credit Loans. The Borrowers shall repay to the Revolving Credit Lenders on the Maturity Date for the Revolving Credit Facility the aggregate principal amount of all Revolving Credit Loans outstanding on such date.

(b) Term Loans. From and after the Amendment No. ~~4~~5 Effective Date, the Borrowers shall repay to the Term Loan Lenders the aggregate principal amount of all Term Loans outstanding in quarterly installments of $~~272,539.06~~293,789.06 (commencing on July 1, 2023) on the first day of each calendar quarter (which installments shall be reduced as a result of the application of prepayments in accordance with the order of priority set forth in Section 2.3); provided that the final principal repayment installment of the Term Loans shall be repaid on the Maturity Date for the Term Loan Facility and in any event shall be in an amount equal to the aggregate principal amount of all Term Loans outstanding on such date.

(c) RELOC Loans / RELOC Term Loans. With respect to the RELOC Term Loans, promptly following the Conversion Date, the Administrative Agent shall calculate and deliver to the RELOC Lenders and the Company an amortization schedule with respect to the RELOC Term Loans providing for annual "straight-line" amortization of principal over a 15-year amortization period with principal due on the first day of each calendar quarter (commencing April 1, 2025). The Borrowers shall repay to the RELOC Lenders the aggregate principal amount of all RELOC Term Loans as set forth in such amortization schedule (which installments shall be reduced as a result of the application of prepayments in accordance with Section 2.3); provided that the final principal repayment installment of the RELOC Term Loans shall be repaid on the Maturity Date applicable thereto and in any event shall be in an amount equal to the aggregate principal amount all RELOC Term Loans outstanding on such date. To the extent not converted to RELOC Term Loans pursuant to Section 2.1(c)(ii) for any reason, the Borrowers shall repay to the RELOC Lenders on the Conversion Date the aggregate principal amount of all RELOC Loans outstanding on such date.

2.6 Interest.



~~172068606~~173891512

case of property insurance, name the Administrative Agent for the benefit of the Secured Parties, as mortgagee and/or lender's loss payee, as applicable, (iii) in the case of liability insurance, name the Administrative Agent for the benefit of the Secured Parties, as additional insured and (iv) be reasonably satisfactory in all other respects to the Administrative Agent.

(b) Without limiting the foregoing, if any portion of the improvements on any real property subject to a Mortgage is at any time located in a special flood hazard area with respect to which flood insurance has been made available, maintain, or cause to be maintained, with a financially sound and reputable insurer, flood insurance in such form, on such terms and in such amounts required by Law or as otherwise required by the Administrative Agent.

6.8 Compliance with Laws. Comply in all material respects with the requirements of all Laws and all orders, writs, injunctions and decrees applicable to it or to its business or property.

6.9 Books and Records. Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of all financial transactions and matters involving the assets and business of such Borrower or such Subsidiary, as the case may be.

6.10 Inspection Rights. Permit representatives and independent contractors of the Administrative Agent and each Lender to visit and inspect any of its properties, to audit and appraise the Collateral, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the expense of the Borrowers and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Company; provided that when an Event of Default exists the Administrative Agent or any Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the expense of the Borrowers at any time during normal business hours and without advance notice.

6.11 Use of Proceeds.

(a) (i) Use the proceeds of the Revolving Credit Facility and the Term Loan Facility for general corporate purposes, including working capital, capital purchases and refinancing of certain Indebtedness as contemplated by Section 4.1, not in contravention of any Law or of any Loan Document ~~and~~, (ii) use the proceeds of the portion of the Term Loan Facility advanced on the Amendment No. 4 Effective Date to purchase the fee-owned real property interest as discussed with the Administrative Agent and (iii) use the proceeds of the portion of the Term Loan Facility advanced on the Amendment No. 5 Effective Date to repay Revolving Credit Loans.

(b) Use the proceeds of the RELOC Facility to finance the construction and build-out of the distillery on the real property currently subject to a Mortgage to be used in the operation of the Borrowers' business as previously discussed with the Administrative Agent, not in contravention of any Law or of any Loan Document.

6.12 Additional Subsidiaries and Real Property.

(a) Additional Domestic Subsidiaries. Promptly following the date any Person becomes a Domestic Subsidiary (whether by creation, acquisition or otherwise) and in any event within 30 days after such date (as such time period may be extended by the Administrative Agent in its sole discretion), (i) cause such Person to (A) become a Subsidiary Guarantor (or, with the consent of the Administrative



Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 02/05/26 Page 327 of 384
PageID #: 4570

**COMMITMENTS**
**AND APPLICABLE PERCENTAGES**

| Lender | Revolving Credit Commitment[1] | Applicable Percentage (Revolving Credit Facility) | Term Loan Commitment[32] | Outstanding Amount of Existing Term Loans[43] |
|---|---|---|---|---|
| Farm Credit Mid-America, PCA | $59,000,000.00 | 100.000000000% | $~~2,300,000.00~~1,700,000 | $~~19,503,125.00~~21,803,125.00 |
| Total | $59,000,000.00 | 100.000000000% | $~~2,300,000.00~~1,700,000 | $~~19,503,125.00~~21,803,125.00 |

| Lender | RELOC Commitment[1] | Applicable Percentage (RELOC Facility) |
|---|---|---|
| Farm Credit Mid-America, PCA | $15,000,000.00 | 100.000000000% |
| **Total** | **$15,000,000.00** | **100.000000000%** |

~~[3] As of the Amendment No. 4 Effective Date, which such amount may be increased pursuant to Section 2.13(a) of the Credit A~~

[32] As of the Amendment No. 45 Effective Date, which such amount does not reflect the outstanding principal amount of the Existing Te

[43] As of the Amendment No. 45 Effective Date, prior to giving effect to the funding of the additional Terms Loans on such date.

[4] As of the Amendment No. 3 Effective Date.

~~17206860~~6173891512

# EXHIBIT 7

COPY

FILED 12/29/2025
1:45 O'clock P m
Curt M. Beck C & M
By [signature]

COPY

FILED 12/29/2025
1:42 O'clock P m
Curt M. Cobb C & M
By [signature]

**WRITTEN CONSENT**
**OF THE SOLE DIRECTOR**
**OF**
**NEAREST GREEN DISTILLERY, INC.**

July 26, 2023

The undersigned, being the sole director of the board of directors of Nearest Green Distillery, Inc., a Delaware corporation (the "***Company***"), does hereby adopt the following resolutions by written consent:

**<u>Amendment No. 6 to Credit Agreement and Limited Waiver</u>**

**WHEREAS**, it has been proposed that the Company enter into an amendment to the secured credit facility with Farm Credit Mid-America, PCA, as administrative agent thereunder (the "***Agent***"), the other lenders party thereto from time to time (each, a "***Lender***"), and Uncle Nearest, Inc. and Uncle Nearest Real Estate Holdings, LLC, together with the Company, as the borrowers, substantially in the form as presented to the sole director (collectively, the "***Sixth Amended Credit Facility***"); and

**WHEREAS**, in order to evidence and incur the obligations and liabilities in connection with the Sixth Amended Credit Facility and to secure or otherwise assure the payment and performance thereof, it has been proposed that the Company execute and deliver to the Agent an amendment to credit agreement along with any other financing statements and other documents, instruments, agreements, notices and certificates, in each case substantially in the form as presented to the sole director (collectively, and together with the Sixth Amended Credit Facility, the "***Sixth Amended Credit Documents***").

