IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

------------------------------------------------------------

FARM CREDIT MID-AMERICA, PCA, :
                               :
          Plaintiff,           :
                               :
vs.                            :  Case No. 4:25-CV-38
                               :
UNCLE NEAREST, INC., ET AL.,   :
                               :  February 9, 2026
          Defendants.          :  Knoxville, Tennessee
                               :  10:00 a.m.

------------------------------------------------------------

MOTION FOR RECONSIDERATION AND MOTION TO CLARIFY
BEFORE THE HONORABLE CHARLES E. ATCHLEY, JR.
UNITED STATES DISTRICT JUDGE

APPEARANCES:

     ON BEHALF OF THE PLAINTIFF:

     DEMETRA LIGGINS
     McGuire Woods
     Texas Tower
     845 Texas Avenue, Suite 2400
     Houston, Texas   77002

     MARY A. SHIPLEY
     McGuire Woods, LLP
     Restructuring & Insolvency
     77 West Wacker Drive, Suite 4100
     Chicago, Illinois   60601

     ERIKA R. BARNES
     Stites & Harbison, PLLC
     SunTrust Plaza
     401 Commerce Street, Suite 800
     Nashville, Tennessee   37219

REPORTED BY:
Aaron H. LaDuke, RMR, CRR
United States Courthouse
900 Georgia Avenue
Chattanooga, Tennessee   37402

ON BEHALF OF THE DEFENDANTS:

MICHAEL E. COLLINS
SAMUEL MARC BUCHMAN
Manier & Herod
1201 Demonbreun Street, Suite 900
Nashville, Tennessee   37203

ON BEHALF OF THE RECEIVER:

PHILLIP G. YOUNG, JR.
JUSTIN TIMOTHY CAMPBELL
Thompson Burton, PLLC
6100 Tower Circle, Suite 200
Franklin, Tennessee   37067

— — —

INDEX OF PROCEEDINGS

PHILLIP G. YOUNG, JR.

Cross Examination by Mr. Collins...........................19
Cross Examination by Ms. Liggins...........................94
Redirect Examination by Mr. Campbell......................103
Recross Examination by Mr. Collins........................105

KATHARINE JERKENS

Direct Examination by Mr. Collins.........................108
Cross Examination by Ms. Liggins..........................138
Redirect Examination by Mr. Collins.......................144

DANIEL ROMANO

Direct Examination by Mr. Collins.........................147

ANTHONY SEVERINI

Direct Examination by Mr. Collins.........................158
Cross Examination by Mr. Campbell.........................165
Cross Examination by Ms. Liggins..........................165

DAVID OZGO

Direct Examination by Mr. Collins.........................169
Cross Examination by Mr. Campbell.........................176
Cross Examination by Ms. Liggins..........................178

KEVIN LARIN

Cross Examination by Mr. Collins..........................181
Cross Examination by Ms. Liggins..........................223
Redirect Examination by Mr. Campbell......................224
Recross Examination by Mr. Collins........................226
Recross Examination by Ms. Liggins........................230

FAWN WEAVER

Direct Examination by Mr. Collins.........................233
Cross Examination by Ms. Liggins..........................247

_ _ _

(Proceedings commenced at 10:00 a.m.)

THE COURTROOM DEPUTY: We're here for a motion hearing in Civil Action 4:25-CV-38, Farm Credit Mid-America versus Uncle Nearest, et al.

THE COURT: All right. Would counsel please make appearances for the record.

MR. COLLINS: Good morning, Your Honor. Michael Collins, Manier & Herod, along with my co-counsel, Marc Buchman. We're here on behalf of Grant Sidney, Inc., Fawn Weaver, Keith Weaver, and I won't name all the nonparties, but all the nonparties as well to the matter.

THE COURT: All right. Thank you.

MR. CAMPBELL: Good morning, Your Honor. Justin Campbell here on behalf of Phillip Young, the receiver. Mr. Young is here as well.

THE COURT: Okay. Thank you.

MS. BARNES: Good morning, Your Honor. Erika Barnes of Stites & Harbison, along with Demetra Liggins and Alexandra Shipley of McGuire Woods, on behalf of Farm Credit Mid-America, PCA.

THE COURT: Okay. Thank you.

All right. Welcome, everyone. We're here on these two motion hearings. I understand from the filings that this is going to be an evidentiary hearing; in other words, you would like the Court to hear some testimony.

Does either party wish to invoke the rule?

MR. COLLINS:  No, Your Honor.

MR. CAMPBELL:  No, Your Honor.

MS. LIGGINS:  No, Your Honor.

THE COURT:  All right.  So then witnesses may remain in the courtroom while other witnesses are testifying.

Okay.  Firstly, it's also my understanding that there are some stipulations for the record.  Would you like to go ahead and enter those into the record?  And then we'll proceed after that.

MS. LIGGINS:  Good morning, Your Honor.  Demetra Liggins on behalf of FCMA.

Yes, we did work on a stipulation.  There was a declaration filed by Phillip Young, or an affidavit.  It will come in as direct testimony.  There is a declaration filed by -- a declaration of Brian Klatt on behalf of Farm Credit in support of both motions.  It will come in as direct testimony.  That's Docket 130.  And then there is a declaration of Kevin Larin, which is Docket 131.  It will also come in as direct testimony.

We also reached some agreements on exhibits.  The receiver's exhibits are A through C and then E through F are admitted.  Farm Credit's exhibits are 1 through 10, 12 through 15, 16 through 20, 22 through 32.

And I would not -- I don't remember your exact list that

we have.

MR. COLLINS: I'm sorry?

MS. LIGGINS: Your list of exhibits, your numbers.

MR. COLLINS: Your Honor, we can file the stipulation proposed. We do have an agreement on them, and as they come in, we'll -- if that's acceptable to Your Honor.

THE COURT: Sure, yeah.

MS. LIGGINS: But I think we agreed to certain of your exhibits up front, right?

MR. COLLINS: You did. That's what --

MS. LIGGINS: Okay.

MR. COLLINS: Yeah. I'm just saying that we're in agreement, and we can file that once -- as opposed to wasting the Court's time.

MS. LIGGINS: Okay. So at this time, I would actually move to admit FCMA's Exhibits 1 through 10, 12 through 16, 20, and 22 through 32.

THE COURT: All right. So ordered without objection.

All right. Anything else preliminarily?

Mr. Campbell.

MR. CAMPBELL: Your Honor, Justin Campbell on behalf of the receiver. I'll just go ahead and admit the ones that I know that we're going to let in. It's A through C and E through F on our list. The first, of course, is the affidavit of Phillip Young. I'm going to offer that as direct

testimony, his direct testimony, and I think we've all agreed to that.

THE COURT:  All right.

MR. CAMPBELL:  Just for the record.

THE COURT:  All right.  So ordered.

Ms. Norwood, are you getting all that down?

THE COURTROOM DEPUTY:  Yes, sir.

THE COURT:  All right.  Thank you.

Anything else?

MR. COLLINS:  No, Your Honor.  We had a draft of a stipulation, but I actually don't have mine.

I think that listed our exhibits that you guys were agreeing to.

MS. SHIPLEY:  I have a copy.

MR. COLLINS:  That would be great if -- we might as well --

MS. SHIPLEY:  Do you need it displayed?

MR. COLLINS:  -- since we're all making this happen right now.

MS. BARNES:  We'll display it.

MS. LIGGINS:  We'll display it.

MR. COLLINS:  Okay.  Perfect.

THE COURT:  All right.  Are we ready to proceed?

MR. COLLINS:  I think so, Your Honor.

THE COURT:  Okay.  How do you-all want to proceed?  I

don't have a preference. So however you think will be the easiest to understand and the most streamlined, I'll be happy to do that since this is just a motion hearing.

MR. COLLINS: I think that -- I think -- and I'll not -- speaking for myself, I guess, and hopefully for them, but I think we talked about having like a brief opening statement, and then -- and then we would go first with our direct.

THE COURT: Proof. Okay.

MR. CAMPBELL: That's fine with us, Your Honor.

THE COURT: Okay. All right. Please proceed.

MR. COLLINS: Good morning again, Your Honor. Michael Collins of Manier & Herod on behalf of the named parties that I just mentioned a moment ago, specifically Grant Sidney and the Weavers in this, with regard to the motion to reconsider.

Before the Court is this motion to reconsider, and with respect to it, Your Honor has seen a lot of, a lot of affidavits and filings. One thing that Your Honor will note is there's been, like, an endless stream of insinuations and allegations.

For example, in the receiver's affidavit, he has 70 paragraphs of allegations and five exhibits. Most of the allegations are just simply not supported by evidence. And so it's -- you know, it sounds like the receiver is just

confident that this Court is going to take his word without actually him having to present evidence to support it. And that's troubling for us, and that's what this hearing is about, is trying to get through that smoke screen and actually see what the real evidence is so the Court can make a decision that really impacts a company that went from zero to a top 30 whiskey brand in a matter of eight years.

You know, this is a company that the growth is third-party demonstrated, right? Their Nielsen number, the numbers, in terms of case sales, are not the company's numbers. They are industry numbers that are verifiable. So no one can dispute that this company did amazing things in this industry, and we'll have testimony to support that amazing growth.

So at the outset, this idea and this picture that's being painted, that this company was a shamble when the receiver took over, is simply not the case. It has issues, Your Honor, no question. No question it has issues, but this is a company that had solid bones and has solid bones, and it doesn't need to be liquidated within a fire sale process.

You know, we're going to talk about the receiver's skill set that he brings to this table. And I've known the receiver for many years. I respect him completely. You know, we're friends. So I don't do this lightly, but I do receivership and trustee work myself. I've done it for 30 years. I've been the receiver or Chapter 11 trustee for over 30 companies

in the past 25 years. What I did before I became a trustee, I got a law degree. I worked for the Department of Justice, in the bankruptcy group. I went back and got an MBA. I became a certified insolvency and restructuring advisor. I worked for PricewaterhouseCoopers, in their financial restructuring group, for a number of years.

I took a lot of actions really solely with the goal to be a receiver and be a trustee because it takes -- it is not an easy job. I mean, it is very difficult and it takes a lot of skill set to do it correctly. And that's -- I think the receiver's skill set is something different, and I think that's being reflected in how this case goes, and that's what we'll try to --

THE COURT: Mr. Collins, this is the receiver you wanted.

MR. COLLINS: Your Honor, companies across the globe hire people every day, and people get fired every day.

THE COURT: I mean, there were three choices. One of them was Uncle Nearest's choice, and the Court chose Uncle Nearest's choice for a lot of reasons, all put forth in the Court's order. But one of them was that, you know, you would think that the one you selected would be the easiest one to work with.

MR. COLLINS: You're right, Your Honor. And decisions like that get made every day in companies around the

world, in terms of who they select as their CEO, who they select, and CEOs get fired and get replaced. I mean, that's just the nature of it. You don't know until you know. And you look at -- I think, you know, the prior counsel that went this route, I'm sure they felt, and, frankly, I think Mr. Young feels like he's the right choice for this company.

My job, in evaluating this and evaluating it for -- and putting this evidence to Your Honor is to let Your Honor decide whether it's the right choice or not, and now we have the benefit of hindsight to work through that. So I don't dispute that he is our guy. He was our guy. We just don't think that right now he's the right guy.

THE COURT: Please proceed.

MR. COLLINS: And then, you know, so what I also want to ask the Court to do is focus on what's here and now. You know, there's probably going to be evidence -- we know the Klatt affidavit talks about things that happened prior. Most of the things that happened prior were made known by an internal investigation to the bank back in October of 2024. The bank took about eight months, knowing all of this information, without seeking a receiver, without seeking an emergency motion. They agreed to the operation of this company, knowing all of that for eight months. They entered into a forbearance agreement, knowing that information.

So, you know, the idea that, you know, all of that

historical information is relevant today is smoke screen. And so I would ask the Court again to -- you know, let's not focus on, you know, what's going to be argued in the underlying litigation. This is about a receivership and whether a receivership is necessary.

And I think the relevant issues are, you know, what's the fair value of the company's assets? Is the -- are those assets adequate to cover the collateral or the claim of Farm Credit? Is the company able to cash flow from its current operations? Is there any malfeasance or fraud by current management? Is the receivership causing more harm than good? And can the company's management team reverse what Your Honor is going to see is in a severe downward sales trend, that has happened literally almost to the day of the receivership is when that downward trend began.

We're going to, you know, prove, we're going to prove that value is there, no evidence of fraud, receivership is causing extreme losses, and existing management is best positioned, and we're going to do it by relying on industry data on value. We're going to use the receiver's own financial reports and projections to show that the twist they're putting on them isn't correct.

We're going to have testimony from industry veterans. Danny Romano, who is an executive of a major U.S. spirit distributor, is here to testify. David Ozgo is the former

chief economist for the Distilled Spirits Council of the U.S., a trade association representing 70 percent of all distilled spirit brands sold in the U.S. He's here to testify. They're going to testify as to the importance of this management team, based on their knowledge of the industry, to the success of this company.

We're also going to provide evidence from a former president of J.B. Thome, which is the highest volume whiskey broker in the U.S. since 1977, regarding the state of the market for barreled Tennessee whiskey, and he's going to indicate the value of barreled Tennessee whiskey remains stable because Tennessee whiskey has a smaller footprint than Kentucky. So looking at Stoli isn't relevant. Stoli is a Kentucky bourbon. There is a glut of Kentucky bourbon. Because there are fewer Tennessee whiskey distillers, there is not as much of a glut. So that -- his evidence will show that that has stabilized and that they're anticipating a growth in the value of Tennessee whiskey moving forward.

Again, we'll talk about the Nielsen numbers and how the retail sales have begun a massive decline since the receivership. We're going to show that the fire sale process that the receiver is undertaking is exacerbating the decline and is only literally going to result in disaster by trying to sell in a down market, in a receivership, in a fire sale, a company that had 41 million of sales. We'll show you the

multiples that have been paid recently for companies that are on the upside, that are growing, and that there's no basis to try to sell it the way that they're trying to sell it.

You know, I know the Court -- we're going to try to move this as quickly along, but we're going to try to address the receiver's allegations, you know, effectively, paragraph by paragraph, and do it as quickly as we can. But it's all -- if Your Honor believes I'm moving in a direction that's irrelevant for Your Honor, please let me know and I'll move on. But I think everything in the receiver's affidavit, he believes it's relevant, and so I think it's necessary for me to try to rebut it.

And then -- and we're going to -- you know, we've got, you know, the receiver, in his affidavit -- you know, the difficulty of pursuing a lot of allegations that we believe are incorrect and not supported by facts is that when you have so many of them, it becomes hard to pick which ones are going to be the most important and which ones aren't.

Two that I think the Court should consider in terms of just the scope of this case, Your Honor has seen the motion to clarify. Your Honor has seen what evidence is in the affidavit to support the motion to clarify. It's an aggregation. He's just simply aggregated a bunch of transactions and said, look, there are so many transactions here, it's got to be commingling. That's kind of the approach

that the receiver has taken to this case. He hasn't dug into any details. He just makes allegations and wants this Court to kind of go, okay, well, you know, whatever.

The number of transactions doesn't prove commingling if the substance of the transactions have business purpose. So you can't just aggregate things. But that's his approach to this is just simply not digging in and doing the work before he makes the allegation. He makes the allegation and then hopes that Your Honor gives him the latitude then to do the work.

That's kind of this approach. And that kind of goes with the allegations he's made against Kate Jerkens. So he -- and this will come up in the testimony. In his affidavit, he accuses an employee, literally the first employee that was ever employed -- so she's been with the company since the start. She does their forecasting. He accused her, in a public pleading, of conspiring with Fawn Weaver to boost up the projections. They're projections, Your Honor. They don't even have much meaning other than internal workings.

But he put that in a pleading. It doesn't appear that he investigated it because, frankly, the projections she made ended up being below. He said she was pumping them up. They ended up being below what the company actually did. So it's those types of things that evidence kind of a broad approach to this that has been difficult for us to deal with, and I

think it's problematic for the company moving forward.

So, again, we ask the Court to just keep an open mind on this. You've seen a lot of -- we haven't -- just because we've been drinking from a fire hose, literally, for the last week or two weeks, we couldn't put in 70, you know, 50-page affidavits, and we just didn't have the ability to get that done. So we're going to -- we're stuck here with trying to get evidence in.

THE COURT: You're not stuck, but, you know --

MR. COLLINS: But that's the practical difficulty that we've had.

THE COURT: Mr. Collins, you're going to be heard.

MR. COLLINS: Okay.

THE COURT: You know, you're going to be heard, but let's get to it.

MR. COLLINS: Yeah. Thank you, Your Honor.

THE COURT: All right. Mr. Campbell, let's see, on your behalf, and then I'll hear from Farm Credit after that.

MR. CAMPBELL: Thank you, Your Honor. Again, Justin Campbell. I have just a very short couple of comments to make as an opening, and then I'm happy to step aside and let everybody get started.

The couple of things that I want to point out to the Court is there's two things before the docket today. There is a motion to reconsider the receivership order and the

receiver's motion for clarification. What's not before the Court today is a motion to remove the receiver. Also what's not before the Court today is a motion to sell any of the property here.

So I know we're conflating this, I know it's going to get bigger than it probably needs to, but I want the Court to understand there's only two things before the Court today, and that's the motion for our clarification and the motion to reconsider the Court's own receivership order.

So with that, that's all I have.

THE COURT: Okay. Thank you.

Farm Credit.

MS. LIGGINS: Thank you, Your Honor. Like Mr. Campbell, I'll be super brief. I also wanted to agree that there's only two motions before the Court. It's the clarification motion filed by the receiver and a reconsideration motion filed by what I'm going to call the Weaver parties. And I know the cast of characters are different because it's a little bit different on a reconsideration motion. Usually it's everybody coming back. Unfortunately, with the change in counsel, Mr. Collins wasn't at the last hearing. Mr. Young wasn't at the last hearing. Only FCMA and the Court were at the last hearing, and the cast of characters has changed, but the facts haven't. And on a motion for reconsideration, you don't retry a hearing; you

need to show a change in circumstances, and the Court said that in their order.

And so we just want to remind the Court that we are here on an interlocutory order that's being moved for reconsideration, and they need to demonstrate and show that there's been a change in circumstances. But we're not here to retry the reconsideration -- I mean the receivership hearing all over again.

THE COURT: All right. Thank you.

All right. Thank you.

Mr. Collins, are you ready to go to proof?

MR. COLLINS: I am, Your Honor.

THE COURT: All right.

MR. COLLINS: Call Phillip Young.

THE COURT: Call your first witness.

And I assume this is for cross-examination, since what his --

MR. COLLINS: Pretty much, because I don't know that we're going to tread any new water than what --

THE COURT: But I'll certainly give you some latitude.

MR. COLLINS: Thank you, Your Honor.

THE COURT: All right. Come on around, sir.

THE COURTROOM DEPUTY: Do you solemnly swear your testimony will be the truth, the whole truth, and nothing but

the truth, so help you God?

THE WITNESS:  I do.

THE COURT:  All right.  Thank you.

THE COURTROOM DEPUTY:  If you would please scoot up to those two microphones.  Please state and spell your name for the record.

THE WITNESS:  Phillip Gary Young, Jr., P-H-I-L-L-I-P, and the last name is Y-O-U-N-G.

THE COURT:  Whenever you're ready, Mr. Collins.

PHILLIP G. YOUNG, JR.,

having been first duly sworn, was examined and testified as follows:

CROSS EXAMINATION

BY MR. COLLINS:

Q   Good morning, Mr. Young.

A   Good morning, Mr. Collins.

Q   So I'm just going to -- I'm not going to get into your background.  That's all in your thing.  We may talk about it a little bit later, but -- so you were appointed receiver in this case on August 22nd, 2025, correct?

A   That sounds right.

Q   And you filed a motion for clarification on September 12th, 2025, correct?

A   I did.

Q   And that was about 21 days after you were appointed,

approximately?

A    That sounds about right.

Q    And actually let me -- prior to the motion to clarify, had you made any request for copies of bank statements from any of those companies?

A    Not that I can recall.

Q    Okay.  So when you filed the motion for clarification, you hadn't done any investigation of those companies other than finding the transactions in the Uncle Nearest records?

A    Right.  Obviously, there was a reason that those -- I didn't pull those names out of thin air, so those names kept coming up in the Uncle Nearest records.

Q    Okay.  Did you seek any explanation of any of those transactions relating to the additional entities?

A    At that time, no.

Q    Okay.  Had you -- did you seek any depositions from any of those entities?

A    No.

Q    No.  And in the motion for clarification, you actually didn't even take a position as to whether they should be part of the receivership, correct?

A    That's correct.

Q    Okay.  I have a bunch of questions.  I'm going to skip to my questions.  Because of time, instead of going through the documents, we'll skip directly to questions relating to

your -- to the motion to reconsider.

So your affidavit consists of 25 pages of factual assertions and also incorporates your second quarterly report, correct?

A    Let me clarify something, Mr. Collins.  There are some factual assertions, and then there are some opinions.

Q    Okay.

A    But, yes, it incorporates -- if your question is does it incorporate the second operating report, the answer is yes.

MR. COLLINS:  Okay.  So we're going to -- I tell you what.  If we can pull up the affidavit, please, that would be easiest to --

THE COURT:  What exhibit number is it?

MR. COLLINS:  That, it would be Mr. Young's exhibit.  Well, it's the affidavit they filed.  I'm not exactly sure how that comes up as an exhibit.

THE COURT:  I don't know what your exhibit numbers are, so you're going --

MR. COLLINS:  Well, it's not my -- it's actually, I'm kind of crossing him on his testimony.  So his affidavit, it's the exhibit to his affidavit.

Well, the affidavit, actually.  I'm sorry.  Okay.  If you scroll down to paragraph 26.

BY MR. COLLINS:

Q    So paragraph 26 of your affidavit, you state that because

of -- and I think it's the top of page 11.  You say that "Because of substantial budget cuts I have made to the Company's operations, its monthly losses have been reduced from approximately $1 million per month to approximately $100,000 per month."

Do you see that?

A    I do.

Q    Okay.  And then you restated that again at paragraph 48.

If you could scroll down to 48, please.  Make sure I've got that right.

A    I don't think it's in 48, but I know that I restated it.

Q    Yeah.  It may be 40 -- 40 -- look at 49 there.

Okay.  Well, you restate it there, and then I think you restate it again at the end of the document.  I think it's paragraph 70.

A    Looks like it's in 46.

Q    46.  And then you restate that again in paragraph 70.  Hopefully I got that one right.  Yeah.  So it's in the final paragraph.  Again, you say 1 million per month to an average of 100,000 per month, right?

A    Right.

MR. COLLINS:  So if you can pull up Exhibit 5 to the Young affidavit.

BY MR. COLLINS:

Q    And then so what is Exhibit 5?  Can you -- if we can get

it to the front there.  Can you describe what Exhibit 5 is?

A    It's an income statement.  And I'll go ahead and say, as I mentioned in the affidavit, certain of this information comes from company data and certain of this information was data that we produced as part of the receivership.  So, as I said in the affidavit, I think it's somewhat limited in its reliability, but in the pleadings you asked for this document, and so I provided this document.

Q    In terms of the -- in terms of your statement that you reduced the company expenses by 100,000 -- or by $900,000 per month, what was that based on?  Because I believe -- let me ask you, what was that based on?

A    Yeah.  And I'm glad you brought this up, because there is a slight clarification, okay?  In one place I say 350, and in one place I say 100 are the operating losses since I've been involved, and I would like to explain that because I'm not sure it was entirely clear.

Q    Well, we'll do that on redirect.

A    Okay.  That's fine.  What's your question?

Q    So the question is, what did you -- when you indicated that you had reduced monthly operating expenses by $900,000, what was that based on?

A    I think, I think the statement was we've reduced losses from a million dollars a month to $100,000 a month.

Q    Okay.

A    And looking at the company records prior to the receivership, it was losing about a million dollars a month. And that is simply just, you know, a revenue minus cost analysis. And looking at the same revenue minus cost since the receivership, putting aside a $1 million initial input that had to be made in order to catch a number of things up, revenue minus cost averaged out to be about a $100,000-a-month loss.

Q    So did you increase revenue?

A    No.

Q    You haven't increased revenue. So in order to get $900,000 of less loss, that means you must have -- that whole amount must have come from a decrease in expenses?

A    Correct.

Q    Okay. So you are saying that you decreased expenses for the company by $900,000 per month?

A    Right.

Q    Okay. So let's look at --

A    Well, it's actually more than 900,000 because revenues have decreased and expenses have decreased by more than revenues have decreased.

Q    Okay. Very good. So let's look at the income statement, and let's look at the -- let's see. So you see at the bottom there's a line titled "Total Expense"?

A    I do.

Q    Okay.  So the receivership began in the third quarter of 2025, correct?

A    Toward the end of the third quarter, I believe.

Q    Right.  So the fourth quarter is where most of the reduction in expenses occurred, correct?

A    That's right.

Q    Okay.  So if we look at -- so in the fourth quarter, when all of your cuts were reflected, the total quarterly expense number, what is that number?

A    Looks like it's 4.2 million.

Q    Correct.  And in terms of operating expenses, what is that total number?  It's the one right above it.

A    3.4 million.

Q    Okay.  And in terms of the -- so if we look at operating expenses, the difference between -- let's see.  So the total, the total quarterly expense number for Q2 is, for operating expenses, is 3.947, correct?

A    3.9 for operating expenses, 6.5 for total expense.

Q    Okay.  And the difference there is about 482,000, correct?

A    The difference where?

Q    Between the 3.947 and the 3.465.

A    Just in operating expense, yes.

Q    Correct.

A    Right.

Q    And then the difference between the total expense line of 4.2, and that was in Q4, and the total expense line in Q3 is what?  5.3 to 4.2 is what number?  How much is that?

A    Just about 1.1 million.  And again I'll remind you, I can't verify anything before August 21st.

Q    But you relied on that for your $900,000, correct?  I mean, you had to rely on something for the $900,000.

A    I think we looked at actual expenses, not what was reported expenses.

Q    Well, so you prepared a financial statement that didn't look at actual -- this is your -- this is prepared by you, correct?

A    Right.  No.  Again, as indicated in the affidavit, this was prepared -- anything prior to the receivership was prepared by the company.

Q    Right.  But you indicated that you cut $900,000.  You had to base it on something prior, right?

A    Actual expenses, not reported expenses.

Q    But you prepared a -- why would you prepare a financial -- if you knew what the actual expenses were, why would you prepare a financial statement that wasn't based on numbers you knew were accurate?

A    We're working on reconciling this, but the reconciliation of this company's finances takes quite some time.

Q    Okay.  Well, so you're basically saying that you really

can't verify whether you reduced this by 900,000?

A    No.  I'm telling you, I'm telling you we can verify that we -- I'm telling you that I can't verify these numbers that you're showing me for Q1, Q2, Q3.  I can for Q4.

Q    So how -- so basically you haven't provided any evidence that actually shows a reduction of expenses?

A    Mr. Collins, I'm not trying to bring -- I'm not trying to prove anything.  I'm trying to do what the Court's asked me to do, and I'm trying to report to the Court my facts and my opinions based on those facts.  I'm not trying to drive any outcome here.

Q    Okay.  Well, let's just presume that the Q3 numbers are -- that you've reported in this financial statement and you attached to your affidavit, let's presume they're correct for purposes of this discussion, right?  And so you've indicated there's about a 1.1 million difference between the expenses between Q3 and Q4, correct?

A    Assuming those numbers are correct.

Q    Assuming they're correct.  Okay.  And then a quarter is three months, is it not?

A    That's correct.

Q    Okay.  So if we base that -- if we assume that then, that that 1.1 is divided by 3, you know, what's that number?

A    It's about 300,000.  But I'll point out that I was operating this about half of Q3.

Q    Correct.  But you were operating it fully in Q4?

A    That's right.

Q    Right.

A    Right.

Q    And so you said you reduced operating expenses by $900,000 -- you said it three times -- per month?

A    Right.

Q    This would show that, at best, it was $300,000 per month?

A    I disagree.

Q    Okay.  Well, you disagree that the analysis we just went through doesn't -- wouldn't indicate 300,000?

A    If these numbers -- assuming these numbers are correct and assuming that I had not operated the company for half of Q3 and so that some of the expenses were already cut in Q3, I would agree with you.  But if you compare Q4 to Q1, I think you'll find a $3.4 million difference, and across three months that's more than a million dollars.

Q    I thought you said you were at the tail end of Q3.  I mean --

A    About midway through.  A month and a half.

Q    You got appointed which date?

A    August 21.

Q    And when did you start implementing cuts?

A    Immediately.

Q    And did they take effect immediately?

A    No, of course not.

Q    Yeah.  So when do you think those cuts took effect?

A    Early September.

Q    You believe that you made cuts in -- you got appointed on August 22nd.  You made cuts as quickly thereafter as you could, and those cuts actually impacted the financial statements immediately?

A    Not, not the complete impact.  But did they begin impacting?  Yes, they did.

Q    So maybe, maybe half a month of Quarter 3 got an impact?

A    I don't know, Mr. Collins.  I'm not sure.

Q    Okay.  But, I mean, you realize that you can't make cuts that impact immediately?

A    Right, of course not.

Q    So based on these numbers, at best, you had a $300,000 benefit in terms of revenue or in terms of reducing losses?

A    I understand the point you're trying to make, and I disagree with it, and I think I've explained why I disagree with your assumptions.

Q    And I'm trying to understand --

A    Your math is correct, but your basis is faulty.

Q    Well, explain that.

A    I think I have explained that because, number one, these numbers are not reliable.  Number two, part of Q3 shows cost cuts that I've already implemented.  I think I've already

explained that.

Q   And I'm asking what your basis -- I mean, what numbers are you relying upon to make that determination?

MR. CAMPBELL:  Your Honor, objection, asked and answered.  I mean, I don't know where we're going with this.

MR. COLLINS:  Do you have -- is there just one thing you can point me to?

THE COURT:  Mr. Collins, Mr. Collins, you made your point.

MR. COLLINS:  Okay.

THE COURT:  I understand the point you're trying to make.  Thank you.

MR. COLLINS:  Let's look at the -- pull up my additional exhibit cash flow spreadsheet.

MR. BUCHMAN:  Which exhibit?

MR. COLLINS:  It's actually in the additional, in our rebuttal.

MR. BUCHMAN:  Oh, rebuttal.

MR. COLLINS:  Sorry, Your Honor.  We're trying to figure out the -- yeah.  You can put this up.  Is it on the screen?  Okay.

BY MR. COLLINS:

Q   So this is, this is basically an analysis we did from the Larin affidavit that will -- that's been put into evidence, Exhibit 4.  And this is a summary of what's in his, in his

affidavit. Are you familiar with his affidavit and exhibits?

A    I am not. I've never looked at his affidavit.

Q    Okay. Then we'll actually -- now are you familiar with the Newpoint cash flow -- pull up Movant's Exhibit 5, please. It's our Exhibit 5.

Is this a document you've seen before?

A    It is.

Q    Okay. And then let's go back to the cash flow spreadsheet we just had.

So basically what this cash flow spreadsheet does, at the bottom, is it takes the actual data from that exhibit and basically shows that from that exhibit and basing it on it, the monthly reduction in operating disbursements pre- and post-receivership is a total of $55,000, okay?

A    Okay.

Q    Do you have any reason to dispute what's in the Newpoint cash flow numbers, the actual numbers?

A    Certainly not.

Q    Okay. But you haven't seen the Larin affidavit?

A    I have not.

Q    Okay.

A    I don't know what this includes and what it doesn't include.

Q    Okay. If those numbers on the operating disbursements are correct in terms of what's shown on the Newpoint cash flow

disbursement -- well, we'll move for this into -- I don't think this was in evidence as one of our exhibits.

MS. LIGGINS: Your Honor, we have never seen this exhibit.

MR. COLLINS: This is a rebuttal, yeah. So this is used just to rebut the assertion that the $900,000 loss -- we'll actually get this in during Mr. Larin's -- we'll go through it more deeply with him because he's the one who prepared the report, so --

THE COURT: So you're not moving it into the record now.

