UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
WINCHESTER DIVISION

| | |
|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) |
| Plaintiff, | ) Case No. 4:25-cv-38 |
| v. | ) Judge Atchley |
| UNCLE NEAREST, INC., *et al.*, | ) Magistrate Judge Steger |
| Defendants. | ) |

**RECEIVER'S POST-HEARING SUPPLEMENTAL BRIEF/RESPONSE TO MOTION TO RECONSIDER THE MEMORANDUM OPINION AND ORDER AND ORDER APPOINTING RECEIVER AND TO STAY ACCESS TO PROPRIETARY INFORMATION**

**COMES NOW** the court-appointed receiver herein, Phillip G. Young, Jr. ("Receiver"), by and through undersigned counsel, and hereby provides his post-hearing supplemental response to the Motion to Reconsider the Memorandum Opinion and Order and Order Appointing Receiver and to Stay Access to Proprietary Information (Doc. 91) (the "Motion") filed by Fawn Weaver, Keith Weaver, and Grant Sidney, Inc. (collectively, the "Movants"), and pursuant to the Court's Order[1] of February 10, 2026, providing for supplement responses/briefing. In his supplemental response to the Motion, the Receiver states as follows:

BACKGROUND

To reiterate what the Receiver has said in his prior responses to this Motion and during his testimony before this Court at the February 9, 2026, hearing (the "Hearing"), the Receiver does not believe that it is his role to defend the existence of this receivership nor to ask for its dissolution. The Receiver was appointed by this Court to carry out certain duties assigned to him by this Court's

---
[1] DE# 143

Order Appointing Receiver[2] (the "Receivership Order"). He has done that to the best of his abilities. The Receiver works at the pleasure of the Court, and only the Court; he is otherwise a stranger to these proceedings and leaves arguments concerning the merits of the Motion to the Plaintiff and the Defendants. The Receiver would respectfully remind the Court that before it is a Motion to Reconsider its own Receivership Order. It is not considering a motion to replace the Receiver or a motion to approve the sale of any assets or property of Uncle Nearest, regardless of how frequently the Movants work to intertwine those issues.

The Court reminded the Movants at the Hearing that the Receiver was their chosen professional, that the Court chose the individual that they proposed.[3] Counsel for the Movants' response was "We just don't think that right now he's the right guy.[4]" Again, the Movants are conflating multiple issues here. Whether the Receiver is the "right" guy or not is not the issue. As the seven hours' worth of testimony at the Hearing demonstrated, the Receiver has performed the duties charged to him by this Court.

For the purposes of this supplemental brief, the Receiver seeks to illustrate for the Court that the Receiver and the Receivership are continuing to carry out the Court's directives related to the Receivership Order. The testimony of the Movants' own witnesses confirm that the Receiver and the Receivership are continuing to appropriately operate the company, and that the Receiver is closely involved in all operations. No evidence produced at the Hearing was in any meaningful way inconsistent with the statements made by the Receiver in his Affidavit.[5] Therefore, the Receiver continues to primarily rely upon his Affidavit as his factual statement regarding the

---

[2] D.E. 39
[3] Hearing Tr. 10:14-15 Feb. 9, 2026
[4] *Id.* 11:11-12
[5] D.E. 126

condition of the company and the merits of the Movants' Motion. This brief is being submitted only because (a) the Court directed all parties to submit post-hearing briefs, and (b) to directly link the Receiver's prior representations to this Court to the evidence and testimony offered at the Hearing.

