| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-38 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| UNCLE NEAREST, INC., *et al.,* | ) | Magistrate Judge Steger |
| | ) | |
| Defendants. | ) | |

## RECEIVER'S POST-HEARING SUPPLEMENTAL BRIEF TO MOTION TO CLARIFY RECEIVERSHIP ORDER

**COMES NOW** the court-appointed receiver herein, Phillip G. Young, Jr. ("Receiver"), by and through undersigned counsel, and hereby provides this post-hearing supplemental brief to his Motion for Clarification of Receivership Order (Doc. 41) (the "Motion") and pursuant to the Court's Order of February 10, 2026, providing for supplemental responses/briefing. In his supplemental brief to the Motion, the Receiver states as follows:

### BACKGROUND

Near the conclusion of the February 9, 2026 hearing (the "Hearing"), the Receiver, through counsel, stated to the Court that he was content with the Court basing its ruling on the Motion on the papers submitted to the Court.[1] While that statement is still true and the Receiver largely relies on the Motion and Affidavits submitted to the Court, the Receiver files this supplemental brief to highlight certain items of importance either filed after the Receiver's submissions, including in admitted evidence before this Court at the Hearing, or provided in testimony before this Court at the Hearing. Rather than rehashing the Receiver's prior papers, the Receiver intends to provide the Court with a relevant summary of this important information.

---

[1] Hearing Tr. 232:5-20, Feb. 9, 2026.

## SINGLE ENTERPRISE

As the Receiver stated in his affidavit, the receivership team has identified almost 500 cash transactions between Uncle Nearest and the Related Entities[2] and significant additional transfers between the Uncle Nearest and the Related Entities that were not cash transactions. While the Related Entities may attempt to categorize or explain away certain individual transfers, the sheer volume of those related transfers gives rise to the need to include the Related Entitles under the Receivership Order.  They demonstrate that Uncle Nearest and the Related Entities were operated at all relevant times as a single enterprise, which the Receiver cannot now disentangle.

## MP-TENN TRANSACTIONS

Notwithstanding the sheer volume of transactions, the Receiver directs the Court to a couple of transactions that illustrate relationship between all of these entities. First, there are the transactions between Uncle Nearest and MP-Tenn, LLC. These transactions included two $10,000,000.00 convertible notes between Uncle Nearest and MP-Tenn, LLC executed in or around February 2025.[3] These transactions were loans from MP-Tenn, LLC to Uncle Nearest. The loans included a provision whereby MP-Tenn, LLC <u>could</u> elect to convert this debt to shares of the company; however, this was not a mandatory or automatic conversion. Ms. Weaver testified extensively that the transaction was a note sale of <u>her</u> shares of Uncle Nearest stock, owned by a company wholly controlled by Ms. Weaver, Grant Sidney, Inc.. While that is the explanation provided by Ms. Weaver, the documents simply tell a different story. Until MP-Tenn, LLC chose to elect the conversion, the transaction was a loan

---

[2] This defined term shall have the meaning as ascribed to it in the Affidavit of Phillip G. Young, Jr. The Related Entities include: Shelbyville Barrel House BBQ LLC, Humble Baron, Inc., Grant Sidney, Inc., Quill and Cask Owner, LLC, Nashwood, Inc., Shelbyville Grand, LLC, and 4 Front Street, LLC.
[3] *See* MP-Tenn, LLC Notes, attached as <u>Exhibit A</u>, and included as Exhibits E & F to Receiver's Exhibits for the February 9, 2026 Hearing.

Case 4:25-cv-00038-CEA-CHS    Document 149    Filed 02/26/26    Page 2 of 32
PageID #: 6045

between Uncle Nearest and MP-Tenn, LLC and a loan only.[4]  Simply put, this was a debt of Uncle Nearest.

Upon the funding of these loans to Uncle Nearest, these funds were immediately transferred by Uncle Nearest to a bank account established by Grant Sidney, Inc. under the direction of CEO, Fawn Weaver. Ms. Weaver's testimony at the Hearing confirmed that she moved the money from the Uncle Nearest account. As justification, Ms. Weaver stated:

> It was specifically your firm (*referring to McGuire Woods*) that was quite aggressive during this window of time where this money was being received, very aggressive. So along with my board and financial advisors, we made the decision to make sure that $20 million coming in could not be snatched by you.[5]

Ms. Weaver further stated,

> So, yes, we brought it into an account that was set up solely for the transaction, has never been used before. And you-all have these bank statements. It had never been used before. It's never been used after. So the transfer was *used as a pass-through and a pass-through only*.[6]

Indeed, Ms. Weaver's testimony in this regard is consistent with her more recent written communications.  Prior to the Hearing, on Monday, February 2, 2026, Ms. Weaver drafted an email to all shareholders and staff of Uncle Nearest. The stated purpose of the email was to provide a response to several pleadings filed earlier in the day with this Court. In her email, explaining this MP-Tenn, LLC transaction to shareholders and employees stated;

> The sole purpose of setting up the Grant Sidney account was that we were in the midst of intense negotiations with the bank, which had taken a very aggressive posture. Every advisor advised that given that posture, we should not give the bank access to this capital investment while negotiations were ongoing. Accordingly, the account was used only as a temporary pass through to ensure Uncle Nearest could continue operating

---

[4] The Receiver acknowledges that there was an agreement in place between Grant Sidney and Uncle Nearest whereby Grant Sidney would surrender an equal number of shares back to Uncle Nearest upon MP-Tenn, LLC's election, but only when and if that occurred. Grant Sidney today has the same number of shares in Uncle Nearest that it did prior to the transaction.
[5] Hearing Tr. 251:19-24.
[6] Id. 252:15-19 (Emphasis Added).

and paying critical obligations. Once we believed we had reached an agreement, the remaining funds were wired directly to Uncle Nearest.[7]

Ms. Weaver has now admitted, on multiple occasions, that she used Grant Sidney, Inc. as a "pass-through" or holding company for funds belonging to Uncle Nearest. She has further admitted that Grant Sidney opened a bank account without any business function for Grand Sidney itself. This transaction alone breaks the corporate formalities of both Grant Sidney and Uncle Nearest, and is clear evidence that the two companies were being operated as a single entity. Additionally, as she has stated at the Hearing and in her email, Ms. Weaver used the Grant Sidney account to ensure that Farm Credit Mid-America ("FCMA") could not reach any of those funds. Grant Sidney, Inc. is wholly-owned by Fawn Weaver, meaning that the moment those loan proceeds were placed in the Grant Sidney account, she and she alone, had direct control, access, and authority to move those Uncle Nearest loan proceeds.

The MP-Tenn, LLC transaction demonstrates that (a) Grant Sidney and Uncle Nearest were operated as a single entity without proper corporate formalities, and (b) on at least this occasion, Grant Sidney was operated for an improper purpose (hiding assets from a secured creditor). While this is hardly the only example demonstrating the need for inclusion of the Related Entities, it is an obvious and salient one.

<u>RELATED ENTITIES' FAILURE TO PROVIDE ACCOUNT STATEMENTS AS REQUIRED BY AGREED ORDER</u>

Not only do available bank statements raise questions about corporate separation, the Receiver was not provided all necessary bank statements despite this Court's order otherwise. Just two days after the Hearing, counsel for the Related Entities provided the Receiver with statements from two additional bank accounts in the name of Grant Sidney, Inc.[8] This was after Ms. Weaver's testimony

---

[7] *See* Email from Fawn Weaver, attached as <u>Exhibit B</u>.
[8] See Email from M. Collins to J. Campbell, attached as <u>Exhibit C</u>.

was provided at the hearing (where the Receiver would have had an opportunity to cross-examine Ms. Weaver about these records) and almost two months after the statements were to be produced under the Agreed Order[9] between the Parties. How is the Receiver to now believe that he has seen everything that was required in the Agreed Order? Are there likely other undiscovered bank accounts for the other Related Entities? Ms. Weaver's email ensures her shareholders that, "The Receiver has been provided with complete records, including bank statements and transaction documentation."[10] That statement has been proven incorrect. Without the Court including these Related Entities in the Receivership, the Receiver will never be able to ensure compliance with the Agreed Order or ensure that Uncle Nearest assets, or assets supported by Uncle Nearest, are properly accounted for.

