# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| **FARM CREDIT MID-AMERICA, PCA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNCLE NEAREST, INC., NEAREST** | ) | **Case No. 4:25-cv-38** |
| **GREEN DISTILLERY, INC., UNCLE** | ) | |
| **NEAREST REAL ESTATE HOLDINGS,** | ) | **Judge Atchley** |
| **LLC, FAWN WEAVER and KEITH** | ) | |
| **WEAVER,** | ) | **Magistrate Judge Steger** |
| | ) | |
| **Defendants.** | ) | |

## SUPPLEMENTAL BRIEF OF FARM CREDIT MID-AMERICA, PCA
## IN SUPPORT OF RESPONSE OF FARM CREDIT MID-AMERICA, PCA TO MOTION
## TO RECONSIDER
[Relates to Dkt. No. 91]

Farm Credit Mid-America, PCA ("FCMA" or the "Lender") submits this supplemental

briefing on FCMA's post-hearing position pursuant to the Court's Order[1] following the hearing on

the *Motion to Reconsider the Memorandum Opinion and Order*[2]  (the "Reconsideration Motion")

filed by Fawn Weaver, Keith Weaver (collectively with Fawn Weaver, the "Weavers") and Grant

Sidney, Inc. ("Grant Sidney" and collectively with the Weavers, the "Weaver Parties") and the

*Motion for Clarification of Receivership Order*[3] (the "Entity Clarification Motion") filed by Phillip

G. Young, Jr. (the "Receiver").[4]

---

[1] Dkt. No. 143.
[2] Dkt. No. 91.
[3] Dkt. No. 41.
[4] Each capitalized term used but not defined herein shall have the meaning ascribed in the *Emergency Motion for the Immediate Appointment of Receiver* [Dkt. No. 3] (the "Receivership Motion").

217820613_12

<u>**INTRODUCTION**</u>

1.      Since this Court's appointment of the Receiver, no "material change in circumstances [has] eliminat[ed] the need for a receiver."[5]   Rather, the Weaver Parties seem to have filed the Reconsideration Motion because of a change in counsel.  The Weaver Parties' filings and evidence show their goal is to relitigate this Court's appointment, over half a year ago, of a receiver.  Their evidence failed to meet their burden for this Court to reconsider or terminate the receivership.  Indeed, the evidence at the hearing on February 9, 2026 (the "<u>Combined Hearing</u>"), overwhelmingly demonstrated that the circumstances warranting this Court's *Memorandum Opinion and Order*[6] (the "<u>Receivership Order</u>") persist.

2.      Moreover, the need for the receivership has been shown to be even greater.  The evidence clearly demonstrates that Fawn Weaver and the prior management team have an egregious inability to effectively manage Uncle Nearest and navigate it out of its distressed situation.  Under the Weavers' management, Uncle Nearest (a) failed to file tax returns for at least five years; (b) incurred an outsized amount of debt (even apart from FCMA's debt) with no viable path to repayment; (c) sold future revenues at a discount; (d) operated at a cash flow deficit; (e) operated without financial controls; and (f) failed to keep reliable financial records.[7]  These factors are just a few of the revelations that underscore precisely why the receivership should remain.  None of the evidence presented at the Combined Hearing or otherwise shows how the Weaver Parties would realistically and reliably address the significant problems facing Uncle Nearest.  Rather, the evidence shows that the Weaver Parties are committed to taking impermissible and

---

[5] Dkt. No. 32 ¶ 25.
[6] Dkt. No. 32.
[7] The Weaver Parties allege that a former employee deleted certain accounting records after being terminated and then blamed the Receiver for not having recovered them yet.  Dkt. No. 137 ¶¶ 1, 39.  The fact remains, however, that the records were apparently deleted while the Weaver Parties were managing the business and no description of their steps taken to recover the records prior to the Receivership has been provided either.

2

inadvisable steps to operate Uncle Nearest as before, including incurring substantial junior debt[8] prohibited by the Credit Agreement[9] and surreptitiously diverting assets from the Loan Parties.[10] Based on the Weaver Parties' pre-receivership conduct, without the Receiver they would clearly disregard Uncle Nearest's contractual obligations, dissipate FCMA's Collateral, and continue to eschew their fiduciary duties. The circumstances that necessitated the Receiver's appointment remain. As such, the receivership should continue.

## STANDARD OF REVIEW

*Motion to Reconsider*

3. "District courts have authority both under common law and Rule 54(b) to reconsider interlocutory orders and to reopen any part of a case before entry of final judgment."[11] "Traditionally, courts will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law; (2) new evidence available; or (3) a need to correct a clear error or prevent manifest injustice."[12]

*Motion to Terminate Receivership*

As this Court recognized, federal district courts "enjoy[] broad equitable powers to appoint a receiver over assets disputed in litigation before the court."[13] This Court is very familiar at this point with the factors that courts in the Sixth Circuit consider when determining whether a receiver is necessary[14] and FCMA will not list them again here. But FCMA will note that each factor strongly weighs in favor of continuation of this receivership.

