Docusign Envelope ID: 6A7D2FD6-8998-4260-A0E5-E840BF2ECE40

**Execution Version**

# UNCLE NEAREST, INC.

## NOTE PURCHASE AGREEMENT

This Note Purchase Agreement (this "**Agreement**") is made as of February 4, 2025, by and among Uncle Nearest, Inc., a Delaware corporation (the "**Company**"), Grant Sidney Inc. ("**Grant Sidney**"), Fawn Weaver ("**Weaver**"), and each of the purchasers listed on Exhibit A attached to this Agreement (each a "**Purchaser**" and together the "**Purchasers**").

### RECITALS

The Company desires to issue and sell, and each Purchaser desires to purchase, one or more unsecured convertible promissory notes, each in the form attached to this Agreement as Exhibit B (each, a "**Note**" and, collectively, the "**Notes**"), which shall be convertible on the terms stated therein into equity securities of the Company. The Notes and the equity securities issuable upon conversion thereof (and the securities issuable upon conversion of such equity securities) are collectively referred to herein as the "**Securities**."

### AGREEMENT

In consideration of the premises, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1. **Purchase and Sale of Notes.**

    (a) **Sale and Issuance of Notes.** Subject to the terms and conditions of this Agreement, each Purchaser agrees to purchase at the Closing (as defined below), and the Company agrees to sell and issue to each Purchaser a Note at the Closing, in the principal amount set forth opposite such Purchaser's name on Exhibit A. The purchase price of each Note shall be equal to 100% of the principal amount of such Note. The Company's agreements with each of the Purchasers are separate agreements, and the sales of the Notes to each of the Purchasers are separate sales.

    (b) **Closing; Delivery.**

        (i) The initial purchase and sale of the Notes shall take place remotely via the exchange of documents on the date first written above (which time and place are designated as the "**Initial Closing**"). In the event there is more than one closing, the term "**Closing**" shall apply to each such closing, unless otherwise specified herein.

        (ii) Subsequent to the Initial Closing, the Company may issue and sell additional Notes pursuant to this Agreement, up to a maximum aggregate principal amount of Forty Million Dollars (US $40,000,000) for all Notes issued pursuant to this Agreement, to such additional purchasers as the Company shall select, in its sole discretion, in one or more subsequent Closings to occur on or before the 90th day following the date of the Initial Closing (each, an "**Additional Closing**," and together with the Initial Closing, each a "**Closing**").

Farm Credit v Uncle Nearest, et al
Plaintiff's Exhibit
9
4:25-CV-00038

(iii) At each Closing, the Company shall deliver to each Purchaser the Note to be purchased by such Purchaser upon receipt of (A) payment of the purchase price therefor by check payable to the Company or by wire transfer to a bank designated by the Company and (B) delivery of counterpart signature pages to this Agreement.

(iv) Subject to the terms hereof, the Company may sell additional Notes to such persons or entities in one or more Additional Closings as determined by the Company in its sole discretion. All such sales shall be made on the terms and conditions set forth in this Agreement. For purposes of this Agreement, and all other agreements contemplated hereby, any additional purchaser so acquiring Notes shall be deemed to be a "Purchaser" for purposes of this Agreement, and any notes so acquired by such additional purchaser shall be deemed to be "Notes" and "Securities" as applicable.

(c) **Use of Proceeds**. All proceeds received by the Company from the Sale of the Notes pursuant to this Agreement shall be used by the Company for general corporate purposes.

