| | | |
|---|---|---|
| **FARM CREDIT MID-AMERICA, PCA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 4:25-cv-38** |
| | ) | |
| **v.** | ) | **Judge Atchley** |
| | ) | |
| **UNCLE NEAREST, INC., et al.,** | ) | **Magistrate Judge Steger** |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## SUPPLEMENTAL BRIEF OF GRANT SIDNEY, INC. TO MOTION FOR CLARIFICATION OF RECEIVERSHIP ORDER AND STATEMENT OF FARM CREDIT

Grant Sidney, Inc. ("Grant Sidney" or the "Company"), by and through its undersigned counsel, provides this Brief with regard to the *Receiver's Motion for Clarification of Receivership Order* (the "Motion to Clarify")[1] and the *Statement of Farm Credit Mid-America, PCA in Support of Motion for Clarification of Receivership Order* (the "Farm Credit Statement"),[2] through which the Receiver and Farm Credit (collectively, the "Movants") seek to divest Grant Sidney, and its board and shareholders, of their control of the company and place the company and its assets into receivership. In support of this Response, Grant Sidney incorporates the Declaration of Fawn Weaver, attached as **Exhibit 1**, and asserts and alleges as follows:

## INTRODUCTION

1.    The Receiver's Motion to Clarify seeks to expand the Receivership to include Grant Sidney, Inc., a separate California corporation formed in 2013—three years before Uncle Nearest,

---

[1] Dkt. 41.
[2] Dkt. 44.

Inc. was created—and not obligated on the Farm Credit loan. The Motion rests largely on a characterization of the February–April 2025 capital infusion as evidence of "commingling" or "single enterprise" conduct. The documentary record does not support that characterization.

2.      The February–April 2025 capital infusion was formally documented, disclosed to Farm Credit in April 2025, approved in writing by the Uncle Nearest Board of Directors and its four largest shareholders, and fully deployed for the benefit of Uncle Nearest. The funds were received into a dedicated Uncle Nearest money market account, temporarily routed through a Grant Sidney account during active forbearance negotiations, and then disbursed to Uncle Nearest operating accounts, payroll vendors, packaging vendors, and other vendor obligations. Certain transfers were deposited into the Uncle Nearest operating account—an account subject to Farm Credit's monitoring and full visibility—and from that account Uncle Nearest directly executed the transactions. The Subordinated Credit Agreement drafted by Farm Credit itemizes the funded amounts and reflects the same transaction pattern.

3.      The record reflects that no portion of the capital infusion—principal or accrued interest—was retained by Grant Sidney, by Ms. Weaver, or by any non–Uncle Nearest entity.

4.      Expansion of a federal receivership to a separate California corporation is an extraordinary equitable remedy. Where the record demonstrates full documentation, full disclosure, and full deployment of funds for the exclusive benefit of the debtor, such expansion is neither necessary nor equitable.

## **BACKGROUND**

5.      On October 21, 2025, Grant Sidney filed its initial response to the Motion to Clarify and the Farm Credit Statement. This Brief provides the underlying documentation of the transactions involving Grant Sidney and Uncle Nearest, a description of the business purposes

behind those transactions, and proof of no commingling of the finances of Uncle Nearest and Grant Sidney. Further, this Supplemental Response provides documentation as to the adherence to corporate formalities by Grant Sidney which demonstrates that Grant Sidney and Uncle Nearest are not alter egos.

6.     Grant Sidney is a holding company formed on June 14, 2013 in California[3] initially under the name "VR Investments, Inc." by the filing of the "Articles of Incorporation of VR Investments Inc." with the California Secretary of State (the "Articles of Incorporation").[4]

7.     VR Investments' initial investment was in ValleyRentals.com in 2013. At that time, Uncle Nearest, Inc. had not yet been formed. Between 2013 and the founding of Uncle Nearest in 2016, VR Investments made investments in three additional companies unrelated to the spirits industry.[5] These investments were independent of Uncle Nearest and demonstrate that VR Investments operated as a holding and investment vehicle prior to any involvement with Uncle Nearest.

