**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TENNESSEE**

| | | |
|---|---|---|
| **FARM CREDIT MID-AMERICA, PCA,** | ) | |
| | ) | |
| Plaintiff, | ) | **Case No. 4:25-cv-38** |
| | ) | |
| v. | ) | **Judge Atchley** |
| | ) | |
| **UNCLE NEAREST, INC., et al.,** | ) | **Magistrate Judge Steger** |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MOVANTS' POST-HEARING RESPONSE IN SUPPORT OF EMERGENCY MOTION TO RECONSIDER THE MEMORANDUM OPINION AND ORDER [DKT. 32] AND ORDER APPOINTING RECEIVER [DKT. 39]

Grant Sidney, Inc. ("Grant Sidney") and Fawn Weaver and Keith Weaver (collectively, the "Founders," and collectively with Grant Sidney, the "Movants"), by and through their undersigned counsel, hereby submit this Post-Hearing Response relating to the *Emergency Motion to Reconsider the Memorandum Opinion and Order [Dkt. 32] and Order Appointing Receiver [Dkt. 39] and to Stay Access to Proprietary Information* (the "Motion to Reconsider")[1] and the hearing held on February 9, 2026 (the "Hearing"). This Response addresses the post-Hearing briefs submitted by the Receiver and Farm Credit (collectively, the "Post-Hearing Briefs").

*Response to the Receiver's Post-Hearing Brief*

With respect to the Receiver's Post-Hearing Brief, the Receiver insists that he is performing the role instructed by the Court. The Movants have not taken the position that the Receiver has acted outside his authority because the scope of a Receiver's authority under the Receivership Order is so broad, it would be almost impossible for him to exceed that authority.

---

[1] Dkt. 91.

The question is not whether the Receiver has acted outside of that authority but, rather, whether the decisions made by the Receiver within that authority and the impact of the Receivership itself weigh in favor of termination of the Receivership. The notions that the Receiver has acted in accordance with the Receivership Order and that his actions and the Receivership itself are harming the Company are not mutually exclusive notions. Both can be, and in these circumstances are, true.

The evidence presented at the Hearing, including sales data and testimony from the Company's personnel and distributors, demonstrates that the operational constraints imposed during the Receivership have materially impacted the Company's ability to execute its sales and marketing strategy.

The Receiver cites the testimony of Kate Jerkens regarding the delays in obtaining approvals for sales and marketing campaigns necessary to maintain sales during the key October-November-December quarter. While the Receiver has indicated that the "vast majority of decisions are made rather quickly,"[2] that is not consistent with the testimony of Ms. Jerkens, who testified that:

> One of the biggest things that's changed for me is just timing, right? It's the ability to have an idea, to ask for something, and to be able to execute it in a timely manner. And unfortunately right now, I now have layers that I have not had prior. So I would say, like, just the ability to execute in a timely manner has been the biggest change.[3]

The Receiver characterizes Ms. Jerkens testimony as supporting his assertion that he has provided the support necessary to market and sell the Company's products, but this is not true. The Receiver ignores the caveat underlying Ms. Jerkens testimony – that she is simply working within the constraints imposed by the Receiver and the Receivership. In other words, when she

---

[2] Receiver's Post-Hearing Brief, p.4.
[3] Tr. 113: 2-7.

testified as to what was being approved and the conversations that were occurring, those were all within the constraints that had already been imposed. For example, Ms. Jerkens stated:

> I think at the moment – so I'll just be perfectly honest. On a weekly basis, I will say that the people that I interact with are very cordial, great conversations, where we have very open and honest conversations about what is needed. **My conversations with them are about what our abilities are today. We don't get into the what-ifs of if we had something else because that's just not what we have.**

> So on -- during those calls, we are talking about we need 1884, which is one of our everyday SKUs. We need that now. We've now sold out in Florida and New Jersey. And then the conversation is, shoot, well, we also need to bottle this Toasted Single Barrel, which has been approved, and we've told our distributors they're getting it. We all as a group need to decide what's more important.[4]

Thus, her testimony was that, operating within the severe funding cutbacks and approvals required from Farm Credit, she is simply working within those existing delays and constraints. Her testimony was <u>not</u> that the Company has been allowed the resources and nimbleness to maintain the sales momentum that the Company had prior to Receivership. Similarly, her testimony regarding the timing of Limited Time Offerings ("LTOs") was made in the context of the in-place cuts and restrictions already made by the Receiver.

Ms. Jerkens also clarified during her testimony that her role does not include marketing for the Nearest Green Distillery itself. As she explained when discussing LTOs:

> And so this is — I want to just also just level-set that our LTOs are in conjunction with our distillery. And so one of the greatest ways — and I do not — just for the record, I do not do distillery marketing."[5]

The LTO releases originate at Nearest Green Distillery, whose marketing and release strategy is overseen by Brielle Caruso, Chief Marketing Officer of the distillery. During the early months of the Receivership, communications with the Receiver and his advisors regarding the timing and

---

[4] Tr. 120: 7-20 (emphasis added).
[5] Tr. 117: 1-4.

approval of those LTO releases were conducted primarily by Ms. Caruso and Fawn Weaver. By the time the timing of market releases was communicated to Ms. Jerkens and the Uncle Nearest sales team, the schedule had already been determined through those earlier discussions with the Receiver's team. Ms. Jerkens' testimony therefore reflects the operational constraints imposed after those decisions had been made, rather than the communications that occurred directly with the Receiver regarding the timing of those LTO releases.

