IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF TENNESSEE

| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNCLE NEAREST, INC., NEAREST GREEN DISTILLERY, INC., UNCLE NEAREST REAL ESTATE HOLDINGS, LLC, FAWN WEAVER and KEITH WEAVER, | ) ) ) ) ) ) | Case No. 4:25-cv-38<br><br>Judge Atchley<br><br>Magistrate Judge Steger |
| Defendants. | ) | |

**RESPONSE OF FARM CREDIT MID-AMERICA, PCA
TO MOVANTS' POST-HEARING BRIEF IN SUPPORT OF EMERGENCY MOTION TO
RECONSIDER THE MEMORANDUM OPINION AND ORDER [DKT. 32] AND ORDER
APPOINTING RECEIVER [DKT. 39]**

[Relates to Dkt. No. 151]

Farm Credit Mid-America, PCA ("FCMA" or the "Lender") submits this response (the "Response") to the *Movants' Post-Hearing Brief in Support of Emergency Motion to Reconsider the Memorandum Opinion and Order [Dkt. 32] and Order Appointing Receiver [Dkt. 39]* (the "Supplemental Reconsideration Brief")[1] filed by Fawn Weaver ("Ms. Weaver"), Keith Weaver (collectively with Ms. Weaver, the "Weavers") and Grant Sidney, Inc. ("Grant Sidney" and collectively with the Weavers, the "Weaver Parties").[2]

**INTRODUCTION**

1. Enough is enough. Despite a full-day hearing and hundreds of pages of filings, the Weaver Parties still failed to present evidence sufficient to justify termination of the receivership. This Court generously granted the Weaver Parties a full-day hearing on February 9, 2026 (the "Combined

---

[1] Dkt. No. 151.
[2] Each capitalized term used but not defined herein shall have the meaning ascribed in the *Emergency Motion for the Immediate Appointment of Receiver* [Dkt. No. 3] (the "Receivership Motion").

Hearing"), and the ability to submit supplemental evidence to support their *Motion to Reconsider the Memorandum Opinion and Order* (the "Reconsideration Motion").[3] Though the Weaver Parties were given ample opportunity, they failed to (1) offer testimony from any qualified witness regarding Uncle Nearest's solvency, (2) provide credible evidence that Uncle Nearest does not owe the mountain of debt identified by Phillip G. Young, Jr. (the "Receiver"), or (3) prove that any viable path forward for Uncle Nearest under the Weaver Parties' management exists.

2. Instead, the Weaver Parties continue to waste the receivership estate's limited resources to push a false narrative clearly intended for public consumption. They paint themselves as victims of greed and portray FCMA as a villain bent on their personal destruction. The true story is simpler, though perhaps far less interesting to the Weaver Parties. Uncle Nearest owed the debt to FCMA and other creditors, Uncle Nearest defaulted on that debt, Uncle Nearest was (and is) insolvent, and this receivership is necessary. The Weaver Parties' own testimony shows they treated Uncle Nearest's cash (and FCMA's collateral) with a reckless abandon to further their quixotic obsession with "growth." But FCMA and other stakeholders should not have to pay for the Weaver Parties' hubris. The Weaver Parties continue their cannibalization of the estate's assets through their never-ending baseless filings. Every dollar the Weaver Parties force the Receiver to spend responding to these motions is money diverted from the operations of Uncle Nearest and potential recovery for creditors, equity holders, and other stakeholders. Ultimately, despite no shortage of opportunity to do so, the Weaver Parties failed to meet their burden of proving that circumstances warranting this Court's *Memorandum Opinion and Order* (the "Receivership Order")[4] no longer persist.

A. **The Weaver Parties still failed to prove Uncle Nearest was, or is, solvent.**

3. The overwhelming evidence shows that Uncle Nearest is insolvent. Nevertheless, through reliance on inflated enterprise valuations derived from unrealistic revenue multiples, the

---

[3] Dkt. No. 91.
[4] Dkt. No. 32.

