| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-38 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| UNCLE NEAREST, INC., *et al.,* | ) | Magistrate Judge Steger |
| | ) | |
| Defendants. | ) | |

## RECEIVER'S THIRD QUARTERLY REPORT

Comes now Phillip G. Young, Jr. (the "Receiver"), the court-appointed receiver in this matter, by and through counsel, and offers this third quarterly report pursuant to the Court's Order Appointing Receiver (the "Receivership Order") entered on August 22, 2025.

### *INTRODUCTION*

1. This quarter has been marred by contentious litigation that has required considerable time and legal resources to address. Despite these distractions, the Receiver has made significant progress in the administration of this estate: identifying a buyer for the real estate on Martha's Vineyard in Massachusetts, having discussions with parties interested in purchasing assets in Cognac, France, and nearing the conclusion of a marketing process for substantially all remaining assets of the receivership entities.

### *TASKS ACCOMPLISHED BY THE RECEIVER*

2. The Receiver has continued in his efforts to bring the Company into compliance with all federal and state tax filings. All outstanding returns have been identified and most have now been filed with the appropriate taxing authorities, with unpaid taxes being brought up to date. The exception is federal income tax returns, which remain unfiled since 2018. The Receiver has

1

identified a tax professional to assist with this rather large task and anticipates beginning work on this in the next quarter.

3.    The Receiver has also continued his work on updating and verifying the Company's capitalization table.  As he has contact with shareholders, he is gathering information to verify and/or correct the information contained in the capitalization table.  While he is not convinced that the capitalization table is completely accurate as of this date, it is much more reliable today than at the beginning of this receivership case.

4.    The Receiver has made significant progress toward liquidating assets for the benefit of the creditors.  As the Court is aware, the Receiver has proposed a sale of the property on Martha's Vineyard for what the Receiver believes is fair market value.  Despite the delays caused by legal challenges, the buyers remain committed to closing this transaction.  The Receiver, through his representatives, has also been in contact with dozens of potential purchasers of the property in Cognac, France.  While no offer has materialized for those assets as of the date of this filing, the Receiver has conference calls set up over the next two weeks with parties expressing serious interest.

5.    With the assistance of Arlington Capital Advisors, the Receiver has conducted an extensive marketing process for the sale of substantially all of the Company's assets or, alternatively, for the refinancing of its debt.  While there was no interest in refinancing the debt, there has been robust interest in the purchase of Company assets.  The Receiver and Arlington Capital have been working with potential purchasers for several months and are nearing the conclusion of that process.  The Receiver hopes to have a stalking horse bidder for the Company's assets identified before the end of April.  At that time, the Receiver will determine whether to pursue a sale in this or another venue.

6.     The Receiver continues to take steps to maintain the Company's existing intellectual property.  He has also taken steps to maintain the Company's relevant licenses with state and federal authorities.

7.     With the assistance of his team of consultants, the Receiver has continued making all operational and financial decisions for the Company.

8.     The Receiver, his consultants, and his attorneys have devoted a significant amount of time this quarter to litigation initiated by Fawn Weaver, Keith Weaver, and Grant Sidney (one of the entities that the Receiver has asked the Court to include in this receivership action).  In particular, the unauthorized bankruptcy filings, which were dismissed by the United States Bankruptcy Court for the Eastern District of Tennessee less than 48 hours after their filing, were a significant distraction and posed a serious threat to the Company's ongoing business operations. While the legal implications of those filings have subsided, the confusion created among creditors, shareholders, vendors, and employees remains an ongoing problem for the Receiver. Additionally, the parties have appealed the dismissal by the Bankruptcy Court and the Receiver expects time and resources will be needed to litigate that appeal.

<em>TASKS IN PROCESS</em>

9.     As mentioned above, the capitalization table continues to be a work in progress. The Receiver and his counsel continue the process of reconciling the capitalization table.

10.     The Receiver has continued his forensic investigation into the finances and transactions of the Company this quarter, and that investigation is ongoing.

11.     The Receiver and his consultants continue monitoring the finances of the Company, creating a rolling 13-week budget, and working with Farm Credit Mid America to fund any

3

operational shortfalls.  The financial details of the last quarter are included below.

