| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-38 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| UNCLE NEAREST, INC., et al., | ) | Magistrate Judge Steger |
| | ) | |
| Defendants. | ) | |
| | ) | |

**DEFENDANT FAWN WEAVER'S SUR-REPLY IN OPPOSITION TO THE
RECEIVER'S EXPEDITED MOTION FOR SANCTIONS**

Defendant Fawn Weaver ("Ms. Weaver"), through her undersigned counsel, submits this Sur-Reply in Opposition to the Receiver's Expedited Motion for Sanctions [DE 178] (the "Motion"), as follows:

**Introduction**

1. The Receiver's Motion implicates important Constitutional and separation of powers issues. The Receiver's request for sanctions relating to the filing of a bankruptcy petition implicates Article I, Section 8 of the Constitution and Congress's role in setting the jurisdiction of the Federal courts. The Receiver's requests for imposition of sanctions and injunctive relief relating to Fawn Weaver's descriptions of these legal proceedings on Instagram and in speaking engagements implicate the First Amendment to the Constitution. Ms. Weaver's exercise of rights embodied in the Constitution are not restricted by any orders of this Court and do not provide a basis for sanctions against her.

2. The Receiver cites to two orders that he asserts to be the basis for his Motion – (a) the Receivership Order [Dkt. 39] and (b) the January 23, 2026 Order [Dkt. 116]. However, neither

of these orders prohibits the exercise by Ms. Weaver of her Constitutional rights. While the Receivership Order enjoins entities from "Interfering with, obstructing, or preventing in any way, the Receiver's actions pursuant to this Order, including, but not limited to, any and all actions that may damage the brand and reputation of the Receivership Assets in any form, whether written, verbal, and disseminated through any medium" and from "Interfering in any other way with the Receiver, directly or indirectly," those restrictions cannot be read to prohibit lawful and Constitutionally protected activity. Indeed, read literally, these provisions would prevent anyone from disputing any allegation made by the Receiver, contesting any motion filed by the Receiver, or even questioning any action taken by the Receiver. Clearly, the import of these provisions are to prohibit unwarranted or illegal interference with the Receiver, not to grant the Receiver plenary authority to act with impunity or to strip interested parties of their legal and Constitutional rights.

3. Likewise, the January 23, 2026 Order only cautions the parties regarding the filing of pleadings for any improper purpose. Consequently, that Order clearly does not prohibit any Constitutionally protected speech outside the court. Furthermore, as further articulated below, the filing of the bankruptcy petitions was clearly not for an improper purpose and did not violate either the Receivership Order or the January 23, 2026 Order.

**The Receiver Has Not Provided Any Valid Legal or Factual Basis for the Imposition of Inherent-Power Sanctions Relating to the Filing of the Bankruptcy Petitions**

4. Ms. Weaver's Response filed on March 19, 2026 [Dkt. 180] provides the legal standards for the imposition of inherent-power sanctions in the Sixth Circuit – specifically, "[a] district court must find '(1) that the claims advanced were meritless, (2) that counsel knew or should have known this, and (3) that the motive for filing the suit was for an improper purpose such as harassment.'" *Jordan v. City of Detroit*, 595 Fed. Appx. 486, 488 (6th Cir. 2014) (citing *Metz v. Unizan Bank*, 655 F.3d 485, 489 (6th Cir. 2011)). "The simple fact that an action is without

merit is not tantamount to bad faith; rather, 'the court must find something more than that a party knowingly pursued a meritless claim or action at any stage of the proceedings,' such as by filing the suit for purposes of harassment or delay, or for other improper reasons." *Id*. at 488-89 (quoting Metz, 595 Fed. Appx. at 489).

5. The Receiver's Motion does not attempt to make these showings. It does not identify evidence of improper purpose, does not establish that counsel acted with knowledge of frivolity, and does not engage the governing standard. Instead, it assumes that because the Receiver views the bankruptcy filings as "unauthorized," sanctions necessarily follow. That is not the law.

6. The Motion fails to establish grounds for sanctions or for injunctive relief relating to the filing of the bankruptcy petitions. First, the filing of bankruptcy petition, a legal document, in the Bankruptcy Court, where (a) significant legal authority exists for the proposition that the state court or a federal district court sitting under diversity jurisdiction cannot strip a company's directors from the right to file a bankruptcy petition, and (b) this Court has directly expressed that this case is better handled in bankruptcy court under bankruptcy law, does not establish the elements necessary to sanction a party or its counsel under Sixth Circuit law. The simple fact that the bankruptcy court disagreed with a legal position taken by Ms. Weaver, as asserted through counsel, does not provide a basis for the imposition of sanctions.

