# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT WINCHESTER

| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) | |
| | ) | |
| *Plaintiff,* | ) | Case No. 4:25-cv-38 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| UNCLE NEAREST, INC., *et al.,* | ) | Magistrate Judge Steger |
| | ) | |
| *Defendants.* | ) | |

## ORDER

Before the Court are Defendant Fawn Weaver, Defendant Keith Weaver, and Non-party Grant Sidney, Inc.'s "Motion to Reconsider the Memorandum Opinion and Order [Dkt. 32] and Order Appointing Receiver [Dkt. 39] and to Stay Access to Proprietary Information" [Doc. 91] and Receiver Phillip G. Young, Jr.'s "Motion for Clarification of Receivership Order" [Doc. 41] which the Court construes as a motion to expand the receivership. For the following reasons, the Motion to Reconsider [Doc. 91] is **DENIED**, the Motion for Clarification [Doc. 41] is **GRANTED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**.

### I. BACKGROUND

This is a breach of contract action. Plaintiff Farm Credit Mid-America, PCA alleges that Defendants Uncle Nearest, Inc., Nearest Green Distillery, Inc., Uncle Nearest Real Estate Holdings, LLC, Fawn Weaver, and Keith Weaver breached a July 22, 2022, Credit Agreement, as amended, and associated loan documents.[1] [*See generally* Doc. 1]. Alongside the Verified

---

[1] The July 22, 2022, Credit Agreement and associated loan documents are described in further detail in the Court's August 14, 2025, Memorandum Opinion and Order granting Farm Credit's motion seeking the appointment of a receiver. [*See* Doc. 32 at pp. 1–3]. Familiarity with the August 14, 2025, Memorandum Opinion and Order is presumed.

Complaint, Farm Credit filed an "Emergency Motion for the Immediate Appointment of Receiver" requesting that the Court appoint a receiver to oversee Uncle Nearest, Inc., Nearest Green Distillery, Inc., and Uncle Nearest Real Estate Holdings, LLC (collectively "Uncle Nearest") during the pendency of these proceedings. [Doc. 3]. Farm Credit was concerned that without the immediate appointment a receiver, its collateral—which encompasses most, if not all, of Uncle Nearest's assets—would be at imminent risk of concealment, dissipation, loss, or diversion. [*See id.* at p. 20 ¶ 47].

The Court held a hearing on Farm Credit's motion on August 7, 2025. [Doc. 26]. At this hearing, Keith Weaver and counsel for Uncle Nearest each conceded that Uncle Nearest was in default under the July 22, 2022, Credit Agreement. [*See* Doc. 30 at p. 31, 73]. Considering this, the arguments and evidence presented at the hearing, the parties' written submissions, and the other materials in the record at the time, the Court determined a receivership was necessary to protect Farm Credit's interests. [Doc. 32]. Accordingly, the Court granted Farm Credit's motion and directed the parties to submit additional briefing regarding who should be appointed to serve as Uncle Nearest's receiver. [*Id.* at p. 10–11]. Farm Credit proposed two candidates, [Doc. 36], and the Defendants proposed one, [Doc. 37]. Ultimately, the Court appointed the Defendants' proposed candidate, Phillip G. Young, Jr., of Thompson Burton, PLLC (hereinafter the "Receiver") to serve in the role.[2] [Doc. 39 at p. 1].

Much has happened since then, not all of which bearing mentioning at this time. For purposes of this Memorandum Opinion and Order, it is sufficient to say the Receiver filed the Motion for Clarification on September 12, 2025, asking the Court to clarify whether it intended to

---

[2] The scope of the receivership, the powers it vests in the Receiver, and the obligations it places on the Receiver are detailed in the Court's August 22, 2025, Order Appointing Receiver. [*See generally* Doc. 39]. Familiarity with the Order Appointing Receiver is presumed.

2

include Uncle Nearest Real Estate Holdings, LLC and ten additional entities in the scope of the receivership.[3] [Doc. 41]. The Receiver requested the Court clarify whether Uncle Nearest Real Estate Holdings LLC is included in the receivership estate because, at the time the Motion for Clarification was filed, certain financial institutions were confused as to the receivership's scope. [*See id.* at p. 2]. As for the ten additional entities, the Receiver noted that each appeared to be somewhat related to Uncle Nearest, Inc., but he took no position regarding whether any of them should be included in the receivership. [*Id.* at pp. 3–4]. In the weeks that followed, the Court clarified that Uncle Nearest Real Estate Holdings, LLC is included in the receivership estate, [Doc. 45 at p. 2 n.1], and it ordered the Receiver to serve the Motion for Clarification on each of the ten additional entities so they could respond to it, [*id.* at p. 2–3].

After each of the ten additional entities responded to the Motion for Clarification, [*see generally* Docs. 51–60], the parties—in a collaborative spirit that has long since vanished from this case—jointly moved for the entry of an agreed order staying further proceedings concerning the Motion for Clarification until such time as the Receiver completed a consented-to review of the additional entities' bank records and either (a) advised the Court he was withdrawing the Motion for Clarification or (b) requested a post-review hearing on whether one or more of the additional entities should be included in the receivership. [*See* Docs. 77, 77-1]. The Court granted the parties' joint motion and entered their proposed agreed order. [Docs. 78, 79]. Thereafter, the Receiver began reviewing the additional entities' bank records.

This review wrapped up towards the end of December 2025. [*See* Doc. 98]. As the Receiver

---

[3] These ten entities are as follows: (1) Shelbyville Barrel House BBQ, LLC; (2) Humble Baron, Inc.; (3) Grant Sidney, Inc.; (4) Uncle Nearest Spurs VI, LLC; (5) Quill and Cask Owner, LLC; (6) Nashwood, Inc.; (7) Classic Hops, Inc. (a/k/a Classic Hops Brewing Co.); (8) Shelbyville Grand, LLC; (9) Weaver Interwoven Family Foundation; and (10) 4 Front Street LLC (originally identified as "4 Park Street LLC"). [*See* Doc. 41].

was finalizing his position on the Motion for Clarification, the second motion currently before the Court was filed. Specifically, Fawn Weaver, Keith Weaver, and Grant Sidney, Inc. (one of the additional entities and the holding company through which Fawn Weaver owns her shares of Uncle Nearest, Inc., [*see* Doc. 41 at 2; Doc. 160-1 at p. 1 ¶¶ 3–4]) filed the Motion to Reconsider on December 23, 2025, asking the Court to end the receivership of Uncle Nearest. [Doc. 91]. A few weeks later, the Receiver (i) notified the Court he was withdrawing the Motion for Clarification as to three of the additional entities,[4] (ii) notified the Court he was now actively the inclusion of the seven remaining additional entities in the receivership estate,[5] and (iii) requested that, in light of the foregoing, the Court set the Motion for Clarification for hearing. [Doc. 98]. The Weavers and Grant Sidney requested an expedited hearing on their Motion to Reconsider shortly thereafter. [Doc. 113].

The Court set both motions to be heard on February 9, 2026. [Doc. 116 at p. 8]. The February 9 hearing began with evidence and argument directed primarily at the Motion to Reconsider. Unfortunately, and despite the parties' best efforts, this consumed the entire day. [*See* Doc. 144]. As the hearing wore on, the Receiver, recognizing the situation, withdrew his request for a hearing on the Motion for Clarification and stated he was comfortable having his motion resolved on the papers. [*See id.* at p. 232]. Considering this and other developments during the hearing—including Fawn Weaver stating she had relevant evidence that she could produce once

---

[4] Specifically, the Receiver withdrew the Motion for Clarification as it pertained to Uncle Nearest Spurs VI, LLC, Classic Hops, Inc. (a/k/a Classic Hops Brewing Co.), and the Weaver Interwoven Family Foundation. [Doc. 98 at p. 2; *see also* Doc. 116 at p. 1 n.1 (acknowledging the Receiver's withdrawal of the Motion for Clarification as to these entities and holding that they "shall not be included in the receivership and need not participate any further in these proceedings.")].

[5] These seven entities are as follows: (1) Shelbyville Barrel House BBQ, LLC; (2) Humble Baron, Inc.; (3) Grant Sidney, Inc.; (4) Quill and Cask Owner, LLC; (5) Nashwood, Inc.; (6) Shelbyville Grand, LLC; and (7) 4 Front Street LLC (originally identified as "4 Park Street LLC"). [*See* Doc. 98 at p. 2].

4

she had access to an electronic device, [*see id.* at p. 233]—the Court ordered the parties to submit supplemental briefing relating to both the Motion to Reconsider and the Motion for Clarification. [*See* Doc. 143]. The Court has since received this supplemental briefing, and both the Motion to Reconsider and the Motion for Clarification are now ripe for review.

## II.     LAW AND ANALYSIS

The Court will begin with the Weavers and Grant Sidney's Motion to Reconsider, addressing why it is necessary for Uncle Nearest to remain in receivership. Then, the Court will turn to the Receiver's Motion for Clarification, explaining why the receivership will be expanded to include Grant Sidney, Inc. but will not be expanded to include any of the other six entities at this time.

### A.  **Motion to Reconsider**

Fawn Weaver, Keith Weaver, and Grant Sidney ask the Court to end the receivership of Uncle Nearest. [*See generally* Doc. 91]. Though they style their motion as one for reconsideration, the Weavers and Grant Sidney do not seek to relitigate the Court's August 2025 decision to appoint a receiver. Rather, they argue circumstances have materially changed since the Receiver was appointed that render the continuation of the receivership inappropriate. [*See, e.g.*, *id.* at p. 10 ¶ 17 ("The Court has inherent authority and discretion to terminate the Receivership where the purpose of the Receivership is no longer needed or appropriate."); Doc. 151 at p. 1 ("The question before the Court on this Motion to Reconsider is whether the Receivership remains appropriate in light of the current and changed circumstances of this case.")]. Accordingly, the Court construes the Motion to Reconsider as being brought pursuant to Paragraph 25 of the Order Appointing Receiver which authorizes Farm Credit and all Defendants to "file a Motion to Terminate Appointment of Receiver upon the occurrence of any material change in circumstances that eliminates the need for

5

a receivership."[6] [Doc. 39 at p. 18 ¶ 25].

In evaluating whether there has been such a material change, the Court looks to the same equitable factors it considered when it originally decided to appoint a receiver. As a reminder, these factors are:

1.     Whether the property at issue is in imminent danger of being lost, concealed, injured, diminished in value, or squandered;

2.     Whether the Defendants have engaged in fraudulent conduct;

3.     Whether legal remedies are inadequate;

4.     Whether less drastic equitable remedies are available;

5.     The likelihood that the appointment of a receiver would do more good than harm;

6.     Whether there is inadequate security for the debts; and

7.     Whether the debtor is insolvent.

*Pension Benefit Guar. Corp. v. Evans Tempcon, Inc.*, 630 F. App'x 410, 414 (6th Cir. 2015). The Court also considered the parties' advance consent when it considered whether to appoint a receiver, [*see* Doc. 32 at 10], though this is less relevant now where the question is whether the receivership should continue as opposed to whether it should begin. This change in the question before the Court has another, more substantive effect; it shifts who bears the burden.

When Farm Credit filed its Emergency Motion for the Immediate Appointment of Receiver, it bore the burden of establishing—through the lens of the foregoing factors—that a receiver was necessary to protect its interests. *See id.* (stating a court should employ a receivership

---

[6] Although Grant Sidney, Inc., is not a defendant authorized to seek termination of the receivership under Paragraph 25, the Court will look past this issue considering that (1) Fawn and Keith Weaver have also joined in the Motion to Reconsider and (2) this Memorandum Opinion and Order expands the receivership to include Grant Sidney, *see infra* pp. 51–55.

"only in cases of clear necessity to protect plaintiff's interests in the property" (internal quotation marks omitted)); *PNC Bank, Nat'l Ass'n v. Goyette Mech. Co.*, 15 F. Supp. 3d 754, 758 (E.D. Mich. 2014) ("Rule 66 of the Federal Rules of Civil Procedure authorizes the appointment of a receiver if a person with an interest in the property provides sufficient justification."). Now that Farm Credit has met this burden, [*see generally* Doc. 32], the continuation of the receivership is the status quo. To justify its termination, the Weavers and Grant Sidney must "demonstrate significant changes in fact, law, or circumstance since the previous ruling." *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 414 (6th Cir. 2012) (internal quotation marks omitted) (stating that a party seeking to dissolve a preliminary injunction, a pre-judgment equitable tool like a receivership, bears the burden of demonstrating the injunction should be dissolved); *see also* [Doc. 39 at p. 18 ¶ 25]. The Weavers and Grant Sidney have failed to meet this burden.[7]

     1.   *Uncle Nearest is insolvent by a considerable margin.*

The Court will begin its analysis by examining Uncle Nearest's solvency as solvency is one of "the most important factors" when evaluating the appropriateness of a receivership. *See PNC Bank, Nat'l Ass'n*, 15 F. Supp. 3d at 758. "[T]here are two principal definitions of insolvency: (1) balance sheet insolvency [and] (2) cash flow insolvency." W.C. Bunting, *Investor Primacy*, 100 TUL. L. REV. 449, 489 n. 169 (2026). Balance sheet insolvency looks to whether the fair value of a company's assets exceed its liabilities while cash flow insolvency asks whether a company can pay its debts as they come due in the ordinary course.[8] *Id.*; *see also* [Doc. 131 at p. 6 ¶ 17

---

[7] The Court further notes that while it is not Farm Credit's burden to establish that the receivership should continue, Farm Credit would easily meet this burden on the current record.

[8] Tennessee law defines insolvency using the balance sheet definition while using the cash flow definition to establish a rebuttable presumption of insolvency. Tenn. Code Ann. § 66-3-303(a), (b). At the federal level, the United States Bankruptcy Code defines insolvency for companies like Uncle Nearest using the balance sheet definition while the cash flow definition is applicable to municipalities. 11 U.S.C. § 101(32).

7

(defining balance sheet insolvency), p. 7 ¶ 22 (defining cash flow insolvency)]. Uncle Nearest is insolvent under both definitions.

Starting with cash flow insolvency, the record reflects that Uncle Nearest has experienced continual difficulty in paying its debts as they come due in the ordinary course since before the receivership began. As of June 12, 2025, Uncle Nearest owed $11,597,565.56 to various entities. [*See generally* Doc. 131-5]. Of this amount, more than $10.5 million was owed on past due debts with over $7.7 million being more than ninety days past due. [*Id.* at p. 22]. This inability or unwillingness to pay outstanding obligations suggests Uncle Nearest was cash flow insolvent in the months leading up to the receivership.

