| | | |
|---|---|---|
| **FARM CREDIT MID-AMERICA, PCA** | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| | § | **Case No. 4:25-cv-38** |
| **v.** | § | |
| | § | **Hon. Charles E. Atchley, Jr.** |
| | § | |
| **UNCLE NEAREST, INC.,** *et al.*, | § | |
| | § | |
| *Defendants*. | § | |
| | § | |

---

### FARM CREDIT MID-AMERICA, PCA'S
### MOTION TO DISMISS THE COUNTERCLAIM

Plaintiff Farm Credit Mid-America, PCA ("Farm Credit") hereby files this Motion to Dismiss the Counterclaim brought by Defendants/Counter-Plaintiffs Uncle Nearest, Inc., Nearest Green Distillery, Inc., and Uncle Nearest Real Estate Holdings, LLC (collectively "Uncle Nearest" or "the Company"), by and through the receiver appointed in this matter, Phillip G. Young, Jr. (the "Receiver").

### INTRODUCTION

Uncle Nearest's Counterclaim is an impermissible attempt to litigate claims that have no validity and have been waived. Not content with defaulting on Farm Credit's loans and otherwise defrauding it, Uncle Nearest now seeks to compound the injury by forcing Farm Credit to litigate a meritless Counterclaim manufactured from the fallout of that same fraud.

In its sworn testimony before this Court and judicial admissions made in its own Answer and Counterclaim, Uncle Nearest conceded that (1) it defaulted on tens of millions of dollars in

1

loans extended by Farm Credit, and (2) its default under the loans was not simply the product of business misfortune, but was due to intentional misrepresentations regarding inventory collateral and other fraudulent conduct. Uncle Nearest has further admitted that its former Chief Financial Officer, Michael Senzaki, acted with malicious intent, falsifying monthly financial reports, forging Fawn Weaver's signature, fabricating board minutes, and diverting funds for his own benefit—enriching himself (and possibly others) at Farm Credit's expense. These are not allegations Farm Credit needs to prove; they are blatant admissions Uncle Nearest cannot escape.

Having admitted all of this under oath, Uncle Nearest now asks the Court to forget everything it just conceded, recasting itself as the aggrieved party and asserting a counterclaim premised on the astonishing theory that Farm Credit's purportedly lax controls somehow mitigated or excused Uncle Nearest's fraud. This is not a supportable legal theory, but an attempt to transform Uncle Nearest's own misconduct and mismanagement into someone else's liability. Farm Credit is confident that its controls met or exceeded industry standards and is prepared to prove as much at trial.[1] But the Court need not reach that issue now, because Uncle Nearest's Counterclaim fails as a matter of law and should be dismissed.

First, the Credit Agreement bars the counterclaim outright: its release provision discharges all claims arising from the Credit Agreement that accrued before April 15, 2025—covering every allegation here. Second, under the Credit Agreement's New York choice-of-law provision, the Counterclaim is barred by New York's economic loss doctrine, and is nothing more than a repackaged (and meritless) breach-of-contract claim seeking economic damages. Third, the Counterclaim fails to state a claim for negligence under New York or Tennessee law, since lenders

---

[1] To be clear, Farm Credit strongly disagrees with the characterization of its conduct as set forth in the Counterclaim and notes for the record that there are factual inaccuracies contained therein. For the purposes of this motion, of course, Farm Credit accepts the facts as pleaded.

2

do not owe borrowers a special duty of care to save them from their own fraud, the Credit Agreement disclaims any duty by Farm Credit to verify borrower certifications, and any reliance on those certifications—later revealed to be fraudulent—cannot constitute a breach. Finally, in pari delicto bars recovery because the fraud of Uncle Nearest's own agent, imputed to Uncle Nearest, outweighs any alleged negligence by Farm Credit.

### FACTUAL BACKGROUND[2]

This action arises out of a Credit Agreement dated July 22, 2022 (the "Credit Agreement"), attached hereto as **Exhibit A**, between Uncle Nearest, Inc. and Farm Credit Mid-America, PCA, which established three credit facilities: a Revolving Loan, a Term Loan, and a Real Estate Line of Credit (the "RELOC," and collectively, the "Loans").[3] Countercl. ¶ 7. Counter-Plaintiffs Uncle Nearest, Inc., Nearest Green Distillery, Inc., and Uncle Nearest Real Estate Holdings, LLC are the Borrowers under the Loans, and Farm Credit is a Lender and Administrative Agent. Ex. A at 1, 17. The Revolving Loan was originally issued in the amount of $35,000,000. Countercl. ¶ 7.

