**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF TENNESSEE**
**WINCHESTER DIVISION**

| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-38 |
| | ) | |
| v. | ) | Judge Atchley |
| | ) | |
| UNCLE NEAREST, INC., *et al.,* | ) | Magistrate Judge Steger |
| | ) | |
| Defendants. | ) | |

# RECEIVER'S FIFTH QUARTERLY REPORT

Comes now Phillip G. Young, Jr. (the "Receiver"), the court-appointed receiver in this matter, by and through counsel, and offers this fifth quarterly report pursuant to the Court's Order Appointing Receiver (the "Receivership Order") entered on August 22, 2025.

## *INTRODUCTION*

1. This quarter, the Receiver has been primarily focused on executing a sale of substantially all assets. Despite his and his consultants' best efforts, no buyer has yet signed an asset purchase agreement. Those sale discussions continue, and the Receiver believes he is close to a sale of substantially all assets. Once an asset purchase agreement has been negotiated and signed, the Receiver intends to file a Chapter 11 bankruptcy on behalf of most of the Receivership Entities in order to consummate a sale of assets pursuant to 11 U.S.C. § 363. Meanwhile, he has finalized the terms of a sale of the French vineyards. The Receiver is working through the process required by the French government and will then present that offer for approval by this Court. Finally, the Receiver continues to respond to government inquiries concerning records of the Receivership Entities. Given the business challenges presented by continued worldwide decline in the sale of spirits, negative publicity concerning this brand and this litigation, and the effects on

business that exist in every receivership, the Receiver is committed to executing a sale as soon as possible.

*TASKS ACCOMPLISHED BY THE RECEIVER*

2. As mentioned above, the Receiver's primary focus during the past quarter has been negotiating a sale of substantially all receivership assets. The party with whom the Receiver signed a non-binding Letter of Intent on May 29, 2026, failed to consummate a transaction prior to the expiration of the exclusivity period. Following the expiration of exclusivity, the Receiver opened discussions with three other parties, all of whom expressed serious interest in purchasing substantially all assets related to the Uncle Nearest whiskey operations. The Receiver and his consultants have spent a substantial amount of time on these potential transactions. Three potential purchasers remain in ongoing discussions with the Receiver. While no asset purchase agreement has been executed, the Receiver feels that he is close to executing an asset purchase agreement.

3. The Receiver has continued working toward a sale of all assets in Cognac, France. As mentioned in the last report, he has received and accepted an offer for the sale of the vineyards, subject to this Court's approval. The sale of Cognac vineyards is subject to the oversight and approval of a French agricultural office known as SAFER. The Receiver has been following the rules mandated by SAFER to gain governmental approval of a sale of vineyards. This includes obtaining a government-sanctioned appraisal, to ensure that a fair price is being offered, and publishing notice in an agricultural publication, to ensure that no higher offers are available. Since these conditions are similar to those mandated in United States federal court receiverships, the Receiver has been working to obtain SAFER approval prior to asking for this Court's approval. Once SAFER has approved the Receiver's sale request, after completing its mandated safeguards, the Receiver will present the offer for this Court's approval as well.

4. The Receiver has also continued marketing the French chateau for sale. Unlike the

vineyards, the Receiver has had little success in finding a buyer for the chateau. Based upon information he has obtained from his resources in Cognac, the sale of cognac internationally is down even more than the sale of whiskey. A recent story in a French spirits publication reported that the production of cognac is down by 90%, in large part due to the impact of American tariffs. This has resulted in many Cognac chateaus being offered for sale, which has complicated the Receiver's attempts to sell the chateau that is part of these proceedings. Recently, the Receiver has begun discussions with a *notaire* in Cognac – an official who is authorized to conduct real estate auctions. The Receiver has begun discussing the potential terms of an auction, whether in person or online. If the Receiver determines that an auction is in the best interest of this estate and its creditors, he will seek this Court's approval of that sale process.

5. With the assistance of his team of consultants, the Receiver has continued making all operational and financial decisions for the Company. Operations have become more difficult as this receivership has continued. As with any prolonged receivership, employees have grown concerned about the future of their positions and have begun to seek employment elsewhere. In the last quarter, the Receivership Entities lost a key operational employee. The Receiver has been able to fill the void created by that departure by shifting some job responsibilities of existing employees and by increasing the day-to-day involvement of his team of consultants. The Receiver remains concerned about the potential impacts of future departures if a sale is not executed soon.

