UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| FARM CREDIT MID-AMERICA, PCA,<br><br>Plaintiff,<br><br>**v.**<br><br>UNCLE NEAREST, INC., et al.,<br><br>Defendants. | ) | Case No. 4:25-cv-38<br>**Judge Atchley**<br>**Magistrate Judge Steger** |

# SUPPLEMENTAL DECLARATION OF DEFENDANT FAWN WEAVER IN SUPPORT OF MOTION FOR INJUNCTION PENDING APPEAL AND REQUEST FOR WAIVER OF SECURITY

I, Fawn Weaver, declare as follows:

1. I am an individual Defendant in this action, a founder of Uncle Nearest, Inc., and its largest equity owner through the combination of shares I hold individually and shares held by Grant Sidney, Inc., of which I am the sole shareholder. I have personal knowledge of the matters stated herein, except where otherwise expressly indicated, and could testify competently to those matters if called as a witness.

2. I submit this supplemental declaration in support of my pending Motion for Injunction Pending Appeal and, specifically, my request that this Court waive monetary security in its entirety.

## I. THE WEAVERS' FINANCIAL CIRCUMSTANCES BEFORE UNCLE NEAREST

3. Before my husband, Keith Weaver, and I founded Uncle Nearest, we had accumulated substantial personal wealth through our respective careers, investments, and real estate holdings. We were multimillionaires with a multimillion-dollar real estate portfolio acquired independently of and prior to the founding of Uncle Nearest.

4. Keith's prior career included serving as Executive Vice President of Global Public Policy and External Affairs for a Fortune 500 company. His annual compensation during that period was approximately $1 million.

5. I was independently successful as an investor, public speaker, and New York Times bestselling author. Our household financial security existed before Uncle Nearest was founded. Neither of us needed to create Uncle Nearest as a means of establishing our initial financial independence.

6. Throughout my tenure at Uncle Nearest, my annual salary ranged from $0 to approximately $90,000. I intentionally kept my compensation modest so that the company's resources could be directed toward growth and operations. Like other members of the leadership team, I was awarded bonuses. However, for most years, rather than accepting payment, I elected to allow those bonuses to accrue so the funds could remain in the company to support its continued growth. Nearly all of our household expenses were funded through resources and income outside Uncle Nearest, including our preexisting investments, Keith's independent business activities, and my professional work.

7. Beginning with the company's earliest years, Keith and I made a deliberate decision to devote substantial portions of the wealth we had already accumulated to building Uncle Nearest.

8. We sold personal assets, invested our own funds, and provided financial support when the business needed capital. That support included helping the company meet payroll and satisfy critical vendor obligations during its formative years.

9. As the business grew, much of our personal wealth became invested in the company or otherwise committed to supporting its operations. The valuations frequently associated with our ownership interest did not reflect an equivalent amount of cash or liquid assets available to us personally.

10. I periodically explained publicly that much of our apparent wealth during the company's growth existed on paper because we had committed so much of our available liquidity to Uncle Nearest.

## II. THE FINANCIAL SACRIFICES WE MADE BEFORE AND AFTER THIS LITIGATION

11. In the period leading up to Farm Credit's July 28, 2025 lawsuit, Uncle Nearest was operating under significant financial constraints, including the $1.5 million minimum-liquidity requirement imposed through our arrangements with Farm Credit.

12. At the same time, restrictions affecting the company's ability to sell whiskey barrels constrained a revenue source that historically had provided important liquidity to Uncle Nearest.

13. In an effort to preserve the business, maintain its liquidity, and meet its obligations, Keith and I contributed essentially all funds then available in our personal bank accounts during the weeks and months preceding the lawsuit.

14. These contributions were made before we knew the full scope of litigation that would follow. They reflected our continuing willingness to sacrifice personal financial security to protect the company and its stakeholders.

15. When Farm Credit commenced this action and obtained the appointment of a Receiver, we began incurring substantial legal expenses personally to defend ourselves, respond to the allegations, protect our property interests, and pursue available judicial remedies.

16. Because so much of our personal wealth had already been invested in or committed to Uncle Nearest, we did not have unlimited liquid resources available to finance years of litigation.

17. To meet those expenses, Keith and I began selling real estate that we had acquired with our personal funds, independently of Uncle Nearest.

18. Among those sales was our personal residence, which we had expected would be our home for the remainder of our lives. We sold that property for approximately $2.1 million.

19. The net proceeds of that sale provided resources that enabled us to continue funding our legal representation and participation in these proceedings.