**NOW, THEREFORE, BE IT RESOLVED**, that the execution, delivery and performance by the Company of the Sixth Amended Credit Documents, including, without limitation, the incurrence and assumption of the obligations and liabilities thereunder and the pledge and grant of the liens and security interest in the assets of the Company described therein are authorized and approved and the officers of the Company are each severally authorized, empowered and directed to execute and deliver the same for and on behalf and in the name of the Company, with such changes in the terms and provisions thereof as the officer executing the same shall, in such officer's sole discretion, deem necessary or appropriate and in the best interests of the Company, and such officer's signature, or such actions by such officer, shall be conclusive evidence that such officer did deem the same to be necessary or appropriate and in the best interests of the Company;

**FURTHER RESOLVED**, that the officers of the Company are each severally authorized to sign, execute, certify to, verify, acknowledge, deliver, accept, file and record any and all such additional agreements, instruments, certificates, documents, notices reports, and schedules (including, but not limited to, any renewals, extensions, amendments, modifications, restatements or waivers of any of the foregoing or of any Sixth Amended Credit Document), and to take, or cause to be taken, any and all such action, in the name and on behalf of the Company which shall be required to consummate the transactions contemplated by the Sixth Amended Credit Documents (or any renewal, extension, amendment, modification, restatement or waiver thereof) or which any officer shall, in such officer's sole discretion, deem necessary or appropriate and in the best interests of the Company in order to effect the purposes of the foregoing resolutions, and such officer's signature, or such actions taken by such officer, shall be conclusive evidence that such officer did deem the same to be necessary or appropriate and in the best interests of the Company in order to effect such purposes; provided that attestation of any agreement or document by the Secretary of the Company shall not be required for the validity thereof, except to the extent expressly required by applicable law;

**FURTHER RESOLVED,** that all acts and deeds done or to be done by any one or more officers of the Company in connection with the Sixth Amended Credit Documents for and on behalf of the Company in negotiating, entering into, executing, acknowledging, delivering or attesting any agreement, document, instrument, certificate, report or schedule as contemplated in the foregoing resolutions or otherwise or in carrying out the terms and intentions of such resolutions are hereby ratified and approved;

**FURTHER RESOLVED,** that the foregoing resolutions may be relied upon by the Agent until receipt and written acknowledgment thereby of written notice of their amendment or rescission and that any such receipt and acknowledgment shall not affect any action taken by the Agent in reliance on the foregoing resolutions prior thereto; and

**FURTHER RESOLVED,** that any officer of the Company be, and such officer hereby is authorized, empowered and directed to certify to the Agent the foregoing resolutions and that the provisions thereof are in accordance with the certificate of formation and bylaws, as applicable, of the Company and with applicable law.

<u>Miscellaneous</u>

**RESOLVED,** that each of the officers of the Company be, and each of them hereby is, authorized, empowered and directed to take all such further action and to execute, deliver and file all such further agreements, certificates, instruments and documents, in the name and on behalf of the Company, as in such officer's sole discretion shall be necessary or appropriate to carry out the intent and to accomplish the purpose of the foregoing resolutions; and

**FURTHER RESOLVED,** that any and all acts taken by any of the officers, representatives or agents of the Company prior to the date hereof taken to carry out the intent and accomplish the purpose of the foregoing resolutions be, and they hereby are, ratified, confirmed and approved as acts on behalf of the Company.

[*Signature page follows*]

**IN WITNESS WHEREOF**, the undersigned sole director of the Company has executed this Written Consent effective as of the date first set forth above.

**SOLE DIRECTOR:**

Name: Fawn Weaver

WRITTEN CONSENT
Signature Page

**WRITTEN CONSENT**
**OF THE SOLE MEMBER**
**OF**
**UNCLE NEAREST REAL ESTATE HOLDINGS, LLC**

July 26, 2023

The undersigned, being the sole member of Uncle Nearest Real Estate Holdings, LLC, a Tennessee limited liability company (the "***Company***"), does hereby adopt the following resolutions by written consent:

**<u>Amendment No. 6 to Credit Agreement and Limited Waiver</u>**

**WHEREAS**, it has been proposed that the Company enter into an amendment to the secured credit facility with Farm Credit Mid-America, PCA, as administrative agent thereunder (the "***Agent***"), the other lenders party thereto from time to time (each, a "***Lender***"), and Uncle Nearest, Inc. and Nearest Green Distillery, Inc., together with the Company, as the borrowers, substantially in the form as presented to the sole member (collectively, the "***Sixth Amended Credit Facility***"); and

**WHEREAS**, in order to evidence and incur the obligations and liabilities in connection with the Sixth Amended Credit Facility and to secure or otherwise assure the payment and performance thereof, it has been proposed that the Company execute and deliver to the Agent an amendment to credit agreement along with any other financing statements and other documents, instruments, agreements, notices and certificates, in each case substantially in the form as presented to the sole member (collectively, and together with the Sixth Amended Credit Facility, the "***Sixth Amended Credit Documents***").

**NOW, THEREFORE, BE IT RESOLVED**, that the execution, delivery and performance by the Company of the Sixth Amended Credit Documents, including, without limitation, the incurrence and assumption of the obligations and liabilities thereunder and the pledge and grant of the liens and security interest in the assets of the Company described therein are authorized and approved and the officers of the Company are each severally authorized, empowered and directed to execute and deliver the same for and on behalf and in the name of the Company, with such changes in the terms and provisions thereof as the officer executing the same shall, in such officer's sole discretion, deem necessary or appropriate and in the best interests of the Company, and such officer's signature, or such actions by such officer, shall be conclusive evidence that such officer did deem the same to be necessary or appropriate and in the best interests of the Company;

**FURTHER RESOLVED**, that the officers of the Company are each severally authorized to sign, execute, certify to, verify, acknowledge, deliver, accept, file and record any and all such additional agreements, instruments, certificates, documents, notices reports, and schedules (including, but not limited to, any renewals, extensions, amendments, modifications, restatements or waivers of any of the foregoing or of any Sixth Amended Credit Document), and to take, or cause to be taken, any and all such action, in the name and on behalf of the Company which shall be required to consummate the transactions contemplated by the Sixth Amended Credit Documents (or any renewal, extension, amendment, modification, restatement or waiver thereof) or which any officer shall, in such officer's sole discretion, deem necessary or appropriate and in the best interests of the Company in order to effect the purposes of the foregoing resolutions, and such officer's signature, or such actions taken by such officer, shall be conclusive evidence that such officer did deem the same to be necessary or appropriate and in the best interests of the Company in order to effect such purposes; provided that attestation of any agreement or document by the Secretary of the Company shall not be required for the validity thereof, except to the extent expressly required by applicable law;

**FURTHER RESOLVED**, that all acts and deeds done or to be done by any one or more officers of the Company in connection with the Sixth Amended Credit Documents for and on behalf of the Company in negotiating, entering into, executing, acknowledging, delivering or attesting any agreement, document, instrument, certificate, report or schedule as contemplated in the foregoing resolutions or otherwise or in carrying out the terms and intentions of such resolutions are hereby ratified and approved;

**FURTHER RESOLVED**, that the foregoing resolutions may be relied upon by the Agent until receipt and written acknowledgment thereby of written notice of their amendment or rescission and that any such receipt and acknowledgment shall not affect any action taken by the Agent in reliance on the foregoing resolutions prior thereto; and

**FURTHER RESOLVED**, that any officer of the Company be, and such officer hereby is authorized, empowered and directed to certify to the Agent the foregoing resolutions and that the provisions thereof are in accordance with the certificate of formation, bylaws and the limited liability company agreement, as applicable, of the Company and with applicable law.

Miscellaneous

**RESOLVED**, that each of the officers of the Company be, and each of them hereby is, authorized, empowered and directed to take all such further action and to execute, deliver and file all such further agreements, certificates, instruments and documents, in the name and on behalf of the Company, as in such officer's sole discretion shall be necessary or appropriate to carry out the intent and to accomplish the purpose of the foregoing resolutions; and

**FURTHER RESOLVED**, that any and all acts taken by any of the officers, representatives or agents of the Company prior to the date hereof taken to carry out the intent and accomplish the purpose of the foregoing resolutions be, and they hereby are, ratified, confirmed and approved as acts on behalf of the Company.

[*Signature page follows*]

**IN WITNESS WHEREOF**, the undersigned sole member of the Company has executed this Written Consent effective as of the date first set forth above.

**SOLE MEMBER:**

**Uncle Nearest, Inc.**

By: ______________________
Name: Fawn Weaver
Title: President and Secretary

WRITTEN CONSENT
Signature Page

COPY

# EXHIBIT 8

FILED 12/29/2025
1:42 O'clock P m
Curt M. Webb C & M
By Gina Cartwright

COPY

*Execution Version*

# AMENDMENT NO. 7 TO CREDIT AGREEMENT AND LIMITED WAIVER

THIS AMENDMENT NO. 7 TO CREDIT AGREEMENT AND LIMITED WAIVER dated as of December 27, 2023 (this "Amendment"), is among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company (together with the Company and Distillery, collectively, the "Borrowers" and each, a "Borrower"), FARM CREDIT MID-AMERICA, PCA, in its capacity as administrative agent (in such capacity, the "Administrative Agent"), and each of the Lenders (as defined below) party hereto.

## RECITALS:

A. The Borrowers, the lenders party thereto (collectively, the "Lenders") and the Administrative Agent have entered into that certain Credit Agreement dated as of July 22, 2022 (as amended, supplemented or otherwise modified prior to the date hereof, the "Existing Credit Agreement"). Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Credit Agreement (as defined below).

B. The Borrowers have requested certain amendments to the Existing Credit Agreement as more particularly set forth below and waivers of certain defaults as set forth in more detail below.