MR. COLLINS: We're not going to move it in. I would ask the Court actually to move it into evidence. And one of the things I wanted to talk to the Court about is where we are in the preliminary proceeding. You know, we recognize that this is -- we haven't had time to kind of fully develop the evidence, and the courts typically will be more lenient in terms of allowing matters in because of the compressed time frame.

THE COURT: Well, you've still got to follow the rules of evidence.

MR. COLLINS: Well, this will -- correct, Your Honor. And I think this is ultimately, this is summarized from exhibits that are --

THE COURT: Tell me, what exhibit number is it?

MR. COLLINS: This is -- we premarked it as Exhibit 19. It's not in the exhibit list yet.

But basically, Your Honor, what this is is the Larin affidavit has been admitted, so it's a summary of that data. And, again, I have to get a witness up here to put it in, and we don't have time, and so I'm asking --

THE COURT: Why do you not have time?

MR. COLLINS: Because we have one day to try to get in a lot of evidence.

THE COURT: Okay.

MR. COLLINS: So what I would ask Your Honor is let's -- that because this is just -- and I'll give Your Honor the thing. This is a summary of what's in the Larin affidavit, and we'll --

THE COURT: Have you even shown it to the other side?

MR. COLLINS: No, not yet.

THE COURT: Okay. Why don't you give them a copy, and then we'll come back and address it after they've reviewed it and had an opportunity to comment on it. They might agree with it. I don't know. But you've got to show it to the other side.

MR. COLLINS: Yeah.

THE COURT: I gave you time to submit what you thought your exhibits were.

MR. COLLINS: Your Honor, we had to do that before we

even saw the affidavit.

THE COURT: Okay.

MR. COLLINS: Your Honor, that's a practical problem is we got a 70-page affidavit, and we have had to scramble to put together the analysis of it in order to just be responsive.

THE COURT: This is your motion, Mr. Collins.

MR. COLLINS: I understand, Your Honor.

THE COURT: Okay.

MR. COLLINS: But that's the practical reality. I understand that it's our motion.

THE COURT: Okay. All right.

MR. COLLINS: So we'll move on, Your Honor.

MR. CAMPBELL: We're not moving it in yet?

THE COURT: What?

MR. CAMPBELL: It's not being moved in currently. Did I understand that?

THE COURT: It's not in the record yet.

MR. COLLINS: Yeah, yeah.

THE COURT: But look at it.

MR. CAMPBELL: I will.

THE COURT: And look, take a look at it. If you don't have any heartburn over it, just let me know and let's move on.

MR. CAMPBELL: Understood.

THE COURT:  I mean, fight about what you need to fight about.

MR. CAMPBELL:  Understood.

THE COURT:  Pick your battle.

BY MR. COLLINS:

Q    Who would be the best person, in terms of the data that supports the $900,000 decrease, and who would -- and from your financial team, who would be the best person to speak to that?

A    Probably Tim Stone or Mark Ruday.

Q    Okay.  Let's move to Exhibit 4 and the Young affidavit.

Okay.  Can you describe what this document is?

A    Yeah.  This is something that I asked Newpoint to produce to show the effects.  This one shows the effects if the receivership had never been instituted, the net loss difference.

Q    Okay.  And the original cash flow base model is what exactly?  That's the first line.  You see that?  What exactly is that?

A    I think that shows the actual result from the last four months, and then what it does is adds to that expenses that would have had to have --

Q    Okay.

A    -- would have been incurred but for the receivership. So, for example, Dash Funding MCA Payments, obviously those were stopped as part of the receivership.  So had the

receivership not been implemented, that would have been an extra cost.

Q    And who prepared the base model?

A    Newpoint.

Q    Newpoint.  And do we have -- is that in the record?

A    I don't know.

Q    Okay.  If it isn't in the record, how do we know that that original cash flow number, what it's based on?

A    You can ask -- you can ask Tim Stone.  He's here today.

Q    Okay.  But you don't know what it's based on?

A    No.  I don't get down in the weeds on every single number, Mr. Collins, no.

Q    All right.  But it's in your -- I mean, you've referenced this in your affidavit, so presumably, hopefully you got somewhat in the weeds.

A    I know what this is.  I asked for this chart to be produced, so I know what this is.

Q    But it's not your chart?

A    No, it's not my -- I didn't sit with a calculator. That's for sure.

Q    Okay.  So in the absence of some --

        THE COURT:  Mr. Collins, Mr. Collins, Mr. Collins, we have no idea what exhibit numbers you're referencing.  So, look, you have to reference what's on your list, okay?  And so this is -- let's see.  The clerk says that she doesn't know

exhibit numbers you're referencing compared to the exhibit list.  Is this Exhibit 5 to affidavit?  What is the exhibit number for this hearing?

MR. COLLINS:  And that's part of the -- I'm not sure what the receiver's -- this is one of the receiver's exhibits.

THE COURT:  Look, okay?  Look, you wanted this hearing, okay?  I gave you time to file an exhibit list so we could go through everything quickly and know how to reference it and get it in the record so that it could be thoughtfully considered, all right?  So stick to your exhibit list, and let's move on.

MR. COLLINS:  If Your Honor please, this is actually the -- this is the receiver's exhibit that he had as part of his affidavit.

THE COURT:  Okay.

THE COURTROOM DEPUTY:  What number is that?

MR. COLLINS:  It's --

MR. BUCHMAN:  Your Honor, this is Exhibit 4 to Exhibit A of the receiver's exhibits.

THE COURT:  Okay.  Does that comport with what's on our exhibit list, Ms. Norwood?

MR. COLLINS:  It would be on the receiver's exhibit list.

THE COURT:  Okay.  Whichever exhibit list.  You can reference what's on their list.  We just have to know what

you're talking about.

MR. COLLINS: Understood, Your Honor. I think part of the issue is I'm not sure the receiver broke out his exhibits into individual --

THE COURT: Mr. Collins, that's your responsibility to, you know, kind of know where you're going.

MR. COLLINS: Understood.

THE COURT: You know, it's not the Court's.

MR. COLLINS: We did an amended --

THE COURT: Ms. Norwood, do we know what he's talking about?

THE COURTROOM DEPUTY: Is it A, B, C?

MR. CAMPBELL: It's A.

MR. BUCHMAN: Exhibit A.

THE COURT: I can see why you wanted seven days, Mr. Collins.

MR. COLLINS: Your Honor, understood.

THE COURT: Are we ready, Ms. Norwood?

THE COURTROOM DEPUTY: Yes, sir.

THE COURT: All right. Is it in the record?

THE COURTROOM DEPUTY: Yes, sir.

THE COURT: All right. Let's go.

MR. COLLINS: So go back to Exhibit, Receiver's Exhibit A, subpart 4.

BY MR. COLLINS:

Q     Okay.  So we're on Receiver's Exhibit A, subpart 4.  And do I -- I guess we can just start where we were.

So you don't have any basis to know what yourself, as the receiver sitting here, what the initial original cash flow model that is the start of this chart, what it's based on or --

A     Well, no, except that it does seem to tie to -- as you were flipping through exhibits, it does seem to tie to cash on hand.

Q     Okay.  But you don't know exactly?

A     No.

Q     Okay.

A     No.  I'm sorry.

Q     Okay.

A     And that would make sense.  In looking at the chart, I mean, it makes sense that that's cash on hand because then you back out the receivership funding and things like that and other expenses that would have had to have been paid but for this Court's order.

Q     Okay.  Very good.  Let's move to paragraph 28.

A     Of my affidavit?

Q     Correct.  It's in the same document.

Yeah, scroll it up.

So this is still Receiver's --

MR. BUCHMAN:  Exhibit A.

MR. COLLINS: -- Exhibit A.

MR. BUCHMAN: You said 28?

MR. COLLINS: Yeah, paragraph 28.

BY MR. COLLINS:

Q    In paragraph 28 you indicate that, as part of the exhibit we were just looking at, that Ms. Weaver provided you, provided you operating projections.  Do you see that?

A    Where is that?

Q    It's in paragraph 28.  Are we in paragraph 28?

A    Are you talking about where I say -- I think it's at the bottom here -- "For the benefit of the doubt, this even assumes that sales during this time would increase" --

Q    Correct.

A    -- "by $1.8 million based on Fawn Weaver's revenue projections."

Q    So did Fawn Weaver actually provide you revenue projections?

A    Or Kate Jerkens.

Q    So are you conflating Kate Jerkens and Fawn Weaver?

A    Perhaps.

Q    So it really wasn't Fawn Weaver that gave you these projections?

A    Perhaps it was Kate Jerkens.  I think that's probably right.

Q    And, in fact, we're going to talk about that later, that

you basically have blamed Kate Jerkens and accused her of conspiring with Fawn Weaver to create these projections?

A    I don't think I've accused anybody of anything.  But I said if you do the math, when you have a -- when you have a revenue projection that comes in for January, which is historically a very low month, that is 20-something percent higher than a revenue projection or an actual revenue for November, which is a very high month, when you see that, then you start asking questions.  And when we did the reverse math, we realized that the revenue projections for January were almost exactly what would be needed to balance the budget of our projections.

Q    And did you investigate that issue?

A    No.  I just -- exactly what I just told you.

Q    So you didn't, you didn't ask the team to go back and verify it?

A    No.

Q    Okay.  And do you know that they actually did go back and verify it?

A    I don't.

Q    So you put the accusation in there without even investigating whether, in fact, it was accurate?

A    I know that we had an internal discussion in -- at the end of December, where we made the determination not to provide the 13-week cash flow analysis anymore because we

thought it was being used for improper purposes.

Q    And do you know that her projection actually came in $500,000 under what actually happened in January?

A    No.

Q    So you don't know the numbers for January?

A    No.

Q    You're the receiver.  You don't know the numbers for January?

A    No.  We're sitting at February 9th, so no.

Q    You don't even know the top-line numbers, I mean, the projection numbers?

A    I mean, I could see it from the chart, but, no, off the top of my head, I do not.

Q    Would it surprise you to learn that, in fact, January was higher than her projection?

A    It would be a pleasant surprise.

Q    It's going to be a fact, and she's here to testify.  So you kind of dragging her through the mud, if that were true, wouldn't that be a problem?

A    I don't think I'm dragging her through the mud, Mr. Collins.

Q    Okay.  We'll let her speak to that.

So when you received this projection -- and let's roll back to Receiver's Exhibit A, subpart 4, I believe.

So when you received this projection from Kate Jerkens,

was it based on a post-receivership scenario?

A    Yes.

Q    I mean, and let me clarify, was it based on a scenario where there was no receivership?

A    Oh, no.

Q    Okay.

A    No.

Q    Do you think that the -- wouldn't the projection be better if it were post-receivership?

A    I don't know.

Q    Haven't you testified, or in your affidavit, that the receivership itself is -- you know, the uncertainty of the receivership is causing a problem with sales?

A    Receiverships and litigation like this always have a negative impact on business.  Would it immediately get better if this were dismissed?  I don't think so.  That's just my opinion based on my experience.

Q    But it would likely get better at some point?

A    Not with this cash flow.

Q    But just talk about, everything being the same, would the lack of litigation increase the future in terms of sales?

A    At some point, maybe, but I think it would be out of business before then based on the cash flow.

Q    Well, that's a different issue, but this is about the projection, right?  So if we -- so if we assume that that

projection would -- well, so as a practical matter, if you're relying on that projection that we know might be different if it were taking into account no receivership, then that's going to impact the validity of this projection too, right?

A    That would be on the next page.  So this, this assumes -- this is backward looking, Mr. Collins.  If you'll see, it says, "Summary of Adjustments to Cash Flow 9/1/25 to 1/18/26." Where you see that increased sales projection would be in the next chart --

Q    Perfect.

A    -- which is forward looking.

Q    It's part of Exhibit 4, but it's the next page, right?

A    That's right.  That next page, right.

Q    And so let's look at that.

A    And, in fact, if you'll look at the second line there, it says Fawn Weaver increased sales collections.

Q    Correct.

A    Increased to 1.8 million.

Q    Correct.  Thank you for the clarification.  So ultimately -- so the first part of your exhibit is backward looking.  This is the forward looking?

A    That's right.  This one looks at essentially the next four months.  Were this receivership to be terminated by the Court, this is what we would project to be the net impact --

Q    Right.

A    -- on the estate.

Q    And so if we look at the -- so the negative original cash flow basis, again, is based on just the forward of other projections?

A    That's right.  If no more funding is inserted in the company, based on projections, at May 31, it would be negative 3 million.  That's right.

Q    So, but that's the beginning balance?

A    That's right.

Q    So if we zeroed that out -- so if we're looking at a go-forward cash flow, wouldn't you zero that out?

A    Yes, I think so.

Q    All right.  So let's zero that out.  Fair enough?

A    I see what you're saying.  So it would be an impact -- I think what you're trying to get me to say is it would be an impact of negative 6.8 million.

Q    No.  What I'm saying is -- yeah.

A    Right.

Q    Well, what I'm really saying is, if you're really looking forward, then you don't come in with a zero -- you don't come in with a negative starting balance, right?

A    Well, it does if you're talking about at the end of May 31, '26.  Assuming no more money is input by Farm Credit, looking at our operating budget, by May 31, it would be negative $3 million.

Q    But this is a beginning balance.  This is as of January 19th, 2025.  That's the original cash flow base model.

A    No, Mr. Collins.  This is showing the end of that time period.  This is showing where, where the --

Q    Okay.

A    -- where the estate would be without any more Farm Credit money, operating as it is currently operating.  At the end of May, it would be negative $3 million in the bank, essentially, right?  And then you see --

Q    I got you.

A    -- adjustments made for that.

Q    I got you.  Well, so if we look at that, so in the original cash flow model, that includes receivership fees.  It might include payment on past obligations, like TDG?

A    I'm not sure I understand your question.

        MR. COLLINS:  Well, so in your original cash flow model -- let's pull up -- pull up the Newpoint.  That is -- yes.  So let's find out where this is as an exhibit.  What is this?

        MR. BUCHMAN:  This is Exhibit 5 for the movants.

        THE WITNESS:  I think maybe I can clarify.  We've tried to zero out the things that would go away, if that's what you're asking me.  If you look at that other chart, we tried to -- like, you'll see that we took out receivership expenses, for example, right?

BY MR. COLLINS:

Q   Well, not, not -- if you're using -- let's look at the exhibit that's before you.  Is this the exhibit -- or is this the -- now, granted, this is -- we don't have the most current one that they've done that I assume you're relying upon, because you haven't provided that because -- even though we've asked.  But this is the December 10th one that was prepared by Newpoint, correct?

A   That looks to be what it is.

Q   Yeah.  And so this is what that -- are you saying this -- it may not be this exact one, but it's the -- this, you know, form in the future that is forming the basis of your base cash flow number?

A   That's right.  That's right.  If you played, if you played the projections forward through May 31, that's what it is.

Q   And so if you look down at the bottom, you've got non-operating disbursements.  Do you see that?

A   I do.

Q   And that includes receiver fees?

A   It does.

Q   And then if you -- would also payments to TDG be reflected and Tennessee Distilling Group be reflected on this cash flow chart?

A   Yes, but you would still have payments to TDG if the

receivership were to go away, because there's --

Q    Well, I'm talking about, I'm talking about payments that were for debts that were incurred prior to the receivership.

A    Yes, that would, that would be, that would be included.

Q    Yeah.  So if you -- and how much has been paid to Tennessee Distilling Group?  I can refresh your memory.  About 1.5 million?

A    I was about to say between a million and 2, but I was trying to do the math in my head.

Q    About 1.5 million?

A    That sounds about right.

Q    And then how much has been paid in receiver fees?

A    I don't know.  It's in the -- it's in the report.

Q    You don't -- I mean, do you have a ballpark of what it is?

A    I know it's under what was budgeted.  That's what I care about.

Q    Okay.  Was it -- I believe that number is approximately 2.4 million.  Does that sound about right?

A    With consultants?  Consultants too?

Q    Everything, yeah.

A    Yes, that's probably right.

Q    Okay.

A    Yeah.

Q    So if you take 2.4 million and you add 1.5 million to it,

what do you get?

A    3.9.

Q    3.9 million.

A    You're challenging my math skills.

Q    So if we go back to the other exhibit, Receiver's Exhibit A, subpart 4, page 2, and we add $3.9 million to that original cash flow number, what do you get?

A    No, we're not adding 3.9 because, again, this is a forward looking model.  The TDG payments have already been made.

Q    I know.  But you have to -- it has to be starting somewhere, right?  Because these numbers don't total up.  The numbers below the original cash flow line, they don't total up to negative 9 -- 9 million.

A    I don't know.  I don't have a calculator here.  It looks like it does to me, but --

Q    You would have to add back the 3.9 million, and you would end up with a starting -- the starting number would be positive $900,000?

A    No.  We've already added it back, 2.5.  This is assuming -- I'm not sure I understand your question, but let me tell you what this chart is.  This is assuming on January 19th, which is -- obviously we're past that today.  But this is assuming on January 19th, this Court were to terminate the receivership, what is the net financial impact from January

19th through May 31?

And honestly, I mean, it's really simple if you look at it. What we've done is, because this Court has stayed certain obligations, we have to add -- because if the receivership goes away, the stay goes away. So you have to add back in those things. You have to add the Farm Credit P&I loans to the negative, right? That's a negative impact. And then we take out because a positive impact would be no professional fees, and we have a positive impact of increased sales of $1.8 million, which is what the projections we've been given were.

Q   Well, again, we're talking about operating cash flow, correct? Isn't that what this is about? Right?

A   That's right.

Q   So when we talk about operating cash flow, you do add back the professional fees, but the principal and interest payments to Farm Credit are not operating cash flow items, correct?

A   Yes, they are. They would be, they would be debits that would be required if this Court were to lift its order.

Q   Well, only if the Court required the payment. I mean, that's a pre-receivership number, correct?

A   No, only if the Court were to lift the stay.

Q   The bank's collection action is the underlying lawsuit in this case, right?

A   That's right.

Q    Okay.  Is there an order that says that they have -- that we have to pay that judgment before it's even rendered?

A    There's a note.

Q    But it's part of this litigation, so it wouldn't be paid?

A    If you say -- that's for the Court to determine.

Q    Is that operating cash flow, though?

A    Yes.  Payment of principal and interest payments is part of operating cash flow.

Q    Okay.  Well, we'll talk about that.  The -- and the stayed vendor payments, again, these are -- we're talking about pre-receivership stuff.  This is historical debt, right?

A    That's correct.

Q    Okay.  And so when we talk about -- when I talk about operating cash flow, and why I'm asking the question, I'm talking about does the company have -- generate enough money from current operations to pay current debts.

A    No.

Q    That's what I'm -- you can't say no.  I'm stating what my --

A    Okay.  I thought you were asking me a question.

Q    No, no.  I'm asking you -- I'm saying that when I ask you about operating cash flow, that's the definition I'm using, right, of can the company generate enough revenue from current operations to pay its current debts.

A    As they're accruing.

Q    As they're accruing.

A    Okay.

Q    Okay.  And so when -- you know, I understand that there are historical debts that have to get paid at some point, and that's, I think that's the difference of what I'm trying to have you testify about is this chart includes the payment of historical debts.  It is not a current cash flow analysis.

A    Right.  That's right.  This is assuming the stay is lifted and that other debt has to be serviced.

Q    Correct.  And the service of that debt is a function of whether the company has agreements with those vendors, for example?

A    Sure.  Right.

Q    Right.  So when this case was filed, how many vendor lawsuits were pending?

A    One that I'm aware of.

Q    Which one was that?

A    It was in Oregon.

Q    Okay.  So you said that there is, like, 50 million of vendor debt or unsecured debt?

A    It's actually more than that --

Q    Okay.

A    -- as of last week, when Advanced Spirits gave me a demand.

Q    And so isn't it interesting that there isn't -- there

weren't any lawsuits pending?

A    No.

Q    Isn't that unique, I mean, to have that much vendor debt and have no lawsuits?

A    No.

Q    And were they all current?

A    No.

Q    And so why do you think it was that there were no lawsuits being filed?

A    I don't know the answer to that.

Q    Would it surprise you if the management of Uncle Nearest had just made arrangements with these vendors?

A    No, that wouldn't surprise me at all.

Q    Okay.  Is it not conceivable that those arrangements would continue once the management got back in control?

A    I don't know how to answer that other than to say, based on the correspondence I've gotten from vendors, I would say that the answer to that is no.

Q    But you don't know that the answer to that is no?

A    Of course not.

Q    Okay.  And you haven't asked them that question?

A    Have I asked them whether they plan to sue --

Q    No.

A    -- if the receivership were terminated?

Q    Whether they would be agreeable to terms with the debtor

post-receivership.

A    No.  That's not my job as receiver to ask about what would happen post-receivership.

Q    Understood.  Understood.  But you don't know the answer to that question?

A    I do not know the answer to that question.

Q    Okay.  Let's turn to paragraph 30 of the receiver's, of again Exhibit A to the receiver.  This is just Exhibit A, paragraph 30.

     Let's see.  Okay.  I believe in paragraph 30 you indicate that the total debt of the company is approximately $164 million; is that correct?

A    That was correct at that time.  That's right.

Q    Okay.  And are you aware that the company's management disputes some of those debts?

A    I've read it in your papers.

Q    Okay.  Has your team audited the debts of the company to determine the validity of them?

A    We've audited them in the sense that we've tried to clean up the books, so if there were, you know, there were conflicting numbers or that kind of thing.  Have I gone through to determine whether or not 1.1 million is actually owed to Dash Funding or whether it's 900,000?  No, I have not.

Q    Okay.  And you haven't sent out letters to the vendors seeking confirmation that they're owed?

A    No, not at all.  And, in fact, you know, what this, what this is, just for clarity, is as we would get demands from creditors that were not on the AP list, we would include them.

Q    Okay.  So at this point in time, that is just an estimate of debt?

A    That's right.  And I will add, Advanced Spirits last week made a $45 million demand on their account.  So actually my number today would be more like 99 million.  I noted in the, in the affidavit that that was a contingent liability, that they had not given me a number, and last week they gave me a number of 45 million.

Q    Now that is offset by the barrel inventory that they hold?

A    In theory.  That would be my argument.

Q    Right.

A    You read my mind because, because that would be something, if we get to -- when we get to the point of reconciling that, I agree.  If we're going to pay $45 million, we want the 20,000 barrels back, right?

Q    Exactly.  And if those --

A    But I'm just telling you that's what their demand is.

Q    Yeah, yeah.  So we don't know that that's -- we don't know what the number of that debt is?

A    I would actually say you need to reduce it by the value of 20,000 barrels.

Q    Correct.

A    Or Uncle Nearest would need to accept the 20,000 barrels. But I'm just telling you what their demand was.

Q    And the demand, the actual loan documents themselves don't require any payment for several years still, correct?

A    That's right.  They declared a default.

Q    They declared a default?

A    Right.

Q    Because of why?

A    Because we did not make the payments during the receivership because it was an upside down deal.

Q    Exactly, right.  Well, it's only -- so the receivership failing to make the payments on that debt is what caused the default?

A    Yeah.  Do you want to know why we failed to make the payments?

Q    I'm just saying, you're basically saying that we've got this additional debt, but in fact it's the receivership that caused that demand to be made?

A    That's right.

Q    Okay.

A    It was a bad contract, though.  That's why.  It was not an advisable contract.

        MR. COLLINS:  Okay.  I would move to strike that, Your Honor.  That wasn't responsive to a question.

THE COURT: Just let's move on, Mr. Collins.

MR. COLLINS: Okay.

THE COURT: Let's keep the back-and-forth to a minimum, gentlemen, okay?

BY MR. COLLINS:

Q   On page 17 of your affidavit -- so move to 17. It's down a bit.

You indicate that "Initially, I was optimistic about the prospects of an aggressive sales price because the Company had reported revenues of $75 million for 2024 and there seemed excitement about the Uncle Nearest brand."

Do you see that?

A   I do.

Q   Okay. And you continued to believe -- at least as late as October '25, you continued to believe that, correct?

A   I sure did.

Q   Yeah. And was it your opinion at that time -- or actually, in this same document, I think you indicate that the word you were getting was that the value of spirit companies ranged from a two times multiple to a 15 times multiplier of revenue, correct?

A   Adjusted revenue, yes.

Q   Adjusted revenue?

A   Yes, correct.

Q   And what is adjusted revenue?

A    My understanding, and I'm not a spirits expert, but my understanding from spirits experts is that you have to take revenue and back out some taxes and then you back out sort of bulk sales.

Q    So it's based primarily on case sales?

A    That's right.

Q    Correct?  Case sales?

A    Right, right.

        MR. COLLINS:  And so let's refer to Larin Exhibit 5. So if you look at the bank's -- can we pull up -- do we have the number for Larin's Exhibit 5?  That is --

    (Off-the-record discussion between Mr. Collins and Mr. Buchman.)

BY MR. COLLINS:

Q    Are you -- have you seen this document?

A    I've seen parts of this document.

Q    Okay.

A    I've not seen it as part of Mr. Larin's affidavit because, again, I didn't look at it.

Q    You didn't review Mr. Larin's affidavit?

A    I did not.

Q    Okay.  But you have seen this document?

A    I've seen pieces of the Keystone document in the company records.

Q    And so you never received a copy of this document?

A    No.

Q    Okay.  Then we'll move on.

This, I believe this document has been admitted into evidence by the -- as part of our stipulations.  So I'm going to turn to page 8.  So this is page 8 of the document.  Do you see that?

A    I do.

Q    And so this chart shows the M&A activity in the spirit industry and gives some examples of M&A transactions.  Do you see that?

A    I do.

Q    And it points out several transactions recently, including, you know, if we look at Aviation Gin, it sold in 2020 for a 24 times revenue multiple.  Do you see that --

A    I do.

Q    -- on the side?  And Proper No. Twelve sold for $600 million at a 12 times revenue in 2021?

A    I see that.

Q    And then Don Papa Rum sold for a 12.5 revenue multiple in 2021 as well.  You see that?

A    Yes, I do.

Q    And then to the left of that, it basically shows the revenue multiples at various, at various revenue numbers?

A    I see that.

Q    And so at 40 you indicated that the -- that in 2024, the

revenue of the company, effectively the adjusted case sale revenue, maybe with some other adjustments for taxes, perhaps, was around 40 million?

A    That's right.

Q    And so --

A    Before tax adjustments, but, yes, 41 million.

Q    So as of the end of -- if you applied the lowest revenue multiple here, the 12 times multiple -- which is still within the range that you had indicated, correct, in your affidavit?

A    Originally, the two to 15 times, yeah.

Q    Two to 15?

A    Right.

Q    It would be in the range of $480 million?

A    If you could get 12X, yes.

Q    Okay.  So what do you indicate the sales for 2025 were, approximately?

A    About 25 million.

Q    About 25 million.  So if you got a 12 times multiple on 25 million, that would be $300 million, correct?

A    That's right, if you got a 12 times.

Q    And even if, even if you got lower than that, you could easily be above 200 million, correct?

A    Depends on what the multiplier is, right.

Q    Yeah.  If, in fact, you could get $300 million, that would make the company solvent, correct?

A    I'm doing some math in my head.  Sorry.

MR. CAMPBELL:  Your Honor, I'm going to object to the question on speculation.  And this is not a motion to sell hearing, so I'm not sure know what this goes to.

THE COURT:  Overruled.

Just answer if you can answer it.  If you know the answer --

THE WITNESS:  I've done the math.  I've done the math.  The answer to that is yes.

THE COURT:  I'm sorry.  What was your answer?

THE WITNESS:  The answer is yes with the assumptions that he's asked me to make.

THE COURT:  All right.  Thank you.

BY MR. COLLINS:

Q    You point to, I think, in that same paragraph 36 -- let's go back to, yeah, 36.  I'm sorry.  Let's see.  You point to several factors affecting the appropriate multiplier.  Do you see that?  I think it's --

A    Yes.

Q    It says, "However, many" -- let's see.

A    Yeah, I see it.  And I have some recollection of that paragraph.

Q    And it's right there at the top, actually.

A    Right.

Q    And so what you say is size of business, trajectory of

growth, brand appeal, and availability of other brands in the market, correct?

A    That's right.

Q    Okay.  And where did you get that information from?

A    In discussions with Arlington and Thoroughbred.

Q    Okay.  So if we look at the size of business -- let me see that Keystone document.

If we go back to page 8, so if we look, for example, again at Aviation Gin, so Aviation Gin sold for 610 million based on a 24 times multiple.  So if you divided 610 by 24, you would get basically their adjusted --

A    Their adjusted revenue.

Q    -- sales, yeah.  Revenue number, right?

A    Right.

Q    And so that means that their sales were $25.4 million at the time of that sale.  Does that make --

A    I'm going to trust your math.

Q    Yeah.  So, yeah, so trust my math on it.  I appreciate that.

A    I'm going to trust your math.  I don't have a calculator.

Q    I did use a calculator when I did it.

A    Okay.

Q    And then Don Papa Rum sold for $280 million at a 12 and a half times revenue.  And if you divide 280 by 12, you get about 22.4 million in sales.

A    Okay.

Q    So those, those are basically similar size revenue numbers to what we even have now, not counting 2024.  That's basically what was done in 2025, correct?

A    Yes, and not counting the time difference between 2021 and 2026.

Q    Correct.  Understood.  You also mentioned trajectory of growth as a factor, correct?

A    That's right.

Q    So that trajectory was upward prior to the receivership, correct?

A    No.

Q    And we're talking about sales growth.  You say the sales growth was not on an upward trajectory prior to --

A    Correct.

Q    And what do you base that on?

A    Well, based on what I know the reported 2023 sales were, revenues were -- which we don't have the record.  I've been really clear about that.  We don't have the records.  We've not been able to go back and reconcile that number.  But actual 2024 numbers were less than reported 2023 numbers, and then obviously 2025 is below 2024.

Q    Did you evaluate that in Park Street?

A    No.

Q    Okay.  So wouldn't Park Street be independently

verifiable information?

A    Yes.

Q    Okay.  So if Park Street showed that 2024 was actually higher than 2023 --

A    That would be the best source.

Q    Okay.  And so if I were to show you -- let's pull up Park Street.

A    If you tell me that Park Street was higher in '24 than '23, then I would say, yes, that was a growth.

        MR. COLLINS:  Okay.  I think it's in our rebuttal exhibit.  It's Park Street --

        MR. BUCHMAN:  Depletion.

        MR. COLLINS:  It's not the depletion scorecard.  It is the sales comparison.

BY MR. COLLINS:

Q    Okay.  And there's a better printout on paper.  It doesn't show up as well on the screen.

A    I've not seen this, but I'm going to take your word for it.  If you tell me that 2023 is higher than 41 -- I mean, is lower than 41 million, I'm going to take your word for it.

Q    Well, I'll show you these numbers.  And these are printed out from Park Street.  This is -- you can see that 2020 -- you can't see it on the screen, but it's available on the print.  This is the 2023 number at 25,309,003, for 2023.

A    Okay.

MR. COLLINS: And then if we scroll to the -- provide it to the Court as well, although I think you -- yeah.

Your Honor, may we approach and provide Your Honor a copy, a readable copy?

THE COURT: What exhibit is this?

MR. COLLINS: This is a rebuttal exhibit, so it's premarked as Exhibit 29. Exhibit 29. So it isn't in the exhibits. This is just rebuttal.

THE COURT: Have you shown it to the other side?

MR. COLLINS: We just gave them a copy.

THE COURT: All right.

MR. CAMPBELL: I don't know how it says what Mr. Collins thinks it says or verifies that it came from where he says it came from.

THE COURT: Well, he can ask his witness about it.

MR. COLLINS: We'll have testimony. We've got Kate Jerkens here.

THE COURT: He can ask the witness about it.

MR. COLLINS: Yeah.

THE COURT: Can you not put it on the thing?

MR. COLLINS: It's on the screen, Your Honor. It's just the dates on it aren't visible. They're visible on the printed copy, but they aren't showing up very well.