RECEIVERSHIP OPERATIONS

The Receiver's testimony at the Hearing primarily concerned the Receivership's operations. His testimony was consistent with, and mostly duplicative of, his testimony offered by affidavit.[6] As the Receiver stated, his directive from this Court was to stabilize the company and preserve the assets of the estate. The Receivership entities were losing approximately $1,000,000.00 per month prior to the commencement of the Receivership. As he testified at the Hearing, the Receiver, through his work and the work of his team of professionals, has been able to significantly reduce the average monthly losses for the company and the Receivership estate.[7] Contrary to the Movants' assertions, the Receivership Order does not charge the Receiver with growing the company or brand, as the Receiver has acknowledged in his testimony.[8]

Following the Receiver's testimony, the Court heard testimony from Katharine Jerkins. Ms. Jerkins testified that she is the company's Chief Business Officer and has been with the company in various capacities since 2016.[9] Ms. Jerkins stated that throughout the Receivership she has had continuous day-to-day contact with the Receiver's team (primarily Mark Ruday of Newpoint Advisor and Scott Schiller of Thoroughbred Spirits) and then further contact with Tim

---

[6] *See* D.E. 126
[7] *Id.* 24:1-8
[8] *Id.* 104:8-14
[9] *Id.* 108:12-21

Stone (of Newpoint Advisors) and the Receiver.[10] Ms. Jerkins' testimony highlights the constant contact that the receivership team has had with the company's staff.

As expected, Ms. Jerkins stated that one of the biggest changes upon the appointment of the Receiver was the timing of approvals. While Ms. Jerkins had been accustomed to approvals in 20-minutes (when decisions were solely made by Ms. Jerkins and Ms. Fawn Weaver), under the receivership some, but not all, decisions could now take up to a month to make.[11] Given the layers of oversight necessary for the receivership (and, indeed, steps that must be taken to ensure transparency for this Court), the expectation that decisions would remain a 20 minute turnaround are simply not plausible. Ms. Jerkins did point out, however, that the delayed decision timeline was not for all decisions, "Could be. Not everything. I want to be clear. Not everything, but it could be at least a month."[12] While some decisions have required additional time by the Receiver, the vast majority of decisions are made rather quickly, due in large part to the continuous communication between the Receiver's team and company staff as highlighted above.

Ms. Jerkins discussed at some length the company's Limited Time Offerings ("LTOs"), which generate attention and some additional revenue for the company. Ms. Jerkins stated "they're very important and it's been a part of our strategy since day one, and people expect them and they get excited about that."[13] The company has released two LTOs during the receivership, a Toasted Barrel LTO and a Cognac Cask LTO. Ms. Jerkins acknowledged that the release of the LTOs and other bottlings had to be approved, stating, "[we] basically had to justify every bottling that we do, not just for LTOs but for all bottling."[14] However, she further stated, in response to a question

---

[10] *Id.* 109:20-22
[11] *Id.* 113:2-22
[12] *Id.* 113:20-22
[13] *Id.* 115:5-7
[14] *Id.* 115:14-15

about approval of marketing for LTOs, that "Nothing hasn't been approved, it's just taken longer."[15] While the Receiver does have an obligation under the Receivership Order to monitor the expenses and protect the assets of the company (and admittedly that does take some additional time), Ms. Jerkins stated that the Receiver has not disapproved any of the LTOs or proposed marketing expenditures. This was further confirmed by the testimony of Danny Romano with Romano Beverages, a distributor for the company in the Chicago area. Mr. Romano testified, in response to a question about whether he had seen a decrease in marketing efforts from the company, "No. I – you know, I have to say that, you know, every time we've come to Kate (Katharine Jerkins), looking for help to build this brand, you know, we have gotten it."[16]

When questioned by Movants' counsel on the approvals of the LTOs and its impact on revenues of company, Ms. Jerkins stated "in all honesty, by the time we got to the conversation about those (*discussing the LTO's revenue impact on 2025*), the strategy that we have in place right now would not have affected 2025"[17] Then when further pressed by Movants' counsel on whether the receivership was the reason that one of the LTOs wasn't released until early 2026, Ms. Jerkins stated, "Not necessarily."[18] When the Receiver was appointed, the company faced empty shelves in many locations, largely due to unpaid fees owed to, and a shipping hold mandated by, Tennessee Distillery Group ("TDG") and various distributers. Ms. Jerkins acknowledged those pre-receivership out-of-stocks and further stated that she believes those have gotten better.[19] The Receiver and his team have gotten product on the shelves where there was none upon the commencement of the Receivership. The Receiver and his team have provided Ms. Jerkins and the