### SHELBYVILLE GRAND FORECLOSURE

Furthermore, the continued mismanagement of the Related Entities threatens the safeguarding of assets that were likely bought and/or maintained with Uncle Nearest funds, and that might otherwise be available for distribution to creditors. As an example, in the days following the Hearing, FirstBank published a foreclosure notice for three (3) parcels of real property owned by Shelbyville Grand, LLC, one of the Related Entities.[11] It is unknown at this time whether, and how much, equity exists in these three parcels of property. However, it is important to note that one of these properties adjoins the Nearest Green Distillery property and is used as part of the ongoing business operations (for, among other things, inventory storage). Allowing foreclosures and repossessions of the Related Entities' assets, without allowing the Receiver an opportunity to evaluate the origin and value of those assets, presents a threat to this estate and its creditors.

### APPLICATION OF THE ALTER EGO STANDARD

---

[9] D.E. 79
[10] *See* attached <u>Exhibit B</u>.
[11] A copy of the Foreclosure Notice is attached hereto as <u>Exhibit D</u>.

As set forth in the Receiver's Brief in Support [D.E. 124], the Sixth Circuit's test for alter ego examines "whether the two enterprises have substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." Nelson Electric v. NLRB, 638 F.2d 965, 968 (6th Cir. 1981). The evidence before this Court satisfies each factor: all seven Related Entities are owned, managed, and controlled by Fawn and/or Keith Weaver; the entities share employees, bank accounts, and operational resources with Uncle Nearest; and as demonstrated by the Grant Sidney pass-through transactions and the nearly 500 intercompany transfers, the entities' funds are pooled and directed at Ms. Weaver's sole discretion without regard for corporate boundaries.

<u>CONCLUSION</u>

In his prior pleadings on this issue, the Receiver has established the statutory authority for this Court to exercise its control over these Related Entities. The Receiver will not belabor that point here. The Receiver simply directs the Court to Ms. Weaver's admissions on using Grant Sidney, Inc. as a "pass-through" for Uncle Nearest, and the totality of the transactions outlined in the Receiver's affidavit and Receiver's Brief in Support of Motion for Clarification of Receivership Order[12] as sufficient evidence to include the Related Entities under the Receivership Order.

While the Related Entities may attempt to explain or categorize certain transactions between themselves and Uncle Nearest, the sheer volume of the transactions outlined supports this Court including those Related Entities in the Receivership Order. Additionally, the Receiver has now received previously undisclosed bank accounts and statements as recently as two (2) days after the Hearing. Furthermore, the clear admission by Ms. Fawn Weaver that at least one of the Related Entities was used as a "pass-through" for Uncle Nearest loan proceeds should, standing alone, be enough for inclusion in the Receivership Order. Finally, the Receiver asserts that without these entities

---

[12] D.E. 124 and 126

included in the Receivership Order, the Receiver will likely be unable to truly identify and safeguard all Uncle Nearest assets or those procured with Uncle Nearest funds. For these reasons, the Receiver respectfully requests that the Court grant his Motion.

Dated this 26th day of February, 2026.

By:  /s/ Justin T. Campbell
      Justin T. Campbell, Tn. Bar No. 31056
      Thompson Burton PLLC
      1801 West End Avenue, Suite 1550
      Nashville, Tennessee 37203
      Voice: (615) 465-6015
      Fax:   (615) 807-3048
      Justin@thompsonburton.com

      *Counsel for Receiver*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via the Court's ECF system.

This 26th day of February 2026.

/s/ Justin T. Campbell.
Justin T. Campbell

Docusign Envelope ID: 6A7D2FD6-8998-4260-A0E5-E840BF2ECE40



**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.**

CONVERTIBLE PROMISSORY NOTE

US$10,000,000                                          February 4, 2025 (the "**Issue Date**")
CPN-01                                                                    New York, NY

For value received Uncle Nearest, Inc., a Delaware corporation (the "**Company**"), promises to pay to **MP-Tenn LLC, a Delaware limited liability company**, or its assigns (the "**Holder**") the principal sum of US$10,000,000 with interest on the outstanding principal amount at the rate of 7.5% per annum, accrued daily and compounded annually. Interest shall commence on the date hereof and shall continue on the outstanding principal until paid in full or converted in accordance with this Note. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. This note (this "**Note**") is issued as part of a series of similar notes (each a "**Note**" and collectively, the "**Notes**") to be issued pursuant to the terms of that certain Note Purchase Agreement (the "**Purchase Agreement**") dated as of February 4, 2025, by and between the Company and the persons and entities listed on the Schedule of Purchasers thereof (collectively, the "**Holders**"). This Note is subject to the following terms and conditions:

1.        **Maturity**.

(a)        **Repayment**. Unless converted or repaid (as applicable) as provided in Sections 1(b), 2 or 4, all outstanding principal and any accrued but unpaid interest under this Note (the "**Conversion Amount**") shall be due and payable upon demand of MP-Tenn LLC, a Delaware limited liability company ("**MarcyPen**"), any time on or after February 4, 2029 (the "**Maturity Date**"). Interest shall accrue on this Note and shall be due and payable with each installment of principal. Notwithstanding the foregoing, at the option and upon the declaration of MarcyPen and upon written notice to the Company, the entire Conversion Amount shall become due and payable upon an Event of Default. An "**Event of Default**" shall occur if (i) the Company fails to pay any and all unpaid principal, accrued interest and all other amounts owing under the Notes when due and payable pursuant to the terms of the Notes; (ii) the Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any general assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; (iii) an involuntary petition is filed against the Company (unless such petition is dismissed or discharged within ninety (90) days) under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company; or (iv) the Company breaches any material term of the Notes (unless such material breach is cured within thirty (30) days of such breach).

2766973.v2

(b)     **Conversion**.  In the event that none of a Qualified Financing, a Corporate Transaction, or conversion pursuant to a Non-Qualified Financing has been consummated on or before the Maturity Date, MarcyPen may elect to convert the Conversion Amount into shares of Common Stock, at a price per share equal to the Conversion Price, rounded down to the nearest whole share.

2.     **Conversion upon a Qualified or Non-Qualified Financing**.

(a)     **Automatic Conversion Upon Qualified Financing**.  Concurrently with the closing of a Qualified Financing (as defined below) prior to the Maturity Date, the Conversion Amount shall be automatically converted into those shares of the Company's Preferred Stock issued in the Qualified Financing, at a price per share equal to the Conversion Price, having the same rights, privileges, preferences and restrictions as the shares of Preferred Stock issued by the Company in the Qualified Financing.

"**Qualified Financing**" means the first issuance of shares of Series F Preferred Stock by the Company following the date hereof and prior to the Maturity Date in a single transaction or a series of related transactions yielding gross proceeds to the Company of at least US$20.0 million (excluding conversion of the Notes and any other convertible notes or convertible securities issued by the Company and then outstanding, including any simple agreements for future equity).