---

[8] *See infra* ¶¶ 25-26.
[9] As amended by that certain Amendment No. 9 to Credit Agreement dated September 10, 2025 and that certain Amendment No. 10 to Credit Agreement dated November 19, 2025.
[10] *See infra* Section A.v.
[11] *Rodriguez v. Tenn. Laborers Health & Welfare Fund*, 89 F. App'x 949, 959 (6th Cir. 2004).
[12] *Id*.
[13] Dkt. No. 32 at 3 (citing *Liberte Capital Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006)).
[14] *See Pension Benefit Guaranty Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414 (6th Cir. 2015).

3

## ARGUMENTS

### A.  No Grounds exist to terminate the receivership.

4.      In the Reconsideration Motion, the Weaver Parties ultimately seek to terminate the receivership.  Here, there has been no relevant intervening change of law since the Court appointed the Receiver.  Further, the Weaver Parties do not argue (and cannot argue) any clear error or manifest injustice resulted from the Court's appointment of the Receiver.  Thus, the only possible argument must be that new evidence is available since the Court appointed the Receiver and that this new evidence warrants termination of the receivership.  The Weaver Parties argue that the receivership is harming Uncle Nearest's brand and market value.  This argument is not new, and was in fact already considered at the August 7, 2025, receivership hearing.[15]

### B.  Continuation of the receivership is warranted.

5.      All of the factors weigh in favor of continuation of the receivership.  In fact, no "occurrence of any material change in circumstances that eliminates the need for a receivership"[16] has occurred.

####        i.      Uncle Nearest is still insolvent.

6.      Uncle Nearest's solvency was a critical factor in appointing the Receiver.  The evidence from the Combined Hearing unequivocally shows Uncle Nearest is insolvent under both the balance sheet and cash flow standards of insolvency.[17]

Uncle Nearest is still insolvent under the balance sheet standard.

7.      As this Court recognized in the Receivership Order, insolvency is measured under

---

[15] Receivership Hr'g Tr. 28:18-25; 69:20-22; 91:20-24.  *Goldman v. Healthcare Mgmt. Sys., Inc.*, No. 1:05-CV-035, 2008 WL 2559030, at *1 (W.D. Mich. June 19, 2008) (citing *Estate of Graham v. County of Washtenaw,* 358 F.3d 377, 385 (6th Cir. 2004) ("A motion for reconsideration will be denied where the issues raised by the moving party have already been raised and ruled upon by the court, either expressly or by reasonable implication.")).

[16] Receivership Order ¶ 25.

[17] Feb. 9 Hr'g Tr. (the "Hr'g Tr.") 98:15-18.  The Receiver testified that Uncle Nearest is "not solvent for two reasons . . . It can't meet its obligations as they come due month to month, and the debt is in excess of the value of the assets."

4

the balance sheet test.[18]  The amount of Uncle Nearest's secured debt to FCMA is approximately $121 million.[19]  Uncle Nearest further has approximately $99 million in other debt,[20] comprised of $21.9 million in vendor debt, $277,000 in credit card debt, $28.1 million in notes payable,[21] a $3.7 million loan obligation to Grant Sidney,[22] and $45 million demanded from Advanced Spirits, LLC ("Advanced Spirits").[23]  As such, Uncle Nearest's liabilities total at least $220 million,[24] as illustrated below:



1. Balance owed to FCMA as of 1/31/26
2. Notes Payable balance as of 12/31/25 reported by Receiver including $20.0 million recorded as "Grant Sidney Investment Loan" which may actually be a convertible note owed to MP-Tenn LLC
3. Accounts Payable balance as of 12/31/25 reported by Receiver
4. Grant Sidney loan
5. Other debts as of 12/31/25 reported by Receiver include credit card payables and sales tax payable
6. Demand letter from Advanced Spirits received February 2026

---

[18] Receivership Order at 5-6; *Webb Mtn, LLC v. Exec. Realty P'ship, L.P. (In re Webb Mtn, LLC)*, 414 B.R. 308, 355 (Bankr. E.D. Tenn. 2009) ("[i]nsolvency is basically a balance sheet test: that is, a debtor is insolvent when the debtor's liabilities exceed the debtor's assets[.]" (cleaned up)).
[19] Pl.'s Ex. 2 ¶ 18; Pl.'s Exs. 23-26.
[20] Receiver's Ex. A ¶ 30; *see also* Hr'g Tr. 96:16-17.  On cross examination, the Receiver testified that Uncle Nearest's debt was $99 million.
[21] Receiver's Exs. E, F.
[22] Receiver's Ex. A ¶ 30.
[23] Hr'g Tr. 55:6-9.
[24] Pl.'s Ex. 8.

7. No viable path allows Uncle Nearest to repay ~$220 million of known debts

8.      FCMA understands that the Receiver has received bids for the purchase of Uncle Nearest.  Upon information and belief, the bids for substantially all of Uncle Nearest's assets demonstrate Uncle Nearest's assets are valued at less than the amount of FCMA's debt, much less Uncle Nearest's total debt.[25]

Uncle Nearest is still insolvent under the cash flow standard.