(d) **Conversion Mechanics**. Upon the conversion of any Note pursuant to the terms thereof, the Company will cancel a number of shares of capital stock held by Grant Sidney equal to the number of shares of capital stock being issued to the Holder, such that only Grant Sidney, but not the Company's other stockholders, will be diluted by such issuance. In furtherance thereof, Grant Sidney hereby agrees that it shall be bound by the terms of this Section 1(d) and the corresponding provision of each Note and that the Company shall have the right to automatically cancel such shares of capital stock held by Grant Sidney in connection with any such conversion without any further action by Grant Sidney. From and after the date hereof and until all Notes have either been converted or repaid in full in accordance with their terms, Grant Sidney hereby agrees that it shall not transfer, directly or indirectly, pledge, hypothecate or otherwise place any lien or encumbrance on any of its shares of a capital stock of the Company. Furthermore, Weaver represents and warrants that she owns one hundred percent (100%) of the issued and outstanding capital stock of Grant Sidney and covenants and agrees that she shall maintain such ownership from and after the date hereof and until all Notes have either been converted or repaid in full in accordance with their terms.

2. **Related Documentation.** Each Purchaser agrees and acknowledges that the conversion of the Notes into equity securities of the Company pursuant to the terms of the Notes may require such Purchaser's execution of a stock purchase agreement and certain additional agreements as set forth in the Notes, relating to the purchase and sale of such equity securities and any rights relating to such equity securities.

3. **Representations and Warranties of the Company.** The Company hereby represents and warrants to each Purchaser as follows:

(a) **Organization, Good Standing and Qualification.** The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to carry on its business as now conducted and as proposed to be conducted. The Company is duly qualified to transact business

Docusign Envelope ID: 6A7D2FD6-8998-4260-A0E5-E840BF2ECE40

and is in good standing in each jurisdiction in which the failure to so qualify would have a material adverse effect on its business or properties.

(b) **Authorization.** Except for the authorization and issuance of the shares issuable in connection with the conversion of the Notes, all corporate action has been taken on the part of the Company, its officers, directors and stockholders necessary for the authorization, execution and delivery of this Agreement and the Notes. This Agreement and the Notes, when executed and delivered by the Company, shall constitute valid and legally binding obligations of the Company, enforceable against the Company in accordance with their respective terms except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(c) **Subsidiaries**. Except as set forth on Schedule 3(c), the Company does not currently own or control, directly or indirectly, any interest in any other corporation, partnership, trust, joint venture, limited liability company, association or other business entity. The Company is not a participant in any joint venture, partnership or similar arrangement.

(d) **Capitalization**. As of the date hereof, the Company has a total authorized capitalization consisting of (i) 34,500,000 shares of Common Stock, par value $0.0001 per share, 8,872,662 of which are issued and outstanding as of the date hereof, and (ii) 17,500,000 shares of Preferred Stock, par value $0.0001 per share, of which (1) 3,203,439 shares have been designated Series Seed Preferred Stock, all of which are issued and outstanding as of the date hereof, (2) 4,520,799 shares have been designated as Series A Preferred Stock, 4,459,702 of which are issued and outstanding as of the date hereof, (3) 4,215,305 shares have been designated as Series B Preferred Stock, all of which are issued and outstanding as of the date hereof, (4) 1,692,076 shares have been designated as Series C Preferred Stock, all of which are issued and outstanding as of the date hereof, (5) 1,984,016 shares have been designated as Series D Preferred Stock, all of which are issued and outstanding as of the date hereof, and (6) 1,500,000 shares have been designated as Series E Preferred Stock, 1,407,004 of which are issued and outstanding as of the date hereof. All of the outstanding shares of capital stock of the Company have been duly authorized, are validly issued and are fully paid and non-assessable and were issued in compliance with all applicable federal and state securities laws. The Company has reserved 4,250,000 shares of its Common Stock for issuance to officers, directors, employees and consultants of the Company pursuant to the Company's stock plan (the "**Stock Plan**"), as amended, duly adopted by the board of directors of the Company and approved by the Company's stockholders. Of such reserved shares of Common Stock, 162,836 shares have been issued pursuant to restricted stock purchase agreements and/or the exercise of options, options to purchase 3,505,164 shares have been granted and are currently outstanding, and 582,000 shares of Common Stock remain available for issuance to officers, directors, employees and consultants pursuant to the Stock Plan.