8.     On January 27, 2016, the Company filed with the California Secretary of State the "Certificate of Amendment to Articles of Incorporation of VR Investments, Inc.," (the "Certificate of Amendment") which changed the name of the corporation to Grant Sidney, Inc.[6]  On January 30, 2025, the Company filed its Statement of Information (the "Statement of Information") for the Company with the California Secretary of State.[7]

9.     The Company is a qualified and active corporation in California and its next statement of information is not due to be filed until June 30, 2026.  As reflected in the Articles of

---

[3] Grant Sidney's initial Response inadvertently and incorrectly stated its state of incorporation as Delaware, not California.
[4] Weaver Ex. 22.
[5] Exhibit 1, ¶ 6-7.
[6] Weaver Ex. 23.
[7] Exhibit 1, ¶ 10.

Incorporation, the Company has a perpetual existence and its purpose is "to engage in any lawful act of activity for which a corporation may be organized under the General Corporation Law of California other than the banking business, the trust company business, or the practice of a profession permitted to be incorporated by the California Corporations Code."[8] The Company has at all times operated in a manner consistent with its Articles of Incorporation and the California Business Code.[9] Grant Sidney has maintained continuous corporate existence under California law since 2013.[10] It is incorporated in California and is not organized under Delaware or Tennessee law.

10.     Grant Sidney has its own tax id number, which is distinct from the tax id numbers of Uncle Nearest, Inc., Nearest Green Distillery, Inc., or Uncle Nearest Real Estate Holdings, LLC (collectively, the "Uncle Nearest Entities").[11]

11.     Grant Sidney's corporate principal address is 6060 Center Dr., 10th Floor, Los Angeles, CA 90045 as reflected on the Statement of Information.[12] From 2013 through 2025, Grant Sidney has filed its federal and applicable state tax returns separately and apart from Uncle Nearest, Inc., and has maintained separate tax reporting, financial records, and corporate books throughout its existence.[13]

12.     Fawn Weaver is, and has at all times been, the holder of 100% of the outstanding shares of Grant Sidney.[14]

---

[8] Weaver Ex. 22.
[9] Exhibit 1, ¶ 11.
[10] Exhibit 1, ¶ 11.
[11] Exhibit 1, ¶ 11.
[12] Exhibit 1, ¶ 12.
[13] Exhibit 1, ¶ 12.
[14] Exhibit 1, ¶ 3.

13. In 2016, Uncle Nearest, Inc., was formed and Grant Sidney acquired 100% of the initial outstanding shares of Uncle Nearest, Inc.[15] Since that time, Uncle Nearest has issued additional shares of stock and Grant Sidney's share of ownership has been diluted to approximately 30% of the outstanding shares of Uncle Nearest. Inc.[16]

14. In addition to its equity holdings in Uncle Nearest, Inc., Grant Sidney is also currently a minority shareholder of another spirit company and has had other business interests from time to time since its formation in 2013, approximately three years prior to the formation of Uncle Nearest, Inc.[17]

15. Grant Sidney has never received any distribution of money or other property from the Uncle Nearest Entities.[18] At all times, Grant Sidney has operated as a California corporation separate and distinct from Uncle Nearest, Inc., which is a Delaware corporation.[19]

16. In early 2025, Uncle Nearest, Inc. was in negotiations with Farm Credit regarding a forbearance agreement relating to its outstanding debts.[20]

17. As Ms. Weaver testified at the February 9, 2026 hearing, a potential transaction being considered in February 2025 was as a sale of approximately $20 million of Ms. Weaver's personal shares, which had been earned by her over time in lieu of salary.[21]

18. The sole intention of that proposed sale of her shares was to invest 100% of the proceeds back into Uncle Nearest.[22] However, the Company's Senior Vice President of Finance and Planning advised that a direct sale would trigger approximately $9.5 million in capital gains

---

[15] Exhibit 1, ¶ 13.
[16] Exhibit 1, ¶ 13.
[17] Exhibit 1, ¶ 13.
[18] Exhibit 1, ¶ 13.
[19] Exhibit 1, ¶ 13.
[20] Exhibit 1, ¶ 14.
[21] Exhibit 1, ¶ 14.
[22] Exhibit 1, ¶ 15.

tax liability in the following tax year.[23] Because the entire purpose of the transaction was to reinvest all proceeds into Uncle Nearest, that tax liability would have materially reduced the net benefit of the capital infusion.[24]

19.     To prevent that unnecessary tax consequence—and solely for that purpose—the transaction was structured as convertible notes with financing from a third-party private equity investor.[25] The notes, totaling $20 million, required no interim payments, accrued interest would convert into equity, and upon conversion an equivalent number of Ms. Weaver's personal shares of stock would be extinguished so that no other shareholder would be diluted.[26]

20.     The financing was documented through written board approval, written shareholder consent, a note purchase agreement, two convertible promissory notes dated February 4 and February 28, 2025 (the "Convertible Notes"), and a related side letter.[27]

21.     In order to facilitate the transaction, a new Uncle Nearest Business Money Market account (Account No. ***873) was opened solely to receive the capital proceeds.[28] The account had no prior activity and a zero opening balance.