Ms. Jerkens acknowledgment that, where the budget cuts had already been made and decision-making delays were already baked into the new process, the decision to delay LTOs was inevitable is not the same as testimony that the LTOs would have been delayed had the Receivership never been in place.

With respect to the Receiver's assertions regarding out-of-stock conditions and the alleged shipping hold by Tennessee Distilling Group ("TDG"), the record reflects a materially different situation than the one described in the Receiver's filings. At the time the Receivership began, the Company was out of stock in only one limited market, and even there only with respect to a portion of the state served by a distributor with whom the Company was already in active negotiations to terminate its relationship. Outside of that limited market, there were no out-of-stock conditions when the Receiver assumed control. The broader supply disruptions referenced by the Receiver did not arise until after the Receivership began and were tied to a change in terms imposed by the Company's bottling partner, Tennessee Distilling Group ("TDG"), following the Receiver's initial communications with that partner.

Prior to the Receivership, the Company had an established arrangement with its bottling partner under which TDG continued bottling and shipping product while the Company paid federal excise taxes at the time of shipment and reduced legacy balances over time. Following the

Receiver's communications with TDG immediately after the Receivership began, those longstanding terms were no longer honored. As a result, shipments that had previously flowed under the existing arrangement were halted until new payment terms were satisfied. Accordingly, the out-of-stock conditions cited by the Receiver were not the result of operational incapacity existing prior to the Receivership but rather the consequence of changes to the Company's supplier relationship that occurred after the Receiver assumed control.

With respect to the testimony of David Ozgo, the Receiver completely mischaracterizes his testimony as it pertains to the Nielsen data and companies facing litigation. The Receiver states that "Mr. Ozgo could not recall what impact litigation had on the Nielsen data for Patrón Tequila."[6] However, Mr. Ozgo actually testified as follows:

> Q       Have you ever analyzed Nielsen data with a company that's in receivership?
>
> A       No, I have not.
>
> Q       What about that's in litigation?
>
> A       You know, there were -- yes. Patrón Tequila was in litigation for a long, long time over some ownership question. We oftentimes looked at Patrón data. And so, yes, I have.
>
> Q       And you saw a downward trend with that data too?
>
> A       That's not actually what I recall. Patrón was up and down. You know, I don't remember any particular downward trend.[7]

Thus, Mr. Ozgo did, in fact, recall examining the Nielsen data for Patrón Tequila while it was engaged in litigation and did not recall any sustained downward trend for that entity. Indeed, the public record reflects that during the period of litigation Mr. Ozgo references, the Patrón brand

---

[6] Receiver's Post-Hearing Brief, p.9.
[7] Tr. 180: 2-12.

continued to grow and was ultimately sold to Bacardi, which already held a 30% stake in Patron,[8] in 2018 for approximately $5.1 billion.[9] Since the acquisition was only for the remaining 70% of the brand (implying an overall sales price of $7.285 billion, and considering the estimate of $675 million of Patron annual sales,[10] the applicable multiple was approximately 10.8x). Clearly, a decline in sales for a company in litigation is not inevitable, as the Receiver apparently believes.

The Receiver also asserts that the decline in sales is not evidence that the Receiver is not doing his job. That may be true, but it does evidence that the Receiver is either doing his job poorly or the Receivership itself is causing the poor performance. In either event, termination of the Receivership in order to allow this Company a chance to recover the lost value for the benefit of all creditors is warranted.

### *Response to Farm Credit's Post-Hearing Brief*

With respect to Farm Credit's brief, Farm Credit's initial assertion that the balance sheet standard for solvency does not contemplate valuation of assets based on market multiples is incorrect. The balance sheet standard is whether the assets of the company at fair value exceed the total debt of the Company. Valuing assets at "fair value" contemplates valuation as a going concern where a company has an expectation of continuing to operate, as is the case here.

> A commercial enterprise is a going concern if it is actively engaged in business with the expectation of indefinite continuance. *In re Payless Cashways, Inc.*, 290 B.R. 689, 702 (Bankr. W.D. Mo. 2003) (citing Black's Dictionary 278 (1996 ed.)); *see also In re Enron Corp.*, 2005 Bankr. LEXIS 3261, 2005 WL 6237551, at *25 (Bankr. S.D. Tex.) (citing *Payless*); *In re Commercial Financial Services, Inc.*, 350 B.R. 520, 544 (Bankr. N.D. Okla. 2005) (citing *Payless*).