Weaver Parties assert Uncle Nearest is balance sheet solvent on a going concern basis.[5] Critically, the Weaver Parties have failed to present testimony from a financial advisor or other qualified financial expert to speak to this salient element of the appointment of a receiver.[6] Rather, the Weaver Parties' solvency case rests on the testimony of Ms. Weaver. Ms. Weaver is not a finance professional and has no professional valuation credentials. The centerpiece of the Weaver Parties' solvency argument is Ms. Weaver's assertion that Uncle Nearest's enterprise value should be calculated using an approximately 12x revenue multiple, yielding an implied enterprise value of approximately $300 million to $480 million.[7] To support Ms. Weaver's conclusion, she relies on years-old multiples (twelve years in one instance) as the proper benchmark for assessing the state of the current spirits market and Uncle Nearest.[8] Unlike the Receiver's financial advisors, who have direct involvement in the sale process and firsthand knowledge of current market conditions, the Weaver Parties offer no professional valuation analysis or any other accepted methodology to support this assertion. Indeed, their claim is contradicted by every piece of objective market evidence already on the record before this Court.

4. The Weaver Parties dismiss the bids received through the Arlington Capital Advisors sale process as the product of a "fire sale" not aimed to maximize value and therefore irrelevant to Uncle Nearest's insolvency.[9] Once again, their sole evidence to the contrary is Ms. Weaver's testimony that these purchase offers do not represent Uncle Nearest's fair value.[10] Thus, the dismissal of the bids

---

[5] Dkt. No. 151 at 2.
[6] *See* Dkt. No. 32 at 5. This Court began its analysis by looking to Uncle Nearest's solvency and whether there was adequate security for FCMA's debt, as these are "the most important factors in evaluating whether to appoint a receiver." *PNC Bank, Nat'l Ass'n v. Goyette Mech. Co.*, 15 F. Supp. 3d 754, 758 (E.D. Mich. 2014); *see also* Dkt. No. 151 at 3 (citing Dkt. No. 39) (discussing Court's recognition that "the key consideration" was "potential insolvency of [Uncle Nearest]" in its *Order Appointing Receiver*).
[7] Dkt. No. 151 at 12.
[8] *Id.* at 9.
[9] Dkt. No. 151 at 13.
[10] *Id.* at 12. Furthermore, although the Weaver Parties offered testimony from David Ozgo ("Mr. Ozgo"), his testimony rested on the analysis of Nielsen data. Therefore, Mr. Ozgo could not speak to any proper valuation determinations, as discussed further in Section E.

3

cannot overcome the fact that, upon information and belief, the bids received for substantially all of Uncle Nearest's assets demonstrate that Uncle Nearest's assets are valued at less than the amount of FCMA's debt alone, much less Uncle Nearest's total debt.[11] While the Weaver Parties rely on hypothetical multiples and theoretical valuations as opposed to testimony from a financial advisor, the Court should credit the only actual market test of value that has been conducted by the Receiver and his professionals. Indeed, real bids from real buyers reflect the market's actual assessment of Uncle Nearest's value. And, that value falls well short of demonstrating solvency.

5. The Weaver Parties again rely on Ms. Weaver's impression of the Tennessee whiskey market (and an unattested letter) to assert that Uncle Nearest's whiskey barrels are worth approximately $80 million at going concern fair value.[12] Ms. Weaver states her impressions "are confirmed" by the Statement of Terry N. Thome ("Mr. Thome").[13] Notably, this statement is not attested to by Mr. Thome. Further, even if this Court were to consider Mr. Thome's statement, it is merely a generic price list for whiskey barrels of all kinds that draws no connection whatsoever to Uncle Nearest's actual inventory and provides no evidence that any of the barrels were sold at those prices. Yet the Weaver Parties nonetheless attempt to rely on it to substantiate their grossly inflated valuation. Ms. Weaver's self-prepared estimate of barrel value is simply insufficient to establish solvency.