*FINANCIAL REPORT*

12.    **Key Financial Metrics.**  In accordance with the Receivership Order filed August 22, 2025, the following financial information is provided for the current reporting period (December 29, 2025 – March 29, 2026) and the receivership period to date (August 23, 2025 – March 29, 2026). Actual results are presented against the original operating budget to provide transparency into performance.

| Category | Q1 (Dec 29, 2025 - Mar 29, 2026) | | | Period-to-Date (Aug 23, 2025 - Mar 29, 2026) | | |
|---|---|---|---|---|---|---|
| | **Actual $'s** | **Budgeted $'s** | **Variance $'s** | **Actual $'s** | **Budgeted $'s** | **Variance $'s** |
| Operating Collections | 5,003,695 | 5,155,627 | (151,932) | 10,684,878 | 12,267,198 | (1,582,320) |
| Farm Credit Mid-America, PCA | - | - | - | 3,800,000 | 3,800,000 | - |
| **Total Collections** | **5,003,695** | **5,155,627** | **(151,932)** | **14,484,878** | **16,067,198** | **(1,582,320)** |
| Operating Disbursements | 3,463,872 | 4,967,444 | (1,503,572) | 10,627,320 | 14,439,750 | (3,812,430) |
| Receivership Professional Fees | 1,658,865 | 1,985,000 | (326,135) | 3,023,822 | 4,146,000 | (1,122,178) |
| **Total Disbursements** | **5,122,737** | **6,952,444** | **(1,829,707)** | **13,651,142** | **18,585,750** | **(4,934,608)** |
| **Net Cash Flow** | **(119,042)** | **(1,796,817)** | **1,677,775** | **833,736** | **(2,518,552)** | **3,352,288** |
| **Net Operating Cash Flow (Operating Collections – Operating Disbursements)** | **1,539,823** | **188,183** | **1,351,640** | **57,558** | **(2,172,552)** | **2,230,110** |

13. **Professional Fees Paid**

**December 29, 2025 – March 29, 2026**

| Firm Name | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Thompson Burton PLLC | 940,425 | 820,000 | 120,425 |
| Newpoint Advisors Corporation | 495,033 | 670,000 | (174,967) |
| Thoroughbred Spirits Group, LLC | 151,147 | 455,000 | (303,853) |
| Other | 72,260 | 40,000 | 32,260 |
| TOTAL | 1,658,865 | 1,985,000 | (326,135) |

Thompson Burton PLLC fees were higher than projected due to increased litigation activity related to multiple filings from Fawn Weaver, Keith Weaver, and Grant Sidney that were not originally projected in the approved budget(s). The "Other" professional fees category relates to expenses incurred for the reconciliation of prior year TTB liquor tax filings and operational reports, which were not filed timely nor accurately by the company's management team prior to the Receivership date.

**August 23, 2025 – March 29, 2026**

| Firm Name | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Thompson Burton PLLC | 1,436,136 | 1,660,000 | (223,864) |
| Newpoint Advisors Corporation | 1,077,145 | 1,360,000 | (282,855) |
| Thoroughbred Spirits Group, LLC | 361,040 | 1,068,000 | (706,960) |
| Other | 149,501 | 58,000 | 91,501 |
| TOTAL | 3,023,822 | 4,146,000 | (1,122,178) |

14.     **Collections Received**

**December 29, 2025 – March 29, 2026**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Collections | 5,003,695 | 5,155,627 | (151,932) |
| Farm Credit Mid-America, PCA | - | - | - |
| TOTAL | 5,003,695 | 5,155,627 | (151,932) |

**August 23, 2025 – March 29, 2026**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Collections | 10,684,878 | 12,267,198 | (1,582,320) |
| Farm Credit Mid-America, PCA | 3,800,000 | 3,800,000 | - |
| TOTAL | 14,484,878 | 16,067,198 | (1,582,320) |

15.     **Expenditures**

**December 29, 2025 – March 29, 2026**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Disbursements | 3,463,872 | 4,967,444 | (1,503,572) |
| Professional Service Expenses | 1,658,865 | 1,985,000 | (326,135) |
| TOTAL | 5,122,737 | 6,952,444 | (1,829,707) |