7. The question of the legitimacy of the chapter 11 filing, which is at issue with respect to the request for sanctions, is different than the question of whether the chapter 11 filing should have been dismissed by the bankruptcy court. The Receiver's sanction Motion is premised on the actions of Ms. Weaver in signing the bankruptcy petition and authorizing its filing. Consequently, the issue for purposes of the sanctions motion is not whether the dismissal of the bankruptcy cases was appropriate, but whether the petition itself was proper. In this case, the bankruptcy court

3

recognized that it had jurisdiction over the companies and the case as a result of the bankruptcy filing. Consequently, the filing of the bankruptcy petition was clearly an appropriate and successful legal action in seeking to establish jurisdiction in the bankruptcy court and cannot be deemed sanctionable conduct. The dismissal of the cases by the bankruptcy court after exercising its jurisdiction over the chapter 11 cases was based on answering the question as to whether the companies should remain in chapter 11 based on the terms of the Receivership Order and applicable law. While Ms. Weaver believes that the bankruptcy erred in dismissing the cases, that question could only be answered by the bankruptcy court and shows that the petition filings themselves were not sanctionable conduct.

8. The Fourth Circuit addressed a similar matter in *Gilchrist v. GE Capital Corp.*, 262 F.3d 295, 303-304 (4th Cir. 2001), which dealt with a bankruptcy filing after the imposition of a federal court receivership, as follows:

> Our examination of the Bankruptcy Code reveals that Congress intended that the bankruptcy process be favored in circumstances such as these. Section 1334(e) of title 28 is unequivocal in its grant of exclusive jurisdiction to the bankruptcy court, and § 362(a) imposes an automatic stay on all proceedings merely upon the filing of a bankruptcy petition. If we were to frustrate these express provisions to further a first-filed policy, we would have to deny bankruptcy jurisdiction to every bankruptcy court in which foreclosure proceedings had already commenced against the debtor's property, on the grounds that the in rem nature of the foreclosure proceeding precludes the bankruptcy court from taking custody of the res. Such a jurisdictional limitation on bankruptcy proceedings would severely limit the efficacy of bankruptcy. In the absence of express language suggesting that Congress intended for bankruptcy jurisdiction to be so limited, we believe it would frustrate Congressional intent to imply such a limitation based solely on consideration of a first-filed policy.
>
> Even if general equitable principles could modify the application of statutory jurisdictional grants, we do not believe that the equities favor the common-law receivership process over the highly developed and specific bankruptcy process. The procedural requirements for liquidating a large corporation with thousands of creditors, many of whom might challenge the priority of liens and the adequacy of asset sales, present a task that would push the receivership process to its limits. *See Baldwin-United*, 765 F.2d at 348 ("To whatever extent a conflict may arise between the authority of the Bankruptcy Court to administer this complex reorganization

and the authority of the District Court to administer consolidated pretrial proceedings, the equities favor maintenance of the unfettered authority of the Bankruptcy Court"). In this case it can be seen, even from the initial transactions in the receivership, that the customized receivership mechanisms are wanting in comparison with established bankruptcy process. For example, when the receiver in this case sold a mill in Georgia for $ 4.2 million, the creditors had no advance notice of the transaction, and some have challenged the adequacy of compensation, proffering evidence that the mill was worth over $ 20 million. More important to the Georgia creditors in this case, the district court did not have in place a mechanism to adjudicate the relative priority of liens. GE claims a first lien by reason of its perfected security interest in most of the assets of Spartan and proffered an order by which the proceeds of liquidation would be paid to it as the superior lien holder. But Spartan's employees claim a prior statutory lien in assets produced by them at the manufacturing plants at which they worked, as created by state law. While they surely could file claims in the receivership, the process for making and adjudicating such claims was not spelled out.

To resolve the claims involving a large corporation with multiple places of business in different districts and thousands of creditors, a bankruptcy court has judicial tools better suited and more specifically tailored to the task, and those tools include nationwide service of process. *See* Bankr. R. 7004(d). While it is true that the district court has broad equity power, any attempt to use that power to supervise a complex corporate liquidation, in the absence of special circumstances, would ultimately be more clumsy and expensive than long-established bankruptcy procedures. At bottom, we are persuaded that in the circumstances of this case, the district court should have recognized the stay provisions of § 362(a).

Unable to direct us to an exception to § 362(a), GE argues that the entire bankruptcy proceeding is void ab initio because it was filed in violation of the district court's May 22 order. **But even if plaintiffs were effectively subject to the court's order not to file a lawsuit or to commence an action in Georgia, this impediment could not undermine the bankruptcy court's jurisdiction to entertain the matter. While it might provide a basis for that court's dismissing the action, its power to exercise jurisdiction is determined by Congress, not by a competing court order. In this case, the petition in bankruptcy was regulated by 28 U.S.C. § 1334 and the Bankruptcy Code.** If those provisions are not complied with, GE's remedy would be to present its objection to the bankruptcy court. But having such an objection does not render the proceeding *void ab initio*. **To reach that conclusion would make the injunction of one court determinative of the jurisdiction of another, setting courts in different districts against one another. This would completely frustrate the scheme of courts created by Congress. In short, until the bankruptcy case is dismissed or otherwise closed, it is viable and must be recognized by other courts.**

*Id*. (emphasis added).