Admittedly, the weight of this evidence is somewhat undercut by the fact that it appears Uncle Nearest had reached agreements with certain vendors to allow for delayed payments. [*See* Doc. 144 at pp. 166–67 (CFO of Uncle Nearest's payroll provider discussing the payment/credit agreement his company had reached with Uncle Nearest); Doc. 151-1 at p. 10 ¶ 42]. But while this may lessen the evidence's weight, it does not eliminate it, particularly where Uncle Nearest failed to reach such an agreement with every one of its vendors despite Fawn Weaver's testimony to the contrary.[9]

Furthermore, it does not appear the agreements Uncle Nearest was able to reach with some

---

[9] During the February 9 hearing, Fawn Weaver testified that "[a]t the time that the receivership began, the reason why there were no lawsuits by any of [Uncle Nearest's] creditors, including [Uncle Nearest's] payroll company, is [Uncle Nearest] had made arrangements *with every single one*…" [Doc. 144 at p. 238 (emphasis added)]. In a post-hearing declaration, Fawn Weaver walked this assertion back, stating instead that "[a]lthough [Uncle Nearest] had a few pending disputes with vendors, it had in place agreements with its key vendors prior to the Receivership." [Doc. 151-1 at p. 10 ¶ 42]. Fawn Weaver does not identify the "disputes" she is referring to, but based on the Receiver's testimony, it appears that at least one of them is *Billips, LLC v. Uncle Nearest, Inc.*, 3:25-cv-823, which is currently pending in the United States District Court for the District of Oregon. [*See* Doc. 144 at p. 52].

of its vendors materially improved its cash position as cash flow forecasts and actual cash flow data from the pre-receivership period show the company was hemorrhaging money. In February 2025, Uncle Nearest's then financial advisor, the Keystone Group, prepared a restructuring plan that indicated Uncle Nearest would lose approximately $2,844,000 between the week ending February 14, 2025 and the week ending May 9, 2025, absent (1) a $2.5 million cash infusion by the Weavers, (2) $20.4 million in cash proceeds from special barrel sales to "Q & Cask,"[10] and (3) Farm Credit deferring Uncle Nearest's April 1, 2025, principal and interest payment. [*See* Doc. 131-3 at p. 17–21]. Cash flow forecasts prepared by Uncle Nearest over the next several months followed a similar course, typically projecting that Uncle Nearest's operations would cost the company more money than it would make. [*See* Doc. 131-4 (projecting Uncle Nearest's cumulative net operational cash flow would be roughly negative $6,788,000 between the week ending May 16, 2025, and the week ending August 8, 2025, for an average weekly loss of $522,153.85); Doc. 173-3 at p. 4 (projecting Uncle Nearest's cumulative net operational cash flow would be roughly negative $5,069,203 over a thirteen-week period, for an average weekly loss of $389,938.69); Doc. 173-5 at p. 7 (projecting Uncle Nearest's cumulative net operational cash flow would be roughly negative $736,306 between the week starting May 17, 2025, and the week starting August 9, 2025, for an average weekly loss of $56,638.92). *But see* Weavers and Grant Sidney's Hrg. Exh. 54 (projecting Uncle Nearest's cumulative net operational cash flow would be roughly $1,145,943 between the week ending June 20, 2025, and the week ending October 31, 2025, for an average weekly gain of $57,297.15)].[11]

---

[10] Assuming "Q & Cask" refers to either Q and Cask, Inc. or Quill and Cask Owner, LLC, it does not appear this transaction was ever consummated. [*See* Doc. 155-1 at p. 13 ¶¶ 43–44].

[11] Fawn Weaver testified unequivocally that Doc. 131-4 is not actually a cash flow forecast but instead is merely a template Uncle Nearest sent Kevin Larin—one of Farm Credit's financial advisors, [*see* Doc. 131 at p. 1–2 ¶ 2, 3 ¶ 7]—to ask if it was in an acceptable format for submitting

9

Now, as someone caught in the rain without an umbrella will tell you, forecasts are not always accurate. Consequently, they carry less weight in establishing whether Uncle Nearest is cash flow insolvent than actual cash flow data does. The problem the Weavers and Grant Sidney face is that pre-receivership actual cash flow data tells the same story as the forecasts: Uncle Nearest—under Fawn Weaver's control—was far better at spending money than making it. Between the week ending April 18, 2025, and the week ending June 13, 2025, Uncle Nearest's "Cumulative Net Operating Cash Flow" was negative $1,214,994. [Doc. 131-2]. Put another way, this means Uncle Nearest's operations were costing the company $134,999 every week on average rather than generating any excess cash.[12] [*Id.*]. This lackluster performance, combined with the generally negative outlook of Uncle Nearest's pre-receivership cash flow forecasts, leads the Court to conclude that Uncle Nearest was cash flow insolvent prior to the receivership.

---

future cash flow forecasts. [*See* Doc. 144 at p. 233–34]. The Court does not find this testimony credible. As an initial matter, there is no documentary evidence supporting Fawn Weaver's contention that Doc. 131-4 is a template. Fawn Weaver testified she had an email proving this fact that she was "happy to forward…in[,]" [Doc. 144 at p. 233], but no such email has been filed in the record. The Court finds this telling, particularly when the parties were expressly given the opportunity to submit additional evidence following the February 9 hearing. [*See* Doc. 143].

Farm Credit, on the other, has filed two cash flow forecasts and related emails from around the same time as Doc. 131-4. [*See generally* Docs. 173-3, 173-4, 173-5]. These cash flow forecasts, which were not presented as "templates," have material similarities to Doc. 131-4 (i.e., line items being held constant over multiple weeks, the use of round numbers, and—in the case of Doc. 173-3—the listing of payroll as a weekly expense). [*See* Doc. 173-3 at p. 4, Doc. 173-5 at p. 7]. This evidence, combined with Larin's testimony that he does not recall Doc. 131-4 being sent to him as a template, [*see* Doc. 144 at p. 206], also undermines Fawn Weaver's testimony.

[12] This actual cash flow data contains a line item for "Other/Uncategorized" disbursements. [Doc. 131-2]. During the February 9 hearing, counsel for the Weavers and Grant Sidney suggested these disbursements may not reflect operating expenses and that, as a result, Uncle Nearest's cash flow position could have been better than the data suggests. [*See* Doc. 144 at p. 185–87]. There are two problems with this argument. First, the Weavers and Grant Sidney cannot rely on mere speculation that Uncle Nearest's cash flow position might have been better than it seems to establish that Uncle Nearest is and/or was cash flow solvent. Second, Uncle Nearest would still be cash flow negative even if the "Other/Uncategorized" disbursements were removed from the data. [*See* Doc. 131-2].

Since the receivership began, the Receiver has made commendable progress improving Uncle Nearest's cash flow position, but Uncle Nearest still loses more money than it makes.[13] The Weavers and Grant Sidney's Hearing Exhibit 5 shows Uncle Nearest's actual cash flows between the week ending September 7, 2025, and the week ending December 7, 2025. Over this period, Uncle Nearest generated a total of $5,071,748 in "Operating Collections." [*See* Weavers and Grant Sidney Hrg. Exh. 5]. Uncle Nearest's "Operating Disbursements" during this same period were $5,085,155, meaning Uncle Nearest lost roughly $13,407 over fourteen weeks. [*See id.*]. This loss is small, but it is still a loss. Furthermore, it does not account for the costs Uncle Nearest would incur if it was required to service its outstanding debt, an obligation the Order Appointing Receiver has paused. [*See id.*; Doc. 39 at p. 13 ¶ 12 (providing for the non-disturbance of the receivership assets and estate); Doc. 126 at pp. 13–14 ¶ 28 (Receiver noting the termination of the receivership would require Uncle Nearest to, among other things, service its outstanding debt)]. Said differently, Uncle Nearest would likely be losing even more money than it already is if not for the receivership. Considering the foregoing, the Court finds Uncle Nearest remains cash flow insolvent.[14]

Turning to balance sheet insolvency, it would be nice if the Court could simply look at Uncle Nearest's balance sheet, evaluate whether its assets exceeded its liabilities, and declare it either solvent or insolvent. But the Court cannot do this for two reasons. First, balance sheet

---

[13] The positive impacts the Receiver has had on Uncle Nearest are discussed in further detail *infra* pp. 32–36.

[14] This conclusion is unaffected by the positive trends in operational cash flow described in the Receiver's Third Quarterly Report. [*See* Doc. 192 at p. 4 ¶ 12, p. 6–7 ¶¶ 14–15]. While the Court commends the Receiver for the steps he has taken to improve Uncle Nearest's cash flow position, it is not yet convinced Uncle Nearest can pay its debts as they come due in the ordinary course, particularly when considering that Uncle Nearest is still not servicing its outstanding debt.

insolvency asks if the sum of a company's liabilities exceeds the sum of its assets *at fair value*. *See, e.g.*, Tenn. Code Ann. § 66-3-303(a); 11 U.S.C. § 101(32). "Fair value is determined by estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions[,]" and "[a]sset values carried on a balance sheet, even if derived in accordance with 'generally accepted accounting principles,' do not necessarily reflect [this] value[.]" *In re F & S Cent. Mfg. Corp.*, 53 B.R. 842, 849 (Bankr. E.D.N.Y. 1985). Consequently, the balance sheet in the record [Doc. 126 at p. 61–64] is of little use in determining the fair value of Uncle Nearest's assets. *See In re F & S Cent. Mfg. Corp.*, 53 B.R. at 849. Second, even if balance sheets could generally be used to establish an asset's fair value, the Court would not give the balance sheet before it any weight because the Receiver has testified it relies upon "substantially flawed and unreliable" pre-receivership financial information.[15] [Doc. 126 at p. 21 ¶ 42]. Thus, to evaluate whether Uncle Nearest is balance sheet insolvent, the Court must look beyond the balance sheet and add up Uncle Nearest's assets and liabilities itself.

The Court will start with Uncle Nearest's liabilities. Uncle Nearest's largest liability is the more than $120,850,721 that Farm Credit claims Uncle Nearest owes. [*See* Doc. 139-1 at p. 2–3 ¶¶ 6–7, p. 13–16]. The Weavers and Grant Sidney dispute this debt, argue it subject to potentially significant offsets through affirmative defenses and counterclaims, and appear to suggest that it should not be included (or perhaps not given much weight) in the Court's solvency analysis. [*See* Doc. 91 at p. 15–16 ¶ 28; Doc. 151 at p. 16; Doc. 172 at p. 7]. Nevertheless, the Court finds it appropriate to consider the entirety of the Farm Credit debt when calculating Uncle Nearest's total

---

[15] The Receiver provided this balance sheet in response to the Weavers and Grant Sidney's request that certain financial records be produced. [*See* Doc. 126 at p. 21 ¶ 42]. The Receiver further explained he had not previously provided this balance sheet or a related income statement due to his concerns about their accuracy. [*Id.*].

12

liabilities. While the Weavers and Grant Sidney dispute the total value of the Farm Credit debt in general terms, [*see* Doc. 91 at p. 15–16 ¶ 28; Doc. 151 at p. 16; Doc. 172 at p. 7], they never provide a calculation the Court could use to discount the Farm Credit debt, nor do they even attempt to ascribe a dollar value to either (1) the affirmative defenses they allude to or (2) Uncle Nearest's hypothetical counterclaims. And without such information, the Court has no reasoned basis for excluding any of the Farm Credit debt from its calculation of Uncle Nearest's total liabilities.

Next, the record demonstrates that Uncle Nearest owes at least $20,000,000 to MP-Tenn LLC pursuant to two convertible promissory notes. [*See* Doc. 149 at p. 8–23; Doc. 157-3]. The Weavers and Grant Sidney do not dispute that Uncle Nearest executed these promissory notes. But they appear to argue the notes should not be included as part of Uncle Nearest's total liabilities because the notes were set to convert to equity in 2030, and it was only because of the receivership that the notes were reclassified as debt. [*See* Doc. 137 at p. 9 ¶ 13; Doc. 151 at p. 15 (citing Doc. 151-1 at pp. 11–12 ¶ 51)]. The Court disagrees.

The Weavers and Grant Sidney have not directed the Court to any authority stating—or even suggesting—that a convertible promissory note should be excluded when calculating a company's total liabilities. And what authority the Court has been able to find through its own research directly undercuts their position. The Financial Accounting Standards Board's Accounting Standards Codification ("ASC") 470-20-25-12,[16] which addresses how convertible

---

[16] "The Accounting Standards Codification ('ASC') is the 'source of authoritative generally accepted accounting principles' published by the Financial Accounting Standards Board ('FASB')." *In re GE Sec. Litig.*, No. 19cv1013 (DLC), 2020 U.S. Dist. LEXIS 81554, at *10 n.6 (S.D.N.Y. May 7, 2020) (citing FASB, Accounting Standards Codification: About the Codification 4 (Dec. 2014), https://asc.fasb.org/imageRoot/71/58741171.pdf; *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016)); *see also, e.g., Pittman v. Unum Grp.*, 2020 U.S. Dist. LEXIS 97379, at *65 n.13 (E.D. Tenn. June 1, 2020) ("The Accounting Standard

13

debt instruments should be recognized for accounting purposes, provides:

> A debt with an embedded conversion feature shall be accounted for in its entirety as a liability and no portion of the proceeds from the issuance of the convertible debt instrument shall be accounted for as attributable to the conversion feature unless the conversion feature is required to be accounted for separately as an embedded derivative under Subtopic 815-15 or the conversion feature results in a premium that is subject to the guidance in paragraph 470-20-25-13.

Similarly, ASC 480-10-25-14, which addresses how certain company obligations to issue a variable number of equity shares should be recognized for accounting purposes, provides:

> A financial instrument that embodies an unconditional obligation, or a financial instrument other than an outstanding share that embodies a conditional obligation, that the issuer must or may settle by issuing a variable number of its equity shares shall be classified as a liability (or an asset in some circumstances) if, at inception, the monetary value of the obligation is based solely or predominantly on any one of the following:
>
> a. A fixed monetary amount known at inception (for example, a payable settleable with a variable number of the issuer's equity shares)
>
> b. Variations in something other than the fair value of the issuer's equity shares (for example, a financial instrument indexed to the Standard and Poor's S&P 500 Index and settleable with a variable number of the issuer's equity shares)
>
> c. Variations inversely related to changes in the fair value of the issuer's equity shares (for example, a written put option that could be net share settled).

Here, the MP-Tenn promissory notes are convertible debt instruments that Uncle Nearest could satisfy through the issuance of a variable number of equity shares. [*See* Doc. 149 at pp. 8–23]. This

---

Codification is maintained by the Financial Accounting Standards Board and is the source of authoritative generally accepted accounting principles recognized by the FASB to be applied to nongovernmental entities."); *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 159 n.4 (2d Cir. 2000) ("The SEC treats the FASB's standards as authoritative"); *SEC v. Escala Grp., Inc.*, 2009 U.S. Dist. LEXIS 67225, at *19 n.6 (S.D.N.Y. July 31, 2009) ("FASB standards sit atop the hierarchy of GAAP sources."). The Court may take judicial notice of the ASC's accounting standards pursuant to Federal Rule of Evidence 201(b)(2) because they "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *See* FED. R. EVID. 201(b)(2); *see also Zulfer v. Playboy Enters.*, No. CV 12-08263-MMM (SHx), 2013 U.S. Dist. LEXIS 199070, at *5–6 (C.D. Cal. Apr. 24, 2013); *Janssen v. Reschke*, No. 17 C 8625, 2020 U.S. Dist. LEXIS 188834, at *10 n.2 (N.D. Ill. Oct. 13, 2020).

14

structure appears to bring the MP-Tenn convertible promissory notes within the scope of ASC 470-20-25-12 and/or ASC 480-10-25-14. And while the Court cannot definitively state that either or both accounting standards govern the MP-Tenn convertible promissory notes, the fact that both standards would treat the notes as liabilities—combined with the fact that the Weavers and Grant Sidney have not directed the Court to any authority suggesting otherwise—leads the Court to conclude that the MP-Tenn convertible promissory notes should be included when calculating Uncle Nearest's total liabilities. Thus, that total just went up by $20,000,000.

Uncle Nearest's next liability is the roughly $45,000,000 it owes to Advanced Spirits, LLC in relation to a January 18, 2024, forward contract for the sale and repurchase of filled whiskey barrels. [*See, e.g.*, Doc. 144 at p. 55; Doc. 157-2; Weavers and Grant Sidney Hrg. Exh. 7]. The Weavers and Grant Sidney do not dispute that Uncle Nearest owes this amount but instead argue that if the Court recognizes the $45 million as a liability, it must also recognize the value of the corresponding whiskey barrels as an asset. [*See* Doc. 144 at p. 55; Doc. 172 at p. 7]. The Court agrees. *See* ASC 606-10-55-67, -68, and -70. But for now, the focus is on Uncle Nearest's liabilities, and the Advanced Spirits, LLC debt adds another $45,000,000 to the total.