---

[2] The background stems from the allegations in the Counterclaim, pleadings, and other documents in the record, as is permitted. *See Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023) ("[T]he court may, in undertaking a 12(b)(6) analysis, take judicial notice of matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint.") (cleaned up); *W. Express, Inc. v. Brentwood Servs., Inc.*, No. M2008-02227-COA-R3-CV, 2009 WL 3448747, at *3 (Tenn. Ct. App. Oct. 26, 2009) (noting exceptions to the general rule that the only pleadings can be considered, including "matters incorporated by reference or integral to the claim, items subject to judicial notice, matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint whose authenticity is unquestioned") (citation omitted). This is particularly true here, where there is a voluminous record already before the Court, and the Court has issued several substantive rulings since the filing of the Complaint (which occurred nearly a year ago). *See Kroger Specialty Pharmacy FL 2, LLC v. Genefic Specialty Pharmacy, Inc.*, No. 3:23-CV-001217, 2024 WL 1774000, at *6 (M.D. Tenn. Apr. 24, 2024) ("Given the large volume of evidence that has been placed in the record since the filing of the Motion to Dismiss, it seems somewhat absurd to consider the motion based on the pleadings alone.").

[3] The Credit Agreement includes several subsequent amendments.

From the Company's earliest stages until his departure in approximately October 2024, Michael Senzaki served as Chief Financial Officer ("CFO") of Uncle Nearest. *Id*. ¶ 8. As CFO, Senzaki allegedly exercised nearly exclusive control over Uncle Nearest's financial reporting systems, loan compliance, and credit facility interactions with Farm Credit[4], and he was responsible for preparing and transmitting all of the Company's recurring inventory, collateral, and financial condition reports to Farm Credit, routinely acting as the sole point of contact on lender matters. *Id*. ¶ 9. As Uncle Nearest admits in its Answer and Counterclaim, Senzaki concealed the Company's true expense burden and outstanding obligations, inflated inventory numbers, and induced Farm Credit to approve multiple increases to the revolving line of credit. *Id*. ¶ 10. Senzaki has now admitted to third-party investigators that he falsified monthly financial reports beginning in 2022, affixed falsified signatures on corporate documents, diverted equity interests, and fabricated board minutes. *Id*. ¶¶ 11-12.

Relying on Senzaki's representations and apparently valid conduct, Farm Credit extended the Revolving Loan capacity from $35,000,000 to $66,980,000 by August 2023. *Id*. ¶ 13. Between July 22, 2022, and August 2, 2023, Senzaki submitted twenty-eight drawdown requests on the credit facility, totaling nearly $67,000,000. *Id*. ¶ 14. According to Uncle Nearest, Senzaki rerouted funds approved for payment to Uncle Nearest vendors to companies he controlled by exploiting a loophole in the Company's own accounting system, and that after his departure the Company discovered that its true outstanding accounts payable exceeded $10 million, even though financial reporting reflected accounts payable of approximately $345,000. *Id*. ¶ 15.

---

[4] As explained below, and as discovery would show, Fawn and Keith Weaver also had meaningful involvement in the lending relationship.

4

Farm Credit did not simply accept these developments passively. In December 2023, when it learned (from the Company) that Senzaki had misrepresented information concerning the Company's capital raise, and again after the Company missed its first scheduled payment in January 2024, Farm Credit worked diligently to obtain accurate information from the Company regarding its financial condition. Notwithstanding these efforts, Farm Credit continued to receive borrowing base reports that did not accurately reflect the Company's true financial condition. This had the obvious effect of making it very difficult for Farm Credit to service the Loans in the manner Uncle Nearest now claims it should have.

In October 2024, Farm Credit ordered an onsite inspection of collateral[5], which revealed discrepancies between the collateral reflected in Uncle Nearest's borrowing base and compliance certificates for August 2024 and what the inspector was able to independently verify. *Id*. ¶ 24.

As Farm Credit's Complaint and the Court's Order entered August 22, 2025 confirm, a receiver was necessary in light of several admitted defaults by the Company, among other problems. *See* ECF Docs. 1; 39. Thereafter, Phillip G. Young, Jr. was appointed Receiver on behalf of Uncle Nearest, Inc., Nearest Green Distillery, Inc., and Uncle Nearest Real Estate Holdings, LLC. ECF Doc. 39. That determination has since been tested and reaffirmed. On December 23, 2025, Fawn Weaver, Keith Weaver, and Grant Sidney, Inc. moved to reconsider the Order Appointing Receiver, asking the Court to end the receivership altogether. *See* ECF Doc. 91. On May 26, 2026, the Court denied that motion, holding that Uncle Nearest remains insolvent by a considerable margin and that the Weavers had failed to carry their burden of showing a significant change in fact, law, or circumstance warranting termination of the receivership. *See* ECF Doc. 198. In doing so, the Court reaffirmed that Senzaki engaged in fraudulent conduct and

---

[5] This was not Farm Credit's first collateral inspection.