6. Overall, litigation subsided during this quarter which allowed the Receiver to focus on a sale. The recent, lessened litigation has also had a positive effect on employee morale. However, in June, one of the entities related to this receivership, Humble Baron, filed for Chapter 11 bankruptcy relief. The Receiver was very involved in this bankruptcy case because (a) Humble Baron is a tenant of one of the Receivership Entities, (b) substantial funds were transferred from

the Receivership Entities to Humble Baron pre-receivership, and (c) Humble Baron claimed in its court filings that the Receivership Entities owed it a debt of approximately $500,000. With the assistance of counsel, and due to the diligent oversight of the United States Bankruptcy Trustee, the Humble Baron bankruptcy was recently converted to Chapter 7 and an independent trustee was appointed to oversee its liquidation. The Receiver has been working with the Humble Baron trustee to ensure an efficient liquidation of the assets of that business, and a seamless abandonment of the leased premises.

7. Last quarter, the Receiver received subpoenas for documents from the United States Attorney for the Southern District of New York and from the Securities and Exchange Commission. Those agencies have continued updating their requests for documents throughout this quarter. The Receiver and his team of professionals have been working to comply fully with the subpoenas in a timely manner. The Receiver, with the assistance of counsel, will continue complying with all subpoenas from governmental entities.

## *TASKS IN PROCESS*

8. As mentioned previously, the capitalization table continues to be a work in progress. All indications are that no funds will be available to shareholders following the liquidation of the assets of these companies; however, the Receiver and his counsel continue the process of reconciling the capitalization table to the extent that records allow.

9. The Receiver continues to cooperate with government investigations, and has continued his own forensic investigation into the finances and transactions of the Company. The Receiver does not anticipate that any causes of action will be brought in conjunction with this receivership proceeding; rather, he anticipates that any cause of action will be brought as an adversary proceeding once a Chapter 11 has been initiated.

10. As indicated throughout this report, the Receiver has continued negotiating an asset purchase agreement for the sale of substantially all assets of these entities. Once that asset purchase agreement is signed, the Receiver anticipates filing a Chapter 11 bankruptcy for most of the receivership entities. The Receiver has already obtained bankruptcy counsel for that purpose and he is already working with counsel on the pleadings needed to initiate that process. While the Receiver intends to file bankruptcy for most of the Receivership Entities to consummate a § 363 sale, the French entities are an exception. Due to the complexities of cross-border insolvency cases, the Receiver has determined that it is most efficient and economical to sell the chateau and vineyards as part of these proceedings rather than to coordinate a French insolvency proceeding and a Chapter 15 bankruptcy filing.

11. Now that the Humble Baron bankruptcy has been converted to Chapter 7, the Receiver is working on legal avenues to retake spaces at the Nearest Green Distillery formerly occupied by it and Shelbyville Barrel House. Both of these tenants are restaurant concepts owned, directly or indirectly and in whole or in part, by Keith Weaver. They both have rental arrears that span over a year. The Receiver anticipates that he will regain the Humble Baron space by agreement with the bankruptcy trustee, but that he will have to regain the Shelbyville Barrel House space through a formal eviction process.

12. The Receiver and his consultants continue monitoring the finances of the Company, creating a rolling 13-week budget, and working with Farm Credit to fund any operational shortfalls. The financial details of the last quarter are included below.

*FINANCIAL REPORT*

13. **Key Financial Metrics.** In accordance with the Receiver Order filed August 22, 2025, the following financial information is provided for the current reporting period (June 29,

2026 – September 27, 2026) and the Receiver period to date (August 23, 2025 – September 27, 2026). Actual results are presented against the original operating budget to provide transparency into performance.