20. As the litigation continued and legal expenses consumed the available proceeds of that sale, we sold another personally owned property to obtain additional liquidity.

21. We are currently in the process of selling two more personally owned properties to fund continuing financial obligations, including the substantial legal costs associated with these proceedings.

22. These sales have not been investment decisions undertaken to improve returns or rebalance our portfolio. They have been driven substantially by the continuing financial demands of this litigation and the need to maintain access to legal representation.

23. Our ability to finance this litigation has therefore come at the direct expense of assets accumulated over decades, including property that we had intended to retain.

24. Every additional stage of litigation imposes further financial demands upon our family. Unlike an institutional lender, we must fund our participation primarily from our finite personal resources, including proceeds from the disposition of assets that cannot simply be replaced.

## III. THE PRACTICAL CONSEQUENCES OF A MONETARY BOND REQUIREMENT

25. As set forth above, Keith and I have already committed substantial personal resources to Uncle Nearest and to defending our interests in this litigation. We have liquidated personally owned real estate, used the proceeds to meet significant legal expenses, and are continuing to sell additional property to finance the proceedings.

26. My personal financial circumstances today are materially different from those that existed before Uncle Nearest was founded and before Farm Credit commenced this action. Although our historical investments and business interests have

substantial value, those interests do not provide equivalent liquid funds available to secure an injunction bond.

27. I do not have unencumbered liquid funds available to post monetary security in connection with the requested injunction without diverting resources needed for essential obligations and my continued legal representation. My remaining available financial resources are needed to meet continuing household obligations, finance legal representation, and preserve my ability to participate meaningfully in the underlying proceedings and appeal.

28. Obtaining a surety bond would require payment of a premium and may require collateral or other financial assurances. Given the resources already committed to Uncle Nearest and this litigation, I do not have the readily available liquidity or unencumbered assets to support such a requirement.

29. I cannot fund a monetary security requirement, including a nominal bond, without diverting money needed for essential household and litigation obligations. Any such requirement would impair my ability to obtain the requested injunction and pursue meaningful appellate review, even if this Court otherwise concluded that preservation was warranted.

30. My request for waiver of security is not based upon an unwillingness to comply with a lawful court order. It is based upon the substantial financial burden these proceedings have already imposed and the practical consequences that an additional monetary security obligation would have upon my ability to obtain meaningful appellate relief.

31. I am willing to comply with reasonable, non-monetary protective conditions ordered by the Court, provided those conditions are consistent with the narrow preservation relief requested and do not effectively prevent meaningful appellate review.

## IV. THE IMPORTANCE OF PRESERVING THE ASSETS PENDING APPELLATE REVIEW

32. I seek preservation because, if substantially all of Uncle Nearest's enterprise assets are sold before the Sixth Circuit resolves the pending appeal, an ultimate ruling in my favor may no longer provide an effective means of restoring the business or pursuing a resolution that preserves its ongoing value.

33. My objective is not to prevent the Receiver from conducting ordinary operations, evaluating offers, negotiating transactions, filing bankruptcy, or seeking judicial approval of a proposed sale.

34. My objective is to preserve the possibility of meaningful appellate relief before the business and assets that are the subject of the appeal are irreversibly transferred.

35. If the Sixth Circuit determines that the receivership should be wound up, I intend to pursue, subject to available financing and applicable legal priorities, a resolution that addresses the interests of the company's secured and unsecured creditors, employees, vendors, shareholders, and the descendants of Nearest Green.

36. I recognize that Farm Credit, like other creditors, is entitled to whatever rights and recoveries the governing law and the evidence establish. I seek an opportunity for the underlying disputes to be adjudicated and for the interests of the broader

stakeholder community to be considered before an irreversible disposition forecloses available alternatives.

37. My financial commitment to Uncle Nearest is not a recent development or a position formulated for litigation. It began before the company's founding, continued throughout its growth, and has persisted through the disposition of substantial personal assets to finance these proceedings.

38. My request for an injunction is therefore not an attempt to obtain a litigation advantage without consequence. I have already borne substantial personal financial consequences in seeking judicial review.

39. Requiring monetary security would make the practical availability of that review depend upon financial resources I cannot divert from essential obligations, even if the Court were otherwise persuaded that preservation relief is warranted.

40. I respectfully request that the Court consider these circumstances and waive monetary bond or security in its entirety. I remain willing to comply with reasonable nonmonetary protective conditions consistent with the limited relief requested.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 19, 2026.

Fawn Weaver