C. Subject to the terms and conditions set forth below, the Lenders party hereto have agreed to make such amendments and grant such waivers.

In furtherance of the foregoing, the parties agree as follows:

**Section 1. LIMITED WAIVER.** Pursuant to Section 10.1 of the Credit Agreement and subject to the terms and conditions set forth herein and in reliance upon the representations and warranties set forth herein, each Lender party hereto hereby waives:

(a) the Event of Default that has occurred prior to the date hereof under Section 8.1(b) of the Existing Credit Agreement due to the Borrowers' failure to deliver the audited consolidated and consolidating balance sheet of the Company and its Subsidiaries as at the end of the fiscal year ended December 31, 2022 (the "2022 Audited Balance Sheet") by the date required by Section 6.1(a) of the Existing Credit Agreement and extended pursuant to that certain Amendment No. 6 to Credit Agreement and Limited Waiver dated as of July 26, 2023 by and among the Borrowers, the Administrative Agent and the Lenders party thereto, so long as the 2022 Audited Balance Sheet is delivered pursuant to the terms of the Credit Agreement on or prior to December 31, 2023 (it being acknowledged and agreed that the failure of the Borrowers to do so shall be an immediate Event of Default);

(b) each Event of Default that has occurred prior to the date hereof under Section 8.1(a) of the Existing Credit Agreement due to the Borrowers' failure to timely make interest payments required by Section 2.6(c) of the Existing Credit Agreement on November 1, 2023; and

(c) each Event of Default that has occurred prior to the date hereof under Section 8.1(b) of the Existing Credit Agreement due to the Borrowers' failure to maintain Consolidated Tangible Net Worth equal to or greater than $100,000,000 for the period beginning on October 31, 2023 through and including the date hereof, as required by Section 7.11(a) of the Existing Credit Agreement.

FILED 12/29/2025
1:42 o'clock P.m
Curt M. Cobb C. & M.
By [signature]

Section 2. **AMENDMENT(S).** Subject to the terms and conditions set forth herein and in reliance upon the representations and warranties set forth herein, the Existing Credit Agreement is hereby amended as follows (as so amended, the "Credit Agreement"):

(a) The proviso in Section 6.1(a) of the Existing Credit Agreement is hereby amended and restated in its entirety to read as follows:

> "provided that, with respect to the financial statements to be delivered hereunder for the fiscal year ending December 31, 2022, the balance sheet for such fiscal year and the related statements of income or operations, changes in shareholders' equity and cash flows for such fiscal year may be reviewed;"

(b) The table in Section 7.11(a) of the Existing Credit Agreement is hereby amended and restated in its entirety to read as follows:

| Period | Minimum Consolidated Tangible Net Worth |
|---|---|
| Closing Date through December 30, 2022 | $58,000,000 |
| December 31, 2022 through December 30, 2023 | $66,000,000 |
| December 31, 2023 through December 30, 2024 | $100,000,000 |
| December 31, 2024 through December 30, 2025 | $122,000,000 |
| December 31, 2025 and thereafter | $146,000,000 |

(c) Exhibit C (Compliance Certificate) to the Existing Credit Agreement is hereby amended and restated in its entirety to read in the form attached hereto as Schedule 1.

Section 3. **CONDITIONS PRECEDENT.** The parties hereto agree that this Amendment, the limited waiver(s) set forth in Section 1 above and the amendment(s) set forth in Section 2 above shall become effective upon receipt by the Administrative Agent of a counterpart of this Amendment duly executed and delivered by each Borrower, the Administrative Agent and each Lender.

Section 4. **REPRESENTATIONS AND WARRANTIES.** In order to induce the Administrative Agent and the Lenders party hereto to enter into this Amendment, each Borrower represents and warrants to the Administrative Agent and the Lenders party hereto as follows:

(a) The representations and warranties of each Borrower contained in Article V of the Credit Agreement and in each other Loan Document are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) on and as of the date hereof, after giving effect to this Amendment, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they are true and correct in all material respects (or, in the case of any such representation and warranty that is subject to materiality or Material Adverse Effect qualifications, in all respects) as of such earlier date;

(b) Since December 31, 2021, there has been no event or circumstance, either individually or in the aggregate, that has had or could reasonably be expected to have a Material Adverse Effect;

(c) No Default exists on the date hereof immediately prior to or after giving effect to this Amendment and the amendment(s) contemplated hereby, other than as expressly waived hereunder.

(d) This Amendment has been duly authorized, executed and delivered by it and constitutes its legal, valid and binding obligation.

**Section 5. MISCELLANEOUS.**

(a) **Ratification and Confirmation of Loan Documents.** Each Borrower hereby consents, acknowledges and agrees to the amendment(s) and limited waiver(s) set forth herein and hereby confirms and ratifies in all respects the Loan Documents to which such Borrower is a party (including without limitation, the continuation of its payment and performance obligations thereunder and the continuation and extension of the liens granted under the Collateral Documents to secure the Obligations), in each case upon and after the effectiveness of the amendment(s) and limited waiver(s) contemplated hereby.

(b) **Fees and Expenses.** The Borrowers shall pay all reasonable out-of-pocket expenses incurred by the Administrative Agent and its Affiliates (including the reasonable fees, charges and disbursements of counsel for the Administrative Agent) in connection with the preparation, negotiation, execution and delivery of this Amendment and any other documents prepared in connection herewith.

(c) Governing Law; Waiver of Jury Trial. This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York, and shall be further subject to the provisions of Sections 10.11 and 10.12 of the Credit Agreement.

(d) Counterparts. This Amendment may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page of this Amendment by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Amendment.

(e) **Entire Agreement.** This Amendment, together with all the Loan Documents (collectively, the "Relevant Documents"), sets forth the entire understanding and agreement of the parties hereto in relation to the subject matter hereof and supersedes any prior negotiations and agreements among the parties relating to such subject matter. No promise, condition, representation or warranty, express or implied, not set forth in the Relevant Documents shall bind any party hereto, and no such party has relied on any such promise, condition, representation or warranty. Each of the parties hereto acknowledges that, except as otherwise expressly stated in the Relevant Documents, no representations, warranties or commitments, express or implied, have been made by any party to the other. None of the terms or conditions of this Amendment may be changed, modified, waived or canceled orally or otherwise except in a writing and in accordance with Section 10.1 of the Credit Agreement. This Amendment is a Loan Document.

(f) Severability. If any provision of this Amendment is held to be illegal, invalid or unenforceable, (i) the legality, validity and enforceability of the remaining provisions of this Amendment shall not be affected or impaired thereby and (ii) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions. The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

(g) **Successors and Assigns.** This Amendment shall be binding upon and inure to the benefit of each party hereto and their respective successors and assigns (subject to Section 10.6 of the Credit Agreement).

*[Remainder of Page Intentionally Left Blank; Signature Pages Follow]*

IN WITNESS WHEREOF, the parties hereto have caused this Amendment No. 7 to Credit Agreement and Limited Waiver to be executed by their duly authorized officers, all as of the date and year first written above.

**BORROWERS:**

**UNCLE NEAREST, INC.**

By: ______________________
Name: Fawn Weaver
Title: President and Secretary

**NEAREST GREEN DISTILLERY, INC.**

By: ______________________
Name: Fawn Weaver
Title: President and Secretary

UNCLE NEAREST REAL ESTATE HOLDINGS, LLC

By: Uncle Nearest, Inc., its Member

By: ______________________
Name: Fawn Weaver
Title: President and Secretary

**ADMINISTRATIVE AGENT / LENDERS:**

**FARM CREDIT MID-AMERICA, PCA,**
as Administrative Agent and a Lender

By: ______________________
Name: Jonathan Boyce
Title: Financial Officer

AMENDMENT NO. 2 TO CREDIT AGREEMENT AND LIMITED WAIVER
Signature Page

**Schedule 1**

Amended Exhibit C to Credit Agreement

*See attached.*

**FORM OF COMPLIANCE CERTIFICATE**

Financial Statement Date: __________, _____

To: Farm Credit Mid-America, PCA, as Administrative Agent
The Lenders party to the Credit Agreement referenced below

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement, dated as of July 22, 2022 (as amended, restated, extended, supplemented or otherwise modified in writing from time to time, the "Credit Agreement;" the terms defined therein being used herein as therein defined), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), each lender from time to time party thereto (the "Lenders") and FARM CREDIT MID-AMERICA, PCA, as administrative agent (in such capacity, the "Administrative Agent").