THE COURT: Okay. Bring it to Ms. Norwood.

All right. You want to show this to the witness and ask

him some questions; is that right, Mr. Collins?

MR. COLLINS: Sure.

THE COURT: You're not approaching. She is. All right. Thank you.

Ms. Norwood, give it to the witness. Thank you.

THE WITNESS: Thank you.

BY MR. COLLINS:

Q   Have you ever gotten into the Park Street yourself?

A   No.

Q   So you don't --

A   No.  Other people have.

Q   Kate Jerkens is here and she can testify as to this, but this is -- so if you were to -- if this were proven to be true Park Street numbers through her testimony, 25 million is shown there for 2023.  You see that?

A   I do.

Q   And then if you scroll to the next page -- let's go to the next page -- this is the 2024 number from Park Street at 34,954,000, so a significant increase?

A   If -- right.  Assuming that these are the Park Street numbers, that's right.

Q   So from 2023 to 2024, at least from Park Street numbers, there was significant growth for Uncle Nearest, assuming again that we verify this is correct?

A   And assuming that this is a complete report, yes, right.

Young - Cross

Q    And there are other parts of sales that go on too.  So there could have been bulk whiskey sales and some other things that happened, but in terms of case sales growth, that's what this is reflecting, correct?

A    Right.  Park Street captures most of the case sale growth.

Q    In terms of performance in the market, case sales is more determinative of that than bulk whiskey sales, correct?

A    I would agree.

Q    Yeah.  And then so that represents 2024.  Now I think you testified that 2025, the first part of 2025, you had questions about whether, you know, it was going to be as good as 2024, correct?

A    That's right.

Q    Okay.  And in terms of your experience now with the industry, what are the strongest and weakest quarters for a brand?

A    My understanding is that the strongest quarter is Q4 and the weakest quarter is Q1.

Q    Okay.  So, and so the bulk of the sales for a spirit brand, the highest volume of sales occurs in OND, as they call it, October, November, December, correct?

A    Right.  I'm not sure it's more than 50 percent for the year, but it's the largest quarter.

Q    Correct.  And you know what depletions are, correct?

A    I do.

Q    Okay.  And do you understand how -- well, tell me, in your own words, just to make sure we understand exactly what they are.

A    Yeah.  My understanding -- again, not being a whiskey expert, right, spirits expert, my understanding is that depletions are when cases are sold out of the stream from the distributor and then replenished.

Q    To the retailer?

A    Right.

Q    So the distributor sells to the retailer, and that's a depletion?

A    That's the way I understand it.

Q    And in terms of how the distributor has a product to deplete, the distributor buys from the distilleries?

A    Correct.

Q    Okay.  And so in terms of revenue for the distillery, that sometimes becomes a function of the pull-through, the depletion pull-through from the distributor, correct?

A    That's my understanding, right.

Q    And if the distributor has a lot of inventory, they're going to wait.  Before they order again from the distillery, they're going to wait until they get the demand pull-through from the retailer?

A    Correct.

Q    So when we think about the health of a brand, we think about the health of a brand at the retail level because that's the source of the whole chain, right?  If you get demand at the retail level, the retailers then buy from the distributors, and the distributors then buy from the distilleries?

A    Right.

Q    Correct.  And if there isn't a whole lot of pull-through, there isn't a whole lot of demand at the retail side, the distributors don't order because they already are sitting on supply?

A    Right, or if the distributors have already ordered too much product.

Q    Exactly.

A    Right.

Q    And so in terms of timing of revenues, a lot of that is kind of based on just the dynamics between the retailer and the distributor, in terms of what they already have in inventory?

A    That's right.

Q    Right.  And so when we talk about whether a company is on the incline or whether it's on the decline, the distributor orders don't tell the whole story, correct?

A    I would agree with that.

Q    Yeah.

A    Right.

Q    And so you really do have to look at what's happening on the retail level?

A    At least to some extent, I agree.

        MR. COLLINS:  Okay.  So let's do -- let's look at Exhibit 10.  Okay.  And actually let's pull, pull the Nielsen data.  What exhibit is that?

        MR. BUCHMAN:  6.

        MR. COLLINS:  Yeah, yeah.  Okay.

BY MR. COLLINS:

Q    Okay.  Have -- do you ever look at the Nielsen numbers?

A    I don't personally, no.

Q    Do you know what Nielsen is?

A    I do know what Nielsen is.

Q    Do you know what Nielsen tracks?

A    I do know what Nielsen tracks.

Q    Okay.  So Nielsen tracks through certain sources, right? It's not a complete set of sources in the industry recognized?

A    Correct.

Q    But it tracks retail sales of whiskey brands?

A    Among certain stores and chains and things, yes.

Q    Right, exactly.

A    Correct.

Q    And would you agree it's most reliable when you're talking about, you know, the bigger distilleries that have

50-state distribution?

A    I don't know that I would say that.

Q    If you don't know, that's fine.  That's fine.

If we look at -- so now pull the next exhibit, Exhibit 10.

So basically taking the data that's on those Nielsen charts, this is a summary of that Nielsen data.  From a trajectory of growth standpoint at the retail level, what's on this chart -- and it's listed as Exhibit A, but this is our Exhibit 10 -- it basically shows Uncle Nearest's dollar growth, based on Nielsen, you know, the percentage growth; it shows the market growth, which is the American whiskey sector growth; and then it shows the difference.

So, as you can see, January through July of 2025, Uncle Nearest's growth was significantly higher.  It was positive, actually, wasn't it, in every, in every month?

A    That's what this chart indicates, yes.

Q    And the market, on the other hand, was actually down in each of those months, correct?

A    That's what this says, yes.

Q    Okay.  And the difference is then shown in that.  The difference between Uncle Nearest's growth versus the market growth is the delta that's calculated there.

So based on the Nielsen numbers, wouldn't you say that Uncle Nearest was a growing company through the first part of

the year?

A     Relative to the market?

Q     Correct.

A     Yes.

Q     So the growth number that's reported is a year-over-year growth, right?  So it reflects -- so for January, for example, this shows that, as compared to January 2024, Uncle Nearest was up 30.2 percent on its own, year over year?

A     I don't know what it's compared to, but --

Q     Yeah.  It compares to the prior year.  It's a year-over-year chart.

     If you go back to Exhibit -- yeah.

     So each of these, each of these are compared for year over year for each of these brands.  And so what this chart shows is basically all -- you can see them all, Woodford, Maker's, Buffalo Trace.  It shows that in -- on this particular chart, it shows on January -- as of January 25th, 2025, Uncle Nearest was the 28th largest, in terms of Nielsen numbers tracking, was the 28th largest American whiskey brand, because I believe this is just all American whiskey is what's on this.  So it includes bourbon.  It includes Tennessee whiskey.  But each one of these show -- the red and the green, it shows the brands that are positive and the brands that are negative in terms of year-over-year growth.

     Okay.  So go back to -- so this chart again kind of shows

the pre-bank lawsuit. The lawsuit was filed in July, as I under -- I think that's right. August 2025, Uncle Nearest was still, still up 7.2 percent in August.

A    That's what it says.

Q    Yeah. And the market was still down in August?

A    .6, yes.

Q    So there's still a healthy delta showing that Uncle Nearest was still performing strong at the retail level, correct? Again, assuming the chart is correct.

A    Assuming the chart is correct.

Q    After the appointment of the receiver, this is what Nielsen shows. It shows that in September we underperformed the market. The market was down 6.8 percent. We were down 8.2 percent. And then each month after that, including January, which just came out, the performance is getting substantially worse --

A    That's what it shows.

Q    -- at the retail level. And again, assuming this chart is correct and the underlying data is correct, that's what Nielsen is showing, correct?

A    That's what it shows.

Q    Okay. So this all started when we were talking about multiples, right? So in terms of an applicable multiple, if we were selling this company in July of 2025, when we're on an upward trajectory as compared to the market, wouldn't that

demand a higher multiple?

A    I think you've asked me to assume a lot.  But assuming that, yes.

Q    Okay.  And now when we're in January and we're on a downward trajectory, that would presume a lower multiple?

A    I mean, that logic follows.

Q    Okay.  And if the company were able to reverse that trajectory again and begin to grow, we would then be talking about a higher multiple again, correct?

A    I think it would have to show some sustained growth, but I agree in general with your premise.

Q    So I think the final thing in terms of the applicable multiple, you were talking about the availability of other brands in the market.  In terms of Tennessee whiskey, that is a much smaller segment than Kentucky bourbon, for example?

A    That's right.

Q    Right.  So --

A    But they're related.

Q    They -- people who drink Tennessee whiskey also drink bourbon?

A    Usually.

Q    Maybe not at the same time, hopefully.

    Let's see.  So, again, if we're looking at July, if we're looking at pre-receivership and we're thinking about multiples, we're -- this company was at a much higher

potential multiple just prior to the filing of the lawsuit and the receivership than it would demand at this point, in your opinion?

A    I'm not sure I agree with that only because of lack of profitability.

Q    But does profitability come into play?  That's not part of the multiple process, correct?

A    It's not directly part of the multiple process, but I think when people look at due diligence, yes, it comes into play when you're figuring multiples.

Q    Let me ask you this:  Is it your understanding that when a company such as Diageo or Brown-Forman purchases a brand, they are purchasing it thinking that they're not going to take over the operations and manage the brand themselves?

A    I'm sure they're thinking they can make it more profitable, if that's your question.

Q    Yeah.  And so in terms of the most likely buyers of this, they are not financial buyers, right?  They are strategic buyers?

A    I don't think I agree with that.

Q    Okay.  If they were -- well, we can probably get this from Arlington.  But if they were strategic buyers, they would be less concerned about profitability, correct?

A    I think that follows.  I understand what you're asking. I think that follows.

MR. COLLINS: Turn to page 36.

I'm trying to skip through, Your Honor, and kind of move this along.

BY MR. COLLINS:

Q    You state in your affidavit some reasons why you changed your feelings about value as the case has gone, and the first thing is you say my -- and this is I think in paragraph -- let's see.

I think we're still on -- we're on paragraph 36 in his affidavit. And scroll one more down. Scroll down to the bottom of 17.

So in subparagraph -- in footnote 8 of your affidavit, you indicate that, you know, "The Weaver Parties acknowledge the state of the spirits industry, and argue it's not a good time to sell whiskey-related assets."

You say you agree with that but that it's effectively the only option?

A    That's right.

Q    Okay. So in terms of it being the only option, what efforts did you take to evaluate the ability to restructure the debt of this company?

A    I considered a lot of things. We made a lot of reach-outs to parties about refinancing debt. I considered whether we could put this into Chapter 11 and reorganize it without a buyer through Chapter 11.

Ultimately, the problem with any of those options was that if the company is not cash flow positive without servicing any debt currently, then even incremental increases in debt service would kill a Chapter 11 plan, for example, or would dissuade -- what we found is it has dissuaded anybody from refinancing the debt.

Q    Did you and your advisors put together a business plan for the company?

A    No.

Q    Okay.  In terms of doing a Chapter 11, wouldn't that be kind of the first thing you would do, in terms of evaluating whether the company was viable moving forward, create an evaluation of the company and a business plan for it?

A    No.

Q    Why do you think a business plan would not have been needed in this case?

A    Because the numbers were self-evident.  It was losing money without any debt service.  If you add any debt service, even if there was some world where we could cram down the secured debt and get rid of the unsecured debt, come up with a plan, it could not service the debt.

Q    But the only way you can determine, as a restructuring professional, whether in fact that can happen is not just to look at current cash flow.  It's a function of creating a business plan that evaluates future cash flow, correct?

A    I disagree with that.

Q    So it's your understanding that, in a reorganization, you only look historically to determine whether there's viability, you don't look to the future?

A    My understanding, based on doing this for 25 years, is that you have to show a track record that then creates the reasonable likelihood that you can hit projections going forward.

Q    But couldn't a Chapter 11 plan be created, right, where you put the company back on an upward trajectory and the plan is then a refinance after you now get that multiple that the company would have gotten prior to, prior to?  Couldn't that be a legitimate reorganization strategy?

A    If the numbers worked, it would be.

Q    And that was not explored?

A    No.  It was explored.  I was just explaining to you, the numbers won't work here.

Q    So you don't even think there is a possibility for some interim financing to get the company moving again in a positive direction, obtain the higher multiple in a structured sale process that is not a fire sale, that that could not lead to a better price in a sale process?

A    What I'm telling you is that we could not find any other source of lending in this case.

Q    But you only looked at lending to take out the Farm

Credit debt, correct?

A     No.  We cast a broad net.

Q     And so you couldn't find anybody -- you have some unencumbered assets, correct?

A     No, not in my opinion.

Q     So does somebody have a lien on -- does Farm Credit have a lien on the cognac assets?

A     No, but its assets were used to purchase the cognac assets, which I think then --

Q     That doesn't create a lien?

A     No, it's not a lien.  So if you're talking about -- that's the only, that's the only asset that I'm aware of -- I'm thinking.  But it's the only asset that I'm aware of in the portfolio that does not have a lien.  That doesn't mean that I'm free to do whatever I want to do with those funds for the receivership.  That's not what that means.  But I agree with you, there is not a lien on the cognac chateau.

Q     All right.  So it isn't -- it is not their property to get -- they don't have a right --

A     They don't have a lien.

Q     -- to the proceeds of that any better than any unsecured creditor, correct?

A     I'm not sure I agree with that, again, because I can trace the funds.

Q     I don't want to waste too much time on that.  So is there

a scenario where equity financing -- did you pursue an equity infusion in order to bridge this and get the company back to an upward trajectory?

A    No.

Q    Okay.  In your change about the feelings of value, you indicate -- I believe it's in the same paragraph -- that "My accounting team determined that the actual revenues for 2024 were only 41 million, and 2025 revenues are expected to be less than 25 million when totally accounted for."

     Does that sound right?

A    That's right.

Q    Okay.  Now, in fact, the case sales of 2024 were actually known, have been known for a while, right?  The question of 70 to 40 is about barrel sales, correct?

A    Known to whom?

Q    Well, in fact, it's in this Keystone report.  So the Keystone report -- we'll put this back up.  So the -- keep them in order so I don't get out of whack.

     So the Keystone report is dated February 11, 2025.

A    I see that.

Q    Yeah.  And --

A    I didn't have the Keystone report, just for clarity.

Q    But you've talked to other professionals in the case that have analyzed, including Riveron, and got information from Riveron about the case, I assume, correct?

A    I've not.  My professionals have.

Q    Okay.  But you're testifying as to -- you're working with your professionals, right?

A    Sure.

Q    So, and in doing your affidavit, you have consulted with your professionals, correct?

A    That's right.

Q    Okay.  So this is the report from Keystone, and you can see at the very top -- and I didn't put the highlighting on this.  This was in their report.  They are showing sales of 40 million, correct?

A    I see that.

Q    Without barrel sales?

A    Right.

Q    So this information about what the actual case sales was has been available.  It's been available on Park Street as well, correct?

A    Yes.

Q    Okay.  So, in fact, you -- while you state that you changed your opinion based on, you know, this idea that you weren't -- you know, the level of sales was misrepresented to you, that's not exactly correct, right?  Because you had access to the -- you had access to the $40 million number very early?

A    I'm not disputing that I had access to it.  I'm telling

you that we had not gotten that information.  Having access to it and having actual knowledge are two different things.

Q    But you -- by the time -- we're talking about late October, right?  You had been -- you had been -- that's when you said you changed your opinion, right?

A    Early October.  Well, it was sometime during October, yes.

Q    Right.  And so you had been in the case for more than five weeks?

A    That's right.

Q    And so you hadn't evaluated the 2024 numbers prior to that?

A    I had not.

Q    Okay.  You mentioned -- again, I think this is still in -- go back to the receiver's affidavit, paragraph 36, I believe we were still on.

Scroll down.  Is that 36?  Yeah.

I believe you indicate that the media coverage and the Weavers' participation is damaging brand viability?

A    That's what I was told.

Q    Yeah.  Who were you told that by?

A    It was just feedback from everybody that was reaching out to me, creditors, shareholders, potential buyers.

Q    Okay.  And so --

A    That was not my individual opinion.  I was trying to

report the feedback I was getting.

Q   And this was happening, again, mid-October time frame, because that's when you say you changed your opinion on value?

A   I think, I think it's been increasing throughout the case.  So, yes, I think it really began picking up mid-October.

Q   Okay.  But, again, in your statement, you're saying mid-October was when you changed your opinion on value?

A   Right, because in the first few weeks, we were just trying to balance the budget and pay the bills, and it was not until after that critical time period passed that we could look beyond what we needed today.

Q   Okay.  And so you were appointed, and then in 21 days you filed the motion to clarify?

A   That's right.

Q   And in the motion to clarify, you made the suggestion that there was all this commingling between the company and these ten entities, correct?

A   Correct.

Q   And you hadn't done any investigation prior to filing that pleading?

A   That's right.

Q   Did it surprise you that the ten entities disputed that they had been commingled with the defendants?

A   No.

Q    Okay.  So them filing pleadings contesting that was not a surprise to you?

A    No.

Q    Okay.  So in October the only -- what pleadings had the Weavers filed by mid-October that you thought were creating this issue in the -- with the value?

A    Nothing in mid-October.  I think what I describe here in the affidavit is that it began to shift in mid-October.  My optimism began to shift in mid-October.  But, no, there had not been any pleadings in the --

Q    Other than responding to motions to verify?

A    Right, right, right, which again I was not surprised by.

Q    And, in fact, the Weavers didn't file anything in this case about the receivership until the end of November, when they filed their motion to begin, to have the litigation begin to move forward?

A    I think that's right.

Q    So there isn't -- there weren't pleadings being filed by the Weavers during this period of time that were causing any media coverage, correct?

A    Not mid-October, right.

Q    Okay.  Or, frankly, until the end of November, correct?

A    That's right.

Q    You indicate in paragraph 38 that the best indicator of value is what the market is currently willing to pay, correct?

A    Correct.

Q    And so, you know, if we -- if you said, you know, look, we need to have all our offers in by tomorrow, you know, everybody put your offer in and that's what we're going to do, no due diligence, would that be an indicator of the true value of the company?

A    No.

Q    Okay.  So the true value of the company is not what a willing buyer is going to pay today.  It's about what a buyer will pay in an orderly sales process?

A    That's correct.

Q    Okay.  And the determination of an orderly sales process, because I know you do a lot of sales, is a function of the asset, correct?

A    I would agree with that, yeah.

Q    And when you're talking about a business, a sale of an operating business, that process can sometimes take awhile?

A    It can.

Q    Okay.  And so if you're -- and you started this process with the sales -- when did you employ them, like Novemberish?

A    November, I believe.

Q    November.  And they've done a call for offers.  They did their call for offers.  When was that?

A    Well, it was not, it was not a call for offers.  It was a call for initial letters of interest.

Q    And when was that?

A    Late December or early January, I believe.

Q    So 30 days.  Had people done significant due diligence?

A    I think it was like 60 days.  But, I mean, yes.  I mean, there's a data room and people had looked in the data room already.

Q    But nobody had met with management?

A    No.

Q    Okay.

A    I mean, this was an asset sale, so --

Q    Correct.  But it's a sale of a going concern operation, correct?

A    Correct.

Q    Are you familiar with the term "normalization" when valuing a company?

A    Somewhat, yes.

Q    And do you have a -- I mean, can you even -- you may not know enough to even state what you think it is.

A    No.  I've heard the term, right.

Q    Would it surprise you if what normalization is is the prospect of looking at a company and normalizing for extraordinary events that are occurring to the company?

A    That's the way I understand it.

Q    And so from a valuation standpoint, you would normalize it by adjusting the value to take away those extraordinary

events and kind of see the true --

A    Right, pluses and minuses.  Correct.  Yeah, right.

Q    Would you consider receivership being kind of an
extraordinary event?

A    Sure.

Q    In terms of the receivership and the expense of
operation, we've already talked about kind of cutting
expenses.  A lot of those expenses that were cut were in the
sales and marketing budget, correct?

A    Yes.  Certainly some of them, yeah.

Q    Well, and if we look at -- go back -- or go to his
exhibit, the financial statements.  I think it's -- this will
be Receiver's Exhibit A, subpart -- keep scrolling down.
Down, down, down.  Right here.

     Okay.  So if we look again at -- this is the income
statement that we already looked at.  This is Receiver's
Exhibit A, subpart 5.

     All right.  So if we look at line -- so I may be looking
at the wrong exhibit.  Let me make sure.  Yeah, scroll, keep
scrolling down.

     So this is -- it's still part of Exhibit 5?

          MR. BUCHMAN:  Yes.

          MR. COLLINS:  So if we scroll down on Exhibit 5 to
sales and marketing expense.  Keep scrolling down.  Yeah.  So,
and scroll all the way down to the very bottom.  Should have a

total line, marketing.  No, no, no.  Yeah.

BY MR. COLLINS:

Q    So, yeah.  So if we look at that marketing line, so you see line 6900 at the top?

A    I do.

Q    Okay.  And you can see -- scroll that page down a little bit.  Yeah, down.  The other way, other direction.

Okay.  So you can see then the dramatic -- so just to remind everybody that the columns, right, it's Q1, Q2, Q3, Q4, and then the total for the year.

So in Q1, you know, 1.4 million in marketing expense; Q2, 1.15; then it decreases substantially in Q3 to 586; and then, you know, again down to 217,232.  So a pretty massive reduction?

A    I would agree.

Q    And you've already indicated, right, that OND is the most important sales time of the year, correct?

A    It's the largest, yes.

Q    Isn't it safe to say that the reduction of sales and marketing expense would have an impact on sales during that period?

A    Yeah, I think that's safe to say.

Q    Okay.  And that's a pretty massive reduction, correct?  It's --

A    Yes.

Q     -- an 80-percent reduction --

A     Yes.

Q     -- or more.

      In terms of multiples, right, so if we just assume, let's say, a six multiple on top-line sales, if we take an assumption that a dollar of marketing expense might lead to a dollar of sales, right?  Can we just make that kind of assumption?

A     Okay.

Q     If you spend a dollar and you increase sales by a dollar and then you apply that six multiple to the sales, your one dollar creates enterprise value of $6.  Does that make sense?

A     Based on your assumptions, yes, right.

Q     Yeah.  And so when you cut sales by a dollar and you lose that dollar of -- you cut your marketing expense by a dollar and you lose a dollar of sales, right, because you've saved your money but you lost the sales, you've actually decreased it by the multiple?

A     I agree, again --

Q     You've decreased enterprise value by the multiple?

A     I agree based on your assumptions.  That's right.

Q     And so the strategy of cutting this company back in the process of a sales process -- I mean, this was a sales process, right?  You were moving towards a sales process, right?

A    I would say we were not moving toward a sales process,

honestly, until we realized that there was no reorganization,

there was no refinance options that were going to be

available.

Q    Well, you were doing it on a dual basis?

A    That's right.

Q    Right.  So they were happening simultaneously?

A    Correct.

Q    Okay.  But you were still -- a sales process was in the

works, assuming you couldn't get a refinance, correct?

A    In November, right.

Q    In November?

A    Right.

Q    And during that period of time, you're slashing -- during

the highest point of the year, right, in terms of sales,

you're slashing the sales and marketing budget.  Isn't that a

reason why you're not getting the sales numbers you thought

you were going to get and then the numbers in terms of what

people would offer for the company?

A    No, I don't think so.

Q    Okay.

A    I mean, is it a contributing factor?  It could be a

contributing factor, but, you know, you can't spend money you

don't have.

Q    Right.  But ultimately did you ever go to Farm Credit and

propose a business plan that said, look, we're going to a sales process; I need some funding in order to make sure we keep sales at this level so we can get the multiple and people are interested in buying?

A    Did I have that exact, that exact conversation?  No.

Q    Okay.  So we're still on this same exhibit.  Let's move to the balance sheet.

THE COURT:  Mr. Collins, how much do you anticipate with this witness more?

MR. COLLINS:  It's hard to say, Your Honor.  I'm trying to skip through and --

THE COURT:  This is your emergency motion.

MR. COLLINS:  I'm not sure what time we're at.  I probably -- I'm probably about halfway through, Your Honor, honestly.

THE COURT:  All right.  Let's take 55 minutes for lunch.  We'll come back, we'll start promptly at 1 p.m.

MR. COLLINS:  Okay.

THE COURT:  Okay.  I want to see Mr. Collins, counsel for the receiver, and counsel for Farm Credit for about three minutes after we recess for lunch.

MR. COLLINS:  Okay.

(Court recessed from 12:08 p.m. to 1:00 p.m.)

THE COURT:  All right.  Mr. Collins, are you ready?

MR. COLLINS:  I am, Your Honor.

THE COURT: Go ahead.

MR. COLLINS: I think, a preliminary matter, we got the exhibits that are the list to go into evidence for the -- that has been agreed to.

THE COURT: Okay. Which witness list are these on?

MR. COLLINS: This would be our witness list -- or not our witness list, excuse me, our exhibit list.

THE COURT: Okay.

MR. COLLINS: I think before the hearing we hadn't done that.

THE COURT: Okay.

MR. COLLINS: So, Madam Clerk, are you ready?

THE COURT: We're listening.

MR. COLLINS: Okay. It is our Exhibit 1 and 2, Exhibits 4 through 8, Exhibits 10 and 11, Exhibits 14 through 18, Exhibits 20 to 28, Exhibit 30 and 31, Exhibit 34 and 35, and Exhibits 37 through 39.

THE COURT: All right. Is that correct, Mr. Campbell?

MR. CAMPBELL: Your Honor, with the exception of Number 11. I think Number 11 is that letter of intent.

MR. COLLINS: Oh, okay. Yeah, excluding Number 11.

THE COURT: All right.

MR. CAMPBELL: With that correction, Your Honor, correct.

THE COURT:  Ms. Liggins?

MS. LIGGINS:  That's correct, Your Honor.

THE COURT:  All right.  So ordered.

MR. COLLINS:  So, Your Honor, I think how we would like to proceed, if Your Honor is amenable, is we would end with Mr. Young, with the possibility that we might call him back if we have time at the end of the hearing, if that's acceptable to Your Honor.

THE COURT:  Yeah.  So you have no further questions at this time of Mr. Young?

MR. COLLINS:  We would cease questions with Mr. Young.

THE COURT:  Okay.  Mr. Campbell, did you have any questions of the receiver?

MR. CAMPBELL:  I've got a little bit of redirect, Your Honor, but I don't know if Ms. Liggins is going to cross Mr. Young.

THE COURT:  Ms. Liggins.

MS. LIGGINS:  I have some questions for Mr. Young, Your Honor.

THE COURT:  Okay.  Do you want to do that now?

MS. LIGGINS:  Yes, Your Honor.

THE COURT:  All right.

MR. CAMPBELL:  Then I'll redirect following that, Your Honor.

THE COURT:  All right.  Thank you.

CROSS EXAMINATION

BY MS. LIGGINS:

Q    Good afternoon, Mr. Young.

A    Good afternoon.

Q    Before we get started, I just want to clear up something you said in both the first and second quarterly report.  You referenced that you -- and in your testimony -- that you had signed or entered into a forbearance agreement with FCMA, and I wanted to make it clear for the record.  Did you really mean the amendments to the credit agreement?

A    Right.  That was a mistake.  It was just an amended credit agreement.

Q    Okay.  And those, those agreements are Exhibits 27 and 28 for FCMA.

     What were those -- those were for protective advances?

A    Yes.  We give Farm Credit a rolling 13-week budget to project what the cash needs of the receivership will be and then, once we agree upon an advance amount, to cover any shortfall that gets documented with a credit agreement.

Q    So, so far during the receivership, what have you used the protective advances to pay?

A    We have paid off Tennessee Distilling Group because they had liens on the barrels.  We have paid operating expenses, shortfalls of the receivership.  And especially at the

Young – Cross

beginning there were some significant amounts that needed to be paid initially in order for vendors to continue doing business with the estate, and then we've paid professional fees.

Q    Okay.  And then you testified earlier that you had made some marketing cuts, sales and marketing cuts.  Can you tell us what kind of cuts those were?

A    Yeah.  It's a lot to travel, honestly.  I know that's a big -- we only cut a couple of employees.  We've cut quite a bit on, quite a bit on travel.  And all of those, all of those cuts were made in consultation with Thoroughbred.

Q    What kind of travel?

A    Travel to do tastings or to do bottle signings or things like that.

Q    And this is multiple employees that are traveling?

A    Yes.

Q    Who is -- is there any employee that travels more than any others?

A    Ms. Weaver travels the most.

Q    Okay.  I'm going to just jump right into it.  In your testimony that's in the record, Receiver's Exhibit C, and in your affidavit, which is Exhibit A, you said that Ms. Weaver and the management team had initially indicated to you that the revenue was 70 million for 2024; is that right?

A    That's correct.

Q    But you then, in your, I guess, recalculations -- I know you said you're putting together the financials again -- it ended up being around, is it 41 million?

A    That's correct.

Q    Okay.  And that you believe that the 2025 revenue, which I understand is not complete, but you're estimating or projecting it's going to be 25 million?

A    That's right.

Q    Okay.  And then when it comes to the debts, Ms. Weaver and the previous management team, they had indicated that the other debt -- when I say other debt, I mean debt other than the FCMA debt -- was around 10 million; is that right?

A    I think it was 5 to 10, something in that range.

Q    Okay.  But you've discovered that that debt is actually 50 million?

A    Well, and now 99 with the Advanced Spirits demand, but, yes, 54 million excluding that.

Q    Okay.  And in addition to Advanced Spirits, have you received any other like demands like the Advanced Spirits demand?

A    Yes.

Q    From whom?

A    A lot of people, WhistlePig, a lot of smaller creditors, and when I say smaller creditors, you know, 100,000, 200,000, I mean, some 3,000, right?  But a lot.

Q    Okay.  How much was the WhistlePig?

A    I think it was between 4 and 5 million.

Q    Okay.  And you said the TDG was 1.5?

A    TDG was 1.5.

Q    And Advanced Spirits, 45?

A    That's right.

Q    Okay.  Any other demand letters?

A    MarcyPen.

Q    What's MarcyPen.

A    So it's MP-TN LLC had two promissory notes, convertible promissory notes, in which Uncle Nearest was the borrower and MP-TN LLC was the lender.

        MR. COLLINS:  If I can object, Your Honor.  I'm not sure -- they've already done direct.  I don't think we got into any of this on cross.

        THE COURT:  Let's just let them flesh it out.  I know how -- overruled to the extent that was an objection. I assume that's what that was.  Overruled.

BY MS. LIGGINS:

Q    Okay.  And how much is the MarcyPen debt?

A    Just over 20 million.

Q    And it's to Uncle Nearest?

A    The loan was to Uncle Nearest.  It was a convertible note, but they declared a default before it converted.

Q    Okay.  And when you say it's a convertible note, what

does that mean?

A    There were some conditions under which the debt could be converted to equity.  If there were certain -- well, it was always at MP-TN's discretion, but if there were certain benchmarks made or a certain time amount, then MP-TN could exercise their right to convert the debt to equity.

Q    Okay.  So you're the person since the receivership hearing, since appointment of the receiver, that you are running the day-to-day of the company, correct?

A    That's correct.

Q    And so do you have an opinion about whether the company is solvent?

A    It's not solvent.

Q    And why do you say that?

A    It's not solvent for two reasons, and I think I've covered this in my affidavit.  It can't meet its obligations as they come due month to month, and the debt is in excess of the value of the assets.

Q    Okay.  And then you also said in your affidavit that the financials -- and these are your words, not mine -- were in shambles.  Is that because there's no audited financials?

A    It's for a lot of reasons.  There were no audited financials, but there were not very good financial controls, which led to a lot of problems.

Q    What do you mean by not very good financial controls?

A    A lot of things.  There were not very good checks and balances like you would expect from a company this size.

MR. COLLINS:  Your Honor, may I object?  We've got a limited amount of time, and we have -- the whole purpose was the direct, they were putting in that as their direct.  It seems like we're just creating more direct in this round of testimony.  So I'm trying to solve time.  So I'll object on the basis that that wasn't -- we're getting into things that weren't into -- that I didn't cover with him.