---

[15] *Id.* 116:19
[16] *Id.* 153:15-25
[17] *Id.* 124:6-8
[18] *Id.* 125:22-24

[19] *Id.* 121:2-7

company the support necessary to market and sell the company's products. Her testimony confirms that.

In addition to addressing the sale and marketing of the Company's products, the Receiver, among many other responsibilities, was tasked with ensuring that all necessary on-going expenses were paid in a timely manner. Primary among these expenses are the company's payroll obligations. Anthony Severini, the CFO of Genesis Global Recruiting, Inc. ("Genesis"), testified that prior to the receivership, the company was indebted to Genesis for over $2 million dollars in prior payroll payment obligations that Genesis had advanced on behalf of the company.[20] Practically speaking, the company was running approximately 60 days behind on payroll[21]. Mr. Severini acknowledged that he was aware of the company's distress prior to the receivership. While the Receiver disagrees with Mr. Severini's characterizations of their conversations at the outset of the receivership and more recently, Mr. Severini admitted that the Receiver has never missed a payroll payment to Genesis.[22] In fact, while Genesis had to wait 60 days to receive a payroll payment from the company when under the control of the Movants, the Receiver has timely paid all payroll obligations to Genesis.

Finally, the company's CEO, Fawn Weaver, testified extensively to the ongoing litigation, the receivership, its purported impact on the company, and other items of varying degrees of relevancy to the matter. While Ms. Weaver may disagree with the Receiver's decisions on certain aspects of the company and the receivership[23], she provided nothing in her testimony to assert that

---

[20] *Id.* 162 8-10, 166-167, 23-6
[21] *Id.* 166 8-22
[22] *Id.* 165 6-10
[23] In fact, in a series of three Instagram posts published just three days after the Hearing, she accused the Receiver of conspiring with the lender to "steal" the company from her. This statement is not only untrue and slanderous, it is also a direct violation of this Court's directive in its January 23, 2026 Order to refrain from using the Hearing as a

Case 4:25-cv-00038-CEA-CHS   Document 148   Filed 02/26/26   Page 6 of 10
PageID #: 6039

6

the Receiver is not doing what the Court has asked him to do. In fact, Ms. Weaver's affidavit, provided as an exhibit to the Motion, states:

> I want to be clear that my request for termination of the Receivership is not borne out of any disrespect for the Receiver or his efforts. I recognize that the Receiver has acted in accordance with his understanding of his mandate and under apparent constraints imposed by Farm Credit.[24]

As the testimony has shown, the Receiver and his team have been diligently involved in the ongoing operations of this company and have attempted, within the constraints of the Receivership Order and the mandate provided therein, to provide employees of the company with what they need, provide critical vendors of the company with timely payments for their services, and responsibly handle the financial operations of the company.

## A.C. NIELSEN AND SALES DATA

In addition to the assertions that the Receiver is not performing his duties or supporting the company's activities, the Movants point to sale numbers from A.C. Nielsen in an attempt to illustrate that the receivership is harming the business. This assertion overlooks two very key points: (1) litigation and receivership always have some harm to business involved in them (this is not new or unique to Uncle Nearest); and (2) the Nielsen data has some significant blind spots that can skew how the company's sales are actually performing. Ultimately, the sales information <u>alone</u> doesn't provide this Court with any meaningful guide as to whether the Receiver is performing the duties assigned to him, whether conditions in the company have materially changed, or whether or not the receivership should remain in place.