(b)     **Optional Conversion Upon Non-Qualified Financing**.  In the event of a Non-Qualified Financing (as defined below) prior to the automatic conversion of this Note in connection with a Qualified Financing, MarcyPen may elect to convert the Conversion Amount into those shares of the Company's capital stock issued in the Non-Qualified Financing, at a price per share equal to the Conversion Price, having the same rights, privileges, preferences and restrictions as the shares of capital stock issued by the Company in the Non-Qualified Financing.

"**Non-Qualified Financing**" means the issuance of shares of capital stock of the Company following the date hereof in one or more transactions yielding gross proceeds to the Company in the aggregate of at least US$10.0 million (excluding conversion of the Notes and any other convertible notes or convertible securities issued by the Company and then outstanding, including any simple agreements for future equity), but which does not otherwise constitute a Qualified Financing.

3.     **Terms of Conversion**.

(a)     For purposes of this Agreement, the following terms shall have the meanings set forth herein:

(i)     "**Conversion Price**" means:

(1)     For a Qualified Financing or Non-Qualified Financing, the price that is equal to the lesser of (A) the Valuation Cap Conversion Price, and (B) the product of (i) the price per share of capital stock paid by investors in the Qualified Financing or Non-Qualified Financing, as applicable (other than through the conversion of any of the Notes or other convertible

2

securities that will convert in connection with the Qualified Financing or Non-Qualified Financing, as applicable) multiplied by (ii) 0.80.

(2)     For a Corporate Transaction, the price that is equal to the lesser of (A) the Valuation Cap Conversion Price, and (B) the quotient derived by dividing the valuation of the Company implied by the Corporate Transaction by the Company's Fully-Diluted Capitalization immediately prior to the Corporate Transaction.

(3)     For a conversion on or after the Maturity Date pursuant to Section 1(b), the Valuation Cap Conversion Price.

(ii)     "**Fully-Diluted Capitalization**" means the total number of shares of the common stock of the Company (the "**Common Stock**") outstanding, assuming full conversion and exercise of all securities convertible or exercisable, directly or indirectly, into Common Stock, other than the Notes and any other convertible notes or such other convertible securities issued by the Company that will convert in connection with the applicable triggering event and, in connection with a Qualified Financing or Non-Qualified Financing, any shares of Common Stock issuable or reserved for issuance to employees, consultants or directors pursuant to a stock option plan, restricted stock plan or other stock equity incentive plan approved by the Company's Board of Directors.

(iii)     "**Valuation Cap Conversion Price**" means the price per share equal to the quotient derived by dividing $774,146,000 (the "**Valuation Cap**") by the Company's Fully-Diluted Capitalization immediately prior to the applicable event triggering conversion; provided, however, that in no event will the Valuation Cap Conversion Price be less than the lesser of (1) $21.25 and (2) the quotient derived by dividing (A) (i) the Valuation Cap plus (ii) the aggregate amount of cash received by the Company for shares of capital stock issued by the Company after the Initial Closing and prior to the applicable date of conversion, by (B) the Company's Fully-Diluted Capitalization immediately prior to the applicable date of conversion.

(b)     Upon conversion of the Note pursuant to Section 1(b) or Section 2, the total number of shares of capital stock to be issued to the Holder shall be equal to the quotient obtained by dividing the Conversion Amount by the applicable Conversion Price, rounded down to the nearest whole share.

(c)     Upon the conversion of the Note pursuant to Section 2, the Holder hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Financing or Non-Qualified Financing (as applicable), including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including a lock-up agreement in connection with an initial public offering). The issuance of capital stock upon such conversion shall be upon the terms and subject to the conditions applicable to the Qualified Financing or Non-Qualified Financing (as applicable) and the Company's then-current Certificate of Incorporation and Bylaws and such other corporate governing documents, in the forms agreed in connection with the Qualified Financing or Non-Qualified Financing (as applicable).

3

(d)     Notwithstanding anything contained herein to the contrary, upon the conversion of the Note pursuant to Section 1(b), Section 2 or Section 4, the Company will cancel a number of shares of capital stock held by Grant Sidney Inc. equal to the number of shares of capital stock being issued to the Holder, such that only Grant Sidney Inc., but not the Company's other stockholders, will be diluted by such issuance.

4.     **Corporate Transaction.**  In the event of a Corporate Transaction (as defined below) prior to repayment of the Note in full pursuant to Section 1(a) or conversion of the Note pursuant to Section 1(b) or Section 2, the Company will provide at least ten (10) days' prior notice to the Holder of such Corporate Transaction and of the material terms of the Corporate Transaction, and the Conversion Amount shall be automatically converted into Common Stock in connection therewith, unless the Company and MarcyPen agree in advance of such Corporate Transaction that the outstanding principal and all accrued but unpaid interest under the Notes shall instead by repaid by the Company upon the closing of such Corporate Transaction (in which case, such amount shall be repaid to the Holder upon the closing of such Corporate Transaction).

"**Corporate Transaction**" means (i) a sale, lease or other disposition, in a single transaction or series of related transactions, of all or substantially all of the Company's assets, or the exclusive license of all or substantially all of the Company's material intellectual property, (ii) a merger, reorganization, consolidation or business combination transaction of the Company with or into another corporation, limited liability company or other entity, in each case pursuant to which stockholders of the Company prior to such merger, reorganization, consolidation or business combination transaction own less than a majority of the voting interests in the surviving or resulting entity, (iii) the consummation of a transaction, or series of related transactions, in which any "person" or "group" (as such terms are defined in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of more than fifty percent (50%) of the outstanding voting securities of the Company, or (iv) an initial public offering of the Company's capital stock.

5.     **Mechanics and Effect of Conversion.**

(a)     **Effectiveness of Conversion.**  Upon conversion of this Note, the Company will be forever released from all of its obligations and liabilities under this Note with regard to the principal amount and accrued interest being converted, including without limitation the obligation to pay such principal amount and accrued interest.  Upon conversion of this Note, the Company shall take all such actions as are necessary in order to ensure that the capital stock issuable with respect to such conversion shall be validly issued, fully paid and nonassessable.

(b)     **Issuance of Certificates.**  Upon conversion of this Note, the Holder shall surrender this Note, duly endorsed, at the principal offices of the Company or any transfer agent of the Company.  At its expense, the Company shall, as soon as practicable thereafter, issue and deliver to such Holder, at such principal office, a certificate or certificates for the number of shares to which such Holder is entitled upon such conversion, together with any other securities and property to which the Holder is entitled upon such conversion under the terms of this Note, including a check payable to the Holder for any cash amounts payable as described herein.

4

Docusign Envelope ID: 6A7D2FD6-8998-4260-A0E5-E840BF2ECE40

(c)     **Fractional Shares**. No fractional shares of the Company's capital stock will be issued upon conversion of this Note. In calculating the number of shares of capital stock to be issued to the Holder upon the conversion of this Note, as set forth herein, the Company shall round down such number of shares to the nearest whole share.

6.     **Payment; Prepayment.** All payments shall be made in lawful money of the United States of America at such place as the Holder hereof may from time to time designate in writing to the Company. Payment shall be credited first to the accrued interest then due and payable and the remainder shall be applied to principal. The Company may not prepay this Note, except with the prior written consent of MarcyPen.

7.     **Transfer; Successors and Assigns.** The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the Company and the Holder. Notwithstanding the foregoing, the Holder may not assign, pledge, or otherwise transfer this Note without the prior written consent of the Company, other than to an Affiliate (as defined below) of the Holder that is not a Competitor (as defined below) of the Company or, with respect to MarcyPen, to a new or continuation fund controlled by MarcyPen Capital Partners LLC or a related investment fund. Subject to the preceding sentence, this Note may be transferred only upon surrender of the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, a new note for the same principal amount and interest will be issued to, and registered in the name of, the transferee. Interest and principal are payable only to the registered holder of this Note.