9.      The evidence from the Combined Hearing further illustrates Uncle Nearest's cash flow insolvency.  Without the Receiver, from September 1, 2025, through January 18, 2026, Uncle Nearest's cumulative cash flow would have been negative $16,309,716.[26]   Even with the Receiver's impressive efforts to turn Uncle Nearest around, the evidence presented at the Combined Hearing shows the cumulative post-receivership cash flow from September 1, 2025, through January 18, 2026, excluding the fees for the Receiver and his professionals from disbursements and the $3,800,000 loan provided by FCMA (the "Receivership Line of Credit") from receipts, was approximately negative $931,701.[27]   Based on subsequent reports from the Receiver, FCMA understands the cumulative cash flow from September 1, 2025, through February 15, 2026, with the same exclusions, was approximately negative $748,667.

---

[25] *See also* Receiver's Ex. A ¶ 4; H'rg Tr. 101:9-18.  When asked on cross examination whether any indications of interest received as part of the sales process were greater than the amount of debts the Receiver is aware Uncle Nearest has as of the Combined Hearing, or whether they are greater than just the FCMA debt, the Receiver answered "no."
[26] Receiver's Ex. A-4.
[27] Pl.'s Ex. 9.

6

| Week Ending | 12/21 Actual | 12/28 Actual | 1/4 Actual | 1/11 Actual | 1/18 Actual | 1/25 Actual | 2/1 Actual | 2/8 Actual | 2/15 Actual | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Restated Cash Flows - Cumulative from 9/1/25** | | | | | | | | | | |
| Total Inflows (excl. FCMA funding) | $ 5,627,568 | $ 5,681,183 | $ 6,756,131 | $ 6,840,538 | $ 7,211,316 | $ 7,748,841 | $ 7,751,797 | $ 8,157,708 | $ 8,381,673 | Excludes FCMA Funding |
| Outflows: | | | | | | | | | | |
| Ramp & Credit Cards | 583,703 | 583,703 | 690,351 | 690,388 | 690,388 | 690,393 | 763,577 | 763,577 | 763,577 | |
| Various Vendor AP Payments | 193,148 | 216,209 | 216,209 | 216,209 | 216,209 | 236,688 | 249,985 | 249,985 | 269,471 | |
| COGS | 954,022 | 2,049,370 | 2,051,943 | 2,054,123 | 2,162,024 | 2,167,565 | 2,177,883 | 2,219,246 | 2,337,033 | |
| SG&A | 548,172 | 571,808 | 589,372 | 589,372 | 630,402 | 652,384 | 657,912 | 698,107 | 718,423 | |
| Utilities | 98,871 | 100,685 | 109,620 | 118,329 | 134,620 | 145,513 | 156,453 | 161,409 | 168,768 | |
| Other Operating | 207,773 | 207,965 | 208,464 | 208,835 | 344,143 | 344,450 | 344,627 | 344,804 | 345,358 | |
| Payroll and Payroll Expenses | 2,943,752 | 2,943,752 | 3,245,817 | 3,245,817 | 3,470,910 | 3,470,910 | 3,766,669 | 3,766,669 | 3,975,569 | |
| Occupancy Costs | 99,882 | 99,882 | 99,882 | 99,882 | 99,882 | 99,882 | 99,882 | 99,882 | 99,882 | |
| Term Debt, Fees, Interest, etc. | 61,287 | 73,337 | 87,188 | 87,188 | 90,362 | 92,794 | 92,794 | 101,548 | 101,548 | |
| *Receiver Engagement - Professional Fees* | *1,390,434* | *1,426,273* | *1,474,971* | *1,571,089* | *1,729,259* | *1,837,901* | *1,953,121* | *2,104,698* | *2,304,447* | |
| Other Non-Operating Disbursements[1] | 213,951 | 255,419 | 255,419 | 255,419 | 304,076 | 328,522 | 342,029 | 350,358 | 350,710 | |
| Total Outflows | 7,294,995 | 8,528,404 | 9,028,936 | 9,136,650 | 9,872,276 | 10,067,012 | 10,604,932 | 10,860,284 | 11,434,786 | |
| Cumulative NCF (excl. FCMA funding) | $ (1,667,427) | $ (2,847,221) | $ (2,272,806) | $ (2,296,112) | $ (2,660,961) | $ (2,318,171) | $ (2,853,136) | $ (2,702,576) | $ (3,053,113) | Excludes FCMA Funding / Includes Receivership Fees |
| **Addback: Receivership Fees** | **1,390,434** | **1,426,273** | **1,474,971** | **1,571,089** | **1,729,259** | **1,837,901** | **1,953,121** | **2,104,698** | **2,304,447** | |
| NCF excl. impact of FCMA funding, and receivership fees[1] | $ (276,993) | $ (1,420,948) | $ (797,835) | $ (725,023) | $ (931,701) | $ (480,270) | $ (900,015) | $ (597,878) | $ (748,667) | Excludes FCMA Funding / Excludes Receivership Fees |

1. Cumulative Other Non-Operating Disbursements reported as of 1/18 were $305,904, which made *Cumulative Net Cash Flow excl. of FCMA funding and receivership fees* ($933,529). Since the Combined Hearing, there was a retroactive cash adjustment recorded for $1,828 decreasing Cumulative Other Non-Operating Disbursements to $304,076 as of 1/18 which modified the *Net Cash Flow excl. impact of FCMA funding and receivership fees* as of 1/18 to ($931,701).