(e) **Absence of Required Consents; No Violations**. Except for the filing of a Form D with the Securities and Exchange Commission and any other filings required to be made in compliance with state "blue sky" laws, no consent, approval, order or authorization of, or registration, qualification, designation, declaration or filing with, any governmental authority on the part of the Company is required in connection with the consummation of the transactions

2762863.v5

contemplated by this Agreement. The Company is not in violation or default (i) of any provision of its Certificate of Incorporation or Bylaws, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, (iv) under any lease, agreement, contract or purchase order to which it is a party or by which it is bound, or (v) any provision of federal or state statute, rule or regulation applicable to the Company, the violation of which could reasonably be expected to have a material adverse effect on its business or properties.

(f) **Offering**. Subject in part to the truth and accuracy of each Purchaser's representations set forth in Section 4 of this Agreement, the offer, sale and issuance of the Notes as contemplated by this Agreement are exempt from the registration requirements of the Securities Act of 1933, as amended (the "**Securities Act**"), and will not result in a violation of the qualification or registration requirements of any applicable state securities laws.

(g) **Rule 506**. No "bad actor" disqualifying event described in Rule 506(d)(1)(i)-(viii) of the Securities Act (a "**Disqualification Event**") is applicable to the Company or, to the Company's knowledge, any Company Covered Person, except for a Disqualification Event as to which Rule 506(d)(2)(ii–iv) or (d)(3), is applicable. "**Company Covered Person**" means, with respect to the Company as an "issuer" for purposes of Rule 506 promulgated under the Securities Act, any Person listed in the first paragraph of Rule 506(d)(1). "**Knowledge**," including the phrase "**to the Company's knowledge**" shall mean the actual knowledge, after reasonable investigation, of Fawn Weaver and Keith Weaver.

(h) **No Conflicts.** The execution and delivery of, and the performance by the Company of its obligations in this Agreement do not (i) conflict with, breach, or result in a default or acceleration under, any material provision of any instrument, mortgage, deed of trust, contract or other agreement to which the Company is a party, or (ii) conflict with, breach or otherwise violate any existing obligation of the Company under a court order, judgment or decree by which the Company is bound.

(i) **Litigation**. There is no material claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to the Company's knowledge, currently threatened in writing (i) against the Company, (ii) against any officer or director of the Company arising out of their employment or board relationship with the Company, or (iii) that questions the validity of Notes or the right of the Company to issue the Notes or to consummate the transactions contemplated by this Agreement. Neither the Company nor, to the Company's knowledge, any of its officers or directors is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers or directors, such as would affect the Company). There is no action, suit, proceeding or investigation by the Company pending or which the Company intends to initiate.

(j) **Intellectual Property**. The Company owns or possesses or can acquire on commercially reasonable terms sufficient legal rights to all patents, patent applications, registered and unregistered trademarks, trademark applications, registered and unregistered service marks, service mark applications, tradenames, copyrights, trade secrets, domain names, persona rights, information and proprietary rights and processes, similar or other intellectual property rights, subject matter of any of the foregoing, tangible embodiments of any of the foregoing, licenses in, to and under any of the foregoing, and in any and all such cases that are

owned or used by the Company in the conduct of the Company's business as now conducted and as presently proposed to be conducted ("**Company Intellectual Property**") without any known conflict with, or infringement of, the rights of others, including prior employees or consultants. The Company has not received any communications alleging that the Company has violated, or by conducting its business, would violate any of the patents, trademarks, service marks, tradenames, copyrights, trade secrets, mask works or other proprietary rights or processes of any other person or entity. To the Company's knowledge, no product or service marketed or sold (or proposed to be marketed or sold) by the Company violates or will violate any license or infringes or will infringe any intellectual property rights of any other party.