22.     The February 2025 statement for acct. ***873  reflects two $10,000,000 deposits and accrued interest, reflecting receipt of the proceeds of the Convertible Notes.[29]

23.     During active forbearance negotiations with Farm Credit, a Grant Sidney account (Account No. ***881) was opened to facilitate temporary routing of funds to ensure operational continuity.[30] Transfers from the Uncle Nearest MMA account (***873) to the Grant Sidney

---

[23] Exhibit 1, ¶ 15.
[24] Exhibit 1, ¶ 15.
[25] Exhibit 1, ¶ 16.
[26] Exhibit 1, ¶ 16.
[27] Weaver Exs. 15-18.
[28] Exhibit 1, ¶ 24.
[29] Exhibit 1, ¶ 23.
[30] Exhibit 1, ¶ 24.

account (***881) occurred in February 2025.[31] The Grant Sidney account statements for acct. ***881 for February 2025 reflect corresponding credits.[32]

24.     Over the following few months, transfers (inclusive of wire fees) were made from the Grant Sidney Account (**881) for the benefit of the Uncle Nearest Entities.

25.     The structure of the funding through the Grant Sidney account was known to and approved by Farm Credit. As part of and in conjunction with Amendment 8 (Forbearance Agreement) to the Farm Credit Credit Agreement, Farm Credit required an executed Subordinated Credit Agreement that included a Schedule 1.1 specifically listing each end every disbursement made by Grant Sidney through Account No. ***881.[33] A reconciliation of the actual disbursements from Grant Sidney Account No. ***881 and the disbursements listed on Schedule 1.1 of the Subordinated Credit Agreement shows the exact correlation.[34] This shows that Farm Credit was fully aware of and consented to the transaction being made through Grant Sidney.

26.     The Grant Sidney Bank Acct. **881 reflects approximately $20 million in total credits and approximately $20 million in total debits.[35]

27.     Disbursements from the Grant Sidney Account No. ***881 in furtherance of the funding include payments to Uncle Nearest operating accounts, payroll vendors, packaging vendors, and other vendor obligations. Certain transfers were deposited into the Uncle Nearest operating account—an account subject to Farm Credit's monitoring and full visibility—and from that account Uncle Nearest directly executed the barrel purchase transactions.[36]

---

[31] Exhibit 1, ¶ 24.
[32] Exhibit 1, ¶ 24.
[33] Dkt. 1, Ex. 9 (Forbearance Agreement), p. 56-57.
[34] Exhibit 1, Ex. I.
[35] Exhibit 1, ¶ 26.
[36] Exhibit 1, ¶ 28.

28.     On April 15, 2025, Uncle Nearest and Farm Credit entered into a Forbearance Agreement. On that same date, Farm Credit, Uncle Nearest, and Grant Sidney executed a Subordinated Credit Agreement, drafted by Farm Credit, which identifies Grant Sidney as "Lender." Schedule 1.1 to that agreement acknowledges funding totaling $20,026,270.00 during the February–April 2025 period and corresponds to the transfers reflected in the Grant Sidney account statements, as reflected in **Exhibit 2**. All underlying bank statements, wire confirmations, and transaction records relating to those transfers were provided to Farm Credit in April 2025.

29.     There were no transactions between Grant Sidney and Uncle Nearest prior to February 2025 or after April 2025.[37]

30.     Grant Sidney has never operated as an active operating company.[38] It is a passive holding and investment entity.[39] Consistent with that structure, it has not maintained a standing operating bank account.[40] Instead, when a discrete investment transaction has been made, a bank account has been opened for that limited purpose and thereafter closed or left dormant once the transaction concluded.[41]

31.     Since the founding of Uncle Nearest, Grant Sidney has had only three bank account relationships.

32.     The first was the CalPrivate account (No. ***881) opened in February 2025 and used solely for the temporary routing of the capital infusion described above.[42] It was not used before February 2025 and was not used after the transaction period.[43]

---

[37] Exhibit 1, ¶ 30.
[38] Exhibit 1, ¶ 31.
[39] Exhibit 1, ¶ 31.
[40] Exhibit 1, ¶ 31.
[41] Exhibit 1, ¶ 31.
[42] Exhibit 1, ¶ 33.
[43] Exhibit 1, ¶ 33.