---

[8] Bacardi Completes Acquisition of Patron (April 30, 2018), https://www.bacardilimited.com/media/news-archive/bacardi-completes-acquisition-patron/.

[9] Bacardi to buy out Patron tequila in $5.1 billion deal (January 23, 2018), https://finance.yahoo.com/news/bacardi-buy-high-end-tequila-maker-patron-5-024856157--finance.html; Why Patron Sold to Bacardi for $5.1 Billion Dollars (January 25, 2018), https://www.texasmonthly.com/the-culture/patron-sold-bacardi-5-1-billion-dollars/.

[10] Id.

The going concern threshold is very low; a debtor may be financially unstable, but it is still a going concern as long as the amount it could realize from converting its assets to cash in the ordinary course of business exceeds the expenses of conducting business. *Heilig-Meyers*, 319 B.R. at 457; *see also Mama D'angelo*, 55 F.3d at 556 ("a business need not be thriving to receive a going concern value"). In other words, unless the business is "on its deathbed," a going concern valuation likely is appropriate. *See, e.g, In re Taxman Clothing Co.*, 905 F.2d 166, 170 (7th Cir. 1970) ("We grant that going-concern value is not the proper standard if the business is 'on its deathbed.'"); *In re HDD Rotary Sales, LLC*, 499 B.R. 542, 551 (Bankr. S.D. Texas 2013) (same); *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1067 (3d Cir. 1992) (same); *In re Hoffinger Indus., Inc.* 313 B.R. 812, 818 (Bankr. E.D. Ark. 2004) (same).[11]

Accordingly, a valuation based on a market multiple of sales, which even the Receiver has recognized as the appropriate valuation approach, is appropriate in this case.

Farm Credit's analysis of the total debts includes disputed debts and includes the Advanced Spirits debt which is offset by the Advanced Spirit barrels.[12] Consequently, the total debt is significantly less than that asserted by Farm Credit.

Farm Credit's recitation of recent market transactions is also inaccurate and does not factor in the assumption of liabilities in addition to the purchase price in assessing value. For example, Kirin Holdings sale of Four Roses was not a sale of the "brand" as alleged by Farm Credit but was a sale of 100% of the membership interests in Four Roses Distillery, LLC.[13] In other words, this was not a sale of assets but a sale of equity. In a sale of assets, the acquirer takes the assets free and clear of the debts and therefore pays a higher dollar consideration. When equity is purchased, the buyer takes the equity subject to the debts of the company being acquired and, therefore, discounts the total consideration to account for the debt. In the Four Roses sale of its equity membership interests, the purchaser, E.J. Gallo, took the equity of Four Roses apparently subject

---

[11] *In re Quick Cash, Inc.*, 620 B.R. 358, 363-364 (Bankr. D.N.M. 2020).
[12] Tr. 55: 4-20.
[13] Notice Regarding the Execution of a Sale and Purchase Agreement for Four Roses (Feb. 6, 2026), https://www.kirinholdings.com/en/newsroom/release/2026/0206_01.pdf.

to the debts of Four Roses Distillery, LLC in addition to the purchase price. Consequently, it is impossible to determine an implied multiple without knowing the debts that were assumed as part of the transaction. Accordingly, Farm Credit's fabrication of the "implied multiple" for that transaction without providing the underlying calculations is simply invalid.

Similarly, Farm Credit's recitation of "publicly traded multiples" doesn't have any applicability to the fair value solvency analysis. First, Farm Credit doesn't identify the multiple being applied. However, assuming that Farm Credit is referring to the Enterprise Value/Sales Ratio, the calculation of enterprise value for purposes of that ratio is completely different than the calculation of enterprise value in a sales transaction. The EV/Sales ratio is a financial ratio that is used to analyze whether a stock is over-valued or undervalued relative to the market.[14] It does not reflect what price a transaction for the target company would generate. The calculation of enterprise value for this financial ratio is the company's total market capitalization plus the total company debt less cash and cash equivalents.[15] This analysis does not account for market dynamics or any of the factors for sale value that the Receiver himself cited as impacting the appropriate multiple for a sale transaction.[16] Accordingly, Farm Credit's citation to publicly traded multiples should be disregarded. Rather, the range of multiples identified by the Receiver (2x – 15x)[17] and in Farm Credit's Exhibit 5 (12x – 24x)[18] should be relied upon as the appropriate ranges of the multiples that should be applicable to Uncle Nearest, with a multiple in the 12x range fitting within both of those ranges.

---

[14] What Is Enterprise Value-to-Sales (EV/Sales)? How to Calculate (March 2, 2026), https://www.investopedia.com/terms/e/enterprisevaluesales.asp.
[15] Id.
[16] Receiver Ex. A, ¶ 36.
[17] Id.
[18] Farm Credit Ex. 5, p.8.