6. Using only the *Declaration of Fawn Weaver in Support of Motion to Reconsider* (the "Fawn Weaver Declaration"),[14] the Weaver Parties unsuccessfully attempt to contradict both the Receiver's financial advisor and FCMA's financial advisor regarding Uncle Nearest's total debt, asserting it is significantly less than $174 million.[15] Most notably, Ms. Weaver asserts that Uncle Nearest, Inc.'s execution of two convertible promissory notes (the "MarcyPen Notes") for a total

---

[11] Dkt. No. 157 ¶ 8 n.25.
[12] Dkt. No. 151-1 ¶¶ 96-97.
[13] Dkt. No. 151-1 ¶ 96.
[14] Dkt. No. 151-1.
[15] Dkt. No. 151 at 15.

amount of $20 million in favor of MP-Tenn LLC ("MarcyPen")[16] either does not reflect presently due third-party enforceable obligations or were impacted by classifications arising during the receivership.[17] Putting aside the fact that unsecured payables should be included in any proper debt analysis, the MarcyPen Notes are presently due.[18] MarcyPen declared an event of default under the MarcyPen Notes and declared the entire amount of the debt immediately due and payable.[19] Ms. Weaver's informal and largely uncorroborated adjustments to Uncle Nearest's liabilities have little credibility and should be afforded no weight. Her denial of Uncle Nearest's total debt, against all evidence to the contrary, only underscores the Weaver Parties' willingness to advance whatever narrative suits their purpose in attempting to end this receivership.

**B. Uncle Nearest's payments to FCMA did not bring the debt current or cure payment defaults.**

7. The Weaver Parties wrongly assert that payments made to FCMA in 2024 and 2025 were "inaccurately characterized by Farm Credit as continuous payment default by the Company."[20] The payments were insufficient to bring the FCMA debt current and did not cure existing payment defaults.[21] The bottom line is that Uncle Nearest missed payments and was in default. Making partial payments later does not retroactively erase a default. The FCMA debt remained in default throughout this time period, as the Weavers and Uncle Nearest acknowledged in the Forbearance Agreement (as

---

[16] Receiver's Exs. F, E.
[17] Dkt. No. 151-1 ¶ 51.
[18] Plaintiff's Supplemental Exhibit 3.
[19] *Id.*
[20] Dkt. No. 151-1 ¶ 14.
[21] A true and correct copy of Uncle Nearest's 2024 loan history with missed payments for non-sufficient funds highlighted in red is attached hereto as **Plaintiff's Supplemental Response Exhibit 1**. A patronage payment was applied to the Revolving Loan on May 7, 2024, in the amount of $1,835,652.04, which was Uncle Nearest's portion of the distributions made to borrower-owners of the FCMA cooperative. A true and correct copy of Uncle Nearest's 2025 loan history with missed payments for non-sufficient funds highlighted in red is attached hereto as **Plaintiff's Supplemental Response Exhibit 2**. Note, these histories only reflect payments that were received and returned for non-sufficient funds. Uncle Nearest also failed to make the $10 million payment due sixty days after the effective date of the Forbearance Agreement. This payment default, and any other payment defaults included in the Specified Defaults not reflected in the loan history statements, would not appear in these statements because they were never received.

5

defined in the *Declaration of Brian Klatt in Support of the Verified Complaint and Emergency Motion for the Immediate Appointment of Receiver*).[22] Specifically, the Weavers and Uncle Nearest acknowledged that "[c]ertain Events of Default identified on Exhibit A [to the Forbearance Agreement] (collectively, the "Specified Defaults") have occurred and are continuing."[23] Exhibit A to the Forbearance Agreement lists 20 Specified Defaults.[24] No number of later assertions by the Weaver Parties can change what the record plainly shows: Uncle Nearest was in default, and the Weaver Parties knew it.