**August 23, 2025 – March 29, 2026**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Disbursements | 10,627,320 | 14,439,750 | (3,812,430) |
| Professional Service Expenses | 3,023,822 | 4,146,000 | (1,122,178) |
| TOTAL | 13,651,142 | 18,585,750 | (4,934,608) |

As the Court can see from collections and expenditures to date, the Company is currently cash flow neutral. Of course, this is without servicing outstanding secured indebtedness or paying any

6

pre-receivership debts. If the Company were required to pay on pre-receivership debts, it would not be capable of normal operations.

16. **Banking & Disbursement Controls.** Immediately following his appointment, the Receiver took steps to secure all existing bank accounts associated with the Company. This included freezing accounts where appropriate and establishing new Receiver-controlled accounts to ensure that all future transactions are properly monitored and documented. By shifting all financial activity into Receiver-controlled accounts, the risk of unauthorized transfers or unapproved expenditure has been significantly reduced. These activities and policies have continued to be in place and enforced throughout the entire receiver period. The Receiver does not have control over bank accounts in the names of certain entities that are detailed in the Receiver's Motion for Clarification filed with this Court on September 12, 2025.

17. The Receiver has instituted a policy that all significant disbursements must receive explicit approval from the Receiver before release. This control mechanism ensures that cash outflows align with the cash flow budget and that only necessary and authorized expenses are incurred. To reinforce this control, weekly reconciliations are performed for all bank accounts. These reconciliations serve to verify accuracy, detect any discrepancies, and confirm that no unauthorized transactions have taken place.

18. **Cash Flow Budgeting & Variance Review.** A rolling 13-week cash flow budget has been developed and is updated weekly to reflect the Company's most current operating realities. This budget is reconciled against actual collections and disbursements every week. Any variances greater than 10% between budgeted and actual results are promptly identified, documented, and explained.

7

19. As part of the agreement with the secured lender, the Receiver is required to submit comprehensive bi-weekly reporting packages to Farm Credit, the Company's secured lender. These packages contain detailed variance analyses, operational expense tracking, and updated sales forecasts. By providing this level of detail, the secured lender can closely monitor performance against established targets and evaluate ongoing compliance with the terms of the forbearance agreement.

20. This enhanced reporting process strengthens transparency and accountability, ensuring that stakeholders have timely and accurate insight into the Company's financial position, operational performance, and near-term prospects.

21. **Payroll & Taxes.** The payroll process remains under the administration of the Company's professional employer organization, Genesis Global, with weekly supervision and review of payroll data by the Receiver team. At the time of the appointment, the Receiver identified that the PEO account was underfunded, jeopardizing employee pay continuity. This issue has since been corrected, ensuring that payroll obligations are consistently met. Indeed, the Receiver has been pre-funding payroll for the majority of this quarter.

22. The Receiver has completed a review of payroll taxes, excise taxes, business taxes, and property taxes. Several potential liabilities have been identified, and these obligations have been incorporated into the cash flow budget for planning purposes. Of particular concern is the discovery that the Company has not filed federal income tax returns since 2018. The Receiver is currently working with appropriate tax authorities and external advisors to address this issue.

23. In addition, the Receiver conducted a review of state-level business, excise and sales tax compliance. Findings indicated that Tennessee and New Jersey have material exposure due to incomplete reporting and unpaid obligations. These issues were corrected for both the states

8

of Delaware and Tennessee during the most recent quarterly period with the Company now in Good Standing.  Business, excise and sales taxes are now current for all Receiver entities.

24.     **Vendor & Operational Continuity.**  The Receiver has established direct lines of communication with key vendors, logistics providers, and employees to maintain uninterrupted operations. This outreach has helped secure the cooperation of critical partners and mitigate risks to the supply chain.

25.     All vendor notices are now being directed to the Receiver. This process has revealed several previously unidentified liabilities that were not fully disclosed in the Company's records. The Receiver has also secured and reviewed critical business documents, including supply chain agreements, bottling contracts, and marketing obligations. These reviews aim to identify operational risks and financial commitments that could have a material impact on cash flow.