9. The Fourth Circuit's decision in *Gilchrist*, as well as applicable Sixth Circuit precedent[1] and *In re 530 Donelson, LLC*, 660 B.R. 887 (Bankr. M.D. Tenn. 2024), supports the argument that this Court's Receivership Order cannot restrict the ability of a party to file a bankruptcy petition of the corporate defendants. Indeed, the simple fact that the bankruptcy court in this case determined that it had subject matter jurisdiction to determine the Motion to Dismiss filed by the Receiver and Farm Credit evidences the fact that the filing of the petitions was not, in itself, improper or inappropriate, and is not sanctionable.[2]

10. The question of whether the bankruptcy court should have dismissed the case is one on which the Sixth Circuit or the Supreme Court will likely need to ultimately answer and is not necessarily dependent on whether the Receivership Order was clear or not with respect to who had the right to file a bankruptcy petition, as both the Fourth and Sixth Circuit have cases indicating that any restriction on the ability to put a case like this into bankruptcy is potentially unenforceable. As noted in *Gilchrist*, the jurisdiction of the bankruptcy court to entertain a bankruptcy petition is determined by Congress, not a competing receivership order. The filing of the bankruptcy petitions simply provided the bankruptcy court jurisdiction to determine whether the case should remain in chapter 11.

11. The undisputed record reflects that the bankruptcy filings were made through counsel, following legal review and consideration of applicable law. The Receiver acknowledges

---

[1] *See In re Yaryan Naval Stores Co.*, 214 F. 563, 565-66 (6th Cir. 1914) ("To deny the right of the debtor . . . to take the benefit of the act and thereby secure a discharge from its debts, is to deny the ultimate paramountcy of the act[.]"); *Merritt v. Mt. Forest Fur Farms of Am., Inc. (In re Mt. Forest Fur Farms of Am., Inc.)*, 103 F.2d 69, 71 (6th Cir. 1938) (recognizing a constitutional right to seek relief under the Bankruptcy Act and Art. 1, Sec. 8, clause 4, Constitution of the United States, and holding a state court order restraining the debtor and its management from filing bankruptcy without the consent of the state court to be "erroneously entered" as it denied the company of its constitutional right), cert. denied 308 U.S. 583 (1939); *In re Donaldson Ford, Inc.*, 19 B.R. 425, 431 (Bankr. N.D. Ohio 1982) (citing *Merritt*) (stating that any attempt to prohibit a voluntary Chapter 11 filing would be ineffective). *Cf. Struthers Furnace Co. v. Grant*, 30 F.2d 576 (6th Cir. 1929); *Muffler v. Petticrew Real Estate Co.*, 132 F.2d 479 (6th Cir. 1942).
[2] Motion to Dismiss Hearing Transcript pp. 30:21-25; 31:1-3.

6

that bankruptcy counsel was aware of the Receivership Order and declined to withdraw the petitions when asked to do so. That fact underscores that the conduct at issue was the product of legal judgment, not defiance or bad faith. Sanctions cannot be imposed simply because opposing counsel disagrees with the legal position taken. To hold otherwise would improperly transform routine legal disputes into sanctionable conduct and would chill the advocacy that the adversarial system depends upon. Here, counsel evaluated a complex and unsettled legal issue at the intersection of receivership law and bankruptcy law, relied on existing authority, and filed in a court of competent jurisdiction. That conduct is not sanctionable.

12. The Receiver further requests a flat $25,000 penalty per filing, for a total of $75,000, and suggests that such sanctions may be imposed jointly and severally against counsel. This request is punitive in nature, yet the Motion provides no evidentiary basis for the amount requested, no analysis of causation, and no findings tying any alleged misconduct by counsel to compensable harm.

13. Inherent-power sanctions must be anchored to specific misconduct and supported by findings that the sanctioned party acted with the requisite level of culpability. They cannot be imposed as a punitive measure untethered to the evidentiary record. The Receiver's request does not satisfy these requirements and instead reflects precisely the type of overreach that Sixth Circuit precedent prohibits.

14. Even accepting the Receiver's position for purposes of argument, the dispute presented is a legal one concerning the interpretation of the Receivership Order and the scope of authority to file for bankruptcy. It is not conduct that rises to the level of bad faith or abuse of the judicial process.

15.     Notably, the Receiver acknowledges that bankruptcy proceedings may ultimately be appropriate but contends that such filings should occur under the Receiver's control and at a time of the Receiver's choosing. That concession confirms that the dispute is fundamentally about timing and authority, not misconduct. A disagreement over legal interpretation and litigation strategy does not justify sanctions against counsel.

16.     In sum, the filing of the bankruptcy petitions was not a meritless act and was not filed for the purpose of harassment or delay, or any other improper purpose.  The petitions were filed because (1) this case is better suited to bankruptcy court (as this Court itself has noted) and (2) applicable case law provides a colorable basis for the bankruptcy court to exercise subject matter jurisdiction notwithstanding the Receivership Order, which the bankruptcy court did in fact exercise.  There is simply no legitimate basis for the imposition of sanctions against Ms. Weaver or her counsel.