Beyond these major liabilities, Uncle Nearest also owes approximately: (i) $13,928,092 in outstanding accounts payable, [Doc. 151-1 p. 13 ¶ 52, p. 42]; (ii) $277,241 in outstanding credit card debt, [Doc. 126 at 65]; (iii) $19,659 in outstanding sales tax payables, [*id.*]; and (iv) $7,834,859 in outstanding notes payable,[17] [*see id.*]. Adding these amounts to the outstanding

---

[17] Although the Court has reservations about taking Fawn Weaver at her word, this figure assumes that—consistent with her representations to the Court—Uncle Nearest does not owe approximately $247,197 in vehicle-related liabilities. [*See* Doc. 151-1 at p. 12 ¶ 51(f) (asserting that the vehicle-related liabilities identified by the Receiver have been fully satisfied); Doc. 126 at 65 (identifying approximately $247,197 in vehicle-related liabilities)]. It further assumes that Grant Sidney did not loan Uncle Nearest approximately $3.7 million in 2023. [*See* Doc.151-1 at p. 12 ¶ 51(c)]. And finally, it does not include the $20,026,270 "Grant Sidney Investment Loan" because, as discussed

liabilities described above, the Court finds that Uncle Nearest's total liabilities for purposes of the Motion to Reconsider are approximately $207,910,572.[18] Thus, Uncle Nearest needs roughly $208 million in assets to be balance sheet solvent.

There are two ways the Court could calculate the total value of Uncle Nearest's assets. First, the Court could add up the value of Uncle Nearest's assets separately to see if their combined value exceeds $207,910,572 (the "asset addition approach"). Alternatively, the Court could calculate Uncle Nearest's enterprise value based on a multiple of sales revenue and compare that figure to Uncle Nearest's outstanding liabilities (the "enterprise value approach"). Uncle Nearest is balance sheet insolvent under both approaches.

Starting with the enterprise value approach, the Weavers and Grant Sidney argue that Uncle Nearest's enterprise value is properly calculated by multiplying Uncle Nearest's annual sales revenue—which was approximately $25 million in 2025 [Doc. 144 at p. 60]—by a 12x to 13x multiplier. [*See* Doc. 137 at p. 8 ¶ 11; Doc. 151 at pp. 9–11; Doc. 172 at p. 8]. This would result in an approximate enterprise value of $300 million to $325 million. Such an enterprise value would render Uncle Nearest balance sheet solvent. The problem the Weavers and Grant Sidney face,

---

*infra* pp. 27–31, it appears the funds underlying this "loan" are actually the funds Uncle Nearest received pursuant to the MP-Tenn convertible promissory notes, and the Court does not want to double count that obligation.

[18]

| Liability | Amount Owed ($) |
|---|---|
| Farm Credit Loans | 120,850,721 |
| MP-Tenn Convertible Promissory Notes | 20,000,000 |
| Advanced Spirits Forward Contract | 45,000,000 |
| Accounts Payable | 13,928,092 |
| Credit Card Debt | 277,241 |
| Sales Tax Payables | 19,659 |
| Notes Payable | 7,834,859 |
| **Total** | **207,910,572** |

16

however, is they have failed to show that a 12x to 13x multiplier accurately reflects Uncle Nearest's enterprise value.

To support their position, the Weavers and Grant Sidney rely on (1) a chart the Keystone Group prepared as part of its February 2025 restructuring plan for Uncle Nearest and (2) the Receiver's testimony concerning the revenue multiplier range applicable to spirits companies generally.[19] [*See* Doc. 144 at p. 59–60; Doc. 151 at p. 9–10; Doc. 172 at p. 8]. Neither demonstrates that Uncle Nearest's enterprise value should be calculated using a 12x to 13x multiplier.

Starting with the Keystone chart, it notes that "[c]elebrity-owned and 'storied' spirits brands have recently sold for revenue multiples ranging from 12–24x with continued investment and rebounding M&A activity in the industry." [Doc. 131-3 at p. 8 (footnote omitted)]. To illustrate this point, the Keystone chart highlights the following sales:

- The sale of Casamigos Tequila for $1 billion (revenue multiple not specified) in 2017;

- The sale of Aviation Gin for $610 million (24x revenue) in 2020;

- The sale of Proper No. Twelve for $600 million (12x revenue) in 2021; and

- The Sale of Don Papa Rum for $180 million (12.5x revenue) in 2021.

[*Id.*]. At first blush, this may appear to lend support to the Weavers and Grant Sidney's position. But there are at least two aspects of the Keystone chart that greatly limit its utility in determining Uncle Nearest's enterprise value. First, while the Keystone chart identifies a revenue multiplier range for "[c]elebrity-owned and 'storied' spirits brands" generally, it does not state where, if at all, Uncle Nearest falls within this range. [*See id.*]. Second, the most recent sales identified in the

---

[19] Prior to the February 9 hearing, the Weavers and Grant Sidney represented they had "[a] recognized expert witness in the spirits industry" who "[was] prepared to provide testimony confirming that the value of the Uncle Nearest brand is no less than the multiple historically used in [Uncle Nearest's] capital raises [i.e., 12.9x] and may be considerably higher[.]" [Doc. 137 at p. 8 ¶ 11]. The Weavers and Grant Sidney, however, never called this witness.

17

Keystone chart are roughly five years old, and the oldest was almost a decade ago. [*See id.*]. Considering that spirits companies like Uncle Nearest are currently facing significant "headwinds in the marketplace[,]" [*see* Doc. 144 at p. 175], that no evidence suggests faced the companies refenced in the Keystone chart, it appears the sales identified by Keystone no longer reflect current market conditions. Thus, all the Keystone chart shows is that spirits companies other than Uncle Nearest sold for 12x to 24x their revenue under conditions that do not currently exist. This is of little to no use in establishing Uncle Nearest's enterprise value as it exists today.

The Receiver's testimony concerning the revenue multiple range applicable to spirits companies generally is similarly of little use. The Receiver testified that it is his understanding spirits companies can "command anywhere from a 2x adjusted revenue multiplier to a 15x adjusted revenue multiplier based on a variety of factors[.]" [Doc. 126 at p. 18–19 ¶ 36 (footnote omitted)]. This 2x to 15x range may show the outer limits of Uncle Nearest's potential enterprise value, but it does not help the Court decide where within that range Uncle Nearest falls. Thus, this testimony fails to establish—both on its own and in conjunction with the Keystone chart—that Uncle Nearest's enterprise value should be calculated using a 12x to 13x multiplier.

Having concluded that Uncle Nearest's enterprise value is not properly calculated using a 12x to 13x multiplier as the Weavers and Grant Sidney claim, the Court now turns to what the proper multiplier range should be. The Receiver—who has been actively soliciting bids for Uncle Nearest's assets—has concluded that a 2x to 4x revenue multiplier most accurately reflects Uncle Nearest's enterprise value. [*See* Doc. 126 at p. 19–20 ¶ 37]. As for Farm Credit, it does not claim that a specific multiplier or multiplier range applies to Uncle Nearest. Instead, it highlights several recent and publicly reported sales of spirts companies, noting that the revenue multipliers involved in those transactions ranged from 1.3x to 4.5x. [*See* Doc. 157 at p. 9–10 ¶ 14]. The Weavers and

18

Grant Sidney take issue with both the Receiver's and Farm Credit's positions.

Regarding the Receiver's 2x to 4x valuation, the Weavers and Grant Sidney argue it does not accurately represent Uncle Nearest's enterprise value because it was reached in the context of a liquidation or "fire sale" process that is likely to be accompanied by steep discounts. [*See* Doc. 137 at pp. 9–11 ¶¶ 14–17; Doc. 151 at pp. 12–13]. Regarding the publicly reported sales identified by Farm Credit, the Weavers and Grant Sidney argue these transactions—and particularly the sale of Four Roses Distillery, LLC—are distinguishable on their facts such that their utility is limited. [*See* Doc. 172 at pp. 7–8].

The Court agrees with the Weavers and Grant Sidney on both points to an extent. Regarding the Receiver's valuation, the Court agrees that, notwithstanding the Receiver's herculean efforts, it is unlikely a sale realized as part of this litigation could command as high a price as Uncle Nearest might otherwise be able to achieve. Regarding the publicly reported sales of other spirits companies, the Court agrees that distinguishing facts limit their utility in establishing the proper revenue multiplier for Uncle Nearest. Thus, both the Receiver's valuation and the sales identified by Farm Credit carry limited weight. That said, they still carry more weight than the evidence the Weavers and Grant Sidney rely upon to argue for a 12x to 13x multiplier.

The Receiver's valuation is the only evidence before the Court that actually calculates Uncle Nearest's potential enterprise value. And the sales identified by Farm Credit may not be on all fours with Uncle Nearest, but they still provide a window into the current state of the spirits market that the Keystone chart lacks. Accordingly, both the Receiver's valuation and the sales identified by Farm Credit are still valuable in determining Uncle Nearest's enterprise value. Using this evidence as a foundation—while keeping its weaknesses in mind—and considering the other evidence in the record, the Court finds, for purposes of the Motion to Reconsider only, that Uncle

19

Nearest's enterprise value is properly calculated using a 2x to 5x revenue multiplier.

This results in an estimated enterprise value of $50 million to $125 million. Considering that Uncle Nearest's total liabilities amount to roughly $208 million, the Court finds that Uncle Nearest is balance sheet insolvent under the enterprise value approach.

Uncle Nearest is similarly balance sheet insolvent under the asset addition approach. As an initial matter, the evidence showing the collective value of Uncle Nearest's assets is scant. Only the balance sheet filed by the Receiver provides a figure for the total value of Uncle Nearest's assets, and the Court declines to give this figure any weight for the reasons described *supra* p. 12. Thus, if the Court is to find the total value of Uncle Nearest's assets, it must add them up on its own just as it did for Uncle Nearest's total liabilities.

This task is complicated by the fact that the Weavers and Grant Sidney have not directed the Court to evidence establishing the separate values of all of Uncle Nearest's different assets. Instead, they focus their attention on three assets: (1) the Nearest Green Distillery, which they contend is worth $70.4 million; (2) Uncle Nearest's filled whiskey barrels, which they contend are worth $81.2 million; and (3) the filled whiskey barrels underlying the Advanced Spirits forward contract, which—based on the Weavers and Grant Sidney's assertion that these barrels offset the liabilities imposed by the contract—the Court presumes the Weavers and Grant Sidney contend are worth at $45 million.[20] [*See* Doc. 144 at p. 55; Doc. 151 at p. 15; Doc. 151-1 at p. 8 ¶ 32, p. 13 ¶ 53, p. 21–22 ¶ 97; Doc. 172 at p. 7]. Assuming the Weavers and Grant Sidney are correct as to the value of the foregoing assets, they would be worth roughly $196.6 million. Adding $2.6 million

---

[20] The Weavers and Grant Sidney also assert that Uncle Nearest's property in Cognac, France has a value of at least $2 million. [Doc. 137 at p. 7 ¶ 9(d)]. But as the Weavers and Grant Sidney have not introduced *any* evidence supporting this assertion, the Court declines to consider it in its asset analysis.

to this total based on the recent appraisals of Uncle Nearest's Martha's Vineyard property, [*see generally* Doc. 196-1], Uncle Nearest would have approximately $199.2 million in assets.[21] This would leave Uncle Nearest roughly $8.8 million short of solvency.

The Court recognizes Uncle Nearest has other assets that could lessen or potentially eliminate this shortcoming. But the Weavers and Grant Sidney have not directed the Court to any evidence tending to show the value of these other assets,[22] and the Court cannot simply speculate they add up to the $8.8 million the Weavers and Grant Sidney need to establish solvency. Thus, even assuming the Weavers and Grant Sidney's proffered valuations of the different assets are correct, Uncle Nearest is still balance sheet insolvent under the asset addition approach.

This insolvency is further established by the fact that the Weavers and Grant Sidney have failed to show that their proffered valuations of the Nearest Green Distillery and the filled whiskey barrels are correct. To show the Distillery is worth $70.4 million, the Weavers and Grant Sidney rely on (1) a July 7, 2025, letter of intent outlining a proposed sale-leaseback transaction involving the Distillery and (2) Fawn Weaver's testimony that—based on the letter of intent, the Distillery's operational performance, and other pre-receivership negotiations—she believes the Distillery's fair value exceeds $70.4 million. [*See* Doc. 151 at p. 15 (citing Doc. 151-1 at p. 22 ¶ 98); Doc. 151-1 at p. 82–85]. The Court does not find this evidence indicative of the Distillery's value.

Looking first to the July 7, 2025, letter of intent, it outlines a transaction wherein Uncle

---

[21] The Weavers and Grant Sidney have argued—without directing the Court to any supporting evidence—that the Martha's Vineyard property is worth $4 million. [*See* Doc. 137 at p. 7 ¶ 9(c)]. The Court declines to consider this unsupported valuation.

[22] *See Dibrell v. City of Knoxville*, 984 F.3d 1156, 1163 (6th Cir. 2021) ("[J]udges are not like pigs, hunting for truffles that might be buried in the record[.]" (citation modified)); *Jordan v. Mathews Nissan. Inc.*, 539 F. Supp. 3d 848, 874 n.35 (M.D. Tenn. 2021) ("It is not the Court's job to root through the record not unlike a pig in search of truffles to uncover any grain of evidence that might support the position of a party that chose to otherwise sit on its hands." (internal quotation marks omitted)).

Nearest would sell the Nearest Green Distillery to STORE Capital for $70.4 million. [Doc. 151-1 at p. 83]. STORE Capital would then lease the Distillery back to Uncle Nearest for at least 25 years with four five-year renewal options. [*Id.*]. During the first year of the lease, Uncle Nearest would pay STORE Capital $5,984,000 in rent. [*Id.*]. This rental payment would then increase 2% every year thereafter. [*Id.*]. In addition to these rent payments, Uncle Nearest would be "responsible for all costs associated with the Property, including maintenance…taxes, insurance and any common area maintenance (CAM) charges, if applicable." [*Id.*]. Said differently, in exchange for its $70.4 million, STORE Capital would receive (1) the Nearest Green Distillery; (2) a guaranteed tenant for at least 25 years who was obligated to pay all costs associated with the Distillery; and (3) approximately $191,669,314 in rent over 25 years.[23] [*See id.*]. These second and third benefits of the transaction undoubtedly contributed to the proposed $70.4 million contract price. As a result, the Court finds the July 7, 2025, letter of intent carries little to no weight in establishing that the Nearest Green Distillery *on its own* is worth $70.4 million.

The Court further finds that the letter of intent undermines Fawn Weaver's testimony that the Distillery is worth at least $70.4 million. [*See* Doc. 151-1 at p. 22 ¶ 98]. Simply put, it is not believable that the Distillery on its own is worth more than a sophisticated buyer like STORE Capital would be willing to pay to acquire the Distillery, plus a tenant who would cover all the Distillery's costs, plus more than $190 million in future revenue. Considering this alongside the other issues with Fawn Weaver's credibility, *see* pp. 23–24, the Court does not give her testimony any meaningful weight. And with neither Fawn Weaver's testimony nor the letter of intent carrying

---

[23] $\sum_{n=1}^{25} 5,984,000 * 1.02^{n-1}$

For this summation, "n" refers to the lease year, "5,984,000" reflects the initial rent payment, and "$1.02^{n-1}$" reflects the annual increase in the rental rate.

any significant weight, the Court finds that the Weavers and Grant Sidney have failed to establish the Distillery's value.

Turning to the value of the filled whiskey barrels, the Weavers and Grant Sidney asset that Uncle Nearest's filled whiskey barrels are worth approximately $81.2 million and that the barrels subject to the Advanced Spirits contract offset that contract's liabilities, meaning they are worth at least $45 million. [*See* Doc. 151 at p. 15; Doc. 151-1 at pp. 21–22 ¶ 97; Doc. 172 at p. 7]. To support this position, the Weavers and Grant Sidney rely on (1) Fawn Weaver's testimony and (2) an unattested letter and accompanying pricing schedule purportedly from Terry N. Thome, retired President of J.B. Thome & Co. Inc., a spirits broker. [*See* Doc. 151-1 at pp. 21–22 ¶¶ 94–97, pp. 68–81]. This evidence fails to carry the weight the Weavers and Grant Sidney need it to.