5

further found that Uncle Nearest, under Ms. Weaver's leadership, engaged in additional fraudulent conduct by concealing from Farm Credit its dealings with MP-Tenn LLC and misrepresenting the source of a $20 million loan those dealings produced. *Id.* The Court also found that, without the continued receivership, Farm Credit's collateral would remain in imminent danger of loss, concealment, or diversion, and on that basis expanded the receivership to include Grant Sidney, Inc., the entity Ms. Weaver used to help move and obscure the MP-Tenn funds. *Id.*

On July 7, 2026, the Receiver answered Farm Credit's Complaint (ECF Doc. 217) and brought the instant Counterclaim for a single count of negligence/gross negligence, alleging that Farm Credit breached a duty to exercise reasonable diligence in administering the credit facility by failing to verify financial reports and borrowing base certificates, confirm drawdowns with authorized officers, properly inspect collateral, and maintain certain fraud controls. *Id.* ¶¶ 25-29. The Counterclaim cites several purported "red flags," such as Senzaki's sole signatory status on the drawdown requests and sole authorship of the underlying financial reports and the amount of money being drawn per month, which it asserts should have led to further investigation and presumably the discovery of fraud. *Id.* ¶ 27. It also alleges Farm Credit collected fees, which created an incentive to continue to process drawdowns (which admittedly were being executed by an authorized officer). *Id.* ¶ 21.

As discussed in detail *infra*, these allegations cannot be divorced from the governing Credit Agreement, including its Amendment No. 8—which released "all possible claims" relating to the Credit Agreement or Loans arising before April 15, 2025—a date that postdates every factual predicate for the Counterclaim, including the alleged drawdown confirmations (July 2022-August 2023), the October 2024 collateral inspection, and Senzaki's departure before year-end 2024. *Id.* ¶¶ 8, 14, 19, 24.

6

<u>**LEGAL STANDARD**</u>

"Courts evaluate motions to dismiss counterclaims under the same standard as a motion to dismiss a complaint." *LPI, Inc. v. Axle Logistics, LLC*, No. 3:24-CV-275, 2025 WL 1439449, at *1 (E.D. Tenn. May 19, 2025) (cleaned up). To survive dismissal, a litigant must allege facts that are sufficient "to raise a right to relief above the speculative level" and "to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft*, 556 U.S. at 678. "The Court need not 'accept as true a legal conclusion couched as a factual allegation.'" *Bruce v. Jet.com, Inc*., 482 F. Supp. 3d 731, 733 (E.D. Tenn. 2020) (quoting *Twombly*, 550 U.S. at 555). Indeed, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Cooper v. Nationwide Recovery Serv., Inc*., No. 1:25-CV-130, 2026 WL 1876165, at *2 (E.D. Tenn. Apr. 21, 2026) (cleaned up).

<u>**ARGUMENT**</u>

**I.      Uncle Nearest has released its purported Counterclaim against Farm Credit.**

Uncle Nearest's Counterclaim should be dismissed because it is barred by a release Uncle Nearest itself executed. As explained below, the Credit Agreement referenced throughout the Counterclaim may properly be considered on this Motion, and that agreement, as amended, contains a broad release covering the claim Uncle Nearest now asserts.

7

**A.      The Credit Agreement can be properly considered at this stage.**

Though the Credit Agreement is not attached to the Counterclaim, it may be properly considered at the motion to dismiss stage because it is "referenced in the complaint and [is] central to [Uncle Nearest's] claims." *Hanson v. Kwiatkowski*, No. 3:19-CV-46-TAV-HBG, 2021 WL 4254865, at *4 (E.D. Tenn. Sept. 17, 2021); *see also Kassem v. Ocwen Loan Serv., LLC*, 704 F. App'x 429, 432 (6th Cir. 2017) ("Under a well-established exception to Rule 12(d), courts may consider documents attached to a Rule 12(b)(6) or 12(c) motion without converting either into a summary judgment motion if the attached materials are: (i) 'referred to in the plaintiff's complaint and are central to the claims' or (ii) 'matters of public record.'").

Here, Uncle Nearest references the Credit Agreement in the very first factual allegation in the Counterclaim. *See* Countercl. ¶ 7. The Credit Agreement is the foundational document from which every factual allegation in the Counterclaim flows: the twenty-eight drawdown requests Mr. Senzaki allegedly submitted were requests against the credit facility the Credit Agreement created, *id.* ¶ 14; the increase in the Revolving Loan from $35,000,000 to $66,980,000 is measured against the facility limits and terms the Credit Agreement fixed, *id.* ¶ 13; and the twenty-four-hour drawdown-funding policy that Uncle Nearest alleges Farm Credit negligently applied is itself a term of the parties' agreement governing the facility, *id.* ¶ 18. Indeed, Uncle Nearest itself asserts that the Counterclaim is brought as "a compulsory counterclaim *arising out of the same transaction or occurrence that forms the basis of Farm Credit's Complaint*"—a pleading that itself arises under the Credit Agreement. *Id.* ¶ 5 (emphasis added). Additionally, it is in the record before the Court. *See* ECF Doc. 1. As such, the Credit Agreement (and all validly-executed amendments thereto) may be reviewed for purposes of the instant Motion.