| **Category** | **Q5 (Jun 29, 2026 - Sept 27, 2026)** | | | **Period-to-Date (Aug 23, 2025 - Sept 27, 2026)** | | |
|---|---|---|---|---|---|---|
| | **Actual $'s** | **Budgeted $'s** | **Variance $'s** | **Actual $'s** | **Budgeted $'s** | **Variance $'s** |
| Operating Collections | 4,323,685 | 3,540,504 | 783,181 | 18,502,041 | 19,598,653 | (1,096,612) |
| Farm Credit Mid-America, PCA | 450,000 | 3,097,907 | (2,647,907) | 4,950,000 | 6,897,907 | (1,947,907) |
| **Total Collections** | **4,773,685** | **6,638,411** | **(1,864,726)** | **23,452,041** | **26,496,560** | **(3,044,519)** |
| Operating Disbursements | 3,159,040 | 3,095,746 | 63,294 | 17,014,900 | 21,778,484 | (4,763,584) |
| Receivership Professional Fees | 1,832,736 | 2,823,714 | (990,978) | 6,145,938 | 8,315,821 | (2,169,884) |
| **Total Disbursements** | **4,991,776** | **5,919,460** | **(927,684)** | **23,160,837** | **30,094,305** | **(6,933,468)** |
| **Net Cash Flow** | **(218,091)** | **718,951** | **(937,042)** | **291,204** | **(3,597,745)** | **3,888,949** |
| **Net Operating Cash Flow (Operating Collections – Operating Disbursements)** | **1,164,645** | **444,758** | **719,887** | **1,487,141** | **(2,179,831)** | **3,666,972** |

14. **Professional Fees Paid**

**June 29, 2026 – September 27, 2026**

| Firm Name | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Thompson Burton PLLC | 832,383 | 800,800 | 31,583 |
| Newpoint Advisors Corporation | 453,149 | 587,200 | (134,051) |
| Thoroughbred Spirits Group, LLC | 104,784 | 65,714 | 39,070 |
| Other | 442,420 | 1,370,000 | (927,580) |
| TOTAL | 1,832,736 | 2,823,714 | (990,978) |

Most professional fees for the quarter were below budget, as the Receiver and its professionals continued to focus on cash conservation. The budget for the "Other" professional fees category included anticipated costs related to the ongoing governmental investigation and a potential bankruptcy filing. Primarily because no bankruptcy filing has occurred to date, this category reflects a favorable variance of approximately $927,580 for the current reporting period.

**August 23, 2025 – September 27, 2026**

| Firm Name | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Thompson Burton PLLC | 2,889,305 | 3,124,508 | (235,203) |
| Newpoint Advisors Corporation | 1,937,867 | 2,396,650 | (458,783) |
| Thoroughbred Spirits Group, LLC | 594,066 | 1,285,064 | (690,998) |
| Other | 724,700 | 1,509,599 | (784,899) |
| TOTAL | 6,145,938 | 8,315,821 | (2,169,883) |

15. **Collections Received**

**June 29, 2026 – September 27, 2026**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Collections | 4,323,685 | 3,540,504 | 783,181 |
| Farm Credit Mid-America, PCA | 450,000 | 3,097,907 | (2,647,907) |
| TOTAL | 4,773,685 | 6,638,411 | (1,864,726) |

During the period from June 29, 2026, through September 27, 2026, the Receivership Estate received $450,000 from Farm Credit Mid-America, PCA ("FCMA") to fund operations. The variance to budget in FCMA funding is primarily attributable to approximately $2,000,000 of budgeted debtor-in-possession ("DIP") financing tied to a bankruptcy filing that has not occurred to date. Separately, the July 2026 sale of a property known as the "Martha's Vineyard House" generated approximately $818,000 of additional net operating collections, which is the primary driver of the favorable $783,181 variance to budget in operating collections.

**August 23, 2025 – September 27, 2026**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Collections | 18,502,041 | 19,598,653 | (1,096,612) |
| Farm Credit Mid-America, PCA | 4,950,000 | 6,897,907 | (1,947,907) |
| TOTAL | 23,452,041 | 26,496,560 | (3,044,519) |

16. **Expenditures**

**June 29, 2026 – September 27, 2026**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Disbursements | 3,159,040 | 3,095,746 | 63,294 |
| Professional Service Expenses | 1,832,736 | 2,823,714 | (990,978) |
| TOTAL | 4,991,776 | 5,919,460 | (927,684) |