The undersigned hereby certifies as of the date hereof that he/she is the chief executive officer, president, chief financial officer, treasurer, controller or director of finance of the Company, and that, on behalf of the Company, in such capacity, he/she is authorized to execute and deliver this Compliance Certificate to the Administrative Agent and the Lenders on the behalf of the Borrowers, and that:

*[Use following paragraph 1 for fiscal year-end financial statements]*

1. The Company has delivered:

(a) the year-end audited financial statements required by Section 6.1(a) of the Credit Agreement for the fiscal year of the Company and its Subsidiaries ended as of the above date, audited by an independent certified public accountant and accompanied by a report and opinion of such accountant, as required by such Section.[[1]] Such consolidated financial statements fairly present in all material respects the financial condition, results of operations, and cash flows of the Company and its Subsidiaries in accordance with GAAP and such consolidating statements are certified to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Company and its Subsidiaries.

(b) the annual business plan and budget of the Company and its Subsidiaries on a consolidated basis, including forecasts prepared by management of the Company, presented on an annual basis for the current fiscal year as required by Section 6.1(c) of the Credit Agreement.

---

[1] Notwithstanding anything to the contrary herein, with respect to the financial statements to be delivered pursuant to Section 6.1(a) of the Credit Agreement for the fiscal year ending December 31, 2022, the balance sheet for such fiscal year shall be audited and the related statements of income and operations, changes in shareholders' equity and cash flows for such fiscal year may be reviewed.

*[Use following paragraph 1 for calendar month-end financial statements]*

1. The Company has delivered the unaudited consolidated and consolidating financial statements required by Section 6.1(b) of the Credit Agreement for the calendar month ended as of the above date. Such consolidated financial statements fairly present in all material respects the financial condition, results of operations, and cash flows of the Company and its Subsidiaries in accordance with GAAP, subject only to normal year-end adjustments and the absence of footnotes and such consolidating statements are certified to the effect that such statements are fairly stated in all material respects when considered in relation to the consolidated financial statements of the Company and its Subsidiaries.

2. The undersigned has reviewed and is familiar with the terms of the Credit Agreement and has made, or has caused to be made under his/her supervision, a review of the transactions and condition (financial or otherwise) of the Company and its Subsidiaries during the accounting period covered by such financial statements.

3. The financial covenant analyses and information set forth on Schedules 1 and 2 attached hereto are true and accurate on and as of the date of this Compliance Certificate.

4. Attached hereto as Schedule 3 is a copy of management's customary discussion and analysis with respect to such financial statements.

5. Attached hereto as Schedule 4 are supplements to Schedules 9(j) and 9(k) of the Security Agreement with respect to Patents, Trademarks and Copyrights issued and/or registered with the United States Patent and Trademark Office or United States Copyright Office, as the case may be, since the Closing Date or the most recent date Schedules 9(j) and 9(k) of the Security Agreement, as applicable, has been updated, which are necessary to keep the representations and warranties in Sections 9(j) and 9(k) of the Security Agreement true and complete.

6. A review of the activities of the Company and its Subsidiaries during such fiscal period has been made under the supervision of the undersigned with a view to determining whether during such fiscal period the Company and its Subsidiaries performed and observed all of their respective Obligations under the Loan Documents, and

*[select one:]*

**[during such fiscal period, each of Company and its Subsidiaries performed and observed each covenant and agreement of the Loan Documents applicable to it, and no Default has occurred and is continuing.]**

*--or--*

**[during such fiscal period, the following covenants or agreements have not been performed or observed and the following is a list of each such Default and its nature and status:]**

*[signature page follows]*

*IN WITNESS WHEREOF*, the undersigned has executed, in his capacity as a Senior Officer and not in his individual capacity, this Compliance Certificate as of __________, _____.

**UNCLE NEAREST, INC.**

By:______________________________________

Name:____________________________________

Title: ____________________________________

For the Calendar Month/Fiscal Year ended ____________ ("Statement Date")

**SCHEDULE 1**
**to the Compliance Certificate**

**I.** **Section 7.11(a) – Consolidated Tangible Net Worth.**

A. Shareholders' Equity of the Company and its Subsidiaries on the Statement Date: $____________

B. Intangible Assets of the Company and its Subsidiaries on the Statement Date: $____________

C. Consolidated Tangible Net Worth

(Line I.A – Line I.B): $____________

D. In compliance? [Yes][No]

E. At any time since the delivery of the most recent Compliance Certificate, has the Consolidated Tangible Net Worth been less than the applicable minimum Consolidated Tangible Net Worth set forth below? [Yes][No]

| Period | Minimum Consolidated Tangible Net Worth |
|---|---|
| Closing Date through December 30, 2022 | $58,000,000 |
| December 31, 2022 through December 30, 2023 | $66,000,000 |
| December 31, 2023 through December 30, 2024 | $100,000,000 |
| December 31, 2024 through December 30, 2025 | $122,000,000 |
| December 31, 2025 and thereafter | $146,000,000 |

**II.** **Section 7.11(b) Consolidated Net Income.**[2]

Consolidated Net Income for the calendar month ending on the Statement Date: $____________

*Minimum permitted:* *$1.00*

[2] To be calculated on a monthly basis commencing with the calendar month ending August 31, 2022.

**SCHEDULE 3**
**to the Compliance Certificate**

**Management's Discussion and Analysis**

*To be attached*

**SCHEDULE 4**
**to the Compliance Certificate**

**Supplements to Schedules 9(j) and 9(k) to the Security Agreement**

*To be attached.*

COPY

# EXHIBIT 9

FILED 12/29/2025
1:42 O'clock P m
Curt M. Cobb C & M
By Trica Cartwright

| Date | Description | | Transaction Amount | Principal | Principal Balance | Requestor of Drawdowns | Sole Signee |
|---|---|---|---|---|---|---|---|
| 7/22/2022 | Principal Distribution Wire | Working Capital 3000 | 1,296,666.11 | 1,296,666.11 | 1,296,666.11 | Michael Senzaki | Michael Senzaki |
| 7/22/2022 | Principal Distribution Wire | Working Capital 3000 | 3,691,411.03 | 3,691,411.03 | [illegible] | Michael Senzaki | Michael Senzaki |
| 7/22/2022 | Principal Distribution Wire | Working Capital 3000 | 6,716,900.00 | 6,716,900.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 7/22/2022 | Principal Distribution Wire | Working Capital 3000 | 160,581.00 | 160,581.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 7/22/2022 | Principal Distribution Wire | Working Capital 3000 | 1,051,298.12 | 1,051,298.12 | [illegible] | Michael Senzaki | Michael Senzaki |
| 7/25/2022 | Principal Distribution Wire | Working Capital 3000 | 9,188,585.05 | 9,188,585.05 | [illegible] | Michael Senzaki | Michael Senzaki |
| 7/25/2022 | Principal Distribution Wire | Working Capital 3000 | 11,600,907.70 | 11,600,907.70 | [illegible] | Michael Senzaki | Michael Senzaki |
| 8/15/2022 | Principal Distribution Wire | Working Capital 3000 | 1,200,000.00 | 1,200,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 9/8/2022 | Principal Distribution Wire | Working Capital 3000 | 1,500,000.00 | 1,500,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 9/28/2022 | Principal Distribution Wire | Working Capital 3000 | 1,615,000.00 | 1,615,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 10/3/2022 | Principal Distribution Wire | Working Capital 3000 | 2,985,000.00 | 2,985,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 12/19/2022 | Principal Distribution Wire | Working Capital 3000 | 5,000,000.00 | 5,000,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 3/20/2023 | Principal Distribution Wire | Working Capital 3000 | 3,013,724.17 | 3,013,724.17 | [illegible] | Michael Senzaki | Michael Senzaki |
| 3/30/2023 | Principal Distribution Wire | Working Capital 3000 | 1,310,752.28 | 1,310,752.28 | [illegible] | Michael Senzaki | Michael Senzaki |
| 1/5/2023 | J&K Cafe Account | Working Capital 3000 | 855,521.25 | 855,521.25 | [illegible] | Michael Senzaki | Michael Senzaki |
| 1/7/2023 | Principal Distribution Wire | Working Capital 3000 | 3,200,000.00 | 3,200,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 1/18/2023 | Principal Distribution Wire | Working Capital 3000 | 875,000.00 | 875,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 1/25/2023 | Principal Distribution Wire | Working Capital 3000 | 550,000.00 | 570,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 1/26/2023 | Principal Distribution Wire | Working Capital 3000 | 1,790,000.00 | 1,700,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 5/3/2023 | Principal Distribution Wire | Working Capital 3000 | 2,500,000.00 | 2,500,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 5/12/2023 | Principal Distribution Wire | Working Capital 3000 | 1,070,000.00 | 1,070,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 5/19/2023 | Principal Distribution Wire | Working Capital 3000 | 150,000.00 | 150,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 6/9/2023 | Principal Distribution Wire | Working Capital 3000 | 1,061,061.00 | 1,061,061.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 6/6/2023 | Principal Distribution Wire | Working Capital 3000 | 26,850.00 | 26,850.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 7/13/2023 | Advance | Working Capital 3000 | 1,623.00 | 1,623.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 7/20/2023 | Principal Distribution Wire | Working Capital 3000 | 27,750.00 | 27,750.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 7/26/2023 | Principal Distribution Wire | Working Capital 3000 | 6,062,250.00 | 6,062,250.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 8/2/2023 | Principal Distribution Wire | Working Capital 3000 | 1,090,000.00 | 1,090,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |

| Date | Description | | Transaction Amount | Principal | Principal Balance | | |
|---|---|---|---|---|---|---|---|
| 1/26/2023 | Advance | Construction 2500 | 25,000.00 | 25,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 1/27/2023 | Principal Distribution Wire | Construction 2500 | 1,801,100.00 | 1,801,100.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 1/27/2023 | Principal Distribution Wire | Construction 2500 | 55,600.00 | 55,100.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 2/3/2023 | Principal Distribution Wire | Construction 2500 | 1,575,000.00 | 1,575,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 2/21/2023 | Principal Distribution Wire | Construction 2500 | 2,250,000.00 | 2,250,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 3/2/2023 | Principal Distribution Wire | Construction 2500 | 1,690,000.00 | 1,600,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 3/16/2023 | Principal Distribution Wire | Construction 2500 | 1,070,000.00 | 1,070,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |

| Date | Description | Loan Type | Transaction Amount | Principal | Principal Balance | | |
|---|---|---|---|---|---|---|---|
| 3/30/2023 | Principal Distribution Wire | Auto Term Note 0100 | 1,920,190.55 | 1,920,190.55 | [illegible] | Michael Senzaki | Michael Senzaki |
| 3/30/2023 | Principal Distribution Wire | Auto Term Note 0100 | 32,500.00 | 32,500.00 | [illegible] | Michael Senzaki | Michael Senzaki |
| 3/30/2023 | Advance | Auto Term Note 0100 | 19,818,911.17 | 19,818,911.17 | [illegible] | Michael Senzaki | Michael Senzaki |
| 6/9/2023 | Advance | Auto Term Note 0100 | 1,700,000.00 | 1,700,000.00 | [illegible] | Michael Senzaki | Michael Senzaki |

| Date | Description | | Transaction Amount | Principal | Principal Balance |
|---|---|---|---|---|---|
| 7/22/2022 | Principal Distribution Wire | [illegible] | [illegible] | [illegible] | [illegible] |
| 7/28/2022 | Principal Distribution Wire | CAPEX | [illegible] | [illegible] | [illegible] |
| 07/29/2022 | Principal Distribution Wire | [illegible] | [illegible] | [illegible] | [illegible] |
| [illegible] | Advance | CAPEX | [illegible] | [illegible] | [illegible] |

FILED 12/29/2025 1:42 o'clock P m
By [signature]

COPY

# EXHIBIT 10

FILED 12/29/2025
1:42 O'clock P m
Curt M. Cobb C & M
By Ina Antuniga

*EXHIBIT 10*

**FORM OF LOAN NOTICE**

Date: May 8, 2023

To: Farm Credit Mid-America, PCA, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of July 13, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the lenders from time to time party thereto, as Lenders, and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

The Company hereby requests a Borrowing of the Revolving Line of Credit to be made to Uncle Nearest Inc.:

1. On _May 8, 2023___ (a Business Day).

2. In the amount of $1,070,000____.

The submission by the Company of this Loan Notice with respect to the Borrowing contemplated herein shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement will be satisfied on and as of the relevant date such Borrowing is made, and the making of such Borrowing shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement are satisfied on and as of such date.

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this notice.

[Signature page follows]

FILED 12/29/2025
1:42 O'clock P.m
Curt M. Cobb C & M
By Mila Cantrell

---------- Forwarded message ---------
From: **Mike Senzaki** <mike.senzaki@unclenearest.com>
Date: Tue, Aug 1, 2023 at 2:04 PM
Subject: Loan request
To: Jonathan Boyce <jonathan.boyce@e-farmcredit.com>

Jonathan,

Loan request for remaining amount on LOC

Mike

**One attachment** • Scanned by Gmail ⓘ



Loan Notice 8-1-2...

A
Form of Loan Notice

168179838

COPY

# EXHIBIT 11

FILED 12/29/2025
1:40 O'clock p.m.
Curt M. Cobb C & M
By [signature]

COPY

*EXHIBIT 11*

**FORM OF LOAN NOTICE**

Date: July 26, 2023

To: Farm Credit Mid-America, PCA, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of July 13, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the lenders from time to time party thereto, as Lenders, and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

The Company hereby requests a Borrowing of the Revolving Line of Credit to be made to Uncle Nearest Inc.:

1. On _July 25, 2023___ (a Business Day).

2. In the amount of $7,000,000 ___.

The submission by the Company of this Loan Notice with respect to the Borrowing contemplated herein shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement will be satisfied on and as of the relevant date such Borrowing is made, and the making of such Borrowing shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement are satisfied on and as of such date.

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this notice.

[Signature page follows]

FILED 12/29/2025
1:42 o'clock p.m.
Curt M. Cobb, C & M
By [signature]

A
Form of Loan Notice

168179838

---------- Forwarded message ---------
From: **Mike Senzaki** <mike.senzaki@unclenearest.com>
Date: Wed, Jul 26, 2023 at 12:12 PM
Subject: loan notice
To: Jonathan Boyce <jonathan.boyce@e-farmcredit.com>

**One attachment** • Scanned by Gmail



A
Form of Loan Notice

168179838

COPY

# EXHIBIT 12

FILED 12/29/2025
1:42 O'clock p .m
Curt M. Cobb, C & M
By Nila Castaneda

COPY

*EXHIBIT 12*

**FORM OF LOAN NOTICE**

Date: August 1, 2023

To: Farm Credit Mid-America, PCA, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of July 13, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the lenders from time to time party thereto, as Lenders, and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

The Company hereby requests a Borrowing of the Revolving Line of Credit to be made to Uncle Nearest Inc.:

1. On _August 1, 2023___ (a Business Day).

2. In the amount of $1,060,000____.

The submission by the Company of this Loan Notice with respect to the Borrowing contemplated herein shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement will be satisfied on and as of the relevant date such Borrowing is made, and the making of such Borrowing shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement are satisfied on and as of such date.

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this notice.

[Signature page follows]

FILED 12/29/2025
1:42 O'clock P m
Curt M. Cobb, C & M
By [signature]

**UNCLE NEAREST, INC.**

By:________________________________
Name: Mike Senzaki
Title: CFO

A
Form of Loan Notice

168179838

## FORM OF LOAN NOTICE

Date: August 1, 2023

To: Farm Credit Mid-America, PCA, as Administrative Agent

Ladies and Gentlemen:

Reference is made to that certain Credit Agreement dated as of July 13, 2022 (as amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), among UNCLE NEAREST, INC., a Delaware corporation (the "Company"), NEAREST GREEN DISTILLERY, INC., a Delaware corporation ("Distillery"), UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, a Tennessee limited liability company ("RE Holdings"), each other Borrower party thereto (together with the Company, Distillery and RE Holdings, collectively, the "Borrowers" and each, a "Borrower"), the lenders from time to time party thereto, as Lenders, and FARM CREDIT MID-AMERICA, PCA, as Administrative Agent. Capitalized terms used herein and not defined herein shall have the meanings assigned thereto in the Credit Agreement.

The Company hereby requests a Borrowing of the Revolving Line of Credit to be made to Uncle Nearest Inc.:

1. On _August 1, 2023___ (a Business Day).

2. In the amount of $930,000_____.

The submission by the Company of this Loan Notice with respect to the Borrowing contemplated herein shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement will be satisfied on and as of the relevant date such Borrowing is made, and the making of such Borrowing shall be deemed to be a representation and warranty by each Borrower that the conditions set forth in Sections 4.2(a) and (b) of the Credit Agreement are satisfied on and as of such date.

Delivery of an executed counterpart of a signature page of this notice by fax transmission or other electronic transmission (e.g. "pdf" or "tif") shall be effective as delivery of a manually executed counterpart of this notice.