THE COURT:  I don't think they're limited by that, Mr. Collins.

MR. COLLINS:  Okay.  Well, that's what I understood, that the direct -- that the affidavit was taken as their direct testimony.  That's what the stipulation was.

THE COURT:  So you're saying -- okay.

MS. LIGGINS:  May I respond?

MR. COLLINS:  So I did -- I had my cross.

THE COURT:  I understand.

MR. COLLINS:  Yeah.  And --

THE COURT:  Yeah.

So let me ask you this, Ms. Liggins:  What is it that you're wanting to show?

MS. LIGGINS:  Well, Your Honor, first, I am limiting my questions to Mr. Young's direct testimony, which I think is allowed under the Federal Rules of Evidence.  I get to

cross on whatever he said on his direct. But I am trying to point out the things that are impactful to show that there is no material change in circumstances since the appointment of the receiver back in August.

THE COURT: Yeah.

Mr. Collins, I'm going to overrule your objection. We'll give them a little bit of latitude on this. However, I understand what your base position is, is that -- and so I understand that argument. So to the extent that there's something out there that's not already in the record that I don't know about, you know, cover that. But if not, let's kind of get on.

MS. LIGGINS: Okay.

BY MS. LIGGINS:

Q   Let's turn then to something that was new, that was not in the testimony, that I believe you filed after your witness and exhibit list and added, which was you were talking about the MarcyPen deal, which is an email from Ms. Weaver that also discussed that deal. Have you seen that email, Exhibit -- I think it's Receiver's Exhibit G?

A   I have seen it. I know what you're talking about.

Q   Okay. And when you say -- and I'm not going to go through the exhibit because it's in evidence. But when you're referring to the MarcyPen deal, you are talking about the transactions that are referenced in that as well?

A    That's correct.  It was a loan from MP-TN LLC to Uncle Nearest, funded to Uncle Nearest.  The money was transferred to Grant Sidney, and then Grant Sidney made some distributions out of its account, including some money that went back to Uncle Nearest.

Q    Okay.  And so that's the $20 million debt that Uncle Nearest has to MarcyPen?

A    It's the same issue.

Q    Okay.  And then you also testified about a sales process, and I think you and Mr. Collins were talking about that you were in the preliminary stages and had received some indications of interest.  Are any of those indications of interest greater than the amount of debts that you're aware of that the company has today?

A    No.

Q    Are any of those indications of interest greater than just the FCMA debt?

A    No.

Q    Are any of those indications of interest greater than the other debt, taking the FCMA debt out?

A    Not if you include Advanced Spirits.  If you exclude Advanced Spirits, then the answer is yes.

Q    Okay.  And then you originally filed the clarification motion, and when you filed it, you initially said that you didn't have an opinion about it; you were just looking for

some direction from the Court, yes?

A    That's right.

Q    But when you filed your supplemental information, you said you now have an opinion about not all ten entities but the reduced seven entities, about whether they should be included or excluded?

A    That's correct.

Q    And what's your opinion now?

A    I think they have to be included in order to have a full view of the financial operations of Uncle Nearest, just because of the amount of transfers that were back and forth between entities that are a part of the receivership and those entities that are not a part of the receivership.

Q    Okay.  You also, you and Mr. Collins were discussing, on his cross, that you were finding the Weavers' conduct to be -- I think you said media and conduct were making things more difficult for you?

A    That's what third parties were telling me is that it was impacting things.

Q    Okay.  And what -- and so do you think that -- do those third parties include prospective buyers?

A    Yes.

Q    Okay.  So buyers have given you that feedback in connection with their --

        MR. COLLINS:  Your Honor, I would object on hearsay

grounds.

THE COURT:  Overruled.

THE WITNESS:  They have.

BY MS. LIGGINS:

Q    Okay.  Thank you.  The last thing I want to touch on is Chapter 11.  You were discussing Chapter 11.  You said that you had considered Chapter 11.  Are you still considering Chapter 11 today, or is that something that is past tense?

A    I'm still considering it today, primarily because a number of the potential buyers have raised that, that they would like to buy assets out of a 363 sale, which I understand, obviously, as a bankruptcy lawyer.

Q    Okay.  So that would be you putting the company and/or some related entities into a Chapter 11 process and then you serving as the debtor in possession in that case?

A    Correct.

MS. LIGGINS:  Okay.  No further questions, Your Honor.

THE COURT:  Thank you.

Mr. Campbell, did you have anything?

MR. CAMPBELL:  Very short.  Maybe a minute and a half, Your Honor.

THE COURT:  All right.

REDIRECT EXAMINATION

BY MR. CAMPBELL:

Q    Mr. Young, when you were appointed receiver, you hired a series or a team of professionals to help you with the matter, correct?

A    I did.

Q    And do you rely on those professionals to give you information to make your decisions?

A    I do.

Q    And I assume you've read the receivership order multiple times?

A    Multiple times.

Q    Do you believe the receivership order mandates you to grow this brand?

A    It does not.

Q    And in your affidavit you mentioned some of your experience working on some larger Chapter 11 cases, Service Merchandise, Murray, Regal Cinemas, which we know here, and James River Coal.  Were those liquidations or reorganization cases?

A    They all started as reorganization.  Murray liquidated.  Service Merchandise liquidated.  Regal Cinemas was an asset sale.  James River was a refinance.

Q    As part of your work on those cases, did you evaluate both options, both a reorganization and a liquidation option?

A    Yes.

Q    And did you review financing options and lending options

for those?

A    We certainly did.

Q    So you have experience in that field?

A    I do.

        MR. CAMPBELL:  No further questions, Your Honor.

        THE COURT:  Thank you.

    All right.  Mr. Collins, I understand that you're reserving the right to call this witness again later.  Did you have anything at all right now?

        MR. COLLINS:  Let me -- just a couple, because there were a couple points that were just brought up.

        THE COURT:  Okay.  All right.

                        RECROSS EXAMINATION

BY MR. COLLINS:

Q    So you just testified that the receivership order doesn't require you to grow the value of the company, correct?

A    That's correct.

Q    Okay.  But it does require you to preserve the value of the company?

A    Yes.

Q    Right.  So if it came into the receivership on an upward trend, then you had more value at that point, correct, than it has today?

A    I'm not sure I agree.  I understand your question.  I'm not sure I agree with your conclusion.  I'm not sure that it

came in on an upward trend. I don't think you can make that determination just looking at Nielsen data.

Q    Okay. And then on your experience, all the cases we just talked about, what was your role in those cases?

A    That was when I was at Bass Berry. So I was with a law firm, obviously, so I was an associate at a law firm in all of those cases.

Q    Okay. So there were two partners ahead of you that were handling those cases directly, correct?

A    One, one partner ahead of me on some of those cases. There were, there were some where there were two partners ahead of me.

Q    Correct. And then in some of those cases you guys were co-counsel with Skadden Arps, for example?

A    I think in all of those cases we had outside counsel.

Q    Right. And you were the outside -- the client was to Skadden Arps and those bigger firms. You guys were just assisting, correct?

A    Well, we were local counsel on some of those and co-counsel on some of those.

Q    Correct, yeah. So --

A    Which may be a difference without a distinction, but I understand.

Q    So that's -- your personal experience was kind of three layers away from kind of being on the front edge of that

negotiation?

A    I wouldn't agree with that.  I was intimately involved with a lot of those conversations, but --

MR. COLLINS:  That's all I have, Your Honor.

THE COURT:  All right.  Thank you.

Thank you.

All right.  Mr. Collins, your next witness, please.

MR. COLLINS:  I call Kate Jerkens.

THE COURT:  Ms. Jerkens.

MR. COLLINS:  Yeah, Katharine Jerkens.

THE COURT:  Ms. Jerkens, come around, please.

THE COURTROOM DEPUTY:  Go ahead and raise your right hand.

Do you solemnly swear your testimony will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Have a seat, please.

THE WITNESS:  Thank you.

THE COURTROOM DEPUTY:  If you'll scoot close to these microphones.

THE WITNESS:  Sure.

THE COURTROOM DEPUTY:  Please state your full name for the record.

THE WITNESS:  Sure.  So my name is Katharine Jerkens. It's K-A-T-H-A-R-I-N-E, and it's Jerkens, J-E-R-K-E-N-S.

THE COURT:  Whenever you're ready.

KATHARINE JERKENS,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COLLINS:

Q    Good afternoon, Ms. Jerkens.  Can you give the Court your position at Uncle Nearest?

A    Sure, yes.  I'm the chief business officer at Uncle Nearest.

Q    And how long have you been with the company?

A    Since December of 2016, so I'm employee number one.

Q    Okay.  So you have a lot of experience with this company?

A    I would say so.

Q    Did you start out as the chief business officer?

A    I started out as all-hands-on-deck, but really started out as more of like a VP of sales and marketing at the time. My job was really to figure out sales and distribution from the very beginning.

Q    Okay.  And then as chief business officer, what do you oversee?

A    I oversee all of our sales, I oversee all of our distributors, I oversee our marketing efforts, and I touch logistics and production as a collaboration.

Q    Okay.  And so in that role, what types of things are you

involved in, in terms of company operations?

A    Sure.  So I collaborate with our production team on, you know, our needs in the market.  So we're following -- we have -- we are following our warehouses, what kind of inventory we have in our warehouses, what our depletions are looking like, and ensuring that we are monitoring our production schedule to ensure we have enough product on the floor.

Q    Okay.  And in that process, you create projections that help assist the company kind of manage its operations moving forward?

A    My goal is always to help assist the company and to ensure that we have enough product for our customers, yes.

Q    And is what you do important in the budgeting process for the company?

A    I would think it's important, yes.

Q    Okay.  And since the -- since the receivership has been in place, who have you communicated with primarily to provide information about the sales and marketing function?

A    Yeah.  Day-to-day it would be Mark Ruday and Scott, and then peripherally it would be Tim, and then Phillip at the beginning.

Q    Okay.  And so Mark Ruday and Tim are part of Newpoint?

A    Part of Newpoint.  Scott is with Thoroughbred.

Q    And that's Scott Schiller?

A    Scott Schiller, correct, yes.

Q    Do you have direct communications with Mr. Young?

A    I do not any longer, no.

Q    Okay.  In terms of how you function in the sales and marketing role, is that function dependent on kind of timely and quick information?

A    Yes, especially for a growing company like ours.  And what I'm accustomed to is being able to be able to pivot and be a little bit more -- be a step ahead of our competitors at any given time, yes.

Q    And that's talking about kind of marketing.  You're dealing with all 50 states, correct?

A    Yes, all 50 states, and then we also have business outside of the U.S.

Q    And in the -- in this industry, because you sell through distributors?

A    We do.

Q    Okay.  And what is your -- how many distributors are you dealing with in that process?

A    We right now have a total of 20 different distributors.

Q    Okay.  And they all have different geographic areas; is that correct?

A    All different geographic areas, and every state in this country has a different rule or a different way of working.  So, yes, it's complex.

Q    And some states are -- do they have different -- they're private versus public --

A    Yeah.

Q    -- in terms of the distributorship?

A    Yeah.  So there's open states, which are -- we will use Tennessee as an open state since we're here, where the distributors are private companies.  So I'm selling direct. We're selling to distributors.  Distributors are selling to retailers.

In a controlled state, so we'll look at a close by state, North Carolina, that particular state is a state -- the liquor there is state-run, so the money runs through the state, or in North Carolina it runs through counties.  But it's not -- there's no private distributors there.

Q    And in terms of the sales and marketing function, what are the types of marketing things that you do?

A    Oh, yeah.  So, well, I mean, from the beginning, conceptually, you know, what kind of trade marketing do we want to do, trade being towards our distributors, and then retail buyers, bartenders, people that are making decisions every day what they're going to pour, looking at overall consumer marketing.  So really high level.

And then my job is also to go, and to go and to actually execute all the way down, anywhere from ensuring that we have enough funds for tastings to attend consumer-facing events,

for having our team be able to go into market and meet with each one of our distributors, because, as we know, this is a competitive market. So we need to be in front of our distributors, having meetings, collaborating with them, patting them on the back, pushing them when we need to push them.

We need to be in front of our actual customers, the people that are -- you know, every single day a bartender is being asked, like, what drink do you recommend? And in order to be competitive in this space, you have to have people that are interacting with those folks and ensuring that they know that Uncle Nearest is the best pour. So it's very -- it's very tactical.

Q    Okay. And in terms of the process, your job, how has that changed between the time prior to the receivership versus after the receivership?

A    Sure. So I want to clarify. We had already been making cuts in 2025. We recognized cuts needed to be made, and I think it's actually very evident when you look at Q1 marketing cuts to Q2 and then you look at Q3. So, yes, Q4 was another cut, but those cuts had already been being made.

Fawn and I sat in a room. Fawn and Keith and I sat in a room. We sat with our financial advisors, and we started looking at things that needed to be cut. We also had already -- we had some -- we had made already some actual

sales team cuts prior to the receivership.

One of the biggest things that's changed for me is just timing, right? It's the ability to have an idea, to ask for something, and to be able to execute it in a timely manner. And unfortunately right now, I now have layers that I have not had prior. So I would say, like, just the ability to execute in a timely manner has been the biggest change.

Q  And so how much -- what's the time difference pre, in terms of generally getting things done so that you can move, versus the process post-receivership, from a timing standpoint?

A  Twenty minutes to a month, and then some in the middle.

Q  Okay. And just to clarify, you're saying before the receivership, you might get an answer in 20 minutes or very quickly?

A  I mean, 20 minutes was generous. I mean, Fawn and I would talk and then we would move forward, yes.

Q  And then post-receivership, more like a month to get those decisions made?

A  Could be. Not everything. I want to be clear. Not everything, but it could be at least a month, if not more, sometimes six weeks.

Q  Can you tell us about limited time offers, LTOs?

A  Yes. Limited time offers are basically offerings that we have. So we have our core SKUs that we have that are

available, what we call our everyday items.  And then throughout -- since 2018, I believe, 2019, we've offered limited time offers, which is something where it's a special bottling.  Maybe it's been aged in a special way.  Maybe it's older than everything else that we have, has a specialty label, and there's a very limited amount of it, right?

And so those, those are very important in this industry. We're seeing everybody else use these as well.  And what they do is, A, they're one of the most -- they're very profit-driven offerings, right?  Because if my everyday offerings are $60 and now I can go sell something that's 130 to $160 or even $99, at the end of the day the actual cost of all those are not the same as what we're actually able to get because of the scarcity of these items.

Scarcity marketing is a huge tactic when it comes to whiskey especially.  So telling the general public that you only have 200 bottles -- well, not 200 -- 2,000 cases or 8,000 bottles or whatever it might be, it makes people clamor for the product.  They want to get it.  It makes them want to go to their local liquor store.  It makes them want to go and find this item.

And what happens is, in that process, well, shoot, I didn't get that, but I picked up a couple extra bottles, right?  And so on top of it just being very profitable for us when we do these limited time offers, it's also a great

marketing tactic as well, because we've seen, for Uncle Nearest, that scarcity marketing does work.

Q    And how important have LTOs been to the growth of Uncle Nearest as a brand?

A    They've been extremely important and it's been part of our strategy since day one, and people expect them and they get excited about them.

Q    Okay.  In terms of the approval process for things like LTOs and getting those approved, what -- again, the process is what?  Like, if you had an LTO that you wanted to put out, how would that happen post-receivership?

A    Yeah.  So in this case what I came to find out at the end of September, which I didn't realize, is that we had to, we basically had to justify every bottling that we do, not just for LTOs but for all bottling, which is why forecasts were being asked of us.  So before we could dump any of the barrels, we needed to have, we needed to have a case for it.

So when it came to the LTOs in question, the Toasted Barrel and then the Cognac Cask, on the Uncle Nearest side, the side that's distributing out into the market, we basically had to show we had purchase orders and preorders for both of those.

And when it comes to even just the other SKUs, we also needed to try and forecast and had to talk about what we thought we were going to be doing for the remainder of the

year, or into this year, in order to be able to move forward with those bottlings.

Q    How -- in terms of the history of Uncle Nearest, how quickly have LTOs typically sold, sold out?

A    So here's the thing:  For us, all that matters is how quickly we get them to the distributors, because the minute they get to our distributors or they get to the states, for the distributors in the open states, an invoice is generated and most of those people are working on 30-day terms.

That being said, the minute -- I would say from the minute we bottle until the minute we get paid is probably about a six-week turnaround, and I would say confidently that our LTOs sell out on the market and they're clamoring.  When we sell our limited amount online, they're sold out within minutes or hours.

Q    When you -- so have there been occasions when you have proposed a marketing expenditure or a bottling that have not been approved since the receivership started, like an LTO?

A    Nothing hasn't been approved.  It's just taken longer.

Q    Okay.

A    Yeah.

Q    So in terms of that time --

A    Uh-huh.

Q    -- so let's think about the first -- what was the first LTO that you requested to be done since the receivership?

A    Right.  And so this is -- I want to just also just level-set that our LTOs are in conjunction with our distillery.  And so one of the greatest ways -- and I do not -- just for the record, I do not do distillery marketing. So I just -- but we do collaborate together.  And one of the greatest ways to get people to the distillery is to launch these LTOs at the distillery.  That creates a lot of excitement.

And we have seen the craziest of crazy things with people coming the night before, with people lining up down the highway, causing traffic jams.  And, in fact, I've heard anecdotally that someone tried to even break in once to sleep inside of our distillery so they could be the first in line for these LTOs.

So that is a big deal.  It's a big deal to be able to have those people come.  And then the minute they walk through the door for that one LTO, now they're there.  They're likely buying more because we have incredible retail, or we had incredible retail.  We have tastings.  We have tours.  So there's a lot to do once you're there.  It's a great way to get people out there.

For us, we were collaborating with the distillery to ensure that we found the right date, the best day of week to get it launched at the distillery, and we always launch into the distillery first, and then we say, let's get it to the

market, let's start shipping it to the market, even the week after it's hit the distillery.

And so there was a plan in place to have the Cognac Cask and the Toasted Barrel happening, but what happened is once the end of September came along and we realized that we were going to have to really get permission to dump all of our barrels, there was quite a bit of back-and-forth, I would say, about when we could actually dump them, and there was a lot of things that we had to prepare, myself and the marketing team at the distillery, in order to get those permissions.

Q    And we're talking about permissions from the receiver, correct?

A    Correct.

Q    Or the receiver team?

A    Which what I understood is, what I was always told is, you're sending this to us; we're getting permission from the bank.

Q    Okay.  So they were --

A    That was always the reference, "the bank."

Q    So just to be clear, when you were asking for approval of an LTO or things like that, the delay, they were referencing the delay was being caused by the bank, or Riveron?

A    Any moment, any, any, any moment, yes.  It was, it was, it was the delay but also just the decision-making in general. There was pushback on it in general.  There was a conversation

that I had where I was even told that, even despite how good the margins are on these LTOs, that the bank did not really care unless they all sold the minute that we bottled them.

So the margins did not matter. It was really about the bank. Again, and I'm just using that because that's how it was said to me is, "the bank" wanted to ensure that whatever we're bottling was going to be sold immediately. Those were the parameters we were looking at, and that was why we had to have very solid plans, in order to present to the bank.

Q   Prior to -- where does Uncle Nearest do its bottling presently?

A   Right now at our distillery in Shelbyville, the Nearest Green Distillery.

Q   Okay. Is that where it's always been bottled?

A   No.

Q   What kind of volume bottling can you do at the distillery?

A   On average, I think we can get to about 2,000 cases a week on a good week. I've learned throughout the years, though, that depends on how cold it is, how hot it is, pending any challenge, operational challenges which could cause us to have a delay.

Q   In your experience, do you think that enough bottling is happening in order to meet demand?

A   I would, I would -- my personal thought is that we need

another, we need another plan.

Q    And do you think that more inventory ought to be held in order to meet the sales requirements?

A    Yes.

Q    Has that -- have you relayed that to the receiver and his team?

A    I think at the moment -- so I'll just be perfectly honest.  On a weekly basis, I will say that the people that I interact with are very cordial, great conversations, where we have very open and honest conversations about what is needed. My conversations with them are about what our abilities are today.  We don't get into the what-ifs of if we had something else because that's just not what we have.

So on -- during those calls, we are talking about we need 1884, which is one of our everyday SKUs.  We need that now. We've now sold out in Florida and New Jersey.  And then the conversation is, shoot, well, we also need to bottle this Toasted Single Barrel, which has been approved, and we've told our distributors they're getting it.  We all as a group need to decide what's more important.

So really what's happening is that because of the limited bottling line that we have, we as a group have to make decisions that sometimes are going to delay getting product to the market.  We very rarely have anything just extra sitting on the floor.

Q    Are you aware of out-of-stocks in the market?

A    Yes, we've had out-of-stocks, especially closer to the beginning, when there were some -- you know, while we were getting our feet wet and all of that good stuff, yes, towards the beginning.  I do feel like we've gotten to a place that is better, and again I just want to clarify, working with what we have.

Q    Okay.  And so in terms of LTOs, how many LTOs have been released since the receivership started?

A    Two.

Q    And that is which two?

A    The Cognac Cask and the Toasted Single Barrel.

Q    Now the Cognac Cask was released broader than the distillery, correct?

A    Both of them were.

Q    And the Toasted Barrel, when was Toasted Barrel supposed to launch initially?

A    In an ideal world, it would have launched early September, to be perfectly frank.  So that's why I just -- it then launched, I believe.  And, again, I believe we ended up having it launch first or second week of November at the distillery.

We actually made a decision that it was more important to make sure the distillery had it and had a way of driving revenue and achieving the forecast that had been set forth and

given to the bank and that we could not -- the one thing you cannot do is send out two LTOs at the same time into the market. So though what was working, going to work for the distillery, wasn't necessarily going to work for us. So we made a strategic decision that they were going to launch it at the distillery.

One of the neat things about the Toasted Single Barrel is it's only ever been at the distillery, so no one on the market had to know that they were missing out on anything in that time. We then made a strategic decision to launch the Cognac Cask on Black Friday through a series of announcements that led up to it, and then that released into the markets.

And then this January, I think the second or third week of January, we started to ship the Toasted Single Barrel out into the market. So people are getting that as kind of a surprise. They didn't know that it was coming because it had been released just at the distillery.

Q    But in the absence of receivership, what would have been the schedule for the release of Toasted Barrel and Cognac Cask?

A    The Toasted Single Barrel for us would have come out earlier. The Cognac Cask was meant to have come out earlier in the year, though. So to be very frank, like, that was -- we -- one of the biggest things that our CMO and myself, when it all started, when the receivership started, is we have

those LTOs, we literally have this product. It is sitting in barrels. We need to get the labels. We need to get the bottles.

The Cognac Cask needed to be bottled, or the idea of it and what we had done with it wasn't going to work any longer. It had been sitting in the barrel, the Cognac Casks, for long enough.

Q   And in terms of timing of release, if you miss a release date of an LTO, that's just basically lost. It's delayed revenue, right?

A   It is delayed revenue.

Q   Yeah.

A   Yeah. There's no -- yeah, it's a delay. If we didn't get it out, if we had it in our forecast for November 1st and we didn't get it out until December 1st, then, yes, that's delayed revenue.

Q   And then it delays the next LTO, correct? So it's a --

A   It is. To go onto the general market, yes, there has to be a time, there has to be time to let it sit.

Q   And at the end of the day, an LTO, does it effectively represent increased sales --

A   Oh, yeah.

Q   -- in your opinion?

A   Yes, because you have your cadence of everyday SKUs, and then you're going to have a little bit of an increase when

those products go onto the market.

Q    So if LTOs had been approved quicker, for example, in 2025, if you had gotten, you know, two full releases of an LTO, would that have, in your opinion, kind of increased the sales revenue, the top-line revenue of the company?

A    In all honesty, by the time we got to the conversation about those, the strategy that we have in place right now would have not affected 2025.  It would have been great if we could have gotten it out earlier in January.  But, no, in my personal opinion for the market, to have released the Single Barrel -- and I've said that to Scott and to Mark, so I'm being very honest.  No, it would have not made sense to -- if by the time the Toasted Single Barrel was ready to -- excuse me.  By the time we decided when we were going to launch the Cognac Cask, it would have not made sense to launch the Single Barrel based on the timing that we were given.

Q    Well, I understand the timing you were given.  I guess what I'm saying is, if you could have gotten the two LTOs out in 2025 --

A    Uh-huh, if we had been able to get them out in 2025, overall, yes.

Q    And the reason you couldn't get them out in 2025 was effectively the receivership?

A    Not necessarily.

Q    If that's not correct, then --

A    No, not necessarily.

Q    Okay.

A    Yeah.  Not necessarily, no.

Q    Okay.  So recently, I think in December, you provided a cash flow forecast for the company to, I guess to the receiver professionals?

A    So, yes.  So the most -- so I don't, I don't, I don't send cash flow forecasts.  I forecast top-line revenue.  So --

Q    For sure.

A    So on January 8th, I sent a Q1 2026 forecast.

Q    And how was that received?

A    The next day, on our weekly Friday calls, I was told, I believe it was by Tim or Mark, that the bank had lost trust or lost, like, trust in the validity of these revenue forecasts. And at that time they wrote, they said to me that my forecast was 25 percent higher for Q1 than it was for how we landed in Q4.

And I know that because I sat befuddled on the call.  I was actually embarrassed because I was like, if I turn in a forecast like that, I don't even know what to do.  So I just was quiet for the rest of the call.  I went back, looked at all the numbers, looked at the emails I sent them, and I sent an email to Ryan and Team.  And I have it here, and I think you have it as well.  I said, "This is what I show we did in Q4 in Park Street, $5.7 million.  Our Q1 forecast that I

submitted was 4.9, which is 18 percent less than what I show on Park Street we did for Q4. I am confused by the discrepancy" is what I wrote. I said, "I am confused by the discrepancy. If you could please share for me the numbers you have so that I can ensure we're all looking at the same numbers, that would be great."

Q    Did you get a response to that?

A    I did not get a response to that email.

Q    Okay. Did anybody ask you for further clarification of your projections?

A    So that day -- that's a Friday, so it was our Friday calls. And Friday afternoons, that Friday afternoon, Mark and I talked. And I said -- you know, we both talked on the phone and decided that it made sense for myself, Mark, Scott, Tim, Ryan, and then Chuck, my colleague, to get on a call on Monday and really talk through the forecast, so we could talk through days on hand -- which days on hand is we have reports where we can see how much product is in our distributor warehouses.

So we can see projections by how things are depleting from every one of our distributors. That's how we can start to make forecasts. If they only have 30 days of inventory, we can assume that in this next month they're going to have to, they're going to have to order X amount of product.

We also, we have the industry knowledge and we have -- Chuck's worked with me since 2018. I've been there since

Jerkens - Direct

before. So we wanted to explain ourselves. And I thought Mark -- I thought it was a great idea. So we got on the call on Monday. That was January 12th. On that call I said, I do want to make sure we're all on the same page. I sent this email. I was then told, "You know what? 25 percent may not have been exactly what you were over. We've only really looked at cases so far." So on this screen, I just got cases, not revenue, and that it maybe was closer to 20 percent. And I said, "I still don't have that number."

And we kind of moved on from that to all of us talking about days on hand, all that kind of stuff. And more than once I said, if you guys don't want to use my forecast, you absolutely don't have to use my forecast. We're using the tools that we have. But that's -- I can only use the tools that we have. And I understand. If your concern is that my forecast is too heavy, feel free to, feel free to utilize whatever you would like to utilize.

Q    So the receiver, in his affidavit, basically said that he was concerned that you specifically -- named you specifically -- had perhaps, I guess, conspired with Fawn Weaver to pump up the projections. Is that true?

A    It's patently false and it's offensive, honestly. I -- nope. So I can tell you exactly -- first of all, Fawn wasn't involved in that forecast. Chuck, my colleague, and I spend time. He puts together a forecast, he sends it to me, I look

at it, I poke holes, I go back, and we go back and forth. When we feel like it's ready, we send it to Fawn. She looks at the format and says, okay, send it, period, end of story.

Q     And --

A     And I just want to say for the record, I don't understand what making a forecast bigger than what it's supposed to be, what it would do for us. Not only that, but I don't have access to cash flow forecasts.

So I would like just to say that Mr. Young mentioned that perhaps I had reverse-engineered. I don't even know how I could have reverse-engineered anything when we're not being given cash flow forecasts. And honestly, like, not -- I just don't know if I'm that clever. I just, I literally turn in a forecast based on all of the knowledge that I have and was able to talk about it with Mark, with Tim, with Scott, and that was the end of it.

Q     And in terms of your forecast and in terms of the actuals, right, the actual outcome, how did your forecast end up in relation to the actual numbers?

A     Sure. So the forecast that I turned in for January was 1.452 million -- 500,000 -- so 1.45. In Park Street, for January, I show that we ended the month at 1.960, so 1,960,000.

Now I will say that there are some -- we had some erroneous postings by Park Street that have been between

November, December, and January. My understanding is that January number is probably 80,000. So if you back that out, it would be 1.88 is what I'm getting.

Again, I've asked more than once -- I have several emails that I can present where I've asked how they pulled their numbers versus how I pull mine. I've worked with Park Street since day one. I only know how to pull the numbers one way. So when I asked for help --

Q    And what is Park Street?

A    Park Street is -- who is Park Street? Park Street is -- the best way to talk about them would be a logistics company. So they basically, they run -- all of our orders run through Park Street. All of our AP and AR, as it relates to our distributors, runs through Park Street. And they then, they also handle all of the orders and dealing with our warehouses, et cetera.

Q    So the numbers you get from Park Street are generally solid numbers?

A    When you log into Park Street on a daily basis, it tells you your sales for the month, your sales year to date, and your cash balance, everything. Like, it's literally just a dashboard that's just there when you plug it in. So, and what I did is I -- so what I have just given you are numbers that people can pull from Park Street.

So I asked more than once. I asked in December and I

asked in January if someone could please show me how they are pulling the numbers so that we could get on the same page, and I received no response either time. I didn't realize that we were at that time not being given access to the forecasts or numbers. So that might -- that's probably why I wasn't answered.

Q    And so just to make sure I'm understanding correctly, so you forecast a number and you're accused of overinflating the forecast?

A    Correct.

Q    And then when the actual numbers happened, you were actually below the actual?

A    Correct. And in Mr. Young's affidavit, he said that I inflated November, the strongest month traditionally of the year for spirits. The number I show for Park Street, again for clarification, for November, is 1.764 million. I again forecasted 1.462 million, which to me is not 20 percent above but is actually below. And then we still hit 1.96.

Q    Okay.

A    And actually on February 2nd, the day that the filings were made with that affidavit, I had a call that day with Mark, Ryan, myself, and Chuck, where Mark during that call acknowledged that we had achieved over our forecast.

Q    Thank you.

A    Uh-huh.

Q    So I've put up on the screen -- this is -- we've marked it as --

MR. BUCHMAN:  29.

BY MR. COLLINS:

Q    This is our Exhibit Number 29.  It's already been provided.  This was dealt with in the Phillip Young direct. This was the Park Street data that compared 2023.  It's the one with the -- where on the screen it's not as clear as on the paper.

Are you familiar with Park Street?

A    I am.

Q    Yeah.  And you're familiar with these two sheets?

A    I am.

Q    Okay.  And is the first sheet an actual representation of the actual Park Street numbers for 2023?

A    So I can't see the date range on here, if I'm being honest.

MR. COLLINS:  Yeah.  If we can have a paper printout, I'm happy to --

THE COURTROOM DEPUTY:  Why don't you put it on that monitor right there.

MR. COLLINS:  Oh, that's a good point.

THE WITNESS:  Not even these glasses will help for that one, unfortunately.  Yes.

BY MR. COLLINS:

Q    I think -- can you see the number there?

A    Yes.  So, just for background, so this is the sales invoice report.  So this is a screenshot of the top of the report, which shows you the top-line revenue and then everything -- you could export it to Excel to see every single cell that related to that time period.

Q    So for 2023 it's 25 million and change?