---

"public relations campaign", D.E. 116, p. 9. The Receiver will defer to the Court on whether and how to sanction the Movants for this violation.
[24] Motion to Reconsider Receivership (D.E. 91) pg. 35, para. 12

The Movants provided purported expert testimony from David Ozgo during the Hearing[25]. Mr. Ozgo is the former senior vice president for Distilled Spirits Council of the United States (DISCUS)[26], leaving DISCUS at the end of 2022 to pursue work in other sectors and industries.[27] While Mr. Ozgo's understanding of Nielsen data is not in question, the actual scope of the Nielsen data to represent the full picture of company sales is questionable.

As Mr. Ozgo testified, the Nielsen data only accounts for approximately 40% of the total sales nationwide.[28] The data excludes sales at on-premises sites (i.e. bars, hotels, restaurants)[29], most independent liquors stores,[30] and control states (where the state controls the distribution of alcohol). Mr. Romano also testified that he only used the Nielsen data "for the major chains"[31]

With these significant sales points excluded, the 40% that Nielsen does cover could lead to incorrect assumptions about the trends of any company in the market, even if the company were not currently involved in litigation and receivership. Moreover, the Movants' reliance on Nielsen data ignores the broader context of the spirits industry. As the Receiver has previously reported to this Court, the spirits industry as a whole is experiencing a significant downturn, with major producers pausing production to correct for oversupply and changing customer demand. The company's largest distributor, Republic National Distributing Company, is itself experiencing significant financial difficulties, which has directly impacted orders of the company's products. The Nielsen data, without this industry context, provides no meaningful basis for concluding that

---

[25] Mr. Ozgo, a paid consultant/expert, was hired the Friday before the Hearing, and only added to the Movant's witness and exhibit list 12 hours prior to the hearing (more than 6 days after such lists were due to the Court). – Transcript 179 6-8
[26] Hearing Tr. 169:16-19, Feb 9, 2026.
[27] *Id.* 176:18
[28] *Id.* 171:18-20
[29] *Id.* 171, 12-16
[30] *Id.* 177:22-25
[31] *Id.* 155:15-16

the Receivership, as opposed to the litigation, the industry decline, and the company's pre-existing financial distress, is the cause of any decreased sales. To further that point, Mr. Ozgo testified that he has not compared the company's Nielsen data to any other spirits company currently in litigation or receivership, nor has he ever reviewed the Nielsen data, other than Patrón Tequila, for a company engaged in the significant litigation or receivership.[32] Mr. Ozgo could not recall what impact litigation had on the Nielsen data for Patrón Tequila. Therefore, there is no comparison to whether or not this receivership and litigation is having an outsized impact on the company compared to other like instances. Even assuming the accuracy of the Nielsen data to tell the story the Movants are asserting, the decrease in sales is not illustrative of whether the Receiver is performing his responsibilities under the Receivership Order or whether the conditions that originally necessitated this receivership have materially changed.

## CONCLUSION

The Receiver acknowledges that receiverships and litigation are disruptive to businesses. It would be disingenuous to think otherwise. However, the testimony during the Hearing demonstrated that the Receiver has performed the duties assigned to him by the Court. He and his team have worked with the company to approved necessary marketing and bottling, have made all payroll and other ongoing expenses in a timely manner, and generally stabilized, what had been (prior to the Receivership) a very volatile situation. The testimony, taken as a whole, confirms that the company remains insolvent, with no logical path out of insolvency absent a sale of assets.

Dated this 26th day of February, 2026.

---

[32] *Id.* 179:23-25, 180:

By: /s/ Justin T. Campbell
Justin T. Campbell, Tn. Bar No. 31056
Thompson Burton PLLC
1801 West End Avenue, Suite 1550
Nashville, Tennessee 37203
Voice: (615) 465-6015
Fax: (615) 807-3048
Justin@thompsonburton.com

*Counsel for Receiver*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via the Court's ECF system.

This 26th day of February 2026.

/s/ Justin T. Campbell.
Justin T. Campbell