"**Affiliate**" shall mean, with respect to any specified Person, any other Person who or which, directly or indirectly, controls, is controlled by, or is under common control with such specified Person.

"**Competitor**" shall mean any Person that is directly or indirectly engaged in, or has taken proactive steps to engage in, the spirts industry or any other business that competes with the Company's business. Competitors shall include, but shall not be limited to, LVMH, Diageo, Brown-Forman, Pernod Ricard, Constellation, Sazerac, Suntory Global Spirits, Molson Coors, AmBev, InBev, Proximo and other Persons similarly sized in terms of revenue and/or volume.

"**Person**" shall mean any individual, corporation, limited liability company, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, government (or an agency or political subdivision thereof) or other entity.

8.     **Governing Law.** This Note and all acts and transactions pursuant hereto and the rights and obligations of the Company and the Holder shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law. Each of the Holder and the Company hereby submits to the exclusive jurisdiction of the state and federal courts located in the State of Delaware.

9.     **Notices.** Any notice required or permitted by this Note shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email (upon customary confirmation of receipt), or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such

2766973.v2

Docusign Envelope ID: 6A7D2FD6-8998-4260-A0E5-E840BF2ECE40

party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

10.   **Amendments and Waivers.**  Any term of this Note may be amended only with the written consent of the Company and MarcyPen; provided, however, that any such amendment or waiver that applies to or affects any Holder in any manner different than such amendment or waiver applies to or affects all other Holders shall require the written consent of the Holder so differently affected.  Any amendment or waiver effected in accordance with this Section 10 shall be binding upon the Company, each Holder and each transferee of any Note.

11.   **Entire Agreement.**  This Note, together with the Purchase Agreement, constitutes the entire agreement between the Company and the Holder pertaining to the subject matter hereof, and supersedes any and all other written or oral agreements existing between the Company and the Holder with respect to the subject matter hereof.

12.   **Counterparts.**  This Note may be executed in any number of counterparts, each of which will be deemed to be an original and all of which together will constitute a single agreement.

13.   **Action to Collect on Note.**  If action is instituted to collect on this Note, the Company promises to pay all costs and expenses, including reasonable attorney's fees, incurred in connection with such action.

14.   **Loss of Note.**  Upon receipt by the Company of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Note or any Note exchanged for it, and indemnity satisfactory to the Company (in case of loss, theft or destruction) or surrender and cancellation of such Note (in the case of mutilation), the Company will make and deliver in lieu of such Note a new Note of like tenor.

15.   **Interest Rate Limitation.**  Notwithstanding anything to the contrary contained in this Note or the Purchase Agreement (the "**Loan Documents**"), the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law.

16.   **Subordination; No Liens.**  Each of the Company and the Holder hereby acknowledges and agrees that this Note and all of the other Notes now or hereafter existing, together with all indebtedness and other obligations represented hereby or thereby (the "**Subordinated Debt**"), are unsecured and are and shall be subordinated in right of payment and collection to the prior payment and collection in full of all indebtedness and other amounts outstanding and/or payable under Senior Facilities (as defined below) from time to time in effect that have been approved by the Company's Board of Directors.  For purposes hereof, "**Senior Facilities**" shall mean any and all credit facilities and/or senior indebtedness owed by the Company to banks or commercial lenders.  The Holder shall execute and deliver such additional documents and instruments as the Company may request from time to time to evidence the subordination of this Note and the indebtedness and other obligations pursuant to this Note to existing or future Senior Facilities.  It is expressly understood and agreed that the Subordinated Debt shall at all times be unsecured and the holder of the Subordinated Debt shall be prohibited

6

2766973.v2

Docusign Envelope ID: 6A7D2FD6-8998-4260-A0E5-E840BF2ECE40

from having any liens or security interests whatsoever in any of the assets of Company or any of its affiliates.

[Signature Page Follows]

2766973.v2

7

**IN WITNESS WHEREOF**, the Company has caused this Convertible Promissory Note to be executed as of the date first above written.

UNCLE NEAREST, INC.

By: _____
    Name:  Fawn Weaver
    Title:  CEO

2766973.v2

**THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933.**

## CONVERTIBLE PROMISSORY NOTE

US$10,000,000                                        February 28, 2025 (the "Issue Date")
CPN-02                                                              New York, NY

For value received Uncle Nearest, Inc., a Delaware corporation (the "**Company**"), promises to pay to **MP-Tenn LLC, a Delaware limited liability company**, or its assigns (the "**Holder**") the principal sum of US$10,000,000 with interest on the outstanding principal amount at the rate of 7.5% per annum, accrued daily and compounded annually. Interest shall commence on the date hereof and shall continue on the outstanding principal until paid in full or converted in accordance with this Note. Interest shall be computed on the basis of a year of 365 days for the actual number of days elapsed. This note (this "**Note**") is issued as part of a series of similar notes (each a "**Note**" and collectively, the "**Notes**") to be issued pursuant to the terms of that certain Note Purchase Agreement (the "**Purchase Agreement**") dated as of February 4, 2025, by and between the Company and the persons and entities listed on the Schedule of Purchasers thereof (collectively, the "**Holders**"). This Note is subject to the following terms and conditions:

1.     **Maturity**.

(a)     **Repayment**. Unless converted or repaid (as applicable) as provided in Sections 1(b), 2 or 4, all outstanding principal and any accrued but unpaid interest under this Note (the "**Conversion Amount**") shall be due and payable upon demand of MP-Tenn LLC, a Delaware limited liability company ("**MarcyPen**"), any time on or after February 4, 2029 (the "**Maturity Date**"). Interest shall accrue on this Note and shall be due and payable with each installment of principal. Notwithstanding the foregoing, at the option and upon the declaration of MarcyPen and upon written notice to the Company, the entire Conversion Amount shall become due and payable upon an Event of Default. An "**Event of Default**" shall occur if (i) the Company fails to pay any and all unpaid principal, accrued interest and all other amounts owing under the Notes when due and payable pursuant to the terms of the Notes; (ii) the Company files any petition or action for relief under any bankruptcy, reorganization, insolvency or moratorium law or any other law for the relief of, or relating to, debtors, now or hereafter in effect, or makes any general assignment for the benefit of creditors or takes any corporate action in furtherance of any of the foregoing; (iii) an involuntary petition is filed against the Company (unless such petition is dismissed or discharged within ninety (90) days) under any bankruptcy statute now or hereafter in effect, or a custodian, receiver, trustee, assignee for the benefit of creditors (or other similar official) is appointed to take possession, custody or control of any property of the Company; or (iv) the Company breaches any material term of the Notes (unless such material breach is cured within thirty (30) days of such breach).

(b)     **Conversion**.  In the event that none of a Qualified Financing, a Corporate Transaction, or conversion pursuant to a Non-Qualified Financing has been consummated on or before the Maturity Date, MarcyPen may elect to convert the Conversion Amount into shares of Common Stock, at a price per share equal to the Conversion Price, rounded down to the nearest whole share.

2.     **Conversion upon a Qualified or Non-Qualified Financing**.

(a)     **Automatic Conversion Upon Qualified Financing**.  Concurrently with the closing of a Qualified Financing (as defined below) prior to the Maturity Date, the Conversion Amount shall be automatically converted into those shares of the Company's Preferred Stock issued in the Qualified Financing, at a price per share equal to the Conversion Price, having the same rights, privileges, preferences and restrictions as the shares of Preferred Stock issued by the Company in the Qualified Financing.