10.      If the receivership were terminated, Uncle Nearest would still not be able to pay its debts as they come due. Uncle Nearest would lose $9,842,522 between January 19, 2026, and May 31, 2026, if this receivership were terminated.[28] Tellingly, based on a cash-flow forecast through April 19, 2026, Uncle Nearest is projected to continue to be insolvent and unable to continue operations without additional funding, which FCMA would not provide if the receivership is terminated.[29] Instead, FCMA would enforce its remedies. Further, termination of the receivership, as this Court recognized, would end the stay of collection efforts for pre-receivership debts.[30] Termination would likely trigger obligations and further increase Uncle Nearest's liabilities.

11.      The Weaver Parties argued at the Combined Hearing that the Receiver's cash flow analysis improperly included debt with respect to which the Weaver Parties had informal

---

[28] Receiver's Ex. A-4.
[29] Pl.'s Ex. 10.
[30] Hr'g Tr. 259:24-260:7.

agreements to delay payment.[31]  These debts, however, have not been forgiven, and no evidence was presented to corroborate the assertion that every creditor but FCMA is willing to stand down indefinitely.  Because these debts remain outstanding, they must be included in any proper cash flow analysis.  Additionally, the Receiver's analysis also included payments to Tennessee Distilling Group ("TDG").  TDG held a possessory lien securing the outstanding amounts owed to TDG.  Under the Receiver's cash flow analysis, the FCMA funding, which included the TDG payment, had already been backed out as a non-operating receipt in the adjusted cash flow analysis.[32]  Furthermore, the TDG payment itself was a normal operating disbursement and therefore a legitimate expense that must be counted against operating cash flow.[33]

The Weaver Parties' argument regarding multiples is irrelevant to the determination of insolvency.

12.    The Weaver Parties argued that the Court should consider a higher revenue multiple in its determination of insolvency.[34]  The correct standard however, as discussed above, is the balance sheet standard.  Even if this Court were to diverge from the balance sheet standard in deciding insolvency, the Weaver Parties' assertion that the proper revenue multiple is 12.9x is plainly unrealistic.[35]

13.    Although the Weaver Parties argued that applying a higher multiple would bring Uncle Nearest solvent, the Receiver's opinion and insight from bids to date has shown that a sale will not exceed the FCMA debt nor Uncle Nearest's total liabilities.  While FCMA hopes for the highest multiple possible, the Weaver Parties based their analysis of the multiples on transactions in the spirits industry that were several years old, with Proper No. Twelve and Don Papa Rum both

---

[31] *Id*. at 51:9-52:7.
[32] *Id*. at 231:2-4.  Specifically, Kevin Larin testified that the $2.7 million funding from FCMA would be "part of cash that came in" under the cash flow analysis.
[33] *Id*. at 231:2-11.
[34] Hr'g Tr. 59:8-63:6.
[35] Dkt. No. 137 ¶ 11.

having sold at a 12x revenue multiple and 12.5x revenue multiple respectively in 2021.[36] However, David Ozgo, the Weaver Parties' own witness, testified that "there are headwinds in the marketplace right now for all bourbons, for all spirits, for all beverage alcohol generally."[37] Revenue multiples from sales that closed almost five years ago unfortunately have little bearing on revenue multiples for sales today. Furthermore, Kevin Larin testified that in terms of barrels, the secondary market is "oversaturated with excess supply," making it "much more difficult to find a place to sell them."[38] Therefore, this Court should credit the Receiver's assessment that a sale will not exceed Uncle Nearest's debts, given the Receiver's direct involvement in the sales process and firsthand knowledge of current market conditions.

14. Publicly reported transactions in the spirits industry between June 2025 and February 2026 demonstrate revenue multiples ranging from approximately 1.3x to 4.5x revenue.[39] Most notably, Kirin Holdings Company, Limited's ("Kirin") sale of the Four Roses brand—widely recognized as the eighth-largest bourbon brand globally by volume—was announced in February 2026.[40] Although Kirin initially brought Four Roses to market in October 2025 reportedly seeking approximately 5.9x revenue,[41] the transaction ultimately closed at an implied multiple of approximately 4.3x to 4.5x revenue.[42] These transaction metrics are further corroborated by public market data. As of January 2026, publicly traded spirits companies reflected enterprise value-to-

[36] Pl.'s Ex. 5.

[37] Hr'g Tr. 175:23-25.

[38] *Id*. at 220:24-221:3.

[39] *See* Elisa Anzolin & Keith Weir, *Italy's Campari to sell Cinzano and Frattina brands for $117 million*, Reuters (June 26, 2025), https://www.reuters.com/en/italys-campari-sell-cinzano-frattina-brands-100-mln-euros-2025-06-26/; *see also* Claudia Cristoferi, *Campari sells Averna and Zedda Piras in 100 million euro deal*, Reuters (Dec. 18, 2025), https://www.reuters.com/business/campari-sells-averna-zedda-piras-brands-100-million-euros-2025-12-18/.

[40] *Notice Regarding the Execution of a Sale and Purchase Agreement for Four Roses*, Kirin Holdings Co. (Feb. 6, 2026), https://www.kirinholdings.com/en/newsroom/release/2026/0206_01.pdf.