(k) **Financial Statements; Liabilities**. The Company has delivered to each Purchaser its unaudited financial statements (including balance sheet, income statement and statement of cash flows) as of September 30, 2024 (the "**Balance Sheet Date**") and for the 9-month period ended on the Balance Sheet Date (collectively, the "**Financial Statements**"). The Financial Statements have been prepared in accordance with generally accepted accounting principles in the United States ("**GAAP**"), applied on a consistent basis throughout the periods indicated, except that the Financial Statements may not contain all footnotes required by GAAP. The Financial Statements fairly present in all material respects the financial condition and operating results of the Company as of the dates, and for the periods, indicated therein, subject to normal year-end audit adjustments. Except as set forth in the Financial Statements, the Company has no liabilities or obligations, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to the Balance Sheet Date; (ii) obligations under contracts and commitments incurred in the ordinary course of business; and (iii) liabilities and obligations of a type or nature not required under GAAP to be reflected in the Financial Statements, which, in all such cases, individually and in the aggregate would not be material to the Company or its business or operations. The Company maintains and will continue to maintain a standard system of accounting established and administered in accordance with GAAP.

(l) **Tax Matters**. There are no federal, state, county, local or foreign taxes due and payable by the Company which have not been timely paid. There are no accrued and unpaid federal, state, country, local or foreign taxes of the Company which are due, whether or not assessed or disputed. There have been no examinations or audits of any tax returns or reports by any applicable federal, state, local or foreign governmental agency. The Company has duly and timely filed all federal, state, county, local and foreign tax returns required to have been filed by it and there are in effect no waivers of applicable statutes of limitations with respect to taxes for any year.

(m) **Employee Matters**. The Company has complied in all material respects with all applicable state and federal equal employment opportunity laws and with other laws related to employment, including those related to wages, hours, and worker classification. The Company has withheld and paid to the appropriate governmental entity or is holding for payment not yet due to such governmental entity all amounts required to be withheld from employees of the Company and is not liable for any arrears of wages, taxes, penalties, or other sums for failure to comply with any of the foregoing.

(n) **Insurance**. All policies of insurance in effect of any kind or nature owned by or issued to the Company, including policies of life, fire, theft, product liability, public

5

2762863.v5

Case 4:25-cv-00038-CEA-CHS   Document 157-9   Filed 02/26/26   Page 5 of 15
PageID #: 6711

liability, property damage, other casualty, employee fidelity, workers' compensation, property and liability insurance (i) are in full force and effect and (ii) in the reasonable judgment of the Company (after consultation with its insurance broker), provide such coverage as the Company deems reasonably appropriate for similarly situated companies engaged in similar businesses.

(o) **Data Privacy**. In connection with its collection, storage, transfer (including, without limitation, any transfer across national borders) and/or use of any personally identifiable information from any users of the Company's products, including, without limitation, any customers, prospective customers, employees and/or other third parties (collectively, "**Personal Information**"), the Company is and has been in material compliance with all applicable laws in all relevant jurisdictions, the Company's privacy policies and the requirements of any contract or codes of conduct to which the Company is a party. The Company has commercially reasonable physical, technical, organizational and administrative security measures and policies in place to protect all Personal Information collected by it or on its behalf from and against unauthorized access, use and/or disclosure. The Company is and has been, to the Company's knowledge, in compliance in all material respects with all laws relating to data loss, theft and breach of security notification obligations. To the Company's knowledge, there has been no occurrence of (x) unlawful, accidental or unauthorized destruction, loss, use, modification or disclosure of or access to Personal Information owned, stored, used, maintained or controlled by or on behalf of the Company such that Privacy Requirements (as defined below) require or required the Company to notify government authorities, affected individuals or other parties of such occurrence or (y) unauthorized access to or disclosure of the Company's confidential information or trade secrets. "**Privacy Requirements**" means requirements of the Company derived from applicable laws and regulations with respect to information privacy.