33.    The second was a First National Bank account (No. **7512) opened under the name Grant Sidney, Inc. dba Grant Sidney Publishing.[44] The account reflects no deposits, no withdrawals, and no activity. The balance remained at $0.00.[45] The account was opened but never funded or used.[46] Until referenced by the Receiver in his recent pleadings, Ms. Weaver had forgotten the account ever existed.[47]

34.    The third was a First National Bank account (No. **6168) opened solely to facilitate an investment in LS Cream Liqueur.[48] The January 2021 statement reflects a deposit followed by an immediate $150,000 outgoing wire for that investment.[49] The full email chain reflects that funds owed personally to Ms. Weaver were deposited into her personal account and then transferred into Grant Sidney so that the investment could be executed.[50] The account thereafter remained largely dormant with a nominal balance.[51] Until referenced by the Receiver in his recent pleadings, Ms. Weaver had forgotten the account ever existed.[52]

35.    Grant Sidney has functioned solely as a passive holding and investment entity.[53] It has had no employees, no payroll, no vendor accounts, and no recurring operating expenses.[54]

36.    Accordingly, it has not maintained an operating accounting system such as QuickBooks for payroll, accounts payable, or accounts receivable, as there has been no operational activity requiring such a system.[55]

---

[44] Exhibit 1, ¶ 34.
[45] Exhibit 1, ¶ 34.
[46] Exhibit 1, ¶ 34.
[47] Exhibit 1, ¶ 34.
[48] Exhibit 1, ¶ 35.
[49] Exhibit 1, ¶ 35.
[50] Exhibit 1, ¶ 35.
[51] Exhibit 1, ¶ 35.
[52] Exhibit 1, ¶ 35.
[53] Exhibit 1, ¶ 40.
[54] Exhibit 1, ¶ 40.
[55] Exhibit 1, ¶ 41.

37. Grant Sidney's financial activity has consisted of capital contributions, discrete investment transactions, and tax reporting related to those investments.[56] Its investments are primarily illiquid equity interests that have not generated dividend distributions.[57] Its accounting records reflect tracking of those investments and the preparation of separate federal and state tax filings.[58]

38. The absence of an operating QuickBooks file is consistent with the absence of operational activity and does not reflect the absence of corporate records.[59]

39. The bank statements, wire confirmations, financing documents, and related transaction records described above were provided to Farm Credit in April 2025.[60] Those records fully reflected the flow of funds from receipt of the capital infusion through final disbursement.[61]

40. At no point prior to filing the Motion to Clarify did the Receiver request additional clarification, supporting documentation, or explanation regarding the structure of the February–April 2025 capital infusion, the purpose of the temporary Grant Sidney account, the LS Cream Liqueur transaction, or Grant Sidney's banking and accounting practices.[62] Had such clarification been requested, the records and explanations set forth in this Supplemental and Amended Response would have been provided in the ordinary course.[63]

41. The transactions characterized by the Movants as evidence of "commingling" or "single enterprise" are fully traceable through the documentary record and reflect discrete, documented transfers made for the benefit of Uncle Nearest.

---

[56] Exhibit 1, ¶ 42.
[57] Exhibit 1, ¶ 43.
[58] Exhibit 1, ¶ 44.
[59] Exhibit 1, ¶ 53.
[60] Exhibit 1, ¶ 54.
[61] Exhibit 1, ¶ 57.
[62] Exhibit 1, ¶ 57.
[63] Exhibit 1, ¶ 58.

## ARGUMENT

42.     In this diversity action, the law of Tennessee is applicable.[64] The Movants seeking to include the Non-Parties in the receivership have the burden of proving entitlement to that relief.[65]

43.     As the Court noted in its September 30 Order, "[c]ourts have broad power and wide discretion to oversee the administration of a receivership."[66] Further, the Court has the power to expand a receivership where the expansion is necessary to effectively safeguard assets of the receivership.[67] It is noteworthy that the vast majority of federal cases dealing with federal equity receiverships arise in securities fraud cases instituted by the SEC or other consumer fraud contexts. In the context of diversity jurisdiction, the courts have found that "[a] receiver is an extraordinary equitable remedy that is only justified in extreme situations."[68]

44.     The cases addressing this issue indicate that expansion of a receivership estate should be done only "with utmost caution and justified only where there is a necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties."[69] Where the requested

---

[64] "Federal diversity jurisdiction provides an alternative forum for the adjudication of state-created rights, but it does not carry with it generation of rules of substantive law." *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 426-27, 116 S. Ct. 2211, 135 L. Ed. 2d 659 (1996). "Under the Erie doctrine, federal courts sitting in diversity apply state substantive law and federal procedural law." *Id.* at 427; *see also Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013) ("In diversity cases, a federal court must rely upon the substantive law of the forum state.").