Farm Credit's cash flow analysis continues to suffer from the same faulty analysis that plagued Farm Credit's advisor, Kevin Larin. The assertion that, but for the Receiver, Uncle Nearest would have been cash flow negative by $16 million over the period September 1, 2025, to January 18, 2026, is ludicrous. It is literally impossible to have a negative actual cash flow. A company can project a negative cash flow in the future, but it can't have actual negative cash flow. A company can only disburse the cash it has – if it doesn't have cash, it can't have disbursements.

With respect to the Receiver's Exhibit A-4, that exhibit bases the hypothetical negative cash flow on payments relating to non-current obligations. This is no different than adding the $108 million allegedly owed to Farm Credit as a negative cash flow item, which is an invalid way to approach a cash flow analysis. If a company's ability to meet its debts as they come due requires that company to have the cash immediately to completely pay off its long and short-term debt, then practically every company in America would be presumed insolvent.

The appropriate cash flow analysis for present purposes is whether the Company can operate in a cash flow neutral or better position. The evidence is clear that the Company has and can continue to operate in a cash flow positive manner once the Farm Credit funding is removed, and the payments to the Receiver ($2.3 million) and to Tennessee Distilling Group ($1.5 million) are added back. As explained in the Movant's Post-Hearing Brief and as supported by the evidence, the Company is, and is expected to remain operating cash flow positive by approximately $900,000 through April 2026.

Farm Credit's assertion that security for its debts is inadequate remains incorrect where the assets are considered at fair value, rather than forced liquidation value. With respect to the barrels, the borrowing base provides no evidence of value. The borrowing base related to the whiskey

remains based on acquisition cost[19] even though those barrels have aged for years and increased in value as they mature. In other words, the bulk of the barrels were produced for approximately $650 each so the borrowing base per barrel was set at $450.00 (i.e. 70% of $650.00) and has never changed even though those barrels have aged for years and increased in value. The assertion that the borrowing base calculation for these whiskey barrels that increase in value with age was set as an approximation of net orderly liquidation is simply false. **In fact, Farm Credit's financial advisor admitted that if the borrowing base were calculated and achievable at 100% of the barrel cost, then the value of the barrels would cover the loans**.[20] That is evidence that Farm Credit has adequate security.

Additionally, there is no evidence that the value of the assets is declining. The whiskey barrels continue to age and become more valuable over time. Additionally, the current glut of whiskey in the market is beginning to clear up as most distilleries have cut back new production such that the improvement in the overall market is inevitable as demand begins to catch up with supply.[21]

Farm Credit's assertion that there are no less drastic equitable remedies available is incorrect. First, Farm Credit ignores that, for more than 8 months after Farm Credit ceased providing capital to Uncle Nearest, the Company was able to continue to grow sales and had arrangements with its key vendors. As Farm Credit is well-aware, the Company had engaged multiple legal and financial advisors in order to address the issues that were created by the Company's prior CFO, and those efforts were progressing. The issues created by the former CFO were brought to the Receiver's attention by the Company's management immediately upon the

---

[19] Tr. 218: 8-9.
[20] Tr. 216: 20-24.
[21] Weaver Post-Hearing Brief, Ex. 1-H.

start of the Receivership – he didn't uncover it. The draft of the lawsuit against the Company's CFO was shared with the Receiver in his very first meeting with Ms. Weaver following his appointment, which she followed up with sharing in email form, along with the exhibits, only days later. The Company's management team had been working to resolve the issues through its engaged professionals literally until the day the Receiver was appointed. That effort stopped because the Receiver required it be stopped by advising all of the Company's advisors to stand down so that the Receiver's advisors could take over. Unfortunately, this has likely led to a significant amount of duplicated effort.

In sum, the Company's management team is well-positioned to take back over full operations and put the Company back on a growth trajectory, which will improve cash flow and improve the Company's enterprise value for the benefit of all of the creditors and shareholders.

Farm Credit's argument that its collateral is "in imminent danger of being lost, concealed, injured, diminished in value, or squandered" is not based in fact. As shown in **Exhibit 1**, the transactions between the Uncle Nearest Entities and the Non-Parties have resulted in a net $17 million positive received by the Uncle Nearest Entities. Contrary to Farm Credit's assertion, the transactions between the Uncle Nearest Entities and the Non-Parties have benefited Uncle Nearest and Farm Credit immensely. Those transactions do not evidence any concealment of assets or any risk to Farm Credit's collateral.

The assertion that Uncle Nearest engaged in fraudulent conduct relating to the MP-Tenn, LLC transaction is not correct. Although the transactions relating to the MP-Tenn, LLC convertible notes were complicated, the end result is that: (1) MP-Tenn, LLC loaned $20 million dollars to Uncle Nearest and Uncle Nearest received the full benefit of the $20 million loan; (2) the MP-Tenn, LLC loans did not impair in any way any of Farm Credit's collateral and did not prime any

of Farm Credit's liens; and (3) the funds were used exactly as contemplated by Farm Credit as set forth in the Schedule 1.1 to the Subordinated Credit Agreement. Farm Credit has no standing to assert that Uncle Nearest acted fraudulently with respect to MP-Tenn, LLC because it was not a party to that transaction and has no knowledge of the specific communications between Uncle Nearest and MP-Tenn, LLC relating to the transaction. MP-Tenn, LLC was fully aware that the convertible credit agreement was structured in lieu of a direct sale of Ms. Weaver's equity in order to avoid a tax liability to the Company, and that the intent of the transaction was for the loan to convert to equity rather than require repayment. That outcome would likely still be the case but for the imposition of the Receivership.