      **C. The Weaver Parties' unconvincing attempt to discredit the cash flow report cited by Kevin Larin is wholly unsupported.**

8. The Weaver Parties claim that FCMA's Exhibit 6, a copy of Uncle Nearest's 13-week cash flow forecast provided in May 2025, was a template with "dummy" numbers that was merely sent to Riveron RTS, LLC ("Riveron") for approval on the format for such reports.[25] As an initial matter, an attack on a cash flow forecast from months before the receivership does not move the needle with respect to determining Uncle Nearest's insolvency today. Nor does it outweigh the Receiver's testimony and Kevin Larin's expert financial testimony establishing Uncle Nearest's insolvency.[26] Even so, FCMA finds it appropriate to respond to the Weaver Parties' falsities about this cash flow forecast to emphasize the dearth of evidence the Weaver Parties provided. At the Combined Hearing, Ms. Weaver testified that FCMA's Exhibit 6 "was sent as a template by Mr. Flores, asking, is this how you want this to be done?"[27] The Weaver Parties did not produce this purported email at the Combined Hearing, nor did they include it in their Supplemental Reconsideration Brief.[28] Having had every

---

[22] Dkt. No. 4.
[23] Receivership Hr'g Pl.'s Ex. 10, Forbearance Agreement at 1.
[24] *Id.* at 20-21.
[25] Feb. 9 Hr'g Tr. (the "Hr'g Tr.") 201:20-202:1.
[26] *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 529–30 (6th Cir. 2008) ("The task for the district court in deciding whether an expert's opinion is reliable is not to determine whether it is correct, but rather to determine whether it rests upon a reliable foundation, as opposed to, say, unsupported speculation").
[27] Hr'g Tr. 234:2-3.
[28] If such an email exists, withholding it until their response would be exemplative of the Weaver Parties' litigation tactics.

opportunity to introduce this purported email into evidence, the Weaver Parties' failure to do so highlights that the Weaver Parties continually employ a scattershot approach, without regard to the truth of the allegations.[29]

9. In support of their claim that the cash flow forecast was a template, the Weaver Parties noted that the projected expenditures held constant across all weeks of the forecast, suggesting the document was not a genuine cash flow forecast.[30] However, Riveron received a "very preliminary" cash flow forecast on May 7, 2025, showing negative $5.1 million of projected cash flows and weekly amounts per line item held constant throughout the thirteen weeks.[31] Riveron continued to receive forecasts in which line items were held constant. On May 12, 2025, Riveron received another forecast showing negative $6.8 million of projected cash flows with weekly amounts per line item held constant throughout the thirteen weeks.[32] On May 21, 2025, Riveron received another forecast showing negative $1.6 million of projected cash flows with weekly amounts per line item held constant throughout the thirteen weeks.[33] This pattern of evidence rings true, these reports were not sent as templates. Rather, these documents were required reports in accordance with the Forbearance Agreement, discussed in detail between Uncle Nearest and Riveron weekly, and relied upon by FCMA and its financial advisors to monitor cash and assess risk. Furthermore, even if this Court were to

---

[29] It is telling that, despite bringing multiple witnesses to the hearing, the sender of this purported template was not presented to substantiate this allegation.
[30] *Id*. at 200:9-19.
[31] A true and correct copy of the email dated May 7, 2025, providing the cash flow forecast is attached hereto as **Plaintiff's Supplemental Response Exhibit 3**.
[32] A true and correct copy of the email dated May 12, 2025, providing the cash flow forecast is attached hereto as **Plaintiff's Supplemental Response Exhibit 4**.
[33] A true and correct copy of the email dated May 21, 2025, providing the cash flow forecast is attached hereto as **Plaintiff's Supplemental Response Exhibit 5**. The $1.6 million is calculated by adding together "Operating Cash Flow" and the "Non Operating Cash Flow (e.g., Dash Funding)".

7

believe that Exhibit 6 contains "dummy" numbers, the evidence shows that Uncle Nearest is insolvent today and further demonstrates the Weaver Parties' inability to produce legitimate financial projections.