26.     An initial review of inventory storage agreements and bailment warehouse contracts was completed with follow-up currently underway. This is necessary to confirm lien positions, assess obligations, and evaluate any potential risks associated with warehouse-held inventory. The Receiver is working with other financial institutions that have started foreclosure proceedings on warehouses owned by related entities not included in the Receivership which currently store Uncle Nearest inventories.

27.     **Financial and Accounting Observations.**  At the beginning of the Receivership, the Company's accounting records were materially unreliable and could not be relied upon for accurate financial reporting. Key deficiencies identified include:

- Non-reconciled balances create uncertainty about the accuracy of financial statements.

- Unusual accounting entries lack proper documentation.

- Improper revenue recognition practices that distort the Company's financial performance.

28.     The absence of solid financial controls and the unreliability of certain financial records has been a challenge in determining historical sales and expenses that would aid with forecasting future sales and expenses.  That challenge has been compounded by the fact that a substantial amount financial records before 2024 were allegedly erased from the Company's computer system.  The Receiver has recovered some of those financial records and is currently working to recover the remaining missing records.

29.     The Receiver has also identified related-party transactions involving Grant Sydney, Inc. and Quill and Cask Owner, LLC, both entities owned by the Weavers. These transactions were reviewed via the use of external records and supporting documentation to determine their accuracy, legitimacy, and whether they represent potential improper transfers.  Irregularities were found and continued review and investigation is in process. Since many of the companies that are subject to this receivership action have comingled assets and liabilities with other non-receiver entities, it has made determination of lien priority, and separation of liabilities among corporations, very difficult.

30.     The Receiver has engaged a third-party CPA bookkeeping firm to assist in the ongoing completion of accounting records and preparation of financial statements for the Receivership period.  This activity has resulted in the reconciliation of all cash activity to the completed financial statements for the full year 2025 and January 2026 period.  Monthly financial statements for the consolidated Receivership entities have been completed and distributed to key stakeholders for the full year 2025 period and January 2026. The Receivership team is currently working on completing the February 2026 financial statements.

31.     In addition, the Receivership team is working on gathering source data to recreate certain prior period financial reports. The Receiver thinks it is critical for the Company to have

10

financial statements that have been created under his independent direction, for which he can verify the accuracy.

32. Overall, cash resources remain limited, necessitating tight cash management and prioritization of critical expenses. The Company is not servicing any secured debt, long-term indebtedness, or pre-receivership indebtedness, as it has no financial ability to do so.

33. **Next Steps – Stakeholder Communications.** The Receiver will continue to provide bi-weekly reporting to Farm Credit, including detailed variance reports, expense reviews, and sales forecasts. Regular updates will also be provided to the Court and other key stakeholders. Direct engagement with vendors, customers, and employees will continue to maintain operational stability and foster transparency.

34. **Asset Recovery & Preservation of Value.** The Receiver will continue to secure and monitor the Company's cash, accounts receivable, inventory, leased equipment, and other assets. To ensure accurate reporting and valuation, updated inventory counts and appraisals will be commissioned as necessary. Bailment warehouse records have been reviewed to confirm lien positions and ensure obligations are properly disclosed and managed.

35. **Cash Management.** The Receiver will continue to have rigorous oversight of all disbursements, requiring prior approval for significant expenses. Bank accounts will be reconciled on a daily and weekly basis to ensure the integrity of records and detect irregularities promptly. Forward-looking projections will continue to be refined and stress-tested to account for potential sales fluctuations, ensuring that the Company remains prepared for varying operational outcomes.

36. The Receiver team spent considerable time assessing the current operations of the Company. As a result of those assessments, the Receiver made significant cuts to the operational

11

expenditure of the Company, including reducing its workforce by thirty-four employees, or 38%. Some of the more recent headcount reductions include reductions in management personnel.