**The Receiver Has Not Provided Any Valid Legal or Factual Basis for the Imposition of Inherent-Power Sanctions or Injunctive Relief Relating to Ms. Weaver's Exercise of Rights under the First Amendment**

17.     With respect to the Receiver's request for sanctions and injunctive relief relating to Ms. Weaver's exercise of her right of Free Speech, the Receiver has not identified any specific court order that expressly prohibits Ms. Weaver from exercising her First Amendment rights and, even if there were such an order that could be construed to blanketly prohibit Ms. Weaver's exercise of her Constitutional rights, that order would be unconstitutional and unenforceable. None of the provisions of the Receivership Order directly restrict the First Amendment rights of any party.  To the extent that the Receiver points to vague provisions, such as prohibitions against damaging the brand or reputation of the Receivership Assets, those provisions are too broad and undefined to be considered valid restrictions on the exercise of First Amendment rights.  In any event, the Receiver has provided no evidence that any statements made by Ms. Weaver have

8

damaged the Uncle Nearest brand or reputation of the Receivership Assets. Indeed, every post made by Ms. Weaver is nothing but positive about the value of the brand and the Receivership Assets. Her statements have done nothing other than dispute the Receiver's assertions that the brand and Receivership Assets have more limited value.

18. Where a party seeks to interpret an order as restricting the exercise of Constitutional rights, the analysis is extremely strict and the burden is extremely high. The Sixth Circuit has stated:

> [I]n general, when a district court issues a TRO, it is to "review factors such as the party's likelihood of success on the merits and the threat of irreparable injury," but "in the case of a prior restraint on pure speech, the hurdle is substantially higher: publication must threaten an interest more fundamental than the First Amendment itself." *Procter & Gamble Co. v. Bankers Trust Co*., 78 F.3d 219, 226-27 (6th Cir. 1996).
>
> . . .
>
> "Any system of prior restraints of expression [bears] a heavy presumption against its constitutional validity," and a party who seeks to have such a restraint upheld "thus carries a heavy burden of showing justification for the imposition of such a restraint." *New York Times Co. v. United States*, 403 U.S. 713, 714, 29 L. Ed. 2d 822, 91 S. Ct. 2140 (1971) (per curiam) (citations omitted). This burden, however, is not impossible to overcome. A prior restraint is permissible if the restrained speech poses "a grave threat to a critical government interest or to a constitutional right." *Procter & Gamble*, 78 F.3d at 225, 227 (vacating two TROs and a permanent injunction prohibiting Business Week from publishing discovery materials that had been filed as confidential pursuant to Rule 26 of the Federal Rules of Civil Procedure, because the planned publication did not pose a threat sufficient to justify the injunctive orders). In such a situation, however, the restraint must be narrowly drawn and be the least restrictive means available. *CBS Inc. v. Young*, 522 F.2d 234, 236, 238, 239-40 (6th Cir. 1975) (holding that an order prohibiting counsel, court personnel, parties, and parties' relatives, friends, and associates from discussing "in any manner whatsoever" the personal injury and wrongful death cases before the court was an invalid prior restraint because, among other reasons, of its "vagueness and overbreadth").

*County Sec. Agency v. Ohio DOC*, 296 F.3d 477, 485-86 (6th Cir. 2002).

19. To the extent that the Receiver argues that the Receivership Order or the January 23, 2026 Order operated to restrict communications prior to their occurrence, then those orders

constitute prior restraints on speech. "One type of prior restraint is a judicial order 'forbidding certain communications when issued in advance of the time that such communications are to occur. Temporary restraining orders and permanent injunctions--i.e., court orders that actually forbid speech activities--are classic examples of prior restraints.'" *Id*. at 485 (*quoting Alexander v. United States*, 509 U.S. 544, 550, 125 L. Ed. 2d 441, 113 S. Ct. 2766 (1993) (emphasis and citations omitted)). In order for a prior restraint on speech to be valid and enforceable, the targeted speech must be found to pose "a grave threat to a critical government interest or to a constitutional right." *Id*. (*quoting Procter & Gamble*, 78 F.3d at 225, 227).

20. In this case, the Receiver has not asserted that any of the speech involved in this case poses a grave threat to any governmental interest or to any Constitutional right, and the specific orders referenced by the Receiver make no such findings. Consequently, the speech complained of by the Receiver cannot be deemed constrained by either the Receivership Order or the January 23, 2026 Order. The Receiver's assertions in that regard clearly have no valid legal basis.

21. The January 23, 2026 Order cited to by the Receiver in his Notice of Exhibits [Dkt. 190] cautions the parties regarding filing pleadings in court intended to influence public opinion, rather than adjudicating legitimate issues. That Order does not restrict or prohibit the exercise by any party of their Constitutional right of Free Speech outside the courtroom. In sum, there is no pending Order issued by the Court that can reasonably be read to prohibit the few Instagram posts and statements made by Ms. Weaver relating to the case.