The Thome letter generally asserts that non-Kentucky bourbons and whiskeys have not experienced the decrease in value that has plagued other spirits as of late. [*See* Doc. 151-1 at pp. 69–70]. The Court, however, cannot rely on the Thome letter or its accompanying pricing schedule as evidence of this assertion because doing so would run afoul of the rule against hearsay. *See* FED. R. EVID. 801(c), 802. Consequently, the Thome letter carries no weight in establishing the value of the filled whiskey barrels.

This means all the Weavers and Grant Sidney have to establish the value of the filled whiskey barrels is Fawn Weaver's testimony. This presents a problem for the Weavers and Grant Sidney because the Court does not find Fawn Weaver to be a credible witness. The Court observed Fawn Weaver's demeanor during the February 9 hearing. It has noted where her testimony has changed during the course of these proceedings and where it has been in tension with the truth. *See supra* p. 8 n. 9, p. 9 n. 11 and *infra* p. 43 n. 32. The Court has also considered Fawn Weaver's interest in ending the receivership and the personal harms she has directly attributed to it and this

litigation. [*See, e.g.*, Doc. 151-1 at pp. 24–25 ¶¶ 110–12]. Combined, the foregoing leave the Court with the firm conviction that Fawn Weaver's testimony thus far—whether on the witness stand or through her many declarations—has been guided by the story she believes best serves her personal interests, irrespective of its relation to the truth. This alone is sufficient for the Court to decline to give her testimony as to the value of the filled whiskey barrels any meaningful weight. But it is not the only reason the Court finds her testimony unreliable.

The Receiver testified that he attempted to sell 10,000 of Uncle Nearest's filled whiskey barrels at a price of $1,000 per barrel but received no offers. [Doc. 126 at p. 20 ¶ 38]. He further testified that the only offer he had received for Uncle Nearest's barrel stock "was an offer of approximately $400 per barrel, for less than 1,000 barrels." [*Id.*]. This testimony—which is based on actual attempts to sell Uncle Nearest's filled whiskey barrels—strongly suggests these barrels do not hold the roughly $1,500 per barrel value Fawn Weaver claims they do.[24] [*See* Doc. 151-1 at pp. 21–22 ¶ 97]. Even acknowledging that the Receiver may not be able to obtain top dollar for the barrels, *see supra* p. 19, that he has experienced so much difficulty selling barrels at what the Weavers and Grant Sidney would consider a significantly discounted rate indicates the barrels are not worth what Fawn Weaver claims.

Considering this alongside Fawn Weaver's general lack of credibility, the Court finds the Weavers and Grant Sidney have failed to establish the value of the filled whiskey barrels, regardless of whether those barrels are held by Uncle Nearest or Advanced Spirits. And because they have also failed to establish the value of the Nearest Green Distillery, the Weavers and Grant Sidney cannot show that Uncle Nearest is balance sheet solvent under the asset addition approach.

---

[24] The Court presumes Fawn Weaver's ~$1,500 per barrel valuation is also applicable to the filled whiskey barrels held by Advanced Spirits since neither she, Keith Weaver, nor Grant Sidney have provided an alternative calculation for these barrels.

For the foregoing reasons, the Court finds that Uncle Nearest is both cash flow insolvent and balance sheet insolvent. This factor therefore weighs strongly in favor of the continuation of the receivership.

### 2. *It is unclear whether there is adequate security for Farm Credit's loans.*

Having found that Uncle Nearest is insolvent, the Court next turns to whether, despite this insolvency, there is adequate security for Farm Credit's loans. For Farm Credit to be fully secured, the evidence needs to show that Uncle Nearest has more than $120,850,721 in collateral that could be used to pay Farm Credit should it prevail in this litigation.[25] [*See* Doc. 139-1 at pp. 2–3 ¶¶ 6–7, pp. 13–16]. As noted above, the Weavers and Grant Sidney have failed to establish the value of any specific Uncle Nearest asset. *See supra* pp. 21–25. Accordingly, the Court cannot simply add up those assets to determine whether sufficient collateral exists. Considering this and the fact that Farm Credit claims a security interest in virtually all of Uncle Nearest's assets, the Court finds it appropriate to evaluate whether Farm Credit is fully secured by comparing its loan value to Uncle Nearest's enterprise value.

As a reminder, the Court estimates Uncle Nearest's enterprise value at $50 million to $125 million. *See supra* p. 20. Thus, it is possible that Farm Credit is fully secured, assuming Uncle Nearest is most accurately valued at the top of the Court's range. But any weight this carries against the continuation of the receivership is offset by (1) the fact that a less than top-of-the-range valuation would mean Farm Credit is not fully secured and (2) even if Uncle Nearest's enterprise value fully secures Farm Credit against the $120,850,721 Farm Credit claims Uncle Nearest owes as of February 2, 2026, accumulating interest may soon render even a top-of-the-range valuation

---

[25] To the extent the Weavers and Grant Sidney argue the Court should discount this figure based on Uncle Nearest's potential defenses and counterclaims against Farm Credit, the Court declines to do so for the reasons stated *supra* pp. 12–13.

insufficient to fully secure Farm Credit, if it has not done so already.

Accordingly, the Court finds this factor does not carry any meaningful weight either in favor of or against the continuation of the receivership.

### 3. *It is similarly unclear whether Farm Credit has an adequate legal remedy.*

The Court's analysis concerning whether Farm Credit has an adequate legal remedy mirrors its analysis of whether there is adequate security for the Farm Credit loans. In theory, Farm Credit could fully recover through this litigation if Uncle Nearest's enterprise value is a top-of-the-range $125 million. But any weight this carries against the continuation of the receivership is offset by (1) the fact that Farm Credit would not have an adequate legal remedy if Uncle Nearest's enterprise value is anything less than a top-of-the-range $125 million and (2) the fact that accumulating interest may soon render even $125 million insufficient to fully compensate Farm Credit should it prevail in this case.

Accordingly, the Court finds this factor also does not carry any meaningful weight either in favor of or against the continuation of the receivership.

### 4. *Uncle Nearest engaged in fraudulent conduct prior to the receivership.*

In response to Farm Credit's Emergency Motion for the Immediate Appointment of Receiver, Uncle Nearest and the Weavers conceded that Uncle Nearest's former CFO, Mike Senzaki, engaged in fraudulent conduct during his tenure with the company, including by materially overstating Uncle Nearest's barrel inventory to Farm Credit. [Doc. 16 at p. 2; *see also* Doc. 16-1 at p. 2 ¶ 2; Doc. 30 at pp. 23–24]. That said, the Weavers and Uncle Nearest attempted to minimize the effect of this concession, arguing the Weavers were neither aware of nor participated in any fraudulent conduct. [*See* Doc. 16 at p. 2; Doc. 16-1 at p. 3 ¶ 3]. The Court found this claimed lack of knowledge limited the weight of the conceded Senzaki fraud but nevertheless held that the fraudulent conduct factor weighed in favor of a receivership overall as Senzaki's

26

actions were properly attributed to Uncle Nearest under traditional principles of agency. [Doc. 32 at pp. 8–9].

Nothing in the Motion to Reconsider calls for a different conclusion now. The Weavers, now joined by Grant Sidney, still maintain Senzaki is a fraudster and that the Weavers neither knew of nor engaged in any fraudulent activity. [*See* Doc. 91 at pp. 17–18 ¶¶ 32–33; Doc. 151 at pp. 22–23; *see also* Doc. 151-1 p. 4 ¶¶ 10–12 (discussing some of Senzaki's improper conduct)]. The Weavers and Grant Sidney's rehashing of old arguments does not lessen the weight Senzaki's conceded fraud still carries. Senzaki's conduct as Uncle Nearest's CFO is still attributable to Uncle Nearest, and the fraud he concededly perpetuated still swings this factor in favor of the receivership.

The weight of this factor is further enhanced by the fact that Uncle Nearest, under Fawn Weaver's leadership, engaged in additional fraudulent conduct. Specifically, the Court finds—for purposes of this Memorandum Opinion and Order only—that Uncle Nearest concealed its dealings with MP-Tenn LLC from Farm Credit and misrepresented the source of $20 million it obtained MP-Tenn.

Uncle Nearest, Inc., Grant Sidney, Fawn Weaver, and MP-Tenn executed a Note Purchase Agreement on February 4, 2026. [*See generally* Doc. 157-9]. Under the terms of this contract, MP-Tenn agreed to purchase up to $40 million in convertible promissory notes from Uncle Nearest, Inc. [*Id.* at pp. 1–2 ¶ 1]. If any of these notes later converted to equity, then Uncle Nearest, Inc. would have been obligated to cancel an equal number of Grant Sidney's Uncle Nearest, Inc. shares to the number of shares granted to MP-Tenn under the relevant note.[26] [*See id.* at p. 2 ¶ 1(d)].

---

[26] Fawn Weaver testified that the transaction with MP-Tenn was structured this way, as opposed to a direct sale of Grant Sidney's Uncle Nearest, Inc. shares, to avoid tax liability. [Doc. 144 at pp. 250–51; *see also* Doc. 160-1 at pp. 3–4 ¶¶ 14–16]. The Court makes no finding as to whether this

MP-Tenn and Uncle Nearest, Inc. executed two $10 million convertible promissory notes in accordance with the Note Purchase Agreement in February 2026. [*See* Doc. 149 at pp. 8–23]. The proceeds from these notes were deposited in a CalPrivate Bank account (Account No. ***873), which was opened by Uncle Nearest, Inc. solely to receive these funds. [Doc. 160-1 at p. 5, ¶ 23, p. 48]. From there, the funds were moved to a separate CalPrivate account owned by Grant Sidney (Account No. ***881). [*See id.* at pp. 41, 43, 48–49 (showing funds leaving Uncle Nearest, Inc. Account No. ***873), pp. 55–58 (showing funds entering Grant Sidney Account No. ***881)]. Fawn Weaver testified she moved these funds to Grant Sidney Account No. ***881 because (1) she did not want the funds to be "snatched" by Farm Credit and (2) she needed to ensure Uncle Nearest could continue financing its operations during forbearance negotiations with Farm Credit. [*See* Doc. 144 at pp. 251–52].

Over the next several months, it appears the $20 million, plus accumulated interest, was disbursed From Grant Sidney Account No. ***881 to different Uncle Nearest and Uncle Nearest vendor accounts. [*See* Doc. 160-1 at pp. 5–6, ¶¶ 25–26, 28, pp. 53–58]. It further appears these disbursements were subsequently memorialized as debt owed to Grant Sidney in the Subordinated Credit Agreement that Uncle Nearest and Grant Sidney executed in conjunction with the eighth amendment to the July 22, 2022, Credit Agreement and attendant Forbearance Agreement between Uncle Nearest, the Weavers, and Farm Credit. [*See id.* at p. 6 ¶ 27. *Compare id.* at pp. 53–58, *with* Doc. 1-9 at p. 56].

Since the source and flow of the MP-Tenn funds has come to light, Grant Sidney has argued that "[t]he structure of the funding through [its] account was known to and approved by Farm

---

transaction, or any transaction for that matter, crossed the all-important line between tax avoidance and tax evasion.

Credit."[27] [*See* Doc. 160 at p. 7 ¶ 25]. But while the evidence shows Farm Credit knew Grant Sidney was disbursing funds for Uncle Nearest's benefit, it does not reflect that Farm Credit knew the MP-Tenn convertible promissory notes were the source of those funds.

The Forbearance Agreement and attendant Subordinated Credit Agreement strongly indicate Farm Credit was not told about the MP-Tenn convertible promissory notes. Starting with the Subordinated Credit Agreement, it treats Grant Sidney's disbursement of the MP-Tenn funds as a loan from Grant Sidney to Uncle Nearest. [*See generally* Doc. 1-9 at pp. 27–59]. If Farm Credit knew that Grant Sidney was not using its own funds to finance Uncle Nearest's operations—but rather was just acting as a "*de facto* disbursing agent" of the MP-Tenn funds [Doc. 172 at p. 12]—then why would Farm Credit agree to or otherwise allow the execution of a contract that treats Grant Sidney as a lender with the right to be repaid? And if the Weavers, Grant Sidney, and/or Uncle Nearest were forthright about the source of the MP-Tenn funds from the beginning, then why would they allow Uncle Nearest to incur an additional ~$20 million in liabilities to Grant Sidney through the Subordinated Credit Agreement rather than insist the contract accurately reflect Grant Sidney's role as a disbursing agent?

Turning to the Forbearance Agreement, it lists a series of defaults that Uncle Nearest, the Weavers, and Farm Credit agreed Uncle Nearest had committed under the July 22, 2022, Credit Agreement. [*See* Doc. 1-9 at pp. 20–21]. One of these defaults concerns the unsecured debt Uncle Nearest purportedly owes to Grant Sidney as part of the Subordinated Credit Agreement. [*Id.* at p.

---

[27] The Weavers and Grant Sidney originally characterized the MP-Tenn funds as "investments," "infusions," and "documented loans" that Grant Sidney was personally making, not once suggesting the funds were connected to outstanding third-party loans. [*See* Doc. 52 at pp. 3–5 ¶¶ 5–9; Doc. 137 at p. 9 ¶ 13, p. 20 ¶ 37]. Now, however, they acknowledge MP-Tenn as the source of the funds. [*See* Doc. 172 at pp. 11–12]. And instead of claiming that Grant Sidney was providing capital infusions or loans to Uncle Nearest, they now contend that Grant Sidney was simply acting as a *de facto* disbursing agent. [*See id.*].

21]. If Farm Credit knew Uncle Nearest owed this debt to MP-Tenn rather than Grant Sidney, why would it not insist that the Forbearance Agreement accurately reflect this fact? Furthermore, if the Weavers, Grant Sidney, and/or Uncle Nearest had informed Farm Credit that Grant Sidney was merely acting as a disbursing agent, then why would the Weavers and Uncle Nearest agree under the Forbearance Agreement that Uncle Nearest had incurred debt to Grant Sidney in relation to these disbursements and therefore defaulted under July 22, 2022, Credit Agreement?

The Weavers, Grant Sidney, Uncle Nearest, and Farm Credit are all sophisticated parties. Thus, it is incredibly doubtful that none of them would have taken issue with the Subordinated Credit Agreement and Forbearance Agreement consistently treating Grant Sidney as a creditor rather than a disbursing agent if Grant Sidney's role and the source of the MP-Tenn funds had been disclosed to Farm Credit. It is further doubtful that neither the Subordinated Credit Agreement nor the Forbearance Agreement would mention MP-Tenn in any way had Farm Credit been told MP-Tenn was the source of the ~$20 million described in the Subordinated Credit Agreement. Considering the foregoing, it is reasonable to conclude that Uncle Nearest concealed its dealings with MP-Tenn from Farm Credit and represented the $20 million MP-Tenn loaned Uncle Nearest as an infusion of Grant Sidney's own funds.