8

**B. The Credit Agreement includes a valid, binding release of the purported Counterclaim.**

As Uncle Nearest began to have financial difficulties in 2024 and 2025, it voluntarily entered into an Amendment to the Credit Agreement that included a Forbearance Agreement—a decision that Farm Credit supported in an effort to address the Company's defaults. Section 8(i) of that Amendment (Amendment No. 8 to the Credit Agreement and Forbearance Agreement), attached hereto as **Exhibit B**, contains a broad general release: "each of the Borrowers . . . knowingly releases and forever discharges the Administrative Agent (and any sub-agent thereof), the Arranger and each Lender, and each Related Party of any of the foregoing Persons" from "all possible claims, demands, actions, causes of action, damages, costs, expenses and liabilities whatsoever, known or unknown, anticipated or unanticipated, suspected or unsuspected, fixed, contingent or conditional, at law or in equity, originating at any time on or before the Effective Date, that in any way relate to or arise from this Agreement, the Credit Agreement, any other Loan Document, any Loan or any transactions contemplated hereunder or thereunder." Ex. B at 16. The effective date of the release, as stated in the Agreement, is April 15, 2025. Ex. B at 11.[6]

Here, by their own admission, all of Uncle Nearest's factual allegations in support of the Counterclaim occurred before the effective date of April 15, 2025. The alleged failures to confirm drawdowns occurred between July 2022 and August 2023. Countercl. ¶ 14. The collateral inspection revealing apparent discrepancies occurred in October 2024. *Id*. ¶ 24. Senzaki left the Company before the end of 2024. *Id.* ¶ 8. Thus, the Counterclaim is barred by this release in the Amendment to the Credit Agreement and Forbearance Agreement, which indisputably applies to

---

[6] Amendment No. 8 further provides that "this paragraph shall survive the termination of each Loan Document and the repayment, satisfaction or discharge of the Loans and other Obligations." Ex. B at 16.

Uncle Nearest as a "Borrower." *See* Ex. B at 2-3 (providing that the Borrowers and Credit Support Parties "do[] not have any valid defense to the enforcement of such agreements or obligations."). The release also reaches this Counterclaim by its terms irrespective of the appointment of the Receiver. *See Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 794 (6th Cir. 2009) ("This Court held that because a court-appointed receiver 'stands in the shoes' of the received entity, the Receiver is bound by the arbitration agreements to the same extent VES and CFL were."). The Counterclaim is brought "on behalf of" Uncle Nearest, Inc., Nearest Green Distillery, Inc., and Uncle Nearest Real Estate Holdings, LLC—each a "Borrower" that executed the release in Section 8(i). It therefore applies and bars the instant Counterclaim.

## II. Under New York law, Uncle Nearest's Counterclaim fails.

### A. Even without the Release, New York law warrants dismissal of the Counterclaim.

As an initial matter, New York law governs this dispute. As noted above, the Counterclaim—which is premised on the revolving credit facility and Senzaki's drawdown requests and other conduct related thereto—necessarily stems from the Credit Agreement. Section 10.11(a) of the Credit Agreement provides in relevant part:

> [T]his Agreement and the other Loan Documents and any claims, controversy, dispute or cause of action (whether in contract or tort or otherwise) based upon, arising out of or relating to this Agreement or any other Loan Document . . . and the transactions contemplated hereby and thereby shall be governed by, and construed in accordance with, the law of the State of New York.

Ex. A at 89.

"A federal district court is required to apply the 'choice of law' rules of the state in which it sits." *United Techs. Corp. v. Sixty-One Indus. Park, Ltd.*, No. 05-2224MA/AN, 2005 WL 3591636, at *1 (W.D. Tenn. Dec. 29, 2005) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S.

487, 496 (1941)).  In Tennessee, that means courts "follow the law dictated by the choice-of-law provision in the parties' agreement if that provision is enforceable."  *Andujar v. Hub Grp. Trucking, Inc.*, 161 F.4th 1014, 1017 (6th Cir. 2025).  A choice-of-law provision is enforceable if: (1) it "was executed in good faith; (2) the state whose law is chosen has a material connection to the transaction; and (3) the chosen state's law is not contrary to a fundamental policy of a state having a materially greater interest and whose law would otherwise govern."  *Id.*  All three prongs are satisfied here.