**August 23, 2025 – September 27, 2026**

| Category | Actual $'s | Budgeted $'s | Variance $'s |
|---|---|---|---|
| Operating Disbursements | 17,014,900 | 21,778,484 | (4,763,584) |
| Professional Service Expenses | 6,145,938 | 8,315,821 | (2,169,884) |
| TOTAL | 23,160,837 | 30,094,305 | (6,933,468) |

17. **Banking & Disbursement Controls.** Immediately following his appointment, the Receiver took steps to secure all existing bank accounts associated with the Company. This included freezing accounts where appropriate and establishing new Receiver-controlled accounts to ensure that all future transactions are properly monitored and documented. By shifting all financial activity into Receiver-controlled accounts, the risk of unauthorized transfers or unapproved expenditures has been significantly reduced. These activities and policies have continued to be in place and enforced throughout the entire Receiver period.

Bank accounts with immaterial (less than 5,000 Euro) cash balances remain in a French bank, over which the Receiver will not have exclusive control until the French courts recognize this Court's Receiver Order (which should occur within the next month). Likewise, the Receiver does not have control over bank accounts in the names of certain entities that are detailed in the Receiver's Motion for Clarification filed with this Court on September 12, 2025.

The Receiver has instituted a policy that all significant disbursements must receive explicit approval from the Receiver before release. This control mechanism ensures that cash outflows align with the cash flow budget and that only necessary and authorized expenses are incurred. To reinforce this control, weekly reconciliations are performed for all bank accounts. These

reconciliations serve to verify accuracy, detect any discrepancies, and confirm that no unauthorized transactions have taken place.

Further to the above, the Receivership team set up a new bank account to manage, control, and track the proceeds related to the sale of the Martha's Vineyard House.

18. **Cash Flow Budgeting & Variance Review.** A rolling 13-week cash flow budget has been developed and is updated weekly to reflect the Company's most current operating realities. This budget is reconciled against actual collections and disbursements every week. Any variances greater than 10% between budgeted and actual results are promptly identified, documented, and explained.

As part of the secured lender forbearance agreement, the Receiver is required to submit comprehensive bi-weekly reporting packages to Farm Credit, the Company's secured lender. These packages contain detailed variance analyses, operational expense tracking, and updated sales forecasts. By providing this level of detail, the secured lender can closely monitor performance against established targets and evaluate ongoing compliance with the terms of the forbearance agreement.

This enhanced reporting process strengthens transparency and accountability, ensuring that stakeholders have timely and accurate insight into the Company's financial position, operational performance, and near-term prospects.

19. **Payroll & Taxes.** At the time of appointment, the Receiver identified that the Company's account with its professional employer organization ("PEO"), Genesis Global, was underfunded, which jeopardized the continuity of employee pay. The Receiver has since corrected the underfunding, and all payroll obligations have been met. However, given a potential bankruptcy filing in the near term, the Receiver determined it was prudent to change providers, as

a payroll servicer holding a material unsecured claim against the estate may present a conflict of interest. Accordingly, payroll administration has transitioned from Genesis Global to a new service provider, Vensure HR. The first employee payroll under Vensure HR is scheduled for October 9, 2026. The Receiver estimates the change will generate annual savings of nearly $342,000 compared to remaining with Genesis Global. The Receiver team will continue to review payroll data on a weekly basis under the new PEO.

The Receiver has completed a review of payroll taxes, excise taxes, business taxes, and property taxes. Several potential liabilities have been identified, and these obligations have been incorporated into the cash flow budget for planning purposes. Of particular concern is the discovery that the Company has not filed federal income tax returns since 2018. The Receiver is currently working with appropriate tax authorities and external advisors to address this issue.

The Receiver also reviewed the Company's compliance with state business, excise, and sales tax requirements. The review identified material exposure in Tennessee and Delaware, resulting from incomplete filings and unpaid obligations. The Receiver is working to remediate these issues and restore the Company's good standing in both states. The Receiver continues to review business, excise, and sales tax compliance for Grant Sidney, Inc., which became part of the Receivership Estate on May 26, 2026.

20. **Vendor & Operational Continuity.** The Receiver has established direct lines of communication with key vendors, logistics providers, and employees to maintain uninterrupted operations. This outreach has helped secure the cooperation of critical partners and mitigate risks to the supply chain.