[Signature page follows]

**UNCLE NEAREST, INC.**

By:________________________________
Name: Mike Senzaki
Title: CFO

A
Form of Loan Notice

168179838

---------- Forwarded message ---------
From: **Mike Senzaki** <mike.senzaki@unclenearest.com>
Date: Tue, Aug 1, 2023 at 2:04 PM
Subject: Loan request
To: Jonathan Boyce <jonathan.boyce@e-farmcredit.com>

Jonathan,

Loan request for remaining amount on LOC

Mike

One attachment • Scanned by Gmail



Loan Notice 8-1-2...

A
Form of Loan Notice

168179838

---------- Forwarded message ---------
From: **Mike Senzaki** <mike.senzaki@unclenearest.com>
Date: Tue, Aug 1, 2023 at 3:42 PM
Subject: Loan request
To: Jonathan Boyce <jonathan.boyce@e-farmcredit.com>

Joanthan ,

Updated Loan Request.

Mike

One attachment • Scanned by Gmail



Loan Notice 8-1-2...

A
Form of Loan Notice

168179838

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**WINCHESTER DIVISION**

| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-38 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| UNCLE NEAREST, INC., *et al.*, | ) | Magistrate Judge Steger |
| | ) | |
| Defendants. | ) | |

## RECEIVER'S FIRST QUARTERLY REPORT

Comes now Phillip G. Young, Jr. (the "Receiver"), the court-appointed receiver in this matter, by and through counsel, and offers this quarterly report pursuant to the Court's Order Appointing Receiver (the "Receivership Order") entered on August 22, 2025.

### *INTRODUCTION*

1. This receivership presents some unique challenges given the size and complexity of the operations of Uncle Nearest, Inc. and its affiliates (collectively, the "Company"), the debt structure of the Company, and the high visibility of this matter. However, the Receiver is very encouraged about the long-term viability of the Company based upon what he has learned in the first five weeks of his service in this matter. The Receiver believes that the Company has significant value and can be reorganized, as a going concern, on a relatively quick timeline. The Receiver does not believe that a fire sale liquidation of the Company (be that as part of this Receivership or as part of a bankruptcy proceeding) is necessary or in the best interest of this Company. While some non-income producing assets may be sold as part of this receivership, the Receiver believes that the core of the Company's business can continue with a refinanced debt structure or, alternatively, can be sold as a going concern.

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
21
4:25-CV-00038

2. Further, the transition to this receivership has been as smooth as one could possibly hope. The founder, management, and employees of the Company have been very cooperative with the Receiver and has granted the Receiver full access to the Company and its records. Due to this cooperation, the Receiver and his team of professionals quickly integrated into the financial and operational control of the Company, and have continued working cooperatively in that regard with the Company's founder and management team. The Receiver has also found the Company's primary secured lender, Farm Credit Mid-America, PCA ("Farm Credit"), to be very cooperative with his efforts. The Receiver has been in frequent contact with counsel for Farm Credit, and the Receiver's financial advisors have been providing bi-weekly, in-depth financial reporting to Farm Credit's financial analysts. In summary, the opportunity for a positive conclusion to this matter is good due to the cooperation of all constituents, and because of the Company's opportunity for future growth.

3. Unless the Court requests a different structure, the Receiver anticipates filing quarterly reports that contain the following sections: Tasks Accomplished; Challenges; Tasks in Progress; Financial Report; and Conclusions, Recommendations and Requests.

## *TASKS ACCOMPLISHED BY THE RECEIVER*

4. The Receiver has been serving in this case for just over five (5) weeks. Here are the major tasks accomplished by the Receiver and his team during that time.

5. The Receiver filed certified copies of this Court's Receivership Order in the United States District Court for the Middle District of Tennessee, and in the United States District Court for the District of Massachusetts. The Company owns assets in both of these districts, thus necessitating these filings. The Receiver has retained counsel in France who is working to translate the Court's Receivership Order into French and file it with a court of competent jurisdiction in the

Cognac region of France.

6. The Receiver gained full access to the physical facilities of the Company and to all software, computer platforms, and records of the Company immediately after his appointment.

7. The Receiver immediately secured multiple bank accounts in the Company's corporate names at three banks, and moved those funds to accounts over which only the Receiver has control. Bank accounts remain in a French bank, over which the Receiver will not have exclusive control until the French courts recognize this Court's Receivership Order. Likewise, the Receiver does not have control over bank accounts in the names of certain entities that are detailed in the Receiver's Motion for Clarification filed with this Court on September 12, 2025.

8. The Receiver interviewed and retained a group of professionals, all of which are detailed in the Receiver's Notice of Receiver's Professionals filed with this Court on September 12, 2025.

9. With the assistance of counsel, the Receiver filed the required regulatory documents with state and federal agencies to notify them of a change of control of the Company. These filings were critical and time-sensitive due to government regulations in the spirits industry.

10. The Receiver met with a large group of Company employees to explain the nature of his role and how that impacts the operations of the Company.

11. Critically, with the assistance of his financial advisors, the Receiver developed a thirteen-week budget for the operations of the Company, and presented that budget to Farm Credit for approval. The budget included line items totaling approximately $1 million in immediate cash needs in order to pay delinquent, necessary operating expenses so that the Company could continue its operations somewhat uninterrupted. It also included line items totaling approximately $1.5 million for the estimated professional fees associated with this receivership through that 13-week

budget period. But for these $2.5 million in extraordinary expenses, the budget presented to Farm Credit was a balanced budget, demonstrating that the Company's revenues could cover its operational expenses over the next thirteen weeks. The Receiver reached a forbearance agreement with Farm Credit whereby Farm Credit agreed to fund the $2.5 million deficiency in exchange for the Receiver's agreement to certain operational and financial benchmarks.

12. The Receiver met with Tennessee Distilling Group ("TDG"), an entity which distills, bottles and stores certain of the Company's products. During the meeting with TDG, the Receiver physically inspected the Company's barrels and finished cases of product. From TDG's records, the Receiver was also able to reconcile the Company's barrel count, which the Receiver understands was a key issue in this underlying litigation. The Receiver provided the reconciled barrel count information to Farm Credit.

13. The Receiver met with the Company's largest distributor, once in-person and several times by video conference. From those conversations, the Receiver was able to ascertain and address certain challenges that existed in the Company's relationships with some of its distributors. It is the Receiver's belief that, as a result of those conversations and implementation of certain action items, the Company's distribution network is strong.

14. The Receiver spent a considerable amount of time in video conferences with existing shareholders, answering questions, allaying concerns, and gathering information concerning the Company's prior operations. These conversations have proven very beneficial to the Receiver, and the Receiver believes that the conversations have been beneficial to shareholders as well.

15. The Receiver also spent a considerable amount of time communicating with creditors, by telephone, email and video conference. Paragraph 12 of this Court's Receivership

Order has proven invaluable to the Receiver's ability to carry out the duties assigned to him by the Receivership Order without the distraction of lawsuits and other collection efforts.

16. As indicated in the Receiver's Motion for Clarification, the Receiver investigated the Company's relationship with other entities and has reported those relationships to this Court. If the Court were to include any or all of those additional entities in this matter, the Receiver is prepared to exercise authority over those additional entities.

17. The Receiver obtained the most recent version of the Company's capitalization table from the Company's prior counsel. Based upon conversations with shareholders, the Receiver determined that the capitalization table is incomplete and inaccurate. He and his team have begun the task of reconciling the existing capitalization table with known or ascertainable shareholders.

18. The Receiver, with the assistance of his financial advisors, has begun evaluating the Company's financial statements and reports. The Receiver believes that certain of these financial statements are inaccurate or incomplete; he and his team are working with source data to update the Company's financial reporting.

19. The Receiver has begun an investigation into allegations made by the Company's founder regarding certain financial improprieties committed by a former employee. Based upon the records of the Company, discussions with employees, and his review of third party investigation reports, the Receiver believes that there is validity to some of the allegations. The Receiver will continue his investigation into these matters in future months in order to determine whether this receivership estate has any valid causes of action to pursue.

20. Relatedly, the Receiver has also begun to investigate whether any current employee or member of the management team has misappropriated funds. To date, the Receiver has found

no evidence of misappropriation, theft, or financial impropriety by the Company's founder, its management team, or any current employee. While there have been multiple transfers among related entities, the Receiver has found no evidence of defalcation to date.

21. The Receiver met with a number of potential investors, in person, by telephone, and by video conference. Based upon these conversations, the Receiver believes there is significant interest in the market for future investment in the Company, whether by debt refinancing, purchase of stock, or purchase of substantially all assets of the Company as a going concern. The Receiver intends to continue discussions with these parties, though he does not intend to accept offers until his financial advisors have produced independently verifiable financial statements, from which the Receiver can assess the value of the Company and its assets.