A    Exactly.

Q    And then this is, this is also a Park Street printout, correct?

A    Yes, it is, correct.

Q    And this is for what period?

A    This is for 2024.

Q    Okay.  And for 2024 it shows 34 million, well, actually close to 35 million, correct?

A    Correct.

Q    So 2024 was significantly higher than 2023?

A    It was.

        MR. COLLINS:  Your Honor, I would move these into evidence, please.

        THE COURT:  Any objection?

        MR. CAMPBELL:  No, Your Honor.

        THE COURT:  So ordered without objection.

        MR. COLLINS:  This, we have -- and do you have a copy?

THE COURT: Mr. Collins, I couldn't see that in ten years. Can you blow that up.

THE WITNESS: I'm glad you said that.

There we go.

THE COURT: What exhibit is this, Mr. Collins?

MR. COLLINS: This --

MR. BUCHMAN: Your Honor, we have it marked as Exhibit 56, but I believe Mr. --

MR. COLLINS: It's not in evidence yet, so we're going to --

MS. LIGGINS: I don't think we've seen it.

BY MR. COLLINS:

Q    Have you seen this document before?

A    Yes. It's a screenshot from our depletion scorecard.

Q    Okay. And this is a report that you generate?

A    That Chuck Cronkhite generates for me, yes, that we use every single month, correct.

Q    And this is -- what is this showing?

A    So the first, the first row, 2025 actual, those are our depletions by month. So the 11,968 refers to -- that refers to January and so on. And the final number, 156,429, would be the total.

Q    Okay. And so the last column is the total?

A    Correct.

Q    Okay. And this compares several years, correct?

A    This is comparing -- yes.  So this is comparing depletions 2025 over 2024, and it's also showing our depletions for 2023.

Q    And in terms of -- I think the Court has already heard what depletions are, so we won't go into that.  But in terms of the growth of depletions -- and maybe quickly just say again what depletions are between the distributor and the distillery.

A    Yeah.  The depletions, how we look at it, are cases leaving the distributor warehouse.

Q    Okay.  And so how do -- from a sales and marketing standpoint, how do depletions impact what you do?

A    Yeah.  I mean, every time product leaves the distributor warehouse, then that leaves us -- that leaves more room for them to come back and order again.  It also means that they've sold into a retailer or to a bar or restaurant.

Q    And how do distributors decide when to buy?

A    When they need the inventory.  So typically, I would say typically -- we also have Danny Romano here who can talk about what their cycle is.  But some of them will run, they want to make sure they have at least 60 days inventory, some people running a little more lean these days at like 30 to 45 days of inventory.

Q    And so high depletions would -- what would that represent?

Jerkens - Direct

A    It would represent them moving through their inventory and needing to order more inventory.

Q    And in terms of this chart, in the third column, what does it -- what does it show as between 2023, 2024, and 2025?

A    Yeah.  So in 2025, we depleted 156,000 -- I'm just going to round if that's okay -- 156,000 cases.  In 2024, we were at 147,000.  And in 2023, we were at 142,000.

Q    So year over year --

A    And I would just like to -- may I clarify?  And this is because this has come up a few times.  All of this is in 4-and-a-half-liter cases.  We do have a product -- so our core SKUs run in 4-and-a-half-liter cases.  Our latest one that we launched in 2024, it comes in 9-liter cases.  But we run the report in 4-and-a-half-liter cases.  And I can tell, because I have my people that I work with in the back, that this is a conversation that we have, and that's kind of a challenge sometimes when you have two different sized cases.  But this represents 4-and-a-half-liter cases, for the record.

Q    So at least in terms of this chart, it shows that, at least between 2023, 2024, and 2025, depletions were increasing?

A    Have increased, correct.

        MR. COLLINS:  Your Honor, I would move for this into evidence.

        MS. LIGGINS:  I have an objection, Your Honor.  I

just, I can't tell actually what it is, where it came from, who prepared it.  This is his direct witness.  This was not on the exhibit list.  I mean, I know it's a printout and she's testifying, but, I mean, we're trying to be lenient.  We let the Park Street in, exhibit.  We can't see it.  I just don't know what it really, truly is.

THE COURT:  All right.  Mr. Campbell, anything?

MR. CAMPBELL:  Your Honor, I generally agree with Ms. Liggins.

THE COURT:  Okay.

MR. CAMPBELL:  But I don't know that I want to lodge a formal objection.

THE COURT:  All right.  Flesh it out a little bit, Mr. Collins, you know, briefly, and I'll let it in.  But flesh it out for me, okay?

MR. COLLINS:  Okay.  I will.

So explain again exactly --

THE COURT:  You heard the issues that she had with it, so just answer those questions.

BY MR. COLLINS:

Q    So explain again how this was created and who created it.

A    Yes.  So this is, this is something our team uses, Chuck Cronkhite, who is my SVP of distributor relations.  The actuals here are taking actual depletions from every open state distributor in the country and then the depletions by

control states.  So those are -- when it comes to the distributors, that's product that's leaving the distributor warehouse.  In the case of control states, it's what they've sold through the control states.  So all of those make up the actuals.  And then is there more?  Does that help?

Q    So you mentioned Chuck.  Chuck is part of your team?

A    He's part of my team, correct.

Q    Part of the sales and marketing team?

A    Uh-huh.

Q    And this is all done -- this is a business record done within the context of --

A    It is.  So we're using -- so the data, the way the data is pulled, it's pulled from a system called VIP.  VIP is a system that basically it dials into all of these distributor warehouses for the open states, and on a nightly, on a nightly basis, it dumps the data from these distributor warehouses. So we actually -- it's actually a great tool for us because on every single day we can go in and see what was literally sold by our open state distributors every day.

Control states are a whole 'nother, they're a whole 'nother bag, to be perfectly honest.  We do not get that data sometimes for 30 to maybe 45, even 60 days, because they have to go through so much more red tape.

Q    But, again, this is not a report that you just kind of put together for this.  This is something you guys use in

the --

A     Yeah.  This is data coming from VIP and then from our control state data.

Q     And it's something you use in the ordinary course of your job?

A     We use it every month to review how we're doing, and we use this to work with our sales teams and our distributors to address when there's challenges and to celebrate when we have successes.

MR. COLLINS:  I believe that's covered.  If there's something else I need to cover, Your Honor, I would be happy to.

THE COURT:  It's admitted.  Let's move on.

MR. COLLINS:  Thank you.  I believe that's all I have, Your Honor.

THE COURT:  All right.  Thank you.

Now you have no questions, Mr. Campbell?

MR. CAMPBELL:  I'm going to let Ms. -- mine are very short.  I've got maybe three.

THE COURT:  Okay.

MR. CAMPBELL:  I'm going to let Ms. Liggins go first, and then I'll clean up.

CROSS EXAMINATION

BY MS. LIGGINS:

Q     Good afternoon, Ms. Jerkens.

A    Hi.

Q    I just have a couple of questions.

A    Of course.

Q    The first one is, you said that you're the chief business officer?

A    Correct.

Q    Okay.  And as the chief business officer, does your compensation include equity?

A    In the first two and a half years I was given some goals, and with those goals I did earn stock options, which I actually have not exercised those options.

Q    So do you hold any equity today?

A    The equity that I hold is based on a $25,000 investment that my husband and I made.

Q    Okay.  So you are an equity holder?

A    Correct.

Q    Okay.  And then you said that, you testified that you guys were already making cuts because we recognized that cuts needed to be made?

A    Uh-huh.

Q    What was the thing that made you recognize that cuts needed to be made?  What was going on?

A    The -- my -- what I was being -- I was brought in to speak to -- and I apologize because I didn't get a lot of introduction.  Like, it was kind of a fast-paced time.  But we

had Carlos, who was working as a consultant with us, and then I believe --

Q    I'm going to stop you real quick.  Who is Carlos?

A    Carlos' last name of --

        AUDIENCE CHORAL RESPONSE:  Flores.

        THE WITNESS:  Sorry?

        AUDIENCE CHORAL RESPONSE:  Flores.

        THE WITNESS:  Flores.  He was the consultant that was working as an acting CFO with us.  Prior to that was Felicia. We had -- we --

BY MS. LIGGINS:

Q    I'm sorry.  I'm going to stop you again.

A    Sorry.

Q    Who is Felicia?

A    Why can't I think?

        UNIDENTIFIED VOICE:  SVP of finance.

        THE WITNESS:  No.  I know who Felicia is, SVP of finance.  I cannot remember her last name.

BY MS. LIGGINS:

Q    Is it Gallagher?

A    Correct.

Q    Okay.

A    So I would say -- do you mind if I back up a little bit to explain?

Q    No.  Go ahead.

A    When the Weavers made some changes in finance and somebody like Felicia came along and Carlos came along, our financial -- those financials, as discovery was made that we needed to -- I don't know how to say this without -- proper financials were being looked at.  We were looking at real-time data and realized that marketing, that there needed to be marketing cuts at that time.

Q    And was the real-time data, was it like a lack of revenue?

A    It was not necessarily a lack of revenue, but it was our costs were outweighed -- the revenue you can control so much. It was that my marketing expenses at that time were too high.

Q    Okay.  And so when you started making cuts, what kind of cuts did you make?

A    The initial cuts that we made, the initial cuts we made in May were to -- well, let me start with earlier in the year we started to taper down our credit card spend with the team. So what Mr. Young referenced earlier, we had made some cuts already to travel.

And travel is kind of a broad term.  If you don't mind, I will say that when you're a sales, when you're a sales rep in the market, it's not just a travel expense, but it's an expense to go into bars and restaurants, to go into those places and to, quote, account-support.  So it's more than just traveling.  A lot of -- there is money that's on those cards

that is spent just to go in, to be in your home market.  So we made reductions to that.

We made reductions to events that we were participating in.  We made reductions to digital marketing spend.  And we made reductions to point-of-sale materials.  And then we also made some staff cuts.

Q    And you said that before you guys weren't doing forecasting.  You and Ms. Weaver would just meet and decide what needed to be done, right?

A    That's not what I said.  What I said, when Fawn and I would meet had to do with when we had like a marketing idea, it didn't have to pass through a week to six weeks of approvals.  We would come up with an idea and start to execute on it.

Q    Because everybody who needed to approve was already in the room?

A    Correct.

Q    Okay.  And then you said that you have had more red tape because of the bank.  When you say bank, who do you mean?

A    That's a good question.  I'm being told the bank.

Q    By whom?

A    By the team that I send my forecasts or my approvals to, so to the team at Thoroughbred or Newpoint.  I understand that the bank -- I think once or twice it's been said that it's actually Riveron, but typically the term is "the bank."

Q    Okay.  But you've never met with anybody at the bank?

A    I have not talked to anyone from Riveron nor the bank.

Q    Okay.  And you were talking about bottling at the distillery?

A    Correct.

Q    Okay.  But there's no distilling going on at the distillery, right?

A    Just the bottling, correct.

Q    Just bottling.  Okay.  And so just real quick on this exhibit, that's the same one where you have the budget, so I apologize.

        THE COURT:  I can't see it.

        MS. LIGGINS:  I can't either.

        THE WITNESS:  Even with these guys.  I'm sorry.

        MS. LIGGINS:  Even with my readers.

        MR. BUCHMAN:  If you switch to my monitor --

        MS. LIGGINS:  Okay.  Great.

BY MS. LIGGINS:

Q    But I'm just going to ask about the budget number.

A    Yes.

Q    And you said who puts the number in for the budget?

A    That budget number for depletions was something that we worked on together, myself, Fawn, and Chuck.  And it was also numbers that we had worked on as we set our 2025 budget, so Felicia and Carlos would have been involved in that as well.

Q    Okay.  And does the red mean that the budget was never met?

A    So, yes, the depletion numbers were not met, correct.

MS. LIGGINS:  Okay.  No further questions, Your Honor.

THE COURT:  All right.  Thank you.

MR. CAMPBELL:  No questions, Your Honor.

THE COURT:  All right.

MR. COLLINS:  Just real quick.

THE COURT:  Anything else?

MR. COLLINS:  Real quick.

REDIRECT EXAMINATION

BY MR. COLLINS:

Q    On the depletions, your projections, we don't control depletions at the distillery or you don't control depletions by the distributors, correct?

A    Our -- we, we -- our goal is to drive depletions with our distributors, correct.

Q    Yeah.  Well, what I'm saying is you couldn't say, we're low on depletions; let's deplete some.  It's the distributor that does the depletions?

A    Correct.

Q    So ultimately -- and it's the retailers that drive it. So you're projecting depletions based on retail sales?

A    By -- yes, by retail sales and also bars and restaurants

purchasing, correct.

Q    Right.  And so it's a function of a lot of parameters that make it somewhat difficult to predict?

A    There are definitely a lot of factors that affect depletions, absolutely, you know, including uncertainty with the receivership, a multitude of things.

Q    At the end of the day, the actual numbers, though, are really what happened, correct?

A    The actual numbers are what happened.  And we did, in fact, despite a market that was in decline, there aren't a lot of spirits companies right now that can say that, in 2025, that we grew our depletions.

Q    And then just to clarify, so when you talk about being an equity holder -- she just asked you the question.

A    Yeah.

Q    You made a 25 -- you're a $25,000 equity holder, correct?

A    Correct.  And we actually did sell some of our shares on the secondary market in 2023, so I have a total of 6,666. Even though that's the 666 we don't like, that's the number of shares that I currently have.

Q    Very good.  And then there was questions about the travel expense and Ms. Weaver.  In terms of the marketing of this company, how important is Fawn Weaver individually to the success of the marketing and sales plan for this company?

A    I mean, when it comes to the travel, the travel that she

spends, it's been incredibly important, from -- we've had some huge initiatives, you know, through starting with the CEO tour, where she made her way around the country and actually met people and met buyers and shook hands and thanked people for their support. There's no CEO in the spirits business that's doing stuff like that, and then the Love and Whiskey Tour, where again the opportunities to interact with consumers.

So those things are important, and there are not CEOs that are doing that in the spirits business. It's something different. It's a way to differentiate us. And so those expenditures make sense to me, and they've been an influential part of our marketing campaign.

Q    And when she does bottle signings, how does that usually turn out?

A    People line up out the door.

Q    And, in fact, in December, didn't the company --

A    Multiple stores had multiple lines outside their door, rain or shine.

Q    In your knowing the sales and being a sales and marketing person, do you think that this company could have had the success it had without the marketing efforts of Fawn Weaver?

A    No.

MR. COLLINS:  No further questions, Your Honor.

THE COURT:  All right.  Thank you.

Thank you.

THE WITNESS: Thank you.

THE COURT: All right. Mr. Collins.

MR. COLLINS: Your Honor, I will call Danny Romano.

THE COURT: Mr. Romano. All right.

THE COURTROOM DEPUTY: Raise your right hand.

Do you solemnly swear your testimony will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Have a seat, please.

Will you state and spell your name for the record.

THE WITNESS: Daniel Romano, R-O-M-A-N-O.

THE COURTROOM DEPUTY: Thank you.

DANIEL ROMANO,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COLLINS:

Q   Good afternoon, Mr. Romano. Can you give us a bit of your employment history.

A   I -- my grandfather started a liquor -- in the liquor business in 1913, and we had a family distributorship in Illinois until 2002, when we sold it. I had a noncompete that ended in 2017, and in 2018 we started a small distributor, and we've been in business since then.

Q    And how has that distributorship grown?

A    My distributor, it went from nothing, and last year we did, like, $70 million.

Q    So you're not a small distributor anymore, correct?

A    Well, we're still small.  You know, there's a couple of distributors that are a billion dollars, and so we're small.

Q    Right.  But 70 million is not tiny?

A    Yeah.  I think we're the fourth largest in Illinois.

Q    Okay.  And then so when you kind of formed this -- what's your new company's name?

A    Romano Beverage.

Q    Romano Beverage.  So when you started Romano Beverage, how did you start it?  What was your --

A    We started by buying a few small companies in Illinois that were basically going out of business.  You know, we bought small ones and just built from there.

Q    And who was your first, your first account for -- your first brand?

A    Our first brand, I don't remember.  We bought some companies that -- we bought some companies that had brands.

Q    Well, how early did you get involved with Uncle Nearest?

A    Oh, like, right at the start.  I met Fawn, and what happened is that we had a couple of small -- we just had a couple small companies, and we just took the owners and maybe one salesman.  But when Fawn came, we ended up having to hire

a bunch more people because of what her plans were and what we thought what we can do with Fawn and the product.  That's when we started adding the people in.  It was our first major brand that we had.  We had just a couple small brands that guys were going out of business with.

Q    Okay.  And so you've been with --

A    Yes.

Q    -- or dealing with the Uncle Nearest products for a little bit?

A    We sold the first case of Uncle Nearest.

Q    Yeah.  Okay.  So in your role as a distributor, how do you interact with retailers?

A    I go to a lot of the buyers' meetings.  I'm the CEO and the owner.  And, you know, I'm not good at a lot of things, but I am good at meeting with buyers and the people who make the decisions, and meet with the restaurant owners, and that's my job.

Q    And as a distributor just kind of generally, the interaction between distributors and retailers, both on-premise and off-premise, right, bars on-premise, liquor stores off-premise, how does that, how does that marketing process between the distributor and the retailer work, like in terms of shelf space and those types of things?

A    Well, it's our job to get the information from the supplier and then present it to the buyer:  This is why you

should have this product, this is the margins you're going to make, this is the advertising that they're going to do, and this is why we think we should get this product in your store or why we should generate this many -- all these shelves or prices and whatever.

Q    Now do you rely on any data for that at all?

A    Yeah.  We rely on what our suppliers say that they're going to spend in the market.  We rely on stuff like that.

Q    Okay.  And in terms of promotional activity, do you work with your distillery accounts and brands in terms of kind of joint marketing efforts?

A    Our suppliers, yes.

Q    And what -- can you tell us a little bit about how that works?

A    I'm not sure what you mean.  It's like we meet with the supplier and they say, okay, this is, this is how we're going to promote the brand.  This is the kind of money that we have to spend.  And then we will say, okay, we need this, this, and this.  And it's up to the supplier and I to, okay, you know, we'll contribute this, you guys contribute this, and together we'll build this so that we can get what we want from a retailer or from a restaurateur.

Q    So it's kind of a --

A    Yes.

Q    -- you guys collaborate together?

A    Yeah.

Q    Both in terms of expertise and money, right?

A    Right.

Q    To promote the brand?

A    Yeah.  I like to envision it or look at it as, you know, you don't know where one company starts and one company ends. It's like, you know --

Q    Symbiotic?

A    Right.

Q    It's a symbiotic relationship?

A    Like we've had with Uncle Nearest for many years.

Q    Okay.  And so from your perspective as a distributor, in terms of, let's say, going back to the middle of the summer, right, before the receivership, what was your view of the brand and its trajectory as of that time?

A    It was great.  We were growing it every month and we had a brand.  It was, you know, it was the first major brand we had, and it was our most important brand that we had in our portfolio.  So our salespeople spent a lot of time, you know, selling the product.  And Fawn and Victoria and Kate, they would come to the market and promote the brand and help us, you know, sell the product.

Q    Okay.  And in terms of the retailers that you deal with, what did you view their view of the brand to be back in, let's say, middle of the summer of 2025?

A    I would say they view it as Fawn Weaver's brand, you know, that she was the energy behind it and it was a great brand.  You know, that was the first thing our salespeople, first thing we talked about in every presentation is, you know, Uncle Nearest, what they have coming, what they're doing.

And then they would have a ton of promotions come in. Fawn would come to auditoriums and sell out.  You know, I don't know how many we had that we would sell out a bunch of stuff.  I had to pay $100 for a ticket.  I was upset about that.  But that was what we would tell the retailers, that we would tell the restaurateurs, hey, she's coming, she's giving a speech in an auditorium.  And that's what we did.

Q    And so in terms of to you, as a distributor, the value of this brand as part of your portfolio, how tied in your mind is that to Fawn Weaver?

A    She's the brand.  I would say 100 percent she's the brand.

Q    So let's kind of move forward now.  Now we're in January. We've been in a receivership for a few months.  Has anything changed in terms of the retailers and the perception of what's happening?

A    Yeah.  What's changed is -- in my opinion, what has changed is we've had to deflect a lot, basically, from our competitors.  You know, they're saying, okay, you know,

they're in receivership. Who knows what's going to happen to them?

So there was a lot of deflecting that we would have to do. We would have to come on the offense because our competitors would say, well, you never know what's going to happen to them, or, you know, who knows what's going to happen? You know, you don't know if they're going to be around, if they're going to be sold or whatever.

So that was the -- that's what I've -- we've had to spend a lot of time deflecting that. And I say, no, no, no, no, no. This is the way it's going. This is where it's going. It's strong. Our numbers are still pretty good. And in terms of, you know, the industry, our numbers are -- have been good on Uncle Nearest.

Q   And in terms of sales and marketing and dollar spend, have you seen any kind of -- has there been any modification in that?

A   From the retailers?

Q   No, from the spend on marketing in your distribution network.

A   From Uncle Nearest to us?

Q   In terms of from the company.

A   No.  I -- you know, I have to say that, you know, every time we've come to Kate, looking for help to build this brand, you know, we have gotten it.

Q    And that's probably why you're seeing in your market that sales have actually --

A    Yeah, they've grown.  You know, there is, there is an issue where, you know, we have a couple major chains, a couple national chains, and the national chains, you know, they hear the chirping from their competitors.  And, you know, there's a national chain that has said that, you know, because of national -- Nielsens, you know, are going to probably discontinue 1884, which, you know, that one chain is 184 accounts that, you know, we're going to lose distribution on.

Q    And do you have any indication of what may be causing them to --

A    I can only surmise, you know, that I would believe that retailers and national accounts, national chains, you know, they look at Nielsen and they decide, okay, what's the trend coming from the east, what's the trend coming from the west. They see the Nielsen.  Then they make the decision.

They also have, you know, their competitors coming in or my competitors coming in and chirping in their ear, like, you know, you never know what's going to happen.  This is going to happen.  This is going to happen.  In the state of uncertainty, you know, buyers make the decisions.

Now, you know, the buyer from this national chain has not told me personally that that's the reason, but I can surmise. You know, I've been in this business since -- I'm 69.  I've

been in this business since I was 13, so I can surmise what happens.

Q    Yeah.  You mentioned about the Nielsen data.  How important is the Nielsen data, especially talking to chains and --

A    For national chains, you know, they make, I don't know, I'm not going to say all their decisions, but I assume they can make a lot of their decisions based on Nielsen.

Now, you know, at the old Romano company that we had, you know, we had brands like Bacardi and Jack Daniels, and we used Nielsens all the time.  We showed, you know, how the Nielsens are growing so that we could get more ads and we could say, well, we need more ads because look at the ads that you run have shown incremental growth.  So we would use Nielsens all the time from my bigger company.  For this company, we use Nielsens for the major chains.

Q    You've mentioned kind of, in your view, the brand is Fawn Weaver.  Can you explain a little bit again why you say that?

A    Well, you know, because, you know, when we first started it, we didn't sell any case of it.  And, you know, I met Fawn and so, you know, I was caught up with the energy.  And because of my relationship with these buyers, I was able to get appointments that not many people in Chicago can get.  You know, I'm not going to say I'm important, but we were the largest distributor in Illinois.  So when I called, I can get

an appointment with anybody.

And, you know, I remember our first appointment we met with the number one restaurateur in Chicago. And he had a meeting with Fawn, and he took it into all his restaurants, I mean, or I think most of his restaurants. And it was just because of the energy she had. That's what I say, she's been -- we've grown the brand, so I'm going to take some, I'm going to take some credit for it.

But when she came in, you know, I was able to get her in front of, you know, the Binny's people, which is a big chain, you know, and all those people. She came in, did whatever she does, and they brought it in. And so I was able to say, oh, look at, Binny's brought it in and they're supporting it. You know, Osco's bringing it in; they're supporting it. Phil Stefani, the restaurateur, he's bringing it in.

And so I was able to use, you know, her first meetings with these people to get them in. I was able to use that as the selling point on growing this brand. So that's what I mean, she was the brand. Does that make sense?

Q    And in terms of -- do you think your story is unique in the distributor world --

A    No.

Q    -- with respect to Ms. Weaver and her impact --

A    No.

Q    -- on other distributors --

A    No.

Q    -- and retailers?

A    Look, I obviously don't know.  But I see, when I go to all the signings that Victoria has or the signings or the talks that Fawn did, where you get all these people, you know, that you feel there's something more than a distributor built in the brand.  There's a -- I wouldn't say it's a cult following, but, you know --

Q    Is it like a celebrity --

A    Oh, yeah, definitely celebrity, definitely so much energy and passion people have for Fawn.  I don't even know if they drink the brand, but they have the passion for her.  You have people crying.  You know, it was crazy.  I spent $100 for a ticket.  Did I tell you that?

Q    In your experience, can the value of this brand, the true value of this brand be achieved without Fawn Weaver?

A    No.

        MR. COLLINS:  Okay.  No further questions, Your Honor.

        THE COURT:  All right.  Thank you.

     Any questions?

        MS. LIGGINS:  No questions, Your Honor.

        THE COURT:  Okay.  Do you have any questions, Mr. Campbell?

        MR. CAMPBELL:  No.

THE COURT:  Thank you, sir.

THE WITNESS:  Thank you.

THE COURT:  Mr. Collins.

MR. COLLINS:  I'll call Anthony Severini.

THE COURT:  All right.

THE COURTROOM DEPUTY:  Raise your right hand.

Do you solemnly swear your testimony will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Would you state and spell your name for the record.

THE WITNESS:  Sure.  It's Anthony Severini, A-N-T-H-O-N-Y, S-E-V-E-R-I-N-I.

ANTHONY SEVERINI,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COLLINS:

Q    Mr. Severini, can you state what your employment is.

A    I'm the CFO for Genesis Global Recruiting, Inc., which is the co-employer of all the Uncle Nearest and Nearest Green Distillery employees.

Q    And when you say co-employer, kind of explain what that means.

A    We do all the payroll and human resource services for

those entities.

Q    Okay.  And how long have you been involved with Uncle Nearest as a company?

A    I think around 2018, 2019, somewhere around there.

Q    Okay.  And you've read the affidavit that was submitted by the receiver?

A    I did not.

Q    Oh, you did not?

A    No.

Q    In terms of the -- so the receivership occurred in, I guess, late August of this year, and can you explain your first interaction with the receiver and how that came about.

A    Sure.  It was around the August time frame.  I guess it was the latter part of August we received the notice from the receiver that Uncle Nearest and Nearest Green were put into a receivership.  So we had to reach directly out to them because we're the payroll providers.  We have to be traditionally working with Fawn and Keith Weavers.  We have the relationship with them that they're guaranteeing that payroll will be covered.

We had given them payment terms as such, being a long relationship, understanding they're a growing brand, they've got a lot of financing needs to do, so that's where we were going to be able to extend the credit to them.  We don't do that with all our clients.

Once the receiver gets inserted, that relationship is now broken. We can no longer rely on them to make sure things are paid. So at that point we went to the receiver, said, you have to pay payroll. We're not covering payroll because we don't have a relationship with you. And the receiver even said, yeah, we don't -- we would suggest that you don't ever put a dollar out.

So that was the initial interactions with him. We continued relationships with Mr. Young throughout. I think I've had four conversations with him as late as early January. Every conversation has been positive in terms of lots of value in the brand, we're making good headway, I'm going to turn this company back over to the Weavers in great shape. So it was always positive, nothing negative.

January was as close as you got to negative, where he said, we haven't had a bank come in and make any offers. And his comment was, it's because they're suing their bank, so no other bank wants to come in. We haven't had any investors come in and make a good offer that we would want to take, but we're still working towards it.

I mean, the first conversation I actually had with Mr. Young was his plan was to sell the company or find a refinancing by the end of 2025, at the latest Q1 of 2026. That didn't change. The latter part of 2025 he made the reference, we're taking longer. I had to go back and restate

numbers. We're finding a lot of inconsistencies, but there's still a ton of value in this brand.

So from that, I don't know if I told you, but today was kind of the first day I'm hearing the negative side of stuff. And when you're intentionally lied to, in my world as a CPA, it's called fraud, and I feel like Mr. Young committed fraud, intentionally lying to me and to my company so that we continue to cover payroll.

Every day that we have an employee there, we incur liability. It's a fiduciary responsibility to make sure every company has enough funds to cover their payroll. If he's saying today they're insolvent, he's breaking that fiduciary responsibility to make sure you've got proper funds to pay your employees.

Q   Well, let's kind of go back. So has -- well, let me just clarify. So what you're saying in terms of the representations of cash flow, what have his representations of cash flow been to you for the company?

A   As of January, they were cash flow neutral to cash flow positive. I had asked, I said, does that include your costs? He says, not all of our costs. So I said, if you removed your costs, you still have to bring in admin fees. He said, yes. So it would make you slightly below cash flow neutral. And he's like, yes.

So from that perspective, my understanding was that the

Severini – Direct

business was operating appropriately and that their operating expenses would be covered.

Q    And then leading up to, leading up to the receivership, you had mentioned the arrangement you had with the company. Was there any point prior to the receivership that you had threatened not to continue to fund or to advance funds for the payroll?

A    No, no.  The conversations are always, because we've got a couple million dollars of debt owed from the companies to us that in a sense are continuing to fund it, was, you have to continue making payments on those debts in order for us to continue, to continue with your payroll.  Once you start failing that, again, it comes out to fiduciary responsibility. If the company isn't solvent, you technically -- I think it's against the law to actually hire or employ somebody knowing that you can't pay them in their time.  So it's just a requirement that we have and something that's needed to be done.

Q    And the receiver's affidavit and certain of his reports have indicated that the company wasn't going to make payroll at the time that he was appointed.  In your opinion, is that incorrect?

A    The day prior to him making -- being receiver, that's incorrect.  We have never made that statement.  That was never the case.  Genesis Global has proper funding to make payroll.

We had an active agreement with the Weavers that things would be going through.

We were well aware it's a growing brand.  I've run many companies, mostly small to growing to becoming sustainable companies.  They all have to start out looking for additional capital, and you need all the sources you can get to get that.

So as the employer of record, we knew there is higher risk with a company like that.  But we understood it's a support that we were doing because we believed in where they were going and how their growth was coming.

Q    Okay.  Are there -- did you guys have regular -- I mean, was there a scheduled regular type of call, or how did these calls occur with the receiver?  Was that you initiating them?

A    I would initiate them all the time because I would want an update.  Like I said, when we first had the conversation late August, early September, we're looking to exit the company or refinance the company.  Since we had a sizable amount of debt that was owed to us, we -- by us providing payroll, we feel like we're protecting our asset.  We're making sure that the company can survive so that the value can improve.  And his comment to me is, I'm going to adjust costs, I'm going to make this a more sustainable business and hand it back to the Weavers in a better position so that they can keep growing it.

And that was reiterated to me several times.  Every time

I would follow up and say, what's the status of stuff, we're doing a good job of, you know, rightsizing the ship and getting where we need to be.

And again today, when I hear this stuff that they're insolvent, that the value of the company is half what their outstanding debt is, Genesis Global is incurring a liability that it's kind of like I'm cutting my nose off to spite my face. I'm putting money out there that I'm not going to get. He knows that we would lose out because we're not secured. We did this as a relationship with the Weavers, understanding what their capability is. So for him to flat-out lie to us to keep us paying, you know, just it infuriated me. It's like that's not what a receiver is supposed to do.

What a receiver is supposed to do is protect your assets. You know, if there is distress happening and you can't adjust and, you know, survive, that's when you're supposed to go back to the court and you're supposed to say, hey, it's not a viable business. We've to figure out how we can do and salvage this. But for five or six months now it's been, oh, no, there's lots of value in this company. You're going to get recuperated. We've just got to get to the right spot. He even in January said, my statement is going to be to the Court, I can't stay here forever because it's too costly. I need to transition this back to the Weavers.

MR. COLLINS: Okay. No further questions, Your

Honor.

THE COURT:  All right.  Thank you.

Mr. Campbell.