"**Qualified Financing**" means the first issuance of shares of Series F Preferred Stock by the Company following the date hereof and prior to the Maturity Date in a single transaction or a series of related transactions yielding gross proceeds to the Company of at least US$20.0 million (excluding conversion of the Notes and any other convertible notes or convertible securities issued by the Company and then outstanding, including any simple agreements for future equity).

(b)     **Optional Conversion Upon Non-Qualified Financing**.  In the event of a Non-Qualified Financing (as defined below) prior to the automatic conversion of this Note in connection with a Qualified Financing, MarcyPen may elect to convert the Conversion Amount into those shares of the Company's capital stock issued in the Non-Qualified Financing, at a price per share equal to the Conversion Price, having the same rights, privileges, preferences and restrictions as the shares of capital stock issued by the Company in the Non-Qualified Financing.

"**Non-Qualified Financing**" means the issuance of shares of capital stock of the Company following the date hereof in one or more transactions yielding gross proceeds to the Company in the aggregate of at least US$10.0 million (excluding conversion of the Notes and any other convertible notes or convertible securities issued by the Company and then outstanding, including any simple agreements for future equity), but which does not otherwise constitute a Qualified Financing.

3.     **Terms of Conversion**.

(a)     For purposes of this Agreement, the following terms shall have the meanings set forth herein:

(i)     "**Conversion Price**" means:

(1)     For a Qualified Financing or Non-Qualified Financing, the price that is equal to the lesser of (A) the Valuation Cap Conversion Price, and (B) the product of (i) the price per share of capital stock paid by investors in the Qualified Financing or Non-Qualified Financing, as applicable (other than through the conversion of any of the Notes or other convertible

2

securities that will convert in connection with the Qualified Financing or Non-Qualified Financing, as applicable) multiplied by (ii) 0.80.

(2)     For a Corporate Transaction, the price that is equal to the lesser of (A) the Valuation Cap Conversion Price, and (B) the quotient derived by dividing the valuation of the Company implied by the Corporate Transaction by the Company's Fully-Diluted Capitalization immediately prior to the Corporate Transaction.

(3)     For a conversion on or after the Maturity Date pursuant to Section 1(b), the Valuation Cap Conversion Price.

(ii)     "**Fully-Diluted Capitalization**" means the total number of shares of the common stock of the Company (the "**Common Stock**") outstanding, assuming full conversion and exercise of all securities convertible or exercisable, directly or indirectly, into Common Stock, other than the Notes and any other convertible notes or such other convertible securities issued by the Company that will convert in connection with the applicable triggering event and, in connection with a Qualified Financing or Non-Qualified Financing, any shares of Common Stock issuable or reserved for issuance to employees, consultants or directors pursuant to a stock option plan, restricted stock plan or other stock equity incentive plan approved by the Company's Board of Directors.

(iii)     "**Valuation Cap Conversion Price**" means the price per share equal to the quotient derived by dividing $774,146,000 (the "**Valuation Cap**") by the Company's Fully-Diluted Capitalization immediately prior to the applicable event triggering conversion; provided, however, that in no event will the Valuation Cap Conversion Price be less than the lesser of (1) $21.25 and (2) the quotient derived by dividing (A) (i) the Valuation Cap plus (ii) the aggregate amount of cash received by the Company for shares of capital stock issued by the Company after the Initial Closing and prior to the applicable date of conversion, by (B) the Company's Fully-Diluted Capitalization immediately prior to the applicable date of conversion.

(b)     Upon conversion of the Note pursuant to Section 1(b) or Section 2, the total number of shares of capital stock to be issued to the Holder shall be equal to the quotient obtained by dividing the Conversion Amount by the applicable Conversion Price, rounded down to the nearest whole share.

(c)     Upon the conversion of the Note pursuant to Section 2, the Holder hereby agrees to execute and deliver to the Company all transaction documents related to the Qualified Financing or Non-Qualified Financing (as applicable), including a purchase agreement and other ancillary agreements, with customary representations and warranties and transfer restrictions (including a lock-up agreement in connection with an initial public offering). The issuance of capital stock upon such conversion shall be upon the terms and subject to the conditions applicable to the Qualified Financing or Non-Qualified Financing (as applicable) and the Company's then-current Certificate of Incorporation and Bylaws and such other corporate governing documents, in the forms agreed in connection with the Qualified Financing or Non-Qualified Financing (as applicable).

3

(d)  Notwithstanding anything contained herein to the contrary, upon the conversion of the Note pursuant to Section 1(b), Section 2 or Section 4, the Company will cancel a number of shares of capital stock held by Grant Sidney Inc. equal to the number of shares of capital stock being issued to the Holder, such that only Grant Sidney Inc., but not the Company's other stockholders, will be diluted by such issuance.

4.  **Corporate Transaction.**  In the event of a Corporate Transaction (as defined below) prior to repayment of the Note in full pursuant to Section 1(a) or conversion of the Note pursuant to Section 1(b) or Section 2, the Company will provide at least ten (10) days' prior notice to the Holder of such Corporate Transaction and of the material terms of the Corporate Transaction, and the Conversion Amount shall be automatically converted into Common Stock in connection therewith, unless the Company and MarcyPen agree in advance of such Corporate Transaction that the outstanding principal and all accrued but unpaid interest under the Notes shall instead by repaid by the Company upon the closing of such Corporate Transaction (in which case, such amount shall be repaid to the Holder upon the closing of such Corporate Transaction).

"**Corporate Transaction**" means (i) a sale, lease or other disposition, in a single transaction or series of related transactions, of all or substantially all of the Company's assets, or the exclusive license of all or substantially all of the Company's material intellectual property, (ii) a merger, reorganization, consolidation or business combination transaction of the Company with or into another corporation, limited liability company or other entity, in each case pursuant to which stockholders of the Company prior to such merger, reorganization, consolidation or business combination transaction own less than a majority of the voting interests in the surviving or resulting entity, (iii) the consummation of a transaction, or series of related transactions, in which any "person" or "group" (as such terms are defined in Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "**Exchange Act**")) becomes the "beneficial owner" (as defined in Rule 13d-3 of the Exchange Act), directly or indirectly, of more than fifty percent (50%) of the outstanding voting securities of the Company, or (iv) an initial public offering of the Company's capital stock.

5.  **Mechanics and Effect of Conversion.**

(a)  **Effectiveness of Conversion**.  Upon conversion of this Note, the Company will be forever released from all of its obligations and liabilities under this Note with regard to the principal amount and accrued interest being converted, including without limitation the obligation to pay such principal amount and accrued interest.  Upon conversion of this Note, the Company shall take all such actions as are necessary in order to ensure that the capital stock issuable with respect to such conversion shall be validly issued, fully paid and nonassessable.

(b)  **Issuance of Certificates**.  Upon conversion of this Note, the Holder shall surrender this Note, duly endorsed, at the principal offices of the Company or any transfer agent of the Company.  At its expense, the Company shall, as soon as practicable thereafter, issue and deliver to such Holder, at such principal office, a certificate or certificates for the number of shares to which such Holder is entitled upon such conversion, together with any other securities and property to which the Holder is entitled upon such conversion under the terms of this Note, including a check payable to the Holder for any cash amounts payable as described herein.

4

(c)     **Fractional Shares**. No fractional shares of the Company's capital stock will be issued upon conversion of this Note. In calculating the number of shares of capital stock to be issued to the Holder upon the conversion of this Note, as set forth herein, the Company shall round down such number of shares to the nearest whole share.

6.     **Payment; Prepayment.** All payments shall be made in lawful money of the United States of America at such place as the Holder hereof may from time to time designate in writing to the Company. Payment shall be credited first to the accrued interest then due and payable and the remainder shall be applied to principal. The Company may not prepay this Note, except with the prior written consent of MarcyPen.