[41] Ivan Levingston, Oliver Barnes & Harry Dempsey, *Japan's Kirin to seek buyer for Four Roses US whiskey line*, Financial Times (Oct. 24, 2025), https://www.ft.com/content/9ef36a83-2551-4b31-a473-3ee49400b0d0.

[42] Public company data sourced from Capital IQ ("CapIQ"). S&P Global Market Intelligence, Capital IQ, https://capitaliq.com (public company data as of January 28, 2026). CapIQ is a financial data and research platform that aggregates all public companies' reports.

217820613_16

revenue multiples in the range of approximately 1.4x to 3.7x.[43]



15.     Against this objective market backdrop, Fawn Weaver's 12.9x revenue multiple, which she characterized as "conservative," is neither supported by recent transaction data nor aligned with prevailing public market valuations.[44]   Rather, it is an extreme outlier with no demonstrated basis in comparable market evidence and should therefore be afforded no weight.

ii.     Security for the debts continues to be inadequate.

16.     The evidence from the Combined Hearing shows that security for the debts is inadequate.  Uncle Nearest continues to be, and even if the Receiver is terminated would remain, in an over-advance position without title to sufficient barrels passing to Uncle Nearest or a paydown of over $20 million on advances made pursuant to the revolving credit commitment (the "Revolving Loan").[45]   The Weaver Parties' counsel questioned whether the percentage of Eligible Inventory (as such term is defined in the Credit Agreement) in the calculation of the borrowing

---

[43] *Id.*
[44] Dkt. No. 137 ¶ 11.
[45] Pl.'s Exs. 10, 12.  The Revolving Loan has matured, so Uncle Nearest could not simply pay down $20 million to restore that credit facility.

base under the Credit Agreement is "arbitrary," because the percentage is not based on the value of the barrels.[46] Borrowing base percentages are not "arbitrary."[47] Rather, borrowing base percentages are specifically designed to approximate net orderly liquidation value.[48] Thus, when Uncle Nearest's debt under the Revolving Loan exceeds the borrowing base, as calculated under the Credit Agreement, it demonstrates Uncle Nearest lacks sufficient realizable asset value to secure its obligations.

### iii.   Legal remedies are inadequate.

17.    FCMA continues to have no other adequate legal remedy aside from the receivership.   At the Combined Hearing, the Receiver testified that he considered many restructuring options to refinance Uncle Nearest's debt, including refinancing the debt or placing Uncle Nearest in a chapter 11 bankruptcy case without a buyer and debtor-in-possession financing:

> [T]he problem with any of those options was that if the company is not cash flow positive without servicing any debt currently, then even incremental increases in debt service would kill a Chapter 11 plan, for example, or would dissuade -- what we found is it has dissuaded anybody from refinancing the debt.[49]

18.    Other evidence also indicates that FCMA is unlikely to fully recover on a money judgment.   For instance, the submitted bids also do not demonstrate that a transaction can be consummated that would generate enough proceeds to satisfy Uncle Nearest's outstanding obligations, including those owed to FCMA.   Moreover, more creditors are beginning to exercise their rights, likely signaling future demands on their debt.[50]

---

[46] Hr'g Tr. 216:25-217:23.
[47] *Id*. at 216:25-217:8.
[48] *Id*. at 217:16-19.
[49] *Id*. at 77:1-6.
[50] Hr'g Tr. 52:19-24; 96:18-25 – 97:1-8 (mentioning Advanced Spirits, WhistlePig, LLC ("WhistlePig") TDG, MarcyPen and "a lot of smaller creditors").   A true and correct copy of a letter from WhistlePig, dated November 11, 2025, notifying the Receiver of its rights under that certain Bulk Whiskey Purchase, Sale, and Contribution Agreement is attached hereto as **Plaintiff's Supplemental Exhibit 1**.   A true and correct copy of a letter from Advanced Spirits, dated February 10, 2026, providing the Receiver with the amount due and owing to Advanced Spirits in the liquidated

11

1

iv.  Less drastic equitable remedies are not available.

19.     The Receiver is continuing to uncover the severity of operational deficiencies that existed pre-receivership.[51]  Anything short of a court-ordered receiver would not provide the operational and financial oversight required to preserve FCMA's Collateral and allow Uncle Nearest to emerge from its distressed situation.[52]  The Receiver described Uncle Nearest's financials as being in "shambles."[53]  As the Receiver testified at the Combined Hearing, his conclusion was due to many reasons, including poor financial controls overall.[54]  And, Uncle Nearest has not filed tax returns since 2018 (despite representations to the contrary in the Loan Documents),[55] and was not in good standing with the States of Delaware and Tennessee when the Receiver took control.[56]  Uncle Nearest further lacked internal controls for approval of marketing decisions, with those decisions made pre-receivership anywhere from "[t]wenty minutes to a month, and then some in the middle," with 20 minutes being "generous."[57]  With Uncle Nearest in receivership, each decision is appropriately vetted.[58]  This prudent business oversight should have existed all along, and its absence facilitated Uncle Nearest's slide into insolvency.  Ultimately, anything short of a court-appointed receiver would bring Uncle Nearest back to the same financial

---

damages amount of $44,306,625.00 and delinquent invoices in the amount of $776,367.79 is attached hereto as **Plaintiff's Supplemental Exhibit 2**.  A true and correct copy of the demand letter from MarcyPen, dated August 22, 2025, is attached hereto as **Plaintiff's Supplemental Exhibit 3**.