4. **Representations and Warranties of the Purchasers.** Each Purchaser hereby represents and warrants, severally and not jointly, to the Company as follows:

(a) **Authorization.** Such Purchaser has full power and authority to enter into this Agreement. This Agreement, when executed and delivered by the Purchaser, will constitute a valid and legally binding obligation of the Purchaser, enforceable in accordance with its terms, except as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, and any other laws of general application affecting enforcement of creditors' rights generally, and as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

(b) **Purchase Entirely for Own Account.** This Agreement is made with the Purchaser in reliance upon the Purchaser's representation to the Company, which by the Purchaser's execution of this Agreement, the Purchaser hereby confirms, that the Securities to be acquired by the Purchaser will be acquired for investment for the Purchaser's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Purchaser has no present intention of selling, granting any participation in, or otherwise distributing the same. By executing this Agreement, the Purchaser further represents that the Purchaser does not presently have any contract, undertaking, agreement or arrangement with any person to sell, transfer or grant participations to such person or to any third person, with respect to any of the Securities. The Purchaser has not been formed for the specific purpose of acquiring any of the Securities.

(c) **Knowledge.** The Purchaser is aware of the Company's business affairs and financial condition and has acquired sufficient information about the Company to reach an informed and knowledgeable decision to acquire the Securities.

(d) **Restricted Securities.** The Purchaser understands that the Securities have not been, and will not be, registered under the Securities Act, by reason of a specific exemption from the registration provisions of the Securities Act which depends upon, among other things, the bona fide nature of the investment intent and the accuracy of the Purchaser's representations as expressed herein. The Purchaser understands that the Securities are "restricted securities" under applicable U.S. federal and state securities laws and that, pursuant to these laws, the Purchaser must hold the Securities indefinitely unless they are registered with the Securities and Exchange Commission and qualified by state authorities, or an exemption from such registration and qualification requirements is available. The Purchaser acknowledges that the Company has no obligation to register or qualify the Securities for resale. The Purchaser further acknowledges that if an exemption from registration or qualification is available, it may be conditioned on various requirements including, but not limited to, the time and manner of sale, the holding period for the Securities, and on requirements relating to the Company which are outside of the Purchaser's control, and which the Company is under no obligation and may not be able to satisfy.

(e) **No Public Market.** The Purchaser understands that no public market now exists for any of the securities issued by the Company and that the Company has made no assurances that a public market will ever exist for the Securities.

(f) **Legends.** The Purchaser understands that the Securities, and any securities issued in respect thereof or exchange therefor, may bear one or all of the following legends:

(i) "THE SECURITIES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AND HAVE BEEN ACQUIRED FOR INVESTMENT AND NOT WITH A VIEW TO, OR IN CONNECTION WITH, THE SALE OR DISTRIBUTION THEREOF. NO SUCH SALE OR DISTRIBUTION MAY BE EFFECTED WITHOUT AN EFFECTIVE REGISTRATION STATEMENT RELATED THERETO OR AN OPINION OF COUNSEL IN A FORM SATISFACTORY TO THE COMPANY THAT SUCH REGISTRATION IS NOT REQUIRED UNDER THE SECURITIES ACT OF 1933."

(ii) Any legend required by the Blue Sky laws of any state to the extent such laws are applicable to the shares represented by the certificate so legended.

(g) **Accredited Investor.** The Purchaser is an "accredited investor" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

(h) **Foreign Investors.** If a Purchaser is not a United States person (as defined by Rule 902(k) under the Securities Act), such Purchaser hereby represents that it has satisfied itself as to the full observance of the laws of its jurisdiction in connection with any invitation to subscribe for the Securities or any use of this Agreement, including (i) the legal

requirements within its jurisdiction for the purchase of the Securities, (ii) any foreign exchange restrictions applicable to such purchase, (iii) any governmental or other consents that may need to be obtained and (iv) the income tax and other tax consequences, if any, that may be relevant to the purchase, holding, redemption, sale or transfer of the Securities. Such Purchaser's subscription and payment for, and its, his or her continued beneficial ownership of the Securities, will not violate any applicable securities or other laws of Purchaser's jurisdiction.