[65] *See Taylor Steel, Inc. v. Keeton*, 417 F.3d 598, 607 (6th Cir. 2005)(holding that party seeking to pierce corporate veil bears the burden of proof); *Oceanics Schools, Inc. v. Barbour*, 112 S.W.3d 135, 140 (Tenn. Ct. App. 2003)( "The party wishing to pierce the corporate veil has the burden of presenting facts demonstrating that it is entitled to this equitable relief.")(citing *Schlater v. Haynie*, 833 S.W.2d 919, 925 (Tenn. Ct. App. 1991)).

[66] *Consumer Fin. Prot. v. Strafs, LLC*, No. 24-CV-40-EAW-MJR, 2025 U.S. Dist. LEXIS 98061, at *28 (W.D.N.Y. May 22, 2025)

[67] *See id.*

[68] *See, e.g.*, *Rochester MSA Bldg. Co. v. UMB Bank, N.A.*, 2022 U.S. Dist. LEXIS 6184, at *17 (D. Minn. 2022)(*quoting Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993)).

[69] *CCUR Aviation Fin., LLC v. S. Aviation, Inc.*, No. 21-cv-60462-BLOOM/Valle, 2021 U.S. Dist. LEXIS 83769, *5 (S.D. Fla. May 3, 2021)(*quoting SEC v. Complete Bus. Sols. Grp.*, 2020 U.S. Dist. LEXIS 253062, at *2 (D, Nev. 1985).).

expansion of a receivership is to bring in another company based on the doctrine of alter ego, the Court "must find that the party was an actor in the course of conduct constituting the abuse of corporate privilege – . . . [the court] may not apply the doctrine to prejudice an innocent third party."[70]

45.     In analyzing the viability, or lack thereof, of the alter ego claims, in addition to applying federal law factors, the Court should also look to applicable state law requirements relating to alter ego.[71] Since the instant case is based on diversity jurisdiction, not federal question jurisdiction, and the claim at issue here is a simple breach of contract claim, not a securities fraud claim, the Court should look to state law in determining the alter ego question. Furthermore, since the receivership is merely procedural mechanism, not a form of relief, and since Grant Sidney has no existing obligations to Farm Credit, Farm Credit would ultimately have to prove alter ego status under Tennessee law in order to actually make Grant Sidney liable for any debts owed by Uncle Nearest to Farm Credit. Consequently, even if federal law still controls the question of expansion of the receivership, a relevant factor for the Court to consider within the federal standards is whether Farm Credit has a reasonable likelihood of maintaining a claim for alter ego under state law based on the facts presently before the Court.

46.     In applying the federal factors first, as set forth in the Court's September 30 Order, neither the Receiver nor Farm Credit has identified any specific assets of the receivership that are to be protected with respect to Grant Sidney. So, out of the gate, the Movants' effort to expand the receivership to include Grant Sidney must fail because the expansion of the receivership is not necessary "to safeguard assets and prevent their dissipation." Further, Farm Credit has not established that Grant Sidney was funded by proceeds of some fraudulent scheme perpetrated by

---

[70] *SEC v. Elmas Trading Corp.*, 620 F. Supp. 231, 233 (D. Nev. 1985).

[71] *See id.*

Uncle Nearest or any other bad actor, as is sometimes used to justify expanding receiverships to non-parties in cases where the public at large has been defrauded, such as in securities fraud actions and consumer fraud cases.[72] This receivership is based on a breach of contract claim, not a fraud claim.

47.     The Movants' effort also fails because they can't meet the bare requirements that would be relevant to a determination that Grant Sidney should have a receiver appointed. This Motion to Clarify and the Statement by Farm Credit go far beyond what is simply an effort to protect assets that are property of the receivership from dissipation—this is an effort to wrest control over Grant Sidney based on mere allegations of potential facts and on factors significantly less rigorous than the very factors that the Court required to be considered in appointing the Receiver over Uncle Nearest in the first place. While Uncle Nearest had pledged its assets to secure the debt to Farm Credit, Grant Sidney is not liable on any debts to Farm Credit and has not pledged any of its assets to secure debts owed to Farm Credit. Grant Sidney is not a party to the Loan Documents and it has not defaulted on any obligations to Farm Credit. Grant Sidney should have at least an equivalent right to the same analysis and burden of proof for divesting its board of control over the business as Uncle Nearest's board had in its defense of the initial Receivership Motion.