The decision of Uncle Nearest to direct the funds received from MP-Tenn, LLC to Grant Sidney as the *de facto* disbursing agent was a proper exercise of business judgment made on the advice of legal counsel. Since the MP-Tenn, LLC funds were earmarked for certain expenditures, the use of a disbursing agent to ensure the funds were used for the required purpose was entirely appropriate, and the funds were disbursed exactly as required. Farm Credit's further insinuation that a company managing for tax liability is improper is simply naïve. It is entirely appropriate for a company to consider the tax implications of transactions in advance and to structure transactions to reduce tax liabilities where prudent. In this case, the structure of the transaction allowed Uncle Nearest to receive $20 million rather than the approximately $11 million it would have received had the transfer been structured as a direct sale of stock, so the transaction structure benefited both Uncle Nearest and Farm Credit.[22]

While the transactions at issue were complex, they were undertaken in consultation with legal and financial advisors and made solely for the benefit of Uncle Nearest and its creditors.[23]

---

[22] Tr. 250: 9-19.
[23] Tr. 251: 19-25.

Farm Credit has produced no evidence of any fraudulent intent by the Uncle Nearest Entities or their management team. In the absence of fraud pled with particularity, Farm Credit's allegations of fraudulent conduct should be ignored, struck, and dismissed.

Finally, contrary to Farm Credit's assertion, the evidence shows that termination of the Receivership will do more good than harm. The best thing that could happen for all parties in this case is that the Company's sales trajectory can begin to recover to the pre-Receivership levels. That can only happen under the leadership team that is responsible for the rapid growth of the Company in the first place. As the Receiver's own numbers show, the Company can cash flow current operations once the $95k per week expense of the Receiver is removed. Putting the Company's management back in full control can only improve the situation at this point – the sales decline is so poor under the Receivership that it can't realistically get worse. Even the Receiver has recognized that placing Fawn Weaver back in control will result in a boost to sales.[24]

Furthermore, the Receiver has now billed the estate more than $2.3 million, and the rate of expense appears to be increasing. However, the Receiver literally has nothing to show for the efforts except a slew of accusations without any supporting facts or evidence put on the record. He has asserted that he has not been able to get the financial records sorted out. He hasn't been able to get the cap table figured out, and he hasn't done any investigation of the transactions related to the Non-Parties. His only accomplishment for $2.3 million in fees is overseeing the massive decline in the Company's sales, which is resulting directly in his inability to find investors willing to refinance the debt or invest market price for the brand.

---

[24] *See* Receiver Ex. A-4, p. 50 (Showing a projected increase in sales collections under Fawn Weaver's management).

*Recurring Pattern of Allegation, Disproof, and Escalation*

Movants do not seek to relitigate matters already addressed on the docket. The documentary record is before the Court. However, the sequence in which allegations have been advanced by Farm Credit and the Receiver, disproven by evidence already available to the alleging parties, and then replaced with new accusations warrants the Court's attention. Since the Receivership and the question of whether it should continue rests in equity, the pattern is relevant to whether Farm Credit is entitled to continued equitable relief.

(1) Farm Credit's "$261,000 Insolvency" Narrative and the 13WCF Report Allegation

In its Complaint and further arguments, Farm Credit asserted alleged insolvency based on a reported $261,000 cash balance for the Company.[25] The record later established that the Company consistently maintained approximately $1.5 million in operating liquidity and that the cited week followed a $7.5 million payment to the lender, along with legacy creditor payments.[26] The figure relied upon reflected a temporary post-payment trough, not structural insolvency.

Farm Credit further submitted to the Court what was characterized as a "13WCF" report purportedly provided by Uncle Nearest to Farm Credit as a cash flow forecast and reflecting approximately negative $6.5 million in cash flow over a 13-week period.[27] That filing and the testimony of Farm Credit's financial advisor, Kevin Larin, stated that the Company had internally generated and transmitted the document as a cash flow forecast predicting the severe negative operating cash flow.[28] As clarified by Ms. Weaver and in subsequent filings, the referenced document was merely provided to Farm Credit as a template for a cash flow report to be provided,

---

[25] Dkt. 1, ¶ 61.
[26] Weaver Post-Hearing Brief, Ex. 1, ¶¶ 33-37.
[27] Farm Credit Ex. 6.
[28] Tr. 194: 19-25; Tr. 195: 1-6.

not as a finalized operating cash flow report reflecting actual projected performance.[29] The actual 20-week cash flow report covering the same timeframe as the format template the Company submitted — including four weeks of actual results — reflects both the four weeks of actuals and the 20-week forecast as positive cash flow in excess of $1 million.[30] That performance is consistent with the approximately $900,000 in current operating cash flow the Company has maintained since the receivership began.