10. The Weaver Parties further argue that Kevin Larin's answers on cross regarding approximately $1.5 million in payments to Tennessee Distilling Group, LLC ("TDG") warrants a negative inference that Uncle Nearest is cash flow positive by approximately $900,000.[34] Because TDG is a contract storage warehouse, payment to TDG is a legitimate normal operating disbursement that must be included in any proper cash flow analysis. The Weaver Parties' insistence on "adding back" the TDG payment effectively asks this Court to ignore real debts that Uncle Nearest must pay to continue operating—an approach they seem to suggest should be applied to all unpaid "legacy" debts. This selective approach to financial analysis is emblematic of the haphazard management that led to Uncle Nearest's current insolvency.

11. Finally, Uncle Nearest is simply not cash flow positive. The Weaver Parties claim that Uncle Nearest is operating on a cash flow positive basis, but this, again, rests on selectively excluding legitimate operating expenses to manufacture an appearance of positive cash flow.[35] As discussed above, the TDG payments must be included in any proper cash flow analysis. The Weaver Parties have not identified any accepted accounting standard or financial methodology that would support the exclusion of operating disbursements from a cash flow analysis. Additionally, the Weaver Parties ignore the Revolving Loan (as defined in the *Verified Complaint and Request for Appointment of Receiver*)[36] debt, which is past due and constitutes a "current" liability under generally accepted accounting principles ("GAAP"). Under the Weaver Parties' approach, any debtor can appear solvent simply by ignoring its debts.

---

[34] Supplemental Reconsideration Brief at 6-8.
[35] Dkt. No. 151 at 16-19.
[36] Dkt. No. 1.

8

218388534_11
Case 4:25-cv-00038-CEA-CHS     Document 173     Filed 03/05/26     Page 8 of 14
PageID #: 7155

### D. The Weaver Parties still fail to show FCMA's Collateral is adequate to secure its debt.

12. The Weaver Parties' allegations that FCMA's collateral is adequate to secure its debt rests entirely upon their illogical analysis of Uncle Nearest's solvency addressed above in Section A. The Weaver Parties cannot assert that FCMA is oversecured by pointing to unverified, layperson asset valuations conducted solely by Ms. Weaver. The Weaver Parties further purport that potential counterclaims will further reduce Uncle Nearest's debt.[37] However, these dubious counterclaims have neither been asserted nor adjudicated.[38] Speculative, unadjudicated counterclaims should not be credited in an assessment of Uncle Nearest's total assets and liabilities.

13. The Weaver Parties' argument that the approximately $21 million of missing barrels "were never missing" because they were purchased under a forward contract with Advanced Spirits, LLC ("Advanced Spirits") is equally unavailing.[39] Because of the Receiver's efforts, the discrepancies between the amount of collateral submitted by Uncle Nearest in its borrowing base certificates and the barrels at TDG have been reconciled.[40] The fact remains, however, that Uncle Nearest included barrels on the borrowing base that were subject to the terms of this forward contract without reflecting Advanced Sprits' interest at all.[41] These barrels, subject to the terms of a forward contract, do not qualify as "Eligible Inventory" under the Credit Agreement.[42] Accordingly, including them on the borrowing base certificate was patently impermissible and Uncle Nearest therefore fraudulently reported the barrels to FCMA as its own. Moreover, Uncle Nearest never disclosed or indicated

---

[37] *Id.* at 16.
[38] Uncle Nearest, Inc., the Distillery, RE Holdings, and the Weavers all waived and released any and all claims that could conceivably have existed as of April 15, 2025, in the Forbearance Agreement. Receivership Hr'g Pl.'s Ex. 10, Forbearance Agreement at 16. The Weaver Parties' continued insistence that any pre-Forbearance Agreement claims could be pursued is therefore disingenuous and appears calculated to influence the public narrative more than anything else. Actually asserting such claims would be vexatious.
[39] Dkt. No. 151 at 23.
[40] FCMA has been seeking such a reconciliation since the collateral discrepancies were discovered by FCMA in the fall of 2024. Receivership Hr'g. Pl's Ex. 23, Letter from FCMA to Uncle Nearest dated November 5, 2024, at 1.
[41] FCMA does not concede that Advanced Sprits has a superior claim to these barrels and reserves all rights to assert a superior claim or other cause of action to the extent that the Advanced Sprits transaction may have violated FCMA's rights as a secured party.
[42] Receivership Hr'g Pl.'s Ex. 2, Credit Agreement dated July 22, 2022, at 10-11.