37. The Receiver continues to evaluate the workforce and expenditures of the Company, in an effort to increase its operational efficiencies and become more profitable. This has led the Receiver to make additional spending cuts to both administrative and sales budgets to improve overall business efficiency and maintain cash liquidity. These activities include an increased focus on working capital management in the areas of accounts receivable and inventory. The Receivership team has focused recent efforts on improved collections which has reduced gross AR from $3,680,121 at year end 2025 to $2,877,092 at the end of March 2026. This represents an increase of $803,029 (22%) in improved collections.

38. **Investigation & Forensic Review.** The Receiver will continue his review of historical financial records and intercompany transfers to uncover any irregularities or potential recovery opportunities. Special focus will be placed on officer and insider compensation, travel and marketing expenditures, and the identification of potential preferential or fraudulent transfers.

39. As necessary, tax advisors will be engaged to quantify exposures associated with the unfiled federal and state income tax returns dating back to 2018. The Receiver will also evaluate potential claims or causes of action that could be pursued for the benefit of creditors, with a focus on maximizing recovery and ensuring equitable treatment of all stakeholders.

40. **Conclusion.** The Receiver has implemented robust controls to stabilize operations, enhance transparency, and identify key risks. Substantial challenges remain, particularly in areas such as tax compliance, accounts payable, and related-party transactions. The Receiver will continue to prioritize transparency, creditor protection, and preservation of value while working closely with all stakeholders to achieve the best possible outcome for the estate.

## CHALLENGES TO RECEIVERSHIP

41. Cash flow continues to be a major challenge to this receivership. As demonstrated by the data included in the Financial Report above, the Company continues operating at a loss. At this juncture, the Company is only able to maintain operations due to (a) cash infusions by Farm Credit, (b) significant reductions to operational expenses, and (c) professional fees coming in substantially below budget.

42. Due to a variety of factors (for example, credit holds on product shipment, legal fees incurred by the Company, and the impact of this litigation on sales), revenue collections were down significantly when the Receiver assumed control of the Company. The distress of the spirits market as a whole, the reduction of worldwide demand for alcohol, and the impact of tariffs on international sales continue to depress sales. Moreover, litigation such as this always has a negative impact on sales, as a company's employees, vendors, and business partners grow concerned about the long-term viability of a company in receivership. Recent pleadings filed in this Court and in the Bankruptcy Court by Fawn Weaver and Keith Weaver, as well as lawsuits filed in Tennessee and New York state courts, have further damaged the value of the brand. The Receiver bases this conclusion upon his conversations with creditors, vendors, employees, shareholders, Receivership consultants, and potential investors.

43. Another challenge to this receivership is the ongoing threat of significant litigation. As mentioned in prior pleadings, the Receiver has fielded dozens of calls and emails from creditors and shareholders threatening the Company and/or its officers and directors with litigation. The continued stay of litigation, as provided for in the Receivership Order, is critical to maintaining normal operations of the Company. Even with the imposition of the stay, the Receiver believes that litigation initiated by (or potentially against) Fawn Weaver and Keith Weaver poses a threat

13

to the Company, in terms of value of the brand, the confusion that the litigation creates in the market, and in terms of focus of officers, directors and employees.

*CONCLUSIONS, RECOMMENDATIONS AND REQUESTS*

44. The Company is insolvent. The Receiver believes that the Company would be forced to cease operations within thirty days without: (a) continued cash injections by Farm Credit; (b) the stay of litigation provided for in the Receivership Order; and (c) the legal, financial, and operational guidance of the Receiver and his team of consultants. The cessation of business would cause the loss of nearly 70 jobs and the disappearance of a brand with significant social and cultural value.

45. The Receiver continues to believe that the Company's business and brand have a future. In order to maximize that value, the Receiver believes that all non-essential, non-income producing assets must be liquidated as soon as possible, and a sale of the Company as a going concern must be completed by no later than the second quarter of 2026.

Dated this 10th day of April 2026.

Respectfully submitted,

/s/ Justin T. Campbell
Justin T. Campbell
Thompson Burton PLLC
1801 West End Avenue, Suite 1550
Nashville, Tennessee 37203
(615) 465-6015 (phone)
justin@thompsonburton.com

Counsel for the Receiver

14

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document has been served via via the Court's ECF system.

This 10th day of April, 2026.

/s/ Justin T. Campbell.
Justin T. Campbell