22. The Receiver further improperly distorts the facts or provides hearsay in order to push his narrative. First, the Receiver asserts that "[t]his Court has repeatedly warned Ms. Weaver about attempting to use social media in furtherance of this case." Yet, the Receiver has not

10

provided any evidence of these alleged repeated warnings.  The only such statement in that regard by the Court related to the Agreed Order entered by the Court on consent of the Parties and was made in footnote 1 to the Court's Order entered August 21, 2025. The Court's statement related specifically to the consented restraint on speech included in the Agreed Order, which restraint expired upon the appointment of the Receiver.  As Ms. Weaver states in her February 12, 2026 Instagram post (Receiver's Exhibit 1), she had been practically silent about the case for the six months prior to the February 9, 2026 hearing. The earliest Instagram post that the Receiver has provided occurred on February 5, 2026.  There is simply no presented evidence of any repeated warnings nor of any history of posts by Ms. Weaver that have had any impact on the Receivership.

23.      The Receiver also alleges that Ms. Weaver brags that she violated an NDA even though he is fully aware that she refused to sign the NDA that the Receiver demanded as a condition to her receipt of any financial information relating to the Company until _after_ the February 9, 2026 hearing. It is telling that the Receiver does not actually attach the executed NDA as an exhibit and does not even seek to identify any specific documents that the Receiver asserts to have been disclosed in violation of the NDA. In other words, there was no NDA to violate at the time that the evidence was submitted at or in conjunction with the February 9, 2026 hearing, and the Receiver knows this fact. Ms. Weaver never asserted that she violated the NDA.  She simply asserted that she refused to sign the NDA demanded by the Receiver, which was geared to prevent Ms. Weaver from filing any financial information with the Court.  The Court's March 26, 2026 Order required the Receiver to provide all of his evidence on this issue by April 9, 2026.  He provided no actual evidence of a violation by Ms. Weaver of any NDA.

24.      With respect to Ms. Weaver's comments on her personal social media account relating to the February 9, 2026 hearing, that hearing was a public hearing with press in attendance.

11

While the parties sought to seal the hearing pleadings and exhibits, the Court denied those efforts. Consequently, just as the Press has the Constitutional right to report on the hearing, Ms. Weaver likewise has a Constitutional right to comment on the hearing and the attacks on her therein on her personal social media accounts. The Receiver has consistently put Ms. Weaver and her personal assets at the center of the conversation in this case even though neither Ms. Weaver, Grant Sidney, nor any of the additional non-party entities are personally obligated on any of the Farm Credit claims. He and Farm Credit have asserted or implied unnecessarily and without evidence that Ms. Weaver committed misappropriation of assets, misrepresented the status of assets, conspired to inflate company projections post-receivership, and other similar allegations. These allegations have been picked up in the media and published widely, directly impairing, without any supporting evidence, Ms. Weaver's reputation and impairing her ability to generate income to cover her personal living expenses.  The unfounded allegations of commingling have put the operations of the non-party companies in limbo for **over 6 months without any legitimate evidence to support a commingling or alter ego determination.** To assert that Ms. Weaver must suffer the slings and arrows of the Receiver, who simply hurls allegations and insinuations without any supporting evidence yet is given inordinate credence in the media due to his position as receiver, without the ability to defend herself on her own social media pages is wrong and inequitable, and is why U.S. citizens are guaranteed a right to freedom of speech.

25.     The Receiver has not asserted that any of the statements made by Ms. Weaver on her social media pages were or are factually incorrect, defamatory, or inciting imminent injury to any party.  Indeed, Ms. Weaver has consistently argued that the value of the Uncle Nearest brand is incredibly strong and urged those following her social media posts to continue to buy Uncle Nearest products and support the brand. To the extent that Ms. Weaver has asserted her displeasure

with the Receiver's actions and the direction of this Receivership, she is entitled to her opinion on those issues and to let her social media followers understand her position. Other than pure conjecture, the Receiver has not provided a scintilla of evidence showing that Ms. Weaver's few social media posts have had any negative impact on the enterprise value of the Uncle Nearest entities. Rather, the negative impact is almost certainly the result of the Receiver's own management of the Companies.

26. While the bankruptcy cases were ultimately dismissed, the Press Release issued indicating that the lawsuit against Farm Credit and the bankruptcy petitions had been filed was factual, non-defamatory. The Press Release, which was issued by Grant Sidney, did not rise to the level of sanctionable speech.