And when the other evidence in the record is taken into account, this conclusion becomes inescapable. As noted above, the MP-Tenn funds were moved from Uncle Nearest to Grant Sidney to both keep the funds beyond Farm Credit's reach and ensure the funds would be used to finance Uncle Nearest's ongoing operations. [*See* Doc. 144 at pp. 251–52]. Concealing the source of the MP-Tenn funds would further these stated goals by preventing Farm Credit from realizing it may have a claim to the MP-Tenn funds or otherwise demanding that Uncle Nearest spend the funds in a certain way. Then there is the fact that Uncle Nearest executed the MP-Tenn convertible

30

promissory notes while in the midst of high pressure forbearance negotiations with Farm Credit, [*see* Doc. 144 at p. 252; Doc. 149 at pp. 8, 16; Doc. 157-9 at p. 1], negotiations that may have broken down had Farm Credit been told Uncle Nearest incurred additional debt seemingly in contravention of the July 22, 2022, Credit Agreement, [*see* Doc. 1-5 at pp. 78–79].[28]

Thus, Uncle Nearest had motive to not tell Farm Credit about the MP-Tenn convertible promissory notes and to disguise the source of those funds. Considering this motive alongside the Subordinated Credit Agreement and Forbearance Agreement (i) treating the MP-Tenn funds as a loan from Grant Sidney and (ii) never mentioning MP-Tenn once, there is only one reasonable conclusion: Uncle Nearest—under Fawn Weaver's leadership—concealed its dealings with MP-Tenn from Farm Credit and misrepresented the $20 million MP-Tenn loaned Uncle Nearest as an infusion of Grant Sidney's own funds.[29] This misrepresentation tips the fraudulent conduct factor further in favor of the receivership's continuation. This weight is lessened by the fact it appears that, at least on the current record, the funds diverted to Grant Sidney flowed back to Uncle Nearest, but the misrepresentation itself still carries considerable weight.

>   5.  *Without the receivership, Farm Credit's collateral would be in imminent danger of being lost, concealed, injured, diminished in value, or squandered.*

Looking next to whether Farm Credit's collateral would be in imminent danger absent the continuation of the receivership, the Court finds that it would be. As detailed above, Uncle Nearest—under Fawn Weaver's leadership—moved $20 million of Farm Credit's collateral in part so that Farm Credit would be unable to reach it. *See supra* pp. 27–31; [Doc. 1-10 at pp. 2–3 ¶ 2

---

[28] The Court cites to the fourth amendment to the July 22, 2022, Credit Agreement because it restates the parties' agreement in its entirety and none of the subsequent amendments altered the cited provisions.

[29] Fraudulent conduct "must be established by clear, unequivocal and convincing evidence." *Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 371 (6th Cir. 1977). For the avoidance of any doubt, the Court finds this standard has been met.

(describing the scope of Farm Credit's security interest)]. Fortunately, it appears these funds eventually flowed back to Uncle Nearest. But the Court is not convinced Uncle Nearest would be so lucky next time, particularly where nothing in the record indicates Fawn Weaver would not attempt to move Uncle Nearest's assets beyond Farm Credit's reach again. Therefore, this factor weighs in favor of the receivership's continuation.

6. *Less drastic equitable remedies would be insufficient.*

The Court has given great thought to whether there is a less drastic equitable remedy that would adequately protect Farm Credit's interests as this litigation plays out. To date, the Court has been unable to identify such a remedy. The combination of Uncle Nearest's precarious financial situation, its pre-receivership fraudulent conduct, and the risks to Farm Credit's collateral absent a receiver render a receivership the least drastic remedy at the Court's disposal. Accordingly, this factor weighs in favor of the receivership's continuation.

7. *The receivership has done more good than harm notwithstanding the downward trend in Uncle Nearest's sales.*

The Weavers and Grant Sidney claim the receivership is doing more harm than good. They point to data showing a decline in Uncle Nearest's sales and operational decisions they disagree with as evidence that the Receiver is doing irreparable damage to Uncle Nearest. [*See, e.g.*, Doc. 91 at pp. 18–22 ¶¶ 34–37; Doc. 137 at pp. 15–19 ¶¶ 28–35; Doc. 151 at pp. 19–22]. The Court disagrees.

The Weavers and Grant Sidney are correct that Uncle Nearest's sales have declined since the Receiver assumed his post. Nielson retail scan data shows Uncle Nearest both experienced negative sales growth and underperformed the American whiskey market every month from September 2025 through February 2026. [*See* Doc. 151-1 at pp. 62–63]. Additional data shows that revenue from the Nearest Green Distillery's on-site operations has also been contracting in

the months since the Receiver was appointed. [*See id.* at 64–67]. Some of this decline may be attributable to the Receiver and his operational decisions as the Weavers and Grant Sidney claim, but the Court cannot lay the entirety of Uncle Nearest's declining growth at the Receiver's feet.

The Receiver was appointed shortly after this litigation commenced and well before it got as ugly as it has now become. Given this, it is virtually impossible for the Court to reasonably conclude what portion of the decline in Uncle Nearest's growth can be attributed to the Receiver as opposed to this litigation more generally. This task is further complicated by the fact that other variables—including issues with distributors, a Q4 2025 decline in marketing efforts by Fawn Weaver, and the Weavers and Grant Sidney's public statements and actions—have undoubtedly also had some effect on Uncle Nearest's sales growth. [*See* Doc. 126 at pp. 20–21 ¶ 44].

Furthermore, while the Receiver could be directly responsible for a portion of the decline in Uncle Nearest's sales growth, growth is but one metric for measuring a company's success. And the Receiver has made tremendous progress in improving another, perhaps even more important metric: profitability. The Receiver has reduced Uncle Nearest's monthly losses from approximately $1 million per month to roughly $100,000 per month, exclusive of receivership fees.[30] [*Id.* at pp. 12–13 ¶ 26, p. 24 ¶ 46, pp. 34–35 ¶ 70]. In other words, the Receiver has cut

---

[30] The Weavers and Grant Sidney dispute this figure. They first argue the income statement produced by the Receiver shows only a roughly $160,685.42 decrease in average monthly expenses, far less than the $900,000 improvement in cash flow claimed by the Receiver. [Doc. 151 at p. 8]. The problem with this argument, however, is that the Receiver has testified this income statement is unreliable and that he only produced it in the interest of full transparency. [*See* Doc. 126 at p. 21 ¶ 42]. Therefore, the Court does not give the income statement any weight when evaluating whether the Receiver has reduced Uncle Nearest's monthly losses by $900,000 as he claims.

Second, the Weavers and Grant Sidney argue that pre- and post-receivership cash flow data shows the Receiver only reduced monthly expenses by approximately $220,000. [*See* Doc. 151 at pp. 8–9]. Putting aside that reducing monthly expenses by roughly $220,000 is still commendable, the Weavers and Grant Sidney's calculations do not call the Receiver's assertion that he reduced losses

33

Uncle Nearest's monthly operating losses by 90% even in the face of declining sales. The Court

finds this improvement in profitability far outweighs any loss of sales growth that can be attributed

specifically to the receivership.

And this is not the only benefit the receivership has brought to Uncle Nearest. For example,

the Receiver has reconciled Uncle Nearest's barrel inventory. [Doc. 46 at p. 4 ¶ 12; Doc. 132 at

---

by approximately $900,000 per month into question.

To reach their ~$220,000 reduction in expenses, the Weavers and Grant Sidney merely added together Uncle Nearest's pre-receivership operating disbursements for the weeks ending 5/23, 5/30, 6/6, and 6/13 and then compared that figure to the sum of post-receivership operating disbursements for the weeks ending 11/16, 11/23, 11/30, and 12/07. [*See* Doc. 151-2 (citing Weavers and Grant Sidney Hrg. Exh. 5; Doc. 131-2)]. This results in a $220,073 reduction in operating disbursements. [*See id.*]. But this is not the only way one can calculate the differences in pre- and post-receivership operating disbursements.

Instead of just adding four weeks together to get a "monthly" total, one could instead average the weekly operating disbursements across the reporting data to get a more accurate representation of Uncle Nearest's average weekly operating disbursements. From there, one could multiply the weekly average by 52 and then divide this new figure by 12 to convert average weekly operating disbursements into average monthly operating disbursements. Then, one could compare the pre- and post-receivership average monthly operating disbursements to see what the difference is between them.

Applying this method to the operating disbursements listed in Doc. 131-2, the Court estimates Uncle Nearest's average pre-receivership monthly operating disbursements were roughly $2,452,258. Applying this same method to the operating disbursements listed in the Weavers and Grant Sidney's Hearing Exhibit 5 (excluding projected disbursements), the Court estimates Uncle Nearest's average post-receivership monthly operating disbursements have been approximately $1,573,977. This translates to a roughly $878,281 reduction in average monthly operating disbursements which is rather close to the $900,000 reduction in monthly losses claimed by the Receiver.

Thus, while the Weavers and Grant Sidney claim the Receiver's math does not add up, the data they rely on can just as easily be used to support the Receiver's position as it can theirs. Considering this—along with the Weavers and Grant Sidney's concession that the Receiver has "better access to [Uncle Nearest's] financial information" than they do [Doc. 137 at pp. 4–5 ¶ 4]— the Court sees no reason to discount the Receiver's testimony that he has decreased Uncle Nearest's monthly losses from approximately $1 million per month to roughly $100,000 per month.

pp. 3–4 ¶ 4]. He has made progress in updating Uncle Nearest's capitalization table to accurately reflect Uncle Nearest's shareholders. [Doc. 126 at p. 32 ¶ 59; Doc. 132 at p. 4 ¶ 5]. He has brought Uncle Nearest and the other entities that make up the receivership estate current on various state tax obligations and is actively working to bring all these companies into full compliance with state and federal tax law, a not insignificant task considering that Uncle Nearest has failed to file tax returns since 2018. [*See* Doc. 132 at p. 5 ¶ 10, pp. 11–12 ¶¶ 30–31, p. 15 ¶ 45]. He has satisfied all outstanding liens held by Tennessee Distilling Group, LLC on Uncle Nearest's inventory. [*Id.* at p. 4 ¶ 7]. And he has secured additional capital from Farm Credit to cover both the costs of the receivership and Uncle Nearest's operating losses. [*See id.* at pp. 8–10 ¶¶ 21–23; Doc. 46 at pp. 3–4 ¶ 11, pp. 13–14 ¶¶ 48–50].

Beyond these benefits tied directly to the Receiver's actions, the receivership itself has had a separate benefit; it has prevented Uncle Nearest from being subject to additional litigation. In Paragraph 12 of the Order Appointing Receiver, the Court enjoined other individuals and entities from interfering with the receivership estate. [Doc. 39 at p. 13 ¶ 12]. This injunction, which functions like the automatic stay under 11 U.S.C. § 362, has stayed litigation against Uncle Nearest in at least two federal lawsuits.[31] First, the injunction has stayed *Billips, LLC v. Uncle Nearest, Inc.*, 3:25-cv-823, a breach of contract case pending in the United States District Court for the District of Oregon in which Uncle Nearest, Inc. allowed default to be entered against it prior to the receivership. Second, the injunction has stayed further proceedings against Uncle Nearest, Inc. in *Menos v. Uncle Nearest, Inc.*, 1:22-cv-1449, an employment discrimination case pending in the United States District Court for the Eastern District of New York. In addition to these two cases,

---

[31] "'Federal courts may take judicial notice of proceedings in other courts of record.'" *Rodic v. Thistledown Racing Club, Inc.*, 615 F.2d 736, 738 (6th Cir. 1980) (quoting *Granader v. Public Bank*, 417 F.2d 75, 82-83 (6th Cir. 1969)).

the anti-litigation injunction has also prevented Farm Credit from foreclosing on any of Uncle Nearest's assets, which Farm Credit and its witnesses have repeatedly suggested Farm Credit will do should the receivership end. [*See* Doc. 30 at pp. 85–86; Doc.130 at p. 8 ¶ 24; Doc. 131 at p. 11 ¶ 40; Doc. 134 at pp. 2–3 ¶ 3, pp. 8–9 ¶ 18].

In short, the receivership has given Uncle Nearest breathing room to get back on its feet, and the Receiver has taken full advantage of this opportunity. He has improved Uncle Nearest's operations, increased its profitability (though he still has some work to do this regard), corrected its records, and generally set the company on a better path. Sales may be down, but this cannot be attributed solely to the receivership. And any sales the Receiver may have cost Uncle Nearest are more than offset by the substantial progress he has made elsewhere. Accordingly, this factor weighs strongly in favor of the continuation of the receivership.

        8.   *On balance, the foregoing factors weigh strongly in favor of Uncle Nearest remaining in receivership.*

Considering the foregoing, it is readily apparent Uncle Nearest should remain in receivership. Uncle Nearest is insolvent. It engaged in fraudulent conduct through its former CFO and through the help of Grant Sidney and Fawn Weaver. Without a receiver, Farm Credit's collateral would be at risk. There does not appear to be a viable alternative equitable remedy. And the receivership has had tremendous benefits for Uncle Nearest notwithstanding the recent decline in Uncle Nearest's sales. Cumulatively, these factors weigh strongly in favor of the receivership's continuation. And the uncertainty surrounding the remaining two factors means those factors neither add to nor detract from this weight. Thus, the factors still weigh in favor of the receivership on balance.

The Court, however, cannot end its analysis here as the Weavers and Grant Sidney have advanced other equitable arguments for terminating the receivership that must be addressed.

9. *The Weavers and Grant Sidney have not demonstrated that any party has perpetrated a fraud on the Court, that Farm Credit has unclean hands, or that the Receiver has been anything but candid with the Court.*

Besides arguing the receivership factors weigh in their favor, the Weavers and Grant Sidney also argue (i) that Farm Credit's unclean hands preclude the receivership from continuing, (ii) that the Receiver can no longer be trusted as a court-appointed fiduciary, and (iii) that Farm Credit and the Receiver's conduct approaches a fraud on the Court. [*See* Doc. 172 at pp. 14–24; Doc. 151 at pp. 22–23]. To support these accusations, the Weavers and Grant Sidney rely on multiple examples of what they contend is a pattern of Farm Credit and the Receiver advancing baseless or intentionally misleading allegations that are subsequently disproven by readily available evidence. These examples, however, fail to demonstrate that either Farm Credit or the Receiver have acted improperly during this litigation.

i.       <u>Farm Credit's allegations concerning insolvency</u>

The Weavers and Grant Sidney argue Farm Credit has advanced a misleading solvency narrative throughout this litigation. [Doc. 172 at pp. 14–15]. They base this argument on two separate points.

First, the Weavers and Grant Sidney take issue with Paragraph 61 of the Verified Complaint which states in full:

> Even more concerning are the Post-Forbearance Execution Defaults arising from failure to meet financial reporting and minimum liquidity requirements. Among other things, under the Forbearance Agreement, Uncle Nearest agreed to provide cash flow budgets (consisting of an initial four-week period and thirteen-week updates thereafter) and weekly cash flow reporting against those budgets, and further agreed to maintain a minimum cash position of $1,500,000 at all times. Based on the cash flow forecast provided by the interim chief financial officer on May 12, 2025, the forecast purported to show an initial cash balance of $1,500,000 as of May 12, 2025, when, in fact, the Company's beginning cash balance at that time was approximately $261,000. Moreover, the same forecast, projected approximately $557,000 of cash burn in the first week, implying that Uncle Nearest would be facing an approximate $296,000 negative cash balance by the end of the first week. This would require an immediate infusion of $1,796,000 to meet the

37

minimum liquidity requirement. Even with such an infusion, Uncle Nearest's own forecast demonstrated that it would require weekly cash infusions of at least $500,000 to maintain a positive cash balance and the agreed-upon minimum liquidity of $1,500,000.

[Doc. 1 at p. 25 ¶ 61]. They argue the $261,000 cash balance mentioned in this allegation is a misleading indicator of Uncle Nearest's solvency because Farm Credit failed to disclose that Uncle Nearest had so little cash on hand at this time due to a combination of the $7.5 million paydown Uncle Nearest made as part of the Forbearance Agreement and other legacy creditor payments. [Doc. 172 at p. 14]. This argument is meritless.

Initially, the only evidence the Weavers and Grant Sidney rely on to support their position is Fawn Weaver's testimony which, again, the Court does not find credible. *See supra* pp. 23–24. Furthermore, alleging insolvency is not the purpose of Paragraph 61. Rather, its purpose is to allege that Uncle Nearest defaulted under the Forbearance Agreement by failing "to maintain a minimum cash position of $1,500,000 *at all times*." [Doc. 1 at p. 25 ¶ 61 (emphasis added)]. The cause of this shortcoming is irrelevant to whether Uncle Nearest defaulted as alleged, and it was not misleading or otherwise improper for Farm Credit to omit the Weavers and Grant Sidney's claimed cause of the low cash balance.