First, the Credit Agreement was negotiated in good faith and at arms-length between two sophisticated commercial parties.  Nothing in the Counterclaim or anywhere else in the record suggests otherwise, and the choice-of-law provision was expressly negotiated and set forth in the Credit Agreement itself.  Second, New York has a material connection to the transaction.  The parties did not select New York law in isolation; they are sophisticated parties, represented by counsel, and voluntarily agreed that any dispute "relating to this Agreement or any other Loan Document" brought by a Borrower would be litigated exclusively in the New York state and federal courts, and each party irrevocably submitted to that jurisdiction and waived any objection to venue there.  Ex. A at 89.  By designating New York as both the source of governing law and the exclusive forum for resolving disputes under the Credit Agreement, the parties deliberately anchored their transaction—and any dispute arising from it, including this one—to New York.  Plus, at the time of many of the alleged events, Farm Credit had an office in New York.  *See Lee v. Captran SC, LLC*, No. 1:10-CV-293, 2011 WL 882756, at *4 (E.D. Tenn. Mar. 11, 2011) (finding the fact that a "company was incorporated under the laws of South Carolina" and that "Defendant had a business office in Charleston, South Carolina at the time the contracts were executed" sufficient for establishing a material connection); *see also Friendship Home Healthcare,*

*Inc. v. Procura, LLC*, No. 3:09-0016, 2010 WL 500427, at *4 (M.D. Tenn. Feb. 5, 2010) (finding a material connection to the state of Utah in part because the Defendant had offices in Utah). Third, New York law is not contrary to any fundamental policy of Tennessee—whose law would govern but for the choice-of-law provision—because New York and Tennessee courts have a substantially similar approach to the interpretation of contracts. *Compare Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (N.Y. 2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.") *with Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006) ("In interpreting contractual language, courts look to the plain meaning of the words in the document to ascertain the parties' intent."). Consequently, the choice-of-law provision must be given effect.

Turning back to the language of the provision, it applies to "any claims . . . arising out of or relating to th[e] [Credit] Agreement." Ex. A at 89. In its Counterclaim, Uncle Nearest alleges that Farm Credit was negligent in the administration of a large credit facility, specifically the Revolving Loan, Term Loan, and RELOC facilities established under the Credit Agreement. *See, e.g.*, Countercl. ¶ 29. As such, there is no question that the Counterclaim "arises out of" or "relates to" the Credit Agreement. Because the choice of law provision unambiguously covers this dispute, New York law applies. *See McCoy v. Stonebridge Life Ins. Co.*, No. 2:11-CV-178, 2013 WL 12123924, at *4 (E.D. Tenn. Mar. 5, 2013) ("If the language of the policy is clear and unambiguous, the literal meaning controls the outcome of the dispute.").

**B.      New York's economic loss doctrine bars the Counterclaim.**

"Under New York's economic loss doctrine, a party to a contract that suffers economic loss only (not personal injury) is, in most cases, limited to recovery pursuant to a claim for breach of contract and cannot recover economic or consequential damages in tort." *Avazpour Networking*

*Servs., Inc. v. Falconstor Software, Inc.*, 937 F. Supp. 2d 355, 361 (E.D.N.Y. 2013). "As noted by the Second Circuit, New York's economic loss doctrine prevents the recovery of 'damages that are inappropriate because they actually lie in the nature of breach of contract as opposed to tort.'" *Id.* (quoting *Hydro Investors, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 16 (2d Cir. 2000)). The doctrine "serves two purposes: (1) it protect[s] defendants from disproportionate, and potentially limitless, liability; and (2) it disentangles contract and tort law by restricting plaintiffs who suffer economic losses to the benefits of their bargains." *Royal Park Invs. SA/NV v. HSBC Bank USA, Nat. Ass'n*, 109 F. Supp. 3d 587, 598 (S.D.N.Y. 2015) (citation omitted). The doctrine exists precisely to prevent a disappointed contract counterparty from re-packaging the other side's alleged underperformance of its bargained-for obligations as an independent tort, thereby manufacturing exposure that the parties never negotiated in their agreement.

Uncle Nearest's negligence counterclaim is exactly this kind of repackaging. The Counterclaim does not seek any recovery for personal injury or property damage, only economic damages. In the Counterclaim, Uncle Nearest points to Farm Credit's supposed failure to "verify[] the accuracy of financial reports and borrowing base certificates," "confirm[] material transactions . . . with the company's authorized officers," "conduct[] meaningful collateral inspections," and "implement[] internal controls." Countercl. ¶ 26. Every one of these supposed duties (to the extent they exist) is a creature of the Credit Agreement, not the common law. Borrowing base certificates, compliance certificates, and periodic financial reporting are contractual reporting mechanisms that Farm Credit itself acknowledges are governed by the Credit Agreement's provisions, including Section 6.11, which Farm Credit's own Complaint invokes and which the Receiver's Answer confirms "speaks for itself" as the governing contractual provision. Farm Credit is entitled to the benefit of the bargain in assessing whether and to what extent the Credit Agreement places upon

13

it any such duty (it does not). Furthermore, these allegations amount to an assertion that Farm Credit oversaw the credit facility in a manner Uncle Nearest now (in hindsight) considers deficient. That is a dispute about how Farm Credit performed under the Loan Documents, not a freestanding legal duty owed independent of them.