All vendor notices are now being directed to the Receiver. This process has revealed several previously unidentified liabilities that were not fully disclosed in the Company's records. The Receiver has also secured and reviewed critical business documents, including supply chain agreements, bottling contracts, and marketing obligations. These reviews aim to identify operational risks and financial commitments that could have a material impact on cash flow.

An initial review of inventory storage agreements and bailment warehouse contracts was completed with follow-up currently underway. This is necessary to confirm lien positions, assess obligations, and evaluate any potential risks associated with warehouse-held inventory. All critical materials have been moved into a warehouse where the Receiver has a third-party contract with appropriate access rights. Concerns over the Receiver's ability to access these materials have been eliminated.

21. **Financial and Accounting Observations.** At the beginning of the Receivership, the Company's accounting records were materially unreliable and could not be relied upon for accurate financial reporting. Key deficiencies identified include:

- Non-reconciled balances create uncertainty about the accuracy of financial statements.
- Unusual accounting entries lack proper documentation.
- Improper revenue recognition practices that distort the Company's financial performance.

The absence of solid financial controls and the unreliability of certain financial records have been a challenge in determining historical sales and expenses that would aid with forecasting future sales and expenses. That challenge has been compounded by the fact that a substantial number of financial records before 2024 were erased from the Company's computer system. According to multiple employees at the Company, those records were erased by a former employee immediately after termination. Other employees have alleged that the records exist on

a platform owned and controlled by Grant Sidney. The Receiver is working to recover some or all of those financial records.

The Receiver has also identified related-party transactions involving entities owned by the Weavers. These transactions were reviewed via the use of external records and supporting documentation to determine their accuracy, legitimacy, and whether they represent potential improper transfers. Irregularities were found and continued review and investigation are in process. Many of the companies that are subject to this Receivership action have commingled assets and liabilities with other non-Receiver entities. This commingling has made determination of lien priority, and separation of liabilities among corporations, very difficult.

The Receiver has engaged a third-party CPA bookkeeping firm to assist in the ongoing completion of accounting records and preparation of financial statements for the Receivership period. This activity has resulted in the reconciliation of all cash activity to the completed financial statements for the full year 2025 and July 2026 period. Monthly financial statements for the consolidated Receivership entities have been completed and distributed to key stakeholders for the full year 2025 period and through July 2026. The Receivership team is currently working on completing the August 2026 financial statements.

In addition, the Receivership team is working on gathering source data to recreate certain prior period financial reports. The Receiver believes it is critical for the Company to have financial statements that have been created under the Receiver's independent direction, for which he can verify the accuracy.

Overall, cash resources remain limited, necessitating tight cash management and prioritization of critical expenses.

22. **Next Steps – Stakeholder Communications.** The Receiver will continue to provide bi-weekly reporting to Farm Credit, including detailed variance reports, expense reviews, and sales forecasts. Regular updates will also be provided to the Court and other key stakeholders. Direct engagement with vendors, customers, and employees will continue to maintain operational stability and foster transparency.

23. **Asset Recovery & Preservation of Value.** The Receiver will continue to secure and monitor the Company's cash, accounts receivable, inventory, leased equipment, and other assets. To ensure accurate reporting and valuation, updated inventory counts and appraisals will be commissioned, as necessary. Bailment warehouse records have been reviewed to confirm lien positions and ensure obligations are properly disclosed and managed.

24. **Cash Management.** The Receiver will continue to have rigorous oversight of all disbursements, requiring prior approval for significant expenses. Bank accounts will be reconciled on a daily and weekly basis to ensure the integrity of records and detect irregularities promptly. Forward-looking projections will continue to be refined and stress-tested to account for potential sales fluctuations, ensuring that the Company remains prepared for varying operational outcomes.

The Receiver continues to evaluate the workforce and expenditures of the Company, in an effort to increase its operational efficiencies and become more profitable. This has led the Receiver to make additional spending cuts to both administrative and sales budgets to improve overall business efficiency and maintain cash liquidity. These activities include an increased focus on working capital management in the areas of accounts receivable and inventory. The Receivership team has focused recent efforts on improving collections, which has reduced gross AR from $2,606,251 at the end of June 2026 to $2,362,620 at the end of September 2026, a decrease of $243,631 (9.3%).