22. The Receiver, through counsel, identified all trademarks that belong to the Company, charted their expiration dates, and renewed any expiring trademarks.

23. The Receiver, through counsel, assessed the incorporation status of all entities related to the Company. For any companies whose incorporation status was inactive, the Receiver is taking all necessary steps to return the companies to good standing.

24. The Receiver, his financial advisors, and his operational advisors spent considerable time assessing the current operations of the Company. As a result of those assessments, the Receiver made significant cuts to the operational expenditures of the Company, including reducing its workforce by twelve employees, or 13%. The Receiver continues to evaluate the workforce and expenditures of the Company, in an effort to increase its operational efficiencies and become more profitable.

25. The Receiver also evaluated the Company's performance regarding sales. As mentioned above, the Receiver has made positive steps with regard to the Company's distributors.

The Receiver has been able to partially restore shipments from TDG, who had previously placed the Company on a credit hold in the wake of this matter, though discussions concerning the full release of product being held by TDG is ongoing. The Receiver anticipates new product releases over the next quarter, which should continue to improve sales of the Company's products.

26. The Receiver evaluated certain non-income producing properties owned by the Company. More specifically, the Receiver found that the Company owned non-income producing real estate in Cognac, France; Martha's Vineyard, Massachusetts; as well as multiple properties in Bedford County, Tennessee. The Receiver found that all of these properties were purchased for specific business purposes, and that they all had the possibility of producing revenue (directly or indirectly) in the future. However, given the current cash position of the Company, the Receiver is evaluating which of these properties should be liquidated by the Receiver in order to satisfy existing debt.

27. Among the assets that are not currently producing income are those assets associated with a potential cognac business, which the Company was working to establish. The Receiver traveled to Cognac, France to assess these assets and to determine their marketability. These assets include a chateau, vineyards, and intellectual property associated with a new cognac release. Based upon conversations with the Company's employees, the Receiver's operational consultant, and other resources he spoke with in Cognac, it is the Receiver's opinion that the Company would need to invest between $15 million - $25 million additional funds in order to introduce a cognac line to the market. The Company lacks the ability to make that investment at this time; therefore, the Receiver has determined that these assets should be liquidated. The Receiver has already received one offer for these assets and has received at least two additional inquiries. The Receiver anticipates filing a motion with this Court seeking to sell the assets once

he determines the highest and best binding offer.

28. The Receiver, with the assistance of his financial and operational advisors, assessed and implemented budget cuts. The Receiver made cuts to both administrative and sales budgets.

*CHALLENGES TO RECEIVERSHIP*

29. While the Receiver is pleased with the progress of this receivership, and the overall opportunities for a successful reorganization, a number of challenges have arisen in the first five weeks that had to be overcome. As demonstrated below, some of these challenges will be ongoing challenges that the Receiver and his team must continue to navigate. The biggest challenges identified by the Receiver to date include the following.

30. Cash flow has been a major challenge to this receivership, especially during the first two weeks of the Receiver's service. Due to a variety of factors (for example, credit holds on product shipment, legal fees incurred by the Company, and the impact of this litigation on sales), revenue collections were down significantly when the Receiver assumed control of the Company. Combined with the fact that a number of critical vendors and other expenses were in significant arrears, it was difficult for the Receiver to continue normal operations during the first two weeks. Fortunately, cash flow concerns have eased considerably during the last two to three weeks. Product is being released to satisfy purchase orders, sales are increasing, expenses are decreasing, and the Receiver has worked with Farm Credit to inject necessary capital in the Company. The Receiver believes that the cash flow crisis has eased, though cash flow will continue to be closely monitored.

31. Another challenge to this receivership is the sheer volume of creditors and shareholders. The Receiver has been contacted by hundreds of constituents asking about the status of the Company and how this receivership impacts their interest in the Company. The Receiver

has done his best to correspond and/or speak to all concerned parties and to explain the receivership process. He believes that educating all constituents about this process will ease concerns and will, therefore, increase the viability of the Company's business moving forward. However, these discussions have taken an inordinate amount of the Receiver's time to date, and will likely continue to require considerable time and attention.

32. As discussed in more detail below, the absence of solid financial controls and the unreliability of certain financial records has been a challenge in determining historical sales and expenses that would aid with forecasting future sales and expenses. That challenge has been compounded by the fact that a substantial amount financial records before 2024 were erased from the Company's computer system. According to multiple employees at the Company, those records were erased by a former employee immediately after termination. The Receiver is working to recover some or all of those financial records.

33. The absence of the observance of corporate formalities among related entities has been another challenge for the Receiver and his staff. Many of the companies that are subject to this receivership action have comingled assets and liabilities to the point in which they are best viewed as a single enterprise. That has made determination of lien priority, and separation of liabilities among corporations, very difficult.

34. Finally, the unreliability of records relating to shareholders of the Company has been a challenge for the Receiver. While he is in possession of a capitalization table, the Receiver's research and conversations with various constituents leads him to believe that the capitalization table is inaccurate. The Receiver believes that the capitalization table fails to recognize a number of secondary market sales, including certain sales of shares that previously belonged to Fawn Weaver. The Receiver believes the Weaver shares were transferred by a former



Case 4:25-cv-00038-CEA-CHS Document 46-39 Filed 10/01/25 Page 9 of 37 PageID #: 2554
Case 4:25-cv-00038-CEA-CHS Document 139-2 Filed 10/05/26 Page 374 of 384 PageID #: 4617

employee of the Company, perhaps without authority to do so. While the capitalization table does not contain an accurate recitation of the current shareholders of the Company, at this point the Receiver does believe that all shares of the Company are represented on the capitalization table. In other words, the Receiver believes that the capitalization table correctly lists all shares, but incorrectly lists the names of all shareholders.

*TASKS IN PROCESS*

35. The Receiver has identified a number of tasks that need to be undertaken and/or completed in the future. Some of these tasks are operational, some financial, and some legal. While some of these tasks will take hours to complete, others will take weeks. Nevertheless, here are the tasks that the Receiver believes lies ahead in this receivership.

36. As mentioned above, the capitalization table is inaccurate. The Receiver and his counsel have begun the process of reconciling the capitalization table. As the Receiver has conversations with shareholders, he has begun to ask them for proof of funding and copies of the documents they were given with their purchase of shares. In the near future, the Receiver anticipates that his counsel will attempt to contact all known shareholders (whether listed on the capitalization table or not) in order to gather necessary information to confirm capitalization table information.

37. The Receiver's financial analysts are working on gathering source data to recreate certain financial reports. The Receiver thinks it is critical for the Company to have financial statements that have been created under his independent direction, for which he can verify the accuracy.

38. Once the Receiver has compiled independent financial statements, he intends to reach out to potential investors and/or asset buyers who have shown interest in the Company. Until

the Receiver has financials upon which he can reasonably rely, he has no way to determine the accurate market value of the Company or any of its assets. The Receiver anticipates accepting offers for refinancing debt, purchasing shares of the Company, and/or purchasing substantially all assets of the Company upon the verification of the financial reports. Once the Receiver determines what he believes, in his business judgment, is in the best interest of the Company, he intends to file a motion with this Court recommending that course of action.

39. In the interim, the Receiver is investigating the sale of the non-income producing assets such as the cognac business assets, the vodka business assets, and the real estate that is not essential to the core business of the Company. As mentioned above, the Receiver has already begun receiving offers on the cognac business. He is in the process of obtaining valuations and appraisals on all other non-income producing assets.

40. The Receiver has also begun interviewing investment bankers to potentially assist with the sale of certain assets of the Company. He plans to begin the vetting process over the next month.

41. The Receiver and his legal staff are continuing to assess the incorporation status of the Company's affiliates, and taking steps to ensure that those companies are in good standing in their respective states.

42. The Receiver and his financial staff are also continuing to work on filing all delinquent tax returns, assessing whether taxes are due, and making any necessary payments to taxing authorities.

43. The Receiver's French counsel is in the process of translating this Court's Receivership Order and domesticating that order in the French courts. This is a necessary step in order for the Receiver to sell any of the Company's French assets, including the chateau and

surrounding vineyards that it owns in Cognac, France. Domestication of the Receivership Order is also necessary for the Receiver to exercise control over a bank account maintained by the Company at a French bank; this account is believed to contain a modest amount of funds.

44. The Receiver will continue assessing further budget cuts, and further actions that might be taken in order to increase sales and profitability of the Company. This includes working on cost-saving steps with vendors, and continuing to improve relationships with the Company's distributors.