CROSS EXAMINATION

BY MR. CAMPBELL:

Q    Mr. Severini, has the receivership missed any payments to you since Mr. Young was appointed?

A    No, they haven't.

Q    None?

A    No.

MR. CAMPBELL:  No further questions.

THE COURT:  Do you have any questions?

MS. LIGGINS:  Just a couple.

CROSS EXAMINATION

BY MS. LIGGINS:

Q    Mr. Severini, you didn't know that they were in distress, but they were a couple million dollars behind in payroll?

A    I didn't say I didn't know they were in distress.

Q    You said you didn't know that there was anything going on with solvency?

A    No.  He said they weren't insolvent.  Then today he said they're insolvent.  I said, as a company, if you're insolvent, you have to have enough payroll dollars to cover payroll. That was our agreement.  Once the Weavers are no longer in place, we're not funding the company.  The receiver has to

then verify that they've got funds to cover the payroll. So prior to that, we knew about the distress. I said that, that it's a growing company. I understand they need financial resources, hence why we extended credit to them, where we don't do that with all our clients.

Q   And what was the agreement to extend that credit?

A   In terms of?

Q   You said you had an agreement with the Weavers. What was it?

A   Net 60, I believe, is what their terms are.

Q   Net 60?

A   Net 60, meaning that --

Q   So they get 60 days behind?

A   -- they get 60 days to pay an existing invoice. So every 60 days -- so if payroll is Friday, you know, the 13th, they have until April 13th to pay for that February 13th payroll.

Q   Okay. So you would front them the money?

A   Correct.

Q   Let them go ahead and pay payroll?

A   Correct.

Q   Even though you weren't getting paid?

A   Until that 60 days, correct.

Q   Right. And then you said you got a couple million dollars in. When did that come in?

A   We've been -- it's been that balance for a long time,

because that's their -- their average payroll a month is $500,000, somewhere around there. Maybe it might have even been more than that, actually, in '24. They've been cutting back. So that's how you accumulate the $2 million.

Q    So they're kind of always running $2 million behind?

A    Correct. Correct.

MS. LIGGINS:  No further questions.  Thank you.

THE WITNESS:  Sure.

THE COURT:  All right.  Thank you.

MR. COLLINS:  Nothing further.

THE COURT:  Thank you, sir.

MR. COLLINS:  Your Honor, can I have five minutes to kind of think about the next witness or just take a quick break?

THE COURT:  All right.  We'll take a -- everybody probably needs to stretch their legs, so we'll take a ten-minute stretch-your-legs break, and then we'll come back in and be ready to go, okay?

MR. COLLINS:  Thank you.

(Court recessed from 2:36 p.m. to 2:48 p.m.)

THE COURTROOM DEPUTY:  Raise your right hand.

Do you solemnly swear your testimony will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS:  I do.

THE COURTROOM DEPUTY:  Have a seat, please.

I'm going to have you scoot up to that microphone.

Will you state and spell your name for the record.

THE WITNESS: Sure. David Ozgo, D-A-V-I-D, O-Z-G-O.

THE COURTROOM DEPUTY: Thank you, sir.

MR. CAMPBELL: Your Honor, before we get started with this witness, this individual was added on a witness and exhibit list at 10:30 last night. We've had no opportunity to review anything as to this particular witness. He got added 12 hours ago. So I'm going to object to his testimony in totality.

MS. LIGGINS: Likewise, Your Honor.

THE COURT: Okay.

MS. LIGGINS: He was not on the witness list. He's not on the exhibit list. We have not received any information about him, who he is, what he is going to be called to testify. We know nothing.

MR. COLLINS: If I can speak, Your Honor.

So Mr. Nielsen -- or excuse me. Mr. Ozgo, he is going to testify about the Nielsen data. And basically we didn't even know we had an issue of the Nielsen data until we got the answers. He's a rebuttal witness. We don't -- I don't think --

THE COURT: Rebuttal to what?

MR. COLLINS: He's a rebuttal to the fact that they are diminishing the implications of the Nielsen data. So he's

basically here to support that the Nielsen data is the valid --

THE COURT: I'm going to allow it. We'll give him a little bit of latitude on this.

But look, let's keep it to what we've already heard about Nielsen data, although I think I understand how that works and we've heard plenty on it. They'll be able to cross-examine him. But let's go on.

MR. COLLINS: Very good.

DAVID OZGO,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COLLINS:

Q    Can you give me a little bit of your background, please?

A    Certainly. I've been an economist for over 30 years. Twenty-two years of that, I was the chief economist and a senior vice president at the Distilled Spirits Council of the United States.

Now, in that role, obviously, I analyzed trends in the industry and had the opportunity to work with virtually all the data sources across the industry. We -- one of the things I did is I developed a dataset called the Market Segmentation Database, which is today used for marketing and planning purposes by a lot of the distilleries for marketing and

planning.

Q    Now what's your educational background?

A    Sure.  I have bachelor's and master's degrees in economics from George Mason University.

Q    Okay.  And you mentioned DISCUS?

A    Yes.

Q    Can you explain exactly what DISCUS is.

A    Yes.  DISCUS stands for the Distilled Spirits Council of the United States.  It's a trade association that represents the distillers and importers of spirits in the U.S.  At various times, they've represented between 60 to 70-some-odd percent of the entire industry.  Like most trade associations, the primary purpose is for public policy, so, i.e., we have a lot of lobbyists, work with a lot of regulators.

In addition to, however, we also provided a service to our member companies of something called Brand Data.  Brand Data was a data sharing program amongst our member companies that allowed them to look at shipments, i.e., movements from the distillery to the distributor, which gave everybody a very, very good overview of what was going on within the marketplace.

Q    And in terms of your involvement with DISCUS, how do you guys use -- well, explain the Nielsen data and how you guys use it, please.

A    Yeah.  For probably ten years or so, we were not a direct

Nielsen client.  However, Nielsen, since all of my members were Nielsen clients, they would give me a report on a monthly basis where I was able to look at the data from a retail perspective and look at which categories were growing, which brands were growing, potentially what kind of volume was being done, and just what exactly sales were.

Q    Okay.  And in terms of your knowledge of how your members view Nielsen, how important are those numbers to the members of DISCUS?

A    Yeah, they were very important, and people had a lot of confidence in the data that they saw.  When you -- it was previously mentioned that, well, Nielsen does not cover the on-premise, on-premise trade.  Well, that is certainly true, but on-premise at this point is only about 20 percent of the total market.  So the Nielsen data covers a segment that accounts for 80 percent of all sales.

Now, obviously Nielsen doesn't necessarily cover all 80 percent.  They have about half of that.  So A.C. Nielsen covers about 40 percent of the total spirits market, 40 percent of everything that's sold.

Now, 40 percent doesn't necessarily sound like a lot if this were an accounting exercise.  Certainly you wouldn't want to try to balance your checkbook with only 40 percent of the entries.  But this is really more of a survey.  And if you were doing a survey, if you were doing a poll and you covered

40 percent of your target audience, assuming that's a randomly distributed survey, that's going to give you extraordinarily accurate information.

It was my experience, over the 22 years that I worked at DISCUS, that when I would compare Brand Data -- now, Brand Data was the only source in the country where I knew that I had 100 percent of the volume being shipped by a member company. So if Bacardi was a member, I can tell you exactly how many cases of Bacardi rum were being shipped into, say, Texas in one-liter bottles. It was that detailed.

When I would look at the trend that I would see in Brand Data, particularly over a 12-month rolling period, it's always very, very consistent when I would look at the 12-month trends in A.C. Nielsen. So from that perspective it told me, okay, when I have a 100-percent view of the marketplace, it's very, very consistent then with what we see in A.C. Nielsen.

Q    And in terms of the issue of -- I believe in the affidavit of the receiver, he indicates that it isn't valid for independent brands. Would you consider that to be applicable in this particular instance?

A    Certainly not in this instance. Even though Uncle Nearest is an independent brand, it's an independent brand that has national coverage. They're in all 50 states. I believe they're in thousands of accounts. So, as a result, they're going to be picked up by A.C. Nielsen, and the trends

are going to be very, very accurate.

MR. COLLINS: If we could show the receiver's affidavit, that is Exhibit A, I believe.

Okay. And if you scroll down, yeah.

BY MR. COLLINS:

Q So, and you've -- did you read this paragraph from --

A Yes, I did.

Q In terms of, again, in terms of how Uncle Nearest is maybe different than other independents in terms of its 50-state scope?

A Yeah. Well, there are a lot of independents out there that just aren't all that large. Many of them aren't even regional brands. They're almost local brands. But with Uncle Nearest being a national brand in all 50 states, with, you know, depending upon which number you're looking at, 25 to 41 million dollars in sales, well, they're a national brand, and national brands are very, very well covered by A.C. Nielsen.

Q And, in fact, on the Nielsen chart that we've already seen, they're on the first page of it?

A Yes.

Q I mean, they're one of the larger --

A That's correct. I've never looked at that entire chart because I know you end up with several hundred brands on it. To be in the top 30 means that you are very, very, very well represented across the A.C. Nielsen collection points.

Q    And so when you talk -- and the reason they use the term "independent brand," what does that mean when you say "independent brand"?

A    Sure.  I mean, there are a lot of brands out there. Larger companies like Jim Beam or Brown-Forman are going to own dozens or even hundreds of brands, whereas A.C. -- or, I'm sorry, whereas Uncle Nearest, it's one brand with, I don't know, seven or eight SKUs, depending upon what products they have in the market at any given time.

Q    And so when you generally talk, when people generally talk about an independent brand, they're usually referring to that lower set of very small --

A    That's correct.

Q    -- distillers?

A    Yes.

Q    But once you get to be a big distiller, even though you're independent, you're really a different type of entity then?

A    You're a different type of entity, exactly.

Q    Okay.  In terms of what you've seen -- and you've had an opportunity to review the Nielsen data --

A    Yes, I have.

Q    -- for this company.  In terms of the change -- pull up --

A    Yeah.  I was able to look at the data, and what I

found -- and it's already been shown. And we won't go month to month. You already saw an exhibit. But essentially from January 2025 through August of 2025, Uncle Nearest was outperforming the market by ten points.

Well, then beginning from September 2025 through January 2026, the last month for which we have data, they are underperforming the market by 10 points. So that's a very, very dramatic turnaround in a short time.

Q   Is that something that, in your experience with DISCUS and kind of reviewing this data, that you've seen kind of before, such a dramatic shift?

A   That certainly would not be the norm. Yes, there were certainly times when brands lost market share and declined, but that would typically happen over time, not that quickly, not over basically a three-month period.

Q   And in terms of your experience, could that decline be just explained by the market, by --

A   Well, no. Since we're comparing Uncle Nearest to the market in general, we see that previously they had been outperforming the market and fairly substantially. To go from outperforming the market to underperforming the market in such a quick time indicates something dramatic happened. There is nothing -- yes, I know there are headwinds in the marketplace right now for all bourbons, for all spirits, for all beverage alcohol generally. But those, those headwinds are impacting

all brands, and it would not impact Uncle Nearest's performance versus the marketplace generally.

Q    So would it be fair to say that if Uncle Nearest -- in the absence of a change of circumstances, if Uncle Nearest were outperforming the market while the market was up, it would still outperform the market, the general market, even if it was down, barring any other circumstances?

A    Yes.  I see no reason that they would have had this dramatic -- barring a change of circumstances, I see no reason why their trajectory would have changed.

MR. COLLINS:  I think that's all I have for this witness, Your Honor.

THE COURT:  All right.  Thank you.

Any cross?

CROSS EXAMINATION

BY MR. CAMPBELL:

Q    Good afternoon, Mr. Ozgo.  Are you still with DISCUS?

A    No.  I left at the end of 2022.

Q    The end of 2022.  Okay.  What did you do after you left DISCUS in 2022?

A    I was the president of the Cigar Association of America for two and a half years, roughly, and now I'm an independent consultant.

Q    Okay.  In what space for independent consulting?

A    I -- my firm is Advocacy Analytics.  I do a lot of public

policy work. I also do work advising, I don't know, investment firms on political risk. I still do some work within the alcohol space. I have one client that I do a lot -- that's in the spirits, beer, and wine space that I do work for. So really I have a number of clients.

Q One client in the spirits industry. So is it safe to say that since 2022 you haven't really had your finger on the pulse of what the alcohol and beverage market would be?

A Not necessarily. I have had to do some work with -- as I said, I do have a client still in the beverage alcohol industry who does have spirits, so I've had to do some work. I also advise informally the current chief economist for DISCUS, even though they're not paying me. The gentleman worked for me for 22 years, so he gets the benefit of my experience. So I'm still -- I still have a hand in the industry.

Q And I want to touch on a point that was in the affidavit that Mr. Collins kept coming back to. The line in the affidavit reads "independent stores." I think Mr. Collins has referred to independent brands. Does Nielsen cover independent stores, independent liquor stores?

A They have some independent liquor stores, but it's not what they specialize in. They do tend to -- they are -- they have the best coverage in larger chains and in larger liquor stores, yes.

Q    So most independent stores are not covered in those numbers is what you're saying?

A    Yes, that's correct.  However, it's been my experience that, particularly over a 12-month period, if something gets hot in an independent liquor store, trust me, the big guys aren't going to sit on their hands for very long.  So, you know, they will pick up the brand fairly readily.  So the trends, they're not perfectly correlated, but they're very, very consistent.

Q    And I think, if I remember your testimony correctly, you said that the Nielsen data covers approximately 40 percent of the sales; is that correct?

A    That's correct, which is very high if you are looking at something as a survey instrument, which a lot of people consider it.

Q    Sure.  And I understand you said that if it was a random survey -- forgive me, my stats.  You've got plenty more stats information than I do.  But if it's 40 percent of everything but all the independent stores are not included, then it's not really a random sample, correct?

A    Well, you're making the assumption that the trends in the independent stores would be dramatically different from the trends in the major stores, and that's just not the case.  You know, if something happens in a major store, the smaller stores are going to want to pick up on it because, hey, they

all like to make money. The same with the independent stores. So while there will be some differences for a major brand like Uncle Nearest, you're going to look -- you're going to have fairly consistent trends.

Q   And if I may ask, when were you asked to come here today?

A   I was -- Friday.

Q   And were you paid to come here today?

A   Yes, I am being paid. I am being compensated.

MR. CAMPBELL: No further questions.

THE COURT: Thank you.

CROSS EXAMINATION

BY MS. LIGGINS:

Q   Just a few questions. Did you prepare this exhibit that's up?

A   No. That was prepared by Uncle Nearest. I did, however, review the background material.

Q   Okay. What was the background material?

A   The background material is A.C. Nielsen reports, which I also did, in fact, get from Uncle Nearest. However, they comport to the reports that I've seen on dozens of occasions that come from A.C. Nielsen, so I was confident that these, in fact, were legitimate A.C. Nielsen reports.

Q   When you were analyzing the Nielsen data, did you analyze other brands that were in receivership?

A   I'm not aware of any other brands that were in

receivership on the list. No, I didn't.

Q    Have you ever analyzed Nielsen data with a company that's in receivership?

A    No, I have not.

Q    What about that's in litigation?

A    You know, there were -- yes. Patron Tequila was in litigation for a long, long time over some ownership question. We oftentimes looked at Patron data. And so, yes, I have.

Q    And you saw a downward trend with that data too?

A    That's not actually what I recall. Patron was up and down. You know, I don't remember any particular downward trend. You know, it could have been a difference in -- it was a question of ownership. Everybody wanted to see the brand succeed, so, you know, you continued operating as if it was -- you know, there was no legal question.

        MS. LIGGINS: Okay. No further questions. Thank you, Your Honor.

        THE COURT: All right. Thank you. Thank you, sir.

        THE WITNESS: Thank you.

        THE COURT: Anything else, Mr. Collins?

        MR. COLLINS: Call Kevin Larin.

        THE COURT: Who?

        MR. COLLINS: Kevin Larin, Your Honor.

        THE COURT: Okay.

THE COURTROOM DEPUTY: Do you solemnly swear your testimony will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: I do.

THE COURTROOM DEPUTY: Be seated, please.

Please state and spell your name for the record.

THE WITNESS: My name is Kevin Larin, L-A-R-I-N.

THE COURTROOM DEPUTY: Thank you.

KEVIN LARIN,

having been first duly sworn, was examined and testified as follows:

CROSS EXAMINATION

BY MR. COLLINS:

Q    Good afternoon, Mr. Larin.

A    Good afternoon, Mr. Collins.

MR. COLLINS: So let's go ahead and pull up the Larin affidavit, please. I believe that is Receiver -- or, excuse me, on FCMA's exhibit list.

Can we pull up the -- I don't know the logistics. There should be a digital copy. Again, I don't know the process of getting it up there. Is that -- okay.

THE COURT: What is it you're trying to show?

MR. COLLINS: Trying to get the declaration of Kevin Larin on the screen. I believe it's FCMA's Exhibit Number 2.

THE COURTROOM DEPUTY: Do you have a paper copy?

MR. COLLINS: I do. I can do it that way.

THE COURT: I assume you-all have seen this. This one's stipulated to; is that correct?

MR. COLLINS: This is his direct testimony. That has been stipulated as his direct.

THE COURTROOM DEPUTY: Yes, sir.

BY MR. COLLINS:

Q    So, Mr. Larin, this is from your affidavit, paragraph 16. Do you kind of recognize this as part of your affidavit?

A    I do recognize this, yes.

Q    In this paragraph, you state that "In analyzing Uncle Nearest's actual cash flows for the 9 weeks ending June" -- and I think it's starting, so I can get you to it, I think it's actually the first sentence. "In analyzing Uncle Nearest's actual cash flows for the 9 weeks ending June 13th, 2025, the Riveron team found that the cash flow was approximately negative by $1,215,000." Correct?

A    Correct.

MR. COLLINS: Okay. I need Exhibit 4 to the Larin affidavit. So let's take this over.

BY MR. COLLINS:

Q    So this has been stipulated to in evidence. This is -- make sure I don't get myself messed up here. Do you recognize this exhibit?

A    I do.

Q    Can you tell us what it is?

A    Yes.  This was -- this was a weekly cash, statement of cash receipts and disbursements that was prepared by the then-interim CFO, Mr. Carlos Flores.

MR. COLLINS:  Okay.  Sorry, Your Honor.  I have misplaced my notes.

Oh, here it is.  Sorry.  Too many things on my table.

BY MR. COLLINS:

Q    So this is not something that you prepared?

A    This is a recitation of Mr. Flores' work.

Q    Okay.  But you prepared this?

A    I believe, yes.  I believe we compiled his work, yes, correct.

Q    Okay.

A    And by the way, I only say that because the top bar, in the blue with the white text, is pretty endemic of the work that we do.

Q    So we'll go under the assumption that you guys prepared this, correct?  It's based on other data, but this is something -- this is a document you prepared?

A    Yes.  We compiled.  I wouldn't say "prepared," but I would say "compiled" probably would be a better term.

Q    So, and you're using this to support conclusions in your affidavit?

A    Correct.

Q    Okay.  So when you say that the cash flows for the nine weeks ending June 13, 2025, were negative, are you, are you saying operating cash flow?

A    What I'm saying is cash receipts minus cash disbursements.  The reason I would make that distinction, operating cash flows on a three-statement financial model would mean that I'm going to the statement of cash flows, which is completely separate.  At these points of emergency in companies that are, for all intents and purposes, losing cash, we deal at the first steps with just cash receipts and disbursements until we have an opportunity to stabilize operations, at which time we can deal with the remainder of the financial statements.

Q    And in that process you're just looking at all cash receipts and all cash disbursements, correct?

A    Yes.  Yes.

Q    Okay.

A    Sorry.  The word "all" gave me a little bit of pause, so I wanted to stop there.

Q    Well, and the point I'm making is -- and perhaps I'm not using the right accounting term.  When we talk about all cash flow for the company, that can include payment, paydown of debt, of existing debt, and other things that are not really the current, kind of showing whether the company is cash-flowing from current operations?

A    Within the three statements, the statement of cash flows, the statement of cash flow from operations is I think where you're going.  If I could just have a point of correction, is that correct?

Q    That's correct.

A    I apologize.  I don't mean to ask questions from the stand.

Q    That's good.  I appreciate that.

A    But I wanted to be clear.  Yeah, at this point, at these points, at these early stages of an engagement, when a company is hemorrhaging cash, we really don't worry about the financial statements and whether they are going to work through a three-statement model.  We worry about whether or not we are losing cash on a daily operating basis.

Q    Got you.  Got you.  And so when we, when we look at this Exhibit 4, what are the last two line items?  There are two line items, if you look there at the bottom.  One is "Other/ Uncategorized," and the next one is "Other Obligations"?

A    Uh-huh.  All right.

Q    Do you know what are in those categories?

A    I do.  I'm familiar with both of those because they both jumped out at us early on.  So we actually investigated that with Mr. Flores.  What we came up with is -- we'll work from the bottom here -- "Other Obligations" were payments to Dash Funding.

Q    Yeah.

A    This is the company that the -- that this line of credit to sell future revenue was entered against.  So these were the periodic payments for that.

    The one above that, frankly, is one -- you know, quite often if you see a line that says "Other" and "Uncategorized" and has large dollar amounts in it, that brings your area of focus.  So we moved our area of focus to that.

    Quite candidly, Mr. Flores was unable to provide us any detail.  The things that he couldn't categorize elsewhere, he just left in this "Other."  So this was cash that went out the door.

Q    Okay.  So we don't know, we don't know whether that was current operating cash or what it was paid to, correct?

A    That would be correct.

Q    Okay.  And the -- what you mentioned in terms of the "Other Obligations" line, you said that was to Dash Funding?

A    Correct.

Q    Was it all Dash Funding?

A    If memory serves me correctly, yes, it was.

Q    Okay.  And what is Dash Funding?

A    Dash Funding is -- I don't even know how I would categorize it, but it's essentially a financing operation where you take on debt, selling future revenue at a discount.

Q    Okay.  Now if you remove -- let's say you removed the

"Other/Uncategorized," right? If we were trying to get to actual kind of operating cash flow -- and this is again leading up to the case, so it's got some relevancy, but it may not have perfect relevancy at the moment.

But if you were to take that out, obviously you would then add back those amounts and that would, from an operating standpoint, decrease this number in terms of a weekly cash burn number, correct?

A    I think it would decrease it, but I don't think it tells the entire picture and what else would need to be normalized in this.

Q    Well, and I think it sounds like you guys haven't fully investigated all of these numbers so that maybe the relevance of this is somewhat not fully there?

A    I don't know if I would go that far. I think we've looked sufficiently in this, and I think that there is significant relevance to it.

Q    But in terms of, you know, what you're stating as the actual weekly cash burn, especially if you were just talking about operating expenses, it could be less than that?

A    And it could be a lot more. I'll tell you why.

Q    But we don't know. I guess the answer is we don't know?

A    No. Actually, we can look and see the week ending 5/30, that large collection from Park Street was actually a pull-forward for receivables out of actual normal cycle. So that

typically sits at a couple hundred thousand dollars a week. It actually approached a million dollars.

On top of that, during this time period, ordinary payables were not being paid in the ordinary course. So that payables balance was continuing to age upwards and upwards. So not only are receipts, these cash receipts overinflated from what was expressed earlier in terms of standardizing operations, the receipts are not standardized; they're actually overinflated.

The disbursements are underrepresentative of the actual obligations as they actually came due. So I would say in totality, probably on a normalized basis, on a standardized basis, this company probably hemorrhages faster cash than what was reflected here in Mr. Flores' own work.

Q    Now you guys have put together the 2024 financials, right?

A    No.

Q    I'm sorry. Not the 2024. I'm talking 2025. I'm sorry. I said the wrong year. You've done the financials for 2025, right?

A    There's nothing in the Riveron engagement that would have us preparing financial statements.

Q    Oh, that's a good point. Okay. Fair enough. Point taken.

So the point of this is, this is what was provided to

you, but in terms of Riveron actually having fully investigated these numbers, that hasn't happened?

A    Fully investigating, no, probably not, because I would tell you, when we asked questions about these, I don't think that the answers were as forthcoming as we would have liked to have done to conduct a full investigation.

Q    But as a practical matter, we have actuals for this full period, correct?

A    I guess that depends on the definition of the term "actuals."  If you're talking about actual prepared financial statements during this time period that would stand up to scrutiny for, let's say, a CPA, I don't think we have actual financials yet.  But I would have to leave that to the receiver and his financial advisors to tell us the state of the affairs of these financials.

Q    So we have a receiver that's been in place for four months with an accounting team that's been going through the records.  And, generally speaking, even if you just cut off 2025 at January, you should be able to find out what the revenue and expenses are for the company, right?  You have bank records.  You have other things that can -- and this is a cash flow statement?

A    I would say that that's probably a resource-loaded question.  You give me enough bodies, I'm sure we could probably do that, but then, of course, each one of those

bodies is going to cost time and money.

Q    Correct.  And that's happened.  So I guess my point is, if we have actual numbers, then really these projections don't really have much pertinence?

A    These aren't projections.  These are actuals as they occurred.  This is cash coming into their bank accounts and leaving their bank accounts.  These are not projections.

Q    And my point is, if we have the receiver having actually kind of gone through and looked at the numbers, those would be the more relevant numbers than these, wouldn't they be?

A    Would you repeat the question.  I'm not sure if I'm following what you're saying.

Q    I mean, if the receiver has actually gone through and done the work that they, that his professionals have been paid to do, then those would be the relevant numbers, not this?

A    Then I'll state that differently.  Maybe if I can answer it this way and you tell me if I'm answering your question correctly.  I'm not trying to be combative.  But I feel relatively confident, because we saw these in the bank statements, that the cash that came in on the week of 4/18 was 377,000, and the cash that went out was 407,000.  And I think if we continued through week by week, I have a pretty high degree of confidence that that would stay, that that would stay true to what this statement shows.  I can't say with absolute certainty here on the stand, but I would be willing

to say that I think we could be relatively confident that this was the amount of cash that left the bank over this time period.

MR. COLLINS:  Okay.  We'll move on.

Go back.  Can you put the affidavit back on.  I think that is Exhibit 2.  Oh, I'm sorry.  I've got to do it on this. I'm sorry.

BY MR. COLLINS:

Q    Okay.  You also state in this paragraph that "Uncle Nearest's own restructuring plan showed forecasts for an additional need for funding, with an approximately $32 million cash need in 2024 and a $48 million cumulative cash need through the first half of 2026."

Do you see that?

A    But just one correction.  You said 2024, but it says 2025.

Q    I'm sorry.  Did I get it wrong, the date?

A    It's okay.  It's okay.  But that is correct.

Q    So let's look at your Exhibit 5 that I think you referred to.  So you recognize this document?

A    I do.  It is a proposed restructuring plan, given to us by the Keystone Group at the early outset of our retention.

Q    And this is the document you're referring to with the projections?

A    Yes.  When I refer to Uncle Nearest's own financial

advisor at the time, it was the Keystone Group.

Q   Let's find the -- I believe that is what you're referring to; is that correct?

A   That's correct.

Q   So when we look at this sheet and we look at the negative cash flow, you see that center section where it talks about debt service and past due debt service?

A   Correct.

Q   Okay.  And if we just look -- we don't include 2024 and we just include 2025 and 2026.  There is 28 -- $35 million that is included in that, in this statement, for paydown of past-due debt service, correct?

A   Past-due debt service would be 13.

Q   Well, or debt service and past-due debt service?

A   So the total fixed charges is what you're --

Q   Now do you know if the debt service -- what is included in that category?

A   Off my memory, no.  This is well over a year ago, so I don't think I can say with confidence.

Q   Understood.  But most likely that is an operating debt, because that would be included up above in the --

A   Yeah.  I don't think that I could testify as to whether the Keystone Group has properly categorized something in one line or another.

Q   But if, in fact, that were and you added back 35 million

in payments, that would significantly impact this negative cash flow that you reference, correct?  Again, in terms of operating, right?  I understand you can always pay down debt and use cash flow to pay that, but when we're talking about operating cash flow and we're not talking about just paydown of debt --

A     Assuming, I would say -- pardon me.  I didn't mean to interrupt you.  But assuming that what has been presented here as a forecast is accurate, then I think, yes, that would, that would make sense, that would hold water.  But I can't attest to that.

I think the observation here was that the first proposal for a plan was that we need 32 to $48 million, along with significant relief, along with the ability to sell off the bank's -- or, excuse me, FCMA's collateral and share in it on an approximately 60/40 split.

Q     Yeah.

A     That seemed like a few too many asks in a first opening foray.

Q     Understood.  And really my point of my question is trying to get to the operating cash flow kind of analysis.  And so I recognize that this isn't your report.  You do have it in your exhibit and reference to it.  And so my point is, and I think you've answered it, is that if, in fact, that debt was not included, that would obviously change the impact of your

statement, at least in terms of operating cash flow?

A    In terms of operating cash flow, maybe it does, but I think that my statement with respect to that report was that their own financial advisor had asked us for relief.  $48 million is just a portion of the ask.

Q    Fair enough.  And, again, my distinction is really just not to say that what you said was wrong, that if, in fact, some of this wasn't operating debt that was being paid, then that, from the standpoint of whether this company can cash-flow, would impact that analysis?

A    Yes, a lot of things could impact that analysis, correct.

Q    Very good.  So in terms of preparing your affidavit -- and you've got your experience in there and you have a lot of experience, and I assume you brought that all to bear in your analysis.  And I know that Riveron has spent a good deal of time on this case.  I think you indicated 2,000 man-hours; is that correct?

A    In the pre-receivership period, yes.

Q    Go back to paragraph 16.  So this, again, paragraph 16 of your affidavit, you state, the next sentence after the one we just spoke about, "Furthermore, a 13-week cash flow forecast that Uncle Nearest provided in May 2025 showed a negative cumulative cash flow of negative $6,788,000 through the week ending August 8th, 2025."

Do you see that?

A    Yes, I do.

Q    Okay.  And when you state that, you cited to this exhibit, correct?

A    Correct.

Q    Okay.  So you've analyzed this exhibit?

A    Yes.  Yes.

Q    Okay.  So when I looked at it, I had some kind of immediate questions, okay?  The first thing I noticed was it says, "Provided by Uncle Nearest," which is kind of odd for something -- that an exhibit would -- you know, somebody would prepare it and say "Provided by" versus "Prepared by."

A    Uh-huh.

Q    So that caught me kind of weird.  Does that sound -- I mean, that may not be weird to you, but that's fine.  But when I look at the total cash in number, I see numbers 235, 235, 235, and this is a cash flow forecast.  So, number one, doesn't Uncle Nearest generally bring in more cash than that in a week?

A    I can tell you that this is the cash forecast that was provided to us.

Q    Okay.  All right.  And you looked at it and didn't see anything interesting about it?

A    I saw, frankly, a lot of rounded numbers.  We asked, you know, what these were built on, especially considering that there was such talk about reliance upon Nielsen data and what

could be derived from that.  For this just to arrive at flat groups of numbers, it just felt a little bit -- I don't mean to sound this pejorative, but a little bit lazy in its execution, that somehow a little more thought should have been put into this.

Q    Well, you know, even if we just kind of look back, so I think you indicated that you had summarized the -- you know, in this Exhibit 4 that we just looked at -- I'll put it back up -- that you had summarized the information that was given to you by Uncle Nearest, correct?

A    Uh-huh.

Q    Okay.  And so what's the total cash in number by week there?

A    Normalized, after we take out some advances on Park Street, I would be stretching my memory to be able to say, but I think I would have to take out Park Street collections as probably its own line.

Q    Actually --

A    And I would have to correct for the pull-forward on Park Street in the week ending 5/30, although I don't have it in front of me, what that exact amount was.  But then that would give me what the Park Street collections would be, which would frankly be a representation of a longer term amount of depletions.

     Then I would also look at retail and tours, which tends

to sit at around $100,000 a week.  I mean, I would say if you asked me in passing for a quick conversation, how much do they do in retail and tours a week, I would tell you $100,000. When it comes to Park Street collections, it really depends. It depends on seasonality.  It depends on the information that they have available and how they put their forecast together.