7.     **Transfer; Successors and Assigns.** The terms and conditions of this Note shall inure to the benefit of and be binding upon the respective successors and assigns of the Company and the Holder. Notwithstanding the foregoing, the Holder may not assign, pledge, or otherwise transfer this Note without the prior written consent of the Company, other than to an Affiliate (as defined below) of the Holder that is not a Competitor (as defined below) of the Company or, with respect to MarcyPen, to a new or continuation fund controlled by MarcyPen Capital Partners LLC or a related investment fund. Subject to the preceding sentence, this Note may be transferred only upon surrender of the original Note for registration of transfer, duly endorsed, or accompanied by a duly executed written instrument of transfer in form satisfactory to the Company. Thereupon, a new note for the same principal amount and interest will be issued to, and registered in the name of, the transferee. Interest and principal are payable only to the registered holder of this Note.

"**Affiliate**" shall mean, with respect to any specified Person, any other Person who or which, directly or indirectly, controls, is controlled by, or is under common control with such specified Person.

"**Competitor**" shall mean any Person that is directly or indirectly engaged in, or has taken proactive steps to engage in, the spirts industry or any other business that competes with the Company's business. Competitors shall include, but shall not be limited to, LVMH, Diageo, Brown-Forman, Pernod Ricard, Constellation, Sazerac, Suntory Global Spirits, Molson Coors, AmBev, InBev, Proximo and other Persons similarly sized in terms of revenue and/or volume.

"**Person**" shall mean any individual, corporation, limited liability company, partnership, trust, incorporated or unincorporated association, joint venture, joint stock company, government (or an agency or political subdivision thereof) or other entity.

8.     **Governing Law.** This Note and all acts and transactions pursuant hereto and the rights and obligations of the Company and the Holder shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law. Each of the Holder and the Company hereby submits to the exclusive jurisdiction of the state and federal courts located in the State of Delaware.

9.     **Notices.** Any notice required or permitted by this Note shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email (upon customary confirmation of receipt), or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such

5

party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

10. **Amendments and Waivers.** Any term of this Note may be amended only with the written consent of the Company and MarcyPen; provided, however, that any such amendment or waiver that applies to or affects any Holder in any manner different than such amendment or waiver applies to or affects all other Holders shall require the written consent of the Holder so differently affected. Any amendment or waiver effected in accordance with this Section 10 shall be binding upon the Company, each Holder and each transferee of any Note.

11. **Entire Agreement.** This Note, together with the Purchase Agreement, constitutes the entire agreement between the Company and the Holder pertaining to the subject matter hereof, and supersedes any and all other written or oral agreements existing between the Company and the Holder with respect to the subject matter hereof.

12. **Counterparts.** This Note may be executed in any number of counterparts, each of which will be deemed to be an original and all of which together will constitute a single agreement.

13. **Action to Collect on Note.** If action is instituted to collect on this Note, the Company promises to pay all costs and expenses, including reasonable attorney's fees, incurred in connection with such action.

14. **Loss of Note.** Upon receipt by the Company of evidence satisfactory to it of the loss, theft, destruction or mutilation of this Note or any Note exchanged for it, and indemnity satisfactory to the Company (in case of loss, theft or destruction) or surrender and cancellation of such Note (in the case of mutilation), the Company will make and deliver in lieu of such Note a new Note of like tenor.

15. **Interest Rate Limitation.** Notwithstanding anything to the contrary contained in this Note or the Purchase Agreement (the "**Loan Documents**"), the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable law.

16. **Subordination; No Liens.** Each of the Company and the Holder hereby acknowledges and agrees that this Note and all of the other Notes now or hereafter existing, together with all indebtedness and other obligations represented hereby or thereby (the "**Subordinated Debt**"), are unsecured and are and shall be subordinated in right of payment and collection to the prior payment and collection in full of all indebtedness and other amounts outstanding and/or payable under Senior Facilities (as defined below) from time to time in effect that have been approved by the Company's Board of Directors. For purposes hereof, "**Senior Facilities**" shall mean any and all credit facilities and/or senior indebtedness owed by the Company to banks or commercial lenders. The Holder shall execute and deliver such additional documents and instruments as the Company may request from time to time to evidence the subordination of this Note and the indebtedness and other obligations pursuant to this Note to existing or future Senior Facilities. It is expressly understood and agreed that the Subordinated Debt shall at all times be unsecured and the holder of the Subordinated Debt shall be prohibited

6

from having any liens or security interests whatsoever in any of the assets of Company or any of its affiliates.

[Signature Page Follows]

**IN WITNESS WHEREOF**, the Company has caused this Convertible Promissory Note to be executed as of the date first above written.

UNCLE NEAREST, INC.

By: _____

    Name:  Fawn Weaver

    Title:  CEO



**From:**
**Subject:** Fw: A Direct Note From Me on Today's Filing
**Date:** February 3, 2026 at 4:40 AM
**To:** Phillip Young phillip@thompsonburton.com

Yahoo Mail: Search Organize, Conquer

----- Forwarded Message -----

Sent: Tue, Feb 3, 2026 at 2:23 AM
**Subject:** Fw A Direct Note From Me on Today's Filing

----- Original Message -----
**From:** Fawn Weaver
**To:** Fawn Weaver
**Sent:** Monday, February 2, 2026 8:42 PM
**Subject:** A Direct Note From Me on Today's Filing

Sixth Man and Uncle Nearest Team,

I have never sent an email to both of you at the same time, but given what was filed tonight, it was important that you hear from me directly and without delay.

I just reviewed the *Receiver's Affidavit*. We will address **all** of its conclusions point by point at next week's hearing and in additional filings over the coming days. However, there is one issue I could not wait to address because my integrity matters too much to me to let it sit even overnight.

I want to be absolutely clear. ***Neither Keith nor I have ever personally gained anything monetarily from Uncle Nearest***. The Receiver and his team did not ask us about the transactions they have now referenced. Had they asked, we would have provided the same complete explanations and documentation that we are now submitting to the Court.

The $20 million dollars referenced in the Receiver's filing came from me selling my personal shares, with 100% of the proceeds invested directly into Uncle Nearest. Not a single penny was kept by me. That infusion is why the company had substantial cash on hand at the end of Q1 2025.

Although those shares were mine and I could have sold them for personal benefit, I never have. I have never sold a share of Uncle Nearest without immediately putting the proceeds into the company. Not once.

***I also did not want to dilute any of you.*** That is why I brought this plan to our Board and to our four major shareholders in advance. I received written approval, and the transaction was done transparently and with full knowledge and consent.

The Receiver knows all of this. He has the bank statements that prove it, statements that were provided directly from the bank to him and his team. And yet, what was filed tonight suggests the opposite.

Because of that, I am sharing with you the entire unredacted transaction history related to the twenty million dollars. Nothing filtered. Nothing omitted.

None of the funds went to Grant Sidney.
None of the funds went to me.
None of the funds went to any entity connected with Keith or me.

Below is the complete list of transactions so you can see for yourself where every dollar went (as well as the direct download from the bank as of tonight).

The $20 million dollars was received into a money market account that was set up solely for this transaction, account ending in 9873 as shown in the attached materials. It had never been used before and has never been used since.

A Grant Sidney, Inc. account number 449881 was also set up solely for the purpose of these transactions. That account had never been used before and has never been used since. The full lifespan of the account is included below and attached in full.

The sole purpose of setting up the Grant Sidney account was that we were in the midst of intense negotiations with the bank, which had taken a very aggressive posture. Every advisor advised that given that posture, we should not give the bank access to this capital investment while negotiations were ongoing. Accordingly, the account was used only as a temporary pass through to ensure Uncle Nearest could continue operating and paying critical obligations. Once we believed we had reached an agreement, the remaining funds were wired directly to Uncle Nearest.