[51] *See, e.g.*, Receiver's Ex. C ¶ 34.  In the Receiver's Second Quarterly Report, he stated that "[t]he Company's existing accounting records are materially unreliable and cannot be relied upon for accurate financial reporting."

[52] Pl.'s Ex. 2 ¶ 41.

[53] Receiver's Ex. C ¶ 3.

[54] Specifically, the Receiver testified at the hearing that "There were no audited financials, but there were not very good financial controls, which led to a lot of problems . . . There were not very good check and balances like you would expect from a company this size." Hr'g Tr. 98:22-99:2.

[55] *See, e.g.*, Receiving Hr'g Pl.'s Ex. 10, Amendment No. 8 to Credit Agreement dated 4/15/2025 at 13-14 (Section 4.5 (Taxes and Tax Returns)).

[56] Receiver's Ex. C ¶ 30.

[57] Hr'g Tr. 113:8-17.  On cross examination, Kate Jerkens further testified that, "when Fawn and [Kate Jerkens] would meet had to do with when we had like a marketing idea, it didn't have to pass through a week to six weeks of approvals. We would come up with an idea and start to execute on it."  Hearing Transcript 142:10-14.

[58] Kate Jerkens testified that with the receivership in place, "unfortunately right now, I now have layers that I have not had prior."  Hearing Transcript 113:5-7.

and operational condition it was in pre-receivership.

     v.    <u>Absent this Receivership, FCMA's Collateral is in imminent danger of being lost, concealed, injured, diminished in value, or squandered.</u>

20.    Evidence presented at the Combined Hearing points to the commingling of assets and the Weaver Parties' concealment of Uncle Nearest's assets. The Receiver asserted that he can trace certain cash proceeds, which importantly includes FCMA's cash collateral, despite the commingling.[59]

21.    For instance, the Distillery made a settlement installment payment on behalf of Shelbyville Barrel House BBQ, LLC and Humble Baron, Inc.—currently two of the entities the Receiver seeks to include within the receivership.[60] Neither Uncle Nearest, nor any other Loan Party, were a party to the settlement agreement or the underlying suit.[61] Fawn Weaver also testified she and "[her] board and financial advisors . . . made the decision to make sure that $20 million coming in [from MarcyPen] could not be snatched by [FCMA]."[62]

22.    During the Receiver's testimony, he also explained that the Weaver Parties' actions of either directly or indirectly interfering with the sales process is a factor leading to diminishment of FCMA's Collateral value.[63] Moreover, that interference appears to violate the Court's Receivership Order by disturbing the receivership estate.[64] Furthermore, Uncle Nearest incurred debt in contravention to the Loan Documents in at least four instances, "result[ing] in at least $1.8 million of FCMA's Collateral [being] diverted to other parties."[65] Even after the Forbearance Agreement was signed, Uncle Nearest entered into another contract in June 2025 agreeing to sell

---

[59] Hr'g Tr. 79:23-24.
[60] Pl.'s Ex. 14; Pl.'s Ex. 1 ¶¶ 42-43.
[61] Pl.'s Ex. 13; Pl.'s Ex. 1 ¶ 43.
[62] Hr'g Tr. 251:22-24.
[63] Hr'g Tr. 82:18-25 – 83:1-6.
[64] Receivership Order ¶ 11(d).
[65] Pl.'s Ex. 1 ¶ 46; Pl.'s Ex. 16. A true and accurate copy of agreements underlying certain of these transactions and a chart showing select borrowings and disbursements are attached as **Plaintiff's Supplemental Exhibits 4-6**.

217820613_16

over $2.2 million of future receipts for the purchase price of $1.6 million.[66] As described in more detail in Section A.vi., Fawn Weaver testified that she intentionally moved cash, which constituted FCMA's Collateral, away from Uncle Nearest to keep it away from FCMA. There is no evidence that the Weaver Parties would not continue to act freely with FCMA's Collateral to serve their purposes, even if the intent is to ultimately benefit Uncle Nearest.

vi. <u>Uncle Nearest engaged in fraudulent conduct.</u>

23. Previously unbeknownst to FCMA, Uncle Nearest, Inc., Fawn Weaver, Grant Sidney and MP-Tenn LLC ("<u>MarcyPen</u>") executed a Note Purchase Agreement (the "<u>NPA</u>"), dated February 4, 2025, pursuant to which MarcyPen agreed to purchase notes from Uncle Nearest, Inc. in an aggregate amount of up to $40,000,000. Pursuant to the NPA, Uncle Nearest, Inc. executed two convertible promissory notes (the "<u>MarcyPen Notes</u>"), for a total amount of $20 million, in favor of MarcyPen.[67] Not only was this $20 million debt never disclosed to FCMA, but the Weaver Parties repeatedly told FCMA that the Weavers' and/or Grant Sidney's funds were being used to infuse capital in early 2025 and a sale of Fawn Weaver's personal shares funded the $7.5 million payment at the closing of the Forbearance Agreement. Neither was true.[68] Despite Fawn Weaver's characterization of the MarcyPen Notes as sales of her personal shares to FCMA,[69] the evidence clearly shows that these are in fact convertible notes. Unless and until they convert into equity

---

[66] A true and accurate copy of the Dash Funding Sale of Future Receipts Agreement dated June 26, 2025, is attached as **<u>Plaintiff's Supplemental Exhibit 7</u>**.