5. **Conditions of the Purchasers' Obligations at Closing.** The obligations of each Purchaser to the Company under this Agreement are subject to the fulfillment, on or before the applicable Closing that such Purchaser is participating in, of each of the following conditions, unless otherwise waived:

(a) **Representations and Warranties.** The representations and warranties of the Company contained in Section 3 shall be true and correct on and as of the applicable Closing with the same effect as though such representations and warranties had been made on and as of the date of the applicable Closing.

(b) **Qualifications.** All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Securities pursuant to this Agreement shall be obtained and effective as of the applicable Closing.

6. **Conditions of the Company's Obligations at Closing.** The obligations of the Company to each Purchaser under this Agreement are subject to the fulfillment, on or before the applicable Closing that such Purchaser is participating in, of each of the following conditions, unless otherwise waived:

(a) **Representations and Warranties.** The representations and warranties of such Purchaser contained in Section 4 shall be true and correct on and as of the Closing that such Purchaser is participating in with the same effect as though such representations and warranties had been made on and as of such Closing.

(b) **Qualifications.** All authorizations, approvals or permits, if any, of any governmental authority or regulatory body of the United States or of any state that are required in connection with the lawful issuance and sale of the Securities pursuant to this Agreement shall be obtained and effective as of the Closing.

7. **Miscellaneous.**

(a) **Successors and Assigns.** The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and assigns of the parties. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

(b) **Governing Law.** This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the parties hereto shall be governed, construed

and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law. Each Purchaser and the Company hereby submits to the exclusive jurisdiction of the state and federal courts located in the State of Delaware.

(c) **Counterparts.** This Agreement may be executed in two or more counterparts, each of which shall be deemed an original and all of which together shall constitute one instrument.

(d) **Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

(e) **Notices.** Any notice required or permitted by this Agreement shall be in writing and shall be deemed sufficient when delivered personally or by overnight courier or sent by email (upon customary confirmation of receipt), or forty-eight (48) hours after being deposited in the U.S. mail as certified or registered mail with postage prepaid, addressed to the party to be notified at such party's address as set forth on the signature page, as subsequently modified by written notice, or if no address is specified on the signature page, at the most recent address set forth in the Company's books and records.

(f) **Finder's Fee.** Each party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. Each Purchaser agrees to indemnify and to hold harmless the Company from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which such Purchaser or any of its officers, employees, or representatives is responsible. The Company agrees to indemnify and hold harmless each Purchaser from any liability for any commission or compensation in the nature of a finder's fee (and the costs and expenses of defending against such liability or asserted liability) for which the Company or any of its officers, employees or representatives is responsible.

(g) **Amendments and Waivers.** Any term of this Agreement may be amended or waived only with the written consent of the Company and MP-Tenn LLC, a Delaware limited liability company. Any amendment or waiver effected in accordance with this Section 7(g) shall be binding upon each Purchaser and each transferee of the Securities, each future holder of all such Securities, and the Company.

(h) **Expenses**. The Company and each Purchaser shall each bear its respective expenses and legal fees incurred with respect to this Agreement and the transactions contemplated herein.

(i) **Severability.** If one or more provisions of this Agreement are held to be unenforceable under applicable law, the parties agree to renegotiate such provision in good faith, in order to maintain the economic position enjoyed by each party as close as possible to that under the provision rendered unenforceable. In the event that the parties cannot reach a mutually agreeable and enforceable replacement for such provision, then (i) such provision shall be excluded from this Agreement, (ii) the balance of the Agreement shall be interpreted as if such

9

2762863.v5

provision were so excluded and (iii) the balance of the Agreement shall be enforceable in accordance with its terms.