48.     In the deciding the Receivership Motion, this Court noted multiple factors used by courts in the Sixth Circuit:

> (1) Whether the property at issue is in imminent danger of being lost, concealed, injured, diminished in value, or squandered;
>
> (2) Whether the Defendants have engaged in fraudulent conduct;
>
> (3) Whether legal remedies are inadequate;

---

[72] *See, e.g., SEC v. Elmas Trading Corp.*, 620 F. Supp. 231, 233 (D. Nev. 1985).

(4) Whether less drastic equitable remedies are available;

(5) The likelihood that the appointment of a receiver would do more good than harm;

(6) Whether there is inadequate security for the debts; and

(7) Whether the debtor is insolvent.[73]

49. Even if all of the allegations in the Motion to Clarify, Farm Credit's Statement, and the Receiver's other filings were assumed factually correct (they are not), those allegations still fail to establish the factors necessary for the appointment of a receiver with respect to Grant Sidney. The Movants have not identified any specific "property at issue" held by Grant Sidney in which the Receivership Estate has an interest, much less made any showing that such property is in imminent danger of being diminished. The Movants have made no showing that Grant Sidney has engaged in fraudulent conduct. Farm Credit has no legal or equitable remedies to assert against Grant Sidney because Grant Sidney is not obligated on any of the Farm Credit Loans, so there is no basis to say the legal remedies are inadequate or that less drastic equitable remedies are not available or even justified.

50. Expansion of the Receivership to control Grant Sidney would do more harm than good. The disruption to its operations, which includes investments and projects in process, that would result from being placed under receivership would cause significant financial damages similar to the financial losses to the Uncle Nearest entities that have been caused by the receivership, as recognized by the Receiver. Furthermore, placing this entity in receivership and saddling the company with the expenses of the Receiver and his multitude of professionals would cause a significant increase in expenses for the company and the negative publicity that would impact its business and investments. Further, such action would ultimately not benefit the

---

[73] Dkt. 32, at 4 (citing *Pension Benefit Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414 (6th Cir. 2015)).

receivership estate at all because there is no proof that would support a finding of alter ego status in any final judgment. Thus, the known actual harm to the company of placing it in receivership would significantly outweigh any prospective unknown, likely unrealizable, potential benefit of putting the company into receivership.

51.     Since Grant Sidney is not obligated on the Farm Credit Loans and holds no collateral securing those Loans, the question of the adequacy of Farm Credit's security has no relevance.

52.     Finally, Farm Credit has not alleged, and has certainly not provided, any evidence that Grant Sidney is insolvent or has been funded by assets of the Corporate Defendants. In sum, with respect to Grant Sidney, the Movants cannot prove a single one of the same factors with respect to Grant Sidney that this Court weighed in determining that Uncle Nearest should be under receivership control.

53.     Since the Movants are disguising a general piercing of the corporate veil argument in the form of expansion of the receivership without identifying a single asset held by the Grant Sidney that is collateral to Farm Credit or that belongs to the Receivership Estate, the effort should be dismissed out of hand as inappropriate. At a minimum, the Movants should be required in this diversity action to meet the standard for piercing the corporate veil under state law.[74]

54.     The Sixth Circuit has held that "[u]nder the long-standing *Erie* doctrine, in actions brought in federal court invoking diversity jurisdiction, a court must apply the same substantive law as would have been applied if the action had been brought in a state court of the jurisdiction where the federal court is located."[75] "When the success of a state law claim brought in federal

---

[74] *See SEC v. Elmas Trading Corp.*, 620 F. Supp. 231, 233 (D. Nev. 1985).
[75] *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007)(citing *Equitable Life Assurance Soc'y of the U.S. v. Poe*, 143 F.3d 1013, 1016 (6th Cir. 1998)).

court under diversity jurisdiction is dependent on piercing the corporate veil, this question of substantive law is governed by the law of the state in which the federal court sits.[76] Since this Court sits in Tennessee, Tennessee law is applicable with respect to the question of piercing the corporate veil and alter ego analysis.