Thus, both the $261,000 snapshot and the 13WCF template were advanced as indicators of insolvency without presentation of the broader liquidity picture or the actual cash flow results reflected in the Company's operating report. Once documentary context was placed on the record, the insolvency narrative was not sustained in the same form. When that narrative failed, the filings shifted to the next headline allegation.

(2) The "$2.2 Million Cape Cod 'Enclave' Property" Allegation

Next, allegations were advanced suggesting misappropriation of $2.2 million to acquire property in an "exclusive enclave of Cape Cod" – i.e. the Martha's Vineyard Property (the "MV Property").[31] The record reflects that:

(a) The purchase agreement for the MV Property had been provided to Farm Credit more than one month before closing;[32]

(b) The structure of the transaction was known to and supported by Farm Credit;[33]

(c) The property operated as the "Uncle Nearest House on the Vineyard" with a clear marketing purpose for Uncle Nearest;[34] and

---

[29] Weaver Post-Hearing Brief, Ex. 1, ¶¶ 38-39; Weaver Ex. 54.
[30] Weaver Ex. 54.
[31] Dkt. 3, ¶ 38.
[32] Weaver Post-Hearing Brief, Ex. 1-B.
[33] Id.
[34] Dkt. 147, ¶ 6.

(d) The $1.5 million loan relating to the MV Property corresponded to documented renovation and lot consolidation costs that were made to the MV Property.[35]

Contemporaneous evidence further confirms that the MV Property and its purpose were known to Farm Credit well before the present dispute. Photographs, shown below, from August 18, 2023, show Farm Credit personnel, including Jonathan Boyce — the bank officer responsible for countersigning Uncle Nearest drawdowns on its credit line — and Brian Klatt present at the MV Property during company-related events. These images depict lender representatives on the property grounds, including use of the outdoor recreational facilities. The photographs are consistent with the documentary record demonstrating that the existence, ownership structure, and use of the MV Property were contemporaneously known to Farm Credit, long before the purchase was later intentionally mischaracterized by Farm Credit in litigation filings as "misappropriation."

After Movants placed the relevant documentary evidence on the record, the misappropriation theory was not pursued by Farm Credit in the same form. As the record clarified the MV Property issue, Farm Credit's filings moved on to the next alleged "headline" misconduct narrative.

---

[35] Weaver Post-Hearing Brief, Ex. 1, ¶ 24



*Figure 1 – Keith Weaver with Farm Credit representatives Jonathan Boyce, Financial Officer, and Brian Klatt, Managing Director – Food and Agribusiness, on the putting green at Uncle Nearest House on the Vineyard on August 18, 2023, during one of three inaugural events Boyce and Klatt attended in person.*

The contemporaneous documentation and photographic evidence demonstrating the lender's awareness of the MV Property and its use underscores a recurring theme throughout these proceedings: allegations advanced by Farm Credit in this litigation that were inconsistent with facts already known to Farm Credit at the time.

(3) The "$21 Million Missing Barrels" Claim

Farm Credit asserted that approximately $21 million in whiskey barrels were missing.[36] Inventory reconciliation and supporting documentation disproved that assertion. Indeed, the Receiver has recognized that the Advanced Spirits barrels indeed exist.[37] Once the evidentiary record clarified the matter, the allegation was not substantiated further. Once the missing barrel

---

[36] Dkt. 30 (Tr. 11: 17-25)

[37] Tr. 55: 4-20.

narrative collapsed under the weight of reconciliation and documentation, Farm Credit's allegations shifted to the next theory of misconduct.

(4) The "$20 Million Commingling" Allegation

Farm Credit then shifted the narrative to an allegation of commingling involving approximately $20 million between Grant Sidney and Uncle Nearest relating to the MP-Tenn transaction. This allegation was directly contradicted by Farm Credit's own filings, which included the Schedule 1.1 to the Subordinated Credit Agreement created by Farm Credit detailing and countenancing transfers from Grant Sidney to Uncle Nearest totaling over $20 million that directly correlate to the payments actually made by Grant Sidney as reflected in the bank statements.[38] The direction and documentation of those transfers were within Farm Credit's possession at the time of filing.

When the transactional record later demonstrated that the funds cited as "commingled" were in fact transfers documented in Farm Credit's own Subordinated Credit Agreement, the narrative shifted again.

(5) The Tax Filing / KPMG Remediation Narrative

Farm Credit then shifted the narrative to allegations of tax noncompliance as evidence of mismanagement. The record reflects that:

(a) Prior to the appointment of the Receiver, KPMG had been retained by the Company to remediate filing deficiencies created by a former CFO who represented returns as filed;[39]

(b) A remediation plan had already been developed;[40]

---

[38] Dkt. 1, Ex. 9, p. 56.
[39] Weaver Post-Hearing Brief, Ex. 1, ¶ 104.
[40] Id.