Advanced Spirits' interest on any borrowing base certificate submitted to FCMA.[43] Uncle Nearest's misrepresentations about these barrels is further evidence of lack of candor and veracity.

### E. The receivership improved Uncle Nearest operations.

14. The record does not support the Weaver Parties' assertions that the receivership has damaged Uncle Nearest's operations. The Weaver Parties rely on Nielsen data and the testimony of Mr. Ozgo, who is three years removed from the Distilled Spirits Council of the United States,[44] to argue that Uncle Nearest's performance at the retail level is a direct result of the receivership rather than industry-wide causes.[45] Mr. Ozgo's own testimony undermines the Weaver Parties' position. Specifically, he testified that most independent liquor stores are not covered in the Nielsen data[46] and that Nielsen data covers only approximately 40% of the sales.[47] A dataset capturing only 40% of the sales and not a random sampling does not serve as an accurate portrayal of overall market performance.[48] Furthermore, Mr. Ozgo has never analyzed Nielsen data with respect to any other company in a receivership.[49] This renders his opinions on the receivership's specific impact on sales speculative at best.

15. No credible evidence supporting the Weaver Parties' contention that the Receiver has suppressed Uncle Nearest's sales exists. To the extent any decline in sales activity has occurred, the Weaver Parties ignore the industry-wide headwinds facing the spirits market. Mr. Ozgo acknowledged this reality during his testimony.[50] Far from causing "significant damage"[51] to Uncle Nearest, the

---

[43] Each Borrowing Base Certificate includes a "Line Reserve" section where Advanced Spirits' interest should have been reflected if Uncle Nearest wanted to accurately attempt to include those barrels in the borrowing base.
[44] Hr'g Tr. 176:17-19.
[45] Dkt. No. 151 at 20.
[46] Hr'g Tr. 178:1-3.
[47] *Id.* at 178:10-15.
[48] An "expert witness must 'appl[y] the principles and methods reliably to the facts of the case.'" *In re Scrap Metal Antitrust Litig.*, 527 F.3d at 530 (6th Cir. 2008) (quoting Fed. R. Evid. 702(3)); *see also* Fed. R. Evid. 702 advisory committee's note, 2000 amend. ("*[A]ny* step that renders the analysis unreliable . . . renders the expert's testimony inadmissible.") (internal quotation marks omitted).
[49] Hr'g Tr. 179:23-180:4.
[50] *Id.* at 175:23-25.
[51] Dkt. No. 151 at 19.

Receiver has steered Uncle Nearest through industry-wide headwinds while simultaneously responding to the Weaver Parties' seemingly endless tirade of filings. The Receiver has accomplished a multitude of important tasks on behalf of Uncle Nearest since his appointment, as outlined at length in the *Receiver's First Quarterly Report*[52] and the *Receiver's Second Quarterly Report*.[53]

16. In pointing to the "whopping" $2.3 million the Receiver has been paid since the start of the receivership, the Weaver Parties fail to account for how much their own extensive litigation or other interference has burdened the receivership estate. Since the Weaver Parties' filing of the *Motion to Reconsider the Memorandum Opinion and Order [Dkt. 32] and Order Appointing Receiver [Dkt. 39]*,[54] they have generated voluminous filings that have required the Receiver to divert significant time and resources away from running the business they care so deeply about and maximizing value for the estate. Every dollar spent on this litigation is a dollar taken away from Uncle Nearest's operations and potential stakeholder recovery.

### F. The record is devoid of evidence that Uncle Nearest would benefit from returning control to prior management.

17. Returning control of Uncle Nearest to its pre-receivership management team is not in the best interest of Uncle Nearest, its creditors, or its shareholders. The Weaver Parties have not presented a credible plan to repay FCMA's debt, nor any of Uncle Nearest's other debts. Instead, the plan depends entirely on the tenuous hope that all creditors will voluntarily agree to further delayed payments.