27. The Receiver's assertion that the filing of the bankruptcy petitions and the statements of Ms. Weaver are causing confusion as to the status of the case ignores the fact that there is a pending Motion to Reconsider seeking to dissolve the Receivership that has been pending since December 23, 2025. Any question of whether the Receiver would be in a position to close on a sale of the Company has been pending since that time without regard to any social media posts or bankruptcy filings. In fact, the filing of the bankruptcy petitions prior to this Court's resolution of the Motion to Reconsider ensured that a determination on that issue would not needlessly extend the question of the Receiver's continued role in the case upon a determination on the Motion to Reconsider. Consequently, the decision to file the chapter 11 petitions prior to this Court's determination on the Motion to Reconsider, and the related social media posts, could not have caused or extended any question as to the Receiver's ultimate authority to consummate a sale of assets. That question won't be answered until the Court issues its opinion on the Motion to Reconsider and rules on a yet to be filed motion to approve a sale of assets.

28. The Receiver lumps everything filed since last Autumn as costing the Receivership "countless hours and hundreds of thousands of dollars." In the Autumn of 2025, the only pleadings filed by Fawn Weaver were (a) the direct result of the Receiver's Motion to Clarify, in which, without having performed any investigation, the Receiver sought to have ten companies, none of which are obligated on the Farm Credit alleged debt, placed in receivership and (b) Ms. Weaver's Motion seeking to set the underlying litigation on a path to resolution. The Receiver's apparent belief is that the ten non-Defendant companies should not have had the right to file pleadings in opposition to being placed in Receivership and the underlying claims and counterclaims relating to the Farm Credit debt should not be resolved until all of the assets of the Defendant companies have been completely liquidated. There was nothing filed by Ms. Weaver in the Autumn of 2025 that had any bearing on the loss of enterprise value that has occurred at the hands of the Receiver. Further, the only filings in December of 2025 by Ms. Weaver, related to the Motion to Clarify, and the Motion to Reconsider the Receivership Order. All of those pleadings were entirely proper. To the extent they were critical of the Receiver, that criticism formed a significant basis for the request to terminate the receivership and were not made for any improper purpose. That criticism, and the risk of further criticism, comes with the territory of being appointed as a Receiver and the creditors, directors and shareholders of the entities in receivership should have the right to lodge such criticisms so long as the allegations are not false and are presented for a legitimate purpose.

29. The simple fact is that, to the extent that the Receivership Estate and the ten non-Debtor companies have had to expend significant resources in dealing with the Motion to Clarify, those expenditures have been caused purely by the Receiver, not by the Weavers or any of the ten additional entities. Accordingly, the Receiver's effort to place that blame on Ms. Weaver's filings is invalid and should be rejected.

30. Finally, the Receiver has not identified any specific damage caused by the exercise by Ms. Weaver of her Constitutional right of Free Speech. The Receiver has not identified any speech that was false or defamatory, or that would create some imminent, identifiable harm. In sum, there is no basis to enjoin the exercise of Free Speech that is sufficient to withstand the strict scrutiny that would be applied to any such order.

31. With respect to Uncle Nearest's sales, there is no evidence that any action taken by Ms. Weaver has caused harm. Attached as **Exhibit A** is a Nielsen summary including the period ending March 2026, which shows that there has been no material change to the decreasing performance of the Uncle Nearest brand at the retail level that has persisted since the start of the Receivership. In fact, the retail performance has nominally improved (i.e. the rate of decrease in performance has lessened) in February and March 2026 during the very period that the social media posts at issue have occurred.

32. The Receiver cites to the Agreed Order entered on August 8, 2025 [Dkt. 29], which was an agreed order submitted to the Court by agreement of the parties and with no opposition. In its Order entered August 8, 2025 [Dkt. 28], the Court specifically recognized that there was no opposition to the entry of the Agreed Order as a primary basis for the Court's decision to enter the Agreed Order. While the parties can certainly voluntarily agree to curtail their respective rights of free speech, that right can be involuntarily restricted only under certain limited circumstances, as outlined above. Here, the Receiver has not provided any evidence that the exercise of Ms. Weaver's right to free speech poses an imminent threat to the government or will impair a competing Constitutional right. In fact, the Receiver has not even provided any valid evidence that Ms. Weaver's few Instagram posts have or will cause any decline in the value of the Receivership Estate or that it has added any material uncertainty to the question of whether the

Receivership will continue, where that question has already been pending before the Court since December 23, 2025. In the absence of evidence satisfying the strict scrutiny that pertains to prior restraints on free speech, there is no basis to impose sanctions on or curtail the First Amendment rights of Ms. Weaver or any other party.

**None of the Evidence Provided by the Receiver Supports the Imposition of Sanctions or Injunctive Relief**

33. Pursuant to the Court's Order entered March 26, 2026, the Receiver was required to produce all of his evidence supporting the request for sanctions and injunctive relief. The total support provided by the Receiver is three posts (one including three parts) made on Fawn Weaver's personal Instagram account, a TikTok video posted by someone other than Ms. Weaver, and a press release by Grant Sidney, Inc., none of which includes any content that the Receiver has asserted is false or defamatory.