Second, the Weavers and Grant Sidney argue that Farm Credit improperly relied on Doc. 131-4, a cash flow forecast they contend is a template, to show that Uncle Nearest was projecting significant negative cash flows before the receivership when Uncle Nearest was actually cash flow positive. [Doc. 172 at pp. 14–15]. This argument, like their first, is meritless. The Court has already found that Uncle Nearest has been cash flow insolvent since before the receivership began. *See supra* pp. 8–11. And the Court has also found that Doc. 131-4 is not a template as the Weavers and Grant Sidney claim. *See supra* p. 9 n. 11.

Thus, nothing supports the Weavers and Grant Sidney's contention that Farm Credit has

38

advanced baseless or misleading allegations concerning Uncle Nearest's solvency.

    ii.    <u>Farm Credit's allegations concerning the Martha's Vineyard Property</u>

The Weavers and Grant Sidney next argue Farm Credit baselessly suggested the Weavers and/or Uncle Nearest misappropriated loan funds to purchase a house in Martha's Vineyard despite knowing and approving of the purchase and its structure. [*See* Doc. 172 at pp. 15–17; *see also* Doc. 151 at pp. 22–23]. The record does not support this argument.

In the Verified Complaint, Farm Credit alleges that, as part of the fourth amendment to the July 22, 2022, Credit Agreement, it loaned Uncle Nearest money to purchase a house on Martha's Vineyard for marketing and brand building purposes. [Doc. 1 at p. 7 ¶¶ 24–25]. Farm Credit further alleges that despite the July 22, 2022, Credit Agreement, as amended, calling for Uncle Nearest to purchase the Martha's Vineyard property, the property was instead purchased by a separate entity, UN HOUSE MV LLC, and then mortgaged to a third party. [*Id.* at pp. 7–8 ¶¶ 26–27]. Farm Credit made similar allegations in its Emergency Motion for the Immediate Appointment of Receiver, arguing that Uncle Nearest had misrepresented how the funds earmarked for the Martha's Vineyard purchase would be used. [*See* Doc. 3 at p. 18 ¶ 38].

In response to these allegations, the Weavers and Uncle Nearest argued they "were fully transparent with [Farm Credit] about the purchase and intended purpose of the [Martha's Vineyard] Property." [Doc. 16 at p. 3]. They supported this argument with (1) a declaration from Fawn Weaver stating the structure of the Martha's Vineyard purchase was fully disclosed to Farm Credit, [Doc. 16-1 at p. 3 ¶ 4], (2) a series of emails detailing a social visit by Farm Credit personnel to the Martha's Vineyard property, [*id.* at p. 10–28], and (3) a purchase contract Uncle Nearest emailed to Farm Credit concerning the Martha's Vineyard property that listed Keith Weaver as the buyer, [*id.* at 6–9]. After considering this evidence and everything else in the record at the time,

39

the Court found there were outstanding factual disputes surrounding the Martha's Vineyard property and did not give the issue any weight one way or another. [*See* Doc. 32 at p. 9 n. 6].

Now, the Weavers and Grant Sidney present (1) a new declaration by Fawn Weaver with materially similar, but more detailed, averments concerning the Martha's Vineyard property, [*compare* Doc. 16-1 at pp. 3–4 ¶¶ 4–5, *with* Doc. 151-1 at pp. 6–7 ¶¶ 20–25], (2) several of the previously provided emails,[*compare* Doc. 16-1 at pp. 10–12, 23–28, *with* Doc. 151-1 at pp. 34–40], and (3) the same purchase contract and accompanying email to Farm Credit, [*compare* Doc. 16-1 at pp. 6–9, *with* Doc. 151-1 at pp. 30–33], as smoking gun proof that Farm Credit knew of the nature and structure of the Martha's Vineyard purchase despite suggesting otherwise to the Court. [*See* Doc. 172 at pp. 15–17]. They further attempt to bolster their position with pictures of Farm Credit personnel at the Martha's Vineyard property. [*See id.* at p. 17]. But none of this evidence clears up the factual disputes surrounding the Martha's Vineyard purchase.

Starting with the emails and photos showing that Farm Credit personnel visited the Martha's Vineyard property, none of this has any bearing on whether Farm Credit knew the property was purchased by an entity other than Uncle Nearest. Looking next to Fawn Weaver's declaration, she avers Farm Credit possessed such knowledge, but the Court does not find her testimony credible. *See supra* pp. 23–24. Thus, the only probative and reliable evidence the Weavers and Grant Sidney have to prove that Farm Credit knew the Martha's Vineyard property would be purchased by an individual or entity other than Uncle Nearest is the purchase contract.

This contract does list Keith Weaver as the buyer of the property, and it was sent to Farm Credit. [*See* Doc. 151-1 at pp. 30–33]. It is therefore consistent with the Weavers and Grant Sidney's position that Farm Credit knew the Martha's Vineyard property would not be purchased directly by Uncle Nearest. The problem the Weavers and Grant Sidney face, however, is the

40

contract is also consistent with Farm Credit's position that it was told Uncle Nearest would be purchasing the property. The purchase contract gave Keith Weaver "the right to assign [the] contract to [his] spouse, issue, a partnership, corporation, limited liability partnership, or limited liability company in which [he], [his] spouse or [his] issue have an interest…" [*Id.* at p. 33]. Therefore, it is entirely possible that Farm Credit was presented with the purchase contract and told Keith Weaver would be assigning it to Uncle Nearest or a subsidiary thereof. This version of events is further supported by the fourth amendment to the July 22, 2022, Credit Agreement which obligates Uncle Nearest or one of its subsidiaries to purchase the Martha's Vineyard property. [Doc. 1-5 at p. 73].

Considering the foregoing, the Court finds that the purchase contract does not prove Farm Credit knew the structure of the Martha's Vineyard purchase. At the same time, the Court is not prepared to definitively find that the Weavers and/or Uncle Nearest misrepresented the nature of the Martha's Vineyard purchase based only on the fourth amendment to the July 22, 2022, Credit Agreement and the fact that the purchase agreement could have been assigned to Uncle Nearest. Simply put, the factual disputes surrounding the Martha's Vineyard purchase remain unresolved. And with these disputes, the Court cannot say that Farm Credit's allegations surrounding the Martha's Vineyard purchase are baseless.

iii.     Farm Credit's allegations concerning the missing barrels

The Weavers and Grant Sidney next take issue with counsel for Farm Credit claiming during the hearing on Farm Credit's Emergency Motion for the Immediate Appointment of Receiver that approximately $21 million in whiskey barrels were missing from Uncle Nearest's inventory. [*See* Doc. 172 at pp. 17–18]. They assert the evidence has since proven this allegation false as the "missing" barrels are merely those subject to the Advanced Spirits, LLC forward

contract. [*See id.*]. The Weavers and Grant Sidney are correct that the "missing" barrels been found. [*See, e.g.*, Doc. 132 at pp. 3–4 ¶ 4]. But this does not mean Farm Credit's allegations were baseless or that it otherwise acted improperly.

One of the loans Uncle Nearest obtained under the July 22, 2022, Credit Agreement is a revolving line of credit where the amount of money Uncle Nearest can borrow is determined by a percentage of its "Eligible Accounts" plus its "Eligible Inventory" minus all its "Availability Reserves," up to a maximum amount set by the contract. [*See* Doc. 1-5 at pp. 16, 22–23, 35, 40–41; *see also* Doc. 1-1 at pp. 10, 16–17, 28, 34]. Uncle Nearest's "Eligible Inventory" includes, among other things, the filled whiskey barrels it owns free of any title defects and certain liens. [*Id.* at pp. 22–23].

Prior to this litigation, Farm Credit received inventory reports from Tennessee Distillery Group, LLC—which stores Uncle Nearest's filled whiskey barrels—indicating Uncle Nearest's barrel inventory was overstated by tens of thousands of barrels. [*See* Doc. 130 at pp. 6–7 ¶¶ 19–20]. This posed a problem for Farm Credit as it had already lent Uncle Nearest money based on these unaccounted for barrels, meaning Uncle Nearest was overadvanced funds it was not entitled to receive under the July 22, 2022, Credit Agreement. [*See* Doc. 131 at p. 10 ¶¶ 35–36].

Uncle Nearest did not originally dispute that it overreported its barrel inventory. The February 11, 2025, restructuring plan prepared by Uncle Nearest's then financial advisor directly stated "the company ha[d] reached a $20M+ over-advance position" on its revolving loan "[b]ased on inaccurate reporting of the borrowing base[.]" [Doc. 131-3 at p. 2]. And Uncle Nearest agreed in the Forbearance Agreement that it had defaulted under the July 22, 2022, Credit Agreement by failing to cure its overadvance position. [*See* Doc. 1-9 at p. 20]. Even leading up to the hearing on Farm Credit's Emergency Motion for the Immediate Appointment of Receiver, Uncle Nearest still

agreed its barrel inventory was overstated, introducing a declaration by Fawn Weaver that stated:

> Regarding the overstatement of Defendants' barrel inventory, Defendants' former Chief Financial Officer, acting on his own, made this representation to Plaintiff. Between 2022 and 2023, the former CFO represented to the Plaintiff that Uncle Nearest had 77,000 barrels of whiskey on hand and used this overstatement to secure a $24 million line of credit increase. The former CFO was the sole signee on all loan notices used to request funding secured by the barrels. Inventory reporting was handled separately and exclusively by the former CFO.
>
> Neither I nor any other officer at Defendants was aware that the CFO had overstated the barrel inventory to Plaintiff. Defendants have terminated the CFO and are investigating his misconduct in connection with pursuing claims against him.

[Doc. 16-1 at pp. 2–3 ¶¶ 2–3].[32]

Considering the foregoing and the fact that Uncle Nearest's overadvance position meant Farm Credit might not have had adequate collateral for its loans, [*see* Doc. 130 at p. 6 ¶ 18], it is unsurprising that counsel for Farm Credit highlighted the "missing" barrels during the hearing on the Emergency Motion for the Immediate Appointment of Receiver. [*See* Doc. 30 at pp. 11–12]. That the Receiver has since found the "missing" barrels does not make Farm Credit's arguments concerning them baseless or otherwise improper. If anything, that it took the Receiver to figure out where the "missing" barrels went vindicates Farm Credit's concerns about Uncle Nearest's barrel inventory.

### iv.     Farm Credit's allegations concerning the MP-Tenn funds

The Weavers and Grant Sidney next accuse Farm Credit of arguing that Uncle Nearest and Grant Sidney commingled the MP-Tenn funds when the Subordinated Credit Agreement and bank

---

[32] Fawn Weaver's testimony has since changed. Now, she argues the "missing" barrels that led to the inventory overstatement were never missing but instead were merely subject to the Advanced Spirits, LLC forward contract. [*See* Doc. 151-1 at p. 7 ¶¶ 26–27]. She further argues that because the forward contract identifies "the specific purchased barrels and require[s] those barrels be paid for by specified dates, it was proper to include those barrels in [Uncle Nearest's] inventory." [*Id.* at p. 8 ¶ 30]. This shift in testimony is another example of why the Court does not find Fawn Weaver credible.

transfers Farm Credit had access to clearly showed that no such commingling had occurred. [Doc. 172 at p. 18]. This accusation ignores the substance of Farm Credit's argument.

Farm Credit asserts that Fawn Weaver's diversion of the MP-Tenn convertible promissory notes' proceeds from Uncle Nearest to Grant Sidney is an example of "commingling and the use of Grant Sidney as an instrumentality to avoid [Farm Credit's] lien on Uncle Nearest's assets."[33] [Doc. 158 at pp. 4–5 ¶ 8]. Given that commingling typically refers to the intermixing of funds, *see Commingling*, BLACK'S LAW DICTIONARY (12th ed. 2024), it may not have been the best term to use when describing the flow of the MP-Tenn funds between Uncle Nearest and Grant Sidney since it does not appear, at least on the current record, that anything but the MP-Tenn funds and associated interest were ever in the relevant Grant Sidney account. [*See* Doc. 160-1 at pp. 53–58]. But an allegation is not rendered baseless simply because it is not laid out in the most articulate way.

The substance of Farm Credit's argument is that Uncle Nearest—under Fawn Weaver's leadership—improperly moved $20 million to Grant Sidney to prevent Farm Credit from being able to reach the funds. [*See* Doc. 158 at pp. 4–5 ¶¶ 7–8]. And this argument is anything but baseless. As noted *supra* pp. 27–31, the Court has already found that Uncle Nearest engaged in fraudulent conduct by concealing the MP-Tenn convertible promissory notes from Farm Credit and misrepresenting the source of those notes' funds. Therefore, the Weavers and Grant Sidney's accusation has no merit.

v. <u>Farm Credit's allegations concerning Uncle Nearest's tax noncompliance</u>

The Weavers and Grant Sidney next accuse Farm Credit of using Uncle Nearest's tax issues

---

[33] The Court assumes this is the commingling argument the Weavers and Grant Sidney take issue with but cannot say for certain as the Weavers and Grant Sidney never cite to the specific allegation they base their accusation on. [*See* Doc. 172 at p. 18].

to paint a misleading picture. [*See* Doc. 172 at pp. 18–19]. They argue Farm Credit relied on Uncle Nearest's alleged tax noncompliance to argue the company was mismanaged while omitting the fact that Uncle Nearest was actively working to remedy its tax issues pre-receivership. [*See id.*]. The record, however, fails to clearly show that Farm Credit intentionally misrepresented the nature of Uncle Nearest's tax issues.

In his Second Quarterly Report, the Receiver stated he had "discovered that the Company has not filed federal tax returns since 2018" and that "[h]e is working with the Company's accountants to develop a timeline and a budget for bringing the Company into compliance with Internal Revenue Service and federal tax law requirements." [Doc. 132 at p. 5 ¶ 10; *see also id.* at pp. 12–13 ¶ 30, p. 15 ¶ 45]. The Second Quarterly Report did not discuss any pre-receivership efforts to fix Uncle Nearest's tax issues, nor was such a discussion necessary considering the purposes of the report. [*See* Doc. 39 at pp. 13–14 ¶ 13].

Farm Credit subsequently relied on the Receiver's statement that Uncle Nearest had not filed taxes for multiple years in two of its briefs opposing the Motion to Reconsider.[34] [*See* Doc. 134 at p. 11 ¶ 21 (citing Doc. 132 at p. 5 ¶ 10); Doc. 157 at p. 2 ¶ 2, pp. 12–13 ¶ 19, pp. 15–16 ¶ 24]. The first of these briefs was filed before the Weavers and Grant Sidney introduced the evidence of Uncle Nearest's pre-receivership tax efforts they now claim Farm Credit omitted. [*See* Doc. 134 (refiled on February 3, 2026); Doc. 151-1 (filed on February 26, 2026)]. It should go without saying that a party's failure to address evidence it was unaware of cannot be considered an intentional misrepresentation.

---

[34] The Court assumes these are the tax-related arguments the Weavers and Grant Sidney take issue with. As is the case with their accusation concerning the MP-Tenn funds, the Weavers and Grant Sidney never cite the specific allegation or argument they take issue with. [*See* Doc. 172 at 18–19].