Nor does Uncle Nearest allege any damages beyond the economic loss the doctrine is designed to exclude from tort recovery. The Counterclaim seeks recovery for: (a) "the improper expansion of the revolving credit facility from $35,000,000 to approximately $67,000,000"; (b) "fees and costs associated with multiple unnecessary amendments totaling nearly $400,000"; and (c) "the harm caused by Mr. Senzaki's concealed misconduct." *Id*. ¶ 31. But these are effectively debt obligations and other monetary fees stemming from the parties' bargained-for agreement. Uncle Nearest never identifies any injury to person or property, nor any loss that would exist but for the existence of the Credit Agreement itself. *See EED Holdings v. Palmer Johnson Acquisition Corp.*, 387 F. Supp. 2d 265, 277 (S.D.N.Y. 2004). As a result, the claim is barred.

**C.      Uncle Nearest's Counterclaim fails to state a claim for negligence under New York law.**

The Counterclaim also independently fails because it does not state a claim for negligence or gross negligence. "It is well-settled that to establish a claim of negligence, a plaintiff must prove: a duty owed to the plaintiff by the defendant, a breach of that duty, and injury proximately resulting therefrom." *William Gottlieb Mgmt. Co., LLC v. Carlin*, No. 20 CIV. 08907 (VM), 2025 WL 3628151, at *9 (S.D.N.Y. Dec. 15, 2025). At a minimum, Uncle Nearest fails to allege both duty and breach.

**1.      Lenders do not owe borrowers special duties under New York law.**

Under New York law, a lender owes a borrower no special common law duty of care. *See Est. of Leventhal ex rel. Bernstein v. Wells Fargo Bank, N.A.*, No. 14 CIV. 8751 ER, 2015 WL

14

5660945, at *11-12 (S.D.N.Y. Sept. 25, 2015) (dismissing negligence claim because a "lender does not owe a borrower any special duties."); *see also Roswell Capital Partners LLC v. Alternative Const. Techs.*, 638 F. Supp. 2d 360, 368 (S.D.N.Y. 2009) (The "borrower-lender relationship is not of a confidential or fiduciary nature."). This is simply because "[t]he relationship between a borrower and lender is normally conducted at an arm's length and governed solely by the contract between them." *Zorbas v. U.S. Tr. Co.*, 48 F. Supp. 3d 464, 480 (E.D.N.Y. 2014).

The Credit Agreement confirms as much. Section 10.14 expressly provides that services provided by the Lenders are "arm's-length commercial transactions" with the Loan Parties, and that Farm Credit has "not been, is not, and will not be acting as an advisor, agent or fiduciary for any Loan Party." Ex. A at 90-91. Critically, under the same section, Borrowers "waive[d] and release[d] any claims that it may have against [Farm Credit] with respect to any breach or alleged breach of agency or fiduciary duty in connection with any aspect of any transaction contemplated hereby." *Id.* In other words, Uncle Nearest has already agreed not to bring the claims they now seek to assert.

Section 9.3(c) also bars the Counterclaim's "red flag" theory advanced in its negligence claim. That provision disclaims any obligation on Farm Credit's part to "ascertain or inquire into" the accuracy of statements, certificates, or reports connected to the Credit Agreement. Ex. A at 73. Farm Credit therefore had no obligation to Uncle Nearest to verify, inquire, or second-guess an authorized officer's financial reporting or drawdown requests—and, more to the point, no contractual obligation to do so. Sections 6.1 and 6.2 further illustrate this, as they impose the affirmative duty to prepare and certify financial statements and other information on Uncle Nearest and its officers, not on Farm Credit. Ex. A at 55-57.

### 2. Farm Credit did not (and could not) breach any duty that it owed.

Even if Uncle Nearest could establish that some form of duty was owed (it cannot), Uncle Nearest still fails to allege a breach. Farm Credit did nothing more than extend credit in response to what were, on their face, legitimate requests from an authorized representative of the borrower for advances of funds that Uncle Nearest, through its CEO Fawn Weaver, had already agreed to. The borrowing base certificates were properly certified by an authorized officer, so reliance on them cannot be negligent. Countercl. ¶¶ 8-9, 29. And it was Uncle Nearest's own agent—not Farm Credit's—who committed intentional fraud, an intervening cause of any alleged damages. *Id.* ¶¶ 8-15.