25. **Investigation & Forensic Review.** The Receiver will continue his review of historical financial records and intercompany transfers to uncover any irregularities or potential recovery opportunities. Special focus will be placed on officer and insider compensation, travel and marketing expenditures, and the identification of potential preferential or fraudulent transfers.

As necessary, tax advisors will be engaged to quantify exposures associated with the unfiled federal and state income tax returns dating back to 2018. The Receiver will also evaluate potential claims or causes of action that could be pursued for the benefit of creditors, with a focus on maximizing recovery and ensuring equitable treatment of all stakeholders.

26. **Conclusion.** The Receiver has implemented robust controls to stabilize operations, enhance transparency, and identify key risks. Substantial challenges remain, particularly in areas such as tax compliance, accounts payable, and related-party transactions. The Receiver will continue to prioritize transparency, creditor protection, and preservation of value while working closely with all stakeholders to achieve the best possible outcome for the estate.

## *CHALLENGES TO RECEIVERSHIP*

27. Cash flow continues to be a major challenge to this receivership. As demonstrated by the data included in the Financial Report above, the Company continues operating at a loss. At this juncture, the Company is only able to maintain operations due to (a) cash infusions by Farm Credit, (b) significant reductions to operational expenses, and (c) professional fees coming in substantially below budget.

28. Due to a variety of factors (for example, credit holds on product shipment, legal fees incurred by the Company, and the impact of this litigation on sales), revenue collections were down significantly when the Receiver assumed control of the Company. The distress of the spirits

market as a whole, the reduction of worldwide demand for alcohol, the changing distributor network, and the impact of tariffs on international sales continue to depress sales. Moreover, litigation such as this always has a negative impact on sales, as a company's employees, vendors, and business partners grow concerned about the long-term viability of a company in receivership. The litigation efforts of Fawn and Keith Weaver have further damaged the value of the brand. The Receiver bases this conclusion upon his conversations with creditors, vendors, employees, shareholders, Receivership consultants, and potential investors. The Receiver believes that sales will continue decreasing while this remains in a receivership, which is why the Receiver has placed such an emphasis on consummating a sale of the assets as quickly and responsibly as possible.

29. Another challenge to this receivership is the ongoing threat of significant litigation. As mentioned in prior pleadings, the Receiver has fielded dozens of calls and emails from creditors and shareholders threatening the Company and/or its officers and directors with litigation. The continued stay of litigation, as provided for in the Receivership Order, is critical to maintaining normal operations of the Company. Even with the imposition of the stay, the Receiver believes that litigation initiated by (or potentially against) Fawn Weaver and Keith Weaver poses a threat to the Company, both in terms of value of the brand and in terms of focus of employees.

30. The ongoing investigations by the United States Attorney for the Southern District of New York and the Securities and Exchange Commission also pose a potential threat to the Company. In addition to the immediate distraction to the receivership team caused by these investigations, the outcomes of these investigations could cause some brand damage in the future (depending upon the nature of the results of the investigations).

## *CONCLUSIONS, RECOMMENDATIONS AND REQUESTS*

31. The Company remains insolvent.

32. The Receiver continues to believe that the Company's business and brand still have a future. In order to maximize that value, the Receiver believes that all non-essential, non-income producing assets must be liquidated as soon as possible, and a sale of the Company as a going concern must be completed as soon as possible. If a sale is not consummated soon, the Receiver is concerned about the continued deterioration of the brand's value. A buyer of these assets can still rehabilitate this brand with an infusion of new capital and more disciplined financial and operational leadership. The Receiver remains focused on executing a sale of substantially all assets to a buyer who is capable of effectuating this turnaround.

Dated this 9th day of October, 2026.

Respectfully submitted,

/s/ Justin T. Campbell

Justin T. Campbell
Thompson Burton PLLC
1801 West End Avenue, Suite 1550
Nashville, Tennessee 37203
(615) 465-6015 (phone)
justin@thompsonburton.com

Counsel for the Receiver

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing document has been served via the Court's ECF system.

This 9th day of October, 2026.

/s/ Justin T. Campbell
Justin T. Campbell