45. Finally, the Receiver will continue to communicate candidly and transparently with all constituents of the Company, including vendors, creditors, employees, and shareholders. He believes that open and honest communications throughout this process will likely lead to more positive outcomes.

46. The Receiver believes that the goals and objectives of this receivership, as established by the Receivership Order and as explained in this report, can be achieved by the conclusion of the first quarter of 2026. While this schedule is somewhat aggressive, the positive outlook for this company's future makes this an achievable goal in the Receiver's opinion. He believes that it is in the best interest of the Company, its creditors, and its shareholders to not linger in receivership, due to the business interruption caused thereby.

*FINANCIAL REPORT*

47. In accordance with the Receivership Order, the following financial information is provided for the reporting period. Actual results are presented against the original operating budget to provide transparency into performance.

48. **Professional Fees Paid**

| Firm Name | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Thompson Burton PLLC | 164,690 | 240,000 | (75,310) |
| Newpoint Advisors Corporation | 155,795 | 180,000 | (24,205) |
| Thoroughbred Spirits Group, LLC | 84,885 | 168,000 | (83,115) |
| TOTAL | 405,370 | 588,000 | (182,630) |

49. **Collections Received**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Collections | 1,451,747 | 1,469,966 | (18,219) |
| Farm Credit Mid-America, PCA | 1,700,000 | 0 | 1,700,000 |
| TOTAL | 3,151,747 | 1,469,966 | 1,681,781 |

50. **Expenditures**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Disbursements | 2,081,796 | 2,618,546 | (536,750) |
| Professional Service Expenses | 405,370 | 588,000 | (182,630) |
| TOTAL | 2,487,166 | 3,206,546 | (719,380) |

51. The Company and its senior lender, Farm Credit, have access to the full details supporting the above figures.

**Banking & Disbursement Controls**

52. Immediately following his appointment, the Receiver took steps to secure all existing bank accounts associated with the Company. This included freezing accounts where appropriate and establishing new Receiver-controlled accounts to ensure that all future transactions are properly monitored and documented. By shifting all financial activity into Receiver-controlled accounts, the risk of unauthorized transfers or unapproved expenditures has been significantly reduced.

53. The Receiver has instituted a policy that all significant disbursements must receive explicit approval from the Receiver before release. This control mechanism ensures that cash outflows align with the cash flow budget and that only necessary and authorized expenses are incurred. To reinforce this control, weekly reconciliations are performed for all bank accounts. These reconciliations serve to verify accuracy, detect any discrepancies, and confirm that no unauthorized transactions have taken place.

**Cash Flow Budgeting & Variance Review**

54. A rolling 13-week cash flow budget has been developed and is updated weekly to reflect the Company's most current operating realities. This budget is reconciled against actual collections and disbursements every week. Any variances greater than 10% between budgeted and actual results are promptly identified, documented, and explained.

55. As part of the secured lender forbearance agreement, the Receiver is required to submit comprehensive bi-weekly reporting packages to Farm Credit, the Company's secured lender. These packages contain detailed variance analyses, operational expense tracking, and updated sales forecasts. By providing this level of detail, the secured lender can closely monitor performance against established targets and evaluate ongoing compliance with the terms of the forbearance agreement.

56. This enhanced reporting process strengthens transparency and accountability, ensuring that stakeholders have timely and accurate insight into the Company's financial position, operational performance, and near-term prospects.

**Payroll & Taxes**

57. The payroll process has been stabilized under the administration of the Company's professional employer organization, Genesis Global. At the time of the appointment, the Receiver identified that the PEO account was underfunded, jeopardizing employee pay continuity. This issue has since been corrected, ensuring that payroll obligations are consistently met.

58. The Receiver has completed an initial review of payroll taxes, excise taxes, business taxes, and property taxes. Several potential liabilities have been identified, and these obligations have been incorporated into the cash flow budget for planning purposes. The Receiver is currently working with appropriate tax authorities and external advisors to address all issues.

59. In addition, the Receiver is conducting an ongoing review of state-level excise and sales tax compliance. Preliminary findings indicate that Tennessee and New Jersey may have material exposure due to incomplete reporting and unpaid obligations. These issues will be prioritized in subsequent reporting periods. The Receiver may be filing a motion in the future seeking approval to pay taxes as a priority expense.

**Vendor & Operational Continuity**

60. The Receiver has established direct lines of communication with key vendors, logistics providers, and employees to maintain uninterrupted operations. This outreach has helped secure the cooperation of critical partners and mitigate risks to the supply chain.

61. All vendor notices are now being directed to the Receiver. This process has revealed several previously unidentified liabilities that were not adequately disclosed in the Company's records. The Receiver has also secured and begun reviewing critical business documents, including supply chain agreements, bottling contracts, and marketing obligations. These reviews aim to identify operational risks and financial commitments that could have a material impact on cash flow.

62. An initial review of inventory storage agreements and bailment warehouse contracts is underway. This is necessary to confirm lien positions, assess obligations, and evaluate any potential risks associated with warehouse-held inventory. The Receiver may be filing a motion in the future seeking approval to pay warehouseman's liens as a priority expense.

**Financial and Accounting Observations**

63. The Receiver has determined that the Company's accounting records cannot be relied upon for accurate financial reporting. Key deficiencies identified include:

- Non-reconciled balances create uncertainty about the accuracy of financial statements.

- Unusual accounting entries are lacking proper documentation.
- Improper revenue recognition practices may inflate the Company's perceived financial performance.

64. The Receiver has also identified related-party transactions involving Grant Sydney, Inc. and Quill and Cask Owner, LLC, both insider entities. These transactions require further review of external records and supporting documentation, since these were not arms-length transactions.

65. Overall, cash resources remain limited, necessitating tight cash management and prioritization of critical expenses.

**Stakeholder Communications**

66. The Receiver will continue to provide bi-weekly reporting to Farm Credit, including detailed variance reports, expense reviews, and sales forecasts. Regular updates will also be provided to the Court and other key stakeholders. Direct engagement with vendors, customers, and employees will continue to maintain operational stability and foster transparency.

**Asset Recovery & Preservation of Value**

67. The Receiver will continue to secure and monitor the Company's cash, accounts receivable, inventory, leased equipment, and other assets. To ensure accurate reporting and valuation, updated inventory counts and appraisals will be commissioned as necessary. Bailment warehouse records are being reviewed to confirm lien positions and ensure obligations are properly disclosed and managed.

**Cash Management**

68. The Receiver will continue rigorous oversight of all disbursements, requiring prior approval for significant expenses. Bank accounts will be reconciled on a daily and weekly basis to

ensure the integrity of records and detect irregularities promptly. Forward-looking projections will continue to be refined and stress-tested to account for potential sales fluctuations, ensuring that the Company remains prepared for varying operational outcomes.

**Investigation & Forensic Review**

69. The Receiver will expand his review of historical financial records to uncover any irregularities or potential recovery opportunities. Special focus will be placed on officer and insider compensation and/or expenditures, unusual financial transactions conducted by a former employee, and the identification of potential avoidable transfers.

70. Tax advisors will be engaged to quantify exposures associated with any unfiled federal and state income tax returns. The Receiver will also evaluate potential claims or causes of action that could be pursued for the benefit of creditors, with a focus on maximizing recovery and ensuring equitable treatment of all stakeholders.

**Conclusion**

71. The Receiver has implemented robust controls to stabilize operations, enhance transparency, and identify key risks. Substantial challenges remain, particularly in areas such as tax compliance, accounts payable, and related-party transactions. The Receiver will continue to prioritize transparency, creditor protection, and preservation of value while working closely with all stakeholders to achieve the best possible outcome for the estate.

<u>*CONCLUSIONS, RECOMMENDATIONS AND REQUESTS*</u>

72. The Receiver believes that this receivership is progressing smoothly and that the opportunity for the Company's successful emergence from receivership is very good. While challenges lie ahead, the outlook is positive. The Receiver hopes to present the Court with motions to sell non-essential, non-income producing assets over the next quarter, with plans to conclude

this receivership in the following quarter via a total refinancing of the Company's debt or a sale of the Company as a going concern.

Dated this 1st day of October, 2025.

Respectfully submitted,

/s/ Justin T. Campbell
Justin T. Campbell
Thompson Burton PLLC
1801 West End Avenue, Suite 1550
Nashville, Tennessee 37203
(615) 465-6015 (phone)
justin@thompsonburton.com

Counsel for the Receiver

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served on all parties having made an appearance herein, via the Court's CM/ECF system.

This 1st day of October, 2025.

/s/ Justin T. Campbell.
Justin T. Campbell