Q    Okay.  All right.  But now Park Street collections is the actual cash collection number, is it not?

A    Yes.

Q    Yeah.  So that number is --

A    Well, I'm sorry.  Let me clarify.  That is the -- those are the cash collections with respect to depletions.

Q    Correct.  But it's a cash number, correct?

A    Correct.

Q    Okay.  So you don't need to adjust that because you're doing a cash flow forecast, correct?

A    Not necessarily, because that week, what happened in the week of 5/30 -- and I realize I have the luxury of having been part of those conversations.  There was an agreement that, as it was represented to us by both Ms. Weaver and I believe Mr. Flores, that there was a pull-forward of collections that were not quite due yet, to be able to bring them in out of cycle, to be able to add additional liquidity to the company because it was burning so much cash even though it wasn't making the payments as they came due.

Q    Just to make sure, are you sure you're not speaking about the difference between the collections number versus the -- effectively there is an account in Park Street that also has funding based upon future collections or has a number based on future collections, and that the discussion you were having with them was whether to include, whether you just include the cash collections number or you also would include the potential for the future collections?  Wasn't that the actual discussion you were having with them at that point?

A    Don't know if that was the actual discussion, but if you have newer and better information on that, then okay.  I don't remember that.  What I remember, what was represented, what I remember being represented to us, there is an amount that we can draw during a time period, and this was an amount that was brought outside of cycle faster than it typically gets paid to be brought in.

Q    Okay. Well, I tell you what.  It may not, it may not matter.  And so, in your estimation, this $235,000 number doesn't cause you any, any notice.  It sounds about right?

A    It doesn't give me heartburn if this is their representation.

Q    Does it seem low?

A    Taken in seasonality -- and I would have to go back and look over my notes to be able to say what was going on during sales leading up to this, what was going on in depletions

leading up to this. I think it's kind of a loaded question for me to say if it feels low, but am I really harmed by 3.2 million over a calendar quarter? Not particularly.

Q   Okay. All right. What about the next line, "Payroll Genesis"? Anything about that line seem weird to you?

A   Absolutely.

Q   What's weird about it?

A   Well, first off, they don't pay their payroll on time. They haven't paid their payroll on time. As we've heard so far, they've had to finance it.

Q   Okay.

A   It has been typically a few months behind, and even despite the fact of what's been purported as 60-day terms, it would often go three, four, five invoices before they finally got paid. So to see a Payroll Genesis line that showed up in every single one, a little bit, a little bit troubling.

Q   Well, in fact, isn't the weird thing that payroll was done twice a week -- or twice a month, not every week?

A   Sure.

Q   And what about the next line, "Ramp"? That's the credit cards, correct?

A   Oh, boy. We referred to them as credit cards, and I would say the only reason I said "Oh, boy" is that we were met with a significant amount of resistance from the folks onsite when we called them credit cards. They are payment cards, not

credit cards, but just thought I would be correct.

Q    But are those paid monthly -- or paid weekly?  Excuse me.
Is that charge paid weekly?

A    Can it be paid weekly?  Yes.  Has it been paid weekly?
At times, yes.

Q    It's not due weekly?

A    I don't know when it's actually due.  I don't know if
I've actually seen an invoice from Ramp.

Q    All right.  Well, fair enough.  Okay.  So let's go down
to the production line, "NGD Production."  Every week it's the
exact same number?

A    Exactly.

Q    And same with the sales and marketing and same with Uncle
Nearest Corporate and NGD Corporate.  Literally, every line is
exactly the same across?

A    Correct.

Q    Do you see that?

A    Yes.

Q    So that doesn't strike you as kind of weird?

A    I think I've already said that it struck me as a bit
lazy.  And, again, I don't mean that in a pejorative manner,
but I don't think that someone thought too hard about this,
the point being when a company, left to their own devices,
provides us with a cash forecast, they show us over the next
13 weeks they're going to lose $6.7 million and really has a

difficult time putting together a cash forecast without assistance.

Q    So just to make sure I'm clear, you saw a report that has plainly ridiculous numbers, and it doesn't strike you enough to say, is this a report that I need to rely upon as a legitimate company report of cash flow?

A    Repeat that again, because I could answer that a couple different ways, and I don't want to sound like --

Q    Right.  That's fine.  In your affidavit, you present this as the company having given you this cash flow forecast, and I guess implying that they gave it to you legitimately as a cash flow forecast.  And it clearly is so ridiculously wrong that it didn't strike you to question whether, in fact, this is really a cash flow forecast that they had provided?

A    I think when the CFO of a company provides me with a cash flow forecast that says over the next 13 weeks, when we are representing the first lien lender, who is severely in arrears, and comes back and says over the next quarter we are going to lose $6.7 million, that gives me pause.

Q    What if I told you -- and maybe you believe this or not.  What if I told you that this, in fact, was a template for a cash flow forecast that they were working on, preparing, and had provided to you and your team as the format for a cash flow forecast and basically they just put dummy numbers in there because it wasn't really a cash flow forecast?  What

would you say to that?

A    Don't know if I would say anything to that.  I didn't know that there was any evidence to that effect.

Q    Well, we'll have to draw that out in testimony.  But your testimony is you and your team got this and believed that it was an actual cash flow forecast being presented to you by the company?

A    I think it was ridiculous on its face, yes.

Q    And did you question the ridiculousness of this forecast?

A    Absolutely.  Absolutely.

Q    And who did you question that to?

A    To Mr. Flores.  I'm trying to think.  I'm not even sure who else was in that conversation.

Q    And you did that personally?

A    Personally?

Q    Yeah.

A    In person?  Probably over the phone.  Probably on Zoom.

Q    But it was you?

A    It was either me and/or someone else on my team at that day.

         MR. COLLINS:  Can we switch to --

         THE COURTROOM DEPUTY:  You said computer?

         MR. COLLINS:  Yeah, use the computer, please.

BY MR. COLLINS:

Q    So what you have -- have you seen this document before?

A    Can't recall that I have specifically seen this, but I may have.

Q    What does this look like to you?

A    It looks like it's following a similar format to what we saw on the other document.

Q    Okay.  And is this the format that you would receive cash forecasts from the company?

A    Wow.  Yeah, it appears that it is.  I don't have any reason to believe that it wouldn't be.

Q    And what's the time period covered by this one?

A    May 23rd to August 15th, 2025.

Q    Okay.  And Exhibit 6 that we were just looking at, what time period did that cover?

A    May 16th to August 8th.

Q    Okay.  All right.  So basically the same time period?

A    Uh-huh.

Q    A week off, correct?

A    Yes, that would be correct.

          MR. COLLINS:  Could we go back to the computer, please.  Thank you.

BY MR. COLLINS:

Q    And so what is the negative cash flow on this spreadsheet?

A    Let's see.  Do we have a cumulative column on here?  Not sure if we do.  To be honest with you, unless I have a

calculator at hand, I would actually prefer to use Excel with this.

Q    I believe -- let's scroll back to the first page of it.

So do you see an ending balance of cash?

A    Ending balance of cash.

Q    This is a report that you use, right?  I mean, this is a report that was provided to you.

A    I'm trying to find where we're looking.  When you say ending balance of cash -- oh, there we go.  As of 8/15, correct.

Q    But let me ask you this:  Is this report -- and take your time to review it.  Is this showing a negative $6,788,000, negative cash flow?

A    No, it does not appear to be.

Q    Okay.  So do you want to change your opinion on what this Exhibit 6 is?

A    No.  I've said that the company presented a cash flow forecast to us that said that they were going to lose over $6 million in the 13-week period as we were working through our processes.  As we were working through finding a path for them to navigate their cash shortfalls, to navigate repayment of the loans, they presented a cash forecast.

Q    And they presented you a cash forecast.  They wanted you to fund and they presented you a cash forecast that forecasts $6 million negative?

A       Uh-huh.

Q       And then, a week later, provided you another cash forecast that was nowhere near that?

A       And a couple months earlier, they presented a business plan that said that they needed $48 million.  I think it's really a testament to the fact that there was a lack of clarity on the financial documents that came out of this company.

Q       Isn't it possible that you just didn't investigate Exhibit 6 and realize that, in fact, it was never intended to be a projection; it was simply the template, which Exhibit 54 -- which I would like to get into evidence, Your Honor.

        Exhibit 54 was then tailored, tailored to, right?  Because, as you said, it looks like the same format, on the topside, as that one.  Isn't that the truth?

A       The truth.  I'm sorry.  I'm --

Q       Isn't it a fact that you just did not investigate this exhibit to determine that, in fact, it was never presented as a true cash flow forecast; it was just presented as a template that was then used to prepare the true cash flow forecast, which shows nowhere near a $6 million negative balance?

A       Yeah.  I don't know in the ordinary course of business, as a financial advisor for a troubled company, if the CFO sends me a document, that I investigate with a question like, was that a joke?  Are you kidding?  Was that just a template

that you sent me?  Those are not typical, ordinary course questions.

Q    And so it's your testimony under oath that this was not sent to you as a template and asking whether you would approve the format?

A    I'm unaware of this being sent to me as a template to approve the format.

MR. COLLINS:  We'll move on.

Your Honor, before this hearing is over, I will get a copy of the email, and we'll probably need to talk with Mr. Larin again, but we'll move on.

THE COURT:  You know, I'm going to reserve a little time for their motion as well, and, you know, you're staring 16 till 4:00 right in the face.

MR. COLLINS:  Yeah.  Got you.

Let's pull up Larin Exhibit 4.

Your Honor, I would like to move Exhibit 54 into evidence.  That was this, what's showing on the screen right now.  This is the cash flow forecast that was --

MS. LIGGINS:  Your Honor, I'm just going to keep a rolling objection going now.  This is an exhibit that we have not seen, that was not designated on the list.  I do not know who prepared it.  I do not know when it was prepared.  We don't have any information about this exhibit.  He showed it to Mr. Larin all of five minutes ago.

MR. COLLINS: Your Honor, he's testified --

THE COURT: Is that true, Mr. Collins?

MR. COLLINS: He's testified that this is --

THE COURT: Mr. Collins.

MR. COLLINS: I'm sorry.

THE COURT: Answer my question. Is that true?

MR. COLLINS: Is what?

THE COURT: That they've never seen this, you didn't provide it to them until five -- and the first time they saw it was five minutes ago. Is that true?

MR. COLLINS: That is true.

THE COURT: It's not admitted.

MR. COLLINS: Your Honor, my understanding is, in rebuttal, we can use rebuttal evidence without having --

THE COURT: You haven't laid the foundation for that.

MR. COLLINS: The foundation is he testified that this is the report that he was receiving.

MS. LIGGINS: Your Honor, I think that's a mischaracterization of Mr. Larin's testimony. He did not testify about this exhibit. He doesn't know what this exhibit is. What he testified to is what he thought Exhibit 6 was, which was provided to the Weaver parties, as ordered by the Court, in accordance with its orders and rules.

MR. COLLINS: May I respond? I would say if you want to limit the -- the purpose of this exhibit is not to prove

the number that's on there. This is to prove the format of -- that, in fact, what he testified to as being a legitimate cash flow forecast being provided to him, showing negative 6 million 7, was not true and that, in fact, it was simply a format that they were agreeing to for this type of report.

THE COURT: I've not seen evidence of that yet. I mean, you've stated that.

MR. COLLINS: And that's --

THE COURT: But I've not seen that. I mean, you've said that there's, I guess, an email or something that says that. Have you got that?

MR. COLLINS: That, we will get that, Your Honor. That's why I reserved for the end of the time.

THE COURT: All right.

MR. COLLINS: Your Honor, honestly, I think the --

THE COURT: Well, then I'll deal with that issue when the rest of that's put forth then.

MR. COLLINS: In terms of allowing --

THE COURT: Whether or not to admit it.

MR. COLLINS: Okay.

THE COURT: All right. Let's move on. And, again, Mr. Collins, and I don't want to fuss at you, but this is your motion and your emergency hearing. You wanted an emergency hearing on this.

MR. COLLINS: Understood, Your Honor.

THE COURT: And so I expect you to be prepared for it.

MR. COLLINS: Your Honor, we're doing the best we can to get through our evidence.

THE COURT: Well, I know, but you called it. I didn't call it. This isn't my hearing.

MR. COLLINS: Understood.

THE COURT: All right.

MR. COLLINS: Understood.

We've got Exhibit 4, please, on the Larin Exhibit 4. So I think we need to -- I need to do that.

So now this -- okay. Actually, let's go back to the affidavit. I think that -- is that -- I need to do that too, don't I?

THE COURTROOM DEPUTY: Doc camera?

BY MR. COLLINS:

Q   So paragraph 23 of your affidavit, you say, "Prior to the appointment of the Receiver, Uncle Nearest provided Riveron with various financial reports." Correct?

A   That's correct.

Q   And among those were the operating receipts and disbursements for the period April 12th through June 13th?

A   Correct.

Q   Let's go to Exhibit 9.

And then we go to the post-receivership receivables.

This, again, was prepared by Riveron?

A    Compiled by Riveron, yes.

Q    And this was based on receivership numbers, correct?

A    Post-receivership, yes.

Q    And in paragraph 24 of your statement, you state, "In particular, cumulative post-receivership cash flow statements demonstrate that operating cash flows continue to be negative. In particular, cumulative post-receivership cash flows from September 1 through January 18 were negative $930,000 or approximately negative $47,000 per week."  Correct?

A    Correct.  And just to refresh, this is where I come to the conclusion that they are -- my opinion that they are cash flow negative, from the -- excuse me -- from an operating cash flow perspective; is that correct?

Q    Okay.

A    I'm just, I'm trying to make sure which section I'm looking at here --

Q    Yeah.  Okay.

A    -- without having to refer back to my notes.

Q    So, but this, this operating report does not exclude payments to Tennessee Distilling Group, correct?

A    Does not -- does not exclude payments?

Q    Well, exclude, include.  I mean, it doesn't -- it basically, it doesn't exclude, correct, the payments to Tennessee Distilling Group, right?  So it includes their

payments?

A     Let me answer that differently and see if that answers your question.  To the best of my knowledge, information, and belief, from the work that my team did, this represents the actual cash received into the bank accounts and that left, but for the FCMA funding.  And these are the adjustments on here. We added back the receivership fees and the FCMA funding to say that, to go back to that conversation from earlier, standardizing cash flows.

Q     But you didn't, you didn't -- this is not an operating cash flow statement in the sense that you also included payments on historical Tennessee Distilling Group debt as part of that cash flow?

A     Oh, the catch-up payment to Tennessee Distilling?

Q     Correct, yes.  Those are included in this cash flow?

A     They are.  So, just so we're clear, when Tennessee Distilling came in and made their demand, wanted to be paid for what they had not been paid for in the past and they were paid, yes, that is represented in the cash that is burned during this time period.

Q     Right.  So when we talk about operating cash flow, generally you wouldn't be talking about payment on liabilities that were before the receivership, at least, when we're talking about does this company cash flow currently?

A     I think the fact that they're paying on old debt that had

not been paid is a statement that they're not paying their bills as they come due.

Q   Well, I mean, you could make this negative.  If you paid $50 million, what you said the past debt is -- if you paid 50 million, you could say it's 50 million in negative cash flow, right?

A   If it's 50 million that you had not paid in the ordinary course when it came due, yes.

Q   But if we're talking about can this company, moving forward, pay its current operations from current income, you would not include in that analysis payments that were not current obligations -- not current obligations?

A   Assuming that they owed nothing, that they didn't owe about $175 million right now, that they didn't owe $22 million in AP, I don't know as a fact.  I would have to spend some time on -- I would like to spend some time on Excel to be able to work through that, to say if starting from right now, if we had a fresh start, let's say emerging from bankruptcy on a fresh start, could it do it?  I would like to reserve my opportunity to answer that question until I have the ability to look at what the assumptions are going into it, what the growth assumptions, what the depletion assumptions are, what the go-forward operating costs are.  There's a lot to be unpacked in that.

Q   But, I mean, don't we have that right here?  Right?

Because all you have to do is add back the Tennessee Distilling payments to see that, but for the Tennessee Distilling payments, this company is cash flow positive by $900,000?

A    I think you're mistaken on that conclusion.

Q    Let's do the math.

A    Because this Judge, this Court, this proceeding has stayed a significant amount of payments, including debt service payments, including trade payments that were wrapped up in the previous receivership period.

Q    I'm just looking at your sheet.  Let's just look at your sheet, right?  If we add back $1,500,000 that was paid on old debt to Tennessee Distilling Group, the cumulative cash, adjusted cash flow would be positive by about $900,000. That's just simple math; isn't that right?

A    Based on those assumptions that you're making, based on a series of assumptions, yeah.  If I added back 1.5 million to this amount, yes.

Q    It's one assumption.

A    Okay.

Q    It's one assumption that we don't include the Tennessee Distilling Group payments on old debt to clear liens, right? That was the point of that, correct, was to clear the lien? That was testified earlier.  You were in here.  If we add that back, the company is cash flow positive by $900,000, based on

this spreadsheet?

A    If that was the only adjustment, perhaps.

Q    Okay.  Let's go to Exhibit 10.  Do you recognize this document?  Let me zoom you in here a little bit.

A    Yeah.  Thank you very much.  It may be a little bit too close there.

All right.  I'm trying to remember.  Yeah, I do remember. This is the -- I think I do remember this.  I'm trying to, trying to recall.  Is this -- hmm.  Apologies.  I recognize the format.  I don't recognize having been through these.

Q    This is part of your affidavit.

A    Sure.

Q    This is, yeah, your exhibit.  So it's Exhibit 10 to your affidavit.

A    Okay.

Q    Do you recognize it?

A    I do.

Q    Okay.  And what is this showing?

A    To be honest with you, right now as I'm looking at this, I'm not remembering exactly what that is.  I would love to be able to refer back to my notes, but I'm not going to do this. But what this shows is that it's both a combination of both actual and projected cash flow from the period of the weeks ending January 18th through April 19th.

Q    Right.  And this is based on the same format as the last

one we just looked at, right?

A    Uh-huh.

Q    And, again, this also includes the Tennessee Distilling Group amount, correct?

A    Correct, yes.

Q    And so, again, if we add back $1,500,000 of cash flow, the ending cash is positive $900,000?

A    If that were the only add-back and that was the only adjustment, yes.

Q    In your affidavit, you indicate -- and we'll go to paragraph 31.  You indicate that "Based on information provided by both Uncle Nearest and the Receiver, it's my opinion that Uncle Nearest lacks sufficient asset value to fully secure the loans."  See that?

A    Yeah.  I apologize, Mr. Collins.  It's cut off on my screen.  Could you shift it up a little bit.  Thank you very much.  Yes.

Q    But earlier in your affidavit, you indicated you aren't giving a value opinion in your affidavit?

A    A valuation opinion.

Q    Valuation?

A    Value would be a different thing.

Q    How is value different than valuation?

A    Well, valuation would mean that I'm giving a number as to the actual valuation.  Value is, of course, a different word.

I have my values. I think that there's value in that statement, right? But am I giving a value opinion? No. And I'm not giving a valuation opinion either.

Q     I'm not sure I'm understanding. You say in this that Uncle Nearest lacks sufficient asset value to fully secure the loans. You aren't saying that -- you aren't using "value" in the way you just said, I don't think, right? I mean --

A     No, I'm not giving an opinion of value. I'm saying that within the rubric that they apply for their revolving line of credit, that there is not sufficient asset value, giving 75 percent value to essentially the AR and 70 percent value to the -- what do you call it -- to the inventory, that that would be -- that would not be enough to cover what they owe on this loan.

Q     You're talking about the borrowing base?

A     I am talking about the borrowing base.

Q     That doesn't say the borrowing base here. It says, "lacks sufficient asset value to fully secure the loans."

A     Uh-huh.

Q     If you're only talking 70 percent, then if you add the other 30 percent, it would cover the loans?

A     If that was achievable, but it's more often than not achievable because banks assign the borrowing base percentages to cover a net orderly liquidation value.

Q     So your basis here is based on an arbitrary borrowing

base number, not based on true asset value, correct?

A    I'm not sure if I would agree with the word "arbitrary." But if --

Q    Let's talk about borrowing base.  How do you set a borrowing base?

A    By agreement with the person who has lent you money.

Q    And isn't that pretty arbitrary?

A    No, I would not agree with the word "arbitrary" on that.

Q    But if they say it's 80 percent, then 80 percent becomes the borrowing base?

A    Then I think there would be a meeting of the minds between the two parties.

Q    But, I mean, it's not something that is defined by the world.  This is something that parties just agree to a number and that's it.  It isn't necessarily based on value, correct?

A    I don't know if I agree with you, just because of my interaction with banks over the years, that they base these percentages off of the work that they do to come to net orderly liquidation value, commonly known as NOLV.

Q    But just to clarify, your testimony is that, based on the borrowing base, they don't secure the loan.  It's not based on the value of the barrels?

A    At least on that point, yes.

Q    In terms of the borrowing base -- let's move to Exhibit 13.  I believe it's his Exhibit 13.

So this is -- what is this we're looking at? I'm sorry.

A It's okay. There we go. Thank you.

This is a projected prospective borrowing base had the company issued a borrowing base at 12/31, using the exact same methodologies and rubrics that they had for every other borrowing base, apart from the ones where they were overstated.

Q And the borrowing base is based on cost, right?

A It is.

Q Are most borrowing bases based on either accounts receivable or inventory?

A Based on, yes, typically a combination of the two and other accounts.

Q And do those types of assets generally appreciate in value over time?

A That's a rather general statement. Across which industries? And wasting and obsolescence, all those things work their way in. So do -- some industries, the values of inventory go down.

Q But generally speaking -- obviously, this is a different inventory. But generally speaking, inventory values and borrowing base calculations do not generally go up over time?

A Yeah. Generally, generally, I would say they either stay constant or they go through some sort of wasting over time.

Q Correct. And same with accounts receivable. Accounts

receivable don't get better over time, correct?

A    Uh-huh.

Q    And --

A    Well, hold on.  Sorry.  I said, "Uh-huh," but I don't know if I necessarily agree with that statement.

Q    Accounts receivable?

A    Accounts receivable don't get better over time was the question?

Q    Right.  As they age, they become less collectible usually, correct?

A    As they age.  Okay.

Q    Yeah.

A    All right.  So that was the distinction.  Excuse me.

Q    So that's correct, though?

A    I think it's a factor of what the terms are.  So if I move to a new supplier who, say, is going to pay me in 90-day terms but they've got a higher credit rating, higher cash flow, as opposed to me dealing with small interests who have 30 days, 30-day terms, and if I've moved my aging and it's now gotten older, it actually may have more value and collectibility because I've got more financially stable sellers.

Q    If I have an account receivable today, is it going to be more valuable in a month than it is most likely today?

A    An individual entry?

Q    An individual account receivable.

A    An individual entry, not the accounts receivable ledger overall?

Q    As a general category.

A    An individual collection entry?

Q    A single asset, a single account receivable, does it get better over time?  As it ages, does it get more valuable?  In fact, it loses value, right, because of time value of money?

A    Not necessarily.

Q    Time value of money?

A    Let's say it's on 30-day terms.  If it's on 30-day terms and the first time you saw it it's five days old, but the second time that you see it you're one day from collection, I would say that has more value because that's about to hit your bank account.

Q    Well, let's talk then about barrels.  Barrels age and increase in value, clearly, right?  You don't have to go through a machination about it.  They get more valuable over time?

A    As I have learned through this engagement, in dealing with various people who are involved in the sale, the purchase of barrels, what has typically been true is that barrels have gone up in value.

What is happening now is that barrels are not necessarily going up in value, or they're going up in a slower rate than

they had in the past, and/or it's much more difficult to find a place to sell them because the secondary market is oversaturated with excess supply.

So it's a loaded answer. I apologize for it. But in the historic, yes, barrels would typically age out and become more valuable, assuming they've been in a good rickhouse, well cared for, that there was good, that there was a good process to getting them there. However, we are at a different stage in the market, from all of my understanding. But I'm not a -- I'm not a BevAlc expert.

Q    Fair enough. But you have kind of indicated about this borrowing base, and the borrowing base is based on cost. So if you have a barrel that's four years old, it's going to be worth more than a new barrel, I mean, in any market, correct?

A    Based on a conversation I just had with a representative who is out there buying and selling barrels is that the cost of a new-fill barrel and the cost of a four or five-year-old barrel is about the same right now. Nobody wants them. That's a statement that was made to me. Again --

Q    Have you talked to -- and who was this made by?

A    This was made by a representative of the Tiger Group.

Q    Have you ever talked with Thome? Are you familiar with J.B. Thome?

A    I'm sorry. With whom?

Q    Are you familiar with J.B. Thome?

A    J.B. Thome.  No, I don't think I've had a conversation with a J.B. Thome.

Q    Okay.  A barrel broker.

A    Okay.

Q    The largest barrel broker since 1977.  If I were to show you a report that he did -- and I won't -- so this is a report from J.B. Thome that basically includes a current --

THE COURT:  I don't even know what it is, so --

MR. CAMPBELL:  I know.  I feel like I've got to reserve the objection.

MS. LIGGINS:  We don't either, Your Honor.

MR. COLLINS:  I won't put this into evidence, Your Honor, but I want him to --

THE COURT:  Mr. Collins, you only have so much time.  I understand the point about the valuation of the barrels, but you're really, you're spending a lot of time on stuff that -- I mean, it's your time, but --

MR. COLLINS:  Yeah, Your Honor.  I appreciate it.  It's hard to try to manage a short period, and we're trying to do what we can.  So I'll move on.  Point well-taken, Your Honor.

I think we're about to wrap up.  Just making sure we don't have anything.

I think that's all, Your Honor, for this witness.

THE COURT:  All right.  Thank you.

Do you-all have any questions?

MS. LIGGINS: I just have a couple clean-ups but not much.

CROSS EXAMINATION

BY MS. LIGGINS:

Q    Mr. Larin, just a couple things.

A    Yes, ma'am.

Q    I'm going to show you what is your declaration, paragraph 31.

A    Yes, ma'am.

Q    I believe Mr. Collins was asking you what Exhibit 10 is, but I don't think you had your declaration in front of you, which is your direct testimony.

A    It has been passed to me just as of recently, yes.

Q    Okay. But if you -- yes, scroll up so you can see what the exhibit is. Scroll down, sorry, to the screen. Yeah, right there.

Do you see the definition of Exhibit 10?

A    Yes.

MS. LIGGINS: Okay. Now can you show me Exhibit 10.

BY MS. LIGGINS:

Q    You said you didn't recall what this is?

A    That's correct.

Q    Does this refresh your recollection of what this actually is?

A    Thank you very much.  Yes, that does refresh my recollection.

Q    And what is it?

A    This is a cumulative cash flow forecast for the period of January 18th through April 19th.

Q    So these are the numbers from the receiver during the receivership?

A    That is correct.

        MS. LIGGINS:  Okay.  No further questions.

        THE COURT:  All right.  Thank you.

    Mr. Campbell, anything.

        MR. CAMPBELL:  I just have one question, Your Honor.

        THE COURT:  All right.

        THE WITNESS:  Yes, sir.

                    REDIRECT EXAMINATION

BY MR. CAMPBELL:

Q    Mr. Larin, I'm going to refer back to Exhibit 9 here.  We talked a lot about TDG and the payment to TDG and whether or not that's calculated.  I want to direct your attention to the second column, the actual 12/8 through 12/14 and then 12/15 through 12/21.  Can you see the million-dollar bump there?

A    I'm sorry.  Give me one second to catch up on your --

Q    Yeah, sure.

A    You said 12/8?

Q    Yes, sir.

A    Yes, got that.  The one that starts at 1.535?

Q    Correct.

A    Over to which, which one?

Q    The column below.  What I'm really looking to ask you about is the FCMA funding, the two totals there.

A    Yes.

Q    Is the difference --

THE COURTROOM DEPUTY:  Touch the screen and you can mark it.

MR. CAMPBELL:  Huh?

THE COURTROOM DEPUTY:  Touch the screen and you can mark it.

MR. CAMPBELL:  Oh, okay.  Yeah, right there.  Fancy.

BY MR. CAMPBELL:

Q    Does that amount include the TDG payment?

A    It does include it.  That was the amount of funding that was provided by FCMA to cover the -- to cover that payment.

Q    Right.  And so you've already backed out the FCMA funding on this, right?

A    Yes, that's correct.

Q    So if you backed out the FCMA funding and then you backed out the TDG funding, you would actually, in fact, be double-counting that number, correct?

A    I think that's probably correct.

MR. CAMPBELL:  No further questions.

THE COURT:  All right.  Thank you.

RECROSS EXAMINATION

BY MR. COLLINS:

Q    Let's run through this again.  The FCMA funding is a negative.  You have to add -- if you add back, you'd then offset the negative, correct?

A    If I add back --

Q    Right.  So, yes, you're showing, the FCMA's funding is showing a negative outflow that is related to the TDG payment, correct?

A    Following the logic here.  Excuse me.  So let's just walk through that.  The cumulative net cash flow report is 1.5.  The add-back for the receiver fees, 1.3.  So that's 2.8, correct.  Now we also -- if it is going to take out, at that point, the 2.7, okay, adding back that 2.7, then that would, in my opinion, reverse any sort of -- not reverse.  How do I say this properly?  It properly accounts for the fact that that 2.7 million is a -- oh, shit, I'm even doing it in the wrong -- oh, excuse me.

Q    Maybe I can make this -- let me simplify this for you.  Let me simplify this for you, right?  You have a cash flow, right, a cumulative net cash flow reported.  That's kind of the net, right, of your model?  You then add back the receiver's fees, but then you take out the FCMA funding.  The FCMA funding paid both the receiver's fees and the TDG

payment.  So if you're going to add back the cumulative receiver fees, you've got to add back the TDG fees in order to make that offset work; is that not correct?

A     That's not correct, because what is in the cumulative net cash flow reported includes the amount of money that Farm Credit has given to Uncle Nearest in the post-receivership period to bring it to that 1.5.

Q     Well, then why do you add back the cumulative receivership fees?  Wouldn't they also then be included if you were going to say that includes those?  This isn't complicated math.

A     No.  I think it's just the positives and negatives going out at various levels that are just giving me pause.  Give me one second to answer this.

So, at this point, add back the cumulative receivership fees.  No.  I would say that no, it doesn't, because the receivership fees at this point were being paid at least out of ordinary -- or at least out of cash flow being generated at that time.

Q     You're saying that the cumulative cash flow number -- because we just went through this, right?  And you testified the other way, and now you're reversing yourself.  So let's -- this is an important point, right, because this determines whether we're cash flow positive or cash flow negative.

So you're saying -- are you saying that in the cumulative

net cash flow you included everything, including the TDG

payments, but you didn't include the receivership fees?

Isn't it true that that is just the top of the net cash

flow number?  It does not include receivership fees, it does

not include the TDG payments; is that correct?

A    I do not think that that's correct because, if my memory

serves me correctly, the cumulative net cash flow reported was

prior to the receivership fees.  Wait a minute.

Q    It was net of all of the TDG -- everything that was

funded by the bank -- the bank funded both the receivership

fees and funded the TDG payments.  That is the correct answer,

is it not?

A    I do not believe that that is the correct answer.

Q    This is your report.

A    Uh-huh.

Q    This is based on your own cash flow -- I'm sorry we have

to wait to deal with this in a short time, but this is what

we've got.

Can we go to the computer, please.  Thank you.

So if we look at this, you see the operating

disbursements line and then you see the non-operating

disbursements line.  You see that.  And then you see

non-operating collections and operating collections.  And in

terms of the payment to TDG, those were included in the

non-operating disbursements, correct?

A    TDG -- let me just see if I can find where the TDG actually is on this.

Q    You can see there's a cash reserve for pre-receiver TDG payments at the bottom?

A    Uh-huh, yeah.  The term "reserve" gives me a little bit of pause to be able to say that that was actually money going out the door rather than just calling it a reserve.

Q    We're just talking a hypothetical then.  If, in fact, you take out the TDG payments, which you should on that prior exhibit, the company was cash flow positive by about $900,000, correct, assuming my assumption?