Here is the full list of payments.

- 2/5/25 Genesis Global for Uncle Nearest payroll $467,852.73

- 2/6/25 Genesis Global for Uncle Nearest payroll $391,145.23

- 2/6/25 Marabou, Inc. for payment related to our Cognac film $600,000

- 2/7/25 Uncle Nearest, Inc. for vendor payments $600,000

- 2/10/25 Uncle Nearest, Inc. for vendor payments $1,000,000

- 2/11/25 Uncle Nearest, Inc. for vendor payments $1,000,000

- 2/20/25 Genesis Global for Uncle Nearest payroll $497,678.27

- 2/20/25 Berlin Packaging for Uncle Nearest bottles $1,000,000

- 2/28/25 Uncle Nearest, Inc. for payment to Farm Credit $4,400,000

- 2/7/25 S1 Organic Vodka for vendor payments for our vodka company

$200,000

- 3/7/25 Domaine d'Anatole for vendor payments for our Cognac company $250,000

- 3/27/25 Uncle Nearest, Inc. for vendor payments $500,000

- 3/28/25 Domaine d'Anatole for vendor payments for our Cognac company $500,000

- 4/1/25 Genesis Global for Uncle Nearest payroll payments $386,651.77

- 4/8/25 Uncle Nearest, Inc. for vendor payments $732,637

- 4/14/25 Uncle Nearest, Inc. for barrel purchases $7,395,900

- 4/15/25 Uncle Nearest, Inc. for barrel purchases $103,294.43

- 5/15/25 Nearest Green Distillery, Inc. for deficit funding $8,400

**That is it.** _18 transactions total_. The $20 million dollars came in, and all of it went to Uncle Nearest or Uncle Nearest related entities or vendors between February and May 2025. Every transaction was recorded in the Uncle Nearest accounting system, and every vendor invoice was marked as paid.

Genesis Global appears multiple times because following the departure of our former CFO, we learned that there was a significant payroll balance, approximately $2 million dollars, that had not been reflected in our records. As a result, payments were made weekly to address both current payroll and past due payroll obligations. No one in the company outside of the former CFO, and possibly one or two individuals he hired, was aware of this at the time.

Please also note that anything referenced regarding Keith's non-Uncle Nearest related entities is supported by the same level of documentation described above. The Receiver has been provided with complete records, including bank statements and transaction documentation. In our response filing, and at next week's hearing, those transactions will be addressed in detail and shown to be fully documented and properly disclosed.

Over the next few days, I will contact as many of you as I possibly can, because it is time you hear directly from me. Following the appointment of the Receiver, I intentionally stepped back from direct investor communication out of respect for the process and to avoid interfering with refinancing efforts. I now recognize that doing so created a vacuum of information that only I could fill.

If I do not reach out to you directly, it is only because my understanding is that you may currently be in the midst of the Arlington Capital sale process, and I want to be careful not to interfere in any way. That said, my cell phone number has not changed, and you are always welcome to contact me.

...................... ....... ....... ......... ......... .. ........ ...

Despite how personally harmful and hurtful tonight's filing was, I remain committed to respecting the legal process as it continues to unfold.

My priority has always been, and will always be, Uncle Nearest, our team, our customers, and our Sixth Man. Even with my name being questioned in public filings, I have not and will not waver from that commitment.

Before the bank first filed its lawsuit, and immediately thereafter, I was advised repeatedly that the most straightforward option would be a Chapter 11 reorganization. That path would have allowed the company to reorganize and move forward, but it also would have wiped out the existing cap table. Every one of you would have lost your investment.

I chose not to take that path.

Instead, I chose the harder road, one that has placed my name, reputation, and personal peace under a microscope, because I believed then and still believe now that protecting our investors and preserving the opportunity for you to be made whole mattered more than taking the easier option.

That conviction is what has kept me engaged and fighting through this process, even when there were moments it would have been far easier to walk away. Unless the Court removes my ability to do so, I will continue to advocate for outcomes that protect our investors and restore the company's strength.

I am deeply grateful to those of you who have committed to remaining on the cap table through this period, and I hold the same sense of responsibility to every investor past, present, and future. My focus in this case remains singular, protecting our investors and working to return Uncle Nearest to the growth trajectory it demonstrated prior to the receivership.

Some of you have also asked how we are continuing to cover the significant legal expenses associated with this process, and how we intend to do so going forward. Keith and I have chosen to fund this personally. To that end, we have placed, or are in the process of placing, all but one of our non Uncle Nearest related real estate assets up for sale, including our personal residence. We have spent more than 25 years building that real estate portfolio, and we are at peace with this decision because finishing the mission we set out to accomplish means more to us than holding on to those assets. I share this not for sympathy, but so you have clarity and transparency.

I am truly sorry that you are having to be part of a journey none of us ever anticipated. Please know that I am committed to transparency. Now that the independent investigation findings are no longer constrained by litigation posture, I am able to speak more openly. When I reach out, I welcome any question you have, and I will answer it directly.

..... ...... .. ... ..... .

With gratitude and respect,

Fawn

Fawn Weaver I CEO & Co-Founder **I Uncle Nearest, Inc.** I 3125 US-231 North I
Shelbyville, TN 37160
Uncle Nearest is the Most-Awarded Bourbon and Tennessee Whiskey of 2019,
2020, 2021, 2022, 2023, 2024 & 2025.

**GSI_Account Details _ CalPrivate
Bank.pdf**
101 KB






Justin Campbell <justin

# Grant Sidney Bank Statements

**Michael Collins** <mcollins@manierherod.com>                    Tue, Feb 10, 2026 at 7:16 PM
To: Justin Campbell <justin@thompsonburton.com>
Cc: "Phillip Young (phillip@thompsonburton.com)" <phillip@thompsonburton.com>

Justin – here are the bank statements for the two Grant Sidney Accounts referenced in Phillip's Declaration.

Regards,

Mike

Michael E. Collins

Manier & Herod, P.C.

1201 Demonbreun Street

Suite 900

Nashville, TN  37203

(615) 429-2145

THIS ELECTRONIC MAIL TRANSMISSION IS PRIVILEGED AND CONFIDENTIAL AND IS INTENDED ONLY FOR THE REVIEW OF THE PARTY TO WHOM IT IS ADDRESSED. IF YOU HAVE RECEIVED THIS TRANSMISSION IN ERROR, PLEASE IMMEDIATELY RETURN IT TO THE SENDER. UNINTENDED TRANSMISSION SHALL NOT CONSTITUTE WAIVER OF THE ATTORNEY-CLIENT OR ANY OTHER PRIVILEGE.