[67] Receiver's Exs. F, E.

[68] A true and accurate copy of an email sent by Fawn Weaver dated February 2, 2026, is attached as **<u>Plaintiff's Supplemental Exhibit 8</u>**. At the time of the Forbearance Agreement, FCMA was advised that Grant Sidney was providing cash infusions to Uncle Nearest, and FCMA accordingly required Grant Sidney to subordinate these loans, which Grant Sidney has characterized as both "financing" and "investments." Dkt. No. 52 ¶¶ 5, 6. FCMA was not informed, however, that the much-needed cash was in fact being provided pursuant to an undisclosed third-party loan to Uncle Nearest and then routed immediately to Grant Sidney to avoid FCMA's interest in the funds. Grant Sidney itself has mischaracterized this aspect of the transaction on the record in this proceeding. *Id.* at ¶ 5 ("As an initial matter, it is important to note that the transfers in question were all transfers from Grant Sidney to the Uncle Nearest entities, not the other way around."). This assertion was offered in support of excluding Grant Sidney from the receivership estate.

[69] Plaintiff's Supplemental Exhibit 8 at 1.

interests, they remain loans.[70]

24.     Even putting aside that the Credit Agreement prohibited the MarcyPen Notes and their existence was concealed from FCMA, the Weaver Parties and Uncle Nearest, Inc. made at least four misrepresentations to MarcyPen in the NPA of which FCMA is aware.  Uncle Nearest, Inc. represented and warranted that the execution of the NPA and performance of obligations thereunder did not "conflict with, breach, or result in a default or acceleration under, any material provision of any instrument, mortgage, deed of trust, contract or other agreement to which Uncle Nearest is a party."[71]  Uncle Nearest, Inc. represented and warranted that Uncle Nearest, Inc. was "not in violation or default . . . under any note, indenture or mortgage . . . [or] any provision of federal or state statute, rule or regulation applicable to [Uncle Nearest, Inc.], the violation of which could reasonably be expected to have a material adverse effect on its business or properties."[72]  It further represented and warranted that Uncle Nearest, Inc. had "duly and timely filed all federal, state, county, local and foreign tax returns."[73]  Uncle Nearest, Inc. also represented and warranted that "there [was] no action, suit, proceeding or investigation by [Uncle Nearest, Inc.] pending or which [it] intend[ed] to initiate."[74]  However, at that time, the Credit Agreement prohibited indebtedness other than specific carveouts and greater than $500,000,[75] Uncle Nearest had received a notice of Events of Default from FCMA,[76] failed to file taxes since 2018,[77] and initiated an investigation into the former CFO's conduct.[78]  The foregoing are only the misrepresentations

---

[70] Furthermore, at the Combined Hearing, Fawn Weaver further testified that the transaction "was done as a loan at [Fawn Weaver's] request."  Hr'g Tr. 250:9-10.

[71] A true and accurate copy of the Note Purchase Agreement dated February 4, 2025, is attached as **Plaintiff's Supplemental Exhibit 9**.  *See* Section 3(e).

[72] *Id.* at Section 3(h).

[73] *Id.* at Section 3(l).

[74] *Id.* at Section 3(i).

[75] Receivership Hr'g Pl.'s Ex. 2, Credit Agreement, Section 7.2 (Indebtedness).

[76] Receivership Hr'g Pl.'s Ex. 20.

[77] Receiver's Ex. C ¶ 30.

[78] Hr'g Tr. 256:17-22.

15

of which FCMA is aware, but Uncle Nearest certainly could have made more.

25.      Perhaps even more troubling, after Uncle Nearest, Inc. received the proceeds from the MarcyPen Notes, Fawn Weaver directed substantially all proceeds to a Grant Sidney account,[79] which is controlled solely by Fawn Weaver.[80]  At the Combined Hearing, Fawn Weaver testified that she moved the MarcyPen Note proceeds from Uncle Nearest to Grant Sidney "to make sure that $20 million coming in could not be snatched by [FCMA]."[81]  In other words, Fawn Weaver intentionally moved a $20 million loan made to Uncle Nearest into Grant Sidney's account for the express purpose of concealing the assets from FCMA.  All of Uncle Nearest's cash, including the proceeds of the MarcyPen Notes, was and remains FCMA's Collateral.

26.      Fawn Weaver further testified that she moved the MarcyPen Note proceeds to the Grant Sidney account "[t]o prevent Uncle Nearest from having to pay the tax liability."[82]  Moreover, Fawn Weaver testified that she requested MarcyPen to structure the capital infusion as a convertible note instead of a direct purchase of shares with the express purpose of preventing Uncle Nearest from having to pay tax liability.[83]  While companies regularly consider tax implications in structuring transactions, the entire MarcyPen transaction is riddled with misrepresentations and schemes to avoid liabilities.  Significantly, the Weaver Parties failed to express any realization that their actions were questionable, which indicates that, without the receivership, similar machinations to borrow from Peter to pay Paul or conceal assets would continue.