(j) **Entire Agreement.** This Agreement, and the documents referred to herein, constitute the entire agreement between the parties hereto pertaining to the subject matter hereof, and supersedes any and all other written or oral agreements existing between the parties with respect to the subject matter hereof.

(k) **Exculpation Among Purchasers.** Each Purchaser acknowledges that it is not relying upon any person, firm or corporation, other than the Company and its officers and directors, in making its investment or decision to invest in the Company. Each Purchaser agrees that no other Purchaser nor the respective controlling persons, officers, directors, partners, agents, or employees of another Purchaser shall be liable for any action heretofore or hereafter taken or omitted to be taken by any of them in connection with the Securities.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the parties have executed this Note Purchase Agreement as of the date first above written.

**UNCLE NEAREST, INC.**

By: _/s/ Fawn Weaver_

    Name:   Fawn Weaver
    Title:    CEO

Solely for purposes of Section 1(d) hereof:

**GRANT SIDNEY INC.**

By: _/s/ Fawn Weaver_

    Name: Fawn Weaver
    Title: CEO

**FAWN WEAVER**:

_/s/ Fawn Weaver_

**SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT**

2762863.v5

**IN WITNESS WHEREOF**, the parties have executed this Note Purchase Agreement as of the date first above written.

**LENDER:**

**\*\*\* If Holder is an individual:**

Signature:_____
Name:_____

**\*\*\* If Holder is NOT an individual:**

MP-Tenn LLC
Printed Name of Entity

Marcy Pen Capital Partners LLC, its Manager

By: *Elbert O. Robinson, Jr. ("Robbie")*
Name: Elbert O. Robinson, Jr. ("Robbie")
Title: CEO

**\*\*\* For BOTH individuals AND entities:**

Address: [REDACTED]

Attention: Elbert O. Robinson, Jr. ("Robbie")
Facsimile:
E-Mail: [REDACTED]

**\*\*\* Principal Amount of Note Purchased:**

US$ 10,000,000

**SIGNATURE PAGE TO NOTE PURCHASE AGREEMENT**

2762863.v5

## Schedule 3(c)

1. The Company owns 100% of the issued and outstanding equity interests of S1 Organic Vodka, LLC.

2. The Company owns 100% of the issued and outstanding equity interests of UNAH, Inc.

3. UNAH, Inc. owns 100% of the issued and outstanding equity interests of Domaine D'Anatole, Inc.

4. Weaver owns 100% of the issued and outstanding equity interests of Nearest Green Distillery, Inc.

5. The Keith & Fawn Weaver Living Trust owns 100% of the issued and outstanding equity interests of Dan Call Farm, Inc.

6. The Company owns 100% of the issued and outstanding equity interests of Uncle Nearest Real Estate Holdings, LLC.

Docusign Envelope ID: 6A7D2FD6-8998-4260-A0E5-E840BF2ECE40

2762863.v5

Case 4:25-cv-00038-CEA-CHS    Document 157-9    Filed 02/26/26    Page 13 of 15
PageID #: 6719

# EXHIBIT A

## SCHEDULE OF PURCHASERS

| Name and Address of Purchaser | Note Principal Amount | Closing Date |
|---|---|---|
| MP-Tenn LLC <br> ███████████████████ <br> ████████████ <br> Attn: Elbert O. Robinson, Jr. ("Robbie") <br> Email: ███████████████ | $10,000,000 | February 4, 2025 |
| MP-Tenn LLC <br> ███████████████████ <br> ████████████ <br> Attn: Elbert O. Robinson, Jr. ("Robbie") <br> Email: ███████████████ | $10,000,000 | February 28, 2025 |
| **TOTAL:** | **US$ 20,000,000** | |

Docusign Envelope ID: 6A7D2FD6-8998-4260-A0E5-E840BF2ECE40

# EXHIBIT B

## FORM OF CONVERTIBLE PROMISSORY NOTE

2762863.v5