55. Earlier this year, in *Youree v. Recovery House of E. Tenn., LLC*,[77] the Tennessee Supreme Court comprehensively addressed the state of the law in Tennessee regarding "alter ego" claims and piercing the corporate veil. First, the court noted that the term "alter ego" was simply a "rhetorical device or picturesque term" that only confuses the fact that what is actually sought is piercing of the corporate veil.[78] The court also recognized that corporate separateness is presumed and that Tennessee courts give substantial weight to that presumption.[79]

56. The court then confirmed the three elements, first articulated in *Continental Bankers Life Insurance Co. of the South v. Bank of Alamo*,[80] that have to be proved in order to pierce a corporate veil as follows:

(1) Control over the entity, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the entity, as to that transaction, had no separate mind, will, or existence of its own;

(2) The control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or to commit a dishonest and unjust act in contravention of a third party's rights; and

(3) The control and fraud, wrong, violation, or injustice must have proximately caused the injury or unjust loss complained of.[81]

---

[76] *Id.*
[77] 705 S.W.3d 193, 206-12 (Tenn. 2025).
[78] *Id.* at 208.
[79] *Id.* at 207.
[80] 578 S.W.2d 625 (Tenn. 1979).
[81] *Id.* at 637.

57.     The *Youree* court further found that certain factors outlined in *Federal Deposit Ins.*

*Corp. v. Allen*,[82]

> have their place in the analysis . . . [but] do not constitute a separate test.  They are merely a list of circumstances that often may be relevant to the existence of one or more of the three *Continental Bankers* elements.  Thus, the eleven circumstances listed in *Allen*, or any other relevant circumstance, may be used in determining whether the three required elements from *Continental Bankers* have been established.[83]

The *Allen* factors are as follows:

> Factors to be considered in determining whether to disregard the corporate veil include not only whether the entity has been used to work a fraud or injustice in contravention of public policy, but also: (1) whether there was a failure to collect paid in capital; (2) whether the corporation was grossly undercapitalized; (3) the non-issuance of stock certificates; (4) the sole ownership of stock by one individual; (5) the use of the same office or business location; (6) the employment of the same employees or attorneys; (7) the use of the corporation as an instrumentality or business conduit for an individual or another corporation; (8) the diversion of corporate assets by or to a stockholder or other entity to the detriment of creditors, or the manipulation of assets and liabilities in another; (9) the use of the corporation as a subterfuge in illegal transactions; (10) the formation and use of the corporation to transfer to it the existing liability of another person or entity; and (11) the failure to maintain arm's-length relationships among related entities.[84]

The *Youree* court then further cautioned

> that checking items off a list is not a substitute for a purposive analysis of whether the *Continental Bankers* elements have been established.  Regardless of the specific circumstances at issue, they must demonstrate all three elements of control, wrongdoing, and causation.[85]

58.     Since the Motion before the Court is not predicated on protecting any specific assets of the Receivership, it should be treated as simply a claim to pierce the corporate veil and should be granted or denied based on whether Farm Credit can carry its burden to prove that such Grant Sidney is an alter ego of Uncle Nearest under Tennessee law.

---

[82] 584 F. Supp. 386 (E.D. Tenn. 1984).
[83] *Youree*, 705 S.W.3d at 211.
[84] *Id.* at 210 (*quoting Allen*, 584 F. Supp. at 397).
[85] *Id.* at 212.

59.     As the Tennessee Supreme Court recently pronounced, the factors relevant to determining whether to pierce the corporate veil are those factors originally set forth in the *Continental Bankers* case.  Neither the Receiver's Motion to Clarify nor Farm Credit's Statement address in any meaningful way this applicable standard with respect to Grant Sidney.

60.     As to the first *Continental Bankers* element—"[c]ontrol over the entity, not only of finances, but of policy and business practice in respect to the transaction under attack, so that the entity, as to that transaction, had no separate mind, will, or existence of its own"— the only transactions at issue have been explained and do not show that Grant Sidney exercised control over the finances, policy, or business practices of any of the Uncle Nearest Defendants. The transactions were in accord with the terms of the subordinated financing that Farm Credit had specifically agreed to and acknowledged. Further, the payments were made to Uncle Nearest and its vendors and subsidiaries at the express direction of Uncle Nearest's CEO and did not pertain to any funds other those included in the Financing Documents and referenced in the Subordinated Loan Agreement that Farm Credit required.