(c) On September 3, 2025, the Receiver and his finance team were introduced to KPMG leadership to complete the process;[41] and

(d) The Receiver instructed KPMG to stand down.[42]

The omission of that remediation context materially altered the impression created regarding tax compliance. Having failed to establish insolvency, missing collateral, or improper transfers, the filings began invoking additional financial narratives unsupported by the record or misleading.

(6) The Personal Real Estate Allegation

The Receiver has since expanded the narrative further, conjecturing that Company funds were "likely" used to purchase assets for the Non-Parties, with no evidence to support that allegation. No tracing analysis or documentary evidence has been identified demonstrating that any Company funds were used to acquire any property not for the benefit of Uncle Nearest.

While the burden of proof is on the Receiver and Farm Credit such that neither the Weavers nor the Non-Parties should be obligated to prove a negative, the Weavers' personal real estate activities and financial capacity clearly predate the founding of Uncle Nearest by many years. In the years leading up to founding the Company, the Weavers engaged in more than $10 million in cumulative real estate transactions involving the purchase, renovation, and resale of investment properties. Prior to the Company's formation, they held more than $2.5 million in real estate assets, generated annual income in excess of $1 million, and had invested more than $2.5 million in other founder-led companies.

Those activities were conducted independently of Uncle Nearest and provided substantial personal capital long before the Company's formation. Nonetheless, the Receiver makes the

---

[41] Weaver Post-Hearing Brief, Ex.1-K.
[42] Id.

unfounded allegations to support expansion of the receivership estate to encompass separate legal entities and personal assets not operationally tied to the Company – the Movants ask the Court not to accept as fact the Receiver's conjecture unsupported by evidence.

(7) <u>The Receiver's Commingling and Alter Ego Allegations Relating to the Non-Parties</u>

The Receiver's allegations relating to commingling and alter ego with respect to the Non-Parties further evidences the lack of any pre-filing investigation and the lack of concern about making allegations without any proof. As the filings by each of the Non-Parties reflects, the Receiver makes completely baseless allegations that the Non-Parties share employees, bank accounts, and "operational resources" with Uncle Nearest.[43] That is simply false and not supported by any evidence.

In the Receiver's Post-Hearing Brief, the Receiver alleges, again without any documentary proof or apparent investigation, that the Non-Parties have "assets that were likely bought and/or maintained with Uncle Nearest funds . . . [including] three (3) parcels of real property owned by Shelbyville Grand, LLC  . . . ."[44]  The Receiver's baseless allegation is not supported by any documentary evidence and was apparently made without any regard to its truthfulness.  The Receiver's conjecture is not proof and that conjecture unsupported by facts is simply geared to mislead the Court. The Receiver has presented no documentary tracing evidence showing that funds from Uncle Nearest Entities were used to acquire or maintain the Shelbyville Grand property, other than the storage fees that are legitimately charged by Shelbyville Grand for storage of Nearest Green Distillery's inventory in the climate controlled space.

---

[43] Receiver's Post-Hearing Brief p. 6.
[44] Receiver's Post-Hearing Brief p. 5.

(8) The "Shared Bank Accounts / Single Enterprise" Allegation

The Receiver has advanced a further theory that Uncle Nearest and several entities owned by Fawn or Keith Weaver operated as a "single enterprise," citing the volume of transactions between those entities and asserting that funds were moved among accounts without regard to corporate boundaries. Again, this allegation is not supported by any credible evidence.

The Receiver's filings identify no instance in which Uncle Nearest maintained a bank account jointly with any entity owned by Fawn or Keith Weaver or the Non-Parties. Nor does the Receiver present any tracing analysis demonstrating that funds belonging to Uncle Nearest were transferred into or used to support the operations of the Non-Parties, other than pursuant to legitimate business transactions.

To the contrary, the documentary record reflects that the Non-Parties maintained separate accounts and separate financial records. Where those entities conducted business in support of Uncle Nearest — such as providing facilities, services, or operational support — the transactions were documented through ordinary business practices. The relevant entity invoiced Uncle Nearest, and the Uncle Nearest accounts payable department processed payment in the ordinary course of business.

Similarly, with respect to Grant Sidney, the record reflects that the capital transactions cited by the Receiver resulted in funds ultimately flowing to Uncle Nearest, not away from it. As documented in Movants' filings and supporting exhibits, the transfers associated with the February 2025 transaction flowed into Uncle Nearest or to vendors on Uncle Nearest's behalf by Grant Sidney acting as a *de facto* disbursing agent. The Receiver has identified no instance in which funds from Uncle Nearest were diverted for the benefit of Grant Sidney or retained by any of the Non-Parties without a legitimate business purpose.