18. The Weaver Parties also did not present any testimony regarding new financial controls they would implement to prevent the type of squandering of assets that occurred. Indeed, in the days leading up to the receivership, the Weaver Parties again sold future revenue streams, at a discount, in

---

[52] Receiver's Ex. B.
[53] Receiver's Ex. C.
[54] Dkt. No. 91.

violation of the Credit Agreement and with no apparent regard for their fiduciary duties.[55]

### G. Continued litigation is unnecessarily burdening the receivership estate.

19. Pursuant to the Receivership Order, the Receiver's task is to "preserve, . . . protect, and manage the Receivership Assets."[56] This undertaking requires the Receiver's full attention and resources. The continued filings have forced the Receiver to divert critical time and resources away from operating and administering the receivership estate. Every dollar the Receiver is compelled to spend responding to these filings is a dollar "snatched" from the receivership estate. In short, the Weaver Parties' filings are cannibalizing the very assets they purport to protect.

### CONCLUSION

A central goal of the receivership is stabilization of the company and the Weaver Parties' attacks are counterintuitive to that aim. The Weaver Parties have had every opportunity to present evidence warranting termination of the receivership, and they have failed to do so. They have not presented expert testimony to support a finding regarding Uncle Nearest's solvency. They have not shown any material change in circumstances that would justify reconsideration, and they have not offered any viable plan to address Uncle Nearest's staggering debt obligations. Meanwhile, the Weaver Parties' continued litigation itself is eroding the remaining value in the receivership estate and diverting resources that should be directed toward maximizing value for all stakeholders. As a result, the receivership should continue.

Respectfully submitted,

/s/Erika R. Barnes
Erika R. Barnes (TN Bar No. 028628)
STITES & HARBISON PLLC
401 Commerce St., Suite 800
Nashville, TN 37219
Telephone: (615) 782-2252
Email: ebarnes@stites.com

---

[55] Plaintiff's Supplemental Exhibit 7.
[56] Dkt. No. 39 ¶10.

- and-

Demetra Liggins (admitted *pro hac vice*)
Dairanetta S. Spain (TN Bar No. 039981)
McGUIREWOODS LLP
Texas Tower
845 Texas Ave., Suite 2400
Houston, TX 77002
Telephone: (713) 353-6661
Email: dliggins@mcguirewoods.com
dspain@mcguirewoods.com

M. Alexandra Shipley (admitted *pro hac vice*)
McGUIREWOODS LLP
77 West Wacker Drive, Suite 4100
Chicago, IL 60601
Telephone: (312) 849-8253
Email: ashipley@mcguirewoods.com

*Attorneys for Farm Credit Mid-America, PCA*

Dated: March 5, 2026

# CERTIFICATE OF SERVICE

I certify that on March 5, 2026, a true and correct copy of the foregoing was served on all parties entitled to service via this Court's ECF/CMF system, via U.S. Mail and electronic mail upon the following:

| | |
|---|---|
| Michael E. Collins<br>S. Marc Buchman<br>Manier & Herod, P.C.<br>1201 Demonbreun Street, Suite 900<br>Nashville, TN 37203<br>mcollins@manierherod.com<br>mbuchman@manierherod.com | Phillip G. Young, Jr.<br>Justin T. Campbell<br>Thompson Burton PLLC<br>1801 West End Avenue, Suite 1550<br>Nashville, TN 37203<br>phillip@thompsonburton.com<br>justin@thompsonburton.com |
| Uncle Nearest, Inc.<br>600 N. Main St.<br>Shelbyville, TN 38106 | Lucas A. Davidson, Esq<br>Oren Bitan<br>Tennessee Distilling Group, LLC<br>1 Music Circle South, Suite 300<br>Nashville, TN 37203<br>ldavidson@buchalter.com<br>obitan@buchalter.com |
| Uncle Nearest Real Estate Holdings, LLC<br>3125 Highway 231 N.<br>Shelbyville, TN 37160 | |

/s/Erika R. Barnes