34. The Receiver's Exhibit 1 is a video posted to Fawn Weaver's personal Instagram account on February 5, 2026. There is literally nothing about this video that harms Uncle Nearest or the current proceeding. In fact, Ms. Weaver merely expresses that she will have the opportunity to cross-examine the allegations made against her and the Company. That she advises her followers that the February 9, 2026 hearing would be open to the public is simply a true fact. That she characterizes the efforts to sell the company in the receivership to a robbery in broad daylight is her opinion of the matter, which is an opinion that she is entitled to hold and to pronounce under the Constitution. She further states "Be clear. This judge is a very fair judge. He will deal with no shenanigans." This is also an opinion that Ms. Weaver is entitled to hold and to pronounce. Neither of these statements, nor any other statement in this Feb. 5, 2026 posting, represents speech that is appropriately prohibited or subject to sanctions.

16

35.     The Receiver's Exhibits 2, 3, and 4 are three connected posts made by Fawn Weaver on her personal Instagram account on February 12, 2026.  The posts provide a summary of the testimony at the February 9, 2026 hearing, which was a hearing open to the public.  The Receiver cites to <u>nothing</u> in any of the three posts that alleges a false fact or a defamatory statement.  With respect to the first post, the Receiver simply takes issue with Ms. Weaver proposing the title of her next book as "The Attempted Heist of Uncle Nearest." Ms. Weaver's consideration of that title as a title for an upcoming book is her right under the First Amendment and does not create a basis for injunctive relief.  With respect to the first post in Exhibit 2, the Receiver does not allege that any of the factual assertions made by Ms. Weaver were false or defamatory.

36.     With respect to the second post (Exhibit 3), the Receiver again does not allege that any of the statements made by Ms. Weaver were false or defamatory. He takes issue with Ms. Weaver pointing out that the Receiver has made millions of dollars already in this Receivership and questions that such a significant amount of money could create any bias on his part. Ms. Weaver does not make that specific allegation in the post, but the Receiver is and should be sensitive to that issue.  Frankly, everyone in this case should be sensitive to that issue and it is always a paramount issue in bankruptcy cases, receiverships and other types of collective proceedings.  However, just because the Receiver is sensitive to that issue does make the simple assertion of how much money he has received a defamatory statement.

37.     Similarly, Ms. Weaver's recitation of the testimony of Anthony Severini made at the February 9, 2026 hearing, which was open to the public, is not inappropriate or defamatory. The Receiver had the ability to cross-examine Mr. Severini with respect to his statement that the Receiver lied to him.  The Receiver had the ability to provide rebuttal evidence, but the Receiver

chose not to do either. Mr. Severini's statements have also been reported elsewhere in the press.[3] Ms. Weaver's factually accurate recitation of unrebutted testimony at a public hearing should not serve as the basis for sanctions or injunctive relief.

38.     With respect to the third post (Exhibit 4), the Receiver again cites to no false or defamatory statements made by Ms. Weaver. Ms. Weaver's highlighting her own testimony from the hearing is not inappropriate and her assertion that her name has been slandered and smeared is a position that she is entitled to take and one that she stated on the record at the February 9, 2026 hearing. That very position has also been laid out in the Complaint recently filed against Farm Credit in New York. Her reference to this Court's own statements at the February 9, 2026 hearing was not false and her acknowledgment and apology that she inappropriately spoke out at the hearing was also accurate and shows her deference for the Court proceeding. The Receiver has pointed to no statement in the third post that would support enjoining Ms. Weaver from continuing to exercise her rights under the Constitution.

39.     The Receiver's Exhibit 5 is a post made on Ms. Weaver's personal Instagram account on or about March 17, 2026 and his Exhibit 7 is a press release issued on or about March 17, 2026 by Grant Sidney, Inc. (the "Press Release"). The Receiver erroneously asserts that the Press Release was published by "Ms. Weaver, Mr. Weaver and Grant Sidney." This is false, as the Press Release clearly states that it is provided by Grant Sidney, Inc.

40.     This post (Exhibit 5) and Press Release were made after the filing of bankruptcy petitions on behalf of the Uncle Nearest entities and after the filing of the Complaint against Farm

---

[3]     See, e.g. https://truthseekersjournal.com/uncle-nearest-to-remain-under-federal-control-as-judge-evaluates-competing-claims-of-solvency/ ("In one of the more serious allegations presented in open court, Severini stated that the Receiver "lied" to him about the company's financial condition. He testified that he did not learn of significant cash-flow concerns on the part of the Receiver until January 2026 . . . . Notably, neither the Receiver's attorney nor counsel for Farm Credit Mid-America chose to cross-examine Severini, leaving his testimony  including his statement that the Receiver "lied" to him unrebutted in the record.").

Credit in New York.  The Receiver asserts that the Instagram post, the bankruptcy filings, and the Farm Credit Complaint "were all filed in coordination to attempt to control the public opinion through their court filings." However, the issuance of a press release, as well as Fawn Weaver's Instagram post, was not expected to "control" public opinion but simply to advise the media of the filing and the current status of the case, which is very common for companies when a bankruptcy petition is filed. Again, the Receiver cites to no statement made in either the Instagram post or the Press Release that is false or defamatory.  Indeed, both the Instagram post and the Press Release are extremely positive about the outlook for Uncle Nearest and in no way disparage either the Company or the Receiver. With respect to Farm Credit, the Instagram post simply recites the allegations made in the New York Complaint. None of the statements made in either the Instagram post or the Press Release violates any Court order or supports enjoining the exercise of First Amendment rights by any party or entity.