As for Farm Credit's second brief, it was filed one hour after the Weavers and Grant Sidney first filed their tax-related evidence as part of a 136 page declaration and accompanying exhibits. [*See* Doc. 151-1 (filed at 8:30 p.m. ET on February 26); Doc. 157 (filed at 9:30 p.m. ET on February 26)]. Thus, it is possible Farm Credit saw this evidence before filing its brief. But considering the length of the Weavers and Grant Sidney's filing, the short gap between when it and Farm Credit's brief were filed, and the fact that Farm Credit knew it would have the opportunity to respond to the Weavers and Grant Sidney's evidence at a later date, [*see* Doc. 143 (setting a post-hearing briefing schedule)], it also entirely possible that Farm Credit did not review or otherwise notice the Weavers and Grant Sidney's tax-related evidence before filing its brief. Considering this, the Court finds the Weavers and Grant Sidney have failed to demonstrate that Farm Credit intentionally misrepresented the nature of Uncle Nearest's tax compliance.

vi.     <u>The Receiver's allegations</u>

After accusing Farm Credit of making baseless and misleading claims, the Weavers and Grant Sidney next make similar accusations against the Receiver. [*See* Doc. 172 at pp. 19–22]. They break these accusations into three separate parts, though the same core complaint runs through them all. Namely, the Weavers and Grant Sidney take issue with the Receiver's position that Uncle Nearest and the entities identified in the Motion for Clarification are best viewed as a single enterprise due to their commingling funds and sharing of resources. [*See id.*]. The Weavers and Grant Sidney assert that the Receiver bases this position on nothing more than conjecture and claim that his position is readily disproven by documentary evidence in the record. [*See id.*]. The Court disagrees.

As noted *infra* p. 51, the Receiver has presented evidence supporting his position that the entities identified in the Motion for Clarification operated as part of a single enterprise with Uncle Nearest. And while the Court is unwilling to expand the receivership based on this evidence alone,

46

its existence demonstrates that the Receiver's position is not based on readily disproven conjecture as the Weavers and Grant Sidney claim. Rather, it has an evidentiary foundation from which the Receiver was entitled to construct a good faith argument. That is what the Receiver did. Accordingly, the Court finds the Weavers and Grant Sidney's accusations against the Receiver are meritless.

### vii. Summary

In short, the evidence fails to even suggest that Farm Credit or the Receiver advanced baseless or intentionally misleading allegations, let alone clear the high bar for proving unclean hands or a fraud on the court. *See Kearney & Trecker Corp. v. Cincinnati Milacron, Inc.*, 562 F.2d 365, 371 (6th Cir. 1977) (stating that unclean hands must be proven by "clear, unequivocal and convincing evidence"); *Gen. Med., P.C. v. Horizon/CMS Health Care Corp.*, 475 F. App'x 65, 71 (6th Cir. 2012) (listing the elements that must be proven by clear and convincing evidence to establish a fraud on the court); 12 Moore's Federal Practice - Civil § 60.21[4][c] (2026) (noting that "even fairly despicable conduct will not qualify as fraud on the court"). Considering this, the Weavers and Grant Sidney cannot invoke the unclean hands doctrine or the fraud on the court doctrine to avoid the receivership's continuation. Furthermore, as the evidence does not support the Weavers and Grant Sidney's claims against the Receiver in particular, the Court sees no reason to find that he can no longer be trusted as a court-appointed fiduciary.[35]

### 10. *Conclusion*

The Weavers and Grant Sidney ask the Court to end the receivership. But the record shows the receivership is still necessary to protect Farm Credit's interests as this litigation plays out. Accordingly, the Motion to Reconsider [Doc. 91] is denied.

---

[35] The Court further notes that if it ever did lose trust in the Receiver, the solution would be to appoint a substitute receiver, not end the receivership.

B.  **Motion for Clarification**

Having found that equity demands the receivership continue, the Court next turns to whether the scope of the receivership should be expanded. The Receiver asks the Court to expand the receivership to include the following entities: (1) Grant Sidney, Inc.; (2) Humble Baron, Inc.; (3) Shelbyville Barrel House BBQ, LLC; (4) Nashwood, Inc.; (5) Shelbyville Grand, LLC; (6) Quill and Cask Owner, LLC; and (7) 4 Front Street, LLC (collectively the "Additional Entities"). [*E.g.*, Doc. 124 at p. 1]. As grounds for this request, the Receiver argues that Uncle Nearest and the Additional Entities operated as a single enterprise prior to the receivership. [*See id.* at pp. 1–3]. He further argues that the Additional Entities qualify as alter egos of Uncle Nearest under the applicable Sixth Circuit test. [*Id.* at pp. 3–4]. The Additional Entities each oppose their inclusion in the receivership estate, generally arguing they are separate and distinct companies from Uncle Nearest and that expanding the receivership to include them is not justified under either federal or Tennessee law, the latter of which they contend controls. [*See generally, e.g.*, Docs. 152–56, 159–60].

Considering these arguments and the evidence in the record, the Court finds that the receivership should be expanded to include Grant Sidney, Inc., and that there is insufficient evidence to warrant bringing Humble Baron, Inc., Shelbyville Barrel House BBQ, LLC, Nashwood, Inc., Shelbyville Grand, LLC, Quill and Cask Owner, LLC, or 4 Front Street, LLC into the receivership at this time. The reasons underlying this conclusion are detailed below.

*1.  Applicable Law*

Before addressing whether the receivership should be expanded, the Court must first determine whether state or federal law governs the expansion of a federal equity receivership. The Additional Entities argue that because Farm Credit's underlying breach of contract claim is based

48

on the Court's diversity jurisdiction, the Court should apply Tennessee law when evaluating whether the receivership should be expanded. [*See, e.g.*, Doc. 152 at pp. 8–11 ¶¶ 20–25]. The Receiver, on the other hand, cites only federal law when arguing in favor of his Motion. [*See* Doc. 124 at p. 3; Doc. 149 at p. 6]. It does not appear the Sixth Circuit has ever addressed which of these positions is correct, but a review of federal receivership case law more generally makes the answer clear: federal law governs.

The initial appointment of a federal equity receiver, even in diversity cases, is governed by federal law. *Nat'l P'ship Inv. Corp. v. Nat'l Hous. Dev. Corp.*, 153 F.3d 1289, 1291 (11th Cir. 1998) (collecting cases); *see also Canada Life Assurance Co. v. LaPeter*, 563 F.3d 837, 842–43 (9th Cir. 2009) (holding that federal law governs the appointment of a receiver in diversity cases); *Aviation Supply Corp. v. R.S.B.I. Aerospace, Inc.*, 999 F.2d 314, 316 (8th Cir. 1993) (same). The reason for this is twofold. First, "the appointment of a receiver in equity is not a substantive right; rather, it is an ancillary remedy which does not affect the ultimate outcome of the action." *Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291. Consequently, the *Erie* doctrine does not require courts to apply state law when deciding whether a receiver should be appointed. *Id.* Second, "Federal Rule of Civil Procedure 66 and the accompanying Advisory Committee's Note assert the primacy of federal law in the practice of federal receiverships[,]" meaning that "to the extent Rule 66 dictates what principles should be applied to federal receiverships, courts must comply with the Rule even in the face of differing state law." *Id.* (footnotes omitted) (citing *Hanna v. Plumer*, 380 U.S. 460, 471 (1965); § 2983 Appointment of Receivers, 12 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2983 (2d ed. 1997)).

The rationale for applying federal law to the initial appointment of a receiver extends with equal force to the alteration of a receivership's scope. Neither the expansion nor the contraction of

49

a receivership "affect[s] the ultimate outcome of the action[,]" meaning *Erie* does not require the application of state law. *Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291. And the Court must comply with Rule 66's dictate that the administration of a receivership estate "must accord with the historical practice *in federal courts* or with a local rule." FED. R. CIV. P. 66 (emphasis added); *see also Nat'l P'ship Inv. Corp.*, 153 F.3d at 1291. Consequently, the Court finds that federal law governs whether the receivership should be expanded to include the Additional Entities.

Under federal law, "receiverships have been expanded by use of the alter ego doctrine to include entities related to defendants where funds have been commingled or corporate assets used for personal purposes." *Consumer Fin. Prot. v. Stratfs, LLC*, No. 24-CV-40-EAW-MJR, 2025 U.S. Dist. LEXIS 98061, at *28 (W.D.N.Y. May 22, 2025). "Some courts have further extended this principle to find that a receiver can exercise control over third-party property purchased using 'scheme proceeds.'" *Id.* And "the expansion of an equity receivership may [also] be appropriate where the requested expansion 'is necessary to effectively safeguard assets for the benefit of [creditors] . . . and to guard against potential dissipation.'" *CCUR Aviation Fin., LLC v. S. Aviation, Inc.*, No. 21-cv-60462-BLOOM/Valle, 2021 U.S. Dist. LEXIS 83769, at *5 (S.D. Fla. May 3, 2021) (ellipsis in original) (quoting *SEC v. Complete Bus. Sols. Grp., Inc.*, No. 20-CV-81205-RAR, 2020 U.S. Dist. LEXIS 253062, at *4 (S.D. Fla. Dec. 16, 2020)). None of these bases for expanding a receivership, however, can be proven lightly. "[A] request to expand [a] receivership estate…is justified only where there is a clear necessity to protect a party's interest in property, legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *Id.* (internal quotation marks omitted).

*2. Analysis*

The Receiver takes a holistic approach to whether the receivership should be expanded to

50

include the Additional Entities. He cites the large number of transactions amongst Uncle Nearest, its subsidiaries, and the Additional Entities as evidence they all operated as a single enterprise with commingled funds or, alternatively, that the Additional Entities are mere alter egos of Uncle Nearest. [*See generally* Doc. 124]. The evidence supporting this argument is not insignificant. Over the past five years, Uncle Nearest, its subsidiaries, and the Additional Entities engaged in hundreds of transactions with one another worth tens of millions of dollars in total.[36] [*See* Doc. 126 at pp. 7–8 ¶¶ 13–14, pp. 41–47]. Many of these transactions lacked customary arm's length documentation like "promissory notes, stated interest, repayment terms, board approvals, or consistent intercompany accounting[.]" [Doc. 126 at p. 9 ¶ 18]. And the documentation that does exist fails to reconcile with either the number of transactions identified by the Receiver or the amount of funds those transactions involved. [*See id.*]. Considering this alongside the other benefits several of the Additional Entities have received at Uncle Nearest's expense, [*see id.* at pp. 8–9 ¶ 15], and the Weavers' involvement in each of the Additional Entities, [*see, e.g.*, Doc. 152-1 at p. 1 ¶ 3, p. 8 ¶ 21, p. 10 ¶ 33, p. 12 ¶ 40, p. 13 ¶ 45, p. 14 ¶ 49; Doc. 160-1 at p. 1 ¶¶ 2–4], it is possible that Uncle Nearest and the Additional Entities may have been run as a single enterprise.

The Court, however, is not prepared to pull the Additional Entities into the receivership based on this aggregated evidence alone. A receivership is a drastic remedy, and the Additional Entities are entitled to an individualized evaluation of whether they should be included in the receivership.

     i.    <u>Grant Sidney, Inc.</u>

Grant Sidney, Inc. is a California corporation whose sole shareholder is Fawn Weaver.[37]

---

[36] This takes into account the exclusion of any transactions involving Classic Hops, Inc. which the Receiver is not seeking to include in the receivership estate. [*See* Doc. 98 at p. 2].

[37] In its initial response to the Motion for Clarification, Grant Sidney represented it is a Delaware

[*See* Doc. 160-1 at p. 1 ¶ 4, p. 2 ¶¶ 6, 9, pp. 14–39]. It is a holding company that owns, among other things, approximately 30% of the outstanding shares of Uncle Nearest, Inc.[38] [Doc. 160-1 at p. 3 ¶ 13]. This makes Grant Sidney Uncle Nearest, Inc.'s largest shareholder. [*Id.* at p. 1 ¶ 4]. Importantly, Grant Sidney was also used by Fawn Weaver and Uncle Nearest as part of their scheme to hide and misrepresent the source of the $20 million Uncle Nearest received from MP-Tenn, as discussed *supra* pp. 27–31.

Considering the role Grant Sidney played in Fawn Weaver and Uncle Nearest's efforts to move the MP-Tenn funds beyond Farm Credit's reach and obscure their source, *see id.*, it is apparent the receivership must be expanded to include Grant Sidney. *See CCUR Aviation Fin., LLC*, 2021 U.S. Dist. LEXIS 83769, at *5 (stating a receivership may be expanded when necessary to effectively safeguard assets and guard against potential dissipation). This is particularly true where—although it appears the MP-Tenn funds were ultimately spent for Uncle Nearest's benefit—the Receiver has been unable to fully reconcile their flow. [*See* Doc. 126 at ¶¶ 20, 21 n.3].

Furthermore, some of Uncle Nearest's other assets may have been improperly diverted to Grant Sidney. The record reflects that Fawn Weaver transferred funds from Uncle Nearest to herself and then to Grant Sidney in 2021 to facilitate a $150,000 investment in LS Cream Liqueur. [*See* Doc. 126 at pp. 6–7 ¶ 11, pp. 39–40; Doc. 160-1 at p. 8 ¶ 35]. Fawn Weaver asserts that Uncle Nearest owed her the funds she transferred, [*see* Doc. 160-1 at p. 8 ¶ 35], but she has not provided

---

corporation. [Doc. 52 at p. 2 ¶ 2]. The Court presumes this was a scrivener's error rather than an intentional misrepresentation.

[38] In its initial response to the Motion for Clarification, Grant Sidney represented it holds approximately 40% of the outstanding shares of Uncle Nearest, Inc. [*See* Doc. 52 at p. 2 ¶ 2]. It is unclear whether this was a scrivener's error or whether Grant Sidney has sold a portion of its Uncle Nearest, Inc. stock since filing its initial response.

52

any documentation substantiating this claim. Considering this alongside Fawn Weaver's lack of credibility, *see supra* pp. 23–24, the Court has serious questions concerning whether Uncle Nearest's funds were used to facilitate the LS Cream Liqueur investment.

The Court also has serious questions regarding whether Grant Sidney provided all relevant bank records to the Receiver—which would allow him to better evaluate whether Grant Sidney has improperly received funds from Uncle Nearest—despite agreeing to do so. Pursuant to the October 29, 2025, Agreed Order, Grant Sidney was required to provide the Receiver with all its bank statements for the past five years. [*See* Doc. 79 at p. 2 ¶¶ 3, 5 (requiring Grant Sidney to produce two years of bank statements, plus up to three additional years of bank statements if requested by the receiver); Doc. 126 at p. 5 ¶ 8 (the Receiver stating he requested five years of bank records)]. Grant Sidney purported to satisfy this obligation by producing bank records for a single account, the CalPrivate account it used to hide the MP-Tenn funds from Farm Credit. [*See* Doc. 126 at p. 5 ¶ 8, pp. 6–7 ¶ 11]. The Receiver, however, later determined that Grant Sidney had at least two additional bank accounts during the relevant period, one relating to the LS Cream Liqueur investment and another relating to "Grant Sidney Inc dba Grant Sidney Publishing." [*See id.* at p. 6–7 ¶ 11, p. 38–40].

Fawn Weaver responded to this development by claiming she had simply forgotten these other accounts existed and by producing bank records for both. [*See* Doc. 160-1 at pp. 7–8 ¶¶ 34–35, pp. 74–139; *see also* Doc. 149 at pp. 29–30]. She further claimed these two accounts and CalPrivate Account No. ***881 make up the only three bank accounts Grant Sidney has ever had. [Doc. 160-1 at pp. 7–8 ¶¶ 32–35]. The Court has trouble taking Fawn Weaver at her word, *see supra* pp. 23–24, and it is concerned there may be other "forgotten" accounts lurking in the shadows.