Uncle Nearest's leadership's own conduct also cannot be ignored. First, Fawn Weaver personally signed each and every amendment to the Credit Agreement reflecting an increasing balance, demonstrating her own awareness of those increases and Uncle Nearest's ability to request funding up to the increased amounts.[7] Second, this Court has already found that Fawn Weaver herself participated in fraud via the MP-Tenn Transaction. ECF Doc. 198 at 27. Third, and perhaps most remarkably, Keith Weaver actually admitted to this Court that Uncle Nearest was itself on notice of accounting issues months before Senzaki was relieved of his duties. ECF Doc. 30 at 65-68. The same testimony also suggests the fraud continued once Senzaki's replacement took over for Senzaki. *Id.* The Court may take judicial notice of these documents and testimony. *See Elec. Merch. Sys. LLC*, 58 F.4th at 883; *Atchison v. Hubbell Indus. Controls,*

---

[7] Farm Credit notes that there have been amendments to the Credit Agreement signed by the Receiver since his appointment. However, to the extent Uncle Nearest attempts to assert that Fawn Weaver was unaware of the increases to the line of credit during the time period that is relevant to the Counterclaim, that assertion is flatly contradicted by her signature on the amendments that memorialized these increases.

16

*Inc.*, 777 F. Supp. 3d 834, 842 (M.D. Tenn. 2025). Simply put, Farm Credit had multiple verifications from multiple parties, and there is no well-pled allegation of breach.

In short, it was Uncle Nearest's oversight of its own accounting, not Farm Credit's oversight of Uncle Nearest, that was consistently lacking, even after the Company's own officers knew the numbers did not add up. Indeed, Farm Credit is not responsible for Uncle Nearest's accounting, and its behavior was wholly reasonable and in line with expectations for a commercial lender in a sophisticated arms-length transaction.[8]

## III. Even if Tennessee law governs, the Counterclaim still fails.

### A. Uncle Nearest fails to plead negligence or gross negligence under Tennessee law.

"In Tennessee, a plaintiff must establish five elements to succeed on a negligence claim: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) actual causation; and (5) proximate, or legal, cause." *Hamrick v. James*, 599 F. Supp. 3d 720, 724 (E.D. Tenn. 2022) (cleaned up). Uncle Nearest fares no better under Tennessee law.

#### 1. Lenders do not owe borrowers special duties under Tennessee law.

As in New York, courts in Tennessee have held that banks and other lenders do not generally owe special duties to customers and other borrowers. *See Harris v. Nationwide Mut. Fire Ins. Co.*, 367 F. Supp. 3d 768, 774 (M.D. Tenn. 2019) ("Tennessee law [] does not impose

---

[8] Finally, to the extent there could be any doubt, Uncle Nearest also falls well short of alleging gross negligence, which "requires a plaintiff to prove that the defendant failed to exercise even slight care, scant care, or slight diligence . . . or that the defendant's actions evince[d] a reckless disregard for the rights of others." *Baidu, Inc. v. Register.com, Inc.*, 760 F. Supp. 2d 312, 318 (S.D.N.Y. 2010) (internal citations and quotations omitted). The allegations in the Counterclaim do not come close. After all, as Uncle Nearest admits, it was Farm Credit (not Uncle Nearest) that ordered the collateral inspection. Countercl. ¶ 24.

17

common law duties on financial institutions with respect to their customers, depositors, or borrowers, absent special circumstances."); *Gallina v. Concord EFS, Inc.*, No. 06-02338 MA/V, 2007 WL 9705974, at \*5 (W.D. Tenn. Apr. 27, 2007) ("A bank generally does not owe a duty of care, however, independent of any contractual obligations it may have. . . . Other jurisdictions have noted that lenders are generally held to no duty of care towards the borrowers.") (internal citations and quotations omitted); *Fountain Leasing, LLC v. Kloeber*, No. 3:12-CV-317, 2013 WL 4591622, at \*7 (E.D. Tenn. Aug. 28, 2013) ("Kloeber has not pointed to any statute or case law which holds that commercial lenders, or those who enter into guaranty agreements, owe a duty of care to others, much less a duty to perform due diligence on behalf of their counterpart in a transaction."). Accordingly, Uncle Nearest's conclusory argument that Farm Credit "owed a duty of care to Uncle Nearest to exercise reasonable diligence as a commercial lender," Countercl. ¶ 26, is foreclosed.

### 2. Farm Credit did not (and could not) breach any duty that it owed.

Even under Tennessee law, Uncle Nearest cannot establish breach for substantially the reasons set forth in Section II.C., *supra*: the borrowing base certificates on which Farm Credit relied were properly certified by an authorized corporate officer, and Section 9.3(c) of the Credit Agreement expressly disclaimed any obligation on Farm Credit's part to independently verify the accuracy of those certifications or the underlying financial reporting. Ex. A at 73. It was Uncle Nearest's own agent—not Farm Credit—who committed the intentional fraud at the heart of this dispute, an intervening act that breaks any causal chain Uncle Nearest might otherwise attempt to draw between Farm Credit's conduct and its alleged losses. Measured against the standard of care Tennessee courts apply to commercial lenders, Farm Credit's decision to extend credit against documents signed by an authorized officer of a sophisticated commercial borrower was reasonable, not negligent.