A    Assuming your assumption.  I would want to compare that to the other one live, but --

Q    We just had this conversation before the re -- or the redirect, I guess.  Is that a yes?

A    Well --

Q    I'll take that you can't answer it, that you're going to go -- that, in fact, you haven't studied this enough to be able to have an answer and that we need to move on.

But, Your Honor, this is --

THE COURT:  Look, I'm giving you a little bit of time because I want you to be able to make your point, but I don't think he's going to answer, so --

MR. COLLINS:  Then I would -- if he can't answer a question about his own spreadsheet, then I think --

THE COURT:  The Court will take its own inference from it.

MR. COLLINS:  Then I think the inference ought to be in our favor, that the 900 --

THE COURT:  Well, the Court will evaluate it.  That's what we're here for.  Are you ready to move on?

MR. COLLINS:  We are.  I don't have any further questions.

THE COURT:  Okay.  All right.

MS. LIGGINS:  Just real quick.  I'm so sorry, Your Honor.

RECROSS EXAMINATION

BY MS. LIGGINS:

Q    On this exhibit that's up, this is for the week ending 11/24, correct?

A    The week ending 11/30, yes.

Q    Right.  And the TDG payment was made in December, so it's not in this sheet?

A    That's correct.  This is the -- this is the cash flow launcher system that Newpoint does.  This is not my spreadsheet.

Q    Right.  It's just a different time period?

A    Correct.

Q    Okay.  And let me just ask it simply like this:  When you do the cash flow, you account for all the money that comes in?

A    Correct.

Q    $2.7 million came in from Farm Credit, so it would be a part of cash that came in?

A    Correct.

Q    But that is not a normal operating receipt, correct?

A    That is not.

Q    Because that was for a protective advance?

A    That is correct.

Q    The payment to TDG, however, is a normal operating disbursement?

A    Yes, it is.

MS. LIGGINS:  No further questions.

THE COURT:  All right.  Thank you.

All right.  Thank you.

All right.  Mr. Collins, I want to reserve a little bit of time for their motion for clarification.  How much do you have left?

MR. COLLINS:  Well, if we can get Fawn Weaver on the stand, we'll move through it as quickly as we can, Your Honor.

THE COURT:  Okay.

MR. COLLINS:  She's going to talk about kind of what it would look like post-termination.

THE COURT:  All right.  If I don't let Ms. Norwood go home at 5:00 o'clock, I'm going to be in trouble, Mr. Collins.

MR. COLLINS:  Okay.  Understood, Your Honor.  We'll

do our best.

THE COURT: All right.

MR. COLLINS: Call Fawn Weaver.

THE COURT: What is it, Mr. Campbell?

MR. CAMPBELL: I think I may be able to speed the Court's process up a little bit, if I can. As it pertains to the motion for clarification, our motion for clarification, we're willing to rest on the pleadings in the affidavit. So I'm not sure that we have a whole lot. So to the extent --

THE COURT: You originally asked for a hearing, and so I was going to give you a hearing. But if you want to rest on the filings, that's fine with the Court.

MR. CAMPBELL: And I understand, Your Honor, and I appreciate the opportunity to have the hearing.

THE COURT: All right.

MR. CAMPBELL: But I think for the purposes of trying to move things along, we feel comfortable with everything we submitted, and we'll move that forward.

THE COURT: Understood. Thank you.

MR. CAMPBELL: Thank you, Your Honor.

THE COURT: All right.

MS. WEAVER: What happened to the Bible?

THE COURTROOM DEPUTY: Do you solemnly swear your testimony will be the truth, the whole truth, and nothing but the truth, so help you God?

THE WITNESS: So help me God. Thank you.

THE COURTROOM DEPUTY: Will you state and spell your name for the record.

THE WITNESS: It is Fawn Weaver, F, as in Frank, A-W-N, last name Weaver.

FAWN WEAVER,

having been first duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. COLLINS:

Q    Ms. Weaver, you've heard some of this cash flow testimony?

A    Yes. It's very interesting.

Q    Do you have any thoughts in terms of -- and you're the CEO --

A    Yeah.

Q    -- of the company, correct?

A    Yes. I have quite a few thoughts. If you put the document back up that's under question that you can't find the email for, but once -- I have a device. I'm happy to forward the email in.

While he's finding that, I will share what it is, because Mr. Larin absolutely has it because that is a part of a folder that still exists to this day of Google Docs. I just simply went in and pulled it down. Not that one. The actual cash

flow.

That was sent as a template by Mr. Flores, asking, is this how you want this to be done?  And the actual cash flow is what came after that.  That is the document you're trying to get into evidence.  Can you put that one up?

While he's doing this, Your Honor, I understand that you do not do these kind of hearings.

THE COURT:  Hold on a minute.

Mr. Collins.

MR. COLLINS:  Yeah.

THE COURT:  Hold on a minute.

Ms. Weaver, please don't speak to me directly.

THE WITNESS:  I'm sorry.

THE COURT:  Okay?

THE WITNESS:  Yeah, yeah.

THE COURT:  Mr. Collins, ask questions.

Ms. Weaver, answer questions.

THE WITNESS:  Got it.

THE COURT:  Let's stay to that, all right?

THE WITNESS:  Okay.  So this particular document was the actual forecast.  That was what actually went in.  You have the actuals to the left, and you have the forecast to the right.

BY MR. COLLINS:

Q    And have you seen this document before?

A    Absolutely.  We all have.  It's a part of the folder that was created in every single week.  Our interim CFO, Carlos Flores, and our other team member would enter this in every single week.  I wasn't involved in the preparation of it, but I most certainly saw it every single week, as did Mr. Larin.

Q    And this is a business record of the company?

A    And it still remains in the same Google Doc that is shared by all of us to this day, Riveron, Uncle Nearest.

MR. COLLINS:  I would move to have this into evidence, Your Honor.

MS. LIGGINS:  Your Honor, I still don't believe she's laid the proper foundation for the admittance of this exhibit. She has actually testified that she did not prepare it, that she has an email that somebody else sent to her that is not --

THE WITNESS:  No, no.  That --

THE COURT:  Hold on a minute.  Ms. Weaver, listen, when you're asked a question, answer it.  Other than that, nothing, okay?

THE WITNESS:  Yes, sir.

THE COURT:  Now go ahead.

MS. LIGGINS:  Thank you, Your Honor.  She has testified that she did not prepare this document.  She's testifying about an email that is not in evidence.  So I do not think the foundation has been properly laid.  I think the same objection that I had before continues.

MR. COLLINS:  I think she has the ability to testify as to this document as a legitimate business record.  She's the CEO of the company.  This is a cash flow forecast that the company prepared.  I think the foundation is there.  I think even the foundation for her to testify to how this process between exhibit, the exhibit to the Larin --

THE COURT:  I understand your objection, and a lot of good points.  It's a little unconventional how we proceeded in this hearing.  The Court's going to admit this and give it the weight that the Court thinks it deserves.  But your objection is overruled and I'm going to admit it.  But let's move on.

MR. COLLINS:  Thank you, Your Honor.

THE COURT:  We've talked about this one a lot.  Now I imagine there are more important points you want to get to, Mr. Collins.

BY MR. COLLINS:

Q    And so let's talk about what might happen to this company and where you see the company moving if the receivership were terminated.

A    Absolutely.  Well, if I can go back to Mr. Severini's testimony, until the beginning of January, we were never told that there was a cash flow challenge at all.  We were told the exact opposite.  Every cash flow forecast that has been provided to me until the receiver stopped providing them showed that we were cash flow positive.  It's the same

communication he has shared with everyone.

And it wasn't until December 10th, when it was the last cash flow report I received, and after that I was advised that unless I sign an NDA and agree not to file those cash flow reports with the Court, it is the only way I would be able to see cash flow reports.

So I sit here having only seen cash flow reports during the entire receivership, sans the first portion of it where the cash flow report was incorrect, and I contacted both Mark and Tim because it was showing a loss of a million dollars. It was incorrect because --

Q    And you're talking about Mark Ruday and Tim Stone?

A    Mark Ruday and Tim Stone.  It was incorrect because -- and I think they're fantastic.  However, they were running a 52-week run rate.  That included an enormous amount of legacy payments between the departure of our CFO in October and that period of time.

For Mr. Severini, we began paying past-due payments of payroll that we didn't know was outstanding while also keeping up with the current payroll.  And so if you're looking at all of these additional payments that were being made during that period of time, they had already been cut out by the time the receivership came in.  I had personally cut 40 percent of expenses by the time he had come in, 40 percent that had been realized.  An additional 20 percent had already been cut by

the time we got to October.

Q    Let me ask you a question.  In January, from all of 2025, has Farm Credit provided any funding in terms of availability on the credit line?

A    No.

Q    So everything that has happened in this company, at least before '25 but certainly all of '25, that eight months, or six or seven, eight months, was all done through company operating cash flow?

A    Absolutely, and because, as the testimony that you've heard today, Uncle Nearest was continuing to grow.  We were continuing to outpace the market.  We always have.  We ran into a very challenging time that I, as a CEO, was trying to maneuver some uncharted waters for me, to say the least, continuing to lead this company forward, continuing to grow this company in a background that is challenging, but still making sure that in the market we're growing, because if in the market Uncle Nearest is beating the market when everyone else is down or mostly everyone else is down, that makes our company highly valuable.  It makes us highly valuable to refinance.  It makes us highly valuable in order to sell.

At the time that the receivership began, the reason why there were no lawsuits by any of our creditors, including our payroll company, is we had made arrangements with every single one, including TDG, and we were on time for all of them, as

Mr. Severini has in his.

So, yes, it was a juggle, yes, it was tough, but I was managing that, and our team was still continuing to grow the brand and to grow the company. We cut the fat. We cut no muscle. The receiver came in. He began insisting on things that would cut muscle, slowing down the process.

So when we're talking about a material change, what has happened from the time that the receivership began to what is happening now, when it began, we were figuring out how to take care of a lot of legacy payments, how to get Farm Credit refinanced. That's what we were figuring out, but we were doing it while still growing. The more we grow in a market that is down, the more options we have. By putting the receiver in, we lost every option.

Q   And during 2025, did you make any payments? Did the company make any payments to Farm Credit?

A   Of course.

Q   How much, about, approximately?

A   In 2025, 7.5 million.

Q   So $7.5 million was paid down on the Farm Credit debt?

A   Correct. In the period of time that -- their prior testimony was that we were in default from January 2024 until the time they filed. We spent, we paid Farm Credit $16 million during that period of time.

Q   Okay. And in terms of -- you know, we've seen the

Nielsen data and the things dropping. How do you see the company moving forward, if the receivership were terminated, in terms of reversing that trend?

A    It will be liquidated. He would have taken a very healthy company that had a --

Q    That's not my question. My question is if the receivership is terminated.

A    If it is terminated, if it is terminated today, say, for instance, if it is terminated today and I walk out onto the front of the courtroom steps and I simply put up a social media post -- and the irony of this conversation about media is I haven't said a single thing in the media since this began because I never wanted to influence anything that was said in the media.

But what I will say is that the Uncle Nearest consumer still believes in me. The majority of Uncle Nearest investors -- who ironically every single one of our largest investors are actually connected to Danny Romano. That's how we found him. They call him on a very regular basis to check in. And the conversation has never been that Fawn makes the company less valuable. It has always been, if she is not out there and building this company, none of us are going to get our money back.

Q    Now, in terms of vendors, let's say the receivership were terminated. Do you believe that the vendors that were working

with you prior to the receivership would also work with you after the receivership?

A   Without question.  If you take Advanced Spirits, for instance, that just wrote a demand letter, that goes away. MarcyPen's convertible note, that was based on the sale of my own personal shares.  They only triggered that because of the receivership.  That wasn't set to convert until 2030.

So you have a series of things that are showing as owed. In their own financial report that they filed, it shows 17 million that's due to UN affiliates.  Who are those affiliates?

So we have all these numbers that if the receivership isn't in place, the 10 million that we started off with, we still get back to that 10 million or very close to it.  But if you're looking at all of the people that are now triggering because I am no longer leading this company and a receiver who told all of them that we were cash flow positive until the first week of January, yes, they are absolutely upset and they are absolutely triggering right now.

Q   In terms of your role as CEO, what would you recommend as the outcome of this hearing and why would that help benefit the company?

A   I would recommend as the outcome of this hearing -- I can't say what the Court should do, could do.  The only thing I know for sure is, as quickly as that Nielsen trend went

down, because the receivership began -- it wasn't the lawsuit. The things that the bank claimed, there's a trial for that or there's a hearing for that. We will do the counterclaims, all of that.

But as consumers of Uncle Nearest, as they looked at it and I was still in control, it is why the sales went up when that happened, because they looked at it as Uncle Nearest is under attack. Fawn Weaver is under attack. We've got to support.

That support comes back. It has gone nowhere. The only reason that Mr. Young gets the calls from investors is because I stepped back from having those communications with them, not wanting to interfere, because he believed that he could get the loan refinanced.

Now that I understand that he's not going to get it refinanced, that he ran a four-week process -- everyone's interest was due on December 19th. He ran a four-week process. It takes months to sell a brand in a healthy market. Four weeks in this market, you're indicating to every potential buyer this is a fire sale. And if I'm a PE company or I'm a VC company and I know the value of Uncle Nearest, I am going to absolutely cram down the value of it, offer something incredibly low, flip it to another PE company immediately, who flips it to another one immediately, who then flips it to a big guy to kill it, because, outside of Tito's,

Uncle Nearest is the first independent spirit brand to succeed nationwide, hard stop.

Q    Okay.  In terms of your marketing and your efforts during the receivership, have you slowed down at all in terms of being out in the public and trying to still build a brand?

A    The only slowdown has happened this year, because even though they spoke about the fact that I travel the most, what they left out is that I cost the least as well.  And the reason I cost the least is because I am a highly sought-after speaker.  At least I was before they put this cloud over me, trying to paint fraud and misappropriation, which their own records show is not true.  When you do that, you lose speaking engagements.

The reason why I had so many speaking engagements, besides the fact that I only pay myself $90,000 a year from Uncle Nearest, but the reason I had so many is because we timed them with going into markets for me to do GSMs, general sales meetings, for me to do bottle signings, for me to -- so they see me all over the country.  But Uncle Nearest wasn't paying for that.  Whoever brought me in to speak was paying for that.

MR. COLLINS:  Your Honor, I know we're running out of time, so I don't want to go long.

BY MR. COLLINS:

Q    Are there any other things about the hearing today that

cause you concern that the Court ought to know?

A    I'm greatly concerned.  We absolutely -- you have an unbelievable amount of affidavits that were filed on Wednesday, and if I were given the time, I could go one by one and dispute every single one with evidence.  But in an environment where everything is crammed into one day, it's absolutely impossible.

I wish I could.  I sort of think that I have superpowers in that regard, but it's just not reasonable.  They labeled their exhibits today when they got here, so there's no way to prepare, to go back and say, okay, this exhibit, this -- so we look like we're fumbling.  But that was intentional.  They literally data-dumped with so many lies, and we can't -- we don't have the ability or the time to dispute.

Mr. Larin going back and forth on his own document, saying that he wasn't familiar with that cash flow, it's in his folder.  He created the folder.  The folder exists to this day.  And the only way that you can put the things that they put in the affidavits is that you are absolutely trying to paint a picture that you cannot paint with the truth.

Through December 10th, the last cash flow report I received from the receiver, every cash flow report is positive, and it doesn't flip negative until potentially the second week in February.  And I told them then that they were under-forecasting, and I knew they were under-forecasting

because they're listening to Scott with Thoroughbred. And Scott is fantastic, his team is fantastic, but they've never worked with a brand our size.

They also have never worked with a brand whose consumer base is the culture. For everyone who isn't a part of the culture, the best way to describe the culture is everybody who dances on two and four. So it's not just Black, it's, you know, certain parts, certain Latinos. But that particular consumer base where they keep going back to, bourbon is down, bourbon is down, yes, bourbon is down, but the Uncle Nearest consumer is not the bourbon consumer. The Uncle Nearest consumer is the Uncle Nearest consumer.

If I had control -- now, I don't care about that. Listen, we had the third-party investigation that was going before the receiver came in.

MS. LIGGINS: Your Honor, what is the question?

MR. COLLINS: We're trying to -- I'm trying to speed this up, Your Honor.

THE COURT: I'm going to give her a little bit of latitude. So to the extent that that's an objection --

MS. LIGGINS: It is an objection.

THE COURT: -- which I assume it is --

MS. LIGGINS: Yes, Your Honor.

THE COURT: -- it's overruled. But let's -- yeah.

BY MR. COLLINS:

Q   So finish up.

A   I don't even remember.  Sorry.

But this is what I will say, and this is what I know for sure, is there is not a single person in this room who has built a brand the size of Uncle Nearest, that has worked with the CPG brand in the spirits industry the size of Uncle Nearest, an independent.

What we have done across this country has never been done before.  And to say that the larger spirit conglomerates would love to get their hands on Uncle Nearest at a discount is an understatement.  So if Mr. Young is getting calls from people saying that my involvement is harming the brand, that is because I haven't gone away, and the Uncle Nearest consumer is waiting to buy again the moment that they know that I am leading the company.

So if I had an outcome -- and I don't even know what the legal is, and you and I haven't spoken about this.  But if I had an outcome that I felt would be most beneficial to allowing the company to grow, it is to put the company back in my hands.  If they want to prove fraud or misappropriation, by all means, please do.  You have access to every record that exists.  By all means, please do.  But until you can actually charge me with something or actually claim something against me, do not kill my company in the process that I built with every penny I have.

So if they want to make sure that what they have is protected, put the receiver in a monitoring role. Let him continue to have everything. But the Uncle Nearest consumer will not show up. Those Nielsen numbers will not return. Our value will not go back to what it was before the receiver came in if I am not the person who the consumers know have control over this company.

Continue doing the third-party investigation. Do whatever you want to do, please, by all means, because it's the only way I'm going to clear my name that you-all have slandered and smeared. Please continue. But that is what I believe.

MR. COLLINS: Thank you, Your Honor. No further questions.

THE COURT: All right. Thank you.

Cross-examination.

MS. LIGGINS: Yes, Your Honor.

CROSS EXAMINATION

BY MS. LIGGINS:

Q    Good afternoon, Ms. Weaver.

A    Good afternoon.

Q    You're not --

A    Nice to see you off-Zoom.

Q    Nice to see you off-Zoom.

A    Yes.

Q    You're not disputing that Advanced Spirits has a debt, right?

A    Well, let's be clear about -- no, no.  You can't ask me a question and -- let's be clear about what that debt is related to.

THE COURT:  Hold on, hold on, hold on, hold on.  Ask a question, answer the question.  I don't want any arguing, okay?

MS. LIGGINS:  Yes, Your Honor.

THE COURT:  You don't have to agree with the question.

THE WITNESS:  Yes.

THE COURT:  But you answer the question.

THE WITNESS:  Yes.

THE COURT:  No back-and-forth.

BY MS. LIGGINS:

Q    Do you dispute that Advanced Spirits has a debt?

A    I can say that Advanced Spirits' debt is directly related to the $21 million in barrels you have said are missing.  So if the debt is due, the $21 million in barrels that you-all said were missing have somehow been found.

Q    Do you dispute that MarcyPen has a debt?

A    MarcyPen has a debt but only because the receivership triggered it.  MarcyPen had no intention of taking on debt. And since you asked the question, let's talk about what that

MarcyPen debt is.

MarcyPen wanted to buy shares into the company. They had no desire to do a convertible note, none whatsoever. I asked them to do a convertible note because the shares that were being sold were my personal shares. And I was putting 100 percent of the $20 million, which you so wonderfully tracked in your subordinated credit agreement, that every single penny that I am now being said to have misappropriated is in the document that you filed, showing that 100 percent of that money went to Uncle Nearest.

But who was the owner of those shares? Me, Grant Sidney. That 21 million was never meant to, was never meant to convert into a loan. And if it hadn't been for the receivership, it would not. And I guarantee if I make a phone call to them and say, would you still like interest in the company instead of the loan, we'll be able to work that out, like every other vendor, every other relationship. The only relationship that we had a challenge with, leading up to this, was Farm Credit, the only one.

Q    To the tune of $100 million?

A    To the tune of $100 million. There's no question about that.

Q    Okay.

A    But you're bringing in other vendors, and none of them -- or creditors -- had an issue. We had -- every single one was

willing to work with us, every single one.

Q   Everybody was working with you with their debt except for MCA, except for Farm Credit?

A   Correct.

Q   Okay.  And MarcyPen gave Uncle Nearest, what did you say, $20 million?

A   It wasn't a gift.

Q   A loan?

A   I sold my shares, and it was done as a loan at my request.

Q   Okay.

A   And it was only for tax purposes.  It was never to be treated -- they never intended it to be a loan.  It was because I was putting all 20 million back into Uncle Nearest. I would have been taxed $9.5 million, which the company would have had to have covered this year.  That didn't make any sense for me to sell my shares, to put it into the company, for the company to then have to pay a $9.5 million capital tax.

So I asked MarcyPen, instead of buying the shares, can we do it as a convertible note, but what you're converting are my personal shares?  That is what is in the document that you have; that if you don't have it, Mr. Young most certainly has it, because he received it on the very first day that his receivership began, and I walked him through what it was on

the very first day.

Q    Okay.  So they, MarcyPen, structured the $20 million as a loan to Uncle Nearest to prevent you from having tax liability?

A    To prevent Uncle Nearest from having to pay the tax liability, because 100 percent of that 20 million was going into the company.  If I had sold it as they had requested, it makes sense if that money is coming to me.  But the money wasn't coming to me.  The money was being invested in Uncle Nearest.

Q    Okay.  So then you moved the $20 million.  Is that why you moved the $20 million from Uncle Nearest to Grant Sidney, because it was for your shares?

A    No.  Let's be very clear.  Let's be very, very clear.  You have, you-all -- well --

Q    When you say you, who are you talking about?

A    Farm Credit.

Q    Okay.

A    That's who you represent, Farm Credit.  But it was specifically McGuire Woods.  It was specifically your firm that was quite aggressive during this window of time where this money was being received, very aggressive.  So along with my board and financial advisors, we made the decision to make sure that $20 million coming in could not be snatched by you.

Q    Okay.  So that's why you moved it into a Grant Sidney

account, because Farm Credit was being so aggressive about wanting to collect its debt, so you moved it to an account so FCMA couldn't get to it?

A No. Actually, that's not what happened. The reason -- it wasn't FCMA. I mean, you would have still had to file things to get to it. It is that we were in the middle of negotiating a forbearance agreement with you, and you were telling us, you personally were telling us that we needed to come up with $40 million in two weeks or you were going to put our company into receivership, a company that was otherwise healthy in terms of the brand and the growth. And we were trying to figure that out, but we needed to also make sure we were able to operate our business, and that meant I needed to bring in outside resources.

So, yes, we brought it into an account that was set up solely for the transaction, has never been used before. And you-all have these bank statements. It had never been used before. It's never been used after. So the transfer was used as a pass-through and a pass-through only.

The reason it came into Grant Sidney is they were my shares, and I needed to make sure that we could continue operating the company when you-all were clearly trying to harm the company. Whether or not you think that's what you were trying to do, that is effectively what was happening. And it was my job, as a CEO and the person who built this company, to

do anything and everything I could to make sure that my company did not die over some past dealings with former employees.

Q    Got it.  And so I heard you say that you are focused on returning the investors back all their money?

A    You heard me say that just now?

Q    When you were testifying with Mr. Collins.

A    That wasn't -- that's not what I said.

Q    That's not your focus?

A    That is not what I said.

Q    Is that your focus?

A    My focus is making sure that every creditor is paid off, that every shareholder is made whole, and that Uncle Nearest continues to grow, yes.  But was that a part of testimony today?  No.

Q    And what's your plan to pay FCMA?

A    The same plan that we were working on when you rejected the offer to pay off the debt, the same thing, because the process that the receiver is running now, you will make less money than you would have if you had accepted the offer from our investor to begin with.

Q    And you did testify that if you went to the courthouse steps, all the other debt would go away, right?

A    No, that's not what I testified.  But I appreciate your -- what I said is that if I went to the courthouse steps

and said Uncle Nearest is back in my hands, every store with Uncle Nearest across this country would sell out, the same thing that happened when you filed the lawsuit. The moment that happened, I went on social media and I said, I can't really tell you-all what's going on right now because I'm under a gag order. However, I need you to go across the country and clear the shelves.

And, as Mr. Romano and any other distributor that will attest to, I did one single post and every bottle of Uncle Nearest across the country cleared out. However, you wouldn't let us dump our barrels in order to replace the Uncle Nearest in the market, so Uncle Nearest just began going out of stock around the market because you believed that your barrels at a liquidated price would make you more money than allowing Uncle Nearest to make between 6,000 and $8,000 a month on our finished goods going out across the country.

So, yes, to answer your question. Do I believe that I turn this company around and the valuation of this company around if it is back in my hands? And, yes, if I did a single post on the courthouse steps that said that? Yes, without question. Those negative numbers that you see in the Nielsen would turn black within 30 days. I am positive of that.

Q    But it won't make the debt go away, will it, Ms. --

A    It will not make the debt go away, but --

Q    Wait. Wait. Let me finish.

A    I thought that was a question.

Q    It won't make the debt go away because you do a social media post, correct?

A    Well, what it will do is it will build the valuation of the company back so that when we're talking about what can investors invest in, they're investing in a company that is going against the entire market, that is growing against all odds.  We are able to tell investors this is the brand that will still be here centuries from now.  We're able to tell investors this is the brand that can beat every other brand in the market if it has what it needs.  We can go out and we can do that, and then you can be paid off.  Yes, that does all correlate.

Q    How many investors do you have today?

A    212.

Q    Do you have an accurate cap table?

A    We do not.  And you know why?

Q    Yes.

A    But would you like me to share why?

Q    I would.

A    Feel free to ask the question so I can answer it.

Q    Oh, thank you.

THE COURT:  Hold on a minute.  That's going to stop or this hearing is over with, okay?  No back-and-forth.

Do you understand me?

THE WITNESS:  Oh, absolutely.

THE COURT:  Do you understand me?

MS. LIGGINS:  Yes, Your Honor.

THE COURT:  All right.  Let's be professional, and if we can't be professional, this hearing is over.

THE WITNESS:  Yes, sir.

BY MS. LIGGINS:

Q    Why don't you have an accurate cap table?

A    We do not have an accurate cap table because our former CFO was selling shares on the market in the secondary, and there are a lot of shareholders that purchased shares, many of the shares belonging to me, in which he used forged stock trade certificates in order to sell shares.

So do we have an accurate cap table based on what we knew had come into the company?  Absolutely.  Do we have an accurate cap table based on the secondary shares that were sold?  We do not.  But we also were the reason for the third-party investigation in which our board hired Duane Morris, a top law firm, who then hired Kroll in order to do a third-party investigation not just into our CFO but into our CFO, the entire finance team, and into myself and into my husband.

This was not a report that we were going to get; that we were going to deliver to the board.  It was going to be delivered directly to the board.  And if there was any

wrongdoing from my husband and I, based on what those third-party results were, that would have been in there. But that ended when the receiver came in, so they never, they never finished. However, had they, we might have a more accurate cap table, because that's what they were working on as a part of their forensic investigation.

Q    Understood. You heard some testimony probably earlier about Chapter 11?

A    What about it? Yes.

Q    Have you considered -- did you consider filing Chapter 11 before the receivership was in place?

A    I did not consider it because every single person who recommended it, every single one said my cap table would be wiped out. So the company would continue, but the cap table would be wiped out, which means that every person who believed in me, every person who invested in me would go to zero. I wasn't willing to let that happen.

Q    You also said you had been working on raising, you know, capital, looking at other deals. You were doing that before the receivership too, though, weren't you?

A    What are you referring to? I haven't looked at raising capital since this began because I can't -- I don't have financials. We've asked for them over and over, and we've either been met with silence or we've been told no.

Q    Did you try to refinance before the receivership?

A    We didn't try to refinance.  We had investors that were willing to take the debt out, and those investors were turned over to the receiver when that began.  And they were all interested in taking out the debt, and then they realized that a fire sale was being run, so they participated in a fire sale, as I would have if I were the investor.

MS. LIGGINS:  Okay.  No further questions, Your Honor.

THE COURT:  Thank you.

Do you have any questions?

MR. CAMPBELL:  No questions, Your Honor.

THE COURT:  All right.  Thank you, Mr. Collins.

MR. COLLINS:  Thank you, Your Honor.

THE COURT:  Thank you, ma'am.

THE WITNESS:  Thank you.

THE COURT:  All right.  Is that it, Mr. Collins?

MR. COLLINS:  If we want to go to the motion to clarify, I guess that's their motion.

THE COURT:  He said he didn't want to pursue that, just to proceed on the pleadings, so --

MR. COLLINS:  We may be able to --

THE COURT:  You can step down.

MR. COLLINS:  I'm trying to think of the best way to make this super short.

THE COURT:  Well, I tell you what we're going to do.

If that's all of our proof, then the Court is going to take that under submission. An order is going to be forthcoming. I'm going to give you a little bit of direction on what I would like from both sides before I decide this issue. And so does that sound fair?

MR. COLLINS: That sounds good, Your Honor. I appreciate all -- I know the timing of this was crazy, but I'm glad we were able to work through it and get it done.

THE COURT: So I will put down an order that will give you a timeline, and I will make some requests in that order of what I will need from you-all. And it might include if you want to submit some additional proof by affidavit for the Court's consideration. The Court will consider it. So that order will be forthcoming.

Until any further order of the Court, all existing orders stay in place, so we're still proceeding as we did when we came in here. I'll make a decision as quickly as possible. I'll get that order down with some further directions quickly. I'm going to put you on a quick timeline because I imagine you want a quick answer to this, and then I'll turn an order, a final order around with a final decision as quickly as I can.

Does that answer your question, Mr. Collins?

MR. COLLINS: Very good, Your Honor. Thank you.

THE COURT: But before you leave here today -- now, and I'm not -- this statement is not intended to forecast a

decision. I haven't made a decision. But if I were to terminate this receivership, that stay goes away, Mr. Collins. You understand that, don't you?

MR. COLLINS: Understood, Your Honor. I understand it very well, Your Honor.

THE COURT: If there are wolves at the door, they're coming inside.

MS. WEAVER: Yes.

MR. COLLINS: Understood.

THE COURT: Ms. Weaver, do not speak out in court.

MS. WEAVER: I'm sorry.

THE COURT: Do you understand?

MS. WEAVER: Yes, sir.

THE COURT: All right. Anything else, Mr. Collins?

MR. COLLINS: Nothing, Your Honor.

THE COURT: Anything from the receiver?

MR. CAMPBELL: No, Your Honor.

THE COURT: Anything from Farm Credit?

MS. LIGGINS: Just one thing, Your Honor. I just want to note our evidence is -- you know, we would like it to be considered for both the clarification --

THE COURT: Yes, of course.

MS. LIGGINS: -- and the reconsideration, even though we did not technically take the clarification up today.

THE COURT: It's been submitted on -- they requested

a hearing on it. I don't know that a hearing is necessary. But I thought that I would, while I'm here, if there was something out there that I was unaware of, but then they've abandoned that. They haven't abandoned their motion. They just abandoned the hearing on it. But, no, everything in the record today and everything filed on both motions will be considered for both.

MS. LIGGINS: Thank you, Your Honor.

THE COURT: All right. Anything else?

MR. COLLINS: And just so Your Honor knows, on the motion to clarify, we were planning to have Mr. Weaver, because he's the owner of a lot of these things, to give testimony about alter ego and that type of thing. We're happy to do that by affidavit if we need to, Your Honor.

THE COURT: All right. Thank you.

MR. COLLINS: Thank you.

(Court adjourned at 5:05 p.m.)

I, Aaron H. LaDuke, do hereby certify that I reported in machine shorthand the proceedings in the above-styled cause, and that this transcript is an accurate record of said proceedings.

_____
s/Aaron H. LaDuke,
Official Court Reporter

262