---

**22 attachments**

📄 **Grant Sidney Inc 05.31.21 Acct 6168.PDF**
7K

📄 **Grant Sidney Inc 06.30.21 Acct 6168.PDF**
3K

📄 **Grant Sidney Inc 08.31.21 Acct 6168.PDF**
3K

📄 **Grant Sidney Inc 09.30.21 Acct 6168.PDF**
3K

📄 **Grant Sidney Inc 10.31.21 Acct 6168.PDF**
3K

📄 **Grant Sidney Inc 11.30.21 Acct 6168.PDF**
3K

**Grant Sidney Inc 12.31.21 Acct 6168.PDF**
3K

**Grant Sidney Publishing Statements Acct 7512.pdf**
29K

**Grant Sydney Inc 07.31.21 Acct 6168.PDF**
3K

**Jan 22 thru Dec 25 Acct 6168.PDF**
27K

**Acct 6168 5.31.2020.PDF**
3K

**Acct 6168 6.30.2020.PDF**
3K

**Acct 6168 7.30.2020.PDF**
3K

**Acct 6168 8.30.2020.PDF**
3K

**Acct 6168 9.30.2020.PDF**
3K

**Acct 6168 10.31.2020.PDF**
3K

**Acct 6168 11.30.2020.PDF**
3K

**Acct 6168 12.31.2020.PDF**
3K

**Grant Sidney Inc 1.31.2021 Acct 6168.PDF**
66K

**Grant Sidney Inc 02.28.21 Acct 6168.PDF**
3K

**Grant Sidney Inc 03.31.21 Acct 6168.PDF**
3K

**Grant Sidney Inc 04.30.21 Acct 6168.PDF**
7K

EXHIBIT
D

**#1 Source to Buy, Sell or Trade!** Call 1-931-455-4545

## 130 PUBLIC NOTICES

shown on plat of record in Deed Book above. In the event 57, Page 549, of Register's Office of weather, the trustee Bedford County, hereby announces Tennessee, to which that the sale will be plat reference is postponed and that hereby made for a notices of said post- more complete and ponement for inclem- accurate description, ent weather will be Tract 2: Beginning at mailed to interested a stake in the east- parties of record. As erly right-of-way on of July 1, 2025, no- Orchard Drive and tices pursuant to being 90.06 feet south Tennessee Code 18 deg. 28 min. west Annotated of the center of Au- §35-5-101 et seq. dubon Road; running are posted online at thence north 72 deg. www.internetpost- 55 min. west 50.0 ings.com by a feet to a stake in Es- third-party internet tes' easterly property posting company, line (Lot 25 of the FLG No. 365202 Shelby Pines Subdi- DATED February 12, vision, plat of which 2026

## 130 PUBLIC NOTICES

Page 848; Address: erence: Book D383, Page 445; Address: 323 E. Depot St. Shelbyville, TN 37162;

**TRACT 3:** Deed ref- 100 N. Side Square/Main Street, Shelbyville, TN 37162. Property Ad- dresses: as indi- cated in Tract 1, Tract 2 and Tract 3 references above.

Tax Map Identifica- tion Nos.: Tract 1: 050-069.00; Tract 2: 089G-B-009.00; Tract 3: 089H-C-008.00 & 089H-D-003.00

## 130 PUBLIC NOTICES

CATION IS TO COL- LECT THE DEBT AND ANY INFOR- MATION OBTAINED AS A RESULT WILL BE USED FOR THAT EXPRESS PURPOSE ONLY. THIS COMMUNI- CATION IS FROM A DEBT COLLEC- TOR.

This the 10th day of February, 2026.

Anthony R. Steele, Successor Trustee

Winchester, Sellers, Foster & Steele P.C. P. O. Box 2428 Knoxville, TN 37901 (865) 637-1980

## 490 GARAGE & RUMMAGE SALES

Tri Star Estate Sales

499 Mount Herman Road Shelbyville, TN Thursday, Feb 19, 3pm-6pm Friday, Feb. 20, 8am-2pm Saturday, Feb. 21, 8am-1pm

Yard Sale 549 Thompson Rd., Unionville Thurs. - Sat. 8am-? Baby clothes, new tools, misc.

## 900 STATEWIDES

DIRECTV- All your enter- tainment. Nothing on your roof! Sign up for Di- rect and get your first free months of Max, Par- amount+, Showtime, Starz, MGM+ and Cine- max included. Choose package $84.99/mo, Some restrictions apply. Call DIRECTV 1-844-230-4803 (TnScan)

Get DISH Satellite TV + all Internet! Free Install, Free HD-DVR Upgrade, 80,000 On-Demand Movies, Plus Limited Time Up To $600 In Gift card! Call today! 1-844-274-6074 (TnScan)

## 600 EMPLOYMENT

NOW HIRING Busy Dental office hiring Dental Assistant. Part time or full time. For more information call 931-684-2688 or text 931-703-9455.

## 720 WANTED TO BUY AUTOS

WE BUY ALL VEHICLES! All Kinds & Types, running or not! We can also remove your junk cars. (931) 993-4007

## 900 STATEWIDES

Auctions



The Classified Cross

NOTICE OF PUBLIC REVIEW
FY 2026 – 2029 Statewide Transportation
Improvement Program (STIP)

BEDFORD COUNTY ZONING BOARD OF APPEALS
1 Public Square Suite 300
Shelbyville, TN 37160

CLUES ACROSS
1. Spiritual leaders
7. Sail
13. Frenfied wine
14. Edible mollusk

**SUCCESSOR TRUSTEE'S NOTICE OF SALE**
**OF REAL ESTATE**

ANTHONY R. STEELE is the Successor Trustee of a Deed of Trust executed on August 22, 2024, by KEITH EDWARD WEAVER AND SHELBYVILLE GRAND, LLC, BY KEITH WEAVER, MANAGER. The Deed of Trust appears of record in the Register's Office of Bedford County, Tennessee, at **Book TD1128, Page 474** ("Deed of Trust"). The Trustee will sell the property described in the Deed of Trust at a foreclosure sale requested by the current holder of the Deed of Trust and underlying indebtedness, **FirstBank.**

**Sale Date and Location**: MARCH 20, 2026, at 10:00 a.m. at the front door of the Bedford County Courthouse, 1 Public Square, Shelbyville, TN 37160. The terms of sale shall be payment by cashier's check or certified funds immediately upon conclusion of the sale.
**Third-party internet posting website: foreclosuretennessee.com**

**Property Description:** Abbreviated description per TCA 35-5-104(a)(2) is the property referenced in the Deed of Trust and otherwise described fully as follows:
**TRACT 1:** Deed reference: Book D366, Page 848; Address: Hwy 2131 North, Shelbyville, TN 37160;
**TRACT 2:** Deed reference: Book D383, Page 445; Address: 323 E. Depot St., Shelbyville, TN 37162;
**TRACT 3:** Deed reference: Book D378, Page 827; Address: 100 N. Side Square/Main Street, Shelbyville, TN 37162.
**Property Addresses**: as indicated in Tract 1, Tract 2 and Tract 3 references above.
**Tax Map Identification Nos.: Tract 1: 050-009.00; Tract 2: 089G-B-009.00; Tract 3: 089H-C-008.00 & 089H-D-003.00** (However, the property description shall control in the event of any inconsistencies between the description and address or tax identification number).

**Parties Interested:** None known.

All sales of Property are "AS IS" and "WHERE IS" without representation or warranty as to merchantability or fitness for a particular purpose or of any kind, except as to title and authority to convey.
The sale of the described property is subject to all matters shown on any recorded plan; any unpaid taxes, any restrictive covenants, easements, set-back lines, prior liens, encumbrances, if any, and any other priority as may appear in the public records including, but not limited to, those certain first priority deeds of trust benefitting FirstBank recorded with the following references: Book TD1128, Page 164; Book TD1128, Page 182; and, Book TD1128, Page 173, in the Register's Office for Bedford County, Tennessee.
The right is preserved to adjourn the day of the sale to another day, time and place certain without further publication, upon announcement at the time and place for the sale set forth above.

**THE PURPOSE OF THIS COMMUNICATION IS TO COLLECT THE DEBT AND ANY INFORMATION OBTAINED AS A RESULT WILL BE USED FOR THAT EXPRESS PURPOSE ONLY. THIS COMMUNICATION IS FROM A DEBT COLLECTOR.**

This the 10th day of February, 2026.

_____
Anthony R. Steele, Successor Trustee

Winchester, Sellers, Foster & Steele, P.C.
P. O. Box 2428
Knoxville, TN 37901
(865) 637-1980

Publication Dates: February 18 and 25, 2026.