---

[79] Receiver's Ex. A ¶ 21.
[80] A true and accurate copy of the statement of information for Grant Sidney is attached as **Plaintiff's Supplemental Exhibit 10**.
[81] Hr'g Tr. 251:14-24.
[82] *Id*. at 251:5-7.  Fawn Weaver also testified that "I would have been taxed $9.5 million, which the company would have had to have covered this year.  That didn't make any sense for me to sell my shares, to put it into the company, for the company to then have to pay a $9.5 million capital tax."
[83] *Id*. at 251:2-10.

27.    Fawn Weaver also testified that Uncle Nearest's former CFO sold forged stock trade certificates to sell shares on the secondary market.[84]  In addition to the fraudulent statements regarding the borrowing base, the former CFO allegedly committed substantial fraud while Fawn Weaver was at the helm, which she claims she never detected.[85]  Indisputably, serious fraudulent conduct took place within Uncle Nearest during Fawn Weaver's tenure.

vii.    Termination of the receivership would do more harm than good.

28.    The Weaver Parties failed to show any material change in circumstances with respect to the receivership doing more harm.  In fact, the evidence shows that the receivership is serving its intended purpose.  Through the Receivership Line of Credit, which FCMA would not have funded without the receivership, FCMA provided credit advances to, among other things, pay off pre-existing TDG liabilities and secure a release of their liens on barrels, pay Uncle Nearest's operating expenses, pay the Receiver's professional expenses, and pay outstanding obligations to other vendors so they would continue to do business with Uncle Nearest.[86] Absent these stabilizing measures, Uncle Nearest would be forced to close its doors.[87]

29.    The evidence presented showed that Fawn Weaver and the pre-receivership management team were unable to effectively lead Uncle Nearest out of financial distress.

## CONCLUSION

The evidence presented at the Combined Hearing overwhelmingly confirms that the circumstances warranting this Court's Receivership Order still persist and have only grown stronger.  The Weaver Parties have failed to demonstrate any material change in circumstances that

---

[84] *Id*. at 256:9-13.
[85] Specifically, the Weaver Parties allege that "[o]nly after [Michael] Senzaki's separation from the company were forged stock transfer certificates discovered, purporting to evidence reassignments of Ms. Weaver's equity that had never been approved, executed, or disclosed." Pl.'s Ex. 20 ¶ 38.
[86] Hr'g Tr. 94:21-25; 95:1-3.
[87] Pl.'s Ex. No. ¶¶ 23-24; Receiver's Ex. C ¶¶ 14, 39.

217820613_16

would justify termination of the receivership. Ultimately, judicial oversight through a court-appointed receiver remains the only adequate means of preserving Uncle Nearest's value for all stakeholders. The purpose of this receivership has not been fulfilled and therefore it should continue.

## PRAYER

WHEREFORE, for the reasons set forth above, Plaintiff Farm Credit Mid-America, PCA respectfully requests that this Court (i) enter an Order denying the Reconsideration Motion, and (ii) grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

/s/ Erika R. Barnes
Erika R. Barnes (TN Bar No. 028628)
STITES & HARBISON PLLC
401 Commerce St., Suite 800
Nashville, TN 37219
Telephone: (615) 782-2252
Email: ebarnes@stites.com

- and-

Demetra Liggins (admitted *pro hac vice*)
Dairanetta S. Spain (TN Bar No. 039981)
McGUIREWOODS LLP
Texas Tower
845 Texas Ave., Suite 2400
Houston, TX 77002
Telephone: (713) 353-6661
Email: dliggins@mcguirewoods.com
         dspain@mcguirewoods.com

M. Alexandra Shipley (admitted *pro hac vice*)
McGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601
Telephone: (312) 849-8253
Email: ashipley@mcguirewoods.com

*Attorneys for Farm Credit Mid-America, PCA*

Dated: February 26, 2026

18

## CERTIFICATE OF SERVICE

I certify that on February 26, 2026, a true and correct copy of the foregoing was served on all parties entitled to service via this Court's ECF/CMF system, via U.S. Mail and electronic mail upon the following:

Michael E. Collins
S. Marc Buchman
Manier & Herod, P.C.
1201 Demonbreun Street, Suite 900
Nashville, TN 37203
mcollins@manierherod.com
mbuchman@manierherod.com

Phillip G. Young, Jr.
Justin T. Campbell
Thompson Burton PLLC
1801 West End Avenue, Suite 1550
Nashville, TN 37203
phillip@thompsonburton.com
justin@thompsonburton.com

Uncle Nearest, Inc.
600 N. Main St.
Shelbyville, TN 38106

Uncle Nearest Real Estate Holdings, LLC
3125 Highway 231 N.
Shelbyville, TN 37160

Lucas A. Davidson, Esq
Oren Bitan
Tennessee Distilling Group, LLC
1 Music Circle South, Suite 300
Nashville, TN 37203
ldavidson@buchalter.com
obitan@buchalter.com

/s/ Erika R. Barnes