61.     As to the second *Continental Bankers* element—"The control must have been used to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or to commit a dishonest and unjust act in contravention of a third party's rights"— the Movants have not submitted any evidence that Grant Sidney controlled Uncle Nearest in order to commit fraud or wrong, perpetuate the violation of a statutory or positive legal duty, or to commit a dishonest and unjust act in contravention of a third party's rights.  As noted, Farm Credit was fully aware of the not only the loaned funds, but also the specific transactions that are reflected in the Grant Sidney Account bank statements.

62.     As to the third *Continental Bankers* element—"The control and fraud, wrong, violation, or injustice must have proximately caused the injury or unjust loss complained of"— since Farm Credit has failed to even establish facts sufficient to satisfy the first two elements, it is impossible for Farm Credit and the Receiver to prove that the first two elements were the proximate cause of any injury or unjust loss to Farm Credit or any other creditor. Certainly, none of the transactions in question have any bearing on the claims asserted by Farm Credit in its Complaint. There is no proximate causation. To the contrary, the transactions show that Grant Sidney was actually seeking to provide the funding of which a significant portion was ultimately paid to Farm Credit.

63.     In sum, application of the *Continental Bankers* factors to Grant Sidney shows that the Movants have not met, and cannot meet, their burden of proof. Overall, the record does not support expansion of the receivership to include Grant Sidney:

   a.   Grant Sidney is a separate California corporation formed in 2013—three years before Uncle Nearest was created;

   b.   It maintains its own corporate governance, bylaws, Employer Identification Number, and separate federal and state tax filings. These undisputed facts weigh heavily against any finding of alter ego or single enterprise;

   c.   Grant Sidney has functioned as a passive holding and investment entity. It has had no employees, no payroll, no recurring vendor obligations, and no operating revenues. Its banking history reflects only discrete, transaction-specific accounts opened for limited purposes and thereafter closed or left dormant. There is no evidence of ongoing operational commingling;

19

d.  The February–April 2025 capital infusion was fully documented, approved in writing by the Uncle Nearest Board of Directors and its largest shareholders, and disclosed to Farm Credit in April 2025. The banking records reflect a fully traceable flow of funds from receipt into the Uncle Nearest money market account, to temporary routing through the Grant Sidney account, and finally to Uncle Nearest operating accounts and vendors;

e.  The Grant Sidney Account No. ***881 reflects approximately $20.026 million in total credits and approximately $20.026 million in total debits. The Subordinated Credit Agreement drafted by Farm Credit acknowledges funding from Grant Sidney to totaling $20,026,270.00 during the relevant period. No funds—principal or accrued interest—were retained by Grant Sidney, by Ms. Weaver, or by any non–Uncle Nearest entity;

f.  The mere fact that funds temporarily passed through a Grant Sidney account during active forbearance negotiations does not establish commingling, misuse of corporate form, or alter ego status—particularly where the funds were fully traceable, fully documented, and fully exhausted for the benefit of Uncle Nearest;

g.  There is no allegation or evidence that Grant Sidney was undercapitalized, used to perpetrate fraud, or used to evade existing obligations. Nor is there evidence of ongoing intercompany transactions outside the discrete February–April 2025 financing window; and

h.  Farm Credit itself executed a Subordinated Credit Agreement identifying Grant Sidney as "Lender" and acknowledging the funded amounts.[86] This treatment is inconsistent with any assertion that Grant Sidney lacked separate legal existence.

64.  In short, the record reflects corporate separateness, adherence to formalities, absence of operational commingling, and full reconciliation of the transaction at issue. The Movants have not met their burden to justify disregarding Grant Sidney's corporate form or expanding the receivership to include it.

WHEREFORE, Grant Sidney, Inc. respectfully requests that the Court decline to expand the receivership to include Grant Sidney or its assets and grant such other and further relief as is appropriate.

Respectfully submitted,

**MANIER & HEROD, P.C.**

/s/ Michael E. Collins

Michael E. Collins      (TN Bar No. 16036)
S. Marc Buchman      (TN Bar No. 41598)
1201 Demonbreun Street, Suite 900
Nashville, TN 37203
Telephone: 615-244-0030
mcollins@manierherod.com
mbuchman@manierherod.com

*Counsel for Grant Sidney, Inc.*

---

[86] Dkt 1, Ex. 9.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on February 26, 2026, the foregoing document was served on all parties registered to receive electronic notice via the Court's CM/ECF system.

*/s/ Michael E. Collins*
_____
Michael E. Collins