Accordingly, the Receiver's assertion that Uncle Nearest and the Related Entities operated through shared bank accounts or pooled funds is unsupported by documentary evidence and rests instead on conjecture derived from the volume of transactions rather than their substance. As with the earlier allegations addressed above, the Receiver's "single enterprise" theory rests on inference drawn from transaction volume rather than any documentary tracing of funds or evidentiary support placed before the Court. In effect, the filings invite the Court to adopt a "where there is smoke there is fire" theory of liability — asking the Court to infer wrongdoing from the existence of activity alone while disregarding the documentary evidence that the Movants have placed on the record explaining the nature and direction of those transactions.

*Cumulative Pattern and Resulting Prejudice*

The false and unsupported assertions by the Receiver and Farm Credit, only a few examples of which have been outlined above, are not isolated occurrences in this case. Rather, they reflect a broader pattern throughout these proceedings in which serious allegations have been advanced without reconciliation to documentary evidence already in the possession of the alleging parties.

In many such instances, clarification could have been obtained by the Receiver through direct inquiry. Prior to November 2025, the Receiver routinely posed questions to Movants, and Movants responded promptly—typically within twenty-four hours—with supporting documentation. That process resulted in clarification without the necessity of motion practice. Since that time, however, allegations have increasingly been advanced through filings without prior inquiry, even where the relevant documentation was either already in the record or readily obtainable. This approach by the Receiver appears to have the intent of portraying the Movants as evasive, which is not true. The most recent example is the Receiver asserting that Grant Sidney did not provide statements for two bank accounts in order to imply that Grant Sidney was

purposefully withholding documents, which is untrue. The bank statements at issue reflect literally no activity in those accounts since early 2021, so there would be absolutely no reason to withhold those statements. Had the Receiver simply asked Grant Sidney, or Ms. Weaver, about the accounts, the information would have been provided. Due to the lack of activity in the accounts for more than four years, the accounts had simply been overlooked.[45] The point is that the Receiver appears so inclined to seek to portray the Movants as bad actors, he is seeking to twist or construct facts to support that false narrative.

Across these episodes, the Court is presented with a recurring sequence:

(a) A serious financial allegation is advanced;

(b) Material context already in the filer's possession is omitted or unreconciled;

(c) The allegation receives significant public emphasis;

(d) Documentary evidence contradicts or materially contextualizes the claim;

(e) The original theory is not substantiated further;

(f) A new allegation follows.

The repeated sequence of serious accusations advanced without a basis in any documentary evidence already in the filer's possession presents a pattern that approaches the concerns addressed under the fraud-on-the-court doctrine. Fraud-on-the-court is reserved for conduct that corrupts the judicial process itself.[46] At a minimum, the series of allegations that are demonstrably false, along with allegations unsupported by any evidence, support a finding that Farm Credit has unclean hands in this proceeding and is no longer entitled to equitable relief. Likewise, the Receiver's repeated advancement of materially incomplete or contradicted allegations has undermined confidence in the neutrality and candor required of a court-appointed fiduciary.

---

[45] Grant Sidney Post-Hearing Brief, Ex. 1, ¶¶ 34-35.
[46] See *Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. 238, 246 (1944).

Equity relief depends on candor. A receivership depends upon accurate, balanced, and complete disclosure. When serious accusations are advanced in sequence without evidentiary support, actual forensic analysis, reconciliation to existing documentation, or reasonable inquiry, the concern ceases to be ordinary adversarial advocacy and begins to implicate the integrity of the process itself. Movants respectfully submit that any determination relating to the requested termination of the Receivership Estate should not be based on the Receiver's or Farm Credit's conjecture but on the actual documentary evidence presented. Movants reserve all rights to seek appropriate relief should further proceedings confirm that material facts were knowingly mischaracterized or withheld.

Because this filing represents the final briefing by the Movants before the Court resolves the pending motions, Movants recognize that additional assertions may appear in the remaining submissions of Receiver and Farm Credit. To the extent any such assertions introduce new allegations unsupported by evidence already before the Court, Movants respectfully submit that they should be considered in light of the pattern described above and evaluated strictly against the documentary record developed in this case.

In sum, the Movants assert that the Receivership should be terminated so that the Company can seek to reverse the downward spiral that has been caused by the Receivership. The evidence adduced at the Hearing and as supplemented in the filed post-Hearing declarations shows changed circumstances warranting termination of the Receivership. Each of the factors that the Court addressed in determining whether the Receivership should be imposed now weigh in favor of terminating the Receivership based on the evidence presented. Accordingly, the Movants request that the Receivership be immediately terminated.

Respectfully submitted,

**MANIER & HEROD, P.C.**

*/s/ Michael E. Collins*
Michael E. Collins (TN BPR No. 16036)
S. Marc Buchman (TN BPR No. 41598)
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
T: (615) 244-0030
F: (629) 500-1137
mcollins@manierherod.com
mbuchman@manierherod.com

*Counsel for Movants*

## CERTIFICATE OF SERVICE

I hereby certify that on March 5, 2026, a copy of the foregoing was served via this Court's CM/ECF system on all parties consenting to receive electronic service.

*/s/ Michael E. Collins*
Michael E. Collins