41.     The Receiver's Exhibit 6 is a TikTok video taken on February 28, 2026 and posted by someone other than Ms. Weaver. In the video, Ms. Weaver discusses the case and the testimony at the February 9, 2026 hearing, which was a hearing open to the public. The Receiver's only specific reference to the content of the hearing is his false assertion that Ms. Weaver claims to have violated an NDA. As discussed previously, in January 2026, Ms. Weaver initially refused to sign the NDA required by the Receiver in advance of the February 9, 2026 hearing because the NDA would have prohibited Ms. Weaver from providing financial information regarding the Receivership to the Court, which type of agreement frankly should never be countenanced by the Court in a public, collective proceeding such as a receivership. As a result, Ms. Weaver had to rely upon financial information provided by the Receiver prior to December 15, 2025 at the February 9, 2026 hearing.  The financial documents that Ms. Weaver references filing with the Court were

19

the pre-December 15, 2026 financials that had already been provided to Ms. Weaver and that were filed in advance of the February 9, 2026 hearing. As the Receiver is fully aware, there was no NDA in effect as of the February 9, 2026 hearing or with respect to the filings associated with that hearing, to which Ms. Weaver was referring.

42. Ms. Weaver signed the NDA on February 18, 2026, after the February 9, 2026 hearing had concluded, because it was the only way for her to obtain current financial information about the Company absent filing a motion before this Court.[4] The Receiver then used Exhibit 6 as a predicate to assert that Ms. Weaver breached the NDA, which was false, and has provided no financial information to Ms. Weaver since February 23, 2026. Ms. Weaver has not violated the NDA, and the Receiver's allegation in that regard is false.

43. There is also nothing about the Tik Tok video that the Receiver has asserted to be false or defamatory. In any event, the video was not made or broadcast by Ms. Weaver and does not support the imposition of an injunction relating to First Amendment rights.

---

[4] Ms. Weaver reserves the right to request that the Court nullify the NDA as against public policy in a receivership proceeding, which is a collective proceeding.

WHEREFORE, Fawn Weaver hereby respectfully requests that the Court deny the Receiver's Motion and grant such other relief as is appropriate.

Respectfully submitted,

**MANIER & HEROD, P.C.**

*/s/ Michael E. Collins*

Michael E. Collins  (TN BPR No. 16036)
S. Marc Buchman (TN BPR No. 41598)
1201 Demonbreun Street, Suite 900
Nashville, Tennessee 37203
T: (615) 244-0030
F: (629) 500-1137
mcollins@manierherod.com
mbuchman@manierherod.com

*Counsel for Fawn Weaver*

### CERTIFICATE OF SERVICE

I hereby certify that on April 16, 2026, a copy of the foregoing was served via this Court's CM/ECF system on all parties consenting to receive electronic service.

*/s/ Michael E. Collins*

Michael E. Collins

# EXHIBIT A

**NIELSEN (NIQ) RETAIL SCAN DATA**

| Period | Uncle Nearest $ Growth | Market $ Growth | Delta |
|---|---|---|---|
| January 2025 | 30.2% | -1.0% | 31.2 pts |
| February 2025 | 5.4% | -7.1% | 12.5 pts |
| March 2025 | -1.1% | -4.3% | 3.2 pts |
| April 2025 | 7.0% | -4.9% | 11.9 pts |
| May 2025 | 1.3% | -5.0% | 6.3 pts |
| June 2025 | 1.3% | -0.4% | 1.7 pts |
| July 2025 | 0.7% | -4.6% | 5.3 pts |
| **Bank Lawsuit Announced** | | | |
| August 2025 | 7.2% | -0.6% | 7.8 pts |
| **Receiver Appointed** | | | |
| September 2025 | -8.2% | -6.8% | -1.4 pts |
| October 2025 | -25.3% | -11.0% | -14.3 pts |
| November 2025 | -14.8% | -7.7% | -7.1 pts |
| December 2025 | -23.8% | -9.0% | -14.8 pts |
| January 2026 | -26.8% | -8.5% | -18.3 pts |
| February 2026 | -19.1% | -3.1% | -16 pts |
| **Social Media (Ex. 8, 9, 10, 11, 13, 14) - Jan 22 to Feb 21, 2026** | | | |
| March 2026 | -17.7% | -2.2% | -15.5 pts |

By January 2026, Uncle Nearest underperformed the market by 18.3 percentage points. By February 2026, that underperformance was 16.0 percentage points, and by March 2026, it was 15.5 percentage points, representing a **46.7-point reversal** from January 2025, when the brand outperformed the market by 31.2 percentage points.