Considering this concern, the questions raised by the LS Cream Liqueur investment, and the fact the Court has already found Grant Sidney was a key part of Fawn Weaver and Uncle Nearest's efforts to hide the MP-Tenn funds and misrepresent their source, the Court finds it necessary to bring Grant Sidney within the scope of the receivership. Specifically, the Court finds that including Grant Sidney in the receivership is necessary to prevent Grant Sidney from improperly dissipating (1) any Uncle Nearest assets it may have in its possession and (2) any of its own assets that may have been improperly acquired using Uncle Nearest's funds or other resources. The Court further finds that lesser remedies would be ineffective in preventing such dissipation considering the lack of visibility into Grant Sidney's operations and its owner's willingness to move assets where they cannot be "snatched." Lastly, the Court also finds that the benefits of bringing Grant Sidney into the receivership outweigh the burdens the receivership will impose on it.

As a "passive holding and investment entity," Grant Sidney does not have operations the receivership might disrupt. [*See* Doc. 160-1 at p. 7 ¶ 31, p. 8 ¶ 40]. This lack of operations also means the Receiver's professionals are unlikely to incur any substantial fees overseeing Grant Sidney. Furthermore, and as detailed *infra* p. 62, the Court will prevent the Receiver from selling, transferring, hypothecating, or otherwise encumbering any of Grant Sidney's assets until further Order of the Court. Finally, the Court will direct the Receiver to promptly evaluate—with the benefit of access to all Grant Sidney's records—whether Grant Sidney should remain in the receivership estate. *See id.* at pp. 61–62. Thus, while the expansion of a receivership always imposes a burden, the burden for Grant Sidney will be relatively light. And when this burden is compared to the benefit of preventing the improper dissipation of Uncle Nearest's assets, it is clear the benefits of expanding the receivership outweigh its burdens.

54

For the foregoing reasons, the Court will expand the receivership to include Grant Sidney.

### ii.    Humble Baron, Inc.

Humble Baron, Inc. is a Delaware C Corporation that operates the Humble Baron Bar, a full-service bar located at the Nearest Green Distillery. [Doc. 159-1 at pp. 1–2 ¶¶ 3–4]. It is owned 100% by a blind trust for which Keith Weaver is the sole beneficiary. [*Id.* at p. 1 ¶ 3].

Over the years, Uncle Nearest has financed or otherwise provided numerous benefits to Humble Baron. For example, while the lease between Uncle Nearest Real Estate Holdings, LLC and Humble Baron requires Humble Baron to pay $5,000 a month in rent, [Weavers and Grant Sidney Hrg. Exh. 26 at p. 1], Uncle Nearest Real Estate Holdings has not collected rent from Humble Baron for some time, [*see* Doc. 126 at pp. 8–9 ¶ 15]. Additionally, after Humble Baron and Shelbyville Barrel House BBQ, LLC settled a lawsuit with Levy Premium Foodservice Limited Partnership in March 2025, Nearest Green Distillery, Inc. paid $70,833.33 in relation to the settlement on Humble Baron and Shelbyville Barrel House's behalf. [*See* Weavers and Grant Sidney Hrg. Exh. 28 at p. 2; Farm Credit Hrg. Exh. 15 at p. 6; Doc. 159-1 at pp. 4–5 ¶ 13]. Uncle Nearest also paid for Humble Baron to be designated by Guinness as the longest bar in the world. [*See* Doc. 159-1 at p. 5 ¶ 14]. And Uncle Nearest has provided Humble Baron with social media services while also paying for Humble Baron's information technology services.[39] [Doc 126 at pp. 8–9 ¶ 15].

Humble Baron generally argues there was nothing improper about its receipt of any of the foregoing benefits. The Court has its doubts. Nevertheless, the Court does not find it appropriate to expand the receivership to include Humble Baron at this time. As the Court has already noted,

---

[39] Uncle Nearest also pays the utilities, insurance, and maintenance costs associated with the Humble Baron Bar, but unlike the expenses described above, this is at least done pursuant to a written agreement. [*See* Weavers and Grant Sidney Hrg. Exh. 27].

the expansion of a receivership is justified only where, among other things, "legal and less drastic equitable remedies are inadequate, and the benefits of receivership outweigh the burdens on the affected parties." *CCUR Aviation Fin., LLC*, 2021 U.S. Dist. LEXIS 83769, at \*5. These considerations counsel against including Humble Baron in the receivership, at least for now.

First, the Receiver has several alternative legal remedies. Regarding Humble Baron's lease, the Receiver could terminate it and/or file suit for the unpaid rent. Regarding the other benefits Humble Baron has received at Uncle Nearest's expense, the Receiver could seek to recover those expenditures through something like an unjust enrichment claim. *See Freeman Indus. LLC v. Eastman Chem. Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (stating the elements of an unjust enrichment claim under Tennessee law). The availability of these alternative remedies weighs against the expansion of the receivership.

Second, the relative burdens and benefits of including Humble Baron in the receivership estate weigh against the receivership's expansion. Humble Baron, like Uncle Nearest, is not profitable. It has operated at a financial loss since its inception, and its revenues have further declined by ~30% since approximately the end of August 2025. [*See* Doc. 159-1 at p. 6–7 ¶¶ 17–18]. Considering this alongside the fact that bringing Humble Baron under the Receiver's control could require Humble Baron to either cease operating or materially change its operations, *see, e.g.*, Tenn. Comp. R. & Regs. § 0100-01-.03(11) (stating that spirits manufacturers and retailers selling alcoholic beverages for on-premises consumption generally cannot have any interest, financial or otherwise, in one another), it appears likely that expanding the receivership to include Humble Baron would cost the receivership estate more than it would gain.

Because of this, and because the Receiver has alternative legal remedies through which he could potentially recover some or all of the funds Uncle Nearest expended for Humble Baron's

56

benefit, the Court will not expand the receivership to include Humble Baron at this time.

### iii.    Shelbyville Barrel House BBQ, LLC

Shelbyville Barrel House BBQ, LLC is a Tennessee limited liability company that owns and operates Chuck's Barrel House BBQ II, a walk-up restaurant located at the Nearest Green Distillery that, among other things, serves beer. [Doc. 154-1 at p. 8 ¶¶ 21, 25]. Keith Weaver is the sole member of Shelbyville Barrel House BBQ. [*Id.* at p. 8 ¶ 21].

Shelbyville Barrel House BBQ stands in a similar position to Humble Baron. It leases space at the Nearest Green Distillery but has not paid rent for some time. [*See* Doc. 126 at pp. 8–9 ¶ 15; Weavers and Grant Sidney Hrg. Exh. 30]. It has also received information technology services at Uncle Nearest's expense and the benefit of the $70,833.33 settlement contribution Uncle Nearest made on it and Humble Baron's behalf. [*See* Doc. 126 at pp. 8–9 ¶ 15; Weavers and Grant Sidney Hrg. Exh. 28 at p. 2; Farm Credit Hearing Exh. 15 at p. 6; Doc. 154-1 at pp. 4–5 ¶ 13]. And like with Humble Baron, the Receiver has alternative legal remedies he could employ to recover from Shelbyville Barrel House BBQ short of expanding the receivership to include it. Considering this alongside the fact that Shelbyville Barrel House BBQ, like Humble Baron, may have to cease or materially alter its operations if it is brought under the Receiver's control, *see, e.g.*, Tenn. Comp. R. & Regs. § 0100-01-.03(11), the Court will not expand the receivership to include Shelbyville Barrel House BBQ at this time.

### iv.    Nashwood, Inc.

Nashwood, Inc. is a Delaware C Corporation that provides consulting, project management, and event management services. [Doc. 156-1 at p. 10 ¶ 33, p. 11 ¶ 36, p. 12 ¶ 39]. It is also the former owner of the Tolley House Bed and Breakfast. [*Id.* at p. 11 ¶ 35]. Keith Weaver is the sole shareholder of Nashwood, Inc. [*Id.* at p. 10 ¶ 33].

Like with Humble Baron and Shelbyville Barrel House BBQ, Uncle Nearest has paid for Nashwood to receive information technology services. [Doc. 126 at pp. 8–9 ¶ 15]. Additionally, the Receiver's aggregated transaction data reflects that Nashwood received nearly $500,000 from Uncle Nearest over the past five years. [*Id.* at p. 44]. Nashwood, however, has provided several reasonable explanations for these transfers. Keith Weaver testified that before Nashwood sold the Tolley House Bed and Breakfast, Uncle Nearest would rent the space out for guest stays and special events. [Doc. 156-1 at p. 11 ¶ 35]. Keith Weaver further testified that "Nashwood provided certain consulting, project management, and event management services, along with preparation of applications that resulted in approximately $500,000 in grants and incentives, to Uncle Nearest during January through August 2024 at the flat rate of $10,000 per month." [*Id.* at p. 11 ¶ 36].

Considering these explanations and the fact that the Receiver could attempt to recover funds Uncle Nearest expended for things like information technology services through alternative means, the Court finds that the Receiver has not cleared the high bar of establishing that Nashwood should be brought into the receivership. Accordingly, the Court will not expand the receivership to include Nashwood at this time.

> v. <u>Shelbyville Grand, LLC</u>

Shelbyville Grand, LLC is a Tennessee limited liability company that owns and manages a variety of real estate holdings. [Doc. 153-1 at pp. 13–14 ¶¶ 45–46]. Keith Weaver is Shelbyville Grand's sole member. [*Id.* at p. 13 ¶ 45].

One of Shelbyville Grand's real estate holdings is a climate-controlled warehouse where Nearest Green Distillery, Inc. stores certain supplies for a $6,500 monthly fee. [*Id.* at pp. 13–14 ¶ 46]. Shelbyville Grand initially represented the Distillery stopped making rental payments after February 2025, [Doc. 59 at p. 2 ¶ 2], but has since asserted that Uncle Nearest paid it $130,000 on

58

July 29, 2025, purportedly for twenty months of outstanding rental fees, [*see* Doc. 153 at p. 3 ¶ 6; Doc. 153-1 at p. 14 ¶ 48].

This transaction bears several badges of fraud that call its legitimacy into question. First, the transfer was to an insider, Keith Weaver, through a wholly owned company. *See* Tenn. Code Ann. §§ 66-3-302(7), 66-3-305(b)(1). Second, Uncle Nearest executed the transaction the day after Farm Credit filed suit. *See* Tenn. Code Ann. § 66-3-305(b)(4). And third, Uncle Nearest was insolvent at the time of the transaction. *See* Tenn. Code Ann. §66-3-305(b)(9). These badges of fraud, combined with the lack of documentary evidence supporting the appropriateness of the transaction (e.g., invoices, billing records, etc.), leave the Court with serious concerns regarding its legitimacy.

Notwithstanding the foregoing, the Court does not find it appropriate to bring Shelbyville Grand into the receivership at this time. For one thing, while the Court has serious concerns about the legitimacy of the $130,000 transaction, it is not prepared to definitively state the transaction was improper. For another, expanding a receivership estate is justified only where, among other things, "legal and less drastic equitable remedies are inadequate[.]" *CCUR Aviation Fin., LLC*, 2021 U.S. Dist. LEXIS 83769, at *5 (S.D. Fla. May 3, 2021). And here, there is another remedy that could potentially be employed to recover the $130,000: a fraudulent transfer action under Tennessee law. *See* Tenn. Code Ann. § 66-3-305. Accordingly, the Court will not expand the receivership to include Shelbyville Grand at this time.

### vi.    Quill and Cask Owner, LLC

Quill and Cask Owner, LLC is a Tennessee limited liability company whose business purpose is to purchase, hold, and sell a variety of assets for profit. [Doc. 155-1 at p. 12 ¶¶ 40–41]. Keith Weaver is the sole member of Quill and Cask Owner. [*Id.* at p. 12 ¶ 40].

Quill and Cask Owner initially represented that "it has no connection to Uncle Nearest other than having made barrel purchases from Uncle Nearest." [Doc. 57 at p. 2 ¶ 2]. Now, however, its position has changed. Quill and Cask Owner now asserts it is just an equity holder of Uncle Nearest, Inc., having invested $584,000 in December 2024 and $275,000 in January 2025. [Doc. 155 at p. 2 ¶ 3, p. 4 ¶ 8]. The Receiver's aggregated transaction data suggests these are not the only funds Quill and Cask Owner has directed to Uncle Nearest, and it appears Quill and Cask Owner has also directed funds to other of the Additional Entities. [*See* Doc. 126 at pp. 44–45]. Importantly, though, no evidence suggests any funds have flowed from Uncle Nearest, a subsidiary thereof, or any of the Additional Entities to Quill and Cask Owner. [*See id.*]. Considering this and the extraordinary nature of expanding a receivership, the Court declines to expand the receivership to include Quill and Cask Owner at this time.

vii.     <u>4 Front Street, LLC</u>

4 Front Street, LLC is a Tennessee limited liability company. [Doc. 152-1 at p. 14 ¶ 49]. Keith Weaver is a minority member of 4 Front Street and does not hold a controlling share of the company. [*Id.*]. 4 Front Street's majority member does not hold any Uncle Nearest stock, nor does he have any other connection with Uncle Nearest. [*Id.*].

The Receiver and 4 Front Street dispute whether 4 Front Street has ever transacted business with Uncle Nearest. It, however, is not necessary for the Court to resolve this dispute. Assuming the Receiver's aggregated transaction data accurately reflects 4 Front Street's business dealings with Uncle Nearest, 4 Front Street was only involved in two transactions during the relevant period: one where it disbursed $25,000 to Uncle Nearest, Inc. and another where Uncle Nearest, Inc. disbursed $39,000 to it. [*See* Doc. 126 at p. 44]. These two transactions—which had a net benefit to Uncle Nearest—are insufficient to justify the drastic remedy of bringing 4 Front Street

60

within the scope of the receivership. Accordingly, the Court will not expand the receivership to include 4 Front Street at this time.

### 3. *Conclusion*

For the foregoing reasons, the Court finds the receivership should be expanded to include Grant Sidney, Inc. but that it should not be expanded to include any of the other Additional Entities at this time. For the avoidance of any doubt, this holding should not be construed as a finding that it would never be appropriate to expand the receivership to include one or more of the six remaining Additional Entities. Rather, it merely reflects that the evidence currently in the record is insufficient to justify the drastic remedy of expanding the receivership to encompass these other entities. Accordingly, the Motion for Clarification [Doc. 41], which the Court construes as a motion to expand the receivership, is granted in part and denied without prejudice in part.

## III. CONCLUSION

For the foregoing reasons, the Court hereby **ORDERS** the following:

1. The "Motion to Reconsider the Memorandum Opinion and Order [Dkt. 32] and Order Appointing Receiver [Dkt. 39] and to Stay Access to Proprietary Information" [Doc. 91] is **DENIED**.

2. The "Motion for Clarification of Receivership Order" [Doc. 41], which the Court construes as a motion to expand the receivership, is **GRANTED IN PART** and **DENIED WITHOUT PREJUDICE IN PART**. Specifically, the Motion is granted as to Grant Sidney, Inc., which shall now be included in the receivership estate, and denied without prejudice as to the six remaining Additional Entities.

3. The Receiver is **DIRECTED** to promptly investigate whether and to what extent Grant Sidney, Inc. holds any assets that rightly belong to Uncle Nearest, Inc., Nearest Green

61

Distillery, Inc., Uncle Nearest Real Estate Holdings, LLC, or any of the "Subject Entities" as that term is defined in Paragraph 2 of the Order Appointing Receiver. [Doc. 39 at p. 2 ¶ 2]. **No later than 60 days from the date of this Memorandum Opinion and Order**, the Receiver **SHALL** submit a report to the Court detailing the results of his investigation. This report **SHALL** also state the Receiver's position on whether Grant Sidney, Inc. should remain in receivership or whether other less drastic measures could be used to recover any improperly diverted assets.

4. The Receiver is **PROHIBITED** from selling, transferring, hypothecating, or otherwise encumbering any of Grant Sidney, Inc.'s assets outside the ordinary course of business pending further Order of the Court. The Court will evaluate whether this prohibition should be lifted or otherwise altered after reviewing the report described in Paragraph 3 above.

**SO ORDERED.**

*/s/ Charles E. Atchley, Jr.*
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**

62