18

In any event, even if Uncle Nearest could establish a breach of some duty (again, it cannot), that would not excuse Uncle Nearest from its own independent obligation to repay amounts properly drawn and outstanding under the Credit Agreement. A borrower's negligence theory against its lender does not operate to discharge, reduce, or offset the borrower's separate and unconditional contractual payment obligations. Farm Credit is not aware of any authority in Tennessee or elsewhere that says the opposite. At most, it could support a claim for damages proximately caused by the alleged breach—which, for the reasons already discussed, Uncle Nearest also cannot establish.

## IV. The in pari delicto doctrine bars the claim.

Finally, the Counterclaim fails for the independent reason that it is barred by the in pari delicto doctrine, which "bars a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault contributed to the loss." *In re Lehr Constr. Corp.*, 551 B.R. 732, 738 (S.D.N.Y. 2016) (quotation omitted). It has also been recognized in Tennessee. *See Capricorn, Inc. v. Tuttle*, No. CA 811, 1989 WL 157804, at *3 (Tenn. Ct. App. Dec. 22, 1989). "The defense requires intentional conduct on the part of the plaintiff or its agents." *Lehr*, 551 B.R. at 738 (citation omitted). "Traditional agency principles play an important role in an in pari delicto analysis . . . namely, the acts of agents, and the knowledge they acquire while acting within the scope of their authority are presumptively imputed to their principals." *Id.* "A corporation is responsible for the acts of its agents, even where those acts were unauthorized." *In re ICP Strategic Credit Income Fund Ltd.*, 568 B.R. 596, 610 (S.D.N.Y. 2017). Imputation also applies "where the agent acts less than admirably, exhibits poor business judgment, *or commits fraud.*" *Id.* (quotation omitted) (emphasis added).

19

Senzaki was an agent of Uncle Nearest, serving as its CFO from the earliest stages of the Company's existence. Countercl. ¶ 8. As noted above and by Uncle Nearest in the Counterclaim, Senzaki admitted "to falsifying monthly financial reports submitted for Farm Credit beginning in 2022." *Id*. ¶ 11. He further admitted to affixing Fawn Weaver's signature on corporate documents without her knowledge or consent, concealing that he was diverting equity interests that belonged to Fawn Weaver for his personal benefit, fabricating board minutes, and using misappropriated funds to purchase his Las Vegas home, acquire vehicles, and gamble. *Id.* ¶ 12. Because Senzaki acted as Uncle Nearest's agent within the scope of his authority as CFO, his intentional fraud is imputed to Uncle Nearest for purposes of in pari delicto. *See In re ICP*, 568 B.R. at 610. The fact that Senzaki engaged in fraud does not release Uncle Nearest from the doctrine's grip. *See id*.

"The 'true focus' of the in pari delicto inquiry is whether the defendant's alleged wrongdoing is at least equal to the plaintiff's." *New Greenwich Litig. Tr., LLC v. Citco Fund Servs. (Eur.) B.V.*, 145 A.D.3d 16, 25, 41 N.Y.S.3d 1 (1st Dep't 2016) (applying the doctrine where the plaintiff-side wrongdoing was at least equal to the alleged misconduct of outside administrators and auditors). That standard is easily met here. Because Senzaki's intentional misconduct substantially exceeds any passive oversight Farm Credit is alleged to have exhibited, and because that misconduct is imputed to Uncle Nearest as principal, the Counterclaim is barred by in pari delicto and should be dismissed.

**<u>CONCLUSION</u>**

For the foregoing reasons, Farm Credit respectfully requests that this Court dismiss Uncle Nearest's Counterclaim with prejudice.

Dated: July 17, 2026

Respectfully submitted,

20

*/s/ Erika R. Barnes*

Erika R. Barnes
Stites & Harbison, PLLC (Nashville)
SunTrust Plaza
401 Commerce Street, Suite 800
Nashville, TN 37219-2449
615-782-2252
Fax: 615-742-0734
Email: ebarnes@stites.com

- and -

Jeffrey J. Chapman, *admitted pro hac vice*
Douglas J. Horn, *admitted pro hac vice*
MCGUIREWOODS LLP
1251 Avenue of the Americas, 20th Floor
New York, New York 10020-1104
Phone: (212) 548-2100
Fax: (212) 715-6284
jchapman@mcguirewoods.com
dhorn@mcguirewoods.com

Demetra Liggins, *admitted pro hac vice*
MCGUIREWOODS LLP
Texas Tower
845 Texas Avenue, Suite 2400
Houston, TX 77002
Phone: 713-353-6661
Email: dliggins@mcguirewoods.com

*Counsel for Farm Credit Mid-America, PCA*

21

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the date noted below, a true and correct copy of the foregoing was

filed and served via the Court's CM/ECF system upon all parties requesting service in the above-

listed case.

/s/ Erika R. Barnes
Erika R. Barnes

Date: July 17, 2026

22